## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | | |
|---|---|---|
| **RANDY AVILES,** | § | **CIVIL ACTION NO:** |
| | § | |
| **PLAINTIFF** | § | **JURY TRIAL DEMANDED** |
| | § | |
| v. | § | |
| | § | **PLAINTIFF'S ORIGINAL** |
| | § | **COMPLAINT** |
| | § | |
| **RIGOBERTO SALDIVAR,** | § | |
| **CITY OF PASADENA, TX** | § | |
| | § | |
| | § | |
| **DEFENDANTS** | § | |
| | § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

### TO THE HONORABLE JUDGE OF SAID COURT

COMES NOW, Plaintiff **RANDY AVILES**, to file this, his original complaint against Defendants, **RIGOBERTO SALDIVAR** and the **CITY OF PASADENA, TX.**

### INTRODUCTION

1.      This is an action under 42 U.S.C. § 1983 brought by Plaintiff Randy Aviles against Defendant Saldivar, an officer with the City of Pasadena Police Department, for shooting Mr. Aviles under the color of law, while Mr. Aviles was unarmed and posing no threat to the safety of Defendant Saldivar or others.  Defendant Officer Saldivar's shooting of Mr. Aviles resulted in severe and permanent injuries to Mr. Aviles' arm (including but not limited to a skin graft, the insertion of 2 metal plates and 15 screws in Mr. Aviles' arm), as well as emotional trauma and Post-Traumatic Stress

Disorder**.** Defendant Officer Saldivar's shooting of Mr. Aviles constituted a violation of Mr. Aviles' rights under the Fourth Amendment of the United States Constitution and in violation of 42 U.S.C. § 1983.

2.      Plaintiff also brings suit against the City of Pasadena, Texas because Defendant Officer Saldivar would not have been in position to shoot Mr. Aviles on January 12, 2021 but for the City of Pasadena's earlier failure to train, supervise, or discipline Officer Saldivar when he killed an unarmed twenty-five year old man by shooting him twice in the back in November 2018.  The City of Pasadena failed to train, supervise, or discipline Defendant Officer Saldivar despite the fact that the lead detective (and his supervisor) investigating the shooting informed the City of Pasadena's Chief of Police of their determination that Defendant Saldivar's killing of that other young man was unjustified and unconstitutional.   The City of Pasadena's decision to not train, supervise or discipline Defendant Officer Saldivar is consistent with their custom and practice of protecting officers who use unconstitutionally excessive force.  Indeed, rather than train, supervise, or discipline Defendant Officer Saldivar, the City of Pasadena gave him a raise.  As a result, Defendant Saldivar was emboldened to believe that he could continue to shoot unarmed individuals who were not an immediate threat to his safety without facing any consequences from his employer.  Thus, the City of Pasadena's failure to train, supervise, or discipline Defendant Saldivar and their custom and practice of protecting officers who used excessive force to shoot, kill, or maim suspects was the moving force behind Defendant Saldivar's decision to shoot a similarly unarmed Mr. Aviles on January 12, 2021, and the City of Pasadena was deliberately indifferent to the risks posed by their sanctioning of Defendant Officer Saldivar's unconstitutional use of

excessive force.

## **JURISDICTION AND VENUE**

**3.**      Jurisdiction exists in this Court pursuant to the 28 U.S.C. § § 1331 and 1343 as this action is brought under the Fourth Amendment (made applicable to Defendant through the Fourteenth Amendment) and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities guaranteed to Mr. Aviles by these constitutional and statutory provisions.

**4.**      Venue lies in United States District Court for the Southern District of Texas, Houston Division, the district and division, in which the claim arose, pursuant to 28 U.S.C. § 1391(b).

## **PARTIES**

**5.**      Plaintiff Randy Aviles is an individual residing in San Antonio, Texas.

**6.**      Defendant Rigoberto Saldivar (Defendant Officer Saldivar) is an individual residing in Deer Park, Harris County, Texas.   He may be served at his residence or anywhere he may be found.  The acts and omissions complained of herein arise from the conduct of Defendant Saldivar while he was acting under color of state law, and each act and omission was committed pursuant to Defendant Saldivar's employment and authority as a police officer with the City of Pasadena police department.

