United States District Court
Southern District of Texas
**ENTERED**
August 24, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RANDY AVILES, | § | CIVIL ACTION NO |
| Plaintiff, | § | 4:22-cv-03571 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| RIGOBERTO R. | § | |
| SALDIVAR and CITY | § | |
| OF PASADENA, TX, | § | |
| Defendants. | § | |

**ORDER DENYING MOTION TO DISMISS**

The motion by Defendant City of Pasadena to dismiss it from this action is denied. Dkt 7.

1. Background

This is a civil-rights action under Section 1983 concerning the non-fatal shooting of Plaintiff Randy Aviles by Defendant Rigoberto R. Saldivar, a City of Pasadena police officer. Saldivar is reportedly under indictment for this shooting, and the civil claim against him here asserts excessive force. See Dkts 1 at ¶¶ 49–55 & 22. The two claims against the City seek to hold it liable under *Monell v Department of Social Services*, 436 US 658 (1978). One alleges that the City failed to discipline, train, or supervise Saldivar after he'd previously shot (and killed) an unarmed suspect named Nathan Schenk. The other alleges that the City has a custom or practice of protecting officers who use excessive force. See Dkt 1 at ¶¶ 56–61.

The shootings of both Aviles and Schenk occurred during traffic stops. Starting with his own shooting, Aviles pleads as follows.

In January of 2021, Saldivar witnessed Aviles speed through a red light and pulled him over. Aviles exited his car with his hands in the air after Saldivar's patrol car came to a stop. Saldivar drew his gun and commanded Aviles to get back into his car. He complied, keeping his hands up as he did so. Saldivar then told Aviles to place his hands outside the driver-side window. He again complied. Id at ¶¶ 8–13. Aviles continued to comply with Saldivar's instructions while in the car until, without apparent provocation, Saldivar yelled "I will shoot you" and moved aggressively towards Aviles with his gun raised. Aviles alleges that he feared for his life and began driving away. Saldivar shot ten times at the car, hitting Aviles three times in his left arm. Id at ¶¶ 9–19. Aviles was unarmed during the encounter. Id at ¶ 1. Saldivar wasn't terminated or otherwise disciplined for this shooting. Id at ¶ 22.

The Schenk shooting occurred three years earlier. Aviles alleges that in November of 2018, Saldivar saw Schenk run a stop sign and pulled him over. When Saldivar approached, Schenk hopped out of his car and began running, prompting Saldivar to tase him twice. A struggle on the ground followed as Saldivar attempted to subdue Schenk, who managed to break free and begin to crawl away on his hands and knees. Saldivar then shot Schenk three times—twice in the lower back and once in his upper chest. Schenck was unarmed and died as a result of the shooting. Id at ¶¶ 20–29.

Aviles also alleges that Detective Michael Cooper investigated the Schenck shooting for the Pasadena Police Department. Detective Cooper found discrepancies between the body camera footage and how Saldivar described the shooting—particularly as to Saldivar's statement that Schenk seemed to be reaching for a gun. He later interviewed Saldivar, who confirmed that the video showed Schenk spinning away before Saldivar shot him. Detective Cooper concluded from his investigation that Saldivar had shot an unarmed man in the back as he was crawling away and that the shooting constituted excessive

force. He informed his supervisor, Sergeant Steven Skripka, of this conclusion. Id at ¶¶ 30–35.

Detective Cooper was later part of a meeting at the Pasadena Police Department that included Chief of Police Josh Brugger, the assistant chief of police, Sergeant Skripka, and two sergeants from Internal Affairs. He played the body-camera footage and informed Chief Brugger of his conclusion that Schenk was crawling away on his hands and knees when Saldivar fired his weapon. After reviewing the video and learning of this conclusion, "Chief Brugger decided not to take any disciplinary action against Defendant Saldivar." Id at ¶ 39. Saldivar wasn't reprimanded or terminated. He also wasn't referred to a training or supervision program, but instead received a raise five months after the incident. Id at ¶¶ 36–40.

