IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RANDY AVILES, | § § § | |
| Plaintiff | § § | |
| v. | § § | Civil Action No.: 4:22-cv-03571 |
| RIGOBERTO SALDIVAR & CITY OF PASADENA, TEXAS, | § § § § | |
| Defendants | § | |

DECLARATION BY JOSHUA BRUEGGER

1. My name is Joshua Bruegger. On the date of all occurrences which form the basis of this lawsuit, I was employed in the paid civil service of the City of Pasadena, Texas, as its Chief of Police. I declare under penalty of perjury in accordance with the laws of the United States of America that the following statements are true and correct. I am over the age of twenty-one and in all other ways qualified and competent to make the statements contained within this declaration. These statements are made of my own personal knowledge because they reflect events I personally observed, or in which I personally participated. I am authorized to make the statements contained herein.

2. I was informed of the shooting of Plaintiff Randy Avilas within an hour of the occurrence. The following morning, I reviewed recordings of the events. I reviewed the recordings because an officer-involved shooting is a significant event. When I was the Pasadena police chief, I reviewed recordings of every officer-involved shooting. When I first saw the Aviles recordings, I had concerns about Officer Saldivar firing into a vehicle that was

1

EXHIBIT 1

driving away. I prepared a memorandum informing then-Officer Rigoberto Saldivar he was placed on administrative leave. While it is standard procedure for any officer who is involved in a shooting to be placed on administrative leave for three to five days to complete administrative procedures to assure the officer is fit to return to police duty, I did not think those procedures were sufficient in the Aviles shooting. Because of my concerns about the propriety of Officer Saldivar's action in the Aviles shooting, Officer Saldivar never returned to Pasadena police duties after he shot Aviles.

3.    On January 25, 2021, thirteen days after the shooting, I met with Officer Saldivar and told him he was assigned to perform administrative duties inside at the property room inside the police station until the investigations were completed. I did not allow Officer Saldivar to wear a Pasadena police uniform after the Aviles shooting.

4.    But regardless of my concerns about Officer Saldivar's actions, Officer Saldivar was nonetheless entitled to due process under federal and Texas law, and other Constitutional protections afforded all citizens. The investigation of all Pasadena police officer shootings involve criminal investigations by Pasadena Police Department detectives and Harris County District Attorney criminal investigators, as well as an administrative investigation by an investigator from the Pasadena police department internal affairs office, that is evaluated for adequacy by Pasadena police department supervisors, administrators, and me. The criminal investigations are utilized to determine whether evidence supports a criminal prosecution against an officer and the administrative investigation is used to determine whether administrative disciplinary action should be initiated against an officer. All such investigations necessarily take time to complete.

EXHIBIT 1

5.      Contrary to the allegations in Mr. Aviles' lawsuit complaint, the City of Pasadena does not have a governmental custom of protecting officers involved in shootings. The City does not provide officers with legal representation at the scene or in the aftermath of shootings. Pasadena officers are members of police associations and a union which typically provide legal representation to officers after police shootings. The City cannot deny officers access to legal counsel provided through such labor organizations.

6.      Moreover, because officers who shoot a person are subjected to criminal investigations, those officers have the same Constitutional rights as every other person. Officers have a Sixth Amendment right to counsel. Officers also have the Fifth Amendment right not to make any statement during a criminal investigation. Included in these rights, is an officer's absolute right to dictate conditions upon which the officer is willing to waive Constitutional rights. An officer, like any other individual subjected to a criminal investigation, has the right to decide when, if ever, the officer will make any statement. An accused officer can, likewise, refuse to waive Constitutional rights and participate in any interview, including a walk-through interview, if investigators record the officer's statements.

7.      Criminal investigators are only able to obtain information from an officer involved in a shooting if the officer provides information. So, competent detectives investigating any crime, including a police shooting, will prudently yield to terms a criminal suspect or his attorney require as a condition for the suspect's participation in the investigation. The accusation that detectives are performing investigations incompetently is ridiculous.

