IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KRISTINE SCHENK, individually and as dependent administrator of, and on behalf of, STANLEY SCHENK individually, the ESTATE OF NATHAN ALEXANDER SCHENK, and NATHAN ALEXANDER'S heirs-at-law; and JENNIFER JACOPS-SCHENK, individually, | § § § § § § § § | |
| | § | Civil Action No. 4:20-cv-03799 |
| | § | |
| | § | JURY DEMANDED |
| Plaintiffs, | § § | |
| v. | § § | |
| CITY OF PASADENA, TEXAS, and RIGOBERTO R. SALDIVAR | § § | |
| Defendants. | § § | |

## OFFICER RIGOBERTO SALDIVAR'S DECLARATION

On this day personally appeared Rigoberto Saldivar, who being duly sworn on his oath, declared and stated as follows:

1.      My name is Rigoberto Saldivar. I declare under penalty of perjury in accordance with the laws of the United States of America that the following statements are true and correct. I am over the age of twenty-one and in all other ways qualified and competent to make the statements contained within this declaration. These statements are made of my own personal knowledge because they reflect matters I personally observed or in which I personally participated. I am authorized to make the statements contained herein.

Summary Judgment Exhibit 2, page 1



EXHIBIT 2

2.      On the date of the occurrences which form the basis of this lawsuit, I was employed in the paid service of the City of Pasadena, Texas, as a police officer with the City of Pasadena Police Department. I hold a peace officer license issued under the Texas Occupations Code through the Texas Commission on Law Enforcement (TCOLE). I have successfully completed all TCOLE peace officer training and licensing requirements.

3.      On November 21, 2018, I was on duty as a Pasadena police officer, wearing a police uniform. The uniform I wore displayed patches and a badge that identified me as a police officer. I was operating my assigned marked patrol unit. While on patrol, working the Selective Traffic Enforcement Program (STEP), I performed a traffic stop of a vehicle that failed to stop at a stop sign at the intersection of 6200 Pine Street and 2400 Jana Lane, while traveling eastbound, at about 7:30 p.m. I immediately activated the emergency lights on my police vehicle and I drove behind the vehicle as it drove on the wrong side of the roadway and continued southbound on Red Bluff Road. I continued following behind the vehicle with my emergency police lights activated. The vehicle finally pulled into the Hawks Place Bar located at 4416 Red Bluff Road without signaling the intent to turn there.

4.      Due to the vehicle not stopping sooner and the vehicle driving on the wrong side of the roadway on Jana Lane, I suspected the driver may be under the influence of alcohol or drugs. I exited my patrol car for officer safety and reported, through the police radio, the location of the vehicle stop. I remained behind the open driver's side door of my police vehicle for cover due to the driver's actions. While waiting for the police dispatcher to acknowledge my traffic stop, the man who had been driving the vehicle I stopped (tall white male wearing a black jacket and blue jeans) exited the vehicle.

Summary Judgment Exhibit 2, page 2



EXHIBIT 2

5.     I would later discover the driver's name is Nathan Schenk. When Schenk looked at me and began walking to the front of his vehicle, I shouted several commands to Schenk directing him to stay inside his vehicle, but Schenk ignored my directions and walked to the passenger side of his car, bent over and reached toward the ground. When he did so, I lost sight of a portion of his body. During this time, I moved from behind the door of my police vehicle across the front of my vehicle to try and determine what Schenk was doing. As I moved closer toward him, I asked Schenk what he was doing but he did not respond to my question. I saw Schenk bend down and pick up a dark colored back pack that was next to the front passenger door of the vehicle he had exited. Schenk then began running westbound on Golden Villas Street. I notified dispatch over the police radio that a suspect was running from me, the direction of our travel, and I provided a physical description of the fleeing suspect. Schenk ran northbound, then into a yard, and he appeared to be attempting to jump a wood fence.

6.     I had been trained, through instruction approved by the Texas Commission on Law Enforcement (TCOLE), that a Taser is an appropriate law enforcement tool to use in such circumstances to apprehend a suspect fleeing from an officer. Schenk did not submit to reasonable detention in response to my "command presence," which is the general authority of a police officer exhibiting the regalia of his office while performing law enforcement duties like enforcing traffic and penal laws. Schenk did not submit to reasonable detention despite me yelling several commands to Schenk to stop his flight. Instead, Schenk continued to commit more criminal offenses.



