IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KRISTINE SCHENK, individually and as dependent administrator of, and on behalf of, STANLEY SCHENK individually, the ESTATE OF NATHAN ALEXANDER SCHENK, and NATHAN ALEXANDER'S heirs-at-law; and JENNIFER JACOPS-SCHENK, individually, | § § § § § § § | |
| Plaintiffs, | § § | Civil Action No. 4:20-cv-03799 |
| v. | § § | JURY DEMANDED |
| CITY OF PASADENA, TEXAS, and RIGOBERTO R. SALDIVAR | § § § | |
| Defendants. | § § § | |

## DECLARATION OF ALBERT RODRIGUEZ

My name is Albert Rodriguez. On this 13th day of January, 2022, I declare under penalty of perjury under the laws of the United States of America that the statements I have made in the two reports attached hereto are true and correct.

I am over the age of twenty-one years, I have not been convicted of a felony or crime involving moral turpitude, and I am in all ways qualified and competent to make the statements I made within these reports. The statements I made in these reports are true and correct and I am authorized to make them. The statements I made within these reports are based upon my own personal knowledge and relate to matters in which I personally participated or which I personally observed.

Albert Rodriguez

**EXHIBIT 7**

# REPORT OF ALBERT RODRIGUEZ

Re:    Civil Action No. 4:20-cv-03 799 No. 4:20-cv-03 799; Kristine Schenk, Individually and as Dependent Administrator of and on behalf of Stanley Schenk, Individually, the Estate of Nathan Alexander Schenk, and Nathan Alexander Schenk's Heirs-at Law; and Jennifer Jacops-Schenk, Individually, *Plaintiffs* v. City of Pasadena, Texas; and Rigoberto R. Saldivar, *Defendants*; In the United States District Court for the Southern District of Texas, Houston Division

## Introduction

1. My name is Albert Rodriguez.  I have been asked by the Law Firm of Lewis Brisbois Bisgaard & Smith, LLP, more specifically Attorney Norman Giles, to review the above styled case and render independent professional opinions on law enforcement training, use of force, arrest, search, and seizure procedures, and policies and procedures.  My opinions are based on the documents provided to me in this case to date, as well as my training, education, experience and research in the field of law enforcement.  I realize that the discovery process is ongoing in this case and I will supplement, amend or modify my report as appropriate based on additional information that is provided to me, including deposition testimony and/or documents.

## Summary of Qualifications

2. I retired on September 31, 2009 from the Texas Department of Public Safety (DPS) with the rank of Commander of the Training Academy.  I held that position for approximately sixteen (16) years.  After retiring, I was commissioned as a Special Ranger by the Texas Department of Public Safety.  In January of 2010, I was hired by the Texas Alcoholic Beverage Commission as a Lieutenant/Internal Affairs Investigator. In that position, I investigated police officer misconduct.  In May 2014, I was promoted to the rank of Captain in the Training Division and in June 2021, I transferred back to the Office of Professional Responsibility with the rank of Captain.  I oversee the use of force training for all of the State Police Officers commissioned by the TABC as well as instruct in the area of police tactics, use of force and related topic areas.  I instruct police officers including TABC Agents on Arrest, Search, Seizure, Use of Force Concepts, and conduct presentations for Grand Juries to assist them in evaluating police officer procedures and responses.

EXHIBIT 7

3. I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977. I served in the Highway Patrol Service as a State Trooper and was then promoted to the rank of Training Officer at the Training Academy. At the Training Academy, I was promoted to Staff Development Specialist I, Lieutenant and ultimately to the rank of Commander of the DPS Training Academy in Austin, Texas. I held that position from 1993 to September 30, 2009. I was employed by the DPS as a law enforcement officer and law enforcement trainer for over thirty-two (32) years and was and continue to be a licensed Texas Peace Officer. While at the training academy, I served at different times as the Department's Arrest and Control Tactics Instructor, Firearms Instructor, Use of Oleoresin Capsicum (pepper spray) Instructor, Straight and Expandable Baton Instructor, Taser Instructor, Use of Force Concepts and Theories Instructor. I have instructed thousands of law enforcement and detention officers throughout the United States, Canada, and Mexico. In addition, I met all of the standards for peace officer licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education, which has changed its name to the Texas Commission on Law Enforcement.

4. I hold a Bachelor's Degree in Education from Texas A&I (now A&M) University in Kingsville, Texas. I also hold Basic, Intermediate, Advanced, Instructors', Firearms' and Masters' certifications from the Texas Commission on Law Enforcement. I am a graduate of the 147th FBI National Academy in Quantico, Virginia. I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States.

5. I have attached a copy of my current CV to this report, which summarizes my education, training and experience. I have studied, attended seminars regarding, and instructed classes pertaining to the issues of law enforcement policies and procedures, use of force and deadly force, detention and arrest procedure, use of force in jail settings, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, application of constitutional law and officer safety. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, police policies and procedures, use of force in jail settings, application of reasonable suspicion and probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

6. I am or have been a member of the FBI National Academy Graduates Association, Texas Police Association, Texas Sheriff's Association, and International Law Enforcement Educators and Trainers Association. I have served on the Southwest Texas State University Criminal Justice Advisory Board,

EXHIBIT 7

Texas Alcoholic Beverage Commission, and the Austin Community College Law Enforcement Advisory Board. I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences in Austin, Texas; and various other locations throughout the United States, Canada, and Mexico. I instruct and consult with the Texas Rangers' and law enforcement agencies throughout the United States on use of force and deadly force.

7. In various settings over many years, I have spoken with many people about law enforcement operations matters and that experience leads me to conclude I possess technical, professional, and other specialized knowledge that will assist laypersons in understanding the facts and issues in the above-captioned lawsuit. More specifically, my education, training, and experience provides me with technical, professional, and other specialized knowledge which will assist a lay person in understanding how law enforcement officers are trained, why they are trained as they are, and why it is necessary to train officers as they are. I have found that this knowledge is key to reaching a reliable evaluation of a law enforcement officers' conduct. I have conferred with many other law enforcement experts regarding police training, supervision, law enforcement policies and procedures, police operations, arrest, search, and seizure, arrest and control tactics, and evaluations thereof. My many associations with other professionals has informed me that the facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in reaching reliable conclusions therefrom.

8. My attached resume contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training, and skills.

**Research and Assessment**

9. The conclusions, opinions and observations in this report are based on having reviewed and researched the following documents and materials: 1) Affidavit of Rigoberto R. Saldivar, 2) Harris County District Attorney's letter to Pasadena Police Department reference Grand Jury "No Bill" of Officer Saldivar dated November 13, 2019, 4) Taser Deployment Log, 5) Attorney General's Custodial Death Report, 6) Stolen vehicle affidavit of Daniel Minshaw (Ford Focus driven by Schenk) 7) Pasadena Police Department Internal Affairs Investigation, 8) Officer Saldivar's Garrity statement, 9) Lieutenant McGill's correspondence reference exoneration of Officer Saldivar's actions, 10) Diagram of incident area, 11) Toxicology Report of Schenk, 12) Autopsy photographs, 13) Harris County Institute of Forensic Science Autopsy Report, 14) Photographs of Officer Saldivar's handgun and body worn camera, 15) Pasadena Police Department Internal Affairs interview of Officer Saldivar, 16) 911 Call reporting gunshots fired, 17)

Channel 1 & 2 Radio Traffic, 18) Report of Arthur Warren Joyce, 19) Report of Jeremy Bauer, 20) Report of Scot A DeFoe, 21) Deposition transcript of City Representative Erwin Gonzalez (academy instructor), 22) Deposition transcript of Sergeant Craig Hamilton, 23) Deposition transcript of Assistant Chief Jerry Wright, 24) Deposition transcript Lieutenant Joe McGill, 25) Deposition transcript of Detective Michael Cooper, 25) Deposition transcript of Chief Joshua Breugger, 27) Officer Saldivar's body worn camera recording, 28) Officer Saldivar's in-car camera recording, 29) United States Court of Appeals, Fifth Circuit; *Maria Del Rosario C. Fraire, Individually and as Next Friend for Myra Fraire and Juan Antonio Fraire, Minor Children, and Josefa Esquivel Fraire, v City of Arlington and James W. Lowery, Jr*., 30) United States Court of Appeals, Fifth Circuit; *Harry Hathaway Individually and as Personal Representative of the Estate of Jon-Eric Hathaway, Deceased; Erica Hathaway, Individually and as Personal Representative of the Estate of Jon-Eric Hathaway, Deceased, v Steven Bazany,* 31) United States Court of Appeals, Fifth Circuit; *Debera Mace, Individually and as representative of the Estate of Jacob Vincent Revill, deceased, v City of Palestine;* Pat Henderson, 32) United States Court of Appeals, Fifth Circuit; *Maria Ontiveros, Individually, and as Next Friend of Modesto Ontiveros, Deceased; Martha Duran; Modesto Ontiveros Jr.; and Erika Zamora, v City of Rosenberg, Texas, Robert Garcia, Chief of Police; and Dewayne Logan, Officer,* 33) United States Court of Appeals, Fifth Circuit; Irene Reese, etc., et al., v Steve Anderson, et al., 34) United States Court of Appeals, Fifth Circuit; *Carolyn R. Young, Individually and As Next Friend of Her Minor Child, Nikiya A. Young, and As Community Survivor of David A. Young, Deceased, v The City of Killen, Texas, etc., et al*., and *Kenneth Olson,* 35) Study titled: Police Responses to Officer Involved Shootings by David Klinger, 36) Force Science Website, 37) Force Science News titled, Force Science pinpoints human dynamics of police-on-police shootings, 38) Law Enforcement Executive Forum article titled, No Recall of Weapon Discharge by Alexis Artwohl, Ph.D. 39) Research Forum article titled, Perceptual and Memory Distortion During Officer Involved Shooting by Alexis Artwohl, 40) Texas Code of Criminal Procedure, 41) Texas Transportation Code, 42) Texas Penal Code, 43) Texas Commission on Law Enforcement Basic Peace Officer Training Curriculum, 44) the Texas Commission on Law Enforcement Intermediate Use of Force Training Curriculum, 45) United States Supreme Court decision in *Graham vs Connor*, 46) United States Supreme Court decision in *Saucier vs Katz,* 47) United States Supreme Court decision in *Mullenix vs Luna, Beatrice Luna, individually and as representative of the Estate of Israel Leija, Jr., et al*., 48) United States Supreme Court decision in *Terry v Ohio*, 49) *Roberts v. City of Shreveport*, United States Court of Appeals for the Fifth Circuit, No. 03-30824, 50) *Benavides vs County of Wilson*, 955 F. 2d 968 (5th Cir.) 51) *Huong v. City of Port Arthur*, 961 F. Supp. 1003 (E.D. Tex. 1997),

52) Scene photographs, 53) Deposition transcript of Retired Officer Rigoberto R. Saldivar, and 54) Supreme Court decision in Scott v Harris.

## Summary of Relevant Facts

10. On Wednesday, November 21, 2018, Pasadena Police Officer Rigoberto Saldivar was working a Selective Traffic Enforcement (STEP) shift starting at 6:00 p.m. and ending at 10:00 p.m. The STEP program involves the enforcement of traffic laws. Officer Saldivar was driving an assigned marked patrol vehicle, and was wearing a Pasadena Police Department regulation uniform with police patches and a badge that identified him as a law enforcement officer. At approximately 7:30 p.m., Officer Saldivar was at the intersection of Pine Avenue and Jana Lane where he observed a silver Ford Focus four-door passenger car, displaying license plate TX FGD 5246, traveling eastbound on Pine Avenue. The Ford Focus approached the stop sign at the intersection of Pine Avenue and Jana Lane, and did not stop. The driver of the Ford Focus was later identified as Nathan Alexander Schenk (hereinafter, "Schenk").

11. Schenk turned eastbound onto Jana Lane toward Red Bluff Road. Officer Saldivar activated the patrol vehicle's emergency lights and pulled in behind the Ford Focus with the intent of conducting a traffic stop. Schenk drove the Ford Focus on the wrong side of the roadway on Jana Lane toward Red Bluff Road. Officer Saldivar noticed Schenk was making no attempt to stop, nor providing any indicator of pulling over and stopping, despite Officer Saldivar following him in the marked patrol unit's red and blue lights activated.

12. Schenk drove the Ford Focus to the intersection of Red Bluff Road and stopped on the wrong side of the roadway, and then turned southbound on Red Bluff Road. Officer Saldivar continued to follow the Ford Focus with the patrol vehicle's emergency lights continuously activated. Schenk, at one point, drove into the Hawks Place Bar parking lot, located at 4416 Red Bluff Road. Officer Saldivar observed that Schenk failed to use the turn indicator to signal his intent to turn into the parking lot.

