IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RANDY AVILES, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.: 4:22-cv-03571 |
| RIGOBERTO SALDIVAR & CITY OF | § | |
| PASADENA, TEXAS, | § | |
| | § | |
| *Defendants* | § | |

## DECLARATION OF MARLIN PRICE

1.      My name is Marlin Price. I have been retained to provide expert testimony in this case. On this 8th day of May 2024, I declare under penalty of perjury in accordance with the laws of the United States of America that the following statements are true and correct. I am over the age of twenty-one and in all other ways qualified and competent to make the statements contained within this declaration.

**Summary of my Qualifications**

2.      My formal education after High School includes both a Bachelor's degree (BS) in Criminal Justice and Law Enforcement awarded in 1973 from Sam Houston State University, and a Master of Public Administration degree (MPA) awarded in 1981 from the University of North Texas. I have also graduated from several prominent law enforcement training academies including the Dallas Police Department's basic training academy, the Institute for Law Enforcement Administration's School of Police Supervision and School of Executive Leadership, the Federal Bureau of Investigation's

1

EXHIBIT 18

National Academy (123rd), and the Police Executive Research Forum's Senior Management Institute for Police at the Kennedy School of Government.

3.      I retired from full-time employment in law enforcement in 2022. At the time of my retirement, I held a Master Certification with the Texas Commission on Law Enforcement (TCOLE) and a Certified Property and Evidence Technician with the International Association of Property and Evidence. During my tenure as Chief of Police in Southlake, Texas, I was certified as an assessor and team leader for the Commission on Accreditation for Law Enforcement Agencies and conducted on-site assessments for multiple departments around the country. Over my 37 years of active law enforcement agency service, I have had a total of over 6,500 hours of specialized law enforcement training.

4.      My law enforcement career began in 1972 as a Dallas Police Officer.  I advanced through the ranks of the Dallas Police Department serving as a patrol officer in the Southeast Patrol Division, a Sergeant in Detentions, a Lieutenant in Property, and a Captain in the Identification, Personnel, and Planning and Research Divisions.

5.      During my tenure in the Planning and Research Division, I testified at a U. S. Congressional Hearing on the Dallas Police deadly force policy and authored a new deadly force policy for the Dallas Police Department.

6.      I was assigned to the Crimes Against Persons Section as a Captain in 1984. This position supervised the investigation of all homicide, robbery, and assault cases in the department as well as all officer-involved shootings. In 1986, I was promoted to Deputy Chief and assigned as Criminal Investigations Division Commander over all department

EXHIBIT 18

criminal investigations.

7.      Like most police agencies in Texas, the Dallas criminal investigation unit usually investigated the criminal review of officer-involved shootings, and the internal affairs unit performed the administrative investigation. Administrative investigations determine if the officer violated a police department policy or procedure. As a result, I supervised the criminal investigation of officer-involved shootings for over seven years and the administrative investigations for over two years.

8.      I subsequently served as Southwest Patrol Division Commander as a Deputy Chief.  The department reorganized with the arrival of a new chief, and I was promoted to Assistant Chief in 1988 and assigned to the Professional Standards Bureau overseeing the Internal Affairs Division. While an Assistant Chief, I also commanded the Northeast and Southwest Patrol Divisions, the Criminal Investigations Division (again), and the Special Investigations Division. I retired in 2000, accepting the job as Chief of Police in Southlake, Texas. After five years as chief, I retired on very good terms with the city.

9.      Because of my experience as an assessor and team leader with the Commission on Accreditation for Law Enforcement, while serving in Southlake, I was recruited by the Texas Police Chiefs Association to build an accreditation program for Texas police departments. I developed the Texas Best Practices Accreditation Program and was its director from 2006 to 2014.

10.     From 2014 to 2017, I remained active in the area of law enforcement by continuing to teach classes and conduct on-site police department audits and staffing studies for the Texas Police Chiefs Association and worked as a consultant for Strategic

EXHIBIT 18

Governmental Resources assisting cities with hiring police chiefs and developing training programs.

11.     I returned to full-time work in 2017 with the Plano Police Department as a civilian Administrative Manager, (at the level of an Assistant Chief) supervising the Property and Evidence Unit, Records, Physical and Technical Services (Crime scene and media analysis units), and Detentions. I retired from Plano in 2022.

12.     I am now semi-retired, still teaching classes for the Texas Police Chiefs Association and conducting staffing studies and department audits for Texas police departments. I teach Managing Patrol Operations, Managing Criminal Investigations, and Auditing and Inspections to chiefs, command officers, and supervisors around the state. I am still a member in good standing of the North Texas Police Chiefs Association, The Texas Police Chiefs Association, and the International Association of Chiefs of Police.

13.     I authored a blog post entitled "What in the world is going on with our Police?" for Strategic Government Resources blog, and recently (2023) published a book entitled "Effective and Accountable Policing: Ideas for Effective Police Reform."

## Purpose of My Analysis

14.     I have been asked to evaluate the conduct of the former City of Pasadena, Texas police chief, Joshua Bruegger. The propriety of any law enforcement officer's actions should be analyzed under an objective standard, so I have performed my evaluation by applying objective criteria. I have, therefore, analyzed Chief Bruegger's conduct in this case from the standpoint of how Texas peace officer administrators are trained regarding actions a reasonable and prudent law enforcement administrator could have taken when

4

EXHIBIT 18

presented with circumstances like those Chief Bruegger encountered.

15.     The first issue I was asked to evaluate is whether Chief Bruegger deviated from established training regarding the proper administration of a law enforcement agency in his supervision and management of Officer Rigoberto Saldivar.

### Law Enforcement Administration Training

16.     During my career of over 37 years in active law enforcement, the majority of that time was spent in positions of Administrative Manager, Deputy Chief, Assistant Chief, and Chief of Police. I have received the following training specific to police department management, administration, and leadership:

1. Institute for Law Enforcement Administration, School of Police Supervision, 160 hours.
2. Institute for Law Enforcement Administration, Command and Management Academy, 480 hours.
3. Federal Bureau of Investigation, National Academy, 123rd Session, 464 hours.
4. Police Executive Research Forum, Senior Management Institute for Police, Kennedy School of Government, 120 hours.
5. American Management Association, Modern Personnel Management, 40 hours.
6. International Association of Chiefs of Police, Managing Criminal Investigation, 32 hours.
7. International Association of Chiefs of Police, Internal Controls and Inspections, 40 hours.
8. Americans for Effective Law Enforcement, Police Discipline and Labor Problems, 40 hours.
9. Dallas Police Department, Police Liability and Labor Relations, 32 hours.
10. Omaha Police Department, Managing Juvenile Operations, 40 hours.
11. National Institute of Justice, Technology Institute, 40 hours.

EXHIBIT 18

12. National Center for Missing and Exploited Children, Safe Schools, 40 hours.

13. National Intelligence Academy, National Intelligence Academy, 30 hours.

14. Sam Houston State University, Law Enforcement Management Institute of Texas, New Chief Development Course, 80 hours.

15. Sam Houston State University, Law Enforcement Management Institute of Texas, Administrative Decisions, 24 hours.

16. Sam Houston State University, Law Enforcement Management Institute of Texas, Executive Issues Seminars and annual Chief Update training, total of 328 hours.

