IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RANDY AVILES,

       Plaintiff,

v.                   Civil Action No.  4:22-CV-03571

RIGOBERTO SALDIVAR,
CITY OF PASADENA, TX,

       Defendants.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

REMOTE VIDEOTAPED DEPOSITION OF

SERGEANT KENNETH URBAN 30(b)(6)

TAKEN ON
MONDAY, APRIL 8, 2024
10:05 A.M.

EXHIBIT 23

1900 WEST LOOP SOUTH
HOUSTON, TEXAS


Powerful
LITIGATION SUPPORT

**REMOTE APPEARANCES**

**Appearing on behalf of the Plaintiff:**

DIMITRI DUBE, ESQUIRE

**The Cochran Firm**

1825 Market Center Boulevard, Suite 500

Dallas, TX  75207

(214) 651-4260

(214) 651-4261 (Fax)

ddube@cochrantexas.com

**Appearing on behalf of the Defendant Rigoberto Saldivar:**

STEVEN D. SELBE, ESQUIRE

**Gordon Rees Scully Manukhani, LLP**

1900 West Loop South, Suite 1000

Houston, TX  77027

(713) 961-3366

(713) 961-3938 (Fax)

sselbe@grsm.com

1                    **REMOTE APPEARANCES**

2

3   **Appearing on behalf of the Defendant City of Pasadena, TX:**

4   NORMAN RAY GILES, ESQUIRE

5   **Lewis Brisbois Bisgaard & Smith, LLP**

6   24 Greenway Plaza, Suite 1400

7   Houston, TX  77046

8   (713) 659-6767

9   (713) 759-6830 (Fax)

10  norman.giles@lewisbrisbois.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
 1                          INDEX

 2                                              Page

 3

 4   EXAMINATION BY MR. DUBE                      8

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
 1                        EXHIBITS

 2   Exhibit                                      Page

 3

 4       1     PLAINTIFF'S ORIGINAL COMPLAINT       12

 5

 6       2     NOTICE OF INTENT TO TAKE ORAL AND    11

 7             VIDEOTAPED DEPOSITION

 8

 9       3     SUMMARY OF COMPLAINT                 12

10

11       4     USE OF FORCE AUDIT                   12

12

13       5     DEPOSITION OF CHIEF JOSHUA BRUEGGER  176

14

15       6     DEPOSITION OF DET MICHAEL COOPER     N/A

16

17       7     VIDEO                                N/A

18

19       8     INVESTIGATION REPORT                 104

20

21       9     VIDEO                                N/A

22

23      10     WRITTEN DIRECTIVE SUBJECT OPERATIONAL N/A

24             POLICIES  USE OF FORCE

25
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
 1                      EXHIBITS CONTINUED

 2  Exhibit                                         Page

 3

 4    11    INTER-OFFICE CORRESPONDENCE SUBJECT      N/A

 5          COMMANDER S SUMMARY

 6

 7    12    VIDEO                                    N/A

 8

 9    13    PERFORMANCE EVALUATION REPORT            170

10

11    14    INVESTIGATIVE POLICY AND PROCEDURE       73

12

13    15    SUBCHAPTER A GENERAL PROVISIONS          49

14

15    16    INDICTMENT                               140

16

17    17    EMPLOYEE SEPARATION FORM - CLASSIFIED    N/A

18

19    18    SUMARY OF COMPLAINT                      119

20

21    19    WRITTEN DIRECTIVE SUBJECT OPERATIONAL    150

22          POLICIES, USE OF FORCE

23

24    20    VIDEO                                    156

25
```

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

1        **REMOTE VIDEOTAPED DEPOSITION OF**

2      **SERGEANT KENNETH URBAN 30(b)(6)**

3              **TAKEN ON**

4        **MONDAY, APRIL 8, 2024**

5            **10:05 A.M.**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

3   **KENNETH URBAN**, having been first duly affirmed to tell the

4   truth, was examined, and testified as follows:

5   **EXAMINATION**

13        Q.   And just to be clear, even though I'm taking your

14   deposition, I'm not taking your deposition in your individual

15   capacity; I'm taking your deposition as a representative of the

16   City of Pasadena.  Do you understand that?

17        A.   I do.

18        Q.   Okay.  And you understand that you are speaking on

19   behalf of the City of Pasadena?

20        A.   Yes.

21        Q.   And your answers may not be your answers, but they

22   are for the City of Pasadena.  Do you understand that?

23        A.   I do.

```
10      Q.    Okay.  How did you prepare?

11      A.    I made myself aware of the materials that were

12  presented to the City, in the Exhibit A, and I believe it's B

13  as well.  And the -- everything that's contained in those.

14      Q.    Did you review the Complaint in this case?

15      A.    I did.

16      Q.    Okay.  Did you review the videos of the shootings in

17  this case?

18      A.    I did.

19      Q.    And that's the shooting of Randy Aviles, correct?

20      A.    Yes.

21      Q.    Okay.  Did you also review the shooting of Nathan

22  Schenk?

23      A.    I did.

24      Q.    Did you review the shooting of Angel Ramirez?

25      A.    I did.
```

```
 1        Q.    Okay.  Did you review the City of Pasadena's use of
 2   force procedures?
 3        A.    I did.
 4        Q.    Okay.  And the use of force audits from the years
 5   2018 to 2021?
 6        A.    Yes.
 7        Q.    Did you review the deposition testimony of Chief
 8   Bruegger?
 9        A.    I did.
10        Q.    Okay.  Did you review the deposition testimony of
11   Michael Cooper?
12        A.    The -- what I had available to me to review, I did
13   review, yes.
14        Q.    Okay.  So there were excerpts that were provided to
15   you from that deposition?
16        A.    Correct.
17        Q.    And you reviewed that?
18        A.    Yes.
19        Q.    Okay.  Is there anything else that I did not mention
20   that you reviewed in preparation for this deposition?
21        A.    I don't believe so.
22        Q.    Did you review the Deposition Notice in this case?
23        A.    The deposition notes?
24        Q.    Notice?
25        A.    Oh, for myself?
```

```
1        Q.   Yes.

2        A.   Yes.

3        Q.   Okay.  Where it listed the topics that I'm going to

4    ask you questions about?

5        A.   Correct.

6        Q.   All right.  Let's start off there.  Okay.  Share

7    screen.  I'm showing you what's been marked as Plaintiff's

8    Exhibit 2 to this deposition, okay.  Are you familiar with this

9    document?

10       A.   Yes.
```



```
21            (WHEREUPON, Exhibit 2 was marked for identification.)

22   BY MR. DUBE:

23       Q.   And here are the exhibits, Exhibit A to that Notice.

24   Do you see that?

25       A.   Yes, sir.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1      Q.   Okay.  And you see a list of topics, correct?

2      A.   Yes.

3      Q.   Okay.  And this first topic is, "The operation of the

4  City of Pasadena police department in the ten years preceding

5  the shooting of Randy Aviles, including but not limited to the

6  identification of the police chiefs, the roles and

7  responsibilities of the police chiefs, the policy and decision-

8  makers ..."; do you see all that?

9      A.   I do.

10     Q.   Okay.  And are you prepared to testify on exhibit 1?

11     A.   Yes.

12     Q.   Okay.  And you see exhibit 2, you can read it to

13  yourself.  Are you prepared to proceed on exhibit 2?

14     A.   I am.

15     Q.   Okay.  And same with exhibit 3, are you prepared to

16  --

17     A.   Yes.

18     Q.   Okay.  And exhibit 4?

19     A.   Yes.

20     Q.   I've been saying exhibit 4, I mean paragraph 4.

21  Paragraph 5?

22     A.   Yes.

23     Q.   Paragraph 6?

24     A.   Yes.

25     Q.   Paragraph 7?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
 1        A.    Yes.

 2        Q.    Paragraph 8?

 3        A.    And in relationship to paragraph 8, are you prepared,

 4   do you -- are you aware of, and are you prepared to testify as

 5   to disciplinary procedures of the City of Pasadena Police

 6   Department?

 7        A.    As far as the process?

 8        Q.    Yes.

 9        A.    I am.

10        Q.    Okay.  And you're familiar with the Civil Service

11   Commission?

12        A.    Yes, sir.

13        Q.    Okay.  Paragraph 9?

14        A.    And on number 9, it's referring to the audits that

15   were provided, correct?

16        Q.    Yes, sir.

17        A.    Okay.  Yes, on number 9.

18        Q.    And paragraph 10?

19        A.    Yes.

20        Q.    What did you do to prepare to testify with respect to

21   paragraph 10?

22        A.    I reviewed the response of the attorney's office

23   representing the City, which indicated that there was an

24   objection I believe on this request because of the enormity of

25   it.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1    Q.    Did you review any communications between the Chief

2   and any employees of the Harris County District Attorney's

3   Office?

4    A.    I have not.

5    Q.    Did you review any communications from the Harris

6   County District Attorney's Office to the City of Pasadena?

7    A.    I have not.

8    Q.    Let's start off briefly with your background. How

9   long have you been employed with the Pasadena Police

10  Department?

11   A.    Over 32 years.

12   Q.    Oh wow.  Congratulations.

13   A.    Thank you.

14   Q.    So that means you started, let's see if my math is

15  good, 1992?

16   A.    That's correct.

17   Q.    How long have you been a Sergeant?

18   A.    For a little over 15 years.

19   Q.    And what department are you I guess in charge of?

20   A.    I am in charge of Internal Affairs.

21   Q.    How long have you been in charge of Internal Affairs?

22   A.    Since about August of last year, of '23.

23   Q.    Who was your predecessor in that role?

24   A.    It was Sergeant Mike Norman.

25   Q.    Are there any other members of the Internal Affairs

1  **Division currently besides yourself?**

2      A.   Detective Mauricio Reyes is a backup investigator.

3  His primary duty is Public Integrity investigations, but he is

4  also the backup Internal Affairs investigator.

5      **Q.   Any other employees?**

6      A.   None assigned to that Division, no.

7      **Q.   When Mr. Norman was -- is Mr. Norman still with**

8  **Internal Affairs, Sergeant Norman?**

9      A.   No, sir.  He retired.

10     **Q.   When he was in charge of Internal Affairs, was there**

11 **anybody else that was working with him in the Division?**

12     A.   Sergeant Eric Fickessen was the Public Integrity

13 Officer at the time, or Sergeant at the time.  He was working

14 next door to Sergeant Norman, just like Detective Reyes is

15 doing with me.

16     **Q.   Understood.  And what are your roles as a Sergeant in**

17 **the Internal Affairs Division?**

18     A.   My roles are to investigate any kind of complaint

19 against officers; to determine whether or not there's any

20 policy violations, that come in either through citizen directly

21 to us or routed through patrol, a supervisor, or directly to

22 the Chief's office.  Whatever comes into our office for us to

23 investigate.

24     **Q.   And you've been a member of Internal Affairs since**

25 **August of last year, correct?**



EXHIBIT 23

1      A.    It was about August, yes.  I think it's been about

2   seven months.

3      **Q.    Okay.  And where were you prior to that?**

4      A.    Prior to that, for six months, I was evening shift

5   patrol.

