IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RANDY AVILES,

     Plaintiff,

V.                   CIVIL ACTION NO. 4:20-CV-03799

RIGOBERTO SALDIVAR,
CITY OF PASADENA, TX

     Defendants.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

VIDEOTAPED DEPOSITION OF

DET. MICHAEL COOPER

TAKEN ON
THURSDAY, DECEMBER 7, 2023
10:04 A.M.

LEWIS BRISBOIS BISGAARD AND SMITH LLP
24 GREENWAY PLAZA, SUITE 1400
HOUSTON, TEXAS 77046



EXHIBIT 24

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4   DIMITRI DUBE, ESQUIRE

 5   COCHRAN FIRM

 6   1825 MARKET CENTER BOULEVARD, Suite 500

 7   Dallas, Texas  75207

 8   (214) 651-4260

 9   (214) 651-4261 Fax

10   ddube@cochrantexas.com

11

12   FOR THE DEFENDANTS:

13   NORMAN GILES, ESQUIRE

14   LEWIS, BRISBOIS

15   24 GREENWAY PLAZA, Suite 1400

16   Houston, Texas  77046

17   (713) 659-6767

18   (713) 759-6830 Fax

19   norman.giles@lewisbrisbois.com

20

21

22

23

24

25
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

```
 1                    APPEARANCES CONTINUED

 2

 3  STEVEN D. SELBE, ESQUIRE

 4  GORDON, REES, SCULLY, MANUKHANI, LLP

 5  3D/INTERNATIONAL TOWER

 6  1900 W. LOOP S #1000

 7  HOUSTON, TEXAS 77027

 8  (713) 961-3366

 9  (713) 961-3938 Fax

10  sselbe@grsm.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 24

**VIDEOTAPED DEPOSITION OF**

**DET. MICHAEL COOPER**

**TAKEN ON**

**THURSDAY, DECEMBER 7, 2023**

**10:04 A.M.**

15      **MR. DUBE:**   Dimitri Dube.   On behalf of the plaintiff,

16  Randy Aviles.

17      **MR. GILES:**   Norman Giles on behalf of the City of

18  Pasadena.

19      **MR. SELBE:**   Steve Selbe for Officer Saldivar.

20  **MICHAEL COOPER,** Having been first duly sworn, testified as

21  follows

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 24

15    Q.   Is there any reason why you would be unable to give

16  truthful testimony this morning?

17    A.   No, sir.

18    Q.   Are you under any medications or influence of any

19  other prescription medicines?

20    A.   No, sir.

21    Q.   Okay.  Well, I'll start with your current employment.

22  Where do you currently work?

23    A.   I am currently employed by the City of Pasadena with

24  the Pasadena Police Department.

25    Q.   What's your role?

NAEGELI

DEPOSITION & TRIAL

(800) 528-3335

NAEGELIUSA.COM

EXHIBIT 24

1      A.    I'm a police officer.

2      **Q.    And do you have a specific title or position?**

3      A.    Yes.   At this time I am a Federal Task Force Officer

4  assigned to the Bureau of Alcohol Tobacco and Firearms.

5      **Q.    So you work with ATF?**

6      A.    Yes.

7      **Q.    So how long have you been in that position?**

8      A.    Since January of 2020.

9      **Q.    What do you do in that role?**

10     A.    My job is the NIBAN group.   And what NIBAN is, is

11 cartridge casing comparison from crime scenes.   And we see if

12 we can link crime guns that have been recovered and casings

13 that have been recovered from scenes to see if we can maybe

14 link cases together.

15          See if, you know, this person that's responsible may

16 be responsible for more than just one.   Or we can link

17 investigations from different counties, cities, even different

18 states.

19      Q.    Okay.   And prior to joining the task force, I think,

