

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


RANDY AVILES,

       Plaintiff,

vs.                 CIVIL ACTION NO. 4:22-CV-03571

RIGOBERTO SALDIVAR,
CITY OF PASADENA, TX,

       Defendants.

_____

NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

FINAL\b0

VIDEOTAPED DEPOSITION OF

CRAIG A. HAMILTON


TAKEN ON
FRIDAY, MARCH 22, 2024
2:54 P.M.


1149 ELLSWORTH DRIVE
PASADENA, TEXAS 77506

EXHIBIT 25


Powerful
LITIGATION SUPPORT

```
 1                    REMOTE APPEARANCES

 2

 3   Appearing on behalf of the Plaintiff:

 4   DIMITRI DUBE, ESQUIRE

 5   Cochran Firm

 6   1825 Market Center Blvd, Suite 500

 7   Dallas, TX 75207

 8   (214) 651-4260

 9   (214) 651-4261 (Fax)

10   ddube@cochrantexas.com

11

12   Appearing on behalf of the Defendant,

13   Rigoberto Saldivar:

14   CHRISTINA H. PITTMAN, ESQUIRE

15   Gordon Rees Scully Mansukhani, LLP

16   1900 W. Loop S., Suite 1000

17   Houston, TX 77027

18   (713) 961-3366

19   (713) 961-3938 (Fax)

20   cpittman@grsm.com

21

22

23

24

25
```

EXHIBIT 25

```
 1              REMOTE APPEARANCES (CONTINUED)

 2

 3   Appearing on behalf of the Defendant, City of Pasadena:

 4   NORMAN R. GILES, ESQUIRE

 5   JIMMIE HOLLOWAY, ESQUIRE

 6   Lewis Brisbois Bisgaard and Smith, LLP

 7   24 Greenway Plaza, Suite 1400

 8   Houston, TX 77046

 9   (713) 659-6767

10   (713) 759-6830 (Fax)

11   norman.giles@lewisbrisbois.com

12   jimmie.holloway@lewisbrisbois.com

13

14   ALSO PRESENT:

15   Luis Guiterrez, Law Clerk, Cochran Firm

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 25

1                    VIDEOTAPED DEPOSITION OF

2              CRAIG A. HAMILTON - FINAL

3                         TAKEN ON

4               FRIDAY, MARCH 22, 2024

5                      2:54 P.M.

6

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

Craig A Hamilton    March 22, 2024    NDT Assgn # 72923                    Page 7

4       Q.    Good afternoon, Sergeant Hamilton.    How are you?

5       A.    Doing well, sir.    How are you?

6       Q.    I'm good.    Sorry we were a little late for your depo.

7    I apologize if I made you wait for a little bit before we got

8    started.

18      Q.    Is this your first deposition, sir?

19      A.    No, sir, it's not.

20      Q.    Okay.    How many times have you been deposed before?

21      A.    One other time.

22      Q.    Okay.    What case was that for?

23      A.    For Nathan Schenk versus Officer Saldivar.

EXHIBIT 25

6    Q.    Okay.  I think we did a really good job of that with

7  the last deposition, so hopefully we can continue doing that

8  for this one as well. Are you under any medications or anything

9  that would affect your ability to recall the incidents that

10 we're going to discuss today?

11   A.    No, sir.

12   Q.    Is there any reason why you would not be able to tell

13 the truth?

14   A.    None that I'm aware of.

EXHIBIT 25

Craig A Hamilton   March 22, 2024   NDT Assgn # 72923

```
5       Q.      How are you employed?

6       A.      How am I employed?  With the -- I'm a sergeant with

7  the Pasadena Police Department.
```

Craig A Hamilton   March 22, 2024   NDT Asson # 72923

```
 9        Q.    That's cool. How long were you in that position?

10        A.    Until 2013 when I promoted to sergeant.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

```
 5     Q.   And so, a sergeant is a supervisor, basically, in --

 6  in the Pasadena Police Department, correct?

 7     A.   Correct.  Firstline supervisor.
```

```
13     Q.   So day shift patrol.  What was your next -- next

14  role.

15     A.   I was -- from there, in 2017, I went to Internal

16  Affairs.
```

```
19     Q.   And who is the chief?

20     A.   At the time it was Mike Thaler.  I directly reported

21  to Assistant Chief Josh Bruegger.
```

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

11      Q.    So what is the role of Internal Affairs?

12      A.    Internal Affairs is basically an administrative arm

13 of the chief's investigative division. We are to investigate

14 specific complaints, officer conduct, as well as perceived --

15 or -- alleged policy and procedure violations.

