**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

RANDY AVILES,

     Plaintiff,

v.                 CIVIL ACTION NO. 4:22-CV-03571

RIGOBERTO SALDIVAR,
CITY OF PASADENA, TX,

     Defendants.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

*Powerful*
LITIGATION SUPPORT

**VIDEOTAPED DEPOSITION OF**

**SEBASTIAN MATA**

**TAKEN ON**
**FRIDAY, MARCH 22, 2024**
**10:25 A.M.**

**1201 DAVIS STREET**
**PASADENA, TEXAS 77506**

EXHIBIT 26

```
 1                    REMOTE APPEARANCES

 2

 3   Appearing on behalf of the Plaintiff:

 4   DIMITRI DUBE, ESQUIRE

 5   Cochran Firm

 6   1825 Market Center Boulevard, Suite 500

 7   Dallas, TX 75207

 8   (214) 651-4260

 9   (214) 651-4261 (Fax)

10   ddube@cochrantexas.com

11

12   Appearing on behalf of the Defendant,

13   Rigoberto Saldivar:

14   CHRISTINA H. PITTMAN, ESQUIRE

15   Gordon Rees Scully Mansukhani, LLP

16   1900 W. Loop S., Suite 1000

17   Houston, TX 77027

18   (713) 961-3366

19   (713) 961-3938 (Fax)

20   cpittman@grsm.com

21

22

23

24

25
```

EXHIBIT 26

```
 1              REMOTE APPEARANCES (CONTINUED)

 2

 3   Appearing on behalf of the Defendant, City of Pasadena:

 4   NORMAN R. GILES, ESQUIRE

 5   JIMMIE HOLLOWAY, ESQUIRE

 6   Lewis Brisbois Bisgaard and Smith, LLP

 7   24 Greenway Plaza, Suite 1400

 8   Houston, TX 77046

 9   (713) 659-6767

10   (713) 759-6830 (Fax)

11   norman.giles@lewisbrisbois.com

12   jimmie.holloway@lewisbrisbois.com

13

14   ALSO PRESENT:

15   Luis Guiterrez, Law Clerk, Cochran Firm

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 26

1             **VIDEOTAPED DEPOSITION OF**

2                **SEBASTIAN MATA**

3                   **TAKEN ON**

4           **FRIDAY, MARCH 22, 2024**

5               **10:25 A.M.**

6

NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 26

```
 7          MR. DUBE:   Okay.  Dimitri Dube on behalf of

 8  plaintiff, Randy Aviles.

 9          MR. GILES:   Norman Giles, I represent the City of

10  Pasadena.

11          MS. PITTMAN:   Christina Pittman, I represent

12  Rigoberto Saldivar.
```

```
16          THE REPORTER:   Oh.  Thank you very much. Mr. Mata,

17  will you please raise your right hand. Do you affirm under

18  penalty of perjury that the testimony you're about -- There's a

19  loud echo.  Sorry.  I'm sorry.  Let's try that again. Mr. Mata,

20  please raise your right hand. Do you affirm under penalty of

21  perjury that the testimony you're about to give will be the

22  truth, the whole truth, and nothing but the truth?

23          THE DEPONENT:   I do.
```

EXHIBIT 26

1          **MR. DUBE:**  Thank you very much.

2  **SEBASTIAN MATA,** having been first duly affirmed to tell the

3  truth, was examined, and testified as follows:

EXHIBIT 26

Sebastian Mata    March 22, 2024    NDT Assgn # 72923

1    Q.    Okay.  Is there any reason why you would not be able

2   to tell the truth this morning for a deposition?

3    A.    No, sir.

4    Q.    Okay.  You take -- are you under any medications that

5   would affect your memory or ability to tell the truth?

6    A.    No, sir.

11    Q.    Welcome.  I promise, I'll be very easy on you. So you

12   know, for -- where do you currently work, sir?

13    A.    I'm currently employed with the City of Pasadena,

14   sir.

15    Q.    And how long have you been employed with the City of

16   Pasadena?

17    A.    Approximately, 12 years.

18    Q.    And what is your current role with the City?

19    A.    I'm currently a member of the Violent Crimes Division

20   as a detective.

EXHIBIT 26

```
17        Q.    During your time as a patrolman on the evening shift,

18   did you have any occasion to interact with Rigoberto Saldivar?

