**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

RANDY AVILES,

Plaintiff,

v. Civil Action No. 4:22-CV-03571

RIGOBERTO SALDIVAR,
CITY OF PASADENA, TX,

Defendants.

___

COURT REPORTING
LEGAL VIDEOGRAPHY
REMOTE DEPOSITIONS
TRIAL PRESENTATION
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

**REMOTE VIDEOTAPED DEPOSITION OF**

**MAURICIO REYES**

**TAKEN ON**
**MONDAY, APRIL 8, 2024**
**6:08 P.M.**

EXHIBIT 27

**1900 WEST LOOP SOUTH**
**HOUSTON, TEXAS**



**REMOTE APPEARANCES**

**Appearing on behalf of the Plaintiff:**

DIMITRI DUBE, ESQUIRE
**The Cochran Firm**
1825 Market Center Boulevard, Suite 500
Dallas, TX 75207
(214) 651-4260
(214) 651-4261 (Fax)
ddube@cochrantexas.com

**Appearing on behalf of the Defendant Rigoberto Saldivar:**

STEVEN D. SELBE, ESQUIRE
**Gordon Rees Scully Manukhani, LLP**
1900 West Loop South, Suite 1000
Houston, TX 77027
(713) 961-3366
(713) 961-3938 (Fax)
sselbe@grsm.com

**REMOTE APPEARANCES**

**Appearing on behalf of the Defendant City of Pasadena, TX:**

NORMAN RAY GILES, ESQUIRE
**Lewis Brisbois Bisgaard & Smith, LLP**
24 Greenway Plaza, Suite 1400
Houston, TX 77046
(713) 659-6767
(713) 759-6830 (Fax)
norman.giles@lewisbrisbois.com

Mauricio Reyes April 8, 2024 NDT Assgn # 73605 Page 4

INDEX

| | Page |
|---|---|
| EXAMINATION BY MR. DUBE | 8 |

NAEGELI DEPOSITION & TRIAL (800)528-3335 NAEGELIUSA.COM

EXHIBIT 27

Mauricio Reyes April 8, 2024 NDT Assgn # 73605 Page 7

**REMOTE VIDEOTAPED DEPOSITION OF**

**MAURICIO REYES**

**TAKEN ON**

**MONDAY, APRIL 8, 2024**

**6:08 P.M.**

**THE REPORTER:** Mr. Reyes, please raise your right hand.

Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

EXHIBIT 27
NAEGELI DEPOSITION & TRIAL CELEBRATING 40 YEARS IN BUSINESS (800)528-3335 NAEGELIUSA.COM

**Q. Tell us your name, sir?**

A. Mauricio Reyes.

**Q. And where are you employed?**

A. With the City of Pasadena Police Department.

**Q. And how long have you been with the City of Pasadena Police Department?**

A. 18 years, 2 months.

NAEGELI DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

A. Currently, I am primary Public Integrity Investigator and I help assist with Internal Affairs.

**Q. Was there ever a time where you were actually employed in Internal Affairs itself?**

A. Not full-time. No, sir.

**Q. So you've never been a full-time employee of the Internal Affairs Division?**

A. No, sir.

**Q. Okay. So how are you specifically related to Internal Affairs; how do you help them?**

A. It's a dual role. I back up, I do inquiries, I basically do everything -- I've been to the internal affairs training. And with Public Integrity and Internal Affairs, it kind of works to have two people; one to conduct criminal investigations, criminal side, and one to conduct the Internal Affairs side where, you know, they're entitled to Garrity and certain -- because of their compel statements.

**Q. How many Internal Affairs investigations have you been part of?**

A. I do not know a number. I do not know.

**Q. Approximately how many?**

A. Four approximately.

**Q. Who were the officers involved in those investigations?**

A. Repeat the question.

**Q. Who were the officers involved in those investigations?**

A. Officer Rigo Saldivar for sure. And it's -- the last time I was in this position was over three years ago, and I'd have to look through the files to see who the officers were.

**Q. How many shootings of Officer Saldivar have you investigated?**

A. Just one.

**Q. And that's the one of Randy Aviles?**

A. Aviles, correct.

**Q. So how were you involved in the investigation of Rigoberto Saldivar?**

A. The following day I was assigned the case, and I'm

not sure if it was by Sergeant Norman or Chief Bruegger at the time.

**Q. Do you know why you were assigned?**

A. I think because Sergeant Norman was overwhelmed. He had a lot of active IA cases, so I was given it after the fact to investigate.

