UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICHOLAS HECKFORD, | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No.: 4:20-cv-04366 |
| v. | § | |
| | § | Jury |
| CITY OF PASADENA, et al., | § | |
| *Defendants*. | § | |

### DECLARATION BY CHIEF OF POLICE JOSHUA BRUEGGER

1.       My name is Joshua Bruegger. I declare under penalty of perjury in accordance with the laws of the United States of America that the following statements are true and correct. I am over the age of twenty-one and in all other ways qualified and competent to make the statements contained within this declaration. These statements are made of my own personal knowledge because they reflect events and matters I personally observed or in which I personally participated. I am authorized to make the statements contained herein.

2.       I was on the date of all occurrences which form the basis of this lawsuit, employed in the paid civil service of the City of Pasadena, Texas, as a police officer in the City of Pasadena Police Department. On all of the dates relevant to this lawsuit and through today I have held the appointed position of Chief of Police for the City of Pasadena, Texas.

3.       I hold a peace officer license issued under the Texas Occupations Code through the Texas Commission on Law Enforcement (TCOLE) and I been so licensed 23 years. I have successfully completed all TCOLE peace officer training and licensing requirements, including continuing education requirements. I hold the designation of Texas Master Peace Officer.

**EXHIBIT 28**

4.      The Pasadena police department is a department of the City of Pasadena, Texas, which is a Texas Home Rule City governed by its Charter under a Mayor-Council form of Government. I am generally familiar with the provisions of the City of Pasadena's Charter and Code of Ordinances that institute and implement city policy, duties, and powers of the City and its elected and appointed officials, including the limits of my responsibilities and authority. The relevant portion of the Code is attached as Exhibit 1 to this declaration.

5.      The duties, authority, and responsibilities for setting city policy is dictated by Texas state law, the City's Charter, and City Ordinances. Pasadena's Charter provides that City Council, composed of the mayor and eight councilmembers, with all powers and authority conferred on or possessed by the City, other than powers expressly conferred upon other City Officers by the Charter, has the sole authority to create city policy. The Charter further reserves to Council the power to inquire into the official conduct of any department, agency, office, officer, or employee of the city, and into any other matters of proper concern to city government. The Pasadena City Council operates as a singular body acting through ordinances and resolutions, with the power to enact legislation, adopt budgets, and determine all polices of the City. No Charter, ordinance, or resolution has delegated the City's policymaking authority to any officer or person other than Council.

6.      As a matter of City policy, the Charter requires every police officer, before beginning police duties, to take and subscribe to the police Oath of Office prescribed by the Constitution and laws of the State of Texas. Under the Oath, every officer is charged with faithfully executing police duties of the State of Texas, and preserve, protect, and defend the Constitution and laws of the United States and of this State.

7.      The police department and I are under control and supervision of the Council's exclusive city policymaking authority, to which my operational authority as Police Chief, is subordinate. Council establishes City policy.

8.      I supervise the day-to-day operations of a department of the City, its police department, in conformity with policies established by Council and requirements of federal, state, and local law. Neither I, nor any subordinate officer within the police department, has authority to enact City policy and I have never purported to do so.

9.      I may create and maintain rules, directives, and general or special orders to carry city policy created by Council to fulfill the role of providing direct supervision over the police department and its officers, provided such regulations are consistent with the laws of the United States, the State of Texas and the Charter, ordinances, and policies of the City.

10.      The State of Texas has delegated to the Texas Commission on Law Enforcement (TCOLE), through Chapter 1701 of the Texas Occupations Code, the authority and responsibility throughout Texas to establish state-wide minimum police officer hiring, training, and licensing requirements. Texas has designated TCOLE as the agency in Texas responsible for establishing a statewide comprehensive education and training program for all peace officers so that officers are adequately trained, through curriculum approved by TCOLE, to perform law enforcement duties.

11.      Section 1701.251 of the Texas Occupations Code provides that TCOLE "shall establish and maintain training programs for officers." Section 1701.253 further requires that TCOLE "shall establish a statewide comprehensive education and training program on civil rights…" and which "covers the laws of [the state of Texas] and of the United States

EXHIBIT 28

pertaining to peace officers" for all licensed law enforcement officers in Texas.

12.     Section 1701.352(d) of the Texas Occupations Code additionally requires that, within 24 months of appointment as a supervisor, all law enforcement officer supervisors receive training regarding supervising officers. Furthermore, sections 1701.307 and 1701.351 provide that, in order to obtain and maintain a peace officer license in Texas, an officer must satisfactorily meet all TCOLE training and licensing standards. Through TCOLE, all officers receive training regarding the Texas Penal Code and Code of Criminal Procedure. The basic TCOLE training course provides instruction on: the U.S. and Texas Constitutions and the Criminal Justice System; the Code of Criminal Procedure; Arrest, Search and Seizure; the Texas Penal Code; Use of Force- Law and Concepts; Mechanics of Arrest; and Criminal Investigation. This training all officers receive through TCOLE teaches officers they may not make an arrest that is not supported by probable cause and may not use excessive force when making an arrest.

13.     In addition to police academy training, all the City's officers, including all related in any way to the incident which forms the basis of this lawsuit, undergo 40 hours of in-service police training every two years to maintain their TCOLE peace officer licenses. Based on my training provided by sources outside the Pasadena Police Department and my experience interacting with other heads of law enforcement agencies throughout Texas, I have learned that the training TCOLE provides adequately prepares officers to reasonably perform the discretionary duties entrusted to them.

14.     My training includes study of appellate decisions issued by the Court of Appeals of the Fifth Circuit which show that TCOLE training has consistently been deemed

constitutionally sound. I have relied upon the circuit court holdings that have made clear that compliance with TCOLE police licensing and training standards not only satisfies the minimum standards required under the Constitution but in fact exceeds constitutional requirements for law enforcement training.

15.      All City of Pasadena police officers, including each of the individual defendants in this case, are required as a condition of City employment to comply with all TCOLE licensing and training standards. I have never heard that complying with TCOLE standards is unconstitutional, and I have no reason to believe that is the case. I rely on the expertise of TCOLE in performing its function of providing well-qualified law enforcement officers. I have never had any reason to believe the training provided to Pasadena officers is constitutionally deficient. To be sure, all Pasadena police officers, including all officers involved in any way in the incident which forms the basis of this lawsuit, were trained in TCOLE-approved modules on probable cause, investigatory stops, arrests, and the constitutional limits of use of force in making stops, arrests, and defending themselves and others, among numerous other training modules. Nothing suggested to me that any officer's training was deficient in any area of law enforcement activities that related in any way to the incident which forms the basis of this lawsuit.

16.      After Pasadena police officers successfully complete training through a TCOLE certified police academy and also pass the Texas state peace officer examination, Pasadena officers go through a program of on-the-job training called a field training officer (FTO) program. The Pasadena police FTO program utilizes a method of instruction approved by TCOLE. In this segment of supplemental instruction, new officers are extensively supervised

with experienced officers who have been specially trained through TCOLE to administer the FTO program.

17.     The FTO program consists of teaching components and testing components which require new officers to demonstrate their competence before the new officers are permitted to perform their duties without direct supervision. The field training officers are supervised by field training supervisors to assure accountability and compliance with TCOLE standards. I have no reason to believe the Pasadena FTO program is constitutionally deficient.

18.     The guidance available to appropriately direct Pasadena officers does not end there. Texas criminal law prohibits all officers, including the individual defendants in this case, from using excessive force. Texas Penal Code §§ 9.51-9.54 governs law enforcement use of force. Any officer who uses force that does not comply with those provisions of the Texas penal laws is subject to criminal prosecution by the State of Texas. Therefore, the individual defendants could not rationally have believed the City or I would, or could, authorize them to violate the Fourth Amendment. I have no reason to believe these laws are not effective in enforcing compliance with appropriate use of force.

19.     The State of Texas has also created, through Chapter 143 of the Texas Local Government Code, police civil service laws that govern the promotion and discipline of police officers in cities like Pasadena that have adopted state civil service. These civil service laws provide the standards under which officers must be selected, promoted, and disciplined. Pasadena has adopted Texas state civil service law which provides due process rights to officers and dictates promotional and disciplinary standards of Pasadena officers. The state civil service system provides for various levels of supervisory personnel to monitor the

actions of subordinate officers. Promotions are earned through a competitive civil service process and supervisors who fail to perform their duties competently are subject to disciplinary actions and/or demotion. I have no reason to believe the Texas police civil service system is constitutionally deficient.

20.     Additionally, each Pasadena police officer swears and subscribes to an Oath of Office, under oath, that the officer will faithfully execute the duties of the office of Pasadena police officer and to the best of his ability preserve, protect, and defend the Constitution and laws of the United States and the State of Texas. I, and all other Pasadena police officers, must also abide by the provisions of the Pasadena City Charter and Code of Ordinances. I have attached a copy of Chapter 30 from the City of Pasadena Code of Ordinances which evidences further training and supervision provided to Pasadena officers. I have no reason to believe Pasadena officers are insufficiently trained or supervised to comply with constitutional requirements. To the contrary, I believe officers under my supervision take their oath to heart, just I have for over two decades.

21.     The Pasadena police department created a published manual which contains police department regulations established in 2016, that have been continuously updated and maintained since then. The content of the manual specifically states that the provisions of this manual are constrained by, and subordinate to, legal standards, and policy established by Civil Service rules, and municipal civil service law, as codified in Chapter 143 of the Texas Local Government Code.

22.     I have always found these manual provisions are thorough and comparable to regulations utilized by other police departments in Texas. The manual provisions are like

those adopted in other progressive law enforcement agencies in Texas. Through various professional interactions and associations like the Texas Police Chief's Association, I regularly confer with other police chiefs regarding administrative matters, including police regulations.  The conference includes training and collaboration with chiefs from many different cities.

23.     All Pasadena police officers must also abide by the written regulations of the Pasadena Police Department, consistent with City Council policy which includes general and specific provisions that apply to the circumstances of this case. It is the policy of the Pasadena Police Department that officers use only the force that is reasonably necessary to bring an incident under control, while protecting the life of the officer and others. The use of force must be objectively reasonable. The officer must only use that force which  a reasonably prudent officer would use under the same or similar circumstances.

24.     The Pasadena Police Department's *Use of Force* regulation also provides a reporting requirement when force is used so that facilitates supervisory review of force encounters. I have attached, to my declaration, a copy of the Pasadena Police Department's *Use of Force* regulation as Exhibit 2. I have no reason to believe these departmental regulations are constitutionally deficient.

25.     To further instruct officers and enforce compliance with these sources of training, supervision, and direction, Pasadena officers are supervised through several supervisory ranks within the police department. Supervisors must fulfill Texas civil service, and TCOLE standards and earn promotions through a competitive process that requires experience, testing of competency on legal and professional knowledge, and demonstration of leadership

skills. I have no reason to believe the rank supervision programis constitutionally deficient.

26.     Furthermore, the Pasadena Police Department maintains an office of professional standards which investigates allegations of police misconduct. The City's officers, thus, are aware that violation of law, City policy, and/or a Pasadena Police Department regulation subjects an offending officer to disciplinary action, including suspension, demotion or termination in appropriate circumstances. I have no reason to believe the training and supervision of the individual Defendants in this suit was constitutionally deficient.

27.     The Pasadena Police Department had no deficiencies in its law enforcement training and supervision regulations and I have no reason to believe that any constitutionally deficient police training or supervision program caused a violation of Nicholas Heckford's federally protected rights.  Each of the officers who encountered Mr. Heckford during the occurrences which form the basis of this lawsuit has provided a rational explanation for the reasons the officer exercised his lawful discretionary law enforcement authority consistent with TCOLE training. The audio and video recording of the events demonstrate Mr. Heckford refused to surrender to custody and that he instead chose to physically resist arrest. Independent police training expert, Houston Police Department use of force trainer Officer David Lopez evaluated the conduct in this case and found the officers' reactions to Heckford's actions appropriate under TCOLE training protocols.

28.     I also have no reason to believe that any City of Pasadena police officers engaged in a practice of unnecessarily escalating any relatively minor incident with excessive force. At the outset, police officers are faced with a daunting task of making split-second decisions under circumstances that are often tense, uncertain, and rapidly evolving based on the

particular situation the officer is presented. Police encounters that may begin as "relatively minor," such as traffic stop, can quickly evolve based on a multitude of factors—namely, the actions of the suspect to which the police officers must react.

29.    Officers are trained through TCOLE, they must apply force proportional to the need for force. This principle is embodied in the Pasadena Police Department use of force regulation and training regarding application of that regulation. The proportionality principle serves as a general guide for an officer when deciding whether a force option may appropriately be used in a particular situation. The proportionality principle provides for consideration of officer and suspect factors and special circumstances that could potentially influence an appropriate method and level of reasonable force based on the totality of the situation. Application of such proportionality provides reasonably measured responses to a criminal suspect's noncompliance with police commands, efforts to evade arrest, and forceful resistance to arrest.

30.    As described above, the reasonableness of force is based the totality of the unique circumstances the officers must confront when, as was the case here, those circumstances are dictated by the criminal suspect. In that regard, every situation involving the use of force is factually distinct making it difficult, if not impossible, to ascertain a pattern.  Thus, I am not aware of a history of any Pasadena police officer unnecessarily escalating "relatively minor" incidents with excessive force given the rapidly evolving factual circumstances that necessarily precede the use of force. Nor am I aware of any pattern of violations that are similar or specific to the facts of the encounter with Heckford in the instant litigation. The facts disprove the existence of such a custom.

31.    The custom in Pasadena is that officers seldom use force, and in those unusual instances when officers use force, the vast majority of the time officers appropriately use justified force. In 2019, Pasadena officers performed 175,283 police-citizen interactions, and used force in 0.03% of those interactions. In 2020, Pasadena officers performed 143,912 police-citizen interactions, and used force in 0.04% of those interactions. In 2021, Pasadena officers performed 143,912 police-citizen interactions, and used force in 0.03% of those interactions. These statistics prove the actual custom in Pasadena 99.97% of the time is to use no force at all.

32.    As part of this litigation, the City has produced Use of Force Reports from 2014 to 2021. In total, the City produced 409 Use of Force Reports completed by all Pasadena police officers between 2014 through 2021; all complaints made against any Pasadena police officer regarding alleged use of greater force than necessary from 2014 through 2018; and all investigations regarding the complaints against any Pasadena officer regarding alleged use of greater force than necessary from 2014 through 2018. From those documents, Plaintiff has identified only 13 instances upon which they argue illustrate a Pasadena custom of unnecessarily escalating minor incidents with excessive force. Of those instances, Pasadena's review found that only one of those incidents involved excessive force.

33.    None of these 13 instances upon which Heckford relies is comparable to the circumstances of his arrest. But even assuming all 13 over an 11 years span of time were comparable during which Pasadena officers had contact with more than 1½ million people, these 13 incidents still would not show an unconstitutional Pasadena custom of unnecessarily escalating minor incidents with excessive force.

34.     I have reviewed the specific instances Plaintiff has alleged in his lawsuit complaint and in his responses to the City's interrogatories. Plaintiff's mis-characterization of those incidents fails to include the suspect's actions preceding the use of force and whether excessive force was ultimately committed. Reviewing the underlying facts, each instance of force identified by the Plaintiff has no similarity to the facts in the instant litigation, and in only one of those instances did an officer use excessive force. In that case the officer was discharged. In one other case in 2019 Plaintiffs did not cite, the City suspended another officer who had been accused of using excessive force, both illustrating that the Pasadena police department does not tolerate or condone excessive force.

35.     Plaintiff identified ten incidents that occurred before the Heckford arrest that Plaintiff alleges show unnecessary escalation and excessive force by Pasadena officers. After reviewing the relevant incident reports cited by the Plaintiff, I disagree with their allegation.

36.     First, Plaintiff summarily describes an incident that occurred on November 21, 2018, wherein Officer Rigoberto Saldivar shot Nathan Schenk. I was informed of Schenk's death on the date it occurred. In accordance with the established procedure approved by the Harris County District Attorney, the Pasadena Sheriff's Office performed an independent criminal investigation of the circumstances of Schenk's death, including Officer Saldivar's actions. The Harris County District Attorney's Office also investigated Officer Saldivar's actions. The District Attorney's Office presented to a Harris County Grand Jury the facts learned through the investigations regarding Nathan Schenk's actions and Officer Saldivar's reactions to Schenk's actions. Each of those investigations by law enforcement and prosecutorial professionals found Officer Saldivar's actions justified. The Grand Jury,

likewise, found Officer Saldivar's actions justified.

37.     At the conclusion of those independent investigations by disinterested persons and entities, the Pasadena police department performed an additional administrative investigation to determine whether Officer Saldivar's actions violated any Pasadena police department administrative regulation. I have studied that administrative investigation report and the exhibits to it including video and audio/video recordings. The Internal Affairs Division police department investigation, Officer Saldivar's immediate supervisor, the Pasadena night shift division commander, the Pasadena assistant police chief, and I all agreed that Officer Saldivar's actions were justified under Pasadena police department administrative regulations. Officer Saldivar complied with all Pasadena police department rules, regulations, procedures, and training and his actions were exonerated.

38.     Due to litigation stemming from the Schenk shooting, law enforcement officer training expert Albert Rodriguez performed a separate professional review and study of Officer Saldivar's actions and found that Officer Saldivar's actions were justified and appropriate. Before his retirement, this expert was the commander of the Texas Department of Public Safety law enforcement training academy and Commander Rodriguez has trained many officers, including Texas Rangers so I believe he is imminently qualified to evaluate the propriety of Officer Saldivar's actions. Commander Rodriguez found Officer Saldivar's actions justified and appropriate. No criminal justice professional of which I am aware has even suggested that Officer Saldivar's actions were improper, much less unreasonable or clearly unlawful. I am not even aware of any lay person, that is fully informed of the facts in this case, who has concluded or opined that Officer Saldivar's actions failed to comport with

the Constitution or laws of the United States.

39.     The facts clearly reveal that before Officer Saldivar initiated any action to detain Schenk, the camera inside Officer Saldivar's police vehicle recorded Schenk drive past a stop sign without stopping, and recorded Schenk driving the motor vehicle on the incorrect side of the road. Either one of those observations warranted Officer Saldivar stopping and temporarily detaining Schenk to investigate whether probable cause supported a criminal charge or citation, and certainly that cluster of apparent violations provided ample justification for Officer Saldivar to detain Schenk. When Schenk exited and fled from his vehicle, Officer Saldivar was further justified in stopping and detaining Schenk.

40.     The video recordings reveal that Schenk grabbed a backpack and ran into a neighborhood, weaving through residential yards. After the foot chase and two taser deployments, Schenk did not submit to arrest. Instead Schenk then assaulted and overtook Officer Saldivar. During the struggle the body worn camera fell off and only audio of the struggle can be heard.  The video was dark and because the framing of the camera that had fallen in the grass. Based on the information available for me to analyze, any reasonable officer could have reasonably believed it was necessary for Officer Saldivar to shoot Schenk to stop the deadly threat Schenk's actions posed while Schenk, taking off with a backpack with unknown contents, physically fought, reached at Officer Saldivar's duty belt, and physically was able to overtake Officer Saldivar in the darkness.

41.     I believe Officer Saldivar's actions were necessary and appropriate under the circumstances Schenk created, which undeniably forced an exhausted Officer Saldivar to react within fractions of seconds during circumstances that were tense, uncertain, and rapidly

4884-9718-7695.2

EXHIBIT 28

evolving, without Officer Saldivar enjoying the leisure of more time or more information which may have allowed him to respond differently had Schenk not accelerated the events as he did. Viewing the circumstances objectively, from the standpoint of a reasonable officer in Officer Saldivar's position, certainly any officer could have reasonably believed shooting Schenk was a reasonable reaction that was not clearly unlawful. Officer Saldivar's actions were justified. Nathan Schenk's decisions and actions are the moving force that caused Officer Saldivar to react to Schenk's unlawful actions. Like Heckford, Schenk could have avoided any use of force by simply cooperating with the traffic stop, and then submitting to arrest, as the law required Schenk to do. Officer Saldivar during the occurrences which form the basis of this lawsuit has provided a rational explanation for the reasons the officer exercised his lawful discretionary law enforcement authority consistent with TCOLE training. The audio and video recording of the events demonstrate that Schenk refused to surrender to custody and chose instead to resist arrest.

42.    The audio and video recording from Officer Saldivar's camera did not refute Officer Saldivar's explanation of the circumstances that prompted him to fire. I reviewed Officer Saldivar's bodycam footage several times and I did not see Schenk turning or spinning away from Officer Saldivar at the moment Schenk was shot. Also, objective forensic tests proved that Schenk had gunshot residue on both of his hands which is consistent with Officer Saldivar's report that Schenk was confronting Officer Saldivar when Officer Saldivar fired. Based on the information I am aware of regarding Schenk's arrest, including but not limited to an audio/video recording and explanations provided by Officer Saldivar, I cannot conclude that Officer Saldivar used force against Schenk that was excessive to the need

under the circumstances under TCOLE training protocols.

43.     I have no reason to believe that a constitutionally deficient police training or supervision program caused a violation of Nathan Schenk's federally protected rights. The information of which I am aware shows that Schenk's criminal decisions and actions caused Officer Saldivar to react to Schenk's chosen unlawful actions. Schenk could have avoided any use of force by simply submitting to arrest, as the law required Schenk to do. Based on the information, of which I am aware, I have no basis for concluding that Officer Saldivar used force against Schenk that was excessive to the need under the circumstances Schenk created. The circumstances in Schenk are not comparable to Heckford's arrest and do not show a constitutionally suspect Pasadena custom.

44.     Second, Plaintiff incorrectly describes an incident that occurred on or around April 27, 2018, wherein Juan Javier Martinez, Jr was detained for resisting arrest, and later died of acute rhabdomyolsis and hypothermia following drug intoxication, physical struggle, hypertensive cardiovascular disease, and obesity. I understand the Chief Southern District Judge analyzed the facts and issued an order describing the facts. Contrary to Plaintiff's mischaracterization of the incident, Officers were dispatched to a disturbance between two males that began near Bailey Elementary School. Officer Paz was the first to arrive on scene and located two males, and a female Mara Capello. Mara Capello indicated Guido had ingested drugs, but was unsure what substance. Due to aggressive behaviors observed, and for officer safety, Guido was detained in handcuffs. As Paz was escorting Guido to a patrol vehicle, Martinez interfered by disregarding commands to stay away and pulling on Guido 's shirt. Paz then struck Martinez with an open palm in the chest, which caused him to move

away. Guido was then placed in the back of Officer F. Cruz 's patrol vehicle.

45.     While Paz was speaking with Mara, Officer Z. Mabes and Cruz had contacted Martinez. Paz observed Martinez becoming agitated and pulling away from officers, before being taken to the ground by Mabes. Officers attempted to detain Martinez in handcuffs without success. Therefore, Cruz was directed to deploy his Taser. Martinez appeared to comply, by raising his hands in the air; however, he continued to refuse commands to lie down. Officers again tried to place Martinez in handcuffs but were unable to do so due because he pulled his hands away and was able to push himself up from the ground.

46.     Due to Martinez's continued refusal, Cruz deployed his Taser and utilized three cycles, which were not effective. At the completion of the third cycle, Martinez stood up, pulled the Taser probes out, and began to walk away before turning aggressively toward Paz, who then deployed pepper spray. Juan appeared to be unaffected and ran from officers westbound towards Lafferty. Juan was then tackled and actively resisted being placed into handcuffs. Paz explained he had used a sweep kick to destabilize Martinez; thus, allowing officers to gain advantage and effect the arrest.

47.     Once in handcuffs, Martinez continued to kick at officers and had to have his legs restrained. Paz and Officer T. Devers tried to place Martinez into a patrol unit for transportation to the jail, but he was uncooperative and had to be placed on the ground. An internal affairs investigation was conducted and submitted to the Harris County District Attorney's office. The Harris County District Attorney's Office labeled the investigation closed and stated they will not be taking any further action.

48.     At the outset, the facts in Martinez indicate a chaotic scene involving three people

simultaneously interfering with officers—two of whom were intoxicated by the consumption of drugs, and where the officers utilized proportional force to detain Martinez. Like above, internal review of the use of force was evaluated, and the use of force was found to be appropriate under the unique circumstances of that instance. Further, as this incident resulted in litigation, excessive force was not found during the litigation of this incident. A copy of the Court's order is attached to this declaration as Exhibit 3.

49.     Third, Plaintiff summarily describes an incident that occurred on or around February 28, 2016, wherein Officer Mark Brinker properly utilized force to restrain an aggressive Anthony Carlisle during inventory processing at the municipal lock-up following his arrest for public intoxication. The facts in Heckford's arrest did not involve an alleged use of force while in custody at the municipal lock-up as Heckford was reportedly sober and in a restaurant parking lot. The facts in the Carlisle incident are easily distinguishable from the instant litigation. Officer Brinker was dispatched regarding a disturbance and upon his arrival to the scene he witnessed an intoxicated Anthony Carlisle subdued on the sidewalk by his father, who reportedly was forced to wrestle Anthony to the ground until the police arrived. Officer Brinker witnessed Anthony to have heavily slurred speech, swayed stance and a strong odor of an alcoholic beverage emitting from his breath and person. Due to Anthony's intoxicated state and the danger he placed to himself and others by attempting to fight in the parking lot of the apartments, he was arrested for public intoxication.

50.     Upon arrival at the jail, Officer Brinker was conducting a property inventory from Anthony and asked him to remove a bracelet. Anthony then turned off the wall and threw the bracelet at Officer Brinker. At that time, Officer Brinker pushed Anthony against the wall in

order to restrict any other aggressive movements. When pushed against the wall, it caused Anthony to strike his head and cause a small laceration above his left eye. EMTs arrived, cleaned the laceration and placed a band aid on the minor laceration.

51.    Again, the circumstances here—involving the restraint of an aggressive and intoxicated person during an inventory at the municipal lock-up, are factually distinct from the facts surrounding Heckford's arrest. Internal review of the use of force was evaluated, and the force was found to be appropriate under the unique circumstances of that instance.

52.    Fourth, Plaintiff reports the events surrounding a citizen complaint as reported by Vanessa Estrada regarding her arrest on September 26, 2015. Plaintiff claims Officer Charlie Sanders "kneed a handcuffed Vanessa Estrada to the Ground," but Estrada makes no such claim. Instead, Estrada claims she was approached by officers following a vehicle accident that occurred in the parking lot as they were leaving the Pasadena Cook-Off.

53.    Estrada claims she began to video tape the encounter with her cell phone, when an unidentified officer "pushed [her] down towards the curb" causing her to "scrape the back of [her] upper right thigh." Estrada claims the officer also grabbed her by the arms and pushed her back down to the curb when she tried to stand back up. At no point in her unsworn statement, does she mention being "kneeled" on while handcuffed. Rather, Officer Sanders reported placing his leg against Estrada's back and between her body and arms to prevent her from leaving the seated position—as she continually refused to do. Estrada did not report any injuries as a result of Officer Sanders actions. The reporting officer indicated that Estrada exhibited signs of intoxication, vomited on herself, refused to comply with officer commands to stay seated, and displayed a belligerent attitude towards all officers on-scene during the

arrest. Due to Estrada's intoxicated state, the fact she was walking around in a busy parking lot, and had no one to escort her from the scene, Officer Jacob Guerra deemed her to be a danger to herself and others and placed her under arrest for public intoxication.

54.     Further, an internal affairs investigation followed up with Estrada to fully investigate the complaint. The investigation found her statements to be inconsistent with her sworn and unsworn statements. At no time, did Estrada report to the IA officer of being kneeled on, as Plaintiff inaccurately highlights.

55.     The circumstances here - involving the restraint of an aggressive and intoxicated person refusing to comply with simple commands to stay seated and out of a busy parking lot - are factually distinct from the facts surrounding Heckford's arrest. An internal review of the use of force was evaluated, and the use of force was found to be appropriate under the unique circumstances of that instance.

56.     Fifth, Plaintiff summarily describes an incident that occurred on or around March 16, 2015, wherein Nelson Onyinyechi was properly arrested for driving while intoxicated after driving with flat tires and crashing his vehicle into a neighborhood basketball post through a fence and into a ditch at approximately 1:43 AM.  Officer Baum arrived on scene and witnessed Onyinyechi exhibit signs of intoxication including red watery eyes, slurred speech, staggered stance, extreme loss of balance, and a strong odor of unknown alcoholic beverage emitting from his breath. Baum further noted Onyinyechi to have trouble walking out of the ditch and called DWI Officer Ridings to perform a DWI investigation. Officer Ridings conducted a standardized field sobriety test and subsequently arrested Onyinyechi for DWI. After Onyinyechi's blood was drawn at the hospital, Onyinyechi reportedly refused

to be secured in the patrol unit, leaned back, and kicked Officer Riding in the groin. Officer Riding was able to restrain Onyinyechi from assaulting him further and transported him to the Pasadena municipal lock-up. The circumstances here are factually distinct from the facts surrounding Heckford's arrest.

57.    Sixth, Plaintiff describes an incident that occurred on or around April 19, 2014, wherein Officers John E. Smith, Juan Salazar, and R. Thortnon properly utilized force to detain an aggressive, combative, and non-compliant Sylvia Gone and Esmeralda Alejandro. Upon reviewing the facts, it is abundantly clear the officers involved in the Gone incident used proportional force in response to the violent behavior exhibited by Gone and her passenger Alejandro. Officer Smith conducted a lawful traffic stop after viewing Gone's vehicle execute an illegal U-Turn. Subsequently, Gone pulled into a gas station, exited the vehicle and began to pump gas. Despite the clear traffic infraction, Gone claimed she was parked and refused to provide her drivers license or registration after being asked twice. Gone then entered the vehicle's back seat and refused to comply with Officer Smith's command to exit the vehicle. Officer Smith was able to cuff Gone's left wrist to the headrest and a struggle ensued.

58.    Namely, Gone attempted to kick Officer Smith, pull away, and attempt to free herself.  Simultaneously, the passenger Alejandro climbed in the back seat and tried to help free Gone by grabbing Officer Smith's hand. Officer Smith advised Alejandro several times to stay back, but she refused to comply. Meanwhile, Gone reached into her waistband forcing Officer Smith to deploy his taser to stop her movements. After being tased, Gone refused to exit the vehicle or keep her hands from her waistband forcing Officer Smith to

deployed his taser a second time. The three officers were then able to successfully remove the non-compliant and violent Gone from the vehicle. Alejandro was arrested outside the vehicle, but claims she was slammed against the car when being handcuffed.

59.     At the outset, the facts in Heckford did not involve a second actor interfering with a police officer during an arrest as evident in the Gone incident. Further, this incident resulted in litigation and the use of force was found to be appropriate under the unique circumstances of that instance.

60.     Seventh, and likely the farthest departure from the instant litigation, Plaintiff summarily describes an incident that occurred on or around February 26, 2014, wherein police officers Mark Adams and Bryan Kelldorf were faced with an intoxicated, violent, and non-compliant Bradford Bates who reportedly assaulted two female victims. The facts in the Bradford incident are clearly distinct from the instant litigation.

61.     In Bradford, Officers Adams and Kelldorf were dispatched to Bradford's residence in reference to an assault report from two female victims. Upon arrival, the two female victims claimed Bradford was intoxicated and threw objects (beer bottle and shoe) at them causing them pain and possible broken ribs. The officers knocked on Bradford's door, found it unlocked, and opened the door from where they were able to see Bradford with the use of their flashlights as the inside of the home was pitch black. Officers called out to Bradford, whom immediately became aggressive and exhibited signs of intoxication. Bradford refused to comply with Officers commands, forcing the officers to utilize proportional force and take Bradford to the ground to detain him. On the ground, Bradford actively resisted by kicking officers and placing his arms underneath his body, and grabbed Officer Kelldorf by the

scrotum causing intense pain. The struggle happened entirely in the dark as the officers were unable to maintain possession of their flashlights due to the struggle.

62.    The circumstances here - involving the restraint of an aggressive, combative, intoxicated person who resisted arrest while in total darkness inside a home - are factually distinct from the facts surrounding Heckford's arrest. Further, this incident resulted in litigation and the use of force was found to be appropriate under the unique circumstances of that instance.

63.    Eighth, Plaintiff incorrectly names the decedent as Jose Maria Moya, when the alleged incident he likely refers involved the death of Jose Sauceda Jr. The Sauceda incident occurred on or around March 25, 2012, wherein police officer Peter Ruffin lawfully stopped and arrested Sauceda for driving while intoxicated without incident. At the jail, Sauceda became uncooperative and combative with officers and an altercation ensued. Officers Ruffin and Coppege and detention officers Richardson and Snelson assisted Officers Mejia and Dollagaray in restraining Sauceda by securing handcuffs and leg shackles due to Sauceda's constant kicking. It is unclear whom placed handcuffs or leg shackles on Sauceda.

64.    However, the report indicates Officer Ruffin used a set of handcuffs to connect the chain of the handcuffs on Sauceda's wrists to the chain on Sauceda's leg shackles behind his back. Admittedly, this "hog-tie" restraint maneuver was prohibited by the Pasadena Police Department Rules Manual at that time. Sauceda was transported to the hospital while restrained in the same manner and had his blood drawn without incident.

65.    Shortly thereafter, Sauceda became unresponsive and was treated by hospital personnel but ultimately died of asphyxiation. The autopsy report, however, would later find

a small clear plastic wrapper in Sauceda's stomach, that he purportedly ingested filled with cocaine as corroborated by Sauceda's passenger at the scene of the DWI stop. The cause of death was listed as acute cocaine toxicity with restraint.

66.    On its face, this isolated 2012 incident is distinct from the facts in the instant litigation. Namely, the Heckford incident did not involve a traffic stop, the consumption of cocaine contributing to death, fatality, or improper use of restraints after becoming combative. While unfortunate, the Sauceda incident bears no similarities to the facts surrounding Heckford's arrest. Further, internal review of the use of force was evaluated, and the use of force was found to be inappropriate under the unique circumstances of that instance. As a result, the officer involved was reprimanded accordingly further illustrating Pasadena police department *does not* tolerate instances of excessive force.

67.    Lastly, I am not aware of other instances involving the improper use of restraints by Pasadena police officers that resulted in a fatality such that this instance can constitute or contribute to an alleged pattern of unnecessary escalation and excessive force by Pasadena police officers.

68.    The ninth and tenth incident involve the same officer and only serve to illustrate Pasadena's successful internal investigation following an incident and subsequent remedial measures when excessive force is found. Plaintiff's tenth purported instance involved Officer Michael Martin properly utilized deadly force against Michael Hernandez on December 25, 2009. In that instance, Officer Martin responded to a disturbance involving a gun at a Pasadena trailer park. Dispatch informed Officer Martin that a Hispanic male wearing a black cowboy hat was armed with a gun.

69.     Upon arrival, two individuals were spotted at the scene wearing cowboy hats. The male wearing the black cowboy hat fled the scene and Officer Jones approached the male wearing the white cowboy hat. Officer Jones gave the suspect wearing the white cowboy hat, later identified as Michael Hernandez, commands to take his hands out of his pockets and raise them in the air. Hernandez refused to comply. Officer Martin arrived shortly thereafter and noted Hernandez was not complying with commands and continued to keep his hands concealed in his pocket.

70.     Instead of complying with directives, Officer Martin observed Hernandez move toward him with his hands concealed and then brough his right hand around his waist in what Officer Martin perceived as an attempt to pull a weapon from his waistband, thus posing a threat of serious injury to Officers Martin and Jones. Officer Martin responded by shooting Hernandez, who although injured did not fall or display his hands. Officer Martin perceived Hernandez to be a continued threat and fired additional shots. Officer Martin struck Hernandez with six bullets.

71.     Under these unique circumstances, an internal review found that Officer Martin was found to have reasonably used deadly force. Training expert Captain Rodriguez independently evaluated the case and found that a reasonable officer could have reasonably believed it was necessary for Officer Martin to shoot Hernandez to stop the deadly threat Hernandez's actions posed after he refused to obey commands to show his hands.

72.     Thus, the incident involving Michael Hernandez bears no similarity to the facts in the instant litigation. Heckford did not involve a report of a disturbance involving a gun or multiple non-compliant suspects with a similar physical description. Internal review of the

use of force was evaluated, and the use of force was found to be appropriate under the unique circumstances of that instance.

73.    Lastly, the Plaintiff refers to a later incident that occurred on July 22, 2011 involving Officer Michael Martin fatally shooting Victor Hernandez during a traffic stop. In that instance, Officer Martin was found to have used excessive force. A copy of that internal investigation is attached as Exhibit 4 to this declaration. Upon the finding, Officer Martin was fired from the police department illustrating the swift remedial action the department has with instances of *proven* excessive force.

74.    The isolated Victor Hernandez incident does not bear any resemblance to the facts in the Heckford litigation. Given the remedial action of discharging Officer Martin after a thorough internal investigation, the incident does not demonstrate a pattern of excessive force. The discharge illustrates that Pasadena does not tolerate excessive force.

75.    Further, Plaintiff lists three incidents that occurred *after* the Heckford's arrest that purportedly show a Pasadena pattern of unnecessary escalation and excessive force. Again, I disagree.

76.    Plaintiff summarily describes the incident involving the death of Jamal Shaw that occurred while he was detained at the Pasadena Municipal lock-up on or about March 29, 2019. I have no reason to believe that a constitutionally deficient Pasadena policy caused a violation of Jamal Ali Shaw's federally protected rights. Each of the officers who encountered Shaw provided a reasonable explanation for the reasons the officer exercised his lawful discretionary law enforcement authority consistent with training. The audio and video recording of the events demonstrate that Shaw resisted when the officers properly sought to

4884-9718-5695.2

restrain him. Therefore, it was appropriate for the officers to use measured force as reasonably necessary to restrain Shaw so he could promptly be provided medical care, and to protect the officers from injury. The reasonable force the officers used was within a permissible range under Pasadena police department regulations.

77.     Shaw's decisions and actions, including forceful physical resistance to reasonable detention, are what prompted the officers to react as they did to Shaw's actions. Shaw could have avoided any force being used against him by Shaw simply submitting to lawful restraint, which was a prerequisite to emergency medical personnel being able to render aid to Shaw aid. Based on the information of which I am aware regarding Shaw's restraint, including an audio/video recording and explanations by the officers involved, I have seen no information which shows that any officer used unreasonable force against Shaw that was excessive to the need under the circumstances, when the force used is evaluated under TCOLE training protocols.

78.     Likewise, I have seen no information which shows that officers did not diligently act to promptly render Shaw medical aid in compliance with departmental policy. As soon as Shaw began to experience what appeared to be a seizure, officers took steps that appeared reasonably necessary to provide medical care to Shaw. Independent corrections expert, Brazos County Chief Deputy Sheriff Kevin Stuart investigated the circumstances of this incident and found no evidence of misconduct by Pasadena personnel.

79.     Plaintiff also describes an incident where "profane language" was used during the detention of Ricardo Salcedo by Officer Aaron. An internal affairs investigation found that no physical force—much less excessive force, was used to detain Salcedo but the

investigation found Officer Aaron used profane language in detaining Salcedo. Given the lack of force used, I am not aware of how the Salcedo incident illustrates a pattern of excessive force by Pasadena police department or its officers.

80.    Also, Plaintiff summarily describes an incident that occurred in October 2019, involving Officers Charles Hawthorne, Jesse Baum, Michael Ludeke II, and Margarita Chapa, Miguel Chapa, Alexander Lopez, and Irene Chapa. In this incident, officers responded to repeated reports that these intoxicated individuals were disturbing the peace while having a party in a residential neighborhood. Officers attempted to persuade the group to discontinue the breach of the peace but the officers were unsuccessful. When officers determined it was necessary to makes arrest, several of these individuals resisted arrest and interfered with arrests of others.

81.    The information I have provided herein establishes that Pasadena's police officers are well-aware that violation of law, City policy, and/or a Pasadena Police Department regulation subjects an offending officer to disciplinary action, including suspension, demotion or termination in appropriate circumstances, as well as possible criminal charges. I have no reason to believe Pasadena has any constitutionally deficient policy, or custom alleged in this lawsuit. Certainly, I have not authorized or permitted any policy I thought was constitutionally suspect to continue. Similarly, I have not authorized or permitted any practice of unnecessarily escalating relatively minor incidents with excessive force. Such practice does not exist and is illogical given the rapidly evolving circumstances that precede the use of force.

82.    Likewise, I have no reason to believe the training or supervision of any Pasadena

Officer, including Officers Aaron Perales, Christopher Aaron, Mark Brinker and Charlie Sanders, was constitutionally deficient. Furthermore, I have not seen any information which shows that any City practice caused the individual officers to use the force they used against Heckford.

83.     Heckford's decisions and actions, therefore, are the moving force that caused officers to react to Heckford's unlawful actions. Heckford could have avoided any use of force by simply submitting to arrest, as the law required Heckford to do. Based on the information I am aware of regarding Heckford's arrest, including but not limited to an audio/video recording and explanations provided by the officers involved in the event, I cannot conclude that any officer used force against Heckford that was excessive to the need under the circumstances under TCOLE training protocols.

84.     Lastly, I am not persuaded the mere filing of lawsuits is any evidence of police misconduct. It has been my experience over the years, that many lawsuits filed are entirely baseless and others are imply premised on mere disagreement with discretionary actions of officers who were forced to make very difficult judgments with life and death consequences, without the benefit of information criticisms are based on, with little time to consider alternative actions.

85.      I am not aware of any judgment being entered against the City of Pasadena based upon any police action. Instead, I have seen many dismissal orders and judgments entered in favor of the city, stemming from suits claiming police misconduct. If any judgment had been entered against the City based on police misconduct, I am certain I would have known about it. Therefore, the judicial judgments of which I am aware do not indicate to me that the City,

4884-3971-3695.2

police department, or City police officers routinely violate the Constitution or laws of the United States.

86.     Similarly, to ensure accountability for police action, the police department openly accepts complaints from anyone about claimed police action. But a mere complaint, like a lawsuit, does not necessarily evidence actual police misconduct. At my direction, the police department investigates complaints of misconduct, as well as non-reported suspected instances of misconduct, to determine whether any evidence shows police misconduct. The way the City of Pasadena and the Pasadena police department handled complaints of alleged police misconduct was consistent with the statutes the State of Texas enacted for such purposes through Chapter 614 of the Texas Government Code. This statute makes it more difficult to discipline an officer based on a citizen complaint when the individual making the complaint does not submit a signed complaint. The procedure provides for investigation of claims of misconduct to determine whether the allegations are substantiated.

87.     I printed the records attached to my declaration from City of Pasadena official governmental records. These exhibits are an authentic, true and correct copy of the original governmental record of the City of Pasadena. I am familiar with the manner in which these records are created and maintained by virtue of my duties and responsibilities as the City's Chief of Police. These records were made at or near the time noted on the record. It is the regular practice of the City of Pasadena for this type of record to be made by or from information transmitted by persons with knowledge of the matters set forth in the record. I know from viewing such records that it is the regular practice of the City of Pasadena to make and keep these types of records in the course of regularly conducted governmental activity.

88.    Executed in Harris County, State of Texas, on this 15th day of April, 2022. On this

day personally appeared City of Pasadena, Texas Chief of Police Joshua Bruegger, who

being duly sworn on his oath, declared and stated as follows:

_____

Police Chief Joshua Bruegger

EXHIBIT 28

Chapter 30 - POLICE    ·

ARTICLE I. - IN GENERAL

Sec. 30-1. - Establishment and composition of department.

A police department for the city is hereby established, to be composed of a chief of police and such other police officers as prescribed by civil service rules and regulations.

(Code 1964, § 23-1)

Sec. 30-2. -Appointment of chief.

The chief of police shall be appointed by the mayor, subject to confirmation by the city council.

(Code 1964, § 23-2)

Sec. 30-3. - General powers and duties of chief and policemen.

(a) The chief of police shall, in person or by a designated police officer, attend upon the municipal court while in session, and shall promptly and faithfully execute all writs and process issued from the court. He shall have like power with the sheriff of the county to execute warrants; he shall be active in quelling riots, disorder and disturbance of the peace within the city limits and shall take into custody all persons so offending against the peace of the city and shall have authority to take suitable and sufficient bail for the appearance before the municipal court of any person charged with an offense against the ordinances of the city. It shall be his duty to arrest all violators of the public peace, and all who obstruct or interfere with him in the execution of the duties of his office or who shall be guilty of any disorderly conduct or any disturbance whatever. To prevent a breach of the peace or preserve quiet and good order, he shall have authority to close any theatre, ballroom or other place or building of public resort. In the prevention and suppression of crime and arrest of offenders, he shall have, possess and execute like power, authority and jurisdiction as the sheriff. He shall perform such other duties and possess such other power and authority as the city council may require and confer, not inconsistent with the Constitution and laws of this state.

EXHIBIT 28

(b)   Each and every member of the police force shall have like powers with the chief of police, except that they shall perform their duties under the direction of and in cooperation with the chief of police.

(c)   It shall be the duty of the chief of police and the members of his force to enforce all ordinances of the city and such laws of the state as the violation of which are misde eanors hearable in the municipal court or courts of like jurisdiction.

(Code 1964, § 23-3}

**Cross reference-** Service and execution of municipal court process by court warrant officers,§ **23-21.**

Sec. 30-4. - Supervision and direction of police officers.

It shall be the duty of the chief of police to supervise and direct the police officers of his department in the conduct of their offices and performance of their duties as such, and each police officer is specially charged with the duty of following the instructions of and cooperating with the chief of police.

(Code 1964, § 23-4}

Sec. 30-5. -Authority of chief to assign special duties.

From time to time, as may be found advisable, the chief of police may designate particular members of the police force to perform specific duties in addition to their general duties as police officers, and to designate a particular officer or officers to attend the municipal court and to serve warrants issued by the judge of the court.

(Code 1964, § 23-5)

10.                    USE OF FORCE

**10.1        POLICY**

It is the policy of the Pasadena Police Department that officers use only the force that is
reasonably necessary to bring an incident under control, while protecting the life of the officer
and others. The use of force must be objectively reasonable. The officer must only use that
force which a reasonably prudent officer would use under the same or similar circumstances.

**10.2        DEFINITIONS**

1) Deadly Force: Force that is intended or known to cause, or in the manner of its use or
   intended use is capable of causing death or serious bodily injury.
2) Force: A defensive or aggressive act committed by a peace officer in performance of
   his duty when it is necessary to accomplish lawful objectives.
3) Objectively Reasonable: In determining the necessity for force and the appropriate
   level of force, officers shall evaluate each situation in light of known circumstances,
   including but not limited to the seriousness of the crime, the level of threat or resistance
   presented by the subject, and the danger to the community.
4) Serious Bodily Injury: Bodily injury that creates a substantial risk of death, or causes
   death, serious permanent disfigurement, or protracted loss or impairment of the
   function of any bodily member or organ.

**10.3        PROCEDURES**

1) Use of Force

   a) Officers may use only that level of force that is objectively reasonable to bring
      an incident under control.
   b) Officers are authorized to use force, including department approved equipment
      and techniques, when one or more of the following apply:

      i.   To protect the officer or others from physical harm.
      ii.  To restrain or subdue a resistant individual.
      iii. To bring an unstable, threatening, or unlawful situation safely and
           effectively under control.

2) Use of Deadly Force: Officers are authorized to use deadly force when it is necessary to
   protect the officer or others from what is reasonably believed to be an imminent threat
   of death or serious bodily harm.

3) Deadly Force Restrictions

   a) Officers will not discharge a firearm from a moving vehicle unless it is
      necessary to prevent imminent death or serious bodily injury to the officer or
      another person.

EXHIBIT 28

b)  Officers will not discharge a firearm at a moving vehicle unless a person in the vehicle is threatening the officer or another person with deadly force. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. An officer threatened by an oncoming vehicle shall first attempt to move out of its path. If conditions make evasive maneuvers a practical impossibility then an officer may discharge a firearm in an effort to protect the officer or others from an imminent threat of death or serious bodily injury.

c)  Officers are not authorized to use deadly force against suspects to prevent the consequences of self-imposed injury or suicide.

d)  Officers are prohibited from firing warning shots.

e)  Application of choke hold or carotid control holds are prohibited, except when the officer reasonably believes such holds are the only means of protecting himself or another person from an imminent threat of serious physical injury or death and the use of deadly force would be authorized.

4)  Duty to Intervene

a)  Any officer present and observing another officer using force that  is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intervene to prevent the use of such force.

b)  Officers shall promptly report these observations to a supervisor.

5)  Documentation

a)  Officers are required to complete and submit Form 196-G, Use of Force, when the officer uses force greater than a physical control technique; e.g., come-alongs, leverage techniques, or any application of force by an officer that results in injury or complaint of injury. The narrative shall include the actions of the suspect that necessitated the use of force, details of the force used by the reporting officer, as well as any injury to the suspect or complaints of injury, medical treatment received, or refusal of medical treatment.

b)  Officers are required to complete and submit Form168-G, Discharge of Firearms Report, anytime an officer intentionally or accidentally discharges a firearm under any circumstance. This requirement does not apply to the intentional discharge of weapons during training, qualifications, or sporting events.

Rev 03-15-17

2

EXHIBIT 28

**Tom Berg**
**First Assistant**

**Vivian King**
**Chief of Staff**



Criminal Justice Center
1201 Franklin, Suite 600
Houston, Texas 77002-1901

# HARRIS COUNTY DISTRICT ATTORNEY
## KIM K. OGG

April 11, 2019

Detective Michael Cooper
Pasadena Police Department
1114 Jeff Ginn Memorial Dr.
Pasadena, Texas 77506

**Re:** ICD-18-10
   OR#18-8867
   C: Martinez, Juan
   Target: None

Dear Det. Cooper:

I am in receipt of Pasadena Police Department Report #18-8867 regarding an incident which occurred on April 28, 2018.

Based on the available evidence I received I have decided to take no further action and administratively close this case.

Thank you and the Pasadena Police Department for your cooperation in this matter. If you have any questions or comments, please contact me at (713) 274-5910.

Sincerely,

Natasha Sinclair
Chief
Civil Rights Division

NS/eh

EXHIBIT 28

# PASADENA POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE



| | | |
|---|---|---|
| **TO:** | M. W. Thaler, Chief of Police | **DATE: October 17, 2011** |
| **FROM:** | Det. C.A. MacGregor, Internal Affairs Division | |
| **SUBJECT:** | IAD Control # 1167 | |

### SUMMARY OF COMPLAINT

On July 22, 2011, Officer M. Martin conducted a traffic stop in the parking lot of a Texaco Gas Station, located at 2626 Spencer, by positioning his marked patrol unit directly behind the traffic violator's vehicle. During Officer Martin's approach to the vehicle and contact with the driver, later identified as Victor Hernandez, Officer Martin stated he observed Hernandez make several furtive movements thus causing Officer Martin to fear for his safety. As a result, Officer Martin discharged his firearm three times at Hernandez. Hernandez then fled from the location in his vehicle. After a brief pursuit, Hernandez was taken into custody at the intersection of Grand and Red Bluff where it was discovered that Hernandez had been shot one time to the left side of the face.

### ALLEGATION
Officer Involved Shooting

### OFFICER INVOLVED
Officer M.T. Martin, Emp. #4233
Patrol Division, Night Shift

### COMPLAINANT
Chief of Police

### WITNESS
Officer R.S. Yzaguirre, Emp. #7048
Patrol Division, Night Shift

1

EXHIBIT 28

## INTERNAL AFFAIRS INVESTIGATION

On July 22, 2011 at approximately 3:36 A.M.; I was notified by Sgt. J. Bruegger of the Pasadena Police Department's Internal Affairs Division that Internal Affairs Investigators were needed at the scene of an officer involved shooting at Grand and Red Bluff. Preliminary information was that the suspect was shot during a routine traffic stop in the area of 2600 Spencer and after a brief pursuit; the suspect was taken into custody at Grand and Red Bluff.

I arrived at Grand and Red Bluff at approximately 4:30 A.M. and met with Sgt. Bruegger who was already on scene. In speaking with Sgt. Bruegger, I was advised that the suspect was no longer at the location and had been taken to Hermann Hospital by ETMC Unit #2 (Ledbetter & Delatorre) for a gunshot wound to the face. Sgt. Bruegger further advised that officers had secured the original location of the shooting (2626 Spencer) and were awaiting the arrival of investigators.

Det. M. Young was the primary case investigator for the Criminal Investigation Division (PPD Case# 2011-17770). Also on scene was Dawn Laporte, Forensic Chemist II with the Pasadena Regional Crime Lab. Dawn Laporte was to recover any ballistic evidence as well as collect and catalog Officer Martin's weapon. Arriving later were Clint Greenwood, Assistant District Attorney with the Harris County District Attorney's Office, and Bill Jordan, Investigator with the Harris County District Attorney's Office, both with the Police Integrity Unit. Officers J. Simm, J. Martinez, E. Ginther, and M. Peeples were the assigned investigators for the Pasadena Police Department's Crime Scene Unit. Their duties were to process and collect all relevant evidence as well as photograph and, where necessary, video the crime scene and "walk-through" interview.

I met with Detective Young who later documented the scene in his investigative supplemental report. Det. Young's scene summary was consistent with my observations while at Grand and Red Bluff as well as at the primary scene located at 2626 Spencer. Refer to Det. Young's supplemental report for detailed scene descriptions.

2

EXHIBIT 28

# Grand Rd. @ 2200 Red Bluff



A – Location of Victor Hernandez's vehicle at the conclusion of the pursuit.

The above photo was retrieved from available satellite photography located via the internet and does not depict the location as it was at the time or date of the incident and is for reference purposes only. The provided location of Hernandez's vehicle is an approximation, therefore, refer to the scale diagram for complete details.

I surveyed the vehicle that had fled from Officer Martin during the initial traffic stop and observed that it was stopped on Grand St. facing north, approximately 25 feet south of the 2200 block of Red Bluff. Observation of the vehicle, blue over gray 1999 Chevrolet pick up Texas registration AE5-0103, revealed that it had sustained front distributed damage resulting in the deployment of its air bag. Observation of the interior of the vehicle revealed apparent blood that had been distributed onto the deployed air bag, steering wheel, dash board, driver side seat, and interior panel of the driver side door. An apparent bullet strike was observed on the passenger side A Pillar approximately 8 inches above the dash board. A survey of the roadway surrounding the vehicle revealed a small pool of apparent blood just west of the driver side door. Observation of the exterior back left quarter panel of the truck bed revealed an apparent bullet strike approximately one and a half feet back from the cab of the vehicle and centrally located.

3

EXHIBIT 28

# 2626 Spencer Hwy.



A – Covered gas islands at the Texaco gas station.
B – Location of Officer Martin's unit.
C – Location of Victor Hernandez's vehicle.

The above photo was retrieved from available satellite photography located via the internet and does not depict the location as it was at the time or date of the incident and is for reference purposes only. The provided locations of Hernandez and Martin's vehicles are an approximation, therefore, refer to the scale diagram for complete details.

2626 Spencer Hwy. suite #100 is the location of the Maisah Food Mart and Texaco Gas Station. The business faces north with the front doors of the business centrally located on the north face of the building that also faces north. A concrete parking lot is located north of the business and extends north to the south curb line of 2600 Spencer and then east to an adjoining business strip center. Centrally located in the northern portion of the parking lot is a covered pavilion containing four (4) individual "gas islands" that are parallel to one another and extend north to south. Each individual "gas island" contains two individual gas pumps that are equally spaced apart. There are two drives providing access to the parking lot of the business, one from the 2600 block of Spencer Hwy. east of the pavilion and one from the 3100 block of Westside Rd. just west of the pavilion. Located on the ground, west of the south end of the eastern most "gas island", are three (3) 9mm caliber spent shell casings. Each shell casing is identified by an orange colored cone that has been placed next to their respective locations. Officer Martin's patrol unit and Victor Hernandez's vehicle are not described in

4

EXHIBIT 28

this scene summary due to the subsequent pursuit from the location. The weather was warm, approximately 79 degrees with approximately 75% humidity. There are multiple lamp posts along the intersection of Westside and Spencer as well as individual lights along the north face of the Maisah Food Mart.

At 6:10 A.M., a walk-through video with Officer M. Martin pertaining to his account of the shooting incident was conducted by Det. M. Young at 2626 Spencer. Assistant District Attorney C. Greenwood, Harris County District Attorney's Office Investigator B. Jordan, I.A.D. Investigator Sgt. J. Bruegger, Person Crimes Investigator Sgt. K.Crislip, Police Union attorney P. Alman and I were present for the walk-through. The interview was video recorded by Officer M. Peeples and J. Martinez with the Crime Scene Unit. The following is a summary of Officer M. Martin's account of the shooting:

*While assisting another officer on a traffic stop in the area of 3100 Shaver, Officer Martin observed a dark colored extended cab Chevrolet pick up revving its engine, "burning" its tires, and doing "donuts" in a near by business parking lot. Martin then departed from the traffic stop via his marked patrol unit and observed the vehicle in question exiting the business parking lot onto Shaver Rd. while failing to signal its intent to turn, "squealing" its tires, and failing to maintain a single lane. Martin initiated a traffic stop by positioning his unit behind the suspect vehicle as the vehicle turned eastbound onto Spencer Hwy. while disregarding the red light at the intersection. Martin was eventually able to stop the vehicle in the parking lot of 2626 Spencer where Martin attempted contact with the driver. Martin advised that as he approached the suspect vehicle he observed that the vehicle's "back up" lights had engaged at which time the vehicle began to roll backwards towards Martin's unit. Martin, while standing at the front of his unit, gave verbal commands in English to the driver that the driver put the vehicle in "park"; however, the vehicle pulled forward, then backed up again, and then forward a second time. Martin then approached the vehicle at a 45 degree angle and observed that the driver side window was down at which time Martin gave additional verbal commands in English for the driver to place both hands on the steering wheel, put the vehicle in park, and to shut off the engine. Martin explained that the driver looked over his left shoulder at him at which time Martin gave further commands for the driver to display his hands and for the driver to put the vehicle in park. After giving the additional commands, the driver dropped his left hand from the steering wheel to the left inside door compartment. Martin stated that he instructed the driver two additional times, "show me your hands" at which time the driver displayed an "aggressive glare" while turning both shoulders towards him to "square off". Martin explained that he stood close enough to the vehicle that he could smell an alcoholic beverage odor emitting from the driver as well as hear the driver "fumbling around" within the door's compartment. Martin stated that the driver then began to lift his left shoulder as if "pulling something up" at which time Martin discharged his firearm once at the driver fearing for his and Officer R. Yzaguirre's safety (Officer Yzaguirre was pulling up behind Martin and adjacent to the suspect vehicle at the time of the engagement). Martin stated that the vehicle then pulled forward and turned towards him at an angle thus the necessity for Martin to discharge his weapon two (2) additional times at the vehicle as it traveled from the parking lot eastbound onto Spencer Hwy. where a brief pursuit ensued. The suspect was later taken into custody with the aid of additional units. Martin elaborated by stating that he didn't fire his second and third shot until the driver began turning the steering wheel and*

5

EXHIBIT 28

*causing the vehicle to travel towards him at an angle. Martin feared that the driver would display a weapon as the driver created a greater degree of an angle between he and the vehicle, thus the necessity for the additional shots fired. Martin advised that he never observed a weapon during his contact and engagement with the driver of the vehicle.* The interview was concluded at 6:30 A.M.

The following is a transcription of a question presented to Martin by Sgt. K. Crislip during the video "walk through" in regards to Martin shooting at the vehicle:

*Sgt. Crislip - So, did you fire any as he was moving away?*

*Martin - When, the last round when I fired it, everything happened pretty much simultaneously. My concern was that if he had a gun, I'm out in the open; I had no, no way other than to fire back to defend my self. I was trying to loop back around to try to use my car as some type of cover, so as I ran around I kind of fired one round like that* **(in the video "walk through" Martin demonstrates the discharging of this round by raising his right arm across the front of his upper torso and left arm as if he was firing back at the vehicle as he retreated to his patrol unit. Martin's demonstration depicted himself as if he was shooting at a vehicle that was behind him. It should be noted that in Martin's MVR video footage, Martin is observed with his right arm fully extended while running with the vehicle and shooting at it).**

*Sgt. Crislip - So, you're moving back to your vehicle?*

*Martin – the last round, I was moving and he was moving so I wasn't, it wasn't as if I was going directly in on that last round into the vehicle. At that point is when I stopped firing my weapon, holstered it, got into my vehicle, and got into the pursuit* **(At no time does Martin attempt to retreat to his patrol unit for cover during the discharge of his weapon. Martin does return to his unit after the vehicle has fled from the location and Martin has holstered his duty weapon).**

A written affidavit was obtained from Officer Martin by Det. Young of the Person Crimes Division on 7-22-11 regarding the shooting incident. I found his affidavit to be consistent with his video walk-through statement. In his walk-through, Martin explained that he had given multiple verbal commands before discharging his firearm at subject Hernandez (I counted four (4) separate occasions during Martin's walk-through where he indicated that he had given verbal commands to the driver during his violator contact). In his written statement, Martin referenced a fifth (5) verbal command that was given after Hernandez raised his left shoulder resulting in Martin discharging his firearm at Hernandez. Refer to Officer Martin's attached affidavit for complete details.

Officer Martin later met with Dawn Laporte, ballistics analyst for the Pasadena Regional Crime Lab, for the cataloging and inventory of his duty weapon. Officer Martin's duty weapon was a Glock Model 17, 9mm pistol bearing serial #MEW975. There was one (1) live 9mm Winchester round in the chamber of the weapon and fourteen (14) live 9mm Winchester rounds in the magazine of the weapon. The maximum capacity for the magazine is 17 rounds. Following the inventory of Martin's ammunition the preliminary finding was that Officer Martin had fired three (3) times at the suspect

6

EXHIBIT 28

as Martin stated that he routinely loaded his weapon with a full magazine of ammunition as well as a live round in the chamber. Martin's weapon was later analyzed by D. Laporte and found to function as designed. The weapon was later returned to Officer Martin.

Current qualification records for the Pasadena Police Department's Training Facility indicated that Officer Martin was up to date with his qualifications and that he last qualified with his Glock 17 on May 31, 2011 with a passing score of 93.

Officer Martin later submitted a Discharge of Firearm report and a Use of Force report in accordance with the Pasadena Police Department Rules. Both forms are consistent with Martin's walk-through video and written affidavit. Refer to attached forms.

The vehicle driven by Victor Hernandez, 1999 blue Chevrolet truck ███████████ was verified via records division as not stolen and registered to Victor Hernandez at ███████████████ ████████████ The vehicle was later towed from Grand and Red Bluff by the Pasadena City Wrecker to the Crime Scene Unit processing bay, located at 1201 Davis, where it was examined by Officer Ginther of the Crime Scene Unit.

Witness to the shooting incident was Officer R. Yzaguirre who had arrived to 2626 Spencer Hwy. prior to Officer Martin discharging his firearm. Detective D. Bittner of the Person Crimes Unit later conducted a video recorded interview with Officer Yzaguirre at the Pasadena Police Department. The following is the summary of Officer Yzaguirre's video recorded interview as obtained from Det. Bittner:

*Yzaguirre is currently assigned to the Patrol Division and working the night shift.  He has been employed by the City of Pasadena for the past 19.5 years.  On 7-22-11, he was assigned to monitor traffic in the area of Spencer Hwy. and Shaver St. as part of a traffic initiative that included several patrol officers.  He had stopped in the area of 2200 Spencer Hwy. to assist Sgt. G. White with a traffic stop when he observed another police unit stopping a black Chevrolet pick up truck, which had been traveling at a high rate of speed eastbound from Shaver St. The officer, later identified as Officer M. Martin pulled the vehicle into the parking lot of 2626 Spencer Hwy.  The suspect vehicle and Martin's vehicle were facing east. Yzaguirre pulled into the parking lot from the north entrance and stopped his vehicle perpendicular to the violator and Martin's vehicles.  His headlights were shining in the open window of the suspect vehicle.  Officer Martin was already walking up to the driver's side door. As Yzaguirre was exiting his vehicle with one foot out of the door, he observed the violator's vehicle drift backward and notified Martin that it did not appear the vehicle was in park.  The violator's vehicle then pulled forward slightly.  Martin commanded the driver to put the vehicle in park.  Yzaguirre observed Martin standing at the open driver's window appearing to struggle with the driver or reaching into the vehicle to put the truck in park.  Yzaguirre said his view was blocked by Martin **(No struggle was observed between Martin and the driver per the MVR footage that was obtained from Martin and Yzaguirre's patrol units. Neither Martin or the driver alleged that a struggle occurred between the two when interviewed)**. Yzaguirre had a sense that the violator was going to flee the scene because prior to Martin contacting the driver, Yzaguirre thought the driver looked "antsy" or was "fidgeting" too much inside the vehicle.*

7

EXHIBIT 28

*Yzaguirre turned to get back into his vehicle as soon as it looked like the driver would flee. As he was entering his vehicle, he heard three gunshots and initially assumed the suspect was shooting at him and Martin. The shots were spaced as one shot a short pause then two consecutive shots. After Yzaguirre entered his vehicle, he observed Martin running back to his car. Yzaguirre gave chase of the suspect vehicle as it exited the north driveway of the business and drove away eastbound. The suspect vehicle was pursued close behind by Officer Stubbs then Yzaguirre. The vehicle fled east on Spencer Hwy. to Waters St. The vehicle turned north on Waters then it drove west through an empty field north of Grunewald before entering Primrose St. where it turned back south and then west onto Grunewald. At this point in the chase, Yzaguirre said that he was out of the chase because neither he nor Stubbs followed behind the suspect as it drove through the empty lot.*

*Yzaguirre did not hear the suspect make any statements while at 2626 Spencer Hwy. He noted that the suspects eyes appeared "glazed over" and he thought for a moment that the suspect didn't speak English because of the look on the suspect's face. He never saw the suspect's hands at any time. Yzaguirre stated that he did not see Martin fire his weapon during this incident. After the suspect vehicle was stopped at Red Bluff and Grand St., Yzaguirre remembers an officer asking the suspect several times if he had any weapons on him and the suspect replied, "No." All these questions were asked in English. Therefore, he understood that the suspect did speak English.*

I later reviewed video recorded affidavits that had been obtained by detectives from several officers that were either present or involved in taking Victor Hernandez into custody at the intersection of Grand and Red Bluff. The following officers were interviewed as follows:

Det. M. Bruegger of the Person Crimes Unit interviewed via video Sgt. G. White, Officers T. Blankenburg, A. Galvan, S. Riddle, J. Stubbs, and W. Palmer. In reviewing the interviews, I found that all the interviews were consistent in that each officer had either responded to or had been involved in the police pursuit of Victor Hernandez which ended at the intersection of Grand and Red Bluff resulting in Hernandez's arrest. The officers were consistent in stating that Hernandez was the lone occupant of the suspect vehicle when Hernandez was contacted and that Hernandez was observed to have sustained an injury resulting in the discovery of apparent blood about the vehicle and his person. No dialogue was found to have occurred between the responding officers and Hernandez. The video recorded interviews are part of this case file for review and detailed information. The summaries of these interviews are documented in Det. M. Bruegger's supplement to Det. Young.

Det. J. Gonzales of the Person Crimes Unit interviewed via video Sgt. M. Norman, Officer C. Jones, and civilian S. Naron. In reviewing the interviews, I found that all the interviews were consistent in that Sgt. Norman and Officer Jones each approached Hernandez's vehicle after it came to a stop at the intersection of Grand and Red Bluff. Norman and Jones observed that Victor Hernandez was the lone occupant of the suspect vehicle and that Hernandez had sustained an injury to the face region resulting in the discovery of apparent blood about the vehicle and his person. No dialogue was found to have occurred between the responding officers and Hernandez.The video recorded interviews are part of this case file for review and detailed information. The summaries of these interviews are documented in Det. J. Gonzales's supplement to Det. Young.

8

EXHIBIT 28

Detective Young viewed the MVR system for the unit that Officer Martin utilized on the date of the shooting incident, unit #0540 and MVR #940, and observed that the entire traffic stop and shooting incident had been recorded. A video copy of the traffic stop was provided to me and later reviewed via departmental lap top computer. In viewing the provided video copy, I observed that the date stamp for the video was correct in its current date, however, the time stamp being displayed on the MVR system was incorrect based on the time stamps listed on the CAD Detailed History Report for this incident. The time stamp displayed on the MVR during the shooting incident will be used for explanation purposes. I further observed that Officer Martin's microphone was not activated during the traffic stop; therefore, no audio is available from Martin's person of the verbal exchange during the traffic stop. The following are the time stamps and actions as observed on the video recorded copy by this investigator:

1:45:43 – MVR begins recording as Officer Martin activates his emergency lights. The unit's AM/FM radio is playing in the background.

1:46:16 – Officer Martin and traffic violator enter the parking lot of a business (2626 Spencer).

1:46:25 – traffic violator's vehicle comes to an initial stop.

1:46:33 – Officer Martin exits his unit (audible sound of door closing) and begins approaching the vehicle as the vehicle slowly rolls backwards towards Martin's unit (Martin is walking at a greater pace than the vehicle is rolling backwards). The sequence of lights as observed on the left tail light are as follows:
  - brake light (truck in drive gear)
  - two brief activations of the reverse light (as if attempting to shift up from drive gear to park but pausing at reverse and then to neutral).

1:46:39 – Officer Martin is at an approximate 45 degree angle to the driver side door as Martin motions with his right arm for the driver to put the vehicle in park. The motion is consistent with one giving a verbal command for the action observed.

1:46:42 – truck slowly rolls forward as Martin begins to unholster his duty weapon (an engagement of the break light is observed on the left tail light).

1:46:44 – Martin advances on the driver side window, moving perpendicular and within 3 feet of the truck.
Martin's gun is pointed at the driver verbalizing, inaudible content, as the truck begins to accelerate.

1:46:44 – the first gun shot is heard as Martin is observed running along side and in the same direction of the moving truck. Martin's arm is parallel with the ground and his gun pointed directly at the driver. The muzzle of Martin's gun is just inside the open window of the cab.

1:46:46 – the second and third shots are heard as the truck accelerates away from Martin increasing the distance between the two.

1:46:57 – Martin returns to his police unit and pursues after the suspect vehicle.

1:51:01 – Martin catches up to the lead chase unit in the pursuit north bound at Burke and Southmore.

1:52:34 – pursuit ends at Grand and Red Bluff.

9

EXHIBIT 28

In reviewing Officer Martin's MVR video footage, it is observed that Victor Hernandez's vehicle does not travel towards Officer Martin. It should be noted that in Martin's previous video recorded walk-through Martin stated that Hernandez turned his vehicle towards him at an angle thus the necessity to discharge his firearm additional times at Hernandez. It is further observed that Martin is actually running along side Hernandez's vehicle as he discharges his duty weapon at Hernandez as the vehicle travels away from Martin. The copy of the video recorded incident is part of this case file for review and further details.

Det. Young viewed the MVR system for the unit that Officer Yzaquirre utilized on the date of the shooting incident, unit #0715 and MVR #4451, and observed that Yzaguirre's MVR had recorded a portion of the traffic stop and shooting incident. A video copy of the traffic stop was provided to me and later reviewed via departmental lap top computer. In viewing the provided video copy, I observed that Yzaguirre's MVR did not have a date or time stamp visible on the recording. The following are the actions as observed on the video recorded copy by this investigator:

- MVR recording begins as Officer Yzaguirre checks by with a unit on a traffic stop west bound on Spencer. The AM/FM radio is heard in the background.
- During the aided traffic stop, a marked unit is observed on the recording with its emergency lights activated initiating a traffic stop on a dark colored truck east bound on Spencer.
- Yzaguirre returns to his unit and activates his emergency lights while traveling to the location of the observed initiated traffic stop (identified via previously viewed video documentation as 2626 Spencer).
- When Yzaguirre's unit is positioned perpendicular to the traffic stop, Officer Martin comes in view of Yzaguirre's camera as Martin approaches the truck with a flash light in his left hand. The driver of the truck is observed facing forward. The truck is observed slowly rolling backwards towards Martin's unit as Martin motions at the driver with his right arm to put the truck into park while giving verbal commands (inaudible).
- The truck begins to slowly move forward as the driver slightly peers over his left shoulder at Martin. As the driver peers over his left shoulder, it appears that the driver's right hand is on the steering wheel and the left hand is raised, off set to the driver's left side of the face, possibly holding a cell phone.
- Martin unholsters his duty weapon.
- The truck accelerates forward, away from Martin, as the driver side window and Martin move out of Yzaguirre's camera view. Prior to moving out of camera view, it appears that the driver's hands have not changed position.
- The first gun shot is heard .7 seconds (verified via stop watch) after the driver side window and Martin are out of camera view followed by audible gun shots 2 and 3.
- Martin comes back into camera view as Martin returns to his patrol unit.
- Yzaguirre then pursues after the suspect vehicle east bound on Spencer until Yzaguirre is delayed at a dead end street and then out of the pursuit.

In reviewing Officer Yzaguirre's MVR video footage, I observed that Hernandez's vehicle slowly

10

EXHIBIT 28

rolls backwards one time towards Martin's patrol unit. Martin stated in his walk-through and written affidavit that Hernandez had reversed his vehicle twice (2) towards Martin's unit in an unsafe and aggressive manner. It is further observed in the video that during Martin's initial contact with Hernandez, Hernandez's right hand appears to be on the steering wheel and his left hand offset at the left side of his face. It appears that Hernandez's left hand possibly holding a cell phone. Hernandez's hands do not change position as Martin is unholstering and pointing his duty weapon at Hernandez as Hernandez slowly rolls forward. In Martin's previous video walk-through and written affidavit, Martin stated that Hernandez had dropped his left hand from the steering wheel to the driver side inner door compartment and then began to raise his left shoulder as if raising a weapon thus resulting in the need for Martin to discharge his duty weapon the first time at Hernandez. I observed on video Martin running along side Hernandez's vehicle as Hernandez flees from the traffic stop location. In Officer Martin's previous video walk-through Martin stated that Hernandez had turned his vehicle towards him at an angle thus the necessity to shoot at Hernandez two additional times. The turning of the truck towards Martin is not observed on the video as Martin is observed engaging and then running along side the vehicle as it flees. The copy of the video recorded incident is part of this case file for review and further details.

Det. Bittner viewed the video surveillance video system utilized at the Maisah Food Mart and discovered that the business utilized three (3) cameras on the north exterior face of the business. Bittner further discovered that the surveillance cameras recorded Officer Martin's traffic stop and shooting incident. A video copy of the video surveillance footage was provided to me and later reviewed via departmental lap top computer. In viewing the provided video copy, I observed that the surveillance footage was divided into three (3) segments, camera's two, three, and six. Of significance were cameras two and three as they recorded the entire shooting incident, camera two from an easterly view and camera three perpendicular to both Martin's unit and Hernandez's truck. Camera three depicts Hernandez's right hand manipulating the gear shift of the vehicle and then moving to the steering wheel as Martin approaches the vehicle. The footage captured is consistent with the provided video footage from Officer Martin and Yzaguirre's MVR's. A copy of the video recorded surveillance footage is part of this case file for review and further details.

Det. Bittner obtained an audio copy of the dispatch "channel one" radio traffic pertaining to the pursuit and subsequent contact with Victor Hernandez. An audio copy of the radio traffic was provided to me and later reviewed via departmental lap top computer. In listening to the provided audio copy, I found that the length of the recording was 34 minutes and 06 seconds long, however, for investigative purposes the first 10 minutes and 28 seconds (pursuit) was transcribed by this investigator. The remaining portion of the audio recording that was not transcribed pertained to emergency services and police personnel responding to the scene post contact with Victor Hernandez. The following is the transcription as created by this investigator:

Dispatch – D
Officer Stubbs – S
Officer Martin – M
Officer Palmer – P
Officer Tang – T

11

EXHIBIT 28

Sgt. Norman – SGT.
Unknown - ???

*S – trying to catch one eastbound on Spencer, shots were fired.*
*D – that's clear, at uh, at yall?*
*S – 27: not sure, there were other units out on traffic stop at Westside…northbound Burke northbound Burke, disregard disregard still eastbound.*
*D – all units hold your traffic, uh 27 has one running, huh eastbound Spencer.*
*S – 27: Bayshore, disregard*
*D – you broke up, he's*
*S – 27: going eastbound, he's trying, trying to…northbound somewhere, still eastbound Spencer.*
*D – ok, what's cross street?*
*S – 27: northbound Watters, northbound Watters.*
*D – northbound Watters from Spencer, all units continue to hold your traffic.*
*S – 27: to these units, you can put out that plate, it looks like a dark extended cab Chevy.*
*T – 422: I'm close to that.*
*M – 46: plate is going to be* ███████████████████
*D – that's clear.*
*T – he cut through the field at Grunewald, he looks like he's going back to the Grunewald area, now he's turning southbound Grunewald going back towards Dabney.*
*T – back up back up, he's going back towards Spencer.*
*T – (inaudible) Bayshore.*
*P – 41: got him a Dabney.*
*D – Dabney at what?*
*M – 46: shots were fired with me, he was reaching for something, tried to run me over with the vehicle.*
*D – so uh, you discharged your weapon at, uh, 3100 Shaver correct?*
*M – that's correct, I can't confirm whether he had a weapon or not but he was reaching in the door.*
*T – where yall at?*
*P – north on Dabney approaching Cherry.*
*D – northbound Dabney approaching Cherrybrook?*
*P – that's clear, he's going, uh, westbound on Cherrybrook now.*
*D – ok, westbound Cherrybrook from Dabney, 41 you want me to call it?...ok crossing Burke.*
*P – that's clear, crossing Burke, he's going north on Burke now.*
*D – northbound Burke from Cherrybrook.*
*P – approaching Blvd.*
*D – northbound Burke approaching Blvd.*
*P - still north on Burke just passing 2001 Burke.*
*D – northbound Burke crossing Pasadena Blvd.*
*P – were passing Austin.*
*D – northbound Burke passing Austin.*
*P – he's having vehicle problems now.*

12

EXHIBIT 28

*D – suspect vehicle is having vehicle problems at this time.*
*P – 41: coming to, uh, Southmore now.*
*D – northbound Burke approaching Southmore.*
*T – (inaudible) I can call it now, I'm behind 41.*
*D – that's clear (inaudible)*
*T – northbound Burke headed northbound Burke, err, uh, crossing uh, Southmore headed*
 *northbound on Burke.*
*D – crossing Southmore headed northbound on Burke.*
*T – still northbound on Burke crossing Jenkins.*

 *Long squelch*

*D – northbound Burke passing Jenkins.*
*T – turning onto, uh, Grand from Burke, north Burke.*
*T – 40: is there a return on that plate?*
*D – eastbound on Grand turning towards Burke.*
*??? – (inaudible).*
*SGT. – he's got blood all over him, he's stopping, I can't see his hands…(inaudible) traffic stop*
 *guys.*
*D – sarge can you tell me where yall are at?*

*Long squelch*

*T – Burke and Red Bluff, Burke and Red Bluff.*
*D – (female voice) clear Burke and Red Bluff*
*D – to all units channel one is still shut down, all units channel one is still shut down.*

*Sirens (inaudible)*

*D – (inaudible) call an ambulance?*
*??? – roll an ambulance.*
*D – we are.*
*??? – Burke and Red Bluff, roll an ambulance.*
*D – were doing it.*
*??? – (inaudible) notify detectives.*
End of transcription.

The copy of the audio recording is part of this case file for review and further details.

On August 12, 2011, I met with Larry Hovey who is a Forensic Examiner for the Greater Houston Regional Computer Forensic Laboratory. In meeting with Hovey, I provided Hovey with a DVD copy of the MVR video footage that had been retrieved from Officer Yzaguirre's patrol unit. I briefed Hovey on the contents of the DVD and the need to enhance the portion of the video footage the depicts Officer Martin's contact with the suspect driver. I displayed to Hovey, via departmental

13

EXHIBIT 28

lap top computer, the portion of the video footage that was in need of enhancing and requested that a copy of the enhanced footage be produced and provided to me when possible.

Later this date, I met with Officer E. Ginther of the Pasadena Police Department's Crime Scene Division in regards to obtaining approximate measurements from the shooting location at 2626 Spencer. I explained to Ginther my need for the approximate distances between Officer Martin's shooting position in relation to the fleeing suspect vehicle. I then provided Ginther with copies of the video surveillance footage that had been obtained from Officer Yzaguirre and Martin's patrol units and the Maisah Food Mart. In utilizing the Crime Scene Unit's previously scaled diagram of 2626 Spencer in conjunction with the provided video surveillance footage, Officer Ginther constructed a second diagram of 2626 Spencer which included the approximate locations of Officer Martin's patrol unit as well as Victor Hernandez's truck as each shot was fired. The approximated locations of Victor Hernandez's truck as it was being fired upon were based on the trucks location in conjunction with the observed muzzle flashes of Officer Martin's duty weapon when viewing the supplied video surveillance footage. In completing the diagram, it was discovered that the approximate distances between Officer Martin and the fleeing vehicle when Martin discharged his duty weapon were as follows:

First discharge at the vehicle – approximately 3 feet.
Second discharge at the vehicle – approximately 23 feet.
Third discharge at the vehicle – approximately 35 feet.

A copy of the original scaled diagram and the completed diagram depicting the approximated vehicle locations and associated distances is part of this case file.

On August 16, 2011, I spoke with Larry Hovey via telephone and was informed that efforts were made at enhancing the provided MVR video footage via technical means, however, due to the lack of available digital information on the video, an enhancement could not be produced. Larry advised that a written report would be provided to me explaining the process and end result of the attempted enhancement.

On September 9, 2011, I received from Larry Hovey the copy of the provided MVR footage as well as a "Report of Examination" for said footage. In reviewing the examination report, Forensic Examiner Keith Medford of the Greater Houston Regional Computer Forensic Laboratory noted that the provided MVR footage could not be enhanced, specifically the driver, due to the lack of detail in the video. The "Report of Examination" is part of this case file.

On September 21, 2011, I spoke with Victor Hernandez's attorney, Larry McCotter, and scheduled an appointment for Hernandez to be interviewed by this detective at the Pasadena Police Department on September 22, 2011. It was agreed upon between McCotter and I that I would only inquire into the events that occurred between Officer Martin's exiting of his patrol unit and Hernandez's leaving from the traffic stop location.

On September 22, 2011, Victor Hernandez and his attorney, Larry McCotter, arrived to the Pasadena

14

EXHIBIT 28

Police Department for interview purposes. Hernandez and McCotter were escorted from the lobby of the police station to the Criminal Investigations Division where Hernandez and McCotter were placed in an interview room for video recording purposes. Accompanying me in the interview was Sgt. J. Bruegger of the Internal Affairs Division. The following is a summary of Victor Hernandez's video recorded interview.

*Victor explained that on the night of the shooting, he had been pulled over by a patrol unit to which Victor pulled into the parking lot of a gas station in order to allow enough room for the officer to pull in behind him. Victor advised that he originally did not put his truck into park but had actually placed his truck into neutral and was holding the brake pedal down. Victor stated that he attempted to put his truck into park during the traffic stop and was subsequently shot by the officer. Victor explained that he didn't drive away from the officer until he observed that the officer was pointing his gun at him and thinking to himself as to why the officer was pointing his gun at him. I inquired from Victor if the officer made any verbal commands to him in regards to putting his vehicle into park and if he observed the officer approaching his vehicle via rear view mirrors or by turning around. Victor explained that he did not remember the officer making any verbal commands to him other than hearing the officer informing him "I will shoot". Victor stated that he briefly observed the officer when he turned his head and then he turned to look forward after observing the officer with his gun in his hand telling him that he would shoot. I asked Victor if he remembered the position of his own hands or if he was holding a cell phone when the officer approached. Victor explained that he remembered that both of his hands were initially on the steering wheel and that he may have tried to put the truck into park. Victor advised that he did have his cell phone in the truck, possibly in the center consol, but did not remember having it in his hands. Sgt. Bruegger inquired from Victor if he ever removed his left hand from the steering wheel and lower it to the driver side door or if he remembered the distance between he and the officer when he was shot. Victor stated that he did not remember ever lowering his left hand from the steering wheel and could not recall the distance between he and the officer. Victor did comment that he didn't remember the officer ever arriving to his window before being shot. I informed Victor that I had reviewed all available video from the traffic stop and that the video shows him rolling forward, away from the officer, prior to the officer unholstering his weapon. Victor reiterated that he didn't leave from the location until after the officer drew his weapon and pointed it at him. Victor stated that he didn't even verbalize anything to the officer other than thinking to himself that he needed to get his insurance information from within the vehicle(location not stated) prior to the officer arriving to the truck. I questioned Victor if he had reached for his insurance information during the traffic stop. Victor reiterated that he had thought to himself that he needed to get his insurance information but did not recall ever actually making an attempt to retrieve it.* This concludes the summary of Victor Hernandez's video recorded interview. The interview was later transferred to DVD and is part of this case file.

At the conclusion of the interview, I spoke with Larry McCotter and asked if he could provide Victor's cell phone number and a copy of Victor's cell phone records for the date of the shooting incident in order to verify if Victor had been on his cell phone prior to or during the traffic stop. McCotter stated that he would contact me at a later date in regards to my inquiry.

A review of Hernandez's medical records revealed that Hernandez's Blood Alcohol Content (BAC)

15

EXHIBIT 28

at the time of his arrival to the hospital was .142. A copy of Hernandez's medical records has been transferred to CD-ROM and is part of this case file.

On September 27, 2011, Det. Young filed Felony Evading and Driving While Intoxicated charges on Hernandez via the Harris County District Attorney's Office.

On October 4, 2011, a final meeting was conducted with ADA Clint Greenwood of the Harris County District Attorney's Police Integrity Division. Present at the meeting was Sgt. Bruegger, Sgt. Crislip, Det. Young, and me. Det. Young provided ADA Greenwood with a final copy of his investigative report. The meeting was concluded by Greenwood advising that no further criminal follow up was needed in the matter and that the case would be presented to a grand jury.

On October 5, 2011, I contacted Officer Martin at his residence via telephone and scheduled an appointment for the purposes of conducting a follow up administrative interview with Martin at the Pasadena Police Department on October 6, 2011 at 1:00 P.M.

On October 6, 2011, Officer Martin arrived to the Pasadena Police Department as scheduled. A video recorded interview was then conducted with Martin for the purposes of clarifying discrepancies that were discovered in the course of the Internal Affairs investigation. Assisting in the interview was Sgt. Bruegger. Prior to any questioning, Martin was provided with an Inter-Office Correspondence advising him that the interview was part of the administrative investigation and that his cooperation in the matter was required. Martin acknowledged the meaning of the correspondence and the necessity of the interview.

At the beginning of the interview, Martin was asked if he remembered anything different or if he had anything to add since his video "walk through" and subsequent written affidavit. Martin advised that his recall of the incident was the same as he remembered it on the date of the shooting. Martin then re-told his account of the shooting incident from recall while periodically referencing a copy of his written affidavit. At the conclusion of Martin's reiteration, Martin was asked if he remembered changing his physical position while at the suspect vehicle when unholstering his duty weapon due to his stated perceived threat. Martin explained that he unholstered his duty weapon after the driver's left shoulder was coming up and the driver was turning to "square off" towards him. Martin advised that the truck had not moved forward yet during this portion of the encounter, however, the driver's left hand had already lowered from the steering wheel to the inner driver side compartment. Martin stated that despite giving the driver two (2) verbal commands to show his hands the driver completely turned his shoulders towards him **(at no time is the appearance of the driver's left hand observed lowering or the turning of the driver's shoulders in any of the obtained video footage)**. Martin was asked about the statement that he previously made in his video "walk through" that the suspect vehicle had been turned towards him at an angle. Martin explained that he felt that the truck could have possibly struck him because he (Martin) had advanced on the truck in the event that the driver may display a weapon to which Martin could then possibly grab the arm of the driver. Martin advised that he could not definitively say that the truck would have struck him, however, Martin was positive that he did not observe the driver in possession of a weapon **(it should be noted that the video footage clearly shows the truck driving away from Martin, however, Martin**

16

EXHIBIT 28

**advances on the truck and runs with it as Martin discharges his duty weapon at the driver and vehicle).** Martin was asked if he remembered where he was standing prior to the driver's left hand lowering from the steering wheel and if he observed anything in the driver's left hand. Martin explained that he was standing along side the driver side of the truck, behind the cab, and that prior to the movement of the left hand, he observed that the left hand was on the steering wheel and that he did not observe anything in the driver's left hand **(it should be noted that the video footage does not show the appearance of the driver's left hand ever being on the steering wheel, especially at the point where Martin states he is able to view the hands of the driver).** During Martin's retelling of his account of the incident, Martin stated that when Yzaguirre exited his vehicle, Yzaguirre informed him that the vehicle was not in park and that he (vehicle) was "going to run" **(it should be noted that in Yzaguirre's statement to Det. Bittner, Yzaguirre observed the suspect vehicle rolling backwards and informed Martin that the vehicle was not in park. However, Yzaguirre does not state that he informed Martin that the suspect vehicle was "going to run").** I later contacted Officer Yzaguirre via telephone and inquired if he had informed Martin during the traffic stop that the suspect vehicle was "going to run". Yzaguirre stated that he only informed Martin that the suspect vehicle was not in park and never stated to Martin that the suspect vehicle was "going to run".

At this point in the interview, Martin was shown all obtained video footage as it pertained to the traffic stop and subsequent shooting (Ofc. Yzaguirre's MVR for perpendicular view to driver side of the suspect vehicle, Ofc. Martin's MVR for the shooting engagement, and convenience store footage for engagement and suspect fleeing). I began by displaying to Martin, Officer Yzaguirre's MVR video footage depicting the constant observable appearance of the driver's left hand. I explained to Martin that based on Yzaguirre's MVR video footage, discrepancies were found in regards to Martin's justification as to why he unholstered his duty weapon and shot at the driver. Martin had no response. During the viewing of the convenience store video footage, Martin was asked what the justifications were for the second and third shots of his duty weapon at the suspect vehicle when no weapon was observed and the suspect vehicle was fleeing without further threat. After a long pause, Martin had no reasonable and articulable explanation other than he was still "curling around" during the engagement. Martin stated that he did stop shooting and holstered his duty weapon after he perceived the suspect vehicle to be fleeing. I questioned Martin in regards to his previous statement during his video "walk through" that the driver had turned his vehicle at an angle towards him thus the necessity to shoot at the driver a second and third time. Martin explained that it wasn't a head on attempt to run him over rather it was the vehicle fleeing and that the vehicle's turning may have struck him as he advanced on the vehicle **(In the video the suspect vehicle travels forward and does not turn at an angle towards Martin. The angle of departure is observed as the suspect vehicle turns slightly to the left to travel around a gas island and towards the parking lot exit).** I displayed to Martin his MVR video footage and his approach to the violator vehicle. Martin reiterated that based on where he was standing; he had given two (2) commands to the driver that the driver show his hands because he could not see the driver's hands. Martin then rephrased by stating that he was only able to see the right hand on the steering wheel and not the left hand **(it should be noted that in Martin's original explanation of where he was standing in order to view the interior of the cab, Martin stated that he was able to see that both hands were on the steering wheel prior to the left hand lowering and that nothing was observed in the left hand).** Martin

17

EXHIBIT 28

was asked by Sgt. Bruegger that if after viewing the video footage, was it Martin's contention that the driver's left hand had gone down. Martin answered, "yes". Sgt. Bruegger then pointed out to Martin that in his MVR video footage, Martin was observed moving forward with the vehicle and shooting. It was further pointed out that the truck didn't turn until after it moved forward away from Martin. Martin explained that he advanced on the vehicle to see if a weapon was observed and in case the driver might try to run him over. I explained to Martin the discrepancies in his statement in regards to the events that unfolded prior to his justification to unholster his duty weapon. I further explained to Martin the lack of the necessary time frame needed for all the actions to have occurred as presented by Martin for his justification for shooting (ie. hand dropping, turning of the driver's head, the fumbling of the left hand at the driver side compartment, the squaring off of the shoulders, the raising of the left arm and shoulder, and the two verbal commands). Martin responded by stating that, "it's my contention that that's how I perceived it at the time". Sgt. Bruegger then asked Martin again if after seeing the videos did it change his opinion. Martin responded, "that's how I perceived it at that moment". Sgt. Bruegger then asked if Martin had shot at the driver because he fled. Martin responded, "no". I then asked Martin, based on viewing the video, where in the video did he believe that he observed the left hand dropping from the steering wheel. Martin pondered for a brief period and stated that in his mind from what he could recall it was still his contention that he observed the hand dropping. When the question was asked again, Martin could not specify at what point during his approach and contact with the driver that he observed the left hand dropping other than stating that it occurred sometime after requesting the driver to put the vehicle into park **(it should be noted that in Martin's video "walk through", Martin stated that he was within five (5) feet of the vehicle when he observed the left hand dropping from the steering wheel)**. Sgt. Bruegger then asked Martin if he would agree that he was running along side the violator vehicle. Martin reiterated that he was trying to "suck up" to the vehicle in the event a weapon was displayed. I pointed out to Martin that he never made it to the back of the vehicle to "suck up" and that he instead ran with the vehicle while shooting at the fleeing vehicle. After questioning Martin further in regards to what the video footage depicted in relation to Martin's explanation of the driver's left hand dropping, Martin conceded that it appeared that something was present on the video but he was not "100%" that it was the driver's left hand. Sgt. Bruegger then asked Martin if it was possible that the driver's left hand did not go down. Martin stated, "yes there is something there"…"ya its possible that his hand didn't go down, but that's where I'm having the problem, that's my concern where I'm having my problem as well as you two, is I didn't perceive it at the time of the traffic stop"…"I remember it being darker than it appears on the video too". The interview was concluded by asking Martin if he had told the driver of the vehicle that he would shoot. Martin stated "no". During Martin's viewing of the video footage, Martin acknowledged that something was present on the video in regards to the drivers' left hand, however, Martin eluded that his inability to see the left hand on the video was possibly due to the driver's shirt collar, portions of the sleeves, and a front portion of the shirt itself being the color white **(it should be noted that in viewing the scene photos of Hernandez at Grand and Red Bluff, Hernandez is observed wearing an all black colored short sleeve collared shirt with a white undershirt that is slightly exposed at the ends of the sleeves and neck line)**.

At the conclusion of the interview, I provided Officer Martin with a questionnaire pertaining to this investigation. The following are the questions as presented to Officer Martin and his responses:

18

EXHIBIT 28

You conducted a traffic stop on victor Hernandez on July 22, 2011 in the 2600 block of Spencer:

1. You stated in your written affidavit and video "walk through" that during you contact with Hernandez; Hernandez had removed his left hand from the steering wheel and reached down towards the compartment on the driver side door. You stated that you were close enough to Hernandez to hear Hernandez's hand "fumbling" inside the compartment of the driver side door despite giving Hernandez two (2) verbal commands to Hernandez that he display his hands. You further stated that Hernandez had begun to raise his left arm and shoulder thus causing you to believe that he was in possession of unknown weapons. As a result, you stated that you feared that your life might be in danger, as well as your "backup" officer, thus resulting in your need to draw your duty weapon and fire it at Hernandez. After reviewing the video footage available in this investigation, it appears that the video footage is not consistent with the information as provided by your in regards to the left hand leaving from the steering wheel and reaching into the driver side door compartment. Explain these discrepancies.

**ANSWER:   After reviewing the video made available to me for the first time since the shooting Incident of July 22, 2011, the video appears to be of poor quality and gives an illusion inconsistent of my perception of the events that occurred. I stand by statement that I believed I was in immediate danger and believed I had no choice but to discharge my weapon.**

2. You stated in your written affidavit and video "walk through" that you shot Hernandez three (3) times. You elaborated in your video "walk through" that the second and third gunshots at Hernandez were in response to Hernandez turning his steering wheel and causing Hernandez's vehicle to travel towards you at an angle as he fled from the location. You further elaborated during your "walk through" that you feared that as Hernandez created a greater angle to you that he may display a weapon thus a greater need to shoot at Hernandez a second and third time. You stated via police radio during your pursuit of Hernandez that Hernandez had tried to run you over. After reviewing the video footage available in this investigation, it appears that the video footage is not consistent with the information as provided by you in regards to Hernandez driving his vehicle at an angle towards you or the police radio traffic that Hernandez tried to run you over. Explain these discrepancies.

**ANSWER:   When I stated that the suspect tried to run over me, I never meant that I was directly in front of the suspect's vehicle. When the suspect fled from the scene, the suspect turned his vehicle at an angle that I believed the cab and/or rear of his vehicle was attempting to strike me. The entire incident occurred within seconds. After reviewing the video, I now believe that the suspect was not attempting to strike me with his vehicle but was angling his vehicle to escape from the parking lot.**

3. After you review of the video footage available in this investigation and subsequent questions pertaining to inconsistencies in the information you provided via written affidavit and video "walk through", do you want to change, add, or modify the information that you originally provided?

19

EXHIBIT 28

**ANSWER:     When this incident occurred, I was placed in a position that no police officer wants to be in. I was forced to make a split second evaluation and decision of what was occurring and act accordingly. As I have stated, the cab of the suspect's truck was not lighted and I perceived Hernandez's intentions and actions as I have stated in my prior original statements.**

After reviewing the answers as provided by Officer Martin, I found that Martin references the lighting conditions of the interior of the cab as a possible contributing factor in his decision to shoot Victor Hernandez; however, the issue of poor lighting was not mentioned as a factor in Martin's video "walk through", written affidavit, or follow up interview.

On October 25, 2011, I received Victor Hernandez's cell phone number and later provided said number to Bill Jordan of the Harris County District Attorney's Police Integrity Division for cell the obtaining of Hernandez's cell phone records.

The following provisions of the Texas Penal Code and Pasadena Police Department's Rules and Regulations Manual may or may not apply:

**Texas Penal Code**

**Section 9.32 Necessity**. Conduct is justified if:
  (1) The actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
  (2) The desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
  (3) A legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

**Section 9.31 Self-Defense**
  (a) Except as provided in Subsection (b) a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force...

**Section 9.32 Deadly Force in Defense of Person**
  (a) A person is justified in using deadly force against another:
      (1) if he would be justified in using force against the other under section 9.31
      (2) if a reasonable person in the actor's situation would not have retreated; and
      (3) when and to the degree he reasonably believes the deadly force is immediately necessary:
              (A) to protect himself against the other's use of attempted use of unlawful deadly force;...

**Section 9.33 Defense of third person**. A person is justified in using force or deadly force against

20

EXHIBIT 28

another to protect a third person if:

(1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

(2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

**Rules Manual**

**2.1 Abide by Laws**

Members of the Department will abide by the laws of the United States and the State of Texas, the ordinances of the City of Pasadena, and the Directives, Standard Operating Procedures, Rules, and Regulations and Policies of the City of Pasadena Police Department. This will include all personnel on or off duty.

**2.82 Necessary Force in Making Arrests**

Members making a lawful arrest will not use more force than necessary in making the arrest or in dealing with a prisoner or any person, and will not subject such prisoner to more restraint than is necessary for his arrest and detention or for the safety and protection of anyone else. The use of force is governed by departmental policy.

**10.2 Use of Force: Policy**

It is the policy of the Pasadena Police Department that officers use only the force that is reasonably necessary to bring an incident under control, while protecting the life of the officer and others. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances.

**10.3 Definitions**

3) Objectively Reasonable: In determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of known circumstances, including but not limited to the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community.

**10.4 Use of Force: Procedures**

2) Use of Deadly Force

Officers are authorized to use deadly force when it is necessary to protect the officer or others form what is reasonably believed to be an imminent threat of death or serious bodily harm.

3) Deadly Force Restrictions

b) Officers will not discharge a firearm at a moving vehicle unless a person in the vehicle is threatening the officer or another person with deadly force. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. An officer threatened by an oncoming vehicle shall first attempt to move out of its

21

EXHIBIT 28

path. If conditions make evasive maneuvers a practical impossibility than an officer may discharge a firearm in an effort to protect the officer or others from an imminent threat of death or serious bodily injury.

**Physical Evidence**

- CDroms (3) containing scene photos.
- CDrom containing video surveillance from 2626 Spencer.
- CDrom containing Officer R. Yzaguirre's MVR footage.
- CDrom containing Officer M. Martin's MVR footage.
- CDrom containing hospital photos of Victor Hernandez.
- CDrom containing the interview with Victor Hernandez.
- CDrom containing the interview with Officer R. Yzaguirre.
- CDrom containing the walk-through video for Officer M. Martin.
- CDrom containing MDC messages.
- CDrom containing Officer Martin's follow up interview.
- CDrom containing Victor Hernandez's medical records.
- CDrom containing Channel 1 radio traffic.

22

EXHIBIT 28

## SUMMATION

On July 22, 2011, Officer M. Martin conducted a traffic stop in the parking lot of the Maisah Food Mart and Texaco Gas Station located at 2626 Spencer. During the course of the traffic stop, Officer Martin drew his weapon and fired three shots at the driver of the vehicle. The suspect fled the scene and was pursued by responding officers. After a brief pursuit by responding officers, Hernandez was taken into custody at the intersection of Grand and Red Bluff where it was discovered that Hernandez was the sole occupant of the vehicle and that Hernandez had been shot a total of one (1) time.

Officer Martin indicated in his interviews that he had given Hernandez multiple verbal commands in English (walk through 4 commands, inter-office correspondence 5 commands) for Hernandez to put his vehicle in park and to display his hands. Martin advised that he did not observe Hernandez in possession of a weapon during his contact with him, however, Hernandez failed to display his hands as requested and made furtive movements resulting in Martin to fear for his and Officer Yzaquirre's safety. As a result, Martin discharged his duty weapon at Hernandez three (3) times.

A review of Officer Martin's MVR recording at the time of Hernandez's traffic stop indicated that Martin motioned with his right arm for Hernandez to put his vehicle into park (time stamp 1:46:40). This motion is consistent with one who would have given a verbal command for the action desired (as stated by Martin in his written affidavit and video "walk through"). A second verbal command is given to Hernandez as Hernandez's vehicle begins to move forward, however, the command is inaudible as it is covered by Martin's interior AM/FM radio (time stamp 1:46:43). It should be noted that Martin stated that he had given multiple verbal commands to Hernandez, four (4) as described in the video recorded "walk-through" and five (5) as stated in his written inter-office correspondence. Further review of the recordings revealed that Hernandez backed his vehicle once in a slow rolling motion towards Martin's patrol unit. Martin stated in his video "walk-through" and written affidavit that Hernandez backed his vehicle twice (2) towards Martin's patrol unit in an unsafe and aggressive manner. It was further observed that during Martin's contact with Hernandez, it appeared on the video that Hernandez's right hand remained on the steering wheel and that his left hand was off set to the left side of his face. This observation is constant during the traffic stop and upon Hernandez's fleeing from the traffic stop location. Martin stated in his "walk-through" and written affidavit that Hernandez had lowered his left hand from the steering wheel to the driver side inner door compartment and then began to raise his left shoulder as if raising a weapon. This action by Hernandez, as described by Martin, was the cause for Martin to fear for his and Officer Yzaguirre's safety and the subsequent discharge of Martin's duty weapon. None of the video evidence supports this account. Martin is observed in all of the videos running along side Hernandez's vehicle as Hernandez fled from the traffic stop location while being fired upon by Martin.

A scale diagram of the convenience store parking lot in conjunction with MVR video footage of Hernandez's traffic stop aided in determining that Martin discharged his duty weapon three (3) times at Hernandez's fleeing vehicle at approximate distances of 3 feet, 23 feet, and 35 feet.

An attempt was made at enhancing the MVR video footage from Officer Yzaguirre's patrol unit via

23

EXHIBIT 28

the Greater Houston Regional Computer Forensics Laboratory; however, due to a lack of detail in the video an enhancement of subject Hernandez during the traffic stop was not obtainable.

Victor Hernandez indicated in his interview that he did not recall Officer Martin giving him verbal commands during the traffic stop other than hearing Martin informing him that he would shoot. Hernandez stated that he did place his truck into neutral during the initial stop and then attempted to place the truck into park prior to being shot. Hernandez explained that he did not recall ever lowering his left hand from the steering wheel towards the inner portion of the door and that he did not accelerate from the location until after Martin had pointed his gun at him. Hernandez advised that he did not verbalize anything to Martin nor did he remember the distance between he and Martin when he was shot.

A follow up interview was conducted with Officer Martin in regards to three key issues. These issues consisted of Martin's observation of Victor Hernandez's left hand dropping from the steering wheel to the driver side inner door compartment, Martin's belief that Victor Hernandez had driven his vehicle at an angle towards him, and if Martin's account of the shooting changed after viewing the video footage. These issues were also provided to Martin in questionnaire form.

Martin's responses to the issue of Victor's left hand dropping from the steering wheel were consistent with his stated belief of "perspective" at the time of the incident, however, during the interview Martin stated that it was possible that the left hand didn't drop from the steering wheel but he was not absolutely certain. In his response to the questionnaire of the same issue, Martin stated that the video viewed was of "poor quality" and gave "an illusion inconsistent of his perception of the events that occurred". In regards to the issue of Victor turning his vehicle at an angle towards Martin, Martin conceded in both the interview and questionnaire that Victor was not attempting to strike him with the vehicle but was angling the vehicle to escape. In regards to whether Martin's opinion had changed after viewing the obtained video footage, Martin stated that his "perspective" of the events that had occurred had not changed; however, in the questionnaire Martin contributes the lighting conditions of the truck's cab as a possible contributing factor for his "perception" and subsequent actions. This issue of the trucks interior lighting was not referenced in Martin's video "walk through" or written affidavit which were obtained shortly after the event.


*CXMacGregor*


**Det. C.A. MacGregor 4150**
**Internal Affairs Division**

24

Pasadena 2652

**EXHIBIT 28**

**11-17770**   Supplement No
**ORIG**

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

Reported Date
**07/22/2011**
Nature of Call
**SHOOTING**
Officer
**STUBBS, JAMES**

PHONE: (713) 477-1221

FAX: (713) 477-4976

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| Pasadena Police Department | 11-17770 | ORIG | 07/22/2011 | 02:27 | 110722057 |

| Status | Nature of Call |
|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | Shooting |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 2626 SPENCER HWY | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 |

| Officer | Assignment | 2nd Officer | Assignment | Entered by |
|---|---|---|---|---|
| 6264/STUBBS, JAMES | PATROL | MARTIN, MICHAEL | PATROL | 7048 |

| Assignment | Confidential | RMS Transfer | Prop Trans Stat |
|---|---|---|---|
| PATROL | City Employee Investigation | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 2155 | 07/22/2011 | 10:24:45 |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| SUS | 1 | I | HERNANDEZ, VICTOR | 291882 | W | M | |
| VIC | 1 | L | MARTIN, MICHAEL | 169413 | W | M | |
| WIT | 1 | L | YZAGUIRRE, ROBERTO | 153898 | W | M | DOB |

## Vehicle Summary

| Invl | Type | | Lic Year | Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|---|
| SUS | 2 | | 2011 | 1999 | CHEV | C15 | PK | BLU |

## Summary Narrative

**Synopsis:** Officer M. Martin, a Pasadena Police Officer, was involved in a shooting at 2626 Spencer.

EXHIBIT 28

**11-17770**

Supplement No
ORIG

## Pasadena Police Department

### SUSPECT 1: HERNANDEZ,VICTOR

| Involvement | Invl No | Type | Name | | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|---|
| SUSPECT | 1 | Individual | HERNANDEZ,VICTOR | | | | 291882 | WHITE | MALE |

| DOB | | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | Skin | PRN |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 20 | Hispanic | No | 5'09" | 164# | BLACK | BROWN | MEDIUM | 500337 |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | | | | |

| ZIP Code | | |
|---|---|---|

| Type | ID No |
|---|---|
| OPERATOR LICENSE or ID CARD | |

| Phone Type |
|---|
| HOME |

### VICTIM (PERSON) 1: MARTIN,MICHAEL

| Involvement | | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|---|
| VICTIM (PERSON) | | 1 | Police Officer | MARTIN,MICHAEL | | 169413 |

| Race | Sex | Means of Attack | Extent of Injury | Dom Violence | PRN |
|---|---|---|---|---|---|
| WHITE | MALE | OTHER DEADLY WEAPON | NO VISIBLE INJURY | NO | 500338 |

| Type |
|---|
| OPERATOR LICENSE or ID CARD |

### WITNESS 1: YZAGUIRRE,ROBERTO

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| WITNESS | 1 | Police Officer | YZAGUIRRE,ROBERTO | | 153898 | WHITE |

| Sex | PRN |
|---|---|
| MALE | 500339 |

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE or ID CARD | PPD EMP# 7048 | TEXAS |

### Vehicle: AE50103

| Involvement | Type | Vehicle License# | State | Lic Year | Lic Type | Year | Make | Model |
|---|---|---|---|---|---|---|---|---|
| SUSPECT | TRUCK/VAN/SUV | | TEXAS | 2011 | TRUCK | 1999 | Chevrolet | C/K 1500 |

| Style | Color | VIN | # Occupants |
|---|---|---|---|
| PICKUP - TRUCK | BLUE | | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| DRV | SUS | 1 | HERNANDEZ,VICTOR | W | M | |
| VIC | VIC | 1 | MARTIN,MICHAEL | W | M | |
| WIT | WIT | 1 | YZAGUIRRE,ROBERTO | W | M | |

### Modus Operandi

| Physical Evidence | Entry Location | Weapon Used | Premise Type |
|---|---|---|---|
| VIDEO/SHELL CASINGS | SIDE | VEHICLE | SERVICE STATION, GAS VENDOR |

| Crime Code(s) |
|---|
| ASSAULTS |

### Narrative

**Scene Summary:**

The 2200 block of Spencer is the site of a public roadway located within the city limits of Pasadena, Harris County, Texas.

The roadway is designed to carry vehicular traffic in both an eastbound and westbound direction.

2626 Spencer is the site of the Texaco Food Mart / gas station that is located in the south side of the roadway and at the southeast corner of the intersection of Westside and Spencer. The business faces a north direction.

Access onto the business can be made by either the 3100 block of Westside or the 2600 block of Spencer via their respective private drives.

Located on the far south side of the property is the food mart to which the entrance faces north.

North of the food mart is a concrete parking lot, which encompasses the entire property.

Located in the central area of the property, and north of the food mart, are the covered gas islands that are positioned from east to west.

| Report Officer | Printed At | |
|---|---|---|
| 6264/STUBBS,JAMES | 10/13/2011 14:04 | Page 2 of 4 |

EXHIBIT 28

11-17770

## Pasadena Police Department

### Narrative

The islands are comprised with four sets of gas pumps, numbered one through eight, #1 starting at the far west and #8 ending at the far east.

Three shell casings were later found in and area south of and in between gas pumps #7 and #8.

Dim artificial lighting, stemming from the food mart, was provided with regard to the scene.

### Details:

While on patrol and while conducting a traffic initiative, I was traveling westbound in the 2700 block of Spencer.

I later observed a police unit conducting a traffic stop in the westbound lane of the 2400 block of Spencer.

I activated my patrol emergency lighting equipment and stopped with Sgt. White while he conducted the traffic stop.

A short time elapsed when I observed another marked patrol unit traveling eastbound from around the 2200 block of Spencer attempting to make a traffic stop on a blue Chevy Pickup.

The pickup appeared to be traveling at a high rate of speed and did not seem to be making any sort of attempt to pull over for the police unit.

I then left Sgt. White's traffic stop and proceeded westbound on Spencer for the purposes of making the back-up for the officer attempting to make the traffic stop, Officer Martin.

The blue Chevy pickup proceeded to turn southbound on Westside and entered the private drive of the Texaco Food Mart located at 2626 Spencer with Officer Martin behind.

I entered the area via the Spencer entrance and maneuvered my unit in between gas pump #6 and #7, which placed my patrol unit perpendicular to the suspect vehicle and Officer Martin's vehicle.

Officer Martin, who had already exited his vehicle, began walking towards the suspect vehicle.

I observed that the driver apparently had not placed the vehicle in park as it began to roll back slowly towards Officer Martin.

As I exited my vehicle, I advised Officer Martin that the vehicle was not in a parked position at which point, Officer Martin began instructing the driver to place the vehicle in park.

While continuing his approach in contacting the driver of the vehicle, Officer Martin continued giving commands to the driver.

The driver, not compliant with Officer Martin's instructions, appeared to be in a disoriented state and displayed signs of an antsy and nervous demeanor.

As Officer Martin approached the cab portion of the vehicle, the vehicle made a sudden forward movement.

Officer Martin immediately went to the driver side window and from my vantage point appeared to have reached into the vehicle in an effort to stop the suspects actions.

The suspect immediately accelerated the vehicle and at that moment, it was my belief that the driver was fleeing the scene, instigating a vehicle pursuit.

As I turned away to re-enter my vehicle, I heard three gunshots which led me to believe that the suspect had discharged a weapon at Officer Martin.

Officer Martin ran back to his vehicle and the suspect exited the parking lot via the Spencer side proceeding eastbound on Spencer at a high rate of speed.

... y the time I entered Spencer and traveled eastbound, Officer Stubbs had initiated the pursuit which continued eastbound on Spencer a significant distance away from my location.

EXHIBIT 28

**11-17770**     Supplement No
ORIG

# Pasadena Police Department

**Narrative**

shadowed the pursuit based upon the radio transmissions relating to the direction of travel.

The pursuit continued through various neighborhoods ultimatley terminating at the intersection Grand and Red Bluff.

Once the suspect was apprehended, I returned to the 2626 Spencer and secured the location along with the assistance of Officer Galvan.

I located three shell casings just south of gas pump #6 and #7. The shell casings were marked by business cards depicting there location pending Identification Divisions arrival.

The crime scene log was maintained by myself, Officer Galvan and Officer Salazar during the investigation.

I later relinquished MVR 4451 to Detective Young at his request.

See additional supplements surrounding this case.

END OF REPORT

R.S. YZAGUIRRE #7048

| Report Officer | Printed At | |
|---|---|---|
| 6264/STUBBS, JAMES | 10/13/2011 14:04 | Page 4 of 4 |

EXHIBIT 28

**11-17770**    Supplement No. 0001

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
07/22/2011
Nature of Call
SHOOTING
Officer
JONES, CHRISTOPHER

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | 11-17770 | 0001 | 07/22/2011 | | 02:27 | 110722057 |
| Status | | | Nature of Call | | | | |
| REFER FOR FOLLOW-UP INVESTIGATION | | | Shooting | | | | |
| Location | | | | City | | ZIP Code | Rep Dist |
| 2626 SPENCER HWY | | | | PASADENA | | 77504 | 611F |
| Area | Beat | From Date | From Time | To Date | | To Time | |
| W | 05 | 07/22/2011 | 02:00 | 07/22/2011 | | 06:00 | |
| Officer | | | | Assignment | 2nd Officer | Assignment | Entered by |
| 3625/JONES, CHRISTOPHER | | | | PATROL | MARTIN, MICHAEL | PATROL | 3625 |
| Assignment | Confidential | | | RMS Transfer | Prop Trans Stat | | |
| PATROL | City Employee Investigation | | | Successful | Successful | | |
| Approving Officer | | Approval Date | | Approval Time | | | |
| 7022 | | 07/23/2011 | | 09:47:02 | | | |

## Summary Narrative

Supplemental Report.

## Property

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | 11-17770 | 11-17770 | 0001 | EVIDENCE |
| Incl Date | In Custody? | Security | Tag No | Item No | # Pieces | |
| 07/22/2011 | Yes | No | 110017770 | 1 | 1 | |
| Description | | | | | | Typ |
| PHOTO CD | | | | | | A |
| Cat | | | | Article | | |
| EVIDENCE (TO BE PROCESSED) | | | | PHOTOGRAPHIC EVIDENCE (PHOTOS /LINEUPS) | | |
| Entered Date | Entered Time | RMS Transfer | | Owner | | |
| 07/22/2011 | 06:39 | Successful | | 4613 0819110813 | | |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

Details: On 07/22/11 at approximately 0225 hours, I was conducting vehicle patrol in the area of Vista and Burke. I heard Officer Stubbs advise by radio that he was trying to catch up to a vehicle that had possibly shot at officers on a traffic stop. Officer Stubbs advised the vehicle was traveling eastbound on Spencer from Westside. I travelled eastbound on Vista to Shaver and then northbound to Spencer. I continued to monitor the radio traffic until officers advised the vehicle went through a field onto Dabney. I turned onto Bayshore Blvd and then north onto Dabney as Officer Palmer advised he was now in pursuit of the vehicle.

I continued to monitor and attempted to catch up to the pursuit as the vehicle continued north on Burke toward Southmore. I shadowed the pursuit as the vehicle had wrecked and appeared to be slowing down. The vehicle turned onto Grand from Burke and came to a stop at the intersection of Grand and Red Bluff.

I approached the vehicle with several officers and ordered the suspect to exit the vehicle. The suspect complied and exited the vehicle and layed on the ground. The suspect appeared to have a gun shot wound in the left cheek area and blood was throughout the cab of the truck. I covered the suspect until officers could check him for weapons and secure him. I then retrieved my camera and took several photos of the suspect, suspect vehicle, and surrounding area. I later transferred the photos to CD and submitted them as evidence. At approximately 0600 hours, I responded to the detective unit and gave a video taped statement of the incident. See supplemental reports for further.

| Report Officer | Printed At | |
|---|---|---|
| 3625/JONES, CHRISTOPHER | 10/13/2011 14:04 | Page 1 of 2 |

**EXHIBIT 28**

**11-17770**   Supplement No
0001

# Pasadena Police Department

**Narrative**

No further action taken.

C Jones, 3625

EXHIBIT 28

**11-17770**    Supplement No 0002

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
07/22/2011
Nature of Call
SHOOTING
Officer
SWEET, CHRISTOPHER

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | 11-17770 | | 0002 | 07/22/2011 | | 07:41 | 110722057 |

| Status | | | | | Nature of Call | | | | |
|---|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | | Shooting | | | | |

| Location | | | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | | PASADENA | | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 |

| Officer | | Assignment | 2nd Officer | | Assignment | Entered by |
|---|---|---|---|---|---|---|
| 6340/SWEET, CHRISTOPHER | | PATROL | MARTIN, MICHAEL | | PATROL | 6340 |

| Assignment | Confidential | | RMS Transfer | Prop Trans Stat |
|---|---|---|---|---|
| PATROL | City Employee Investigation | | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 3451 | 07/22/2011 | 12:42:29 |

## Summary Narrative

***Supplement Report***

## SUSPECT 1: HERNANDEZ, VICTOR ANTONIO

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| SUSPECT | 1 | Individual | HERNANDEZ, VICTOR ANTONIO | | 291881 | WHITE | MALE |

| DOB | Age | Juvenile? | PRN |
|---|---|---|---|
| | 20 | No | 500487 |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | | | | |

| ZIP Code | | Date |
|---|---|---|
| | 07/22/2011 | |

| Phone Type | Phone No | Date |
|---|---|---|
| HOME | | 07/22/2011 |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

***Supplement Report***

On Friday 07-22-11 at approximately 0258 hours I escorted ambulance transporting the suspect identified as Hernandez, Victor to Memorial Herman Hospital. Upon arrival Victor was treated by hospital staff of the Trauma Unit. Victors clothing and personal belongings were collected as evidence. Victor remained in care of hospital staff under my supervision until relived by Day Shift Officer. Upon relief I transported Victor's clothing and personal belongings to the Pasadena Police Department. Upon arrival to the police department I turned over custody of Victor's clothing and personal belongings to the Pasadena Police Department's I.D. Division, Officer Ginther. See Officer Ginther's supplement for further detail.

No further action was taken by this Officer.

C.T. Sweet #6340

| Report Officer | Printed At | |
|---|---|---|
| 6340/SWEET, CHRISTOPHER | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

**11-17770**          Supplement No
0003

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

Reported Date
07/22/2011
Nature of Call
SHOOTING
Officer
SALAZAR, JUAN

PHONE: (713) 477-1221

FAX: (713) 477-4976

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| Pasadena Police Department | 11-17770 | 0003 | 07/22/2011 | 08:03 | 110722057 |

| Status | Nature of Call |
|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | Shooting |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 2626 SPENCER HWY | | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 |

| Officer | | Assignment | 2nd Officer | Assignment | Entered by |
|---|---|---|---|---|---|
| 5779/SALAZAR, JUAN | | PATROL | MARTIN, MICHAEL | PATROL | 5779 |

| Assignment | Confidential | RMS Transfer | Prop Trans Stat |
|---|---|---|---|
| PATROL | City Employee Investigation | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 3451 | 07/22/2011 | 12:42:46 |

## Summary Narrative

Supplement to Case # 11-17770

## Property

| Item | Agency | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|
| 1 | Pasadena Police Department | 11-17770 | 11-17770 | 0003 | EVIDENCE |

| Invt Date | In Custody? | Security | Tag No | Item No | # Places |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 2 | 1 |

| Description | Typ | Cat |
|---|---|---|
| crime scene sign-in sheet | A | MISCELLANEOUS |

| Article | Brand | Model | Entered Date | Entered Time | RMS Transfer |
|---|---|---|---|---|---|
| UNLISTED MISCELLANEOUS | CRIME | SIGN-IN | 07/22/2011 | 08:03 | Successful |

| Control |
|---|
| 4613   0819110814 |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

Details: I arrived on scene and took custody of the Crime Scene log from Officer Yzaguirre at approximately 0619hrs. I would later log and tag the Crime Scene Log into the BEAST.

No further action taken by this Officer.
J.Salazar #5779

| Report Officer | Printed At | |
|---|---|---|
| 5779/SALAZAR, JUAN | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

**11-17770**    Supplement No **0004**

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713)477-1221

FAX: (713)477-4976

Reported Date
**07/22/2011**
Nature of Call
**SHOOTING**
Officer
**BUCKERT,DOUGLAS**

## Administrative Information

| Agency | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | 11-17770 | | 0004 | 07/22/2011 | | 21:37 | 110722057 |

| Status | | | Nature of Call | |
|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | Shooting | |

| Location | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|
| BURKE RD/RED BLUFF RD | | | | PASADENA | | 77506 | 234B |

| Area | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| N | 02 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 |

| Officer | | | Assignment | 2nd Officer | | Assignment | Entered by |
|---|---|---|---|---|---|---|---|
| 0745/BUCKERT,DOUGLAS | | | PATROL | MARTIN,MICHAEL | | PATROL | 0745 |

| Assignment | Confidential | | RMS Transfer | Prop Trans Stat | |
|---|---|---|---|---|---|
| PATROL | City Employee Investigation | | Successful | Successful | |

| Approving Officer | Approval Date | Approval Time | |
|---|---|---|---|
| 3451 | 07/22/2011 | 21:43:31 | |

## Summary Narrative

supplement

## Modus Operandi

| Crime Code(s) |
|---|
| ASSAULTS |

## Narrative

Details - I arrived at the intersection of Red Bluff Rd. and Burke Rd and assisted other Officers in securing the scene.  I then started and maintained the crime scene log for the duration of the investigation at the scene.  The crime scene log was later scanned in by records.

No further action by this Officer.

D. Buckert #0745

| Report Officer | Printed At | |
|---|---|---|
| 0745/BUCKERT,DOUGLAS | 10/13/2011 14:04 | Page 1 of 1 |

**EXHIBIT 28**

**11-17770**    Supplement No 0005

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713)477-1221

FAX: (713)477-4976

Reported Date
**07/23/2011**
Nature of Call
**SHOOTING**
Officer
**STUBBS,JAMES**

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| Pasadena Police Department | | 11-17770 | 0005 | 07/23/2011 | 04:22 | 110722057 |

| Status | Nature of Call |
|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | Shooting |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 2626 SPENCER HWY | | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 |

| Officer | | Assignment | 2nd Officer | | Assignment | Entered by |
|---|---|---|---|---|---|---|
| 6264/STUBBS,JAMES | | PATROL | MARTIN,MICHAEL | | PATROL | 6264 |

| Assignment | Confidential | RMS Transfer | Prop Trans Stat |
|---|---|---|---|
| PATROL | City Employee Investigation | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 6780 | 07/23/2011 | 05:04:55 |

## Summary Narrative

Supplement.

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

Scene Summary:  2600 Spencer is a two way roadway with seven lanes.  There are three lanes which travel east and three lanes which travel west.  There is also a center turning lane.  The roadway is located within the city limits of the City of Pasadena, Harris County Texas.

The weather was warm and humid with minimal lighting provided by artificial means.

Details:  While on patrol in the 2600 block of Spencer I observed a traffic stop with two police units.  I began to pull into the parking lot where the stop was being conducted and while doing so heard approximately two gun shots. While hearing the gunshots the vehicle that was stopped fled the scene at a high rate of speed traveling east on Spencer.  I then initiated my emergency lights and siren and pursued the vehicle.

The vehicle, a dark blue Chevrolet, was attempting to turn north from Spencer on several roadways however was able to do so at Watters.  I continued to pursue the suspect until Watters came to a dead end.  It was at that time the suspect traveled west through a large field with what appeared to be small ditch like trenches.  Knowing my police vehicle would be unable to safely traverse the terrain of the field I terminated my pursuit.  I was able to give the direction and roadway that the suspect continued evading on and later arrived at the location where the suspect vehicle stopped.

No further police action by this officer.

Stubbs, J. #6264

| Report Officer | Printed At | |
|---|---|---|
| 6264/STUBBS,JAMES | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

**11-17770**  Supplement No
**DRAFT**  0017

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
09/30/2011
Nature of Call
SHOOTING
Officer
YOUNG, MICHAEL

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| Pasadena Police Department | | 11-17770 | 0017 | 09/30/2011 | 10:02 | 110722057 |
| Status | | | Nature of Call | | | |
| REFER FOR FOLLOW-UP INVESTIGATION | | | Shooting | | | |
| Location | | | | City | ZIP Code | Rep. Dist |
| 2626 SPENCER HWY | | | | PASADENA | 77504 | 611F |
| Area | Beat | From Date | From Time | To Date | To Time | |
| N | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 | |
| Officer | | | | Assignment | 2nd Officer | Assignment |
| 7038/YOUNG, MICHAEL | | | | DETECTIVE | MARTIN, MICHAEL | PATROL |
| Entered by | Assignment | Confidential | | Prop Trans.Stat | Approving Officer | |
| 7038 | DETECTIVE | City Employes Investigation | | Pending | 1415 | |
| Approval Date | | Approval Time | | | | |
| 09/30/2011 | | 10:23:22 | | | | |

## Summary Narrative

Detective Supplement

## Property

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | | |
| 07/22/2011 | Yes | No | 110017770 | 20 | | |
| Description | | | | | Typ | Cat |
| written affidavit from officer martin | | | | | A | MISCELLANEOUS |
| Article | | Entered Date | Entered Time | Control | | |
| UNLISTED MISCELLANEOUS | | 09/30/2011 | 10:02 | 7038 | 0930111003 | |
| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
| 2 | Pasadena Police Department | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | | |
| 07/22/2011 | Yes | No | 110017770 | 21 | | |
| Description | | | | | Typ | Cat |
| spent 12 gauge casing | | | | | A | MISCELLANEOUS |
| Article | | Entered Date | Entered Time | Control | | |
| UNLISTED MISCELLANEOUS | | 09/30/2011 | 10:03 | 7038 | 0930111004 | |
| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
| 3 | Pasadena Police Department | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | | |
| 07/22/2011 | Yes | No | 110017770 | 23 | | |
| Description | | | | | Typ | Cat |
| mvr from officer galvan's vehicle | | | | | A | MISCELLANEOUS |
| Article | | Entered Date | Entered Time | Control | | |
| DVD'S / CD'S/ TAPES/ ETC | | 09/30/2011 | 10:04 | 7038 | 0930111005 | |
| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
| 4 | Pasadena Police Department | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | | |
| 07/22/2011 | Yes | No | 110017770 | 24 | | |
| Description | | | | | Typ | Cat |
| mvr from officer yzaguirre's car | | | | | A | MISCELLANEOUS |
| Article | | Entered Date | Entered Time | Control | | |
| DVD'S / CD'S/ TAPES/ ETC | | 09/30/2011 | 10:06 | 7038 | 0930111007 | |

EXHIBIT 28

**11-17770**

**DRAFT**

Supplement No. 0017

# Pasadena Police Department

| Item Agency | | | | Report No | Original Warrant No | Original supplement # | Involvement |
|---|---|---|---|---|---|---|---|
| 5 Pasadena Police Department | | | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Ind Date | In Custody? | Security | Tag No | Item No | | | |
| 07/22/2011 | Yes | No | 110017770 | 25 | | | |

| Description | | | | | | Typ Cat | |
| dvd from sgt norman's vehicle | | | | | | A MISCELLANEOUS | |

| Article | | Entered Date | Entered Time | Comm | | | |
| DVD'S / CD'S/ TAPES/ ETC | | 09/30/2011 | 10:07 | 7038 | 0930111007 | | |

| Item Agency | | | | Report No | Original Warrant | Original supplement # | Involvement |
|---|---|---|---|---|---|---|---|
| 6 Pasadena Police Department | | | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Ind Date | In Custody? | Security | Tag No | Item No | | | |
| 07/22/2011 | Yes | No | 110017770 | 26 | | | |

| Description | | | | | | Typ Cat | |
| dvd from sgt white's vehicle | | | | | | A MISCELLANEOUS | |

| Article | | Entered Date | Entered Time | Comm | | | |
| DVD'S / CD'S/ TAPES/ ETC | | 09/30/2011 | 10:07 | 7038 | 0930111008 | | |

| Item Agency | | | | Report No | Original Warrant | Original supplement # | Involvement |
|---|---|---|---|---|---|---|---|
| 7 Pasadena Police Department | | | | 11-17770 | 11-17770 | 0017 | EVIDENCE |
| Ind Date | In Custody? | Security | Tag No | Item No | | | |
| 07/22/2011 | Yes | No | 110017770 | 22 | | | |

| Description | | | | | | Typ Cat | |
| cd of channel 1 radio traffic | | | | | | A MISCELLANEOUS | |

| Article | | Entered Date | Entered Time | Comm | | | |
| DVD'S / CD'S/ TAPES/ ETC | | 09/30/2011 | 10:10 | 7038 | 0930111010 | | |

## Modus Operandi

Crime Code(s):
ASSAULTS

## Narrative

Details: On 07-22-2011 at approximately 02:34 am, I was contacted via the telephone in reference to an Officer involved shooting that occurred at Spencer and Westside. I was advised by a civilian dispatcher that the shooting occurred at Spencer and Westside, but the suspect vehicle that was involved was stopped at Burke and Red Bluff after a police chase. I was requested to check by the scene at Burke and Red Bluff with Sgt. Norman and Sgt. White.

### Initial Investigation @ Red Bluff and Grand

I arrived at the intersection of Red Bluff and Grand at approximately 03:16 am and contacted Sgt. Norman and Sgt. White. I obtained the following information from both Sergeants, who were on scene at the conclusion of the police pursuit. They stated Officer Martin had stopped a vehicle in the 2600 block of Spencer, near the intersection of Spencer and Westside. The driver of the vehicle, later identified as the suspect Victor Hernandez, was contacted and sometime during the traffic stop Officer Martin discharged his duty weapon three times. One round struck Hernandez apparently on the left cheek and traveled through the upper jaw and out the right cheek. Hernandez then fled the scene in his truck, with police vehicle pursuing behind him, with their lights and siren activated. They indicated Hernandez lost control of his vehicle in the area of Dabney and Grunewald, striking a tree on the center median of Dabney. The vehicle continued to travel north on Dabney and through the city streets. The vehicle came to a stop at the intersection of Burke (Grand) and Red Bluff, facing eastbound. Hernandez was removed from his vehicle at which time his injuries were observed to his face and medical assistance was requested. Hernandez was transported to Herman Hospital by ETMC Ambulance (Medic #2). Both sergeants indicated Officer Martin was currently seated in his marked patrol until, which was parked on the street behind Hernandez's vehicle and along with other marked police vehicle. Both sergeants indicated Officer Yzaguirre was at 2626 Spencer, which is the original location of the shooting, securing the parking lot and any physical evidence that may be at the scene. I was also informed that Officer Sweet was at Herman Hospital with the suspect Victor Hernandez. I requested that Officer Sweet be contacted and asked to retrieve Hernandez's clothing as evidence. See Officer Sweet's supplement for more details on the chain of custody of the clothing.

I was advised during the "felony stop" that took place at the intersection of Burke (Grand) and Red Bluff of an unintentional discharge of another weapon by Officer Stubbs who was carrying his Winchester Defender (Serial 'L1385074) at the time of the felony stop. He was observed walking to the back of Hernandez's truck after the scene was secured and Hernandez was taken into custody carrying the shotgun in his hands. Sometime when Stubbs reached the back of the truck, an unintentionally discharge occurred while his shotgun was pointed

| Report Officer | Printed At | |
|---|---|---|
| 7038/YOUNG, MICHAEL | 10/13/2011 14:04 | Page 2 of 13 |

EXHIBIT 28

**11-17770**　　　　Supplement No
**DRAFT**　　　　0017

# Pasadena Police Department

## Narrative

owards the ground. The shotgun discharged striking the concrete roadway with a 2 ¾ shotgun slug, sending concrete debris out from the ground. The unintentional discharge occurred at the back of Hernandez's truck and away from suspect Hernandez. Sgt. Norman indicated the shotgun was placed into the trunk of a patrol unit which was on scene.

### Scene Summary @ Red Bluff and Grand

Scene Summary: 2200 Red Bluff is the location of a four lane roadway, which travels north and south through the city of Pasadena, Texas. 800 Grand is a three lane roadway, which travels east and west with an eastbound turn lane to northbound Red Bluff. The intersection of Red Bluff, Grand and Burke is located within the city limits of Pasadena Harris County, Texas. Burke Street is located on the east side of Red Bluff and Grand is located on the west side of Red Bluff. I observed a 1999 Chevrolet extended cab 1500 pickup, (License Plate # parked on the roadway of Grand, at the intersection of Grand and Red Bluff. The vehicle was parked at the intersection facing eastbound, in the first position at the traffic light. I observed this vehicle to have heavy center front end damage to the bumper, hood, and grill area. The engine was leaking fluids onto the concrete roadway. I observed the drivers door open with blood seen throughout the interior of the cab of the truck. The air bag had been deployed and was observed covered in blood. There was blood on the driver's seat, driver's door, passenger seat, rear seat and on the interior of the rear window. I also observed a cell phone covered with blood, on the driver's seat of the truck. I observed a hole in the door frame of the passenger door. The hole was the diameter that is consistent with the diameter of a spent projectile (bullet). There was blood on the exterior of the truck that traveled from the exterior of the driver's door to the back bed area of the truck. Both side windows on the truck were rolled down and appeared to be intact.

I observed on the driver's side of the truck near the left rear quarter panel, what appeared to be a bullet hole. The hole was located below the gas tank fuel door. The bullet appeared to travel through the exterior wall of the quarter panel into the truck bed frame, cut the rear wall of the truck bed and strike the rear wall of the truck cab. The projectile did not penetrate the cab wall and appears to have falling off sometime between the shooting, car chase and the stopping of the vehicle at this final location. I did not observe any other bullet holes on the exterior of the vehicle. The vehicle was later photographed in its original position at Red Bluff and Grand, later towed to the Pasadena Police Department where it was placed into the ID vehicle processing storage area for controlled processing and documentation.

Located directly behind the truck on the concrete roadway is a void in the concrete. The void is located approximately 2 feet west of the rear bumper of the truck and 8 to 10 feet north of the south curb line of 800 Grand. The void in the concrete was caused when Officer Stubbs had an unintentional discharge of his Winchester Defender shotgun, with the slug striking the concrete and dispersing concrete debris to officers in the area. This projectile was not recovered at the scene.

The first police vehicle located behind the truck is police unit #0537, which was driven by Officer Palmer. This vehicle is a 2005 Ford four-door white in color     with official police decals on the vehicle, along with emergency lights and siren on the roof and front bumper.

The second police vehicle unit #1116 driven by Officer Stubbs was located southwest of police unit #0537. This vehicle is a 2010 Ford four-door white in color     with official police decals on the vehicle, along with emergency lights and siren on the roof and front bumper.

The third police vehicle unit #0540 driven by Officer Martin was located west of police unit #0537. This vehicle is a 2005 Ford four-door white in color     with official police decals on the vehicle, along with emergency lights and siren on the roof and front bumper.

The fourth police vehicle unit #1065 driven by Officer Jones was located north west of suspect's truck and police unit #0537. This vehicle is a 2011 Ford four-door white in color     with official police decals on the vehicle, along with emergency lights and siren on the roof and front bumper.

The fifth police vehicle unit #08110 driven by Officer Mubarak was located north west of suspect's truck and police unit #0537. This vehicle is a 2008 Ford four-door white in color     with official police decals on the vehicle, along with emergency lights and siren on the roof and front bumper.

| Report Officer | Printed At | |
|---|---|---|
| 7038/YOUNG,MICHAEL | 10/13/2011 14:04 | Page 3 of 13 |

EXHIBIT 28

**Pasadena Police Department**

**11-17770**

**DRAFT**

Supplement No
0017

### Narrative

The sixth police vehicle unit #08109 driven by Sgt. Norman was located south of suspect's truck on the parking lot of the convenience store (2204 Red Bluff) located in the southwest corner of Burke and Grand. This vehicle is a 2011 Ford four-door white in color ▮▮▮▮▮▮ with official police decals on the vehicle, along with emergency lights and siren on the roof and front bumper.

I spoke with Officer Ginther of the Pasadena Police Department Crime Scene Division and requested overall photographs of the scene. I also requested the scene be documented with a video camera. Officer Ginther also indicated he would complete a scale diagram of the scene at Red Bluff and Grand.

**Investigator Details 07-22-2011**

I concluded checking the scene for physical evidence and other related items to this investigation. I confirmed with ID Officer that Dawn LaPorte was responding to the scene in regards to the documentation and ballistic testing of Officer Martin's duty weapon. It was confirmed that she would be responding to the scene.

I spoke with Officer Stubbs who was still on scene and securing the perimeter with crime scene tape. I asked Stubbs if he was at the original traffic stop where the shooting had occurred. Officer Stubbs stated he was in the 2600 block of Spencer Highway, where he observed two police units conducting a traffic stop in the parking lot on 2626 Spencer. He stated he began to pull into the parking lot when he heard what sounded like two gun shots. He stated he observed the vehicle which had been stopped by the two police units exit the parking lot of the business at a high rate of speed, traveling east bound on Spencer Highway. Officer Stubbs stated he initiated his emergency equipment (lights & siren) and began pursuing the suspect vehicle. Officer Stubbs stated he pursued the suspect vehicle onto Watters street where the suspect drove through ditches and onto a field, where police vehicles were unable to travel. Officer Stubbs stated he was unable to continue the pursuit, but broadcasted the vehicle description, direction and roadway the vehicle was traveling. Officer Stubbs stated he arrived later at the intersection of Grand and Burke where the suspect vehicle was stopped and the suspect was arrested.

I spoke with Officer Palmer who was the lead vehicle in the pursuit from the area of Watters and Grunewald, where the suspect vehicle drove through the ditch and fields. Officer Palmer stated he picked up the pursuit in the area of Watters and Grunewald and pursued the suspect vehicle onto Dabney. Officer Palmer stated the suspect vehicle continued on Dabney after striking a tree or bush on the median of Dabney near Grunewald. Officer Palmer stated the pursuit continued through the city unit the driver stopped the truck at the intersection of Grand and Red Bluff. Officer Palmer stated he approached the suspect's vehicle from the passenger side, but was unable to open the passenger door. He stated he observed blood through out the cab of the truck and on the suspect's head and chest area. Officer Palmer stated he was not aware of what had taken place at the primary traffic stop where shots were fired.

I contacted Detective Gonzales with the Pasadena Police Department Persons Crime Division. I requested that he check all the police units that were involved in the police pursuit and the traffic stop and obtain their video from each vehicle. I asked him to document which vehicles video was removed from and the information provided on each video. I also asked him to check with the business at 2204 Red Bluff to see if the business has exterior cameras which might have recorded the stop and arrest at Red Bluff and Grand.

I contacted Detective Bittner with the Pasadena Police Department Person Crime Division. I requested that he respond to 2626 Spencer which is the location of the original scene of this officer involved shooting. I advised Detective Bittner that Officer Yzaguirre was at that location securing any physical evidence that might be at the scene. I also asked Detective Bittner to check the surrounding business for any exterior or interior surveillance cameras which might have recorded the traffic stop and shooting.

I spoke with Detective M. Bruegger wit the Pasadena Police Department Person Crime Division. I requested that he respond to the police station and obtain video statements from each officer involved in the original traffic stop, the shooting, the pursuit and the felony stop which concluded at the end of the pursuit.

I then contacted Officer Martin, who was with his TMPA Attorney Paul Aman. I spoke with Officer Martin and Aman regarding the shooting and the walk-through. I advised both subjects I would like to do two walk-throughs, one at Grand and Red Bluff and the second at 2626 Spencer where the shooting actually occurred. I explained I wanted to do a walk through at Grand and Red Bluff, which would explain what, took place during the pursuit and

| Report Officer | Printed At | |
|---|---|---|
| **7038/YOUNG,MICHAEL** | **10/13/2011 14:04** | **Page 4 of 13** |

**EXHIBIT 28**

11-17770

**Pasadena Police Department**                                     **DRAFT**

## Narrative

he arrest of the suspect Victor Hernandez. We would then return to 2626 Spencer and a second walk through of the actual shooting. Both Martin and Aman agreed to both walk-throughs.

On 07-22-2011 at 5 am, we began the walk through with Officer Martin at Grand and Red Bluff. The walk through was video recorded by Officer Simm and Officer Ginter, with the Pasadena Police Department Crime Scene Division. Present during the walk through was Detective Gonzales, MacGregor, Sgt. Crislip, Sgt. J. Bruegger ADA Clint Greenwood Chief of Police Integrity, and D.A. Investigator Bill Jordan of the Harris County District Attorney's Office. Officer Martin was accompanied by his TMPA Attorney, Paul Aman. The following is a brief summary of Officer Martin's walk through at Grand and Red Bluff.

Officer Martin stated he had stopped a vehicle in the area of Shaver and Westside for a traffic violation. During the traffic stop, he discharged his duty weapon at the driver and the only occupant of the vehicle. Officer Martin stated the driver fled the scene in his vehicle eastbound on Spencer, followed by Officer Stubbs. Officer Martin stated the vehicle finally stopped at the intersection of Grand and Red Bluff, where the driver was removed from the truck and taken into custody. Officer Martin stated that once the suspect was taken into custody, he returned to his police unit, where he waited for detectives and his TMPA Attorney.

We concluded the walk through at Grand and Red Bluff, with little attention paid to the details at 2626 Spencer until we could return to that location. The walk-through video was later tagged and logged into the property room as evidence. At the conclusion of the walk-through, Dawn LaPorte escorted Officer Martin to the Pasadena Police Department Crime Scene Vehicle, where she took custody of his duty weapon and documented the live rounds in the chamber and magazine. See her supplement for more details.

### Initial Investigation @ 2626 Spencer

At the conclusion of the investigation at Grand and Red Bluff, we proceeded to 2626 Spencer, which is the location of the original traffic stop and the shooting. Upon arriving at the scene, I contacted Detective Bittner and Officer Yzaguirre who were on scene. Detective Bittner indicated he was waiting on the owner of the business at 2626 Spencer Suite#100 to return so they could view the video surveillance for the parking lot.

I spoke with Officer Yzaguirre who had returned to 2626 Spencer at the conclusion of the pursuit to secure any possible physical evidence. I asked Officer Yzaguirre if he observed the shooting or the traffic stop that took place with Officer Martin. Officer Yzaguirre stated he was working traffic enforcement in the area of Spencer and Westside when he observed Officer Martin stop a vehicle at Spencer and Westside. Officer Yzaguirre stated he pulled onto the parking lot and placed his unit facing towards the suspect's vehicle drivers door. Officer Yzaguirre stated as he was exiting his vehicle he could tell that the suspect vehicle was still moving and appeared that the driver was about to drive away. He immediately turned to return to his vehicle, at which time he heard gun shots. Officer Yzaguirre stated he was unsure if Officer Martin had fired the shots or if they came from the truck. Officer Yzaguirre stated he observed Officer Martin returning to his police car and they proceeded to pursue the suspect's truck. Officer Yzaguirre stated when the suspect was stopped in the area of Grand and Red Bluff, he returned to Spencer and Westside to secure the original scene.

Officer Yzaguirre stated the "Watch Guard" system in his patrol car was able to record a portion of the traffic stop by Officer Martin. Officer Yzaguirre showed me the video of Officer Martin's traffic stop and then provided me with the MVR disk from his "Watch Guard" system. The video shows Officer Martin as he is approaching the suspect's truck. Officer Martin is seen walking up to the driver's side door as the truck is rolling backwards. Officer Martin is heard saying something unintelligible to the driver, and then the truck begins to roll forward. The truck continues to roll forward and never stops. As the truck is rolling forward and out of view of the camera, Officer Martin is seen drawing his duty weapon from his holster and pointing it in the direction of the truck and driver. As the suspect and the officer disappear from the camera view, one round is heard being fired, followed shortly by two additional rounds. Officer Martin is then seen running across the view of the camera returning to his patrol car. Both Officers then leave the parking lot in pursuit of the suspect vehicle.

After reviewing the video a second time, I observed Officer Martin out of his police unit and walking towards the suspect truck. Officer Martin is seen walking up to the truck and reaches the drivers door in approximately five seconds. Two seconds later, the truck begins to roll forward (east) and Officer Martin is seen drawing his duty weapon from his right hand holster. The truck continues to roll (east) and out of the view of the camera and

EXHIBIT 28

11-17770          Supplement (A)
                          0017

# Pasadena Police Department          DRAFT

## Narrative

approximately two seconds later the first round is heard being discharged. Two seconds later, two additional rounds are heard being discharged. The amount of time that lapsed between the times Officer Martin is first seen on Officer Yzaguirre's patrol video and the first round is discharged approximately nine seconds. The two additional rounds are discharged approximately 2 seconds later or 11 seconds from the time Officer Martin is first seen on Officer Yzaguirre's video system. Officer Martin is seen returning to his police unit approximately 15 seconds after the time he was first seen on video. The MVR disk was later tagged and logged into the property room as evidence.

### Scene Summary @ 2626 Spencer

Scene Summary, 2626 Spencer is the location of the Texaco Convenience Store, located at the corner of Spencer and Westside. The business is located within a strip mall on the southeast corner of the intersection of Spencer and Westside. The front of the business faces north, with the west side of the building close to Westside. The business is closed for business at the time of the shooting. I observed four gas island, located north of the front of the building approximately 50 feet north of the front doors. The four gas island consists of two gas pumps on each island for a total of eight pumps. The gas pumps start with number one on the far west side of the gas islands and continue east ending with eight. Each gas island is separated from the other approximately 20 feet, which allows vehicles to pull up to each pump.

The only physical evidence that was located at the scene was three spent shell casings. The shell casings were located southwest of gas pump #7, between the gas island and the building. The three shell casings were photographed in their original position and later documented on a scaln diagram which was completed by Officer Ginther.

### Investigator Details @ 2626 Spencer:

On 07-22-2011 at 8:10 am, we began the walk through with Officer Martin at 2626 Spencer (Spencer and Westside) The walk-through was video recorded by Officer Peeples and Officer Martinez, with the Pasadena Police Department Crime Scene Division. Present during the walk through was Detective MacGregor, Sgt. Crislip, Sgt. J. Bruegger, ADA Clint Greenwood Chief of Police Integrity, and D.A. Investigator Bill Jordan of the Harris County District Attorney's Office. Officer Martin was accompanied by his TMPA Attorney, Paul Aman. The following is a brief summary of Officer Martin's walk through at 2626 Spencer:

Officer Martin stated he was working traffic enforcement in the area of Spencer and Shaver. He checked by with Officer Buckert who had a vehicle stopped on Shaver. While the driver was being checked to see if he was intoxicated, Officer Martin observed a dark colored extended cab truck in a parking lot south of their location. He observed the truck revving his engine, squealing his tires and doing donuts in the parking lot. Officer Martin observed the vehicle exit the parking lot onto Shaver Street where the driver failed to give a signal of intent or maintain a single lane of traffic. He got behind the truck and followed it to the intersection of Shaver and Spencer where the driver turned through the intersection and turned eastbound on Spencer Highway. Officer Martin was able to stop the vehicle at the corner of Spencer and Westside in the parking lot of 2626 Spencer. Officer Martin stated as he exited his patrol car he observed the truck's reverse lights come on and the truck began rolling backwards. He stated he yelled at the driver to put the truck in park. Martin stated the truck moved forward, back and then forward again. Martin stated he yelled at the driver to put his hands on the steering wheel, put the vehicle in park and turn off the vehicle. He stated the driver of the vehicle refused to comply with his verbal commands. Martin stated the driver then dropped his left hand down into the driver's door compartment and he could hear the driver "messing" around with something. Martin stated the driver then began staring at him in a menacing type glare. He sees the driver turn his shoulders towards him and his left shoulder started to come up, like he was pulling something out. Martin stated he felt threatened that the subject was going to harm him or Officer Yzaguirre, who had just pulled onto the parking lot. He stated he was giving the subject commands and drawing his gun and firing, because he thought the subjects was coming up with some type of weapon. Officer Martin stated he never saw the subject present any type of weapon as he was fleeing the scene. Martin stated as the truck began to drive away, the driver turned the wheel towards him, as he was standing off to the side of the truck. He stated he fired one round about five feet away from the truck and then one or two more rounds as the truck drove away. Martin stated the driver never said a word and there was no one else in the vehicle.

We concluded the walk through at 2626 Spencer at 8:30 am. The walk though video was later tagged and logged

EXHIBIT 28

**11-17770**          Supplement No
                      **0017**

## Pasadena Police Department          **DRAFT**

**Narrative**

nto the property room as evidence.

I then contacted Officer Martinez and Officer Peeples with the Pasadena Police Department Crime Scene Division. I confirmed with them what evidence was going to be collected. I also confirmed that they would document the scene with photographs and video which they confirmed they would. The scene was also measured so a scene diagram could be completed at a later date and time.

Prior to arrival at the Pasadena Police Department, I followed the path of the pursuit from 2626 Spencer to Grand and Burke. I arrived in the area of Dabney St. and Grunewald Dr. to inspect the area. I observed where yaw marks were left by a vehicle which had left the roadway in an apparent attempt to turn from westbound Grunewald Dr. to northbound Dabney St. The vehicle struck a curb and left the roadway entering the large median which separated northbound and southbound Dabney St. Approximately 30 yards north of the curb, there was a tree which had been cut in half about 3 feet from the ground and uprooted. The upper half of the tree was approximately 25 feet north of the initial location of the where the tree had been planted. The tree appeared to be approximately 10" in diameter. Lying next to the upper half of the tree was a Texas license plate bearing the numbers AE50103. This license plate returned to Victor Hernandez, 14327 Falling Tree Ct., Houston TX. The area was later photographed and evidence was collected by Officer Martinez with the Pasadena Police Department Crime Scene Division. I continued following the path to the area of Grand and Red Bluff. I did not find anything on the roadway or close to the roadway which might have been discarded by the driver during the pursuit.

I returned to the police station where I contacted Officer Martin and Paul Aman. We arrived in the Detective division where I obtained a written affidavit which was completed by Officer Martin. The following is a copy of Officer Martin's written affidavit:

My name is Michael T. Martin and I am 42 years old. My date of birth is ▇▇▇▇▇ am employed by the Pasadena Police Dept. as a Police Officer assigned to the Night Shift working the hours of 10pm to 6am. I began my career with Pasadena P. D. in 6-16-08. I can read and write the English language.

This affidavit is in regards to the shooting incident at 2626 Spencer on 07-22-11 at approximately 2:30am.

On 07-22-11, I was working night shift patrol driving a marked police patrol vehicle and wearing my regular police uniform. At approximately 0227 hours I was assisting Officer Buckert perform a traffic stop in the 3100 block of Shaver. While assisting Officer Buckert, I observed a dark colored extended cab Chevrolet pickup reaving the its engine, screeching the vehicle's tires and doing "doughnuts" in the parking lot of 3316 Shaver, the business known as "El Regio". I then observed the dark colored extended cab Chevrolet pickup exit the private driveway and begin to travel northbound in the 3100 block of Shaver, at a high rate of speed. I pulled behind the dark colored extended cab Chevrolet pickup ▇▇▇▇▇▇▇▇▇▇, activated the emergency lights and sirens on my marked patrol unit and initiated a traffic stop on the vehicle. I observed the driver of the vehicle approach a red light at the intersection of Shaver and Spencer and proceeded to turn eastbound onto Spencer, failing to come to a complete stop at the red light. I continued to follow the vehicle and observed the driver fail to maintain a single lane of traffic. The driver of the dark colored extended cab Chevrolet pickup continued traveling eastbound, refusing to stop the vehicle. The driver of the vehicle then turned southbound onto Westside. The driver then pulled into the parking lot of a convenience store located at 2626 Spencer. I pulled into the parking lot and parked behind the dark colored extended cab Chevrolet pickup. I then exited my marked patrol unit and approached the suspect's vehicle to make contact with the Hispanic driver, later identified as Victor Hernandez (H/M DOB: ▇▇▇▇▇

As I approached suspect Hernandez's vehicle, I observed suspect Hernandez still had not put the vehicle in park. I then observed suspect Hernandez put the vehicle into reverse and began backing his vehicle towards my marked patrol unit, in an unsafe manner. I then gave verbal commands for suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I could see them. Suspect Hernandez refused to comply with any of my commands and instead pulled the vehicle forward. I again told suspect Hernandez to place the vehicle in park and show me his hands, however, he again refused to comply with my commands. Suspect Hernandez then placed his vehicle in reverse, a second time, and began backing his vehicle towards my marked patrol unit, in an unsafe and aggressive manner. I again told suspect Hernandez to

| Report Officer | Printed At | |
|---|---|---|
| **7038/YOUNG,MICHAEL** | **10/13/2011 14:04** | **Page 7 of 13** |

**EXHIBIT 28**

**11-17770**    Supplement No
**0017**

## Pasadena Police Department    DRAFT

### Narrative

lace his vehicle in park and to place both of his hands on the steering wheel, so that I might see them.  Suspect Hernandez then complied by placing both hands on the steering wheel, however, he still did not place the vehicle in park.

I then approached suspect Hernandez's vehicle from the driver's side rear.  As I approached the vehicle, I observed that the driver side window was down.  I again told suspect Hernandez to place the vehicle in park, which he refused to do.  I then observed suspect Hernandez turn, look over his left shoulder and begin facing me.  I observed suspect Hernandez to have a menacing and aggressive look on his face.  I observed suspect Hernandez then remove his left hand from the steering wheel and reach down towards the compartment on the driver side door.  At this point, I was unable to view any portion of suspect Hernandez's left arm, from his shoulder to his hand.  At this point, I was close enough to suspect Hernandez's vehicle that I could hear him fumbling inside the compartment of the driver side door.  I also could smell the odor of an alcoholic beverage on and about suspect Hernandez's person.  I again told suspect Hernandez to show me both his hands.  I then observed suspect Hernandez to square off both shoulders towards me, in what I believed to be an aggressive posture.  Simultaneously, suspect Hernandez then began to raise his left shoulder and arm.  I then again told suspect Hernandez, twice, to show me his hands.  Suspect Hernandez refused to comply with my commands, at which time, I believed that suspect Hernandez was pulling up a weapon (due to the movements he was making with his left shoulder and arm).  In addition, fearing that my life might be in danger, as well as  the life of my backup (Officer Yzaguirre),  I withdrew my duty weapon (a Glock 17, 9mm) from my duty holster and fired it at suspect Hernandez, approximately three times.  I then began to retreat from my current position, since I did not have the advantage of cover and/or concealment.  I ran to my marked patrol unit, in order that I might seek some form of cover.  Suspect Hernandez then speed out of the parking lot, heading eastbound in the 2600 block of Spencer.

I then holstered my duty weapon and entered my marked patrol unit.  I then engaged in the pursuit of suspect Hernandez, which lasted until suspect Hernandez stopped in the 800 block of Burke Road.  Suspect Hernandez was then taken into custody by various Officers on scene.  Suspect Hernandez was then attended to by ETMC medical staff and transported to Herman Hospital, in Houston, TX for further medical treatment.

The affidavit was signed by Officer Martin on 07-22-2011 at 08:40 am.  I witnessed his signature on the bottom of the affidavit and signed the affidavit as a witness.  The original affidavit was later tagged and logged into the property room as evidence.

On 07-22-2011 I requested a copy of Channel One's radio traffic for the time span during the time of the officer involved shooting.  I received a copy of the radio traffic and this CD was later tagged and logged into the property room as evidence.  Detective MacGregor provided the following partial transcript of the police radio traffic from the time of the traffic stop at 2626 Spencer and the pursuit to Grand and Red Bluff.

Dispatch - D
Officer Stubbs - S
Officer Martin - M
Officer Palmer - P
Sgt. Norman - SGT.
Unknown voice - ???

S - *trying to catch one eastbound on Spencer, shots were fired.*
D - *that's clear, at uh, at yall?*
S - *27 not sure, there were other units out on traffic stop at Westside...northbound Burke        northbound Burke, disregard disregard still eastbound.*
D - *all units hold your traffic, uh 27 has one running, huh eastbound Spencer.*
S - *27 Bayshore, disregard*
D - *you broke up, hes*
S - *27 going eastbound, hes trying, trying to...northbound somewhere, still eastbound Spencer.*
D - *ok, whats cross street?*
*ᴤ - 27 northbound Watters, northbound Watters.*
*Ɔ - northbound Watters from Spencer, all units continue to hold your traffic.*
S - *27 to those units, you can put out that plate, it looks like a dark extended cab chevy.*

| Report Officer | Printed At | |
|---|---|---|
| 7038/YOUNG,MICHAEL | 10/13/2011 14:04 | Page 8 of 13 |

EXHIBIT 28

**Pasadena Police Department** 11-17770 DRAFT Supplement No 0017

## Narrative

??? - 422 I'm close to that.
M - 46 plate is going to be [redacted]
D - that's clear.
??? - he cut through the field at Greenwald, he looks like hes going back to the Greenwald area, now hes turning southbound Greenwald going back towards Dabney.
??? - back up back up, hes going back towards Spencer.
??? - (inaudible) Bayshore.
P - 41 got him a Dabney.
D - Dabney at what?
**M - 46 shots were fired with me, he was reaching for something, tried to run me over with the vehicle.**
D - so uh, you discharged your weapon at, uh, 3100 Shaver correct?
**M - that's correct, I cant confirm whether he had a weapon or not but he was reaching in the door.**
??? - where yall at?
P - north on Dabney approaching Cherry.
D - northbound Dabney approaching Cherrybrook?
P - that's clear, hes going, uh, westbound on Cherrybrook now.
D - ok, westbound Cherrybrook from Dabney, 41 you want me to call it?...ok crossing Burke.
P - that's clear, crossing Burke, hes going north on Burke now.
D - northbound Burke from Cherrybrook.
P - approaching Blvd.
D - northbound Burke approaching Blvd.
P - still north on Burke just passing 2001 Burke.
D - northbound Burke crossing Pasadena Blvd.
P - were passing Austin.
D - northbound Burke passing Austin.
P - hes having vehicle problems now.
D - suspect vehicle is having vehicle problems at this time.
P - 41 coming to, uh, Southmore now.
D - northbound Burke approaching Southmore.
??? - (inaudible) I can call it now, Im behind 41.
D - that's clear (inaudible)
??? - northbound Burke headed northbound Burke, err, uh, crossing uh, Southmore headed northbound on Burke.
D - crossing Southmore headed northbound on Burke.
??? - still northbound on Burke crossing Jenkins.

Long squelch

D - northbound Burke passing Jenkins.
??? - turning onto, uh, Grand from Burke, north Burke.
??? - 40 is there a return on that plate?
D - eastbound on Grand turning towards Burke.
??? - (inaudible).
SGT. - hes got blood all over him, hes stopping, I cant see his hands...(inaudible) traffic stop guys.
D - sarge can you tell me where yall are at?

Long squelch

??? - Burke and Red Bluff, Burke and Red Bluff.
D - (female voice) clear Burke and Red Bluff
D - to all units channel one is still shut down, all units channel one is still shut down.

Sirens (inaudible)

D - (inaudible) call an ambulance?
??? - roll an ambulance.

11-17770

DRAFT

# Pasadena Police Department

## Narrative

D - we are

??? - Burke and Red Bluff, roll an ambulance.

D - were doing it

??? - (inaudible) notify detectives.

End of transcription

I then contacted Detective Bruegger who was also at the police station conducting interviews with Officers who were either at the scene on Red Bluff and Grand, involved in the pursuit or at the scene at 2626 Spencer. Detective Bruegger indicated all the officer he spoke with were not at the traffic stop that had occurred at 2626 Spencer they were only involved in the pursuit or the arrest at Red Bluff and Grand. Detective Bruegger indicated all the interviews were digitally recorded and later transferred onto a DVD-R, which were tagged and logged into the property room as evidence. See Detective Bruegger's supplement for more details regarding the interviews.

I contacted Detective Gonzales who obtained videos from marked patrol units involved in the pursuit and Officer Martin's unit, which showed the traffic stop and shooting. Detective Gonzales indicated the videos he obtained from all the marked patrol units video systems showed either the pursuit or the felony traffic stop at Grand and Red Bluff with the exception of Officer Martin's police unit. Detective Gonzales stated Officer Martin's unit showed Martin exiting his marked patrol unit and walking up to the suspect's vehicle. The video shows Officer Martin drawing his duty weapon and firing one round into the driver's side open window. The video shows the suspect driving off from the scene at a high rate of speed and Officer Martin on the parking lot firing two additional rounds at the fleeing suspect vehicle. Detective Gonzales indicated Officer Martin unit's video system recorded onto a VHS and he was able to transfer the VHS onto a DVD. The VHS was later tagged and logged into the property room as evidence by Detective Gonzales. Detective Gonzales also tagged and logged the videos from the other marked patrol units into the property room as evidence. Detective Gonzales also indicated he had obtained a copy of the video surveillance from the store at 2204 Red Bluff, which is located at the corner of Grand and Red Bluff. He was able to view the video from the store and stated the video shows the end of the pursuit. The video shows the suspect vehicle pulling up to the intersection and several marked police cars pulling in behind or to the side of the suspect's truck. The video does not provide a clear view of the suspect exiting his vehicle. Detective Gonzales later tagged and logged the CD from the store surveillance into the property room as evidence. See Detective Gonzales's supplement for more details.

I spoke with Detective Bittner who arrived at the Pasadena Police Department. Detective Bittner had obtained a copy of the video surveillance from the store at 2626 Spencer. Detective Bittner stated that he met with Faisal Kahn, a clerk, and the manager of the store, Mohamad Majib. Mr. Majib allowed him access to the surveillance recording where a copy of the parking lot video was downloaded onto a DVD as evidence. Detective Bittner indicated that there were three different angles of the parking lot surveillance video that showed the suspect vehicle and Officer Martin pulling onto the parking lot. The furthest east camera on the building obtained the incident via the passenger side of the suspect vehicle. The passenger window appeared open as the driver's right arm could be seen holding the steering wheel or the gearshift lever. The driver's head was only partially visible. This video did not fully reveal the driver's activities just prior to the shooting. Detective Bittner provided me with a copy of the video footage and later tagged and logged the original CD into the property room as evidence. Detective Bittner also conducted an interview with Officer Yzaguirre who had arrived at the police after the completion of the investigation at 2626 Spencer. The following is a brief summary of the information that Detective Bittner received from Officer Yzaguirre during the interview.

Detective Bittner stated at approximately 7:15am, he met with Officer R. Yzaguirre in the Detective Division office for purposes of obtaining a video-recorded affidavit from him regarding Officer Martin's shooting. On 7-22-11, he was assigned to monitor traffic in the area of Spencer Hwy. and Shaver St. as part of a traffic initiative that included several patrol officers. He had stopped in the area of 2200 Spencer Hwy. to assist Sgt. G. White with a traffic stop when he observed another police unit stopping a black Chevrolet pick up truck which had been traveling at a high rate of speed eastbound from Shaver St. The officer, later identified as Officer M. Martin pulled, the vehicle into the parking lot of 2626 Spencer Hwy. The suspect vehicle and Martin's vehicle were facing east. Yzaguirre pulled onto the parking lot from the north entrance and stopped his vehicle perpendicular to the violator and Martin's vehicles. His headlights were shining in the open window of the suspect vehicle. Officer Martin was already walking up to the driver's side door. As Yzaguirre was exiting his vehicle with one foot

EXHIBIT 28

11-17770
DRAFT

0017

# Pasadena Police Department

## Narrative

lut of the door, he observed the violator's vehicle drift backward and notified Martin that it did not appear the vehicle was in park. The violator's vehicle then pulled forward slightly. Martin commanded the driver to put the vehicle in park. Yzaguirre observed Martin standing at the open driver's window appearing to struggle with the driver or reaching into the vehicle to pull the front in park. Yzaguirre said his view was blocked by Martin. Yzaguirre had a sense that the violator was going to flee the scene because prior to Martin contacting the driver, Yzaguirre thought the driver looked "antsy" or was "fidgeting" too much inside the vehicle. Yzaguirre turned to get back into his vehicle as soon as it looked like the driver would flee. As he was entering his vehicle, he heard three gunshots and initially assumed the suspect was shooting at him and Martin. The shots were spaced as one shot, a short pause and then two consecutive shots. After Yzaguirre entered his vehicle, he observed Martin running back to his car. Yzaguirre gave chase of the suspect vehicle as it exited the north driveway of the business and drove away eastbound. The suspect vehicle was pursued close behind by Officer Stubbs then Yzaguirre. The vehicle fled east on Spencer Hwy. to Waters St. The vehicle turned north on Waters then it drove west through an empty field north of Grunewald before entering Primrose St. where it turned back south and then west onto Grunewald. At this point in the chase, Yzaguirre said that he was out of the chase because neither he nor Stubbs followed behind the suspect as it drove through the empty lot.

Yzaguirre did not hear the suspect make any statements while at 2626 Spencer Hwy. He noted that the suspects eyes appeared "glazed over" and he thought for a moment that the suspect didn't speak English because of the look on the suspect's face. He never saw the suspect's hands at any time. Yzaguirre stated that he did not see Martin fire his weapon during this incident. After the suspect vehicle was stopped at Red Bluff and Grand, Yzaguirre remembers an officer asking the suspect several times if he had any weapons on him and the suspect replied, "No." All these questions were asked in English. Therefore, he understood that the suspect did speak English.

Detective Bittner completed the interview with Officer Yzaguirre. The digitally recorded interview was later tagged and logged into the property room as evidence.

I then checked on the condition of Victor Hernandez and was informed that Hernandez was being prepared for surgery. Officers at the hospital stated they spoke with doctors who were caring for Hernandez and were informed that Hernandez needed surgery and would be in the hospital for an undetermined amount of time. They were informed of the possibility of several surgeries needed for Hernandez.

On 07-22-2011, at approximately 10 am, I contacted the Harris County District Attorney's Office Intake Division and spoke with ADA Davis. I advised Davis of the on going investigation and the current condition of suspect Victor Hernandez. Davis advised me that he would accept Evading Arrest Charges, but suggested no charges be filed at this time due to Hernandez's condition. Davis also suggested waiting on filing charges until medical records could be obtained from the hospital. Davis suggested officers release custody of Hernandez to the medical staff of the hospital and a to-be warrant be issued at a later date and time. I then contacted officers at Herman Hospital and advised them to release Hernandez to the medical staff and then return to the police department.

While at the police station I was able to view the videos which were obtained from Officer Martin's patrol unit, Officer Yzaguirre's patrol unit and the video from the store at 2626 Spencer. Watching the video from Officer Yzaguirre's patrol unit, I was able to verify the time span from the time Officer Martin was first scene on the video and the time he returned to his vehicle. While reviewing the video I was able to see the driver of the truck Victor Hernandez. I observed Hernandez to be seated on the drivers seat, with the seat slightly reclined back. Hernandez's right arm is seen extending across the window with his right hand holding the steering wheel. Hernandez is seen looking at Officer Martin when Officer Martin illuminates the inside of the truck with his flashlight. There appears to be something in front of Hernandez's face as he is looking towards Officer Martin. I am not able to clearly identify the object which could be several things such as: light reflection, hand, or any unknown type object.

## 07-25-2011

On 07-25-2011 at approximately 08:30 am, I arrived at the Pasadena Police Department Crime Lab. I took custody of Officer Martin's duty weapon (Glock), magazines and the rounds (bullets) which were taken into

EXHIBIT 28

**11-17770**     Supplement No **0017**

## Pasadena Police Department     **DRAFT**

### Narrative

ustody by lab technicians on the night of the shooting. The items were transferred to the Pasadena Police Department where they later released to Officer Martin at 4:45 pm on 07-25-2011.

On 07-25-2011 at approximately 3 pm, I arrived at Herman Hospital to check on the condition of suspect Victor Hernandez. I was able to make contact with Victor Hernandez and his father Victor Hernandez Sr. ████ Suspect Hernandez was unable to speak due to his injuries and medical equipment which was attached to his mouth and nose. I did speak to his father Victor Hernandez Sr. Victor Sr. stated the doctors told him that his son still had another surgery to undergo and they did not provide him with a date that his son would be released. Due to the medical condition of suspect Victor Hernandez I was unable to obtain any type of statement from him. Victor Sr indicated when his son was released he would contact this Detective and bring his son to the station so a statement could be obtained. I provided Victor Sr. with a business card and advised him to contact this Detective if he had any other questions.

On 07-25-2011, I received a copy of a Facsimile, which was sent to the custodian of records regarding Victor Hernandez. The Facsimile indicated Larry McCotter had been retained by Victor Hernandez in regards to the "police stop and shooting." I contacted McCotter and confirmed with him that he was representing Hernandez in the criminal case. He stated if criminal charges were filed he would be representing Hernandez in the criminal case along with any civil matters.

#### 08-08-2011

On 08-08-2011, I received a facsimile from the Harris County Institute of Forensic Science in regards to Victor Hernandez. The fax contained the laboratory report on Victor Hernandez in regards to the results of the gunshot residue by S.E.M. The report indicated "Item #016 samples were analyzed using and automated scanning electron microscope (SEM) equipped with a gunshot residue analysis package. The most accurate method of identifying gunshot primer residue (GSR) is by its element content. The chemical elements Lead (Pb), Barium (Ba), and Antimony (Sb) are components of virtually all primer mixtures except some .22 calibers".

The findings on the test were as follows "No particles confirmed as having a composition characteristic with GSR were detected on item #016 samples labeled as Right Hand and Left Hand.

#### 08-22-2011

On 08-22-2011, I contacted Larry McCotter via the telephone and inquired about the condition of Victor Hernandez. McCotter stated Hernandez was recovering, but was still having difficulty in speaking. I asked McCotter if he would allow his client to provide a video statement about the night of the traffic stop and shooting. McCotter stated he would contact ADA Greenwood and ask to see the videos before providing any statements. McCotter asked if certain personal items belonging to Hernandez could be released to Hernandez's father. I advised McCotter to have Victor Hernandez Sr contact me on 08-23-2011 and we would see what items could be released.

#### 08-23-2011

On 08-23-2011 at approximately 11am Victor Hernandez Sr arrived at the Pasadena Police Department. I escorted him to the property room, located within the police department. I was able to release several items to Hernandez. The following items were released: money, belt, cell phone and papers. See property release forms for more information.

#### 09-20-2011

On 09-20-2011 I received a CD-R from the Harris County District Attorney, from Investigator Bill Jordan. The CD-R contained the medical records for the suspect Victor Hernandez. I was able to locate the Laboratory Data, which contained the blood alcohol level for Hernandez. The blood alcohol level for Victor Hernandez was 0.142 at the time he was admitted and began receiving treatment at the hospital.

#### 09-22-2011

| Report Officer | Printed At | |
|---|---|---|
| 7038/YOUNG,MICHAEL | 10/13/2011 14:04 | Page 12 of 13 |

**EXHIBIT 28**

**11-17770**    Supplement No
**DRAFT**    0017

# Pasadena Police Department

## Narrative

On 09-22-2011 Detective MacGregor and Sgt. Bruegger conducted an interview with Victor Hernandez and his attorney Larry McCotter. The following is a brief summary of the interview with Hernandez:

Hernandez explained on the night of the shooting, he had been pulled over by a patrol unit. He stated he pulled into a gas station in order to allow enough room for the officer to pull in behind him. Hernandez stated he originally did not put his truck into park but actually placed his truck in neutral and was holding the break pedal down. Hernandez stated he attempted to put his truck into park during the traffic stop and was subsequently shot by the officer. Hernandez stated that he did not drive away from the officer until he observed the officer pulling out his gun. Detective MacGregor asked Hernandez if Officer Martin made any verbal commands to him in regards to putting his vehicle into park or if he observed the officer approaching his vehicle via the rear view mirror or turning around. Hernandez stated he did not hear the officer making any verbal commands to him other than hearing the officer say "I will shoot." Hernandez stated he briefly observed the officer when he turned his head and then began to look back forward after observing the officer with his gun in his hand informing him that he would shoot. Detective MacGregor questioned Hernandez if he could remember the position of his hands or if he was holding a cell phone when the officer approached. Hernandez explained that he remembered that both of his hands were initially on the steering wheel and that he may have tried to put the truck into park. He stated he did have his cell phone in the truck, possibly in the center console, but did not remember having it in his hands. The questioned was asked if Hernandez remembered if he ever removed his left hand from the steering wheel and lower it to the driver side door or if he remembered the distance between he and the officer when he was shot. Hernandez stated he did not remember lowering his left hand from the steering wheel and could not recall the distance between he and the officer. Hernandez stated he did not remember the officer arriving to his window before the shot. Detective MacGregor informed Hernandez that he had reviewed all the video from the traffic stop and that the video shows him rolling forward away from the officer prior to the officer drawing his duty weapon from his holster. Hernandez reiterated that he did not leave from the location until after the officer drew his weapon and pointed it at him. Hernandez stated that he did not verbalize anything to the officer and was thinking to himself that he needed to get his insurance card. Hernandez stated that he did not recall ever actually making an attempt to retrieve his insurance card.

Detective MacGregor concluded the interview with Victor Hernandez and Larry McCotter and allowed them to leave. Detective MacGregor later provided this Detective with a copy of the digitally recorded interview, which was placed into this case folder.

### 09-27-2011

On 09-27-2011, I contacted the Harris County District Attorney's Office and spoke with Assistant D.A. George. I advised George of the circumstances surrounding this case and the information that was obtained. She advised that she would accept Evading Arrest charge along with Driving While Intoxicated on the suspect Victor Hernandez.

I then filed charges via the Harris County DIM's computer system under transaction number 1790762. The charges were sent to the District Attorney's Office at 10:18 am on 09-27-2011. I later arrived at the District Attorney's Office and filed a probable cause affidavit and two warrants were later issued. I also contacted Larry McCotter via the telephone and informed him that charges had been filed on his client Hernandez. I informed McCotter of the bond amounts and the charges, so he could allow his client to post bond without being arrested due to his current medical condition.

With charges filed on the suspect Victor Hernandez and the officer involved shooting referred to the District Attorney's Office, this case is considered cleared.

End of Report

M.R. Young

| Report Officer | Printed At | |
|---|---|---|
| 7038/YOUNG,MICHAEL | 10/13/2011 14:04 | Page 13 of 13 |

**EXHIBIT 28**

**11-17770**    Supplement No 0006

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
07/25/2011
Nature of Call
SHOOTING
Officer
BRUEGGER, MATTHEW

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | 11-17770 | 0006 | 07/25/2011 | | 07:58 | 110722057 |

| Status | | Nature of Call | | | | | |
|---|---|---|---|---|---|---|---|
| REPORT - No follow-up Needed | | Shooting | | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | PASADENA | | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time | |
|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 | |

| Officer | | Assignment | 2nd Officer | | Assignment |
|---|---|---|---|---|---|
| 0719/BRUEGGER, MATTHEW | | DETECTIVE | MARTIN, MICHAEL | | PATROL |

| Entered by | Assignment | Confidential | | RMS Transfer | Prop Trans Stat |
|---|---|---|---|---|---|
| 0719 | DETECTIVE | City Employee Investigation | | Successful | Successful |

| Approving Officer | Approval Date | Approval Time | |
|---|---|---|---|
| 2822 | 07/28/2011 | 02:14:26 | |

## Summary Narrative

***Detective Supplement***

### Property

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | 11-17770 | 11-17770 | 0006 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | | |
|---|---|---|---|---|---|---|
| 07/25/2011 | Yes | No | 110017770 | 8 | | |

| Description | | | | Typ | | |
|---|---|---|---|---|---|---|
| Officer Blankenburg Statement | | | | A | | |

| Cat | | Article | | Entered Date | Entered Time |
|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | RECORDINGS (VIDEO /AUDIO) | | 07/25/2011 | 07:58 |

| RMS Transfer | Control | | | | |
|---|---|---|---|---|---|
| Successful | 4613  0819110820 | | | | |

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | 11-17770 | 11-17770 | 0006 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | | |
|---|---|---|---|---|---|---|
| 07/25/2011 | Yes | No | 110017770 | 9 | | |

| Description | | | | Typ | | |
|---|---|---|---|---|---|---|
| Officer Galvan Statement | | | | A | | |

| Cat | | Article | | Entered Date | Entered Time |
|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | RECORDINGS (VIDEO /AUDIO) | | 07/25/2011 | 07:58 |

| RMS Transfer | Control | | | | |
|---|---|---|---|---|---|
| Successful | 4613  0819110820 | | | | |

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 3 | Pasadena Police Department | | 11-17770 | 11-17770 | 0006 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | | |
|---|---|---|---|---|---|---|
| 07/25/2011 | Yes | No | 110017770 | 10 | | |

| Description | | | | Typ | | |
|---|---|---|---|---|---|---|
| Officer Riddle Statement | | | | A | | |

| Cat | | Article | | Entered Date | Entered Time |
|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | RECORDINGS (VIDEO /AUDIO) | | 07/25/2011 | 07:59 |

| RMS Transfer | Control | | | | |
|---|---|---|---|---|---|
| Successful | 4613  0819110820 | | | | |

EXHIBIT 28

**11-17770**

Supplement No. 0006

# Pasadena Police Department

| Item | Agency | Report No. | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|
| 4 | Pasadena Police Department | 11-17770 | 11-17770 | 0006 | EVIDENCE |

| M Date | In Custody? | Security | Tag No | Item No |
|---|---|---|---|---|
| 07/25/2011 | Yes | No | 110017770 | 11 |

| Description | Type |
|---|---|
| Sergeant White Statement | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | RECORDINGS (VIDEO /AUDIO) | 07/25/2011 | 07:59 |

| RMS Transfer | Control |
|---|---|
| Successful | 4613   0819110820 |

| Item | Agency | Report No. | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|
| 5 | Pasadena Police Department | 11-17770 | 11-17770 | 0006 | EVIDENCE |

| M Date | In Custody? | Security | Tag No | Item No |
|---|---|---|---|---|
| 07/25/2011 | Yes | No | 110017770 | 12 |

| Description | Type |
|---|---|
| Officer Stubbs Statement | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | RECORDINGS (VIDEO /AUDIO) | 07/25/2011 | 07:59 |

| RMS Transfer | Control |
|---|---|
| Successful | 4613   0819110820 |

| Item | Agency | Report No. | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|
| 6 | Pasadena Police Department | 11-17770 | 11-17770 | 0006 | EVIDENCE |

| Ind Date | In Custody? | Security | Tag No | Item No |
|---|---|---|---|---|
| 07/25/2011 | Yes | No | 110017770 | 13 |

| Description | Type |
|---|---|
| Officer Palmer Statement | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | RECORDINGS (VIDEO /AUDIO) | 07/25/2011 | 07:59 |

| RMS Transfer | Control |
|---|---|
| Successful | 4613   0819110820 |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

**Details:** On July 22, 2011, at approximately 3:30 AM, Detective M. Young contacted me via telephone in reference to an officer-involved shooting. Detective Young requested that I respond to the scene to assist with the investigation. I advised Detective Young that I would be en route to the scene.

A short time later, I arrived on scene and contacted Detective Young. Detective Young requested assistance with obtaining video recorded statements from several police officers. I advised Detective Young that I would be en route to the police station to obtain the video recorded statements from the police officers. I departed the scene and drove to the police station.

At approximately 4:55 AM, Officer T. Blankenburg provided a video recorded statement, which was later transferred to a DVD and submitted to the Property Room as evidence. The following is a summary of Officer Blankenburg's video recorded statement: *Officer Blankenburg stated that he is currently employed as a peace officer with the City of Pasadena. Officer Blankenburg advised that he is currently assigned to night shift patrol and is assigned to West district. Officer Blankenburg indicated that he began his shift at 10:00 PM on July 21, 2011, and was scheduled to get off at 6:00 AM on July 22, 2011. Officer Blankenburg advised that around 12:30 AM on July 22, 2011, he was assigned to a "traffic initiative" in the West district. Officer Blankenburg stated that Sergeant White was in charge of the initiative and it was centered around the Spencer and Shaver area. According to Officer Blankenburg, the three main patrol units assigned to the initiative were himself, Officer Santillanes, and Officer Buckert, but the other patrol units assigned to West district were also helping out with the initiative. Officer Blankenburg stated that around 2:30 AM, he heard radio traffic pertaining to a traffic stop involving Officer Martin and Officer Yzaguirre. Officer Blankenburg advised that he did not initially know the location of the traffic stop, but later learned that it was in the 2600 block of Spencer. Officer Blankenburg stated that a short time later he heard Officer Yzaguirre broadcast over the police radio that the driver of the vehicle involved in the traffic stop was fleeing. Officer Blankenburg advised that he was in the 2500 block of Shaver when he heard Officer Yzaguirre's radio transmission that the vehicle was fleeing eastbound on Spencer. According to Officer Blankenburg, another officer, possibly Officer Stubbs, broadcasted over the police radio that shots had been fired at the scene, but it was unclear if an officer had fired the rounds or if the driver of the vehicle had shot*

| Report Officer | Printed At | |
|---|---|---|
| 0719/BRUEGGER, MATTHEW | 10/13/2011 14:04 | Page 2 of 6 |

EXHIBIT 28

11-17770

Supplement No
0006

# Pasadena Police Department

## Narrative

t an officer. Officer Blankenburg stated that the vehicle continued eastbound on Spencer and eventually ended up driving northbound on Burke. Officer Blankenburg indicated that he was eventually able to catch up to the other officers and the suspect vehicle near the intersection of Burke and Southmore. Officer Blankenburg stated that the vehicle continued traveling northbound on Burke and came to a stop at Grand and Red Bluff. Officer Blankenburg advised that several officers approached the vehicle and he and Officer Palmer approached the passenger side of the vehicle. Officer Blankenburg stated that he observed that the driver and sole occupant of the vehicle was "obviously injured" because there was a lot of blood inside the vehicle. According to Officer Blankenburg, it appeared that the driver of the vehicle had some sort of facial injury. Officer Blankenburg indicated that the driver of the vehicle was complying to verbal commands and had his hands in the air. Officer Blankenburg advised that at some point, the driver of the vehicle exited the vehicle and was taken into custody. Officer Blankenburg indicated that shortly after the driver of the vehicle was taken into custody, Officer Stubbs accidentally discharged a round from his shotgun.

Officer Blankenburg stated that he never heard the driver of the vehicle say anything while he (Blankenburg) was on scene. Officer Blankenburg described the vehicle as a dark colored truck and described the driver of the vehicle as a Hispanic male in his late 20s. Officer Blankenburg stated that Officer Martin was wearing the standard issued Pasadena Police Department uniform that identified him as Pasadena Police Officer and Officer Martin was driving a marked Pasadena Police Department patrol unit. Refer to Officer Blankenburg's video recorded statement for further details.

At approximately 5:10 AM, Officer A. Galvan provided a video recorded statement, which was later transferred to a DVD and submitted to the Property Room as evidence. The following is a summary of Officer Galvan's video recorded statement. Officer Galvan stated that he is currently employed as a peace officer with the City of Pasadena. Officer Galvan advised that he is currently assigned to night shift patrol and assigned to North district. Officer Galvan indicated that on July 21, 2011, he began his shift at 10:00 PM and was scheduled to get off at 6:00 AM on July 22, 2011. According to Officer Galvan, around 2:30 AM on July 22, 2011, he heard an officer, possibly Officer Vazquine, broadcast over the police radio that shots had been fired and "they" were eastbound on Spencer. Officer Galvan stated that he had just left the police station when the initial radio transmission was broadcasted. Officer Galvan advised that he believed that the pursuit would end up going north, so he began driving towards Red Bluff. Officer Galvan stated that the suspect vehicle eventually began traveling northbound on Burke from the Bayshore area. Officer Galvan advised that he eventually caught up to the suspect vehicle and the other police officers near the end of the pursuit at Grand and Red Bluff. Officer Galvan indicated that he exited his patrol unit and observed the driver of the vehicle was still seated in the driver's seat. Officer Galvan stated that he was positioned at the rear of the vehicle and observed that the driver of the vehicle had his hands extended up in the air and out the driver's side window. Officer Galvan advised that he believes that the driver of the vehicle opened the driver's side door, exited the vehicle, and got flat down on the ground. Officer Galvan indicated that he observed that the driver of the vehicle was bleeding and observed blood on his neck, back, and buttocks. According to Officer Galvan, he then heard a loud explosion which he initially believed was a "flash bang". Officer Galvan stated that he later learned that Officer Stubbs had accidentally discharged a round from his shotgun.

Officer Galvan described the vehicle as a blue Chevrolet truck and described the driver and sole occupant of the vehicle as a younger Hispanic male. Refer to Officer Galvan's video recorded statement for further details.

At approximately 5:30 AM, Officer S. Riddle provided a video recorded statement, which was later transferred to a DVD and submitted to the Property Room as evidence. The following is a summary of Officer Riddle's video recorded statement. Officer Riddle stated that she is currently is employed as a peace officer with the City of Pasadena. Officer Riddle advised that she is assigned to night shift patrol and is assigned to East district. Officer Riddle indicated that she began her shift at 10:00 PM on July 21, 2011, and was scheduled to get off at 6:00 AM on July 22, 2011. Officer Riddle advised that at approximately 2:30 AM on July 22, 2011, she heard Officer Stubbs broadcast over the police radio that there was a vehicle fleeing eastbound on Spencer. According to Officer Riddle, she was in the 5700 block of Fairmont when she heard the radio transmission. Officer Riddle relaid that she heard an officer broadcast over the police radio that shots had been fired, but did not know which officer broadcasted that information. Officer Riddle advised that the vehicle eventually began traveling northbound on Burke. Officer Riddle indicated that the vehicle was already stopped at the intersection of Grand

EXHIBIT 28

11-17770

# Pasadena Police Department

## Narrative

...nd Red Bluff when she arrived on scene. Officer Riddle stated that as she positioned her vehicle, the driver of the vehicle was already out of the vehicle and was in a "secured" mode. Officer Riddle advised that she exited her vehicle and heard a loud bang, which she later learned was an accidental discharge from Officer Stubbs' shotgun.

Officer Riddle described the vehicle as a blue Dodge truck and described the driver of the vehicle as a middle aged Hispanic male. According to Officer Riddle, she observed blood "all over" the Hispanic male's face and in the interior of the vehicle. Officer Riddle stated that the airbag in the vehicle was deployed and there was blood on the airbag as well. **Refer to Officer Riddle's video recorded statement for further details.**

At approximately 5:40 AM, Sergeant G. White provided a video recorded statement, which was later transferred to a DVD and submitted to the Property Room as evidence. The following is a summary of Sergeant White's video recorded statement: Sergeant White indicated that he is currently employed as a peace officer with the City of Pasadena. Sergeant White stated that he is currently assigned to night shift patrol and is currently assigned as the supervisor of the DWI Task Force. Sergeant White advised that he began his shift at 8:00 PM on July 21, 2011, and was scheduled to get off at 6:00 AM on July 22, 2011. Sergeant White indicated that at approximately 12:30 AM on July 22, 2011, he began a "traffic initiative" in the Spencer and Shaver area. Sergeant White stated that the initiative included members of the DWI Task Force as well as patrol officers from the various districts. According to Sergeant White, Officer Martin was one of the patrol officers that was assisting with the initiative. Sergeant White described Officer Martin as wearing a standard issued Pasadena Police Department uniform that clearly identified him as a Pasadena Police Officer and indicated that Officer Martin was driving a marked Pasadena Police Department patrol unit equipped with lights and siren. Sergeant White stated that around 2:30 AM on July 22, 2011, he was on a traffic stop on the north side of Spencer, west of Westside, when he observed Officer Martin attempting to stop a vehicle that had turned eastbound on to Spencer from northbound Shaver. Based on his training and experience relating to intoxicated drivers, Sergeant White advised that he believed that the driver of the vehicle that Officer Martin was attempting to stop was possibly intoxicated. Sergeant White stated that he observed the vehicle pull into a gas station located at the southeast corner of Spencer and Westside. According to Sergeant White, Officer Yzaguirre, who had been on scene with him, began driving towards Officer Martin's location. Sergeant White indicated that immediately after Officer Yzaguirre left his (White) scene, he heard what he recognized as gunshots. Sergeant White advised that he believes he heard one gunshot, followed by a pause, and then three additional gunshots. Sergeant White indicated that he heard Officer Yzaguirre broadcast over the police radio that the vehicle was fleeing. Sergeant White stated that an officer, possibly Officer Stubbs, broadcasted over the police radio that shots had been fired. Sergeant White indicated that the suspect vehicle traveled eastbound on Spencer, turned northbound on Walters, went through a field, turned westbound on Grunewald, turned northbound on Dabney, turned westbound on Cherrybrook, and then turned northbound on Burke. According to Sergeant White, the vehicle finally came to a stop at the intersection of Grand and Red Bluff. Sergeant White indicated that officers "swarmed" the vehicle and he attempted to give verbal commands to the driver of the vehicle. Sergeant White advised that it was obvious that the driver of the vehicle had been shot, and the driver of the vehicle opened the driver's side door from the outside and exited the vehicle. Sergeant White stated that the driver of the vehicle complied with his commands and laid down on the ground. According to Sergeant White, he observed a gunshot entrance wound to the driver of the vehicle's left cheek area and he observed a gunshot exit wound to the right temple area. Sergeant White indicated that the driver of the vehicle had blood on his face, hands, and clothing. Sergeant White advised that there was a large amount of blood inside the vehicle as well. Sergeant White stated that after the driver of the vehicle was lying on the ground, he heard what he believed to be a discharge from either a rifle or a shotgun.

Sergeant White described the vehicle as a dark colored extended cab Chevrolet truck and described the driver and sole occupant of the vehicle as a Hispanic male in his "younger" 20s. **Refer to Sergeant White's video recorded statement for further details.**

At approximately 6:05 AM, Officer J. Stubbs provided a video recorded statement, which was later transferred to a DVD and submitted to the Property Room as evidence. The following is a summary of Officer Stubbs' video recorded statement: Officer Stubbs stated that he is currently employed as a peace officer with the City of Pasadena. Officer Stubbs advised that he is currently assigned to night shift patrol and assigned to West district. Officer Stubbs indicated that on July 21, 2011, he began his shift at 10:00 PM and was scheduled to get off at

EXHIBIT 28

11-17770

0006

# Pasadena Police Department

## Narrative

:00 AM on July 22, 2011   Officer Stubbs stated that Officer Martin was also assigned to West district and he described Officer Martin as wearing a standard issued Pasadena Police Department uniform that clearly identified him as a Pasadena Police Officer. Officer Stubbs advised that Officer Martin was driving a marked Pasadena Police Department vehicle equipped with lights and a siren. Officer Stubbs stated that around 2:30 AM on July 22, 2011, he was traveling westbound on Spencer when he stopped at the Pasadena Honda store located at 2901 Spencer to check on his vehicle. Officer Stubbs advised that he exited his vehicle and noticed that there was a knock stuck near the muffler of his vehicle, so he removed the stick and got back into his vehicle. Officer Stubbs stated that he began driving westbound on Spencer and heard the "chirp" of a siren. Officer Stubbs indicated that he initially thought that the siren was from an ambulance but then saw a marked police vehicle attempting to stop a vehicle near Spencer and Westside. Officer Stubbs stated that he began driving towards the location of the other patrol unit to check by with the officer on the traffic stop, when he heard what he believed to be two or three gunshots. Officer Stubbs indicated that as he heard the gunshots, he observed the suspect vehicle flee the scene of the traffic stop and begin traveling eastbound on Spencer. Officer Stubbs stated that he immediately began pursuing the suspect vehicle as it fled eastbound on Spencer. Officer Stubbs advised that the vehicle turned northbound on Walters and drove through a small field to Grunewald. Officer Stubbs stated that he broadcasted the vehicle's location and several other units located the vehicle on Dabney. According to Officer Stubbs, he eventually caught back up to the vehicle after it had already stopped at the intersection of Grand and Red Bluff. Officer Stubbs stated that the driver of the vehicle was still seated in the driver's seat when he arrived on scene. Officer Stubbs advised that he approached the rear of the vehicle and other officers were able to get the driver of the vehicle out of the vehicle. Officer Stubbs indicated that the driver of the vehicle was "covered in blood" and it was unclear what type of injury he had. Officer Stubbs stated that he attempted to put some latex gloves on and in doing so, he accidentally discharged a round from his shotgun into the ground.

Officer Stubbs described the vehicle as a truck and described the driver and sole occupant of the vehicle as a Hispanic male in his early 20s. Officer Stubbs indicated that the vehicle he was initially pursuing was the same vehicle at Grand and Red Bluff. Officer Stubbs stated that at some point Officer Martin broadcasted over the police radio that he had been involved in the shooting and that he had discharged his weapon after the driver of the vehicle reached under the seat and after the driver of the vehicle attempted to strike him with the vehicle. Refer to Officer Stubbs' video recorded statement for further details.

At approximately 6:35 AM, Officer W. Palmer provided a video recorded statement, which was later transferred to a DVD and submitted to the Property Room as evidence. The following is a summary of Officer Palmer's video recorded statement. Officer Palmer stated that he is currently employed as a peace officer with the Pasadena Police Department. Officer Palmer indicated that he is currently assigned to night shift patrol and is assigned to West district. Officer Palmer stated that on July 21, 2011, he began his shift at 10:00 PM and was scheduled to get off at 6:00 AM on July 22, 2011. Officer Palmer advised that on July 21, 2011, he was assigned in East district. Officer Palmer stated that he heard Officer Stubbs broadcast over the police radio that a vehicle was fleeing eastbound on Spencer and that shots had been fired. Officer Palmer indicated that he was near the intersection of Spencer and Preston at the time of the broadcast, so he began traveling westbound on Spencer. According to Officer Palmer, he observed the suspect vehicle turn northbound onto Walters from Spencer and observed the marked Pasadena Police Department units following the vehicle. Officer Palmer advised that the other three marked patrol units got stuck at the dead end of Walters, and he was able to continue following the vehicle and pulled in behind the vehicle near Dabney and Grunewald. Officer Palmer indicated that the suspect vehicle went northbound on Dabney, westbound on Cherrybrook, and then northbound on Burke. According to Officer Palmer, the suspect vehicle eventually stopped at the intersection of Grand and Red Bluff. Officer Palmer stated that he exited his vehicle and approached the passenger side of the suspect vehicle. Officer Palmer indicated that he attempted to open the passenger side door, but the door would not open. Officer Palmer stated that he gave the driver of the vehicle to put his hands up, but the driver of the vehicle was not complying with his commands. Officer Palmer advised that he observed a large amount of blood inside the vehicle, as well as on the driver of the vehicle. Officer Palmer stated that he backed up a little bit and an officer on the driver's side of the vehicle was able to open the driver's side door and the driver of the vehicle was removed from the vehicle. Officer Palmer indicated that as the driver of the vehicle was lying on the ground, he heard what he believed to be a shotgun blast. Officer Palmer advised that Officer Stubbs accidentally discharged his shotgun into the ground.

Repo Officer
0719/BRUEGGER, MATTHEW

Printed At
10/13/2011 14:04

Page 5 of 6

Pasadena 0680

EXHIBIT 28

**11-17770**

Supplement No
0006

# Pasadena Police Department

## Narrative

*Officer Palmer described the suspect vehicle as a tan colored Chevrolet Z71 truck and described the driver and sole occupant of the vehicle as a Hispanic male in his early to mid 20s.* **Refer to Officer Palmer's video recorded statement for further details.**

At the conclusion of the above listed video recorded statements, I contacted Detective Young and advised him of the details of the statements. I also provided Detective Young with DVDs containing the above listed video recorded statements.

No further police action taken.

**M.E. Bruegger**
**#0719**

| Report Officer | Printed At | |
|---|---|---|
| 0719/BRUEGGER,MATTHEW | 10/13/2011 14:04 | Page 6 of 6 |

EXHIBIT 28

**11-17770**   Supplement No 0009

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
08/01/2011
Nature of Call
SHOOTING
Officer
BITTNER, DANIEL

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | 11-17770 | 0009 | 08/01/2011 | 13:48 | 110722057 |

| Status | | | | Nature of Call | | | |
|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | Shooting | | | |

| Location | | | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time | | |
|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 | | |

| Officer | Assignment | 2nd Officer | Assignment |
|---|---|---|---|
| 0533/BITTNER, DANIEL | DETECTIVE | MARTIN, MICHAEL | PATROL |

| Entered by | Assignment | Confidential | | RMS Transfer | Prop Trans Stat | |
|---|---|---|---|---|---|---|
| 0533 | DETECTIVE | City Employee Investigation | | Failed | Pending | |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 6373 | 08/03/2011 | 08:14:01 |

## Summary Narrative

Detective supplement

## Property

| Item | Agency | | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | | | 11-17770 | | 11-17770 | 0009 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | | Item No | # Pieces | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08/01/2011 | Yes | No | 110017770 | | 1 | 1 | | | |

| Description | | | Typ |
|---|---|---|---|
| CDrom w/ surveillance footage from Maisah Store | | | A |

| Cat | | Article | |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | PHOTOGRAPHIC EVIDENCE (PHOTOS /LINEUPS) | |

| Entered Date | Entered Time | Control | |
|---|---|---|---|
| 08/01/2011 | 13:48 | 0533  0801111350 | |

| Item | Agency | | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | | | 11-17770 | | 11-17770 | 0009 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | | Item No | # Pieces | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08/01/2011 | Yes | No | 110017770 | | 2 | 1 | | | |

| Description | | | Typ |
|---|---|---|---|
| DVD Interview with Officer R. Yzaguirre | | | A |

| Cat | | Article | Entered Date | Entered Time |
|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | RECORDINGS (VIDEO /AUDIO) | 08/01/2011 | 13:50 |

| Control | |
|---|---|
| 6373  0803110814 | |

## Modus Operandi

| Crime Code(s) |
|---|
| ASSAULTS |

## Narrative

11-17770

On 7-22-11 at approximately 3:30am, I was notified by Sgt. K. Crislip that I was needed to assist in the investigation of an officer-involved shooting at 2600 Spencer Hwy. I was instructed to meet at the intersection of Red Bluff Rd. and Grand St., which was the final resting point of a chase with the suspect/shooting victim that ensued following the original traffic stop made by Officer Martin on Spencer Hwy.

I arrived on scene at Red Bluff Rd. and Grand St. at approximately 4:15am and met with Sgt. Crislip and lead investigator M. Young. Det. Young briefed me as to what had occurred prior to my arrival. He stated that Officer M. Martin had approached a traffic violator who after being contacted did something to warrant Officer Martin to draw and fire his duty weapon at the suspect while the suspect was sitting inside his own vehicle. Following the

| Report Officer | Printed At | |
|---|---|---|
| 0533/BITTNER, DANIEL | 10/13/2011 14:04 | Page 1 of 3 |

EXHIBIT 28

**11-17770**    Supplement No
0009

# Pasadena Police Department

<span style="background:black;color:white">Narrative</span>

hooting the suspect fled the parking lot of 2600 Spencer Hwy. and fled east on Spencer Hwy. at a high rate of speed. The suspect vehicle was pursued to Red Bluff Rd. and Grand St. where the vehicle eventually came to a stop, but only after striking a tree on Dabney St. during the chase.   The suspect was reportedly shot one time in the face.  Detective Young directed me to the Maisah Food Mart at 2626 Spencer Hwy.   Once at that location I was to document the location and see to the collection of any pertinent evidence including shell casings and surveillance footage from any of the businesses located in the strip center along side of the Maisah Food Mart.

Det. Young mentioned that during the chase, the suspect reportedly left the roadway on Dabney St. at Grunewald Dr. and struck a tree.  Prior to arrival on Spencer Hwy., I went to Dabney St. and Grunewald Dr. to inspect the area.  I noted where yaw marks left by a vehicle had left the roadway in an apparent attempt to turn from westbound Grunewald Dr. to northbound Dabney St.   The vehicle struck a curb and left the roadway entering the large median, which separated northbound and southbound Dabney St.   Approximately 30 yards north of the curb there was a tree which had been cut in half about 3 feet from the ground and uprooted.  The upper half of the tree was approximately 25 feet north of the initial location of the where the tree had been planted.   The tree appeared to be approximately 10" in diameter.  Lying next to the upper half of the tree was a Texas license plate bearing the number ▓▓▓▓▓▓  This license plate returned to Victor Hernandez, ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓  I took several digital photos of the area prior to proceeding to 2600 Spencer Hwy.

I arrived on Spencer Hwy at approximately 5:00am and met with Officer Jose Martinez with the Crime Scene Unit.  Martinez stated that he was instructed by Detective Young to obtain general scene photographs, and to mark then recover the three spent shell casings from the scene. The scene would be scale diagramed at a later date.  While on scene I noted that, the Maisah Food Store had surveillance cameras on the outside of the business.   I later met with Faisal Kahn a clerk and the manager of the store, Mohamad Majib.  Mr. Majib allowed me access to the surveillance recorded where a copy of the parking lot video was downloaded onto a DVD as evidence.  There were three different angles of the parking lot surveillance video that showed the suspect vehicle and Officer Martin pulling onto the parking lot.   The furthest east camera on the building obtained the incident via the passenger side of the suspect vehicle.  The passenger window appeared open as the driver's right arm could be seen holding the steering wheel or the gearshift lever.  The driver's head was only partially visible.  This video did not fully reveal the driver's activities just prior to the shooting.   The surveillance footage was later turned over to Detective Young.

At approximately 7:15am, I met with Officer R. Yzaguirre in the Detective Division office for purposes of obtaining a video-recorded affidavit from him regarding Officer Martin's shooting.  My interview with Yzaguirre reflected the following:  Yzaguirre is currently assigned to the Patrol Division and working the night shift.  He has been employed by the City of Pasadena for the past 19.5 years.  On 7-22-11, he was assigned to monitor traffic in the area of Spencer Hwy. and Shaver St. as part of a traffic initiative that included several patrol officers.  He had stopped in the area of 2200 Spencer Hwy. to assist Sgt. G. White with a traffic stop when he observed another police unit stopping a black Chevrolet pick up truck, which had been traveling at a high rate of speed eastbound from Shaver St.  The officer, later identified as Officer M. Martin pulled the vehicle into the parking lot of 2626 Spencer Hwy.  The suspect vehicle and Martin's vehicle were facing east.  Yzaguirre pulled into the parking lot from the north entrance and stopped his vehicle perpendicular to the violator and Martin's vehicles.  His headlights were shining in the open window of the suspect vehicle.  Officer Martin was already walking up to the driver's side door.  As Yzaguirre was exiting his vehicle with one foot out of the door, he observed the violator's vehicle drift backward and notified Martin that it did not appear the vehicle was in park.  The violator's vehicle then pulled forward slightly.  Martin commanded the driver to put the vehicle in park.  Yzaguirre observed Martin standing at the open driver's window appearing to struggle with the driver or reaching into the vehicle to put the truck in park.  Yzaguirre said his view was blocked by Martin.  Yzaguirre had a sense that the violator was going to flee the scene because prior to Martin contacting the driver, Yzaguirre thought the driver looked "antsy" or was "fidgeting" too much inside the vehicle.  Yzaguirre turned to get back into his vehicle as soon as it looked like the driver would flee.    As he was entering his vehicle, he heard three gunshots and initially assumed the suspect was shooting at him and Martin.  The shots were spaced as one shot a short pause then two consecutive shots.  After Yzaguirre entered his vehicle, he observed Martin running back to his car. Yzaguirre gave chase of the suspect vehicle as it exited the north driveway of the business and drove away eastbound.  The suspect vehicle was pursued close behind by Officer Stubbs then Yzaguirre.  The vehicle fled east on Spencer Hwy. to Waters St.  The vehicle turned north on Waters then it drove west through an empty field north of Grunewald before entering

| Report Officer | Printed At | |
|---|---|---|
| 0533/BITTNER,DANIEL | 10/13/2011 14:04 | Page 2 of 3 |

EXHIBIT 28

**11-17770**    Supplement No
0009

# Pasadena Police Department

**Narrative**

'rimrose St. where it turned back south and then west onto Grunewald.   At this point in the chase, Yzaguirre said that he was out of the chase because neither he nor Stubbs followed behind the suspect as it drove through the empty lot.

Yzaguirre did not hear the suspect make any statements while at 2626 Spencer Hwy.  He noted that the suspects eyes appeared "glazed over" and he thought for a moment that the suspect didn't speak English because of the look on the suspect's face.  He never saw the suspect's hands at any time.  Yzaguirre stated that he did not see Martin fire his weapon during this incident.   After the suspect vehicle was stopped at Red Bluff and Grand St., Yzaguirre remembers an officer asking the suspect several times if he had any weapons on him and the suspect replied, "No."  All these questions were asked in English.  Therefore, he understood that the suspect did speak English.

Following my interview with Yzaguirre, I transferred the interview onto a DVD and labeled it as "original."    The DVD was tagged and logged as evidence.

End of report
Det. D. P. Bittner  0533

| Report Officer | Printed At | |
|---|---|---|
| 0533/BITTNER,DANIEL | 10/13/2011 14:04 | Page 3 of 3 |

EXHIBIT 28

**11-17770**  Supplement No 0013

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

Reported Date
08/19/2011
Nature of Call
SHOOTING
Officer
GONZALES, JOSEPH

PHONE: (713)477-1221

FAX: (713)477-4976

## Administrative Information

| Agency | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | 11-17770 | | 0013 | 08/19/2011 | | 09:08 | 110722057 |

| Status | | Nature of Call | |
|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | Shooting | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | PASADENA | | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | | To Time | |
|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | | 02:35 | |

| Officer | | | Assignment | 2nd Officer | | Assignment |
|---|---|---|---|---|---|---|
| 2887/GONZALES, JOSEPH | | | DETECTIVE | MARTIN, MICHAEL | | PATROL |

| Entered by | Assignment | Confidential | | RMS Transfer | Prop Trans Stat |
|---|---|---|---|---|---|
| 2887 | DETECTIVE | City Employee Investigation | | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 1415 | 08/19/2011 | 09:45:47 |

## Summary Narrative

Detective Supplement

### WITNESS 10: NARON, STEPHEN

| Involvement | Invl No | Type | | Name | | | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WITNESS | 10 | Individual | | NARON, STEPHEN | | | | | 294419 | WHITE | MALE |

| DOB | | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 30 | No | 5'10" | 150# | BROWN | BROWN | 501741 | | | |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | | | | |

| ZIP Code | Date | |
|---|---|---|
| | 08/19/2011 | |

### Property

| Item | Agency | | | Report No | | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | | 11-17770 | | 11-17770 | | 0013 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | | Item No | # Pieces | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08/19/2011 | Yes | No | 11017770 | | 56 | 1 | | | |

| Description | | | | | | | | Typ | Cat |
|---|---|---|---|---|---|---|---|---|---|
| DVD of interview with Officer C. Jones | | | | | | | | A | MISCELLANEOUS |

| Article | | Entered Date | | Entered Time | RMS Transfer | | Control | |
|---|---|---|---|---|---|---|---|---|
| UNLISTED MISCELLANEOUS | | 08/19/2011 | | 09:29 | Successful | | 4613 | 0825111712 |

| Item | Agency | | | Report No | | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | | 11-17770 | | 11-17770 | | 0013 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | | Item No | # Pieces | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08/19/2011 | Yes | No | 11017770 | | 57 | 1 | | | |

| Description | | | | | | | | Typ | Cat |
|---|---|---|---|---|---|---|---|---|---|
| DVD of interview with Sgt. M. Norman | | | | | | | | A | MISCELLANEOUS |

| Article | | Entered Date | | Entered Time | RMS Transfer | | Control | |
|---|---|---|---|---|---|---|---|---|
| UNLISTED MISCELLANEOUS | | 08/19/2011 | | 09:30 | Successful | | 4613 | 0825111712 |

| Item | Agency | | | Report No | | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 3 | Pasadena Police Department | | | 11-17770 | | 11-17770 | | 0013 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | | Item No | # Pieces | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08/19/2011 | Yes | No | 11017770 | | 58 | 1 | | | |

| Description | | | | | | | | Typ | Cat |
|---|---|---|---|---|---|---|---|---|---|
| DVD of interview with Stephen Naron | | | | | | | | A | MISCELLANEOUS |

| Article | | Entered Date | | Entered Time | RMS Transfer | | Control | |
|---|---|---|---|---|---|---|---|---|
| UNLISTED MISCELLANEOUS | | 08/19/2011 | | 09:31 | Successful | | 4613 | 0825111712 |

| Report Officer | Printed At | |
|---|---|---|
| 2887/GONZALES, JOSEPH | 10/13/2011 14:04 | Page 1 of 7 |

EXHIBIT 28

**11-17770**    Supplement No. 0013

# Pasadena Police Department

| Item 4 | Agency Pasadena Police Department | | | Report No. 11-17770 | | Original Incident 11-17770 | | Original supplement 0013 | Involvement EVIDENCE |
|---|---|---|---|---|---|---|---|---|---|
| Inv Date 08/19/2011 | In Custody? Yes | Security No | Tag No 11017770 | Item No 59 | # Pieces 1 | | | | |

| Description | | | | | | | | Typ A | Cat MISCELLANEOUS |
|---|---|---|---|---|---|---|---|---|---|
| CDR recording of video surveillance from 2204 Red | | | | | | | | | |
| Article UNLISTED MISCELLANEOUS | | Entered Date 08/19/2011 | | Entered Time 09:31 | RMS Transfer Successful | | Control 4613 | 0825111712 | |

| Item 5 | Agency Pasadena Police Department | | | Report No. 11-17770 | | Original Incident 11-17770 | | Original supplement 0013 | Involvement EVIDENCE |
|---|---|---|---|---|---|---|---|---|---|
| Inv Date 08/19/2011 | In Custody? Yes | Security No | Tag No 11017770 | Item No 60 | # Pieces 1 | | | | |

| Description | | | | | | | | Typ A | Cat MISCELLANEOUS |
|---|---|---|---|---|---|---|---|---|---|
| MVR 69 | | | | | | | | | |
| Article UNLISTED MISCELLANEOUS | | Entered Date 08/19/2011 | | Entered Time 09:33 | RMS Transfer Successful | | Control 4613 | 0825111712 | |

| Item 6 | Agency Pasadena Police Department | | | Report No. 11-17770 | | Original Incident 11-17770 | | Original supplement 0013 | Involvement EVIDENCE |
|---|---|---|---|---|---|---|---|---|---|
| Inv Date 08/19/2011 | In Custody? Yes | Security No | Tag No 11017770 | Item No 61 | # Pieces 1 | | | | |

| Description | | | | | | | | Typ A | Cat MISCELLANEOUS |
|---|---|---|---|---|---|---|---|---|---|
| mvr # 940 | | | | | | | | | |
| Article UNLISTED MISCELLANEOUS | | Entered Date 08/19/2011 | | Entered Time 09:34 | RMS Transfer Successful | | Control 4613 | 0825111712 | |

| Item 7 | Agency Pasadena Police Department | | | Report No. 11-17770 | | Original Incident 11-17770 | | Original supplement 0013 | Involvement EVIDENCE |
|---|---|---|---|---|---|---|---|---|---|
| Inv Date 08/19/2011 | In Custody? Yes | Security No | Tag No 11017770 | Item No 62 | # Pieces 1 | | | | |

| Description | | | | | | | | Typ A | Cat MISCELLANEOUS |
|---|---|---|---|---|---|---|---|---|---|
| mvr # 654 | | | | | | | | | |
| Article UNLISTED MISCELLANEOUS | | Entered Date 08/19/2011 | | Entered Time 09:34 | RMS Transfer Successful | | Control 4613 | 0825111712 | |

| Item 8 | Agency Pasadena Police Department | | | Report No. 11-17770 | | Original Incident 11-17770 | | Original supplement 0013 | Involvement EVIDENCE |
|---|---|---|---|---|---|---|---|---|---|
| Inv Date 08/19/2011 | In Custody? Yes | Security No | Tag No 11017770 | Item No 63 | # Pieces 1 | | | | |

| Description | | | | | | | | Typ A | Cat MISCELLANEOUS |
|---|---|---|---|---|---|---|---|---|---|
| MVR # 4737 | | | | | | | | | |
| Article UNLISTED MISCELLANEOUS | | Entered Date 08/19/2011 | | Entered Time 09:36 | RMS Transfer Successful | | Control 4613 | 0825111712 | |

| Item 9 | Agency Pasadena Police Department | | | Report No. 11-17770 | | Original Incident 11-17770 | | Original supplement 0013 | Involvement EVIDENCE |
|---|---|---|---|---|---|---|---|---|---|
| Inv Date 08/19/2011 | In Custody? Yes | Security No | Tag No 11017770 | Item No 64 | # Pieces 1 | | | | |

| Description | | | | | | | | Typ A | Cat MISCELLANEOUS |
|---|---|---|---|---|---|---|---|---|---|
| MVR # 4784 | | | | | | | | | |
| Article UNLISTED MISCELLANEOUS | | Entered Date 08/19/2011 | | Entered Time 09:38 | RMS Transfer Successful | | Control 4613 | 0825111712 | |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

**Details:**

On July 22, 2011, at approximately 3:00 a.m., I was contacted by Detective M.R. Young, of the Pasadena Police Department Criminal Investigations Division, by telephone. Detective Young requested assistance in investigating an Officer Involved Shooting, which had occurred in the area of 2600 Spencer, but requested my assistance in the 2200 block of Red Bluff.

I traveled to the 2200 block of Red Bluff and arrived on scene at approximately 3:49 a.m. Upon arrival, contact was made with Detective Young and I was briefed on the incident and the duties which Detective Young requested I perform. Detective Young requested I collect all available Mobile Video Recorder videos from all patrol units which have a functional system.

The following is a list of MVR recordings collected:

| Report Officer 2887/GONZALES, JOSEPH | Printed At 10/13/2011 14:04 | Page 2 of 7 |
|---|---|---|

EXHIBIT 28

11-17770 

# Pasadena Police Department

**Narrative**

MVR #946   Officer M. Martin
MVR # 654   Officer M. Martin (Not in Recorder)
MVR # 089   Officer W. J. Palmer

After collecting MVR videos, Detective Young requested I assist Detective M. Bruegger, who was currently at the Pasadena Police Department, in interviewing witnesses to the incident, consisting mostly of patrol officers. Prior to travelling to the Pasadena Police Department, the surveillance recording equipment to the business located at 2204 Red Bluff was reviewed. The end of the pursuit was captured on Camera 7. The incident was recorded to a CDR and collected as evidence.

I traveled to 1201 Davis, the Pasadena Police Department, and met Officer C. Jones, Sergeant M. Norman and the witness Stephan Naron in the Criminal Investigations Division in order to obtain video recorded affidavits from each.

Officer C. Jones, of the Pasadena Police Department Patrol Division, was escorted to an interview room where he provided a video recorded affidavit of his accounts of the incident. The following is a summary of Officer Jones' video recorded affidavit:

*The interview was conducted on July 22, 2011, at approximately 6.05 a.m. The subject identified himself as Christopher Jones a Police Officer employed by the City of Pasadena, TX assigned to night shift patrol. Officer Jones advised he was travelling westbound on Vista after he completed a traffic stop in the area of Vista and Burks. As he approached the intersection of Vista and Strawberry, he heard Officer Stubbs broadcast over the police radio, he was attempting to catch a vehicle that had possibly shot at officers during a traffic stop. Officer Jones was unable to recall the exact time the pursuit started but estimated the time to be between 2:30 a.m. and 3.00 a.m. Officer Jones was unaware of where the incident had occurred but referenced his onboard computer and observed a unit on traffic in the area of Spencer and Shaver. Officer Jones continued west on Vista until reaching the intersection of Vista and Shaver. Officer Jones turned north onto Shaver towards Spencer. It was then he heard the location of the pursuit and learned the pursuit had originated in the area of Westside and Spencer. The pursuit was headed east on Spencer from Westside. Officer Jones turned east on Spencer in an attempt to catch up to the pursuit. Officer Jones continued to follow the pursuit and eventually caught up to the pursuit in the area of Burke and Southmore. The vehicle continued north on Burke and turned east on Grand where the pursuit terminated. After the vehicle stopped, Officer Jones noted the damage to the vehicle and believed the vehicle stopped because it was disabled. Several Officers approached the suspect vehicle from the driver's side. Officer Jones identified the Officers as Sergeant G. White, Officer W. Palmer, himself and possibly Officer J. Mubarak. Officer Jones observed the suspect in the vehicle with his hands up. Officer Jones observed blood on the left front passenger door, and in the cab of suspect vehicle. The suspect was ordered out of the vehicle, which he complied, and secured by Officer Sweet. An ambulance was called for the suspect.*

*Officer Jones advised that when the incident began, he did not know who had been involved in the shooting. Officer Jones did not witness the shooting nor the events which led to the shooting. Officer Jones believed that Officer Naron had informed responding officer, via the police radio, that he had been the officer who had been involved in the shooting. Officer Jones advised he learned this information approximately midway through the pursuit. Officer Jones also confirmed no shots were fired at the end of the pursuit. The suspect was taken into custody without further incident.*

Officer Jones was unable to forward any addition details so the interview was terminated.

**Refer to Officer Jones' Video Recorded Affidavit for further details.**

Officer Jones' interview was recorded to DVD which was collected as evidence. The DVD was entered into the BEAST Property Inventory System, tagged, logged and secured in the property room. It should be noted that Officer M. Young was provided with three copies of the interview.

Sergeant M. Norman, of the Pasadena Police Department Patrol Division, was escorted to an interview room where he provided a video recorded affidavit. The follow is a summary of the interview with Sergeant Norman.

*The interview was conducted on July 22, 2011 at approximately 6.15 a.m. The subject identified himself as*

EXHIBIT 28

11-17770  Supplement H: 0012

# Pasadena Police Department

## Narrative

Michael Norman. Mr. Norman advised he is a Sergeant employed by the Pasadena Police Department and is currently assigned to the Night Shift Patrol Division. While monitoring the police radio, Sergeant Norman heard a possible shooting being broadcasted in the area of Spencer and Westside. Sergeant Norman also heard a pursuit had been initiated and was headed east on Spencer. Sergeant Norman proceeded to the area in an attempt to intercept the pursuit. Sergeant Norman overheard Officer Martin broadcast that he had "fired a couple of shots". Sergeant Norman managed to catch up to the pursuit as it was terminating. He positioned his patrol unit in a manner where he could oversee the "high risk" (traffic stop). Sergeant Norman advised that as patrol officers approached the vehicle, the driver of the vehicle refused to obey verbal commands. From his position, Sergeant Norman could see the driver of the vehicle was "real bloody". Patrol Officers then attempted to open the passenger door of the vehicle but the door would not open, all the while, officers approached the left side of the vehicle and were able to get the driver out of the vehicle and place him in a prone position next to the vehicle. As officers conducted a secondary search of the vehicle, to ensure there were no other occupants in the vehicle, Sergeant Norman heard a gunshot from behind his position. Sergeant Norman turned and observed a shotgun lying on the ground and believed someone had inadvertently discharged their weapon into the ground. Sergeant Norman secured the weapon, emptied the magazine, and had an officer place the shotgun in their patrol unit. Sergeant Norman returned to his duty of overseeing the original reasons why they had come to the location, which was to investigate the shooting and pursuit.

Sergeant Norman indicated he was not present during the course of the original shooting, which occurred in the area of Spencer and Westside. Originally, Sergeant Norman was unaware who had been involved in the original incident until Officer Martin clarified, over the police radio, he had been the one involved and that he was the one who had fired the shots. Sergeant Norman could not advise what time the incident had occurred or what time the pursuit had been initiated.

Sergeant Norman had been present for the discharge of the shotgun at the end of the pursuit. Sergeant Norman was confident the round fired from the shotgun was directed into the ground and not in close proximity to the driver of the vehicle. Sergeant Norman was also confident the suspect was not injured as a result of the discharge of the shotgun at the end of the pursuit. Prior to the discharge of the shotgun, Sergeant Norman had observed injuries to the driver's facial area. There were no other injuries sustained after the termination of the pursuit. Sergeant Norman advised he had no verbal or physical contact with the driver of the vehicle. He also identified the Officer who had inadvertently discharged the shotgun into the ground as Officer W. Stubbs.

The only contact Sergeant Norman had with Officer Martin was to reassure him that "everything was going to be all right." Sergeant Norman made a point not to discuss the details of the incident with Officer Martin.

Sergeant Norman was unable to forward any additional information so the interview was terminated.

Refer to Sergeant Norman's Video Recorded Affidavit for further details.

Sergeant Norman's interview was recorded to DVD and collected as evidence. The DVD was entered into the BEAST Property Inventory System, tagged logged, and secured in the property room. It should be noted Detective Young was provided with three copies of the interview with Sergeant Norman.

The witness Stephen Naron was escorted to an interview room, located in the Criminal Investigations Division, where he provided a video recorded affidavit on his accounts of the incident. The following is a summary of the interview with Mr. Naron.

The interview was conducted on July 22, 2011, at approximately 6:30 a.m. The witness identified himself as Stephen Naron and provided a date of birth of March 10, 1981. Mr. Naron was presented a printed copy of the Aggravated Perjury Statute which he read and acknowledged he understood the repercussions if he intentionally provided false information. Mr. Naron was doing a "Ride-Along" with Officer Stubbs during the morning hours of July 22, 2011. Mr. Naron indicated he was not a member of an organization, such as a citizen's police academy group, police explorers, but was a good friend of Officer W. Stubbs. Mr. Naron has wanted to do a ride-along for some time and he and Officer Stubbs finally made the necessary arrangements for him to ride on this particular night. Officer Stubbs picked up Mr. Naron at his residence on July 21, 2011 at approximately 9:30 p.m., before the start of Officer Stubbs' shift. Mr. Naron advised that prior to the incident, they had stopped in the parking lot of Pasadena Honda, approximately the 2900 block of Spencer, because they believed there was something

Report Officer
2887/GONZALES, JOSEPH

Printed By
10/13/2011 14:04

Page 4 of 7

Pasadena 0688

EXHIBIT 28

11-17770   Supplemental 0013

# Pasadena Police Department

## Narrative

mechanically wrong with Officer Stubbs' patrol unit. Upon closer inspection, they observed a stick under the vehicle. They removed the stick and began exiting the parking lot. As they were exiting the parking lot, Officer Stubbs heard sirens in the area and began driving towards the source of the sound. As they were traveling west on Spencer, Mr. Naron could see overhead lights in the distance. As they approached the area, Mr. Naron heard gunshots. Mr. Naron could advised exactly how many gunshots he heard but advised he heard more than one but less than four. Mr. Naron did not observe the events leading up to the shots being fired and added that he and Officer Stubbs were a substantial distance away from the traffic stop to actually witness any activity at the traffic stop. As they approached the vicinity of the traffic stop, Mr. Naron observed a truck "peel" out of a gas station parking lot and sped east on Spencer. He described the truck as a dark colored, possibly blue, Chevrolet truck. The vehicle passed Officer Stubbs and Mr. Naron, who were still traveling west on Spencer, at which time, Officer Stubbs made a u-turn to pursue the vehicle. The vehicle led officers on a chase through a field and several unnamed roads. When the vehicle left the roadway and drove through the field, Officer Stubbs did not follow the vehicle and lost his position in the pursuit. Other officers pursued the vehicle as it exited the field and Officer Stubbs was forced to catch up to the pursuit. Officer Stubbs caught up to the pursuit and followed the pursuit to its end. When the vehicle stopped, Mr. Naron remained in the vehicle as Officer Stubbs and other officers exited their vehicles to "apprehend the suspect". Mr. Naron remained in the vehicle for over an hour and did not observe the suspect being taken into custody. By the time Mr. Naron exited the patrol unit, Detectives had arrived on scene and the suspect had been transported to the hospital.

Mr. Naron was unable to forward any addition information so the interview was terminated. Mr. Naron was escorted from the interview room to the lobby of the Pasadena Police Department.

**Refer to Stephen Naron's Video Recorded Affidavit for further details.**

The interview with Mr. Naron was recorded to a DVD. The DVD was entered into the BEAST Property Inventory System where it was tagged, logged and secured in the property room.
The collected recordings from the Mobile Video Recorders were viewed. The first viewed was to Unit 9540 driven by Officer M. Martin. The recording of the incident was located on MVR VHS videotape # 940, collected from Officer Martin's assigned unit. According to the date stamp and time stamp on the video, the incident began recording at 01:45:38 on 07/22/2011. According to dispatch records, at 02:27:52, Officer Stubbs began broadcasting the pursuit of the suspect vehicle. There was no dispatch record of the initial traffic stop conducted by Officer Martin. The only audio available for the video was that of the interior of the vehicle. Throughout the course of the incident, the vehicle's car stereo could be heard, along with the gunshots and police radio, however the violator contact, between Officer Martin and the driver of the vehicle, cannot be heard. The following is a timeline of the incident as per Officer Martin's Mobile Video Recorder:

| 01:45:38 | Officer Martin's MVR is activated and he begins to pursue a vehicle with lights and siren activated. |
|---|---|
| 01:45:45 | Vehicle comes into camera view but is still unidentifiable. Vehicle is observed traveling in the inside lane. |
| 01:45:49 | Vehicle can be identified as a dark colored truck, possibly Chevrolet. |
| 01:45:50 | Brake lights and right turn signal are activated on suspect vehicle presumably acknowledging Officer Martin's presence. |
| 01:45:52 | Vehicle begins changing lanes. |
| 01:45:54 | Vehicle completes lane change and is now traveling in the middle lane. |
| 01:45:55 | Vehicle begins changing lanes from middle lane to outside lane. |
| 01:45:58 | Vehicle completes second lane change and is now traveling in outside lane. Right signal was still activated. |
| 1:46:11 | Vehicle approaches an intersection, presumably Westside at Spencer, and begins negotiating a right hand turn. |

EXHIBIT 28

11-17770    Supplement No. 0013

# Pasadena Police Department

## Narrative

**01:46:14** Vehicle completes right turn and is momentarily out of camera view. Officer Martin begins negotiating the right hand turn.

**01:46:16** Vehicle returns into camera view as Officer Martin negotiates the right hand turn. Suspect vehicle is seen turning left into the parking lot of a business, presumably 2626 Spencer.

**01:46:18** Officer Martin begins to negotiate the left hand turn into the same parking lot as the suspect vehicle, presumably 2626 Spencer. Suspect vehicle goes out of camera view.

**01:46:19** Officer Martin continues his left hand turn into the parking lot and vehicle comes into camera view. Vehicle is rolling to a stop.

**01:46:22** Suspect vehicle stops and Officer Martin's patrol unit approaches the suspect vehicle from behind.

**01:46:24** Officer Martin stops his patrol unit behind the suspect vehicle and illuminates the passenger cab of the vehicle.

**01:46:34** Sound of vehicle door closing is heard, presumably Officer Martin exiting the vehicle.

**01:46:36** Suspect vehicle appears to be rolling backwards towards Officer Martin's patrol unit.

**01:46:37** Officer Martin enters camera view as he approaches the vehicle along the left side in order to initiate violator contact.

**01:46:39** Officer Martin appears to have initiated violator contact from a distance of approximately five feet from the suspect vehicle.

**01:46:41** Suspect vehicle begins to roll forward.

**01:46:42** Officer Martin reaches for his service weapon and appears to be giving the driver of the vehicle verbal commands.

**01:46:43** Officer Martin unholsters his service weapon and points his service weapon at the cab of the vehicle while closing the distance between him and the vehicle. Suspect vehicle continues to roll forward.

**01:46:44** Suspect vehicle begins to accelerate. Officer Martin continues to point his weapon at the vehicle, with his right arm at full extension. Officer Martin is following the forward progress of the vehicle and fires a single shot into the cab of the vehicle. After the first shot, the vehicle speeds away and Officer Martin begins pursue the vehicle on foot.

**01:46:45** Officer Martin is seen following along the left side of the vehicle as the vehicle accelerates through the parking lot.

**01:46:46** The vehicle is leaving camera view and presumably exiting the parking lot of the business. Officer Martin fires two more shots at the fleeing vehicle. After the second volley of shots, the vehicle and Officer Martin are now out of camera view.

**01:46:52** A second patrol unit comes into view of the camera with lights activated. This operator of the patrol unit is later identified as Officer R. Yzaguirre.

**01:46:55** The sound of the vehicle door opening, to Officer Martin's patrol unit, is heard.

**01:46:56** The second patrol unit is seen exiting the parking lot to pursue the suspect vehicle.

**01:46:57** The sound of a door closing is heard in Officer Martin's patrol unit.

EXHIBIT 28

**11-17770**   Supplement No 0013

# Pasadena Police Department

1:46:59          Officer Martin accelerates begins to accelerate out of the parking lot.

01:47:04        Officer Martin exits the parking lot and makes a right hand turn on the roadway, presumably the 2600 block of Spencer.  Overhead emergency
          lights can be seen in front of Officer Martin's unit.

01:47:05        Officer Martin, and other patrol units pursue the vehicle.

01:52:37        Suspect vehicle stops at the intersection of Red Bluff and Grand, terminating the pursuit.  Patrol Officers position vehicles for a "High Risk
          Traffic Stop".  Although not visible from Officer Martin's patrol unit, suspect is taken into custody without further incident.

01:53:37        Officer Stubbs accidentally discharges his patrol shotgun into the ground behind the suspect vehicle.

The VHS tape collected from Officer Martin's patrol unit, MVR # 940, was entered into the BEAST Property Inventory System as evidence
MVR # 654, VHS Tape collected from Officer Martin, was viewed but was of no evidentiary value.  The video tape was entered in the BEAST property Inventory System as evidence, tagged, logged and secured in the property room.

MVR # 69, collected from Officer W. Palmer, was viewed but was unusable due to the quality of the recording. .
The video tape was entered in the BEAST property Inventory System as evidence, tagged, logged and secured in the property room.

I reviewed the video surveillance recording collected from 2204 Red Bluff and showed the termination of the pursuit.  The suspect vehicle is seen stopping at the intersection of Grand and Red Bluff.  Several patrol units stop behind and along the right side of the vehicle.  Officers are seen approaching the vehicle and taking the suspect into custody without incident.  There was no other evidence observed.

The recording collected from 2204 Red Bluff was entered into the BEAST Property Inventory System as evidence, tagged, logged, and secured in the property room.

DVDs from Officer T. Blakenburg's (MVR # 4784 from Unit # 0789) Mobile Video Recorder and Officer S. Riddle's (MVR # 4737 from Unit # 0958) Mobile Video Recorder were provided to me by Sergeant Gary White.  Sergeant White also provided Detective Young with copies of these recordings.  Detective Young documented the details of the incident, as captured on Officer Riddle's and Officer Blakenburg's MVR,  in his Supplement Report.  The original MVRs were entered in the BEAST Property Inventory System, tagged as evidence, logged and secured in the property room.

No further action taken at this time.

**Detective J.M. Gonzales  # 2887**

| Report Officer | Printed At | |
|---|---|---|
| 2887/GONZALES,JOSEPH | 10/13/2011  14:04 | Page 7 of 7 |

EXHIBIT 28

**11-17770**    Supplement No. 0008

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
07/27/2011
Nature of Call
SHOOTING
Officer
SIMM, JON

## Administrative Information

| Agency | | | | | Report No | | Supplement No. | Reported Date | | Reported Time | CAD Call No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | | | 11-17770 | | 0008 | 07/27/2011 | | 10:55 | 110722057 |

| Status | | | | | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | | Shooting | | | | | | |

| Location | | | | | | City | | ZIP Code | | Rep Dist |
|---|---|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | | PASADENA | | 77504 | | 611F |

| Area | Beat | From Date | | From Time | To Date | To Time | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | | 02:25 | 07/22/2011 | 02:35 | | | | |

| Officer | | | | | | Assignment | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5978/SIMM,JON | | | | | | IDENTIFICATION DIVISION | | | | |

| 2nd Officer | | Assignment | Entered by | Assignment | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| MARTIN,MICHAEL | | PATROL | 5978 | IDENTIFICATION DIVISION | | | | | |

| Confidential | | | RMS Transfer | Prop Trans Stat | Approving Officer | |
|---|---|---|---|---|---|---|
| City Employee Investigation | | | Successful | Successful | 6825 | |

| Approval Date | Approval Time | | | | | |
|---|---|---|---|---|---|---|
| 07/27/2011 | 16:41:00 | | | | | |

## Summary Narrative

Crime Scene Unit supplement.

## Property

| Item | Agency | | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | | | 11-17770 | | 11-17770 | 0008 | EVIDENCE |

| Init Date | In Custody? | Security | Tag No | Item No | | | | Typ | |
|---|---|---|---|---|---|---|---|---|---|
| 07/27/2011 | Yes | No | 110017770 | 14 | | | | A | |

| Description | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| tape and 2 dvd copies of scene video | | | | | | | | |

| Cat | | Article | | Entered Date | Entered Time |
|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | RECORDINGS (VIDEO /AUDIO) | | 07/27/2011 | 10:55 |

| RMS Transfer | Control | | | | |
|---|---|---|---|---|---|
| Successful | 4613 | 0819110828 | | | |

| Item | Agency | | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | | | 11-17770 | | 11-17770 | 0008 | EVIDENCE |

| Init Date | In Custody? | Security | Tag No | Item No | | | | Typ | |
|---|---|---|---|---|---|---|---|---|---|
| 07/27/2011 | Yes | No | 110017770 | 15 | | | | A | |

| Description | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| tape and 2 dvd copies of off. walk thru video | | | | | | | | |

| Cat | | Article | | Entered Date | Entered Time |
|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | RECORDINGS (VIDEO /AUDIO) | | 07/27/2011 | 10:56 |

| RMS Transfer | Control | | | | |
|---|---|---|---|---|---|
| Successful | 4613 | 0819110828 | | | |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

Details:

On 7/22/2011, I was contacted via cell phone by dispatch, in reference to an Officer involved shooting investigation at Grand and Red Bluff. Upon arrival I contacted Officer E Ginther who was the lead Crime Scene Unit investigator. Officer Ginther advised that lead Detective M. R. Young was requesting a video be taken of the scene as well as the "Officer walk through".

Using a Panasonic DVX100B digital video camera I began videotaping the scene. Starting on Grand, from behind the marked patrol units, I documented the positions of all the units and the suspect vehicle. I continued filming as I entered the intersection of Grand / Burke and Red Bluff showing the street signs. I then circled around the

| Report Officer | Printed At | |
|---|---|---|
| 5978/SIMM,JON | 10/13/2011 14:04 | Page 1 of 2 |

EXHIBIT 28

**11-17770**    Supplement No
0008

# Pasadena Police Department

## Narrative

uspect vehicle paying close attention to the interior. I finished filming at the location where the shotgun round contacted the concrete at the rear of the suspect vehicle.

I then placed a new tape in the same video camera and filmed the Officer walk through. The walk through was conducted by Det. Young.

I returned to the Pasadena Police Department where copies of the videotapes were made. Both the originals and the copies of the two videos were packaged together, entered into the BEAST as item #14 (scene video) and item #15(Officer walk through). The videos were secured into the property room.

J.A. Simm 5978
Crime Scene Investigation

| Report Officer | Printed At | |
|---|---|---|
| 5978/SIMM, JON | 10/13/2011 14:04 | Page 2 of 2 |

EXHIBIT 28

**11-17770**    Supplement No.
0010

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

Reported Date
08/10/2011
Nature of Call
SHOOTING
Officer
MARTINEZ, JOSE

PHONE: (713) 477-1221

FAX: (713) 477-4976

## Administrative Information

| Agency | | | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | | 11-17770 | | 0010 | 08/10/2011 | | 14:47 | 110722057 |

| Status | | | | | Nature of Call | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | | Shooting | | | | | |

| Location | | | | | | City | | Zip Code | | Rep Dist |
|---|---|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | | PASADENA | | 77504 | | 611F |

| Area | Beat | From Date | | From Time | To Date | | To Time | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | | 02:25 | 07/22/2011 | | 02:35 | | | |

| Officer | | | | | | Assignment | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 4275/MARTINEZ, JOSE | | | | | | IDENTIFICATION DIVISION | | | | |

| 2nd Officer | | Assignment | Entered by | Assignment | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| MARTIN, MICHAEL | | PATROL | 4275 | IDENTIFICATION DIVISION | | | | | | |

| Confidential | | | | RMS Transfer | | Prop Trans Stat | | Approving Officer | | |
|---|---|---|---|---|---|---|---|---|---|---|
| City Employee Investigation | | | | Successful | | Successful | | 6825 | | |

| Approval Date | | Approval Time | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/18/2011 | | 13:26:49 | | | | | | | | |

## Summary Narrative

Supplement:

## Property

| Item | Agency | | | | | Report No | | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | | | | 11-17770 | | 11-17770 | | 0010 | EVIDENCE |

| Inf Date | In Custody? | Security | Tag No | Item No | # Pieces | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 16 | 1 | | | | | | |

| Description | | | | | | | | | Typ | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-Scanning Electron Microscopy kit | | | | | | | | | A | | |

| Cat | | | | | Article | | | | | | Entered Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | | | | UNLISTED EVIDENCE (TO BE PROCESSED) | | | | | | 08/10/2011 |

| Entered Time | RMS Transfer | | Control | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14:50 | Successful | | 5535 | 0818111538 | | | | | | | |

| Item | Agency | | | | | Report No | | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | | | | 11-17770 | | 11-17770 | | 0010 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 28 | 1 | | | | | | |

| Description | | | | | | | | Typ | Cat | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-Videotape recording of scene at 2626 Spencer | | | | | | | | A | MISCELLANEOUS | | |

| Article | | | Entered Date | | Entered Time | RMS Transfer | | Control | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DVD'S / CD'S/ TAPES/ ETC | | | 08/10/2011 | | 14:51 | Successful | | 5535 | 0818111538 | | |

| Item | Agency | | | | | Report No | | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Pasadena Police Department | | | | | 11-17770 | | 11-17770 | | 0010 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 29 | 1 | | | | | | |

| Description | | | | | | | | Typ | Cat | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-DVD copy of videotape recording of scene at 2626 | | | | | | | | A | MISCELLANEOUS | | |

| Article | | | Entered Date | | Entered Time | RMS Transfer | | Control | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DVD'S / CD'S/ TAPES/ ETC | | | 08/10/2011 | | 14:53 | Successful | | 5535 | 0818111538 | | |

## Modus Operandi

Case Code(s)
ASSAULTS

## Narrative

Equipment Used:

Nikon D300 SLR digital camera, Panasonic DV camcorder, DVD-R 4.7 GB compact disc, Mini DV video cassette, Scanning Electron Microscopy kit, orange colored, numbered cones and latex-non sterile gloves

| Report Officer | Printed At | |
|---|---|---|
| 4275/MARTINEZ, JOSE | 10/13/2011 14:04 | Page 1 of 3 |

EXHIBIT 28

11-17770

Statement No
0010

# Pasadena Police Department

## Narrative

Details:

On 7-22-11, at approximately 2:55am, I was dispatched to process the scene of an officer-involved shooting. I proceeded to the scene, identified as the intersection of Red Bluff/Burke, and arrived at approximately 3:20am. CSU/ID Officer Ginther, CSU/ID Officer Peeples and CSU, ID Officer Simm responded to assist in processing the scene.

Upon arrival, I contacted Detective Young, who informed me on the facts of this case. Detective Young informed me that the scene consisted of this location where the suspect vehicle had came to a stop, the location of the shooting, identified as a gasoline station located at 2826 Spencer, and the alleged route taken by the suspect as he fled from police after the shooting.

It was determined that CSU/ID Officer Peeples and I would process the actual shooting scene, identified as the "Maisah Food Mart" "Texaco" gasoline station, located 2826 Spencer, and the alleged route the suspect took as he fled from police. CSU/ID Officer Ginther and CSU/ID Officer Simm processed the scene where the suspect vehicle came to a stop, that was identified as the 600 block of Grand.

CSU/ID Officer Peeples and I proceeded to the gasoline station located at 2826 Spencer, and arrived at approximately 4:10am.

Using the above listed videotaping equipment, I videotape the scene, giving special attention to three spent cartridge cases observed on the ground near and between gasoline pump isles #6 and #7. The videotape recording of the scene was eventually labeled and tagged as 028. A copy of the videotape recording was made on a DVD and was eventually labeled and tagged as 029.

CSU/ID Officer Peeples took photographs of the scene and collected the three spent projectile cases as evidence in this case (See CSU/ID Officer Peeples supplemental report).

CSU/ID Officer Peeples and I searched the alleged route the suspect used as he fled from police for possible evidence in this case (See CSU/ID Officer Peeples supplemental report).

I proceeded to Memorial Hermann Hospital, located at 6624 Fannin in Houston, Texas, to take photographs of the suspect and to process his hands for gunshot powder residue.

Upon arrival, I contacted hospital personnel who allowed me access to the suspect in this case.

Using the above listed camera equipment, I took overall photographs of the suspect, giving special attention to his visible injuries observed on his face.

Using the above listed scanning electron microscopy kit, I processed the alleged suspect's hands for gunshot powder residue, following the instructions provided with the kit. The scanning electron microscopy kit was eventually labeled and tagged as 016.

All the evidence collected at the scene was transported to the Pasadena Police Department and secured in the Crime Scene Unit/Identification Division.

On 7-30-11, at approximately 6:00pm, evidence item, 016, was logged into the Pasadena Police Department Property room.

On 8-3-11, at approximately 10:00am, evidence item, 016, was signed out of the Pasadena Police Department Property room and transported to the "Harris County Institute of Forensic Sciences" where it was released to the custody of "Harris County Institute of Forensic Sciences" personnel for further processing and analysis at a later date.

On 8-5-11, at approximately 1:30pm, evidence items, 028 and 029, were logged into the Pasadena Police Department Property room.

The photographs taken as evidence in this case were copied on full size DVD-R compact discs. One disc was labeled as a master copy and the other disc was labeled as a working copy. The DVD-R compact discs were

Report Officer
1275/MARTINEZ, JOSE

Printed At
10/13/2011 14:04

Page 2 of 7

Pasadena 2696

EXHIBIT 28

**11-17770**  Supplement No 0010

# Pasadena Police Department

**Narrative**

ubsequently released to Pasadena Police Department Photo Lab personnel as evidence in this case.

**J. Martinez 4275**
**Crime Scene Investigator**

| Report Officer | Printed At | |
|---|---|---|
| 4275/MARTINEZ,JOSE | 10/13/2011 14:04 | Page 3 of 3 |

EXHIBIT 28

**11-17770**   Supplement No 0011

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
**08/12/2011**
Nature of Call
**SHOOTING**
Officer
**GINTHER, KENNETH**

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| Pasadena Police Department | 11-17770 | 0011 | 08/12/2011 | 10:34 | 110722057 |

| Status | Nature of Call |
|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | Shooting |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 2626 SPENCER HWY | | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 |

| Officer | Assignment |
|---|---|
| 2717/GINTHER, KENNETH | IDENTIFICATION DIVISION |

| 2nd Officer | Assignment | Entered by | Assignment |
|---|---|---|---|
| MARTIN, MICHAEL | PATROL | 2717 | IDENTIFICATION DIVISION |

| Confidential | RMS Transfer | Prop Trans Stat | Approving Officer |
|---|---|---|---|
| City Employee Investigation | Successful | Successful | 6825 |

| Approval Date | Approval Time |
|---|---|
| 08/18/2011 | 13:43:45 |

| Diagram | Evidence Submitted | Wrecker Slip | Lab Analysis Request | Photos |
|---|---|---|---|---|
| Yes | Yes | Yes | Yes | Yes |

## Summary Narrative

Crime Scene Supplement

### Vehicle: AE50103

| Involvement | Type | Vehicle License# | State | Lic Year | Lic Type | Year | Make | Model |
|---|---|---|---|---|---|---|---|---|
| SUSPECT | TRUCK/VAN/SUV | | | 2011 | TRUCK | 1999 | Chevrolet | Silverado |

| Style | Color | VIN | Dispo | Dispo Date |
|---|---|---|---|---|
| PICKUP - TRUCK | BLUE | | IMPOUNDED | 07/26/2011 |

### Property

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 33 | 2 |

| Description | Typ |
|---|---|
| DNA Swabs from - lead fragment | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/12/2011 | 10:39 |

| RMS Transfer | Control |
|---|---|
| Successful | 5535   0818111539 |

| Item | Agency | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 34 | 2 |

| Description | Typ |
|---|---|
| DNA Swabs from - copper jacketing | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/12/2011 | 10:40 |

| RMS Transfer | Control |
|---|---|
| Successful | 5535   0818111539 |

| Report Officer | Printed At | |
|---|---|---|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 1 of 8 |

EXHIBIT 28

**11-17770**　　Supplement No. 0011

# Pasadena Police Department

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 3 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 35 | 2 |

| Description | | Typ |
|---|---|---|
| DNA Swabs from - possible tooth | | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/12/2011 | 10:40 |

| RMS Transfer | Control |
|---|---|
| Successful | 5535　0818111539 |

---

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 4 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 36 | 2 |

| Description | | Typ |
|---|---|---|
| DNA Swabs from - bloodstain driver seat | | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/12/2011 | 10:40 |

| RMS Transfer | Control |
|---|---|
| Successful | 5535　0818111539 |

---

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 5 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 37 | 2 |

| Description | | Typ |
|---|---|---|
| DNA Swabs from - bloodstain interior rear window | | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/12/2011 | 10:40 |

| RMS Transfer | Control |
|---|---|
| Successful | 5535　0818111539 |

---

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 6 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 38 | 2 |

| Description | | Typ |
|---|---|---|
| DNA Swabs from - bloodstain exterior driver door | | A |

| Cat | Article | Entered Date | Entered Time |
|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/12/2011 | 10:40 |

| RMS Transfer | Control |
|---|---|
| Successful | 5535　0818111539 |

---

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 7 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 39 | 1 |

| Description | | Typ |
|---|---|---|
| lead fragment from passenger door jamb | | A |

| Cat | Article | Entered Date |
|---|---|---|
| AMMUNITION / CASINGS / GUN ACCESSORIES | AMMUNITION / BULLETS | 08/12/2011 |

| Entered Time | RMS Transfer | Control |
|---|---|---|
| 10:42 | Successful | 5535　0818111539 |

---

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 8 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 40 | 1 |

| Description | | Typ |
|---|---|---|
| copper jacketing from passenger door pocket | | A |

| Cat | Article | Entered Date |
|---|---|---|
| AMMUNITION / CASINGS / GUN ACCESSORIES | AMMUNITION / BULLETS | 08/12/2011 |

| Entered Time | RMS Transfer | Control |
|---|---|---|
| 10:43 | Successful | 5535　0818111539 |

---

| Item | Agency | | | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 9 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0011 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|
| 07/22/2011 | Yes | No | 110017770 | 41 | 1 |

| Description | | Typ | Cat |
|---|---|---|---|
| possible tooth from passenger door jamb | | A | MISCELLANEOUS |

| Article | Entered Date | Entered Time | RMS Transfer | Control |
|---|---|---|---|---|
| UNLISTED MISCELLANEOUS | 08/12/2011 | 10:44 | Successful | 5535　0818111539 |

---

| Report Officer | Printed At | |
|---|---|---|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 2 of 8 |

EXHIBIT 28

**11-17770**  Supplement No 0011

# Pasadena Police Department

| Item | Agency | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 10 | Pasadena Police Department | | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 42 | 1 | | | |

Description: Klein punch tool from driver floorboard | Typ: A

Cat: TOOLS / NON-VEHICULAR CONSTRUCTION EQUIP | Article: HAND TOOLS/ SHOVELS/ RAKES/ ETC

| Brand | Entered Date | Entered Time | RMS Transfer | Control | |
|---|---|---|---|---|---|
| KLEIN | 08/12/2011 | 10:47 | Successful | 5535 | 0818111539 |

| Item | Agency | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 11 | Pasadena Police Department | | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 43 | 1 | | | |

Description: Stanley screwdriver from driver floorboard | Typ: A

Cat: TOOLS / NON-VEHICULAR CONSTRUCTION EQUIP | Article: HAND TOOLS/ SHOVELS/ RAKES/ ETC

| Brand | Entered Date | Entered Time | RMS Transfer | Control | |
|---|---|---|---|---|---|
| STANLY | 08/12/2011 | 10:48 | Successful | 5535 | 0818111539 |

| Item | Agency | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 12 | Pasadena Police Department | | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 44 | 1 | | | |

Description: black leather belt - between driver seat/console | Typ: A

Cat: CLOTHING (APPAREL / SHOES / ACCESSORIES)

Article: BELT/ SCARF/ SOCKS/ GLASSES/ WATCHES /ETC

| Entered Date | Entered Time | RMS Transfer |
|---|---|---|
| 08/12/2011 | 10:49 | Successful |

Control: 5535  0818111539

| Item | Agency | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 13 | Pasadena Police Department | | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 45 | 1 | | | |

Description: black plastic trailer plug driver door pocket | Typ: A  Cat: MISCELLANEOUS

Article: UNLISTED MISCELLANEOUS

| Entered Date | Entered Time | RMS Transfer | Control | |
|---|---|---|---|---|
| 08/12/2011 | 10:50 | Successful | 5535 | 0818111539 |

| Item | Agency | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 14 | Pasadena Police Department | | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 46 | 1 | | | |

Description: Samsung cell phone from driver seat | Typ: A

Cat: TV'S / STEREO EQUIPMENT / PERSONAL DEVICES

Article: CELLPHONE/PAGER /2-WAY RADIO /AIRCARD /ETC

| Brand | Entered Date | Entered Time |
|---|---|---|
| SAMSUN | 08/12/2011 | 10:51 |

RMS Transfer: Successful | Control: 5535  0818111539

| Item | Agency | | | Report No | | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 15 | Pasadena Police Department | | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 47 | 1 | | | |

Description: pocket knife from inside center console | Typ: A

Cat: TOOLS / NON-VEHICULAR CONSTRUCTION EQUIP | Article: HAND TOOLS/ SHOVELS/ RAKES/ ETC

| Entered Date | Entered Time | RMS Transfer | Control | |
|---|---|---|---|---|
| 08/12/2011 | 10:52 | Successful | 5535 | 0818111539 |

| Report Officer | Printed At | |
|---|---|---|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 3 of 9 |

EXHIBIT 28

**11-17770**    Supplement No. 0011

# Pasadena Police Department

| Item | Agency | | | Report No | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 16 | Pasadena Police Department | | | 11-17770 | 11-17770 | | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 48 | 1 | | | |

Description: utility knife from inside center console    Typ: A

| Cat | | | | Article | | |
|---|---|---|---|---|---|---|
| TOOLS / NON-VEHICULAR CONSTRUCTION EQUIP | | | | HAND TOOLS/ SHOVELS/ RAKES/ ETC | | |
| Entered Date | Entered Time | RMS Transfer | Control | | | |
| 08/12/2011 | 11:09 | Successful | 5535  0818111539 | | | |

| Item | Agency | | | Report No | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 17 | Pasadena Police Department | | | 11-17770 | 11-17770 | | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 49 | 6 | | | |

Description: suspect's clothing from hospital    Typ: A

| Cat | | | | Article | | |
|---|---|---|---|---|---|---|
| CLOTHING (APPAREL / SHOES / ACCESSORIES) | | | | UNLISTED CLOTHING ITEMS | | |
| Entered Date | Entered Time | RMS Transfer | Control | | | |
| 08/12/2011 | 11:10 | Successful | 5535  0818111539 | | | |

| Item | Agency | | | Report No | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 18 | Pasadena Police Department | | | 11-17770 | 11-17770 | | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 50 | 2 | | | |

Description: suspect's boots from hospital    Typ: A

| Cat | | | | Article | | |
|---|---|---|---|---|---|---|
| CLOTHING (APPAREL / SHOES / ACCESSORIES) | | | | UNLISTED CLOTHING ITEMS | | |
| Entered Date | Entered Time | RMS Transfer | Control | | | |
| 08/12/2011 | 11:12 | Successful | 5535  0818111539 | | | |

| Item | Agency | | | Report No | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 19 | Pasadena Police Department | | | 11-17770 | 11-17770 | | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 51 | 1 | | | |

Description: suspect's wallet and contents    Typ: A

| Cat | | | | Article | | |
|---|---|---|---|---|---|---|
| CLOTHING (APPAREL / SHOES / ACCESSORIES) | | | | UNLISTED CLOTHING ITEMS | | |
| Entered Date | Entered Time | RMS Transfer | Control | | | |
| 08/12/2011 | 11:14 | Successful | 5535  0818111539 | | | |

| Item | Agency | | | Report No | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 20 | Pasadena Police Department | | | 11-17770 | 11-17770 | | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 07/22/2011 | Yes | No | 110017770 | 52 | 1 | | | |

Description: receipt from suspect's rf pants pocket    Typ: A

| Cat | | | | Article | | |
|---|---|---|---|---|---|---|
| CLOTHING (APPAREL / SHOES / ACCESSORIES) | | | | UNLISTED CLOTHING ITEMS | | |
| Entered Date | Entered Time | RMS Transfer | Control | | | |
| 08/12/2011 | 11:14 | Successful | 5535  0818111539 | | | |

| Item | Agency | | | Report No | Original Incident | | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|---|
| 21 | Pasadena Police Department | | | 11-17770 | 11-17770 | | 0011 | EVIDENCE |
| Inv Date | In Custody? | Security | Tag No | Item No | # Pieces | | | |
| 08/09/2011 | Yes | No | 110017770 | 55 | 2 | | | |

Description: Crime Scene diagrams    Typ: A

| Cat | | | | Article | | |
|---|---|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | | | | DOCUMENTS /STATEMENTS / EVIDENTIARY PAPERS | | |
| Entered Date | Entered Time | RMS Transfer | Control | | | |
| 08/12/2011 | 11:15 | Successful | 5535  0818111539 | | | |

| Report Officer | Printed At | |
|---|---|---|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 4 of 8 |

EXHIBIT 28

**11-17770**   Supplement No 0011

# Pasadena Police Department

| Item | Agency | | Report No. | | Original Incident | Original supplement | Involvement |
|------|--------|--|-----------|--|------------------|---------------------|-------------|
| 22 | Pasadena Police Department | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |

| Init Date | In Custody? | Security | Tag No | Item No | Value | # Pieces | Typ |
|-----------|-------------|----------|--------|---------|-------|----------|-----|
| 07/22/2011 | Yes | No | 110017770 | 53 | $6.00 | 2 | 5 |

| Cat | | Article | |
|-----|--|---------|--|
| CURRENCY / NEGOTIABLES | | CURRENCY / MONEY | |

| Property Description | Entered Date | Entered Time |
|---------------------|--------------|--------------|
| $6 CASH - 1X $5 BILL AND 1X $1 BILL | 08/12/2011 | 11:17 |

| RMS Transfer | Control | |
|--------------|---------|--|
| Successful | 5535   0818111539 | |

| Item | Agency | | Report No. | | Original Incident | Original supplement | Involvement |
|------|--------|--|-----------|--|------------------|---------------------|-------------|
| 23 | Pasadena Police Department | | 11-17770 | | 11-17770 | 0011 | EVIDENCE |

| Init Date | In Custody? | Security | Tag No | Item No | Value | # Pieces | Typ |
|-----------|-------------|----------|--------|---------|-------|----------|-----|
| 07/22/2011 | Yes | No | 110017770 | 54 | $1.24 | 7 | 5 |

| Cat | | Article | |
|-----|--|---------|--|
| CURRENCY / NEGOTIABLES | | CURRENCY / MONEY | |

| Property Description | Entered Date | Entered Time |
|---------------------|--------------|--------------|
| $1.24 CASH 1X $1 BILL, 2 DIMES, 4 PENNIES | 08/12/2011 | 11:18 |

| RMS Transfer | Control | |
|--------------|---------|--|
| Successful | 5535   0818111539 | |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

Details:

On Friday 7-22-2011 at approximately 3:00AM I responded to Red Bluff and Grand in reference to an Officer involved shooting investigation. Upon arrival we contacted Detective M.R. Young, who was the lead Detective. He requested the scene be photographed, video recorded, sketched, and any useable evidence collected. He also requested that the suspect's vehicle be processed after removal from the roadway.

Fellow Crime Scene Investigator J.A. Simm assisted me in the processed of this scene. Crime Scene Investigator J.M Martinez and J.M. Peeples processed the original scene located at 2626 Spencer. See their reports for further details.

Using a Nikon D700 digital camera I photographed the scene. Special attention was paid to the overall location which involved the paved public roadways of 2200 Red Bluff and 600 Grand. Special attention was also paid to the locations of the marked police vehicles and the suspect's vehicle.

There were six marked police vehicles at the scene. All were Ford Crown Victoria Police Interceptors. They were unit numbers 0537, 0540, 08109, 08110, 1085, and 1116. See crime scene diagram for locations and relationships. The suspect vehicle was a blue and silver 1999 Chevrolet Silverado pickup truck bearing Texas registration number ▮▮▮▮▮▮▮

None of the police cars had any noticeable damage. Photos were taken showing the suspect vehicle suffered heavy front end damage. It reportedly hit a tree and other objects prior to coming to a stop at this location. There was also a large amount of blood inside the vehicle and on the exterior driver side. There was a small hole, believed to be a bullet hole, in the plastic trim on the passenger side of the front windshield. There was another small hole, believed to be a bullet hole, in the exterior driver side of the bed of the truck, just below the gas filler door.

The interior of the truck was not searched at the scene. The vehicle's doors were closed and it was later towed by the City wrecker. The vehicle and wrecker were escorted by Crime Scene Investigator Simm to the Crime Scene Unit processing garage at 1201 Davis. The vehicle was secured to be fully processed later.

There was a bloodstain on the ground outside the driver side door. This was reportedly made when the suspect was removed from the vehicle, taken into custody and then treated by paramedics.

In the concrete at the rear of the truck, near the center of the back bumper, was a small crater approximately four inches in diameter. This was reportedly made when an officer accidentally discharged a shotgun into the ground after the suspect was taken into custody.

| Report Officer | Printed At | |
|----------------|-----------|--|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 5 of 8 |

EXHIBIT 28

11-17770

Sequence No.
0011

# Pasadena Police Department

## Narrative

When Officer Martin relinquished his pistol to Firearms Examiner Dawn LaPorte from the Pasadena Regional Crime Lab I photographed the gun, magazine and ammunition. The gun was ultimately taken by Mrs. LaPorte for further examination. See her report for further details.

Crime Scene Investigator Simm made video recordings of the crime scene and of Officer Martin giving his walk thru statement describing the details of the incident. See Simm's report for further details.

After the scene had been photographed and videotaped, the involved police vehicle's position were marked on the ground with paint, and then they were removed from the scene. The suspect vehicle's position was also marked and it was escorted to the Crime Scene Unit garage.

The scene was cleared at approximately 6:45AM on Friday 7-22-2011.

At approximately 7:30AM on Friday 7-22-2011, while at the Crime Scene Unit garage securing the suspect vehicle I was contacted by Officer C. Sweet of the Patrol Division. He had in his possession, the suspect's clothing that he had collected while at the hospital. I then took possession of the clothing. Since the items were wet with blood I secured them in the Crime Scene Unit Lab drying room to dry prior to any further processing or examination.

After the suspect vehicle and clothing were secured, I retrieved the Department's Sokkia Total Station robotic surveying machine. Crime Scene Investigator Simm and I returned to the scene at Red Bluff and Grand to take measurements to create a crime scene diagram.

After completing the measurements at Red Bluff and Grand, Crime Scene Investigator Peeples and I went to the scene at 2626 Spencer. He had marked the items of evidence at the scene with paint as well.

After completing the measurements of the scene at 2626 Spencer, I returned to the Crime Scene Unit garage to examine the suspect vehicle.

At approximately 4:30PM on Friday 7-22-2011 I examined the suspect vehicle for useable evidence. The interior of the vehicle was littered with clothing, tools, papers, and baseball equipment. The interior was also covered with numerous bloodstains.

As mentioned before, I observed what appeared to be a bullet hole in the plastic trim panel around the passenger side windshield. I removed this trim in an attempt to locate a projectile that may have made the hole. After removing the trim I observed that there was not an impact mark behind the panel, leading me believe the projectile did not completely penetrate the panel. I was also unable to locate a projectile in the space behind the trim.

I was able to locate a piece of copper jacketing in the passenger front door pocket. I also located a piece of lead in the floor by the passenger door jamb. I also located a possible human tooth on the passenger door jamb near the lead fragment. These items were photographed and collected as evidence.

In the driver floorboard I collected a Stanley screwdriver and a Klein punch tool. I collected a black leather belt that was wedged between the driver seat and center console. I also collected a black trailer plug adapter from the driver door pocket. I collected a Samsung cell phone from the driver seat, I collected a small pocket knife and a utility knife from inside the center console.

Using de-ionized water and sterile swabs for each item, I swabbed the lead fragment, the copper jacketing, and the possible tooth for DNA. I also swabbed the bloodstains on the driver seat, the interior of the rear window, and the exterior of the driver door for DNA.

All of the above mentioned items were packaged separately and secured in a locker in the Crime Scene Unit Lab at approximately 6:00PM on Friday 7-22-2011. They were to be processed further at a later date.

On Tuesday 7-26-2011 I placed aluminum trajectory rods in the possible bullet holes in the truck and photographed their directionality. The truck was then transferred to the City's impound lot by the City's wrecker. Per Detective M.R. Young, no holds were placed on the vehicle.

The DNA swabs were later tagged as evidence as follows and submitted to the Pasadena Regional Crime Lab for further analysis:

| Report Officer | Printed At | |
|---|---|---|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 6 of 8 |

EXHIBIT 28

**11-17770**     Supplement No
0011

# Pasadena Police Department

**Narrative**

Item# - Description

033 - DNA swabs from lead fragment
034 - DNA swabs from copper jacketing
035 - DNA swabs from tooth
036 - DNA swabs from driver seat
037 - DNA swabs from the interior rear window
038 - DNA swabs from the exterior driver side

The following items were tagged as evidence as follows and submitted to the Pasadena Regional Crime Lab for firearms examination:

Item# - Description

039 - Lead fragment
040 - Copper jacketing

The other items were tagged as follows and secured in the Police Property Room pending requests for any further processing:

Item# - Description

041 - Possible tooth
042 - Klein punch
043 - Stanley screwdriver
044 - Black leather belt
045 - Trailer plug adapter
046 - Samsung cell phone
047 - Pocket knife
048 - Utility knife

The following items of clothing accepted from Officer C. Sweet were tagged as evidence as follows and secured in the Police Property Room pending requests for any further processing:

Item# - Description

049 - Suspect's clothing consisting of the following items:
Black EXPRESS fitted button front short sleeve shirt
Blue Wrangler denim jeans size 30x32
White EXPRESS medium under shirt
White Nike tube socks
Black Hilfiger underwear
Brown leather belt with silver colored Texas buckle
050 - brown Ariat cowboy boots
051 - brown leather wallet and contents
052 - paper receipt from right front pants pocket
053 - US currency from right front pants pocket - $6.00
054 - US currency from wallet - $1.24

The measurements collected from each scene were later imported into the Cad Zone drawing program to complete a crime scene diagram for each scene. The diagrams were printed out and the Cad Zone digital files were copied to a DVD. These items were packaged and tagged as evidence item# 55 and secured in the Police Property Room.

The digital photos I took associated with this case were later transferred to DVD discs, marked with pertinent case information and ultimately secured in the Police Department Photo Lab for storage.

No further action at this time.

| Report Officer | Printed At | |
|---|---|---|
| 2717/GINTHER, KENNETH | 10/13/2011 14:04 | Page 7 of 8 |

EXHIBIT 28

**11-17770**

# Pasadena Police Department

**Narrative**

Officer K.E. Ginther #2717
CCSI/LPE

**11-17770**   Supplement No. 0012

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
08/15/2011
Nature of Call
**SHOOTING**
Officer
**PEEPLES, JAMES**

## Administrative Information

| Agency | | | | Report No. | | Supplement No. | Reported Date | | Reported Time | CAD Call No. |
|---|---|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | | 11-17770 | | 0012 | 08/15/2011 | | 14:35 | 110722057 |

| Status | | | | | Nature of Call | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | | Shooting | | | | | |

| Location | | | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | | PASADENA | | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | | To Time | | | |
|---|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | | 02:35 | | | |

| Officer | | | | | Assignment | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5090/PEEPLES, JAMES | | | | | IDENTIFICATION DIVISION | | | | |

| 2nd Officer | Assignment | Entered by | Assignment | |
|---|---|---|---|---|
| MARTIN, MICHAEL | PATROL | 5090 | IDENTIFICATION DIVISION | |

| Confidential | | RMS Transfer | Prop Trans Stat | Approving Officer |
|---|---|---|---|---|
| City Employee Investigation | | Successful | Successful | 6825 |

| Approval Date | Approval Time |
|---|---|
| 08/18/2011 | 13:46:32 |

## Summary Narrative

Crime Scene Supplement

### Property

| Item | Agency | | | Report No. | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 1 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0012 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | | | |
|---|---|---|---|---|---|---|---|
| 08/15/2011 | Yes | No | 110017770 | 19 | | | |

| Description | | | | | | Typ | |
|---|---|---|---|---|---|---|---|
| mini DV cassette/CD of officer scene walk through | | | | | | A | |

| Cat | Article | | Entered Date | Entered Time |
|---|---|---|---|---|
| EVIDENCE (TO BE PROCESSED) | RECORDINGS (VIDEO /AUDIO) | | 08/15/2011 | 14:40 |

| RMS Transfer | Control | |
|---|---|---|
| Successful | 5535 | 0818111539 |

| Item | Agency | | | Report No. | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 2 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0012 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | | | |
|---|---|---|---|---|---|---|---|
| 08/15/2011 | Yes | No | 110017770 | 30 | | | |

| | | | Typ | |
|---|---|---|---|---|
| ████████████ | | | A | |

| Cat | Artist | Entered Date |
|---|---|---|
| EVIDENCE (TO BE PROCESSED) | UNLISTED EVIDENCE (TO BE PROCESSED) | 08/15/2011 |

| Entered Time | RMS Transfer | Control |
|---|---|---|
| 14:42 | Successful | 5535   0818111539 |

| Item | Agency | | | Report No. | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 3 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0012 | EVIDENCE |

| Invl Date | In Custody? | Security | Tag No | Item No | | | |
|---|---|---|---|---|---|---|---|
| 08/15/2011 | Yes | No | 110017770 | 31 | | | |

| Description | | | | | Typ | |
|---|---|---|---|---|---|---|
| Budlight glass bottle with cap | | | | | A | |

| Cat | Article | Entered Date |
|---|---|---|
| EVIDENCE (TO BE PROCESSED) | UNLISTED EVIDENCE (TO BE PROCESSED) | 08/15/2011 |

| Entered Time | RMS Transfer | Control |
|---|---|---|
| 14:42 | Successful | 5535   0818111539 |

| Report Officer | Printed At | |
|---|---|---|
| 5090/PEEPLES, JAMES | 10/13/2011 14:04 | Page 1 of 3 |

EXHIBIT 28

**11-17770**

Supplement No:
0012

# Pasadena Police Department

| Item | Agency | | | Report No: | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|---|---|
| 4 | Pasadena Police Department | | | 11-17770 | 11-17770 | 0012 | EVIDENCE |
| Incident Date | In Custody? | Security | Tag No | Item No | | | |
| 08/15/2011 | Yes | No | 110017770 | 32 | | | |

| Description | | | Type |
|---|---|---|---|
| swab samples from Item #31 Budlight bottle | | | A |
| CSN | Article | Entered Date | Entered Time |
| EVIDENCE (TO BE PROCESSED) | SWABS / SCENT SAMPLES | 08/15/2011 | 14:44 |
| RMS Transfer | Control | | |
| Successful | 5535  0818111539 | | |

## Modus Operandi

| Crime Code(s) |
|---|
| ASSAULTS |

## Narrative

### Details:

**On 7/22/2011**, I was called out to the area of Red Bluff and Burke in reference to an officer involved shooting investigation. Upon arrival I was advised by the lead investigator Detective M. Young, that the shooting occurred at 2626 Spencer Highway, and after a pursuit, the subject was taken into custody at the intersection of Red Bluff and Burke.

I was advised by Sergeant Welch to process the scene at 2626 Spencer Highway.

Officer J. Martinez and I, arrived on scene and found 2626 Spencer Highway to be a strip center of businesses, located on the south side of the roadway. The incident was said to have occurred in the parking lot of a business known as the Maisah Food Mart (Suite #100). The businesses in the strip center were closed. The area was dimly lit with artificial lighting.

The Maisah Food Mart and gas station, was located on the southwest corner of the parking lot, with the front of the business facing north. There were four separate gas islands, just north of the business. The islands were numbered from 1 through 8, with the numbers increasing from the west to the east.

There were two entrances into the business, one entrance on the north side of the business (Spencer Highway), and one entrance on the west side of the business (Westside).

The area had been taped off with crime scene tape by officers prior to our arrival. Near the gas pump island #7 and #8, were (3) cartridge cases that had been marked with individual pieces of white folded paper.

Using a Nikon D300 digital camera and electronic flash attached, I took several photographs of the scene, paying particular attention to the (3) cartridge cases found near gas pump #7.

Officer Martinez made a scene video using a Panasonic video camera (See his supplement).

Detective M. Young arrived on scene and requested a video of the scene walk through with the officer involved. Using a Panasonic video camera I recorded the interview with the officer involved. A copy of the Fujifilm mini digital video cassette was transferred to a DVD-R, and an additional DVD-R copy was made. The mini video cassette and DVD-R were entered into the B.E.A.S.T. system, labeled as (**ITEM# 19**), sealed and submitted to the Pasadena Police Property Room.

The location in which the cartridge cases were discovered were marked with orange numbered cones, #1, #2 and #3. The cartridge cases were photographed with and without a scale. The cartridge cases were later collected by D. Laporte #3831, of the Pasadena Police Crime Laboratory for further analysis. The location from which the cartridge cases were collected was marked with orange spray paint so measurements could be taken at a later time.

I was advised after the shooting incident, the subject fled the scene in his vehicle and officers pursued him. He was reported to have left east bound on Spencer Highway, turned northbound onto Watters, and left the roadway at the dead end of Watters where he continued through an open field. There were visible tire impressions through the field. The vehicle was said to re-enter the roadway again at Primrose and continued west and south on Primrose.

There was a plastic valance to the vehicle, located just off of the roadway on Primrose. There was also a Bud-light bottle with cap, collected from underneath the plastic valance. The bottle was photographed in the position and

| Report Officer | Printed At | |
|---|---|---|
| 5090/PEEPLES, JAMES | 10/13/2011 14:04 | Page 2 of 3 |

EXHIBIT 28

**11-17770**   Supplement No
0012

# Pasadena Police Department

**Narrative**

cation in which it was found, and collected as evidence (**ITEM #31**), to be processed at a later date.

The subject reportedly went west bound onto Grunewald from Primrose, then north onto Dabney from Grunewald. The vehicle left the roadway and traveled onto the grassy median between north and south bound lanes of Dabney, and struck a tree in the grassy median. The front license plate became detached from the vehicle. The license plate (Texas Truck # AE50103) was photographed and collected as evidence and placed in a brown paper bag. It was later entered into the B.E.A.S.T. system, labeled as (**ITEM #30**), and submitted to the Pasadena Police Property Room.

The vehicle reportedly continued north bound on Dabney to Cherrybrook and turned west bound onto Cherrybrook, and then northbound onto Burke. There was a turn signal in the north bound lanes of 2100 Burke. The pieces of the subject's vehicle were photographed, collected and later placed in the bed of the subject's vehicle, which was being stored at the Pasadena Police Department's Crime Scene Unit Processing Garage.

Using the Total Station measuring system, I assisted Crime Scene Investigator E. Ginther #2717, in taking measurements of the scene at 2626 Spencer Highway (See Officer Ginther's Supplement).

**On 8/8/2011**, (ITEM #31 - Budlight bottle) was processed for latent print evidence. Using Cyanoacrylate fuming and black powder, the bottle was processed for latent prints, which was met with negative results. Using sterile swabs and de-ionized water, a swab sample for DNA was collected from the bottle (Item #31) at 9:48 hours. The swabs were placed in a swab box, sealed in an envelope, entered into the B.E.A.S.T. system, and labeled as ( **ITEM #32**). Item #32 (Swabs of bottle) were packaged, sealed, had a Pasadena Police Crime Laboratory Submission form completed, and were submitted to the Pasadena Police Crime Laboratory for further analysis. Item #31 (Budlight bottle) was packaged, sealed and submitted to the Pasadena Police Property Room for storage.

The photographs of the scene were transferred to a DVD-R, with a master and an additional copy made, both of which were submitted to the Pasadena Police Photo Lab.

No further action taken

J.M. Peeples 5090
Crime Scene Unit

| Report Officer | Printed At | |
|---|---|---|
| 5090/PEEPLES, JAMES | 10/13/2011 14:04 | Page 3 of 3 |

EXHIBIT 28

**11-17770**    Supplement No 0007

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
**07/26/2011**
Nature of Call
**SHOOTING**
Officer
**LAPORTE, DAWN**

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | 11-17770 | | 0007 | 07/26/2011 | | 11:29 | 110722057 |

| Status | | | | Nature of Call | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | Shooting | | | | | |

| Location | | | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | | PASADENA | | 77504 | 611F |

| Area | Beat | From Date | | From Time | To Date | To Time | | | |
|---|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | | 02:25 | 07/22/2011 | 02:35 | | | |

| Officer | | | | | Assignment | | 2nd Officer | | Assignment |
|---|---|---|---|---|---|---|---|---|---|
| 3831/LAPORTE, DAWN | | | | | CRIME LAB | | MARTIN, MICHAEL | | PATROL |

| Entered by | Assignment | Confidential | | RMS Transfer | Approving Officer | |
|---|---|---|---|---|---|---|
| 2760 | CRIME LAB | City Employee Investigation | | Failed | 2760 | |

| Approval Date | | Approval Time | |
|---|---|---|---|
| 07/26/2011 | | 11:31:14 | |

## Summary Narrative

NOT ORIGINAL LAB REPORT

## Modus Operandi

Crime Code(s)
**ASSAULTS**

## Narrative

**LABORATORY REPORT**

**Lab Number:** L11-1202 **Report Number:** 1 **Case#:** 11-017770 **Complainant:** **Offense Date:** 07/22/2011
**Offense Charge:** Shooting Investigation **Report Date:** 07/26/2011
**Submitting Agency:** Pasadena Police Department
**Submitted By:** Laporte, Dawn **Submission Date:** 07/22/2011
**Suspect(s):** Victor Hernandez

**Evidence:**

003.  One Glock 9mm Luger semiautomatic pistol, Model 17, serial number MEW975 with magazine
004.  Fifteen (15) unfired Winchester brand 9mm Luger cartridges
005.  One (1) fired Winchester brand 9mm Luger cartridge case from Cone 1
006.  One (1) fired Winchester brand 9mm Luger cartridge case from Cone 2
007.  One (1) fired Winchester brand 9mm Luger cartridge case from Cone 3

**Results:**

Item 003 was examined and found to be in good mechanical operating condition with the safety features functioning properly.

Test fires, Item 003.1, were produced by test firing Item 003. Test fires from an Officer's weapon are not suitable for entry into the Integrated Ballistics Identification System (IBIS). Therefore, no entry will be made.

Items 003 and 004 will be returned to the Officer. Items 003.1, 005, 006, and 007 will be transferred to the Harris County Sheriff's Office for further analysis.

Dawn LaPorte
Forensic Chemist II

| Report Officer | Printed At | |
|---|---|---|
| 3831/LAPORTE, DAWN | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

**11-17770**  Supplement No 0014

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
**08/25/2011**
Nature of Call
**SHOOTING**
Officer
**MCINNIS, PAMELA**

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | 11-17770 | | 0014 | 08/25/2011 | 16:18 | 110722057 |

| Status | Nature of Call |
|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | Shooting |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 2626 SPENCER HWY | | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time | | | |
|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 | | | |

| Officer | | Assignment | 2nd Officer | Assignment |
|---|---|---|---|---|
| 4405/MCINNIS, PAMELA | | CRIME LAB | MARTIN, MICHAEL | PATROL |

| Entered by | Assignment | Confidential | | RMS Transfer | Prop Trans Stat |
|---|---|---|---|---|---|
| 2760 | CRIME LAB | City Employee Investigation | | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 2760 | 08/25/2011 | 16:19:38 |

## Summary Narrative

NOT ORIGINAL LAB REPORT

## Modus Operandi

Crime Code(s)
**ASSAULTS**

## Narrative

**LABORATORY REPORT**

**Lab Number:** L11-1202 **Report Number:** 2 **Case#:** 11-017770 **Complainant: Offense Date:** 07/22/2011
**Offense Charge:** Shooting Investigation
**Report Date:** 08/25/2011
**Submitting Agency:** Pasadena Police Department
**Submitted By:** Gant, W. **Submission Date:** 08/10/2011
**Suspect(s):** Victor Hernandez

**Evidence:**

036.    Swabs from - bloodstain driver seat bottom - suspect vehicle
037.    Swabs from - bloodstain interior rear window - suspect vehicle
038.    Swabs from - bloodstain exterior driver door - suspect vehicle

**Results:**

A presumptive test indicated the presence of blood on items 36, 37, and 38. Samples of the listed item(s) reacted positively to the HemaTrace test.

Items 36, 37, and 38 will be submitted to HCIFS for DNA analysis at a later date.

Pamela J. McInnis
Laboratory Director

| Report Officer | Printed At | |
|---|---|---|
| 4405/MCINNIS, PAMELA | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

**11-17770**　　Supplement No 0015

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

PHONE: (713) 477-1221

FAX: (713) 477-4976

Reported Date
**09/06/2011**
Nature of Call
**SHOOTING**
Officer
**SANTIAGO, MARIA**

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | 11-17770 | | 0015 | 09/06/2011 | 12:04 | 110722057 |

| Status | | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | Shooting | | | | | | |

| Location | | | | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | | PASADENA | 77504 | 611F |

| Area | Beat | From Date | From Time | To Date | To Time | | | |
|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 | | | |

| Officer | | | | | Assignment | 2nd Officer | | Assignment |
|---|---|---|---|---|---|---|---|---|
| 6561/SANTIAGO, MARIA | | | | | CRIME LAB | MARTIN, MICHAEL | | PATROL |

| Entered by | Assignment | Confidential | | | | RMS Transfer | Prop Trans Stat | |
|---|---|---|---|---|---|---|---|---|
| 2760 | CRIME LAB | City Employee Investigation | | | | Successful | Successful | |

| Approving Officer | | Approval Date | | Approval Time | | | | |
|---|---|---|---|---|---|---|---|---|
| 2760 | | 09/06/2011 | | 12:05:21 | | | | |

## Summary Narrative

NOT ORIGINAL LAB REPORT

## Modus Operandi

Crime Code(s)
**ASSAULTS**

## Narrative

**LABORATORY REPORT**
**Lab Number:** L11-1202 **Report Number:** 3 **Case#:** 11-017770 **Complainant: Offense Date:** 07/22/2011
**Offense Charge:** Shooting Investigation **Report Date:** 09/01/2011
**Submitting Agency:** Pasadena Police Department **Submitted By:** Santiago, M. **Submission Date:** 08/30/2011
**Suspect(s):** Victor Hernandez

**Evidence:**
032.  Possible DNA sample from Budlight bottle
033.  Possible DNA sample from lead fragment collected from suspect vehicle
034.  Possible DNA sample from copper jacketing collected from suspect vehicle
035.  Possible DNA sample from possible human tooth collected from suspect vehicle
036.  Possible DNA sample from bloodstain on driver seat bottom of suspect vehicle
037.  Possible DNA sample from bloodstain on interior rear window of suspect vehicle
038.  Possible DNA sample from bloodstain on exterior driver door of suspect vehicle

**Results:**
The evidence remained sealed and unopened and was transported to the Harris County Institute of Forensic
Sciences for analysis on 08/30/2011. The evidence was submitted to Marla Luera in the Evidence Receiving
Section of the Laboratory to be transferred to the DNA Section for analysis.

Maria Santiago
Evidence Technician

| Report Officer | Printed At | |
|---|---|---|
| 6561/SANTIAGO, MARIA | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

**11-17770**          Supplement No
                      0016

# Pasadena Police Department



1114 JEFF GINN MEMORIAL DRIVE

PASADENA, TEXAS 77502

Reported Date
09/16/2011
Nature of Call
SHOOTING
Officer
LAPORTE, DAWN

PHONE: (713) 477-1221

FAX: (713) 477-4976

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|---|
| Pasadena Police Department | | | 11-17770 | | 0016 | 09/16/2011 | | 09:26 | 110722057 |

| Status | | | | Nature of Call | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| REFER FOR FOLLOW-UP INVESTIGATION | | | | Shooting | | | | | |

| Location | | | | | City | | ZIP Code | | Rep Dist |
|---|---|---|---|---|---|---|---|---|---|
| 2626 SPENCER HWY | | | | | PASADENA | | 77504 | | 611P |

| Area | Beat | From Date | From Time | To Date | To Time | | | | |
|---|---|---|---|---|---|---|---|---|---|
| W | 05 | 07/22/2011 | 02:25 | 07/22/2011 | 02:35 | | | | |

| Officer | | | | Assignment | 2nd Officer | | Assignment |
|---|---|---|---|---|---|---|---|
| 3831/LAPORTE, DAWN | | | | CRIME LAB | MARTIN, MICHAEL | | PATROL |

| Entered by | Assignment | RMS Transfer | Prop Trans Stat | Approving Officer | | Approval Date |
|---|---|---|---|---|---|---|
| 2760 | CRIME LAB | Successful | Successful | 2760 | | 09/16/2011 |

| Approval Time |
|---|
| 09:27:16 |

## Summary Narrative

NOT ORIGINAL LAB REPORT

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

**LABORATORY REPORT**

**Lab Number:** L11-1202 **Report Number:** 4 **Case#:** 11-017770 **Complainant: Offense Date:** 07/22/2011
**Offense Charge:** Shooting Investigation **Report Date:** 09/15/2011
**Submitting Agency:** Pasadena Police Department **Submitted By:** Gant, W. **Submission Date:** 08/10/2011
**Suspect(s):** Victor Hernandez

**Evidence:**
039.   One lead fragment collected from suspect vehicle
040.   One copper-jacket collected from suspect vehicle

**Results:**
Item 039 is a lead fragment that lacks individual characteristics as well as class characteristics and was unsuitable for comparison.

Item 040 appears to be the jacket portion of a 38/9mm caliber-class bullet fired from a firearm with a polygonal rifling pattern of six lands and grooves with a right twist. Firearms with a similar rifling pattern include, but are not limited to, the following: FIE, Glock, H&K, and Kahr Arms 9mm Luger pistols.

This is not meant to be an all-inclusive list but rather an investigative aide.

Items 039 and 040 will be returned to property.

Dawn LaPorte
Forensic Chemist II

| Report Officer | Printed At | |
|---|---|---|
| 3831/LAPORTE, DAWN | 10/13/2011 14:04 | Page 1 of 1 |

EXHIBIT 28

# AFFIDAVIT

Case #2011-17770
Date:  07-22-2011
Time: **7 : 40 Am**

**THE STATE OF TEXAS  §**

**AFFIDAVIT**

**COUNTY OF HARRIS   §**

*Before me,* the undersigned authority, on this day personally appeared, **Michael T. Martin**, known to me to be the person who subscribed his name below, who, after having first been duly sworn by me, on oath deposes and says:

My name is Michael T. Martin and I am 42 years old.  My date of birth is ▮▮▮▮▮ I am employed by the Pasadena Police Dept. as a Police Officer assigned to the Night Shift working the hours of 10pm to 6am.  I began my career with Pasadena P. D. in 6-16-08.   I can read and write the English language.

This affidavit is in regards to the shooting incident at 2626 Spencer on 07-22-11 at approximately 2:30am.

On 07-22-11, I was working night shift patrol driving a marked police patrol vehicle and wearing my regular police uniform.  At approximately 0227 hours I was assisting Officer Buckert perform a traffic stop in the 3100 block of Shaver.  While assisting Officer Buckert, I observed a dark colored extended cab Chevrolet pickup reaving the its engine, screeching the vehicle's tires and doing "doughnuts" in the parking lot of 3316 Shaver, the business known as "El Regio".  I then observed the dark colored extended cab Chevrolet pickup exit the private driveway and begin to travel northbound in the 3100 block of Shaver, at a high rate of speed.  I pulled behind the dark colored extended cab Chevrolet pickup ▮▮▮ LP # ▮▮▮▮▮ ), activated the emergency lights and sirens on my marked patrol unit and initiated a traffic stop on the vehicle.  I observed the driver of the vehicle approach a red light at the intersection of Shaver and Spencer and proceeded to turn eastbound onto Spencer, failing to come to a complete stop at the red light.  I continued to follow the vehicle and observed the driver fail to maintain a single lane of traffic.  The driver of the dark colored extended cab Chevrolet pickup continued traveling eastbound, refusing to stop the vehicle.  The driver of the vehicle then turned southbound onto Westside.  The driver then pulled into the parking lot of a convenience store located at 2626 Spencer.  I pulled into the parking lot and parked behind the dark colored extended cab Chevrolet pickup.  I then exited my marked patrol unit and approached the suspect's vehicle to make contact with the Hispanic driver, later identified as Victor Hernandez (H/M DOB: ▮▮▮▮▮ .

As I approached  suspect Hernandez's vehicle, I observed suspect Hernandez still had not put the vehicle in park.  I then observed suspect Hernandez put the vehicle into reverse and began backing his vehicle towards my marked patrol unit, in an unsafe manner.  I then gave verbal commands for suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I could see them.  Suspect Hernandez refused to comply with any of my commands and  instead pulled the vehicle forward.  I again told suspect Hernandez to place the vehicle in park and show me his hands, however, he again refused to comply with my commands.  Suspect Hernandez then placed his vehicle in reverse, a second time, and began backing his vehicle towards my marked  patrol unit, in an unsafe and aggressive manner.  I again told suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I might see them.  Suspect Hernandez then complied by placing both hands on the steering wheel, however, he still did not place the vehicle in park.

I then approached suspect Hernandez's vehicle from  the driver's side rear.  As I approached the vehicle, I observed that the driver side window was down.  I again told suspect Hernandez to place the vehicle in park,

Page 1 of 2

EXHIBIT 28

which he refused to do. I then observed suspect Hernandez turn, look over his left shoulder and begin facing me. I observed suspect Hernandez to have a menacing and aggressive look on his face. I observed suspect Hernandez then remove his left hand from the steering wheel and reach down towards the compartment on the driver side door. At this point, I was unable to view any portion of suspect Hernandez's left arm, from his shoulder to his hand. At this point, I was close enough to suspect Hernandez's vehicle that I could hear him fumbling inside the compartment of the driver side door. I also could smell the odor of an alcoholic beverage on and about suspect Hernandez's person. I again told suspect Hernandez to show me both his hands. I then observed suspect Hernandez to square off both shoulders towards me, in what I believed to be an aggressive posture. Simulataneously, supect Hernandez then began to raise his left shoulder and arm. I then again told suspect Hernandez, twice, to show me his hands. Suspect Hernandez refused to comply with my commands, at which time, I believed that suspect Hernandez was pulling up a weapon (due to the movements he was making with his left shoulder and arm). In addition, fearing that my life might be in danger, as well as the life of my backup (Officer Yzaguirre), I withdrew my duty weapon (a Glock 17, 9mm) from my duty holster and fired it at suspect Hernandez, approximately three times. I then began to retreat from my current position, since I did not have the advantage of cover and/or concealment. I ran to my marked patrol unit, in order that I might seek some form of cover. Suspect Hernandez then speed out of the parking lot, heading eastbound in the 2600 block of Spencer.

I then holstered my duty weapon and entered my marked patrol unit. I then engaged in the pursuit of suspect Hernandez, which lasted until suspect Hernandez stopped in the 800 block of Burke Road. Suspect Hernandez was then taken into custody by various Officers on scene. Suspect Hernandez was then attended to by ETMC medical staff and transported to Herman Hospital, in Houston, TX for further medical treatment.

**I am aware of Article 37.03 of the Penal Code of Texas, which says:**
**Any person commits the offense of Aggravated Perjury, if that person, with intent to deceive and with knowledge of the statement's meaning, makes a false statement under oath or swears to the truth of a false statement if the statement is required or authorized by law to be made under oath, and if the statement is material and made during or in connection with an official proceeding. If found guilty of Aggravated Perjury the person may be confined in the penitentiary for, Not Less than Two nor More Than Ten Years and/or a Fine not to exceed $10,000.00.**

_____
                                    *Affiant*

**Sworn and subscribed** to before me, the undersigned authority, while engaged in, and related to, the performances of my duties as a peace officer on this, *the 22nd day of July 2011.*

_____
Detective M.R. Young
Pasadena Police Department
Pasadena, Harris County, Texas

Page 2 of 2

EXHIBIT 28

## PASADENA POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

| | | |
|---|---|---|
| **TO** | : **Officer M. Martin** | **DATE: October 6, 2011** |
| **FROM** | : **Officer C.A. MacGregor #4150** | |
| **SUBJECT:** | **Internal Affairs Control #1167** | |

This office is currently investigating a shooting incident that occurred on July 22, 2011 involving your self and Victor Hernandez. You are required to respond to all questions asked of you in this investigation.  However, in accordance with the United States Supreme Court's decision in **Garrity v. New Jersey**, 335 U.S. 493 (1997); your statement, as well as any information gained through your statement, cannot be used against you in any criminal proceeding.

It is believed that you may have information that would be pertinent to this investigation; therefore, I request that you respond in writing (interoffice format) to the following questions by October 10, 2011. **Your responses should be *detailed* in narrative form or in the form of complete sentences and not simply "yes/no" answers.**

If you have any questions concerning this investigation please feel free to contact me at any time.

**You conducted a traffic stop on Victor Hernandez on July 22, 2011 in the 2600 block of Spencer:**

1. You stated in your written affidavit and video "walk through" that during your contact with Hernandez; Hernandez had removed his left hand from the steering wheel and reached down towards the compartment on the driver side door. You stated that you were close enough to Hernandez to hear Hernandez's hand "fumbling" inside the compartment of the driver side door despite giving Hernandez two (2) verbal commands to Hernandez that he display his hands. You further stated that Hernandez had begun to raise his left arm and shoulder thus causing you to believe that he was in possession of unknown weapons. As a result, you stated that you feared that your life might be in danger, as well as your "backup" officer, thus resulting in your need to draw your duty weapon and fire it at Hernandez. After reviewing the video footage available in this investigation, it appears that the video footage is not consistent with the information as provided by you in regards to the left hand leaving from the steering wheel and reaching into the driver side door compartment. Explain these discrepancies.

2. You stated in your written affidavit and video "walk through" that you shot at Hernandez three (3) times. You elaborated in your video "walk through" that the second and third gun shots at Hernandez were in response to Hernandez turning his steering wheel and causing Hernandez's vehicle to travel towards you at an angle as he fled from the location. You further elaborated during your "walk through" that you feared that as Hernandez created a greater angle to you that he may display a weapon thus a greater need to shoot at Hernandez a second and third time. You stated via police radio during your pursuit of Hernandez that Hernandez had tried to run you over. After reviewing the video footage available in this investigation, it appears that the video footage is not consistent with the information as provided by you in regards to Hernandez driving his vehicle at an angle towards you or the police radio traffic that Hernandez tried to run you

EXHIBIT 28

over. Explain these discrepancies.

3. After your review of the video footage available in this investigation and subsequent questions pertaining to inconsistencies in the information you provided via written affidavit and video "walk through", do you want to change, add, or modify the information that you originally provided?

I have included with this hard-copy an IAD flash-drive.  Please provide your responses on a signed hardcopy as well as on the flash-drive.  For your convenience, I have included these questions on the flash drive as well.

Det. C.A. MacGregor #4150
Internal Affairs Division
713-475-7891

EXHIBIT 28

# INTER-DEPARTMENTAL CORRESPONDENCE

**TO:** Detective C. A. MacGregor
Internal Affairs Division
PASADENA POLICE DEPARTMENT

**DATE:** October 11, 2011

**FROM:** Michael Martin, Police Officer
PASADENA POLICE DEPARTMENT

**SUBJECT:** Control No. 11-049

On September 6, 2011, I was ordered to submit this statement by Detective C. A. MacGregor of the Pasadena Police Department Internal Affairs Division. I submit this statement at his order as a condition of my employment. In view of possible job forfeiture, I have no alternative but to abide by this order.

It is my belief and understanding that the department requires this statement solely and exclusively for internal purposes and will not release it to any other agency. It is my further belief that this statement will not and cannot be used against me in any subsequent proceeding, including criminal proceedings other than disciplinary proceeding within the confines of the department itself.

For any and all purposes, I hereby reserve my constitutional right to remain silent under the FIFTH and FOURTEENTH AMENDMENTS to the UNITED STATES CONSTITUTION and other rights prescribed by law. Further, I rely specifically upon the protection afforded me under the doctrines set fourth in Garrity vs. New Jersey 385 U.S. 493 (1967), and Spevack vs. Klein, 385 U.S. 511 (1967), should this report (statement) be used for any other purpose of whatsoever kind or description.

**You conducted a traffic stop on victor Hernandez on July 22, 2011 in the 2600 block of Spencer:**

1.  **You stated in your written affidavit and video "walk through" that during you contact with Hernandez; Hernandez had removed his left hand from the steering wheel and reached down towards the compartment on the driver side door. You stated that you were close enough to Hernandez to hear Hernandez's hand "fumbling" inside the compartment of the driver side door despite giving Hernandez two (2) verbal commands to Hernandez that he display his hands. You further stated that Hernandez had begun to raise his left arm and shoulder thus causing you to believe that he was in possession of unknown weapons. As a result, you stated that you feared that your life might be in danger, as well as your "backup" officer, thus resulting in your need to draw your duty weapon and fire it at Hernandez.  After reviewing the video footage available in this investigation, it appears that the video footage is not consistent with the information as provided by your in regards to the left hand leaving from the**

1

EXHIBIT 28

steering wheel and reaching into the driver side door compartment. **Explain these discrepancies.**

ANSWER:    After reviewing the video made available to me for the first time since the shooting Incident of July 22, 2011, the video appears to be of poor quality and gives an illusion inconsistent of my perception of the events that occurred. I stand by statement that I believed I was in immediate danger and believed I had no choice but to discharge my weapon.

**2.    You stated in your written affidavit and video "walk through" that you shot Hernandez three (3) times. You elaborated in your video "walk through" that the second and third gunshots at Hernandez were in response to Hernandez turning his steering wheel and causing Hernandez's vehicle to travel towards you at an angle as he fled from the location. You further elaborated during your "walk through" that you feared that as Hernandez created a greater angle to you that he may display a weapon thus a greater need to shoot at Hernandez a second and third time. You stated via police radio during your pursuit of Hernandez that Hernandez had tried to run you over. After reviewing the video footage available in this investigation, it appears that the video footage is not consistent with the information as provided by you in regards to Hernandez driving his vehicle at an angle towards you or the police radio traffic that Hernandez tried to run you over. Explain these discrepancies.**

ANSWER:    When I stated that the suspect tried to run over me, I never meant that I was directly in front of the suspect's vehicle. When the suspect fled from the scene, the suspect turned his vehicle at an angle that I believed the cab and/or rear of his vehicle was attempting to strike me. The entire incident occurred within seconds. After reviewing the video, I now believe that the suspect was not attempting to strike me with his vehicle but was angling his vehicle to escape from the parking lot.

**3.    After you review of the video footage available in this investigation and subsequent questions pertaining to inconsistencies in the information you provided via written affidavit and video "walk through", do you want to change, add, or modify the information that you originally provided?**

ANSWER:    When this incident occurred, I was placed in a position that no police officer wants to be in. I was forced to make a split second evaluation and decision of what was occurring and act accordingly. As I have stated, the cab of the suspect's truck was not lighted and I perceived Hernandez's intentions and actions as I have stated in my prior original statements.

Finally, from the information provide me to date, I have fully cooperated and have answered all issues presented to me to the best of my ability and recollection. However, I reserve the right to supplement and/or amend this statement should additional facts be brought to my attention on the

2

EXHIBIT 28

matter, because of an honest defect in perception of the event(s), or the common short comings of human memory.

Respectfully submitted:

Michael Martin

EXHIBIT 28



# PASADENA POLICE DEPARTMENT
## INTERNAL AFFAIRS – DISCHARGE OF FIREARMS REPORT

| Date of Report | Time of Report | Offense Report Case Number (If Any) |
|---|---|---|
| 07/22/2011 | 9:00 AM | 2011-17770 |

| Name of Officer | Assignment | Employee No. |
|---|---|---|
| M. Martin | Patrol - Night Shift (West) | 4233 |

| Date Weapon Fired | Time Weapon Fired | Location Where Weapon Fired |
|---|---|---|
| 07/22/2011 | 2:30 AM | 2626 Spnecer |

**Officer Discharging Firearm Was: (Check All That Apply)**

☒ In Uniform ☐ In Plain Clothes ☒ On Duty ☐ On Extra Employment ☐ Off Duty

| No. Of Shots Fired | Make of Weapon | Model | Caliber | Serial No. |
|---|---|---|---|---|
| 3 | Glock | 17 | 9mm | MEW975 |

## INJURED PERSON'S INFORMATION

| Name | Race | Date of Birth | Sex |
|---|---|---|---|
| Victor Antonio Hernandez | W | ▮▮▮▮ | M |

**Address:** ▮▮▮▮▮

**Home/Business/Cell Phone No.:**

**Nature of Injuries:** Gunshot wound(s) to the face

**Was Injured Person Hospitalized?** ☒ Yes ☐ No **Name of Hospital:** Herman Hospital

**Attending Physician's Name:** Unknown

**Attending Physician's Address:** Unknown

**Attending Physician's Phone Number:** Unknown

## Describe Circumstances Surrounding Discharge Of Firearm (Use Additional Sheet If Necessary)

On 07-22-11, I was working night shift patrol driving a marked police patrol vehicle and wearing my regular police uniform. At approximately 0227 hours I was assisting Officer Buckert perform a traffic stop in the 3100 block of Shaver. While assisting Officer Buckert, I observed a dark colored extended cab Chevrolet pickup reaving the its engine, screeching the vehicle's tires and doing "doughnuts" in the parking lot of 3316 Shaver, the business known as "El Regio". I then observed the dark colored extended cab Chevrolet pickup exit the private driveway and begin to travel northbound in the 3100 block of Shaver, at a high rate of speed. I pulled behind the dark colored extended cab Chevrolet pickup (TXLP ▮▮▮▮ activated the emergency lights and sirens on my marked patrol unit and initiated a traffic stop on the vehicle. I observed the driver of the vehicle approach a red light at the intersection of Shaver and Spencer and

EXHIBIT 28

**INTERNAL AFFAIRS – DISCHARGE OF FIREARMS REPORT (CONTINUED)**

proceeded to turn eastbound onto Spencer, failing to come to a complete stop at the red light. I continued to follow the vehicle and observed the driver fail to maintain a single lane of traffic. The driver of the dark colored extended cab Chevrolet pickup continued traveling eastbound, refusing to stop the vehicle. The driver of the vehicle then turned southbound onto Westside. The driver then pulled into the parking lot of a convenience store located at 2626 Spencer. I pulled into the parking lot and parked behind the dark colored extended cab Chevrolet pickup. I then exited my marked patrol unit and approached the suspect's vehicle to make contact with the Hispanic driver, later identified as Victor Hernandez (H/M DOB: ▓▓▓▓▓▓.

As I approached suspect Hernandez's vehicle, I observed suspect Hernandez still had not put the vehicle in park. I then observed suspect Hernandez put the vehicle into reverse and began backing his vehicle towards my marked patrol unit, in an unsafe manner. I then gave verbal commands for suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I could see them. Suspect Hernandez refused to comply with any of my commands and instead pulled the vehicle forward. I again told suspect Hernandez to place the vehicle in park and show me his hands, however, he again refused to comply with my commands. Suspect Hernandez then placed his vehicle in reverse, a second time, and began backing his vehicle towards my marked patrol unit, in an unsafe and aggressive manner. I again told suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I might see them. Suspect Hernandez then complied by placing both hands on the steering wheel, however, he still did not place the vehicle in park.

I then approached suspect Hernandez's vehicle from the driver's side rear. As I approached the vehicle, I observed that the driver side window was down. I again told suspect Hernandez to place the vehicle in park, which he refused to do. I then observed suspect Hernandez turn, look over his left shoulder and begin facing me. I observed suspect Hernandez to have a menacing and aggressive look on his face. I observed suspect Hernandez then remove his left hand from the steering wheel and reach down towards the compartment on the driver side door. At this point, I was unable to view any portion of suspect Hernandez's left arm, from his shoulder to his hand. At this point, I was close enough to suspect Hernandez's vehicle that I could hear him fumbling inside the compartment of the driver side door. I also could smell the odor of an alcoholic beverage on and about suspect Hernandez's person. I again told suspect Hernandez to show me both his hands. I then observed suspect Hernandez to square off both shoulders towards me, in what I believed to be an aggressive posture. Simulataneously, supect Hernandez then began to raise his left shoulder and arm. I then again told suspect Hernandez, twice, to show me his hands. Suspect Hernandez refused to comply with my commands, at which time, I believed that suspect Hernandez was pulling up a weapon (due to the movements he was making with his left shoulder and arm). In addition, fearing that my life might be in danger, as well as the life of my backup (Officer Yzaguirre), I withdrew my duty weapon (a Glock 17, 9mm) from my duty holster and fired it at suspect Hernandez, approximately three times. I then began to retreat from my current position, since I did not have the advantage of cover and/or concealment. I ran to my marked patrol unit, in order that I might seek some form of cover. Suspect Hernandez then speed out of the parking lot, heading eastbound in the 2600 block of Spencer.

I then holstered my duty weapon and entered my marked patrol unit. I then engaged in the pursuit of suspect Hernandez, which lasted until suspect Hernandez stopped in the 800 block of Burke Road. Suspect Hernandez was then taken into custody by various Officers on scene. Suspect Hernandez was then attended to by ETMC medical staff and transported to Herman Hospital, in Houston, TX for further medical treatment.

Pasadena 2720

EXHIBIT 28

# Pasadena Police Department
## Use of Force Report

Confidential: This report is prepared as an internal administrative instrument. It is not to be released to persons or agencies outside the department without prior approval from the Chief of Police

Date: 7/22/2011    Time: 2:27 AM    Case #: 2011-17770

Location of Incident: 2626 Spencer

Name: Hernandez    Victor    A    ▓▓▓    W    M

| Last | First | Mi | DOB | Race | Sex |
|---|---|---|---|---|---|

### Nature of Initial Contact (check one only)

| | | |
|---|---|---|
| ☐ Felony Arrest | ☐ Call: Suspicious Person | ☐ Call: Stolen Auto |
| ☐ Felony Warrant | ☐ Call: Disturbance | ☐ Car Check |
| ☐ Misdemeanor Arrest | ☐ Call: Emotionally Disturbed | ☐ Pedestrian Check |
| ☐ Misdemeanor Warrant | ☐ Call: Armed Suspect | ☐ Search Warrant |
| ☒ Traffic Violation | ☐ Call: Domestic Violence | ☐ Possible Drug Related |

### Force Used Against Officer(s) (check all that apply):

**Deadly Force**

☐ Revolver   ☐ Automatic   ☐ Shotgun   ☐ Knife   ☐ Other:

**Less than Deadly Force**

☐ Fist   ☐ Feet   ☐ Teeth   ☒ Other:

### Force Used by Officer(s) (check all that apply):

**Deadly Force**

☐ Revolver   ☒ Automatic   ☐ Shotgun   ☐ Other:

**Less than Deadly Force**

☐ Physical Force   ☐ Physical Restraint   ☐ ASP   ☐ O.C. Spray   ☐ Taser (See Taser Section)   Other:

### Injuries

**Injuries to Suspect**

☐ Death   ☒ Serious Injury   ☐ Minor Injury   ☐ Complaint of Injury   ☐ No Injury

**Treatment**

☒ Admitted - Hospital   ☐ Treated – Released   ☐ Delayed Treatment   ☐ Refused Treatment

Location of Treatment or Hospitalization: Herman Hospital

Was Injury Photographed?   ☒ Yes   ☐ No   By Whom?   ID Units   Unit #

### Injuries

**Injuries to Officer (if so, complete Injury Report Forms)**

☐ Death   ☐ Serious Injury   ☐ Minor Injury   ☐ Complaint of Injury   ☒ No Injury

**Treatment**

☐ Admitted - Hospital   ☐ Treated – Released   ☐ Delayed Treatment   ☐ Refused Treatment

Location of Treatment or Hospitalization:

Was Injury Photographed?   ☐ Yes   ☒ No   By Whom?   Unit #

### Identify All Officers or Civilians Involved:

| Names: | Emp. No. | Used Force? | What Did They Witness? How Were They Involved? |
|---|---|---|---|
| M. Martin | 4233 | Yes | Fired duty weapon |
| R. Yzaguirre | 7048 | No | Witnessed |
| | | | |
| | | | |

EXHIBIT 28

Incident on Video:   Yes ☒ No ☐          Videotape Number or Other Identifier:      #940

Supervisor Notified:          Yes ☒    No ☐          Name:

Responded to:    Scene  ☒     Jail  ☐     Other (Specify):                          Did not Respond        ☐

Commander Notified:     Yes ☒  No ☐          Name:

Responded to:    Scene  ☐     Jail  ☐     Other (Specify):                          Did not Respond        ☒

| TASER Usage Section | | |
|---|---|---|
| ☐ TASER Application | ☐ Arc Display Only | ☐ Laser Light Display Only |

TASER Serial #:                                    TASER Cartridge Number:

| TASER Model: | TASER X26 ☐ | Advanced TASER M26 ☐ | | |
|---|---|---|---|---|
| Dart-probe Contact: | Yes ☐ No ☐ | Drive-Stun Contact: | Yes ☐ No ☐ | Subject Wearing Heavy Clothing:   Yes ☐ No ☐ |
| Number of Air Cartridges Fired: | | | Number of Cycles Applied: | |
| Air Cartridge Type(s): | 15-ft ☐ | 21-ft ☐ | 21-ft XP (Yellow Cartridge) ☐ | |
| Approximate Target Distance at the Time of Deployment: | | | feet | |
| Distance Between Probes: | inches | | Need for Additional Applications: | Yes ☐ No ☐ |
| Dart-Probes Penetrated Skin: | Yes ☐ No ☐ | Dart-Probes Removed On-Scene: | Yes ☐ No ☐ | |

| Diagram |
|---|



FRONT            BACK

(Place "Xs" at points of *dart-probe* contact and "Os" at points of *drive-stun* contact)

| Summary of Incident |
|---|

On 07-22-11, I was working night shift patrol driving a marked police patrol vehicle and wearing my regular police uniform. At approximately 0227 hours I was assisting Officer Buckert perform a traffic stop in the 3100 block of Shaver. While assisting Officer Buckert, I observed a dark colored extended cab Chevrolet pickup reaving the its engine, screeching the vehicle's tires and doing "doughnuts" in the parking lot of 3316 Shaver, the business known as "El Regio". I then observed the dark colored extended cab Chevrolet pickup exit the private driveway and begin to travel northbound in the 3100 block of Shaver, at a high rate of speed. I pulled behind the dark colored extended cab Chevrolet pickup ▮▮▮LP ▮▮▮▮▮▮▮▮▮▮▮ activated the emergency lights and sirens on my marked patrol unit and initiated a traffic stop on the vehicle. I observed the driver of the vehicle approach a red light at the intersection of Shaver and Spencer and proceeded to turn eastbound onto Spencer, failing to come to a complete stop at the red light. I continued to follow the vehicle and observed the driver fail to maintain a single lane of traffic. The driver of the dark colored extended cab Chevrolet pickup continued traveling eastbound, refusing to stop the vehicle. The driver of the vehicle then turned southbound onto Westside. The driver then pulled into the parking lot of a convenience store located at 2626 Spencer. I pulled into the parking lot and parked behind the dark colored extended cab Chevrolet pickup. I then exited my marked patrol unit and approached the suspect's vehicle to make contact with the Hispanic driver, later identified as Victor Hernandez (H/M DOB: ▮▮▮▮▮▮▮

EXHIBIT 28

As I approached suspect Hernandez's vehicle, I observed suspect Hernandez still had not put the vehicle in park. I then observed suspect Hernandez put the vehicle into reverse and began backing his vehicle towards my marked patrol unit, in an unsafe manner. I then gave verbal commands for suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I could see them. Suspect Hernandez refused to comply with any of my commands and instead pulled the vehicle forward. I again told suspect Hernandez to place the vehicle in park and show me his hands, however, he again refused to comply with my commands. Suspect Hernandez then placed his vehicle in reverse, a second time, and began backing his vehicle towards my marked patrol unit, in an unsafe and aggressive manner. I again told suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I might see them. Suspect Hernandez then complied by placing both hands on the steering wheel, however, he still did not place the vehicle in park.

I then approached suspect Hernandez's vehicle from the driver's side rear. As I approached the vehicle, I observed that the driver side window was down. I again told suspect Hernandez to place the vehicle in park, which he refused to do. I then observed suspect Hernandez turn, look over his left shoulder and begin facing me. I observed suspect Hernandez to have a menacing and aggressive look on his face. I observed suspect Hernandez then remove his left hand from the steering wheel and reach down towards the compartment on the driver side door. At this point, I was unable to view any portion of suspect Hernandez's left arm, from his shoulder to his hand. At this point, I was close enough to suspect Hernandez's vehicle that I could hear him fumbling inside the compartment of the driver side door. I also could smell the odor of an alcoholic beverage on and about suspect Hernandez's person. I again told suspect Hernandez to show me both his hands. I then observed suspect Hernandez to square off both shoulders towards me, in what I believed to be an aggressive posture. Simulataneously, supect Hernandez then began to raise his left shoulder and arm. I then again told suspect Hernandez, twice, to show me his hands. Suspect Hernandez refused to comply with my commands, at which time, I believed that suspect Hernandez was pulling up a weapon (due to the movements he was making with his left shoulder and arm). In addition, fearing that my life might be in danger, as well as the life of my backup (Officer Yzaguirre), I withdrew my duty weapon (a Glock 17, 9mm) from my duty holster and fired it at suspect Hernandez, approximately three times. I then began to retreat from my current position, since I did not have the advantage of cover and/or concealment. I ran to my marked patrol unit, in order that I might seek some form of cover. Suspect Hernandez then speed out of the parking lot, heading eastbound in the 2600 block of Spencer.

I then holstered my duty weapon and entered my marked patrol unit. I then engaged in the pursuit of suspect Hernandez, which lasted until suspect Hernandez stopped in the 800 block of Burke Road. Suspect Hernandez was then taken into custody by various Officers on scene. Suspect Hernandez was then attended to by ETMC medical staff and transported to Herman Hospital, in Houston, TX for further medical treatment.

| | | | |
|---|---|---|---|
| Reporting Officer's Name: | M. Martin | Emp. # | 4233 |
| Reporting Officer's Signature: | | Date: | 7/22/2011 |

**Notification and Review**

| | | |
|---|---|---|
| Shift Supervisor | | Date: |
| Shift Commander | | Date: |
| Bureau Commander | | Date: |

Pasadena 2723

EXHIBIT 28

# IAD History for Officer M. Martin

Control# 1113
Case# 200932186
Complaint: Officer Involved Shooting (Class I)
Date Received: December 25, 2009
Complainant: Chief of Police
Disposition: Justified – No billed by Grand Jury

Control# 1127
Case# 2010-7093
Complaint: Misconduct (Class II)
Date Received: April 6, 2010
Complainant: Mr. James A. Baker
Disposition: Not sustained

Control# 1141
Case# 2010-21705
Complaint: Failure to Take Prompt/Effective Police
Action (Class II)
Date Received: September 3, 2010
Complainant: Ms. Toni Mcguire
Disposition: Not sustained

EXHIBIT 28

## PASADENA POLICE DEPARTMENT

### 2011 QUALIFICATIONS

Name: <u>Martin, Michael</u>

| Course # | Date | Make | Model | Serial | Score | Inspected By | Signature |
|---|---|---|---|---|---|---|---|
| 44 | 5-31-11 | Glock | 17 | MBJ9975 | 93 | JB | |
| 44 | 5-31-11 | " | 26 | MKD-970 | 94 | JB | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Pasadena 2725

EXHIBIT 28

# PASADENA POLICE DEPARTMENT
## FIREARMS QUALIFICATION RECORD

NAME: Martin, M.    D.O.B. 7-16-69    EMPLOYEE #: 4233

### Weapon Information

| Weapon # | Make | Model | Serial # | Caliber |
|---|---|---|---|---|
| 1 | Glock | 17 | MEW975 | .9 |
| 2 | Glock | 26 | MKD970 | .9 |
| 3 | Remington | 870 | CA024964M | 12ga. |
| 4 | Benelli | M1 | M486557 | 12 ga |
| 5 | Glock | 19 | GXN932 | .9 |
| 6 | Para-Ordnance | Hi-Cap 45 | PS1072 | .45 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

### Qualification Information

| Weapon | Date | Score | Course # | Inspection / Care & Cleaning | Range Officer |
|---|---|---|---|---|---|
| 1 | 10-10-08 | 94 | H-1 | MM | MM |
| 2 | 12-9-08 | 96 | H-3 | | |
| 3 | 12-12-08 | 100 | S-1 | SJ | SJ |
| 4 | 6-9-09 | 100 | S-1 | SJ | SJ |
| 1 | 6-9-09 | 77 | H-4 | MM | MM |
| 5 | 12-28-09 | 88 | H-4 | SJ | SJ |
| 2 | 12-28-09 | 91 | H-4 | SJ | SJ |
| 6 | 12-28-09 | 91 | H-4 | SJ | SJ |
| 3 | 12-28-09 | 100 | S-1 | SJ | SJ |
| 4 | 12-28-09 | 100 | S-1 | SJ | SJ |
| 1 | 12-30-09 | 91 | H-4 | SJ | SJ |

EXHIBIT 28

07-22-11;08:10AM;    ;281 998 2681    # 3/ 8

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

NAME: Martin, M.

| | | | | | |
|---|---|---|---|---|---|
| 1 | 5-27-10 | 95 | H-4 | SJ | SJ |
| 2 | 5-27-10 | 88 | H-2 | MH | MH |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

EXHIBIT 28

## PASADENA POLICE DEPARTMENT
## RECORD OF COMPLAINT

Report Date:    7/22/2011    Time:    2:27    ☒ AM ☐ PM

Complainant Received from:

☐ Person    ☐ Phone    ☐ Letter    ☐ Anonymous

**INFORMATION FROM** : (CIRCLE ONE)

☒ Complainant    ☐ Reportee    ☐ Witness    ☐ Police Officer    ☐ Civilian

NAME:

Last:    Chief Of Police    First:    Middle:

DOB:    Age:    Race:    Sex:    DL#:

Social Security Number:

ADDRESS:    CITY STATE ZIP

Residence:    Phone:

Business:    Phone:

Was the complainant charged with an offense?    ☐ Yes    ☐ No

Charges Filed:    Case #:

**INCIDENT INFORMATION:**

Date:    7/22/2011    Time:    02:27    Location:    2626 Spencer

Officer(s) Involved:

| Rank | Name | Emp# | Race/Sex | Assignment | Shift |
|------|------|------|----------|-----------|-------|
| OFC. | Martin, Michael | 4233 | W/M | Patrol | Night Shift |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**ALLEGATIONS:** Complainant alleges:

Officer Involved Shooting

The person making this complaint should be informed that no investigation will be made by this Department regarding this complaint until a signed complaint is received by Internal Affairs within 30 days of the date of this incident.

| Det. C.A. MacGregor | Officer | 4150 |
|---------------------|---------|------|
| Name | Rank | Employee # |

| **IAD Use ONLY** | |
|---|---|
| Date Received: 7/22/11 | Control Number: 1167 |
| Classification: I | Allegation(s): O.I.S |

Form # 119-EMP    Revised: 07/02/08

# EXHIBIT 28

# PASADENA POLICE DEPARTMENT
**Inter-Office Correspondence**



**To:** Officer Michael T. Martin, Emp. #4233        **Date:** July 22, 2011

**From:** M.W. Thaler, Chief of Police

**Subject:** Administrative Leave with Pay

In accordance with Section 3.7.7 Post Incident Procedure, of the Pasadena Police Rules Manual, you are hereby placed on *administrative leave with pay* until further notice and pending successful completion of the following instructions:

- You are to meet with and follow any instructions conveyed to you by the Department's police psychologist, Dr. Gregory Riede. You appointment with Dr. Riede will be scheduled by the Police Academy staff.

- You are to make arrangements as soon as practical with the Department's firearms range personnel and re-qualify with your duty weapon.

Should you have any questions concerning these instructions, please contact me directly or through the chain of command.

M.W. Thaler
Chief of Police

Cc: A/C AHC    Internal Affairs
     Lt. CUG     Human Resources
     Audrey Seawright - Payroll

Form # 176-G                                                        Revised: 10/26/09

EXHIBIT 28



# **CITY OF PASADENA**
## POLICE DEPARTMENT



July 22, 2011

Officer Michael Martin
Employee #4233
Patrol Division

Re: Complainant: Chief of Police
    Allegation: Officer involved shooting
    Control #1167

Officer Martin :

It is alleged that on July 22, 2011 at 2626 Spencer Hwy, you discharged your firearm at an individual. The allegation has been categorized as a Class I complaint.

This letter is to serve as a formal complaint against you, and at the direction of the Chief of Police, the Office of Internal Affairs will be conducting a thorough investigation into this allegation. Any questions concerning this investigation may be directed to Internal Affairs during normal business hours.

*C. A. MacGregor*

Detective C. A. MacGregor
Internal Affairs Division


cc: M. W. Thaler, Chief of Police
    M. P. Jackson, Asst. Chief of Police
    A. H. Corbett, Asst. Chief of Police
    S.L. Clifton, Lieutenant
    C.U. Goodman, Lieutenant

Pasadena 2730

EXHIBIT 28

# PASADENA POLICE DEPARTMENT
## Inter-Office Correspondence



**To:**      Officer Michael T. Martin, Emp. #4233          **Date:**   October 6, 2011

**From:**    J.A. Bruegger, Sergeant

**Subject:**  Internal Affairs Control #1167

This office is currently investigating a shooting which you were involved in at 2600 Spencer on July 22, 2011. You are required to respond to all questions asked of you in this **administrative** investigation. However, you are afforded all the protections afforded to you in the United States Supreme Court's decision in **Garrity v. New Jersey**, 335 U.S. 493 (1997).

J.A. Bruegger, Sergeant
Internal Affairs Division

# AFFIDAVIT

Case #2011-17770
Date: 07-22-2011
Time: *8 : 40 A~*



**THE STATE OF TEXAS §**

**AFFIDAVIT**

**COUNTY OF HARRIS §**

*Before me*, the undersigned authority, on this day personally appeared, **Michael T. Martin**, known to me to be the person who subscribed his name below, who, after having first been duly sworn by me, on oath deposes and says:

My name is Michael T. Martin and I am 42 years old. My date of birth i[      ] I am employed by the Pasadena Police Dept. as a Police Officer assigned to the Night Shift working the hours of 10pm to 6am. I began my career with Pasadena P. D. in 6-16-08. I can read and write the English language.

This affidavit is in regards to the shooting incident at 2626 Spencer on 07-22-11 at approximately 2:30am.

On 07-22-11, I was working night shift patrol driving a marked police patrol vehicle and wearing my regular police uniform. At approximately 0227 hours I was assisting Officer Buckert perform a traffic stop in the 3100 block of Shaver. While assisting Officer Buckert, I observed a dark colored extended cab Chevrolet pickup reaving the its engine, screeching the vehicle's tires and doing "doughnuts" in the parking lot of 3316 Shaver, the business known as "El Regio". I then observed the dark colored extended cab Chevrolet pickup exit the private driveway and begin to travel northbound in the 3100 block of Shaver, at a high rate of speed. I pulled behind the dark colored extended cab Chevrolet pickup (TXLP #AE50103), activated the emergency lights and sirens on my marked patrol unit and initiated a traffic stop on the vehicle. I observed the driver of the vehicle approach a red light at the intersection of Shaver and Spencer and proceeded to turn eastbound onto Spencer, failing to come to a complete stop at the red light. I continued to follow the vehicle and observed the driver fail to maintain a single lane of traffic. The driver of the dark colored extended cab Chevrolet pickup continued traveling eastbound, refusing to stop the vehicle. The driver of the vehicle then turned southbound onto Westside. The driver then pulled into the parking lot of a convenience store located at 2626 Spencer. I pulled into the parking lot and parked behind the dark colored extended cab Chevrolet pickup. I then exited my marked patrol unit and approached the suspect's vehicle to make contact with the Hispanic driver, later identified as Victor Hernandez (H/M DOB: 10-01-91).

As I approached suspect Hernandez's vehicle, I observed suspect Hernandez still had not put the vehicle in park. I then observed suspect Hernandez put the vehicle into reverse and began backing his vehicle towards my marked patrol unit, in an unsafe manner. I then gave verbal commands for suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I could see them. Suspect Hernandez refused to comply with any of my commands and instead pulled the vehicle forward. I again told suspect Hernandez to place the vehicle in park and show me his hands, however, he again refused to comply with my commands. Suspect Hernandez then placed his vehicle in reverse, a second time, and began backing his vehicle towards my marked patrol unit, in an unsafe and aggressive manner. I again told suspect Hernandez to place his vehicle in park and to place both of his hands on the steering wheel, so that I might see them. Suspect Hernandez then complied by placing both hands on the steering wheel, however, he still did not place the vehicle in park.

I then approached suspect Hernandez's vehicle from the driver's side rear. As I approached the vehicle, I observed that the driver side window was down. I again told suspect Hernandez to place the vehicle in park,

Page 1 of 2

EXHIBIT 28

which he refused to do. I then observed suspect Hernandez turn, look over his left shoulder and begin facing me. I observed suspect Hernandez to have a menacing and aggressive look on his face. I observed suspect Hernandez then remove his left hand from the steering wheel and reach down towards the compartment on the driver side door. At this point, I was unable to view any portion of suspect Hernandez's left arm, from his shoulder to his hand. At this point, I was close enough to suspect Hernandez's vehicle that I could hear him fumbling inside the compartment of the driver side door. I also could smell the odor of an alcoholic beverage on and about suspect Hernandez's person. I again told suspect Hernandez to show me both his hands. I then observed suspect Hernandez to square off both shoulders towards me, in what I believed to be an aggressive posture. Simulataneously, supect Hernandez then began to raise his left shoulder and arm. I then again told suspect Hernandez, twice, to show me his hands. Suspect Hernandez refused to comply with my commands, at which time, I believed that suspect Hernandez was pulling up a weapon (due to the movements he was making with his left shoulder and arm). In addition, fearing that my life might be in danger, as well as the life of my backup (Officer Yzaguirre), I withdrew my duty weapon (a Glock 17, 9mm) from my duty holster and fired it at suspect Hernandez, approximately three times. I then began to retreat from my current position, since I did not have the advantage of cover and/or concealment. I ran to my marked patrol unit, in order that I might seek some form of cover. Suspect Hernandez then speed out of the parking lot, heading eastbound in the 2600 block of Spencer.

I then holstered my duty weapon and entered my marked patrol unit. I then engaged in the pursuit of suspect Hernandez, which lasted until suspect Hernandez stopped in the 800 block of Burke Road. Suspect Hernandez was then taken into custody by various Officers on scene. Suspect Hernandez was then attended to by ETMC medical staff and transported to Herman Hospital, in Houston, TX for further medical treatment.

**I am aware of Article 37.03 of the Penal Code of Texas, which says:**
**Any person commits the offense of Aggravated Perjury, if that person, with intent to deceive and with knowledge of the statement's meaning, makes a false statement under oath or swears to the truth of a false statement if the statement is required or authorized by law to be made under oath, and if the statement is material and made during or in connection with an official proceeding. If found guilty of Aggravated Perjury the person may be confined in the penitentiary for, Not Less than Two nor More Than Ten Years and/or a Fine not to exceed $10,000.00.**

_____
                              *Affiant*

**Sworn and subscribed** to before me, the undersigned authority, while engaged in, and related to, the performances of my duties as a peace officer on this, *the 22nd day of July 2011.*

_____
**Detective M.R. Young**
**Pasadena Police Department**
**Pasadena, Harris County, Texas**

Page 2 of 2

EXHIBIT 28



EXHIBIT 28



EXHIBIT 28



EXHIBIT 28

10/25/2011 08:44 FAX 7137550173 &001/002

JIM LEITNER
FIRST ASSISTANT



PATRICIA R. LYKOS
District Attorney
Harris County, Texas

CRIMINAL JUSTICE CENTER
1201 FRANKLIN, SUITE 600
HOUSTON, TEXAS 77002-1901

# FAX COVER SHEET

| TO: | T-Mobile |
|---|---|
| ATTENTION: | Law Enforcement Relations |
| FAX NUMBER: | 973-292-8697 |

| FROM: | Inv. Bill Jordan |
|---|---|
| TELEPHONE | (713)755-0172 |
| FAX NUMBER | (713)755-0173 |
| NUMBER OF PAGES (including cover sheet): | 2 |
| Date and Time Sent | October 25, 2011, 9:27 AM |
| REMARKS: | |

Telephone (713) 755 - 5800

Facsimile (713) 755 - 6865

EXHIBIT 28

10/25/2011 08:44 FAX 7137550173                                                    @002/002

**THE STATE OF TEXAS**                                          IN THE MATTER OF A
**COUNTY OF HARRIS**                                       GRAND JURY INVESTIGATION

TO THE SHERIFF OR ANY OTHER TEXAS PEACE OFFICER              Agency: HCDA ORI: S-11-16

GREETINGS:

WHEREAS the grand jury of Harris County is inquiring into certain offenses liable to indictment; and

WHEREAS Art. 20.10 of the Texas Code of Criminal Procedure provides that the attorney representing the state, in term time or in vacation, may issue a summons or an attachment for any witness in the county, which summons or attachment may require the said witness to appear before the grand jury at a time fixed, or forthwith, without stating the matter under investigation; and

WHEREAS any Texas peace officer receiving this process shall execute the same forthwith by reading the same in the hearing of the said witness or by delivering a copy of this process to the named witness and thereafter due return make showing the time and manner of service, if served, and if not served, said officer shall show in his return the cause of his failure to serve it, and if the witness could not be found, he shall state the diligence he has used to find him, and what information he has as to the whereabouts of the witness:

NOW THEREFORE YOU ARE HEREBY COMMANDED to forthwith summon, **Custodian of Records T-Mobile 4 Sylvan Way Parsippany, NJ 07054,** to appear before the 209th Judicial District Court Grand Jury for the **August Term, 2011,** at 1201 Franklin, 3rd Floor, Rm. 3034, Houston, Texas, INSTANTER.

FURTHER, you are directed that the said witness shall bring with him the following writing or other thing desired as evidence in accordance with Article 24.02 or the Texas Code of Criminal Procedure, and more specifically described as follows:

**Please provide subscriber information, toll records, and any text message data for T-Mobile # 281-736-3458 for the date of July 22, 2011.**

**Please mail or email the records to HCDA Investigator Bill Jordan at Jordan_bill@dao.hctx.net or 1201 Franklin St. # 600 Houston, TX 77002**

The officer receiving this process is instructed to inform said witness that our law provides that a witness who refuses to obey a subpoena may be fined, or an attachment may be issued commanding an officer to take the body of the witness and bring him before the court or the grand jury forthwith. A witness has refused to obey a subpoena if he is not in attendance on the day set for attendance or if the witness refuses without legal cause to produce evidence in his possession which he has been summoned to bring with him and produce.

**You may comply with this subpoena by tendering the requested records, along with a completed business records affidavit to: Inv. Bill Jordan, Harris County District Attorney's Office, 1201 Franklin St # 600, Houston, TX 77002, Agency OR #: S-11-16.**

HEREIN FAIL NOT, and due return make of this process in accordance with law as provided in such cases.

WITNESS MY SIGNATURE, on this the 25 day of October 2011

SEAL

Assistant District Attorney
Eric Bily
Harris County, Texas

EXHIBIT 28

**T·· ·Mobile· stick together**

T-Mobile USA
Law Enforcement Relations Group
4 Sylvan Way
Parsippany, New Jersey 07054
Phone (973) 292-8911
Fax (973) 292-8697

# Facsimile Cover Sheet

To: **Inv Bill Jordan**                                     Fax Number:
From: **Jennifer Mercedes 973-451-8392**      Voice Number:
Date: **November 11, 2011**                           Subject: **Subpoena Response**
Pages:          **including cover**                                    **2011-167118**

**Message:**

**File:**              **2011-167118**

The information contained in this facsimile transmission is privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original to us at the address listed below via regular U.S. Mail. Thank you.

EXHIBIT 28

**T · ·Mobile· stick together**

T-Mobile USA
Law Enforcement Relations Group
4 Sylvan Way
Parsippany, New Jersey 07054
Phone (973) 292-8911
Fax (973) 292-8697

Date    November 11, 2011

Inv Bill Jordan

Houston, TX

Dear Inv Jordan

This is in response to the Subpoena , dated Oct 25, 2011, and served upon T-Mobile USA, Inc. on Nov 11, 2011. This subpoena requests Subscriber Information for the T-Mobile subscriber associated with MSISDN: 281-736-3458

A search of our subscriber database discloses the following information:

Billing Account Number: **354810009**
Billing Account Status: **Opened**
Billing Account Name: **VICTOR HERNANDEZ**
Date of Birth:
Social Security Number:
Company Name: **HERNANDEZ**
Address:
Telephone 1:
Telephone 2:
IMSI: **310280469019879**
Mobile Number:
Mobile Number Name: **VICTOR HERNANDEZ**
Date Account Established: **5/23/2008**
MSISDN Status: **Active**
Disconnect Type and Date: **N/A**
Post Paid/Pre-Paid: **Post-Paid-Prod**
Last Refill Date: **N/A**
Ported Indicator: **Regular**

Original materials follow via US Mail.

Should you have any questions regarding this information please feel free to contact me at your convenience. My direct telephone number is: 973-451-8392.

Very truly yours,

Jennifer Mercedes
T-Mobile Law Enforcement Relations Group

File:    2011-167118

EXHIBIT 28

Itemized Details For:     (281) 736-3458
Account Number:            354810009

**Customer Service Number**     1-800-937-8997

Aug 08, 2011

Page A     7   of  103

| Date | Service | Time | | | Messages | | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/20/11 | Houston, TX | 3:04 PM | | (F) | 8 | $ | - | $ | - | $ | - |
| 7/20/11 | Houston, TX | 5:31 PM | | (F) | 3 | $ | - | $ | - | $ | - |
| 7/20/11 | Houston, TX | 6:21 PM | | (F) | 1 | $ | - | $ | - | $ | - |
| 7/20/11 | Houston, TX | 6:21 PM | | | 2 | $ | - | $ | - | $ | - |
| 7/20/11 | Houston, TX | 7:00 PM | | (F) | 2 | $ | - | $ | - | $ | - |
| 7/20/11 | Incoming | 7:35 PM | | (F) | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Incoming | 5:20 AM | | (F) | 2 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 7:31 PM | | (F) | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Baytown, TX | 7:49 PM | | (F) | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 7:50 PM | | (F) | 3 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 8:59 PM | | (F) | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 8:59 PM | | | 2 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 9:04 PM | | (F) | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 9:06 PM | | | 2 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 9:09 PM | | (F) | 5 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 9:18 PM | | | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 9:54 PM | | | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 10:01 PM | | | 1 | $ | - | $ | - | $ | - |
| 21/11 | Houston, TX | 10:05 PM | | | 1 | $ | - | $ | - | $ | - |
| 7/21/11 | Houston, TX | 10:07 PM | | | 1 | $ | - | $ | - | $ | - |
| 7/22/11 | Houston, TX | 1:02 AM | | | 1 | $ | - | $ | - | $ | - |
| 7/22/11 | Houston, TX | 1:11 AM | | | 8 | $ | - | $ | - | $ | - |
| **SUBTOTAL** | | | | | **528** | **$** | **-** | **$** | **-** | **$** | **-** |

**Included Messages with Zero Charges**

| Date | Service | Time | Destination | Message Type | Messages | Direction | Total | |
|---|---|---|---|---|---|---|---|---|
| 7/08/11 | Houston, TX | 3:16 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston, TX | 8:34 AM | | ext | 1 | Incoming | $ | - |
| 7/08/11 | Houston, TX | 10:04 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston Sb, TX | 10:14 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston Sb, TX | 10:15 AM | | ext | 1 | Incoming | $ | - |
| 7/08/11 | Houston, TX | 10:15 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston Sb, TX | 10:15 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston Sb, TX | 10:18 AM | | ext | 1 | Incoming | $ | - |
| 7/08/11 | Houston Sb, TX | 10:18 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston Sb, TX | 10:19 AM | | ext | 1 | Incoming | $ | - |
| 7/08/11 | Houston Sb, TX | 10:19 AM | | ext | 1 | Outgoing | $ | - |
| 7/08/11 | Houston Sb, TX | 10:19 AM | | ext | 1 | Outgoing | $ | - |

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls

(I) Intl Disc Call (J) Intl Disc Call to Mobile (K) WPS Call (T) T-Mobile Number (U) HotSpot Call (V) myFaves Call (X) T-Mobile @Home Call

EXHIBIT 28

Itemized Details For: **(281) 736-3458**
Account Number: 354810009

**Customer Service Number** 1-800-937-8997

Aug 08, 2011

| Date | Location | Time | | Type | | | Direction | Total | |
|---|---|---|---|---|---|---|---|---|---|
| 7/21/11 | Houston, TX | 7:05 PM | | Text | 1 | | Outgoing | $ | - |
| 7/21/11 | Houston, TX | 7:20 PM | | Text | 1 | | Outgoing | $ | - |
| 7/21/11 | Houston, TX | 7:21 PM | | Text | 1 | | Incoming | $ | - |
| 7/21/11 | Houston, TX | 7:25 PM | | Text | 1 | | Outgoing | $ | - |
| 7/21/11 | Houston, TX | 7:26 PM | | Text | 1 | | Incoming | $ | - |
| 7/21/11 | Houston, TX | 7:26 PM | | Text | 1 | | Outgoing | $ | - |
| 7/21/11 | Houston, TX | 7:44 PM | | Text | 1 | | Outgoing | $ | - |
| 7/21/11 | Houston, TX | 8:24 PM | | Text | 1 | | Outgoing | $ | - |
| 7/22/11 | Baytown, TX | 8:36 AM | | Text | 1 | | Incoming | $ | - |
| **SUBTOTAL** | | | | | **1,181** | | | **$** | **-** |

### Web and Data Usage Charges

| Date | Service | Time | Volume | Measurement | Total | |
|---|---|---|---|---|---|---|
| 7/08/11 | Mobile Broadband | 7:12 AM | 0.2236 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 10:30 AM | 0.0537 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 4:19 PM | 0.0224 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 4:22 PM | 0.2119 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 4:30 PM | 0.0605 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 8:43 PM | 1.5234 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 9:09 PM | 0.9287 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 10:26 PM | 0.2529 | Megabytes | $ | - |
| 7/08/11 | Mobile Broadband | 10:53 PM | 0.0439 | Megabytes | $ | - |
| 7/09/11 | Mobile Broadband | 12:46 AM | 0.0009 | Megabytes | $ | - |
| 7/09/11 | Mobile Broadband | 4:45 AM | 0.0068 | Megabytes | $ | - |
| 7/09/11 | Mobile Broadband | 1:02 PM | 0.1316 | Megabytes | $ | - |
| 7/09/11 | Mobile Broadband | 4:44 PM | 0.6201 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 4:42 AM | 0.2956 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 8:11 AM | 0.0810 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 8:13 AM | 0.4160 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 9:53 AM | 0.0009 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 5:35 PM | 0.5029 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 5:41 PM | 1.1513 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 7:06 PM | 0.4101 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 11:11 PM | 0.7060 | Megabytes | $ | - |
| 7/10/11 | Mobile Broadband | 11:17 PM | 0.2216 | Megabytes | $ | - |
| 7/11/11 | Mobile Broadband | 3:50 AM | 0.0117 | Megabytes | $ | - |
| 7/11/11 | Mobile Broadband | 3:51 AM | 0.3310 | Megabytes | $ | - |
| 7/11/11 | Mobile Broadband | 7:15 AM | 0.1357 | Megabytes | $ | - |

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls

(I) Intl Disc Call (J) Intl Disc Call to Mobile (K) WPS Call (T) T-Mobile Number (U) HotSpot Call (V) myFaves Call (X) T-Mobile @Home Call

EXHIBIT 28

PAGE  01/01



# *Brass*
# *&McCotter*

*Attorneys and Counselors at Law*

318 North Main Street
Conroe, Texas 77301
Email: lcmccotter@yahoo.com

Telephone 936-788-5700
Facsimile 936-788-5701
Cell (281) 703-1539

## FACSIMILE COVER SHEET

From:    **Larry McCotter**

To:    Vance Mitchell; Custodian of Records: 713-477-4976

Date:    July 25, 2011

No. of Pages (Including Cover Sheet):    1

> ### PLEASE DELIVER IMMEDIATELY

COMMENTS:

Dear Mr. Mitchell:

    This fax is to put you on notice that I represent Victor Hernandez who was involved in a Police stop and shooting on Friday morning at approximately 2:30 am off of Shaver Road. Please be advised we will send you a subpoena for all related video specifically including all patrol car video from the patrol Officer involved in the stop.

    Please take all necessary measures at this time to preserve the patrol car video in question.

    Thank you so much for your assistance.

Yours very truly,

*Larry McCotter* /B

Larry McCotter

Encl.

c:\o\lmcc\1107\ Hernández V fax

PLEASE NOTE: The content of this facsimile message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please call this office immediately at (936) 788-5700, and return the original message to the above address via United States Mail. Thank you.

Pasadena 2762

# EXHIBIT 28

*08/08/2011  11:55    9367663701               BRASS & MCCOTTER                     PAGE  01/01*

*1 AD*

# Brass &McCotter

*Attorneys and Counselors at Law*

318 North Main Street
Conroe, Texas 77301
Email: lcmccotter@yahoo.com

Telephone 936-788-5700
Facsimile 936-788-5701
Cell (281) 703-1539

## FACSIMILE COVER SHEET

**From:**   Larry McCotter

**To:**   Mr. Vance Mitchell; Pasadena Police Department Records: 713-477-4976

**Date:**   August 8, 2011

**No. of Pages (Including Cover Sheet):**     1

### PLEASE DELIVER IMMEDIATELY

**COMMENTS:**    **Re:**    Victor Hernandez – weapon discharge by officer 7/22/11

Dear Mr. Mitchell:

Further to our telephone conversation of a few minutes ago, please provide my office with the following as soon as possible:

1. Name and badge number of officer involved;
2. Complete copy of patrol car video of said officer showing the stop and what transpired;
3. Complete copy of store video obtained from the Texaco gas station; and
4. Complete copy of incident report.

We continue to request that you make every effort to assure that both the patrol car video and the Texaco store video are preserved.

Please don't hesitate to call me at the office or on my cell with any questions or information. My fax and cell numbers are above.

Thank you very much for your kind assistance.

Yours very truly,

*Larry McCotter*

Larry McCotter

c:\o\lmcc\1108\Hernandez Pas PD fax

PLEASE NOTE: The content of this facsimile message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please call this office immediately at (936) 788-5700, and return the original message to the above address via United States Mail. Thank you.

Pasadena 2763

EXHIBIT 28

18-1 (Rev. 2-15-2011)



**Greater Houston Regional
Computer Forensics Laboratory**

13333 Northwest Freeway
Suite 400
Houston, Texas 77040



## REPORT OF EXAMINATION

To:     Pasadena Police Department
Attn: Chris Macgregor
713-475-7891

Date:     August 19, 2011

Case ID No.: N/A

Lab No.:     GH11-318

Reference:   Communication dated July 12, 2011

Ref. No.:   IAD Investigation 11-67

Title:     IAD COMPLAINT

Date specimen received:     August 12, 2011

Specimens:

GH27640 Memorex DVD + R labeled:  MVR video Unit 0715 2011-17770,
Officer Yzaguirre MVR #4451

Request:

In a service request dated August 12, 2011, Detective Chris Macgregor requested the
GHRCFL exam the above specimen and attempt to enhance a video sequence
regarding an officer traffic stop. In particular identify the actions of the driver in the
suspect vehicle.

The specimens are to be processed under legal authority composed under the current
internal affairs investigation.

Page 1 of 3

An ASCLD/LAB-*International*
Accredited Laboratory
Since June 10, 2009



For Official Use Only

EXHIBIT 28

Opinions and Conclusions:

    N/A

Summary of Examination:

    The video file contained on GH27640 was reviewed and the sequence in question located. There was not enough detail in the video to enhance the driver of the suspect vehicle.

Details of Examination:

    No DE was generated for this request.

    The following processes were performed:

- The Request for Service and the Legal Authority was reviewed.

- A listing of the files contained on GH27640 was created.

- The traffic stop in question was reviewed from the video file contained on GH27640.

- One still image showing the suspect vehicle was exported from the video contained on GH27640.

- The still frame could not be enhanced to show enough detail of the driver.

- No final results were generated for this request.

Disposition of Evidence:

    GH27640 placed within RCFL evidence control.

    The examiner notes are retained with the RCFL request file. There are no enclosures included with this report and this request is considered closed

N/A
GH11-318
Page 2 of 3

For Official Use Only

EXHIBIT 28

Examiner: _____
Keith G. Medford, FE

Greater Houston RCFL
Computer Analysis Response Team

For Official Use Only

EXHIBIT 28

07-22-11:09:10AM: :281 998 2501 W 8/ B

## PASADENA POLICE DEPARTMENT

Sumwj ~~SMITH~~ QUALIFICATION

May 2011

Course: .P2

S-1

| Name | Date | Make | Serial | Score | Inspected By: | Signature |
|---|---|---|---|---|---|---|
| MICHAEL S | 6-9-11 | REM 870 | C55R261m | 100 | 54 | *[signature]* |
| STUBBS J. | 5-23-11 | Winchester 1200 | L335014 | 100 | 54 | Charles Shell |
| Cointher E. | 5-24-11 | REM 870 | | 100 | 54 | *[signature]* |
| T. Remy | 5-25-11 | REM 870 | R0552222m | 100 | 54 | *[signature]* |
| S. SHEPPEA | 5-25-11 | REMINGE | 288x434 | 100 | 54 | *[signature]* |
| M. CANTEA | 5-26-11 | REM 870 | C84414107m | 100 | 54 | *[signature]* |
| O. Peterlou | 5-26-11 | Mossberg | 1092693 | 100 | SB | *[signature]* |
| C. Hermitson | 5-26-11 | Winchester | L32.97223 | 100 | 54 | *[signature]* |
| C. WILLIAMS | 5-07-11 | Winchester | | 100 | 54 | *[signature]* |
| R. Teetie | 5-21-11 | REM 870 | V46 29991 | 100 | 54 | *[signature]* |
| K. Frissell | 5-27-11 | REM 870 | AB885025m | 100 | 54 | *[signature]* |
| M. Johnson | 5-27-11 | KEN 870 | M4790972 | 100 | 54 | *[signature]* |
| D) MARTINEZ | 5-27-11 | Benley | | 100 | 54 | *[signature]* |
| D. Remington | 6-9-11 | REM 187 | P844665 | 100 | 54 | *[signature]* |
| N. Sucat | 6-8-11 | Rem. | | 100 | 54 | *[signature]* |
| K. Nunman | 6-8-11 | REM 870 | AB894 sm | 100 | 54 | *[signature]* |

EXHIBIT 28