Deposition Transcript Correction Page
Witness Name: Joshua Bruegger
Date Of Deposition: January 5, 2024

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 58 | 8 | replace "counsel" with "Council" | Governmental office, not attorney |
| 58 | 9 | replace "counsel" with "Council" | Governmental office, not attorney |
| 59 | 1 | replace "take" with "initiate" | More precise response considering civil service (See testimony at p. 62, ll. 9-22) |
| 59 | 12 | insert "initiate proceedings to" between "could" & "fire" | |
| 60 | 18 | replace "take" with "initiate" | More precise response considering civil service. (See testimony at p. 62, ll. 9-22) |
| 63 | 2 | before "." Insert ", I could initiate indefinite suspension proceedings, but the police civil service commission or an arbitrator appointed under Texas police civil service law has the final authority over the discharge decision." | More precise response considering civil service (See testimony at p. 62, ll. 9-22) |
| 64 | 1 | replace second "to" with "initiating" & before "." insert "in accordance with the civil service law that controlled the final disposition of my recommendation. | More precise response considering civil service (See testimony at p. 62, ll. 9-22) |
| 65 | 22 | Before "." insert "subject to the final authority of but the police civil service commission or an arbitrator appointed under Texas police civil service law. | |
| 66 | 5 | before "." insert "at the City, but the police civil service commission or an arbitrator appointed under Texas police civil service law has the final authority. if an officer appeals my recommendation." | More precise response considering civil service (See testimony at p. 62, ll. 9-22) |
| 66 | 11 | before "." insert "subject to the final authority of the police civil service commission or an arbitrator appointed | More precise response considering civil service (See testimony at p. 62, ll. 9-22) |

EXHIBIT 32

|     |     |  |  |
|-----|-----|--|--|
|     |     | under Texas police civil service law. | |
| 73  | 6   | insert before current response, | More precise responsive to the question answered |
|     |     | "When an armed person encounters a | |
|     |     | Police officer, the armed person has an | |
|     |     | opportunity to, and should, drop his | |
|     |     | weapon." | |
| 91  | 20  | replace response with "There are | Upon further thought about the question, |
|     |     | Pasadena police department policies. | and review of the police department written |
|     |     | Rule 2.81, Procedure 1.6, and | regulations, the following correction is appropriate |
|     |     | Written Directives A1.5, C6.2, C6.11, | |
|     |     | C6.12, P1.8, & U3. | |
| 99  | 21  | before "." insert ", that is all I can | More precise response |
|     |     | observe on the recording you have | (See also testimony at p. 100, l. 5) |
|     |     | shown me but that recording does not | |
|     |     | depict movements, if any, the suspect made | |
|     |     | after the lighting no longer illuminated | |
|     |     | the suspect" | |
| 99  | 24  | before "." insert ", that is all I can | More precise response |
|     |     | observe on the recording you have | (See also testimony at p. 100, l. 5) |
|     |     | shown me but that recording does not | |
|     |     | depict movements, if any, the suspect made | |
|     |     | after the lighting no longer illuminated | |
|     |     | the suspect" | |
| 100 | 5   | after "." insert "If that occurred, I | More precise response |
|     |     | cannot see it on the recording you have | |
|     |     | shown me. The recording does not depict | |
|     |     | movements, if any, the suspect made | |
|     |     | after the lighting no longer illuminated | |
|     |     | the suspect." | |

I, Joshua Bruegger, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

Joshua Bruegger

Before me ___Lindsey Ervin___ on this day personally appeared, Joshua Bruegger, who is known to me to be the person whose name is subscribed to the foregoing instrument and

EXHIBIT 32

acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office February **22** 2024.

NOTARY PUBLIC IN AND FOR
THE STATE OF SOUTH CAROLINA

My Commission Expires: **10|15|2029**



EXHIBIT 32



EXHIBIT 32

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON TEXAS**



Randy Aviles,

      Plaintiff,

vs.                                 #4:22-CV-03571

Rigoberto Salvidar,
City of Pasadena, TX,

      Defendants.

_____

**VIDEOTAPED DEPOSITION OF**

**CHIEF JOSHUA BRUEGGER**

**TAKEN ON**
**FRIDAY, JANUARY 5, 2024**
**9:22 A.M.**

**937 BROADWAY STREET**
**MYRTLE BEACH, SOUTH CAROLINA 29577**

EXHIBIT 32

```
 1                        APPEARANCES

 2

 3   For the Plaintiff:

 4   Dimitri Dube, Esquire

 5   The Cochran Firm

 6   1825 Market Center Blvd., Suite 500

 7   Dallas, TX 75207

 8   (214) 651-4260

 9   (214) 651-4261 (Fax)

10   ddube@cochrantexas.com

11

12   For the Defendant:

13   Norman Giles, Esquire

14   Lewis Brisbois

15   24 Greenway Plaza, Suite 1400

16   Houston, TX 77046

17   (713) 659-6767

18   (713) 759-6830 (Fax)

19   Norman.giles@lewisbrisbois.com

20

21

22

23

24

25
```

EXHIBIT 32

```
 1                    APPEARANCES CONTINUED

 2

 3    For the Defendant:

 4    Steven D. Selbe, Esquire

 5    Gordon Rees Scully Mankhani, LLP

 6    3/D International Tower

 7    1900 W. Loop S #1000

 8    Houston, TX 77046

 9    (713) 961-366

10    (713) 961-3938 (Fax)

11    sselbe@grsm.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 32

```
 1                    EXAMINATION INDEX

 2                                              Page

 3

 4  EXAMINATION BY MR. DUBE                      8

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM

EXHIBIT 32

```
 1                      EXHIBITS INDEX

 2    PLAINTIFF'S EXHIBIT                          Page

 3

 4                 (ALL EXHIBITS WERE RETAINED.)

 5

 6       19       VIDEO                              85

 7

 8       32       VIDEO                             174

 9

10       34       DEPOSITION TRANSCRIPT (COOPER)    145

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1              S T I P U L A T I O N S

 2   It is stipulated among Counsel that this deposition

 3   is being taken pursuant to the Federal Rules of

 4   Civil Procedure; and that all objections, except as

 5   to the form of the question, are reserved until the

 6   time of trial.

 7   It is also stipulated among Counsel for the

 8   respective parties and the deponent that the

 9   deponent will exercise the right to read and sign

10   this transcript.

11

12   The deposition is taken pursuant to notice

13   and/or agreement, in the above-entitled cause

14   pending in the above-named court and pursuant to

15   the Federal Rules of Civil Procedure.

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 32

1                **VIDEOTAPED DEPOSITION OF**

2                **CHIEF JOSHUA BRUEGGER**

3                       **TAKEN ON**

4               **FRIDAY, JANUARY 5, 2024**

5                        **9:22 A.M.**

6

7            **VIDEO TECHNICIAN:**  We're on the record in

8    the video deposition of Chief Joshua Bruegger in the

9    matter of Aviles versus Saldivar.  Today's date is

10   January 5th, 2024. We're located at Myrtle Beach

11   City Hall in Myrtle Beach, South Carolina.  The

12   court reporter is Mark Hagood.  My name is Arthur

13   Daugomah with Naegeli Deposition and Trial.  The

14   time is now 9:22.  Will counsel please identify

15   themselves for the record?

16            **MR. DUBE:**  Dimitri Dube on behalf of

17   plaintiff Randy Aviles.

18            **MR. GILES:**  Norman Giles.  I represent the

19   City of Pasadena.

20            **MR. SELBE:**  Steve Selbe for off-- Officer

21   Saldivar.

22          **MR. DUBE:**  And Larry Taylor from my

23   office, Cochran Firm, will also be joining us at

24   some point.  I think when he comes or not, he's

25   going to make his appearance as well.

1        **VIDEO TECHNICIAN:**  All right.  Mark, would

2    you please swear in the witness.

3    Thereupon, **JOSHUA BRUEGGER,** being first duly sworn

4    by the Court Reporter, as hereinafter certified,

5    testified as follows:

6            **MR. DUBE:**  We're ready to start?

7            **COURT REPORTER:**  Yes, sir.

8    **EXAMINATION**

16       **Q**    Okay.  And you know the lawsuit we're

17   **talking -- we were referring to is lawsuit Aviles**

18   **versus the City of Pasadena and Rigoberto Saldivar.**

19       A    Yes, sir.

20       **Q**    And you are familiar with that lawsuit?

21       A    Yes, sir.

22       **Q**    Okay.  All right.  We are here in Myrtle

23   **Beach.**

24       A    Yes, sir.

25       **Q**    And this is where you work. Correct?

```
 1       A     Correct.

 2       Q     Okay.  What do you do?

 3       A     Assistant city manager.

 4       Q     Okay.  How long have you been in that

 5   role?

 6       A     October 30th of 2023.

 7       Q     Okay.  And -- bef--- October 30th of 2023?

 8       A     Yes, sir.

 9       Q     Okay.  So -- so very recently?

10       A     Yes, sir.

11       Q     When did you leave employment with the

12   City of Pasadena?

13       A     October 6th of 2023.
```

```
23       Q     And you are ready to proceed today?

24       A     Yes.

25       Q     Okay.  How did you prepare for this
```

EXHIBIT 32

1  deposition?

2      A    I reviewed the reports, previous

3  testimony.

4      **Q    Which reports did you review?**

5      A    The internal affairs report and the

6  documents that go with that for this particular

7  incident.

8      **Q    Okay.  Is that -- by internal affairs**

9  **report, are you referring to the report from**

10 **Sergeant Hamilton to you at the conclusion of -- of**

11 **the investigation of the Schenk case?**

12     A    I -- I reviewed that as well, but the one

13 that detective Mauricio Reyes drafted or authored

14 for this -- the Aviles shooting.

15     **Q    Okay.  Okay.  So you've reviewed the one**

16 **for the Schenk shooting and the one for the Aviles**

17 **shooting?**

18     A    Yes.

19     **Q    Okay.  Anything else that you reviewed?**

20     A    No.

21     **Q    Okay.  Did you review any videos?**

22     A    No.

EXHIBIT 32

9      Q      What did you do after you graduated from

10  high school?

11      A      Started college in January of 1995 at Sam

12  Houston State.

13      Q      What was your major?

14      A      Criminal justice.

15      Q      They have a good program --

16      A      They do.

17      Q      -- there, right?

18      A      A very good program.

19      Q      Did you complete it?

20      A      I did.

21      Q      Okay.  So when did you graduate from

22  college?

23      A      My undergraduate, I graduated in December

24  of '97.

25      Q      Oh, so you finished a little early?

1    A    Yes.

2    **Q    Okay.  How so?**

3    A    Took a bunch of classes.

4    **Q    And so --**

5    A    Year 'round.

6    **Q    Okay.  So you took summer classes?**

7    A    Yes.

8    **Q    Okay.  What did you do immediately after**

9    **college?**

10    A    Started with the Pasadena Police

11    Department March 2nd of 1998.

12    **Q    So you graduated in '97?**

13    A    I graduated in December of '97.

14    **Q    Uh-huh.**

15    A    Started with the Pasadena Police

16    Department in March of nin--- 1998.

23    **Q    And were you employed with the Pasadena**

24    **Police Department from 1998 until you left this past**

25    **October?**

1        A      Correct.

```
1      Q      Tell us about that.

2      A      He was in the police academy with me.

3      Q      Okay.  So for the entire time period?

4      A      Yes, sir.

5      Q      Did you guys have a friendship or

6 relationship during that time?

7      A      Just coworkers.  Didn't hang out outside

8 of work or anything.
```

EXHIBIT 32

1  administer field sobriety tests, make determination

2  whether they were intoxicated.  If they were, make

3  the arrest, take them to jail and then offer them a

4  breath test.

5      Q    Did you have any other role as a case --

6  as the case would proceed?

7      A    Provide courtroom testimony often times.

8      Q    So you have testified in court before?

9      A    A bunch, yes.

10     Q    Okay.  Have you ever had your deposition

11  taken before?

12     A    Yes.

13     Q    How many times?

14     A    Probably five or six.

15     Q    Okay.  What kind of cases were those in?

16     A    I know at least two were related to

17  crashes.

18     Q    Uh-huh.

19     A    And then I know at least three out of

20  lawsuits since I've been the chief -- or was the

21  chief.

22     Q    Were you personally named in those suits?

23     A    One of them, I was.

24     Q    Uh-huh.  Do you recall the circumstances

25  of that case, or the all--- the allegations in those

NAEGELI
DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 32

1  cases?

2      A      Each of the cases or the case where I was

3  personally named?

4      Q      Sorry.  Do you recall the allegations in

5  the case that you were personally named?

6      A      Yes.  It -- it was an allegation of

7  excessive force in an arrest and it was -- I either

8  failed to train or failed to supervise. One -- I --

9  one of -- one of those or both of those.  I don't

10 remember specifically.

11     Q      Uh-huh.  Was it alleged that you had used

12 excessive force?

13     A      No.

14     Q      So you were just the chief and it was --

15     A      I was -- yes.

16     Q      Okay.  And what was the nature of the

17 force that was used in that case?

18     A      Physical force.

19     Q      Okay.  Was it a shooting?

20     A      No.

21     Q      Okay.  Do you recall the outcome of the

22 case?

23     A      Personally, I was released from the

24 lawsuit.

25     Q      Uh-huh.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1     A    And then the case settled.

2     **Q    Do you recall for how much?**

3     A    I do not.

4     **Q    Do you recall the name of the officer who**

5  **was named in the lawsuit?**

6     A    There was a bunch.

7     **Q    Uh-huh.**

8     A    I know one of them was Officer Brinker.

9     **Q    Uh-huh.**

10    A    I -- I don't remember the other ones.

11    **Q    Okay.  What year was this?**

12    A    The lawsuit or when it happened?

13    **Q    Both.**

14    A    I don't know.  I believe it settled last

15  year.

16    **Q    Okay.**

17    A    I think in early '23 or late '22.

18    **Q    Okay.**

19    A    I believe.  And I'm just going to -- I

20  don't know exactly when it happened.  My guess is a

21  couple of years earlier just because of I know how

22  it plays out --

23    **Q    Uh-huh.**

24    A    But I couldn't tell you a...

25    **Q    Do you recall what the allegations in the**

NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  lawsuit were?

2       A    They were excessive force.  I know that.

3       Q    Okay.  So but give me a little -- can you

4  give me a little more factual detail, like what was

5  the circumstance of the force that was used?

6       A    I know he was struck like with a fist,

7  hit.  I don't remember if there was any other -- I -

8  - I don't remember that he was alleged to be kicked

9  or anything like that.  I don't recall that, but --

10      Q    Uh-huh.

11      A    All I recall is strikes.

12      Q    What area in Pasadena did -- did the for--

13  - was the force used?

14      A    Where at?

15      Q    Yes.

16      A    It was at a Denny's.  Around the 4100

17  block of Spencer Highway.

18      Q    How did they allege that you failed to

19  supervise the officers in question?

20      A    I honestly don't know.

21      Q    Okay.

22      A    I'm not sure.

23      Q    Okay.  You -- you don't recall reading the

24  complaint or petition?

25      A    I did, but I don't remember -- I -- I

8    Q    Gotcha.   Okay.   What is the process to get

9  promoted?

10   A    It's varied in the organization, but

11  because it's a 143 local government code agency in

12  Texas that governs the promotional process, and so I

13  guess you could go by default.  If there's not an

14  alternative promotional process, it's a test, a

15  competitive test.

16   Q    Uh-huh.

17   A    And then the -- the candidates are ranked

18  based on test score and seniority points, and that

19  creates the eligibility list and then you're

20  promoted off that as openings come open.

21        At one point, we also later on had an

22  alternative promotional process which involved a

23  test and then assessment center as well and then

24  combine the two of those together and that created

25  an eligibility list.

1      Q      Okay.

2      A      So there's been two different processes in

3 the organization.

4      Q      **Which process was in play when you were**

5 **promoted?**

6      A      When I was promoted --

7      Mr. Giles:  Object to form.

8 By Mr. Dube:

9      Q      **To sergeant.**

10      A      When I was promoted to sergeant, it was a

11 test only.

12      Q      **Test only?**

13      A      Yes.

14      Q      **How did your responsibilities change when**

15 **you went from a member of the task force to a**

16 **sergeant in charge of the task force?**

17      A      At that point, I was a first line

18 supervisor.

19      Q      **Uh-huh.**

20      A      And so day-to-day oversight of the

21 officers that were assigned to that unit,

22 scheduling, approving reports, payroll, respond to -

23 - you know, when officers would call or citizens

24 would call, would respond.

25      Q      **Did you have any responsibilities in terms**

EXHIBIT 32

```
 1  of discipline?

 2      A    No.  Discipline -- no.  Discipline came

 3  from above.

 4      Q    So you moved to day shift patrol?

 5      A    Yes.

 6      Q    Okay.  And that was in '06. Correct?

 7      A    Correct.

 8      Q    Okay.  Tell us about your responsibilities

 9  there.

10      A    First line supervisor over squad and day

11  shift patrol officers.  And it was a -- a similar

12  role.  It was just more broad because the officers

13  assigned -- or duties weren't as narrowly focused,

14  and so they would respond to calls for service,

15  traffic, crime, disturbances, things like that.  And

16  so my responsibility was still, you know, approving

17  reports, day-to-day oversight, payroll, you --

18  working through, you know, some of the minor

19  complaints, but really just day-to-day supervision

20  of -- of the officers under my -- in my squad.

21      Q    How many officers were -- were you

22  responsible for?

23      A    It depends, but anywhere from usually six

24  to ten.

25      Q    And you were the first -- I guess first
```

```
 1   line of supervisors is the word -- is the word you

 2   used before?

 3        A    The first line supervisor, yes.

 4        Q    Okay.  So give me a sense of the hierarchy

 5   in -- in the chain of supervision at Pasadena.

 6        A    So again, it's varied.

 7        Q    Okay.

 8        A    At one time, we had patrol officers,

 9   sergeants, lieutenants, captains, assistant chiefs

10   and the chief.

11        Q    Uh-huh.

12        A    I don't know.  Maybe 15-ish years ago,

13   they did away with the captain position. And so for

14   that time period, it's been officers, sergeant,

15   lieutenant, assistant chief, chief.

16        Q    So at the time of this -- of this 2008 --

17   I mean, 2018 through twen--- 2021, the process that

18   was in place was officer, sergeant, lieutenants,

19   assistant chiefs and chief?

20        A    Correct.

21        Q    Okay.  So what were the roles of the

22   lieutenants?

23        A    Lieutenants would have a squad of

24   sergeants and they would oversee the sergeants, make

25   sure the sergeants, if you will, were doing their
```

1  job or their assignment.

2      Q    How many sergeants were there in the

3  department, you know, throughout the years?

4      A    It's -- it's either been 39 or 40.

5      Q    Okay.

6      A    It's -- I would say gone back and forth,

7  but it's been one of those two numbers throughout my

8  career.

9      Q    Why those two numbers?

10     A    At one point when there was a downturn in

11 the economy, they cut some positions.  And then as

12 the economy returned, they added the position back.

13     Q    And how many lieutenants?

14     A    There were nine until July of last year.

15 Now there are ten.

16     Q    Okay.  How about assistant chiefs?

17     A    It's -- it's fluctuated between two and

18 three throughout my almost 26 years there.

19     Q    Uh-huh.

20     A    Most of the time, it's been three, but

21 there's been times where it's been two.

22     Q    Okay.  And one chief?

23     A    And one chief.

24     Q    I guess we discussed the role of the

25 lieutenants.  What is the -- what were the role --

1  **what was the role and responsibilities of the**

2  **assistant chief?**

3      A    So the assistant chief then oversee the

4  lieutenants.  They -- and they also regularly meet

5  with the chief and -- at -- at -- once you are in

6  the assistant chief role, it's more setting policy,

7  setting direction, kind of the vision, the goals for

8  the organization.  So it's -- it's a little bit

9  broader scope beyond just the day-to-day

10 supervision.  It's also, you know, helping move the

11 -- the organization in the direction we're trying to

12 go.

3    Q    Uh-huh.  And approximately how many

4  patrolmen, officers are employed by the City of

5  Pasadena, typically?

6    A    So it's varied.

7    Q    Uh-huh.

8    A    Total sworn personnel from the chief all

9  the way, you know, to the bottom of the

10  organization, there have been anywhere from about

11  225 to 290.

EXHIBIT 32

2    **Q    Okay.  We're still tracking down your**

3  **career path.  So daytime supervisor?**

4    A    Correct.

5    **Q    Okay.  Or day -- or day shift supervisor?**

6    A    Day shi--- correct.

7    **Q    How long were you in that role?**

8    A    Until either May or June of 2006.

9    **Q    And where were you shifted then?**

10    A    I was then shifted to investigations, but

11  specifically, property crimes or also known as

12  burglary and theft.

13    **Q    What was your role there?**

14    A    To oversee the investigators in burglary

15  and theft and, you know, supervise investigations.

16  I would work some cases as well.

17    **Q    Uh-huh.**

18    A    But really, my -- my primary role is the

19  day-to-day supervision of -- of the investigators

20  assigned there, overseeing investigations, approving

21  reports, you know, payroll, make sure everybody's

22  complying with, you know, rules, policies, things

23  like that.

24    **Q    Were you still a sergeant at that time?**

25    A    I was a sergeant, yes.

EXHIBIT 32

1      **Q     When did you receive your next promotion?**

2      A     Next promotion?

3      **Q     Uh-huh.**

4      A     Was October of 2012.

5      **Q     Uh-huh.   What is that process?**

6      A     The promotional process?

7      **Q     Uh-huh.**

8      A     That was a test in an assessment center.

9      **Q     What's an assessment center?**

10     A     So a -- a verbal command and high -- do

11     various scenarios.  There's also a writing exercise

12     to it, a -- a -- a presentation part of it, and

13     you're assessed on your performance on that and

14     given a score.  And then I believe the test was 60

15     percent and then the assessment center was 40

16     percent.  Combine those two together and that's how

17     you grade the eligibility list.

18     **Q     And who -- who are the people making the**

19     **assessment?**

20     A     I don't know.  They -- outside -- out---

21     it was an outside firm that would bring typically

22     supervisors in from other organizations of

23     comparable size from outside the Houston area --

24     **Q     Uh-huh.**

25     A     -- to come in and do the assessment.

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

17      **Q      Okay.  And what was your next role?**

18      A      In November of 2009, I was transferred to

19   internal affairs.

20      **Q      How long were you in that role?**

21      A      Until October of 2012.

22      **Q      That's when you were promoted to**

23   **lieutenant?**

24      A      Correct.

25      **Q      Okay.  What was your role at -- as a**

1  sergeant in internal affairs?

2      A    Taking complaints, conducting

3  investigations.

4      Q    Anything else?

5      A    Would review use of force forms when they

6  were committed and submitted.  That -- that's the

7  primary function is inves--- you know, conducting

8  investigations of complaints and review -- and doing

9  internal review of force incidents in the

10  department.

11     Q    So let's go back a little bit.  How is the

12  internal affairs division organized?

13     A    What -- so what do you mean?

14     Q    Because in -- in the other divisions, you

15  had, you know, I guess officers or patrolmen that

16  you supervise.  Right?

17     A    Right.

18     Q    And then they did -- and you were in

19  charge of their day-to-day activities and et cetera,

20  et cetera.  Then you go to sergeant and there would

21  be a lieutenant.  Right?  So give me the same sce---

22  scenario how the general affairs division was

23  organized.

24     A    So it depended.  At times, there were a

25  lieutenant and a sergeant.  There were two

EXHIBIT 32

1 sergeants.  There was a sergeant and an officer.

2 While there still is the rank structure --

3      Q      Uh-huh.

4      A      -- in internal affairs, you're both

5 investigators, both -- so while there may be a rank

6 difference, for a lot -- for really all practical

7 purposes, you're pretty much two investigators

8 working.  And so almost like part -- you know, you

9 would be partners as opposed to, you know,

10 supervisor subordinate even though there may be rank

11 difference.

12      Q      Is that -- it was less formal than it

13 would be in -- in other departments?

14      A      The -- the -- the rank, yes.  The rank

15 structure, yes.

16      Q      All right.

17      A      And -- and then you would report directly

18 to the chief's office, whether it was directly to

19 the chief or an assistant chief. But it -- that's...

20      Q      Understood.  And who is your I guess

21 lieutenant or -- and partner while you were there?

22      A      I know Dan Bittner was there for a while.

23 Chris McGregor.  Those are the two I remember.  It's

24 not to say there weren't others, but those are the

25 two that stand out to me.

EXHIBIT 32

1    **Q      And you were in internal affairs for**

2    **approximately three years?**

3        A      Yes.

4    **Q      Okay.  Can you give us a sense of what --**

5    **well, actually, let's ask this this way. Were there**

6    **any officer involved shootings during those three**

7    **years you were a member at internal affairs?**

8        A      Yes.

9    **Q      Okay.  How many were there?**

10       A      I couldn't give you a number.  I would say

11   probably ten-ish, but that's a approximation.

12   **Q      Do you recall during your three years**

13   **there if any of these officer-involved shootings you**

14   **determined that the shootings were unjustified?**

15       A      Yes.

16   **Q      Okay.  How many?**

17       A      I know of one for sure.  There --

18   **Q      Why -- why does that one stick out?**

19       A      Because it was cold that night and I

20   remember being out there.  That's why.  I mean, the

21   circumstances.  There was another one that I -- I

22   remember the facts very specifically.  I just don't

23   know -- I -- I was assigned to internal affairs

24   because now I -- yeah, so at least two that I know

25   of that -- yes.

1        Q    All right.  Tell us about the first one.

2        A    The first one was an off-duty officer.  Do

3   you -- my description of it, it was a road rage.  He

4   had been drinking.  Ends up following him into an

5   apartment complex.  Words were exchanged between the

6   off-duty officer and the driver of the other

7   vehicle.  Driver of the other vehicle begins to

8   drive.  The officer shoots at the back of the

9   vehicle.

10       Q    Do you remember the officer's name?

11       A    Kazz.  K-A-Z-Z.

12       Q    K-A?

13       A    Z-Z.

14       Q    First name?

15       A    I don't know.

16       Q    No worries.  Okay.  What was the outcome

17   of -- of the investigation?

18       A    He was found to have violated policy.  I

19   don't remember if he voluntarily separated his

20   employment or was terminated.  And he ultimately was

21   charged with an offense.  I don't remember if it was

22   aggravated assault or something else, but he was --

23   he was charged with a crime.

24       Q    So he was formally prosecuted?

25       A    Yes.

