# PASADENA POLICE DEPARTMENT
## Inter-Office Correspondence



**To:**   J. Bruegger, Chief of Police          **Date:**   August 12, 2019

**From:**   Sgt. C.A. Hamilton #1122

**Subject:**   Control #1286

## SUMMARY OF COMPLAINT

On November 21, 2018, at approximately 7:32pm, Officer Saldivar, who was working an overtime traffic assignment (S.T.E.P.), attempted to conduct a traffic stop for a vehicle that failed to stop at a stop sign at the intersection of 6200 Pine Street and 2400 Jana Lane. The suspect vehicle continued eastbound on Jana Lane, turned southbound on Red Bluff Rd, and finally stopped in the parking lot of Hawk's Bar (4416 Red Bluff). The suspect then exited the vehicle, failed to follow commands, and attempted to evade Officer Saldivar. As he pursued the suspect, Officer Saldivar deployed his Taser twice, which had minimal to no effect. At the end of the foot pursuit, Officer Saldivar struggled with the suspect before drawing his duty weapon, discharging it, and ultimately killing the suspect. As of this date, the Harris County Grand Jury has not yet met to discuss the outcome of this investigation. Upon receiving their findings, an administrative supplement will be completed.

## ALLEGATION

*Officer Involved Shooting*

## OFFICER INVOLVED

*Officer R. Saldivar*
*Employee #5750*
*Night Shift - Patrol*

## COMPLAINANT

*Chief of Police J Bruegger*
*Pasadena Police Department*
*1201 Davis, Pasadena, TX, 77506*

**EXHIBIT 37**

Revised: 10/26/09

CONFIDENTIAL

## DECEDENT

*Nathan Schenk*
*W/M, 12/14/1983*

## INTERNAL AFFAIRS INVESTIGATION

On November 21, 2018, at approximately 7:45pm, I was notified by Dispatch that an officer involved shooting had just occurred and that I needed to respond to the intersection of Jana Ln and Pine St. I arrived at about 8:37pm and was briefed by Detective Cooper and Sergeant Skripka. Officer Saldivar had been sequestered to a patrol unit, with peer support Officer Traxler, and was standing by for the arrival of legal counsel.

**SCENE SUMMARY:** At the time of my arrival, the weather was cold with intermittent rain. It was night time with moderate artificial lighting, which was provided by police lights and nearby street lights.

6200 Jana Ln is a two-lane public roadway within the city limits of Pasadena, Harris County, Texas. The roadway runs generally east and west, with one lane designated for each direction of travel. At the east end of Pine Ave, is the intersection with 2500 Jana Ln. At the intersection, eastbound traffic on Pine Ave has a Stop sign, which is posted at the southwest corner of the intersection, facing west. Jana Ln curves northeast, where it intersects with 4400 Red Bluff Rd. That intersection has a stop sign for traffic on Jana Ln, and no stop sign for Red Bluff. In this section of Red Bluff, the roadway runs generally northwest to southeast. The roadway consists of 4 lanes, two for each direction of travel. Yellow crime scene tape had been erected to encompass the intersection of Jana Ln at Pine Ave, an open grass lot north by northwest of the intersection, a connected driveway and parking area for 2412 Jana, and across the roadway, to the east, extending into a residential yard (2407 Jana).

Laying in the grass, just west of the driveway for 2412 Jana Ln and north of the north curb line of 6200 Pine Ave, is a white male lying face down. The body was positioned with the head of the subject oriented toward the south and the feet oriented toward the north. His wrists are handcuffed behind his back, and his face was turned slightly to his left (east). The male was wearing a black fleece jacket, dark colored t-shirt, blue jeans with a black belt, and black tennis shoes. On initial inspection, there appeared to be two bullet holes in the subject's lower back. Further evidence was not easily viewed due to the position of the deceased and the area being lightly saturated (wet) because of rain.

West of the body was a set of keys on a silver clip. North of the keys, a few feet north of the feet of the deceased was a black flashlight in the grass. There were three silver colored spent cartridge casings laying in the grass near the flashlight. To the west of the flashlight, and cartridge casings, was a grouping of other items: A Taser, which was turned on (light illuminated) and laying in the grass facing east. There is a spent cartridge attached to the front of the Taser, and the bottom cartridge well (used for a second cartridge) was empty. Near the Taser was a dark colored canvas bag, a red lighter, and a Marlboro cigarette box. Approximately 20 feet west of the set of keys was a clear plastic baggie containing a clear crystal substance.

**EXHIBIT 37**

**CONFIDENTIAL**

- 3 -

To the east of the deceased (2412 Jana) is a large concrete driveway and parking area between the front of a metal framed building and to the northwest of the curb line of 2400 Jana Ln. Parked in the driveway, north by northeast of the deceased, was a Silver 2008 Ford F350 Dually (TX: DMG3435), facing north. Immediately east of the front passenger door of the dually is a trail of white round pills. The pills continue in a southeast arc toward Jana Ln. Approximately midway between the pills and the roadway, laying in the grass, was a black spent Taser cartridge case. The wires for the cartridge extended west from the case. Directly south (behind) the rear of the truck, on the ground, is an open pill bottle that appeared empty.

In speaking with **Detective Cooper**, I learned Officer Saldivar was working a Selective Traffic Enforcement Program when he observed a vehicle fail to come to a stop at a stop sign at the intersection of Pine Ave and Jana Ln. After initiating the stop, the vehicle continued traveling to a parking lot located at 4400 Red Bluff (Hawk's Bar). The male driver of the vehicle then exited the vehicle, fled westbound, and was pursued by Officer Saldivar on foot. During the course of the pursuit, Officer Saldivar had utilized his Taser without effect. At the conclusion of the foot pursuit, Officer Saldivar struggled with the suspect until discharging his weapon multiple times and striking him a minimum of two times. Acadian ambulance #966 had been dispatched to the scene where they pronounced the suspect as deceased at 19:48pm.

Detective Cooper also informed me the shooting event had been recorded on Officer Saldivar's body worn camera. The initial traffic stop was recorded on Officer Saldivar's MVR (Dash Camera). Sergeant White had already been called to the scene in order to retrieve these cameras and download them so they may be viewed. Sergeant White later completed a supplement (see attached) documenting his handling of these cameras. Detective Cooper advised Officer Saldivar would provide a non-recorded walk-through statement after he and his attorney had reviewed the video.

I then learned, prior to my arrival, the Harris County District Attorney's Shoot Team and the Harris County Medical Examiner's Office (HCIFS) had been contacted and were sending representatives to the scene.

Assistant District Attorney Johnson and Investigator Lieutenant Field arrived at approximately 21:25pm and were briefed by Detective Cooper.

The Medical Examiner's Office, with body car, arrived at approximately 21:31pm, and conducted a cursory investigation. HCIFS Investigator Godfrey processed the deceased and assisted in identifying him by his Texas Driver's License (#███████ as Nathan Schenk (w/m, ███████ Investigator Godfrey also noted the appearance of two gunshot wounds to the decedent's lower back and two underneath his left armpit. It was during this time that a spent projectile was located amongst Schenk's clothing. The body car attendants retrieved Schenk and departed the scene at approximately 22:35pm.

I next accompanied Detective Cooper, Crime Scene Investigators Dudley and Coulter, ADA Johnson, Lt. Field, IAD Sergeants Bowman and Sanders, Officer Saldivar, and his legal counsel Mr. Cagle into the Crime Scene Mobile Command Unit in order to catalog Officer Saldivar's duty weapon. The cataloging showed Officer Saldivar's duty weapon to be a Glock, model 19, 9mm bearing serial number TBV181. One live round was found in the chamber of the weapon and nine live rounds within the magazine for a total of 10 rounds within the weapon. Officer

EXHIBIT 37

         Revised: 10/26/09
CONFIDENTIAL

Saldivar had two additional magazines filled to capacity, 15 rounds. Upon completion, the cataloging revealed Officer Saldivar had discharged five rounds.

Shortly thereafter, Sergeant White arrived with copies of body and dash cam videos for review. Those present were able to review the video; however, due to a small viewing screen, details were difficult to discern. Officer Saldivar was then afforded an opportunity to review the video alone with his attorney.

After reviewing video footage, Officer Saldivar provided a non-recorded "walk-through". Present were Detectives Cooper and Mata, Violent Crimes Sergeant Skripka, ADA Johnson, ADA Investigator Lt. Field, IAD Sergeants Bowman and Sanders, Mr. Cagle, and myself. It should be noted the "walk-through" was consistent with Officer Saldivar's written affidavit, which was provided later, and no follow-up questions were asked.

Detective Cooper chose to leave the scene secured by patrol officers in order to return the next morning and reexamine the area for evidence. I left the scene at approximately 01:51am.

I later retrieved copies of Officer Saldivar's dash and body camera videos for a more detailed review. The following is a timeline of those videos:

**Dash Camera Video:** It should be noted there is limited sound in this video as the majority of audio is recorded via the body worn camera.

The video begins at **19:29:02**, with Officer Saldivar's vehicle facing south while parked north of the intersection of Pine St at Jana Rd.

**19:29:56** – Silver Ford Focus, suspect vehicle, disregards the stop sign while turning left from Pine St eastbound to Jana Rd northbound.

**19:29:58** – Officer Saldivar activates the patrol unit's emergency equipment and pulls in behind the vehicle. The suspect vehicle travels in the opposite lane of travel (northbound in a southbound lane) while continuing toward Red Bluff Rd.

**19:30:06** – The suspect vehicle is in the wrong lane of travel but is stopped for the stop sign Jana at Red Bluff.

**19:30:16** – The suspect vehicle turns south (right) from Jana Rd to southbound Red Bluff Rd.

**19:30:26** – Suspect vehicle pulls into "Hawk's Place," 4416 Red Bluff. The vehicle stops within the parking lot, not in a parking space, toward the entrance/exit which leads to 2500 Golden Villas St.

**19:30:36** – The driver of the vehicle pushes a dark colored bag out of the passenger window. The driver is making several undiscernible / furtive gestures within the car.

**19:31:04** – The driver exits the car and proceeds around the front of the vehicle toward the passenger side. Officer Saldivar can barely be heard saying, "sir what are you doing?"



**EXHIBIT 37**

CONFIDENTIAL

**19:31:11** – The driver retrieves the bag and begins running southbound on Golden Villa.  Officer Saldivar is seen between the patrol car and the Ford Focus before pursuing the driver.

**19:31:13** – The driver and Officer Saldivar go out of view of the dash camera.

**19:31:16** – Via the police radio, Officer Saldivar is heard broadcasting "one on the ground" along with a suspect description.

**19:31:41** – Officer Saldivar broadcasts, "He's still running.  We're going back to Pine."  It is apparent Officer Saldivar is running as he sounds out of breath.

**19:31:53** – Officer Saldivar broadcasts "Pine and Jana."

The video concludes at **19:31:58** and is approximately 3 minutes in length.

**Panoramic Dash Camera Video:**  The video begins at **19:29:02** with an expanded view of the dash camera video.  The video is darker and more difficult to discern what is occurring.  However, it is more easily seen at **19:30:36** when the suspect pushes the back pack from the vehicle.

The video concludes at **19:31:58** and is approximately 3 minutes in length.  It should be noted both dash camera videos were "trimmed" for a more appropriate review.  The initial full video was reviewed (3 hours of footage); however, no additional information was gained after Officer Saldivar and the suspect exit the view of the dash camera.

**Body Camera Video:**  Due to the manner of the recording, all intervals in this video are based on the amount of time that has elapsed rather than being "time-stamped."  The video begins at **00:00:00**, with Officer Saldivar sitting in his patrol vehicle and an open Mobile Data Computer displaying a web browser.

**03:59** – The patrol unit's emergency lights have been activated.  Audio commences.

**04:01** – The sound for the recording can be heard activating and simultaneously the [mic] display turns from white to green.

**04:06** – It appears Officer Saldivar is turning the steering wheel to the left indicating the patrol unit is executing a left turn onto the public roadway (Jana Ln.).

**04:09** – Officer Saldivar can be heard saying, "What the f..., the hell?  What are you doing? In the middle of the street?"  During this time, a small white 4 Dr car (suspect vehicle) can be seen approaching the intersection of Jana Ln and Red Bluff Rd.

**04:14** – The vehicle appears to brake as it approaches the stop sign in preparation to make a right turn onto Red Bluff Rd.  However, based upon the movement of the body camera, it is not apparent if the suspect vehicle has come to a complete cessation of movement.

**04:15** – As Officer Saldivar approaches the stop sign for Jana Ln., he can be heard saying, "FGD5246."

**EXHIBIT 37**



Revised: 10/26/09
CONFIDENTIAL

**04:25** – Officer Saldivar states, "Driving on the wrong side of the road."

**04:30** – Officer Saldivar executes another right turn into the parking lot of the business, "Hawk`s Place" (4400 Red Bluff). Once in the parking lot, Officer Saldivar positions the patrol unit offset and behind the suspect vehicle.

**04:37** – Officer Saldivar exits the patrol unit

**04:42** – Officer Saldivar stands in the void between the vehicle`s open door and the interior of the patrol unit.

**04:53** – Officer Saldivar can be heard saying, "3303 copy traffic 4400 Red Bluff." As he is making this statement, the driver of the suspect vehicle can be seen reaching to the far side of the vehicle (passenger side). The subject reaches into this passenger side several times prior to Officer Saldivar attempting to make contact with him.

**05:02** – The driver`s door to the suspect vehicle opens and the driver (suspect) exits.

**05:05** – As the male exits the vehicle Officer Saldivar is heard saying, "Sir you can get out of, stay in the car. Stay in the car sir, sir, what are you doing, sir." As Officer Saldivar is giving these instructions, the male subject closes the door to the car.

**05:05** – The driver makes an unintelligible statement, and begins to walk around the front of the vehicle. As the male moves toward the front right quarter panel (passenger side), he appears to be ignoring Officer Saldivar and trying to conceal the front of his person.

**05:09** – The male picks up what appears to be a dark colored backpack from the ground outside the vehicle`s front passenger door.

**05:11** – The suspect to his left (Officer Saldivar`s right), takes approximately two steps, and begins to run south toward Golden Villas St. Officer Saldivar can be heard saying, "03" and then in elevated tones "one on the ground, I got one on the ground."

**05:23** – As he pursues the suspect, Officer Saldivar appears to be broadcasting, "one on the ground. He`s running westbound, white male, black jacket, 5`10." As he provides the information, lighting diminishes and only Officer Saldivar's flashlight can be seen.

**05:24** – The suspect passes artificial light source and proceeds into a small alleyway northbound, which is between a residence and a 6` wooden fence.

**05:26** – The suspect continues, what appears to be north, between the aforementioned residence and a white sheet metal storage building / shed. As they are running between the two structures there is no adequate ambient light other than what is believed to be the light from Officer Saldivar's flashlight.

**05:28** – White lighting and a possible laser sight, believed to be from Officer Saldivar`s Taser, can be seen moving from right to left as Officer Saldivar pursues the subject.

**EXHIBIT 37**

Revised: 10/26/09

CONFIDENTIAL

**05:30** – The rear of the Taser display can be seen. Officer Saldivar is holding the Taser in his right hand. There is an opening between the two buildings and the suspect can be seen running.

**05:31** – Suspect appears to lose his balance and bends over at the waist.

**05:32** – Officer Saldivar emerges from the alley and a Taser deployment can be heard. The Taser wires can be seen; however, it does not appear effective and the suspect continues fleeing northbound.

**05:35** – Officer Saldivar states, "Taser Deployed, he`s still running. We are going back to, we`re going back to Pine."

**05:41** - Officer Saldivar appears to be manipulating his Taser in a manner believed to be discarding the original and reloading a second Taser Cartridge.

**05:51** – Officer Saldivar can be heard saying, "Pine and Jana. We`re Pine and Jana, running westbound"

**05:55** – Officer Saldivar can be heard commanding the subject to, "Get on the ground."

**05:57** – A second Taser deployment is administered. The suspect can be heard responding (cries out) and appears to be falling to the ground.

**05:59** – Officer Saldivar is heard saying, "Mother fucker < unintelligible >" as he makes contact with the suspect, who has rolled onto his back and is facing up toward Officer Saldivar.

**06:01** – The suspect, while still on his back, reaches up toward Officer Saldivar with this right hand. Officer Saldivar is able to grab the suspect's right hand with his right hand in an attempt to restrain him.

During this struggle, the following dialogue is heard:

| | |
|---|---|
| Suspect – "Don`t hit me man" | Saldivar – "Get it turn around" |
| Suspect – "Don`t hit me" | Saldivar – "Get down" |
| Suspect – "Don`t hit me" | Saldivar – "Get on the ground" |

**06:04** – The video appears to cut out as it goes dark.

**06:06** – Video resumes. During this time, the sound goes off and on, which is signified by the white [mic] display turning from green to white.