**7.**      Defendant City of Pasadena, Texas ("Pasadena" or "City of Pasadena") is a Texas incorporated municipality/city. Pasadena may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Mayor Jeff Wagner, at Pasadena City Hall, 1149 Ellsworth Drive, Pasadena, Texas 77506, or wherever he may be found. Pasadena may also be served with process pursuant to Federal Rule of Civil

Procedure 4(j)(2) by serving its clerk, secretary, or treasurer wherever any such person may be found. Pasadena acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

**FACTUAL BACKGROUND**

*Defendant Saldivar's Shooting of Mr. Aviles Constituted Excessive Force*

8.      On January 12, 2021, Plaintiff Randy Aviles was driving southbound on Red Bluff Rd at approximately 10.27 pm.  As Mr. Aviles approached the traffic lights at the intersection of Red Bluff Rd and Spencer, the traffic light turned red.  Nevertheless, Plaintiff Aviles continued traveling at a high rate of speed, through the red light.

9.      At the time Mr. Aviles was proceeding through the red light at the intersection of Red Bluff Rd and Spencer, Defendant Officer Saldivar was stopped at the same intersection, with his vehicle facing northbound.  Upon observing Mr. Aviles drive through the redlight, Defendant Officer Saldivar made a U-Turn, activated his emergency lights and siren to initiate a traffic stop against Mr. Aviles.

10.      Once Mr. Aviles saw that Defendant Officer Saldivar had initiated a traffic stop, he made a left turn onto the first available side-street at the 6900 block of Lance Avenue.  He then immediately stopped on the right side of the road.

11.      As Defendant Officer Saldivar's patrol vehicle came to a stop behind his car, Mr. Aviles, exited his car with both of his hands visible and up in the air:



12.     Nevertheless, when Defendant Officer Saldivar stopped his vehicle, he draws his gun, points it at Mr. Aviles, and begins yelling aggressively at Mr. Aviles, loudly yelling "Don't you fucking move", "don't you dare move" and harshly commanding him to "Get back in the car."

13.     Mr. Aviles complies and gets back in the car.    While in the car, Mr. Aviles continues putting his hand up in the air.   Defendant Officer Saldivar then yells for Mr. Aviles to place his hands out the car so he that he can see them.  Mr. Aviles complies, with both hands out the car, visible to Defendant Officer Saldivar.

14.     As Mr. Aviles continues to maintain his hands out the car, Defendant Officer Saldivar continues to yell at him to keep his hands up.  Mr. Aviles verbally tells him that he will comply with his instructions, telling Defendant Officer Saldivar: "OK, Ok. I got you."

15.     In spite of the fact that Mr. Aviles is actually complying with his hands up and verbally informing him of his intent to comply, Defendant Officer Saldivar escalates the situation by yelling "I will shoot you" at Mr. Aviles and begins moving aggressively towards Mr. Aviles with his gun pointed at Mr. Aviles.

16.     At the time Defendant Officer Saldivar yelled "I will shoot you", Mr. Aviles had his empty hands out the window and visible.



17.     Fearing for his life, Mr. Aviles begins to drive away from Defendant Officer Saldivar.    Even as he starts to drive away, Mr. Aviles still has his hands up, showing that he does not have a weapon.



**18.**     As Mr. Aviles pulls away, Defendant Officer Saldivar shoots his gun ten times at Mr. Aviles' vehicle, emptying his clip.   At the time Defendant Officer Saldivar shot into Mr. Aviles' car, Mr. Aviles was driving away from the officer and posed no threat to him.  Further, there were no innocent bystanders or anyone else on the street that were put at risk of death or serious bodily injury by Mr. Aviles driving away.



8

      **19.**     Defendant Officer Saldivar's shooting spree at Mr. Aviles and his car resulted in Mr. Aviles being struck three times in his left arm.    The bullets caused substantial damage to Mr. Aviles' arm.