Aviles says that this result wasn't surprising. He alleges that the City of Pasadena has a custom or practice of protecting police officers who use excessive force. This policy is effectuated through (i) immediately providing offending officers an attorney at the scene of the incident, (ii) permitting the officer to perform an unrecorded walk-through of the incident in the presence of his attorney "where they can craft their version of the incident," (iii) conducting officer-friendly investigations in which Internal Affairs allows the officer to clarify his positions through soft questioning, (iv) ignoring physical and video evidence in favor of uncorroborated statements from the offending officers, and (v) ignoring written use-of-force policies and caselaw to protect officers. Id at ¶ 42.

Aviles alleges that these procedures were employed in the aftermath of both the Schenk and Aviles shootings. Id at ¶ 43. As a result, Saldivar was exonerated and permitted to remain on the force in both instances without receiving discipline or training. Aviles also alleges that these procedures have been widely employed:

> [T]hese practices are not only evident in these two cases, but are widespread and routine within the Pasadena Police Department in response to officer involved

3

> shootings. Detective Cooper has testified under oath in every instance where he was involved as an investigator or shooter in an officer-involved case, the officer was afforded the opportunity to go through an unrecorded walkthrough in the presence of an attorney.

Id at ¶ 44. Aviles pleads neither the number of cases that Detective Cooper has investigated, nor how many cases have involved these procedures.

Pending is a motion by the City seeking dismissal of the claims against it. Dkt 7. Saldivar hasn't brought any similar motion.

### 2. Legal standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows the defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted."

Read together, the Supreme Court holds that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v Taylor*, 503 F3d 397, 401 (5th Cir 2007), quoting *Twombly*, 550 US at 555.

A complaint must therefore contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 US at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678,

4

citing *Twombly*, 550 US at 556. This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id at 678, quoting *Twombly*, 550 US at 557.

Review on motion to dismiss under Rule 12(b)(6) is constrained. The reviewing court "must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Walker v Beaumont Independent School District*, 938 F3d 724, 735 (5th Cir 2019), quoting *Campbell v Wells Fargo Bank NA*, 781 F2d 440, 442 (5th Cir 1986). But "courts 'do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Vouchides v Houston Community College System*, 2011 WL 4592057, *5 (SD Tex), quoting *Gentiello v Rege*, 627 F3d 540, 544 (5th Cir 2010). The court must also generally limit itself to the contents of the pleadings and attachments thereto. *Brand Coupon Network LLC v Catalina Marketing Corp*, 748 F3d 631, 635 (5th Cir 2014).

    3. Analysis

Section 1983 of Title 42 of the United States Code provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The Supreme Court held in *Monell v Department of Social Services* that cities are included within the term *persons* as used in this provision. 436 US 658, 701 (1978). But a complex and often unclear body of caselaw has since

5

attempted to delineate the circumstances in which a city may be held liable when an officer employed by the city engages in unconstitutional conduct.

One thing is clear from *Monell* itself—a municipality may not be held liable simply on a *respondeat superior* basis. 436 US at 691. The plaintiff must present evidence that the *municipality* is itself legally responsible for the challenged conduct. See *Doe v Edgewood Independent School District*, 964 F3d 351, 364–65 (5th Cir 2020). This is generally established by proving that (i) an official policy (ii) promulgated by a municipal policymaker (iii) was the "moving force" behind the violation of a constitutional right. *Piotrowski v City of Houston*, 237 F3d 567, 578 (5th Cir 2001) (citations omitted).

The focus of the City's motion is upon the first and third of these requirements. See Dkt 7. It doesn't dispute that its Chief of Police is a policymaker.