8.      Before the Harris County District Attorney's Office presented the criminal investigations to a Grand Jury, Officer Saldivar retired from the Pasadena police department.

EXHIBIT 1

I had no ability to prevent Officer Saldivar from retiring. Even if I had initiated proceedings to discharge Officer Saldivar before he retired, I could not have prevented him from receiving retirement benefits. After Officer Saldivar retired from the Pasadena Police Department he was indicted by a grand jury.

9. I held a peace officer license issued under the Texas Occupations Code through the Texas Commission on Law Enforcement (TCOLE) and I been a licensed peace officer for 23 years. I have successfully completed all TCOLE peace officer training and licensing requirements, including continuing education and police administration requirements. I hold the designation of Texas Master Peace Officer.

10. The Pasadena police department is a department of the City of Pasadena, Texas. The City of Pasadena is a Texas Home Rule City governed by its Charter, under a Mayor-Council form of Government. I am generally familiar with the provisions of the City of Pasadena's Charter and Code of Ordinances that institute and implement governmental policy, duties, and powers of the City and its elected and appointed officials, including the limits of my responsibilities and authority while serving as the City's chief of police under City policy. The relevant portion of the City Code is attached to this declaration, identified as Summary Judgment Exhibit 13.

11. It is my understanding based upon my experience and training in performing the duties of the Pasadena police department police chief, that the duties, authority, and responsibilities for setting City policy is dictated by Texas state law, the City's Charter, and City Ordinances. Pasadena's Charter expressly states that City Council has the sole authority to create City policy. The Council is composed of the mayor and eight councilmembers, with all powers and

EXHIBIT 1

authority conferred on or possessed by the City, other than powers expressly conferred upon other City Officers by the Charter. The Charter further reserves to Council the power to inquire into the official conduct of any department, agency, office, officer, or employee of the City, and into any other matters of proper concern to City government. The Pasadena City Council operates as a singular body acting through ordinances and resolutions, with the power to enact legislation, adopt budgets, and determine all City polices.

12. Other than the City adopting State of Texas municipal police civil service which I will discuss later in this declaration, no Charter, ordinance, or resolution of which I am aware has delegated the City's policymaking authority to any officer or person other than Pasadena City Council. If the City made such a delegation, I believe I would have known that due to my job.

13. As a matter of City policy, the Charter requires every police officer, before beginning police duties, to take and subscribe to the police Oath of Office prescribed by the Constitution and laws of the State of Texas. Under the Oath, every officer is charged with faithfully executing police duties of the State of Texas, and preserve, protect, and defend the Constitution and laws of the United States and of this State.

14. The police department and I are under control and supervision of the Council's City policymaking authority, to which my operational authority as Police Chief, is subordinate. Council establishes City policy except on those subjects expressly controlled by Texas statutes such as Chapter 1701 of the Texas Occupations Code (police training and licensing), Chapter 143 of the Texas Local Government Code (municipal police civil service), and Chapter 614 of the Texas Government Code (protections beyond civil service afforded officers limiting disciplinary authority).

EXHIBIT 1

15. I supervise the day-to-day operations of a department of the City, its police department, in conformity with policies established by Council and requirements of federal, state, and local law. I understand that neither I, nor any subordinate officer within the police department, has authority to enact City policy, and I have never purported to do so.

16. As police chief, I was authorized to – and did - create and maintain rules, directives, and general or special orders to carry out City policy created by Council to fulfill the role of providing direct supervision over the police department and its officers, provided such regulations are consistent with the laws of the United States, the State of Texas and the Charter, ordinances, and policies of the City.

17. I have been trained through Texas state mandated police chief training that the State of Texas has delegated to the Texas Commission on Law Enforcement (TCOLE), through Chapter 1701 of the Texas Occupations Code, the authority andresponsibility throughout Texas to establish state-wide minimum police officer hiring, training, and licensing requirements. Texas has designated TCOLE as the agency in Texasresponsible for establishing a statewide comprehensive education and training program for all peace officers so that officers are adequately trained, through curriculum approved by TCOLE, to perform law enforcement duties.