EXHIBIT 2

7.    By then, I had seen Schenk commit traffic offenses, including failing to stop at a stop sign and not promptly stopping when directed to do so by an officer operating a police vehicle. I had also observed Schenk evade detention and arrest by flight from me. Probable cause provided grounds to arrest Schenk, even without confirming that the backpack he carried contained illegal drugs or controlled substances. In accordance with my TCOLE training, I deployed my Taser in an effort to apprehend Schenk. A prong struck Schenk's back but the Taser was ineffective in stopping Schenk's flight. Schenk continued running northbound through the backyard and crossed a lot leading to Jana Lane. As he ran, Schenk was discarding items from his person and the backpack he was carrying during the chase.

8.    I continued to chase Schenk as he ran west approaching the intersection of Pine Avenue and Jana Lane. I broadcast, over the police radio, my locations and reloaded my Taser. I yelled for Schenk to get on the ground, but he ignored my command. I then deployed my Taser a second time, striking Schenk again in his back. This Taser deployment was temporarily effective in stopping Schenk's flight. He fell in the yard located at 2420 Jana Lane. Believing the Taser had been effective on the second deployment and that I had sufficient time to handcuff Schenk while he was still under the effect of the taser, I attempted to place handcuffs on Schenk's wrists. But Schenk resisted handcuffing by extending his arms upward toward me. I reacted to Schenk's movement by grabbing his extended right arm in an attempt to place handcuffs on him. But instead of achieving control of Schenk, he and I ended up face to face on the ground. This was a very dangerous position for me to be in because I was very vulnerable to injury without having a reasonable opportunity to protect myself.

9.    Schenk grabbed me as soon as he and I made contact and Schenk pushed me to the

Summary Judgment Exhibit 2, page 4



EXHIBIT 2

side as if he was trying to flip me onto my back. I struggled with Schenk to protect myself because Schenk was overpowering me. I realized Schenk was strong and was about to get me in an even more vulnerable position, so I released my grasp of his right arm and I rotated off of his body moving into a position where we were head to head with our feet on opposite sides, still on the ground. In this position, I remained at risk of injury. As Schenk and I struggled to use leverage, I was able to trap his right arm and his head in a bear hug with my upper torso on top of his head, from which I attempted to use my body weight to keep Schenk lying on the wet grass.

10.     However, Schenk pushed forward toward me and lifted me off of the ground. Schenk had use of both of his arms and could reach my body. Despite my weight on Schenk's head and upper back, Schenk continued to lift me up and he tried several times to pull my legs underneath him to place me in a mounted position under him. I yelled commands several times for Schenk to stay down on the ground but he refused to comply with any command I stated. I felt Schenk's hands grabbing my duty belt along my gun side, near my magazine pouches where my knife was located.

11.     This altercation remained dynamic, with Schenk's body parts and mine moving rapidly in various unpredictable directions at different instances in time. I was practically exhausted by this protracted physically demanding battle with Schenk. Under these circumstances, in which I had been unable to gain control of Schenk even before I was fatigued to the degree I had become, I feared Schenk may disarm me and use my gun or knife to seriously injure or kill me.

12.     Fearing Schenk was attempting to take control of my knife, I verbally warned Schenk

Summary Judgment Exhibit 2, page 5



EXHIBIT 2

I would shoot him if he did not stay on the ground but Schenk did not heed my warning. He continued pushing me and he was again overpowering me. Schenk lifted me off of the ground and flung me to my right. In these circumstances, I could not maintain my grasp of Schenk anymore, so I released my hold and pushed away from Schenk as hard as I could to create distance between us so I would have a bit more time to take necessary reactionary defensive actions. I still did not know if Schenk had control of my knife.

13.     Even after I pushed Schenk away from me, Schenk was still within approximately five feet from me and I was on the ground. As I tried to raise up onto my knees, I saw Schenk facing me in a standing, but slightly crouched over position, that I would describe as a football stance. From that position, Schenk reached with his right hand toward his waist line. I interpreted Schenk's actions and movements as posing a threat of serious injury to me. I did not view his actions at this moment as merely trying to get away from me. If Schenk had then wanted to escape from me, he could have done so at that instant by running away from me. My observation of the fact that Schenk did not simply flee at this point, and was instead facing me and standing in that position, led me to believe Schenk intended to hurt me.