13. Schenk stopped the Ford Focus in the parking lot, but not within a parking space. Schenk positioned the Ford Focus toward the entrance/exit, which leads to Golden Villas Street. The in-car camera recording from Officer Saldivar's patrol vehicle shows Schenk reaching to the passenger side of the vehicle. Schenk reached toward the passenger side several times prior to Officer Saldivar attempting to make verbal contact with him. Officer Saldivar does not report having seen Schenk reaching toward the passenger side of the car.

*Expert Opinion Report of Albert Rodriguez*

Pasadena_20537

EXHIBIT 7

14. Officer Saldivar reportedly believed Schenk was possibly under the influence of alcohol or drug due to Schenk's dangerous driving and disregard for the public's safety. Officer Saldivar stepped out of the patrol vehicle and remained behind the driver's door for cover. Officer Saldivar remaining behind the driver's door is a modified "High Risk" traffic stop procedure commonly used when suspicious circumstances exist during a traffic stop. Officer Saldivar informed the dispatcher that he was out on a traffic stop and provided his location. Officer Saldivar reported that he normally uses the Mobile Data Computer to inform the dispatcher of his location and the activity he is performing, however in this case, because of Schenk's reckless driving and disregard for police presence, Officer Saldivar wanted to maintain his focus on Schenk.

15. Officer Saldivar observed Schenk exit the Ford Focus while Officer Saldivar waited for the dispatcher to acknowledge his notification of being on a traffic stop. Officer Saldivar described Schenk as a tall white male wearing a black jacket and blue jeans. Schenk stepped out of the Ford Focus, looked back at Officer Saldivar, closed the car door, walked to the front of car, and then walked to the passenger side. Officer Saldivar told Schenk to stay inside his car and asked him what he was doing. Officer Saldivar was not able to fully see Schenk's body because Schenk was moving across the front of the Ford Focus, and then to the passenger side.

16. Officer Saldivar shouted several commands to Schenk, instructing him to stay in his car. Schenk did not comply with Officer Saldivar's verbal commands. Officer Saldivar moved from behind the patrol vehicle's driver door, and moved across the front of the patrol vehicle in an attempt to determine what Schenk was doing and to fully observe him. Officer Saldivar asked Schenk what he was doing as Officer Saldivar moved toward him. Schenk did not respond.

17. Officer Saldivar observed Schenk bend down and pick up a dark backpack that was next to the Ford Focus' front passenger door. Schenk then began running westbound on Golden Villas Street after picking up the backpack. Officer Saldivar immediately notified, via police radio, the dispatcher of Schenk evading detention, and Officer Saldivar provided the direction Schenk was running, and a description of Schenk. Officer Saldivar then observed Schenk running northbound between an alley on the east side of a private residence located at 2510 Golden Villas Street. Officer Saldivar managed to catch up with Schenk even though Schenk had gotten a head start on him. Approximately 18 seconds after Schenk began to run, Officer Saldivar deployed the Taser for the first time in an attempt to stop Schenk. Schenk did not react to the Taser deployment, which led Officer Saldivar to believe the Taser had been ineffective.

6

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

18. Schenk continued running northbound through the backyard of a private residence and across an open lot leading to Jana Lane.  Officer Saldivar broadcasted his new pursuit location, and reloaded the Taser with another cartridge.  Officer Saldivar directed Schenk to get on the ground.  Schenk did not comply with Officer Saldivar's verbal commands.  Officer Saldivar deployed his Taser a second time, approximately 45 seconds after Schenk commenced to evade, and approximately 27 seconds after the first Taser deployment.  The Taser probes struck Schenk in the back.  Schenk fell to the ground, on his back, in the front yard of 2420 Jana Lane.

19. At the time, Officer Saldivar believed the Taser deployment had been effective, and that he had time to physically control and handcuff Schenk while under the effects of the Taser's neuromuscular incapacitation.  At this point, Officer Saldivar had been running after Schenk for approximately 45 seconds. Officer Saldivar made physical contact with Schenk in an attempt to control and handcuff him.  As Officer Saldivar was attempting to take Schenk into custody, Schenk extended his arms upward toward Officer Saldivar.  Officer Saldivar grabbed Schenk's extended right arm in an attempt to execute an arm bar mechanical control technique and handcuff him.  Officer Saldivar reported that Schenk was so strong, he was unable to place the arm bar on him because of both Schenk's resistance, and his strength.  Officer Saldivar fell to the ground.  Schenk immediately grabbed Officer Saldivar, and commenced to push Officer Saldivar to the side, as if to try to flip Officer Saldivar onto his back.  Officer Saldivar reported that he was being overpowered by Schenk, as he continued to realize that Schenk was extremely strong.

20. Officer Saldivar released Schenk's right arm and rotated off of Schenk's body, moving into a position where they were both head-to-head, but still on the ground.  As Officer Saldivar continued to struggle for leverage, Officer Saldivar was able to trap Schenk's right arm and head in a bear hug type of hold, with his upper torso on top of Schenk's head.  Officer Saldivar was attempting to use his body weight to keep Schenk lying flat on the wet grass.  Schenk was able to push forward toward Officer Saldivar and lift him off the ground.  Schenk used both his arms so he could reach around Officer Saldivar's body. Officer Saldivar had his complete weight on Schenk's head and upper back and Schenk was still able to lift, and continued to lift, Officer Saldivar up.  Schenk tried several times to pull Officer Saldivar's legs underneath him in an attempt to place Officer Saldivar in a mounted position below him.  Officer Saldivar reportedly felt exhausted as a result of the foot pursuit and physical struggle with Schenk.

21. Officer Saldivar continued to issue Schenk commands, to no avail.  Officer Saldivar could feel Schenk's hand grab at his police duty belt along Officer Saldivar's handgun side, and near Officer Saldivar's

handgun ammunition magazine pouches. In the area of the ammunition magazine pouches, Officer Saldivar kept a knife, and he was fully aware of the knife being there. Officer Saldivar feared that Schenk would disarm him of one of his weapons. Saldivar repeatedly ordered Schenk to stay on the ground or he would shoot him. Schenk continued to push forward, and was able to push Officer Saldivar to his right. Officer Saldivar, reportedly exhausted from the struggle and foot pursuit, released his hold on Schenk, and pushed away from Schenk as hard as he could in order to get away from Schenk, and to create distance between he and Schenk. Officer Saldivar stated he recalls attempting to stand up, but at that point, he did not know if Schenk had removed his knife from his duty belt. Officer Saldivar believed that he may have been on his knees, but was not sure, and that Schenk was approximately five (5) feet away.

22. Officer Saldivar stated he feared for his life because of Schenk's life-threatening actions, more specifically, Schenk grabbing at his duty belt, Schenk overpowering him, and Officer Saldivar's level of exhaustion. Officer Saldivar warned Schenk that he was going to shoot him if he did not stay on the ground. Schenk continued to assault Officer Saldivar by pushing him, as Schenk continued to overpower Officer Saldivar. Schenk was able to lift Officer Saldivar off the ground, and to sling him to Officer Saldivar's right. Officer Saldivar was reportedly exhausted and could no longer physically attempt to control Schenk or defend himself against Schenk's threatening actions. In addition, Officer Saldivar was unaware of whether Schenk had managed to access his knife, or if he had it in his possession.

23. Officer Saldivar observed Schenk facing him in a standing position, but in a slightly crouched posture. Officer Saldivar observed Schenk commence to reach for his waistline with his right hand. Officer Saldivar was on the ground, an estimated distance of approximately five (5) feet away from Schenk. The events were occurring very quickly, and Officer Saldivar recalls, to a certain degree, attempting to get up from the ground and up to his knees. Officer Saldivar observed Schenk was not attempting to flee, but was instead in close proximity to Officer Saldivar. Because of Schenk's previous actions, posture, movements, and not attempting to flee, Officer Saldivar reportedly believed that Schenk was in the process of attempting to cause Officer Saldivar serious harm, or to kill him.

24. Some of the events were occurring simultaneously and quickly. The totality of the circumstances, and Schenk reaching for his waistline, reportedly led Officer Saldivar to believe Schenk was drawing a weapon and could be in possession of his knife. Officer Saldivar stated he feared for his life, and as a last resort, quickly unholstered his handgun and discharged gunshots at Schenk. Officer Saldivar reportedly believed that at the time he discharged the shots, he was getting up to his knees and his left hand

could still have been on the ground supporting his body, but he was not sure of his exact position or posture at the time.

25. Officer Saldivar observed Schenk fall to the ground, on his back, and Officer Saldivar stood up, or raised up, from whatever position he was in. Schenk attempted to stand up and Officer Saldivar warned him that he would shoot him again if he did so. Schenk remained on the ground. Officer Saldivar, even though he was exhausted, managed to broadcast that shots had been fired. During this time, Schenk tried to stand up on two other occasions, and Officer Saldivar yelled at him to stay down. Officer Saldivar said he was so exhausted, and believed that he could not, in any manner, physically handle or defend himself against Schenk, if Schenk stood up and attacked him again. Officer Saldivar continued to yell commands at Schenk not to stand up. Officer Saldivar used profanity when addressing Schenk in an attempt to deter Schenk from standing up.

26. Officer Salazar was the first other officer to arrive on the scene. Officer Salazar handcuffed Schenk and promptly requested emergency medical services (EMS). Acadian ambulance was dispatched and arrived. Schenk was pronounced deceased at 7:48 p.m.

27. The Pasadena Police Department immediately assigned administrative and criminal investigative teams to the scene. The Harris County District Attorney's Public Integrity Team and the Harris Medical Examiner's Office (Harris County Institute of Forensic Science -HCIFS) were also contacted to respond to the scene. Assistant District Attorney Johnson and Investigator Field arrived at approximately 9:25 p.m. HCIFS Investigator Godfrey arrived at 9:31 p.m., and conducted a cursory investigation. Investigator Godfrey processed the deceased and identified him as Nathan Schenk. The Harris County District Attorney's, Medical Examiner's, and Pasadena Police Department's Investigative Teams conducted a walk-through interview, at the scene, with Officer Saldivar.

28. The investigation revealed that Officer Saldivar had discharged five (5) shots at Schenk, striking him three (3) times, with two (2) misses. An autopsy was performed. The toxicology report showed the presence of Tetrahydrocannabinol (Marijuana), and Meprobamate, a barbiturate, in Schenk's blood specimen. Pills, pill containers, and a jar containing Marijuana were found in the route Schenk had taken during the foot pursuit. Schenk was found to be in possession of numerous illegal narcotics (prescription pills), and he had more than $8,000.00 in various currencies in his backpack, pants pockets, and wallet; 5,880.00 in the backpack, and $3,034.26 from Schenk's pants pockets and wallet. It was suspected that

*Expert Opinion Report of Albert Rodriguez*

**EXHIBIT 7**

Schenk was distributing narcotics, and evaded, resisted, and assaulted Officer Saldivar in order to avoid arrest.

29. The Ford Focus had originally been reported stolen.  The investigation revealed that the car had been taken from the JC Penny's parking lot sometime between 5:00 p.m. and 9:00 p.m., on November 21, 2018.  It was later determined that the Ford Focus had not been stolen, rather, the owner had allowed Schenk to borrow it for a time.  The Ford Focus was reported stolen due to Schenk not returning the vehicle to its owner.  It was later learned that the owner of the Ford Focus had purchased prescription drugs from Schenk.

30. Detective Michael Cooper and Sergeant Skripka reported seeing, in Officer Saldivar's body worn camera recording, Schenk on the ground, on his hands and knees, at the time he was shot by Officer Saldivar.  Chief Joshua Breugger, Assistant Chief Jerry Wright, Lieutenant Joe McGill, and Sergeant Craig Hamilton testified that in observing the recording numerous times, they could not determine Schenk's posture at the time of the shooting, and more specifically, they could not see Schenk on his hands and knees at the time of the shooting.