17.    Also, during my career, I continue to provide instruction to police chiefs, command officers, and supervisors in the following areas:

1. Managing Patrol Operations. The course covers the historical research on police patrol operations, and how to properly staff, schedule and deploy available resources for the best results.  The class also covers what crime control techniques work based on research and how to develop those resources in their departments. The 16-hour course also covers supervision and leadership issues specific to patrol operations and the inspections and audits that should be performed to ensure proper service delivery.

2. Managing Criminal Investigations. This course covers how to manage the criminal investigation functions within a department to ensure appropriate follow-up of criminal offenses.  It discusses workload levels, analysis of crime clearances, the use of civilians in the investigative function, and trauma-informed investigative procedures.

3. Auditing and Inspections for Law Enforcement. This course provides instruction on how to conduct audits of various functions and programs within a police department, sampling techniques, and the benefits of audits and inspections.

18.    I recently published a book entitled "Effective and Accountable Policing: Ideas for Effective Police Reform."  This book covers what police should be doing, effective

EXHIBIT 18

crime control strategies, how to determine proper police staffing levels, and the questions

that city or school leadership should be asking their police department.

### Resource Information Analyzed

- Texas Commission on Law Enforcement Standards and Education regulations, handbook, and website. Specifically, the new mandated 8-hour course on Trauma-Informed Approach to Sexual Assault Investigations. https://tcole.teex.org/course/index.php?categoryid=16

- Force Science Institute Web Site (http://www.forcescience.org); Specifically reports

  - https://www.forcescience.com/2005/08/new-findings-expand-understanding-of-tunnel-vision-auditory-blocking-lag-time/

  - https://www.forcescience.com/2007/07/the-camera-doesnt-lie-right/

  - https://www.forcescience.com/2008/07/a-survey-of-the-research-on-human-factors-related-to-lethal-force-encounters-implications-for-law-enforcement-training-tactics-and-testimony/

  - https://www.forcescience.com/2009/01/should-officers-see-video-of-their-encounters/   https://www.forcescience.com/2010/03/do-head-cameras-always-see-what-you-see-in-a-force-encounter/

  - https://www.forcescience.com/2011/05/important-new-reaction-time-study-addresses-whats-reasonable-in-armed-suspect-encounters/

  - https://www.forcescience.com/2014/10/10-limitations-of-body-cams-you-need-to-know-for-your-protection/

  - https://www.forcescience.com/2024/01/bodycam-videos-and-honest-accountability/

  - https://www.forcescience.com/2024/03/forty-two-officers-forty-two-responses-one-scenario/

- International Association of Chiefs of Police.  Officer Involved Shooting Guidelines, 2018. https://www.theiacp.org/sites/default/files/2019-05/Officer%20Involved%20Shooting%20Guidelines%202018.pdf

EXHIBIT 18

- National Institute of Health. Effects of Acute Stress on Psychophysiology in Armed Tactical Occupations: A Narrative Review. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8834678/

- FBI Law Enforcement Bulletin (2002). Perceptual and memory distortions in officer-involved shootings.

- Texas Local Government Code, Chapter 143.

- Texas Police Chiefs Association Foundation, Texas Best Practices Accreditation Manual and Standards.

### Factual Information Analyzed

- The Pasadena, Texas, Police Department Manual consists of the Rules and Policy Manual, Department Rules of Conduct and Behavior, and the Department-wide and Specific Division Procedure Manual. (electronic)

- The City of Pasadena job description for Police Officer

- The Pasadena, Texas, Police Department annual Use of Force Audits for 2019, 2020, and 2021.

- The Pasadena, Texas, Police Department, Use of Force Report on Aviles

- The Pasadena, Texas, Police Department, Ramirez Internal Affairs investigation.

- The Pasadena, Texas, Police Department, Search Warrant and affidavit for Avilas' vehicle.

- The Pasadena, Texas, Police Department, Aviles Shooting Scene sign-in Sheets and Photos

- The Pasadena, Texas, Police Department, Schenk Internal Affairs Investigation, and officers body camera and vehicle video.

- Expert Report of Albert Rodriguez in Schenk case.

- Memorandum and Order granting Summary Judgement in Schrek Case

- Internal Affairs investigations of Smith and Strahan shootings.

- Aviles Case, Plaintiff's Original Complaint

- Brazoria County Sheriff's Office Incident Report dated 1/12/2021

EXHIBIT 18

- Recorded Video. Interview of R. Saldivar in Aviles case.

- Recorded Body Cam and Vehicle Video of Officer R. Saldivar Aviles's shooting.

- The Pasadena, Texas, Police Department, Aviles Internal Affairs Investigation, Scene Photographs, Scene Sign-in Sheet, Incident Report, Firearms Discharge Report.

- Officer Rigoberto Personnel File

- City of Pasadena, Civil Service Commission Rules

- City of Pasadena, Police Department, Lesson Plans for Critical Incident Training and Tactical Firearms courses.

- City of Pasadena, Police Department, TPCA Accreditation Program file submission for Standard 3.02.

- The Pasadena, Texas, Police Department, Officer Rigoberto Saldivar Training Record.

- Depositions of Randy Aviles, Chief Joshua Bruegger, and Detective Michael Cooper.

- Expert Report of Mr. Jeremy Bauer. Ph.D.

- Plaintiff's Expert Report of Mr. Scott De Foe.

### Summary of Facts Derived from Information I Analyzed

19.     The Pasadena Police Department hired Officer Saldivar as a police cadet on March 2, 1998, and promoted him to Probationary police officer on August 17, 1998. Twenty years later, on April 16, 2018, Officer Saldivar shot at Angel Ramirez, who was not struck by any shot Officer Saldivar fired. A subsequent Pasadena Internal Affairs investigation was conducted of that firearm discharge. The investigation included statements from Ramirez, Officer Saldivar, all responding officers, and review of all recordings of the events. The investigation of that firearm discharge was thorough, competent, and consistent with accepted industry practices.

EXHIBIT 18

20.     The body camera video of that event showed Mr. Ramirez with a gun in his hand at the instant Officer Saldivar began to react to the apparent potential threat Ramirez posed. Later, the recording of the position of the gun Ramirez held was blocked by darkness and fencing when Officer Saldivar fired toward Ramirez. There is no recording of Ramirez's specific actions between the moment Officer Saldivar observed the gun in Ramirez's hand and Officer Saldivar fired shots.

21.     The Pasadena police department chain of command reviewed the Ramirez investigation and concluded the objective evidence did not establish that Officer Saldivar violated any Pasadena police department policy, therefore no disciplinary action was called for or taken against Officer Saldivar based on his encounter with Mr. Ramirez. A criminal investigation was also conducted, and the Harris County District Attorney accepted a charge of Aggravated Assault on a Police Officer, against Mr. Ramirez.

22.     The job description of a Pasadena Police Officer includes the following duties:

- Recognizes suspicious behavior of persons which may indicate involvement in criminal offenses, stopping and interviewing suspicious persons, and completing field interview cards.
- Observing and recognizing erratic driving, issuing traffic citations. Conducting field sobriety tests, making arrests, and when appropriate, to ensure the safety of persons on roadways within the city.