6      **Q.    What was your responsibilities in evening shift**

7   **patrol?**

8      A.    So evening shift patrol, or any patrol sergeant

9   supervises, first line supervisor, who has a squad of

10  individuals that report directly to him or her, and they're

11  responsible for the growth and guidance of the officers. Also,

12  for evaluating their performance over a six month period.

13     **Q.    And where were you before that?**

14     A.    Before that, I was the Juvenile Crimes Supervisor,

15  Detective Supervisor.

16     **Q.    And how long were you in that capacity?**

17     A.    For five years.

18     **Q.    And where were you before Juvenile Crimes?**

19     A.    I was evening shift patrol supervisor for about two

20  and a half years I think.

21     **Q.    And then where were you before that?**

22     A.    Prior to that, I was assigned to the Pasadena Police

23  Academy for approximately three years, three and a half years I

24  think.

25     **Q.    Were you a Sergeant --**

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1      A.    I was.

2      Q.    -- during that time?

3      A.    Yes, sir.

4      Q.    What was your role at the police academy?

5      A.    So my role was to oversee the day to day activities

6  of the police academy, which included recruiting, included

7  class participation in courses, reviewing course content, and

8  make sure that proper documentation is presented to TCOLE to be

9  applied to the records of the officers.

10     Q.    And how long were you in that role?

11     A.    About three years, three and a half years.

12     Q.    Three years, okay.  So I think we've covered

13 basically at least the last 10 years of your career, correct?

14     A.    Yes, sir.

15     Q.    So let's start with the Pasadena Police Department.

16 How is the Police Department structured in terms of, you know,

17 the visions and positions of I guess employees?

18     A.    Now, you're referring to like the rank structure?

19     Q.    We can start there, yes.

20     A.    So at the top of the rank structure, you have the

21 Chief of Police.  Under the Chief of Police, you have,

22 currently we have two Assistant Chiefs.  That varies at times.

23 After that, below the Assistant Chiefs you have 10 Lieutenants.

24 And then below that, you have 40 Sergeants. And then Patrol

25 Division, I mean, then the rank of Officer below the police



EXHIBIT 23

1  sergeants.

2      Q.    So it goes Officer to Sergeant?

3      A.    Yes.  It's Officer.  If you promote, then it's

4  Sergeant, and then it's Lieutenant.  And then if you get

5  selected, Assistant Chief, and then the Chief is above

6  everybody.

7      Q.    Is a Detective a separate rank, like what is I guess

8  the position of the Detective in terms of the police

9  department?

10     A.    It's not a separate rank.  It is just a title, but

11 it's not a separate rank.  You don't take a test or do anything

12 to obtain the position other than interview for it when there's

13 an opening.

14     Q.    Are there other titles similar to Detective?

15     A.    No, sir.  I mean, you may hear the word investigator,

16 but it's the same.

17     Q.    And so for the other ranks; Sergeant, Lieutenant,

18 Assistant Chief, do you have to take tests to acquire those

19 positions?

20     A.    You take a test to become a Sergeant and Lieutenant,

21 not for Assistant Chief or Chief.

22     Q.    Let's start with the Chief of Police.

23     A.    Okay.

24     Q.    What is his role or her role?

25     A.    The role of the Chief of Police is to guide and



EXHIBIT 23

1  direct the members of the department, just like any department

2  head.  And also, make sure that the policies that are in place

3  are adhered to, and -- but they're the overall person that

4  keeps an eye on the daily operation of the police department,

5  and direction for the future.

6       **Q.   You mentioned the word department head.  What does**

7  **that mean to you in terms of the Chief of Police?**

8       A.   Well, as I mentioned, as far as what their role is.

9  But a department head is a person, just like any other

10  department within the City, you have a person that is in charge

11  of that department, so they're the overseer. They're the ones

12  that report usually to the Mayor, City Council, with whatever

13  questions or, you know, that's a point of contact for the City

14  administration to go to -- to -- if they want to -- have

15  questions or they want things done.

NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

EXHIBIT 23

15     **Q.  So for each decision with the Pasadena Police**

16 **Department, it is the job of the Mayor to make those decisions,**

17 **and City Council?**

18     A.  So the Chief of Police will, they have meetings with

19 the -- just like all department heads, have meetings with City

20 Council and the Mayor twice a month.  And during that time, any

21 new policies or things that are being brought up will be

22 addressed to them at that time.

23     **Q.  How about decisions -- how about day to day**

24 **operations, who runs the police department?**

25     A.  The operations, it depends on -- are you talking



EXHIBIT 23

1  about overall?

2      Q.   **Overall, correct.**

3      A.   Okay.  That would be the Chief.

4      Q.   **With respect to discipline at the Pasadena Police**

5  **Department, who is in charge of making decisions with respect**

6  **to discipline at the police department?**

7      A.   The final decision comes from the Chief of Police, as

8  far as initiating the process to administer discipline.

9      Q.   **So the Chief of Police is the final decision maker at**

10 **the City of Pasadena Police Department with respect to**

11 **discipline?**

12         **MR. GILES:**  Objection.  Form.

13         **THE DEPONENT:**  No.  The Chief of Police is the person

14 who starts the process of administration of discipline.

15 **BY MR. DUBE:**

16     Q.   **Is the Chief of Police authorized to suspend officers**

17 **for violations of Pasadena police procedure and the rule of**

18 **law?**

19         **MR. GILES:**  Objection.  Form.

20         **THE DEPONENT:**  The Chief of Police has the authority

21 to start the process for any kind of discipline.

22 **BY MR. DUBE:**

23     Q.   **I hear you.  That's not my question.  My question**

24 **addressed specifically suspensions.  Is the Chief of Police as**

25 **the department head authorized to suspend an officer for a**

**NAEGELI**
DEPOSITION & TRIAL        (800)528-3335
                          NAEGELIUSA.COM

EXHIBIT 23

1   violation of department rules and procedures?

2            MR. GILES:  Objection.  Form.

3            THE DEPONENT:  The Chief of Police can start the

4   procedure for suspension of an officer for a violation of

5   policies, yes.

6   BY MR. DUBE:

7       Q.   Can the Chief of Police place an officer on

8   indefinite suspension for a violation of a rule or procedure?

9            MR. GILES:  Objection.  Form.

10           THE DEPONENT:  The Chief of Police can start the

11  process, yes.

12  BY MR. DUBE:

13      Q.   What do you mean start the process; what do you mean

14  by that; when you say start the process, what do you mean by

15  that?

16      A.   So after the Chief of Police obtains whatever

17  information has been obtained to make that decision on

18  administration of discipline, ultimately the Civil Service

19  Commission can review that information and they can overturn

20  it, they can uphold it, they can reduce it.  They have the

21  final say so on that matter.

22      Q.   But until the Civil Service Commission rules, is the

23  word of the Police Chief, is that the operating -- strike that.

24  Let me ask that again.

25           Can a police chief, if a police chief suspends a

NAEGELI
DEPOSITION & TRIAL        (800)528-3335
                          NAEGELIUSA.COM

EXHIBIT 23

1   **person, a police officer, do they remain suspended until the**

2   **Civil Service Commission makes a ruling?**

3       A.    So you're saying if the Chief of Police suspends an

4   individual, are they suspended until the Civil Service

5   Commission has an opportunity to examine it --

6       **Q.    Correct.**

7       A.    -- and possibly change it?  Yes.

8       **Q.    Who is the Civil Service Commission comprised of?**

9       A.    Who is it comprised of?

10      **Q.    Um-hmm.**

11      A.    There's three individuals; one being the

12  Commissioner, and two other individuals.

13      **Q.    Who are those in individuals?**

14      A.    Those individuals are selected by City Council and

15  the Mayor.

16      **Q.    Do they have a day to day role at the police**

17  **department?**

18      A.    No, they do not.

19      **Q.    How about the Commissioner, does he have or she have**

20  **a day to day role at the police department?**

21      A.    No, they do not.

22      **Q.    Is there anyone else authorized to, in your words,**

23  **start the process of discipline at the City of Pasadena Police**

24  **Department besides the Chief of Police?**

25      A.    The only time that that would happen I think would be

1  if the Chief was incapacitated and someone else was appointed

2  interim Chief, but majority of the time it is the Chief of

3  Police that makes that decision.

4      **Q.    So the Chief of Police or an interim Chief are the**

5  **ones authorized to make decisions for the police department,**

6  **correct?**

7      A.    When it comes to start the process of administering

8  discipline, yes.

9      **Q.    What is the role of the Assistant Chiefs?**

10     A.    The Assistant Chiefs' roles are to -- they oversee

11 particular divisions within the police department. Over the

12 years, the number of Chiefs and organization has changed, but

13 currently we have two Assistant Chiefs.

11       Q.    What are the levels of discipline that can be

12   administered to a City of Pasadena police department who has

13   violated policy?

14       A.    You can have a letter -- a verbal reprimand, a letter

15   of reprimand.  You can get a suspension or you can get

16   indefinitely suspension, or indefinite suspension, which is

17   basically being fired.  But that's, again that's just the

18   beginning process that the Chief starts.

19       Q.    So the person who can issue these four separate

20   levels of discipline is the Chief of Police, correct?

21       A.    Yes.

22       Q.    And at the police department itself, is there is

23   anyone who is authorized to overrule the decision of the Chief

24   of Police with respect to these levels of discipline?

25       A.    There's no one within the police department, no, sir.



NAEGELI DEPOSITION & TRIAL   CELEBRATING 40 YEARS IN BUSINESS   (800)528-3335   NAEGELIUSA.COM

EXHIBIT 23

1        Q.    Can the Mayor overrule the Chief of Police with

2    respect to those levels of discipline?

3            MR. GILES:  Objection.  Form.

4            THE DEPONENT:  Well, the person that evaluates the

5    discipline of officers is the Civil Service Commission. So

6    they, if someone was going to be overruling the Chief, you

7    know, they would look at the case or the information, and they

8    make that decision if it was just or not, or final decision.

9    BY MR. DUBE:

10       Q.    And I guess that's my question.  The Civil Service

11   Commission is permitted to overrule the Mayor based on some of

12   those rules, but the Mayor himself cannot arbitrarily, like

13   decide on his own to overrule the decision of the Police Chief,

14   correct?

15       A.    It does not go from the Chief's initial issuance of

16   discipline -- it doesn't go from him to the Mayor.  It goes --

17   it has to go through the Civil Service Commission.

18       Q.    Understood.  Thank you.

19       A.    You're welcome.

20       Q.    And what's a verbal reprimand?

21       A.    Basically a discussion.  If there was a complaint,

22   and depending on the severity of it, the officer is talked to

23   about the situation and how to improve it.

24       Q.    Are those documented?

25       A.    Yes.

NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

EXHIBIT 23

1    Q.   So once an officer has received a verbal reprimand,

2    it's documented that that occurred?

3    A.   Correct.

4    Q.   And what is a letter of reprimand?

5    A.   Basically it's the situation where they, let's say

6    they've had a verbal reprimand previously, and this would be

7    the next level up.  Let's say if either the same or something

8    similar type of policy violation had occurred, then the next

9    level up would be a letter of reprimand.