20  I heard you say you work for the City of Pasadena in the

21  Violent Crimes Unit?

22      A.    Correct.

23      Q.    And when did you start there?

24      A.    I went to the Violent Crimes Unit in February, 2017.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 24

8    Q.    Okay.  So roughly, how much of your time is split

9  between the ATF and the City of Pasadena?

10    A.    I'd say prior to the last couple months, it was,

11  like, a 75/25 percent.  75 ATF, 25 percent City of Pasadena.

12  But the last few months it's kind of reversed itself.

13    Q.    Okay.  All right.  Any particular reason for that?

14    A.    Just change over of detectives.  Our officers are --

15  some moving out of the group, new ones coming in, new ones

16  haven't been trained up yet.  So they ask me if I'd come back

17  and help out with stuff a little bit more often until we could

18  get the new guys up to speed.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

15      Q.    Okay.    That's my next topic.    Speaking of

16  preparation, how did you prepare for this deposition?

17      A.    Received an e-mail that I had to be depositioned. I

18  didn't know anything about the case, so I came down here like I

19  was ordered to.

20      Q.    Did you review anything?

21      A.    No, sir.

22      Q.    Did you participate at all in the investigation of

23  the shooting of Mr. Aviles?

24      A.    No, I did not.

25      Q.    Did you hear anything about --

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM    EXHIBIT 24

1    A.   I apologize.  They asked me to do an eTrace on the

2  gun.  And what that is, is that -- there's, like, a website we

3  can enter the gun information in.  And it sends it off to a,

4  somewhere over in the East Coast.

5       And that they send the information back on the

6  history of the gun.  Wherever it, like, who the importer was,

7  who's the original seller, original purchaser.  That's my only

8  role.

9    Q.   **Did you hear about the shooting?**

10   A.   Yes.

11   Q.   **Okay.  What did you hear about the shooting?**

12   A.   I heard about it and I didn't want nothing to do with

13  it.

NAEGELI
DEPOSITION & TRIAL          CELEBRATING 40 THIS IN BUSINESS          (800)528-3335
                                                                     NAEGELIUSA.COM

EXHIBIT 24

5      **Q.   How did you make -- make it clear that you did not**
6  **want to participate?**
7      A.   When I came into the office one day and they were
8  talking about it.  And they said, hey, do you want to go do
9  some follow-ups on this and I was, like, no.

15      **Q.   I understand you didn't want to be involved in it.**
16  **I'm just trying to figure out if you can tell me why you didn't**
17  **want to be involved in it?**
18      A.   Because I was involved in the first one and then
19  investigated the second one.  And I'm -- I just -- I've -- I --
20  And I had other investigations going on.  And I just didn't
21  want to be involved in it.  Because it just -- these are long
22  complex investigations and I just -- I just believe -- I had a
23  lot on my plate.  I just didn't want to be involved in it.
24      **Q.   When you say the first one, what you mean by the**
25  **first one?**