22      Q.    And you said -- you used the word administrative,

23 like, a little while ago.  What -- what does that mean; how

24 does that differentiate from another function?

25      A.    The other side would be as in -- as criminal side,

**NAEGELI** DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 25

1  which would be --

2      **Q.   Mm-hmm.**

3      A.   -- cases that would be presented to a district

4  attorney's office would be handled by a detective from that

5  specific bureau based upon what kind of case it was.

6      **Q.   So does the Internal Affairs Division have a function**

7  **in reporting officer involved crimes?**

8      A.   We would investigate it on behalf of the Department,

9  again, in that administrative function.

10     **Q.   Mm-hmm.**

11     A.   But you would have an actual -- from our Department,

12  a Violent Crimes Detective would investigate the criminal

13  aspect of that.

22     **Q.   So Internal Affairs -- if I understand correctly --**

23  **and correct me if I'm wrong -- the -- the job of Internal**

24  **Affairs is to determine whether or not the officer ought to be**

25  **disciplined or reprimanded in any way, not with respect to**



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

1  **whether or not they committed a crime?**

2      A.    No, that is not correct.

3      **Q.    Gotcha.**

4      A.    Our job is simply to report our -- like, we would

5  parallel the investigation handled by the criminal detective --

6      **Q.    Mm-hmm.**

7      A.    -- and in that regard, we simply denote facts and

8  gather the information in order to report it to the chief. And

9  then the chief makes the determination on whether or not

10  punishment is necessary or appropriate.

11      **Q.    Does Internal Affairs make any recommendation to the**

12  **chief?**

13      A.    We do not.

Craig A Hamilton   March 22, 2024   NDT Assgn # 72923                    Page 17

 7      Q.   So we were going through the structure of the

 8  Internal Affairs Department at the time you were there.

 9      A.   Yes, sir.  It was just two sergeants that reported

10  directly to the chief or his designee.

EXHIBIT 25

```
10      Q.   Did you investigate excessive use -- excessive use of

11   force cases, other than shootings?

12      A.   Yes, I have.

13      Q.   Was that a regular -- was that a regular occurrence

14   for you?

15      A.   No, it was not.
```

9    Q.   Do you recall the names of the alleged victim and the

10   name of the alleged shooters in each of these, the ones you

11   were involved in?

12   A.   I -- I don't recall.  The only ones I can recall

13   directly are the -- the two involving Officer Saldivar.

14   Q.   Were you primary on both?

15   A.   I was.

16   Q.   And which two shootings were those?

17   A.   There was one in, I believe, April of 2018.  I do not

18   recall that subject's name. And then the one involving Schenk,

19   which was in November of 2018.

20   Q.   And if I were to tell you the one in April 2018 was

21   Angel Ramirez, would that refresh your recollection?

22   A.   That name does sound correct, yes.

NAEGELI DEPOSITION & TRIAL   (800)528-3335   NAEGELIUSA.COM   EXHIBIT 25

 2      Q.    You mentioned before, you would observe to see proper

 3 protocols were followed in terms of who the officer spoke to or

 4 didn't speak to. Can you tell us what those protocols would

 5 have been?

 6      A.    Just in -- in regards to once you're arriving on

 7 scene, they're not -- they are most likely not going to speak

 8 to us until their attorney has arrived. They are afforded a

 9 peer support officer to sit with them as that is progressing

10 through.  And that's primarily it until they're allowed, you

11 know, with the attorney present, they're allowed to speak to us

12 or not.

13      Q.    And are they afforded the attorney regardless of

14 whether or not they ask for it?

15      A.    Yes, usually they are.

EXHIBIT 25

1      Q.    Mm-hmm.  Have you ever discharged a firearm and been

2   involved in an officer-involved shooting?

3      A.    I have not.

4      Q.    So -- so after being at the scene and observing,

5   making sure, I guess, policies and protocols are being

6   followed, what other role did you have at the scene?

7      A.    To simply just kind of shadow and kind of just try to

8   see what they're seeing. If they're going to catalog the

9   weapon, if they are going to review any video, I'm able to be

10  there and just witness.

11     Q.    You -- you're shadowing them as they do those things?

12     A.    Yes, sir.

13     Q.    What's your next function and role in investigating

14  an officer-involved shooting?

15     A.    Once we have left the scene and the criminal

16  investigators have closed that scene, it's simply to review

17  video, review reports, and draw up an administrative

18  investigation of facts, and complete a report that is turned

19  over to the chief.