19        A.    Yes, sir.
```

```
23        THE DEPONENT:  We would work -- I believe he was on

24   night shift, and I was on evening shift.
```

EXHIBIT 26

```
 2      A.    So in passing.  And then we were also members of the

 3  Honor Guard Team.
```

```
19      Q.    Was Officer Saldivar a member of the Honor Guard Team

20  with you for the entire six-and-a-half years?

21      A.    Yes, sir.

22      Q.    How would you characterize your relationship with

23  Officer Saldivar?

24      A.    We were friends, good -- coworkers.  We had a good

25  relationship.
```

EXHIBIT 26

1      **Q.    When did you guys first become friends?**

2      A.    Whenever we met on the Honor Guard Team.

3      **Q.    Can you describe the nature of your friendship?**

4      A.    Nothing beyond outside of work.  It was merely all

5  work related, like work hours.

12      Q.    When is the last time you spoke to Officer Saldivar?

13      A.    In passing, I would say about two thousand and twenty

14  -- well, it was -- it was whenever he was in the property room.

15  I don't remember the exact date.

16      Q.    Was this before or after the shooting of Mr. Aviles?

17      A.    It was after, sir.

18      Q.    And did that -- this would have been before he left

19  the force?

20      A.    Yes, sir, before.

21      Q.    So that would have been 2021?

23      Q.    Okay.    Thank you.    So about six years ago, you became

24  a detective, correct? Actually -- actually, let me pause.    Let

25  me go back. You stated that in -- as part of your training to

```
1   become a detective, you took some classes in terms of how to

2   investigate officer-involved shootings; is that correct?

3       A.    Yes, sir.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

3      Q.    And as you, you know, remain a member of the police

4 force, are you required to take the continuing education from

5 TCOLE?

6      A.    Yes, sir, we are.

EXHIBIT 26

3    Q.   Yes.  The City of police -- the City of Pasadena

4  Police Department require you to take classes on the

5  appropriate use of force, under use of appropriate use of

6  force?

7    A.   Yes, sir.  If it's a requirement by the state, then -

8  - then they require us to -- to take the classes that are

9  necessary.

14    Q.   Does the City of Pasadena ever have any training

15  regarding its own policies regarding the use of force?

16    A.   Yes, sir, they do.

NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 26

Sebastian Mata    March 22, 2024    NDT Assgn # 72923

Page 25



```
14        Q.    I think I had just asked you, Mr. Mata -- Detective
15   Mata, what type of crimes you investigate as part of the
16   Violent Crimes Unit. And I think you said crimes against
17   persons, correct?
18        A.    Yes, sir.  Correct.
19        Q.    And what other crimes did you say?
20        A.    Cases ranging from homicides, robberies, sexual
21   assaults, officer-involved shootings, harassments, terrorist
22   threats, anything, again, having to do against an adult victim.
23        Q.    Thank you for repeating that.  How many officer-
24   involved shootings have you investigated?
25        A.    This is the only one that I've been primary on.
```

EXHIBIT 26

1    Q.    So the shooting involving Officer Saldivar is -- it

2  was your first primary?

3    A.    Sir?

4    Q.    The shooting involving Officer Saldivar and Mr.

5  Aviles was your first one that you were primary detective on?

6    A.    Yes, sir.

7    Q.    Have you been secondary on any others?

8    A.    Not so much -- not so much secondary.  Just I've been

9  there trying to learn, and then helping out with anything

10 that's -- that -- that's needed.

11   Q.    How many shootings have you had that role for?

12   A.    For the one where I'm not really associated, just --

13 just watching?

14   Q.    Yes.

15   A.    Approximately, four, five.

16   Q.    Do you recall when those were?

17   A.    When or where?

18   Q.    When.

19   A.    Not the exact date, sir.

20   Q.    I'm not asking for the exact date.  Approximate

21 dates, please.