**Q. Did you make an appearance on the original scene of the incident?**

A. No, sir.

**Q. So you were not present at the original scene of the shooting?**

A. No, sir.

**Q. How did you become aware of what happened at the original scene?**

A. The following day I worked closely with Sergeant Norman. He explained to me everything that went on, and I cooperated or corroborated with Sergeant Skripka, and Detective Mata who was there, and after the report was complete he approved it. He even wrote an IOC that all the facts were accurate.

**Q. Okay. And what was the first thing you did upon learning that you would be handling the investigation?**

A. Reviewing everything that was already completed; the video of the incident. Just the normal investigation protocol.

**Q. You have reviewed the video of the incident?**

A. Yes, sir.

**Q. So you were not permitted to make any determinations?**

A. No, sir. I can review the video and I make -- I make the statements of everything that would have occurred, and I input possible violations of City policies involved. I don't make the determination if they could or could not have been violated.

A. Okay. Section U3.1, Policy; Section U3.4, Procedures, Use of deadly force, and Section C4.16, Respect for all.

**Q. What page of your report are you reading from?**

A. It's page 26 of 27.

**Q. I'm sorry. Give me a quick second, okay. Did you make any determination as to whether or not Officer Saldivar had violated any of these policies?**

A. No, sir. It says that the following policies may or may not have been applicable in this incident. That's all I put in there, and they reference -- and I don't make the determination. The Chief of Police, his staff.

EXHIBIT 27

**Q. Yes. And was there any particular reason why you thought that policy was implicated in Officer Saldivar's actions on January 12, 2021?**

A. There was a discharge of a firearm and a complaint of an injury from a subject.

**Q. How about policy 3.4, "Use of deadly force-Law enforcement officers are authorized to use deadly force to protect the officer or others from what is reasonably believed to be an immediate threat of death of serious bodily harm." Do you see that?**

A. Yes, sir.

**Q. And part b) where practical -- "Where practicable, prior to discharge of the firearm, officers shall identify themselves as law enforcement officers and state their intention to shoot." Do you see that?**

A. Yes, sir.

EXHIBIT 27

**Q. But you made no determination or conclusion as to whether or not Officer Saldivar violated that policy, correct?**

A. No, sir.

**Q. And that was exclusively the job of the Chief of Police, correct?**

A. Yes, sir.

**Q. You were not authorized to make that determination as to whether or not that policy was violated, correct?**

A. Correct.

EXHIBIT 27

Mauricio Reyes April 8, 2024 NDT Assgn # 73605 Page 17

**Q. In your other capacity as a Detective, are you permitted to make recommendations as to whether or not you believe an offense had been committed?**

A. As presenting the case to the district attorney's office, is that what you mean?

**Q. Yes.**

A. We tell them everything we have. We provide them all the evidence that could support our belief and they make the determination. It's just like the Chief. They make the determination whether they accept the charge or not.

NAEGELI DEPOSITION & TRIAL (800)528-3335 NAEGELIUSA.COM
EXHIBIT 27

**Q. Do you know Officer Saldivar?**

A. Yes.

**Q. How long have you known him for? At the time of this incident?**

A. Probably my entire career. When I started in '06.

**Q. So tell us about your relationship to Officer Saldivar?**

A. Professional.

**Q. Were you guys friends?**

A. I would consider us friends.

**Q. Why would you consider yourselves friends?**

A. I knew of him. He was a police officer for the City of Pasadena. I believe we were on night shift together. I'm not 100 percent certain, but I've worked with him in passing and here with the PD.

**Q. So you've interacted with him often during the course of your employment?**

A. Yes, sir; while on duty, yes.

**Q. Okay. Did you guys ever spend time together outside of your employment?**

A. No, sir.

**When you are evaluating and investigating police officer's actions, from whose perspective do you do that from?**

A. I believe from the action -- what I observe on the camera, what I see on the camera because I was not there. You know, I take that into consideration. And his statement.