```
 1        Q    Okay.  Do you recall the outcome?

 2        A    I'm fairly certain he was found not

 3   guilty.

 4        Q    But he was terminated?

 5        A    Yes.  Well, he was terminated -- I don't

 6   know if he was terminated or if he --

 7        Q    Well --

 8        A    -- quit in lieu of being terminated.  I --

 9   I don't know.

10        Q    So he -- so he left his employment as a

11   Pasadena police officer?

12        A    Correct.

13        Q    Okay.  And do you recall what his rank

14   was?

15        A    He was an officer.

16        Q    He was an officer?  Okay.  Do you recall

17   what year this was?

18        A    Somewhere between 2009 and 2012. No.

19        Q    I knew you were going to say that.  Okay.

20   2009, 2012.  Gotcha.  Okay.  Anything else about

21   that incident that stick out -- that sticks out in

22   your mind?

23        A    No.

24        Q    What was your role in the investigation?

25        A    I was a supervisor.
```

1     **Q     Uh-huh.  Did you interview witnesses?  Did**
2  **you interview --**
3     A     No, I was just out there overseeing the
4  investigation, but I did not conduct the
5  investigation.
6     **Q     Okay.  Do you know who -- do you know**
7  **which -- so -- so somebody in the investigations**
8  **unit would have conducted the investigation?**
9     A     Yes.
10    **Q     Okay.  Do you recall who it was?**
11    A     I do not.
12    **Q     What was the second incident?**
13    A     The second incident was a traffic stop
14  involving Officer Martin.
15    **Q     Uh-huh.**
16    A     Some point, the driver drove away and
17  Officer Martin fired at him and struck him. And the
18  -- it was a pursuit after that, probably about ten
19  minutes, and then he was apprehended.
20    **Q     Do you recall what year that was?**
21    A     No.
22    **Q     What was your role in that investigation?**
23    A     I was assigned to internal affairs, so I -
24  - I did not work it.  The other person assigned to
25  internal affairs worked it, or -- or was the lead

1 | investigator.  I oversaw the investigation.  I'm

2 | sure I helped him on some things.

3 |     **Q**    **That's two shootings -- unjustified**

4 | **shootings that both involve allegation of a driver**

5 | **driving away and an officer shooting at them?**

6 |     A    Right.

3      Q    Gotcha.  But that's what I'm asking, I

4  guess.  Is there -- was there a process -- well, let

5  me start over.  Was there a process at the Pasadena

6  Police Department for internal affairs to i--- to

7  identify those type of recommendations for the chief

8  and the assistant chief?

9      A    As far as a formal process, no.  But I

10 mean, all -- all internal affairs reports go -- you

11 know, go to the chief's office for a review.  So

12 they are gonna -- they are gonna see them.  And --

13 and I'll -- I'll -- I mean, as far as this -- I

14 mean, we have a policy, you know, you can't shoot at

15 somebody that's not a threat. So this is not a --

16 that's -- as far as a training, I mean, it is

17 trained -- officers are trained, you know, you

18 cannot shoot somebody that's not a -- a threat and,

19 you know, meets the -- the elements of, you know,

20 chapter nine of the penal code.  But yes.

21     Q    So -- so I guess this is somebody's

22 testimony, the officer should know that they should

23 not shoot at a car that's moving away from them and

24 not a threat to them, based on training?

25     A    And -- and I'm going to say more not a --

EXHIBIT 32

```
 1            MR. GILES:  Object to form.

 2            THE DEPONENT:  I'm going to say not a

 3    threat as opposed to driving away because you could

 4    drive away and still be a threat.  So I mean, it's

 5    going to depend on the circumstances. But does the

 6    department have a policy prohibiting, you know, the

 7    use of unjustified force?  Absolutely.  State law

 8    prohibits the use of unjustified force.  And so

 9    those exist.  And there's also the very real, you

10    know, possibility of being indicted for criminal

11    offense if you use, you know, force.  And so there

12    are -- the -- the organization has taken steps to

13    ensure that -- you know, to the best of our ability

14    --

15       Q     Uh-huh.

16       A     -- that officers do not use unjustified

17    force.

18       Q     But despite the policy, you will agree

19    with me that officers do sometimes use un---

20    unjustified force?

21       A     Yes.

22       Q     And was there any procedures in place at

23    the police department to identify those areas where

24    despite their training, officers were still using

25    force -- unjustified force, any patterns along those
```

1  **lines?**

2      A    I mean, I guess the process would be when

3  the chief's office sees, you know, these internal

4  affairs reports coming up, they are going to see

5  them and can identify.  But I -- I'm not sure what

6  else you're looking for or asking because, I mean,

7  that -- that's I guess the best way I can answer the

8  question.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

9      Q    Okay.  What was your next role after

10 internal affairs?

11     A    When I was promoted to lieutenant in

12 October of 2012, I was assigned to night shift --

13 night shift patrol as a night shift commander.

14     Q    Let me ask this question.  So we're

15 October of 2012.  Correct?  And you and Officer

16 Saldivar went to the academy together.  Correct?

17     A    Correct.

18     Q    Do you have any interaction with him from

19 when you began with the police department and up

20 until this role?

21     A    If we were assigned to the same areas, it

22 was for a very short time because I don't really

23 remember -- he and I weren't friends, and so -- I

24 mean, we were academy mates, but not friends.  And

25 so not that I didn't keep up with him, but there's a

1  whole bunch of people in the organization and I --

2  you know, I didn't keep up with him.  So I don't --

3  I don't remember.  And it's not to say we didn't,

4  but I don't remember us working together or him

5  working for me.

6       Q    Uh-huh.

7       A    Directly for me.  I mean, obviously, as --

8  as a chief, ever--- you know, they all -- but you

9  know, as far as being a sergeant and supervising

10 him, I -- I don't remember that ever happening.

11 Even as a lieutenant, I don't recall -- I was on

12 nights for nine months or so as a lieutenant and he

13 might have been assigned to nights, but I -- I mean,

14 there's 35, 40 people assigned to nights, so I don't

15 -- I don't know.

16      Q    Nothing you recall directly.  Right?

17      A    Correct.

18      Q    Okay.  How about when you were in internal

19 affairs?  Did you come across any investigations

20 that -- where he was involved?

21      A    Yes.

22      Q    Okay.  Tell us about that.

23      A    He was involved in a shooting in two-

24 thousand-and--- I don't remember -- nine or twelve,

25 somewhere in there, I think.

1    **Q    Okay.**

2    A    Maybe '12.

3    **Q    Okay.  Can you give us -- what were the**

4    **circumstances of that shooting?**

5    A    Yes.  He was dispatched out to a subject

6    with a gun -- actually, two guns.

7    **Q    Uh-huh.**

8    A    Officer Saldivar -- they had been taken in

9    a theft from Walmart.

10    **Q    Uh-huh.**

11    A    Officer Saldivar located the individual,

12    said he had a gun in his hand -- at least one gun in

13    his hand, I -- I recall, and Officer Saldivar

14    perceived him to be a threat because of the gun in

15    his hand; didn't obey commands.  And Officer

16    Saldivar discharged his weapon.

17    **Q    Was that through a fence?**

18    A    Yes.

19    **Q    Okay.  So I don't think that was when you**

20    **were in internal affairs.  That was later on.**

21    A    I was out there.  I --

22    **Q    Okay.**

23    A    I -- I was there at least in -- several

24    hours after it happened 'cause I -- I may have been

25    an assistant chief.

1      Q      Uh-huh.

2      A      Maybe stopped by on my way to work because

3  it was light out and I know it happened at night.

4      Q      Uh-huh.  Okay.

5      A      I was at the scene for at least a short

6  period of time.  I know that.

7      Q      Okay.

8      A      So...

9      Q      Gotcha.  Okay.  So if -- if I told you

10  that happened in about April of 2018, would you have

11  any reason to disagree with me?

12      A      No.

13      Q      Okay.  And you were assistant chief at the

14  time?

15      A      Yes.  I was assistant chief.  So yes.

16  That's correct.  That was in April and the other one

17  was in November.  That's correct. Yes.

18      Q      We'll get back to that shooting --

19      A      Okay.  Yeah.  Okay.  I was the assistant

20  chief probably on the way to work and stopped by the

21  scene.

22      Q      Gotcha.  Okay.  All right.  So let's go

23  back.  So I guess we're in 2012; no real

24  interactions with Officer Saldivar that you recall.

25      A      Correct.

EXHIBIT 32

1    **Q     Okay.  And so in 2012, you get promoted to**
2    **lieutenant.**

3    A     Correct.

4    **Q     And you are at nighttime patrol?**

5    A     Yes, sir.

6    **Q     Okay.  How long are you there?**

7    A     July of 2013.

8    **Q     So a very short time?**

9    A     Yes.

10    **Q     Okay.  What's next?**

11    A     I was promoted to assistant chief.

12    **Q     Okay.  When were you promoted to assistant**
13    **chief?**

14    A     July of 2013.

15    **Q     Okay.  Got it.  What is your role as**
16    **assistant chief?**

17    A     I was over operations most of my time as
18    an assistant chief, which is -- again, the easiest
19    way to tell you is everybody that wears a uniform on
20    a day-to-day basis fell under that umbrella.

21    **Q     Uh-huh.**

22    A     The biggest one being patrol.  But again,
23    that's the day-to-day operations.  That's more
24    setting the vision, the direction, a little bit more
25    involved in the discipline of -- of the

1  organization, making recommendations.  You know,

2  depending on -- you know, formal discipline by civil

3  service can only be done by the chief. And so, you

4  know, verbal reprimands, letters of reprimands,

5  things like that would sometimes come from the

6  assistant chief.  But anything beyond that as far as

7  discipline per civil service law would have to come

8  from the chief. And so that would be some of the

9  roles.

10      Q    Okay.  I want to unpack that a little bit.

11  Actually, before we do that, what was the process in

12  promoting to assistant chief?

13      A    It was an interview process with the

14  chief.

15      Q    Uh-huh.

16      A    And then it's -- by civil service law in

17  Texas, at least, it's pretty much the prerogative of

18  the chief who they want to be assistant chief.

19      Q    So you serve at the pleasure of the chief?

20      A    Serve at the pleasure of the chief. Yes.

21      Q    And who was the chief at the time?

22      A    Mike Thaler.

23      Q    Okay.  How long did you serve under him as

24  assistant chief?

25      A    He retired on June 30th of 2017.

EXHIBIT 32

1    **Q    Is that when you were promoted to active**

2  **chief?**

3    A    No.

4    **Q    All right.**

5    A    There was another chief for about 15

6  months between Chief Thaler and myself.

7    **Q    Okay.  And who was that?**

8    A    Al Espinoza.

9    **Q    And you were the assistant chief under him**

10 **as well?**

11    A    Yes.

12    **Q    Okay.  Did he select you to be assistant**

13 **chief or was it just --**

14    A    He didn't unselect me.  How about that?

15    **Q    Got it.  When did he leave as chief--- was**

16 **he formally appointed as chief or was he a --**

17    A    He was formally appointed as a chief.

18    **Q    Okay.**

19    A    The end of November of 2018 was his --

20 when he retired.  But I was appointed the acting

21 chief before he officially departed.  He didn't come

22 to work the last couple weeks.

23    **Q    Okay.**

24    A    So I was appointed the active chief I

25 believe on -- it was the beginning of November.  I

```
1   believe November 7th of 2018.

2        Q    Do you -- do you recall why he left his

3   employment as chief?

4        A    He chose to retire.
```

EXHIBIT 32

5       Q    Okay.  And just to get this out of the

6   way, when you were chief, who were your assistant

7   chiefs?

8       A    Kevin Wingerson.

9       Q    Uh-huh.

10      A    Rick Styron, Jerry Wright.  And then

11  Assistant Chief Styron retired and Tom Warnke was

12  who I appointed to assistant chief.  And those were

13  the assistant chiefs when I left in October.

14      Q    Who's the chief now?

15      A    Jerry Wright.

21      Q    All right.  Okay.  So let's get to you as

22  -- how long were you acting chief for?

23      A    From the beginning of November, I --

24  again, I believe it was November 7th of 2018 until I

25  was confirmed by council on January 2nd, 2019.

1    **Q    As acting chief, were your roles any**

2    **different than they was as -- as appointed chief?**

3    A    The -- the biggest difference is, because

4    of civil service law, the acting chief cannot take

5    some disciplinary actions like formal discipline,

6    per 143 local government code.  So an acting chief,

7    if -- if they have not been -- you could have an

8    acting chief confirmed by counsel as the acting

9    chief, but if they are not confirmed by counsel,

10    they can't take disciplinary action such as days

11    off, involuntary demotion, an indefinite suspension

12    or the equivalent of a termination.  So you can't do

13    those things.  Other than that, pretty much can do

14    all the other stuff.

15    **Q    So during that time, who -- who would have**

16    **been able to I guess terminate a -- an officer?**

17    A    Nobody.  They would have gotten -- if

18    there would have been a situation where there had to

19    been termi--- you would have had to gone before City

20    Council and at least gotten confirmed as an acting -

21    - as an acting chief.

22    **Q    Could you have made the recommendation at**

23    **--**

24    A    There's nobody to make a recommendation

25    to, because under civil service law, the only one

1  who can take disciplinary action against an officer

2  is the chief.

3      **Q      So you had no ability to make a**

4  **recommendation -- so -- so acting chief has no**

5  **ability to make a recommendation to the City Council**

6  **to terminate an officer for a violation of policy?**

7      A      City Council can't --

8          **MR. GILES:**  Objection to form.

9          **THE DEPONENT:**  City Council cannot -- city

10 can't -- the only person is the chief.  City Council

11 cannot fire a police officer.  The mayor cannot fire

12 a police officer.  The only person that could fire,

13 suspend, indefinitely su--- suspend an officer is

14 the chief.

15     **Q      Okay.**

16     A      Nobody else can do it.

17     **Q      And -- and including the acting chief?**

18     A      That's correct.

19     **Q      Okay.  So if an officer needed to be**

20 **terminated by an action that warranted termination**

21 **during that time, what could -- what could be done?**

22     A      The acting chief could be confirmed by

23 Council as the acting chief and then they could do

24 it, because if you look at 143 and it talks about

25 the department head, the department head has to be

EXHIBIT 32

1  basically nominated, if you will, by the chief

2  executive, which would be the mayor, and then

3  confirmed by the Council.  And then later on in the

4  code, it talks about the department head.  Well, to

5  be the department head, you've got to be confirmed

6  by Council. And so City Council could confirm you as

7  an assistant chief so that you could take

8  disciplinary action if you needed to.

9      **Q    Say that again.  I'm sorry.  I -- I -- I**

10 **got lost.**

11     A    So City Council could confirm you, say we

12 are confirming you as the -- the assis--- the

13 interim chief.  That way, you are at least confirmed

14 by Council, which is what you've got to be per 143

15 to be the department head, because the department

16 head of the police department, the police chief is

17 the only person under civil service law that can

18 take disciplinary action.

19     **Q    Okay.  So I guess I -- where I'm getting**

20 **confused is there are three categories. There's**

21 **acting chief, there's interim chief and then there's**

22 **the chief.**

23     A    Interim and acting are the same thing.

24 They are synonymous, just different terms that

25 different people use.

1    Q    But I thought you said the City Council

2  could confirm the interim chief.

3    A    Interim or acting, whatever you want to

4  call it, they could confirm that.  They're saying,

5  basically, we're giving you all the rights as the

6  chief, but we're still looking for a chief.  Right?

7    Q    Oh.

8    A    It doesn't mean you're going to be the

9  chief forever.  It just means temporarily, until we

10 name a permanent chief, if you will -- and it's not

11 permanent, but --

12    Q    Uh-huh.

13    A    -- you have --

14    Q    You have --

15    A    -- the authority of -- of a chief.

16    Q    Were you ever confirmed by City Council,

17 then, in the time between November 2018 and January

18 2019?

19    A    No, it was only two months and there

20 wasn't a need at that point to -- to do it.

21    Q    Okay.  So you were just -- you served as

22 the acting chief, but you were not formally

23 appointed by City Council --

24    A    That's correct.

25    Q    -- during that time.  But in January 2019,

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM

EXHIBIT 32

1  you were appointed.

2     A     January 2nd of 2019, just under two

3  months.  Yes.

4     Q     Okay.  And at that time, you had all the

5  respons--- you had all the roles and

6  responsibilities and -- and -- and authority as

7  chief?

8     A     Yes.

9     Q     Okay.  Would you have had the ability to

10 fire or terminate an officer for actions he had done

11 prior to you obtaining that role?

12    A     Absolutely.  Well, let me back up. As long

13 as it met the other requirements of civil service

14 law because you have to -- disciplinary action 143

15 052 of the local government code, you have to take

16 disciplinary action within 180 days of misconduct

17 occurring; not the discovery of the misconduct, but

18 the misconduct occurring.  And so it would have had

19 to have taken place -- I couldn't go back five years

20 and -- and you know, dig something up and -- and --

21 and so just understand that there is -- there are

22 some time parameters in civil service.

23    Q     But if something occurred in November of

24 2018, you could -- you had authority when you were

25 appointed chief to terminate a officer for that

1  misconduct?

2      A    Yes.

3      Q    What are your -- what were your roles as -

4  - as chief of police for the City of Pasadena Police

5  Department?

6      A    How long you got?  No.

7      Q    At least 'til lunch break.

8      A    You know, setting the policy of the

9  organization, you know, the direction, the vision,

10  the day-to-day operations, discipline when it's

11  needed.  You -- you know, out in the community, you

12  know, community relations.  And so there -- there's

13  -- there's a lot of roles.

14      Q    What do you mean by setting policy?

15      A    Uh-huh.

16      Q    What do you mean by that?

17      A    Make the policies.  Whether that's kind of

18  the vision of the organization, which way we're

19  going to go, what's important, you know, that --

20  that we want to accomplish or both rules and

21  policies and procedures, set those for the

22  organization as well.

23      Q    And what were your roles and

24  responsibilities in terms of discipline?

25      A    At the end of the day, I was the final

EXHIBIT 32

1  decision maker when it came to -- to discipline.

2  And -- and I just want to be clear when we talk

3  about discipline that, okay, when we talk about

4  civil service discipline, it is a disciplinary

5  discipline or days off, it's an indefinite

6  discipline, an involuntary demotion, those are what

7  I consider discipline or what's considered -- not I

8  -- it's what state law considers to be discipline.

9  But officers also sometimes get verbal repri---

10 reprimands or letters of reprimands and they are

11 often referred to as discipline, but by civil

12 service law, they are not discipline.  So just as we

13 talk, I just want to make sure that we -- you know,

14 are we talking about discipline overall or are we

15 talking about civil service discipline? Because

16 there's a difference.

17     **Q    I understand.  So just -- just to clarify,**

18 **so there's informal discipline in terms of**

19 **reprimands and other things that can be done.**

20 **Correct?**

21     A    Correct.

22     **Q    Okay.  And then there are more final**

23 **disciplinary procedures that -- that can also be**

24 **done.**

25     A    Correct.

```
 1        Q    Okay.  And who had --

 2             MR. GILES:  Objection to form.

 3             MR. SELBE:  Same --

 4  BY MR. DUBE:

 5        Q    -- besides -- let me ask this question.

 6  Okay.  For the reprimands and other lesser forms of

 7  discipline, what -- who had the authority to make

 8  those recommendations and make those actions?

 9        A    The assistant chief.

10             MR. GILES:  Objection to form.

11             THE DEPONENT:  The assistant chiefs were

12  able to --

13             MR. DUBE:  Okay.

14             THE DEPONENT:  The more informal

15  discipline, if you will.

16  BY MR. DUBE:

17        Q    You had the authority to do so?

18        A    Yes.

19        Q    And you -- and when -- the chief had the

20  authority to make the more final, including termin--

21  - discipline, including termination?

22        A    Yes.

23        Q    Okay.

24             MR. GILES:  Objection.  Form.

25  BY MR. DUBE:
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    **Q    Now, I think you used the word decision**
2    **maker.  You were the final -- when you were the**
3    **chief of police for the City of Pasadena, you were**
4    **the final decision maker for policy and discipline?**
5    A    Yes.
6         MR. GILES:  Objection.  Form.
7    **BY MR. DUBE:**
8    **Q    So from January 2019 until you retired,**
9    **you were the final decision maker for the City of**
10   **Pasadena Police Department?**
11   A    For the police department, yes.
12   **Q    You -- you spoke a little bit earlier**
13   **about a shooting that happened in 2018 involving**
14   **Officer Saldivar.**
15   A    Yes.
16   **Q    Okay.  Tell us what you recall about that**
17   **incident.**
18   A    He and other officers were dispatched out
19   to the area.  It was an apartment complex south of
20   the Walmart in the 5200 block of Fairmont.  It was -
21   - there was a theft call from Walmart and there was
22   also I believe a homeowner had seen someone was on
23   the front area with a gun and called the police.
24   Officer Saldivar went out there, located the person
25   with the gun in his hand and ended up discharging

NAEGELI DEPOSITION & TRIAL   (800)528-3335   NAEGELIUSA.COM   EXHIBIT 32

1   his weapon.  And it was -- I believe a person was on

2   the other side of a -- like a wrought iron fence --

3   I mean, you could see through it; it was a wrought

4   iron fence -- with a gun.

5       Q    Uh-huh.

6       A    And Officer Saldivar discharged his weapon

7   and he hit a couple different things, but I don't

8   think he hit the person, from what I recall.

9       Q    Do you recall watching the video?

10      A    Back then, yes.

11      Q    Do you recall anything about the person

12  who was shot at?

13      A    All I can remember is he had a gun in his

14  hand.  I don't remember --

15      Q    Do you -- do you remember how old he was?

16      A    He was younger, but I don't know -- no, I

17  don't -- late teens, early twenties comes to mind,

18  from what I recall, but...

19      Q    Do you recall if the gun was a -- was a

20  working gun or -- or a toy gun?

21      A    It was working.  I believe it was either a

22  BB or a pellet gun, but it was -- it was a working

23  gun.

24      Q    Okay.

25      A    And I recall it looked like a -- I say a

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  regular gun.  It looked like --

2       **Q**    **A firearm?**

3       A    -- a firearm, not a -- did not -- at a

4  glance would not appear to be a BB gun or a pellet

5  gun.