**06:07** – The video goes dark again; however, the recording continues until 6:44. Audio can be heard during this time.

**06:08** – The [mic] display changes from white to green, signifying audio recording has continued. Officer Saldivar can be heard giving suspect several commands.

**EXHIBIT 37**

Revised: 10/26/09
CONFIDENTIAL

**06:10** – Officer Saldivar makes several muffled statements but can be heard saying, "Ah! Get on the ground"

**06:18** – The [mic] display changes from green to white and Officer Saldivar can be heard saying, "Get on the ground."

**06:24** – The [mic] display changes from white to green.

**06:27** – The [mic] display returns to white; however, Officer Saldivar can be heard saying, "Get on the ground". It is apparent that Officer Saldivar's breathing has become increasingly labored.

**06:36** – The camera shifts from all black to a view of the street. Based upon the sound of scuffling noises, it appears Officer Saldivar and the suspect are involved in a physical struggle.

**06:44** – Video resumes but appears to be in a fixed position on the ground pointing upward. It is believed the camera was pulled from Officer Saldivar's camera mount during the preceding struggle. Due to poor lighting, the video is of poor quality.

**06:50** – Officer Saldivar is seen positioned over the suspect in a grappling position. He appears to be attempting to keep the suspect down; however, is being pulled forward and off camera.

**06:55** – Officer Saldivar disappears from view. He moves from his position to the right (forward for his body) and out of view. Although not fully visible, it is believed he was thrown off balance by the suspect.

**06:59** – The camera view shakes abruptly. In the lower left corner of the display, the suspect appears to emerge into the video. Although it is very difficult to discern, the suspect appears to be moving up and forward. Initially it appears the suspect is crouched low but is attempting to rise up to a standing position. It should be noted that only the back-right portion of the suspect can be seen, which is why it is hard to discern his exact movements.

**07:02** – The suspect's body is primarily out of view; however, his hairline is visible due to backlighting from the streetlight. It appears the suspect is spinning away.

**07:04** – The video continues without audio. In the upper center portion of the video appears to be a flash (muzzle flare) followed by multiple puffs of smoke. At the same time the puffs of smoke are seen, the suspect starts falling to the ground. As he falls, the suspect spins displaying his full back before turning to the left side of his body, and landing on the ground.

There is no discernable movement again until **07:08** when a vehicle can be see passing in the lower left-hand corner of the camera view.

**07:10** – Officer Saldivar's weapon is drawn in his right hand. He appears to be reaching for his camera, with his left hand, in order to return it to the mount without success.

**07:13** – Officer Saldivar has recovered the body camera. The suspect is lying on his back.

EXHIBIT 37

CONFIDENTIAL

**07:14** – Officer Saldivar can be heard screaming, "Mother Fucker" as the subject can be heard saying, "I don`t have a gun." Officer Saldivar follows by screaming, "Oh, you son of a bitch" and the subject says, "what are you doing to me?"

**07:18** – Officer Saldivar continues to scream the commands, "Keep your hands where I can see them. Don`t you fucking move. I will shoot you again." Officer Saldivar`s left hand is observed on the video still attempting to manipulate the camera into its mount; however, he is not successful.

**07:23** – The suspect can be seen with his head raised off the ground looking at Officer Saldivar with both of his hands extended out from his side. The suspect says, "I don`t have anything," and Officer Saldivar responds, "Don`t you damn move."

**07:24** – The suspect again states "I don`t have anything." Officer Saldivar repeats his demand, "Don`t you fucking move," to which the subject says, "I don`t have a gun."

**07:30** – The suspect's hands fall to the ground while his arms remain extended from his side. He also rests his head on the ground, looking up. The suspect states, "I don`t have a gun," multiple times.

**07:50** – Officer Saldivar can be heard broadcasting "Shots Fired, Shots Fired," while maintaining a "ready position" and his weapon drawn.

**07:52** – Officer Saldivar yells to the suspect, "Don`t you damn move," repeating "Don`t you move. Don`t you damn move."

**07:59** – The suspect attempts to roll from his back onto his right side, but is unable to do so. Officer Saldivar stutters, but tells the subject "Don`t you move dammit."

**08:01** – The suspect rests on his back as it appears a vehicle is approaching eastbound on Pine St. Officer Saldivar again broadcasts, "Pine and Jana, have shots fired."

**08:05** – The suspect again tries to roll onto his right side. Officer Saldivar again instructs the suspect to, "Get, get on the ground." As the demand is made, Officer Saldivar's camera again falls from its mount to the ground and the screen goes black.

**08:09** – The camera is recovered by Officer Saldivar and the view returns.

Between **08:09** and approximately **08:14** Officer Saldivar is seen manipulating the camera and trying to return it to the mount on his shirt. As the camera is re-secured a patrol unit (white SUV) is seen approaching.

**08:19** – Officer Saldivar is heard saying, "That`s negative, Suspect shot," and emergency sirens are heard approaching. As the patrol unit approaches, Officer Saldivar can be heard saying to the suspect, "Don`t you move, you stay, you stay right there."

**08:45** – Officer Salazar is the first officer to respond to the scene and exits his vehicle. Officer Salazar says something that is inaudible, to which Officer Saldivar responds, "I don`t know." EXHIBIT 37

handcuffs on `em get handcuffs, get handcuffs. Get handcuffs on him, I don`t know what he has."

**08:59** – Officer Salazar grabs the suspect`s left arm and rolls him to the right and onto his stomach before placing him in handcuffs.

**09:34** – Officer Saldivar's body camera falls from his mount and is immediately retrieved.

**10:00** – Officer Saldivar is approached and assisted by Officer Quintanilla, who has him sit in a marked patrol unit. Officer Saldivar points out how the suspect discarded items during the foot pursuit.

**10:05** – Officer Saldivar is able to return his body camera to its mount.

**10:31** – Officer Saldivar provides the route of the pursuit to Officer Quintanilla.

**10:56** – Officer Saldivar enters a patrol unit where he is later contacted by Officer R. Barrionuevo. While seated, Officer Saldivar's breathing is obviously labored.

**14:01** – Officer Saldivar is instructed to turn off his body camera by Sergeant M. Scott at 19:40pm.

Although the audio recording is terminated, the video continues recording until **14:59**. The total time of the video is 14 minutes and 59 seconds.

Copies of all videos were burned to DVDs and are included with this investigation.

I also retrieved and reviewed the radio traffic (Channel 1, Channel 2) from that evening. I found the broadcasts to confirm the accounts previously provided to me on scene. Copies of the radio traffic were burned to a CD and are included with this investigation.

During the course of my investigation, I located several Superion reports. **Officer C. Sanders** authored the primary report. The following is his report, in whole, and unedited:

*Scene Summary:  6200 Jana Ln is a public roadway within the city limits of Pasadena, Harris County, Texas. The roadway runs generally east and west, with one lane designated for each direction of travel. At the east end of Pine Ave, is the intersection with 2500 Jana Ln. At the intersection, eastbound traffic on Pine Ave has a Stop sign, which is posted at the southwest corner of the intersection, facing west. Jana Ln curves northeast, where it intersects with 4400 Red Bluff Rd. That intersection has a stop sign for traffic on Jana Ln, and no stop sign for Red Bluff. In this section of Red Bluff, the roadway runs generally northwest to southeast. The roadway consists of 4 lanes, two for each direction of travel.*

*4416 Red Bluff Rd is the location of "Hawks Place", a bar which is located within the city limits of Pasadena, Harris County, Texas. The building is located on the west side of the roadway, facing northeast. Northeast of the building is a small parking lot. The south side of the parking lot is bordered by 2500 Golden Villas St. In the southeast corner of the parking lot, just north of the north curb line of 2500 Golden Villas is a silver 2008 Ford Focus (TX:* ▆▆▆▆

EXHIBIT 37

Revised: 10/26/09

CONFIDENTIAL

*parked facing southeast. The engine is running, and the front two windows on the four-door vehicle are down. Visible through the open windows are two pill bottles. One on the center console, and one open on the front passenger seat. Spilled out of the bottle on the passenger seat are numerous white oblong pills. On the ground west of the front passenger door are two white oblong pills which appear to be similar to those in the passenger seat of the vehicle. Parked behind (north of) the vehicle is a Black and White 2016 Ford Explorer (TX:* ▮▮▮▮ *(Pasadena Police Unit #1631) with its red and blue emergency lights activated.*

*Approximately 125 feet west of the west curb line of 4400 Red Bluff, 6-10 inches south of the north curb line of 2500 Golden Villas is a pill bottle laying in the street, next to the dumpster for Hawk`s Place.*

*4418 Red Bluff Rd is the location of Brother`s Recycling, which is located west of Hawk`s Place, and is accessed by a single driveway that runs north off of 2500 Golden Villas.*

*2510 Golden Villas St is the location of a single-family residence which is located just southwest of Brother`s Recycling. The residence is located on the northwest side of the roadway, facing southeast. There is a single concrete driveway that runs north off of 2500 Golden Villas, to a covered carport area. There is a single surveillance-type camera mounted on the southeast corner of the residence, facing southeast toward the driveway and Golden Villas. On the ground beneath the security camera is a prescription pill bottle, laying in the driveway.*

*Northwest of the driveway and carport of 2510 Golden Villas is a grassy area that leads between the garage of the residence and the back wall of 4418 Red Bluff Rd. Continuing northwest through the grassy area, there is an opening that widens out to a common yard area between the residence at 2510 Golden Villas and the residence behind it at 2407 Jana Ln.*

*The common yard area for the two residences of 2407 Jana Ln and 2510 Golden Villas is bordered on the north by a wooden fence of approximately 6 foot in height. Running east from that wooden fence, to the corner of the building at 4418 Red Bluff Rd, is a 6-foot chain link fence. Immediately west of the wooden fence that borders the backyard of 2407 Jana Ln is the detached garage for that residence. West of the garage is an open field area, that is not fenced. Near the southeast corner of the detached garage is a pill bottle and a lid for another pill bottle, laying in the grass. Running from the northeast corner of the detached garage to the southwest corner of the residence at 2407 Jana Ln is a 4-foot chain link fence. Between the front of the garage and the roadway is a grassy yard area and a driveway that runs to the east curb line of 2400 Jana Ln. North of the driveway, in the grass, approximately 20 feet west of the front of the garage is two pill bottles and a box which is labeled as belonging to a digital scale.*

*North of the residence at 2407 Jana Ln is a large lot which houses a metal building at 2412 Jana Ln, which appears to be a three-bay garage or storage building. This building faces southeast toward 2400 Jana Ln. There is a large concrete driveway and parking area between the front of the building and the northwest curb line of 2400 Jana Ln. Running south along the west side of the parking area for 2412 Jana Ln is a driveway that runs south to the north curb line of 6200 Pine Ave. Parked in the driveway for 2412 Jana Ln is a Silver 2008 Ford F350 Dually (TX:* ▮▮▮▮ *facing north. Immediately east of the front passenger door of the dually is a trail of white round pills. The pills continue in a southeast arc toward Jana Ln. Approximately midway between the pills and the roadway, laying in the grass was a black spent Taser cartridge with*

**EXHIBIT 37**

Revised: 10/26/09

CONFIDENTIAL

*The wires for the cartridge extended west from the case. Directly south (behind) the rear of the truck, on the ground, is an open pill bottle that appears empty. West of the pill bottle, laying in the grass for the residence at 2420 Jana Ln is the lid for a pill bottle.*

*2420 Jana Ln is the location of a single-family residence which is located at the northwest corner of Jana Ln and Pine Ave. The residence faces south, with a large grass yard to the south and east of the residence.*

*Laying in the grass, just west of the driveway for 2412 Jana Ln and north of the north curb line of 6200 Pine Ave, is a White male lying face down. The body was positioned with the head of the subject oriented toward the south and the feet oriented toward the north. His wrists are handcuffed behind his back, and his face was turned slightly to his left (east). The male was wearing a black fleece jacket, dark colored t-shirt, blue jeans with a black belt, and black tennis shoes. There were what appeared to be two bullet holes in his lower back, and a spent bullet laying on top of his skin on the right shoulder blade area.*

*West of the body was a set of keys on a silver clip. North of the keys, a few feet north of the feet of the deceased was a black flashlight laying in the grass. There were three silver colored spent cartridge cases laying in the grass near the flashlight. West of the flashlight and cartridge cases was a grouping of other items:*

*A Taser, which was turned on (light illuminated) and laying in the grass facing generally east. There is a spent cartridge attached to the front of the Taser, and the bottom cartridge well (used to carry a second cartridge) was empty. Near the Taser was a dark colored canvas bag, a red lighter, and a Marlboro cigarette box.*

*Approximately 20 feet west of the set of keys was a clear plastic baggie containing a clear crystal substance.*

*At the time of this incident and investigation, the weather was cloudy and cool. The time was night time with artificial light provided by police lights and street lights. There was intermittent light rain, and the ambient temperature was approximately 60 degrees Fahrenheit.*

***Details:** On Wednesday, November 21, 2018 at approximately 1932 hours, I overheard Officer Saldivar broadcast that he had a person running from him, "eastbound". Officer Tabor and I responded to the area. While enroute, I overheard Saldivar advise that he had deployed his Taser, and then later scuffling sounds on his radio before he advised "shots fired".*

*Upon our arrival at the scene of the incident at 6200 Pine Ave, I found Officer Saldivar had already been escorted to a nearby police vehicle. Officer Salazar was standing near the male suspect, who was lying face down with his wrists handcuffed behind his back. Officer McClain was nearby, blocking traffic.*

*I put on Nitrile gloves and went to the suspect, to determine if any emergency medical intervention was necessary, but found him to not be breathing and not have a pulse when I checked his Carotid artery. I observed him to have what appeared to be two bullet wounds in his lower back. While assessing his injuries, I noted that there was a spent round laying on top of his skin, around the area of his right shoulder blade. I requested that Officer Turpin take photos of the area and suspect while waiting for EMS to arrive, to ensure that the evidence was*

EXHIBIT 37

CONFIDENTIAL

*documented prior to being disturbed by EMS or other responders.*

*A perimeter was secured with police vehicles and notifications were made that EMS was clear to respond to the scene. A short time later, Acadian Unit #966 arrived on scene (Staffed by Alison Jones and Rebecca Ellis). They applied 4 leads on his back and legs. During this process, Ellis began to cut away the back of the jacket that the suspect was wearing. However, it was determined that he was deceased (Time of Death 1948) and I stopped Ellis from further cutting of his clothing to preserve the scene as much as possible.*

*Person Crimes Detectives, Internal Affairs, and Crime Scene were notified and responded to the scene. We held the scene until the arrival of those investigators and briefed Detective Cooper on our actions to that point. Upon walking the scene, it appeared that the traffic stop began at the area of 4400 Red Bluff, in the Hawk`s Place parking lot. Due to the discarded items along the way, it appears that the suspect ran southwest from his vehicle, dropping or discarding a prescription pill bottle near the dumpster at Hawk`s Place, another near the corner of the residence at 2510 Golden Villas. It appears that he may have then ran north along the "alley" between the garage at 2510 Golden Villas and Brother`s Recycling at 4418 Red Bluff.*

*Once behind the garage at 2510 Golden Villas, it appears the suspect dropped or discarded another pill bottle behind the garage at 2407 Jana Ln. There was also a pill bottle lid near the pill bottle that appeared to be from another bottle.*

*North of the garage at 2407 Jana Ln was a clear jar containing a green leafy substance that appeared to be consistent through my training and experience as Marijuana, a box labeled as containing a digital scale consistent with the sale and trafficking of illegal narcotics, and another prescription pill bottle which appeared to contain only a knife blade.*

*It appeared as though the foot chase continued north across Jana Ln, where it appears that more pills (round white pills) were discarded in the parking area in front of the business at 2412 Jana Ln. There the scene appeared to have turned west, into the yard of 2420 Jana Ln.*

*While investigating the incident at the scene, I was advised by Police Dispatch that the residents at 2502 Jana Ln called in to report the shooting. I then went to the residence where I spoke with Jerry Deerdorff (W/M ████████ and Frances Deerdoff (W/F ██████  Jerry advised that at approximately 1930 (he remembers the time because he had just finished putting his Thanksgiving Turkey in the oven), his wife said she heard gunshots outside. He stated he looked outside but didn`t see anything. Frances went on to say that she first heard muffled voices (which she described as someone moaning or yelling) outside and she told Jerry who looked outside but didn`t see anything. She explained that a short time after Jerry came back from the front door from looking for the source of the talking/moaning, she heard 4-5 gunshots and called 9-1-1. Jerry then confirmed Frances` account, stating he forgot that he initially looked outside for people talking first, before the shots. He also believed there to be 4-5 gunshots heard.*

*See Officer Turpin`s supplement regarding photos taken prior to the arrival of the Crime Scene Unit.*

*See Officer Salazar`s supplement regarding his actions prior to my arrival.*

**EXHIBIT 37**

Revised: 10/26/09
CONFIDENTIAL

*All evidence at the scene was collected by Crime Scene Investigators, see their supplement(s) for further details.*

*This case is forwarded to Detective Cooper for follow-up investigation.*

*No further police action taken by this officer.*

*C. Sanders #5827*

**Officer Salazar** had been the first to arrive on scene after the incident occurred. In his supplement, he recorded how he had observed Officer Saldivar standing east of the suspect with his gun drawn. The suspect was lying on his back; therefore, he turned the suspect over and placed him in handcuffs. Officer Salazar observed the subject had agonal breathing and requested an ambulance. He also requested a sergeant to the scene and took no further action.