      **20.**     Mr. Aviles' arm required two surgeries, the insertion of 2 metal plates, 15 screws, and a skin graft.  The damage to Mr. Aviles' arm is permanent as he has not regained full function of hands and fingers due to the damage that Defendant Officer Saldivar's bullets caused to the tissues and nerves of his arm.

      **21.**     In addition to the physical pain, Mr. Aviles has suffered tremendous emotional trauma and distress as a result of the shooting.  Mr. Aviles has been diagnosed and is being treated for Post-Traumatic Stress Disorder as a result of the shooting.

      **22.**     Defendant Officer Saldivar testified in July 2021, approximately five

months after the shooting that he has never received any adverse employment action while employed as City of Pasadena police officer.  Thus, Defendant Officer Saldivar received no adverse employment action for his shooting of Mr. Aviles.  He was not terminated and did not receive any written or verbal reprimands for shooting Mr. Aviles while he was unarmed and driving away from him without posing any immediate threat to Mr. Saldivar or any other person.

*Defendant Saldivar Has Previously Used Excessive Force to Shoot and Kill an Unarmed Man*

**23.**     Unfortunately, the night that Defendant Officer Saldivar shot an unarmed Mr. Aviles was not the first time that he had shot an unarmed suspect.

24.     On November 21, 2018, Defendant Saldivar was working patrol in Pasadena when Nathan Schenk drove past a STOP sign without stopping.  Defendant Officer Saldivar, in a Pasadena police patrol vehicle, pulled Mr. Schenk over.   As Defendant Officer Saldivar approached, Mr. Schenk exited the vehicle and ran.

25.     Defendant Officer Saldivar then chased Mr. Schenk, shooting his Taser at Nathan twice. Officer Saldivar jumped on Mr. Schenk after the second Taser deployment in an attempt to subdue him. Officer Saldivar and Mr. Schenk then struggled on the ground, as Mr. Schenk tried to escape Officer Saldivar to run away.

26.     At all times, during the struggle, Mr. Schenk was unarmed.

27.     During the struggle, Mr. Schenk managed to separate himself from Defendant Officer Saldivar.  Mr. Schenk then crawled away from Defendant Officer Saldivar and was approximately five feet away from him on his hands and knees.

28.     Defendant Officer Saldivar then, without any warning, shot Mr.

Schenk twice in his lower back and then once in his upper chest near his arm pit.  Mr. Schenk was not suspected of a serious crime, was not threatening anyone or displaying any weapon, and was not a threat to Defendant Officer Saldivar's safety or to the safety of any other person in the area. Nevertheless, Defendant Officer Saldivar shot and killed him.

29.    While Mr. Schenk was lying on the ground, dying, Defendant Officer Saldivar called him a "motherfucker" and a "son of a bitch." He also said, "Don't you fucking move! I'll shoot you again!"

*City of Pasadena Detective Determines Schenk Shooting Was Excessive and Unjustified, Informs Policymakers at Pasadena Police Department, Who Fail to Discipline Defendant Officer Saldivar*

30.    Detective Michael Cooper of the Pasadena Police Department investigated Defendant Officer Saldivar's shooting of Mr. Schenk.

31.    During his investigation, Detective Cooper noted discrepancies between Defendant Officer Saldivar's description of Mr. Schenk's shooting and the video evidence through the body worn camera system and the dash camera systems. Specifically, while Defendant Officer Saldivar had stated that he "observed [Mr. Schenk] facing me in a standing, but slightly crouched over position [in a football defensive stance] and Mr. Schenk started reaching with his right hand towards his waist line" as the reason he fired his gun at Mr. Schenk, Detective Cooper noted that this stance is never observed on the body worn and dash cameras.  Rather, the video shows that Mr. Schenk was spinning and turning away from Defendant Officer Saldivar immediately before the shooting.

32.    In January 2019, approximately two months after the shooting,

Defendant Officer Saldivar later attended a meeting with his attorney and internal affairs where he was shown the video of the shooting and his statements and asked to address the discrepancy between his statement and the video.  Detective Officer Saldivar stated "he was unsure if could provide any further information."