Various types of *Monell* claims have developed over the years. When distinguishing between them, the first prong's requirement of an official policy is the most important. This prong is typically established by showing *either* "written policy statements, ordinances, or regulations," *or* a widespread practice by non-policymaking employees "that is so common and well-settled as to constitute a custom that fairly represents municipal policy." See *Webb v Town of Saint Joseph*, 925 F3d 209, 214–15 (5th Cir 2019). But a written policy or widespread practice isn't always required to establish an official policy. In certain "rare circumstances," a single decision may also constitute an official policy. See ibid. What's more, a failure to train, supervise, or discipline employees may, "[i]n limited circumstances," also "rise to the level of an official government policy for purposes of § 1983." *Connick v Thompson,* 563 US 51, 61 (2011); accord *Madden v Gribbon*, 2022 WL 4360558, *5 (ND Tex).

Neither claim brought by Aviles proceeds with regard to a written policy. Instead, one of the claims (discussed immediately below) appears to mix allegations of both widespread practice and a single decision, alleging that the

6

City is liable for the single decision by the Chief of Police not to discipline, train, or supervise Aviles. The other appears to proceed strictly upon allegation that the City had a widespread practice of protecting officers involved in police shootings.

### a. Failure to discipline, train, or supervise

The first of two claims Aviles brings under *Monell* alleges that the City—through its Chief of Police—failed to discipline, train, or supervise Saldivar after he shot and killed Schenk, resulting in the shooting of Aviles three years later. See Dkt 1 at ¶ 60. To be clear, Aviles specifically disclaims this as a ratification claim, which is a primary basis of attack by the City. Compare Dkt 9 at 15, with Dkt 7 at 9–10.

Caselaw establishes that claims for failure to discipline, train, or supervise require proof that (i) the municipality, through an official policymaker, failed to discipline, train, or supervise its employees, (ii) the failure amounted to deliberate indifference, and (iii) the failure directly caused the constitutional violation in question. See *Hunter v City of Houston*, 564 F Supp 3d 517, 529 (SD Tex 2021), citing *Deville v Marcantel*, 567 F3d 156, 171 (5th Cir 2009). By comparison to the three prongs initially noted above as applicable to all *Monell* claims, the first prong on this claim variant corresponds to and combines those first and second prongs; the requirement of proof of deliberate indifference under the second prong is an additional limitation imposed on claims of this type; and the third prong essentially stays the same. See *Connick v Thompson*, 563 US 51, 61 (2011).

Claims of this variety most often proceed on argument that the municipality's disciplinary, training, or supervision *program* is inadequate in some way, and that this inadequacy resulted in the deprivation of constitutional rights. See *Roberts v City of Shreveport*, 397 F3d 287, 293 (5th Cir 2005); see also *City of Canton v Harris*, 489 US 378, 390 (1989): "The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it

7

actually causes injury." The focus of such claims is thus *systemic* failure by the municipality. For example, in the failure-to-discipline context, this might entail showing that investigations into misconduct were subjected to "systematic inattention" or were purely formalistic and perfunctory.

Regardless the context, this means that such claims will almost always entail showing "a pattern of abuses" by untrained, undisciplined, and/or unsupervised employees. *Piotrowski v City of Houston*, 237 F3d 567, 581–82 (5th Cir 2001). This demonstration of a pattern matters for establishing not only an official policy (as required for all *Monell* claims), but also deliberate indifference (as required for all claims for failure to discipline, train, or supervise in particular). See id at 582. For example, as stated by the Fifth Circuit in *Hutcheson v Dallas County*, the plaintiff "normally must allege a 'pattern of similar constitutional violations by untrained employees'" to establish deliberate indifference for a failure-to-train claim. 994 F3d 477, 482 (5th Cir 2021) (citation omitted).

But the failure to discipline, train, or supervise needn't *always* be a systemic one. The Fifth Circuit made clear in *Brown v Bryan County* that, "under limited circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations." 219 F3d 450, 459 (5th Cir 2000). *Brown* was itself a failure-to-train case, but the conclusion of its nature applies equally to all failure-to-act claims. This means that a *single decision* by a policymaker not to discipline, train, or supervise a *specific officer* may, in limited circumstances, constitute an official policy and thus set part of the predicate for municipal liability on such a theory.