18. Section 1701.251 of the Texas Occupations Code provides that TCOLE "shall establish and maintain training programs for officers." Section 1701.253 further requires that TCOLE "shall establish a statewide comprehensive education and training program on civil rights…" and which "covers the laws of [the state of Texas] and of the United States pertaining

EXHIBIT 1

to peace officers" for all licensed law enforcement officers in Texas.

19. Section 1701.352(d) of the Texas OccupationsCode additionally requires that, within 24 months of appointment as a supervisor, all law enforcement officer supervisors receive training regarding supervising officers. Furthermore, sections 1701.307 and 1701.351 provide that, to obtain and maintaina peace officer license in Texas, an officer must satisfactorily meet all TCOLE training andlicensing standards. Through TCOLE, all officers receive training regarding the Texas Penal Code and Code of Criminal Procedure. The basic TCOLE training course provides instruction regarding: the U.S. and Texas Constitutions and the Criminal Justice System; the Code of Criminal Procedure; Arrest, Search and Seizure; the Texas Penal Code; Use of Force- Law and Concepts; Mechanics of Arrest; and Criminal Investigation. This training all Texas peace officers receive through TCOLE teaches officers they may not make an arrest that is not supported by probable cause and may not use objectively unreasonable excessive force when making an arrest.

20. In addition to police academy training, the City's police officers, including Rigoberto Saldivar, undergo at least 40 hours of in-service police training every two years to maintain TCOLE peace officer licenses. Based on my training provided by sources outside the Pasadena Police Department, including Texas police chief training, and my experience interacting with other heads of law enforcement agencies throughout Texas, I have learned the general training TCOLE provides well-prepares officers to reasonably perform the duties entrusted to them.

21. My training includes study of appellate decisions issued by the Fifth Circuit Court of Appeals which confirm my understanding that TCOLE training has consistently been deemed constitutionally sound. I have relied upon the Fifth Circuit Court holdings which show that

EXHIBIT 1

compliance with TCOLE police licensing and training standards both satisfies the minimum standards required under the Constitution and exceeds constitutional requirements for law enforcement training.

22.     All City of Pasadena police officers, including Rigoberto Saldivar when he was a Pasadena officer, are required as a condition of City employment to comply with all TCOLE licensing and training standards. I have never thought or even heard that complying with TCOLE standards is unconstitutional, and I have no reason to believe that is so. I rely on the expertise of TCOLE in performing its function of providing well-qualified law enforcement officers. I have never had reason to believe the training provided to Pasadena officers is constitutionally deficient. All Pasadena police officers, including Rigoberto Saldivar, are trained in TCOLE-approved modules on probable cause, investigatory stops, arrests, and the constitutional limits of use of force in making stops, arrests, and defending themselves and others, among numerous other training modules. Nothing suggested to me that Rigoberto Saldivar's or any other Pasadena officer's training is deficient in any area of law enforcement activities that related in any way to the incident which forms the basis of this lawsuit.

23.     After Pasadena officers successfully complete training through a TCOLE certified police academy and pass the Texas state peace officer examination, Pasadena officers go through a program of on-the-job training called a field training officer (FTO) program. The Pasadena police FTO program utilizes a method of instruction approved by TCOLE. In this segment of supplemental instruction, new officers are extensively supervised with experienced officers who have been specially trained through TCOLE to administer the FTO program.

24.     The FTO program consists of teaching and testing components which require new

EXHIBIT 1

officers to demonstrate their competence before they are permitted to perform police duties without direct supervision. The field training officers are supervised by field training supervisors to assure accountability and compliance with TCOLE standards. I have no reason to believe the Pasadena FTO program is constitutionally deficient.