14.     The movement Schenk was making with his hand appeared to be that of a person drawing a weapon from his waistband. Fearing Schenk was reaching for a weapon to kill or injure me, I drew my handgun and fired shots at Schenk while I was raising onto my knees. I may have still had my left hand on the ground supporting my body at this time.

Summary Judgment Exhibit 2, page 6



EXHIBIT 2

15.    When I saw Schenk fall onto his back, I stood and saw my body-worn-camera on the ground. I picked up the camera and placed it back on my uniform shirt. However, the body-worn-camera would not stay attached to my shirt. I later discovered it was damaged during my physical struggle with Schenk. I broadcasted over the police radio that I had shot Schenk. During this time, I repeatedly directed Schenk to remain on the ground until additional officers arrived on scene, searched and placed handcuffs on Schenk's wrists.

16.    I did not use force that was excessive to the need. In fact, until I shot Schenk, I did not use force that was adequate to meet the need. Before Schenk was shot, I never achieved control of Schenk. Schenk evaded detention and arrest until he intensely resisted arrest. Throughout the entire ordeal, Schenk's actions determined the level and amount of force needed to overcome his violent, criminal resistance to arrest.  Schenk is the individual who controlled the level of force I used because he controlled the level of force that I needed to use to gain control of his actions. The force I needed to use was a mirror reflection of resistance Schenk presented. Schenk made decisions, and took actions, I was required to react to. Therefore, Schenk chose the force necessary to end the conflict.

17.    Before I used any force against Schenk, he evaded arrest by fleeing away from me. During that time when Schenk was merely trying to avoid capture, I used a level of force I believed necessary to apprehend Schenk under the circumstances that existed at that point in time. I was trained through TCOLE approved instruction that use of a Taser and other intermediate weapons would be appropriate to arrest a person evading arrest in comparable circumstances. But when I used that level of force, it proved insufficient for the need because I was not able to arrest Schenk.

EXHIBIT 2

18.    Instead, Schenk elevated the level of force necessary to safely apprehend him by Schenk changing from evading arrest to using force against me to physically resist arrest. Schenk's choice and action in this regard warranted me using a higher level of force to arrest him and to protect me. Therefore, when Schenk forcefully resisted arrest, I used force I believed immediately necessary to protect myself and gain control of Schenk. I adjusted the force I used based on the ineffectiveness of other tactics I had tried to apply that had proven ineffective. I selected the force options I utilized during Schenk's arrest by applying what has generally been identified, in TCOLE instruction, as a use of force continuum. Some TCOLE instructors no longer use the continuum term, but regardless of the term the TCOLE instructor uses to explain the training, the principle is unchanged.

19.    An officer must use force proportional to the need for force. This principle is embodied in the Pasadena *Policies Manual* and training provided through TCOLE. The principle serves as a general guide for an officer when deciding whether a force option may appropriately be used in a particular situation. The proportionality principle provides for consideration of officer and suspect factors and special circumstances that could potentially influence an appropriate method and level of reasonable force based on the totality of the situation. Application of such proportionality provides reasonably measured responses to a criminal suspect's noncompliance with police commands, efforts to evade arrest, and forceful resistance to arrest. This incident evidences my application of the proportionality principle taught through TCOLE instruction I received. I did not use unnecessary force against Schenk that was not proportional to the need for force. The force I used to arrest Schenk and to protect myself was necessary due to Schenk's actions.

Summary Judgment Exhibit 2, page 8



EXHIBIT 2

20.    Based on my training, I have no reason to believe the necessary force I used was excessive to the need under these circumstances. I believe I used reasonable force throughout my encounter with Schenk. During these events, I performed discretionary police actions, within the scope of my police duties, in a manner I believed necessary and consistent with TCOLE training I had received. I am not aware of any law that required me to perform my duties differently. Nothing I have read, heard, or been taught about applying force has informed me that I was required to perform my duties in this case differently.

Executed in Harris County, State of Texas, on January 14, 2022.

_Rigoberto Saldivar_

Declarant Officer Rigoberto Saldivar

EXHIBIT 2