31. The investigative package was submitted to the Harris County District Attorney's Office, to include Detective Cooper's statement believing that Schenk was on his hands and knees at the time he was shot.  The available video recordings of the incident were also submitted to the Harris County District Attorney's Office.  On November 13, 2019, the Harris County District Attorney's Office sent a letter to the Pasadena Police Department informing them that the *"....police involved incident has been presented to the* **184*th* Judicial District Grand Jury***.***  The case was presented on **November 12, 2019***, and the Grand Jury returned a* **No Bill***."*

32. Officer Saldivar retired from the Pasadena Police Department on July 9, 2021.

**Standard of Review**

33. It is my customary practice to evaluate the appropriateness of police conduct on a case-by-case basis, using the reasonable force standard under which law enforcement officers are trained.  I analyzed Officer Saldivar's actions under the standard of how law enforcement officers are trained to respond to generally comparable situations, with the understanding that all such situations are different and unpredictable, so I certainly do not claim this interaction is the same as any other I am aware of.  My objective analysis involves evaluating how any well-trained and reasonable law enforcement officer, not necessarily just Officer Saldivar, could reasonably be expected to respond when faced with Schenk's

*Expert Opinion Report of Albert Rodriguez*

10

EXHIBIT 7

unlawful and threatening actions.  My analysis includes an evaluation of the totality of the circumstances, as could reasonably be perceived by a well-trained law enforcement officer, at the time Officer Saldivar exercised his duties and authorities.  Texas police officers must complete the Texas Commission on Law Enforcement (hereinafter, "TCOLE") legislatively required training, and to attend continuing education and training.  The records reviewed reveal that Officer Saldivar, at the time, was a Texas Licensed Police Officer.  He completed and met all TCOLE training and licensing requirements.  Officer Saldivar, at the time of this incident, held Basic, Intermediate, Advanced, and Master's Peace Officer Certifications.  The Master's certification is the highest level of training and certification that can be obtained by a law enforcement officer in Texas.

34. In 1989, the United States Supreme Court, in the decision of *Graham v Connor*, applied the objective standard to a force situation, and further established that reasonable force must be judged objectively.  The Court's analysis began by considering the suspect's Fourth Amendment right to remain free from any unreasonable seizure, against the government's interest in maintaining order through effective law enforcement.  The Court noted that determining the objective reasonableness for the use of force must be fact specific and established the following four, nonexclusive, components for determining reasonableness:

- Judged from the perspective of a reasonable officer based on the same or similar facts and circumstances,
- Examined through the eyes of an officer on the scene at the time the force was applied rather than 20/20 hindsight,
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation,
- Based on the knowledge that the officer acted properly under the established law at the time,

35. The *Graham v Connor* decision, in part, stated that because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including:

1) The offenses committed and/or being committed by Schenk, as perceived by a reasonable law enforcement officer on the scene at the time Officer Saldivar was required to deploy self-defense measures,

*Expert Opinion Report of Albert Rodriguez*

11

EXHIBIT 7

2) Whether it objectively appeared to a reasonable officer on the scene, at the time, presented a danger to Officer Saldivar or others,

3) Whether it objectively appeared Schenk was resisting or evading arrest, at the time force was deployed

36. I analyzed and evaluated Officer Saldivar's actions in connection with Scheck, pursuant to law enforcement training on the United States Supreme Court decision in *Graham v Connor,* and the court decisions listed in the "Research and Assessment Section" of this report, the Texas Penal Code, and the Texas Code of Criminal Procedure. I have consistently found that the general manner in which law enforcement officers are trained on the use of force provides a valid, objective means for evaluating any officer's conduct, because such training is based upon constitutional and statutory standards, and reflects that which a reasonable officer could have reasonably believed appropriate. Law enforcement training involves both legal and practical considerations pertaining to how officers may appropriately apply the Fourth Amendment's constraints in real-life law enforcement situations, therefore, it is extremely useful for the purposes of identifying how and why a reasonable police officer, may have appropriately responded, to a particular use of force situation.

37. I am familiar with, and instruct, the TCOLE Use of Force Training Standards, which include the constitutional standards, to law enforcement officers. All officers, including Officer Saldivar, are trained that officers may only use objectively reasonable force when encountering resistance and threats, as a result of successfully completing the TCOLE legislatively mandated law enforcement training curriculum. The general content of law enforcement training regarding use of force is primarily based upon decisions of the United States courts interpreting the Fourth Amendment. I study, and use as a resource when providing instruction to officers, federal court decisions of the United States Supreme Court informed by, and consistent with, accepted research regarding law enforcement protocol. While I do not propose to offer any opinion on the law, because my duties involve training law enforcement officers, I often read court decisions pertaining to law enforcement action, and I also use judicial decisions to assist me in providing training to law enforcement officers. Therefore, I can provide expert testimony on the standard utilized in training police officers as to both tactical considerations, as well as, the legal parameters officers are taught governs their conduct.

38. The objective analysis considers the fact that law enforcement officers, at times, are required to make split second decisions in tense, dangerous and rapidly evolving circumstances, as was the case in this

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

situation. Furthermore, the potential consequences of officer inaction are extremely important to understand in order to objectively evaluate a police officer's actions in any given law enforcement arrest situation. It is not uncommon for persons to incorrectly evaluate an officer's actions subjectively based on information known only after the fact, or speculative interpretations about facts. The analysis can only be appropriately conducted from the vantage point of a reasonable police officer on the scene.

39. Lastly, I'm presently a police officer, law enforcement trainer, and supervisor, and I interact with and train police officers on a daily basis. My opinions and observations are presented from the viewpoint of contemporary tactics and concepts currently being taught to law enforcement officers.

## **Observations and Opinions**

40. On Wednesday, November 21, 2018, at approximately 7:30 p.m., Officer Saldivar observed Schenk commit a traffic offense in violation of the Texas Transportation Code Section 545.151:

> Vehicle Approaching or Entering Intersection
>
> (a) *"An operator approaching an intersection: (1) shall stop, yield, and grant immediate use of the intersection: (A) in obedience to an official traffic-control device, including a stop sign or yield right-of-way sign."*

41. After Officer Saldivar initiated traffic enforcement procedures by activating the patrol unit's emergency lights with the intent of conducting a traffic stop, Schenk began driving the Ford Focus on the wrong side of the road, in violation of Texas Transportation Code 545.051:

> Driving on Right Side of Roadway
>
> (a) *"An operator on a roadway of sufficient width shall drive on the right half of the roadway, unless: (1) the operator is passing another vehicle; (2) an obstruction necessitates moving the vehicle left of the center of the roadway and the operator yields the right-of-way to a vehicle that……*
>
> (b) *An operator of a vehicle on a roadway moving more slowly than the normal speed of other vehicles at the time and place under the existing conditions shall drive in the right-hand lane available for vehicles, or as close as practical to the right-hand curb or edge of the roadway, unless the operator…..."*

42. Officer Saldivar continued to follow the car driven by Schenk, and subsequently observed Schenk turn into a parking lot without signaling the intent to turn, in violation of Texas Transportation Code Section 545.104:

> Signaling Turns; Use of Turn Signals
>
> *"An operator shall use the signal authorized by Section 545.106 to indicate an intention to turn, change lanes, or start from a parked position. (b) An operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn."*

43. Schenk finally stopped the car, exited, failed to comply with Officer Saldivar's commands, picked a dark backpack up from the ground, and fled, in violation of Texas Penal Code Section 38.04:

> Evading Arrest or Detention:
>
> (a) *"A person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting to lawfully arrest or detain him."*

44. Officer Saldivar initiated a foot pursuit in an attempt to take Schenk into custody. Officer Saldivar's response to Schenk's unlawful actions was within the course and scope of his law enforcement authority, pursuant to law enforcement training on the Texas Code of Criminal Procedure, Article 2.13, *DUTIES AND POWERS*, "*It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case, where he is authorized by the provision of this code, interfere without a warrant to prevent and suppress crime.*" Officer Saldivar followed his law enforcement training by responding to Schenk's unlawful actions for the purpose of preventing and suppressing crime, and more specifically, for the public's safety.

45. Texas law enforcement officers receive comprehensive training and education on the Use of Force and Civil Rights. Officers, at times, are placed in situations in which force and/or deadly force is necessary to protect their own lives, the lives of others, and/or to effectuate arrests of individuals that are threatening human life. Officers are trained that the use of objectively reasonable force is within the course and scope of a law enforcement officer's authority when encountering resistance and/or threats. When law enforcement officers are presented with resistance and/or a threat of serious bodily injury and/or death, the use of force and deadly force is appropriate, pursuant to law enforcement training. More specifically, law enforcement officers are trained to understand that the use of deadly force by law enforcement officers is

within the course and scope of their authority, and not a violation of civil rights, when said force is in compliance with:

A. Texas Penal Code Section 9.31, Self-Defense - *"(a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor <u>reasonably believes</u> the force is <u>immediately necessary</u> to protect the actor against the other's use or attempted use of unlawful force."*

B. Texas Penal Code, Section 9.32. Deadly Force in Defense of Person, *"(a) A person is justified in using deadly force against another: (3) when and to the degree he <u>reasonably believes the deadly force is immediately necessary</u>: (A) to protect himself against the other's use or attempted use of unlawful deadly force; or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery."*

C) Texas Penal Code Section 9.51, Arrest and Search. *"(c) A peace officer is justified in using deadly force against another when and to the degree the peace officer <u>reasonably believes the deadly force is immediately necessary</u> to make an arrest, or to prevent escape after arrest, if the use of force would have been justified under Subjection (a) and: (1) the actor reasonably believes the conduct for which the arrest is authorized included the use or attempted use of deadly force; or (2) the actor reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the actor or another if the arrest is delayed."*

D) United States Supreme Court decision in *Graham vs. Connor*

46. Texas Peace Officers are trained, as was Officer Saldivar, that the aforementioned United States Supreme Court decision and Texas Penal Code statutes are the guiding law and principles on the use of force and lethal force. I personally instruct law enforcement officers on the dictates of *Graham v Connor*, and the Texas Penal Code. As I previously mentioned, Officer Saldivar's actions were analyzed pursuant to training I have received, and training I routinely provide, regarding police application of those Constitutional and Texas Penal Code authorities during dynamic law enforcement situations, like that evidenced here.

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

47. Officer Saldivar was called upon to respond to a dangerous and rapidly evolving situation, and he responded in accordance with accepted training and authority as a law enforcement officer. Officer Saldivar's actions in attempting to seize, and seizing Schenk, while utilizing permissible force to arrest him and stop the threat of bodily injury, and serious bodily injury, was also within the parameters of his law enforcement authority. Objective law enforcement trainers would undoubtedly concur that Officer Saldivar's actions were performed within the scope of his law enforcement authority. Enforcing traffic and criminal laws, and then having to resort to a reasonable degree of force in self-defense and to effectuate Schenk's arrest, is well within the course and scope of a law enforcement officer's duties and responsibilities.

48. The analysis of Officer Saldivar's actions also involves taking into consideration that in the law enforcement profession, there are a virtually unlimited number of circumstances law enforcement officers may be presented with, or encounter, when attempting to arrest a suspect that has evaded law enforcement detention for unknown reasons. When conducting traffic stops, law enforcement officers often have no idea who they are stopping. Law enforcement officers, through their training and experience, understand that persons that commit routine traffic violations generally comply with an officer's commands during traffic stops, do not flee, nor do they abandon the vehicle they were operating at the time. Well-trained law enforcement officers, through experience, also recognize that when suspects flee from law enforcement officers after committing a routine traffic violation, in many instances, the suspect is wanted for a serious crime, or is committing another crime at the time, as was the case in this incident.

49. There is no training manual and/or law enforcement instructor that can specifically prescribe a course of action for every single situation or the indefinite number of variables that may be involved. There is nothing that dictates a step-by-step protocol when attempting to apprehend a suspect that is evading detention for unknown reasons. Law enforcement officers, in situations, in which suspects flee, are required to use their judgment and discretion in evaluating the immediate danger that a fleeing suspect may pose to the public, if the apprehension is delayed. Therefore, law enforcement officers are sent to police training academies and specialized classes, as was Officer Saldivar, that provide instruction intended to equip officers with a firm foundation upon which to apply the knowledge he/she has been taught, and to utilize legitimate discretion in the performance of those duties in response to situations that the officer can reasonably be expected to encounter in the performance of his/her duties.

*Expert Opinion Report of Albert Rodriguez*

16

EXHIBIT 7

50. Officer Saldivar was responsible, as a law enforcement officer, to respond to Schenk's unlawful and threatening actions, and was required to use his judgment and discretion in determining how to respond, stop, and control Schenk's assaultive resistance and threatening behavior. The documents and recordings reviewed revealed Officer Saldivar was required to apply his training, experience, judgment and discretion, and based on the totality of the circumstances, make split-second, practical, common-sense decisions in evaluating Schenk's actions upon Schenk exiting the vehicle, not complying with commands, picking up the backpack, evading, resisting arrest, and assaulting him. The determinations made by Officer Saldivar required the evaluation of rapidly and/or simultaneously occurring events, and mandated creating responsive reactions in seconds, or fractions thereof. Officer Saldivar's decisions were acceptable under the circumstances at hand, and were not prohibited by any law enforcement training protocol. The materials reviewed clearly confirm that Officer Saldivar was performing legitimate discretionary law enforcement functions in connection with Schenk's unlawful, assaultive, and threatening actions.