23.     On November 21, 2018, Officer Saldivar fatally shot Nathan Schenk, during a physical struggle after Officer Saldivar had pursued Mr. Schenk on foot when Mr. Schenk fled detention carrying illegal drugs.  As required by Pasadena police department policy, both a criminal and Internal Affairs administrative investigations were conducted of the Schenk shooting.

EXHIBIT 18

24.      The criminal investigation was completed by Pasadena police Detective Michael Cooper, and other Pasadena investigators, in conjunction with Harris County District Attorney's Office personnel. The criminal investigation was submitted to the Harris County District Attorney on January 9, 2019. Detective Cooper reported he interpreted the body-worn camera recording as showing actions on the part of Officer Saldivar and Mr. Schenk during the shooting that were inconsistent with Officer Saldivar's description of the events. Detective Cooper met with Chief Bruegger and Assistant Chief Styron and provided them with Detective Cooper's interpretation of the recording. Detective Cooper also provided his interpretation of the recording to the Internal Affairs investigator.

25.      The Internal Affairs investigation into the shooting of Mr. Schenk was competent and consistent with the best industry standards. The investigation included statements from all officers at the scene, a review of crime scene evidence, a review of objective scientific testing, a review of all recorded evidence, a review of medical examiner reports, and evidenced attempts to locate additional witnesses and recordings.

26.      In his report, Internal Affairs investigator Sergeant Hamilton, clearly noted and considered Detective Cooper's opinion of the interpretation of the recording. Sergeant Hamilton required Officer Saldivar to respond to Detective Cooper's interpretation of the recording.   Officer Saldivar's response to questions regarding Detective Cooper's interpretation of the recording was that Officer Saldivar had already provided all the information Officer Saldivar could about his perception of the events as they had occurred.

27.      When the Internal Affairs investigation was complete, supervisors and administrators in Officer Saldivar's chain of command reviewed the investigation and all

EXHIBIT 18

supporting documents and recordings and found no violation of police department policy or procedure, therefore, no disciplinary action was taken or appropriate against Officer Saldivar. Sergeant Hamilton, and police department administrators did not interpret the unclear - ambiguous at best - recording as had Detective Cooper.

28.     The Harris County District Attorney's Office reported that it possessed the video recording.  Presumably, if the District Attorney's Office agreed the recording substantiated Detective Cooper's interpretation, a criminal charge would likely have been filed against Officer Saldivar. On November 12, 2019, the Harris County Grand Jury No-Billed Officer Saldivar in the Schenk shooting.

29.     The Pasadena Police Department has a comprehensive policy and procedure manual that clearly outlines the department's Use of Force Policy and specifically its Use of Deadly Force Policy.

30.     The Pasadena Police Department Use of Deadly Force Policy reads, in relevant part, as follows:

- (2) Use of deadly force - Law enforcement officers are authorized to use deadly force to:
     To protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm.
     Where practicable, prior to the discharge of the firearm, officers shall identify themselves as law enforcement officers and state their intent to shoot.
- 3) Deadly force restrictions:
     Warning shots shall not be fired.
     Firearms shall not be discharged at a moving vehicle in an attempt to disable the vehicle.

EXHIBIT 18

Officers threatened by an oncoming vehicle shall make a reasonable effort to attempt to move out of its path, if possible, instead of discharging a firearm at it or any of its occupants. However, if an officer reasonably believes that a person is immediately threatening the officer or another person with deadly force by means of a vehicle, an officer may use deadly force against the driver of the vehicle.

Officers are not authorized to use deadly force against suspects to prevent the consequences of self-imposed bodily injury or suicide.

- (4) Officers may use deadly force to destroy an animal that represents a threat to public safety or as a humanitarian measure if the animal is seriously injured and the officer reasonably believes deadly force can be used without harm to the officer or others. In these circumstances, a supervisor shall be contacted prior to the use of deadly force if time permits.

31.    The Pasadena Police Department's Deadly Force Policy is clear, concise, and consistent with the Texas Best Practices Accreditation Program.

32.    The Texas Best Practices Accreditation Program requires annual training in a department's deadly force policy. (Standard 3.02) The department uses Power DMS for policy and training distribution.  The new policy was revised and issued using Power DMS as part of the new departmental policy manual.  The department developed a test over the contents of the new deadly force policy and tested all sworn officers.  Officer Saldivar scored 100 percent on the test.

33.    The department also has a policy that prohibits officers from using more force than necessary.  Policy 2.82 reads:

- 2.82 Necessary Force in Making Arrests:

Officers making a lawful arrest will not use more force than necessary in making the arrest or in dealing with a prisoner or any person, and will not subject such prisoner to

EXHIBIT 18

more restraint than is necessary for his arrest and detention or for the safety and protection of anyone else.

34.     Pasadena Police have a detailed written Post-Shooting procedure in section 1.6 of their department manual. That procedure specifies that both a criminal and administrative investigation will be conducted.  The procedure is similar to other Texas Law Enforcement agencies and includes the requirement for the notification of the Harris County District Attorney's Office Civil Rights Division.

35.     Chief Bruegger was appointed as the Chief of Police on January 2, 2019. Chief Bruegger, acting as Chief of Police, reviewed the completed Internal Affairs investigation of the Schenk shooting and after review, agreed with the chain of command that no department policy was violated and, therefore, initiated no disciplinary action against Officer Saldivar.

36.     In addition to the criminal and administrative investigations conducted by the department, the Harris County District Attorney's Office, and the Harris County Grand Jury, an investigation was done by a highly qualified expert during a civil lawsuit in which the federal district court ruled in favor of the City of Pasadena.

37.     On January 12, 2021, Officer Saldivar shot Mr. Randy Aviles as he was driving away from a traffic stop.  Officer Saldivar fired 10 rounds at Mr. Aviles's car as he was driving away, striking Mr. Aviles in the arm.  Mr. Aviles was ultimately arrested after a vehicle chase.

38.     Again, both a criminal investigation and an Internal Affairs administrative investigation were conducted into this shooting (Aviles).

14

EXHIBIT 18

39.     The morning after the Aviles shooting, Chief Bruegger promptly personally reviewed the vehicle and body camera recordings of the Aviles shooting.  Chief Bruegger immediately believed there would likely be a policy violation because the officer fired at a vehicle driving away and was no immediate danger to the officer.

40.     Chief Bruegger initially placed Officer Saldivar on Administrative Leave for 5 days according to Pasadena's administrative policy.

41.     When Officer Saldivar returned to work on January 25, 2021, Chief Bruegger assigned Officer Saldivar to desk duties in the Property and Evidence Room, where uniform equipment is distributed.  Officer Saldivar never returned to police patrol duties. After nearly six months in the non-police assignment, Officer Saldivar retired from the Pasadena Police Department on July 9, 2021.

42.     When Officer Saldivar retired, the criminal investigation into the Aviles shooting had been submitted to the District Attorney's Office and the police department was waiting on the results of the Grand Jury before completing the Internal Affairs administrative investigation.  The District Attorney's investigation and presentation to the Grand Jury was delayed due to the District Attorney's investigation of a City of Houston (Harding Street) police shooting.

43.     Chief Bruegger thought the shooting of Mr. Aviles was in violation of the Pasadena deadly force policy and had decided not to return Officer Saldivar to police duties. Understandably, Chief Bruegger hesitated to prematurely implicate the due process procedures afforded to police officers through Texas police civil service statutes in an officer discharge case until after the criminal investigation and officer prosecution, if any,

15

EXHIBIT 18

was completed.