10   Q.   Is there anything specific that the letter of

11   reprimand states or says?

12   A.   Basically it's a -- just a report on, you know, the

13   allegation itself, the complaint itself, and what was discussed

14   with the officer about the situation.  But it basically -- the

15   indication is that you had a verbal reprimand, and now this is

16   either the same thing or something similar has happened again,

17   and so now we're going to the next level of reprimand.

18   Q.   So is that a progressive discipline structure at the

19   City?

20   A.   Yes.  In the ones I gave you, that's the progression.

21   Q.   So from verbal to letter, and then suspension, then

22   indefinite suspension?

23   A.   Yes, sir.

24   Q.   Does it always have to go through that progression or

25   can somebody commit an offense or a violation that



EXHIBIT 23

1  automatically jumps to a higher level?

2      A.    It can -- it does not have to go through the levels

3  of progression.

4      Q.    What is a suspension?

5      A.    A suspension is where you get a day off from work

6  without pay, or however many, however much time off is, that

7  was administered.

8      Q.    What's the maximum days for a suspension?

9      A.    That, I don't know.  I don't know the -- I don't know

10  if it's -- cause the indefinite would be the maximum.



19      Q.    Would you agree with me that number would be in the

20  Civil Service Commission, I guess, code or policy?

21      A.    I believe that it's readily available, yes.

22      Q.    I'm saying -- that's not my question.  My question is

23  --

24          MR. GILES:  Would you like a stipulation on that?

25          MR. DUBE:  Well, I'm going to get to at some point,



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 23

1  but it's 15 days.

2          MR. GILES:  Right.  It is 15 days.  Unless there's an

3  agreement from the officer, it's 45 days.

4          MR. DUBE:  Okay.  Thank you.

6      Q.   So let's say an officer has been suspended, correct,

7  or even indefinitely suspended, and they wish to make an

8  appeal, what is that process?

9      A.   Did you say why is that process?

10     Q.   What is that process?  What?

11     A.   Oh.  I'm sorry.  The -- after -- within 10 days of

12 the decision from the Chief, the officer has the opportunity to

13 appeal to the Commission to hear his, basically hear his

14 discipline, you know, that was given to him.  At that point,

15 the officer, whether represented by an attorney or whatever the

16 case, they go in front of the Commission, and they listen to

17 the evidence or what is presented to them, and then make the

18 decision from there on if it was just, or they can reduce it,

19 or eliminate it.

20     Q.   And so there's a formal hearing that's done, correct?

21     A.   Correct.

22     Q.   An officer, instead of going through that appeal

23 procedure, can an officer accept the decision of the chief?

24     A.   He can or she can.

25     Q.   What happens when that occurs?



EXHIBIT 23

```
 1        A.    What kind of discipline; I mean, are you --

 2        Q.    Let's say a suspension?

 3        A.    So if the -- let's say the officer receives two day

 4   suspension, the officer signs documentation indicating that

 5   they will not appeal that decision and they accept it, and then

 6   it's scheduled at a later time for the officer to take that

 7   time off without pay.

 8        Q.    So the Chief makes a decision, the officer accepts

 9   it, the discipline goes forward, correct?

10        A.    Correct.

11        Q.    Is a demotion possible discipline that can be

12   enforced on an officer?

13        A.    I'm sorry.  Say that again.

14        Q.    Is a demotion a possible form of discipline that can

15   be enforced on an officer?

16        A.    Yes.  Yes.  An officer can be demoted.

17        Q.    What is a demotion?

18        A.    When you are -- go from one rank to another, to one

19   usually below it or whatever is attached to the discipline.

20        Q.    Are there any other forms of demotions?

21        A.    No.

22        Q.    So what if you are a, I guess the lowest rank, which

23   is officer, correct?

24        A.    Yes.

25        Q.    So how -- can you be demoted from that rank?
```



EXHIBIT 23

1    A.    Not without -- no.  There's no rank lower than an

2    officer.

3    Q.    **Can you be reassigned to different roles and duties;**

4    **would that be considered a demotion?**

5    A.    It would not.  No.  As long as it's in the same rank

6    structure from what you previously were, it's not a demotion.

7    Q.    **I guess, are there different levels of pay for the**

8    **different ranks?**

9    A.    Yes.

10    Q.    **So a demotion would include I guess a reduction in**

11    **pay?**

12    A.    I believe so, yes.  I mean, if you went from a

13    sergeant back to an officer, usually it -- as that example, I

14    believe you stay at the top of the pay scale of the lower rank

15    if that makes sense to you.

16    Q.    **That makes sense.**

17    A.    Okay.

18    Q.    **Are officers sometimes reassigned to different roles**

19    **within the department?**

20    A.    Yes.

21    Q.    **Tell me about that process?**

22    A.    Well, it varies.  So the -- if there is an opening,

23    let's say in investigations, let's say violent crimes, then the

24    process is a letter is put out to everyone in the department

25    indicating that there's an opening.  The officers will fill out

NAEGELI
DEPOSITION & TRIAL

40 CELEBRATING YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  a form indicating their interest in transferring to that

2  position, and interviews are held, and then a person is picked

3  to take the spot.

4      Q.   So how many different divisions are there at the

5  police department?

6      A.   I don't have an exact number.  There's quite a few.

7  I would say probably between 15 and 30.  Because some are very

8  small that, and one like internal affairs for instance, I'm the

9  only one there, so.

10     Q.   Got it.  One man crew.

11     A.   I am.

12     Q.   So how many cases do you have at any particular time?

13     A.   It varies.  The most I've had so far since I've been

14 there has been about three.

15     Q.   Are you aware of Chief Bruegger -- well, do you know

16 who Chief Bruegger is?

17     A.   Absolutely, yes.

18     Q.   And how do you know him?

19     A.   He came to work with the Pasadena Police Department

20 after I did, so I've known him ever since he started as an

21 officer, as he progressed through the ranks up to Chief.  So I

22 have worked I guess under him, you know, for -- ever since he

23 became Chief of Police.

24     Q.   But he's not Chief now, correct?

25     A.   That's correct.



NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

EXHIBIT 23

1    **Q.    Okay.  So you were under him and he was the Chief**

2  **until he retired, correct?**

3    A.    Yes.

4    **Q.    And how long ago was that, do you know?**

5    A.    When did he retire?

6    **Q.    Yes.**

7    A.    That was last year, '23 I believe.

8    **Q.    Do you remember what month?**

9    A.    Not exactly, no.  I think -- I would say it's later

10  in the year, but I don't know the exact month.

11    **Q.    Do you recall when he became Chief?**

12    A.    He became Chief in I want to say 2018 is my guess.

13  I'm not 100 percent on that, but I think it was 2018.

14    **Q.    So from 2018 through 2023, Joshua Bruegger was the**

15  **Chief of the police department?**

16    A.    Yes.  That's my understanding of the times, yes. If

17  those times are accurate, yes.

18    **Q.    And he had the full authority of the Pasadena Police**

19  **Department -- sorry.**

20        **He has the full authority of the office of Chief of**

21  **Police for the Pasadena Police Department, correct?**

22    A.    He was the Chief of Police and had authority over the

23  police department, yes.

24    **Q.    He had the ability to issue letters of reprimand,**

25  **correct?**

1        A.    Yes.

2        Q.    Okay.  He had the ability to issue verbal reprimands,

3   correct?

4        A.    Yes.

5        Q.    Okay.  I'm saying ability, I mean authority.  He had

6   the authority to issue verbal reprimands, correct?

7        A.    Yes.  He would start -- he has the authority to start

8   the process for discipline, yes.

9        Q.    And he had the authority to suspend an officer,

10  correct?

11       A.    To start the process, yes.

12       Q.    And he had the authority to issue an indefinite

13  suspension to a police officer, correct?

14       A.    To start the process, yes.

15       Q.    Okay.  And by starting the process, he had the

16  authority to suspend them pending an appeal to Civil Service

17  Commission, correct?

18       A.    Yes.

19       Q.    Okay.  And during that time, from 2018 to 2023, no

20  one else at the Pasadena Police Department had that authority,

21  correct?

22       A.    That's correct.

23       Q.    Are you aware that Chief Bruegger testified that

24  after Officer Rigoberto Saldivar shot my client, Randy Aviles,

25  he essentially ordered Mr. Saldivar to no longer be able to

NAEGELI
DEPOSITION & TRIAL            (800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1   patrol the streets of Pasadena; are you aware of that?

2       A.   I'm aware that Officer Saldivar was assigned to the

3   property room after the shooting, yes.

4       Q.   So after the shooting, he was assigned to the

5   property room, correct?

6       A.   Yes.

12      Q.   Is the property room a separate division within

13  Pasadena Police Department?

14      A.   It is a division within the Pasadena Police

15  Department, yes.

16      Q.   Actually, I guess, let me clarify.  I'm using the

17  word division a lot.  What do you understand division to mean?

18      A.   So for the police department, different units are

19  called divisions.  For instance, the Detective Division,

20  Violent Crime Division, Property Crimes.  There's also, you

21  know, like the property room.  I mean, they're all just, we

22  called them divisions.  So they have their own separate unit

23  with usually a supervisor in there.

24      Q.   And the property room is an actual division within

25  the police department, correct?



1      A.    Yes.

2      Q.    Okay.  How many officers are assigned to that

3   division?

4      A.    Currently, it is, the personnel in there is all

5   civilians.  It changes over time, but currently it's all

6   civilians.

7      Q.    How many -- what do you mean by civilians?

8      A.    A person who is not a police officer.  They're not a

9   certified police officer.  They don't have any formal police

10  training.

11     Q.    They haven't been to the academy, correct?

12     A.    Correct.

13     Q.    And how many civilians are assigned to that?

14     A.    I believe four or five, somewhere in there.

15     Q.    What do they do on a regular basis?

16     A.    So they accept property that has been turned in by

17  officers from their calls for service.  It could be a found

18  article.  It could be evidence on a case that was collected.

19  They take that, enter it into their computer system, and then

20  they will store it in their facility.

21     Q.    Do you know what was Officer Saldivar's role in that

22  division while, when he was reassigned there?

23     A.    I do not.  Not specifically, no.

24     Q.    Are the civilian members of the property division, or

25  the property room I should say, are they authorized to carry

**NAEGELI**
DEPOSITION & TRIAL          CELEBRATING 40 YEARS IN BUSINESS          (800)528-3335
                                                                     NAEGELIUSA.COM

**EXHIBIT 23**

1  firearms?

2      A.   They are not.

3      Q.   Do you know whether or not Officer Saldivar had his

4  firearm when he was assigned to the property room?

5      A.   Are you asking if he carried it when he was working

6  at the property room?

7      Q.   Yes.

8      A.   I do not know that.

9      Q.   Do you know whether or not, at any point whether

10 Officer Saldivar's ability to carry a firearm was taken away

11 from him?

12     A.   His ability to carry a firearm during working hours

13 -- he wasn't on the street, and I don't know if he had it with

14 him when he worked in the property room.  His traveling back

15 and forth to his job, that falls under different laws that he,

16 would make it permissible for him to do it.  So I don't know

17 the answer, if he actually carried it on his body while he was

18 working in the property room.