```
 1        A.    There was a shooting, I can't even tell you when,

 2   maybe in 2018.  Beginning of 2018.  I'm not sure.  I can't even

 3   give you the exact -- Maybe it was the end of 2017.  I don't

 4   know.  And I assisted the primary guy with that one.

 5        Q.    Okay.

 6        A.    And I just assisted.  Just, hey, will you go and see

 7   what you can find in the evidence wise or so forth.

 8        Q.    Okay.  And is that the shooting involving the kid

 9   with the gun?

10        A.    Yes, sir. Yes, sir.

11        Q.    Okay.

12        A.    Yes, sir.

13        Q.    If I say the name Angel Ramirez, does that ring a

14   bell?

15        A.    No, sir.

16        Q.    Okay.  But you know of the shooting involving a young

17   man with a gun?

18        A.    Yes, sir.
```

████████████████████████████████████████████████████

```
21        Q.    Your memory is pretty good.  It was early 2018.

22        A.    Okay.

23        Q.    It was April of 2018.

24        A.    Okay.

25        Q.    And what did you do with that investigation?
```

1      A.    The first one?

2      **Q.    Yes.**

3      A.    I -- I just assisted the primary investigator. One

4  thing he asked me to do, was if I could see if I could figure

5  out, if I remember correctly, I think four shots were fired.

6          And he asked if I could go find -- if I could see the

7  path of maybe the projectiles went.  So I walked through the

8  apartment complex trying to find possible bullet holes.

9      **Q.    And what was the second shooting you're referencing?**

10     A.    It was an investigation that I worked.

11     **Q.    Okay.  And which one was that one?**

12     A.    It was November 21 or 22nd of 2018.  Can't remember.

13  It was the night before Thanksgiving, I remember that.  And it

14  was an investigation involving Officer Saldivar.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

8     **Q.   Did you review your report on the second shooting? I**

9  **should -- Before I ask you that -- XX On the first shooting,**

10  **did you watch the video of that shooting?**

11     A.  On the first shooting?  I -- If I remember correctly,

12  I think, I saw a dash cam where he's standing in front of the

13  car and firing.  But that's -- alls you see is him.

14     **Q.   Okay.  Did you see the body cam?**

15     A.  No, I did not, sir.

16     **Q.   Okay.  And you are not in charge of making any**

17  **investigating findings on that shooting; correct?**

18     A.  No, sir, I was not.

25    Q    (By Mr. Dube) Just to clean up that question.  Who

1  was the person that was shot?

2      A.    Nathan Schenk.

3      Q.    **And Mr. Schenk was deceased --**

4      A.    Correct.

5      Q.    **-- from the shooting; correct?**

6      A.    Yes, sir.

7      Q.    **How did you become involved in that investigation?**

8      A.    That was my week for primary on call, for any call-

9  outs.  And I was actually, myself and one of my partners, were

10  out investigating a series of robberies when this call went

11  out.

12          So I asked him to go to the scene, get it --

13  everything secured while I went and put on my shirt and tie,

14  dress pants that we have to wear for all call outs.

15      Q.    **Okay.  And who was the other detective that was with**

16  **you?**

17      A.    Joe Stephens.  Joseph Stephens.

18      Q.    **So it's a requirement to wear a shirt and tie for**

19  **investigations?**

20      A.    For call-outs like this, yes.

21      Q.    **And then -- so you were -- you and -- Is it Detective**

22  **Stephens?**

23      A.    Yes, sir.

24      Q.    **You and Detective Stephens were out on a call-out for**

25  --

EXHIBIT 24

1       A.    We weren't out on a call-out.  We were doing an

2   investigation.

3       Q.    **Oh, sorry.**

4       A.    We were doing investigations.  We had a serial robber

5   that was hitting in the timeframe, usually between 7:00 p.m.

6   and 10:00 p.m.  So we were out just canvassing the area, seeing

7   if we spot the vehicle, spot him.

16      Q.    **What is it that you heard?**

17      A.    Shots fired.

18      Q.    **Okay.**

19      A.    It started off with, one running.  I've got one

20  running.  And then it ended with shots fired.

21      Q.    **And who is the person that's reported shots being**

22  **fired?**

23      A.    Officer Saldivar.

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

**(800)528-3335**
NAEGELIUSA.COM

EXHIBIT 24

18   **Q.   And Detective, is it Sanders?   Joseph Sanders?**

19   A.   I apologize, sir?

20   **Q.   Detective Joseph Sanders?**

21   A.   Oh, Stephens?

```
15      Q.   -- for the loop around.  So Mr. -- Officer Sanders

16  and Detective Stephens reviewed what occurred.  Which is, there

17  is a police stop, a chase, and then they went back to, I guess,

18  near the area where --

19      A.   Yes, sir.
```

EXHIBIT 24

2        Q.    Earlier you said, you walked the path that he said

3   occurred.    And by that he you mean Officer Saldivar?

4        A.    Oh, yes.    Yes, sir.    What Officer Saldivar initially

5   told them he had ran, that's the path that I had walked.

21    **Q.    Okay.  When did you first speak to Officer Saldivar?**

22    A.    I think the first time I talked to him that night, at

23    the scene, is when I told him we needed to, what we call,

24    catalog his weapon.

5     **Q.    Did you get a chance to look at the body, yourself?**

6     A.    A little bit there, yes.

7     **Q.    What did you notice, if you remember?**

8     A.    I did observe some gunshot wounds to the body.

9     **Q.    And is this before you spoke to Officer Saldivar?**

10    A.    Now, what do you mean by spoke to Officer Saldivar?

11 You talking about when I cataloged the weapon?

EXHIBIT 24

18      Q.   So we're going to get to the body cam footage and the

19  dash cam footage.   Prior to watching the footage of the body

20  cam and the dash cam, do you recall anything else you did at

21  the scene?

22      A.   We just -- We did a non-recorded walk through.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

```
10       Q.    But did that occur before or after you'd watched the

11  video?