20     Q.    Do you interview witnesses?

21     A.    If necessary.  But it would not be to the criminal

22  side of it.  It would most likely be to the administrative

23  side.  So that would be mostly officers involved.

24     Q.    So you -- so you would interview the officer that was

25  involved?

NAEGELI   (800)528-3335
DEPOSITION & TRIAL   NAEGELIUSA.COM

EXHIBIT 25

1     A.   Yes.

16     **Q.   Beyond the investigations, did you know Officer**

17 **Saldivar?**

18     A.   Yes, I did.

19     **Q.   How did you know him?**

20     A.   He was on patrol shift while I was a supervisor.  But

21 he also was a member of the Honor Guard, which is a collateral

22 unit that I supervised.

23     **Q.   How long were you a supervisor in the patrol shift?**

24     A.   For day shift patrol, I was there about four-and-

25 half-years.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

```
 4         Q.    What do you remember about his performance?

 5         A.    That he was proactive.  That he -- he sought

 6    opportunities to -- to do his job.  And that he had worked -- I

 7    knew him to have worked investigations.  So his reports were

 8    adequate and complete.

 9         Q.    Anything else?

10         A.    No.

11         Q.    How did you interact with him in the Color (sic)

12    Guard?

13         A.    He was reliable.  He had a specific role, and within

14    that, whether it be on flags or rifle detail.  And he was -- he

15    was more than adequate in his assignment.

16         Q.    Did you have a relationship with him outside of work?

17         A.    No, I did not.

18         Q.    You guys wouldn't -- you wouldn't consider him to be

19    a friend?

20         A.    An acquaintance, but not necessarily a friend, no.
```

6      Q.   Do you have active conversations with the criminal

7    investigators during the course of investigation?

8      A.   I can have conversations with them in regards to what

9    they had found, but I am not to offer up any information to

10   them as the -- the officer's protected by Garrity.

11     Q.   What does that mean?

12     A.   That the officer has normal protections in regards to

13   being able to speak to a criminal investigator with an attorney

14   present.  All those coverages. But in a Garrity form, they are

15   not allowed that.  They have -- as a condition of employment,

16   they have to answer my questions. Therefore, because they're

17   protected under Garrity, it cannot be used against them in a

18   criminal investigation.

19     Q.   So essentially, under the -- in the -- in the

20   criminal side, they have the Fifth Amendment protections,

21   right?

22     A.   Mm-hmm.

23     Q.   But they're not afforded those same protections under

24   the civil -- I guess, the administrative investigation?

25     A.   Correct.

8    Q.    So how many, beyond just officer-involved shootings,

9  how many investigations would -- would you handle during the

10 course of a year, typically?

11    A.    I don't recall any exact numbers.  But maybe 20.

12    Q.    And who were the chief's designees that you reported

13 your -- your reports to?

14    A.    At one time, it was Assistant Chief Bruegger --

15    Q.    Mm-hmm.

16    A.    -- before he became chief.  And then it was Assistant

17 Chief Rick Styron.

18    Q.    Anyone else?

19    A.    Any of the assistant chiefs could make the request

20 for information.  But those were the two that I reported

21 directly to most often.

22    Q.    What do you recall of the Angel Ramierz

23 investigation?

24    A.    That Officer Saldivar was dispatched to a suspicious

25 circumstance.  The individual was knocking on doors, saying I'm

EXHIBIT 25

1  a stranger, let me in. When Officer Saldivar contacted him, the

2  subject had a weapon in his hand.  When Officer Saldivar

3  instructed him to put his hand -- you know, put his hands up,

4  the gun was raised up towards him, which he responded by firing

5  four shots.

6      **Q.    So you specifically recall Officer Saldivar telling**

7  **him to put his hands up?**

8      A.    I -- I don't believe if it was put his hands up.  I

9  believe it was along the lines of don't move. I can look at my

10  notes and -- to confirm that.

11     **Q.    Please do.**

12     A.    He does -- he did tell the subject, show me your

13  hands.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

```
16        Q.    Did any other witnesses observe whether or not the

17   individual raised his gun on Officer Saldivar?

18        A.    There were no other known witnesses of that.

19        Q.    How many shots did Officer Saldivar fire?

20        A.    Four.

21        Q.    Okay.  Did any of them strike the individual?

22        A.    They did not.
```

EXHIBIT 25

Craig A Hamilton    March 22, 2024    NDT Assgn # 72923    Page 36

```
24        Q.    Did the -- the -- what kind of weapon did the suspect

25   have?
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

Craig A Hamilton   March 22, 2024   NDT Assgn # 72923                Page 37

```
 1        A.    I believe he was found to have a total of three

 2   pellet guns that -- one which resembled a semi-auto, another

 3   that resembled a revolver --

 4        Q.    Mm-hmm.

 5        A.    -- two that resembled revolvers.

 6        Q.    Are those firearms the definition of as you

 7   understand firearms to mean?