22   A.    (No audible response.)

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

23      Q.   Do you recall a shooting in 2018 involving a victim

24  by the name of Nathan Schenk and Officer Saldivar?

25      A.   Yes, sir.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

1    Q.    What do you recall about that shooting?

2    A.    The -- I was dispatched, but I wasn't primary or

3 secondary to that.  Since I was still kind of new to the Unit,

4 they wanted me to just observe and kind of in the background. I

5 remember there was a traffic stop, and then Officer Saldivar

6 was in a fight with that guy.  I -- I don't recall his name.  I

7 -- even though you just said it, I -- I couldn't pronounce it.

8 I want to say it was around Thanksgiving.

9    Q.    Mm-hmm.

10    A.    It was around Thanksgiving.  I remember that because

11 being new, I was still trying to get adjusted to the holidays

12 and when I was going to have to work.  And you know.

13    Q.    Anything else you remember about that shooting and --

14 and investigation?

15    A.    The -- the guy that was -- that was -- that he was

16 fighting with, he was shot.  I don't -- I don't remember if he

17 was taken to the hospital or not. I remember the following --

18 whenever they were doing the walkthrough, they followed the

19 trail of -- from the traffic stop to the final place where they

20 were fighting, and I think something about the guy that was

21 dropping, like, pieces of property or something, or evidence.

22    Q.    Do you recall whether the person lived or died?

23    A.    I'm sorry?

24    Q.    Do you recall if Mr. Schenk lived or died?

25    A.    I believe he passed, sir.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

Sebastian Mata   March 22, 2024   NDT Assgn # 72923                    Page 30

1        Q.   Do you recall where he was shot?

2        A.   No, sir.  I don't recall.

3        Q.   Do you recall whether or not the Department had any,

4   I guess, trainings or seminars or anything regarding that

5   shooting as to the dos -- the dos or don'ts to learn from that

6   shooting afterwards?

7        A.   I don't recall, sir.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

2    Q.   Okay.  Did you have any occasion to talk to Officer

3  Saldivar about that shooting?

4    A.   No, sir.

5    Q.   You never asked him about it while you guys were on -

6  - on Honor Guard together?

7    A.   No, sir.  We -- we -- I -- I -- whenever an officer

8  is involved in a shooting, I -- I try not to ask any questions.

9  I don't want to get in trouble for talking to somebody when I'm

10  not supposed to.

11    Q.   Why would you get in trouble for asking about the

12  shooting?

13    A.   I just don't want to -- you know, if -- if -- well,

14  whether it's an investigation that's ongoing, or -- or even

15  after that.  I don't know how the officer, you know, feels

16  personally about talking about it. So I try to just be a good

17  friend.  And if some -- if he wanted to open up about it, then

18  he would have.

19    Q.   So why -- why would you use the word trouble; like

20  why would you get in trouble if you were to ask him questions

21  about it, and talk to him about it?

22    A.   Not so much trouble.  It's just, I don't want to do

23  anything to hinder any kind of investigation, whether it's

24  internally or -- or -- or outside.

25    Q.   When you investigated -- and actually, let me ask a

EXHIBIT 26

1  foundational question first.  You -- you were -- you were the

2  detective that investigated the shooting involving Mr. Aviles,

3  correct?

4       A.   Correct.

5       Q.   Okay.  When you investigated the shooting of Mr.

6  Aviles, did you go back and review the files regarding the

7  shooting of Mr. Schenk?

8       A.   No, sir.

9       Q.   Any reason why not?

10      A.   No, sir.

23      Q.   Did you review the shooting of Mr. Angel Ramirez?

24      A.   I don't know who that is, sir.

EXHIBIT 26

Sebastian Mata   March 22, 2024   NDT Assgn # 72923                    Page 33

```
 8      Q.    Did you investigate the shooting of Officer Saldivar

 9   -- sorry. Did you investigate Officer Saldivar's shooting of

10   Mr. Angel Ramierz?
```

```
13           THE DEPONENT:  No, I did not.
```

16      **Q.  As far as you were concerned, each of these shootings**

17  **were siloed off on their own, and you did not investigate any**

18  **connections between them or any -- or any connecting thread**

19  **between those shootings?**

20      A.   They were their own individual -- their own

21  individual incident.  Yes, sir.