**Q. Whose statement?**

A. Officer Saldivar's statement.

**Q. So Officer Saldivar made a statement with respect to this investigation, correct?**

A. Yes, sir.

**Q. When you observed the video, and we're going to play in a minute so if you to wait until then, did Officer Saldivar shoot at a stationary point, or did he move his gun as the vehicle was proceeding away from him?**

A. I see him tracking the vehicle as it's going.

**Q. Yes?**

A. Yes, sir. He was trying to get the vehicle as it was moving away.

NAEGELI DEPOSITION & TRIAL CELEBRATING 40 YEARS IN BUSINESS (800)528-3335 NAEGELIUSA.COM

**THE DEPONENT:** You want to know about my shooting?

**BY MR. DUBE:**

**Q. Yes.**

A. It was a stolen vehicle pursuit. I was behind the vehicle believing the suspect was about to flee on foot because the car was damaged very bad I figured he couldn't drive it anymore, but it backed up trying to run me over so I discharged as he was backing up and continued firing on the side as I got out of the way, and as he was gaining distance away from me I continued to shoot.

**Q. When did this occur?**

A. Maybe 2008.

**Q. And you said you discharged 12 rounds?**

A. I'm not even sure how many. It was multiple and in my mind I thought it was four, five.

Mauricio Reyes April 8, 2024 NDT Assgn # 73605 Page 36

**Q. Did Sergeant Norman know of your previous shooting?**

A. I do not know.

**Q. How long was Sergeant Norman in the Pasadena Police**

NAEGELI DEPOSITION & TRIAL (800)528-3335 NAEGELIUSA.COM

EXHIBIT 27

**Department?**

A. He retired a couple years ago. I'm not sure, possibly 25, and that's approximate --

**Q. Was he employed with the police department at the time of your shooting?**

A. Yes, sir.

**Q. Was he a Sergeant at the time of your shooting?**

A. I believe so.

**Q. Was he in Internal Affairs at the time of your shooting?**

A. No, sir.

**Q. Who was in Internal Affairs at the time of your shooting?**

A. Officer Bittner.

**Q. But didn't you reference it in your report?**

A. Respect for all.

**Q. Correct.**

A. Threatening, insulting or profane language. I said I believe so, yes.

**Q. So you believe that policy was implicated by his use of language, correct, at the time you wrote your report?**

A. It applies in this case, yes.



**Q. At this moment in time, where are Mr. Aviles' hands?**

A. I know his left is up towards the top, the headboard. The right one, possibly could be on the shifter placing the vehicle in gear.

**Q. And you still have no opinion as to whether the shooting was justified, correct, even after watching the video?**

EXHIBIT 27

A. No opinion. When he discharged his firearm, his right hand was on the bottom of the right steering wheel, what I observed, and the other one was up.

**Q. He was not turned toward the officer, correct?**

A. He mentioned that -- no. He -- yeah, he was turning away because he mentioned that he saw his left ear, and I did see that in the video, like just his head was turning away a little bit.

**Q. Were you aware of the Schenk shooting?**

A. No, sir.

**Q. Were you aware of the Schenk shooting at the time it happened?**

A. No, sir.

NAEGELI DEPOSITION & TRIAL CELEBRATING 40 YEARS IN BUSINESS (800)528-3335 NAEGELIUSA.COM

**Q. Why not?**

A. Because I don't even know what -- what's he facing or anything like that. I don't -- this is the first I've heard of this deposition. I just got news today about my deposition date, so I had no idea of what was going on.

**Q. No. I'm asking you, you investigated this charge, correct. You saw what Officer Saldivar did. And you know that he's separated from the police department, and he's currently under indictment by Harris County. Do you feel any sympathy for him at the moment that we're speaking?**

A. No, sir.

**Q. And so why not?**

A. He'll be judged by the jury and his peers. That's appropriate law.

EXHIBIT 27

Mauricio Reyes April 8, 2024 NDT Assgn # 73605 Page 47

**MR. DUBE:** No further questions.

**MR. GILES:** All right. MR. DUBE: 7:30.

**MR. GILES:** Thank you, Detective Reyes, for staying so late. We appreciate it.

NAEGELI DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 27

**THE VIDEOGRAPHER:** Okay. Excellent. Then this is the end of the deposition of Detective Reyes. The time is 7:28 p.m. and we are off the record.

**(WHEREUPON, the deposition of MAURICIO REYES was concluded at 7:28 p.m.)**

EXHIBIT 27

CERTIFICATE

I, the undersigned Austin Halvorsen, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Mauricio Reyes, in the above captioned matter on the 23rd day of April, 2024, taken at the location of 1900 W Loop S. Houston, TX 77027.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

______________________________

Austin Halvorsen

EXHIBIT 27

CERTIFICATE

I, Nancy Do, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 23rd day of April, 2024.

Nancy Do

EXHIBIT 27