6       **Q**    **Yeah.  So it was a BB gun or a pellet gun,**

7  **but not a firearm.  This is the distinction we're**

8  **making?**

9       A    Yes.

10      **Q**    **But it appeared to look like a firearm?**

11      A    Correct.

12      **Q**    **What was your role in that investigation?**

13      A    I was assistant chief over patrol.

14      **Q**    **Right, because this was night patrol.**

15      A    Oh, '18, I was assistant chief.

16      **Q**    **Okay.**

17      A    And -- and I would not have had much of a

18  role in it other than it was personnel under my

19  command that were involved.

20      **Q**    **Uh-huh.**

21      A    But as far as the investigation, it would

22  have been under investigations, and that assistant

23  chief, internal affairs did not fall under -- under

24  my command either.  And so as far as a real role in

25  the investigation, I would not have had one.

1    Q    Uh-huh.  But you recall saying that --
2  that you actually went out on the scene?
3    A    Yes.
4    Q    Okay.  Tell -- tell us about that.
5    A    I just remember stopping by.  It was early
6  morning.  I know there was a light outside.  But
7  that would not have been uncommon for me on
8  something that happened overnight where they still
9  had the scene for me to make an appearance and --
10 and check on everybody out there.
11   Q    What do you recall about that particular
12 night in terms of what you did at the scene?
13   A    I don't remember doing anything other than
14 finding out what happened.
15   Q    So you found out what happened at the
16 scene?
17   A    I -- yes.
18   Q    Okay.  Well, how did you find out what
19 happened?
20   A    I would have talked to somebody out there.
21   Q    Do you recall who you spoke to?
22   A    No.
23   Q    And do you recall what they said?
24   A    Other than what I just told you in my --
25 you know, the rundown of the scenario of the guns

1  had been stolen from Walmart, the original call was

2  somebody on the front porch that somebody had seen

3  or the front door area on a ring camera with a gun.

4  Saldavar had gotten out there, located the person;

5  he was on the other side of the fence, had a gun in

6  his hand. Officer Saldavar fired his gun several

7  times, didn't strike the person, but -- I think he

8  struck a car, a building and maybe the fence, from

9  what I recall.  But that was -- that's all I recall

10 from it.

11      **Q    Okay.  And you said you recall watching a**

12 **video of the shooting?**

13      A    Uh-huh.  Yes.

14      **Q    Do you recall reviewing the reports of**

15 **them -- of that investigation?**

16      A    Do I recall it?  No.

17      **Q    Okay.**

18      A    Would I have?  Yes, just because he was

19 under my command and the recommendation would have

20 come up from the chain of command because that's how

21 it works.

22      **Q    Uh-huh.**

23      A    But do I have an independent recollection

24 of reading it, I -- I don't.

25      **Q    Okay.  Would you have read the report of**

```
 1   the interview with the person who was shot at?

 2        A    I would have read whatever was in the

 3   internal affairs report.  So...

 4        Q    Do you recall reading that the person who

 5   was shot at indicated that he had never raised his

 6   gun at the officer?

 7             MR. GILES:  Objection.  Form.

 8             THE DEPONENT:  I don't recall him saying

 9   that.

10   BY MR. DUBE:

11        Q    So let's -- let me guess I'll ask it.

12   What do you recall about what the various -- what

13   Officer Saldivar said happened and what the

14   witnesses or -- and what the person who was shot at

15   said?

16        A    All I remember is that Officer Saldivar

17   had told him, you know, drop the gun for -- whatever

18   the words were.  And then the person had the gun in

19   the hand and Rigo fired his.  But as far as the -- I

20   -- I don't remember the exact -- I have not gone

21   back and reviewed that since probably 2018.  So it's

22   probably been six -- five or six years since I've

23   read that report.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

4      Q    Let -- let's just ask this question. What

5  are your expectations for an officer encountering a

6  person who has a -- a firearm in their hand?

7      A    And officer --

8           MR. GILES:  Objection.  Form.

9  BY MR. DUBE:

10     Q    Per policy.

11     A    Per policy --

12          MR. GILES:  Objection.  Form.

13          THE DEPONENT:  So -- so policy says, when

14 possible, to give a command.  But the other -- you -

15 - you asked about my expectation. The other thing is

16 action is faster than reaction as well.

17          MR. DUBE:  Uh-huh.

18          THE DEPONENT:  And so certainly, officers

19 or really anybody at least in the State of Texas has

20 a right to defend themselves if they are in fear of,

21 you know, imminent bodily injury, death.  And you

22 know, somebody having a -- a firearm, you know,

23 expectation, if you -- somebody has a firearm in

24 their hand and is encountered by a police officer,

25 the expectation is that you drop it whether we get

1  the verbal command out or not, that they are still a

2  threat to the officer.

3      **Q     Per policy, should the officer give the**

4  **person an -- an opportunity to drop the weapon?**

5          **MR. GILES:**  Objection.  Form.

6          **THE DEPONENT:**  The policy say when

7  possible.  It doesn't say that you -- you -- you

8  know, you have to or you're in violation of policy.

9  And so it's going to -- you know, depending on the

10  circumstances, it depends, you know -- there's --

11  there's countless scenarios that, you know, we could

12  go through.  And so you know, that's one thing with

13  policy is trying to give them enough guidance, but

14  also giving them the latitude to navigate through

15  these dynamic, ever-changing situations.  And so we

16  can't write a policy for every single situation that

17  occurs, and so we basically trying to give the

18  officers, hey, these are -- these are the ground

19  rules you have to operate between, but we're not

20  going to tell you, you know, every single scenario

21  how to do it because it just would not be possible.

22          I mean, the scenario you're talking about,

23  with this one, I mean, the -- the officer -- I mean,

24  we're going to write a policy that says they don't

25  drop the -- you know, drop -- if they are given --

1  you know, given instruction, drop the gun; they

2  don't drop it within half a second, you're -- you

3  know, and so it's got to be where it's possible.

4  And so it's going to depend on -- it's going to

5  depend on the circumstances and -- and in this

6  particular scenario that -- that you're talking

7  about with Officer Saldivar, it -- in my estimation,

8  you know, it was a reasonable use of force.

9      **Q     So you're affirming, you know, the**

10  **determination that it was reasonable use of force?**

11      A     The recommendation would have come in from

12  the lieutenant and I would have concurred with it.

13  I don't remember exactly when this happened.  As far

14  as recommendation came up, it -- these

15  investigations typically take some time to play out.

16  And so I don't remember was that made before I was

17  the acting chief or was Chief Espinoza still there,

18  because when this happened, I -- I don't know.

19      **Q     Okay.  And this happened April 2018.**

20  **Correct?**

21      A     Correct.

22      **Q     And Mr. Schenk was shot on November 2018?**

23      A     Yes.

24      **Q     Okay.  So as you're evaluating the**

25  **circumstances of the shooting of Mr. Schenk, were**

1  you area that Officer Saldivar had been involved in

2  another shooting incident that same year?

3       A    Yes.

4       Q    Okay.  Let's go back a little bit. So you

5  -- I -- I hear you when you say that, you know, you

6  can't give policy upfront to cover every possible

7  scenario an officer will encounter on the street.

8       A    Correct.

9       Q    Okay.  As when -- as assistant chief or as

10 chief, or any time while you were at the police

11 department, did -- was there ever any procedures to

12 go over with the officer the video of the incident

13 and -- and suggest how they could have handled that

14 scenario differently?

15      A    Are you asking did it happen in this case

16 or did it ever happen?

17      Q    Well, I -- well, both -- I'm going to ask

18 you about did it ever happen and then -- so let's

19 start with that first.

20      A    I -- I know from time to time the training

21 academy would review videos of incidents; not just

22 shootings, but pursuits, any kind of incident.  They

23 would review them.  I can't tell you one way or

24 another definitively whether, you know, in this

25 particular incidence anybody, you know, watched the

```
 1  video of Officer Saldivar.  I don't know.

 2       Q    Okay.  And I don't know if you misspoke or

 3  not.  You said the academy.  So does the academy

 4  have authority or opportunity to meet with ca---

 5  with officers who are not cadets and actual officers

 6  who are actually on the force?

 7       A    Sometimes they did.

 8       Q    Okay.  Was that -- was that -- would it be

 9  possible when you're assistant chief or acting chief

10  or -- or appointed chief, did you have the -- the

11  opportunity to recommend for an officer -- after

12  reviewing a report, hey, maybe you've -- you fell

13  within the structures of policy, but there's still

14  things you could have done differently; review this

15  with -- with a -- with instructor or some other type

16  of training like that?

17       A    Yes.

18       Q    So you had that -- you had that ability to

19  do that?

20       A    Yes.
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

10      Q     When you were in the -- worked in the

11 chief's office, not just as the, you know, appointed

12 chief, but assistant chief, interim chief and all of

13 those things, did you keep apprized of national news

14 stories related to police shooting incidents?

15      A     Yes.

16      Q     Why?

17      A     It's better information, current events,

18 know what's going on.

19      Q     Did that inform how -- you know, what --

20 how you trained your officers and what your -- what

21 you informed them or anything of that sort?

22      A     I mean, that would be part of it. Learn

23 from other -- you know, other incidents that

24 happened.

25      Q     So I guess let's -- let's go just

1  generally, you know -- I remember I asked you a

2  question before, if as internal affairs, if you

3  noticed any particular trends that needed to be, you

4  know, fixed or to let your officers at least -- that

5  would be the office -- the -- the job of the

6  persons, the people in the chief's office. Okay.

7  Remember -- do you recall that testimony?

8       A    Uh-huh.

9       Q    Okay.

10      A    Yes.

11      Q    And now, you know, we're in the part of

12  the story that you're going -- you're now in the

13  chief's office.  Right?

14      A    Right.

15      Q    As assistant chief, as the -- as the

16  interim chief and then eventually as the actual

17  appointed chief.

18      A    Correct.

19      Q    In -- in -- in those capacities, how did

20  you direct policy and inform policy and things on

21  trends that you notice from -- from day-to-day

22  experience within your police force?

23      A    Some of it would be conversations with the

24  -- with the training academy because they would

25  also, you know, stay abreast.  But it -- it was, you

1  know, also, you know, if we had officer injuries,

2  you know, a -- one of the common things is, you

3  know, vehicle backing, all right, backing up, you

4  know.  And so we would do an analysis to see, you

5  know, our crashes at the end of the year.  And you

6  know, we may see a bunch of backing accidents and

7  so, you know, that may nece--- necessitate some, you

8  know, backing training, for example.  And so it --

9  it really just depends.

10     **Q     Uh-huh.  So would you -- like how would**

11  **you -- if you notice something that needed to be**

12  **trained by your officers, how would you make that**

13  **known?  What are the various forms of communication**

14  **you would use?**

15     A     Roll call training was a big one.

16     **Q     What -- what's that?**

17     A     Where the supervisor may go over a topic

18  in -- in -- in roll call.

19     **Q     Uh-huh.  And what's roll call?  Just**

20  **assume we know nothing about the police.**

21     A     Patrol at the beginning of the shift.

22     **Q     Uh-huh.**

23     A     The patrol shift that -- you know, they

24  will meet.

25     **Q     Uh-huh.**

1      A      And the sergeant could provide roll call

2   training to the officers that are present.

3      **Q      Like these are things you need to keep --**

4   **keep abreast of, things you need to know and be**

5   **aware of?**

6      A      Correct.

7      **Q      So the -- and what else?**

8      A      The training academy.

9      **Q      Uh-huh.**

10     A      In-service training could provide updated

11  training on -- on various, you know, topics.

12     **Q      Uh-huh.  What else?**

13     A      We could push out training through a

14  platform we have on -- on different topics and it

15  will keep track of the officers that, you know, have

16  taken the training.  Those are the main -- and then

17  -- and then there's one on one too, you know, if --

18  you know, sometimes there's not a policy violation,

19  but maybe there's a better way to do it and so the

20  supervisor sitting down with -- with an officer and

21  saying, look, you did not violate policy, but maybe

22  there was a better way to do it.  Because in -- in

23  police work, there's a -- you know, a lot of ways to

24  skin a cat.  And so --

25     **Q      Right.**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
EXHIBIT 32

 1        A    -- just because you do it one way and I do

 2   it another doesn't make it wrong.  One may be better

 3   than the other, but it doesn't make the other

 4   person's wrong.

 5        Q    And I guess what -- what was the culture

 6   at the police depart--- Pasadena Police Department

 7   while you were there in terms of providing those

 8   type of training opportunities for the officers?

 9        A    We did it.  That -- that was -- that was

10   important to me.  You know, and on the discipline

11   side of things, if there was discipline that wasn't

12   just discipline, but if there was -- you know, reme-

13   -- remedial training aspect that went with it, we

14   would avail ourselves to that as well.

15        Q    Okay.  Did you guys go over, you know, I

16   guess past scenarios that had occurred involving

17   your officers to train current officers to how to

18   handle those situations?

19        A    I know the academy uses some past

20   scenarios.  Which ones, I don't know, but I do know

21   that they use --

22        Q    Okay.  So I guess, then, let's back up a

23   little bit.  What's the role of the academy in terms

24   of training officers post, you know, graduation from

25   -- from cadet school?

 1      A    So the state requires ongoing training

 2   just like most professions.  So you have to have so

 3   many hours of training.  And so they provide that.

 4   But also, we -- I mean, the Pasadena Police

 5   Department as an organization each year would often

 6   times have mandatory training that we would put

 7   officers through, depending on, you know -- you

 8   know, maybe some current events, what's going on,

 9   you know, crisis intervention, mental health, you

10   know, is one that, you know, comes to mind that, you

11   know, I know we -- we did training on.  Excited

12   delirium is another one that I know that -- you

13   know, and so that is another way that we would --

14   would do it.

15      Q    Okay.  As police, do -- do -- did you

16   recall an incident involving the shooting of Tamir

17   Rice?

18      A    Is that the one in Cleveland?

19      Q    Yes.

20      A    I -- I -- yes.

21      Q    You -- you were aware of that?

22      A    Yes.

23      Q    Do you recall the circumstances of that

24   shooting?

25      A    I believe it was a juvenile.  He had a

1  gun.  The officer came up and I believe the -- the -

2  - he ended up shooting Tamir Rice.  I believe he had

3  the gun in his hand.  I -- I -- I don't remember if

4  it was a firearm or a BB gun, but something.  But

5  vaguely, do I remember it? Yes.  Much more than what

6  I just told you, no, but that's -- yeah.

7       **Q    No, that's pretty good.  That's pretty --**

8  **that -- that -- and it was a BB gun.**

9       A    Was it?  Okay.

10      **Q    Do you recall the -- do you recall how**

11 **long after the officer arrived on the scene that he**

12 **shot Tamir Rice?**

13      A    It was pretty quick.  I remember that.

14      **Q    Okay.**

15      A    As far as time, I don't know.

16      **Q    Did that present any opportunities -- or**

17 **any opportunities for you in your department?**

18      A    I know there were discussions about it

19 amongst some of the -- the patrol supervisors in --

20 in taking it to roll call.  But other than that, no.

21      **Q    Do you recall if it was actually ever**

22 **taken to roll call?**

23      A    I -- I know it's -- yes.

24      **Q    And what -- what do you recall the**

25 **discussion was at roll call training?**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1      A     It -- if you can create space, to be able
 2  to create space at times, that was really the big
 3  takeaway is don't force the situation if you don't
 4  have to and take a little bit more time.  That was,
 5  from what I recall, what the -- the message was.
 6      Q     Do you recall like -- like around what
 7  year the Tamir Rice incident occurred?
 8      A     No idea.
 9      Q     Do you know whether or not it had occurred
10  before or after the -- the -- and we're going to
11  talk -- the shooting with the -- at the fence with
12  Officer Saldivar, the person who was shot at, his
13  name was Angel Ramirez.  So I'm going to refer to
14  that as the Ramirez shooting.
15      A     Okay.
16      Q     Okay?  Do you recall whether or not it was
17  before or after the Ramirez shooting?
18      A     I don't recall that.
19      Q     Okay.  If it occurred before the Ramirez
20  shooting, would that have been you think in your
21  mind, in the back of your mind, at the time of the
22  Ramirez shooting?
23      A     I -- six years ago, I don't remember.
24      Q     Okay.  If it happened April twenty---
25  about four years before the Ramirez shooting, would
```

EXHIBIT 32

1    you have expected that the -- the roll call training

2    that you discussed would have occurred prior to the

3    Ramirez shoo--- shooting?

4        A    It would have, yes.

5        Q    Okay.  So it would have happened fairly

6    quickly after the Tamir Rice shooting became

7    national news?

8        A    Somewhere -- yes.  Somewhere.  Yeah.

9        Q    I'm going to show you what's been

10    previously marked as exhibit 19.  I'm going to play

11    it both at regular speed and then --

```
12      Q    So I'm showing you what has been marked as

13  exhibit 19.  It's a shooting.  It's the Ramirez

14  shooting, captured on Officer Saldivar's body cam

15  video.

16      A    Okay.

17      Q    Okay?  And you -- you recall having seen

18  that?

19      A    At some point.  Maybe years ago, yes.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1          The Deponent:  He's on mute.

2          **MR. DUBE:**  Oh.

3          **MR. SELBE:**  I -- I have no objection to it

4  being played in the deposition.

5          **MR. DUBE:**  Thank you, sir.

6          **(Plaintiff's exhibit 19 referenced by**

7  **identification.)**

8          **(Whereupon, a video was played.)**

17    **Q    Sure.  What do you see?**

18    A    I saw him get out.  Clearly -- or at least

19  to me, my thought is, he says, oh shit, which would

20  indicate to me or is consistent with his, you know,

21  account of it where, you know, he had a gun in his

22  hand and he discharged his weapon.

23    **Q    Uh-huh.  Did you tell him tell the**

24  **individual to drop a weapon?**

25    A    No.

1      **Q      Okay.  Do you think is that consistent**

2  **with his training?**

3            **MR. GILES:**  Objection.  Form.

4            **THE DEPONENT:**  Is it consistent with

5  training?  Could be, yes.

6  BY MR. DUBE:

7      **Q      What factors would you -- would you**

8  **analyze?**

9      A      The -- the threat to Officer Saldivar.

10  Somebody's got a gun in their hand. Again, action

11  being faster than reaction certainly could, you know

12  -- gun in the hand, you know, at his side is -- is a

13  -- could be a threat to the officer.

14      **Q      Texas is an open carry state. Correct?**

15      A      Hasn't always been.

16      **Q      Okay.  Do you recall if it was in 2018?**

17      A      2018?  I don't recall.

18      **Q      Okay.  Are officers authorized to shoot**

19  **individuals solely because they have a weapon in**

20  **their hand?**

21      A      Depends on the circumstances.

22      **Q      Right.  That's -- but is the -- is the**

23  **presence of a gun in a person's hand sufficient**

24  **reason on its own for an officer to open fire?**

25      A      It could be.

EXHIBIT 32

1      Q     Okay.  What -- what factors could make it

2  so?

3      A     If -- if an officer is in uniform, gets

4  out to contact the individual and they have a gun in

5  their hand, the -- I -- there's a reasonable

6  expectation that -- I mean, it's a threat to the

7  officer, a threat to anybody, but certainly, you

8  know, a law enforcement officer gets out -- you

9  know, contacts somebody and they have a gun in their

10 hand, I believe that it could pose an imminent

11 threat of death or bodily injury to themselves or

12 somebody else.



20     Q     How does that play with re--- with respect

21 to what we just discussed with the Tamir Rice

22 shooting and -- and the need to sometimes take time

23 and assess and -- and everything else you said

24 before?

25           MR. GILES:  Objection.  Form.

EXHIBIT 32

1          **THE DEPONENT:**  So I think there's a couple

2    things here.  I think one is -- I mean, hindsight's

3    always 2020, and the other is because you or

4    somebody else thinks it should be done one way

5    doesn't make the way another person does it as wrong

6    or unjust -- or not justified. And so it -- it -- it

7    depends.

8          **Q**    Uh-huh.

9          A     And so, you know, potentially, you know,

10   could another officer have handled this another way

11   and been justified?  Yes.  But it doesn't make

12   Officer Saldivar's wrong.  You know, a reasonable

13   officer in that situation and in that set of

14   circumstance, you know, I believe could take the

15   same actions or would take the same actions.

16         **Q     Let me ask this question.  Do you think**

17   **the way that Officer Saldi--- actually, I already**

18   **asked that question.  I'll strike that. Would there**

19   **have been an opportunity to do an evaluation and**

20   **investigation of this to then speak to Officer**

21   **Saldivar regarding how he handled the situation?**

22         A     Could -- I mean, every situation, you

23   could talk about it.  So is it an opportunity?  Of

24   course.  I mean, any incident there is, there's an

25   opportunity to discuss it.

1      Q     Okay.  Was -- do you know whether or not

2  Officer Sal--- Saldivar was trained after this

3  incident how -- regarding the way he handled this

4  particular shooting?

5      A     I don't know the answer to that.

15      Q     Sure.  I'll reask it.  Did you have a

16  policy in the Pasadena Police Department to review

17  shootings or other significant uses of force of

18  officers regarding the way they handled the

19  situation?

20      A     There was not a policy, no.

8      Q    So when you watch videos like this, do you

9   watch it at regular speed or do you sometimes slow

10   it down?

11      A    You usually do it in both, but you also

12   have to be careful with, you know, body cam, dash

13   cam, for two reasons.  One is the field of view is

14   often different than the officer's field of view at

15   the time that the event occurred.  And the other is

16   we have the luxury of looking at it in hindsight and

17   Monday morning quarterbacking an officer's split

18   second decisions, slowing it down.  And whether it's

19   Rigo, Officer Saldivar or any other officer, don't

20   have the advantage of slow motion out there at the

21   scene.  So it's -- it's a dynamic situation.

22           And so again, you have to judge it

23   through, you know, reasonableness, you know, the

24   threat, the -- the totality of the circumstances and

25   not just frame by frame.  But do we look at them in

1  slow motion?  Absolutely.  But it's more than just

2  looking at a video in slow motion and identifying

3  something after the fact.  It's again, the -- the --

4       **Q      Totality?**

5       A      The totality of it.  And on this

6  particular one, it's, you know, the middle of the

7  night.  I know the original call was he was at a --

8  you know, at least in front of the -- I believe he

9  was knocking on a door, actually, with a gun in his

10 hand.  And so, you know, Officer Saldivar, you know

11 -- armed is the wrong word -- but you know, armed

12 with that inform--- you know, having that -- that

13 knowledge going into the situation, you know, is a

14 factor in it other than just a video at slow motion

15 or frame by frame.

16      **Q      Thank you.**

17      A      And while you're loading it, I -- you

18 know, the -- the example I'll give you is right

19 here, is this body camera is facing toward the left-

20 hand of the street.

21      **Q      Uh-huh.**

22      A      You know, from the picture here, Saldavar

23 -- whether he is or he isn't, I don't know, but just

24 as an example, he could be looking to the left right

25 now and see something that you and I don't see on

1   body camera right here after the fact.

2       Q    Uh-huh.

3       A    And so I think that, you know, we need to

4   make sure that -- or I want to make sure that the

5   record at least reflects that, you know, body

6   cameras and dash cameras are a great tool, but they

7   can have limitations and, you know.

8       Q    Yeah.  But the can also -- they can also

9   show -- you know, resolve factual discrepancies.

10  Correct?

11      A    Potentially, yes.

16      Q    Do you recall whether or not you watched

17  this particular incident on -- in slow motion or

18  not?

19      A    I don't recall.

20      Q    Okay.

21           (Whereupon, a video was played.)

22  BY MR. DUBE:

23      Q    Can you describe what you are seeing?

24      A    I see a gun and it appears to be in his

25  left hand.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1      **Q    Uh-huh.**

2      A    It almost looked like it was tilted a

3   little forward, not straight down, but titled a

4   little forward is what it looked like to me.

5      **Q    Okay.  Uh-huh.**

6      A    And you have an officer that's in uniform

7   in a police car.

8      **Q    Uh-huh.**

9      A    It looks like his lights are on, so it's

10   pretty clear -- or should be clear, at least as I

11   evaluate this, that he knows he's being contacted by

12   the police.