**Officer Turpin** arrived to the scene and took photographs of the scene and deceased. The photos were later logged as evidence. A copy of those photos is included with this investigation.

**Officers Sanchez** and **Edwards** authored supplements documenting their handling of crime scene security and the crime scene log.

**Officer Helgesen** had originally been dispatched to an Auto Theft report at 5045 Crenshaw. Through the course of his investigation, he learned the alleged stolen vehicle involved had been driven by the deceased. Allegedly the car had been taken from the parking lot of JC Penny (5104 Fairmont) sometime between 5pm and 9pm, November 21, 2018. After gaining additional details, Officer Helgesen learned the vehicle was not stolen as the owner, Kathie Minshall, had actually allowed the deceased (Schenk) to borrow it. Minshall was attempting to report the vehicle as stolen due to Schenk not returning the vehicle. Therefore, Officer Helgesen completed a supplement in order to document the information as the Auto Theft was unfounded.

**Detective Stephens** authored a supplement explaining how he transferred Officer Saldivar's body worn camera from Peer Support Officer Traxler to Sergeant White.

**Crime Scene Investigator Dudley** was responsible for conducting the crime scene investigation. In her report, Investigator Dudley documented how she had received a callout on Wednesday, November 21, 2018, at approximately 19:45 hours. She responded to the scene with Investigator Coulter and was briefed, with known details, by Sergeant Johnson.

Investigator Dudley made a detailed account of the location for Officer Saldivar's patrol unit, the suspect vehicle, and of contraband (white pills) located at the initial scene. She went on to document the path of pursuit noting contraband (prescription bottles) along the way. Investigator Dudley continued the path of travel to a storage building, north of Golden Villas Street, where additional contraband (green leafy substance / believed to be marijuana, broken kitchen knife, prescription bottle) was found discarded on the ground. At the conclusion of the pursuit path, north of 2400 Jana Ln, Investigator Dudley noted the following items were found: taser cartridge sans probes, Taser wires, empty prescription bottles, and numerous white tablets (dissolving in standing water).

**EXHIBIT 37**

Form # 176-G

Revised: 10/26/09

CONFIDENTIAL

Investigator Dudley documented the deceased as laying in the grass on the east side of Pine Road. She described him as wearing pants, a shirt, heavy blue jacket, and athletic shoes. She stated the deceased was prone and had been cuffed. Investigator Dudley added how a green back pack, red lighter, prescription bottle, Officer Saldivar's Taser with a spent cartridge, and a flashlight were found north of the deceased.

Investigator Dudley photographed the scene paying special attention to the victim, drugs, paraphernalia, and foot path taken by both the deceased and the officer. Investigator Coulter assisted by completing a to-scale FARO scan of the area. A scale diagram using the FARO system is included with this investigation.

Upon search of the area surrounding the deceased, Investigator Dudley located three FC 9mm spent cartridge casings. She noted how she had been advised, by potential witnesses, that four to five shots had possibly been fired. However, she was not able to locate any additional spent cartridges.

Investigator Dudley next documented how she assisted HCIFS personnel by photographing and collecting evidence from the deceased. She specifically noted collecting $5,880.00 in cash from the backpack.

Upon arrival of the DA Shoot Team, Investigator Dudley took photographs of Officer Saldivar in his uniform. She paid special attention to the broken WatchGuard attachment (body camera mount), a sheathed knife located behind his magazine pouch, and the dirt on his pant legs.

Investigator Coulter next did a charting sheet for Officer Saldivar's duty weapon (Glock 19, 9mm, with attached Streamlight). Investigator Dudley noted how she removed the gun magazine and ejected a live round, which resulted in 10 rounds being removed from the weapon. Officer Saldivar had advised only 15 rounds had been loaded into the weapon despite the magazine's capability of holding 17 rounds (Glock 17 Magazine – 17 9mm round capacity). Investigator Dudley documented both of Officer Saldivar's additional magazines contained 17 rounds.

Investigator Dudley completed her investigation, on the initial date, by escorting the deceased's vehicle to the Pasadena Police Processing Garage.

On Thursday, November 22, 2018, Investigator Dudley returned with Detective Cooper and Investigator Coulter in order to utilize the daylight in attempt to locate additional evidence. During this time, two additional FC 9mm cartridge casings were found.

During the course of her investigation, Investigator Dudley documented the following: Friday, November 23, 2018, processed the suspect vehicle and located prescription bottles and loose prescription pills in the rear of the vehicle. Tuesday, November 27, 2018, collected Officer Saldivar's body worn camera, which had already been downloaded. Friday, November 30, 2018, released Officer Saldivar's firearm, magazines, live ammunition, projectile, and 5 spent FC cartridges to the HCIFS for testing.

See Investigator Dudley's supplement report, which is included with this jacket, for a more detailed account of how the evidence was processed and stored. All crime scene photographs were copied to two compact discs and 1 digital video disc and included with this investigation.

EXHIBIT 37

Revised: 10/26/09

CONFIDENTIAL

All supplement reports are included with this investigation.

On November 26, 2018, at approximately 11:00am, **Officer Saldivar**, in the presence of his attorney Greg Cagle, reported to the Office of Internal Affairs. Upon his arrival, he was provided with the formal notification for this investigation, which he acknowledged, and signed a letter of receipt. I then conducted an audio recorded interview which is summarized below:

*The interview began at approximately 11:10am. Officer Saldivar began by stating the events provided would be to the best of his recollection.*

*The incident began while working the Selective Traffic Enforcement Program (6pm – 10pm). Officer Saldivar was monitoring the stop sign located at the intersection of Pine and Jana. He was observing the stop sign from a parking lot located north of the intersection.*

*Officer Saldivar saw the suspect vehicle disregard the stop sign; therefore, turned on the patrol unit's emergency lights, which initiated his body worn camera and the patrol unit's dash camera. As he followed the suspect vehicle, eastbound on Pine, Officer Saldivar observed the vehicle driving in the wrong lane of travel (counter flow). This behavior led Officer Saldivar to believe the suspect may attempt to evade. However, the vehicle proceeded southbound on Red Bluff and came to rest in the parking lot of Hawk's Bar.*

*Once the vehicle was stopped, Officer Saldivar exited his vehicle and attempted to check out on traffic with his patrol radio rather than on his mobile data computer (MDC). Officer Saldivar articulated that he "didn't feel right" about the stop due to the suspect disregarding the stop sign, driving counter flow to normal traffic, and not coming to an immediate stop after the patrol unit's lights had been activated. It was because of these actions that Officer Saldivar exited the patrol unit and attempted to notify dispatch of the traffic stop.*

*During this time, the suspect exited his vehicle despite Officer Saldivar giving him commands to remain in his car. Officer Saldivar advised the male made an inaudible statement and proceeded to the front of his vehicle and then around to the passenger side of the car. As he approached the passenger side, Officer Saldivar observed the suspect bend down. He believed the suspect was checking air pressure in the front right tire. After reviewing dash camera video, Officer Saldivar learned the suspect had retrieved a back pack, which he had pushed out of the passenger window as the stop was occurring. Once the suspect had retrieved the back pack, he fled westbound on foot.*

*Officer Saldivar detailed how the suspect ran westbound on Golden Villas, past Hawk's bar, and then northbound through a dark alley which was located next to a residence (believed to be 2510 Golden Villas). As he was in pursuit, Officer Saldivar decided to utilize his Taser in order to cease the suspect from fleeing. In the back yard of the residence, was a big light; therefore, Officer Saldivar deployed the Taser striking the suspect in the back. Officer Saldivar broadcast that he deployed the Taser; however, the suspect did not respond and continued to flee. Officer Saldivar described that he pursued the suspect through a vacant lot but had difficulty seeing due to it being very dark. The direction of travel led back to the intersection of Pine and Jana. The suspect next ran northbound into the parking lot north of the intersection. By this time, Officer Saldivar had reloaded his Taser and deployed it at the suspect as he continued running westbound into the lot west of the parking area (2400 Jana). Officer Saldivar believed the Taser*

EXHIBIT 37

Revised: 10/26/09

CONFIDENTIAL

worked because the suspect stopped running and fell to the ground. He stated the suspect fell face forward but was able to turn his body and slid on his back.

Once the suspect was on the ground, Officer Saldivar grabbed the suspect's arm in an attempt to turn him over and handcuff him. The suspect then used the opposite hand to grab him; thus, preventing Officer Saldivar from turning him over. This led Officer Saldivar to believe the Taser was no longer working.

Officer Saldivar then explained that he struggled with the suspect who was attempting to push him onto his back. This concerned him as he believed being on his back would allow the suspect to have advantage over him. When asked, he said he had the suspect by his right arm but the suspect had used his right hand to grab Officer Saldivar by the body and twist him over.

At that time, Officer Saldivar was able to spin out, which caused him and the suspect to flip over and become face to face. Officer Saldivar was positioned slightly above the suspect and was attempting to push the suspect to the ground. When asked, he responded that he and the suspect were both on their knees during this struggle. Officer Saldivar said, as he was pushing the suspect to the ground, he could feel him grabbing at his magazine pouches, his handgun, his holster, and the area behind his magazine pouches where a knife is secured in a sheath.

As the struggle continued, Officer Saldivar had the suspect positioned underneath him in a "bear hug". He said the suspect was struggling to be released and abruptly felt him "powering up" to lift him, push him forward, and suck him underneath (pull him off balance). Officer Saldivar felt both of the suspect's hands grabbing at him as he continuously "powered up" to get him off balance. Officer Saldivar responded to each of these actions by putting his weight back down onto the suspect. Officer Saldivar said that he could hear Dispatch calling for him but was unable to respond because he was unable to release the suspect.

Officer Saldivar next stated, at that point in the struggle, he was becoming tired. When asked, Officer Saldivar stated he had given the suspect multiple commands to stay down. The suspect had never responded nor made any comments toward Officer Saldivar. Due to becoming tired and feeling that he was about to be overpowered, Officer Saldivar felt the need to disengage with the suspect. When asked to explain "overpowered" in more detail, Officer Saldivar responded that the suspect had been able to lift Officer Saldivar's entire body almost into a fully standing position despite Officer Saldivar being positioned on top of him. Officer Saldivar stated he felt like he was being placed into an old-style wrestling move which would have allowed the suspect to gain the advantage over him.

At that time, the suspect was able to toss Officer Saldivar to the side, which allowed him to disengage. Officer Saldivar was able to push away to gain separation. However, he observed the suspect reaching to his waistline, leading him to believe the suspect was reaching for a weapon. I asked him if it was at that moment, he chose to draw his weapon. Officer Saldivar responded, "all I know is I saw him reaching. I wasn't thinking and it just happened." Officer Saldivar became emotional as he explained that all he could remember was his gun being in his hand and pulling the trigger. He did not recall what he observed during this time.

I then recounted the struggle in order to confirm the order of events. Officer Saldivar stated that my recount was accurate. When asked, he stated he believed he was thrown to his right side.

EXHIBIT 37

Revised: 10/26/09

CONFIDENTIAL

*suspect. Officer Saldivar said the suspect was then standing over him, crouched, as if in a football stance. Based upon the suspect reaching for his waist and his stance, Officer Saldivar believed the suspect was about to shoot him. Officer Saldivar could not recall "going sights" (taking aim) at the suspect. The next thing he could recall was retrieving his body camera from the ground. Officer Saldivar stated he was exhausted, his weapon was drawn, and he was continuing to give the suspect commands. He was unsure if he had struck the suspect; however, the suspect had tried to stand back up but was told to stay down. Officer Saldivar held cover until back-up officers arrived and did not go "hands on" with the suspect again.*

*In order to clarify, I asked Officer Saldivar where the suspect had been reaching and he answered, "the front." He could not recall but believed the suspect had done so with his right hand. I asked if the suspect was standing as he reached for his front, which Officer Saldivar explained that the suspect was crouched and not standing. I asked what position Officer Saldivar had been in (standing, kneeling) when he discharged his weapon, to which he could not recall. I then asked why Officer Saldivar had felt the need to retrieve his camera. He responded that he had seen the camera on the ground and felt the need to put his camera back on. However, he later learned the mount had been broken and would not hold the camera. When asked, Officer Saldivar stated, prior to this incident, his camera had been working without issue. He then recalled, during the struggle, that his camera had stopped recording; therefore, he had reactivated it.*

*At that time, Officer Saldivar and I reviewed his body worn camera video. The video began with him sitting inside his patrol unit until he observed the suspect disregard the stop sign. He pointed out how the suspect traveled "counter flow," eastbound in the westbound lanes. He called out the vehicle's license plate as well as the observed violations in order to have it documented on video. Officer Saldivar pointed out that the vehicle continued on to the 4400 block of Red Bluff and had already been preparing to "drop the bag" (place the backpack outside of the vehicle). Officer Saldivar explained how he had not seen this occur but learned of it later after reviewing his dash camera video.*

*Officer Saldivar then exited the vehicle and prepared to broadcast the traffic stop; however, had paused due to a large truck passing by. Upon doing so, Officer Saldivar did not believe his transmission went through; however, he was unsure why. Officer Saldivar was waiting for dispatch to respond and positioned himself behind the patrol unit door for cover.*

*As the suspect was exiting his car, Officer Saldivar was asked if he had seen the suspect moving inside the vehicle prior to removing the backpack, which he responded he had not. Officer Saldivar stated he was sure the suspect had nothing in his hands as he went to the front of the vehicle. He called out to the suspect and believed he was checking his tire in order to use it as an excuse for his driving behavior.*

*After grabbing the backpack, the suspect fled. Officer Saldivar broadcasted a description of the suspect and a direction of travel. As the suspect traveled to the dark alley, I asked for Officer Saldivar to provide a better reference of their exact location, at that time. Officer Saldivar stated that it was the rear of a recycling center, which was behind the bar, and a small "cut through" which belonged to the residence of 2510 Golden Villas. As Officer Saldivar proceeded through the alley and emerged into the back yard, there was a partially lit area, which* ~~could have~~

EXHIBIT 37

CONFIDENTIAL

*he deployed his Taser. Officer Saldivar had believed the suspect was attempting to jump a fence or dispose of evidence but was unsure. Officer Saldivar broadcast that the Taser had been deployed and that the alley was leading back toward Pine Ave. This area was poorly lit and orientation was difficult until Officer Saldivar had returned to the initial intersection. When asked, Officer Saldivar advised there were no obstacles (fences / gates) preventing them from transgressing back to Pine Ave.*

*Officer Saldivar was then asked if he could remember where he was when he reloaded his Taser. He stated he recalled reloading his Taser because he had been aware that the first cartridge had not worked. After crossing Pine and Jana, Officer Saldivar deployed the Taser again. This caused the suspect to fall to the ground and land on his back. Officer Saldivar stated the suspect was talking which led him to believe the Taser was not effective. When asked, Officer Saldivar could not recall what the suspect had stated. He then rewound the video and learned the suspect had stated, "don't hit me man."*

*Due to the video going off and on, there were periods of black silence in the video. When the video returned, I asked Officer Saldivar to explain what was occurring. Officer Saldivar stated, based upon what he was seeing, the suspect was attempting to push him over, which allowed him to roll out and place himself on top of the suspect in a face to face direction. I asked Officer Saldivar if he had delivered any strikes. He responded that he did not because the suspect was very strong.*

*Officer Saldivar next paused the video and described holding the suspect's head under his arm, at the suspect's chin, while trying to maintain control of the suspect's arm. He stated they were locked up and he was trying to place his weight on the suspect; however, the suspect was able to lift him. When asked, Officer Saldivar answered he felt the suspect grabbing at his waist and gun belt throughout the struggle. He elaborated that he felt the suspect was trying to "suck him under" and gain control over him while grabbing at his waistline.*