33.     During that same interview, Defendant Officer Saldivar was asked: "You can tell that he's spinning away and it's after that he's away that the first shots are fired."  Officer Saldivar responded: "Right."   Defendant Officer Saldivar also admitted during that interview that his first two shots were into Mr. Schenk's back.

34.     Detective Cooper's investigation ultimately concluded that Defendant Officer Saldivar shot an unarmed Mr. Schenk in the back as Mr. Schenk crawled away from Defendant Officer Saldivar. Detective Cooper's investigation further concluded that Defendant Officer Saldivar had used excessive force in shooting Mr. Schenk.

35.     Detective Cooper informed his supervisor, Sergeant Steven Skripka, of his conclusion that Defendant Officer Saldivar had used excessive force by shooting Mr. Schenk in the back.

*Pasadena Chief of Police and Other Policymakers Learn of Detective Cooper's Conclusion that the Shooting Was Not Justified & Of the Discrepancies Between Defendant Officer Saldivar's Account and the Investigation, But Fail to Discipline Him*

36.     Subsequent to his investigation, Detective Cooper was part of a meeting at the Pasadena Police Department.  The attendees were the Chief of Police of Pasadena Police Department Josh Bruegger, the Assistant Chief of Police Rick Styron, Detective Cooper's supervisor Steven Skrikpa, and two sergeants from Internal Affairs.

37.     During that meeting, Detective Cooper played the video of the

Schenk shooting for the Chief of Police and others. Detective Cooper informed them that the video did not match Defendant Officer Saldivar's version of events.

38.     Detective Cooper and his supervisor Sergeant Skripka also informed Chief of Police Bruegger and Assistant Chief Styron of their conclusion that Mr. Schenk was on his hands and knees crawling away when Defendant Officer Saldivar shot him.

39.     Despite viewing the video and receiving the recommendation of Detective Cooper and Sergeant Skripka, Chief Brugger decided not to take any disciplinary action against Defendant Officer Saldivar.  Specifically, Defendant Officer Saldivar was not terminated, did not receive any written reprimand, did not receive any verbal reprimands, referred to any training or supervision program, or receive any other adverse employment action for his shooting of the unarmed Mr. Schenk.

40.     Instead of any adverse employment action or training or supervision, Defendant Officer Saldivar received a raise in April 2019, five months after shooting Mr. Schenk.

_Protecting & Not Disciplining Officers Who Use Excessive Force Is a Custom and Practice of the Pasadena Police Department_

41.     Further, the City of Pasadena's policymakers' decisions to not subject Defendant Officer Saldivar to any adverse employment actions or training or supervision for shooting two unarmed men within a three year period evidences a longstanding custom within the City of Pasadena and its police department to protect rather than train, supervise or discipline officers who are involved in officer-involved shootings, even if they use unconstitutional excessive force.  That custom is not only known by but it has also been sanctioned by the City of Pasadena Chief of Police, who

made the final decision in both of these cases to not discipline Defendant Officer Saldivar.

42.     The City of Pasadena's custom of protecting officers in officer-involved shootings, including those who use excessive force, is effectuated through the following practices:

(a) The offending officer is provided with an attorney at the scene of the incident.  The attorney is requested on the behalf of the officer without the officer even requesting for the attorney.  The offending officer is not asked any questions before the officer arrives.  This is not an alternative that is provided to civilians who have shot and killed other persons.

(b) The offending officer is afforded the opportunity to perform an unrecorded walk-through of the incident in the presence of their attorney where they can craft their version of the incident.

(c) The Pasadena Police Department's Internal Affairs Unit conducts an officer-friendly investigation where they allow the officer to clarify their positions through soft-questioning in the presence of their attorney.

(d) Policy and decision-makers in the City of Pasadena ignore physical and/or video evidence in favor of uncorroborated statements from the offending officer.

(e) Policy and decision makers in the City of Pasadena ignore written use of force policies and caselaw to protect Officers who have committed excessive force violations.

43.     Evidence of the City of Pasadena's custom of protecting officers

involved in excessive force cases is evident throughout the investigation of the two cases.

(A) In the aftermath of the Schenk shooting, the following tactics are employed to protect Defendant Officer Saldivar:

    **a.** Another police officer on the scene calls for an attorney who arrives to represent Defendant Officer Saldivar before he is asked any questions. The attorney was requested for Defendant Officer Saldivar prior to him requesting an attorney's presence.