Even so, where a single decision is the basis of such a claim, the second prong—deliberate indifference—is particularly difficult to establish. The plaintiff must "prove that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Hutcheson*, 994 F3d at 482, quoting *Valle v City of Houston*, 613 F3d

536, 549 (5th Cir 2010); accord *Brown*, 219 F3d at 461. An injury is *highly predictable* only when the municipality "failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Littell v Houston Independent School District*, 894 F3d 616, 624–25 (5th Cir 2018). The "duty not to use excessive force" has been recognized as a clear constitutional duty in this respect. Ibid. And as for the third prong's requirement of causation, the failure to act must be "clearly connected" to the constitutional injury suffered by the plaintiff. *Brown*, 219 F3d at 461.

The Fifth Circuit in *Brown* determined that all three of the above elements were satisfied upon review of a jury verdict against Bryan County, Oklahoma. The case concerned an inexperienced reserve deputy, who forcefully removed a woman from a car using an "arm bar" technique that resulted in severe injuries. Id at 454. That deputy had essentially no law enforcement background, and Bryan County had provided him with no training and very little supervision. Its apparent practice was simply to hire individuals who had already completed a training program provided by the State of Oklahoma, which the deputy may or may not have completed. He'd also engaged in childish and unlawful behavior before joining the force and had a history of questionable takedown arrests in the short time that he'd served as a deputy. Id at 455–56.

The Fifth Circuit determined that the relevant policymaker in the case—the county sheriff—had sufficient notice of the above facts to know that there was a need to train or supervise this particular deputy, and that the deputy would be involved in making forcible arrests. Despite such knowledge, the sheriff chose not to train or supervise an inexperienced, reckless officer. This single decision, the Fifth Circuit held, could serve as the basis for a failure-to-train claim. Id at 459–61. And it was a highly predictable consequence of that decision that the deputy would violate the Fourth Amendment rights of citizens while working as an officer—meaning that the deliberate-

9

indifference prong was satisfied. Id at 462–63. The causation prong was also satisfied, there being sufficient evidence that the failure to train or supervise the deputy resulted in the constitutional violation of the woman he injured during the traffic stop. Id at 463–65.

The current posture here is only upon review of a motion to dismiss. Unlike *Brown*, then, the sufficiency of the evidence isn't being tested. Aviles may well not be able to muster sufficient evidence to resist a future motion for summary judgment, particularly as the circumstances of the Schenk shooting become clear. But the question at hand is solely whether he's pleaded facts that plausibly support each element of a failure-to-act claim. He has.

The allegations in the original complaint are summarized above. It suffices to note that this generally includes allegations that (i) Saldivar shot and killed Schenk, who was unarmed and crawling away, during an altercation following a traffic stop; (ii) Chief Brugger was informed of an investigatory conclusion that Saldivar used excessive force against Schenk; (iii) Chief Brugger watched the video of that shooting himself; (iv) Chief Brugger then decided not to take any disciplinary action against Saldivar or require additional training or supervision; (v) this emboldened Saldivar to believe that he could shoot unarmed citizens without consequence; and (vi) Saldivar subsequently shot Aviles, who was also unarmed, during a traffic stop. See Dkt 1 at ¶¶ 8–48.

This is sufficient to state a claim for failure to discipline, supervise, or train under *Brown*. As there, the single decision by Chief Brugger not to act in response to the Schenk shooting may serve as the basis for a claim against the City for failure to discipline, train, or supervise. And it's at least plausible that a further shooting of an unarmed, fleeing man was a "highly predictable consequence" of not disciplining, training, or supervising Saldivar after that prior shooting—meaning that the decision not to act in this respect could plausibly amount to deliberate indifference. See *Brown*, 219 F3d at 461. It's also plausible that this decision, as Aviles alleges,

emboldened Saldivar to use excessive force again (or at least left him in a position to do so) against Aviles, providing the necessary causal link.

Though not cited in its motion, the City at hearing noted *Grandstaff v City of Borger*, 767 F2d 161 (5th Cir 1985), arguing that the extreme circumstances supporting municipal liability on the basis of a single incident there don't exist here. *Brown* is often treated as though it stands for the same proposition as *Grandstaff* with respect to municipal liability. But *Brown* is in fact quite distinct from *Grandstaff*, while also being of more pertinent application under the allegations here.