25. The guidance available to appropriately direct Pasadena officers does not end there. Texas criminal law prohibits all officers, including former officer Saldivar who was indicted in this case, from using excessive force. Texas Penal Code §§ 9.51-9.54 govern law enforcement use of force. Any officer who uses force that does not comply with those provisions of the Texas penal laws is subject to criminal prosecution by the State of Texas. Officer Saldivar could not rationally have believed the City or I could, or would, authorize him to use excessive force that violates the Fourth Amendment. I have no reason to believe these criminal laws are ineffective in enforcing compliance with reasonable force restrictions.

26. The State of Texas has also created, through Chapter 143 of the Texas Local Government Code, police civil service laws that govern the promotion and discipline of police officers in cities like Pasadena in which the voters have adopted state civil service. These civil service laws provide the standards under which all officers must be selected, promoted, and disciplined. In accordance with the decision by voters invoking Texas statutes, Pasadena has adopted Texas state civil service law which provides due process rights to officers and dictates promotional and disciplinary standards of Pasadena officers. The state civil service system provides for various levels of supervisory personnel to monitor the actions of subordinate officers. Promotions are earned through a competitive civil service process and supervisors who fail to perform their duties competently are subject to disciplinary actions and/or demotion.

EXHIBIT 1

I have no reason to believe the Texas police civil service system is constitutionally deficient.

28. Additionally, each Pasadena officer swears and subscribes to an Oath of Office, under oath, that the officer will faithfully execute the duties of the office of Pasadena police officer and to the best of his ability preserve, protect, and defend the Constitution and laws of the United States and the State of Texas. I, and all other Pasadenapolice officers, must also abide by the provisions of the Pasadena City Charter and Code of Ordinances. I have attached a copy of Chapter 30 from the City of Pasadena Code of Ordinances which evidences further training and supervision provided to Pasadena officers. I have no reason to believe Pasadena officers are insufficiently trained or supervised to comply with constitutional requirements. To the contrary, I believe Pasadena officers take their oath to heart, just I have for over two decades.

28. The Pasadena Police Department maintains a published manual which contains police department regulations that have been updated and maintained. The content of the manual states that the provisions of this manual are constrained by, and subordinate to, legal standards, and policy established by Civil Service rules, and municipal civil service law, as codified in Chapter 143 of the Texas Local Government Code.

29. I have found these manual provisions are thorough and comparable to regulations utilized by other police departments in Texas. The manual provisions are like those adopted in other progressive law enforcement agencies in Texas. Through various professional interactions and associations like the Texas Police Chief's Association, I have regularly conferred with other police chiefs regarding administrative matters, including police regulations. The conference includes training and collaboration with chiefs from many different cities.

10

EXHIBIT 1

30. All Pasadena officers must also abide by the written regulations of the Pasadena Police Department, consistent with City Council policy, which includes general and specific provisions that apply to the circumstances of this case. It is the policy of the Pasadena Police Department that officers use only the force that is reasonably necessary to bring an incident under control, while protecting the life of the officer and others. The use of force must be objectively reasonable. Officers may only use that force which a reasonably prudent officer would use under the same or similar circumstances. The Pasadena Police Department's *Use of Force* regulation also provides a reporting requirement when force is used so that facilitates supervisory review of force encounters. I have attached, to my declaration, a copy of the Pasadena Police Department's *Use of Force* regulation, identified as Summary Judgment Exhibit 16. I have no reason to believe these regulations are constitutionally deficient.

31. To further instruct officers and enforce compliance with these sources of training, supervision, and direction, Pasadena officers are supervised through several supervisory ranks within the police department. Supervisors must fulfill Texas civil service, and TCOLE standards and earn promotions through a competitive process that requires experience, testing of competency on legal and professional knowledge, and demonstration of leadership skills. I have no reason to believe the rank supervision program is constitutionally deficient.