## Fundamental Law Enforcement Training on Responding to Resistance/Threats

51. It is correct to state generally that, all law enforcement officers are held accountable for complying with the constitutional and statutory standards; therefore, they are trained to conform their conduct to those standards. Texas law enforcement officers are trained on the applicable statutory and constitutional standards, as was Officer Saldivar, regarding the use of reasonable force. More specifically, law enforcement officers receive in-depth instruction on the previously quoted Texas Penal Code sections, and the United States Supreme Court decisions in *Graham v Connor*.

52. The instruction on the Texas Penal Code provides law enforcement officers with a practical understanding as to "WHEN" force or lethal force is reasonable, and more specifically, it addresses that an officer must have a "*reasonable belief*" that force is "*immediately necessary*" to protect himself and others, and effectuate an arrest. Law enforcement officers are trained that the resistance and/or the threat level presented by an individual(s), and the circumstances surrounding the individual's resistance and/or threat, determines the type of response(s) that is appropriate for the circumstances. The documents and recordings available clearly show that Officer Saldivar responded reasonably to the unlawful resistance, assault, threat, and circumstances created by Schenk.

53. Law enforcement officers are instructed that the force deployed in any given situation must be "objectively reasonable," and proportional relative to the totality of the circumstances and the threat. Having to evaluate the totality of the circumstances is not an easy task, and even more so when having to

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

make split second decisions in tense, dangerous, and rapidly evolving circumstances.  Therefore, officers are trained to understand that their actions, pursuant to *Graham v Connor,* will be evaluated from the standpoint of the information known and perceived by an on-scene officer, and not from the comfort and safety of "Monday Morning Quarterbacking."

## Texas Commission on Law Enforcement Response to Resistance/Threat Information

54. Texas Law Enforcement Officers are required to complete the legislatively mandated State Training Standards established by TCOLE.  Officer Saldivar had met and exceeded the TCOLE State Training Standards, to include having completed the most advanced use of force course TCOLE offers to Texas Law Enforcement Officers.  The State Training Standards outline the Officer Responses relative to the Resistance/Threat encountered.  The following TCOLE Response to Resistance Model, derived from Chapter 17.3.1 of the Use of Force State Training Standard curriculum, illustrates the appropriate and reasonable Response for specific Threats/Resistance.



EXHIBIT 7

55. The model demonstrates how law enforcement officers are trained in connection with TCOLE State Training Standards. Law enforcement officers are trained that when:

1) "*No Resistance (Compliance*) is encountered, Command Presence and Verbal Commands are appropriate, both of which are non-physical responses,

2) "*Non –Threatening Resistance*" is presented by a subject, control holds, pressure points, and similar weaponless strategies are reasonable,

3) "*Threatening Resistance*" is encountered, the use of Electronic Control Devices (ECW/Taser), Oleoresin Capsicum (pepper spray), police baton and personal weapons are appropriate,

4) Faced with "*Deadly Resistance,*" the use of firearms and all available tools and tactics are objectively reasonable.

56. To re-emphasize, the threat/resistance levels presented by an individual(s), and the circumstances surrounding the individual's threat/resistance, determines the type of officer responses that are appropriate for the situation at hand. The aforementioned training is not stand-alone instruction, rather it is presented in conjunction with the dictates of *Graham v Connor*, the Texas Penal Code, and other court decisions. The instruction provides law enforcement officers with an understanding of the practical application of, "*reasonable belief*" that force or deadly force is "*immediately necessary.*" The methodology in determining whether a "*reasonable belief*" that force or deadly force is "*immediately necessary,*" in this case, will be addressed later in this report.

**Fundamental Taser Information**

57. Electronic Control Weapons (ECWs) are commonly called Tasers. However, the name "Taser" is the brand name of tools that immobilizes a subject, using short bursts of electricity, via barbed darts on a wire. Holding down the trigger of the "Taser" allows the user to activate it, and subsequently projects two (2) darts. Tasers are categorized as non-lethal use of force, however, even non-lethal force must be justified by the need for the specific level of force employed. The Taser, when effective, causes neuromuscular incapacitation, which can be characterized as strong muscle contractions. In order for neuromuscular incapacitation to occur in the probe projection mode, both darts must come in contact with/penetrate the individual. The darts should have significant separation in order to have full neuromuscular incapacitation.

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

58. Generally speaking, patrol officers use the Taser with wires that extend twenty-one (21) feet. The ideal distance from Taser to target, for full neuromuscular incapacitation, is approximately fifteen (15) feet. The Taser is designed in such a manner that the top dart impacts the actual point of aim, and the bottom travels at an eight (8) degree downward angle for separation. The anticipated response when neuromuscular incapacitation occurs is the individual "stiffening up" and falling. Noteworthy, the preferred and recommended target area is the suspect's back, to avoid possible cardiac related allegations. Officer Saldivar deployed the Taser to Schenk's back.

59. It is recommended that prior to the deployment of the Taser, an audible verbal warning such as, "*Taser, Taser, Taser*," be announced to any officers that may be in the immediate area. The purpose of the audible warning is to notify other officers that the Taser is about to be deployed, therefore, decreasing the chances of the Taser deployment being mistaken as a firearm discharge. Because the Taser probes are propelled by compressed nitrogen, an audible sound is projected upon deployment. The secondary purpose of announcing the deployment of the Taser is to prevent officers, in the immediate area, from approaching the subject at the time of deployment, and inadvertently being struck by the probes. Furthermore, announcing "*Taser, Taser, Taser,*" allows the suspect an opportunity to comply, however, it also provides advance warning to the suspect of the intent to deploy the Taser, thus, giving the suspect an opportunity to counter the Taser.

**Inattentional Blindness/Critical Incident Amnesia**

60. I have attended numerous law enforcement training certification courses throughout the United States in my forty-three (43) years of law enforcement, and interviewed numerous officers involved in shootings incidents. I have attended certification courses and education to include the FBI National Academy, Force Science Analyst certification course, Understanding and Reviewing Officer Involved Shootings Course, Force Encounters Analysis and Human Performance Course, and numerous other courses, that have provided me with information on the physiological impact, on law enforcement officers, during a shooting incident. Through my training and experience, I have learned that officers involved in life threatening situations usually do not recall all the details after a shooting incident. Contemporarily trained investigators and/or use of force experts are aware of the impact of the phenomenon known as "inattentional blindness," also referred in part to as "Critical Incident Amnesia." I will refer to the phenomenon not from the perspective of a medical expert, but rather from the law enforcement training

*Expert Opinion Report of Albert Rodriguez*

Pasadena_20552

EXHIBIT 7

standpoint, utilizing the training and experience I have received, and the instruction I presently provide to law enforcement investigators and officers, to include the Texas Rangers.

61. The phenomenon of "inattentional blindness" refers to the concept of being able to look directly at something and your mind focused elsewhere. It is no different than when a person is talking on a cell phone while driving. Inevitably, there will be a point where the person loses track of the conversation as the person focuses on something on the road, or vice versa, which sometimes causes collisions. Multitasking is extremely difficult to perform effectively, if not impossible, when tasks are complicated. Not surprisingly, when a person focuses his/her attention on one activity, the person "tunes out" details related to other activities. The reason this matters in policing is that in high-stress encounters, such as an officer involved shooting incident, it takes up a tremendous amount of attentional load. Following such encounters, it's not uncommon for an officer's recollection of an incident to be incomplete in some respects and for an officer to be unable to recall certain aspects of the incident. Sometimes, these imperfections in memory are characterized by some as inconsistencies or an officer deliberately trying to distort the details of the incident to defend his/her actions. However, law enforcement training recognizes that because of the limitations of attentional load, and the focus of attention, apparent inconsistencies or inaccuracies in an officer's account of events, or lack of recall, are not necessarily indicative of deception.

62. Law enforcement training explains that in addition to the limited attentional load, there is also the impact of stress on human physiology. Officers involved in shootings or life-threatening incidents are subject to extreme stress. Remarkably, the extreme stress is also seen in realty-based law enforcement training sessions, where the students understand there is no actual danger. Law enforcement training emphasizes that extreme stress may result in, but not limited to:

1) selective attention also known as tunnel vision: the immediate tendency to focus on the perceived threat. Research, and my experience in interviewing officers involved in life threatening situations, indicates that an officer's peripheral vision during deadly encounters can constrict down from approximately 180 degrees, to as narrow as 3 to 4 degrees; the attached photograph is an illustration used in training law enforcement officers reference tunnel vision,

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7



Possible Narrowed Vision

Tunnel vision view

2) auditory exclusion: in high stress situations people may hear sounds and voices as muffled or distanced, or may lose hearing during the incident entirely,

3) loss of motor skills,

4) time distortion: slow motion,

5) auditory distortion,

6) tremors/shakes,

7) rapid pulse,

8) hyperventilation.

63. A person's focus, in a life-threatening situation, is on the perceived threat not the peripherals. An example of distorted perceptions is when a citizen has been a victim of an armed robbery, and is asked to describe the gun or knife. Inevitably, the response is that it was "huge," even though in reality, the gun or knife might have been small in size. This occurs because the threat is the victim's focus, which is what is important to the victim, at the time. Contemporarily trained law enforcement investigators or procedures experts understand that selective attention/peripheral narrowing, auditory exclusion, and distortion of distances, timing, vision and hearing may occur in life threatening situations, and even more so when physical fatigue and exhaustion is involved.

64. Police officers are human beings, and a job title, training, or experience does not mean an officer's brain processes information any differently than that of a civilian. Understanding basic concepts about human perception and recall helps investigators and use of force experts explain apparent or claimed discrepancies, lack of recall or inaccurate recall, and the dynamic factors that may affect an officer's actions during officer involved shootings. It is important to understand that every situation is different, every time, to every law enforcement officer.

*Expert Opinion Report of Albert Rodriguez*

22

EXHIBIT 7

**Officer Saldivar's Actions Relative to Law Enforcement Training**

65. The initial facts of this case raise a series of circumstances that commonly surface in well documented instances of real-life threats to law enforcement officers. Circumstances similar to this case are often addressed during law enforcement training scenarios. In conducting an objective evaluation of Officer Saldivar's actions, and for the purpose of being consistent with training law enforcement officers receive on the United States Supreme Court decision in *Graham v Connor,* it is of utmost importance to contrast Officer Saldivar's actions, in this case, relative to how law enforcement officers are trained to respond to similar circumstances. Analyzing how officers are trained relative to circumstances similar to this case allows an objective reviewer to evaluate the totality of the circumstances from Officer Saldivar's perspective at the time, and not from the vantage point of a sterile, non-threatening environment, with indefinite amounts of time to react and/or make decisions, and without the benefit of 20/20 hindsight.

66. There may be opinions offered about what Schenk *could have* done, if Officer Saldivar would have responded differently, but no one can reasonably predict such events. It is relatively simple to criticize an officer's actions with the claimed benefit of hindsight, however, it is extremely important to understand that officers, at times like those here, are required to make judgments and split-second decisions in situations that are tense, dangerous, and rapidly evolving, regarding which actions to take. The information available shows that Officer Saldivar responding in a timely manner was critical, as a result of the totality of the circumstances that existed, to include reasonably believing that Schenk presented a threat of serious bodily injury or death. Is important to recognize that law enforcement officers are trained to understand that they have the right to protect their lives and the lives of others.

67. An officer facing a threat on a scene does not have the benefit of knowing how everything will or might turn out later, nor does the officer have indefinite amounts of time to decide on a perfect response, if such could actually be divined. For example, if Schenk had been in possession of Officer Saldivar's knife and would have stabbed Officer Saldivar to his death, the condemnation could be that Officer Saldivar should have recognized the deadly threat and shot Schenk sooner. The same holds true if Schenk had managed to access a weapon from his own waistline and caused serious bodily injury or death to Officer Saldivar. Considering the consequences of officer inaction is critical when evaluating use of force incidents.

68. The indisputable information unequivocally shows that Schenk escalated a mere traffic stop to a life-threatening altercation. At any given point prior to the instant Officer Saldivar fired, Schenk could have peaceably ended the encounter by merely stopping his criminal actions that precipitated Officer

EXHIBIT 7

Saldivar's responses. It is unknown whether Schenk's unlawful and dangerous actions were partially a result of having Marijuana and a Barbiturate in his body, however, what is known is that Schenk escalated the situation to a life-threatening point.