44.    Before the Grand Jury took any action regarding the Aviles shooting, Officer Saldivar considered retiring from the Pasadena Police Department. Chief Bruegger had no ability to prevent Officer Saldivar from retiring and if Officer Saldivar decided to retire Pasadena would face no risk of being required by Texas civil service laws to keep Officer Saldivar on the police payroll as an officer. When Officer Saldivar asked Chief Bruegger if the Chief would later attempt to modify his report on the Texas Commission on Law Enforcement separation of duty reporting form (TCOLE F-5) after Saldivar retired to a less than an honorable separation, Chief Bruegger informed Saldivar that Chief Bruegger would not attempt to modify the F-5 form based on developments that occurred after Chief Bruegger submitted the TCOLE form.

45.    When Officer Saldivar retired, he had not been charged with committing a crime, nor proven, in accordance with Texas law, to have violated any State civil service provision. When Officer Saldivar retired, had the Chief reported to TCOLE that the circumstances of Officer Saldivar's separation from the Pasadena Police Department were other than retirement, such a report would have implicated Officer Saldivar's right to a hearing before a Texas Administrative Law Judge to evaluate the propriety of the Chief reporting such a designation before the Civil Service Commission had made any finding of officer misconduct, before the criminal investigation was completed, and before Pasadena had finalized its administrative investigation.

46.    The citizens of the City of Pasadena voted to adopt Texas Local Government Code Section 143 as its civil service protection for police officers. The Chief of Police

EXHIBIT 18

(department head of the police department) is the only person within the police department who can initiate disciplinary action including suspensions, demotions, and indefinite suspensions (discharge). But the Chief's authority in this regard is subject to officer protections afforded by Texas civil service law.

47.    Under Local Government Code Section 143.053, officers who are suspended, demoted, or indefinitely suspended may appeal their discipline to the Civil Service Commission or an independent hearing examiner (arbitrator). The Civil Service Commission, or a hearing examiner, can uphold, modify, or reverse disciplinary action a police chief commences.

48.    Under civil service provisions, in accordance with § 143.051: "The following are declared to be grounds for dismissal or suspension of any employee from the classified service in the City of Pasadena:

   a.  Indictment, deferred adjudication or other deferred disposition, or conviction of a felony, State Class A or B misdemeanor, federal misdemeanor, or other crime involving moral turpitude;

   b.  Violation of the provisions of the Charter of the City of Pasadena;

   c.  Acts of incompetency;

   d.  Neglect of duty;

   e.  Discourtesy by said employee to the public or fellow employees;

   f.  Acts of said employee showing a lack of good moral character;

   g.  Drinking of intoxicants while on duty or intoxication while off duty;

   h.  Conduct prejudicial to good order;

   i.  Neglect or refusal to pay just debts;

EXHIBIT 18

j.  Absence without leave, including unauthorized absence from work for a period of two (2) consecutive work shifts or more, which shall be considered a resignation;

k.  Shirking duties;

l.  Cowardice;

m.  Failure to follow all requirements and limitations established by a medical professional, including limitations on activities while off duty due to illness or work-related injury; or

n.  Violation of any of the rules and regulations of the Pasadena Police Department; or special orders as applicable; or of these Rules; or any of the City Personnel Policies; or any other City Ordinance or Policy applicable to Police Department employees.

49.     The Texas Commission on Law Enforcement is the state regulatory agency that specifies the minimum standards for hiring police officers and the minimum standards for both basic and continuing education. The Commission sets both two and four-year training requirements for continuing education of police officers and requires at least a total of 40 training hours every two years. The Commission also require certain training courses during each two- and four-year period based on laws passed by the state legislature and governor.

50.     During Officer Saldivar's career with the Pasadena Police Department, he was provided with a much higher level of training than most departments can provide and more training than the State of Texas requires.  Officer Saldivar had 1,403 continuing hours of police instruction, ranging from a low of 63 hours to a high of 214 hours in any one of the two-year TCOLE training cycles.

18

EXHIBIT 18

a. Included in this training was 373 hours of Patrol tactical training hours that included use of patrol tactics of approaching suspect vehicles and residences, and maintaining cover and concealment.

b. He completed his state-required Use of Force training for his Intermediate proficiency certificate.

c. He completed Patrol Rifle Training which includes cover and concealment issues.

d. He completed Field Training Officer training.

e. He completed the Mental Health Police Officer certification.

f. He completed a tactical firearms training program in 2016.

g. He completed Crisis Intervention Training which includes de-escalation and handling of mentally challenged in 2017.

h. He completed a course in hands-on defensive tactics on February 18, 2020.

i. He completed a Less-lethal Chemical weapons refresher on November 14, 2020.

51.    Officer Saldivar's classes in Crisis Intervention Training and Tactical Firearms training lesson plans for the 2016 and 2017 classes included discussions of de-escalation, cover, and concealment. Officer Saldivar's training records establish the training provided by the department is above average.  Officer Saldivar was hired on March 2, 1998. He had previously attended the Houston Community College Police Academy. At the time, that academy consisted of a total of 540 hours of instruction when the state requirement was only 400 hours.  Officer Saldivar worked for the Houston Independent School District Police Department before he was hired by the Pasadena Police Department in 1998. He then attended the Pasadena Police Academy, which at the time consisted of 872 hours of instruction when the state requirement was only 560 hours for untrained officers. Because

19

EXHIBIT 18

Officer Saldivar had already completed police academy training before he joined the Pasadena Police Department, the State of Texas and TCOLE did not require Officer Saldivar to complete the Pasadena Police Academy training.

52.     At the time of the Aviles incident, Officer Saldivar had averaged well over 100 continuing education hours for every two-year cycle, well over the 40-hour two-year minimum set by the State, and well above the average number of hours provided to most officers in Texas. Officer Saldivar was awarded his Master Peace Officer Certificate by the Texas Commission on Law Enforcement in 2011.

53.     The Pasadena Police Department policies also include detailed sections on the qualification, carrying, and use of less-lethal weapons such as batons, tasers, and chemical weapons.  Policies also require the continuing training of officers to include:

U 3.8 TRAINING

1) All officers shall receive training in the use of their firearms and all non-lethal weapons authorized by the department, hands-on arrest and defensive tactics, as well as the "Use of Force" policy prior to performing any law enforcement duties.

2) All officers shall be trained and qualified with their firearms at least bi-annually.

3) All members shall receive training in the department's "Use of Force" policy at least annually.

4) All officers shall receive hands-on arrest and defensive-tactics training at least every two years.

5) Officers shall receive training in all non-lethal weapons issued or used by the department and demonstrate proficiency with those weapons at least every two years.

20

EXHIBIT 18

6) All use of force training shall comply with the standards established by TCOLE.

54.    The Pasadena, Police Department Policy and Procedure Manual does not contain any written policy that prohibits or discourages taking disciplinary action against employees for failing to comply with policies and procedures. The opposite is true, with numerous policies indicating violation of the policies and procedures will result in disciplinary action.

55.    The Department began conducting annual Use of Force audits in 2019 to better track use of force and identify trends and issues for future training.