19     Q.   but he was authorized to carry it while traveling to

20 and from work?

21     A.   According to State law, yes.  He can do that.

22     Q.   While he was assigned on property room, if he had

23 observed a traffic violation or a crime being committed, would

24 he have had the authority to intervene?

25          MR. GILES:  Objection.  Form.



NAEGELI
DEPOSITION & TRIAL     (800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
 1              THE DEPONENT:  He would not.

 2   BY MR. DUBE:

 3        Q.   Why not?

 4        A.   Because under -- his police powers basically were

 5   taken from him is my understanding.  That'd be one of the

 6   positions of the Chief of Police.

 7        Q.   I'm not sure I understand that answer.  Can you

 8   explain what you mean?

 9        A.   So the Chief has the authority to like reassign

10   people as he did in this case.

11        Q.   Right.

12        A.   And you were asking me if his authority to remove or

13   keep Officer Saldivar from carrying his weapon, and I don't

14   know if he did that or not is what I'm saying.

15        Q.   No.  But that isn't the question.  The question was

16   if he had observed a crime being committed while still being in

17   employment as a City of Pasadena Police Department officer,

18   would he have had the authority or ability to intervene in

19   stopping that crime?

20              MR. GILES:  Objection.  Form.

21              THE DEPONENT:  I believe the answer to that is no.

22   BY MR. DUBE:

23        Q.   And you say that because he had his police powers

24   taken away from him is I believe what your answer was, correct?

25        A.   That is my understanding of what took place, yes.
```



1     **Q.**   **How was his police powers taken away from him?**

2     A.   He was told by the Chief of Police of why he was

3 being moved, and he was also told that his, you know, while he

4 was there his police powers would be taken away from him.

5     **Q.**   **Is that one of the levels of discipline that we**

6 **discussed?**

7       **MR. GILES:**  Objection.  Form.

8       **THE DEPONENT:**  Taking away a person's police powers?

9 BY MR. DUBE:

10     **Q.**   **Yes.**

11     A.   Not necessarily, no.

12     **Q.**   **Under what authority did the Chief of Police take**

13 **away Officer Saldivar's police powers?**

14     A.   As the authority of the Chief.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

15    Q.    So what authority -- under what authority did the

16  Chief of Police take away Officer Saldivar's police powers?

17    A.    Under the powers that are given to the Chief of

18  Police, he has the ability to advise an individual that while

19  there's an ongoing investigation, things, you know -- there are

20  actions that will be taken.  Which is, in this particular case,

21  he was reassigned from patrol to the property room.

22    Q.    Right.  That's a reassignment to the property room,

23  right, which is different from taking away an officer's police

24  powers, or -- correct?

25    A.    Well, when a person is no longer in their assigned or



EXHIBIT 23

1  in their assignment, you know, the Chief, you know, who is in

2  charge of the department, he can advise someone, and he has the

3  authority to manage his personnel. So if he thinks it's in the

4  best interest of the, not only the city, but the citizens and

5  the officers themselves, to not have an individual go out there

6  and enforce these laws, then he has the authority to say, this,

7  you're going to do this until this investigation is complete.

8      Q.   So as police chief, he has the authority to manage

9  personnel, correct?

10     A.   That's correct.

11     Q.   Okay.  And that authority includes the authority to

12  make decisions on behalf of the City, correct?

13     A.   He makes decisions for the best interest of the

14  citizens of this City.

15     Q.   Correct.

16     A.   Yes.

17     Q.   And that authority includes the authority to take a

18  police officer off the streets, correct?

19     A.   Correct.  He can reassign them, and he can also

20  advise them that during that time of reassignment, they are not

21  to enforce police powers, or not to enforce, take any other

22  police actions.

NAEGELI
DEPOSITION & TRIAL   CELEBRATING 40 YEARS IN BUSINESS   (800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1    Q.   **Where is the source of that power to do so?**

2    A.   It is with any department head who has the power to

3    manage his own personnel.  He can move individuals under his

4    command to where he would -- wants them to go.

5    Q.   **And I understand that, you know, he can move -- he**

6    **can reassign them to different positions and different places,**

7    **right.  But it's something different I think, what I'm trying**

8    **to hone in on is, you know, would you say that during the time**

9    **when he was in the property room that Officer Saldivar was**

10   **still a Pasadena Police Department officer?**

11   A.   Yes.

12   Q.   **So he was still a police officer, correct?**

13   A.   That's correct.

14   Q.   **And he was still being paid as a police officer,**

15   **correct?**

16   A.   Yes.

17   Q.   **Okay.  And I think you testified earlier that, you**

18   **know, he was authorized, you know, to go from his home to the**

19   **police department and carry a weapon issued by the police**

20   **department, correct?**

21        MR. GILES:  Objection.  Correct.

22        THE DEPONENT:  No.  That's not what I said.  He - -

23   because the police department doesn't issue weapons, number

24   one.

25   **BY MR. DUBE:**

**NAEGELI**
DEPOSITION & TRIAL          (800)528-3335
                           NAEGELIUSA.COM

EXHIBIT 23

1    Q.    Okay.

2    A.    And number two, under State law, you know, traveling,

3 you know, you can carry a weapon in your vehicle.  So that's

4 what I was referring to.

5    Q.    Got it.  So he would have the authority to carry a

6 weapon as any other citizen of Texas could, is that what you're

7 trying to say?

8    A.    Who is legally allowed to carry it, yes.

9    Q.    Okay.  So the Pasadena Police Department does not

10 issue weapons to officers?

11    A.    Correct.

12    Q.    Okay.  Are there rules regarding which weapons they

13 can carry, and the manner in which they can carry it?

14    A.    Yes.

15    Q.    And what are those rules?

16    A.    So they, like everything else, change over the years.

17 It used to be you purchased your own weapon, which we still do.

18 You can carry pretty much any caliber weapon as long as you can

19 qualify with it.  The -- over the years, and more recently,

20 they've transitioned to everyone carrying the 9 millimeter

21 pistol.  They prefer the Glock pistol; however, individuals

22 that had something different at the time that this went into

23 place were grandfathered in, and they could carry their own

24 pistol, whatever the make and model is.

25    Q.    When did those rules change?



EXHIBIT 23

1     A.   I'd say about, anywhere from three to five years ago.

2     **Q.   Were there any restrictions or rules and policies in**

3  **place as to the manner in which a Pasadena Police Department**

4  **officer could carry a weapon?**

5     A.   What do you mean?

6     **Q.   Well, I guess like meaning like were there any rules**

7  **and restrictions in place as to like what their**

8  **responsibilities were with the weapons that they are carrying**

9  **as an officer?**

10    A.   Are you talking about like on duty?

11    **Q.   On duty.   We can start with on duty.**

12    A.   Okay.   Well, I mean, they are issued equipment, duty

13  belt, which includes a holster in which the weapon would be

14  secured in.

15    **Q.   Okay.   Anything else?**

16    A.   As far as carrying a weapon, that's where the weapon

17  is carried when the officer's on duty, in uniform.

18    **Q.   Were there any restrictions in the manners of use or**

19  **what they could do with it?**

20    A.   Of course.

21    **Q.   What were those?**

22    A.   So use of force, that would fall under use of force

23  issues.

24    **Q.   Okay.**

25    A.   And if they had to use their weapon, then it would



EXHIBIT 23

1  fall under the policies of the use of force.

2      Q.    Okay.  So let's go back to Officer Saldivar and his

3  reassignment to the property room.  What were his roles in the

4  property room?

5      A.    I don't know what his exact roles were.  It was

6  whatever was -- he was there to assist them, so I don't know

7  what his roles were, assignment was.

8      Q.    Okay.  Do you not know like any output of his work

9  during that time?

10     A.    I do not.

11     Q.    Did he have a sergeant or supervisor during that

12  time?

13     A.    I believe there was a sergeant over the property room

14  at that time.

15     Q.    Would Officer Saldivar been able to challenge the

16  assignment to the property room?

17     A.    No.

18     Q.    Why not?

19     A.    Because it's at the discretion of the Chief of Police

20  for where to place their personnel.  And if you look at the,

21  under Civil Service, assignments are not challenged and heard

22  from the Commission.

23     Q.    So assignments -- reassignments and assignments

24  cannot be challenged?

25     A.    Yes, that's correct.



1      Q.   And the person who was authorized to make the

2  assignment/reassignment would have been the Chief of Police?

3      A.   Correct.

4      Q.   And he could make that decision based on his

5  assessment on what was best for the interests of the citizens

6  of the City of Pasadena?

7      A.   Not only that, but any information that he has at the

8  time he makes that decision.



23     Q.   Okay.  What was the Chief's -- did the Chief have

24  authority to request an officer receive additional training?

25     A.   He does have that authority, yes.



EXHIBIT 23

1    Q.    So if the Chief determined that an officer was

2   deficient in a particular area, he could request that the

3   officer obtain training in that particular area?

4    A.    The Chief has the authority to have anyone receive

5   additional training in any subject.

6    Q.    And that would include additional training with

7   respect to use of force, correct?

8    A.    Yes.

9    Q.    Was there anyone that had, anyone else that had that

10  ability?

11   A.    Does anyone else have the ability to request --

12   Q.    That officers undergo additional training?

13   A.    If you have someone that has identified an issue of

14  someone under their command, you can request that, with

15  approval of the -- through the chain of command.

16   Q.    You anticipated my next question.  So they could

17  determine that the person needs additional training, but then

18  they would have go through the chain of command to get that

19  authorized?

20   A.    Yeah.  It's a recommendation.  I mean because you

21  can't just send a whole squad of people to training without

22  checking on manpower, to making sure there's adequate coverage

23  for the streets, for instance, if it's a patrol officer.

24   Q.    Who would that recommendation be to?

25   A.    So it would go -- it depends on who discovers the

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1   deficiency.  If it is an officer, it'd go up to, you know,

2   notify the sergeant who could make that recommendation to the

3   lieutenant or commander, which is the same person over that

4   shift.  And then the commander can say to, authorize go ahead

5   and schedule that individual for more training.

6       Q.   I'm showing you -- actually before I show you that.

7   I believe you testified that officers may not appeal a

8   reassignment under the Civil Service Commission rules and

9   procedures, correct?

10      A.   The Civil Service Commission does not hear

11  involuntary or voluntary transfers, cases.  That's correct.

12      Q.   Do you know which rule specifies that?

13      A.   I do not.  It's in their -- the rules of the

14  Commission.  It states what they will take an appeal on and

15  what they won't.

20      Q.   Do you think -- have you reviewed the rules of the

21  Commission before?

22      A.   I have looked over them, yes.

23      Q.   Did you look over them for purposes of this

24  deposition?

25      A.   I did.

EXHIBIT 23

1        Q.   Do you recall whether you saw the rule with respect

2    to challenging or appealing a reassignment?

3            MR. GILES:   Objection.  Form.

4            THE DEPONENT:   The -- I think there is specifically

5    something in there that states that they do not, that is not

6    one of the items that they will take on appeal, as someone who

7    is trying to appeal a movement of that kind.

8    BY MR. DUBE:

9        Q.   Do you know what chapter of the government code the

10   rules of the Civil Service Commission is listed in?

11       A.   The Local Government Code 143 is my understanding.

12       Q.   143.  So I am going to share screen.  I'm showing you

13   what's been marked as Exhibit 15, which is Section 143 of the

14   Local Government Code.  Do you see that?  And I've scrolled

15   down to the Disciplinary Actions subchapter.  Do you see that?

16       A.   Yes.

17       Q.   Okay.  I guess we can just go through it.  The first

18   section of that subchapter is 143.051.  Do you see that?

19       A.   I do.

20       Q.   Actually, are you familiar with subchapter -- I mean

21   Government Code Chapter 143?

22       A.   I am familiar with it, yes.

23           MR. DUBE:   Okay.  I offer Exhibit 15 into evidence.

24           MR. GILES:   We don't object to it for purpose of the

25   deposition.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

**EXHIBIT 23**

```
 1              MR. SELBE:  No objection for purpose of deposition.