12       A.    That was before the video.  I know the video was

13  played, but I couldn't see it.
```

20      Q.    After you?   Okay.   Did you attempt to speak to

21   Officer Saldivar prior to the video coming to the scene with

22   Sergeant White?

23      A.    No, sir.

24      Q.    Is there any reason why?

25      A.    Just didn't.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

2      Q.    Okay, so tell me about the walk-through.   What

3  happens at the walk-through?  Well, no.  We're not at the walk-

4  through.  We are at the video; right?  The video has been

5  brought by Sergeant White.  So tell me about that. What happens

6  at that time?

7      A.    They played it on a computer.  And probably, like,

8  the size of that Apple one down there.  Something to that size.

9  Small laptop computer.  And as I put in my report, it was

10 difficult to see.  I couldn't even see.

4      Q.    So during the walk-through, he made the statement of,

5   the guy got in the linebacker stance or football stance and

6   reached for his waist?

7      A.    Something like that.

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

EXHIBIT 24

14      Q      (By Mr. Dube) Okay.  So now, I guess, let's get to

15   the video.  When did you first watch the video?

16      A.    The next day.

17      Q.    Where were you when you watched it?

18      A.    In my office.  Or in my cubicle.  In the detective

19   bullpen.

20      Q.    So you came in on Thanksgiving?

21      A.    Yes, sir.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

| 18 | Q. | Describe your setup.  Your video setup. |
|----|----|------|
| 19 | A. | I got a 34" ultrawide Dell monitor. |
| 20 | Q. | Okay. |
| 21 | A. | And that's what I watched it on. |
| 22 | Q. | Nice screen. |
| 23 | A. | Yes, sir. |
| 24 | Q. | Which video did you watch first; do you recall? |
| 25 | A. | Body cam. |

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

20      **Q.    No, not multiple screens, multiple speeds.**

21      A.    Oh, multiple speeds.  You got the -- the player I

22   watched it on was that VLC.  I used that player.  And it has

23   frame by frame.

24      **Q.    So you watched it, at some point, frame by frame?**

25      A.    Yes, sir.  And then you can -- It has a playback

17    Q.    (By Mr. Dube) Why?

18    A.    Because what I'm seeing on video didn't match the

19    story he gave in the walk-through.

20    Q.    So you watched the video.  And you came up to a

21    conclusion.

22    A.    Initially, yes.

23    Q.    And what was that conclusion?

24    A.    Why did he shoot?

```
 6      Q.    Okay.  So what he has said in the walk-through and

 7   what you observed in the video were different?

 8      A.    Yes.

 9      Q.    So did you feel that what he had said in the walk-

10   through was untrue?

11      A.    No.

12      Q.    Okay.

13      A.    I just -- It was different.

14      Q.    Different.  Okay.  What had he said in the walk-

15   through that was different from what you saw in the video?

16      A.    He talked about how the guy got in, like, a

17   linebacker stance.  Hands at the waist.  I did not see that.
```

EXHIBIT 24

23          **THE WITNESS:**  What I saw was Schenk almost, like,

24  turning away.  Or he's in a, like, a bear crawl or, like, even

25  a runner or a track stance.  Something like that.  He's on all

1  fours.  And he's getting up to run away.  He is trying to get

2  up and run away, like he had been.

17      Q      (By Mr. Dube) Okay.  At the time that Officer

18  Saldivar shot at Mr. Schenk, was he, in your opinion, in a

19  linebacker stance reaching for his waistband?

20      A.     In my opinion, I did not observe that in the video.

21      Q.     Okay.  And so what did you do -- So you called your

22  supervisor; correct?

23      A.     Correct.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

Det. Michael Cooper    December 7, 2023    NDT Assgn # 70640                          Page 79

11      Q    (By Mr. Dube) Excessive force?

12      A.   Yes, sir.

13      Q.   What happened next?

14      A.   I know at some point that day, Sergeant Craig

15 Hamilton came in because he was, I believe, he was the lead

16 internal affairs investigator.  I believe he was.  And he said

17 -- asked me how it was going and if I had watched the video and

18 I said, yes.  And I told him what I observed on the video.