 8        A.    Are the pellet guns --

 9        Q.    Yes.

10        A.    -- firearms?  Yes, they are.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

6    Q.   So in your family violence cases that you did when --

7  when you were in that role, there -- if there are discrepancies

8  between witnesses, how would you resolve those?

9    A.   You use what evidence you had at the time, whether it

10  be injuries, if it would be -- even with conflicting

11  statements, you look to other witnesses if there are some or

12  not.  But it was not a common practice to -- to result. Then

13  you would even include the district attorney and tell them both

14  sides of the case.  And then they would make the determination.

8     Q.    Would you have access to the video now where you are?

9     A.    I do not where I'm at.

10    Q.    Okay.  Well, the video will show what it shows.  I --
11  I only have the excerpt right now, but we'll -- we'll figure
12  that part out later, okay.  All right.  So the next shooting was
13  the Schenk shooting, correct?

14    A.    Correct.

14      Q.    How were you assigned to that case?

15      A.    Simply by being on call or rotation.  I don't recall

16  the circumstances.  It was just -- it was my turn.

17      Q.    And this shooting occurred in November of 2018?

18      A.    Yes, it did.

19      Q.    That's approximately six to seven months after the

20  Ramirez shooting?

21      A.    Correct.

EXHIBIT 25

Craig A Hamilton   March 22, 2024   NDT Assgn # 72923                    Page 61



 9      Q.   So tell me what -- what's the first thing that

10   happened after you were told to report to the scene?

11      A.   Responded to the scene.  And once -- and spoke with

12   Detective Cooper to get a summation of what had occurred prior

13   to my arrival.

14      Q.   What did he tell you had occurred?

15      A.   The summary of what I just shared with you in regards

16   to Officer Saldivar working STEP, and a pursuit had been

17   involved -- a foot pursuit had been involved, and that it

18   resulted in a shooting.

19      Q.   What's the next thing that you did?

20      A.   I just began to shadow the investigation.

21      Q.   How long -- how long were you at the scene for?

22      A.   I don't recall.  I would definitely say several

23   hours.

24      Q.   It was the night before Thanksgiving, correct?

25      A.   I believe you are correct.

EXHIBIT 25

1      Q.   Did you go into work the next day, on Thanksgiving,

2   on this case?

3      A.   I don't recall.

4      Q.   After you left the scene, what's the next thing you

5   remember happening?

6      A.   After I left the scene?

7      Q.   Mm-hmm.

8      A.   I waited for reports, as well as Officer Saldivar's

9   statement to be turned in.

10     Q.   What reports did you wait for?

11     A.   Any that were completed by the investigating

12   detectives in regards to the criminal investigation, to the

13   crime scene investigation, as well as supplements and

14   statements based upon videos and that nature.

15     Q.   Did you watch the videos?

16     A.   I did.

17     Q.   And did you speak to Detective Cooper?

18     A.   I did.

19     Q.   Did you speak to, I think, Sergeant Skripka?

20     A.   Yes.

```
6          Q.     Do you recall Detective Cooper telling you that it
7    was his belief that Mr. Schenk was on his hands and knees at
8    the time that Officer Saldivar shot him?
9          A.     I don't recall him saying that, no.
```

```
25         Q.     What do you recall seeing on the video, sir?
```

EXHIBIT 25



24      Q.    Could you -- could you tell what -- who was on top

25  and who was on the bottom during the struggle on the video?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

1        A.    At one point, it appeared that Officer Saldivar, the

2   way they were locked up.  Again, the camera is off angle at

3   this time.  But it shows that they are -- that potentially

4   Officer Saldivar is above him for a moment.



15        Q.    Did you ever ask for any resources to enhance the

16   video?

17        A.    I did not.

18        Q.    Any particular reason why not?

19        A.    Because of the -- the -- the camera.  You can't

20   enhance what the camera doesn't see. So the -- being broken

21   during the altercation, being picked up and dropped several

22   times, and as well as those kinds of -- if there was need for

23   that additional enhancement, that would also, I believe, go

24   towards the criminal investigation side if they needed to see

25   more.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

22      **Q.   So I just want to point you to this sentence that**

23 **begins with, however. Can you read that sentence for me?**

24      A.   However, Schenk turned away as Officer Saldivar drew

25 and discharged his weapon.