11      Q.   Okay.  So I believe I understand.  You give two

12 different ways the things are, I guess, cases are assigned.

13 There is -- if it goes through the Patrol Division, that's one

14 way.  And then there's another way where it's a call out,

15 correct?

16      A.   Correct.

17      Q.   Okay.  What's a call out?

18      A.   An incident that occurs outside of normal business

19 hours or normal working hours.

20      Q.   If I remember you saying correctly, you work for the

21 -- you work night shift for the Violent Crimes?

22      A.   No, sir.  We -- our department only has one -- one

23 shift.  We're -- We're not a big agency like others around us.

24 So we typically work business hours, unless a specific -- a

25 specific investigator, you know, if he requests specific hours

```
 1  for their own reasons.

 2      Q.    Got it.  So you typically work a regular business

 3  day.  But there are officers who are on call if something

 4  happens outside of business hours?

 5      A.    Yes, sir.

 6      Q.    Okay.  How many are typically on call?

 7      A.    At the time?

 8      Q.    Mm-hmm.

 9      A.    Just one.

10      Q.    Okay.  How about now?

11      A.    Now?  Just one.

12      Q.    Was the Aviles shooting a -- a call out?

13      A.    Yes, sir.  It was a call out.

14      Q.    And you were -- were you the officer on call that

15  night?

16      A.    Yes, sir.

17      Q.    Okay.  So let me ask this because I think you

18  mentioned there was a period of time in which you just joined

19  the Department. And so, you were -- you would have been

20  assisting others doing investigations, right? What would have

21  happened if a, you know, an officer- involved shooting occurred

22  while you were on call during those times?

23      A.    We -- we have a -- there's no set rules in our Unit.

24  There's seven of us, I believe.

25      Q.    Mm-hmm.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

1     A.    But we're a pretty tightknit group that if -- if --

2  if needed, then we could have called somebody to go handle

3  another call out.

4     Q.    Do you recall if that happened; if -- with you at any

5  time prior to this shooting?

6     A.    I don't recall.  No, sir.

7     Q.    Actually, I just saw that.  You said you assisted on

8  three or four shootings prior to the Aviles shooting. I only

9  asked you about one in the -- where there any other shootings

10 that you recall that you were not lead on -- officer-involved

11 shootings that you were not a lead on that you assisted the

12 primary in investigating?

13    A.    I want to say the ones that led -- I mean, whenever

14 you first start, it's kind of an unspoken rule that we're going

15 to be responding to everything, the new guys.  That way we can

16 get exposure to every kind of case. And that way we can see

17 different detectives work, you know, in their own way.

18    Q.    But there's a -- there's a on-the-job training

19 portion after you become a detective?

20    A.    Right.  Well, was that a question?  I'm sorry.

21    Q.    Yes.  Is -- so is there an on-the-job training type -

22 - let me go back. Is there an on-the-job training portion when

23 you first join the -- as a detective?

24    A.    Yes, sir.

25    Q.    Okay.  How long does that last?

 1       A.    There's no specific date.  It's just whenever the

 2   supervisor feels.

 3       Q.    **How long did yours last?**

 4       A.    Mine went for a few months.  I'm not too sure.  I --

 5   I know I started in June, and by the holidays I was on my own.

 6       Q.    **How many shootings prior to the Aviles shooting had**

 7   **you handled, prior to January 2021?**

 8       A.    Primary, sir?

 9       Q.    **As a primary, correct?**

10       A.    This was -- with officer-involved shootings, he was

11   my first one.

25       Q.    **Do you recall the date of the Saldivar shooting?**

1    A.    No, sir.  I believe it was March.

2    Q.    **Let me reask that question.  Do you recall the date**

3 **of the Aviles shooting?**

4    A.    Yes, sir.

5    Q.    **What was the date of that shooting?**

6    A.    Are you saying the date or the day?  Like -- like --

7    Q.    **The date.  The date.**

8    A.    Oh.  No, sir.  I don't remember the exact date.  I

9 believe it was in March 2020 -- 2019, or '21.

10    Q.    **It would have been January of 2021.**

11    A.    It was in January.  Okay. I remember that it was at

12 the beginning of the year.

13    Q.    **How did you get assigned to that case?**

14    A.    I was on -- I happened to be the one on -- on -- on

15 call that night.  And at the time, Sergeant Skripka was our

16 supervisor. He -- he notified about the case, and got ready,

17 and went out there.

18    Q.    **What -- do you recall around what time that call came**

19 **in?**

20    A.    I want to say approximately 11:00 o'clock.  It was --