13      **Q    Uh-huh.**

14          **(Whereupon, a video was played.)**

15   **BY MR. DUBE:**

16      **Q    Did you see any opportunity where Officer**

17   **Saldivar gave the person an opportunity to drop**

18   **their weapon?**

19      A    Did I see it?

20          **MR. GILES:**  Objection.  Form.

21   **BY MR. DUBE:**

22      **Q    Uh-huh.  Did he -- well, let me ask you,**

23   **did he -- did he state -- ask the person to drop the**

24   **weapon?**

25      A    Did he state?  No.

1    **Q     Okay.  Did he give an oppor-- did -- do**

2 **you -- did he give him sufficient time to drop the**

3 **weapon before he began firing?**

4    A    I believe he did.

5    **Q     Okay.**

6    A    He got out of the car in a marked police

7 car.  He's in a marked police car with lights on and

8 a uniform.

9    **Q     And do you recall what the person had done**

10 **right immediately beforehand?**

11    A    Stole the guns from Walmart and then was

12 at -- on the front porch of somebody's house that

13 called the police with a gun in his hand.

14    **Q     Do you recall that the person had just**

15 **jumped the fence?  Correct?  Do you recall that**

16 **part?**

17    A    I don't -- I don't -- no.

18    **Q     Okay.**

19    A    I don't know how he got over the fence.  I

20 don't recall that.

21    **Q     Okay.  Would you have recalled -- would**

22 **you have recalled that at the time you reviewed this**

23 **incident?**

24    A    Yeah.  Yeah, 'cause it -- I mean, if it's

25 in the report, yes, I would have.

1      **Q      Okay.**

2      A      But the -- the other thing, I mean,

3   talking about the fence, I mean, clearly you can see

4   through it.  He could -- Officer Saldivar can see

5   him and see the -- the gun and --

6      **Q      Uh-huh.**

7      A      -- the other person has the same

8   opportunity.  And so that fence is not -- it's not a

9   barrier.  It's not bullet proof.  It's not -- and so

10   certainly, the -- you know, the -- the presence of

11   the fence does not take away the threat, you know,

12   to Officer Saldivar or others of death or, you know,

13   serious bodily injury because he has a firearm.

14      **Q      So was -- was there any opportunity in --**

15   **upon what you just reviewed for Officer Salv---**

16   **Saldivar to have handled this situation differently**

17   **or in a better way?**

18          **MR. GILES:**  Objection.  Form.

19          **TEH DEPONENT:**  Is there an opportunity?  I

20   -- I -- I -- I don't know the answer to that.  I

21   mean, we can play the what-if game.  I mean, he

22   could have given him a, you know, drop the gun, but

23   --

24      **Q      So --**

25      A      -- again, action -- it's possible, but

1  action being faster than reaction, the person could

2  have responded by firing a firearm at -- toward

3  Officer Saldivar.  So you know, could he have done

4  it?  Yeah.  What would the result have been?  Maybe

5  he dropped it; maybe he shot at him.  We don't know.

6      Q    Yeah.  I'm not asking you what the result

7  is.  I'm asking, you know, from your position as

8  chief of police, assistant chief, where you're

9  trying to, you know, evaluate and train officers to

10  handle these situations and other situations, you

11  know, like -- you know, upon reviewing this, you

12  know, were the -- you know, would you have trained

13  Officer Saldivar to handle this in a better way or

14  given him guidance as to how to handle this in a

15  different way?

16      A    No.

17          MR. GILES:  Objection.  Form.

18  BY MR. DUBE:

19      Q    So -- so you really -- so it's your

20  testimony that you believe he handled this situation

21  in an optimal way?

22          MR. GILES:  Objection.  Form.

23          THE DEPONENT:  I -- I believe it was

24  within policy and state law.

25  BY MR. DUBE:

EXHIBIT 32

```
 2      Q    Did you obs--- did you observe the person
 3  raising their gun towards the officer at any point
 4  during this incident?
 5      A    You couldn't see it.
 6      Q    Okay.  In the video, you could -- you did
 7  not see the person raising their gun at the officer.
 8  Correct?
 9          MR. GILES:  Objection.  Form.
10  By Mr. Dube:
11      Q    You -- and I can play it again for you.
12      A    You cannot see it because he's being
13  blocked.
14  BY MR. DUBE:
15      Q    Okay.  Well, do you see a person raising
16  the gun -- what -- what blocks the view?
17      A    Officer Saldivar.
18      Q    Doing what?
19      A    Raising his firearm.
20      Q    Okay.  So do you agree with me that prior
21  to Officer Saldivar raising his weapon that the
22  person did not first raise -- raise their weapon?
23          MR. GILES:  Objection.  Form.
24  BY MR. DUBE:
25      Q    From what you could see.
```

1      A     The only thing I can tell you definitively

2  is the last spot that you see the firearm is at his

3  side.  What happens after that, I can't tell you

4  based on the video.

5  **BY MR. DUBE:**

6      **Q     Okay.  If the person never raised his**

7  **weapon prior to Officer Saldivar discharging his**

8  **weapon, would that still have been a justified use**

9  **of force?**

10     A     I answered --

11         **MR. GILES:**  Objection.  Form.

12         **THE DEPONENT:**  I answered that yes.

13  **BY MR. DUBE:**

14     **Q     Okay.  Even if he never raised his weapon?**

15     A     Correct.

16         **MR. GILES:**  Objection.

17  **BY MR. DUBE:**

18     **Q     So if he had the weapon at his side during**

19  **the entire encounter, the mere presence of the**

20  **weapon in his hand would be sufficient reason for**

21  **the officer to shoot at him?**

22         **MR. GILES:**  Objection.  Form.

23         **THE DEPONENT:**  I mean, it's a

24  hypothetical.  It's -- 'cause I -- I don't have all

25  the facts that -- all I can tell you is what I know,

1  you know, or believe happened in this event.

2  **BY MR. DUBE:**

3      **Q    No.   I'm not asking about this event.   I**

4  **am giving you, in fact, a hypothetical.   If the**

5  **person never raised his weapon and he had the weapon**

6  **at his side the entire time, would the officer have**

7  **been justified in shooting him at that time?**

8      A     What are the circumstance --

9          **MR. GILES:**  Objection.   Form.  Objection.

10  Form.

11          **TEH DEPONENT:**   What are the circumstances

12  leading up to it, time of day, what information does

13  the officer have?  I mean --

14  **BY MR. DUBE:**

15      **Q    Okay.   I'll -- I'll -- I'll -- I'll --**

16  **I'll add to it.**

17      A     Okay.

18      **Q    To my hypothetical.   So my hypothetical is**

19  **the person has jumped a -- has been accused of**

20  **stealing some pellet guns from Walmart.   Okay?**

21      A     Okay.

22      **Q    He is observed at a -- at a residence.**

23      A     Okay.

24      **Q    Okay?   An officer comes upon him.**

25      A     Okay.

1    **Q**    Right?  And he -- he has jumped the fence

2  prior to officer coming up upon him.  The officer

3  sees him and the officer -- and he has a gun at his

4  side without ever raising it at the officer.  Is

5  that sufficient reason for the officer to shoot at

6  him at that time?

7          **MR. GILES:**  Objection.  Form.

8          **THE DEPONENT:**  Yes.

9  BY MR. DUBE:

10    **Q**    Okay.  Is the gun at a person's side, does

11  that police officer in a bodily harm or death?

12          **MR. GILES:**  Objection.  Form.

13          **THE DEPONENT:**  I think it depends on the

14  circumstances.

15  BY MR. DUBE:

16    **Q**    Okay.  In this video, was the -- was -- is

17  it, in your opinion, Officer Saldivar was in

18  imminent bodily -- or imminent harm of bodily harm

19  or death?

20    A    Yes.

21    **Q**    Okay.  Is it also your testimony that upon

22  viewing -- reviewing the video, you did not feel any

23  need to -- to counsel or guide Officer Saldivar into

24  how to better approach this or similar situations in

25  the future?

**NAEGELI**
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1        A    That's correct.

2        Q    Can you explain how that squares with I

3   guess your review or your analysis of what occurred

4   in the Tamir Rice shooting situation?

5             MR. GILES:  Objection.  Form.

6             THE DEPONENT:  What do you mean?

7   BY MR. DUBE:

8        Q    Can you explain how your view -- your

9   review of this situation squares with the

10  conclusions you stated you learned from the Tamir

11  Rice shooting?

12            MR. GILES:  Objection.  Form.

13            THE DEPONENT:  I don't know that I ever

14  compared the two.  I -- I didn't -- I didn't compare

15  the two.  I -- I -- what I told you about the Tamir

16  Rice is all I know about the Tamir Rice.  And so I

17  evaluated this -- this event based on the facts and

18  the circumstance that were available to me at the

19  time and -- and --

20  BY MR. DUBE:

21       Q    Do you see how somebody could make that

22  comparison given the fact that both scenarios

23  involved a teenager with a pellet gun, an officer

24  shooting upon them within less than a second of

25  arriving at the scene?

NAEGELI
DEPOSITION & TRIAL     CELEBRATING 40 YEARS IN BUSINESS     (800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1              THE DEPONENT:  Do I --
 2              MR. GILES:  Objection.  Form.
 3              TEH DEPONENT:  -- see how somebody could?
 4    BY MR. DUBE:
 5         Q    Yeah.
 6         A    I --
 7         Q    Do you -- yes.
 8              THE DEPONENT:  I -- I mean, I -- I don't
 9    know the answer to that.  I don't know what other
10    people --
11    BY MR. DUBE:
12         Q    Well, okay, do you see a comparison
13    between the two?
14              MR. GILES:  Objection.  Form.
15              MR. DUBE:  Personally.
16              THE DEPONENT:  Do I --
17              MR. GILES:  Objection.
18              THE DEPONENT:  The problem is I don't have
19    enough information other than the limited that I
20    have on Tamir Rice.  I got more on this one.
21    There's at least some video.  The circumstances, I -
22    - I don't remember the circumstance leading up to
23    Tamir Rice.
24              MR. DUBE:  Uh-huh.
25              THE DEPONENT:  And so I think we have to
```

1  be careful looking at them in a vacuum and saying

2  this is a teenager with a pellet gun who was shot

3  pretty quickly and the same thing with Tamir Rice.

4  I don't think Tamir Rice was accused of going to

5  Walmart, stealing guns.  I don't think he was on

6  Ring kit.  So I don't know even know that it was the

7  middle of the night. And so could somebody compare

8  them?  Sure.  But you -- you got to have the fa--- I

9  mean, anybody can do anything, but you got to have

10  the facts to be able to -- to compare them.  You

11  can't just say this Tamir Rice because of a pellet

12  gun and a teenager and getting shot quickly.

EXHIBIT 32

6      Q    All right.  So on November 18, 2018, what
7    -- what was your role?
8      A    The interim or the acting chief.
9      Q    So you had been there just for a short
10   amount of time.  Correct?
11     A    In that capacity, yes.
12     Q    And I'm going to refer to the incident
13   where Officer Saldivar shot Mr. Schenk as the Schenk
14   shooting.
15     A    Okay.
16     Q    Is that fair?
17     A    Yes.
18     Q    Okay.  When did you first become aware of
19   the Schenk shooting?
20     A    Shortly after it happened.
21     Q    Were you -- did you make it out to the
22   scene that night?
23     A    I did.
24     Q    Okay.  So when you say shortly after it
25   happened, like what -- what does that mean?  Or

1   **what's shortly after?**

2       A    Probably within the hour.

3       **Q    Okay.**

4       A    Normally, a significant event like this,

5   it goes up the chain of command.  It's probably much

6   sooner than that.  It's probably within 15, 20

7   minutes, but safe to say an hour.

8       **Q    And how did you become aware of it? Like**

9   **who contacted you?  Do you recall?**

10      A    No.  Somebody would have called me, but I

11  don't know who.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

 9      Q      What did you do at that time?

10      A      Took a shower and got dressed.

11      Q      Okay.  What did you do next?

12      A      Drove out to scene.

13      Q      Okay.  How far was the scene from your

14  house?

15      A      Probably an hour or close to it.

16      Q      What did you do in the hour drive?

17      A      Listened to the radio.

18      Q      Well, did you talk to anybody, any

19  investigators or any detectives in that drive?

20      A      Not that I recall.

21      Q      Okay.

22      A      I'm going out there, so...

23      Q      So what happened once you arrived at the

24  scene?

25      A      I would have gotten briefed by somebody on

1  what at least they knew at that point in the

2  investigation.

3      Q   Do you recall what you were told?

4      A   At that point, I just remember it being

5  pretty vague, that there was a traffic stop, the

6  driver had taken off running, was discarding

7  narcotics as he was running.  There was a physical

8  struggle between the driver and Officer Saldivar.

9  And at some point, Officer Saldivar discharged his

10 weapon, striking and killing the person.

11     Q   How long you -- were you at the scene for?

12     A   A couple hours.  I think it was the night

13 before Thanksgiving or somewhere around there, I

14 think.  But it was a couple of hours.

15     Q   Were you there when Officer Saldivar

16 conducted his walk-through?

17     A   If I was there, I was not present for it.

18     Q   You did not observe him conducting his

19 walk-through?

20     A   That's correct.

21     Q   Did you speak to Officer Saldivar that

22 night?

23     A   Briefly.

24     Q   What did you speak to him about?

25     A   Just to make sure he was okay physically,

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  that he had notified his family. And that was --

2  that was the extent of it.

3      Q    Okay.  Do you recall anything specific he

4  said to you?

5      A    No.  That he was good and he had already

6  contacted wife, girlfriend, somebody. But that was -

7  - that was the extent of the conversation.

8      Q    Where was he at the time you spoke to him?

9      A    He was sitting in the passenger side of a

10  police car with another officer, I believe.

11      Q    Was that standard operating procedure?

12      A    Yes.

13      Q    Okay.  And describe that procedure for me.

14      A    The -- after an officer's involved in a

15  shooting, take them from the immediate area, put

16  them in a -- a police vehicle with somebody else.

17  Sometimes it's their choosing. If they don't have

18  anybody in particular, we'll try to find somebody

19  whose maybe been in a similar circumstance, a

20  traumatic event like that.  They are told don't

21  discuss the -- y'all can talk about anything else,

22  but don't discuss the event.  And it's really there

23  just to -- so they are not sitting in a car by

24  themselves feeling alienated from everybody else.

25      Q    Actually, back up.  At what point --

```
 1  because you say you were informed there was an

 2  officer-involved shooting.  Correct?

 3      A    Yes.

 4      Q    Okay.  At what point were you told the

 5  name of the officer who was involved?

 6      A    I'm not sure when.

 7      Q    Okay.  Was it before you arrived at the

 8  scene or at the time you arrived at the scene?

 9      A    I don't know the answer.

10      Q    Who -- who -- who all did you make contact

11  with at the scene?  You...

12      A    I know I talked to Sergeant Skripka.

13      Q    Uh-huh.

14      A    I believe I briefly talked to Detective

15  Cooper.

16      Q    Uh-huh.

17      A    There were other people out there. I just

18  don't know.  There was a lot of people out there.  I

19  just don't know who else I talked to.  I just know

20  those two specifically.

21      Q    Okay.  Were you there when the dash cam

22  video was brought out, when the dash cam and body

23  cam videos were brought out?

24      A    I don't recall seeing them that night.

25      Q    Can you, like, describe for us everything
```

1  **you did at the scene that day once you arrived?**

2      A    I got there, I checked on Officer

3  Saldivar.  I talked to Sergeant Skripka and

4  Detective Cooper.  And then honestly, after that, I

5  just stood around shooting the breeze with people

6  that were out there.

7      **Q    And you just watched what was happening.**

8  **Correct?**

9      A    Actually, I really couldn't even see.

10  When it was dark, there were a whole bunch of cars

11  and my car was at the back.  And so after my initial

12  talking to those folks, I was back closer to my car,

13  standing, talking for a while.

14      **Q    Okay.  Do you recall the nature of your**

15  **conversation with -- with Sergeant Skripka?**

16      A    Yes.  It was very brief at that time.  It

17  was just the -- the -- the facts that, you know --

18  and really, it was what Officer Saldivar had told

19  them and kind of what they had -- had seen at that

20  point, that I guess Schenk had run a stop sign in

21  the area, traffic stop.  Schenk got out of the car,

22  started walking off.  And then I know they had told

23  me the route and they had -- they had walked it.  I

24  didn't go on the route that Schenk had run from the

25  vehicle.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1        Q      Uh-huh.
 2        A      And they had said there were some
 3  narcotics that Schenk had thrown --
 4        Q      Uh-huh.
 5        A      -- or discarded as he was running from
 6  Officer Saldivar.  They said that there was a
 7  physical struggle.  They said that his body camera
 8  had been ripped off in the struggle.
 9        Q      Uh-huh.
10        A      And at that point, they hadn't viewed it,
11  so they didn't know what was on it, but they said it
12  was on the ground there --
13        Q      Uh-huh.
14        A      -- when I talked to them.  They said it
15  was on the ground.  And that was -- that was all I
16  knew.
17        Q      They said the body camera was on the
18  ground at the time they arrived?
19        A      It was on the ground at some point, they
20  told me.  I -- I -- where it was at when they got --
21  I don't know.  But it was -- at some -- I know at
22  some point, they had told me it was on the ground.
23        Q      Got it.
24        A      That it had gotten ripped off, because my
25  question was, did he have his body camera on, or
```

NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

EXHIBIT 32

1    something -- something along those lines.  And the

2    response was, he did, but it was ripped off and on

3    the ground during part of the struggle.

4        **Q     Yeah.**

5        A     It's -- but where it was at when they got

6    there, the respon--- I -- I don't know. I just know

7    at some point, they had told me it was on the

8    ground.

9        **Q     Understood.  So that's the conversation**

10   **with Sergeant Skripka?**

11       A     Yes.

12       **Q     Anything else you remember about that**

13   **conversation?**

14       A     That was it at that point.

15       **Q     How about officer -- Detective Cooper?**

16       A     It was almost identical to that. I -- I

17   think he had walked the actual route that Schenk had

18   taken.

19       **Q     Uh-huh.**

20       A     And so I -- I think he described in a

21   little bit more detail maybe the -- the narcotics

22   that were disposed of.  I don't remember what it

23   was, but --

24       **Q     Uh-huh.**

25       A     But he -- it was essentially the same

1  account at that point.

2      **Q    Did you know Detective Cooper prior to**

3  **this?**

4      A    Did I know him?

5      **Q    Yes.**

6      A    Yes.

7      **Q    How did you know him?**

8      A    We've worked -- I mean, he started shortly

9  after I did.

10     **Q    Uh-huh.**

11     A    He's worked -- he's worked for me a couple

12 of times.  I -- that --

13     **Q    So when and how did he work for you?**

14     A    He worked for me when I was over burglary

15 and theft, directly, at least.

16     **Q    Uh-huh.**

17     A    Probably as a chief.  I mean, they all

18 work under you.  But as far as --

19     **Q    Yeah.  Well -- well, when I mean work for**

20 **you, I mean directly.**

21     A    Yeah.  Burglary and theft I believe is the

22 only time that he worked directly for me.

23     **Q    Okay.  What were your interactions like**

24 **when he worked for you?**

25     A    He's a hard worker.  He -- he does good

1    investigations, but sometimes you have to -- he's

2    not a detail guy sometimes.  And so that was -- you

3    know, you have to go back and get Cooper to --

4    writing was not his strong suit at times.

5         **Q    Uh-huh.**

6         A    And so...

7         **Q    Any other observations about his work?**

8         A    No.  He -- he's a hard worker.

9         **Q    Did you ever -- when he worked for you at**

10   **burglary and theft, did you ever disagree with con--**

11   **- his conclusion on an investigation?**

12        A    Not that I recall.

13        **Q    Did you know him to do good work?**

14        A    He was a hard worker.

15        **Q    That's a different question.  You can do -**

16   **- I mean --**

17        A    But he -- he --

18        **Q    -- you can do hard work --**

19        A    He wasn't a detailed --

20        **Q    You can --**

21        A    He wasn't a detailed guy at times. He

22   didn't like to write the report.  He wanted to go

23   out and catch the bad guys, but lots of times would

24   -- didn't -- you know, you had to stay on him to --

25   to write the reports and to -- you know, but he --

1  he was a -- he was a hard worker and you just had to

2  stay on top of him sometimes.

3      **Q    What about his conclusions?  Were they**

4  **usually reasonable and -- and -- and -- and good?**

5          MR. GILES:  Objection.  Form.

6          THE DEPONENT:  But investigators often --

7  they don't usually draw a conclusion.

8          MR. DUBE:  Uh-huh.

9          THE DEPONENT:  I mean, burglary and theft,

10  it's -- you investigate it.  Somebody identifies so

11  and so as the suspect.  You get whatever evidence.

12  You present the charge.  And so as far as presenting

13  a conclu--- or finding a clu--- I think when he

14  worked for me, that -- it's a -- it's a different

15  scenario than different -- other types of

16  investigations.

17  **BY MR. DUBE:**

18      **Q    Were -- were there any scenarios where he**

19  **had to try to figure out, you know, who stole what**

20  **or who committed the burglary?**

21      A    All the time.

22      **Q    Okay.  Was he often right or wrong?  Which**

23  **one?  Was he often right in his conclusions?**

24      A    I -- I don't know of him being wrong.

25      **Q    Okay.  Do -- so you know the -- so --**

1    **okay, at the time he worked for you, there were**

2    **never any instances where he drew the conclusion,**

3    **assumed the -- the wrong person committed the crime?**

4        A    Not that I'm aware of.

5        **Q    So now we're back at the scene. You've --**

6    **so you said a couple occasions.  Did he work for --**

7    **did Detective Cooper work for you on any other**

8    **occasion besides burglary and theft?**

9        A    I think when I was on patrol as a patrol

10   sergeant.

11       **Q    Okay.**

12       A    Twenty years ago, maybe.

13       **Q    Okay.**

14       A    And then his ATF role, I created the --

15   that -- that assignment, not for him, but created

16   the assignment and he got picked for it over at ATF.

17   And because of my relationship with the special

18   agent in charge of ATF, I talked to Cooper maybe

19   more than I would some other officers.

20       **Q    Uh-huh.**

21       A    But again, he -- still being assigned to

22   A--- ATF still had a sergeant, still had a

23   lieutenant and an assistant chief.  But I would see

24   him in the hallway and he would tell me what's going

25   on over at ATF.

1      Q     Okay.  So who had regular interactions
2  with him while he was at ATF?
3      A     Regular once a month, maybe, in the
4  hallway.
5      Q     When was the ATF task force created?
6      A     Sometimes during my time as chief. But I
7  don't -- it's been a couple of years. I --
8      Q     Okay.  So -- so this would have been
9  before or after the Schenk and Ramirez --
10      A     After.  After.
11      Q     So now we're back at the scene.  Did you -
12  - did you observe the body cam or dash cam video at
13  the scene?
14      A     No.
15      Q     When did you decide to leave the scene?
16      A     Whenever we ran out of things to talk
17  about.  I -- I don't know.  I mean, it -- it -- I --
18  I was there probably two hours, it seemed like, and
19  then I left.
20      Q     Were you there when they discarded the
21  body -- or removed the body from the scene?
22      A     I don't know.  If I was, I wasn't over
23  there.  I never even -- I saw his body from a
24  distance in the field, but I never -- never got up
25  close to it or anything.  And so I wasn't -- I

1  wasn't there when all that -- no.

2      **Q    Were you informed at -- at the scene where**

3  **the -- where Mr. Schenk had been shot?**

4      A    I don't recall, because whatever way he

5  was laying, I know they couldn't see one side.  I do

6  remember that.  But I don't -- I don't -- I don't

7  remember if he was face up, face down.  I -- I --

8  like I said, all I could see is a body in the

9  distance.  It was dark --

10     **Q    But --**

11     A    -- and wet and I couldn't see.

12     **Q    It was raining that night.  Correct?**

13     A    Yes.

14     **Q    Okay.  But you said you spoke to Sergeant**

15  **Skripka and you spoke to Detective Cooper.**

16     A    Yes.

17     **Q    Correct?  And they gave you a rundown of**

18  **what happened.  Correct?**

19     A    Yes.

20     **Q    Okay.  And do you know whether or not they**

21  **told you where on his body Mr. Schenk had wounds**

22  **from the shooting that night?**

23     A    At that night, I don't recall them telling

24  me.  It's not to say they didn't, but I don't recall

25  them telling me that night.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1        Q     Fair enough.  I assume after you left the

2   scene, you went home?