*Officer Saldivar then explained that he was coming to a point in the altercation where he was becoming tired, which is when the suspect abruptly threw him to the side allowing Officer Saldivar to disengage. He rewound the video and showed how the suspect had lifted him off of his knees before throwing him to his right side. Upon being thrown, Officer Saldivar and the suspect are not seen on camera. I asked him what was happening off camera, which he answered "he's up." He explained the suspect was in a crouched position before spinning away.*

*I then began a frame by frame progression of the video. I showed Officer Saldivar the point at which the shots were fired. I also showed him that the suspect was turning away and asked him if he was already in the motion of firing at that point. He responded, "yes." I then asked, after watching the video, if it aided in is recollection of when and how he had drawn his weapon and his location when doing so. Officer Saldivar answered, "I really don't know."*

*We again reviewed the struggle and shooting portion of the video at regular speed. During this time, he added that it had been the up and down struggle (the suspect lifting while Officer Saldivar pushed down) that caused his camera to break from its mount. I asked, upon disengaging from the suspect, how far away had they been from each other and he responded, "best estimate, about five feet." I asked if the suspect had been close enough to continue or*

EXHIBIT 37
Revised: 10/26/09
CONFIDENTIAL

*reengage, which Officer Saldivar answered, "I felt he could get me. He was that close." He went on to add that as the suspect was crouched, he reached for his waistline, and that's when Officer Saldivar had reacted (drew his weapon). I asked how the suspect had responded to Officer Saldivar drawing his weapon, he responded that he could only recall feeling afraid for his safety. Officer Saldivar added that things went "black" and he could not recall going to sights, if he had fully extended, or if he had used one or two hands.*

*After the shooting had occurred, I allowed the video to continue. Officer Saldivar explained that several items had been strewn about. He specifically noted that his Taser had been ineffective and discarded as he engaged the suspect. There was minimal radio traffic and Officer Saldivar told the suspect to not move, several times, while he waited for officers to respond.*

*Officer Salazar had been the first to respond on scene. Officer Saldivar explained that Salazar began by checking the suspect for injuries; however, because he was unsure if the suspect had weapons, he instructed Officer Salazar to first handcuff the suspect for officer safety. It should be noted throughout this portion, the camera continued to fall from Officer Saldivar's mount despite his repeated efforts. Officer Saldivar turned the camera off after being sequestered in a patrol unit.*

*I concluded the interview by asking Officer Saldivar if he had any further information to add. He responded by wanting to note, at times, suspects will state they are not resisting; however, their actions show continued resistance. He felt the suspects comments in this situation were similar. Officer Saldivar explained, had the suspect cooperated with commands, he believed the outcome would have been different. He stated he had been unaware about the quantity of contraband dropped by the suspect until after the scene had been secured. Officer Saldivar also added how he felt the amount of fear for his safety was at such a high level, he believed there was an urgent need to defend himself to this extent.*

The interview concluded at 11:58am and was approximately 48 minutes and 23 seconds in length. A copy of the interview was later downloaded to a CD and is included with this investigation.

Following the interview, Officer Saldivar was allowed to converse with his attorney and subsequently provided his statement. The following is his complete affidavit without corrections:

*On November 21, 2018, I was on duty working a Selective Traffic Enforcement Program (STEP) from 6:00 p.m. to 10:00 p.m. at the intersection of Pine Ave and Jana Ln. I was operating my assigned marked patrol unit (#1631) and wearing my patrol uniform. At approximately 7:30 p.m., I observed a small silver Ford Focus four door (TX-FGD5246) car traveling eastbound on Pine Ave. As the vehicle approached the stop sign at Pine and Jana, it failed to stop and disregarded the stop sign and turned eastbound on to Jana Ln. toward Red Bluff. I immediately activated my emergency lights and pulled behind the vehicle which was now driving on the wrong side of the roadway on Jana Ln. as it approached Red Bluff Rd. The vehicle made no attempt to pull over despite the emergency red and blue lights on my marked patrol unit. The vehicle stopped at Jana Ln. and Red Bluff Rd., still on the wrong side of the roadway and then continued southbound on Red Bluff Rd. I continued behind the vehicle with my emergency lights*

EXHIBIT 37

CONFIDENTIAL

activated.  The vehicle finally pulled into the Hawks Place Bar located at 4416 Red Bluff Rd. without signaling the intent to turn.

Due to the vehicle not stopping immediately and the vehicle driving on the wrong side of the roadway on Jana Ln., I believed the driver was possibly under the influence of alcohol or drugs. I exited my patrol car for officer safety and called out on traffic on channel one giving my location.  I would typically use my MDC, but the driver's action caused me to want to remain focused on the driver.  I remained behind my open driver's side door for cover.  While waiting for channel one to acknowledge my traffic, the driver (tall white male wearing black jacket, blue jeans) exited the vehicle.  The suspect looked back at me, and began walking to the front of his vehicle.  I shouted several commands for the driver to stay in the car which he ignored, instead walking to the passenger side of his car, causing me to lose sight of his lower body.  I moved from behind my door during this time and moved across the front of my vehicle to try and determine what the driver was doing.  As I moved toward the male I asked him what he was doing and he did not respond. I observed him bend down and pick up a dark back pack that was next to the front passenger door of the vehicle he had exited.  He then began running westbound on Golden Villas.  I immediately notified dispatch over the radio I had one running providing my direction of travel and a suspect description.  The suspect then ran northbound between an alley on the east side of a house located at 2510 Golden Villas.  The male ran into the back backyard and looked like he was attempting to jump a wood fence when I deployed my Taser striking the male in the back.  The Taser was ineffective and he continued running northbound through the backyard and crossing an open lot leading to Jana Ln.

I continued to chase the suspect who was now running westbound and approaching the intersection of Pine Ave and Jana Ln.  I broadcasted my new location to dispatch and reloaded my Taser.  I yelled at the suspect to get on the ground.  He ignored my command and I then deployed my Taser a second time striking the suspect in his back.  The suspect then fell into the front yard at 2420 Jana Ln. ending up on his back.  Believing the Taser was effective and I had time to attempt to handcuff him while he was under the effect of the taser, I jumped onto the suspect.  As I was doing so, the suspect extended his arms upward at me.  I grabbed his extended right arm in an attempt to place handcuffs on him and we ended up face to face on the ground. The suspect grabbed me as soon as we made contact and started pushing me to the side as if he was trying to flip me onto my back.  I began struggling with the suspect, who was overpowering me.  I realized he was strong and was about to get me in an extremely bad position.  I released his right arm and rotated off his body moving into a position where we were both head to head with our feet on opposite sides, but still on the ground.  As we continued to struggle for leverage, I was able to trap his right arm and his head in a bear hug with my upper torso on top of his head in an attempt to use my weight to keep the suspect lying flat on the wet grass.  The suspect was able to push forward toward me and lift off the ground.  As a result, he had use of both of his arms in the position and could reach my body.  Despite my complete weight on the suspect's head and upper back, he continued to lift me up and tried several times to pull my legs underneath him to place me in a mounted position below him.  I yelled commands several times to stay on the ground which he refused.  I could feel the suspect grabbing at my duty belt with his hands along my gun side and near my magazine pouches where my knife is located.  Fearing the suspect was attempting to take one of my weapons, I warned him I was going to shoot him and to stay on the ground.  The suspect continued pushing and started to overpower me.  The suspect was able to lift me up off the ground and sling me to my right.  At this time, I was exhausted from the struggle

EXHIBIT 37

Revised: 10/26/09

CONFIDENTIAL

*and could not hold onto to him anymore. I released my hold and pushed away from him as hard as I could creating some distance, but still not knowing if he had control of my knife.*

*I then observed the suspect facing me in a standing, but slightly crouched over position (I would describe it as football defensive stance) and he started reaching with his right hand toward his waist line. At this point I was on the ground approximately 5 feet away from the suspect. I was trying to get up to my knees. The fact that the suspect did not simply flee at this point and was instead facing me and standing in the position described made me believe he definitely wanted to hurt me. The movement he was making with his hand appeared to be that of a person drawing a pistol from their waistband. Fearing the suspect was reaching for a weapon to kill me, I drew my duty weapon and fired several shots at the suspect. I believe I was just getting up onto my knees at this point and may have still had my left hand on the ground supporting my body. I observed the suspect fall on his back. I stood up and observed my body camera on the ground and picked it up and placed it on my uniform. The body camera would not stay attached and I later learned it had been broken during the struggle. The suspect attempted to get up, at which time I informed him he would be shot again and he remained down. I broadcasted that shots had been fired notifying dispatch the suspect was shot. During this time the suspect tried two other times to stand up as I yelled at him to stay down. I continued to yell commands for the suspect to not to move until additional patrol officers arrived on scene and handcuffed the suspect.*

*I surrendered my duty weapon and magazines (Glock 19 / 9mm) to ID Officer S. Dudley.*

*End of Statement*

*Officer R. Saldivar 5750*

On November 28, 2018, I received Officer Saldivar's post incident Pasadena Police Department qualification scoresheet from Officer Huffman. It should be noted Officer Saldivar PASSED, on that date, with a Glock Model 19 (9mm). A copy of the score sheet is included with the pertinent documentation.

On January 9, 2019, I was contacted by Detective Cooper and was advised that his investigation had been completed and forwarded to the Harris County District Attorney's Office for review and determination of status. He provided me with his case report, which is included with this investigation. From his report I learned the following additional information:

At approximately 7:33pm, Detective Cooper and Stephens were on-duty and heard Officer Saldivar's broadcast of a subject running with a Taser deployment. A short time later, he heard the broadcast of "shots fired" and directly responded to the intersection of 2400 Pine Ave and 2500 Jana Lane. Prior to Cooper's arrival, Detective Stephens had retrieved Officer Saldivar's Body Worn Camera (BWC) and maintained custody until Sergeant White arrived to take custody and download it for viewing.

Upon arrival, Detective Cooper was briefed by Officer Sanders, who would be completing the original report. He learned, Officer Saldivar had conducted a traffic stop in the 4400 block of Red Bluff, in front of Hawk's Place Bar (4416 Red Bluff). The driver of the vehicle fled on foot, southbound, on Golden Villas. The driver led Officer Saldivar on a foot chase through two yards and ended up at / near the intersection of Pine and Jana. During the pursuit, Officer Saldivar had

**EXHIBIT 37**

CONFIDENTIAL

used his Taser twice. The foot chase ended in the front yard of 2420 Jana Lane where an unknown type of struggle / fight occurred and resulted in Officer Saldivar discharging his service weapon.

Officer Salazar was first on scene and found the deceased suspect lying on his back with Officer Saldivar holding him at gun point. Officer Salazar had rolled the deceased over to his stomach and handcuffed his hands behind his back. Acadian Ambulance #966, staffed by Paramedics Rebecca Ellis and Alison Jones, pronounced the suspect deceased at approximately 7:49pm. A printed copy of Acadian Ambulance Call for Service #20181121-ZN-1488 was logged into the Property Room as evidence.

At approximately 8:15pm, the Pasadena Police Department's Crime Scene Unit arrived on scene. Crime Scene Detectives Dudley and Coulter were advised of the crime scene and the areas it covered. Photographs were requested and a possible tent be placed up over the deceased to preserve any unseen evidence. This was asked due to incoming rain. Detective Cooper also requested photographs be taken of the exterior of the vehicles, the observed spent shell casings, the evidence scattered across the scene (bag, drugs, Taser, etc), any apparent blood stains, the decedent, and the handcuffs. He followed by requesting Crime Scene Detectives collect the aforementioned items and any other items of evidentiary value. Detective Cooper called for a scaled diagram of the crime scene and photographs of Officer R. Saldivar in order to document his appearance at the time of the incident.

At approximately 8:23pm, Detective Cooper made contact with the Harris County District Attorney's Office (HCDAO) Intake Division and notified them of the Officer Involved Shooting (OIS). They were advised the suspect was deceased and the officer was not injured in the incident. Cooper was advised members of the Harris County DA Shoot Team would be enroute to the scene. At approximately 9:25pm, Assistant District Attorney (ADA) Jules Johnson and Investigator Lt. Dennis Field arrived on scene and were briefed on the obtained details.

At approximately 8:29pm, Detective Cooper notified the Harris County Institute of Forensic Science (HCIFS) of the Officer Involved Shooting scene and that the suspect is deceased. The HCIFS advised an Investigator and Body Car would be enroute to the scene. At approximately 9:31pm, HCIFS Medical Examiner Investigator Godfrey arrived on scene, along with HCIFS Body Car Unit #9036. The Attendants in the body car were V. Flores and S. Davidson.

HCIFS Inv. Godfrey was escorted through the scene, starting at the location of the traffic stop, and leading to the scene of the shooting. Inv. Godfrey then processed the decedent by taking the necessary photographs of the decedent and scene as well as inventorying the decedent's property. In inventorying the decedent's property, $3,034.26 was collected from various pants pockets and his wallet. This was in addition to the $5,880.00 previously located in the suspect's backpack.

It was during this time the deceased was identified by his State of Texas issued driver's license as Nathan Alexander Schenk (w/m, ███████, TDL #████████).

Two gunshot wounds were located in the decedent's back lower torso, and two in the left arm pit. Investigator Godfrey speculated one of the wounds in the armpit was an exit wound, due to the spent bullet located on the decedent's back, under his t-shirt.

**EXHIBIT 37**

Revised: 10/26/09
CONFIDENTIAL

At approximately 10:35pm, HCIFS Inv. Godfrey and the Body Car departed from the scene with the decedent. See HCIFS case #ML 18-4115.

Officer Saldivar was then instructed to meet with Crime Scene Unit Detectives Dudley and Coulter in the Mobile Crime Scene Command Unit for the cataloging of his weapon. Present during the cataloging of the weapon were ADA J. Johnson, ADA Inv. Field, Attorney G. Cagle, Officer Saldivar, Officer Traxler, IAD Sergeants C. Hamilton, A. Sanders, and K. Bowman and myself. In cataloging the weapon, Detective Cooper found CSU Dudley's account to be consistent with his own. Following the inventory of Officer Saldivar's ammunition, the preliminary finding was that Officer Saldivar had fired five (5) times at the suspect.

Detective cooper noted all but two spent shell casings were initially accounted for at the shooting scene, possibly because Officer Saldivar was standing on a grassy area when discharging his firearm.

Upon Sergeant White's return to the scene, a copy of the body cam footage was reviewed. Attorney Cagle played the video on his computer for himself, Officer Saldivar, the IAD sergeants, and Detective Cooper to view. However, due to the small screen, it was difficult to view. Detective Cooper then took possession of the video as evidence.

After the cataloging of Officer Saldivar's weapon and viewing of the body cam footage, a non-video/audio recorded "walk through" was conducted with Officer Saldivar. Present during the non-recorded "walk through" were ADA J. Johnson, ADA Investigator Field, IAD Sergeants A. Sanders, C. Hamilton and K. Bowman, Attorney G. Cagle, Violent Crime Sgt. S. Skripka, and Violent Crimes Detectives Mata and Cooper. Detective Cooper noted the non-recorded "walk through" was consistent with Officer Saldivar's later provided written affidavit.

Due to the rainy weather and poor lighting conditions, Detectives chose to keep the shooting scene secure overnight in order to return at daybreak and complete a search for the remaining shell casings and previously unseen evidence. On 11/22/2018, after daybreak, Detective Cooper located the remaining two spent shell casings in the grass. Detectives Dudley and Coulter recovered the shell casings and took photographs of the area in daylight. No other evidence was recovered that morning.

On 11/22/2018, Detective Cooper traveled to the HCIFS and met with Medical Examiner Dr. Janis. Cooper provided details of the incident and remained to observe the autopsy. During the autopsy, Dr. Janis removed the handcuffs and retuned them to Cooper's possession. Dr. Janis located and removed all four (4) Taser probes on the deceased's hooded sweatshirt. The deceased was found to have been shot three (3) times; two (2) entry wounds in the lower back and one (1) entry wound in the left armpit area. There was one (1) exit wound and that was in the left armpit area as well. Two (2) of the fired rounds were still in the deceased's body. Detective Cooper was advised a report would be completed and forwarded documenting this information. On 11/30/2018, Cooper received a copy of the autopsy photos and x-rays from HCIFS on a DVD. A copy of the photos is included with this investigation.

On 11/23/2018, Detective Cooper met with Sergeant White and obtained copies of the Dash Camera from Officer Saldivar's patrol unit. Sergeant White advised the Dash Camera was not

**EXHIBIT 37**

Revised: 10/26/09

CONFIDENTIAL

turned off right away and the video is almost three (3) hours long; therefore, he provided a "trimmed" down [five (5) minute] copy of the video on DVD.