    **b.** Defendant Officer Saldivar is permitted to give a walkthrough, which is an opportunity to provide his unrecorded version of events in the presence of his attorney. The lead detective investigating the shooting described Defendant Officer Saldivar's version of events during the walkthrough as intentionally vague, which he describes as customary because the attorneys in these officer involve shootings do not allow police officers to provide detailed responses to questions.

    **c.** After Detective Cooper notes the discrepancy between the video and Defendant Officer Saldivar's version of events, Defendant Officer Saldivar is provided an opportunity to come into questioning not by Detective Cooper, but instead by Sergeant Hamilton of the Internal Affairs Department who had already expressed his view to Detective Cooper that he believed Defendant Officer Saldivar's uncorroborated version of events.

    **d.** During the questioning of Defendant Officer Saldivar by Sergeant

Hamilton, Sergeant Hamilton feeds Defendant Officer Saldivar answers through leading questions that provide a narrative that would justify the shooting:

> **Sergeant Hamilton:** All right, so it just ... so what you're saying is, just so I, I'm perceiving you right, is that basically that as he got up, just the circumstances being what they were, that you were definitely in fear for your li- your safety.
>
> **Officer Rigo Saldivar:** Absolutely.
>
> **Sergeant Hamilton**: And you just r- reacted almost without instinct, or on instinct alone and you were thinking that he was goin' for something unsure of what he had.
>
> **Officer Rigo Saldivar**: Right.

**e.** Subsequently, Sergeant Hamilton wrote a report to the Chief of Police in which he omits that during the interview, Defendant Officer Saldivar acknowledged that Mr. Schenk was spinning away from him at the time of that shooting and that Mr. Schenk was shot in the back.  That same report credits Defendant Officer Saldivar's uncorroborated statement that Mr. Schenk was in a football stance at some point prior to the shooting.

(B) In the aftermath of the Aviles shooting, the same tactics are employed to protect Defendant Officer Saldivar:

**a.** Within ten minutes of the shooting, another officer informs Defendant Officer Saldivar that he is calling Attorney Cagle on

his behalf (the same attorney who represented him for the Schenk shooting).

**b.** Upon information and belief, Defendant Officer Saldivar was again provided the opportunity to participate in an unrecorded walkthrough of the crime scene to craft his version of the events.

**c.** Upon information and belief, the City of Pasadena Internal Affairs conducted a shooter-friendly investigation that exonerated Defendant Officer Saldivar of culpability for the shooting despite the video evidence showing that he shot an unarmed man who did not pose any immediate threat to his safety or the safety of others.

**d.** Moreover, the City of Pasadena Police Department and its police chief exonerated Defendant Officer Saldivar of wrongdoing and failed to discipline or take any adverse employment against him for the shooting of Mr. Aviles despite the fact that Defendant Officer Saldivar's shooting of Mr. Aviles' moving car violated two provisions of the City of Pasadena's written use of force policy.  Of course, this is because the City of Pasadena's custom and practice of protecting Officers who use excessive force overrode any such Policy.

**44.**     To be clear, these practices are not only evident in these two cases, but are widespread and routine within the Pasadena Police Department in response to officer involved shootings.     Detective Cooper has testified under the oath in every instance where he was involved as an investigator or shooter in an officer-involved case,

the officer was afforded the opportunity to go through an unrecorded walkthrough in the presence of an attorney.  He further testified that the walkthroughs are tightly controlled by the attorneys and the officer's statements are intentionally vague at the behest of the attorney.

*The Chief of Police's Decision to Not Discipline Defendant Officer Saldivar for the Schenk Shooting & The Custom & Practice of the City of Pasadena to Protect Officers Who Shoot Victims Is the Moving Force Behind Saldivar's Shooting of Mr. Aviles*

      **45.**    On January 12, 2021, when he encountered the unarmed fleeing Mr. Aviles who posed no threat to him, Defendant Officer Saldivar knew that:

                    (a)  He had killed an unarmed fleeing suspect before without any consequences;

                    (b)  He had been protected by an attorney that was provided to him that helped him craft a narrative to avoid those consequences;

                    (c)  He had been protected by the Internal Affairs who had helped him craft a narrative to avoid any such consequences'

                    (d)  Internal Affairs and His Chief of Police had ignored the lead investigator and the video evidence of him shooting an unarmed young man who posed no threat to him in the back.