In *Grandstaff*, six police officers showered bullets on an innocent man whom they mistook for a fugitive. Id at 164–65. The Fifth Circuit held that the city that employed the officers could be held liable for this shooting, even though the plaintiff had no proof of prior incidents of misconduct by the police. Most important in this respect, the court determined that the responsibility of the city for an unconstitutional policy or custom could be inferred from "so gross an abuse of the use of deadly weapons" on the night of the shooting. Id at 171. *Grandstaff* was thus a case in which the responsibility of the municipality was inferred from *a single incident of misconduct* simultaneously involving *a large number of officers* that resulted in injury. Since such inferential steps draw very near to holding a municipality liable on a *respondeat superior* basis, *Grandstaff* has largely been cabined to its facts. See *Peña v City of Rio Grande City*, 879 F3d 613, 623 (5th Cir 2018) (rejecting argument that "single incident in which [plaintiff] was tased plausibly suggests deliberate indifference by the city").

By comparison, *Brown* stands for the proposition that *a single decision by a policymaker* with respect to *a particular officer* may constitute an official policy in certain circumstances. It doesn't stand for the proposition that either deliberate indifference or the existence of an unconstitutional policy may be inferred from the fact that the officer engaged in the single incident of misconduct at

11

issue. To the contrary, the Fifth Circuit made it harder in *Brown* to establish deliberate indifference in single-decision cases by requiring proof that it was highly likely that the officer in question would commit future violations in the absence of training or supervision. Such a high likelihood was proven in *Brown* itself by looking at the characteristics and past conduct of the deputy, including his history of forcible arrests. But no inference was made from the fact of the forcible takedown of the plaintiff.

Aviles doesn't argue that the failure to discipline, train, or supervise should be inferred from the fact that Saldivar shot him. He simply argues that the *prior* shooting of Schenk by Saldivar put Chief Brugger on notice that Saldivar was highly likely to commit future Fourth Amendment violations in the absence of disciplinary or other corrective action. This brings the case within the ambit of *Brown*.

The motion to dismiss is denied with respect to the failure-to-discipline claim.

### b. Custom of protecting officers

The second claim by Aviles alleges that the City had a custom of protecting officers involved in police shootings, resulting in the shooting of Aviles. Dkt 1 at ¶ 60. Though weaker, this claim is also sufficient to survive a motion to dismiss.

A *custom* is "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F3d at 579. Proof of a *pattern* of conduct is thus typically necessary. And that "requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Peterson v City of Fort Worth*, 588 F3d 838, 851 (5th Cir 2009).

The complaint by Aviles describes in detail the purportedly officer-friendly procedures employed by the City following shooting incidents. Dkt 1 at ¶ 42; accord *Estate of Baker v Castro*, 2018 WL 4762984, *17 (SD Tex).

He also pleads that these particular procedures were applied in both incidents involving Saldivar, resulting in his exculpation in each case. Dkt 1 at ¶ 43. And he pleads that at least one of the procedures—the unrecorded walkthrough—was employed in all of the cases involving Detective Cooper as an investigator. Id at ¶ 44.

This plausibly pleads that the City has a custom of protecting officers who use excessive force. That said, missing from the complaint are specific prior incidents (aside from the Aviles and Schenk shootings) in which the post-shooting procedures he describes were employed. Also missing are statistics on the frequency of use of excessive force by officers for the City. But it was clear from the motion hearing that the City was satisfied with this claim proceeding to discovery, given the limited availability of such statistics pre-discovery.

The motion to dismiss with respect to the custom-or-practice claim will also be denied.

    4.   Conclusion

The motion by Defendant City of Pasadena to dismiss is DENIED. Dkt 7.

SO ORDERED.

Signed on August 23, 2023, at Houston, Texas.

_____
Hon. Charles Eskridge
United States District Judge