32. Furthermore, the Pasadena Police Department maintains an office of professional standards which investigates questions of police misconduct. Pasadena's officers, thus, are aware that violation of law, City policy, and/or a Pasadena Police Department regulation subject an offending officer to disciplinary action, including suspension, demotion, or

EXHIBIT 1

discharge in appropriate circumstances. I have no reason to believe the training and supervision of Rigoberto Saldivar was constitutionally deficient.

33. The Pasadena Police Department had no deficiencies in its law enforcement training and supervision regulations of which I am aware, and I have no reason to believe that any constitutionally deficient police training or supervision program caused a violation of Randy Aviles' or Nathan Schenk's federally protected rights. In the Schenk encounter, Rigoberto Saldivar provided a rational explanation for the reasons he exercised legitimate discretionary law enforcement authority consistent with TCOLE training. The audio and video recording of the Schenk events demonstrate Schenk refused to surrender to custody and physically resisted arrest. Independent police training expert, Captain Albert Rodriguez, evaluated Rigoberto Saldivar's conduct in the Schenk case and found the officer's reactions to Schenk's actions were appropriate under TCOLE training protocols.

34. Pasadena officers are trained through TCOLE, that they must apply force proportional to the need for force. This principle is embodied in the Pasadena Police Department use of force regulation and training regarding application of that regulation. The proportionality principle serves as a general guide for an officer when determining whether a force option may appropriately be used in a particular situation. The proportionality principle provides for consideration of officer and suspect factors and special circumstances that could potentially influence an appropriate method and level of reasonable force based on the totality of the situation. Application of such proportionality provides reasonably measured responses to a criminal suspect's noncompliance with police commands, efforts to evade arrest, and forceful resistance to arrest.

EXHIBIT 1

35. As described above, the reasonableness of force is based the totality of the unique circumstances an officer must confront when those circumstances are dictated by the criminal suspect. In that regard, every situation involving the use of force is factually distinct making it difficult, if even possible, to ascertain a pattern of using unreasonable force in sufficiently comparable circumstances. Even in a general sense, I am not aware of a history of Pasadena police officers unnecessarily employing force excessive to the need. Nor am I aware of any pattern of using excessive force in circumstances that are like the facts of Officer Saldivar's encounters with Schenk or with Aviles. The Schenk and Aviles encounters are not even factually similar. Each of these two events required Officer Saldivar to make discrete, observations and evaluations about the risk of harm he faced and take discretionary reactions appropriately addressing the particular circumstances of the two situations.

36. In Pasadena, officers seldom use force, and in those unusual instances when an officer uses force, most of the time that officer appropriately use justified force. In 2019, Pasadena officers performed 175,283 police-citizen interactions, and used force in 0.03% of those interactions. In 2020, Pasadena officers performed 143,912 police-citizen interactions, and used force in 0.04% of those interactions. In 2021, Pasadena officers performed 143,912 police-citizen interactions, and used force in 0.03% of those interactions. These statistics prove the actual custom in Pasadena 99.97% of the time is to use no force at all.

37. The City has produced Use of Force Reports from 2014 to 2021. In total, the City produced 409 Use of Force Reports completed by all Pasadena police officers between 2014 through 2021; all complaints made against any Pasadena police officer regarding alleged use of greater force than necessary from 2014 through 2018; and all investigations regarding the

EXHIBIT 1

complaints against any Pasadena officer regarding alleged use of greater force than necessary from 2014 through 2018.

38.　　Even if I personally erred in my evaluation of the propriety of Officer Saldivar's reaction to the threat Schenk's actions presented, my decision in that regard in that isolated incident could hardly establish a pervasive governmental City custom of tolerating excessive force such that officers could reasonably believe they could escape the consequences of violating criminal laws and clearly stated written police department regulations prohibiting use of excessive force.