69. Officer Saldivar recognized Schenk's actions not only as a threat to public safety, but suspected that Schenk could present a danger to Officer Saldivar shortly after Schenk stopped the Ford Focus in the bar parking lot. Officer Saldivar momentarily remained behind the patrol unit's driver door for his safety, and focused on Schenk. As previously noted, officers do not know who they are stopping during traffic stops. Any reasonable law enforcement officer's alert level would have been elevated when Schenk did not stop for the patrol vehicle's emergency lights, and drove on the wrong side of the road. Staying behind the driver's door of the patrol vehicle is a modified "high risk" traffic stop procedure that officers use in situations that are suspicious, or when weapons are suspected. In a true "high risk" traffic stop, officers are instructed to unholster their handgun, stay behind the patrol unit's door, and issue commands from that location. Officer Saldivar stayed behind the patrol unit's door and issued commands, but did not unholster his firearm. Officer Saldivar was suspicious of Schenk's actions. Maintaining that distance provided Officer additional time in which to respond to a specific perceived threat.

70. The materials and recording reviewed clearly show that Schenk did not comply with Officer Saldivar's commands to stay in the car, rather Schenk walked to the front, and then to the passenger side of the car. Schenk picked up a backpack that was laying on the ground outside the passenger door of the Ford Focus. Any well-trained law enforcement officer's alert level could have elevated even more so at that particular point in time.

71. Schenk subsequently further escalated the situation by fleeing after picking up the backpack. Officer Saldivar did not know who Schenk was, why he was running, whether he was armed or not, nor what the contents of the backpack were. Any prudent law enforcement officer could have believed that Schenk's taking time to pick up the backpack before evading was extremely suspicious, and a reasonable officer could have believed that the backpack contained something illegal and/or dangerous. To reiterate, law enforcement officers, through their training and experience, learn that persons that commit everyday traffic violations generally comply with law enforcement commands during traffic stops, and do not flee and abandon their car. Furthermore, officers also recognize that when suspects flee from law enforcement officers after committing a traffic violation, in many instances, they evade because they are wanted for a serious crime or they are committing a serious crime at the time, as was the case in this incident. Any

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

reasonable and well-trained law enforcement officer could have believed Schenk was wanted, was, or had, committed a serious crime, and that the backpack contained something illegal and dangerous.

72. Officer Saldivar immediately initiated a foot pursuit upon Schenk evading. It is true that the safest place or procedure for Officer Saldivar was not to initiate a foot pursuit, but such a response would have been a dereliction of his law enforcement duty. Officer Saldivar not pursuing Schenk would have done nothing for the immediate safety of the public, and/or the occupants of the nearby residences. Any prudent law enforcement officer could have reasonably believed Schenk posed a danger to the public as a result of the circumstances Schenk created at the time; there were too many unknowns about Schenk and the backpack. Officer Saldivar reported his location, direction of the foot pursuit, and Schenk's description for the purpose of notifying his need for assistance, informing responding officers where go to, in case they encountered him.

73. Any reasonable law enforcement officer could have believed Schenk evading in the general area where occupied residences were located constituted "*Threatening Resistance*." Officer Saldivar sprinted after Schenk, and managed to close the gap between he and Schenk, even though Schenk had a head start. Officer Saldivar had quit sprinting, as part of his exercise routine, because of two (2) knee surgeries, but was sprinting after Schenk at the time.

74. There should be no doubt that Officer Saldivar's respiration rate, blood pressure, and heart rate were elevated, and his steadiness and fine motor skills, at that point, had diminished to a certain degree. Having conducted and supervised hundreds of reality-based training sessions, in which physical exertion is involved, it is the norm to see these types of physiological changes in the trainees, even though the trainee, at the time, is aware there is no real danger in contrast to real life-threatening situations. In my career as a law enforcement trainer, I have received, and continue to receive, training in reference to the physiological changes that may occur during physical exertion and critical law enforcement situations.

75. Schenk did not allow Command Presence or Verbal Communication to be effective, and continued to evade by running northbound between an alley on the east side of a private residence located at 2510 Golden Villas Street. Approximately 18 seconds after Schenk commenced to evade, Officer Saldivar deployed the Taser for the first time, in an attempt to stop Schenk. Schenk did not react to the Taser deployment, which caused Officer Saldivar to believe that the Taser had been ineffective. Schenk continued running northbound through the backyard of the private residence and across an open lot leading to Jana Lane. Because Schenk ran through the backyard of a private residence, any reasonable law

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

enforcement officer could have continued to believe Schenk presented a danger to the residents in the immediate area.

76. Officer Saldivar yelled at Schenk to get on the ground.  Schenk did not comply with Officer Saldivar's verbal commands.  Officer Saldivar deployed his Taser a second time, approximately 45 seconds after Schenk commenced to evade, and approximately 27 seconds after the first Taser deployment.  The Taser probes struck Schenk in the back.  Schenk fell to the ground on his back in the front yard of 2420 Jana Lane.

77. Law enforcement officers are trained to understand that going "hands on" in situations similar to this one creates a significantly higher risk of injury to the officer and the suspect, than when deploying the Taser.  Going "hands on" requires the officer to physically make contact with the suspect, and to physically force the suspect to the ground for control.  Law enforcement officers are trained to understand that going "hands on" in situations similar to this one creates a significantly higher risk of not only injury, but also of the officer being disarmed during the physical struggle.

78. Officer Saldivar's use of the Taser was reasonable and proportional to Schenk's threatening resistance.  Any reasonable law enforcement officer could have believed that Schenk presented a threat to members of the public that he could have encountered while evading.  The circumstances, as known by Officer Saldivar at the time included:

      1) Schenk drove erratically and did not yield to the patrol vehicle's emergency lights,

      2) Officer Saldivar suspected Schenk may be under the influence of alcohol or illegal drugs,

      3) Schenk did not comply with Officer Saldivar's commands to stay inside his car,

      4) Schenk, before evading, took time to pick up a backpack that he had thrown on the passenger side of the Ford Focus,

      5) Schenk evaded detention,

      6) It was unknown why Schenk was evading,

      7) Schenk's identity was unknown,

      8) It was unknown whether Schenk was armed with a weapon,

      9) The contents of the backpack were unknown,

      10) Schenk continued to disregard Officer Saldivar's commands,

      11) Schenk was running in close proximity to, and through the backyard of occupied residences,

26

EXHIBIT 7

12) Officer Saldivar was fatigued.

79. Any reasonable law enforcement officer could have believed Schenk's actions constituted threating resistance because of the totality of the circumstances that existed at the time. Pursuant to TCOLE training, the deployment of the Taser was proportional and reasonable as illustrated in the TCOLE Use of Force model in paragraphs #'s 54 & 55, of this report.

80. Officer Saldivar stated he believed the second deployment of the Taser had been effective because Schenk fell to the ground. Officer Saldivar understandably believed that he had time to control and handcuff Schenk while under the effects of the Taser. Schenk did not allow Officer Saldivar to control or handcuff him upon Officer Saldivar attempting to physically take him into custody. Officer Saldivar had been sprinting for approximately forty-eight (48) seconds at the time he made physical contact with Schenk. During the physical struggle, Schenk resisted Officer Saldivar's attempt to use an arm bar to control and handcuff him, however, Schenk's strength and resistance did not allow for application of the arm bar.

81. At one point, Officer Saldivar fell to the ground. Schenk reportedly grabbed Officer Saldivar and assaulted Officer Saldivar by pushing him to the side, as if to try to flip Officer Saldivar onto his back. Law enforcement officers are trained to understand that Schenk's assaultive action were in violation of:

Texas Penal Code Section 22.02 Aggravated Assault

(a) "*A person commits an offense if the person commits assault as defined in Section 22.01 and the person: (a) causes serious bodily injury to another, including the person's spouse; or (2) uses of exhibits a deadly weapon during the commission of the assault. (b) An offense under this section is a felony of the second degree, except that the offense is felony of the first degree if: (1) the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with the defendant is described by Section 71.00219B), 71.003, OR 71.005, Family Code; (2) regardless of whether the offense is committed under Subsection (a)(1) or (a)(2), the offense is committed: ………(B) against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant……(c) The actor is presumed to have known the person assaulted was as public servant or a security officer if*

*the person was wearing a distinctive uniform or badge indicating the person's employments as a public servant or status as a security officer."*

82. Officer Saldivar stated he realized Schenk was strong, and was overpowering him, and he believed Schenk had him in a position of disadvantage. Officer Saldivar grappled with Schenk in an attempt to control him, but Schenk would not allow it. Schenk pushed, lifted, tried to flip, and place Officer Saldivar in such a position as to get on top of him. Officer Saldivar continued to issue commands to Schenk, however, he would not comply. Officer Saldivar was exhausted as result of the foot pursuit, physical struggle, and Schenk's assaultive actions.

83. Officer Saldivar said he felt Schenk grab at his duty belt along Officer Saldivar's handgun side and near Officer Saldivar's handgun ammunition magazine pouches. In the area of the ammunition magazine pouches, Officer Saldivar kept a knife, and he was cognizant of that fact during the struggle. Officer Saldivar reported he feared Schenk would disarm him of one of his weapons. Officer Saldivar repeatedly ordered Schenk to stay on the ground or he would shoot him. Schenk continued his assaultive actions by pushing Officer Saldivar forward, and was able to push him to Officer Saldivar's right. At one point, Officer Saldivar recalls releasing his hold on Schenk, and pushing away from Schenk as hard as he could in an attempt get away from Schenk, and to create distance between them.

84. Any reasonable officer would have feared for his life based on the totality of these circumstances. Officer Saldivar was exhausted and could no longer physically attempt to control Schenk, or defend himself against Schenk's threatening actions. In addition, Officer Saldivar was unaware of whether Schenk had managed to access his knife, or if he had it in his possession, and Schenk was an estimated distance of five (5) feet away from him.

85. After Officer Saldivar pushed away from Schenk, Officer Saldivar stated he recalls observing Schenk facing him in a somewhat standing and crouched posture. Officer Saldivar also reported observing that Schenk was not attempting to flee any longer, but instead was in close proximity to Officer Saldivar. Officer Saldivar further reported observing Schenk reach for his waistline with his right hand. The events and movements were occurring very quickly, with some happening simultaneously. Officer Saldivar stated he recalls, to a certain degree, attempting to get up from the ground, to his knees. Officer Saldivar said he feared for his life, and as a last resort, quickly unholstered his handgun and discharged several shots at Schenk. Officer Saldivar stated he believed that at the time he discharged the shots, he was getting up to

his knees and may have still had his left hand on the ground supporting his body, but was not sure of his posture at the time. Officer Saldivar observed Schenk fall to the ground on his back.

86. Officer Saldivar reported that Schenk was grabbing at his duty belt during the physical struggle. At that point any reasonable law enforcement officer could have believed that Schenk was attempting to disarm Officer Saldivar of his handgun or knife. There have been many instances in which officers were disarmed of their own weapon during physical struggles, and were killed or seriously injured.

87. Officer Saldivar had a vague recall of some of the details of the incident. For example, he did not know how many shots he discharged at Schenk, which is not unusual, and even more so considering these circumstances. The materials reviewed clearly show that any objective officer could reasonably have perceived a threat to Officer Saldivar's life that necessitated a defensive reaction. Officer Saldivar discharged five (5) shots at Schenk within a distance of ten (10) feet or less, and missed two (2) of those five (5) shots. Officer Saldivar missing those two (2) shots, at that distance, can be explained as the urgency he perceived in preserving his life. Furthermore, that Officer Saldivar does not recall his own posture or the exact posture of Schenk at the time he discharged the gunshots is understandable. As previously noted, Officer Saldivar's lack of recall could be a result of the stress, exhaustion, and focus on Schenk's hand reaching for his waistline. Suspects are known to conceal weapons in their waistband. Officers are trained to watch the suspect's hands because it is the suspect's hands that can kill officers when they are used to access weapons.