56.    The Department also began the Texas Best Practices Accreditation Program under Chief Bruegger and the department was Accredited on July 9, 2021.

57.    Officer Saldivar's last Performance Evaluation in file from his supervisor in patrol (June 2019) shows him as Exceeds Standards in all but four areas of performance.

58.    The Pasadena, Police Department also has a Supervisory Intervention Program that allows supervisors to administratively correct officer behavior as necessary to improve performance as well as lower levels of administrative discipline such as written reprimands.

59.    The department has terminated (or separated) officers in the past due to excessive or unnecessary force.

**Analysis**

60.    After the Schenk shooting, there were three investigations. Pasadena detectives, including Detective Cooper and the Harris County District Attorney's Office, performed

21

EXHIBIT 18

criminal investigations that a Harris County Grand Jury reviewed. Sergeant Hamilton of the Pasadena Police Department Internal Affairs unit performed an administrative investigation of whether Officer Saldivar violated any Pasadena rule of conduct. A third investigation was done by experts and lawyers during a civil lawsuit in which the federal district court ruled in favor of the City of Pasadena.

61.    Criminal and administrative investigations run simultaneously, but with care to not contaminate the criminal investigation. The criminal investigation is sent to the Harris County District Attorney for review, further investigation if necessary, and presentation to a Harris County Grand Jury to determine if charges should be filed against the involved officer. The Pasadena Police Department has a detailed post-shooting procedure that outlines the investigation process and activities to be conducted. This procedure is consistent with those found in other progressive Texas agencies and is usually developed in conjunction with the local district attorney. One of the immediate calls the Communication Division makes after an officer-involved shooting is to the Civil Rights Division of the Harris County District Attorney's Office. Both an Assistant District Attorney and a District Attorney Investigator are sent to the scene of all officer-involved shootings where a citizen is injured. An Assistant District Attorney and a DA investigator were sent to both the Schenk and Aviles shooting scenes.

62.    The procedure provides that both a criminal and administrative investigation will occur. It also indicates that the responding criminal investigation detective will be in charge of the scene. The procedure conforms to appropriate crime scene activities such as securing the scene, identifying witnesses, protecting physical evidence, and calling for

EXHIBIT 18

necessary assistance.  It does not provide for calling for an attorney for the involved officer.  However, the procedure must permit an officer to consult with an attorney if the officer decides to do so. Since this is a criminal investigation, police officers have the same rights as other citizens and are allowed by the Miranda Supreme Court decision to consult legal counsel.  Most officers belong to employee organizations that provide attorneys for officers, and the involved officer, or other officers, will usually call for the on-call attorney to speed up the investigation process.

63.     A typical investigative procedure provides that the detective in charge will conduct a walk-through with the officer. The procedure cannot specify whether the walk-through will be recorded because the officer who is subject to the criminal investigation, like any other individual who is under a criminal investigation, has the right to dictate the circumstances under which the accused will waive constitutionally protected rights and make statements to investigators. The purpose of the walk-through is to get an initial understanding of the shooting, to attempt to determine where the officer and suspect were at the time of the shooting and which direction and number of shots fired. It is critical for the immediate investigation that investigating officers and crime scene personnel attempt to locate where the fired rounds went to ensure no other individuals were injured during a shooting.

64.     Over the years of investigating shootings, attorneys representing officers have objected to the recording of the walk-through because studies show the officer may be stressed such that the officer may speculate about information the officer did not observe or cannot recall.  If the detective in charge insists on recording the walk-through, the

EXHIBIT 18

attorney can simply advise the officer not to participate further in the investigation. Any citizen who is the subject of a criminal investigation has the same constitutionally protected rights. Officers have no greater rights than any other person who is the subject of a criminal investigation. Investigators, whether the suspect is a police officer or not, generally prefer to perform investigations in a way the subject is willing to continue to provide information.  It would be short-sighted for any investigator to cut off voluntary cooperation from a person involved in a criminal investigation by attempting to dictate conditions that a reasonable lawyer would not accept.

65.     In those rare situations when an involved officer's attorney recommends actions that could possibly hamper a criminal investigation, an Internal Affairs detective could order the officer to do the walk-through under circumstances dictated by the police department that are not agreeable to the officer or his attorney, but the criminal detective cannot be present or use anything from the recorded walk-through because of the Supreme Court Garrity decision. Since doing so could conceivably impair criminal charges, this procedure is very rare.

66.     The common procedure is that the officer involved in the shooting will accompany the criminal detective to the department for an interview. In many cases, at the officer's attorney's insistence, the officer is not immediately interviewed. Studies show that because of the stress, fatigue, and the new understanding of the impact of trauma and its resulting interference with memory formation, the IACP Psychological Services Section has recommended delaying officer interviews, if possible, for at least one full sleep cycle. Most attorneys are aware of these issues and often tell criminal Detectives who are

EXHIBIT 18

investigating shootings that the officer will instead provide a written statement over the next couple of days.

67.     Nonetheless, if at any time the evidence indicates the officer may have violated the law, and if a criminal investigator in accordance with assistant district attorney approval believes probable cause exists, the officer is subject to arrest at the scene or later.

68.     Detective Cooper, the primary criminal investigator in the case, met with Chief Bruegger, an Assistant Chief, and the Internal Affairs Investigator, Sergeant Hamilton, in the weeks after the shooting and presented Detective Cooper's interpretation of the recording. Detective Cooper interpreted the recording to show Schenk was on his knees moving away when the shots were fired.

69.     I have personally viewed the recording Detective Cooper's opinions are based on. The video is quite dark (being recorded at night). Sergeant Hamilton, Assistant Chief Styron, and Chief Bruegger have reported and testified that they could not make out the recorded images.  The criminal investigation, including Detective Cooper's perceived descriptions of the events, was forwarded to the Harris County District Attorney. The District Attorney presented the case to a Harris County Grand Jury on November 12, 2019, and the Grand Jury No Billed Officer Saldivar.  If the District Attorney agreed with Detective Cooper's interpretation of the recording, I do not understand why a criminal charge would not have been filed against Officer Saldivar in the Schenk shooting.

70.     After hearing Detective Cooper's interpretation of the recording, the Internal Affairs investigator, Sergeant Hamilton, recontacted Officer Saldivar and asked for clarification.  Officer Saldivar's response to questions regarding Detective Cooper's

EXHIBIT 18

interpretation of the recording was that Officer Saldivar had provided all the information he could about the events that occurred.

71.    While Officer Saldivar's memory is imprecise as to some details, that is understandable in light of research on the neurological activity of the brain during trauma. Since about 2005, there has been remarkable research done on the impact of trauma on brain functioning.  This has become so significant that this TCOLE training cycle has a mandated 8-hour course on Trauma Informed Sexual Assault investigations. In this training, it is presented that while the training is directed primarily at sexual assaults, it applies as well to all kinds of trauma.