 2              (WHEREUPON, Exhibit 15 was marked for

 3  identification.)

 4  BY MR. DUBE:

 5      Q.   And can you -- could you read 143.051 to yourself?

 6  Let me know when you're ready.  If you need me to scroll or

 7  anything.  Let me know when you're ready.

 8      A.   I will let you know.  You can scroll down if you

 9  would.  Okay.

10      Q.   If you could read the next subchapter, the next

11  section as well.

12      A.   Okay.  You can scroll down.  Can you back up just a

13  little bit?  There you go.  Thank you.  Okay.  If you want to

14  scroll down a little bit more.  Okay.

15      Q.   Can I go down to here?

16      A.   That's fine.  Right there.  Okay.

17      Q.   And the section you just read was Section 143.052,

18  correct?

19      A.   Yes.

20      Q.   Okay.  So let's go to the next section.  I just want

21  to make sure you've read it, so I'm going to ask you questions

22  about this.  I want to make sure you've taken your time to read

23  it before we proceed, okay.

24              So can you read the next subchapter please, next

25  section?
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
 1        A.    Sure.  Okay.  If you scroll down.  Can you go up just
 2   a little bit more?  There you go.  Okay.  Can you scroll up a
 3   little bit more?  Yeah, a little bit more I think.  There we
 4   go.  Okay.  If you can scroll down to where the -- page 44,
 5   where the (1) up top.  Perfect.  All right.
 6        Q.    Okay.  I think we can stop there.  Yeah.  We can stop
 7   there.  So you've read Sections 143.051 through 053, correct?
 8        A.    Was that the last one?
 9        Q.    Yeah.  That's the last one I asked you to read.
10        A.    Okay.  Yes.
11        Q.    I think so.  Let me just be sure of that.  Yeah. 054
12   is the next one.
13        A.    Yes.
14        Q.    And did you see anything in there that stated that an
15   officer may not challenge a reassignment?
16        A.    It does not specifically say that in those sections,
17   no.
18        Q.    Okay.  Do you know any sections in Chapter 143 that
19   states that?
20             MR. GILES:  Objection.  Form.
21   BY MR. DUBE:
22        Q.    Are you aware of any sections --
23        A.    Not of the --
24             MR. GILES:  Objection.  Form.
25             THE DEPONENT:  Not of the sections that I have, you
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  have just asked for me to read.

2  BY MR. DUBE:

3      **Q.   Okay.  And what is this subchapter dealing with, what**

4  **subject matter?**

5      A.   Are you talking about the 143.051?

6      **Q.   Yeah, 051, 052, and 053, or Subchapter D?**

7      A.   Yeah.  So Subchapter D under Disciplinary Actions is

8  talking about the Cause for Removal or Suspension of a police

9  officer, in this particular case.  It also applies to

10  firefighters that have civil service protection.

11      **Q.   And it says in 052, "This section does not apply to a**

12  **municipality with a population of 1.5 million or more."  Do you**

13  **see that?**

14      A.   Correct.

15      **Q.   Do you know whether or not the City of Pasadena's**

16  **population is greater than 1.5 million?**

17      A.   It is not.

18      **Q.   Was it between the years 2018 and 2023, was it ever**

19  **greater than 1.5 million?**

20      A.   Not to my knowledge, no.  I don't -- no.

21      **Q.   So as far as you know, this subchapter and section**

22  **applies to your -- to the City of Pasadena, correct?**

23      A.   Yes.

24      **Q.   Okay.  And then in I guess paragraph (b), it says,**

25  **"The head of the fire or police department may suspend a fire**

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  fighter or police officer under the department head's

2  supervision or jurisdiction for the violation of a civil

3  service rule."  Do you see that?

4      A.    Yes.

5      Q.    Okay.  And the head of the police department under

6  this section would be the Chief of Police, correct?

7      A.    Yes.

8      Q.    Okay.  And from 2018 to 2023, when he was the Chief

9  of Police for the Pasadena Police Department, that would have

10 been Josh Bruegger, correct?

11     A.    Yes.

12     Q.    So -- "In the original written statement and charges

13 and in any hearing conducted under this chapter, the department

14 head may not complain of an act that occurred earlier than the

15 180th day preceding the date the department head suspends the

16 fire fighter or police officer."  Do you see that?

17     A.    Yes.

18     Q.    Okay.  So what does that section mean to you?

19     A.    I'm sorry.  Repeat that.

20     Q.    What does that, I guess, sentence mean to you; how

21 have you interpreted that sentence?

22     A.    So this is talking about a complaint of some kind

23 that came in before the 180th day before the officer or

24 individual was suspended.

8       **Q.    What is the role of the Internal Affairs Division at**

9       **the Pasadena Police Department?**

10          A.    The role of the investigator in Internal Affairs is

11      to, when we receive complaints, whether it's on an officer or

12      any employee within the police department, we take the initial

13      complaint.  And then there's a discussion, depending on the

14      circumstances, with the Chief of Police who makes the decision

15      if a control number and a formal complaint will be opened up on

16      the -- to investigate the complaint that came in.

17          **Q.    And what is a control number?**

18          A.    A control number is assigned to a formal complaint.

19      So any formal complaint receives a control number.  And

20      depending on the, what the complaint is, whether or not it's

21      investigated by Internal Affairs or it's investigated by the

22      supervisor of the individual who basically received the

23      complaint.

24          **Q.    And what is a formal complaint?**

25          A.    It is a complaint that's in violation or that needs



EXHIBIT 23

1   to be investigated and is a possible violation of policy with

2   the City of Pasadena Police Department.

3        **Q.    So you're using the word formal complaint as opposed**

4   **to just the word complaint.  What's the difference between --**

5   **what other types of complaints are there?**

6        A.    Okay.  So there's two types of complaints.  There's a

7   Level 1 and a Level 2.  The difference between a formal

8   complaint and an informal complaint, which we call inquiry, is

9   someone will call in to make a complaint and we do some

10  investigation on it and there's just -- we find out that it is,

11  you know, it did not happen; or we look into it and it's like

12  well, okay -- let's say an investigation of rudeness, for

13  instance.

14       **Q.    Um-hmm.**

15       A.    Then we take that information and we will usually see

16  if they want, they being the administration, want to have a

17  control number assigned, which makes it a formal complaint.

18  And then something of that nature would be pushed down to the

19  supervisor over the individual who received the complaint to

20  investigate.

21       **Q.    And what does an investigation of the complaint**

22  **entail?**

23       A.    Depending on the nature of the complaint.  You know,

24  anything that would help either substantiate or disprove that

25  the complaint actually was valid.  So whatever information is

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  available to look at.

15      Q.    I believe you mentioned a Class I complaint. What is

16  a Class I Complaint?

17      A.    So a Class I complaint consists of items of serious

18  misconduct, officer involved shootings, things that are above

19  the level of Class II; which is harassment, not being

20  courteous, rude, those type of -- just things that people would

21  encounter sometimes on a traffic stop let's say.

22      Q.    And you said serious misconduct, and officer involved

23  shootings would be Class I complaints?

24      A.    Yes.

25      Q.    How about other categories of uses of force,



EXHIBIT 23

1  excessive use of force allegations; would those all be -- let

2  me ask this question.

3          Are all excessive use of force complaints classified

4  as Class 1 complaints?

5      A.   If they are so designated by the Chief to be

6  investigated, then yes, it'd be a Class I complaint.

7      Q.   So is the Chief the person who designates the

8  categories of complaints, whether it's Class I or Class II?

9      A.    It doesn't have to be the Chief, but the Chief makes

10  the determination if a control number is going to be issued to

11  a specific complaint.  But the actual category of the complaint

12  could be the Assistant Chief.  I mean, it doesn't have to be

13  the Chief.

14      Q.   So is the control number the initiation of the

15  Internal Affairs investigation?

16      A.   Not necessarily.  A formal investigation, yes. If

17  there's a formal investigation, the Chief designates that and a

18  control number is issued.

19      Q.   So that part gets like -- would you say the Chief

20  initiates formal investigations to the Internal Affairs

21  department, correct?

22      A.   He gives approval for that, yes.  But he's the one

23  that has to make that decision.

24      Q.   So can you detail for us the process of a formal

25  Internal Affairs complaint that has acquired a control number?



EXHIBIT 23

1    A.    Sure.   So depending on how it comes in.   Let's say,

2  for instance, somebody wants to complain about an officer.

3  That person will, is required to come in and give a formal

4  statement that is signed.   That information, once received,

5  then the Chief will have to make a determination of hey, let's

6  go ahead and issue a control number so this can be

7  investigated.

8          Then, depending on the allegations in the complaint



17          I mean you just -- but you do the complete

18  investigation.   And at the end, it is -- you list any potential

19  policy violations that may or may not be involved, but any

20  potential ones.   And then the final case or the final report,

21  investigation is sent to the Chief's office.

22    Q.    And is that all conducted by I guess a Sergeant or

23  person who's in the Internal Affairs Division, the

24  investigation?

25    A.    It doesn't have to be -- whoever's in Internal



EXHIBIT 23

1  Affairs and has been assigned the case is the one that

2  completes the investigation.  It's -- also too it can be

3  handled on the patrol level at times depending on the

4  allegation, and the seriousness of it.

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

3      Q.   Do the Internal Affairs investigators, do they have

4   any role in assessing or determining whether or not there's

5   been a violation of the City of Pasadena policies and

6   procedures?

7      A.   We do not have a role in determining, we being

8   internal affairs does not have a role in -- we don't make a

9   determination if rules or policies are violated.  We merely add

10  in or suggest, or not suggest, but we would add in to our

11  report possible policies that would, may or may not be included

12  in this, the actions by the officer and what the investigation

13  produced.

14     Q.   So you may include the polices that are implicated by

15  the actions, but you don't conclude whether or not they've been

16  violated?

17     A.   Yeah.  We just include possible policies that were,

18  that come into play from whatever case we're investigating,

19  possibly.  I mean, we put them in there, but the Chief makes

20  the determination if that is actually true or not.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

4        Q.    All right, sir.   We just had our lunch break. Are you

5   ready to proceed?