```
14        Q.    Did Sergeant Hamilton say anything to you at that

15   time?

16        A.    I think he made a comment one time afterwards, like,

17   you know, I'm not seeing what you are seeing.  And then we

18   watched it, like, a couple more times and something to the

19   effect, like, okay.  He didn't tell me his opinion, or anything

20   like that after that.  He just said, I didn't see what you're

21   seeing.  And that was towards the beginning of watching the

22   video.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 24

18     **Q.    What did you do next, after that meeting?**

19     A.    Kept working the case.  Typing, and waiting for stuff

20  to come in from the Medical Examiners Office and then when I

21  completed the case file, I send it over to the District

22  Attorney's Office.

13          **THE REPORTER:**   We can go off the record now.

14          **VIDEOGRAPHER:**   Off the record at 3:17.

15           **(Deposition concluded at 3:17)**

16

17

18

19

20

21

22

23

24

25

EXHIBIT 24

```
1                          CERTIFICATE

2

3       I, the undersigned, Sam Swain, am a videographer on

4  behalf of NAEGELI Deposition & Trial. I do hereby certify

5  that I have accurately made the video recording of the

6  deposition of Det. Michael Cooper, in the above captioned

7  matter on the 7th day of December, 2023 taken at the

8  location of Lewis Brisbois Bisgaard and Smith LLP, 24

9  Greenway Plaza, Ste. 1400, Houston, TX 77046.

10

11      No alterations, additions, or deletions were made

12  thereto.

13

14      I further certify that I am not related to any of

15  these parties in the matter and I have no financial

16  interest in the outcome of this matter.

17

18

19  _____

20                             Sam Swain

21

22

23

24

25
```

EXHIBIT 24

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE SOUTHERN DISTRICT OF TEXAS

 3                          HOUSTON DIVISION

 4

 5    RANDY AVILES,

 6    Plaintiff,

 7    vs.                        CIVIL ACTION NO. 4:22-CV-03571

 8    RIGOBERTO SALDIVAR,

 9    CITY OF PASADENA, TX

10    Defendants.

11

12                     REPORTER'S CERTIFICATION

13                DEPOSITION OF DET. MICHAEL COOPER

14                        DECEMBER 7, 2023

15

16        I, Mary Kai Brandenburg Court Reporter, hereby certify

17    to the following:

18        That the witness, Det. Michael Cooper, was duly sworn

19    by the officer and that the transcript of the oral

20    deposition is a true record of the testimony given by the

21    witness;

22        That the deposition transcript was submitted on

23    December 21, 2023, to the witness or to the attorney for

24    the witness for examination, signature and return to

25    NAEGELI DEPOSITION AND TRIAL by January 10, 2024;
```

EXHIBIT 24

1      That the amount of time used by each party at the

2  deposition is as follows:

3          DIMITRI DUBE - 3hr 9min

4          NORMAN R. GILES - 0hr 0min

5          STEVEN D. SELBE - 0hr 0min

6      That pursuant to information given to the deposition

7  officer at the time said testimony was taken, the following

8  includes counsel for all parties of record:

9          DIMITRI DUBE ATTORNEY FOR PLAINTIFF

10          NORMAN R. GILES ATTORNEY FOR DEFENDANT

11          STEVEN D. SELBE ATTORNEY FOR DEFENDANT

12          I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties or attorneys

14  in the action in which this proceeding was taken, and

15  further that I am not financially or otherwise interested

16  in the outcome of the action.

17      Certified to by me this 21st day of December, 2023.

18

19

20

21

22

23          Mary Kai Brandenburg No. 12496

24

25

EXHIBIT 24