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

**(800)528-3335**
NAEGELIUSA.COM

EXHIBIT 25

1    **Q.    Okay.   Now read the next sentence, please?**

2    A.    Officer Saldivar discharged his duty weapon five

3    times, striking Schenk once in the left side of his torso, and

4    twice in the lower back.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

 8      Q.    Is this the area where you said it's black because

 9  the body camera has broken off?

10      A.    Yes, it is believed it's -- it's on the ground and

11  being covered at this point.

EXHIBIT 25

 2          MR. DUBE:  Thank you, sir.  I appreciate your time. I

 3  pass the witness.

 4          MR. GILES:  All right.  I reserve mine 'til time of

 5  trial.

 6          MR. DUBE:  Thank you.

 7          THE VIDEOGRAPHER:  All right. Before we go off the

 8  record, counsel, our court reporter will take orders for the

 9  transcript.

10          THE REPORTER:  Attorney Dube, would you like the

11  original?

12          MR. DUBE:  Yes.

13          THE REPORTER:  Okay. Attorney Giles, would you like

14  the copy?

15          MR. GILES:  Yes.  Thank you.

16          THE REPORTER:  Thank you. Counsel Pittman, would you

17  like a copy?

18          MS. PITTMAN:  Yes.  Thank you.

19          THE VIDEOGRAPHER:  And Mr. Giles --

20          MR. GILES:  Let me ask -- yeah, send me the read and

21  sign, please for --

22          THE REPORTER:  Okay.

23          MR. GILES:  -- for the witness.

24          THE REPORTER:  Both of them?

25          MR. GILES:  Both of them.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 25

```
 1              THE REPORTER:  Okay.

 2              MR. DUBE:  I have to run and --

 3              THE VIDEOGRAPHER:  And Mr. Giles, did you want a

 4   video copy?

 5              MR. GILES:  No, I don't need the video. Thank you.

 6              THE VIDEOGRAPHER:  All right.  All right. The time is

 7   6:20 p.m., and we're off the record.

 8              (WHEREUPON, the videotaped deposition of CRAIG A.

 9   HAMILTON was concluded at 6:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF VIDEOGRAPHER

2

3         I, the undersigned, Vincent Guerrera, am a

4    videographer on behalf of NAEGELI Deposition & Trial. I

5    do hereby certify that I have accurately made the video

6    recording of the deposition of Sebastian Mata, in the

7    above captioned matter on the 22nd day of March, 2024

8    taken at the location 1201 Davis St. Pasadena, Texas

9    77506.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20             Vincent Guerrera

21

22

23

24

25
```

EXHIBIT 25

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                       HOUSTON DIVISION

 4

 5   RANDY AVILES,

 6   Plaintiff,

 7   v.                        CIVIL ACTION NO. 4:22-CV-03571

 8   RIGOBERTO SALDIVAR,

 9   CITY OF PASADENA, TX,

10   Defendants.

11

12                     REPORTER'S CERTIFICATION

13                 DEPOSITION OF CRAIG A. HAMILTON

14                    FRIDAY, MARCH 22, 2024

15

16        I, Laila Khoury, Court Reporter, hereby certify to the

17   following:

18        That the witness, CRAIG A. HAMILTON, was duly sworn by

19   the officer and that the transcript of the oral deposition

20   is a true record of the testimony given by the witness;

21        That the deposition transcript was submitted on April

22   8, 2024 to the witness or to the attorney for the witness

23   for examination, signature and return to NAEGELI DEPOSITION

24   AND TRIAL by April 28, 2024;

25        That the amount of time used by each party at the
```

EXHIBIT 25

1  deposition is as follows:

2          Dimitri Dube - 03 hrs 04 min

3      That pursuant to information given to the deposition

4  officer at the time said testimony was taken, the following

5  includes counsel for all parties of record:

6          Dimitri Dube, ATTORNEY FOR PLAINTIFF

7          Christina H. Pittman, ATTORNEY FOR DEFENDANT

8          Norman R. Giles, ATTORNEY FOR DEFENDANT

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties or attorneys

11  in the action in which this proceeding was taken, and

12  further that I am not financially or otherwise interested

13  in the outcome of the action.

14      Certified to by me this 8th day of April, 2024.

15

16

17

18

19          Laila Khoury, No. 818

20

21

22

23

24

25

EXHIBIT 25