21 it was during night shift hours, which start at 10:00 p.m.

22    Q.    **Who did you receive the call from?**

23    A.    Sergeant Skripka.

24    Q.    **What did you do after you received the call?**

25    A.    I got ready, and I went to the case -- or -- to the

1  address that I was told to go to.

2      Q.   And what address was that; do you recall?

3      A.   I don't remember the exact block number.  I remember

4  it was the -- near the intersection of Red Bluff and Lance, I

5  believe.

6      Q.   Did you go where the shooting occurred, or where he

7  was placed into custody?

8      A.   I went where the initial shooting occurred first.

9      Q.   Who was there when you arrived?

10     A.   Sergeant Neilon was there on patrol.  She -- at the

11 time, she was a night shift supervisor. I believe Officer Pas

12 (phonetic) was near the intersection.  They had a few officers

13 that were blocking the intersection that way traffic can --

14 could go the other way. I don't recall who else was there

15 specifically.

16     Q.   Why do you remember Officer Pas?

17     A.   Because he's a friend of mine.  And I know he was

18 there.

19     Q.   What's the first thing you recall once you arrived at

20 the -- what's the first thing you recall once you arrived at

21 the scene?

22     A.   I was notified that there was a -- that there was a

23 weapon that was on the ground.  At the time, we -- we didn't

24 know if it was involved or not. I remember the -- on Lance, it

25 was a little dark.  There was casings on the ground.  It was

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

1  quiet.  I mean, there wasn't a lot of traffic then.

2     **Q.   Where was the weapon found in relationship to the**

3  **casings; how far were they apart?**

4     A.   I'm not sure the distance.  It was positioned a few

5  feet southwest of where the shooting occurred, a little bit

6  more to the south.

7     **Q.   So why -- so where exactly was -- was that firearm**

8  **found in terms of where you -- you understand the shooting**

9  **occurred, and where the intersection was prior to the turn?**

10    A.   It was near -- it was -- so the roadway isn't a

11 normal -- a normal intersection with four roads.  It's only, I

12 guess, technically, two roads --

13    **Q.   Mm-hmm.**

14    A.   -- where it T's off.  It was -- it would have been

15 south of the traffic stop in, like, a little grassy area.

16    **Q.   Do you recall where Mr. Aviles' car stopped?**

17    A.   I do.  Yes, sir.

18    **Q.   How far -- and -- and you recall that from observing**

19 **the videos, correct?**

20    A.   Yeah, it was -- it was a few feet from the -- from

21 the turn on -- on to Lance.

22    **Q.   How far would it have been away from where the car**

23 **eventually stopped?**

24    A.   I don't remember specifically the -- the -- like, the

25 distance from the turn, sir.

1      Q.    So what -- so now that -- so you noticed the gun,

2    you've seen the casings.  What did you do next?

3      A.    After I saw that there was -- that I was told that

4    that's where the initial traffic stop happened, I drove to the

5    other location where -- where Aviles was -- was apprehended by

6    the officers.

7      Q.    Mm-hmm.

8      A.    And I wanted to see what -- if there was any evidence

9    out there that I needed to note for my case.

10     Q.    And what did you determine?

11     A.    That the traffic stop ended whenever Mr. Aviles's car

12   -- it was a white sedan at the time -- ran into a chain link

13   fence just northwest of the O'Reilly's, that there was a --

14   that he got out of the car, Mr. Aviles got out of the car. He

15   ran around the -- I remember it was, like, a light pole.  It

16   was a pole that was -- that -- that -- that was near, like, the

17   -- the spot of the crash. And then at some point, he -- Officer

18   Saldivar got out of his unit, and him, along with some other

19   officers were able to apprehend Mr. Aviles.

20     Q.    What did you do next?

21     A.    I confirmed with -- with patrol and who was going to

22   write the primary report.  I believe Mr. Aviles was taken to a

23   hospital, a nearby hospital.  I don't remember the exact name.

24   And then by that time, they had already contacted Internal

25   Affairs, the DA Shoot Team. We looked around the grass to see

1  if there was any other evidence that we may have missed.  And I

2  -- I just started writing down who all was there to make sure

3  that we didn't -- that we didn't miss anything.

4      Q.    And this is at the site where he was apprehended,

5  correct?

6      A.    Yes, sir.

7      Q.    Okay.  All right.  What else did you do?

8      A.    If I remember correctly, the -- we waited there until

9  Crime Scene showed up.  And at that time, we started doing the

10  -- we spoke with -- with Officer Saldivar's lawyer. I don't