3        A     Yes.

4        Q     Okay.  What's the next thing you recall,

5   you know, doing or hearing in connection to the

6   investigation?

7        A     At some point, I want to say it was the

8   following week, after Thanksgiving, after the

9   weekend, one of my assistant chiefs, Rick Styron,

10  came to me and said -- or asked if I could meet with

11  the investigators Cooper and Skripka because they

12  wanted to run the Schenk shooting down to me, at

13  least what they knew at that point.

14       Q     Okay.  So the following week, so after the

15  Thanksgiving holiday?

16       A     Yes.

17       Q     Okay.  You were approached and said that

18  Detective Cooper and Sergeant Skripka wanted to

19  discuss the shooting with you?

20       A     Yes.

21       Q     Okay.  Before Styron came to you and --

22  and made that request, do you recall anything --

23  hearing anything about the investigation or

24  participating in any way in that investigation

25  during that time?

```
 1        A    No.
 2        Q    What occurred after Chief Styron --
 3   Assistant Chief Styron approached you to discuss the
 4   fact that Cooper and Skripka wanted to discuss the
 5   Schenk shooting with you?
 6        A    At some point that day, we went down to
 7   the conference room in detectives, and it was
 8   myself, Assistant Chief Styron, Detective Cooper,
 9   Sergeant Skripka.  I think there were others there,
10   but I don't know who the others were.  I just seem
11   to remember more people being in the room.
12        Q    Okay.  So I was taking notes, but I didn't
13   get all the names.  So who are --
14        A    Cooper, Skripka.
15        Q    Uh-huh.
16        A    Styron.
17        Q    Uh-huh.
18        A    Myself.
19        Q    Uh-huh.
20        A    And I don't know who else.  I -- I recall
21   there being other people in there because it wasn't
22   just the four of us, but I don't remember who else.
23        Q    Lieutenant Warnke, was he there?
24        A    Yes.  He was the lieutenant over
25   investigations, yes.
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    Q    Lieutenant Hamilton -- or Sergeant

2    Hamilton, was he there?

3    A    I don't recall.

4    Q    Okay.  So you were in the conference room

5    with Cooper, Skripka, and the other individuals who

6    were there.

7    A    Yes.

8    Q    What -- what happened at that time?

9    A    Somebody, I don't know if it was Cooper or

10   Skripka or -- I think it was kind of both of them

11   back and forth, giving a rundown what they knew or,

12   you know, their theory on what had taken place based

13   on what they had at that point.

14   Q    What do you recall what they said?

15   A    I mean, it was basically the same

16   beginning.  And by beginning, I mean the traffic

17   stop.  They played the video and saw Schenk running,

18   watched the dash cam until he got out of sight.

19   Q    Let's pause for a second.  Did they give

20   you a rundown of what occurred before or after they

21   played the video or did it -- did -- did they do it

22   simultaneously?

23   A    They were doing it simultaneously is what

24   my recollection was.  They would tell me and then it

25   was let's watch -- you know, watch the video, and

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  then moved on to the next part.

2      **Q      Understood.   Okay.**

3      A      So after the body cam -- or the -- excuse

4  me, the dash cam from the car, then they went to the

5  body cam.  And at some point, I don't remember if it

6  was before they played it, played it, stopped it,

7  played it and then told me, at some point, they told

8  me what their theory was on what they thought had

9  taken place out there.

10     **Q      Okay.  And what was that theory?**

11     A      That there was a physical struggle between

12  Officer Saldivar and Schenk.  During that struggle,

13  Officer Saldivar's body camera came off.  It was on

14  the ground facing straight up.  They -- you know, I

15  -- I -- again, I don't remember the order of it, but

16  they told me you could tell Rigo was winded, you

17  know, that there -- he -- you know, clearly some

18  exertion. Then somewhere in there, they discussed,

19  you know, where the wounds were on the body.

20     **Q      Uh-huh.**

21     A      And then a theor--- they had a -- you

22  know, what they believed happened.  And then they

23  explained it.  I believe they even acted it out a

24  little bit.  And then we watched the video a bunch.

25  I don't know how many times, but it was a bunch.

NAEGELI
DEPOSITION & TRIAL          (800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1      Q    Okay.  We got to slow it down a little

2  bit.  You said they explained where the wounds were?

3      A    Yes.

4      Q    Okay.  Where were the wounds?

5      A    I believe one was in the chest, kind of to

6  Schenk's left of the midline, I believe.

7      Q    Okay.

8      A    In the front.  And then there were two in

9  the lower back, I believe, at an upward trajectory,

10  if I recall correctly.

11      Q    So there were two shots in the back?

12      A    Yes.

13      Q    Okay.  And you said the one on the side

14  was in the -- was the front part of the --

15      A    That was my recollection, was it was front

16  toward the side was...

17      Q    Okay.  Do you recall whether or not there

18  was an exit wound and an entrance wound in the area?

19      A    I don't recall.

20      Q    Okay.  Do you remember tell--- them

21  telling you where the entrance wound on the side

22  was?

23      A    No.

24      Q    Okay.  Do you recall whether they told you

25  the two wounds in the back, were they entrance

NAEGELI  DEPOSITION & TRIAL    (800) 528-3335    NAEGELIUSA.COM

EXHIBIT 32

```
 1  wounds or exit wounds?

 2      A    They were entrance.

 3      Q    Okay.  They told you there were entrance

 4  wounds in Schenk's back.  Correct?

 5      A    Yes.

 6      Q    Did that concern you?

 7           MR. GILES:  Objection.  Form.

 8           THE DEPONENT:  In and of themselves, not

 9  necessarily, no.  It could be -- there could be a

10  lot of explanations for it, so...

11  BY MR. DUBE:

12      Q    Okay.  So what was their theory -- you

13  said they explained their theory of what occurred to

14  you.  Correct?

15      A    Correct.

16      Q    What was -- what was that theory?

17      A    There was a physical altercation between

18  Officer Saldivar and Schenk.  And at some point,

19  Schenk turned and was crawling away and Officer

20  Saldivar shot the two rounds -- or the three rounds.

21      Q    So --

22      A    But initially, they -- because the

23  question I had was the -- the wound to the front, at

24  least my recollection during this conversation, was

25  that it was -- they believed at that time at least
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
1  that it was toward -- the -- there was an entrance
2  wound on the front or the side.  And so the -- the
3  theory was that the first round hit him on the -- on
4  the side in the front and then he turned and was
5  crawling away and he fired the other two rounds was
6  the -- the theory that day.
7      Q    Do you recall that's what they told you
8  that day?
9      A    That day, yes.
10     Q    Do you recall them telling you that
11 officer -- I mean, that Mr. Schenk was his -- on his
12 hands and knees at the time he was shot?
13         MR. GILES:  Objection.  Form.
14         TEH DEPONENT:  I know they bel--- believed
15 that for the two rounds in the back, at least.
16 BY MR. DUBE:
17     Q    You said they play acted what occurred.
18 Correct?
19     A    Yes.
20     Q    Okay.  Did they play act Mr. Schenk being
21 on his hands and knees at the time he was shot?
22     A    Yes.
23     Q    They demonstrated to you that Schenk was
24 on his hands and knees at the time Officer Saldivar
25 shot two other rounds?
```

```
 1              MR. GILES:  Objection.  Form.

 2              THE DEPONENT:  Yes.

 3  BY MR. DUBE:

 4      Q    Did they tell you whether or not they

 5  believed the shooting was justified or unjustified?

 6      A    I don't recall them using -- they -- it

 7  was more here's what happened.  They weren't drawing

 8  a conclusion.  It was here's what we think happened.

 9  And they didn't say this, but it was kind of

10  presented and you draw your own conclusion, but

11  here's what we think happened.

12      Q    Do you recall whether or not they informed

13  you that the force used was excessive during that

14  meeting?

15      A    I do not recall that.

16      Q    And you have a specific recollection of

17  them telling you that Mr. Schenk was shot in the

18  front first?

19      A    Yes, because their theory was he was

20  turning when the first shot was fired.  And then as

21  he was crawling away, that the sub--- subsequent

22  shots occurred.  And so that was how it happened

23  because he was turning and that's how he got hit on

24  the side as he was turning, and then as he was

25  crawling away, the two in the back.
```

1      **Q      Did it make a difference to you whether or**
2  **not the shots in the back occurred after he was shot**
3  **in the front?**
4      A      Did it make a difference?  Make a
5  difference how?
6      **Q      In terms of the way you evaluated the --**
7  **the case.**
8      A      I think you got to go back to the totality
9  of all of it.  Again, wounds in the back, I mean,
10  there could be reasonable, legitimate explanation
11  for it.  So at -- at this point, I wasn't -- I
12  wasn't prepared to draw a conclusion.  The
13  investigation was still ongoing.
14      **Q      What legitimate reasons could be -- there**
15  **be for an officer to shoot a person in the back?**
16      A      So if I make the decision -- if I identify
17  you as a threat and I make the decision to shoot
18  you, that message has to go from my brain to my hand
19  to -- to fire.  And if as I pull my gun and start to
20  fire, you're turning, I can still be in the process
21  of firing and it -- there's -- I mean, it happens
22  quick, but there's a time from the time I tell my
23  brain to stop 'til I stop pulling the trigger.  So
24  you can still be turning while I can still be
25  shooting. So there -- there's -- I mean, it's...

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1        **Q    So I guess I'll better try to say what I**

2   **think you said.  There could be a reasonable**

3   **explanation as to how a suspect was -- was shot in**

4   **the back.  Correct?**

5        A    Correct.

6        **Q    But is it also -- would it also be**

7   **reasonable for an officer to -- to intentionally**

8   **shoot someone in the back?**

9             **MR. GILES:**  Objection.  Form.

10            **THE DEPONENT:**  I -- it depends on the

11  circumstances.  If you're running away and have a

12  gun, you know, over the shoulder pointed at me and I

13  shoot you in the back, that's -- you know, that's --

14  that's a scenario.  I mean, there's -- that's not

15  the only one, but that's a scenario.  So I don't --

16  you know.

17  **BY MR. DUBE:**

18       **Q    Would that be a legitimate reason for an**

19  **officer to shoot an individual who is on his hands**

20  **and knees crawling away from him?**

21       A    Depends on the circumstances, I guess.

22       **Q    What circumstances would it be justified**

23  **for an officer to shoot individ--- an individual on**

24  **his hands and knees crawling away from him?**

25            **MR. GILES:**  Objection.  Form.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1          **THE DEPONENT:**  It -- it -- I mean, if you

2  had a gun and you're crawling away, you still could

3  -- still could shoot.  That -- that would be one.

4  The scenario I gave you of, you know, as I begin

5  shooting you, at the same time, you see the gun, you

6  know, and -- and -- you know, a lot of people -- I'm

7  not going to say everybody, but a lot of people, if

8  you shoot a gun at them, their first response, you

9  know, is -- is to turn.

10         And so if, you know, I begin to shoot and

11  you're turning and going away, I could still be

12  shooting.  And so that doesn't necessarily -- you

13  know, if that first round -- you know, the first

14  shot was -- you know, was justified, the subsequent

15  ones potentially could.  I mean, the window doesn't

16  stay open forever, but there could be a time period

17  after that, again.

18  **BY MR. DUBE:**

19    **Q    I believe you said there could be**

20  **circumstance where it's reasonable for officers to**

21  **shoot somebody in the back if they had a weapon.**

22  **Are there any scenarios in which it would be**

23  **reasonable for an officer to shoot an individual in**

24  **the back crawling away when they were unarmed?**

25    A    I think this scenario right here, in the

NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM    EXHIBIT 32

 1  Schenk scenario, based on at least the evidence.  I

 2  don't have any -- there's no evidence -- there's

 3  theories, but there is no evidence to support a

 4  theory other than Officer Saldivar's.

 5      Q    Uh-huh.  So you think if there was a --

 6  you agree that there's no evidence that Mr. Schenk

 7  was armed.  Correct?

 8      A    Correct.

 9      Q    And -- and you think that if Officer

10  Saldivar shot Mr. Schenk in the back while he was

11  crawling away from him, that would have been

12  justified?

13          MR. GILES:  Objection.  Form.

14          THE DEPONENT:  That's not what happened

15  here, though.

16  BY MR. DUBE:

17      Q    I -- I -- I -- we'll get to what happened

18  because we have videos and everything else as to

19  what happened.

20      A    Well, I know.  But you're saying that

21  Schenk --

22      Q    No, I --

23      A    -- crawling away, shot in the back, could

24  it ever be --

25      Q    So -- okay, so let's -- let's -- let's

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  come at it this way.  Detective Cooper and Officer -

2  - and Sergeant Skripka, right, informed you it was

3  their belief that Mr. Schenk was on his hands and

4  knees and crawling away when Officer Saldivar shot

5  and fired two rounds in his back.

6      A    But we're leaving out the first round.

7      Q    Well, we'll get -- we'll get there, trust

8  me.

9      A    I know, but we've got to tell the stor---

10  I mean, I can't --

11      Q    Okay.

12      A    You're asking me to draw a conclusion,

13  leaving out a key important piece of it, which is

14  the first round.

15      Q    Okay.

16      A    And I can't ignore that and just address

17  these.  That's not what happened here.

18      Q    Okay.  So if I were to tell you that

19  Detective Cooper was deposed --

20      A    Yes.

21      Q    -- and he stated that he never told you

22  that the first round came while Mr. Schenk was

23  standing up, would you have reason to disagree with

24  that?

25      A    Yes.

1          MR. GILES:  Objection.  Form.

2  BY MR. DUBE:

3      Q    And if he stated that there were five

4  rounds there, based on the number of shell casings

5  that were found, would you have any reason to

6  disagree with that?

7      A    I -- I don't recall how many there were.

8  I don't disagree with it, but I don't -- I don't

9  recall.

10     Q    Okay.  And if he testified that --

11 actually even demonstrated the five puffs of smokes

12 exiting Officer Saldivar's gun at the time of

13 shooting and Mr. Schenk was on the ground, would you

14 have any reason to disagree with that?

15         MR. GILES:  Objection.  Form.

16         THE DEPONENT:  Do I have a reason to

17 disagree?  I -- I don't know where Mr. Schenk was.

18 They profess that the video shows where Mr. Schenk

19 is.  I've watched that video countless times and I -

20 - I don't agree with -- I don't agree that the video

21 demonstrates that.

22 BY MR. DUBE:

23     Q    Okay.  So I guess that's -- let's pause

24 there for a second.  What did you see in the video?

25     A    It's been awhile since I've seen it, but

1  there was the physical struggle.  I remember more

2  than anything hearing the physical struggle because

3  the body camera goes down pretty quick. And you

4  continue to hear it.  And at some point -- I know

5  you hear the -- the gunshots. But after that, it's -

6  - it's various shades of a black screen.  That --

7  that's what I recall seeing on it.  I -- I -- I -- I

8  do --

9       **Q    Do you --**

10      A    -- remember the -- the puffs of smoke.

11      **Q    Uh-huh.**

12      A    But I don't remember -- I -- well, not

13  that I don't remember.  I never saw Schenk on the

14  ground, crawling away or anything else that

15  Detective Cooper and Sergeant Skripka believe is on

16  the screen.

17      **Q    So let's just set the scene.  So they are**

18  **showing you the videos.  Correct?**

19      A    Correct.

20      **Q    Did they slow it down for you?**

21      A    I don't remember if they slowed it down or

22  we just watched it a bunch.  I don't remember.

23      **Q    All right.**

24      A    I be--- I believe they paused it.

25      **Q    Okay.  Do you recall if they went frame by**

NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM    EXHIBIT 32

1    **frame?**

2         A    I don't recall.  It's not to say they

3    didn't.  I -- I don't recall.  I just remember

4    watching it a bunch and I know it was stopped at

5    several times during the...

6         **Q    Did you have access to the video yourself?**

7         A    Yes.

8         **Q    Okay.  Did you ever watch it?**

9         A    Yes.

10        **Q    Did you ever pause it?**

11        A    Yes.

12        **Q    Did you ever go frame by frame?**

13        A    Yes.

14        **Q    Okay.  In all the times you saw it, is it**

15   **your testimony that even going frame by frame, you**

16   **could not tell that Mr. Schenk was on his hands and**

17   **knees during the video?**

18        A    I never saw that on the video.

19        **Q    What screen were you guys watching it on**

20   **that day?**

21        A    I don't remember if it was a T.V. or a

22   drop-down screen from the ceiling through a

23   projector 'cause there's both in that room.  But I -

24   - I don't remember.

25        **Q    And were Sergeant Skripka and Detective**

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM    EXHIBIT 32

1  Cooper narrating what they saw as you watched the

2  video?

3      A    Yes.

4      Q    Okay.  Was there ever a point in when they

5  stopped the video and says here is Schenk on his

6  hands and knees?

7      A    Yes.

8      Q    Okay.  And it's your testimony that -- so

9  how did they do that?  Did they point out a -- a --

10 a shading or a figure or anything?

11     A    I'm honestly not sure what they pointed

12 out.  They pointed to a section of the screen and

13 said, here it is, and myself and Lieutenant Styron

14 both --

15     Q    Chief Styron.

16     A    Yeah, Chief Styron -- did not come to the

17 same conclusion.

18     Q    Assistant Chief Styron.

19     A    Assistant Chief Styron did not come to

20 same conclusion.

21     Q    So they paused the video.  They said, hey,

22 this is where Schenk is on his hands and knees.

23     A    Correct.

24     Q    And you did not see what they saw.

25     A    Correct.

1       Q    Did you say anything to that effect?

2       A    That -- yes, I said, I don't see what

3  you're seeing.  Yes.

4       Q    Okay.  Did you ask for any further

5  explanation from them?

6       A    No, because we were -- not at an impasse,

7  but they were convinced they saw it. Chief Sti---

8  Assistant Chief Styron and I didn't see what they

9  were seeing.  And it was y'all keep investigating

10  and that was -- yeah, we'll go from there.

11      Q    And then, again, you testified that they

12  were on their hands and knees to demonstrate to you

13  what -- what they believe occurred in the video?

14      A    Yes.

15      Q    Okay.  Did they mention to you there was

16  any discrepancies between what Officer Saldivar

17  stated and what they were observing in -- in the

18  video?

19      A    I don't recall.  I don't recall either

20  way.  So I'm not sure.

21      Q    So you state -- you told them you did not

22  see what they saw.  Correct?

23      A    Correct.

24      Q    What happened after that?

25      A    Some point, I went and watched the video

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM

EXHIBIT 32

```
 1  in my office, both on the computer and the T.V.

 2  there.  Turned the lights out.  I slowed it down

 3  frame by frame.  Everything that -- you know, try to

 4  see what they were saying they saw.

 5      Q    And the video is dark.  Correct?

 6      A    Yes.

 7      Q    Okay.  Did you attempt to have the video

 8  enhanced?

 9      A    No.

10      Q    Okay.  Was there any reason -- anything

11  preventing you from doing that?

12      A    No.

13      Q    Did you have the resources to do that?

14      A    We don't have resources internally to do

15  that.

16      Q    Okay.  Was there anything stopping you

17  from hiring a -- a -- you know, a reconstructionist

18  expert or a video enhance--- a video enhancer?

19      A    We could have hired somebody, yes.

20      Q    Was it concerning to you that Detective

21  Cooper and Sergeant Skripka believe that Officer

22  Saldivar had shot Mr. Schenk while he was on his

23  hands and knees?

24      A    Concerned?  No.

25      Q    Okay.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

Chief Joshua Bruegger - January 5, 2024 - NDT Assgn # 21056    Page 144

```
23        Q    Okay.  Do you recall being deposed in the

24   Schenk case?

25        A    Yes.
```

1      Q      And if I told you that deposition occurred

2   on July 15th, 2021, would you have any reason to

3   object to that?

4      A      No.

5      Q      Okay.  Does that score with your memory

6   that's when it occurred?

7      A      I -- I don't know when it occurred.  I know

8   it was a couple of years ago, but yes.

9      Q      And do you recall at that time being asked

10  the position Nathan and -- was in when Officer

11  Saldivar first fired his shots?

12     A      I don't recall.  No.

13     Q      Okay.  But it's your testimony now that

14  Detective Cooper and Sergeant Skripka told you that

15  Mr. Schenk was standing at the time the shots were

16  first fired?

17     A      I don't remember where they said he was

18  when he -- they first fired.  I just know that at

19  some point, they said he was crawling away when

20  shots were fired.  But I don't...

21     Q      Okay.

22         MR. DUBE:  Can you please pull up exhibit

23  34, please, at page 44?

24         EXHIBIT TECHNICIAN:  Absolutely. Just one

25  moment, please.  And which page would you like, sir,

NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM    EXHIBIT 32

```
 3              (Plaintiff's exhibit 34 referenced for

 4   identification.)

 5   BY MR. DUBE:

 6       Q     Could you read lines 16 through 24,

 7   please.

 8       A     Okay.  And did either Detective Cooper or

 9   Sergeant Skripka say at that meeting that it

10   appeared to them that Nathan was on his hands and

11   knees at the time the shots began? The answer, they

12   thought that to be the case, yes.

13       Q     And that's -- and that's your answer.

14   Correct?

15              MR. GILES:  Objection.  Form.

16              THE DEPONENT:  Yes.

17   BY MR. DUBE:

18       Q     Okay.  That -- answer the question, did

19   either Detective Cooper or Sergeant Skripka say in

20   the meeting that it appeared to them that Nathan was

21   on his hands and knees at the time the shots began.

22   And your answer to that was yes.  Correct?

23       A     Yes.

24       Q     Okay.  Can you read the next four lines

25   through 24?
```

1    A    Okay.  And did they point out on the video

2  recording when -- what they saw that caused them to

3  have that perception when viewing the video

4  recording?  Yes.

5    **Q    All right.  And you would agree with me**

6  **that your memory in July 2021 as to that meeting is**

7  **fresher back at that time than it is currently?**

8    A    It was closer to the time of the event.

9    **Q    So I guess if I asked you -- did Detective**

10  **Cooper and Sergeant Skripka tell you that Nathan was**

11  **on his hands and knees at the time the shots first**

12  **began during that meeting?**

13    A    After reviewing this, yes.

14    **Q    Did they tell you that Nathan was standing**

15  **up when the first shots began?**

16    **MR. GILES:**  Objection.  Form.

17    **THE DEPONENT:**  I don't recall because I

18  know there was a -- re--- Officer Saldivar's -- you

19  know, at some point, he was facing him, but I don't

20  -- I don't recall the --

EXHIBIT 32

```
 4     Q    Did they tell you at that meeting that
 5   Nathan was standing up at the time that the shots
 6   first began?
 7            MR. GILES:  Objection.  Form.
 8            THE DEPONENT:  I don't know at what point
 9   -- I don't know the answer to that.
```

```
13     Q    And you testified, sir, that you had the
14   capability to -- well, let me ask you, what about
15   the video made it hard for you to perceive what
16   occurred?
17     A    It was dark.
18     Q    And anything else?
19     A    I mean, it was dark and grainy. That --
20     Q    Okay.
21     A    That pretty much sums it up.
22     Q    Okay.  And you testified that you had the
23   capability to ask for it to be enhanced in -- in
24   some way, shape or form?
25     A    Yes, but in the past when we've done it,
```

1  it's never been of any value, so...

2       Q    Uh-huh.  And but did you -- did your --

3  did you have a -- you had investigators.  Correct?

4       A    Yes.

5       Q    Okay.  Do you know if they had ever

6  enhanced video in -- you know, in past crimes or --

7  or shootings or anything of that sort?

8       A    I know they've made attempts and you get

9  back a more pixilated image of what it was before.

10 It's not been beneficial.

11      Q    So it's your testimony that it's never

12 been beneficial, to your knowledge, to enhance the

13 video?

14      A    My experience?  No.

15      Q    Did you speak to any -- is there a

16 particular unit that handles those enhancements and

17 -- and rec--- reenactments and recreations?

18      A    Enhancements, recreations?

19      Q    Yes, of videos.  Enhan--- so let me ask

20 the question simpler.  Is there a particular unit

21 within the police department that handles

22 enhancements of video?

23      A    No.  We'd have to go to an outside agency.

24      Q    Gotcha.  Has that been done by your police

25 department in the past?