On 11/23/2018, Detective Cooper met with Kathie Minshall (w/f, ▇▇▇▇), who along with her husband (Daniel Minshall), are the owners of the suspect vehicle (Silver, 2008, Ford Focus, Texas Reg - ▇▇▇▇). On 11/21/19, Minshall had reported her vehicle as stolen; however, later admitted to giving the suspect the vehicle in order to run errands (as documented in Officer Helgesen's Supplement report). During this interview, Detective Cooper learned Minshall had purchased prescription pills from the suspect in the past.

Detective Cooper then received a consent to search the vehicle, which was carried out by Crime Scene Detective Dudley. The vehicle was photographed and evidence was collected. The vehicle was subsequently released to Minshall.

On 11/23/2018 Detective Cooper viewed the videos obtained from Officer Saldivar's Dash Camera and Body Worn Camera (BWC). He then completed a non-certified transcription, assisted by Sergeant Skripka. See Officer Cooper's case report for transcription.

On 11/26/2018, Detective Cooper received a written affidavit from Officer Saldivar in the presence of his attorney Greg Cagle. The affidavit was signed and would later be logged into the property room as evidence. It should be noted this affidavit was the same as provided to Internal Affairs.

After viewing the videos and comparing them to the affidavit provided by Officer Saldivar, Detective Cooper noted a discrepancy. Officer Saldivar, in his affidavit, stated he "observed the suspect facing me in a standing, but slightly crouched over position (I would describe it as football defensive stance) and he started reaching with his right hand toward his waist line", which is why he fired his service weapon. While viewing the BWC footage, that stance is not observed. Officer Cooper attempted to clarify this with Officer Saldivar, through his attorney, however, did not receive a clarification.

On 12/4/18, Detective Cooper took Officer Saldivar's department issued Taser to the Pasadena Police Department Firearm Range for a download of data. Officer M. Huffman downloaded the Taser and verified it was deployed twice on 11/21/2018. Each deployment of the Taser lasted a full 5 second cycle. Officer Huffman provided a printed copy of the data from the Taser download. Detective Cooper provided a copy to Internal Affairs, which is included with the pertinent documentation.

Detective Cooper then forwarded to the Harris County District Attorney's Office for further review. No further action taken.

On January 14, 2019, I received the HCIFS autopsy / toxicology report from Detective Cooper. In the report (Case #ML18-4115), **Assistant Medical Examiner H. Jarvis MBBS** ruled the manner of death as **Homicide** with the cause of death being **gunshot wounds of torso**. The toxicology report showed the presence of two forms of tetrahydrocannabinol (Marijuana) and Meprobomate (tranquilizer / barbiturate) in the deceased's blood specimen.

**EXHIBIT 37**

Revised: 10/26/09

CONFIDENTIAL

According to AME Jarvis' report:  Penetrating gunshot wound of torso (**#1**) entered the lateral left of the chest and proceeded through the left fourth intercostal space, left upper lung upper lobe, and left third intercostal space, which resulted in fractures of the left third, fourth, and fifth ribs.  The bullet's direction was front-to-back, left-to-right, and upward.  This resulted in a left hemothorax (pooling of blood).  The bullet was recovered in the upper right back.  Penetrating gunshot wound of torso (**#2**) entered the lower right back and proceeded through the vertebral column causing fractures.  The bullet's direction was back-to-front, right-to-left, and upward, which led to a hemorrhage of the spinal cord.  The bullet was recovered in the upper left abdomen.  Perforating gunshot wound of torso (**#3**) entered the mid left back and proceeded through the left tenth intercostal space and hemidiaphragm, the spleen, and left seventh intercostal space, which resulted in fractures of the left seventh, eighth, and eleventh ribs.  The bullet's direction was back-to-front, right-to-left, and upward, which contributed to a left hemothorax.  The bullet exited the left lateral chest and was recovered at the scene.

AME Jarvis noted blunt impact injuries to the head (abrasions / contusions), blunt impact injury to the torso (abrasion), blunt impact injury of the right upper extremity (abrasion), and handcuff injury to the left upper extremity (hand and wrist furrows).  Four electroshock weapon electrodes (Taser Probes) were located within the clothing but did not appear to penetrate the body.

Copies of the Autopsy / Toxicology report along with all associated photographs are included with this investigation.

Based upon Detective Cooper's note of discrepancy, I contacted Officer Saldivar and requested him to the Office of Internal Affairs.  He responded on January 7, 2018, along with his attorney, Greg Cagle.  The interview began at approximately 12:01pm and included Officer Saldivar, Mr. Cagle, IAD Sergeant Bowman, and I.  The following is a summary of that interview:

*I began by informing Officer Saldivar how the interview would not cover the entirety of the incident.  I advised him the need to focus on the struggle and why it led to him discharging his weapon.  Officer Saldivar responded that he understood.*

*I first asked why Officer Saldivar had not delivered any strikes or kicks during the altercation. He simply responded, "Because he was strong."  When asked to elaborate, Officer Saldivar explained how he had attempted to place the suspect into an arm-bar.  He said the suspect had been able to resist this action "without issue" and had been able to flex his arm despite Officer Saldivar putting a lot of pressure on the arm.  I asked if he felt he was unable to place himself into a dominant position over the suspect, which he responded, "this person was very, very strong."  Officer Saldivar added that he believes himself to be "in-shape"; however, he was overcome by the suspect and was afraid.  I asked if Officer Saldivar had been free to deliver any strikes.  He answered that he was only able to "lock-up" with the suspect and was hoping to "hold on" until back-up officers arrived.  Despite being entangled, the suspect was still able to throw Officer Saldivar around like a "rag doll".*

*I next followed a line of questioning, which pointed out the discrepancy, noted by Detective Cooper, between Officer Saldivar's statement and the video.  It should be noted these questions were not meant to make an implication of wrong-doing.  I began with how Officer Saldivar had stated the suspect arose in a "football-like" stance while reaching at his waistline for a potential weapon.  However, in the video, it appears the suspect is turning / spinning a*

**EXHIBIT 37**

CONFIDENTIAL

*described how these actions, as well as when Officer Saldivar drew his weapon, are not seen on video, which makes it difficult to discern what occurred. I then requested Officer Saldivar address the discrepancy.*

*Officer Saldivar responded how he was unsure if he could provide any further information. He explained how, upon disengaging from the suspect, he had been in the lower position with the suspect over him. Officer Saldivar said he was unsure if the suspect had a weapon or retrieved a knife from his duty belt during the struggle; therefore, he "reacted." Officer Saldivar stated that suspect was still in a position over him when he grabbed his weapon. He then explained how he did not recall the exact timing of events or if he had "got sights on him" nor did he wish to recall. Officer Saldivar said he definitely felt the suspect was a threat and he had been overpowered "without fail". When asked to clarify, Officer Saldivar advised that he had been in fear for his safety and had responded on instinct.*

*Officer Saldivar made several comments about his recollection was limited. I advised that I was not requesting for him to make additions to his statement unless, due to the additional recovery time, he had recalled more information. Officer Saldivar reiterated how he was aware he had shot at the suspect; however, could not recall exact details nor if the rounds fired had struck the suspect. He acknowledged the limited time span in which this incident occurred but he could not "see anything".*

*I concluded by asking why Officer Saldivar had not responded to Detective's Cooper's additional questions. He responded how the information had been forwarded to Mr. Cagle, who advised him to not respond because the original statement was to the best of his recollection. Mr. Cagle stated that an additional affidavit would have been redundant and unnecessary.*

The meeting concluded at 12:10pm, and was approximately 9 minutes and 20 seconds in length. A copy of the recording was downloaded with Officer Saldivar's initial interview onto a CD and is included with this jacket.

## SUMMARY

On Wednesday, November 21, 2018, Officer Rigoberto Saldivar was working a Selective Traffic Enforcement Program (STEP). Officer Saldivar had chosen to monitor the stop sign for the intersection of 6200 Pine Street and 2400 Jana Lane. At approximately 7:29pm, the suspect vehicle (Silver, Ford Focus, Texas tag – ████████) approached the intersection eastbound on Pine St. As the suspect vehicle arrived to the intersection, it slowed but failed to come to a complete stop before turning northbound on Jana Ln. Officer Saldivar then attempted to initiate a traffic and observed the suspect vehicle proceed northbound on Jana Ln; however, it traveled in the wrong lane (northbound in the southbound lane). The suspect vehicle then made a turn south-by-southeast onto the 4400 block of Red Bluff Road before entering a private parking lot for Hawk's Bar (4416 Red Bluff Rd).

Once in the parking lot, the suspect, later identified as Nathan Schenk (w/m, ████████), pushed a back pack outside of the passenger window of the vehicle before exiting. As Schenk exited, Officer Saldivar gave several commands for him to remain in the car. Schenk disregarded the



EXHIBIT 37

Revised: 10/26/09

CONFIDENTIAL

commands, retrieved the back pack, and began evading by running south-by-southwest on Golden Villas Street.

Officer Saldivar continued the pursuit southbound on Golden Villas before the suspect ran through a small alleyway located between Brother's Recycling (4418 Red Bluff Rd) and the residence of 2510 Golden Villas St. As Schenk entered the back yard of the residence, Officer Saldivar deployed his Taser without effect. The suspect continued westbound into the backyard of 2407 Jana Ln, which had no barricade (fence) to separate the two properties. Schenk then proceeded across the roadway, through the parking lot of 2412 Jana Ln, and into the grass yard of 2420 Jana Ln. It should be noted, throughout the pursuit, Schenk discarded multiple items of contraband (pill bottles, prescription pills). As they were approaching the grass yard, Officer Saldivar deployed his Taser a second time. This caused the suspect to cease evading and fall to the ground.

As Schenk fell to the ground, Officer Saldivar engaged and attempted to place him into custody. Officer Saldivar was able to grab Schenk's right arm; however, was unable to gain control over him. Based upon body camera footage, Schenk continued to struggle and was able to pull Officer Saldivar up and off balance, which caused him to fall over.

Once on the ground, per Officer Saldivar's statement, the suspect arose in a manner that lead Officer Saldivar to believe the suspect was reaching to his waistline for a weapon or preparing to attack. However, Schenk turned away as Officer Saldivar drew and discharged his weapon. Officer Saldivar discharged his duty weapon five times striking Schenk once in the left side of his torso and twice in the lower back. It should be noted these actions were not recorded on the body worn camera and were discerned from statements and evidence.

Following the shooting, Officer Saldivar maintained cover over the suspect until back-up officers arrived and secured Schenk in handcuffs. Acadian Ambulance #966 arrived shortly thereafter and pronounced Schenk deceased at 7:48pm. The deceased was left at the location, in the position of arrest, as Detectives and Internal Affairs were contacted.

Upon completion of the investigation, Schenk was found to be in possession of numerous illegal narcotics (prescription pills) and more than $8,000.00 in various currencies. It is believed Schenk was distributing narcotics and evaded / resisted Officer Saldivar in order to avoid arrest. After this incident had occurred, it was also learned that Schenk had borrowed the suspect vehicle from a female who admitted she had purchased pain medication from him in the past.

As of January 9, all investigative reports were completed and forwarded to the Harris County District Attorney's Office for presentation to the Grand Jury. However, as of this date, per Assistant District Attorney Johnson, the investigation has not yet been presented for review. Once the Grand Jury has had an opportunity to evaluate all case documents and reach a finding, ADA Johnson will notify Detective Cooper and I. At that time, an administrative supplement will be included to document the results. No further action taken at this time.

**EXHIBIT 37**

Revised: 10/26/09

CONFIDENTIAL

- 29 -

# EVIDENCE

1 DVD – Body Camera Video
1 DVD – Dash Camera Video
1 DVD – Dash Camera Panoramic Video
1 CD – Officer Saldivar Interviews (2)
1 CD – Chanel 1 & 2 Radio Traffic
2 CD – Crime Scene Photographs
1 DVD – Crime Scene Photographs
1 DVD – Autopsy Photographs / Report

**C.A. Hamilton, Sergeant  #1122**
**Internal Affairs**

EXHIBIT 37

Revised: 10/26/09
CONFIDENTIAL

# PASADENA POLICE DEPARTMENT
### Inter-Office Correspondence



| | | | |
|---|---|---|---|
| **To:** | Sgt. Hamilton | **Date:** | November 26, 2018 |
| **From:** | R.Saldivar 5750 | | |
| **Subject:** | Shooting 18-21371 | | |

On 11/26/2018 at 2:25 AM at 1201 Davis Street, I was ordered to give this statement by R.Saldivar. I give this statement at his order as a condition of employment. In view of possible job forfeiture, I have no alternative but to abide by this order.

It is my belief and understanding that the Department requires this statement solely and exclusively for internal purposes and will not release it to any other agency. It is my further belief that this statement will not and cannot be used against me in any subsequent proceedings other than disciplinary proceedings within the confines of the Department itself.

For any and all other purposes, I hereby reserve my constitutional right to remain silent under the FIFTH and FOURTEENTH AMENDMENTS to the UNITED STATES CONSTITUTION and any other rights PRESCRIBED by law. Further, I rely specifically upon the protection afforded me under the doctrines set forth in GARRITY vs. New Jersey, 385 US 493, and Spevack vs. Klein, 385 US 551, should this statement be used for any other purpose of whatsoever kind or description.

On November 21, 2018, I was on duty working a Selective Traffic Enforcement Program (STEP) from 6:00 p.m. to 10:00 p.m. at the intersection of Pine Ave and Jana Ln. I was operating my assigned marked patrol unit (#1631) and wearing my patrol uniform. At approximately 7:30 p.m., I observed a small silver Ford Focus four door (███████) car traveling eastbound on Pine Ave. As the vehicle approached the stop sign at Pine and Jana, it failed to stop and disregarded the stop sign and turned eastbound on to Jana Ln. towards Red Bluff. I immediately activated my emergency lights and pulled behind the vehicle which was now driving on the wrong side of the roadway on Jana Ln. as it approached Red Bluff Rd. The vehicle made no attempt to pull over despite the emergency red and blue lights on my marked patrol unit. The vehicle stopped at Jana Ln. and Red Bluff Rd., still on the wrong side of the roadway and then continued southbound on Red Bluff Rd. I continued behind the vehicle with my emergency lights activated. The vehicle finally pulled into the Hawks Place Bar located at 4416 Red Bluff Rd. without signaling the intent to turn.

Due to the vehicle not stopping immediately and the vehicle driving on the wrong side of the roadway on Jana Ln., I believed the driver was possibly under the influence of alcohol or drugs. I exited my patrol car for officer safety and called out on traffic on channel one giving my location. I would typically use my MDC, but the driver's action caused me to want to remain focused on the driver. I remained behind my open driver's side door for cover. While waiting for channel one to acknowledge my traffic, the driver (tall white male wearing black jacket, blue jeans) exited the vehicle. The suspect

**EXHIBIT 37**



**CONFIDENTIAL**

Revised 11/80/11

looked back at me, and began walking to the front of his vehicle. I shouted several commands for the driver to stay in the car which he ignored, instead walking to the passenger side of his car, causing me to lose sight of his lower body. I moved from behind my door during this time and moved across the front of my vehicle to try and determine what the driver was doing. As I moved towards the male I asked him what he was doing and he did not respond. I observed him bend down and pick up a dark back pack that was next to the front passenger door of the vehicle he had exited. He then began running westbound on Golden Villas. I immediately notified dispatch over the radio I had one running providing my direction of travel and a suspect description. The suspect then ran northbound between an alley on the east side of a house located at 2510 Golden Villas. The male ran into the back backyard and looked like he was attempting to jump a wood fence when I deployed my Taser striking the male in the back. The Taser was ineffective and he continued running northbound through the backyard and crossing an open lot leading to Jana Ln.