                    (e)  Other officers similarly situated to him had been protected by the custom and practice of the City of

Pasadena Police Department

**46.**     Defendant Officer Saldivar also knew that he would again be provided with those same protections again if he shot the unarmed and fleeing Mr. Aviles.

**47.**     Thus, the effect of (a) the decision by the Chief of Police to not train, supervise, and discipline Defendant Officer Saldivar after he shot Mr. Saldivar and (2) the custom and practice of the City of Pasadena to protect  officer like Defendant Officer is that,  on January 12, 2021, Defendant Officer Saldivar was unleashed to shoot and maim an unarmed and fleeing Mr. Aviles on January 12, 2021.

**48.**     The actions of the City of Pasadena through its Chief of Police and other policy makers and the City's custom and practice were the moving force behind Defendant Officer Saldivar's shooting and maiming of Mr. Aviles, and the City of Pasadena and its policymakers were deliberately indifferent to the likelihood that Defendant Officer Saldivar would shoot another unarmed person such as Mr. Aviles.

### COUNT 1: PLAINTIFF'S CIVIL RIGHTS CLAIM FOR USE OF EXCESSIVE AND UNNECESSARY FORCE AGAINST DEFENDANT SALDIVAR UNDER 42 U.S.C. § 1983

**49.**     Mr. Aviles  repeats and realleges each of the facts alleged in paragraphs 1-48.

**50.**     Plaintiff brings a claim against Defendant Saldivar for use of excessive and unnecessary force, pursuant to 42 U.S.C. § 1983.

**51.**     Force is excessive, and therefore violates the Fourth Amendment, if it is not reasonable in light of the circumstances facing the officer. *See Graham v. Connor*, 490 U.S. 386, 398 (1989). The facts and circumstances of this case show that the Defendant Saldivar's actions here were clearly unreasonable.

52.     Specifically, it was objectively unreasonable for Defendant Saldivar to shoot Mr. Aviles when he posed no threat to Defendant Saldivar's safety.  It was also objectively unreasonable for Defendant Saldivar to shoot Mr. Aviles when Mr. Aviles was unarmed, his hands were up and visible to Defendant Saldivar.  Finally, it was further unreasonable for Defendant Saldivar to shoot into Mr. Aviles' car as he attempted to flee from Defendant Saldivar's attempts to shoot him in a manner that did not cause any danger to Defendant Saldivar's safety or the safety of any bystanders.

53.     Defendant Saldivar's conduct violated Mr. Aviles' clearly established constitutional right—the right to be free from excessive force—that was established well before Defendant Saldivar shot and severely injured him. See, e.g., *Reyes v. Bridgewater*, 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others.").  More specifically, the right to be free from the use of excessive force was clearly established under the particular circumstances presented to Defendant Saldivar. See *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 417–18 (5th Cir. 2009) ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.").

54.     Therefore, by using excessive and unnecessary force while acting under color of state law, Defendant Officer Saldivar violated Mr. Aviles' rights under the Fourth and Fourteenth Amendments to the United States Constitution and caused his physical injuries, his mental and emotional distress and injuries, Post-Traumatic Stress Disorder, pain and suffering. Defendant are therefore liable to Plaintiff for all

compensatory and exemplary damages and his attorneys' fees and costs.

54. 55. Defendants' actions violated clearly established constitutional law

and Defendants are not entitled to qualified immunity.

## <u>COUNT 2: PLAINTIFF'S CIVIL RIGHTS CLAIM FOR USE OF EXCESSIVE AND UNNECESSARY FORCE AGAINST DEFENDANT CITY OF PASADENA UNDER 42 U.S.C. § 1983</u>

56. Plaintiffs hereby incorporate by reference each and every allegation

in Paragraphs 1-55 above.