39.　　But I am not aware of evidence that establishes I erred in my evaluation of the propriety of Officer Saldivar's reaction to the threat Schenk's actions presented. On November 21, 2018, when Officer Saldivar shot Schenk I was informed of Schenk's death on the date it occurred. In accordance with the established procedure approved by the Harris County District Attorney, the Pasadena police department in conjunction with the Harris County District Attorney's Office, performed a criminal investigation of the circumstances of Schenk's death, including Officer Saldivar's actions. After the investigation, the District Attorney's Office presented to a Harris County Grand Jury the facts learned through the investigations regarding Nathan Schenk's actions and Officer Saldivar's reactions to Schenk's actions. Those investigations by law enforcement and prosecutorial professionals found Officer Saldivar's actions justified. The Grand Jury, likewise, found Officer Saldivar's actions justified.

40.　　The Pasadena police department also performed an administrative investigation to determine whether Officer Saldivar's actions violated any Pasadena police department regulation. I studied that administrative investigation, including but not limited to video and

EXHIBIT 1

audio/video recordings. That Pasadena Internal Affairs Division police department investigation, Officer Saldivar's immediate supervisor, the Pasadena night shift division commander, the Pasadena assistant police chief, and I all agreed there was no evidence establishing Officer Saldivar's actions improper. There was no evidence that Officer Saldivar violated any Pasadena police department rule, regulation, procedure, or training. Therefore, no legitimate basis existed for me to initiate disciplinary action through the Texas police civil service statutes.

41.   Additionally, due to litigation stemming from the Schenk shooting, law enforcement officer training expert Albert Rodriguez performed a separate professional review and study of Officer Saldivar's actions and found Officer Saldivar's actions were justified and appropriate. Before his retirement, this expert was the commander of the Texas Department of Public Safety law enforcement training academy. Commander Rodriguez has trained many officers, including Texas Rangers so I have no reason to believe he is not imminently qualified to evaluate the propriety of Officer Saldivar's actions. Commander Rodriguez found Officer Saldivar's actions justified and appropriate.

42.   The undisputed facts clearly reveal that before Officer Saldivar initiated any action to detain Schenk, the camera inside Officer Saldivar's police vehicle recorded Schenk drive past a stop sign without stopping, and recorded Schenk driving the motor vehicle on the incorrect side of the road. Either one of those observations warranted Officer Saldivar stopping and temporarily detaining Schenk to investigate whether probable cause supported a criminal charge or citation, and certainly that cluster of apparent violations provided ample justification for Officer Saldivar to detain Schenk. When Schenk exited and fled from his vehicle, Officer

EXHIBIT 1

Saldivar was further justified in stopping and detaining Schenk.

43. The recordings reveal Schenk grabbed a backpack and ran into a neighborhood, weaving through yards. After the foot chase and two taser deployments, Schenk did not submit to arrest. Instead, Schenk assaulted Officer Saldivar. During the struggle with Schenk, Officer Saldivar's body worn camera was knocked off his uniform and fell to the ground. Afterward, the recorded video was dark and did not depict the events that occurred.

44. Based on the information available for me to analyze, any officer could have rationally believed it necessary for Officer Saldivar to shoot Schenk to stop an apparent deadly threat Schenk's actions posed while Schenk, taking off with a backpack with unknown contents, physically fought, reportedly reached at Officer Saldivar's duty belt, and reportedly was physically able to overpower Officer Saldivar. No evidence disproved the apparent serious threat Schenk's reported and recorded actions presented.

45. I believe Officer Saldivar's actions were necessary and appropriate under the circumstances Schenk created, which forced an exhausted Officer Saldivar to react within fractions of seconds during circumstances that were tense, uncertain, and rapidly evolving, without Officer Saldivar enjoying the leisure of more time or more information which may have allowed him to respond differently had Schenk not accelerated the events as he did. Viewing the circumstances objectively, from the standpoint of an objective officer trained through TCOLE in Officer Saldivar's position, certainly any officer could have believed shooting Schenk was a logical defensive reaction that was not clearly forbidden under TCOLE training. Based on my experience, my training, and the information about the Schenk events available to me, I concluded Officer Saldivar's actions were justified. I concluded Schenk's

EXHIBIT 1

decisions and actions led Officer Saldivar to react as he did to Schenk's unlawful actions.