88. Officer Saldivar did not observe a weapon in Schenk's hands, however the totality of the circumstances could have led any reasonable law enforcement officer to believe Schenk was reaching to obtain a weapon or was in possession of Officer Saldivar's knife. Contemporarily trained law enforcement officers understand the concept of "Action vs. Reaction," more specifically officers are trained not to wait until they verify that the suspect is actually accessing a weapon or has a weapon in their possession. The United States Court of Appeals, 5th Circuit's decision in *Maria Ontiveros, Individually, and as Next Friend of Modesto Ontiveros, Deceased; Martha Duran; Modesto Ontiveros Jr.; and Erika Zamora, v. City of Rosenberg, Texas, Robert Garcia, Chief of Police; and Dewayne Logan, Officer*, demonstrates the importance of timing, in officers taking action, when suspects take life threatening actions or movements. The Court referred to Texas Ranger Jeff Cook's testimony when he explained the basic principles of "Action vs. Reaction" by testifying to the following:

Q. *If Lieutenant Logan perceived Mr. Ontiveros's actions as Mr. Ontiveros putting his hand inside the boot do you think it would have been necessary for Lieutenant Logan to wait until Mr. Ontiveros exhibited a weapon before taking defensive action?*

A. *Absolutely not.*

Q. *And why not?*

A. <u>Because he will then be behind the curve on reacting.  Action is always-action always beats reaction.</u>

Q. *If Mr. Ontiveros had a handgun in this boot, would there be any threat to Lieutenant Logan by Mr. Ontiveros just leaving his hand in the boot?*

A. *Absolutely.*

Q. *And why so?*

A. *Because you can shoot through a boot.  If Mr. Ontiveros had a weapon, a gun in the boot, he could simply fire through the boot at Officer Logan.*

Q. *And do you think that it's likely that Lieutenant Logan would have had enough time to take appropriate steps to protect himself if he waited until Mr. Ontiveros removed a handgun from the boot if he had had one in there?*

A. *No. Once again, action beats reaction.  If someone pulls a gun-I don't know if you want me to go into that or not but-*

Q. *Explain that for us.*

A. *Action is going to beat reaction every time. For example, if I have-if I have a gun and my brain-I have made the decision to shoot, then that message is going to travel down to my muscles and I'm going to shoot.  For you to react to that-I have already started a process.  You have to recognize it, then your brain has to tell your muscles to react, and then you're reacting to my actions.  So action is going to beat reaction simply because of the cognitive element involved.*

Q. *Have you observed a training exercise where one training officer stands across a room from an officer, for example, and the training officer has his hand down next to his body with a gun in it and then the other officer is supposed to react?  Have you seen that kind of training exercise?*

A. *I actually participated in that training about three weeks ago.*

Q. *Can you explain that in detail, how that training section works?*

A. *Well, we had simunition guns.  I don't know if I need to explain, but it's guns that look and feel real but they don't shoot real bullets.  And literally, I stood there and pointed a gun at the instructor and the instructor had the gun actually pointed to the ground and just told me to shoot*

30

*whenever he acted. And I could not shoot him before he shot me. At best, I could tie him. He could bring the gun up, pull the trigger before I could pull the trigger. I never beat him, and at best could tie him.*

Q. *Is a tie good enough in this work?*

A. *No, a tie, you die, you know.*

89. To re-emphasize, Ranger Cook explains the importance of officer timing, in taking action, to prevent officers from getting killed. In the aforementioned case, the officer reasonably believed that the suspect was attempting to access a weapon, and the officer responded with the use of deadly force. Ontiveros was shot by the officer because of the circumstances that existed, and Ontiveros' actions, which the officer perceived as life-threatening. Ultimately, the Defendant Officer was granted summary judgment because his reaction was objectively reasonable. The Court recognized the importance of "timing" on the use of force, based on the officer's perception, relative to the totality of the circumstances. Officers are trained to understand that they do not have the luxury of waiting until they confirm that a suspect has accessed a weapon and is in the process of using it against them.

90. It is important to recognize that there are two (2) components when intentionally discharging a firearm; making the mental decision to shoot, and then physically pulling the trigger. There is a delay in time between making the mental decision to shoot, and the actual squeezing of the trigger, therefore, during that delay, a suspect can change his/her position or posture. Once the mental decision to shoot is made, the actual shots, for all practical purposes, are fired, regardless of any change in the suspect's position or posture during the delay between the mental and physical components. In addition, in order for the officer to stop shooting, after making the decision to shoot, he/she must reverse the mental process of perceiving, evaluating, formulating a plan, and sending the message to the flexor muscles of the forearm to stop shooting; in the mean-time shots are being fired. Simply stated, it takes time to start shooting, as well as to stop shooting; the processes are not instantaneous. During the mental process to shoot, and actually discharging the firearm, a person can change his position or posture from when the decision was made to shoot.

91. I have viewed Officer Saldivar's body worn camera numerous times, and I have never seen Schenk on his hands and knees, at the time he was shot. The investigative package was presented to the Harris County Grand Jury and Detective Cooper's belief a recording showed Schenk on his hands and knees

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

at the time he was shot was plainly documented in Detective Cooper's report.   Nonetheless, Officer Saldivar was "no billed" by the Grand Jury.

92. My understanding of the Supreme Court decision in *Scott vs. Harris* is that the court found that a court need not rely only on the plaintiff's description of the facts, but should instead consider the facts in the light depicted by a recording.  The court held that video recordings are stand-alone evidence, and are considered factual evidence.  The video itself in this case is self-explanatory.  The Harris County District Attorney Office and the Harris County Grand confirm the reasonableness of Officer Saldivar's actions in this case

93. The overwhelming information shows that Schenk presented a threat of serious bodily injury or death at the time Officer Saldivar shot Schenk to stop the imminent threat Schenk's actions posed.  Schenk was in complete control of the situation, and Schenk could have stopped his unlawful actions prior to Officer Saldivar acting to protect himself; Schenk chose to continue to escalate the situation, which unfortunately, resulted in tragedy.

94.  The methodology I used, and that has been previously accepted in State and Federal Courts, goes beyond the use of force curriculum.  The formula of the methodology used is:

Subject Actions
+
Circumstances
=
Totality of the Circumstances &
Identifies the appropriate and reasonable force option(s)

95. In summary, the sum of the "Subject Actions," and the "Circumstances" surrounding the suspect's actions and/or inactions, comprises the totality of the circumstances, and identifies which force option(s) is reasonable and proportional to the threat.  In this case, Schenk's actions, and the circumstances surrounding his actions, as known and perceived by Officer Saldivar, consisted of but not limited to:

> 1) Schenk drove erratically and did not yield to the patrol vehicle's emergency lights,
>
> 2) Officer Saldivar suspected Schenk was under the influence of alcohol or illegal drugs,
>
> 3) Schenk did not comply with Officer Saldivar's commands to stay in the car,

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

4) Schenk, before evading, took time to pick up a backpack that was by the passenger door of the Ford Focus,

5) Schenk evaded detention,

6) It was unknown why Schenk was evading,

7) Schenk's identity was unknown,

8) It was unknown whether Schenk was armed with a weapon,

9) The contents of the backpack were unknown,

10) Schenk continued to disregard Officer Saldivar's commands,

11) Schenk was running in close proximity to, and through the backyard of an occupied residence,

12) Officer Saldivar was fatigued as a result of the foot pursuit,

13) The Taser had been ineffective in temporarily controlling Schenk,

14) Schenk continued to disregard Officer Saldivar's commands,

15) Schenk physically resisted Officer Saldivar's attempt to physically control him,

16) Officer Saldivar's exhaustion level increased,

17) Schenk was overpowering and assaulting Officer Saldivar by pushing him, and attempting to flip him,

18) Schenk exhibited a tremendous amount of strength,

19) Schenk grabbed at Officer Saldivar's duty belt,

20) Schenk continued to disregard Officer Saldivar's commands,

21) Officer Saldivar was unaware whether Schenk had accessed his knife,

22) It was nighttime, and visibility was low,

23) Officer Saldivar was by himself, with no known assistance in the immediate area,

24) Officer Saldivar noticed that Schenk did not flee upon disengaging from him,

25) Officer Saldivar and Schenk were in close proximity to each other,

26) Officer Saldivar observed Schenk reaching toward his waistband, as if to access a weapon,

27) Officer Saldivar perceived there was an urgent need to defend himself from the threat of serious bodily injury or death, to the degree that he missed two (2) of the five (5) shots he fired from a distance of less than ten feet.

*Expert Opinion Report of Albert Rodriguez*

33

EXHIBIT 7

96. Based on the totality of the circumstances that existed, Officer Saldivar's actions were reasonable under law enforcement training on the United States Supreme Court decision in *Graham v Connor*. Any objective officer could have reasonably believed that Schenk presented an imminent threat of serious bodily injury and/or death. The following *Graham v Connor* analysis is based on the totality of the circumstances that existed, and as known by Officer Saldivar, at the time, and as could reasonably be perceived by any judicious and well-trained objective law enforcement officer:

1) The offenses committed by Schenk as perceived by Officer Saldivar at the time he discharged his handgun at Schenk

   ➤ ***Officer Saldivar reasonably believed that*** *Schenk* ***had committed traffic offenses, evaded detention, aggravated assault, and presented him with a threat of serious bodily injury or death***

2) Whether Schenk presented a danger to Officer Saldivar and/or others

   ➤ ***The indisputable information overwhelmingly revealed that Schenk resisted arrest, assaulted Officer Saldivar and Officer Saldivar reasonably believed that Schenk presented an imminent threat of serious bodily injury or death, at the time he discharged his handgun at Schenk***

3) Whether Schenk was resisting or evading arrest at the time

   ➤ ***Schenk was Resisting and Evading detention/arrest at the time Officer Saldivar discharged his handgun at him***

97. I don't know of any reasonable law enforcement officer that would have waited longer to take defensive measures to stop Schenk's threatening actions. There is no accepted law enforcement officer standard that applies to the circumstances of this case, which could have reasonably put Officer Saldivar on notice that his conduct in this matter would be deemed improper, clearly illegal, and/or in violation of any clearly established law. There is no training standard, which suggests that a competent law enforcement officer could not reasonably believe that Officer Saldivar's actions were within an acceptable range of legitimate law enforcement procedures. Likewise, from a law enforcement officer training perspective, Officer Saldivar's actions were sound and in compliance with contemporary law enforcement training.

**The City of Pasadena and its Police Department**

98. Plaintiffs in their lawsuit complaint allege that, "*Officer Saldivar had sufficient knowledge, training, and/or education to know that his use force with, and shooting and ultimately seizing and killing Nathan, objectively unreasonable and violated the United States Constitution.  TCOLE records indicate that Officer Saldivar had sufficient experience and/or education to be fully aware that a failure to act reasonably and appropriately would violate Nathan's rights under the Constitution.*"

99. Plaintiffs are somewhat correct, and I am in total agreement in reference to Officer Saldivar having sufficient law enforcement knowledge, training, and education to know that an officer may not lawfully use objectively unreasonable force.  Officer Saldivar attended the Houston Community College Police Academy and became a licensed law enforcement officer in 1991. The Houston Community College Police Academy is accredited by the TCOLE.  Officer Saldivar received the TCOLE legislatively mandated training.  The mandated curriculum attended and successfully completed by Officer Saldivar consisted of 540 hours of training which included the below reference topics, but not limited to:

1. United States and Texas Constitution
2. Arrest, Search, and Seizure
3. Criminal Investigations including interviewing persons
4. Crisis Intervention Techniques
5. Patrol Procedures
6. Texas Penal Code
7. Texas Code of Criminal Procedure
8. First Aid
9. Firearms
10. Arrest and Control Strategies
11. Use of Force and Deadly Force to include the statutory and constitutional standards
12. Community Policing

100. Officer Saldivar served as a Houston Independent School District Police Officer from 1995 through 1998.  Officer Saldivar applied with the Pasadena Police Department and attended the Pasadena Police Academy.  The Pasadena Police Department required Officer Saldivar to attend another licensing academy to ensure that he received the required training. Pasadena Police Academy consisted of 872 hours, almost twice the amount required by the TCOLE, to become a licensed law enforcement officer.  The Pasadena Police Academy is accredited by the TCOLE, and is required to provide instruction on the legislatively mandated curriculum.  Officer Saldivar was licensed as a law enforcement officer when he

*Expert Opinion Report of Albert Rodriguez*

EXHIBIT 7

applied with the Pasadena Police Department, and there was nothing that required the Pasadena Police Department to send Officer Saldivar to another academy.

101. The materials reviewed showed that the Pasadena Police Department ensured that Officer Saldivar was properly trained by sending him to another training academy, therefore, again receiving law enforcement training in the topics listed in paragraph #99, of this report. I am familiar with, and instruct the TCOLE Use of Force Training Standards, which includes the constitutional standards, to law enforcement officers. Officer Saldivar was trained that he may only use objectively reasonable force when encountering resistance and threats, as a result of successfully completing the TCOLE legislatively mandated law enforcement training curriculum. The general content of law enforcement training regarding use of force is primarily based upon decisions of the United States courts interpreting the Fourth Amendment.

102. TCOLE requires law enforcement officers to continuously comply with all legislatively mandated standards and policies and procedures in order to maintain their law enforcement licenses. Officer Saldivar complied with, and exceeded the required training, and there is nothing that indicates that his law enforcement license was ever suspended or revoked. Officer Saldivar attended and successfully completed the most advanced Use of Force course that TCOLE offers Texas Law Enforcement Officers. TCOLE offers four (4) certifications that are based on required training, education, and time served as a police officer: Basic, Intermediate, Advanced, and Masters. Officer Saldivar held all four (4) certifications. The Plaintiffs are correct in acknowledging that Officer Saldivar had sufficient knowledge, education, experience, and training. The Pasadena Police Department's policies and procedures ensured that Officer Saldivar had sufficient guidance, knowledge, education, experience, and training.