72.    Force Science Institute is recognized in law enforcement as one of the most respected research organizations in the country. The Institute has been researching and publishing articles regarding the physiological impact of officer-involved shootings since 2006.  The same types of neurobiological findings in Force Science's research are found in trauma research. While not a complete list of symptoms, some of the effects of both trauma and officer-involved shooting are:

> Increased heart rate, increased blood pressure, and increased respiration
> Decreased decision-making quality
> Increased cognitive errors
> Tunnel vision, blurred peripheral vision
> Auditory occlusion
> Loss of fine motor skills
> Fragmented or memory loss
> Inability to recall the sequence of events

73.    In the Schenk case, Officer Saldivar had chased Schenk at maximum effort for 48 seconds and then fought Schenk, which Officer Saldivar discovered was very strong, for

EXHIBIT 18

65 seconds, while wearing approximately 20 extra pounds of police equipment and a protective vest. The audio portion of the video recording shows that Officer Saldivar was clearly winded, almost unable to talk. He was clearly under high stress and according to his statements believed he was losing the battle to control Schenk. Officers are taught that every physical encounter is an armed encounter because the officer carries a weapon. If that weapon is taken from the officer, lives are at risk. That is the reason officers are encouraged to wear a protective vest with a protection level that can stop rounds fired from the officer's own weapon.

74.    Force Science research has shown that the reaction time, the time it takes for an officer to perceive a threat, make the conscious decision to fire, and send the signal down to the hand to unholster the weapon and pull the trigger may take as long as 1-2 seconds when under high stress. And the ability to recognize that the threat is over and to stop firing can be similarly delayed. This scientific principle must be considered in deadly force encounters like those involved here.

75.    It is clear from his testimony that Chief Bruegger was aware he should be cautious in relying solely on recordings to evaluate an officer's performance in a shooting. I have watched the recordings of the Schenk encounter multiple times, in slow motion and frame by frame, and like Chief Bruegger, I am unable to discern the positions of the participants when shots are fired or their positions in the split-seconds preceding the shots. Even if Detective Cooper is correct in his opinion of the content of the recording, the danger Officer Saldivar perceived took place at some moments immediately before the shots were fired. The recording does not prove Officer Saldivar could not reasonably fear for his life

EXHIBIT 18

at the critical moments in the Schenk encounter. The camera is not winded and exhausted, is not afraid, and it is a two-dimensional picture that can be rewound and reviewed endlessly in the comfort of an office. The recording can be manipulated by technology, which changes the brightness of images depicted and may distort, rather than enhance the events Officer Saldivar observed and perceived.  It is the ultimate in hindsight, to assume Officer Saldivar's perceptions, degraded by tunnel vision and loss of peripheral detail, only available instants in time, and in a dark and stressful situation are accurately depicted in a recording made from a perspective other than Officer Saldivar's eyes. Possibly Officer Saldivar's reported perception of the events may have been mistaken, but certainly no evidence I have seen proves they were.

76.     Based on my experience and training, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."

77.     Furthermore, the objective evidence proving Schenk had gunshot powder residue on both of his hands calls into question Detective Cooper's subjective interpretation of the recording. Retired Texas Department of Public Safety training academy commander Albert Rodriguez explained in his expert analysis reasons Chief Bruegger could reasonably conclude Officer Saldivar was justified in shooting Schenk.

78.     Subject to the Civil Service Commission's or an Independent Civil Service Hearing Examiner's final determination, Chief of Police Bruegger was the Pasadena official who was tasked with determining whether Officer Saldivar violated the Pasadena

EXHIBIT 18

deadly force policy. It is clear from the Chief's testimony that he was aware of, and considered, the information Detective Cooper, including his opinion interpreting the same recording Chief Bruegger personally watched.

79.      It appears from Chief Bruegger's testimony that he believed Officer Saldivar fired because he reasonably believed his life was in danger, as could any other reasonable officer in the same situation. Other respected members of the police department concurred with Chief Bruegger's conclusion, as did the Harris County Grand Jury. Chief Bruegger made a discretionary decision in accordance with his responsibilities and, according to his testimony, Chief Bruegger's decision regarding Officer Saldivar's compliance with police department regulations in the Schenk matter was based on Chief Bruegger's education, training, and experience. Given that there was no proof of a violation of department policy, there could be no disciplinary action taken due to the Civil Service rules. I concur with Chief Bruegger's decisions in this regard.

80.      I will also address whether Chief Bruegger should have discharged Officer Saldivar immediately upon suspecting his use of force against Mr. Aviles appeared unnecessary. Chief Bruegger testified he had significant concerns regarding the shooting of Mr. Aviles on the morning after the shooting when the Chief watched the recording of the shooting. The shooting appeared to be directed at the vehicle as Mr. Aviles was driving away and not an imminent threat to Officer Saldivar. I have reviewed that video and share the Chief's concern. Regardless, as Chief Bruegger's experience dictated, it was necessary to complete a full investigation and prove a violation of Pasadena regulations if there was any chance of the City prevailing on a subsequent civil service appeal.

EXHIBIT 18

81.    Police Chiefs of cities in Texas in which Local Government Code Chapter 143 provides civil service protection for officers are frequently frustrated with the civil service appeal process.  Subject to limitations, civil service cities can develop their own specific civil service rules, regulations, rules of evidence, and appeal processes but cities cannot violate the fundamental statutory due process protections Texas statutes provide. For the most part, local civil service regulations primarily consist of procedural rules that apply to conducting hearings.

82.    Many chiefs have expressed frustration that civil service heavily favors officer interests over city concerns. Hearing examiners may not be familiar with police procedures but, nonetheless, have legal authority to uphold discipline, modify discipline, or reverse the discipline. It is not infrequent that police chiefs discharge an officer for violating police department policy, only to have a civil service hearing examiner modify or reverse the discipline because the examiner opines punishment is too severe. A 2020 KSAT (a San Antonio television station) study of San Antonio police officers fired over the past decade found that over two-thirds of them were reinstated after arbitration.  Charles Ramsey, Police Commissioner in Philadelphia stated nine of ten officers he fired got their job back through arbitration. So, before a police chief initiates civil service discipline, the chief wants as compelling, complete, and error-free an investigation as possible, and even then the odds for sustaining discipline do not favor the city.

83.    The internal investigation of the Aviles shooting was well begun but not yet completed when Officer Saldivar retired. The criminal investigation was not concluded, the criminal prosecution had not begun, and Officer Saldivar had not been compelled to

EXHIBIT 18

waive constitutional protections afforded to him during the criminal investigation and prosecution. Certainly, it would have been premature to initiate civil service discipline before Officer Saldivar retired with any reasonable expectation that discipline would have survived scrutiny through the civil service process. Arguably, additional protections provided by Texas Government Code Chapter 614 may have provided sufficient grounds alone for a hearing examiner to reverse a premature disciplinary decision.

84.     Despite information suggesting Officer Saldivar appeared to ignore or fail to follow his training and made some tactical approach errors which put him in a position to be in fear of his life when the confrontation with Aviles occurred, that alone would not likely support disciplinary action before the investigations and prosecution were completed.

85.     The portion of the Use of Deadly Force policy which Officer Saldivar would have likely been held to violate was that the use of deadly force was not immediately necessary because he never actually saw a gun, Officer Saldivar just claimed to believe there was a possibility a gun existed.  Moreover, the Deadly Force policy restricts officers from firing at a moving vehicle in an attempt to disable the vehicle.  The problem that could arise on appeal was that a gun was found at the scene of the shooting that Mr. Aviles had possessed and fired that day. Mr. Aviles admitted to having a gun in his car when Officer Saldivar signaled Aviles to pull over.  This could likely cause a hearing examiner to find reasonable cause for Officer Saldivar's fear and his actions, thereby reversing disciplinary action. Chief Bruegger testified he did not believe Officer Saldivar should remain a Pasadena Police Officer. To ensure Officer Saldivar would no longer be employed by the City, Chief

EXHIBIT 18

Bruegger took prudent course.