6        A.    Yes.

7        Q.    Okay.   I believe you testified that -- prior to the

8   lunch break I believe you testified that the role of Internal

9   Affairs Division is to gather the facts relating to a formal

10  complaint, correct?

11       A.    Yes.   Investigate complaints against officers.

12       Q.    And then -- but not to make conclusions, correct?

13       A.    That's correct.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23



14      Q.    What if the investigator believes that the officer

15   has violated the law, like, and committed, you know, and

16   committed a violation of criminal law; what can they do at that

17   point?

18      A.    The role of the Internal Affairs Division is to

19   investigate policy violations, not criminal violations. That is

20   the job of the Detective Division of the police department,

21   investigations.

22      Q.    So there's a separate investigation that gets taken

23   place into the use of force, correct?

24      A.    Any -- yeah.  Any kind of criminal activity of the

25   officer involved in a complaint would be handled by --



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  especially like an officer involved shooting, as you talked

2  about, they would handle that part of it.

13     **Q.   So the Internal Affairs Division can investigate a**

14  **criminal complaint related to officer conduct if that becomes**

15  **apparent during their administrative investigation?**

16     A.   So let me try to -- I'll try to make it easy.  So if

17  a complaint comes in on let's say rudeness, right, and during,

18  you're watching the bodycam video, and you see the officer do

19  something that's a criminal activity, during that, while you're

20  investigating the rudeness complaint then the officer in

21  Internal Affairs can initiate the investigation.

22          And it'll be up to the Chief of Police to say this is

23  going to go -- you know, go ahead and investigate it, or it can

24  go to the Detective Division for them to investigate.

25  Routinely, it's we do administrative complaints on officers for

1  policy violations.

13       Q.    No.   I'm trying to see, I'm trying to ask you, what

14  does Internal Affairs do when they have decided to undergo a

15  criminal investigation within the Internal Affairs complaint?

16       A.    So the information that is observed -- of course with

17  anything that you observe, it's always a potential to be a

18  criminal investigation or a criminal act.   Just like anything

19  else, it is investigated and, you know, fully. That would be

20  presented to the Chief of Police to advise of any, you know,

21  direction or where they want to go from there.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

6          **THE DEPONENT:**  The investigator as always is to

7   conduct a complete investigation on the incident.  Just because

8   you see something you're concerned about, it does not mean that

9   it could not have been justified.  If that makes sense.  I

10  mean, it doesn't change -- it doesn't change how the

11  investigation is started or concluded.  It's you know -- if

12  you're doing an investigation, it should be a complete

13  investigation of all the facts.

16          **I'm going to show you what's been marked as Exhibit**

17  **14.  Are you familiar with this document?**

18      A.   Yes.

19      **Q.   What is this document?**

20      A.   That appears to be the internal, the portion of our

21  rules and procedure, policy and procedures for Internal

22  Affairs.

23      **Q.   Is there a time limit that Internal Affairs has to**

24  **complete their investigations?**

25      A.   Initially, it is six months, but depending on the --



NAEGELI
DEPOSITION & TRIAL          (800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1 they try -- I mean, it's not a time limit per se.  It is a

2 recommendation to have it done by then.  And -- but they can be

3 extended if there's circumstances that would warrant that.

4      Q.   **What could those circumstances be?**

5      A.   Let's say that the, for instance, the complainant had

6 been arrested again, and they were like in jail, or they were

7 -- maybe they had a medical condition to where you're unable to

8 complete your investigation.  Any type of circumstances, it

9 could be extended further.

```
23        Q.    Could you read the Primary Objectives of Internal
24   Affairs?
25        A.    Sure.  18.2, Primary Objectives of Internal
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1      Affairs.  Number 1 is, "Protection of the Public:  The

2  public has the right to expect fair, efficient, and impartial

3  law enforcement; therefore, any misconduct by department

4  personnel must be detected, thoroughly investigated, and

5  properly adjudicated to assure maintenance of these qualities."

6      **Q.   You can stop there.  Sorry.  So it states -- so is**

7  **there, as far as that right that the public has to the fair,**

8  **efficient, impartial law enforcement and that any misconduct**

9  **should be detected, thoroughly investigated, and properly**

10 **adjudicated, right?**

11     A.   Yes.

```
 7        Q.    Since you've been in Internal Affairs, how many

 8   police shootings have occurred?

 9        A.    Since I've been in Internal Affairs, there's been

10   one.
```

```
20        Q.    Okay.   What were the circumstances of that shooting?

21        A.    It was -- one of our members was part of a task

22   force, and they were set up to go serve the warrant.   I think

23   they had a location on them.   Individuals got into a vehicle,

24   failed to obey commands, pulled out a gun, and the other

25   officers did have to discharge their weapons at them, and end
```

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

1 | up killing an individual.

15     **Q.**   **Got you.**   **What about when you were the Sergeant in**

16 **charge of evening patrol, were there any instances of shootings**

17 **by one of your officers?**

18     A.   No.

19     **Q.**   **Your entire five years in that position?**

20     A.   So you're talking about the two different times that

21 I was on evening shift patrol?

22     **Q.**   **Yes.**

23     A.   No.   Well, I had -- I did respond to -- not on

24 evening shift patrol there was not any, no.   I was just

25 thinking back.

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

 1      Q.    During your entire time as a police, as an officer --

 2  actually let me rephrase.

 3            During your entire time as a Sergeant in the Pasadena

 4  Police Department, has any officer under your control been

 5  involved in an officer involved shooting?

 6      A.    Not under my control, no.

 7      Q.    Or supervision?

 8      A.    Not direct supervision.  So if I'm the only -- I

 9  would have a squad of officers, but if there's a night that I'm

10  working by myself technically I'm, you know, I'm in charge of,

11  you know, all of the officers that are on there for that shift.

12  But they don't report directly to me.

13      Q.    Got you.  That's a very good record, sir.

14      A.    Thank you.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

11      Q.   And I think you testified that in addition to the

12   Internal Affairs investigation in a police shooting, there will

13   be a criminal investigation, correct?

14      A.   Well, there will be an investigation into the offense

15   of the shooting itself, so that's more of the criminal

16   investigation, that's correct.

17      Q.   And that would be conducted by separate officers

18   other than the Internal Affairs Division, correct?

19      A.   Yes.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

3       Q.    Okay.   So an officer investigates the shooting and

4   presents their findings to the grand jury, correct -- I mean to

5   the district attorney's office?

6       A.    Correct.   Because any charge in Harris County is

7   through the district attorney's office that's above a Class C

8   misdemeanor.

2     **Q.**    **Do you know Officer Rigoberto Saldivar?**

3     A.    Do I know him?

4     **Q.**    **Yes.**

5     A.    I do.

6     **Q.**    **Did you know -- are you familiar with his employment**

7 **with the Pasadena Police Department?**

8     A.    Yes, sir.

9     **Q.**    **How long was he employed with the police department?**

10    A.    I want to say roughly 16 to 18 years.  I don't know

11 the exact numbers.

12    **Q.**    **Not, well, to you, but he was there for a fairly long**

13 **time, correct?**

14    A.    Yes, sir.

22    **Q.**    **Okay.  Did you ever supervise Officer Saldivar?**

23    A.    I don't believe so.  I know we had worked -- I was an

24 officer, we worked together for a little bit in detectives.  I

25 don't think that I worked with him on patrol.  I think he was

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  always on a different shift.

2      Q.    Okay.   Personnel records in preparation for this

3  deposition?

4      A.    I'm sorry.   Was that a question?

5      Q.    Yes, sir.   I said, have you reviewed his personnel

6  records in preparation for this deposition?

7      A.    I've looked over them, yes.

NAEGELI
DEPOSITION & TRIAL   CELEBRATING 40 YEARS IN BUSINESS   (800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

| | | |
|---|---|---|
| 20 | Q. | So the grand jury indicted Officer Saldivar, correct? |
| 21 | A. | Yes. |
| 22 | Q. | The grand jury is not the City though, correct? |
| 23 | A. | No, it is not. |

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

 9    **Q.    Is it necessary for the criminal investigation, the**

10   **criminal trial to be concluded before Internal Affairs can**

11   **determine whether or not an officer has violated the use of**

12   **force policy?**

13       A.    It's not necessary, no.

14       **Q.    Okay.  Is it necessary for the criminal investigation**

15   **to be completed before the Pasadena Police Department can**

16   **conclude its Internal Affairs investigation?**

17       A.    Usually they are completed around the same time. That

18   way -- because even though the Internal Affairs completes their

19   own investigation separate from the criminal aspect of it, if

20   one of them is completed then, you know, you can't use the

21   information from one to another, correct.  So they want -- a

22   case that there was information that one didn't have, then we

23   want to make sure it's a total complete investigation.  But

24   it's an option more so than a standard.

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

5     Q.   Okay.  Thank you.  And ask you another question

6 related to initials.  Josh Bruegger was the former Chief of

7 Police, correct?

8     A.   He is the former -- yes.

22       All right.  So this is the Internal Affairs

23 Investigation of the shooting of Randy Aviles, correct?

24     A.   It appears to be, yes.

25     Q.   Okay.  And there is -- this is an Inter-Office



1   Correspondence, correct?

2      A.   Yes.

3      Q.   Do you recognize -- have you reviewed this report --

4      A.   Yes.

5      Q.   Okay.  And you reviewed all these pages, correct?

6      A.   That is correct.

7      Q.   Okay.  And does it appear to be the typical way these

8   Internal Affairs investigation officer-involved shootings are

9   documented?

10     A.   Yes, it does.

11     Q.   And it's -- we're looking at page 1 of 27.  Do you

12  see that at the bottom?

13     A.   I do.

14     Q.   And there was -- it's a report that is addressed to

15  Chief Bruegger, correct?

16     A.   That is correct.

17     Q.   Okay.  And this is the Control Number 1331?

18     A.   1331, that's correct.

19     Q.   And that was a Control Number for the shooting of

20  Officer Saldivar of Randy Aviles, correct?

21     A.   That is correct.

22     Q.   And the report is dated April 29, 2021?

23     A.   Yes.

24     Q.   Okay.  What does that day signify?

25     A.   I believe that's the date when the investigation from

NAEGELI
DEPOSITION & TRIAL         (800)528-3335
                           NAEGELIUSA.COM

EXHIBIT 23

```
1  Internal Affairs was completed and turned in.  It may not be

2  the exact date, but it is something around that time.