11  remember exactly where Officer Saldivar was at the time.  But I

12  know at some point, he -- he went to the scene and we -- we did

13  a -- we went into the Crime Scene van where -- I'm drawing a

14  blank on the term -- but we take pictures of him to see how --

15  how -- how he looked at the time. The term is used all the

16  time, but we take out, like, the magazines, and then we count

17  them.  We count the number of rounds that are in the magazine.

18      Q.    Is it called charting?

19      A.    That's right.  Charting.  I'm sorry.

20      Q.    So you charted his weapon?

21      A.    Yes, sir.

22      Q.    And where are you guys at this time; are you guys

23  still at the -- where he was apprehended, or where the initial

24  stop occurred?

25      A.    Where he was apprehended in the parking lot.

EXHIBIT 26

1      Q.    You stated you spoke to Officer Saldivar's attorney.

2  What was his name?

3      A.    Mr. Kagel (phonetic).

4      Q.    Had you met Mr. Kagel before?

5      A.    Not officially.  I've known about him.

6      Q.    What do you know about him?

7      A.    That he represents us, the -- the police officers,

8  and that he responds whenever he's needed by -- by -- by the

9  Department.

10      Q.    So he represents us being --

11      A.    The police officers.

12      Q.    -- police officers when they're involved in

13  shootings?

14      A.    Yes, sir.  Not just with shootings, but with any

15  other kind of, I guess, like, a legal matter.

16      Q.    Had -- how had you heard about him?

17      A.    I'm sorry?

18      Q.    How had you heard about Mr. Kagel?

19      A.    I mean, being there for the time that I had been, his

20  name popped around a few times. I don't -- I remember first

21  seeing him -- I don't even remember the first time that I saw

22  him.  But I -- I've never had, you know, like, a one-on-one

23  conversation until then.

24      Q.    Do you recall what you and him discussed the night of

25  Officer Saldivar shooting Mr. Aviles?

1      A.    I believe I asked him if Officer Saldivar was okay

2    with what had happened.  And then we went over the charting of

3    the weapon. And then I asked him if he -- if he wanted to do a

4    walkthrough of the incident.

5      Q.    So he was present when you did the charting of the

6    weapon?

7      A.    Yes, sir.

8      Q.    How did you get in possession of the weapon?

9      A.    I don't remember if he handed it to us, or if a

10   member of the Union had it at the time.

11     Q.    What do you recall about the charting of the weapon?

12     A.    That he had -- he had a full magazine.  He had a full

13   magazine for sure -- or -- two full magazines.  And I don't

14   remember if -- how many rounds were in the magazine that was --

15   that was inside of his pistol.

16     Q.    Do you recall how many shots he had fired?

17     A.    I don't remember the exact number.

18     Q.    Approximately, how many shots had he fired?

19     A.    I want to say it was over seven, I believe.  Seven or

20   eight.

21     Q.    What did you do after you finished charting?

22     A.    We, I believe -- I believe we -- we contacted a tow

23   truck.  They took Mr. Aviles's vehicle to the impound -- or --

24   I actually believe they took it to our -- to our -- to our

25   police station that way we could secure it, you know, and --

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

1 | and like nothing would happen to it. And then I believe we went

2 | back to the original scene of the shooting.

11          **THE DEPONENT:**  Yes, ma'am. The -- so Officer Saldivar

12  said that the -- whenever he made the traffic stop, the driver

13  of the sedan got out.  He gave him commands to go back inside.

14  Whenever he approached the vehicle, he -- he was still giving

15  him commands to keep his hands up. He said at some point, he

16  reached down, and then the -- the car took off eastbound on

17  Lance.

18  **BY MR. DUBE:**

19      **Q.   Oh, I guess, let's back up a little bit. He -- he**

20  **stated that the -- the driver of the car stepped out of the**

21  **vehicle, correct?**

22      A.   Yes, sir.  I believe he said he was already out of

23  the vehicle whenever he -- by the time he got behind him.

24      **Q.   Did you -- did you ask him why he asked the person to**

25  **get back in the vehicle?**

1        A.    I believe it was -- I believe he said that it was for

2    his safety just to get back in the car, that way he could have

3    control of -- of the traffic stop.

4        **Q.    What do you think of that -- what did you think of**

5    **that answer when you -- when he told you that?**

6        A.    I didn't think anything of it.   I -- I've had traffic

7    stops where I would rather have the guy, the driver in -- in

8    the car to keep it safe until I get closer to him.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