1    A    Gone to an outside agency?

2    **Q    Yes.**

3    A    Yes.

4    **Q    And it's your testimony that upon viewing**

5    **the video and upon viewing what Skripka and Cooper**

6    **told you, you could not discern what was occurring**

7    **on the screen?**

8    A    That's correct.

9        **MR. DUBE:**  Can you please play exhibit 17,

10   please.

11       **EXHIBIT TECHNICIAN:**  Absolutely. Just one

12   moment, please.

13   **BY MR. DUBE:**

14   **Q    Just in the interest of saving time, I'm**

15   **going to skip ahead to about three minutes when --**

16   A    Okay.

17   **Q    Is that okay?**

18   A    Yes.

19       **MR. DUBE:**  Can I get -- perfect. You can

20   skip ahead to five minutes.  Okay. Perfect.

21       **(Whereupon, a video was played.)**

22       **MR. DUBE:**  Can you pause, please? Can you

23   pause, please?  Vincent.  Can he hear me?  Vincent,

24   can you pause, please?  And can you give me, I

25   guess, control?  Thank you. Okay.  I'm going to go

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM    EXHIBIT 32

```
 1  back a little bit to the position I wanted to pause
 2  at.
 3              (Whereupon, a video was played.)
 4  BY MR. DUBE:
 5      Q    This is Officer Saldivar effectuating the
 6  traffic stop, correct?
 7      A    Yes.
 8      Q    Okay.  And as we see, shortly after, Mr.
 9  Schenk begins running.
10      A    Correct.
11      Q    Okay.  And are you able to observe all of
12  that in the video, correct?
13      A    Yes.
14      Q    Okay.  And Mis--- and Officer Saldivar
15  cha--- eventually chases him down. Correct?
16      A    Yes.
17      Q    Okay.  And I think right when I tried to
18  pause it, he was being tased correct? Mr. Schenk was
19  being tased by Officer Saldivar?
20      A    He attempted to tase him, yes.
21      Q    Okay.
22              (Whereupon, a video was played.)
23      Q    And this is Mr. Schenk running away?
24      A    Yes.
25              (Whereupon, a video was played.)
```

NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM    EXHIBIT 32

1        Q    And this is the moment that he's tasing --
2   or trying to tase him.  Correct?
3        A    Yes.
4             (Whereupon, a video was played.)
5   BY MR. DUBE:
6        Q    The first attempt to tase did not work?
7        A    Correct.
8        Q    And he still kept running?
9        A    Correct.
10            (Whereupon, a video was played.)
11  BY MR. DUBE:
12       Q    And at that moment at 5:58 in the video,
13  he is attempting to tase him again. Correct?
14       A    Correct.
15            (Whereupon, a video was played.)
16  BY MR. DUBE:
17       Q    And what can you tell -- what happens at
18  that moment?
19       A    It appears that Schenk is on his back and
20  Officer Saldivar is over him.
21       Q    Okay.  So I'm just going to play it now
22  through the shooting.
23       A    Okay.
24       Q    And then I'm going to ask you what you see
25  after I pause it.  Okay?

```
 1      A     Okay.

 2      Q     And then I will go back and replay it

 3  again.

 4      A     Okay.

 5      Q     Okay.

 6            (Whereupon, a video was played.)

 7  BY MR. DUBE:

 8      Q     What are we observing?  What did you just

 9  observe up -- up -- up to this moment?

10      A     I'm not sure.  Black screen.  You can hear

11  -- you can hear exertion.  Sounds like a struggle is

12  what it sounds like.  That's all I can tell you.

13      Q     Okay.  And at this point that we've paused

14  it, what can you observe?

15      A     It looks like Officer Saldivar on the --

16  my right side of the screen, the upper right corner.

17      Q     Okay.  And do you see Mr. Schenk at any

18  point?

19      A     Right now?

20      Q     Yes.

21      A     No.

22      Q     Okay.  Do you have an opinion as to where

23  he is in this video based on where Officer Saldivar

24  is?

25      A     Maybe on the ground in front of him.
```

EXHIBIT 32

1      Q      What -- what are you basing that opinion

2  on?

3      A      Officer Saldivar's position.

4      Q      I'm going to play again.

5      A      Okay.

6             (Whereupon, a video was played.)

7  BY MR. DUBE:

8      Q      And if there's any point you want me to

9  stop, if you maybe see and there's something you

10 observe, please let me know as well.

11     A      Okay.

12            (Whereupon, a video was played.)

13            THE DEPONENT:  There's a car that drove

14 by.

15 BY MR. DUBE:

16     Q      Did you see anything prior to the car

17 driving by?

18     A      Looked like a shadow on the lower left

19 corner, but --

20     Q      So you saw a shadow on the lower left

21 corner?

22     A      Well, shadow might be misleading. Kind of

23 the -- the color changes of the screen. I -- I don't

24 know what it is, but...

25     Q      I'm going to go back to 6:45 again, play

EXHIBIT 32

1   it one more time.

2         **(Whereupon, a video was played.)**

3   **BY MR. DUBE:**

4      **Q**   **Okay.  Do you see anything just now?**

5      A   I saw the screen discoloration change over

6   on the left side.

7      **Q**   **Okay.  Did you see a puff of smoke?**

8      A   I didn't.

9      **Q**   **Okay.  I'm going to play it again. Tell me**

10   **if you see it this time.  Tell me if you see any**

11   **puffs of smokes or any sparks at the time that this**

12   **is being shown.**

13         **(Whereupon, a video was played.)**

14         **THE DEPONENT:**  There's one.

15   **BY MR. DUBE:**

16      **Q**   **You saw it?**

17      A   Yeah.

18      **Q**   **What -- what did you see?**

19      A   Looked like a puff of smoke and like a

20   spark like consistent with gun fire.

21      **Q**   **Consistent with gun fire?**

22      A   Yeah.

23      **Q**   **And did you see what was the person who**

24   **was shooting was shooting at?**

25         **MR. GILES:**  Objection.  Form.

NAEGELI
DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM    EXHIBIT 32

```
 1              THE DEPONENT:  No.

 2   BY MR. DUBE:

 3       Q    Okay.  All right.  I'm going to play it

 4   again and you can -- and tell me -- and actually,

 5   I'll play it a little bit further. Who is that

 6   coming back on screen as -- as we -- see this?

 7       A    That looks like Officer Saldivar.

 8       Q    Yeah.  And you -- and what -- okay. I'm

 9   going to play it and you tell me what you see him

10   doing.

11              (Whereupon, a video was played.)

12   BY MR. DUBE:

13       Q    What do you -- what do you think he did --

14   just did right there?

15       A    I'm not sure.
```

EXHIBIT 32

```
 8              (Whereupon, a video was played.)
 9  BY MR. DUBE:
10      Q    Are you able to tell from that view what
11  Officer Saldivar is shooting at?
12      A    No, I can't see anything.
13      Q    Okay.  All right.  Now, what position is
14  the camera at this point?  Can you tell?
15      A    It appears to be on the ground at an
16  angle.
17      Q    Uh-huh.  And does that make it difficult
18  for you to discern what's going on?
19      A    The fact that it's dark is what makes it
20  difficult to discern what's going on.
21      Q    Understood.  All right.  I'll go back to
22  6:45 again.  That's a good marker.  And I'll -- this
23  time, I'll play it -- oh, and you stated that when
24  Officer Skrick--- Sergeant Skripka and Detective
25  Cooper played the video, they played it multiple
```

1    time for you.  Correct?

2        A    Yes.

3        Q    Okay.  And they slowed it down at well?

4        A    Yes -- I don't know about slow down. I

5    remember them pausing it.

6        Q    Okay.

7        A    But I can't tell you definitively whether

8    they did or they didn't slow it down.

9        Q    And you watched it at your desk. Correct?

10       A    Yes.

11       Q    And you testified you -- you -- you slowed

12   it down.  Correct?

13       A    Yes.

14       Q    Okay.  And did you attempt to play it

15   frame by frame?

16       A    Yes.

17       Q    So you had the capability to do all of

18   those things.  Correct?

19       A    Yes.

20       Q    This time, I'll slow it down for you.

21            (Whereupon, a video was played.)

22   BY MR. DUBE:

23       Q    And you had a copy of the video yourself,

24   personally.  Correct?

25       A    I did at the time.  Yes.

EXHIBIT 32

```
 1              (Whereupon, a video was played.)
 2  BY MR. DUBE:
 3      Q    What, if anything, have you seen so far?
 4      A    Nothing, really.
 5      Q    Okay.  Well, see did Officer Saldivar.
 6      A    I saw Officer Saldivar on the right side
 7  of it and then it -- somebody moved it, bumped it,
 8  something because it looks like it shifted the
 9  position.  But...
10      Q    Okay.  All right.  Please pay attention to
11  the left side of the screen, okay, as we play it
12  this time.
13              (Whereupon, a video was played.)
14  BY MR. DUBE:
15      Q    What did you see -- observe?
16      A    The colors change over there on that side,
17  but that's all I can tell you.
18              (Whereupon, a video was played.)
19  BY MR. DUBE:
20      Q    Okay.  What, if anything, did you observe?
21      A    Again, the colors shift and there's a car
22  driving by.
23      Q    Did you see a puff of smoke?
24      A    Over in the lower left corner? That's
25  where I was paying attention.  That's where you told
```

NAEGELI
DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM    EXHIBIT 32

```
 1  me to watch.
 2       Q    Okay.  All right.  We'll play it again.
 3  And so I'm not telling you to look at any particular
 4  area.  Just look at it and tell me what you see.
 5            (Whereupon, a video was played.)
 6            THE DEPONENT:  Something on the top right,
 7  but I...
 8            (Whereupon, a video was played.)
 9            THE DEPONENT:  There's smoke around the
10  light.
11  BY MR. DUBE:
12       Q    Okay.  Do you see anything consistent with
13  gun fire?
14       A    That and the muzzle flash.
15       Q    You saw a muzzle flash?
16       A    Uh-huh.
17       Q    Okay.  What position is the muzzle facing?
18       A    I can't really tell.  I mean, it --
19       Q    Is it being pointed upwards?  Is it being
20  shooting down or is it shooting up?
21       A    It's hard to see.  I -- I...
22       Q    All right.  We'll play it again. And this
23  time, I'm going to move -- I'm going to do it at 7
24  minutes because I think that's really where the...
25            (Whereupon, a video was played.)
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1  BY MR. DUBE:

 2      Q    I direct you to pay attention to see what

 3  direction the shots are being fired at. And also

 4  tell me if you see anything consistent with a person

 5  on their hands and knees.  On the ground, I should

 6  say.

 7              (Whereupon, a video was played.)

 8  BY MR. DUBE:

 9      Q    To the left, like did you see anything

10  consistent with somebody falling onto the screen and

11  -- yes or no?

12      A    No.

13      Q    Okay.  Did you see anything consistent

14  with -- with a muzzle flash?

15      A    Yes.

16      Q    Okay.  What position was the muzzle facing

17  and where was the shot being shot at?

18      A    I'm not completely certain because of the

19  -- the poor lighting in the video.

20      Q    Uh-huh.

21      A    I just saw it at the top at the center of

22  the screen.

23      Q    Uh-huh.

24      A    I -- I'm not sure where it's going. I

25  don't know.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1        Q    Okay.  This time I'm going to do it frame
 2   by frame for you.  Okay?
 3        A    Okay.
 4        Q    Let's see if that helps.  Okay. I'll try
 5   to get it to seven minutes so we don't -- okay.
 6   Perfect.  All right.  Actually, let me go up a
 7   little bit more.  Oh, too far. And what -- what I
 8   want you to pay attention to is if you see anything
 9   consistent with somebody coming into the frame from
10   outside of the frame on the left-hand side, falling
11   down and being on the ground.  Okay?
12        A    Okay.
13        Q    Let me know if you see that.
14             (Whereupon, a video was played.)
15   BY MR. DUBE:
16        Q    Do you see anything there?
17        A    No.
18        Q    Okay.  Can you see my -- my cursor?
19        A    I can.
20        Q    Okay.  Do you see anything right here?
21        A    A dark spot.
22        Q    Okay.  All right.
23        A    The -- the third of the left side of the
24   screen is dark.
25        Q    Right where my cursor is, right here.
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1        A    It's no different than the rest of the

2   left side of the screen.

3        Q    **Fair enough.  That -- did you see that --**

4   **what -- move?**

5        A    I saw a coloration change.

6        Q    **Okay.  Do you see it moving?**

7        A    When you say it, I --

8        Q    **The -- right here.  This.  This --**

9        A    Right.  But when you're saying it, what am

10  I -- I can't tell you that's a person, so that --

11       Q    **Okay.  I'm not -- I'm not --**

12       A    If you're saying it --

13       Q    **I'm not saying it's a person yet.  I --**

14  **when you -- if you --**

15       A    But you said do you see it.

16       Q    **Yes.  Do you see this blob right here**

17  **moving?**

18       A    I see the colors changing.

19       Q    **Okay.  All right.  We'll keep going frame**

20  **by frame.**

21            (Whereupon, a video was played.)

22  BY MR. DUBE:

23       Q    **Does that appear consistent with a person**

24  **falling down to you?**

25       A    I have no idea what it is.

NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM    EXHIBIT 32

```
 1        Q     Okay.  It's not -- for some reason...

 2              (Whereupon, a video was played.)

 3   BY MR. DUBE:

 4        Q     Do you see anything?

 5        A     Colors going from dark black to light

 6   black or a lighter black.

 7              (Whereupon, a video was played.)

 8        Q     How about now?  What do you see at this

 9   moment?

10        A     There's a muzzle flash at the top.

11        Q     Okay.

12        A     Appears to be a muzzle flash.

13        Q     Okay.  Can you discern what this is right

14   here?

15        A     No.

16        Q     Okay.

17              (Whereupon, a video was played.)

18   BY MR. DUBE:

19        Q     Can you -- in those last few frames, have

20   you -- is there any conclusion or opinion that

21   you've drawn?

22        A     No.

23        Q     Okay.  Anything there?

24        A     No.  I mean, other than slight color

25   changes here and there, no.
```

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

Chief Joshua Bruegger    January 5, 2024    NDT Assgn # 71056    Page 166

```
 1      Q    Okay.  Can you tell the position of the

 2  shooter in relationship to where the color changes

 3  are occurring?

 4      A    Only because where the muzzle flash is,

 5  maybe to the right.

 6      Q    Okay.  Are they below or above where the

 7  color change is occurring?

 8          MR. GILES:  Objection.  Form.

 9          THE DEPONENT:  I -- I'm not sure. I...

10          MR. DUBE:  Okay.  All right.  Can you

11  please play exhibit 18?

12  BY MR. DUBE:

13      Q    Okay.  So we've isolated that portion of

14  the video.  Okay?  And so I'm going to play it for

15  you.

16          MR. DUBE:  And can you do a VIC player,

17  sir?

18          THE DEPONENT:  When you say we, who is we?

19          MR. DUBE:  We is defense.

20          THE DEPONENT:  Okay.

21          EXHIBIT TECHNICIAN:  Absolutely.

22          MR. DUBE:  I'm sorry.  Not the defense.

23  I'm usually -- the plaintiffs.  Sorry.

24          THE DEPONENT:  Okay.

25  BY MR. DUBE:
```

```
 1      Q    Okay.  And do -- I have to do the playba--
 2  - okay, so I'm going to play it one time, regular
 3  speed.
 4      A    Okay.
 5      Q    Okay?  And I'm going to slow it down again
 6  and you tell me if you observe anything.
 7          MR. DUBE:  Do I have control?  I think you
 8  have to do it each time.
 9          EXHIBIT TECHNICIAN:  Yes, sir.  You have
10  control.
11          MR. DUBE:  Is it playing -- oh, it's
12  playing at regular -- I want it at regular speed
13  first.
14          (Whereupon, a video was played.)
15  BY MR. DUBE:
16      Q    What do you see there?
17          MR. GILES:  Objection.  Form.
18          THE DEPONENT:  I'm not sure.
19  By Mr. Dube:
20      Q    Okay.  I'll play it again.
21          (Whereupon, a video was played.)
22  BY MR. DUBE:
23      Q    Do you see where it's marked Nathan's
24  head?
25          MR. GILES:  Objection.  Form.
```

```
 1              THE DEPONENT:  I see -- I see where the
 2  marker is, yes.
 3              (Whereupon, a video was played.)
 4  BY MR. DUBE:
 5      Q    Is that consistent with a person's head up
 6  here and back over here?
 7              MR. GILES:  Objection.  Form.
 8              THE DEPONENT:  I can't say that.
 9              MR. DUBE:  Okay.
10              (Whereupon, a video was played.)
11  BY MR. DUBE:
12      Q    Do you see it consistent with a person on
13  the ground being shot?
14      A    I don't -- no, I -- it -- it's different
15  color -- I mean, it's lighter, different colors, but
16  I can't tell you -- I can't tell you what it is.
17  The other thing I -- I mean --
18      Q    I just -- you don't have to go further.
19  Just I'm asking if -- if you -- you see something.
20  If you see it, you see it.  If you don't, you don't.
21      A    Okay.
22      Q    That's all.  And I'll play -- this time,
23  I'll play it at -- this one.  Where is that?
24              (Whereupon, a video was played.)
25              MR. DUBE:  The problem with this player is
```

NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM    EXHIBIT 32

1  that you can't change the speed until after you

2  press play.  And so you have to -- it's unique --

3  it's a -- it's a exercise in reflexes.  Okay.

4  Playing at .25 speed.  Tell me what you see.

5          **(Whereupon, a video was played.)**

6  BY MR. DUBE:

7      **Q    What, if anything, do you see?**

8      A    I see more discolorations, moving. It --

9  they are clearer than the other one, but they're not

10  -- I can't tell you definitively that's a person.  I

11  -- I see where whoever's labeled it.  I also don't

12  know -- I -- I mean, you're showing me a video, but

13  I don't know who's done this, who -- you know, what

14  they've done.  And so that's -- I don't know the

15  process.

16     **Q    I -- I'm not asking you any of that. I'm**

17  **just asking you what do you see?**

18     A    I saw a lighter-colored blob moving around

19  on the side over there.

20     **Q    Okay.  Do you see anything -- where it's**

21  **labeled head, do you see something that is**

22  **consistent with what you would expect a head to look**

23  **like?**

24     A    It's not round.  It's -- no.

25     **Q    With -- with hair flopping?**

NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

 1    A    I -- I'm not sure what it is.

 2    Q    I'll play it one more time.  And I'll try

 3 to pause it.  Right...

 4            (Whereupon, a video was played.)

 5 BY MR. DUBE:

 6    Q    Do you see anything here consistent with a

 7 person's head?  And -- and then the back?

 8    A    I see a big dark side on the left over

 9 there.

10    Q    Okay.  Do you see a puff of smoke?

11    A    Yes.

12    Q    Okay.  Does this appear the puff of smoke

13 is shooting at whatever it is that you see down

14 here?

15    A    Appears that direction, yes.

16    Q    And you can't tell from this still image

17 right here that this is a person's head?

18    A    You're telling me or asking me?

19    Q    I'm asking you, can you tell that?

20    A    No.

21    Q    Okay.

22            MR. GILES:  Objection.  Form.

23 BY MR. DUBE:

24    Q    Can you tell that this is a person's back?

25    A    No.

1      **Q      The back side right here.**

2      A      No.

3      **Q      Okay.  Do you see any movement consistent**

4   **with somebody turning over after being shot?**

5      A      No.  It just -- the -- I -- I see the --

6   what I call the blob -- the blob move to the bottom

7   of the screen or to the bottom left, but I can't

8   tell you that's a person.

9      **Q      Okay.  If that is a person, where would**

10  **they be in -- relative to the -- to the -- to the**

11  **gun that you see shooting down?**

12          MR. GILES:  Objection.  Form.

13          THE DEPONENT:  I don't know that there's

14  enough there that I can tell you where they're at.

15  **BY MR. DUBE:**

16     **Q      All right.  Now the last time I'm going to**

17  **play it, but this time, I'll play it frame by frame**

18  **for you.  Okay?**

19     A      Okay.

20     **Q      And tell me if that helps you in any way,**

21  **shape or form.  If you see anything you want me to**

22  **pause, let me know and I'll -- I'll gladly pause for**

23  **you.  Okay?**

24     A      Okay.

25          **(Whereupon, a video was played.)**

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1  BY MR. DUBE:

 2      Q    So I want you to pay attention to this

 3  area right here.  Do you see that right there with

 4  my mouse?

 5      A    Yes.

 6      Q    Okay.

 7           (Whereupon, a video was played.)

 8  BY MR. DUBE:

 9      Q    And you see that something has emerged

10  right here?  Do you see that?

11      A    I -- I see the color shifted.

12      Q    So you see -- you see a change from the

13  previous frame.  Correct?

14      A    Yes.

15      Q    Okay.

16           (Whereupon, a video was played.)

17  BY MR. DUBE:

18      Q    Do you see any change from the previous

19  frame?

20      A    Yes.

21      Q    It's stuck.

22           MR. DUBE:  Did it freeze on your end, sir?

23  Vincent?  Can you get me back to -- I don't think

24  this is -- okay.

25           (Whereupon, a video was played.)
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  BY MR. DUBE:

2      Q    All right.  You see right here where it

3  says Nathan's head?  Do you see that?

4      A    Yes.

5      Q    Okay.

6           (Whereupon, a video was played.)

7  BY MR. DUBE:

8      Q    What do you see here?

9      A    The dark discoloration move to the right a

10  little bit.

11      Q    Okay.

12      A    Continuing to move to the right. Same.

13           (Whereupon, a video was played.)

14           MR. DUBE:  I don't know why it's not --

15  all right.  Let's do this.  Let's just do the same

16  thing.

17           (Whereupon, a video was played.)

18  BY MR. DUBE:

19      Q    You see where it says two?

20      A    No, I see three.

21      Q    Three?  Okay.

22           (Whereupon, a video was played.)

23  BY MR. DUBE:

24      Q    And you can't te--- you cannot tell that

25  is a person on the ground being shot?

1       A      No.

2       Q      **Okay.**

3              **MR. DUBE:**  All right.  Let's play exhibit

4    number --

5              **MR. GILES:**  Could I please make sure we're

6    clear on the record that what you've been playing as

7    exhibit 18 is not a copy of the actual video that

8    the chief looked at and not an actual video of this

9    event, but some other recording that's been

10   modified?

11             **MR. DUBE:**  Correct.

12   BY MR. DUBE:

13      **Q      And is there anything that prevented you**

14   **from hiring somebody, a video enhancer, to do the**

15   **same thing at the time of the incident?**

16      A      No.

17      **Q      Okay.  It was just your opinion decision**

18   **not to do so.  Correct?**

19      A     I mean, mine, the investigators, yeah.

20             **MR. DUBE:**  Okay.  All right.  We will play

21   one more.  I think it is exhibit 32.

22             **EXHIBIT TECHNICIAN:**  Sorry, sir. What was

23   the exhibit number one more time?

24             **MR. DUBE:**  Thirty-two, please.

25             **EXHIBIT TECHNICIAN:**  Thirty-two. Got it.

EXHIBIT 32

BY MR. DUBE:

Q    Okay.  So in this video, the camera --
because the camera was on the ground, it has been
shifted, it's been rotated so that, you know, we are
at street level now.  And you will see where the car
passes and you will see where the light post is.
Okay?  So I'm going to play it one time for you.
I'm showing you what's been marked exhibit 32.

A    Okay.

MR. DUBE:  Any objection to it being moved
into this deposition?

MR. GILES:  No, I don't mind -- I don't --
I don't object to you using this for the deposition
as long as we identify again, this is not a copy of
a recording the chief has seen and not a copy of a
recording that is the actual recording made at the
scene.

MR. SELBE:  No problem with using it in
the deposition.

MR. DUBE:  Okay.  Thank you.

(Plaintiff's exhibit 32 marked for
identification.)

BY MR. DUBE:

Q    Okay.  I am playing it one time at regular
speed, then I'm going to slow it down. Okay?

1    A    Okay.

2         (Whereupon, a video was played.)

3   BY MR. DUBE:

4    Q    What did you see?

5    A    I saw gun fire -- appeared to be gun fire.

6   Saw something moving, and at the end, Officer

7   Saldivar appears to be picking up his body camera.

8    Q    Was the thing moving the object that was

9   being shot at?

10   A    I am not sure.

11   Q    Okay.  Was the thing moving on the ground?

12   A    Not sure.

13   Q    All right.  We'll play it one more time.

14        (Whereupon, a video was played.)

15  BY MR. DUBE:

16   Q    What did you see?

17   A    Same thing I saw before, that it moves.

18   Q    Does it appear to you that Officer

19  Saldivar is shooting at a person on the ground?

20   A    I'm not sure of that because I don't know

21  what's -- I -- I -- I don't know what that is.

22   Q    Okay.  I'm -- I'm asking you, based on

23  what you see in the video, does it appear to you

24  that Officer Saldivar is shooting at the object on

25  the ground?

1        A    The object on the ground?

2        **Q    Yes.**

3        A    I -- I -- I don't know 'cause I don't know

4    what it is and I don't know.

5        **Q    Are you able to discern whether or not**

6    **that is a person on the ground?**

7        A    I am not.

8        **Q    Okay.  And I'm going to play it in slow**

9    **motion for you the next time we go through. So you -**

10    **- so you do not see the person's hands moving,**

11    **flailing, the head moving or anything from what you**

12    **just saw?**

13        A    No.

14        **Q    Okay.  Now we're going -- we're going to**

15    **do the exercise where I try to stop it.**

16            **(Whereupon, a video was played.)**

17    **BY MR. DUBE:**

18        **Q    How many muzzle flashes did you see?**

19        A    I think two.

20        **Q    Okay.  Could you tell what the -- what the**

21    **gun was shooting at?**

22        A    Could not.

23        **Q    Did you see an object in the direction**

24    **where the gun was shooting at?**

25        A    I don't know what I saw there.

1    **Q    So it's your testimony you can't -- you**

2    **don't know what you were seeing on the screen?**

3    A    That I don't know what I'm seeing?

4    **Q    Yeah.**

5    A    I see colors moving, but I don't know what

6    -- or colors changing, but I don't know what those

7    colors are.

8    **Q    Okay.  Within the context of the**

9    **investigation where you know they've been shot --**

10    **Schenk was shot.  Correct?**

11    A    Yes.

12    **Q    Okay.  And he was shot twice in the back.**

13    **Correct?**

14    A    Yes.

15    **Q    Okay.  And you are a -- and you've seen**

16    **the muzzle flash.  Correct?**

17    A    Correct.

18    **Q    Okay.  And you've seen the muzzle flash**

19    **put into a particular direction.  Correct?**

20    A    Correct.

21    **Q    Okay.  It's still your testimony you**

22    **cannot discern what is occurring in this video in**

23    **terms of where Officer Saldivar was and where Mr.**

24    **Schenk was at the time of the shooting.**

25    A    I can't --

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    **Q    Is that -- is that your testimony?**

2    A    I cannot tell you that because there's

3    also an entrance wound to the front that -- I -- I

4    can't tell you what's happening when or where or who

5    he's pointing it at.

6    **Q    I'm not asking you to make a conclusion as**

7    **to whether or not the shooting is justified.  I'm**

8    **not asking you to make any -- let me finish -- any**

9    **of those conclusions.  I am just asking you if you**

10    **can look at the video and tell me where you think**

11    **Schenk is, where Officer Saldivar is and what**

12    **direction he's shooting at.**

13    A    I cannot.

14    **Q    Okay.  And it's your testimony, sir, you -**

15    **- at this point of the movie, you cannot tell that**

16    **is Mr. Schenk being on his hands and knees while**

17    **Officer Saldivar is shooting?**

18    A    I cannot tell you that from that image,

19    no.

20    **Q    Okay.  One final time and then we'll move**

21    **on.**

22    **(Whereupon, a video was played.)**

23    **MR. DUBE:**  Can you please show -- pull up

24    exhibit number -- hold on.  Let me grab it; 33,

25    please.