I continued to chase the suspect who was now running westbound and approaching the intersection of Pine Ave and Jana Ln. I broadcasted my new location to dispatch and reloaded my Taser. I yelled at the suspect to get on the ground. He ignored my command and I then deployed my Taser a second time striking the suspect in his back. The suspect then fell into the front yard at 2420 Jana Ln. ending up on his back. Believing the Taser was effective and I had time to attempt to handcuff him while he was under the effect of the taser, I jumped onto the suspect. As I was doing so, the suspect extended his arms upward at me. I grabbed his extended right arm in an attempt to place handcuffs on him and we ended up face to face on the ground. The suspect grabbed me as soon as we made contact and started pushing me to the side as if he was trying to flip me onto my back. I began struggling with the suspect, who was overpowering me. I realized he was strong and was about to get me in an extremely bad position. I released his right arm and rotated off his body moving into a position where we were both head to head with our feet on opposite sides, but still on the ground. As we continued to struggle for leverage, I was able to trap his right arm and his head in a bear hug with my upper torso on top of his head in an attempt to use my weight to keep the suspect lying flat on the wet grass. The suspect was able to push forward towards me and lift off the ground. As a result, he had use of both of his arms in the position and could reach my body. Despite my complete weight on the suspect's head and upper back, he continued to lift me up and tried several times to pull my legs underneath him to place me in a mounted position below him. I yelled commands several times to stay on the ground which he refused. I could feel the suspect grabbing at my duty belt with his hands along my gun side and near my magazine pouches where my knife is located. Fearing the suspect was attempting to take one of my weapons, I warned him I was going to shoot him and to stay on the ground. The suspect continued pushing and started to overpower me. The suspect was able to lift me up off the ground and sling me to my right. At this time, I was exhausted from the struggle and could not hold onto to him anymore. I released my hold and pushed away from him as hard as I could creating some distance, but still not knowing if he had control of my knife.

I then observed the suspect facing me in a standing, but slightly crouched over position (I would describe it as football defensive stance) and he started reaching with his right hand towards his waist line. At this point I was on the ground approximately 5 feet away from the suspect. I was trying to get up to my knees. The fact that the suspect did not simply flee at this point and was instead facing me and standing in the position described made me believe he definitely wanted to hurt me. The movement he was making with his hand appeared to be that of a person drawing a pistol from their waistband. Fearing the suspect was reaching for a weapon to kill me, I drew my duty weapon and

**EXHIBIT 37**

Revised: 114/3001

CONFIDENTIAL

- 3 -

fired several shots at the suspect. I believe I was just getting up onto my knees at this point and may have still had my left hand on the ground supporting my body. I observed the suspect fall on his back. I stood up and observed my body camera on the ground and picked it up and placed it on my uniform. The body camera would not stay attached and I later learned it had been broken during the struggle. The suspect attempted to get up, at which time I informed him he would be shot again and he remained down. I broadcasted that shots had been fired notifying dispatch the suspect was shot. During this time the suspect tried two other times to stand up as I yelled at him to stay down. I continued to yell commands for the suspect to not to move until additional patrol officers arrived on scene and handcuffed the suspect.

I surrendered my duty weapon and magazines (Glock 19 / 9mm) to ID Officer S. Dudley.


End of Statement

*R. Soldivan*

Officer R.Saldivar 5750

EXHIBIT 37

CONFIDENTIAL

PASADENA POLICE DEPARTMENT
**RECORD OF COMPLAINT**

Report Date: _11/22/2018_     Time: _08:00_     ☒ AM ☐ PM
Complainant Received from:
☐ Person          ☒ Phone          ☐ Letter          ☐ Anonymous

**INFORMATION FROM :** (CIRCLE ONE)
☐ Complainant     ☐ Reportee     ☐ Witness     ☒ Police Officer     ☐ Civilian
NAME:
Last: _Chief J. Bruegger_     First: _____     Middle: _____

DOB: _____ Age: _____ Race: _____ Sex: _____ DL#: _____
Social Security Number: _____
ADDRESS:                    CITY STATE ZIP
Residence: _____     Phone: _____
Business: _____     Phone: _____

Was the complainant charged with an offense?     ☐     Yes     ☐     No
Charges Filed: _____     Case #: _18·021371_

**INCIDENT INFORMATION:**

Date: _11/21/2019_     Time: _19:32_     Location: _6200 Pine Ave_

Officer(s) Involved:

| Rank | Name | Emp# | Race/Sex | Assignment | Shift |
|------|------|------|----------|-----------|-------|
| Officer | Rigoberto Saldivar | 5750 | Male | Patrol | Nights |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**ALLEGATIONS:** Complainant alleges:

| Officer Involved Shooting |
|---|

I certify that the person making this complaint has been informed by me that no investigation will be made by this Department regarding this complaint until a signed complaint is received by Internal Affairs within 30 days of the date of this incident.

| C. Hamilton | Sergeant | 1122 |
|---|---|---|
| Name | Rank | Employee # |

**IAD Use ONLY**

Date Received: _11/22/18_     Control Number: _1286_

Classification: _I_     Allegation(s): _OIS_

**EXHIBIT 37**

CONFIDENTIAL



# CITY OF PASADENA
## POLICE DEPARTMENT



Officer R. Saldivar
Employee #5750
Patrol Division

Re: Complainant: Acting Chief of Police J. Bruegger
    Allegation: Officer–Involved Shooting
    Control #1286

Officer Saldivar:

It is alleged that on 11-21-2018, in the 6200 block of Pine Avenue, City of Pasadena, Harris County, Texas, you were involved in an Officer-Involved Shooting.  The allegation has been categorized as a Class I complaint.

This letter is to serve as notice to you that, at the direction of the Chief of Police, the Office of Internal Affairs will be conducting an investigation into this allegation.  Any questions concerning this investigation may be directed to Internal Affairs during normal business hours.

Regards,

Sergeant C. Hamilton
Internal Affairs Division

cc: J. A. Bruegger, Acting Chief of Police
    R. Styron, Asst. Chief of Police
    K. Wingerson, Asst. Chief of Police



EXHIBIT 37

CONFIDENTIAL

# Record of Receipt

Employee: R. Saldivar  #5750
Internal Affairs Control Number:  1286

On this date, I acknowledge I received a copy of:

1. Notification of Complaint letter
2. Record of Complaint  or Affidavit

I understand this copy serves as my official notification of the investigation and that any questions I may have in regards these documents or the investigation otherwise may be directed to personnel in the Office of Internal Affairs.

_____  11/26/18  11:08AM
Signature, date, and time of officer delivering notice

_____  11/26/18  11:08AM
Signature, date, and time of officer receiving notice



EXHIBIT 37

CONFIDENTIAL

# PASADENA POLICE DEPARTMENT
## Inter-Office Correspondence





**To:** Officer Rigoberto Saldivar, Emp. #5750          **Date:** November 22, 2018

**From:** J.A. Bruegger, Acting Chief of Police

**Subject:** Administrative Leave with Pay

In accordance with Section 1.6.5 Post-Incident Procedure, of the Pasadena Police Department's Procedures Manual, you are hereby placed on *administrative leave with pay* until further notice and pending successful completion of the following instructions:

- You are to meet with and follow any instructions conveyed to you by the Department's police psychologist, Dr. Rion Hart. Your appointment with Dr. Hart will be scheduled on Monday, November 26, 2018, and you will be informed of the date and time.

- You are to make arrangements as soon as practical with the Department's firearms range personnel and re-qualify with your duty weapon.

Should you have any questions concerning these instructions, please contact me directly or through the chain of command.

J.A. Bruegger
Acting Chief of Police

Revised: 10/26/09

**EXHIBIT 37**

**CONFIDENTIAL**

# PASADENA POLICE DEPARTMENT
### Inter-Office Correspondence



| | | | |
|---|---|---|---|
| **To:** | J. Wright, Assistant Chief of Police | **Date:** | September 19, 2019 |
| **From:** | J.M. McGill, Lieutenant | | |
| **Subject:** | Commander's Summary - IAD Control #1286 - Officer R. Saldivar # | | |

I received the completed IAD investigation for review and recommendation on the portion of the investigation pertaining to Officer Saldivar. The IAD Investigator's Summary of Complaint states:

*On November 21, 2018, at approximately 7:32pm, Officer Saldivar, who was working an overtime traffic assignment (S.T.E.P.), attempted to conduct a traffic stop for a vehicle that failed to stop at a stop sign at the intersection of 6200 Pine Street and 2400 Jana Lane. The suspect vehicle continued eastbound on Jana Lane, turned southbound of Red Bluff Rd, and finally stopped in the parking lot of Hawk's Bar (4416 Red Bluff). The suspect then exited the vehicle, failed to follow commands, and attempted to evade Officer Saldivar. As he pursued the suspect, Officer Saldivar deployed his Taser twice, which had minimal to no effect. At the end of the foot pursuit Officer Saldivar struggled with the suspect before drawing his duty weapon, discharging it, and ultimately killing the suspect. As of this date (August 12, 2019), the Harris County Grand Jury has yet to meet to discuss the outcome of this investigation. Upon receiving their findings, an administrative supplement will be completed. Sgt. C.A. Hamilton #1122.*

I have reviewed all the information gathered by IAD Sergeant C.A. Hamilton and the following is a summary of that information:

On December 10, 2016, Officer Saldivar was working an overtime assignment (S.T.E.P. the Selective Traffic Enforcement Program) when he observed a vehicle (Silver Ford Focus 4-door TX. LP. FGD-5246) traveling eastbound on Pine Avenue. As the suspect vehicle approached the stop sign, located at the intersection of Pine Avenue and Jana Lane, the vehicle failed to stop and disregarded the stop sign turning onto Jana Lane towards Red Bluff Road. Officer Saldivar activated his marked patrol unit's emergency equipment (blue and red overhead lights and siren) and pulled behind the vehicle, which was now driving on the wrong side of the road, on Jana Lane approaching Red Bluff Road. The suspect vehicle stopped briefly at the intersection of Jana Lane and Red Bluff (still on the wrong side of the roadway) and the vehicle then continued southbound on Red Bluff Road. The suspect vehicle then pulled off of Red Bluff Road into the parking lot of the Hawk's Place Bar, 4416 Red Bluff Road. Once stopped, the driver of the suspect vehicle (later identified as Schenk, Nathan Alexander W/M ████████ exited his vehicle and refused to obey the commands of Officer Saldivar. The suspect walked to the passenger side of his vehicle and retrieved a dark colored backpack all the while ignoring the commands of Officer Saldivar. The suspect then fled, on foot, running westbound on Golden Villas. Officer Saldivar pursued the

**EXHIBIT 37**
Revised: 11/30/11
**CONFIDENTIAL**

suspect, on foot, while advising police dispatch via radio that he was in pursuit of the suspect. The suspect, with Officer Saldivar in foot pursuit, then ran northbound in an alleyway located on the east side of the residence located at 2510 Golden Villas. The suspect then ran into the backyard the residence and it appeared as if he was attempting to go over a wooden fence in the backyard. Officer Saldivar at this time deployed his Taser with the probes striking the suspect in his back. The Taser was not effective and the suspect continued to flee northbound through the backyard and across an open lot leading to Jana Lane.

Officer Saldivar continued after the fleeing suspect as he ran westbound towards the intersection of Pine Avenue and Jana Lane (the location of the initial traffic violation observed by Officer Saldivar). Officer Saldivar advised dispatch of their current located and reloaded his Taser with a new cartridge while running after the suspect. Officer Saldivar yelled at the suspect to get on the ground, but when his command was ignored, Officer Saldivar deployed his Taser a second time. This time the Taser had an effect on the suspect upon the probes striking the suspect in his back. At this time they were in the front yard of 2420 Jana Lane. The suspect fell to the ground, onto his back, and Officer Saldivar, believing the Taser deployment had been effective attempted to gain control of the suspect by throwing himself on top of the suspect. At this time the suspect extended his arms upwards towards Officer Saldivar. Officer Saldivar grasped the suspect's extended right arm in an attempt to place handcuffs on the suspect and was now face to face, on top of, the suspect. The suspect tried to force Officer Saldivar off of him in an attempt to "flip" Officer Saldivar onto his back. Officer Saldivar, realizing that he was about to be placed in a disadvantageous situation, instead rotated his body so that he was now still face to face with the suspect but with their feet pointed in opposite directions. Officer Saldivar was able to "trap" the right arm of the suspect and the suspect's head in a "bear hug" and attempted to use his own body weight to keep the suspect on the ground and on his (the suspect's) back. The suspect instead was able to push forward and lift Officer Saldivar, still holding the suspect's head and part of the suspect's upper body, off of the ground. Both of the suspect's arms were free and even with the weight of Officer Saldivar's entire bodyweight on the suspect he continued to lift up Officer Saldivar and was attempting to grab Officer Saldivar's legs in an attempt to pull Officer Saldivar beneath him. The suspect was also grabbing at Officer Saldivar's duty belt at this time, near the magazine pouches on the duty belt, where Officer Saldivar had a knife. Fearing the suspect was attempting to get the knife Officer Saldivar repeatedly ordered the suspect to stay on the ground or he would shoot him. The suspect continued to push forward and began to overpower Officer Saldivar. The suspect instead continued to push forward and was able to push Officer Saldivar to his (Saldivar's right). Officer Saldivar, exhausted from the struggle, released his hold on the suspect and pushed away from the suspect as hard as he could in order to create distance between the two. Not knowing if the suspect had removed the knife from his duty belt Officer Saldivar and the suspect, now standing, and Officer Saldivar, attempting to stand but still on his knees, were approximately 5 feet apart. The suspect began to reach for his own waistband. Fearing the suspect was reaching for a weapon, to kill him with Officer Saldivar then fired several shots from his duty weapon at the suspect. The suspect then fell to the ground and Officer Saldivar advised via police radio that shots had been fired. The suspect attempted to get up from the ground two (2) more times and Officer Saldivar ordered him to stay on the ground. Responding units then began arriving to secure the scene.

It was later learned that the suspect was struck 3 times by rounds from Officer Saldivar's sidearm and succumbed to these injuries.

**EXHIBIT 37**

Revised: 11/30/11

CONFIDENTIAL

The allegation being investigated is listed as, "Officer Involved Shooting" and the use of deadly force by Officer R. Saldivar.

After reviewing the information gathered by Sergeant C.A. Hamilton, and regarding the "Officer Involved Shooting" and the use of deadly force, it is my opinion that Officer R. Saldivar's actions were justified and he should be exonerated of any wrongdoing in this investigation.

Officer Saldivar's actions were within the following sections of the Pasadena Police Department's Rules and Policies Manual and within State Law:

## 2.1    Abide By Laws

Officers of the Department will abide by the laws of the United States and the State of Texas, the ordinances of the City of Pasadena, and the Directives, Standard Operating Procedures, Rules, and Regulations and Policies of the City of Pasadena Police Department. This will include all personnel on or off duty.

## 2.82    Necessary Force in Making Arrests

Officers making a lawful arrest will not use more force than necessary in making the arrest or in dealing with a prisoner or any person, and will not subject such prisoner to more restraint than is necessary for his arrest and detention or for the safety and protection of anyone else.

## 10.1    POLICY

It is the policy of the Pasadena Police Department that officers use only the force reasonably necessary to bring an incident under control, while protecting the life of the officer and others, the use of force must be objectively reasonable. The officer must use only that force which a reasonable prudent officer would use under the same or similar circumstances.

## 10.3    PROCEDURES

1)    Use of Force
a) Officers may use only that level of force that is objectively reasonable to bring an incident under control.
b) Officers are authorized to use force, including department approved equipment and techniques, when one or more of the following apply:
    i.    To protect the officer or others from physical harm.
    ii.    To restrain or subdue a resistant individual.
    iii.    To bring an unstable, threatening, or unlawful situation safely and effectively under control.



EXHIBIT 37

Revised: 11/30/11

CONFIDENTIAL

- 4 -

2)   Use of Deadly Force:  Officers are authorized to use deadly force when it is necessary to protect the officer or others from what is reasonably believed to be an imminent threat of death or serious bodily harm.

It should be noted that as of this date the Harris County Grand Jury has yet to meet to discuss the outcome of this investigation per Sgt. C.A. Hamilton's original summary of complaint.