57. To succeed on a claim under Section 1983 against a municipality, the

plaintiff must demonstrate that the city "had some inadequate custom or policy that acted

as the moving force behind a constitutional violation." *Forgan v. Howard Cty., Tex.*, 494

F.3d 518, 522 (5 Cir. 2007) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658,

690-91 (1978)); see also *Connick, 563 U.S. at 61.* "Official municipal policy includes the

decisions of a government's lawmakers, the acts of its policymaking officials, and

practices so persistent and widespread as to practically have the force of law." Connick,

563 U.S. at 61.

58. The following challenged practices may constitute official municipal

policy or custom: (1) a formal regulation or policy statement; (2) an informal custom

amounting to a widespread practice that, although not authorized by written law or

express municipal policy, is so permanent and well settled as to constitute a custom or

usage with the force of law; (3) the decisions of employees with final policymaking

authority; (4) the ratification by such final policymakers of the decisions—and the basis

for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train, supervise, or discipline employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

59.    Defendant City of Pasadena, acting through its Chief of Police as the relevant policymaker, is liable to Plaintiff Randy Aviles for violating his rights guaranteed by the United States Constitution, including the 4th Amendment.  The City of Pasadena's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Mr. Aviles' suffering and and damages.

60.    The City of Pasadena is liable to Plaintiff because its failure to train, supervise, or discipline Defendant Officer Saldivar for his 2018 unconstitutional killing of Mr. Nathan Schenk and the City of Pasadena's general custom and practice of protecting officers who used excessive force in shooting citizens led Defendant Officer Saldivar to believe that he could continue to shoot unarmed individuals who were not an immediate threat to his safety without facing any consequences from his employer.   Indeed, had it not been for the failure to discipline Defendant Officer Saldivar and the City of Pasadena's custom and practice of protecting officers who use excessive force, Defendant Officer Saldivar would not have been employed and in position to encounter Mr. Aviles. Thus, the City of Pasadena's failure to train, supervise, or discipline Defendant Saldivar and general custom and practice of protecting officers who used excessive force in

shooting citizens was the moving force behind Defendant Saldivar's decision to shoot an unarmed Mr. Aviles on January 12, 2021.  Finally, by protecting and not terminating Defendant Officer Saldivar (and other officers who used excessive force), the City of Pasadena was deliberately indifferent to the risks posed by their sanctioning of Defendant Officer Saldivar's unconstitutional use of excessive force.

**61.**     Defendant City of Pasadena is therefore liable to Plaintiff for all compensatory and exemplary damages and his attorneys' fees and costs, including but not limited to his physical injuries, his mental and emotional distress and injuries, Post-Traumatic Stress Disorder, pain and suffering

### REQUEST FOR ATTORNEYS' FEES UNDER 42 U.S.C. § 1988

**62.**     Plaintiff is entitled to his attorneys' fees and costs in this action under 42 U.S.C. § 1988. Plaintiff therefore requests that the Court and jury grant his request for attorneys' fees and costs.

### JURY DEMAND

**63.**     Plaintiff respectfully requests a jury trial under Federal Rule of Civil Procedure 8(b).

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants be cited to appear and answer herein, and that Plaintiff have judgment against Defendants, for actual damages above the jurisdictional minimum of the Court; exemplary damages; pre-judgment interest; post-judgment interest, costs of court, attorney's fees and expenses and all other relief to which Plaintiff is justly entitled, at law or in equity.

Respectfully submitted,

/s/ Larry Taylor
Larry Taylor
SBOT: 24071156
Email: Ltaylor@CochranTexas.com
**THE COCHRAN FIRM**
1825 Market Center Boulevard
Suite 500
Dallas, Texas 75204


 /s/ Dimitri Dube

Dimitri Dube
TX State Bar No.
24068944
The Cochran Firm
1825 Market Center Boulevard
Suite 500
Dallas, TX
469.233.1159 (cell)
469.651.4260 tel
214.975.2010 fax
Dd601@nyu.edu
ddube@cochrantexas.com

ATTORNEYS FOR
PLAINTIFF