46. Based on my analysis of the audio and video recordings from Officer Saldivar's cameras, I do not think recordings refute Officer Saldivar's explanation of the circumstances that prompted him to fire. I reviewed Officer Saldivar's bodycam footage several times and I did not see Schenk turning or spinning away from Officer Saldivar when Schenk was shot. Objective forensic tests do not support the assertion Schenk turning or spinning away from Officer Saldivar when Schenk was shot. Objective forensic testing established instead that Schenk had gunshot residue on both of his hands, which provides evidence consistent with Officer Saldivar's report Schenk was confronting Officer Saldivar when Officer Saldivar fired. Based on the information I am aware of regarding the Schenk encounter, including but not limited to recordings, objective forensic test results, and explanations provided by Officer Saldivar, I did not conclude Officer Saldivar used force against Schenk that was excessive to the need under the circumstances when Officer Saldivar's reaction is analyzed under TCOLE training protocols and Pasadena police department regulations.

47. During my tenure at the Pasadena police department, the department has consistently investigated each police shooting to determine the merits of each individual shooting. Police shootings inevitably involve analysis of dynamic events specific to each shooting. When an investigation establishes an officer was not justified in firing, that officer has been separated from the Pasadena police department.

48. For example, on July 22, 2011, former Pasadena police officer Michael Martin shot Victor Hernandez during a traffic stop. In that instance, Officer Martin was found to have used excessive force. A copy of that internal investigation is attached to this declaration, identified

EXHIBIT 1

as Summary Judgment Exhibit 28. Upon the finding, Officer Martin was indefinitely suspended (discharged) from the police department. His discharge illustrates the remedial action Pasadena has taken with instances of *proven* excessive force.

49. The information I have provided herein establishes that Pasadena's police officers are well-aware that violation of law, City policy, and/or a Pasadena Police Department regulation subject an offending officer to disciplinary action, including suspension, demotion or termination in appropriate circumstances, as well as possible criminal charges. I have no reason to believe Pasadena has any constitutionally deficient policy, or custom alleged in the Aviles lawsuit. Certainly, I have not authorized, permitted, or maintained any policy I thought was constitutionally suspect.

50. To ensure accountability for police action, the police department openly accepts complaints from anyone about claimed police action. But a mere complaint, like a lawsuit, does not necessarily evidence actual police misconduct. At my direction, the police department investigates complaints of misconduct, as well as non-reported suspected instances of misconduct, to determine whether any evidence shows police misconduct. The way the City of Pasadena and the Pasadena police department handled complaints of alleged police misconduct was consistent with the statutes the State of Texas enacted for such purposes through Chapter 614 of the Texas Government Code. This statute makes it more difficult to discipline an officer based on a citizen complaint when the individual making the complaint does not submit a signed complaint. The procedure provides for investigation of claims of misconduct to determine whether the allegations are substantiated.

EXHIBIT 1

51. I obtained the records attached to my declaration from City of Pasadena official governmental records. These exhibits are an authentic, true and correct copy of the original governmental record of the City of Pasadena. I am familiar with the manner in which these records are created and maintained by virtue of my duties and responsibilities as the City's Chief of Police. These records were made at or near the time noted on the record. It is the regular practice of the City of Pasadena for this type of record to be made by or from information transmitted by persons with knowledge of the matters set forth in the record. I know from viewing such records that it is the regular practice of the City of Pasadena to make and keep these types of records in the course of regularly conducted governmental activity.

52. Lastly, I am not aware of any judgment being entered against the City of Pasadena based upon any police action. Instead, I have seen many dismissal orders and judgments entered in favor of the City, stemming from suits claiming police misconduct. If any judgment had been entered against the City based on police misconduct, I am confident I would have known about it.

May 9, 2024

_____
Joshua Bruegger

EXHIBIT 1