103. Plaintiffs allege that the Pasadena Police Department's *"policies, practices, and/or customs were such that it could not or would not meet its constitutional obligations regarding use of force."* Plaintiffs admit that Pasadena Police Department Use of Force policy states, "*the City of Pasadena police officers should use only the force reasonably necessary to bring an incident under control, while protecting the life of the officer and others."* Plaintiffs allege the Pasadena Police Department's Use of Force policy provides its officers with a nebulous legal statement, "*The officer must use that force which a reasonably prudent officer would use under the same or similar circumstances*." But there is nothing nebulous about the policy. Pasadena requiring its officers to use "only the force reasonably necessary to bring incident under control" is objectively reasonable. Furthermore, there is nothing vague about the Pasadena Police

Department's Use of force policy in requiring its officer to comply with the dictates of *Graham v Connor*, and mandating that its officers' use of force consistent with which a reasonable and prudent law enforcement officer could take, when presented with the same or similar circumstances.

104. Plaintiffs allege the Pasadena Police Department's Use of Force policy does not provide a use of force continuum, allowing officers to use various levels of force before moving to deadly force. Plaintiffs allege that the Pasadena Police Department's Use of Force policy does not allow officers "*to use various levels of force before moving to deadly force.*" The facts in this case clearly contradict the Plaintiffs' allegation. Officer Saldivar, in attempting to deescalate the situation, used Command Presence, Verbal Commands, hands on physical control, and the Taser before Schenk presented a life-threatening situation and Officer Saldivar, as a last resort, was required to use deadly force. The factual information clearly contradicts Plaintiffs' allegation of an inadequate Use of Force policy. The Pasadena Police Department's Use of Force Policy is consistent with contemporary police training standards, as well as my understanding of current constitutional standards.

105. Plaintiffs allege that the "*City of Pasadena policy, practice, and/or custom of its police officers of concentrating on "production," or assuming that they made a sufficient number of arrests and charge a sufficient number of citizens with crimes, was the moving force behind, caused, and proximately caused damages and death reference in this pleading. Upon information and belief, the City of Pasadena Police Department placed an undue focus and emphasis on, and required, its officers to proactively arrest and prosecute people.*" It is truly unbelievable that Plaintiffs would make that particular allegation. Officer Saldivar observed Schenk disregard a stop sign, and subsequently observed him driving on the wrong side of the road. Schenk presented a threat to the public due to his reckless and dangerous driving. No reasonable and prudent law enforcement officer would have disregarded Schenk's reckless actions, regardless of required numbers. Citizens expect to be protected from the dangerous behavior that Schenk exhibited, therefore, to allege that it was strictly a numbers or production issue is unimaginable. Officer Saldivar took an oath to enforce the laws of the state of Texas and protect the citizens of the United States. Officer Saldivar disregarding Schenk's dangerous driving behavior would truly be negligent on his behalf, and in direct violation of his oath of office.

106. The Harris County District Attorney Officer and the Grand Jury "no billed" Officer Saldivar, in general, relaying the message that Officer Saldivar's actions were within the parameters of the governing

law.  The fact that the Harris County Grand Jury "no billed" Officer Saldivar demonstrates that his reasonable actions were within the course and scope of his law enforcement authority.

## **Conclusion**

107. Officer Saldivar's actions in defending himself, and protecting the public, were in compliance with accepted law enforcement training standards and practices.  There is no accepted law enforcement officer standard that applies to the circumstances of this case, which could have reasonably put Officer Saldivar on notice that his conduct in this matter would be deemed improper.  Any reasonable and well-trained law enforcement officer could have taken the same or similar actions that Officer Saldivar took, in connection with Schenk, when presented with the same or similar circumstances.  Furthermore, when viewing the facts through the eyes of a well-trained law enforcement officer on the scene, not benefitted by information only available through hindsight, under standard law enforcement training, Officer Saldivar did not use improper force against Schenk.  There is no factual information which reasonably suggests that the City of Pasadena or its Police Department failed to properly train or guide Officer Saldivar to follow contemporary police training and operational protocols.  The Pasadena Police Department's policies and procedures in regards to use of force were, and continue to be, in compliance with relevant police training standards.

The aforementioned opinions and observations are true and correct to a reasonable degree of professional certainty.

My fees for work performed in connection with this case are at a rate of $175.00 per hour plus expenses and fees for deposition are at a rate of $2,600.00 per day (to be paid prior to deposition) plus travel time and expenses.

Attached is a listing of cases I testified in, by trial or deposition in the last four years.

*Albert Rodriguez*
Albert Rodriguez
Date: 08/31/21

EXHIBIT 7

## SUPPLEMENTAL REPORT OF ALBERT RODRIGUEZ

RE:    Civil Action No. Civil Action No. 4:20-cv-03799; Kristine Schenk, Individually and as Dependent Administrator of and on behalf of Stanley Schenk, Individually, the Estate of Nathan Alexander Schenk, and Nathan Alexander Schenk's Heirs-at Law; and Jennifer Jacops-Schenk, Individually, *Plaintiffs* v. City of Pasadena, Texas; and Rigoberto R. Saldivar, *Defendants*; In the United States District Court for the Southern District of Texas, Houston Division

1.    My name is Albert Rodriguez.  I previously submitted a report dated August 31, 2021, on the above styled case.  Attached to my initial report was my curriculum vita, which contains a listing of my qualifications, experience, education, training, and skills.    Since the submission of the aforementioned report, I have recently received and/or reviewed the following additional investigative and resource materials implicated by the additional investigative materials:

a)  Harris District Attorney Civil Rights Case Investigative Report
b)  Harris County Institute of Forensic Sciences Gunshot Residue Report
c)  Gunshot Wounds, Second Edition, Vincent J.M. DiMaio,
d)  Practical Homicide Investigation, Fourth Edition, Vernon J. Geberth
e)  Forensic Science, Jay A. Siegel
f)  Criminal Investigation, A Method for Reconstructing the Past, James W. Osterburg, & Richard Ward
g)  Crime Scene Investigation, Jacqueline T. Fish, Larry S. Miller, and Michael C. Braswell

2.    This report was generated and submitted, as a result of the recently received and reviewed aforementioned documents, addressing the supplemental opinions and observations that are within the expertise of this author and relevant to this case.  All of the previously expressed opinions and observations submitted remain as noted.  The previously submitted opinions and observations were expressed and supported by information and/or law enforcement studies and training, as is this supplemental report.  As I stated in my initial report, I do not make credibility judgments, nor do I assume, speculate, or guess as to whether any witness or any involved officer was untruthful.  It is my understanding that is not the role of an expert witness.  I did evaluate the evidence from the perspective of what could be or was corroborated, and I did note inconsistencies with objective evidence or other accounts that are relevant to my analysis.

1

EXHIBIT 7

3.  The summary of relevant facts previously submitted in my initial report was based on the information available at the time.  The summary of relevant facts will not be completely redrafted however, additional information was ascertained from the materials recently received and reviewed, and said applicable information will be noted.

4.  The standard of review in analyzing Officer Saldivar's actions is the same as previously submitted.  The analysis consisted of comparing Officer Saldivar's actions in relationship to training received by law enforcement officers.  More specifically, my objective analysis involves evaluating how any well-trained officer, not necessarily just Officer Saldivar, could reasonably be expected to respond when faced with the same or similar circumstances.  The analysis includes the evaluation of the totality of the circumstances, as could reasonably be perceived by any well-trained law enforcement officer, at the time Officer Saldivar exercised his duties and authorities as a law enforcement officer.

5. The analysis involves the evaluation of Officer Saldivar's actions from the vantage point of an on-scene officer, based on what Officer Saldivar knew and perceived at the time, and not from 20/20 hindsight, with consideration given to the fact that at times officers are required to make split-second decisions in tense, rapidly evolving circumstances.  The analysis can only be appropriately conducted from the vantage point of a reasonable police officer on the scene.   As previously outlined, I am presently a police officer, law enforcement trainer, and supervisor, and I interact with and train police officers on a daily basis.  My opinions and observations are presented from the viewpoint of contemporary subject control tactics and concepts currently being taught to law enforcement officers.

6. A fact-specific evaluation must be used when determining and assessing whether force used by an officer in a particular circumstance is consistent with relevant law enforcement training. Officers are taught that the right to use force to protect themselves from threats of serious bodily injury or death is reasonable and within the course and scope of their authority.  Law enforcement officers are also trained that when resistance is encountered when effectuating an arrest, it necessarily carries the right to use some degree of physical coercion or threat thereof to effect the arrest.  An objective evaluation must consider all the facts available to include any and all evidence, and not rely on speculation.

7. I served as the Texas Department of Public Safety Firearms Range Master and conducted numerous tests on handguns, rifles, and ammunition during my tenure as the Department's Firearms Range Master at the Academy.  I had the opportunity to attend numerous Firearms and Homicide Investigation training sessions that addressed gunshot residue (GSR).  In addition, I have assisted the

2

EXHIBIT 7

Texas Rangers in numerous officer involved, and citizen shooting incidents that required the interpretation of gunshot residue from an investigative perspective.

**Gunshot Residue**

8. When a primer in a bullet is hit by the firing pin of a gun, a small explosion is created that lights a propellant, causing gasses to form that force the projectile through the barrel of the firearm. Gunshot residue (GSR) and a projectile (bullet) are expelled through the barrel of a firearm, as well as any opening found in the firearm, when it is discharged. GSR may be found at the site of a wound, or body parts in close proximity to the discharge. GSR can be useful for identifying the distance between the muzzle of a gun discharged and another object or person.

9. GSR is composed of the deposits of unburned or partially burned gunpowder particles, primer residues, and soot that remain after a firearm is discharged. Primer residue includes barium, antimony, and lead, and it is produced from the ignition of the primer. When the bullet emerges from the barrel of the gun, it is accompanied by a jet of flame, gas, powder, soot, primer residue, metallic particles stripped from the bullet, and vaporized metal from the bullet and cartridge casing. These particles and jet flame emerge from the end of the gun barrel ahead of the bullet. The jet of flame is commonly recognized as the "muzzle flash."

10. As the materials exit the barrel of the firearm, it spreads out like a funnel. As the distance from the barrel of the firearm increases, the density of the particle pattern decreases. The muzzle flash does not travel very far away from the muzzle of the firearm barrel, the smoke travels a little further, and the powder particles travel even further, dependent on the individual factors. At the 3-5 foot range the gunshot residues from a handgun may only consist of a few trace particles.

Supplemental Summary of Relevant Facts, Opinions, and Observations

11. Harris County District Attorney's Investigator Dennis Field responded to the incident site on the evening of the incident. Investigator Field provided a synopsis upon completing his investigation. The summary of relevant facts outlined in my previous report is very similar to Investigator Field's synopsis. Investigator Field's report, in part, stated,

    "*Schenk fell to the ground and Officer Saldivar advanced on him to take him into custody. Schenk grabbed Officer Saldivar and a physical struggle ensued for an extended amount of time (over a minute). It was at this point during the struggle that Officer Saldivar tired and was losing the upper hand on Schenk. Officer Saldivar felt Schenk grabbing at him. Officer Saldivar knew that he had not only his gun on him, but Officer Saldivar also had a pocket knife.*

3

EXHIBIT 7

*Officer Saldivar did not know if Schenk was able to grab his gun or his knife.  Officer Saldivar thought he was losing the fight.  Schenk was getting up and picking him (Officer Saldivar up. Officer Saldivar made a decision to tell Schenk that he was going to shoot him if he did not stop struggling.  Officer Saldivar repeated that command multiple times.*

*At this point, Schenk was still struggling and still actively fighting Officer Saldivar.  Officer Saldivar disengaged from the physical fight, withdrew his firearm, and fired several time striking Schenk.*

*Officer Saldivar told Schenk to stay on the ground or he would shoot him again.  Shortly thereafter, the secondary officer arrived, handcuffed Schenk and called EMS.  EMS arrived shortly and found Schenk unresponsive, pronouncing him dead at the scene.*

*Charting Officer Saldivar's weapon indicated he discharged his pistol 5 times.  5 matching spent cartridge casings were recovered from the scene.  Officer Saldivar deployed his Taser X26 twice prior to using deadly force, but the Taser had little or no effect on Schenk."*

12. Investigator Field also outlined the Scene Summary in his report, and included an analysis of the video from Officer Saldivar's body worn camera.  Investigator Field summarized and utilized the time stamps indicated on the video recording.  Investigator Field, in part, stated,

*"05.57 a second deployment of the Taser is administered by Officer Saldivar.  A groan can be heard from what is believed to be the subject as the Taser is deployed.*