86.     While a violation of department policy provides grounds for discipline, that seldom on its own, justifies discharge unless the evidence presented at the civil service hearing is particularly compelling. The commission of a criminal offense or the indictment for a criminal action is usually much more powerful in sustaining disciplinary action on appeal. The criminal investigation of the Aviles incident was conducted by the criminal investigation unit and submitted in a timely fashion to the Harris County District Attorney. There was a good possibility that the DA would seek an indictment against Officer Saldivar in the Aviles matter. So, it was sensible for a chief to wait and add that violation to the Internal Affairs findings before termination of police employment. A policy violation that includes a criminal indictment would increase the chances of prevailing on appeal and preventing Officer Saldivar from returning to employment by the department. This delaying action would not endanger the public because the Chief had assigned Officer Saldivar to inside desk duty in the Property Division.

87.     The District Attorney is normally efficient in reviewing and submitting cases to the Grand Jury, but during the interim period, the DA's Office was working on a very high-profile and complicated Houston Police Department shooting case. During this delay in completion of the DA's review, Officer Saldivar offered to resign, with no appeal, if he was given an "Honorable" discharge on his TCOLE F-5, which was the appropriate classification when Officer Saldivar retired.

88.     Regardless of the characterization of the F-5 form, conscientious police departments typically still contact the former officer's employer and investigate

EXHIBIT 18

employment history. Chief Bruegger understandably viewed Officer Saldivar's offer to resign as an opportunity for the department and city to ensure Officer Saldivar did not return to the Pasadena Police Department.

89.     Chief Bruegger testified he acted on his experience with the Civil Service process and acted in what he believes in the best interests of the City of Pasadena. The pay provided to Officer Saldivar during this interim period was minuscule compared to the potential liability of some future incident if Officer Saldivar exercised poor judgment. Chief Bruegger's actions were appropriate, intelligent, and effective.

**Regarding Training**

90.     A review of Officer Saldivar's training records shows he received an average of well over 100 hours of training during each training cycle. TCOLE requires 40 hours of continuing education in every two-year training cycle.  He had also completed both the basic and Intermediate level TCOLE Use of Force training programs required for his Intermediate certificate. This level of training is much higher than the average number of training hours in other departments in Texas. Cities often cut training funds when budget cuts are needed, but this does not seem to be the case in Pasadena. The Pasadena department has its own modern Police Academy and other cities use the Pasadena academy to train other officers. The Pasadena academy also provides significant in-service training. The department also has an automated policy and training distribution system that can easily distribute new online training and policy changes and tracks when the officer receives the training. Lesson plans for both the Critical Incident Training in 2017 and the Tactical Firearms training in 2016, provided to Officer Saldivar show a discussion of de-

EXHIBIT 18

escalation, communication, cover, and concealment. The department also offers hands-on defensive training as evidenced by the training records. Department records also show Officer Saldivar received and signed for the new department policy manual and was tested on his knowledge of the new Deadly Force policy on July 1, 2020, scoring 100 percent correct.

**Regarding Policy**

91.      A complete review of the Pasadena Police Department's Policy and Procedure Manuals, individual Divisional Procedure Manuals, and the Civil Service Rules does not reveal any rule or policy that requires, directs, encourages, or suggests that officers not be held accountable for their Use of Force actions. The opposite is true.  There are multiple locations in the policy manual and Civil Service Rules that indicate that violation of the rules and regulations of the department may result in discipline up to and including termination (indefinite suspension).

92.      The Pasadena Police Department's Deadly Force Policy states that it values the protection and sanctity of human life. It is restricted to the protection of life, and requires, if time and opportunity permit, to give warning. It prohibits warning shots and gives concise guidance regarding shooting at vehicles.  This policy is similar to those in use throughout the State of Texas and was accepted by the Texas Best Practices Accreditation program at meeting its standards.  Requiring the addition of lists of more specific instructions of doing this when this happens and doing that when that happens does more to delay decision-making by officers faced with uncertain and quickly evolving circumstances.

EXHIBIT 18

93.     The post-shooting policy is sound, and the issues complained of by the plaintiff are matters of Constitutional law requirements and the rights of criminal defendants. The plaintiff points to only these two shootings as evidence of a pattern of practice where officers are not held accountable.  In the first case (Schenk), no violation was found, and no discipline could be taken. This was a discretionary decision for which I agree for the reasons provided earlier.  In the second (Aviles), Chief Bruegger had decided that termination of police employment was probable, took the officer off the street, and was waiting for the DA to make her determination about the case. Chief Bruegger acted wisely in his decisions that eliminated the possibility of a return of the officer on appeal through civil service.

94.     The police department has a robust supervisory program through various civil service ranks. Supervisors routinely evaluate their officers and Officer Saldivar's last patrol evaluation in the file reviewed was rated Exceeds Standard in all but four categories where he was rated Meets Standards. There were no categories where he was below standards. The department has a Supervisory Intervention Program where supervisors can formally correct inappropriate behavior and initiate lower levels of discipline. Supervisors can also initiate higher-level Internal Affairs investigations. These supervisory activities are consistent with the best practices of Texas law enforcement.

### Regarding Internal Investigations

95.     I find no information in the materials reviewed that the department, because of one prior incident (Schenk) where the plaintiff disagrees with a department finding, that all findings are suspect. Chief Bruegger identified at least two instances in his deposition

EXHIBIT 18

where officers were terminated (or resigned under threat of termination) for violation of the department's Use of Force policy. The department began an annual Use of Force audit in 2019 to better analyze its use of force and to identify trends for additional training. In addition, the department entered the Texas Best Practices Accreditation Program in 2019 under Chief Bruegger and received Accredited status in July of 2021.

96.     During the almost three years of commanding the Professional Standards Bureau for the Dallas Police Department, I reviewed hundreds of internal investigations including the administrative investigations of officer-involved shootings. During my tenure as commander of the Criminal Investigations Division, I reviewed all criminal investigations of officer-involved shootings. There were many of those investigations that I sent back for further investigation because they were lacking in information, detail, or accuracy. As a Patrol Division commander, I reviewed the officer-involved shooting incidents by officers under my command. In some circumstances, I sent those investigations back for lacking information or accuracy, even after other commanders had reviewed and approved them.

97.     The internal investigations conducted and reported by the Pasadena Police Department (Ramirez, Schenk, and Aviles) are well done and as complete as any I have seen.

     Their summary report of the investigation's activities and results include:

- Internal Affairs investigator notification and response to scene.
- Description of the immediate notification of supervisors, detectives, crime scene personnel, the Civil Rights Division of the Harris County District Attorney, and the Chief of Police.
- Detailed physical description of the scene and preservation efforts.

EXHIBIT 18

- A description of the actions taken by officers and supervisors before the investigator's arrival including the movement of the involved officer away from the immediate scene and the assignment of an officer to stay with him or her.

- Listing of all persons present at the scene and use of a sign-in log to record all those entering the crime scene.

- Immediate capturing and preserving of the officer's body camera, and vehicle camera video footage, as well as responding officer's video.