3      Q.    Okay.  So that would have been the date,

4  approximately the date that this report was sent to Chief

5  Bruegger, correct?

6      A.    Yes.

7      Q.    And the report summarizes the investigation or is the

8  investigation of Detective Reyes with respect to Officer

9  Saldivar's shooting of Randy Aviles, correct?

10     A.    That is correct.
```

14        A.    Internal Affairs investigations?

15        Q.    **Yes.**

16        A.    Yes.  It's about policy violations.

17        **Q.    It's -- Internal Affairs is an administrative**

18  **proceeding to determine whether or not the rules of the**

19  **Pasadena Police Department has been violated, correct?**

EXHIBIT 23



11      Q.    I believe I was done.  What is the purpose of an

12  Internal Affairs investigation?

13      A.    To gather information of an incident or complaint.

14  And after all the information is gathered, if there's something

15  that might be a potential policy violation, that is listed well

16  for the -- then it's all given to the Chief, and he makes the

17  determination if there was an actual policy violation.

18      Q.    Okay.  So are you making a distinction between the

19  chief's determination as to whether or not the policy has been

20  violated based on the Internal Affairs investigation and the

21  Internal Affairs investigation itself?

22      A.    Internal Affairs doesn't make a determination if

23  policy was violated.

24      Q.    Okay.  The Chief does that?

25      A.    That is correct.



EXHIBIT 23

1      **Q.    Using the investigation from Internal Affairs?**

2      A.    That, and whatever other information that he may have

3   available to him.

4      **Q.    And Internal Affairs is the administrative**

5   **proceeding, correct?**

6      A.    We investigate administrative policy violations or

7   complaints, yes.

8      **Q.    So you investigate the policy violations without ever**

9   **make a conclusion?**

10     A.    That is correct.

11     **Q.    And that administrative investigation is different**

12  **and separate from the criminal investigation, correct?**

13     A.    Yes.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

7     **Q.   When was Officer Saldivar terminated from -- or**

8  **sorry, when did Officer Saldivar separate from Pasadena Police**

9  **Department?**

10     A.   That was in 2021.

11     **Q.   July 9, 2021, sound correct?**

12     A.   It does.

13     **Q.   And the report we saw before was sent to officer, I**

14  **mean to Chief Bruegger on April 29th, correct?**

15     A.   I believe, yeah, that was the date on there.

4      Q.    Did he ever discipline Officer Saldivar for shooting

5 Angel Ramirez?

6      A.    There was no discipline issued on -- and that usually

7 doesn't happen on a case that is either exonerated or

8 justified.

9      Q.    Did he ever discipline Officer Saldivar for shooting

10 and killing Nathan Schenk?

11      A.    There is usually no discipline issued when the end

12 result of an officer involved shooting has been justified.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

14        Q.    I'm showing you the IAD investigation with respect to

15   the Schenk shooting.   Do you see that?

16        A.    I do.

17        Q.    Are you familiar with this document?

18        A.    I am.

19        Q.    I'm going to flip through just so you can see if

20   that's the same document that you previously looked at. I'm

21   going to scroll.   All right.   So I direct your attention to the

22   first page, okay?

23        A.    All right.

24        Q.    This is from Sergeant Hamilton, correct?

25        A.    That's correct.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1    Q.    And who is Sergeant Hamilton?

2    A.    He was the Sergeant over Internal Affairs at the

3  time.

4    Q.    And it's to Chief Bruegger, correct?

5    A.    Yes.

6    Q.    Okay.  And the Control Number, that's the Control

7  Number for the Schenk shooting, correct, 1286?

8    A.    Yes, sir.

9    Q.    And the date of this report is August 12, 2019; do

10  you see that?

11   A.    I do.

12   Q.    And it's the same format as the one for the Aviles

13  shooting, correct, Summary of Complaint, Allegation,

14  Complainant, and then the details of the investigation.  Do you

15  see that?

16   A.    Yes.  They look similar.

17   Q.    And then there's a Summary at the end that summarizes

18  the conclusion of the investigation, correct?

19   A.    Yes.

20   Q.    And is this your reports are written as well, sir?

21   A.    They all follow a similar format, but most generally,

22  yes, that's the format that they follow.

23   Q.    Do you recognize these signatures here?

24   A.    I think the one in the middle, the 8-20 of '19, I

25  think that's Bruegger's.

NAEGELI
DEPOSITION & TRIAL        (800)528-3335
                          NAEGELIUSA.COM

EXHIBIT 23

1     **Q.    Okay.**

2     A.    Chief Bruegger's I believe.  I am not sure on the

3 other signature.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

18    **Q.    Starting here on 1358, do you see that right here?**

19    A.    I do.

20    **Q.    What is this document?**

21    A.    So that is what's called a Commander's Summary. So

22    what will happen at times is, after the Internal Affairs

23    investigation is completed, and a Summary from the Internal

24    Affairs investigation is put onto the -- into the report, the

25    report is then forwarded to a Commander over the officer that

1  is involved.  If it's a patrol officer -- or sometimes it could

2  go into investigations.

3        They will read over it and then they also, or they

4  too will summarize the incident that -- the incident that was

5  investigated by Internal Affairs.

6    **Q.    Do they make a conclusion?**

7    A.    Well, if you look at the end of it, you'll see they

8  look at all of the information, and they may -- they don't make

9  a conclusion so much as what their opinion on the investigation

10  itself.

11    **Q.    Okay.  Do you know whether or not a Commander's**

12  **Summary was done for the Randy Aviles shooting?**

13    A.    I don't believe there was because the fact that the

14  investigation was not concluded because of his separation from

15  the City.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

6       Q.    And in those three months, a Commander's Summary was

7  not completed, correct?

8       A.    According to the dates on the reports, that would be,

9  sounds correct.

9        Q.    Do you know the date that the Schenk grand jury made

10   their determination?

11        A.    I believe it was in -- it was almost, I don't know if

12   it was a full year later, but I know it was in 2019.

NAEGELI
DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 23

17          **THE DEPONENT:**   So as stated previously, the district

18   attorney presents the case to the grand jury, and if they

19   listen to all the evidence involved in the case and they make a

20   determination that there was a, what they call a, no-bill

21   meaning that essentially that the officer did not violate any

22   law and charges would not be filed against him.

10          **THE DEPONENT:**  The City believes that the

11  investigation that was conducted in this case, in this incident

12  was done thoroughly and the results that were concluded from

13  that was the -- Officer Saldivar was -- there was an indictment

14  against him in this case.  But the final conclusion of the case

15  has not been rendered.

24          **Q.**   I'm showing you what's been marked as Exhibit 16,

25  which is a copy of the Saldivar indictment.  Do you see that?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

 1      A.    I do.

 2      Q.    **Are you familiar with this document; have you seen it**

 3  **before?**

 4      A.    I don't think I have.

 5      Q.    **Okay.  Well, take your time to read it.  Let me know.**

 6      A.    Okay.

 7          **MR. DUBE:**  I move Exhibit 16 into evidence.

 8          **MR. GILES:**  There's no objection to it being used in

 9  the deposition.

10          **MR. SELBE:**  No objection to the use in deposition.

11          **(WHEREUPON, Exhibit 16 was marked for**

12  **identification.)**

13  BY MR. DUBE:

14      Q.    **Okay.  Do you see where it says, "The duly organized**

15  **Grand Jury of Harris County presents in the District Court of**

16  **Harris County that in Harris County RIGOBERTO SALDIVAR,**

17  **hereafter styled the Defendant, on January 12, 2021, did then**

18  **and there unlawfully, while a public servant, to-wit; a police**

19  **officer, acting under color of his office and employment,**

20  **intentionally and knowingly caused bodily injury to Randy**

21  **Aviles hereafter called the Complainant by discharging a deadly**

22  **weapon, namely a firearm, in the direction of the Complainant";**

23  **do you see that?**

24      A.    I do.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

Kenneth Urban 30(b)(6)   April 8, 2024   NDT Assgn # 73605                      Page 142

12        A.    The City believes that an investigation was done, and

13   the facts were presented to the district attorney's office, who

14   presented it to the grand jury, and a warrant was issued on the

15   belief that this had occurred.   This is not indicating that

16   Officer Saldivar is guilty of a crime.

NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS   (800)528-3335   NAEGELIUSA.COM

EXHIBIT 23

1          THE DEPONENT:   Again, the mere fact that it is stated

2   in there of what the grand jury and the warrant information

3   contains, the City does not believe that Rigoberto Saldivar has

4   any other or less rights than anybody else.  So until the final

5   disposition of his court case, the City cannot render a

6   decision on the mere fact of a warrant being issued.

19          Q.   Are you familiar with the Use of Force Audits?

20          A.   I have looked at them, yes.

21          Q.   I'm only going to ask you about one of them. Okay.

22   I'm showing you the Use of Force Audit for 2021.  Do you see

23   that?

24          A.   I do.

25          Q.   Okay.  This has been marked as Plaintiff's Exhibit 4.



EXHIBIT 23

1  **Are you familiar with this document?**

2      A.   I have looked over it, yes.

3          **MR. DUBE:**  I move Exhibit 4 into evidence.

4          **MR. SELBE:**  No objection to using it in the

5  deposition.

6          **MR. GILES:**  Same.

7          **(WHEREUPON, Exhibit 4 was marked for identification.)**

8  **BY MR. DUBE:**

9      **Q.   Okay.  Can you read the paragraph that begins with**

10 **"Two incidents ..."?  You can read it out loud or to yourself,**

11 **whichever you prefer.**

12     A.   What was that -- out loud you said?

13     **Q.   Yeah.  Please read it out loud, yes.**

14     A.   Okay.  You're talking about where the "Two incidents

15 during 2021 required ...?

16     **Q.   Um-hmm.**

17     A.   Okay.  "Two incidents during 2021 required officers

18 to use deadly force against a suspect.  In both cases the

19 suspect was evading police in a vehicle.  One of the incidents

20 required an officer to discharge a single round from his weapon

21 toward the suspect.  The suspect was not struck by the

22 discharged round.  In that same incident, officers utilized

23 their patrol vehicles to stop the evading suspect, who was

24 ramming police and civilian vehicles, driving counterflow to

25 traffic, and placing the general public in danger.  No one was

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

CELEBRATING 40 YEARS IN BUSINESS

EXHIBIT 23

1  injured in the incident.  In the other incident, and officer

2  utilized his vehicle to stop a dangerous felon with three

3  outstanding felony warrants and a history of evading the

4  police.  No one was injured in that incident either."

5      **Q.    So this is referring, this is use of force audits,**

6  **correct?**

7      A.    Yes.

8      **Q.    What's the purpose of the Use of Force Audit?**

9      A.    It is a collection of information on the different

10  types of use of force that have occurred in that particular

11  year.

12      **Q.    This is the one for 2021, correct?**

13      A.    That's what it indicates, yes.

8       Q.   The first incident, "One of the incidents required an

9   officer to discharge a single round from his weapon toward the

10  suspect."  You would agree with me that would not be the

11  incident involving Officer Saldivar, correct?

12      A.   That would be?

13      Q.   That would not be?

14      A.   Oh.  Yes.

15      Q.   Yes, it would not be, correct?

16      A.   That's correct.  It's not the Aviles shooting.

17      Q.   "In the other incident, an officer utilized his

18  vehicle to stop a dangerous felon with three outstanding felony

19  warrants and a history of evading the police."  You would agree

20  with me that is also not the Aviles shooting, correct?

21      A.   That is correct.

22      Q.   Okay.  And the Aviles shooting occurred in 2021?

23      A.   Yes.

24      Q.   January 12, 2021, correct?

25      A.   That's correct.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
19      Q.   The question was are you aware of any officer

20  involved shootings that occurred between January 2011 and

21  January 2021?

22      A.   Are you talking about just officer involved

23  shootings?

24      Q.   Yes.

25      A.   Yes, I am.
```

EXHIBIT 23

1    Q.    How many occurred during that time period?

2    A.    I believe there were three.  I believe.  I'm just --

3    while we had a break, I was looking at the Interrogatory from

4    the City that I had used to initially study for to -- on the

5    information that the City provided.