```
 9        Q.    Have you ever discharged your weapon as a Pasadena

10   Police Officer?

11        A.    No, sir.

12        Q.    Are you familiar -- you stated you've taken use of

13   force classes as a Pasadena Police Officer, correct?

14        A.    Yes, sir.

15        Q.    What -- what have been your main takeaways from these

16   classes?

17        A.    Of the use of force?

18        Q.    Mm-hmm.

19        A.    To use use of force whenever -- whenever we feel like

20   we're -- we're in danger for ourselves. Or not just us, but any

21   -- you know, anybody if it's justified.

22        Q.    So to use force when you feel that you are in danger,

23   correct?

24        A.    Correct.

25        Q.    Or others are in danger?
```

1      A.    Or others.

20      Q.    Sure.  What were your takeaways to when it's

21  appropriate to use deadly force?

22      A.    Whenever the officer feels like he's in danger, when

23  his life is in danger, and he's justified to do so.

24      Q.    Do you recall any -- before an officer is authorized

25  to use force, do you recall whether or not your training

EXHIBIT 26

5      Q.    Have you ever gone over it with any -- have you ever

6  gone over it with any supervisor or -- or -- yeah, any

7  supervisor?

8      A.    Just besides the -- the -- whenever they update us.

9  But I've never done a personal, you know, like a one-on-one

10  with a supervisor over them.

11      Q.    Have you ever had a class or any formal education on

12  what that Pasadena Police Department Use of Force Policies

13  state?

14      A.    I believe we have, sir.  It's -- but I -- I don't

15  know when I took that class, sir, if it was part of another

16  class.

NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

EXHIBIT 26

5      **Q.    What did you discover with respect to the casings?**

6      A.    There was -- I don't remember the exact number, but I

7   know there was about -- they were mixed between -- between the

8   officer's.  I believe he had Speer, which was -- was -- was the

9   make of the -- of the casings. And I believe there was another

10  -- there was another brand of casings in it.  I just don't

11  remember the name of it.

12     **Q.    Was it a Blazer?**

13     A.    I believe a Blazer.  I know some -- I remember the

14  name American-something, or -- or maybe USA.  But it could have

15  been from -- from another casing that wasn't on the street.

16     **Q.    How many casings of Officer Saldivar's was on the**

17  **street?**

18     A.    I don't remember the exact number, sir.

EXHIBIT 26

Sebastian Mata   March 22, 2024   NDT Assgn # 72923

14    Q.    Okay.  As I play this, tell me what you're observing,

15 please?

16    A.    Starting with the reason for the traffic stop?

17    Q.    Sure.

18    A.    Okay.

19    Q.    Anything you observe that you think is relevant.

Sebastian Mata   March 22, 2024   NDT Assgn # 72923

3     **Q.    Did you hear him say, I will shoot you?**

4     A.    Yes, sir, I heard that.

13      Q.   Are you guys given -- are you -- part of your

14  training in duties of a police officer through the City of

15  Pasadena Police Department, are you given any training on -- on

16  escalation and de-escalation?

17      A.   Yes, sir, during a verbal judo.

18      Q.   What is verbal judo?

19      A.   It is just having the ability to -- to -- to meet

20  somebody at -- at where they're at as far as, like, they're

21  aggression. You know, don't -- don't escalate things if -- if

22  you don't have to.  Try -- try and maintain control of the

23  scene, of -- of your own scene.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

8       Q.    And where -- I moved ahead a little bit too far.    But

9   where -- when he initially gets out of the car, is Officer

10  Saldivar standing behind anything?

11      A.    It looked like he was at the opening of -- of his

12  driver door.

13      Q.    Does his door provide him cover?

14      A.    It -- it appears like it does.

15      Q.    What's cover?

16      A.    Cover?    It's -- so the cover would be something that

17  you use to, I guess, to protect yourself from -- from -- from

18  any other kind of danger, to not get hurt.

19      Q.    Are you trained to maintain cover when -- when

20  possible?

21      A.    Yes.    But whenever you -- whenever you feel like it's

22  -- like it's safe to do so, you -- you come around cover.

EXHIBIT 26

Sebastian Mata    March 22, 2024    NDT Assgn # 72923                    Page 138

22          **MR. DUBE:**  No further questions.

23          **MR. GILES:**  I reserve my questions for the time of

24  trial.

25          **MR. DUBE:**  Can I get, like, 15 minutes before we get

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

20          **THE VIDEOGRAPHER:**  Okay. All right.  The time is 2:30

21  p.m., and we are off the record.

22          **(WHEREUPON, the videotaped deposition of SEBASTIAN**

23  **MATA was concluded at 2:30 p.m.)**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 26