```
1              EXHIBIT TECHNICIAN:  I'm sorry, sir.  I
2    couldn't hear you.  What was the number one more
3    time?
4              MR. DUBE:  Thirty-three.
5              EXHIBIT TECHNICIAN:  Thirty-three. Got it.
6              MR. DUBE:  Actually, before we go there,
7    let me take a quick break.
8              VIDEO TECHNICIAN:  All right.  The time is
9    now 2:09.  We're off the record.
10             (Whereupon, a break was taken from the
11   proceedings.)
12             VIDEO TECHNICIAN:  The time is now 2:12.
13   We're back on the record.
14             MR. DUBE:  If we can show exhibit thirty--
15   - I think it was 33, which -- whatever number I said
16   prior to break.  Is there anyway you can make this
17   full screen, sir?
18   BY MR. DUBE:
19       Q    I'm showing you what has been -- which are
20   screenshots from the video I just sent you -- I just
21   showed you.  Okay?  It's been marked as exhibit
22   number 33.
23       A    Okay.
24       Q    Do you -- do you see that?
25       A    Yes.
```

```
 1      Q    Okay.  What if anything are you able to
 2   see in this screenshot?
 3      A    Street light, maybe some trees.  I'm not
 4   sure -- there's black stuff down on the -- all along
 5   the right -- left side, but I don't know what --
 6   what it is.
 7      Q    Okay.  Do you see something right here
 8   where I'm moving my cursor?
 9      A    It's not moving.  Where at?
10      Q    Oh, am I on the right -- yeah, I'm --
11   right here where my cursor is.  See my cursor right
12   here?  Do you see my cursor?
13      A    No.
14           MR. DUBE:  Can you give me cursor control,
15   sir?
16           THE DEPONENT:  Now.  It's moving around,
17   the cursor.
18           EXHIBIT TECHNICIAN:  I did, sir.
19   BY MR. DUBE:
20      Q    Okay.  Can you see this cursor moving?
21      A    Well, it stopped moving, but I...
22      Q    This one going in the circle?
23      A    It's not moving.
24           MR. DUBE:  It's not moving, sir.
25           THE DEPONENT:  It was and then it stopped.
```

EXHIBIT 32

```
 1              MR. DUBE:  No, it was his cursor.

 2              THE DEPONENT:  Oh.

 3              EXHIBIT TECHNICIAN:  For -- for some

 4   reason, when I give you control and you take over,

 5   the mouse disappears.

 6              MR. DUBE:  Okay.  Can you -- can you go to

 7   the bottom left corner where -- do you see a blob on

 8   the left corner right here?  Yes.

 9   BY MR. DUBE:

10       Q    Do you see that?

11       A    Yes.

12       Q    Okay.  What -- what do you think that is?

13       A    I -- I don't know.

14       Q    Okay.  Next slide, please.  Okay. What is

15   that?

16       A    I'm not sure.

17       Q    All right.  Do you -- can you tell the

18   outline of a head right here?

19       A    I don't know where you're pointing to.

20       Q    Okay.  Can you see a head right here?

21       A    Can I see it?  No, I cannot see a head

22   there.

23       Q    Okay.  Do you see outline that's different

24   from what you see right here?

25       A    It looks like bushes, if -- it looks like
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  a bush or a tree.  It looks consistent to the one to

2  the right of it after the lighter -- right here --

3      Q     Uh-huh.

4      A     -- this looks consistent with this.

5            MR. DUBE:  Okay.  All right.  Next slide,

6  please.

7  BY MR. DUBE:

8      Q     Okay.  What do you see up here?

9      A     That's a -- appears to be a muzzle flash.

10     Q     Okay.  Is it pointing towards this object

11  right here?

12     A     Actually, it looks like it's pointing

13  above it.

14     Q     So it's above it.  What -- what direction

15  is it shooting at?

16     A     It's shooting above the area that you're

17  pointing.  It appears to be shooting at this area.

18     Q     Okay.  Do you see anything consistent with

19  a person's body shape here?

20     A     I do not.

21     Q     Okay.  Next slide, please.  Okay.  This has

22  been annotated.  Do you see that?

23     A     Yes.

24     Q     Okay.  And it says muzzle flash here.  Do

25  you see that?

1    A    Yes.

2    Q    Okay.  And it says Nathan's head. Do you

3  see that?

4    A    Yes.

5    Q    And --

6    A    I see the words on the screen.

7    Q    Yeah.

8    A    How about that?

9    Q    Yes.  Do you see the words that say

10  Nathan's back?

11    A    Yes.

12    Q    Okay.  All right.  Do you see that?

13    A    Yes.

14    Q    Okay.  And is it your testimony that this

15  is not consistent with a person's head and a

16  person's back with a gun being shot down at them?

17    A    I can't tell you -- I -- fairly confident

18  about the muzzle flash at the top. What you have

19  labeled Nathan's back and Nathan's head, I cannot

20  tell you that's what that is.

21    Q    Okay.  All right.  Thank you.  No further

22  questions -- on -- on -- on this topic. Sorry.

23  After the conclusion of the investigation, did you -

24  - did you terminate Officer Saldivar?

25    A    I did not.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    **Q    Okay.  Would you have had the authority to**

2    **terminate Officer Saldivar?**

3    A    The authority, I could -- have the

4    authority to indefinitely suspend him.

5    **Q    Okay.**

6    A    Which would start the appeals process

7    because there's a -- there's a back side in civil

8    service if you terminate somebody. It's while I make

9    the decision to initiate the process, it's not the -

10   - it's not the final say.

11   **Q    Okay.  So you had the authority to ensure**

12   **that he was no longer working as a member of the**

13   **police department at that time?**

14   A    My decision's not final.  It can be

15   overridden by the civil service commission or an

16   arbitrator.  So to say that I could definitively

17   keep him from working for Pasadena Police

18   Department, I can't say that.

19   **Q    But you have the authority to stop him**

20   **from operating from -- at that point until civil**

21   **service commission could make a determination.**

22   **Correct?**

23   A    I could do that.  Yes.

24   **Q    What is the process to terminate somebody**

25   **from the police force?**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1      A     Beginning when?

2      **Q     Beginning at act of misconduct.**

3      A     At some point, you draft a letter laying

4  out the -- the policy violations, law violations.

5  It becomes what's sometimes called the charging

6  document in civil service.  And it's delivered to

7  the -- to the officer, telling them that they have

8  been indefinitely suspended and that they have a

9  certain -- the -- the appeals process is laid out to

10 them and the -- and the deadline and the timelines.

11     **Q     Yes.  Did you do anything with respect to**

12 **Offi--- any of those things with respect to Officer**

13 **Saldivar after the shoo--- the Schenk shooting?**

14     A     After the Schenk shooting, no.

15     **Q     Did you take any steps to discipline**

16 **Officer Saldivar for the Schenk shooting?**

17     A     No.

18     **Q     What is your opinion of Officer Saldivar's**

19 **conduct with respect to the Schenk shooting?**

20     A     It was lawful and justified.

21     **Q     Do you see anything that he could have**

22 **done better?**

23     A     No.

24     **Q     Did anyone offer an opinion to you as to**

25 **whether or not Officer Saldivar should have remained**

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    **on the police force after the Schenk shooting?**

2         A    No.  Oh -- oh, let me correct that. The

3    lieutenant reviewed it and didn't find any policy

4    violations, misconduct, the assistant chief and then

5    myself.  And so we were in agreement that he -- he

6    should remain employed with the department.

7         **Q    The officers -- did Sergeant Skripka offer**

8    **an opinion to you that Detective Saldivar (sic)**

9    **should not remain on the police force?**

10        A    No.  And I -- he -- they were conducting a

11   criminal investigation, which is separate from the

12   administrative investigation. And so -- so as not to

13   appear to be influencing a criminal investigation in

14   any way, they run that investigation after initial

15   contact that I had with them regarding the video.

16   They pre--- completed their case, present it to the

17   D.A.'s office and then we go through the

18   administrative process.

19        **Q    You mentioned that the -- the -- the video**

20   **could have been sent to an outside agency for it to**

21   **be enhanced.**

22        A    Could have been?  Yes.

23        **Q    Okay.  Is there a particular agency that**

24   **the Pa--- Pasadena Police Department uses?**

25        A    We've gone to NASA before.  We've gone to

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM

EXHIBIT 32

1  Houston before.  We've gone to some of our federal

2  partners before.

3      **Q    At the time you were evaluating Officer**

4  **Saldivar's conduct, did you take the account that he**

5  **had also shot -- well, let me start over.  At the**

6  **time you evaluated Officer Saldivar's conduct for**

7  **the Schenk shooting, did you also consider the**

8  **Ramirez shooting and his actions in that shooting as**

9  **well?**

10     A    No, because there -- it was a -- it was a

11 justified shooting in compliance with departmental

12 policy.

13     **Q    Did it concern you that the same officer**

14 **had shot two individuals within six months of each**

15 **other?**

16     A    No.

17     **Q    Okay.  How did you hear about the Aviles**

18 **shooting?  And by Aviles, I'm talking about the**

19 **shooting of Randy Aviles by Rigo Sal--- Salvidar.**

20     A    It was the night of, but I don't remember

21 -- I didn't make the scene, so I don't -- I don't

22 remember how I found out or who.

23     **Q    What did you hear about the shooting?**

24     A    That -- that it was a traffic stop that

25 Officer Saldivar had made.  The driver had stopped,

1  jumped out, simply drove away and Officer Saldivar

2  fired at the vehicle.

3      Q     How were you contacted?

4      A     I assume by phone, but I don't know.  I

5  can't tell you -- I -- I don't have an independent

6  recollection on this one like I do on some of the

7  other ones.

NAEGELI
DEPOSITION & TRIAL

40 CELEBRATING YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
22    Q    Okay.  What were you told?

23    A    That there was a traffic stop, the -- the

24 driver had gotten out, driven away. And at some

25 point, Officer Saldivar discharged his firearm at
```

NAEGELI    (800)528-3335
DEPOSITION & TRIAL    NAEGELIUSA.COM

EXHIBIT 32

```
 1  the -- at the person in the vehicle.
 2      Q    Were you told anything else?
 3      A    At that point, no.
 4      Q    Okay.  Was --
 5      A    Well, he -- I -- I was told that the
 6  person was struck, but he was likely going to
 7  survive his injuries.  But that was -- that was the
 8  extent of it.
 9      Q    Okay.  What's the next thing you recall
10  with respect to the -- of the shooting that involved
11  you and your participation?
12      A    The next morning, I reviewed the video,
13  drafted the administrative leave letter for Officer
14  Saldivar.  And that's what I recall my initial --
15      Q    What were your thoughts upon seeing that
16  video?
17      A    I had concerns.
18      Q    Okay.  What were those concerns?
19      A    That Officer Saldivar had shot at a
20  vehicle that was driving away.
21      Q    Any other concerns?
22      A    I mean, I think that's a big enough
23  concern.  That's the only one I had at the time.
24      Q    Did you feel that he was under any
25  imminent harm at the time he was shooting?
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    A    Some years there's more than others. So I

2    don't -- I don't know.

3    Q    Okay.  Let's just take it -- let's take it

4    position by position.  Okay?  When you were

5    assistant chief, do you recall whether or not there

6    were more than five, more than ten? How many

7    officer-involved shootings occurred while you were

8    assistant chief of police?

9    A    I would say ten.  Probably more than ten.

10    Q    And how long were you chief of police?

11    Assistant chief of police.  Sorry.

12    A    Five years and a couple months.

13    Q    And then in the two months that you were

14    interim chief of police, how many officer-involved

15    shootings occurred during that time?

16    A    I only know of the Schenk, but that

17    doesn't mean there wasn't another one.  I don't --

18    I'm not sure.

19    Q    And how long between that -- because that

20    -- that was in April -- or that was in November of

21    2018.  Correct?

22    A    Correct.

23    Q    Okay.  And you became chief of police

24    January 2019.  Correct?

25    A    Yes.

EXHIBIT 32

1    **Q    Okay.  So from January ni--- 2019 to**
2    **January 2021 when Officer Saldivar shot Mr. Aviles,**
3    **how many officer-involved shootings occurred during**
4    **that time?**
5        A    I'm not sure.  They all run together and I
6    can't tell you by -- you know, by years.
7        **Q    Okay.  More than five, more -- less than**
8    **ten?  Like can you give me your best estimate?**
9        A    My best estimate is five to ten.
10       **Q    Five to ten.**
11       A    Well, that might be high because I'm --
12   I'm thinking my entire time as chief. That's just a
13   two-year period.  Probably closer to five.
14       **Q    Closer -- okay.  So while you were chief,**
15   **you estimate there were about five to ten shootings**
16   **that occurred?**
17       A    During the five years that I was -- or
18   almost five years I was chief, yes.
19       **Q    Okay.  And during the two years between**
20   **when you became chief and when Officer Saldivar shot**
21   **Mr. Aviles, there were approximately five shootings?**
22       A    Give or take, yes.
23       **Q    Of those shootings, how many did the**
24   **police department determine were justified or**
25   **unjustified?**

```
 1        A    I'm not -- I -- I don't know the answer to
 2   that.
 3        Q    What other pro--- so what are the
 4   procedures that your police department implemented
 5   or incorporated while you were chief for an officer-
 6   involved shooting?  Like what were the due process
 7   rights of an officer?  What were the steps after a
 8   shooting?
 9        A    So they were already in place.  The only
10   change we made was when an officer's involved in a
11   shooting, they previously had gotten three -- were
12   on administrative leave for a minimum of three days.
13   We moved that to five.
14        Q    Uh-huh.
15        A    To five days.
16        Q    Uh-huh.
17        A    And so that was the only change that was
18   made.  There was already a pretty good process and
19   procedure in place.
20        Q    And what was that process and procedure?
21        A    So when an officer's involved in a
22   shooting, at the time of the scene, they are put in
23   a car with what we call a buddy officer and they are
24   not to talk about the case.  The officer then goes
25   on administrative leave after that day for at least
```

NAEGELI

DEPOSITION & TRIAL

(800)528-3335

NAEGELIUSA.COM

EXHIBIT 32

1  three days.  And then before they come back, they

2  have to go see a police psychiatrist to be cleared

3  to come back as well as have to go to the range and

4  qualify. Once those are done -- and again, each case

5  is a little bit different because it depends on the

6  circumstances of the shooting as well.

7            This last shooting the Officer Saldivar,

8  the Aviles shooting, was a little bit different

9  because he never went back to the streets after that

10  shooting.

11            That day was -- after that, he never

12  worked the streets.  And that was because of the

13  concerns.  And so allowing the process to play out -

14  - and so you asked about due process; you -- you --

15  there's really three investigations that go on when

16  there's a shooting.  You have the criminal

17  investigation done by the detectives with the

18  organization. You have the internal affairs

19  investigation, which in some ways parallels the

20  criminal investigation, but it's also separate.

21            And then you also have the district

22  attorney's office comes out on all of the officer-

23  involved shootings and they conduct their own

24  investigation.  And then they take their

25  investigation and the criminal investigation and

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  present it to a grand jury.

2      **Q     What -- are officers given access to an**

3  **attorney at the scene of a shooting?**

4      A     Are they given access?

5      **Q     Yes.**

6      A     That's their right through the union.

7  It's a criminal investigation, so just like anybody

8  else that's accused of a crime, if they request an

9  attorney, then they are entitled to an attorney just

10 like anybody else.

11     **Q     Are they provided an attorney with the --**

12 **are they required to request an attorney before the**

13 **attorney gets there or is the off-- is the attorney**

14 **automatically dispatched to the scene?**

15     A     It's not automatic.  We -- the Pasadena

16 Police Department as an organization does not do it.

17 Now, if other officers call for an officer, I have

18 no knowledge of that.  I don't -- I don't ask, hey,

19 how did you get out here?  So I'm not sure.  I can

20 just tell you from my experience with the

21 organization that sometimes the officer will call;

22 sometimes another officer will call on their behalf.

23 But the legal protection is -- is provided through

24 their union dues.

25     **Q     Uh-huh.**

1      A    And so sometimes the union president will

2 find out about it and the union president will

3 contact the attorney.

4      **Q    Okay.  Back to Officer Saldivar in the**

5 **Aviles shooting, so after the Aviles shooting, you**

6 **stated the next day, you watched the video.**

7 **Correct?**

8      A    Yes.

9      **Q    And then you wrote a -- a administrative**

10 **leave memo?**

11      A    Yes.

12      **Q    What did that memo say?**

13      A    It's standard.  It says you're -- you --

14 basically, you're on leave, administrative leave,

15 because you were involved in a shooting, and -- and

16 you can't come back to work until at least these --

17 this criteria is met.

18      **Q    Did you draft the administrative leave**

19 **memo after the Schenk shooting?**

20      A    Yes.  Well, one was drafted. Whether I did

21 it or one of the assistant chiefs, one was done.

22 Yes.  Yes.

23      **Q    Okay.  So one was done, but not you?**

24      A    I may have done it.  I don't know.

25      **Q    Okay.  How about after the Ramirez**

EXHIBIT 32

1 shooting?

2    A    Yes.

3    Q    Okay.

4    A    It would have been -- it -- it's standard

5 procedure that's done on officer-involved shootings.

6    Q    Do you recall whether or not you did it?

7    A    I don't recall.

8    Q    Okay.  Why -- why did you take it upon

9 yourself to write the memo after the Aviles

10 shooting?

11    A    Because I was in the office dealing with

12 all of that -- normally, I do them.

13    Q    Okay.

14    A    If I'm out of town, not there, somebody

15 else will do it.

16    Q    Uh-huh.

17    A    But generally, I do them.  So that wasn't

18 out of the ordinary for me to do it for the Aviles

19 shooting.

20    Q    Gotcha.  And then what did you do after

21 you wrote the memo?

22    A    Delivered it to internal affairs so they

23 could deliver it to Officer Saldivar.

24    Q    Uh-huh.

25    A    Because he was on administrative leave.  I

EXHIBIT 32

1  -- I believe the shooting was on January 12 of '21.

2  I believe.  And then the following day, the letter

3  was drafted and then Officer Saldivar stayed out on

4  administrative leave until the 24th of January.

5       **Q**    **Okay.**

6       A    And then when he came back on the 25th, I

7  met with him and told him he was going to be

8  assigned to inside duties.

9       **Q**    **And how long would he be assigned to**

10  **inside duties did you tell him?**

11       A    I told him until we got this all -- the

12  investigation was done.

13       **Q**    **And who was conducting that investigation?**

14       A    Detectives were investigating, one, the

15  criminal investigation, and then internal affairs

16  conducted the administrative investigation.