J.M. McGill, Lieutenant
Night Shift Commander

EXHIBIT 37

Revised: 11/30/11

CONFIDENTIAL

## PASADENA POLICE DEPARTMENT

### QUALIFICATION SCORE SHEET

Name: Saldivar, Rigo

Emp. #: 5750

| Course # | Date | Make | Model | Pass/Fail | Inspected By | Signature |
|---|---|---|---|---|---|---|
| H-5 | 4/19/18 | G | 22 | PASS | SR | Rigo Saldivar |
| H-6 | 5/2/18 | G | 43 | PASS | SR | Rigo Saldivar |
| R-3 | 5/2/18 | BM | XM 15 | PASS | SR | Rigo Saldivar |
| H-5 | 10-10-18 | G | 19 | Pass | DS | Rigo Saldivar |
| H-5 | 10-28-18 | G | 19 | Pass | SR | Rigo Saldivar |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

ECD: _____  Cartridge:_____  Cartridge:_____

EXHIBIT 37

CONFIDENTIAL



# EVIDENCE⊘SYNC™

| TASER Information | | Offline Report | |
|---|---|---|---|
| Serial | X00-706753 | Local Timezone | Central Standard Time (UTC -06:00) |
| Model | TASER X26 | Generated On | 04 Dec 2018 08:44:55 |
| Firmware Version | Rev. 22 | | |
| Application Version | 3.15.98 | | |

## Device (X26)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1 | 12 Feb 2013 08:09:28 | Sync | Invalid Date/Time to 12 Feb 2013 08:09:28 | | |
| 2 | 12 Feb 2013 08:09:30 | Sync | 12 Feb 2013 08:09:30 to 12 Feb 2013 08:09:30 | | |
| 3 | 12 Feb 2013 08:10:31 | Trigger | 5 | 22 | 99 |
| 4 | 12 Feb 2013 08:10:37 | Trigger | 5 | 22 | 99 |
| 5 | 12 Feb 2013 08:10:43 | Trigger | 5 | 23 | 99 |
| 6 | 08 Apr 2015 23:13:48 | Trigger | 5 | 18 | 94 |
| 7 | 08 Apr 2015 23:24:03 | Trigger | 5 | 20 | 94 |
| 8 | 16 Apr 2015 05:17:50 | Trigger | 5 | 23 | 93 |
| 9 | 23 Apr 2015 18:41:17 | Trigger | 5 | 24 | 93 |
| 10 | 23 Apr 2015 18:41:36 | Trigger | 5 | 25 | 92 |
| 11 | 26 Apr 2015 22:17:43 | Trigger | 5 | 21 | 92 |
| 12 | 30 Apr 2015 22:38:38 | Trigger | 5 | 22 | 92 |
| 13 | 06 May 2015 00:48:22 | Trigger | 5 | 23 | 91 |
| 14 | 08 May 2015 22:59:49 | Trigger | 5 | 25 | 91 |
| 15 | 18 May 2015 22:01:13 | Trigger | 5 | 21 | 90 |
| 16 | 24 May 2015 13:29:21 | Trigger | 5 | 24 | 90 |
| 17 | 02 Jun 2015 00:16:54 | Trigger | 5 | 21 | 89 |
| 18 | 04 Jun 2015 01:59:35 | Trigger | 5 | 22 | 89 |
| 19 | 05 Sep 2015 18:10:27 | Trigger | 5 | 29 | 88 |
| 20 | 10 Sep 2015 01:40:01 | Trigger | 5 | 24 | 88 |
| 21 | 14 Sep 2015 00:04:51 | Trigger | 5 | 20 | 87 |
| 22 | 17 Sep 2015 22:51:55 | Trigger | 5 | 26 | 87 |
| 23 | 21 Sep 2015 21:57:50 | Trigger | 5 | 20 | 86 |
| 24 | 25 Sep 2015 19:15:34 | Trigger | 5 | 23 | 86 |
| 25 | 28 Sep 2015 01:07:11 | Trigger | 5 | 23 | 86 |
| 26 | 30 Sep 2015 20:11:22 | Trigger | 5 | 24 | 85 |
| 27 | 08 Oct 2015 23:32:01 | Trigger | 5 | 22 | 85 |
| 28 | 21 Oct 2015 23:26:43 | Sync | 21 Oct 2015 23:39:52 to 21 Oct 2015 23:26:43 | | |
| 29 | 21 Oct 2015 23:27:56 | Trigger | 5 | 23 | 84 |
| 30 | 10 Nov 2015 21:15:30 | Trigger | 5 | 22 | 84 |
| 31 | 16 Nov 2015 23:37:59 | Trigger | 5 | 23 | 83 |

EXHIBIT 37

Page 1 of 3

CONFIDENTIAL

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 32 | 04 Dec 2015 02:02:41 | Trigger | 5 | 21 | 83 |
| 33 | 16 Dec 2015 22:33:00 | Trigger | 5 | 19 | 82 |
| 34 | 18 Jan 2016 04:20:48 | Trigger | 5 | 21 | 82 |
| 35 | 19 Jan 2016 23:10:01 | Trigger | 5 | 17 | 81 |
| 36 | 28 Jan 2016 23:21:37 | Trigger | 5 | 24 | 81 |
| 37 | 08 Feb 2016 02:05:38 | Trigger | 5 | 20 | 80 |
| 38 | 10 Feb 2016 22:03:48 | Trigger | 5 | 20 | 80 |
| 39 | 09 Mar 2016 04:28:17 | Trigger | 5 | 20 | 79 |
| 40 | 23 Mar 2016 04:03:55 | Trigger | 5 | 20 | 79 |
| 41 | 15 Apr 2016 04:56:09 | Trigger | 5 | 21 | 78 |
| 42 | 19 Apr 2016 22:13:57 | Trigger | 5 | 22 | 78 |
| 43 | 28 Apr 2016 23:30:31 | Trigger | 5 | 20 | 77 |
| 44 | 26 May 2016 00:01:12 | Trigger | 5 | 23 | 77 |
| 45 | 01 Jun 2016 02:16:12 | Trigger | 5 | 23 | 77 |
| 46 | 04 Jun 2016 17:53:23 | Trigger | 5 | 20 | 76 |
| 47 | 03 Jul 2016 22:46:30 | Trigger | 5 | 26 | 75 |
| 48 | 04 Jul 2016 06:14:59 | Trigger | 2 | 20 | 75 |
| 49 | 15 Jul 2016 00:12:33 | Trigger | 5 | 25 | 75 |
| 50 | 27 Jul 2016 13:17:15 | Sync | 27 Jul 2016 13:21:27 to 27 Jul 2016 13:17:15 | | 74 |
| 51 | 27 Jul 2016 13:20:24 | Trigger | 5 | 23 | 74 |
| 52 | 04 Sep 2016 22:17:43 | Trigger | 5 | 17 | 74 |
| 53 | 13 Sep 2016 00:42:06 | Trigger | 5 | 20 | 73 |
| 54 | 02 Oct 2016 23:30:04 | Trigger | 5 | 21 | 73 |
| 55 | 04 Oct 2016 03:23:56 | Trigger | 5 | 22 | 72 |
| 56 | 11 Oct 2016 23:56:54 | Trigger | 5 | 21 | 72 |
| 57 | 10 Nov 2016 14:02:19 | Trigger | 5 | 22 | 71 |
| 58 | 28 Nov 2016 22:04:05 | Trigger | 2 | 20 | 71 |
| 59 | 05 Dec 2016 23:31:35 | Trigger | 5 | 20 | 70 |
| 60 | 06 Dec 2016 23:50:15 | Trigger | 5 | 24 | 70 |
| 61 | 06 Dec 2016 23:50:21 | Trigger | 5 | 25 | 70 |
| 62 | 09 Dec 2016 05:42:48 | Trigger | 5 | 19 | 69 |
| 63 | 18 Dec 2016 22:22:27 | Trigger | 2 | 17 | 69 |
| 64 | 22 Dec 2016 02:31:20 | Trigger | 5 | 19 | 68 |
| 65 | 22 Dec 2016 02:31:31 | Trigger | 6 | 20 | 68 |
| 66 | 22 Dec 2016 21:07:26 | Trigger | 2 | 22 | 68 |
| 67 | 06 Jan 2017 05:30:17 | Trigger | 5 | 21 | 67 |
| 68 | 13 Jan 2017 21:53:44 | Trigger | 5 | 21 | 67 |
| 69 | 18 Jan 2017 16:25:56 | Trigger | 5 | 22 | 66 |
| 70 | 13 Feb 2017 00:59:11 | Trigger | 5 | 21 | 65 |
| 71 | 14 Feb 2017 00:59:31 | Trigger | 5 | 22 | 65 |
| 72 | 14 Feb 2017 01:01:10 | Trigger | 2 | 24 | 64 |
| 73 | 28 Apr 2017 01:11:31 | Trigger | 5 | 23 | 64 |
| 74 | 08 May 2017 23:35:49 | Trigger | 5 | 22 | 63 |
| 75 | 10 May 2017 23:32:00 | Trigger | 5 | 22 | 63 |
| 76 | 22 May 2017 22:16:37 | Trigger | 5 | 21 | 62 |

EXHIBIT 37
Page 2 of 3

CONFIDENTIAL

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 77 | 05 Jun 2017 23:44:25 | Trigger | 5 | 22 | 62 |
| 78 | 15 Apr 2018 21:53:12 | Trigger | 1 | 18 | 60 |
| 79 | 15 Apr 2018 21:53:30 | Trigger | 1 | 19 | 60 |
| 80 | 15 Apr 2018 21:53:58 | Trigger | 1 | 20 | 60 |
| 81 | 24 Apr 2018 05:47:53 | Trigger | 5 | 19 | 85 |
| 82 | 24 Apr 2018 22:20:19 | Trigger | 5 | 20 | 85 |
| 83 | 06 May 2018 21:54:12 | Trigger | 4 | 21 | 85 |
| 84 | 07 May 2018 04:42:44 | Trigger | 5 | 24 | 84 |
| 85 | 16 May 2018 21:51:27 | Trigger | 3 | 20 | 84 |
| 86 | 18 May 2018 00:36:00 | Trigger | 5 | 23 | 83 |
| 87 | 27 Jun 2018 02:01:58 | Trigger | 5 | 19 | 83 |
| 88 | 11 Jul 2018 01:53:02 | Trigger | 5 | 23 | 82 |
| 89 | 28 Jul 2018 20:50:10 | Trigger | 3 | 24 | 82 |
| 90 | 31 Jul 2018 00:35:16 | Trigger | 5 | 23 | 82 |
| 91 | 09 Aug 2018 00:57:47 | Trigger | 5 | 19 | 81 |
| 92 | 12 Aug 2018 23:43:23 | Trigger | 5 | 18 | 81 |
| 93 | 16 Aug 2018 22:24:53 | Trigger | 5 | 22 | 80 |
| 94 | 21 Aug 2018 01:45:22 | Trigger | 5 | 20 | 80 |
| 95 | 27 Aug 2018 22:06:49 | Trigger | 5 | 21 | 79 |
| 96 | 06 Sep 2018 02:38:41 | Trigger | 5 | 25 | 79 |
| 97 | 13 Sep 2018 00:05:01 | Trigger | 5 | 21 | 78 |
| 98 | 08 Oct 2018 03:10:50 | Trigger | 5 | 22 | 78 |
| 99 | 16 Oct 2018 00:57:57 | Trigger | 5 | 20 | 77 |
| 100 | 21 Nov 2018 19:44:36 | Trigger | 5 | 18 | 77 |
| 101 | 21 Nov 2018 19:45:03 | Trigger | 5 | 19 | 76 |
| 102 | 04 Dec 2018 08:49:37 | Trigger | 5 | 16 | 70 |
| 103 | 04 Dec 2018 08:39:25 | Sync | 04 Dec 2018 08:52:41 to 04 Dec 2018 08:39:25 | | |
| 104 | 04 Dec 2018 08:44:23 | Sync | 04 Dec 2018 08:44:23 to 04 Dec 2018 08:44:23 | | |

**EXHIBIT 37**

Page 3 of 3

CONFIDENTIAL



**HARRIS COUNTY**
**INSTITUTE OF FORENSIC SCIENCES**
SCIENCE. SERVICE. INTEGRITY.

Luis A. Sanchez, M.D.
Executive Director &
Chief Medical Examiner

## AUTOPSY REPORT

Case No.   ML18-4115

November 22, 2018

### ON THE BODY OF

Nathan Alexander Schenk

CAUSE OF DEATH:   Gunshot wounds of torso

MANNER OF DEATH:   Homicide

DATE OF DEATH:   November 21, 2018

_____          12/7/18
Hannah C. Jarvis, MBBS                         MMDDYY
Assistant Medical Examiner

Reviewed by:

_____          12/11/18
Dwayne A. Wolf, M.D., Ph.D.                   MMDDYY
Deputy Chief Medical Examiner

1861 Old Spanish Trail, Houston, Texas 77054 | (832) 927-5000 | (832) 927-2869 (F) | ifs.harriscountytx.gov

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-2-

## POSTMORTEM EXAMINATION ON THE BODY OF

### Nathan Alexander Schenk

**HISTORY:** This 34-year-old white man was pronounced dead at 2420 Jana Lane, Pasadena, Texas, on November 21, 2018, at 7:49 p.m. Positive identification was confirmed by fingerprint comparison.

**AUTOPSY:** The autopsy is performed at the Harris County Institute of Forensic Sciences by Assistant Medical Examiner Hannah C. Jarvis, pursuant to Article 49.25, beginning at 9:15 a.m. on November 22, 2018. Detective M.D. Cooper, Pasadena Police, was in attendance.

**EXTERNAL APPEARANCE:** Morgue identification bands encircle the left wrist and left ankle. A green tracking alarm encircles the left ankle. The wrists are secured together around the lower back with grey metal handcuffs, and the hands are covered with brown paper bags.

The body is that of a well-developed, well-nourished, average framed, 69 inch, 171 pound white man whose appearance is consistent with the given age of 34 years. The straight brown scalp hair measures up to approximately 6 inches. There is a 3/4 of an inch mustache and beard. The eyes have blue irides and clear conjunctivae without petechiae, hemorrhage, or jaundice. There are no palpable facial fractures. The oral cavity has natural teeth and an atraumatic mucosa. The abdomen is soft and flat. The posterior torso is unremarkable except for injuries described below. The fingernails are intact and extend short of the fingertips. The atraumatic external genitalia and anus are that of a normal adult male. The testes are descended and free of palpable masses.

**POSTMORTEM CHANGES:** There is moderate symmetrical rigor mortis in the upper and lower extremities, neck and jaw. Livor mortis is unfixed and posterior, sparing pressure points. The body is cold, subsequent to refrigeration.

**THERAPEUTIC PROCEDURES:** There is an adhesive electrocardiogram electrode on each leg.

## EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-3-

CLOTHING:  The body is received clad in jeans with a belt, two socks, two shoes (the left shoe is loose in the body bag), a T-shirt and a jacket. The clothing is blood stained and there are multiple defects which correspond to some of the gunshot wounds described below.

INJURIES:
There are three gunshot wounds of the torso. All descriptions and directions are referenced to the standard anatomical planes with the body lying in the horizontal position and no sequence is implied.

A. GUNSHOT WOUND OF TORSO (#1):

A gunshot entrance wound on the lateral left chest is centered 20 inches below the top of the head, 6 inches to the left of the midline in the mid axillary line.  It consists of a 1/4 of an inch circular defect in the skin. There is a 1/16 of an inch symmetric margin of abrasion. There is no stippling or fouling on the adjacent skin.

After perforating the skin and soft tissues of the lateral chest wall, the bullet enters the left pleural cavity through the fourth intercostal space, fracturing the fourth and fifth left ribs. There is internal beveling of the ribs. It then perforates the upper lobe of the left lung and exits the left pleural cavity through the posteromedial third intercostal space, fracturing the third and fourth ribs. The bullet then continues in the musculature of the upper back, crossing the midline posterior to the vertebral column and becomes lodged in the upper right back.

There is associated soft tissue hemorrhage and parenchymal hemorrhage of the left lung within the wound track. The exit wound of gunshot wound #3 is located 2 inches superior and 1-1/4 inches posterior to the entrance wound of gunshot wound #1. Both tracks intersect with one another. There is a faint purple-grey contusion surrounding the entrance wound and skin defect.

The bullet lodgment site is centered 15 inches below the top of the head and 2 inches to the right of the midline within the subcutaneous tissues of the upper right back at the T1 thoracic vertebral level.

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-4-

The bullet is deformed and has a gray metal core covered with an orange metal jacket.
It is photographed and submitted to the evidence unit in a labelled envelope.

The bullet travelled from front to back, left to right and upward.

B. GUNSHOT WOUND OF TORSO (#2):

A gunshot entrance wound on the lower right back is centered 25 inches below the top
of the head and 3 inches to the right of the midline.  It consists of a 1/4 of an inch
circular defect in the skin.   There is an asymmetric margin of abrasion that measures
up to 1/8 of an inch between the 2 o'clock and 4 o'clock positions and 1/16 of an inch
between the 4 o'clock and 2 o'clock positions. There is no stippling or fouling on the
adjacent skin.

After perforating the skin and soft tissues of the lumbar back, the bullet perforates the
vertebral column, fracturing the L1 and L2 lumbar vertebral bodies with injury of the
underlying cauda equina. It then continues into the retroperitoneal space and enters the
peritoneal cavity inferior to the pancreas. It perforates the transverse mesocolon and
becomes lodged within the greater omentum.

There is associated soft tissue and peri-pancreatic hemorrhage within the wound track.
There is epidural and subdural hemorrhage surrounding the lower lumbar spinal cord
and cauda equina.

The bullet lodgment site is centered 22 inches below the top of the head and 3 inches
to the left of the midline in the upper left abdomen.

The bullet is deformed and has a gray metal core covered with an orange metal jacket.
It is photographed and submitted to the evidence unit in a labelled envelope.