*05.59 Officer Saldivar can be heard saying, "Mother fucker < unintelligible >" as the subject appears to be on his back looking up towards Officer Saldivar.  Officer Saldivar makes physical contact with the subject.  The statement by Officer Saldivar and the physical contact between the two occur almost simultaneously.*

*06:01 the subject can be seen looking up toward Officer Saldivar while the subject is still on his back.  The subject reaches up towards Officer Saldivar with this right hand, however Officer Saldivar is able to grab the subject's right hand with his right hand. As this physical struggle is occurring between Officer Saldivar and the subject there is continuing dialog that consist of:*

> *Subject – "Don't hit me man"*
> *Saldivar – "Get it turn around"*
> *Subject – "Don hit me"*
> *Saldivar – "Get down"*

4

EXHIBIT 7

Subject – *"Don't hit me"*
Saldivar – *"Get on the ground"*

*06:03 one can see what looks like the back of the subject's head as he is getting up on his feet. The mic is muffled for the next few seconds, which indicates that the subject and Officer Saldivar are locked in a close hand-to-hand struggle with their torso contacting each other, which covers the mic.*

*06:04 the video is a dark screen until 06:06 where the video resumes*

*06:06 when it resumes the only footage shown is a street lamp and several lights from nearby houses.*

*06:07 the screen returns to relative darkness and while the recording continues, there is limited recording of the subject or Officer Saldivar's action until 06:44*

*06:08 the (mic) display changes from white to green. During this time period Officer Saldivar gives the subject commands.*

*06:10 his body camera's microphone activates, but the statement by Officer Saldivar is muffled. Officer Saldivar can be heard saying, "Ah! Get on the ground"*

*06:14 followed immediately by "Mother fucker get on the ground"*

*06:18 the (mic) display changes from green to white and Officer Saldivar can be heard saying, "Get on the ground"*

*06:27 the (mic) display returns to white, immediately after Officer Saldivar can be heard say, "Get on the ground." As Officer Saldivar is heard on the video, his breathing appears to become increasing labored.*

*06:28 the sound muffles again (close struggle muffling the mic) and when a clear picture resumes the footage appears to be Officer Saldivar being propelled toward the ground as one can see the grass as the camera approaches the ground. It is clear the BWC is still attached to Officer Saldivar's uniform, because the picture resumes (06:31) with a better picture of the grass field in which this struggle is taking place and is moving along with Officer Saldivar.*

*\*\*\*\*\*\*\*(INVESTIGATOR NOTE: at this point Officer Saldivar has been in a close quarter's hand-to-hand struggle with the subject (Schenk) for nearly 30 SECONDS.)\*\*\**

*06:31 the picture resumes with what appears to be the subject's backside extending away from Officer Saldivar as Officer Saldivar is grappling with the subject*

5

EXHIBIT 7

*06:34-06:43 (9 full seconds) the video is dark/covered because of the close quarter struggle (grappling) Officer Saldivar is engaged in with the subject*

*06:43 the picture resumes with the camera view "in spiral" as the camera is falling to the ground. It is at this point that the BWC came unfixed from Officer Saldivar's uniform and fell to the ground pointing upward. The camera appears to be in a static position on the ground pointing upward. A streetlight can be seen in the lower left portion of the view, while Officer Saldivar can be seen in the right side of the screen. Officer Saldivar's face can be seen along with his right shoulder. It is clear that he is still engaged in the struggle with the subject. Officer Saldivar's right arm is stationary in his grip of the subject during the struggle.*

*06:44 Officer Saldivar is saying something to the subject, but the mic is not picking up any sound.*

*06:55 a surge in the struggle moves the two out of the camera view. Officer Saldivar disappears from view. Although not clearly visible, it is believed he continues to struggle with the subject due to the light reflecting from his uniform insignia.*

*06:59 the camera view shakes abruptly. No one is in the camera's view. The view changes slightly, but still pointed upward toward a street lamp.*

*****(INVESTIGATOR NOTE: at this point Officer Saldivar has been in a hand-to-hand struggle with the subject (Schenk) for nearly 60 SECONDS.)*********

*07:02 the subject appears in the left side of this video. At this point in the video, audio is inoperable. The subject appears to fall to the ground uncontrolled on his hands and knees (left side of the screen). (See Next Investigator's Note) (No audio)*

*07:03 the subject immediately attempts to get on his feet (still moving). (No audio)*

*07:04 Officer Saldivar shoots the subject twice more (2 puffs of smoke in the top center of the screen, the two flashes of the gunshots and the image of Officer Saldivar's pistol (No audio)*

*07:05 the subject starts falling to the ground and rolls onto his back. Still moving, he tries to rise up. Meanwhile Officer Saldivar delivers two more shots. (Two more puffs of smoke can be seen from the top center of the screen.) (No audio)*

*07:10 Officer Saldivar can be seen with his weapon drawn in his right hand, and reaching for the camera with his left hand.*

6

EXHIBIT 7

*07:13 Officer Saldivar can be seen with his weapon drawn in his right hand, and reaching for the camera with his left hand.*

*\*\*\*\*\*(INVESTIGATORS NOTE: It appears that something happens off-screen (out of camera view) to cause the subject to fall to the ground between 06:59 and 7:02. As the video continues from the point when the subject falls into view, one can see the flash and puff of smoke from two shots and then two more puffs of smoke following that for a total of 4 shots. The charting of Officer Saldivar's weapon indicates he discharged his weapon 5 times. This indicates that what happened off-screen may have been the first gunshot.)\*\*\*\*\*\**

13. Investigator Field outlines the "*close hand-to-hand struggle*" that Officer Saldivar and Schenk were entangled in. In fact, Investigator Field, stated, "*The mic is muffled for the next few seconds which indicates that the subject and Officer Saldivar are locked in a close hand-to-hand struggle with their torso contacting each other which covers the mic.*" Investigator Field never mentions having seen any significant distances between Officer Saldivar and Schenk, and/or Schenk running away at any point during the physical struggle.

14. The Harris County Institute of Forensic Sciences, more specifically, Forensic Chemist II Kristina M. May, analyzed the Gunshot Residue Kit (S.E.M.) on Schenk's hands that was submitted and reported the findings. Forensic Chemist May's report, in part, states,

"<u>*Examination Information*</u>

*Item #1 TR samples were analyzed using an automated scanning electron microscope (SEM) equipped with a gunshot residue analysis package. The most accurate method of identifying gunshot primer residue (GSR) is by its elemental content. The chemical elements Lead (Pb), Barium (Ba) and Antimony (Sb) are components of virtually all primer mixtures except some .22 calibers.*

*The following factors should be considered for interpretation of the results below:*

*1.  Time interval since firearm discharge and specimen collection,*

*2.  Hand proximity/posture to discharging firearm,*

*3.  Protection/handling/wiping of hands after firearm discharge prior to specimen collection,*

*4.  Ammunition type/weapon type, and environmental factors.*

7

EXHIBIT 7

*Results and Interpretation*

*Item #TR sample labeled Right Hand had four particles confirmed as having a composition characteristic of GSR (Pb-Ba-Sb) which likely resulted from activities such as firing a weapon, being in close proximity to a firearm during discharge, or handling a firearm, cartridge, or some other surface bearing GSR.*

*Item #1 TR sample labeled Left Hand had one particle confirmed as having a composition characteristic of GSR (Pb-Ba-Sb) which likely resulted from activities such as firing a weapon, being in close proximity to a firearm during discharge, or handling a firearm, cartridge, or some other surface bearing GSR."*

15. Investigator Field also notes in his report the Harris County Institute of Forensic Sciences (HCIFS) analysis of the GSR.  Investigator Field part, stated,

*"I reviewed HCIFS Lab Report 18-13877-002 which is a Gunshot Residue Report.  The report details the examination of the S.E.M. samples collected during autopsy (ML-18-4115 Nathan Schenk.  The S.E.M. samples are respectfully from Schenk's left and right hands.  The examination revealed that both of Schenk's hands were positive for gunshot residue (GSR).*

*(INVESTIGATOR NOTE: The presence of GSR could have resulted from activities such as firing a weapon, being in close proximity to a firearm during discharge or handling a firearm, a fired cartridge, or some other surface bearing GSR.)"*

16. Gunshot residue on Schenk's hands confirms that Schenk was in close proximity to Officer Saldivar's handgun at the time gunshots were fired.   As previously noted, Investigator Field analyzed Officer Saldivar's body worn camera recording and confirmed Officer Saldivar's report, and my findings, of Schenk being in close proximity to Officer Saldivar's handgun at the moment Officer Saldivar fired.  Officer Saldivar estimated Schenk was approximately five (5) feet away from him at the time, which is confirmed by the particles objective scientific testing prove were on Schenk's hands.

17. The GSR on both of Schenk's hands corroborates Officer Saldivar's report of Schenk reaching towards Officer Saldivar and his handgun, at the time it was discharged.  GSR on both of Schenk's hands disproves the bare speculation of Schenk being on his hands and knees facing away from Officer Saldivar when he fired; the GSR on Schenk's hands conflicts with such a scenario.

Pasadena_22814

EXHIBIT 7

18. Officer Salazar was the first back-up officer at the scene, shortly after the shooting incident. Officer Salazar handcuffed Schenk, which required Schenk's hands to be moved and manipulated for the handcuffing procedure.  In addition, EMS treated Schenk, and it was a rainy night.  Those factors, in of themselves, could have decreased the amount of GSR on Schenk's hands.

19. There is no factual information to support that Schenk discharged a handgun at the time, handled a spent cartridge casing, or had touched any surface bearing GSR.  The objective information clearly shows that both of Schenk's hands were in close proximity to Officer Saldivar's handgun at the time the gun was discharged.  Schenk reaching for Officer Saldivar's handgun at the time it was discharged is consistent with Schenk's previous actions of Schenk's hand grabbing at Officer Saldivar's police duty belt, along Officer Saldivar's handgun side as Officer Saldivar reported.

20. Based on the totality of the circumstances that existed, Officer Saldivar's actions were appropriate under law enforcement training, including TCOLE instruction regarding application of the United States Supreme Court decision in *Graham v Connor*.   Any objective officer could have reasonably believed Schenk presented an imminent threat of serious bodily injury and/or death to Officer Saldivar.  The following objective analysis is based on the totality of the circumstances that existed at the time, as could reasonably be perceived by any judicious and well-trained objective law enforcement officer, when faced with the same or similar circumstances:

1) The offenses Schenk committed, as perceived by an objective officer at the moment Officer Saldivar discharged his handgun

> ➤ ***An officer could have reasonably believed that Schenk had committed traffic offenses, evaded detention, aggravated assault, and presented a threat of serious bodily injury or death to Officer Saldivar***

2) Whether Schenk presented a danger to Officer Saldivar and/or others

> ➤ ***The indisputable information overwhelmingly revealed that Schenk resisted arrest, assaulted Officer Saldivar, and an officer could reasonably have believed that Schenk presented an imminent threat of serious bodily injury or death, at the time Officer Saldivar discharged his handgun***

3) Whether Schenk was resisting or evading arrest at the time

> ➤ ***Schenk was Resisting and Evading detention/arrest at the time Officer Saldivar discharged his handgun***

9

EXHIBIT 7

21. Viewing the facts through the eyes of a well-trained officer, Officer Saldivar did not use unnecessary force against Schenk. No objective officer could have reasonably waited longer to take defensive measures to stop Schenk's actions that posed potential life-threatening consequences to Officer Saldivar.  There is no accepted officer training standard that applies to the circumstances of this case, which could have reasonably notified Officer Saldivar that his conduct would be clearly inappropriate or in violation of any clearly established training procedure.  There is no training standard, which suggests that a competent officer could not reasonably believe that Officer Saldivar's actions were within an acceptable range of legitimate law enforcement action.

22. The facts demonstrate that Schenk presented a threat of serious bodily injury or death at the time Officer Saldivar shot Schenk to stop the imminent lethal threat Schenk's actions posed.  Schenk's chosen actions forced Officer Saldivar to react in self-defense. Schenk could have stopped his unlawful actions before Officer Saldivar reacted to protect himself, but Schenk instead chose to escalate the threat to Officer Saldivar's life, which culminated in the tragedy of Schenk losing his life.

23. When I prepared my initial report, I had not received a copy of the records referenced herein from the Harris County District Attorney's investigation. I understand these records only became available to the parties to this litigation after I prepared my initial report. Information contained in the additional references I have identified further substantiates my analysis of the facts revealed in the District Attorney's investigation.

The aforementioned opinions and observations are true and correct to a reasonable degree of professional certainty.

_Albert Rodriguez_
Albert Rodriguez
Date: 11/30/21

Pasadena_22816

EXHIBIT 7