- Examination, recording, and documentation of the involved officer's weapon condition, loading, and spent cases.

- Physical evidence collection by crime scene search personnel to include photographs.

- Detailed scene mapping and analysis using laser scanners.

- Examination and documenting officer's non-lethal equipment (Taser) including prior testing and usage records.

- An investigative walkthrough of the event with investigators from the department's Criminal Investigation, Internal Affairs investigations, and the Harris County District Attorney's Office (if responding).

- Allowing an officer's attorney to be present and advise the involved officer regarding the criminal investigation.

- Description of criminal investigative and administrative investigative efforts at the scene.

- Pulling and transcribing any 911 calls and all radio transmissions allowing a detailed timeline (by seconds) to be constructed and included in the report.

- Requiring the first responding officer to prepare a detailed offense report of his or her response, arrival, physical description of the scene, his or her actions at the scene, and the involved officer's comments and actions on arrival.  This formal offense report is summarized in the IAD summary report and also attached in full to the investigation.

EXHIBIT 18

- Requiring all officers and supervisors at the scene to provide detailed supplement reports regarding their activities at the scene.
- Attempts to identify and locate uninvolved witnesses and non-departmental video evidence and statements.
- Requiring a detailed interview with the involved officer and requiring a detailed written statement of the event.
- Interviewing any independent witnesses, including the suspect, and obtaining written statements if possible.
- Obtaining a copy of any evidence obtained in the criminal investigation for inclusion in the report. (Including medical records for anyone injured and autopsy records for any deceased.)
- The identification of any discrepancies between the criminal and administrative investigation and efforts made to resolve those discrepancies.

98.     The Internal Affairs investigation is complete when all investigative activities have been conducted. The internal affairs investigator then prepares a summary report that outlines all the evidence including a detailed timeline of the events, a summary of the involved officer's interview and statement, a summary of the responding officer's statements, a summary of the physical evidence, any discrepancies between the administrative investigation and the criminal investigation, and any efforts made to resolve the differences. In addition, this summary report is prepared and a copy of all documents, reports, statements, and video evidence is attached and forwarded to the officer's chain of command for review and recommendation.

99.     Sergeant Hamilton did not soft-soap his investigation into Officer Saldivar's actions. The plaintiff's allegation of leading questions by Sergeant Hamilton in the original filing appears to be taken from the clarification portion of the interview. Sergeant

EXHIBIT 18

Hamilton's description of the interview in the Schenk Internal Affairs report describes Officer Saldivar's statement as beginning with his statement of what occurred. Most investigators like to try to summarize the salient points of an interview near the end and Sergeant Hamilton's report indicates that he did that near the end of his interview. The first portion of that interview was Officer Saldivar telling what he remembered about the event which coincided with what he told Detective Cooper during his initial walk-through at the scene.

100.    Because of Detective Cooper's assertions, even though Sergeant Hamilton did not himself see the issues described, Sergeant Hamilton called Officer Saldivar back in for a follow-up interview. The results of that interview and Detective Cooper's criminal investigation report were made a part of the Internal Affairs investigation packet. This packet and the accompanying videos were reviewed by Officer Saldivar's chain of command, and they recommended no violation of policy.

101.    Chief Bruegger reviewed the complete package, including the criminal investigation package and Detective Cooper's investigation, and using his experience, education, and knowledge of officer-involved shootings and the physiological aspects of trauma, agreed with the chain of command and found no policy violation.

102.    The internal affairs investigator serves only as the collector of evidence. While he or she may develop an opinion regarding policy violations, it is not expressed in the summary report. The evaluation of whether an officer's actions are a violation of department policy is analyzed by those more senior and experienced. Members of the officer's chain of command, the officer's Lieutenant, Assistant Chief, and Chief will

EXHIBIT 18

usually have much greater experience, training, and understanding of policy and department liability than those in lower positions in the department. They are also the ones who will have to defend their official decisions and actions in either court or the community depending on their decisions.

## Summary Conclusion

103.     During my career with the Dallas Police Department, I supervised and evaluated policy compliance in hundreds of officer-involved shootings, both in criminal and administrative investigations. In one year alone in the 1980s, Dallas had 36 officer-involved shootings, with 9 wounded and 10 killed. The information in this case was more than sufficient to determine that the decision to find no policy violation in the Schenk shooting case was appropriate. Any reasonable administrator facing the same situation could make the same decision as did Chief Bruegger. My examination of the facts indicates that Mr. Schenk's death resulted from his failure to comply with Officer Saldivar's commands and Mr. Schenk's refusal to stop resisting, not because of any governmental policy of the police department or the city. Police officers often stop vehicles for traffic violations and most of the time officers give warnings or citations. But when someone refuses to promptly pull over, there is usually a reason. However, officers typically have no way of knowing whether the motorist robbed someone, is holding drugs, has warrants, or there is some other reason for not swiftly stopping. In this case, the officer was involved in an exhausting pursuit and a fatiguing struggle with a more powerful opponent. Officer Saldivar reportedly saw what he believed was a threat to his life and Chief Bruegger had insufficient evidence to disagree with Officer Saldivar's perception of

EXHIBIT 18

the risk.  I concur with Chief Bruegger's decision.

104.    Pasadena's training program is excellent, providing not only an outstanding basic academy for recruits but also providing all state-mandated and other necessary courses for in-service training. Agencies that operate an academy in Texas, must have a Training Advisory Board of police professionals and citizens, who are also required to receive training in Board duties and responsibilities. This Board reviews and approves basic and in-service curricula. The in-service courses and specialty courses provided to Officer Saldivar over his tenure were greater than most agencies in Texas provide. I found no evidence of a failure to train Pasadena officers.

105.    My examination of the department rules and regulations found no deficiency or suggestion of leniency in Use of Force investigations. The department has been Accredited, which required Pasadena to submit its policies and procedures to outside assessors, who are current or former police chiefs and attorneys. Pasadena was compared to the current best practices in Texas and approved. Pasadena has also begun annual Use of Force audits to identify issues and trends for future training.   Another of the requirements of the Texas Best Practices Accreditation Program is required annual training on the department's Use of Force Policy. This is usually done immediately before or during the annual firearms qualifications. I found no information showing Pasadena Police Department policies regarding the use of force, investigations, or discipline are deficient.

106.    After a review of the investigations by the department in both the incidents in 2018 (Ramirez and Schenk) and the investigations into the Aviles case, I found they are

EXHIBIT 18

well done. I can identify no credible investigative actions omitted that would lead to different outcomes. Based on my experience in supervising well over a hundred officer-involved shooting investigations, from the perspective of an upper-level command officer, I find Pasadena investigations exceptionally well done.

107.    In his deposition, Chief Bruegger identified instances in the past where officers were discharged (or resigned facing termination). I can find no evidence of a policy, pattern, or practice of failing to discipline officers for violation of policy. Nor can I find evidence of the lack of supervision or training. The plaintiffs point to a single case and have offered it as proof of a pattern without providing proof of any other cases. The City of Pasadena, Police Department provides training at a level that meets Texas Best Practices and funds the agency to a higher level of training than most cities. I cannot agree that amounts to deliberate indifference.

By Chief Marlin R. Price (Ret.)
McKinney, Texas

EXHIBIT 18