6    Q.    Okay.  So the shootings identified in that

7    Interrogatory, that remains the case as to the ones that

8    occurred during that time period?

9    A.    That's the ones that were listed, among other -- yes,

10   that's on the list.

11   Q.    And there's nothing -- there are no other shootings

12   that you have identified since that Interrogatory, correct?

13   A.    Nothing that is not on the list that was submitted.

14   Q.    Okay.  How many of those involved the death of the

15   suspect?

16   A.    There was only one involved in a shooting.

17   Q.    Only one death between January 2011 and January 2021,

18   as a result of a shooting?

19   A.    That's what -- the information that I have at this

20   time, yes.

21   Q.    And that would be Mr. Schenk?

22   A.    That's correct.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

19     Q.   Are you familiar with the City of Pasadena Use of

20  Force Policies?

21     A.   Yes, sir.

22     Q.   How are you familiar with the Use of Force Policy?

23     A.   How am I familiar?

24     Q.   Yes.

25     A.   I have read them.  And then every time a change comes

1  out, we are -- the new version of any kind of policy change is

2  usually sent out for review.

3      Q.   **Can you read the definition of Deadly Force, please?**

4      A.   Under U3.3 Definitions, Deadly Force says, "Any use

5  of force that creates a substantial risk of causing death or

6  serious bodily injury."

7      Q.   **Would you agree that the force used by Officer**

8  **Saldivar against Randy Aviles was deadly force?**

9      A.   It would fit that definition.

10     Q.   **Would you agree that the force used by Officer**

11 **Saldivar against Nathan Schenk was deadly force?**

12     A.   Yes.

13     Q.   **Would you agree that the force used by Officer Aviles**

14 **against Angel Ramirez was deadly force?**

15     A.   Yes.

16     Q.   **Okay.  Under 3.4, can you let us know when the use of**

17 **deadly force is appropriate?**

18     A.   When the use of deadly force is appropriate?

19     Q.   **Yes.**



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

3            **THE DEPONENT:**   The City's response is that the

4   complete investigation that was conducted from the detectives

5   and what was done with Internal Affairs indicates that charges

6   were filed against or accepted from the District Attorney's

7   office against Officer Saldivar, and that case is currently

8   working its way through the system.

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 23

 8        **THE DEPONENT:**  Our policy states that an officer in

 9  fear of his life or someone else's can use deadly force in a

10  situation if he believes that that will protect him or someone

11  else.

NAEGELI
DEPOSITION & TRIAL     40     (800)528-3335
                              NAEGELIUSA.COM

EXHIBIT 23

18      Q.      You had a role in the training academy, correct?

19      A.      I'm sorry.  I had what?

20      Q.      You were a Sergeant in the training academy at some

21 point?

22      A.      I was, yes.

23      Q.      Okay.  For how long?

24      A.      For about two and a half years.

25      Q.      Okay.  And did you -- during that time, did you teach

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1   police officers how to conduct police stops?

2        A.    I did not.

3        Q.    Have you ever conducted a police stop?

4        A.    I have.

NAEGELI
DEPOSITION & TRIAL     40     (800)528-3335
                              NAEGELIUSA.COM

EXHIBIT 23

21      Q.    I'm showing you page 2 of Exhibit 13.  Do you see it?

22      A.    I don't see a page number on this.

23      Q.    Oh you know what it may not be -- okay.  Fair enough.

24   I'm showing you Officer Saldivar's Performance Evaluations for

25   the year 2018, from July 1, 2018, to December 31, 2018.  Do you

EXHIBIT 23

```
 1    see that?

 2         A.   Yes.

 3         Q.   Are you familiar with this document?

 4         A.   Yes.

 5         Q.   Have you reviewed this document in preparation for

 6    this deposition?

 7         A.   I don't remember specifically looking at this

 8    particular one, but I glanced over all of them.

 9         Q.   In the time period between 07/01/2018 and 12/31/2018,

10    the shooting of Mr. Schenk occurred during that time period,

11    correct?

12         A.   Yes.

13         Q.   The shooting occurred in November of 2018, is that

14    correct?

15         A.   Yes, sir.

16         Q.   And there's been identified no areas needing

17    improvement.  Do you see that?

18         A.   I do.

19         Q.   And do you see any mention of the shooting in this

20    evaluation?

21         A.   I do not.
```

11    Q.   I'm showing you his evaluation from January of 2019

12  to June of 2019.  Do you see that?

13    A.   I do.

14    Q.   Okay.  And that time period would have been when the,

15  at least the initial investigation by IAD of the Schenk

16  shooting would have occurred, correct?

17    A.   Yes.  That is correct.

18    Q.   And there's no mention of that shooting in this

19  evaluation, correct?

20    A.   That's correct.  I don't know if that's the same

21  evaluator or not that did the previous one.

22    Q.   Well, when an evaluator is making an evaluation,

23  shouldn't they take into account all of the information for the

24  officer during that time period?

25    A.   In a perfect world, yes.  But just because the

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

1  investigation is completed by internal affairs, the rater on

2  this evaluation may not have knowledge of said investigation

3  and upon its completion to add that into the evaluation.

4      **Q.**    **So -- and who would the rater be?**

5      A.    The rater is -- the vast majority of the time is the

6  supervisor of that particular officer.  Like in this case --

7  I'm sorry.  Go ahead.

8      **Q.**    **No.  You can finish.  I'm sorry.**

9      A.    It looks like this one was Sergeant Michael, in the

10  upper right hand corner.

11      **Q.**    **And then Reviewer is Lieutenant McGill?**

12      A.    Yes.  He would be the Lieutenant on the shift.

13      **Q.**    **And then you have I guess Assistant Chief Wright,**

14  **correct?**

15      A.    Yes.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

16      Q.   What is the date of this indictment?  I'm showing you

17 again Exhibit 16 with is Officer Saldivar's indictment. Do you

18 see that?

19      A.   I do.

20      Q.   Okay.  What is the date on the indictment?

21      A.   I believe that's the date there of January 4th of

22 '23.  Of 2023.  That was -- well, that was when it was filed.

23      Q.   And I'm showing you Plaintiff's Complaint in this

24 case.  What date was it filed on?

25      A.   October 16, 2022, which is what's highlighted on top.



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 23

```
14      Q.    Okay.  Did you speak to officer -- to Chief Bruegger

15  or former Chief Bruegger in preparation for this deposition?

16      A.    I did not.
```

2       Q.    Did you speak to anybody with the Harris County

3   District Attorney's office prior to this deposition?

4       A.    I have not.

EXHIBIT 23

2     **Q.   So -- okay.   To prepare -- is it fair to say to**

3 **prepare, you did not attempt to speak to Chief Bruegger or**

4 **attempt to speak to the district attorneys, or review their**

5 **emails and communications to see what communications occurred**

6 **between the two?**

7     A.   So the City is relying on the information that is

8 provided in the investigation and in reference to this

9 particular lawsuit, which was the deposition of the -- of Chief

10 Bruegger.   So any information that he provided in that

11 deposition is what the City is using as a response to what was

12 -- what actions were taken by the Chief at the time of this

13 incident.

14     **Q.   So would it be fair to say that the City adopts the**

15 **deposition testimony of Chief Bruegger as its own?**

16     A.   We are -- we have no reason to believe that the

17 information that was provided in the deposition is inaccurate

18 in any way.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 23

```
1                        CERTIFICATE

2

3         I, the undersigned, Vincent Guerrera, am a

4    videographer on behalf of NAEGELI Deposition & Trial. I

5    do hereby certify that I have accurately made the video

6    recording of the deposition of Kenneth Urban 30(b)(6), in

7    the above captioned matter on the 8th day of April, 2024,

8    taken at the location of 1900 W Loop S. Houston, TX

9    77027.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20              Vincent Guerrera

21

22

23

24

25
```

EXHIBIT 23

```
 1                            CERTIFICATE

 2

 3        I, Nancy Do, do hereby certify that I reported all

 4    proceedings adduced in the foregoing matter and that the

 5    foregoing transcript pages constitutes a full, true and

 6    accurate record of said proceedings to the best of my

 7    ability.

 8

 9        I further certify that I am neither related to

10    counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14    23rd day of April, 2024.

15

16

17

18    _____

19                                 Nancy Do

20

21

22

23

24

25
```

EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RANDY AVILES, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 4:22-cv-03571 |
| | § | |
| v. | § | |
| | § | |
| RIGOBERTO SALDIVAR & CITY OF | § | |
| PASADENA, TEXAS, | § | |
| | § | |
| *Defendants.* | § | |

**CITY OF PASADENA'S OBJECTONS SUBPOENA DUCES TECUM SERVED WITH NOTICE OF DEPOSITION OF CITY'S DESIGNATED REPRESENTATIVE**

The City of Pasadena, Texas, herein serves its objections to the subpoena duces tecum served to the City with the notice of deposition of the City's designated representative.

Respectfully submitted,

*Norman Ray Giles*

William S. Helfand
Attorney-In-Charge
Texas Bar No. 09388250
S.D. Tex. Bar No. 8791
Norman Ray Giles
Texas Bar No. 24014084
S.D. Tex. Bar No. 26966

OF COUNSEL:

LEWIS BRISBOIS BISGAARD SMITH LLP
24 Greenway, Suite 1400
Houston, Texas 77046
(713) 659-6767
(713) 759-6830 (Fax)
Attorneys for Defendant
City Of Pasadena, Texas

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to the following counsel of record by e-mail on April 5, 2024.

138786615.1

EXHIBIT 23

Larry Taylor & Dimitri Dube
The Cochran Firm
1825 Market Center Boulevard
Suite 500
Dallas, Texas
ltaylor@CochranTexas.com
ddube@cochrantexas.com
*Attorneys for Plaintiff*

Steven D. Selbe
Gordon Rees Scully Mansukhani
TransWestern Tower
1900 West Loop South
Suite 1000
Houston, Texas 77027
sselbe@grsm.com
*Attorney for Officer Rigoberto Saldivar*

## *Norman Ray Giles*

Under the Amended Scheduling Order [Doc. 33], the deadline for completion of discovery is April 9, 2024. On March 27, 2024, Plaintiff served the City of Pasadena with a subpoena duces decum that would be untimely under FED. R. CIV. P. 34. To be timely served, Plaintiff was required to serve the City with a request for documents that provided for a response at least 30 days after service of the request. *See* FED. R. CIV. P. 26; 34.

Alternatively, the City disclosed and produced to Plaintiff, before the deposition of the City's designated representative, more than 7,000 items. Requiring the City's re-produce these items disclosed places an undue burden on the City and the deponent. *See* FED. R. CIV. P. 26.

Therefore, the Plaintiff, who will decide the questions to be asked at deposition, should bear the burden at deposition of utilizing those records the City has disclosed and produced before the deposition.

EXHIBIT 23