```
1                    CERTIFICATE OF VIDEOGRAPHER

2

3         I, the undersigned, Vincent Guerrera, am a

4    videographer on behalf of NAEGELI Deposition & Trial. I

5    do hereby certify that I have accurately made the video

6    recording of the deposition of Sebastian Mata, in the

7    above captioned matter on the 22nd day of March, 2024

8    taken at the location 1201 Davis St. Pasadena, Texas

9    77506.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20             Vincent Guerrera

21

22

23

24

25
```

EXHIBIT 26

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4

 5    RANDY AVILES,

 6    Plaintiff,

 7    v.                        CIVIL ACTION NO. 4:22-CV-03571

 8    RIGOBERTO SALDIVAR,

 9    CITY OF PASADENA, TX,

10    Defendants.

11

12                     REPORTER'S CERTIFICATION

13                   DEPOSITION OF SEBASTIAN MATA

14                     FRIDAY, MARCH 22, 2024

15

16        I, Laila Khoury, Court Reporter, hereby certify to the

17    following:

18        That the witness, SEBASTIAN MATA, was duly sworn by

19    the officer and that the transcript of the oral deposition

20    is a true record of the testimony given by the witness;

21        That the deposition transcript was submitted on April

22    8, 2024 to the witness or to the attorney for the witness

23    for examination, signature and return to NAEGELI DEPOSITION

24    AND TRIAL by April 28, 2024;

25        That the amount of time used by each party at the
```

EXHIBIT 26

1  deposition is as follows:

2          Dimitri Dube - 02 hrs 46 min

3      That pursuant to information given to the deposition

4  officer at the time said testimony was taken, the following

5  includes counsel for all parties of record:

6          Dimitri Dube, ATTORNEY FOR PLAINTIFF

7          Christina H. Pittman, ATTORNEY FOR DEFENDANT

8          Norman R. Giles, ATTORNEY FOR DEFENDANT

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties or attorneys

11  in the action in which this proceeding was taken, and

12  further that I am not financially or otherwise interested

13  in the outcome of the action.

14      Certified to by me this 8th day of April, 2024.

15

16

17

18          _Laila O Khoury_

19          Laila Khoury, No. 818

20

21

22

23

24

25

EXHIBIT 26