17       **Q**    **How long did Officer Saldivar remain on**

18  **inside duty?**

19       A    Until his separation from the department.

20       **Q**    **When was that?**

21       A    I believe it was July 9th of 2021.

22       **Q**    **What caused the separation from the**

23  **department?**

24       A    What caused it?  He ele---

25       **Q**    **For -- go ahead.**

```
 1        A      Go --

 2        Q      No.   What caused it?

 3        A      He elected to retire.

 4        Q      Was he suspended for the Aviles shooting?

 5        A      Suspended?

 6        Q      Yes.

 7        A      No.   The investigation wasn't done when he

 8  separated.  He still had an open criminal

 9  investigation that was at the -- the district

10  attorney's office.  And so as chief, if I'm at --

11  end up having to indefinitely suspend or terminate

12  somebody, I want the best case that I can get

13  because the last thing I want is an officer that --

14  you know, that I separate from, an arbitrator

15  sending them back.

16             And so we have -- one of our rules, for

17  example, is that you have to follow the laws.  And

18  so, you know, my concerns with this last shooting,

19  the Aviles shooting, was potentially, there could be

20  criminal violations.  And if so, it would be prudent

21  for me as chief to wait until all of it's done

22  because he was no longer -- he -- he was inside.

23             He was restrictive duties, inside duties.

24  And so he -- he didn't have contact with the public.

25  He was assigned to the property room.  And so to
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  allow this investigation to play out, allow the

2  district attorney's office to make their decision

3  because if I get to a position where I have to

4  terminate or indefinitely suspend him, the more I

5  have, the better.

6          And so you know, had he been -- had he

7  still been employed with us when he was indicted,

8  that would be another -- another thing that I could

9  articulate as a reason for the -- for the

10  termination.  And so...

11     Q    While he was inside, did -- did he have

12  access to a weapon?

13     A    I don't recall.  I don't rec--- I -- I

14  don't remember whether his police powers were

15  terminated or he was just inside because I know he

16  could not work extra jobs; he couldn't -- I can't

17  take somebody -- I -- I can't take somebody's

18  weapon.  Officers' weapons are owned by the officer.

19  They are not owned by -- by the organization.  So I

20  -- I can't take officers' weapons.  Even --

21     Q    Well, his -- so you -- you could not

22  restrict his ability to have a gun while he was

23  working for the City?

24     A    I could restrict his ability to possess a

25  gun because of his being a peace officer in the

1  State of Texas.  However, I think you said earlier,

2  you know, open carry and all of that, because of

3  that, just like anybody else in Texas, assuming

4  you're not a felon and -- and the limited criteria,

5  could carry a gun, Officer Saldivar could carry a

6  gun under that authority whether I took his police

7  powers away from him or not.

8       **Q    Could -- but while he was at the police**

9  **department and on his way to work at the police**

10 **department or leaving work from the police**

11 **department, would you have had the ability to**

12 **restrict his ability to possess a gun during those**

13 **times?**

14      A    Coming to and from work?  No.

15      **Q    At work?**

16      A    At work, I could.  He was in plain

17 clothes.  He was not in uniform.  After -- whenever

18 he came back on June 25th, he was never in uniform

19 again either.  So I don't --

20      **Q    So -- and --**

21      A    He wasn't walking around with a gun on his

22 hip.  I don't know if -- I -- I -- again, I -- one,

23 I don't know if we suspended those privileges.

24      **Q    Do you -- so let me ask the question this**

25 **way.  Sitting where you are today, do you recall**

1  **affirmatively taking away his ability to carry a gun**

2  **while performing his duties as a police officer**

3  **after the Aviles shooting?**

4      A    He wasn't performing duties as a police

5  officer after the shooting.  He was inside assigned

6  to the property room doing clerical work.

7      **Q    Okay.  Is clerical work not part of police**

8  **duties?**

9      A    It's no different than all the civilians

10 that are in there.  It's -- it's all civilians and

11 then it was him while he was assigned there.

12     **Q    Was he being paid?**

13     A    Yes.

14     **Q    He was being paid by the police**

15 **department?**

16     A    Yes.

17     **Q    Okay.  So at -- at that time, do you**

18 **recall whether or not you took -- you took away his**

19 **ability to possess a gun while on the premises of**

20 **Pasadena Police Department?**

21     A    I do not recall that.

22     **Q    So from January 25th 'til he retired in --**

23     A    It was July 9th, I believe.

24     **Q    -- on July 9th, he remained employed by**

25 **the Pasadena Police Department?**

```
 1      A    Yes.
 2      Q    Okay.  And he was being paid by the
 3 Pasadena Police Department?
 4      A    Yes.  But civil service also governs the
 5 ability to --
 6      Q    There's not a question pending, sir.
 7      A    I'm sorry?
 8      Q    There's not a question pending.  I just
 9 ask the questions I ask.  I'm -- would it have been
10 -- would it have been accurate for him during that
11 time period to tell somebody I am a Pasadena Police
12 Department officer?
13      A    Would it have been what?
14      Q    So during -- from Jan--- January 2021 --
15 January 25th, 2021 to July 9th, 2021, if Officer
16 Saldivar was asked, are you a Pasadena Police
17 Department officer and he said yes, would that have
18 been accurate?
19      A    Yes.
20      Q    Do you know when the -- when the
21 investiga--- when the internal affairs investigation
22 into the Aviles shooting concluded?
23      A    It wasn't until after he was gone because
24 it was left open and not concluded with findings
25 because we were waiting on the district attorney's
```

1  office because, again, that -- that rule that I

2  mentioned about having to follow the laws.  And then

3  once he separated from the organization, there was

4  no hurry at that point because he -- he didn't work

5  for the organization and we could wait until it

6  played out in the -- in the criminal system.

7       Q    Do you know when the investigation was

8  sent over to the district attorney's office?

9       A    Definitively, no.

10      Q    Okay.  Approximately, in your

11  approximation, when do you think that would have

12  been done?

13      A    I seem to recall it being in April

14  sometime.

15      Q    Okay.  The shooting occurred in January

16  and was sent over to the D.A.'s office approximately

17  April?

18      A    That's my recollection.

19      Q    Okay.

20      A    I'm not a hundred percent certain on that.

21  But...

22      Q    Okay.  And you said when he came back on

23  January 25th, 2021, you had a conversation with

24  Officer Saldivar?

25      A    A brief conversation, yes.

EXHIBIT 32

```
 1       Q     What was that conversation?  What did you
 2  say; what did he say?
 3       A     That with this shooting, the investigation
 4  pending, there was some concerns and he was going to
 5  be on inside duty, no uniform, no extra jobs, all of
 6  that, until after the investigation was complete.
 7       Q     What did he say in response?
 8       A     Not much.  He was mad and left.
 9       Q     How do you know he was mad?
10       A     I could tell by the look on his face and
11  the way that he left the room, quickly without
12  saying anything.
13       Q     Did you have any interaction with him
14  between January 2021 and July 9th, 2021?
15       A     Yes.
16       Q     Okay.  Tell me about those interactions.
17       A     The only interaction was right before he
18  separated from the organization, the -- the
19  circumstance under which he was going to leave and -
20  - and TCOL and all of that.
21       Q     The jury doesn't know.  So explain to the
22  jury what you mean by that.
23       A     The Texas Commission on Law Enforcement
24  and -- and how hi--- how he was going to be -- his
25  classification was going to be on the -- when he
```

1  separated from the organization.

2      **Q    Okay.  Well, what was his classification**

3  **when he separated?**

4      A    It was honorable.

5      **Q    So he received an honorable -- is it**

6  **discharge?  What --**

7      A    Yes.

8      **Q    What do you call it?**

9      A    Yes, discharge.

10      **Q    What's the effect of having a honorable**

11  **discharge in terms of his pension and other things?**

12      A    It has no effect on pension. Whether he --

13  I mean, under these circumstances, had I -- had it

14  gotten to the point where I indefinitely suspended

15  him, it -- it -- your pension doesn't change in the

16  State of Texas. His pension is his pension.  I mean,

17  even hypothetically in this case, if he were to be

18  convicted and go to prison, he still continues to

19  receive his pension.  Those are his -- his monies

20  under the -- in the state.

21      **Q    Is there a -- a dishonorable discharge**

22  **that can be given to an officer separating?**

23      A    There is.

24      **Q    Okay.  What's the difference between a**

25  **dishonorable discharge and honorable discharge?**

1      A     Typically, dishonorable, most often,

2  criminal conduct or untruthfulness are the two big

3  ones.

4      **Q     Okay.  But in terms of benefits and terms**

5  **of how it -- it affects a person going forward,**

6  **what's the difference in honorable discharge and**

7  **dishonorable discharge?**

8      A     Changes absolutely nothing.  And that's

9  the reason the State of Texas is about to change it,

10  changed the last legislative session.

11      **Q     Okay.  How is -- what's the change?**

12      A     There is no categories.  You just --

13      **Q     Discharge --**

14      A     You work from this -- for the organization

15  from this day to this day.

16      **Q     When you were chief of police, did you**

17  **have any role in hiring or -- or not hir--- or -- in**

18  **hiring or -- sorry.  When you were chief of police,**

19  **did you have any role in hiring officers?**

20      A     Yes.

21      **Q     Okay.  Would you have hired an officer**

22  **with a dishonorable discharge from another police**

23  **department?**

24      A     It depends.  It's the background process.

25  Kind of -- you -- and the chiefs, we don't give a

1  lot of credence to the classifications.  And that's

2  why it's incumbent upon organizations to do a

3  thorough background check with another department.

4      **Q     Well, if -- if you had a -- two candidates**

5  **for -- for -- for a position, one was honorable**

6  **discharge and one was dishonorably discharged, would**

7  **it have affected you view as to making a decision**

8  **either way?**

9      A     Again, it would depend on what the -- I

10  mean, you have politics in like sheriff's offices

11  and constable's office that sometimes come into play

12  in these things.  And so it -- it depends on the

13  background investigation and what's the reasoning

14  behind it.

15      **Q     So it played no role in your hiring**

16  **process?**

17      A     No.

18      **Q     Why did you decide to give Officer**

19  **Saldivar an honorable discharge as opposed to a**

20  **dishonorable discharge?**

21      A     As an incentive for him to separate from

22  the organization.

23      **Q     Explain what you mean by that.**

24      A     So like I mentioned, any time if I

25  indefinitely suspend an officer, they have a right

EXHIBIT 32

1  to appeal and go to the civil service commission or

2  an arbitrator.  Arbitration is binding.  And way too

3  often -- this has been a topic that's come up, you

4  know, post-George Floyd, the arbitration process,

5  there's a Vanderbilt law, I recall, 46 percent of

6  terminations were overturned by an arbitrator.

7        And so as chief, first and foremost is

8  protect the organization, protect the citizens.  And

9  that was at this point, after this -- this case,

10  Officer Saldivar being outside -- being out of the

11  organization.  And so if he would separate without

12  me having to terminate him, it's a benefit to the --

13  it's a win/win for the organization because there's

14  no appeals process, so it's final.  He's -- he's

15  gone.  There's no risk of him coming back to the

16  organization.

17        And so any agency that does a background

18  check should -- all of it's there. We -- we, by law,

19  have to open up all the files to those

20  organizations.  So with that said, if that was

21  important to him to get him to -- to separate from

22  the organization...

23    Q    At the time Officer Saldivar departed --

24  separated from Pasadena Police Department, was there

25  anything in his employment files that indicated that

```
13      Q     Sure.  So at the time he separated from

14   the Pasadena Police Department eight months after

15   the Aviles shooting, there is nothing in his

16   employment file that indicated that you or anybody

17   else at the Pasadena Police Department determined

18   that his shooting of Randy Aviles was unjustified.

19      A     There wasn't because we couldn't.
```

```
 9        Q    During the time from January of 2021 and

10   August of 2021 when he was terminated -- sorry, when

11   he retired, what were his exact duties for Officer

12   Saldivar?

13        A    They were inside, basically clerical

14   duties, receiving evidence as it comes in, doing

15   research on evidence that -- that can be destroyed.

16   And so it's clerical work.

17        Q    Okay.  Are there any other Pasadena police

18   officers who performed that same -- those same

19   duties and work?

20        A    It's civilians.

21        Q    Okay.

22        A    There's a sergeant in there.

23        Q    Uh-huh.

24        A    There is now -- it's gone back and forth,

25   but as far as officers, there's not officers.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1  It's...
 2       Q    And that was a decision that you made.
 3  Correct?
 4       A    Yes.
 5       Q    And that was within your authority.
 6  Correct?
 7       A    Yes.
 8       Q    Okay.  And the reason you made that
 9  decision was to prevent him from interacting with
10  the public?
11       A    Yes.
12       Q    Okay.  And from placing the public in
13  danger?
14       A    Yes.
15       Q    Okay.  And did you believe that he was a
16  threat to the public at that time?
17       A    I don't know that I -- threat's not the
18  right word.
19       Q    A danger.
20       A    I -- I -- I don't even know that I would
21  call it danger.  I just think the prudent thing to
22  do would be to keep him inside and not interact with
23  the public.
24       Q    Prudent in what way?
25       A    You had an open investigation.  I had
```

1  concerns, you know, with -- with the last shooting.

2  And so to prevent anything else, you know, from

3  happening until all of this was done and I could

4  make a final decision was the best place.

5      **Q    So because there's an open investigation**

6  **into the Aviles shooting, you felt it was best to --**

7  **to keep him from interacting with the public?**

8      A    Because of the circumstances of the Aviles

9  pu--- Aviles shooting, yes.

10     **Q    And that investigation did not close prior**

11 **to him leaving the police department?**

12     A    That's correct.  Criminal investigation

13 was open -- I mean, technically, it's still open.

14     **Q    Do you recall when he was actually**

15 **indicted?**

16     A    Right before the two-year anniversary.  I

17 want to say the middle of December of 2022.

18     **Q    If I told you it was the beginning of**

19 **January of 2023, would you have any reason to**

20 **dispute --**

21     A    No, it was around that time. Right --

22 short of two years.  I knew that.  Or right around

23 two years.

24     **Q    And you stated before that the D.A.'s**

25 **office had received the file from you guys in about**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 1  April of 2021?
 2       A    Yes.
 3       Q    Do you know why it took so long for an
 4  indictment?
 5       A    Do I know why?
 6       Q    Uh-huh.
 7       A    I know what I was told.
 8       Q    Okay.  What were you told?
 9       A    The civil rights prosecutors were busy
10  with Harding Street and didn't have time to review
11  it and get on it.
12       Q    What's Harding Street?
13       A    Harding Street was a shooting in Houston,
14  ended up with several officers indicted.
15       Q    So how did you learn this information?
16       A    I talked to the district attorney.
17       Q    Okay.  When did you talk to the district
18  attorney?
19       A    November of -- he was indicted in January
20  of '23?
21       Q    Uh-huh.
22       A    November of '22.
23       Q    Well, can you tell me about that
24  conversation?
25       A    Tell you about it?
```

NAEGELI DEPOSITION & TRIAL  (800)528-3335  NAEGELIUSA.COM  EXHIBIT 32

1      **Q      Yes.**

2      A    I -- I just asked her why it was taking so

3  long, that they had had it for some time.

4      **Q      Uh-huh.**

5      A    And she was initially surprised, told me

6  they shouldn't take that long, told me that, you

7  know, they had been busy with Harding Street.  And

8  she told me when she got back to the office, she

9  would figure out what the delay was.

10     **Q      Okay.  Do you know whether or not it had**

11 **been presented to the grand jury prior to January**

12 **2023?**

13     A    Aviles shooting?

14     **Q      Yes.**

15     A    To my knowledge, no.



25     **Q      And at that time, in November 2022,**

1  **Officer Saldivar had already separated himself from**

2  **the police department.  Correct?**

3      A    Yes, but we still had -- we still had the

4  open case sitting there, so yes.

5      **Q    Do you know approximately how long after**

6  **the Schenk shooting did that case go to the grand**

7  **jury?**

8      A    There was a delay there as well.  It

9  wasn't two years.  But I -- I don't remember when it

10 was.  I -- I know it took a long time only because

11 there was some litigation over -- over some records

12 over it, but it was -- it was awhile.

13     **Q    It was -- it was less than two years?**

14     A    Yes.

15     **Q    Was it less than a year?**

16     A    I -- I don't know.  I -- I seem to recall

17 it being around a year, but it was -- it was

18 lengthy.

19     **Q    How about the Ramirez shooting?  Was there**

20 **a grand jury there as well?**

21     A    I don't know -- I -- I'm not sure if that

22 one was presented since nobody was hit. They've gone

23 back and forth on whether they present cases where a

24 person is not actually struck.

25     **Q    Okay.  So Officer Saldivar was indicted in**

NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    late December, early January twenty-twen--- late

2    December 2022, early January 2023.  Correct?

3        A    Yes.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

```
 4        Q    Do you recall whether in your conversation

 5   with the -- with the -- a D.A. if you told -- if you

 6   informed them that the City had been sued for a

 7   shooting?

 8        A    No, I had not.

 9        Q    You don't recall or you did not tell them?

10        A    I did not tell them that.

11        Q    Do you know if anybody told him that?

12        A    I have no knowledge of anybody telling

13   him, no.

14        Q    What's your opinion -- actually, no,

15   before we get to that, tell me how the conversation

16   -- I'm sorry, let me start over. Tell me the

17   conversations that occurred at the time of Saldivar

18   separating himself from the police department August

19   2021.

20        A    A lot of it's going to be attorney--- it's

21   going to be attorney/client, so...

22        Q    Well, I'll -- let's unpack that a little

23   bit because I just -- I'm trying to understand what

24   -- what -- what would have been and what would not

25   have been.  The conversation with Saldivar would not
```

EXHIBIT 32

1   be attorney/client privilege.

2        A    Correct.

3        Q    Okay?  And so -- so without telling me

4   what -- like, you know, what you said, okay, or what

5   any attorney said to you, okay, tell me what type of

6   conversations you had at the time that Officer

7   Saldivar separated from the police department.

8        A    There was only one conversation.  It was

9   after discussions with the attorney where Officer

10  Saldivar reached out about separation and his F-5

11  form with TCOL.  And he just wanted it in writing

12  what it was going to be.  And I said I would do that

13  as long as I got his retirement from him.  And that

14  was the extent of the conversation.

15       Q    What's a T-5 file?

16       A    No.  F-5.

17       Q    F-5.

18       A    It's the separation form with TCOL.

19       Q    I'm sorry.

20       A    Yeah.

21       Q    What's -- what's the F-5 file?

22       A    What is it?

23       Q    Yes.

24       A    It's the separation form with TCOL, the

25  honorable, dishonorable.  That -- that --

EXHIBIT 32

1      **Q     Okay.**

2      A     It's that form.

3      **Q     I gotcha.  And he wanted to know what it**

4  **would say?**

5      A     Yes.

6      **Q     Did he ask you why?  Did he -- did he tell**

7  **you why he wanted to know?**

8      A     Yes, he said, I just want to make sure

9  this is going to be an honorable discharge. And he

10  said, I just don't want you to say one thing and

11  change it later.  And so I said, I'll give it to you

12  in writing as long as I have a resignation letter

13  from you.  And so...

14      **Q     When did he first inform you that he**

15  **intended to resign?**

16      A     It was the week -- it was within a week or

17  two of him actually leaving because part of the

18  problem was we were coming up -- civil service, you

19  got to impose discipline within 180 days from the

20  day of the offense.  And I believe that day was July

21  11th because I think the 9th was a Friday.  And so

22  it was a Sunday and I wasn't coming to work Sunday.

23  And so we had to -- I -- at that point, was being --

24  my hand was being forced to -- to -- to make a

25  decision. And so --

EXHIBIT 32

```
 1        Q    Okay.  So let's -- let's back up. So the

 2   incident ha--- occurred on January 12th, 2021.

 3        A    Yes.

 4        Q    Okay.  Civil service discipline, right --

 5        A    One -- yeah, 143.052 of the local

 6   government code.

 7        Q    Okay.  Had to occur within six months?

 8        A    180 days is what it says.

 9        Q    180 days of the misconduct.

10        A    Correct.

11        Q    Okay.  So that would be July --

12        A    11th.

13        Q    -- 11th?

14        A    Yes.

15        Q    Okay.  Of 2021.  Okay.

16        A    Yes.

17        Q    Okay.  So during -- so during those six

18   months, did you impose any civil service discipline

19   upon Officer Saldivar?

20        A    I didn't because the investigation wasn't

21   complete.

22        Q    I'll strike everything after did not.  So

23   I'm going to ask you the question again.  Between

24   January 12th, 2021 and July 11th, 2021, did you

25   impose any civil service discipline on Officer
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1  Saldivar?  Yes or no.

2       A    No.

3       Q    So his employment file would not reflect

4  any discipline for the shooting of Randy Aviles in

5  his -- sorry, I'm going to say it twice.  Strike

6  that.  So his employment file would not reflect any

7  civil service discipline for the shooting of Randy

8  Aviles.  Correct?

9       A    Correct.

10      Q    Would they issue any reprimands or lesser

11 discipline for that shooting?

12      A    No.

13      Q    Would -- would -- would it reflect that he

14 was placed in the -- what's it called? What did you

15 say?

16      A    The property room?

17      Q    The property room?

18      A    I don't know that his file will say it.  I

19 know there's a record of it, but his file doesn't

20 say it.

21      Q    So now we're going from July 11, 2021 to

22 August 2021.  Or August 9th when he --

23      A    July 9th.  He separated July 9th.

24      Q    No, he separated August 9th.

25      A    From the Pasadena Police Department?

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT 32

1      Q    Uh-huh.  Yeah.  It...

2      A    I don't think so.  You might be right, but

3   it's not my recollection.



16     Q    Do you have any regrets with respect to

17  any of the decisions you made with respect to

18  Officer Saldivar?

19     A    No.

20     Q    What is your ultimate opinion of Officer

21  Saldivar as a police officer?

22     A    I -- I don't think he should be a police

23  officer.

24     Q    Why not?

25     A    His judgment on the Aviles shooting.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT 32

1    **Q    Anything else?**

2    A    No.

3    **Q    Up until the Aviles shooting, did you have**

4    **any cause for concern about his judgment as a police**

5    **officer?**

6    A    No.

7    **Q    Does the Aviles shooting make you reflect**

8    **on the decision that you made for prior two -- on**

9    **the prior two shootings?**

10    A    Does it make me what?

11    **Q    Reflect on the decisions that you made for**

12    **the prior two shootings.**

13    A    No.

14    **Q    Why not?  Same person.**

15    A    Different sets of facts.

22    **Q    Okay.  When do the raises typically occur?**

23    A    Well, the police officers are on a step

24    scale.

25    **Q    Uh-huh.**

```
 1        A      And so it doesn't matter whether you're a
 2   mediocre officer, superstar; once you hit, you know,
 3   say five years, this is your salary.  And then COLAs
 4   are the same thing when the city does cost of living
 5   adjustments at the -- so it goes to everybody.  And
 6   so he -- he -- he wouldn't have gotten a -- Ri---
 7   Salvidar wasn't singled out and said, hey, you get a
 8   raise.  It's the step system and --
 9        Q      Did you --
10        A      -- COLAs.
11        Q      Did you have authority to stop him from
12   receiving that raise?
13        A      No, that's civil service.
14        Q      How about after the Aviles shooting? Did
15   he receive a raise after that shooting?
16        A      It would have been the same set of
17   circumstances, depending on where he was on the step
18   chart as far as years of service and cost of living
19   adjustments across the board for the city.
20        Q      My question was do you know if he received
21   a raise after the Aviles shooting.
22        A      I -- I don't know the answer to that.
23        Q      I'm trying to find it, but I'm recalling
24   that during your deposition in the Schenk case, you
25   testified that it was ultimately within your
```

1    authority to determine whether or not he received a

2    raise.  Is there any reason why you would testify

3    that -- to that effect?

4        A    No.

5        Q    Give me a second.  When you retired from

6    the Pasadena Police Department, you received a

7    retirement party.  Correct?

8        A    Yes.

9        Q    Okay.  How -- how -- how did that occur?

10       A    How did it occur?

11       Q    Uh-huh.  Like who planned it?  Like what

12   were the circumstances around it?

13       A    Everybody that leaves, retires from the

14   organization, you have the option to do it and...

15       Q    Do -- do you know whether Officer Saldivar

16   received a retirement party before he left?

17       A    He did not.

18       Q    Okay.  Did he have the option to?

19       A    I don't know that he was even given -- I -

20   - he was not given the option. There was never a

21   discussion.  He didn't ask and we weren't offering

22   it.

```
 1                 CERTIFICATE OF VIDEOGRAPHER

 2

 3        I the undersigned, Clark Bolen, am a videographer

 4   on behalf of NAEGELI Deposition & Trial.  I do hereby

 5   certify that I have accurately made the video recording of

 6   the deposition of Chief Joshua Bruegger, in the above

 7   captioned matter on the 5th day of January 2024, in the

 8   location of 937 Broadway Street, Myrtle Beach, SC 29577.

 9

10        No alterations, additions or deletions were made

11   thereto.

12

13        I further certify that I am not related to any of

14   these parties in the matter and I have no financial

15   interest in the outcome of this matter.

16

17

18

19

20   Clark Bolen

21   Videographer

22

23

24

25
```

```
1                              CERTIFICATE

2

3          I, Mark W. Hagood, do hereby certify that I

4     reported all proceedings adduced in the foregoing matter

5     and that the foregoing transcript pages constitutes a

6     full, true and accurate record of said proceedings to the

7     best of my ability.

8

9          I further certify that I am neither related to

10    counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14    23rd day of January, 2024.

15

16

17

18    _____

19                    Mark W. Hagood

20

21

22

23

24

25
```

EXHIBIT 32

```
 1   Date:      January 23, 2024          Assignment #: 71056

 2   Attorney: Norman R. Giles, Esquire

 3   Deponent: Chief Joshua Bruegger

 4   Case:      Aviles vs. Saldivar

 5

 6   ATTORNEY - TRANSCRIPT ENCLOSED:  Signature of your client

 7   is required.  Please have your client make any corrections

 8   necessary.  Sign the Correction Sheet where indicated.

 9   Forward a COPY of the executed Correction Sheet directly

10   to the attorney(s) listed below.  (The Address(es) can be

11   found on the Appearance page of the deposition.)  Also,

12   send a COPY of the executed Correction Sheet to our

13   corporation.

14

15

16

17

18

19

20   CC:  Naegeli Deposition & Trial

21        Dimitri Dube, Esquire

22

23

24

25
```

EXHIBIT 32