The bullet travelled from back to front, right to left, and upward.

C. GUNSHOT WOUND OF TORSO (#3):

A gunshot entrance wound on the mid left back is centered 23 inches below the top of
the head and 4 inches to the left of the midline.   It consists of a 1/4 of an inch circular

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-5-

defect in the skin.  There is an irregularly shaped asymmetric margin of abrasion that measures up to 1/8 of an inch between the 3 o'clock and 9 o'clock positions and up to 1/16 of an inch between the 9 o'clock and 3 o'clock positions. There is a 3/16 by 1/8 of an inch rectangular shaped abrasion extending from the wound in the 4 o'clock position. There is no stippling or fouling on the adjacent skin.

After perforating the skin and soft tissues of the mid back, the bullet enters the left pleural cavity through the tenth intercostal space, fracturing the eleventh rib.  It then perforates the posterior aspect of the dome of the left hemidiaphragm to enter the peritoneal cavity. It grazes the diaphragmatic surface of the spleen, penetrating up to 2 centimeters into the splenic parenchyma, penetrating deeper towards the superior margin. The bullet also grazes the abdominal surface of the left hemidiaphragm. It then perforates the anterior aspect of the dome of the left hemidiaphragm to re-enter the left pleural cavity. A portion of greater omentum is protruding through the anterior defect in the left hemidiaphragm into the left pleural cavity. The bullet exits the left pleural cavity via the lateral seventh intercostal space, fracturing the seventh and eighth left ribs. There is external beveling of the ribs.

There are associated contusions of the left lower lobe of the lung, and soft tissue hemorrhage within the wound track.

The exit wound is a 1 inch non-abraded slit-like defect on the lateral left chest wall centered 18 inches below the top of the head, 6 inches to the left of the midline, and 1-1/4 inches posterior to the mid axillary line. The exit track of gunshot wound #3 intersects with the entrance track of gunshot wound #1 within the soft tissues overlying the left lateral chest.

The bullet travelled from back to front, right to left, and upward.

COMMENT:
No bullet is recovered from the track associated with gunshot wound #3. However, a bullet is recovered between the skin and inner clothing of the decedent at the scene, overlying the upper right posterior torso. (See "Scene Photographs").

ASSOCIATED FINDINGS: There is 800 milliliters of blood in the left pleural cavity and slight renal parenchymal pallor.

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-6-

## D. BLUNT IMPACT INJURIES OF HEAD:

There is a 1 by 1 inch v-shaped abraded contusion above the right eyebrow. The apex of the 'v' points upward. There are two 1/16 of an inch dry, red circular abrasions within the inferomedial aspect of the right eyebrow. There is a 1/8 by 1/16 of an inch dry, red rectangular abrasion on the right ala of the nose. There are multiple linear, dry red abrasions which range in size from 1/16 to 1/4 of an inch on the right temple. There are two roughly triangular-shaped dry, red abrasions overlying the right zygomatic arch, measuring up to 1/2 of an inch.

## E. BLUNT IMPACT INJURIES OF TORSO:

There are multiple dry, red irregularly shaped abrasions on the left flank ranging in size between 1/16 and 1/8 of an inch. There is a 3/16 of inch dry, red circular abrasion on the left periumbilical region.

## F. BLUNT IMPACT INJURIES OF RIGHT UPPER EXTREMITY:

There are two 1/2 of an inch dry, red linear abrasions on the dorsum of the right hand; each overlying the extensor tendon to the middle and ring fingers, respectively.

## G. HANDCUFF INJURY OF LEFT UPPER EXTREMITY:

There are two curvilinear dry, orange furrows of the skin coursing across the dorsal left hand and wrist, each measuring 2 inches and 4 inches in length, and 1/8 of an inch in width. They are separated from each other by 1/8 of an inch. There is no underlying subcutaneous hemorrhage.

These injuries, having been described, will not be repeated.

OTHER: Four electrodes from an electroshock weapon are lodged within the outer layers of the jacket. One is adjacent to the lower left front pocket, one is adjacent to the lower right front pocket, one is on the mid left back and one is on the mid right back. They are removed from the jacket, photographed and submitted to the evidence unit in a labelled container.

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-7-

**INTERNAL EXAMINATION:**

HEAD:  The scalp has no contusion.  The skull has no fracture.  There is no epidural, subdural, or subarachnoid hemorrhage.  The brain weighs 1340 grams and is normal size and shape.  The cerebral hemispheres are symmetrical and have the usual pattern of sulci and gyri.  The leptomeninges are thin and translucent.  The cerebral vessels are normally distributed and free of atherosclerosis or aneurysms.  The cranial nerves are normally distributed.   The white and gray matter, deep nuclei, brainstem, cerebellum, and ventricles are unremarkable and free of focal lesions.

NECK:  The anterior and posterior musculature is examined in layers and reveals no hemorrhage.  The cervical vertebrae, hyoid bone, tracheal and laryngeal cartilages, and paratracheal soft tissues have no trauma.  The upper airway is unobstructed.  The tongue is unremarkable.

BODY CAVITIES:  The organs are in their normal situs.  There are no fibrous adhesions.

CARDIOVASCULAR SYSTEM:  The aorta has no atherosclerosis.  The venae cavae and pulmonary arteries have no thrombus or embolus.

The heart weighs 340 grams and has a normal distribution of right predominant coronary arteries without atherosclerotic stenosis.  There are no recent thrombi.  The myocardium is homogenous dark red and firm and free of pallor, hemorrhage, softening, or fibrosis.   The left and right ventricular walls are concentrically 1.4 and 0.2 centimeters in thickness, respectively.   The endocardial surfaces and four cardiac valves are unremarkable and free of vegetations or thrombi.  The following circumferential valve measurements are obtained:  tricuspid valve 14 centimeters, pulmonic valve 7 centimeters, mitral valve 11 centimeters, and aortic valve 8 centimeters.   The coronary ostia are normal in location and morphology.

RESPIRATORY SYSTEM:  The right lung weighs 390 grams and the left lung weighs 290 grams.  The uninjured pleural surfaces are smooth and shiny with minimal anthracotic pigmentation.    The uninjured parenchyma is free of masses, hemorrhage, consolidation, or focal lesions.  The bronchial tree and vasculature are unremarkable and free of obstruction or thrombi.

**EXHIBIT 37**

CONFIDENTIAL

Nathan Alexander Schenk
ML18-4115
-8-

**LIVER, GALLBLADDER, AND PANCREAS:** The liver weighs 1410 grams and has an intact capsule. The parenchyma is red-brown, soft and free of focal lesions or nodularity. The gallbladder contains approximately 20 milliliters of dark green bile without gallstones. The pancreas is unremarkable in lobulation, color, and texture.

**HEMIC AND LYMPHATIC SYSTEMS:** The spleen weighs 120 grams. The uninjured parenchyma is soft and maroon without prominent white pulp. There is no lymphadenopathy.

**GENITOURINARY SYSTEM:** The right kidney weighs 130 grams and the left kidney weighs 140 grams. Each kidney has a smooth subcapsular surface with an unremarkable architecture and vasculature. The ureters maintain uniform caliber into an unremarkable bladder containing approximately 50 milliliters of clear yellow urine. The prostate gland is unremarkable and free of focal lesions.

**ENDOCRINE SYSTEM:** The thyroid and adrenal glands are each normal in color, size, and consistency. The parathyroid glands are inconspicuous.

**DIGESTIVE SYSTEM:** The esophagus and gastroesophageal junction are unremarkable. The stomach contains approximately 30 milliliters of opaque, light brown fluid. There are no identifiable intact pills or pill fragments. The gastric mucosa has no focal lesions. The serosal surfaces of small and large intestines are smooth and glistening. The appendix is unremarkable.

**MUSCULOSKELETAL SYSTEM:** The vertebrae, clavicles, sternum, and pelvis have no fracture. The musculature is normal in distribution and appearance, except for the injuries described above. There is no subcutaneous hemorrhage on the torso or extremities, except for that in association with injuries described above.

**HISTOPATHOLOGY:** Tissue sections are retained.

**TOXICOLOGY:** Samples are submitted for toxicologic analysis; a separate report will be issued.

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18–4115
–9–

POSTMORTEM RADIOGRAPHY:   Postmortem radiographs of the entire body are taken and retained.

PHOTOGRAPHY:   Photographs are taken.

EVIDENCE:   Two bullet envelopes, a container with four electrodes and the clothing as listed above are submitted to the evidence unit.

Handcuffs were removed, photographed, placed in labeled enveloped and handed directly to Detective M.D. Cooper.


PATHOLOGICAL FINDINGS

I. Penetrating gunshot wound of torso (#1)
    A. Entrance: lateral left chest
    B. Path and injuries:
        1. Left fourth intercostal space, left lung upper lobe, left third intercostal space
        2. Fractures of left third, fourth and fifth ribs
    C. Bullet recovered from upper right back
    D. Direction: front to back, left to right and upward
    E. Associated findings: contribution to left hemothorax, 800 mL

II. Penetrating gunshot wound of torso (#2)
    A. Entrance: lower right back
    B. Path and injuries:
        1. Lumbar vertebral column, cauda equina
        2. Lumbar L1 and L2 vertebral body fractures
    C. Bullet recovered from greater omentum, upper left abdomen
    D. Direction: back to front, right to left and upward
    E. Associated findings: epidural and subdural hemorrhage of spinal cord

EXHIBIT 37

CONFIDENTIAL

Nathan Alexander Schenk
ML18–4115
–10–

III. Perforating gunshot wound of torso (#3)
    A. Entrance: mid left back
    B. Path and injuries:
        1. Left tenth intercostal space, left hemidiaphragm, spleen, left seventh intercostal space
        2. Fractures of left seventh, eighth and eleventh ribs
    C. Bullet recovered at scene
    D. Exit: left lateral chest
    E. Direction: back to front, right to left and upward
    F. Associated findings: contribution to left hemothorax, 800 mL

IV. Blunt impact injuries of head
    A. Abrasions and contusion

V. Blunt impact injuries of torso
    A. Abrasions

VI. Blunt impact injuries of right upper extremity
    A. Abrasions

VII. Handcuff injury of left upper extremity
    A. Hand and wrist furrows

VIII. Electroshock weapon electrodes (4) recovered from clothing and submitted

**EXHIBIT 37**

CONFIDENTIAL

**Harris County Institute of Forensic Sciences**

| | | | |
|---|---|---|---|
| Case Number: NU18 4115 | | Page: 1 of 2 | |
| Decedent's Name: Nathan Schenk | Length: 69 | Weight: 171 | |
| Examiner: Janis | Date: 1/22/18 | Time: 0915 | |

S1 BR 6" 3/4" M/B B° PHJ
handcuffed
bags
Nat
front
Lt
No Slf

Jeans & belt
2 socks 2 shoes
(L loose)
+ shirt
jacket

neck & ear drabr
1/16 44"
1x1"
2x1/16" drabr
1/8x1/16"
drabr

1/2 x 2
drabr

exit C
1"
18" TOH
6" LOM
1/4" post midax
2" above ent
ent A
20" TOH
6" LOM
mid ax
1/4" Ø
1/16" MOA

lodge A
15" TO H
2" ROM

ent b
25" TOH
3" ROM
1/4" Ø
1/8 2-4
1/16 4-2

abr  3/16

mlt
1/16-1/8

OM

dry
orange
furrows
2" 4"
1/8" apart
1/8" width

2x1/2"
d/rear

lodge B
22" TOH
3" LOM

ent C
23" TOH
4" LOM
1/4" Ø
1/8 3-9
1/16 9-3
3/16 x 1/8 □ @ 4

abr   m
A

4x electrodes
in jacket

| | | |
|---|---|---|
| Section: Pathology | Authorized by:  DA Wolf | **EXHIBIT 37** |
| Form Title:  Autopsy Diagram – Adult Male, Front/ Back | Form No.:  PAT.001 | |
| Rev.: | Rev. date:  11/5/13 | |

Pasadena 1376

CONFIDENTIAL

| Harris County Institute of Forensic Sciences | | | | |
|---|---|---|---|---|
| Case Number: MU8 4115 | | | Page: 2 of 2 | |
| Decedent's Name: Nathan Schenck | | Length: | Weight | |
| Examiner: Janes | | Date: 1/2/18 | Time: | |

A- Lateral left chest
  L pleural via 4th IC, Int bev
  L UL perf → 3rd IC → post to vert → R back
  lodges 15" TOH 2° ROM, T1

B- R back
  L1/L2 #
  cauda equina, EDH, SDH
  below pancreas → + mesocolon → g. omentum

C  L back
  10th IC #11 → diaph → spleen → diaph → LpL
  7th IC #7|8  ext bev

A+C communicate lat SFT + DSM → defect
exit  L lat chest

EXHIBIT 37

CONFIDENTIAL

## HARRIS COUNTY INSTITUTE OF FORENSIC SCIENCES

1861 Old Spanish Trail
Houston, TX 77054-2001
Phone: 832-927-5005   FAX: 832-927-2876

### TOXICOLOGY REPORT

January 10, 2019

**LABORATORY NUMBER: ML18-4115**
**SERVICE REQUEST: 0001**



**Deceased: NATHAN ALEXANDER SCHENK**

**Submitted By:**                              **Submission Date:** November 22, 2018

Hannah Jarvis, MBBS
Assistant Medical Examiner
Harris County Institute of Forensic Sciences
1861 Old Spanish Trail
Houston, TX 77054

### *RESULTS:*

#### 001 - Blood (left chest)

| Analyte | Result | Analytical Method | Analyst |
|---|---|---|---|
| Delta-9-tetrahydrocannabinol | Present | GC/MS/MS | K. Cooper |
| Norcarboxytetrahydrocannabinol | Present | GC/MS/MS | K. Cooper |
| Carisoprodol | Less then 5.0 mg/L | GC/MS | K. Cooper |
| Meprobamate | Present | GC/MS | K. Cooper |

#### 001 - Blood (left chest)

| Analyte | Result | Analytical Method | Analyst |
|---|---|---|---|
| Acetone | None Detected | Headspace GC/FID | R. Callaway |
| Ethanol | None Detected | Headspace GC/FID | R. Callaway |
| Isopropanol | None Detected | Headspace GC/FID | R. Callaway |
| Methanol | None Detected | Headspace GC/FID | R. Callaway |

#### 002 - Blood (left chest)

| Analyte | Result | Analytical Method | Analyst |
|---|---|---|---|
| Benzoylecgonine | None Detected | Immunoassay - ELISA | L. Perry |
| Amphetamine / MDA | None Detected | Immunoassay - ELISA | F. Chavez |
| Benzodiazepines | None Detected | Immunoassay - ELISA | F. Chavez |
| Fentanyl | None Detected | Immunoassay - ELISA | F. Chavez |
| Methadone | None Detected | Immunoassay - ELISA | F. Chavez |
| Methamphetamine / MDMA | None Detected | Immunoassay - ELISA | F. Chavez |
| Opiates | None Detected | Immunoassay - ELISA | F. Chavez |
| Oxycodone | None Detected | Immunoassay - ELISA | F. Chavez |
| Phencyclidine | None Detected | Immunoassay - ELISA | F. Chavez |

Only those items listed in the results section were tested.

Medical Examiner's Initials and Date _____ 1/11/19

An ASCLD/LAB-*International*, Texas Forensic Science Commission, and American Board of
Forensic Toxicology Accredited Testing Laboratory

Page 1 of 2

We welcome your feedback at http://ifs.harriscountytx.gov/Pages/CrimeLaboratoryService.aspx.

EXHIBIT 37

CONFIDENTIAL

**LABORATORY NUMBER: ML18-4115**
**SERVICE REQUEST: 0001**

**DATE: January 10, 2019**

Evidence Disposition: All items will be retained by the laboratory for at least one year following the issuance of an original Toxicology Report.

INSTITUTE / ? FORENSIC SCIENCES

JAN 1 0 2019

RECEIVED
RECORDS CUSTODIAN _____

_Josie A Hollowell_

Josie  Hollowell, B.S., D-ABFT-FT
Case Reviewer
Toxicologist II
January 10, 2019

_Anna Kelly_

Anna  Kelly, Ph.D., F-ABFT,
Expert Reviewer
Deputy Chief Toxicologist
January 10, 2019

Medical Examiner's Initials and Date _____

An ASCLD/LAB-*International*, Texas Forensic Science Commission, and American Board of
Forensic Toxicology Accredited Testing Laboratory

We welcome your feedback at http://ifs.harriscountytx.gov/Pages/CrimeLaboratoryService.aspx.

Page 2 of 2

EXHIBIT 37

CONFIDENTIAL