**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| RANDY AVILES, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-CV-03571 |
| | § | |
| RIGOBERTO SALDIVAR, | § | |
| CITY OF PASADENA, TX | § | |
| | § | |
| DEFENDANTS. | § | |

**PLAINTIFF'S FIRST AMENDED MOTION FOR SUMMARY JUDGMENT[1]**

---

[1] This motion has been amended to edit a mistake with respect to Exhibit numbers and add two legal citations.

# TABLE OF CONTENTS

Table of Contents…………………………………………………………………………… 2

I.      NATURE & STAGE OF PROCEEDINGS ......................................................3

II.     STATEMENT OF UNDISPUTED FACTS ....................................................4

III.    SUMMARY JUDGMENT

        STANDARD………………………………………………………………… 13

IV.     ARGUMENT …………………………………………………………………14

V.      CONCLUSION……………………………………………………………..21

VI.     CERTIFICATE OF SERVICE…………………………...…………………………...22

## TO THE HONORABLE JUDGE OF SAID COURT

COMES NOW, Plaintiff **RANDY AVILES**, to file this, Brief In Support of His Motion for Summary Judgment against Defendant, **CITY OF PASADENA, TX (hereinafter "Pasadena").**

## NATURE & STAGE OF PROCEEDINGS

On October 16, 2023, Plaintiff sued the City of Pasadena after an officer with the Pasadena Police Department, Defendant Rigoberto Saldivar, shot Mr. Aviles while Mr. Aviles was unarmed, driving away from Defendant Saldivar, and posing no threat to the safety of Defendant Saldivar or others. Plaintiff alleged that Defendant Saldivar would not have been in position to shoot Mr. Aviles on January 12, 2021 but for the Pasadena's earlier failure to train, supervise, or discipline Officer Saldivar when he killed an unarmed twenty-five year old man by shooting him twice in the back in November 2018. The City of Pasadena failed to train, supervise, or discipline Defendant Officer Saldivar even though the lead detective (and his supervisor) investigating the Schenk shooting informed Pasadena's Chief of Police of their determination that Defendant Saldivar's killing of that other young man was unjustified and unconstitutional. Plaintiff further alleged that Pasadena's failure to train, supervise, or discipline Defendant Saldivar after the Schenk shooting was the moving force behind Defendant Saldivar's decision to shoot a similarly unarmed Mr. Aviles on January 12, 2021 because it left Saldivar in position to believe that he could continue to shoot unarmed individuals who were not an immediate threat to his safety without facing any consequences from his employer. Finally, Plaintiff alleged that Pasadena, through the actions of its Chief of Police, was deliberately indifferent to the risks posed by their sanctioning of Defendant Officer Saldivar's unconstitutional use of excessive force.

At the pleadings stage, this Court denied Pasadena's 12(b)(6) motion to dismiss. In denying the motion, the Court, relying on the Fifth Circuit's decision in *Brown v. Bryan County,* made clear that Pasadena could be held liable under *Monell* if its policymaker (i.e. its Chief of Police) had failed to discipline, train, or supervise Saldivar on his constitutional duty not to use excessive force after the Schenk shooting if the circumstances of the Schenk shooting warranted discipline, training or supervision; and the Chief of Police's failure to act either emboldened Saldivar or placed him in position to use excessive force against Mr. Aviles. *See Order Denying Pasadena's Motion to Dismiss*, Document No. 30, at page 11. The Court then determined that Plaintiff's allegations that—

(i)     Saldivar shot and killed Schenk, who was unarmed and crawling away, during an altercation following a traffic stop;

(ii)    Chief Brugger was informed of an investigatory conclusion that Saldivar used excessive force against Schenk;

(iii)   Chief Brugger watched the video of that shooting himself;

(iv)    Chief Brugger then decided not to take any disciplinary action against Saldivar or require additional training or supervision;

(v)     this emboldened Saldivar to believe that he could shoot unarmed citizens without consequence; and

(vi)    Saldivar subsequently shot Aviles, who was also unarmed during a traffic stop

—were sufficient to state a claim for failure to discipline, supervise, or train.

Discovery is now complete and Plaintiff Randy Aviles now moves for summary judgment against the City of Pasadena alleging that Pasadena is subject to *Monell* liability for the injuries he sustained at the hands of Defendant Rigoberto Saldivar.

## STATEMENT OF UNDISPUTED FACTS

The evidence obtained by Plaintiff through written records, dashcam and body cam footage, and deposition testimony from Chief Bruegger, Detective Michael Cooper and the City's 30(b)(6) representative conclusively establish each of the six pleading allegations set forth above,

as well as additional facts that demonstrate that prior to Saldivar shooting Randy Aviles, Pasadena

Chief of Police Joshua Bruegger was put on notice and was deliberately indifferent to the fact that

Defendant Saldivar was highly likely to commit Fourth Amendment excessive force violations in

the absence of disciplinary or corrective action.[2]

Specifically, Detective Michael Cooper testified at his deposition that he informed Chief

Bruegger that Defendant Saldivar had shot Nathan Schenk while Mr. Schenk was on his hands and

knees crawling away (Exhibit 1, Cooper Deposition, at pg. 89-90).[3] Cooper testified that he played

the body camera video of the shooting for Chief Bruegger, both at regular speed and in slow motion

(Exhibit 1, Cooper Deposition, at pg. 111). Cooper also testified that he showed the Chief the

video of the Schenk shooting frame by frame to show the muzzle flash from Saldivar's gun as

Schenk was on his hands and knees (Exhibit 1, Cooper Deposition, at pg. 111). Cooper testified

that he stopped the video to show when Saldivar shot with Schenk on his hands and knees (Exhibit

1, Cooper Deposition, at pg. 112). Cooper further testified that he went down to his own hands and

knees in front of Chief Bruegger to show Mr. Schenk's exact position at the time Saldivar shot

him (Exhibit 1, Cooper Deposition, at pg. 82-83).[4]

---

[2] The Exhibits referenced herein are located and can be accessed at the following link:
https://www.dropbox.com/scl/fi/547rz0qqmi3sbxlcesrpl/Exhibit-1-Detective-Cooper-Deposition-Transcript.pdf?rlkey=jn0kej0g6escmoufe2j3y2w36&st=67t5p1ri&dl=0 .

[3] Q.   And you would have narrated that Mr. Schenk was on his hands and knees going away as the first shot was fired; correct?
 A.:  Yes, that would have been narrated.
Q.   So in that meeting, did you make clear that it was your opinion that Officer Saldivar shot Mr. Schenk while he was on his hands and knees crawling away?
A.   What I was trying to portray to the command staff, that was there watching, or listening to my demonstration is that, in my opinion, on the video, I see him crawling away when the shots are being fired.
Q.   And the next question is, Chief Bruegger was in the room when you did that?
 A.   In our conference room?  Yes, sir, he was.

[4] Q. What do you mean by reenacted?

The summary judgment record includes the body camera video that the Court can view at regular speed, slow-motion and frame by frame that conclusively depicts Defendant Saldivar shooting and killing Nathan Schenk while he was on his hands and knees in November 2018 (Saldivar Body Cam Schenk Shooting, Exhibit 2).[5]  In Officer Saldivar's bodyworn camera, Officer Saldivar initiates the traffic stop against Schenk at minute 4:00.  At 4:45, Saldivar exits his police car.  At 5:00, Schenk exits his car.  At 5:12, Schenk begins running and Officer Saldivar begins a foot pursuit running after Schenk.  At 5:31, Saldivar unsuccessfully attempts to deploy his taser against Schenk.  From 5:31 to 5:51, Saldivar continues to chase Schenk.  At 5:51, Saldivar successfully tases Schenk.  Schenk falls and he and Saldivar struggle and wrestle on the ground. At 6:05, Saldivar's bodyworn camera dislodges from Saldivar and falls on the ground.  From 6:05 and 6:45, sound and audio is intermittent as Saldivar and Schenk appear to wrestle on the ground. At 6:45, Saldivar appears on the right side of the video.  He appears to be engaged with Schenk, with Saldivar on top and Schenk below him.  At 6:56, Saldivar goes off camera, however the light from items on his belt can still be seen on the right side of the camera.  At 7:01, Schenk is seen spinning and falling on the ground on the left side of the screen.  At 7:02, Schenk attempts to raise up and is on all fours when you see muzzle flash and gun smoke emanate from the top middle left

---

A. So what we saw on the video, Sergeant Skripka and I reenacted ourselves. Where, just, not on a video, not shooting one another, nothing. We're just, like, okay this is the position we believe we are seeing in the video. This is position we see what led up to the shooting.
Q.So basically like a live-action. You and him like play acted what you had seen on the video?
A. Yes, playacting. That's a good way to put it. Not you know -- the play act of what we -- our opinion of what we're seeing in the video.
Q. Did one of you guys get on his hands and knees?
A. Yes, sir.
Q. Do you recall who did that?
A. I think it was me.

[5] https://www.dropbox.com/scl/fi/mxcmgscfeimt5kf5gex0t/Exhibit-2-Saldivar-BWC-Shenck-shooting.mp4?rlkey=5u2ccsnzzo2dgo6y281lofo45&st=w49rmwe1&dl=0

of the video, indicating gunfire, where the light from Saldivar's belt had been.

Pasadena Police Chief Bruegger confirmed at his deposition that Cooper showed him the video (at regular speed, slow-motion, and frame by frame) and went down to his hands and knees to show him how Saldivar shot Schenk (Exhibit 3, Bruegger Deposition, at pg. 128-129). Bruegger also admits that Cooper and Skripka told him that Schenk was on his hands and knees when Saldivar first began shooting him (Exhibit 3, Bruegger Deposition, at pg. 128-129) (Exhibit 1, Cooper Deposition at pg. 72).[6] Bruegger admits learning that Schenk had two entrance wounds in his back from the Saldivar shooting (Exhibit 3, Bruegger Deposition, at pg. 130, Exhibit 1, Cooper Deposition at pg. 69-71). Bruegger also testified that he maintained a copy of the body camera video that he watched multiple times in slow motion, where he, like anyone watching the video in slow motion, presumably could see that Schenk was on his hands and knees when shot (Exhibit 3, Bruegger Deposition, at pg. 128).

In any event, the evidence makes clear that Chief Bruegger showed no curiosity or desire to investigate whether one of his officers had indeed shot and killed an unarmed man twice in the back. Cooper testified that after he showed Bruegger the video and explained the circumstances of the shooting, Bruegger merely said thank you and asked no questions of him (Exhibit 1, Cooper Deposition at pg. 95).  In the subsequent weeks after the shooting, Chief Bruegger asked Cooper

---

[6] Q    Do you recall them telling you that officer -- I mean, that Mr. Schenk was his -- on his hands and knees at the time he was shot?
A:  I know they bel--- believed that for the two rounds in the back, at least.
Q    You said they play acted what occurred. Correct?
 A    Yes.
Q    Okay.  Did they play act Mr. Schenk being on his hands and knees at the time he was shot?
A    Yes.
Q    They demonstrated to you that Schenk was on his hands and knees at the time Officer Saldivar shot two other rounds?
A:  Yes.

no questions about the shooting or his investigation (*Id.*). Bruegger testified that it was not concerning to him that Cooper and Skripka informed him that Saldivar had shot and killed Schenk while he was on his hands and knees (Exhibit 3, Bruegger Deposition at pg. 143).[7]   As such, he did not attempt to engage any outside law enforcement agencies or third-parties to enhance the video (*Id.*).  Here, Plaintiff's expert Jeremy Bauer was able to simply rotate the camera angle to street level to clearly depict Saldivar shooting Schenk while on his hands and knees.   (Exhibit 4: Saldivar Schenk Body Camera Annotated); (Exhibit 5, Saldivar Schenk Body Camera Rotated).

Bruegger did not discipline or retrain Defendant Saldivar in anyway after the Schenk shooting (Exhibit 3, Bruegger Deposition, at 186).[8]   Pasadena admits that its Internal Affairs Department is structured and operates in a manner that gives the Chief of Police sole and unfettered authority to decide whether an officer involved shooting is justified (Exhibit 3, Bruegger Deposition at pg. 185).  Bruegger exercised that authority to find that Saldivar's shooting of Schenk was justified (Exhibit 3, Bruegger Deposition at pg. 201).

Further, as Pasadena Chief of Police, Bruegger was the only person with the authority to formally discipline Saldivar for the shooting (Exhibit 6, Urban 30(b)(6) Deposition at pg. 21). He had the authority to issue Saldivar a reprimand, suspend him for a term of days or indefinitely suspend him to effectuate his termination (Exhibit 6, Urban 30(b)(6) Deposition at pg. 33-34).  He also had the authority to order Saldivar to undergo additional training (Exhibit 6, Urban 30(b)(6) Deposition at pg. 33-46).  Under Bruegger's authority, Saldivar received no consequences for

---

[7] Q    Was it concerning to you that Detective Cooper and Sergeant Skripka believe that Officer Saldivar had shot Mr. Schenk while he was on his hands and knees?
 A   Concerned?  No.

[8] Q Did you take any steps to discipline Officer Saldivar for the Schenk shooting?
A No.

shooting and killing an unarmed man twice in the back (Exhibit 6, Urban 30(b)(6) Deposition at pg. 116). Indeed, Saldivar's performance evaluations included zero mention of the Schenk shooting (Exhibit 6, Urban 30(b)(6) Deposition at pg. 174); (Exhibit 7 Saldivar 2019 Performance Evaluation).

Bruegger did not discipline or retrain Defendant Saldivar after Schenk shooting despite his knowledge that Saldivar had been involved in another questionable shooting four months before shooting Nathan Schenk (Exhibit 3, Bruegger Deposition at 94-95).[9] In that shooting, Officer Saldivar encountered an 18 year old young man named Angel Ramirez who had been accused of suspicious activity in a neighborhood (Exhibit 8, Saldivar Body Cam Ramirez Shooting). Upon leaving his vehicle and approaching Ramirez, Defendant Saldivar used his flashlight to see Ramirez in the dark (Exhibit 8 Saldivar Body Cam of Ramirez Shooting, at 0.06). The flashlight showed Ramirez holding what appeared to be a firearm pointing downward. Within a second of encountering Ramirez, Officer Saldivar fired four shots at Ramirez (Exhibit 8 Saldivar Body Cam of Ramirez Shooting, at 0.07), missing him and hitting a house and vehicle instead. Ramirez was not holding a firearm, but instead a pellet gun (Exhibit 3, Bruegger deposition, at 67). Prior to shooting at Ramirez, Saldivar did not announce himself as a police officer and did not instruct the young man to drop his weapon, as set forth in the Pasadena Police Department Use of Force policy (Exhibit 8 Saldivar Body Cam of Ramirez Shooting, Exhibit 3, Bruegger at 72, 80) (Exhibit 14, Pasadena Use of Force Policies. There is also no evidence in the videos of Ramirez raising the toy pellet gun in the direction of Defendant Saldivar before Saldivar fired his weapon (Exhibit 8, Saldivar Video of Ramirez Shooting). Saldivar was not disciplined or retrained for this shooting. (Exhibit 6, Urban 30(b)(6) Deposition at pg. 116). Saldivar's performance evaluation for 2018

---

[9] https://www.dropbox.com/scl/fi/nyo2cssk369itqq2dtla0/Exhibit-7-Ramirez-Shooting.mp4?rlkey=stle2dnlg7cy7mq2u9yt7zk04&st=yw8i6no7&dl=0

also included zero mentions of the Ramirez shooting (Exhibit 6, Urban 30(b)(6) Deposition at pg. 174). Bruegger testified that he did not consider the Ramirez shooting at all in his evaluation of Saldivar's action in Schenk's shooting (Exhibit 3, Bruegger Deposition at 188).

Bruegger's decision to not discipline or terminate Saldivar after he used excessive force to kill Schenk kept him on the force to encounter and shoot an unarmed Randy Aviles on January 12, 2021. On that day, Plaintiff Randy Aviles ran a red light in Pasadena at approximately 10.27 pm (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 00:28).[10] Upon observing Mr. Aviles drive through the redlight, Defendant Officer Saldivar made a U-Turn, activated his emergency lights and siren to initiate a traffic stop against Mr. Aviles (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 00:29). Once Mr. Aviles saw that Defendant Officer Saldivar had initiated a traffic stop, he made a left turn onto the 6900 block of Lance Avenue (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 00:41). He then immediately stopped on the right side of the road. (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 00:48).

As Defendant Officer Saldivar's patrol vehicle came to a stop behind his car, Mr. Aviles, exited his car with both of his hands visible and up in the air (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 00:51 – 00:54; Exhibit 10, Saldivar Body Cam Aviles Shooting, at 00:32 – 00:35).[11] Nevertheless, when Defendant Officer Saldivar stopped his vehicle, he draws his gun, points it at Mr. Aviles, and begins yelling aggressively at Mr. Aviles, loudly yelling "Don't you fucking move", "don't you dare move" and harshly commanding him to "Get back in the car" (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 00:54 - 01:02; Exhibit 10, Saldivar Body Cam Aviles

---

[10] https://www.dropbox.com/scl/fi/33zx1hx5wotz3i2xpk50y/Exhibit-9-Aviles-Shooting-Body-Cam-2-minute-version.mp4?rlkey=rvk3y6oigm0m3lu1r23jvuh86&st=4mom5hvl&dl=0

[11] https://www.dropbox.com/scl/fi/5x2yq6k33h5cnc47tbl74/Exhibit-10-Aviles-Shooting-Dash-Cam-2-minute-version.mp4?rlkey=mzsr279rf9rsolg6rfjcl2e47&st=4npfmw24&dl=0

Shooting, at 00:32-00:35).   Mr. Aviles complies and gets back in the car (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:02).    While in the car, Mr. Aviles continues putting his hand up in the air (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:30 – 01:48).    Defendant Officer Saldivar then yells for Mr. Aviles to place his hands out the car so he that he can see them (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:45).  Mr. Aviles complies, with both hands out the car, visible to Defendant Officer Saldivar (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:47 – 01:50).

As Mr. Aviles continues to keep his hands out the car, Defendant Officer Saldivar continues to yell at him to keep his hands up.  Mr. Aviles verbally tells him that he will comply with his instructions, telling Defendant Officer Saldivar: "OK, Ok. I got you" (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:43; Exhibit 10, Saldivar Body Cam Aviles Shooting, at 01:20). Although Mr. Aviles is complying with his hands up and verbally informing him of his intent to comply, Defendant Officer Saldivar escalates the situation by yelling "I will shoot you" at Mr. Aviles and begins moving aggressively towards Mr. Aviles with his gun pointed at Mr. Aviles (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:46).

At the time Defendant Officer Saldivar yelled "I will shoot you", Mr. Aviles had his empty hands out the window and visible.  Fearing for his life, Mr. Aviles begins to drive away from Defendant Officer Saldivar (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:46).    Even as he starts to drive away, Mr. Aviles still has his hands up, showing that he does not have a weapon. (Exhibit 10, Saldivar Body Cam Aviles Shooting, at 01:29-01:35)



As Mr. Aviles pulls away, Defendant Officer Saldivar shoots his gun ten times at Mr. Aviles' vehicle, emptying his clip (Exhibit 9, Saldivar Dash Cam Aviles Shooting, at 01:53 – 01:56).  At the time Defendant Officer Saldivar shot into Mr. Aviles' car, Mr. Aviles was driving away from the officer and posed no threat to him (*Id.*).  Further, there were no innocent bystanders or anyone else on the street that were put at risk of death or serious bodily injury by Mr. Aviles driving away (*Id*).



After Defendant Saldivar shot Aviles while he was unarmed and fleeing, Pasadena Chief Bruegger decided to not initiate any formal disciplinary charges against Saldivar (Exhibit 3, Bruegger Deposition at pg. 223-224). He did not reprimand him, suspend him for a term of days, or involuntarily suspend him (Exhibit 3, Bruegger Deposition at pg. 201). Bruegger also did not issue a decision on the Saldivar use of force Internal Affairs investigation to determine whether Saldivar's use of force against Aviles was justified or excessive (Exhibit 3, Bruegger Deposition, pg. 206). As a result of Chief Bruegger's decision, Saldivar remained on the Pasadena police force, earning his same salary until July 2021 when he retired. *Id.*

Additionally, prior to Saldivar's retirement, Chief Bruegger promised Saldivar in writing (Bruegger pg. 222) that Saldivar would be permitted to retire with an honorable discharge (Bruegger pg. 208) and that he would not change that designation on Saldivar's personnel files after he retired. (Exhibit 12, Chief Bruegger Email to Rigoberto Saldivar). The honorable discharge designation resulted in Officer Saldivar gaining employment with the Houston ISD police department after his retirement with the Pasadena (Exhibit 13, Saldivar Houston ISD

Employment docs). It was not until Saldivar was indicted after the filing of this lawsuit that Houston ISD learned about the Schenk and Aviles shooting, and terminated Saldivar for not disclosing these shootings and civil actions in his employment application (Exhibit 135, Houston ISD docs).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]his court construes 'all facts and inferences in the light most favorable to the nonmoving party.' " *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir.2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir.2010)). But "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." Id.

## ARGUMENT AND AUTHORITIES

42 U.S.C. § 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States. A city/municipality is a "person" under § 1983, and it may be sued in law or equity for constitutional torts that are caused by some official municipal policy. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). However, the doctrine of *respondeat superior* does not apply to an action brought under § 1983 and "a city is only liable when it can be fairly said that the city itself is the wrongdoer." *Collins v. City of Marker Heights, Tex.*, 503 U.S. 115, 122(1992).

Under *Monell,* the failure to train, supervise or discipline municipal police officers can also

establish an official municipal policy or custom and subject a city/municipality to liability under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989); *see also Ed. of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997). The failure to train, supervise, or discipline municipal officers may serve as the basis for § 1983 liability where that failure amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388 (emphasis added).  That deliberate indifference standard is met where municipal decision makers have notice that a failure to train, supervise or discipline has resulted in constitutional violations but continue adherence to the program, policy, or failures that they know or should know has failed to prevent tortious conduct by employees." *Brown*, 520 U.S. at 407.

In an action for inadequate hiring or police training, two fundamental requirements must be met: culpability and causation. *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998), *cert. dismissed*, 526 U.S. 1083 (1999). Culpability is established when "with respect to specific officers, a need for more or different training [or discipline and supervision] can be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that the can reasonably be said to have been deliberately indifferent to the need for training [discipline or supervision]. *Brown v. Bryan Cty.,* 219 F.3d 450, 459 (5th Cir. 2000). Causation requires proof that the municipality's actions or inactions were the "'moving force' behind the constitutional violation." *Id*.

This Court and the Fifth Circuit has made clear that a *single decision* by a policymaker not to discipline, train, or supervise a *specific officer* may, in limited circumstances, constitute an official policy and thus set part of the predicate for municipal liability on such a theory.  *See* Order Denying Pasadena's Motion to Dismiss, Document 30, at pg. 8; see also *Brown v. Bryant County,*

219 F3d 450, 459 (5th Cir 2000).    In these circumstances, Plaintiff must also show that the municipality "failed to train [supervise or discipline] its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Littell v Houston Independent School District*, 894 F3d 616, 624–25 (5th Cir 2018). The "duty not to use excessive force" has been recognized as a clear constitutional duty in this respect. Ibid.

<u>Pasadena Is Liable Under Monell Because Its Failure To Discipline, Train, or Supervise Saldivar After He Used Excessive Force to Shoot and Kill Nathan Schenk in the Back Was the Moving Force Behind His Shooting of Plaintiff</u>

Here, the summary judgment evidence conclusively establishes that with respect to Defendant Saldivar, the need for discipline or additional training or supervision was so obvious to Pasadena's policymaker—Chief of Police Joshua Bruegger—after Saldivar shot an unarmed Mr. Schenk[12] in the back that the failure to do so constituted deliberate indifference to the likelihood that Saldivar would violate the constitutional rights of others.

*As Chief of Police, Bruegger Was Pasadena's Policymaker*

As an initial matter, the evidence conclusively establishes that Pasadena Chief of Police Joshua Bruegger is Pasadena's policymaker.    Chief Bruegger was the acting police chief at the time that Saldivar shot Nathan Schenk.  He was then appointed Chief of Police in January 2019, within the 180 days allotted to exercise the full authority of a police chief with respect to discipline for the November 2018 shooting of Schenk.    Bruegger admits that he had full authority to discipline Saldivar for using excessive force to shoot Schenk in the back if he so chose.  He admits he had the authority to issue Saldivar a reprimand, suspend him for a term of days or indefinitely suspend him to effectuate his termination (Exhibit 6, Urban 30(b)(6) Deposition at pg. 33-34).  He also had the authority to order Saldivar to undergo additional training (Exhibit 6, Urban 30(b)(6)

---

[12] And shot at Angel Ramirez without identifying himself as a police officer or commanding him to drop his weapon as set forth in the Pasadena use of force manual.

Deposition at pg. 33-46).   In similar circumstances, the Fifth Circuit has held Texas police chiefs are policymakers for purposes of *Monell*.  *See Roundtree v. City of San Antonio*, No. SA-18-CV-01117-JKP-ESC, at *1 (W.D. Tex. Mar. 28, 2022) (citing to "*Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) (citing *Zarnow*, 614 F.3d at 168; *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847-48 (5th Cir. 2009); *Lewis v. Pugh*, 289 Fed.Appx. 767, 776 (5th Cir. 2008); *cf. Kelley v. City of Cedar Park*, No. 1:20-CV-481-RP, 2022 U.S. 8 Dist. LEXIS 19462, at *49-50, 2022 WL 329342, at *19 (W.D. Tex. Feb. 3, 2022) (where the plaintiff identified the Chief of Police as the City's policymaker and cited *Garza* in support, plaintiff "met the first element of *Monell*" because "the Fifth Circuit has found repeatedly that 'Texas police chiefs are final policymakers for their municipalities'").")

*Chief Bruegger Failure to Train, Supervise, or Discipline When He Was on Notice That Saldivar Needed Such Training, Supervision, or Discipline Because He Had Used Excessive Force to Shoot Nathan Schenck Constituted Deliberate Indifference*

The summary judgment evidence also conclusively that Chief Bruegger knew that Defendant Officer Saldivar should have been disciplined or terminated after he had shot and killed an unarmed victim in the back, and that such discipline/termination was necessary to prevent him from using excessive force to shoot additional victims.  The evidence is clear that Chief Bruegger was told in explicit terms by Detective Cooper that Saldivar shot and killed Nathan Schenk by shooting him in the back.  Detective Cooper and his supervisor showed the Chief the video, narrated the shooting for Bruegger, paused the video at the moments where Saldivar shot Schenk in the back while on his hands and knees.

The summary judgment record also includes the video of the Schenk shooting. The body camera video  shows Saldivar shooting Schenk while on his hands and knees at both regular speed and slow motion as Bruegger claims he saw the video.  Plaintiffs submit that plain viewing of the

video at regular speed and slow-motion belies any notion that Chief Bruegger did not see that
Saldivar shot Schenk while on his hands and knees. Indeed, at his deposition, the video was played
numerous times for Chief Bruegger with him disclaiming seeing footage clearly displayed on the
screen (Exhibit 12, Video of Joshua Bruegger Deposition, at 2:54 to 3:43). *See Dishman v. Cox*,
Civil Action 2:22-CV-00258 (S.D. Tex. Apr. 28, 2023)( "courts are not obligated to accept a
party's version of events when clearly contradicted by video evidence."

The evidence makes clear that Bruegger intentionally and deliberately pretended to not see
the evidence of the unconstitutional shooting depicted in the video.  This is entirely consistent with
the fact that after Cooper showed Bruegger the video and explained the circumstances of the
shooting, Bruegger merely said thank you and asked no questions of him then and later in the
subsequent weeks(Exhibit 1, Cooper Deposition at pg. 95).  It is also consistent with Bruegger
testifying that it was not concerning to him that Cooper and Skripka informed him that Saldivar
had shot and killed Schenk while he was on his hands and knees (Exhibit 3, Bruegger Deposition
at pg. 143).[13]

The video and Detective Cooper's statements to Chief Bruegger is conclusive evidence
that Pasadena's policymaker had the relevant facts to have actual or constructive notice of the need
to train, supervise or discipline Saldivar regarding unconstitutional uses of excessive force.   The
shooting of an unarmed civilian who poses no deadly threat to the officer is a flagrant violation of
the Constitution and Pasadena's use of force of policies. *See Tennessee v. Garner*, 471 U.S. 1
(1985).  It was highly predictable that an officer who would so flagrantly violate a basic tenet of
constitutional policing—to not shoot unarmed civilians in the back—would do so again unless

[13] Q   Was it concerning to you that Detective Cooper and Sergeant Skripka believe that Officer
Saldivar had shot Mr. Schenk while he was on his hands and knees?
 A   Concerned?  No.

they were disciplined in a manner that would prevent them from doing so (i.e. terminated) or retrained and/or supervised to protect the public. Chief Bruegger's failure to terminate (discipline) or train/supervise Saldivar on the use of deadly force in light of these facts amounted to a conscious disregard of the risk that Saldivar posed to civilians he would encounter. This is particularly true when Bruegger also knew that Saldivar had shot at Angel Ramirez without identifying himself as a police officer or ordering him to drop his weapon. In other words, Bruegger ignored that Saldivar was trigger happy and had killed someone using unconstitutional and extrajudicial force. This is the epitome of deliberate indifference.

The Chief's decision to not discipline Saldivar by terminating him, or at the very least to subject him to training or supervision after the Schenk killing, also constitutes the moving force behind Saldivar shooting an unarmed Mr. Aviles. As an initial matter, if Pasadena and its chief of police had terminated Saldivar after the Schenk shooting, he would not have been in position to shoot Mr. Aviles. Further, the causal connection between the failure to discipline Saldivar after the Schenk shooting and his shooting of Mr. Aviles is also evident in the similarity of the two shootings. Both shootings stemmed from initial traffic stops. In both cases, Saldivar shot an unarmed man who was attempting to escape away from him. Defendant Saldivar did not face a deadly threat in either case. Finally, Saldivar's knowledge that he had been permitted to shoot another unarmed civilian without consequences is the precise evidence of a direct causal link between defendant's actions and the city's failures that the Fifth Circuit requires. *See James v. Harris County*, 577 F. 3d. 612, 618 (5th Cir. 2009)(finding no liability for city because defendant did not know city did not conduct full investigations of use of force violations). That fact that Saldivar was never disciplined, trained or supervised after killing Schenk was the moving force behind the Aviles shooting because the lack of consequences emboldened Saldivar to believe he

could shoot Aviles with impunity.

Finally, Chief Bruegger actions with respect to the Aviles shooting is further conclusive evidence of his deliberate indifference to the unconstitutional uses of excessive force by his officers.  Bruegger testified that he reviewed video of Saldivar shooting Aviles.  He had concerns that Saldivar shot Aviles while his car was driving away since shooting at a vehicle driving away is a clear violation of Pasadena Police Department Use of Force policies and the constitutional standards on the use of force.  Despite these concerns, Chief Bruegger never initiated any formal disciplinary proceedings against Saldivar for the Aviles shooting. Chief Bruegger allowed Saldivar to remain employed for six months earning his regular pay.  Bruegger then allowed Saldivar to negotiate a retirement with an honorable discharge designation that facilitated Saldivar getting employment with Houston ISD.  Bruegger's failure to discipline Saldivar and allow him to retire with an honorable discharge and no negative findings in his personnel file demonstrates his willingness to protect Saldivar from indefensible excessive force violations—which is the same reason he did not fire Saldivar after unconstitutionally killing Schenk and unconstitutionally shooting at Ramirez.  *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("[S]ubsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy."); *Bordanaro v.McLeod,* 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after [constitutional violations], . . . officials took no steps to reprimand or discharge the [subordinates], or if they otherwise failed to admit the [subordinates'] conduct was in error.").

The City of Pasadena is therefore liable to Plaintiff Randy Aviles because its policymaker,

Chief Joshua Bruegger, was deliberately indifferent to the dangers posed by Rigoberto Saldivar to Randy Aviles and others, and that deliberate indifference which was evidence by his failure to discipline/terminate Saldivar led to the Saldivar being in position to shoot and maim Aviles on January 12, 2021.

**CONCLUSION**

For the reasons set forth above, Plaintiff Randy Aviles requests that the Court grant summary judgment in his favor against the City of Pasadena.

Respectfully submitted,

**THE COCHRAN FIRM- DALLAS, PLLC**

*/s/ Larry Taylor*
Larry Taylor
SBN: 24071156
ltaylor@cochrantexas.com
Dimitri Dube
SBN: 24068944
ddube@cochrantexas.com
1825 Market Center Blvd.
Suite 500
Dallas, Texas 75207
Telephone: (214) 651-4260
Fax: (214) 651-4261
**COUNSEL FOR PLAINTIFF RANDY AVILES**

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed this document with the Clerk of this Court and served all counsel of record by using the CM/ECF system, on May 10, 2024.

Mr. Steven D. Selbe
Gordon Rees Scully Manukhani, LLP
3D/International Tower
1900 W. Loop S #1000
Houston, Texas 77027

Mr. Norman Giles
Lewis Brisbois
24 Greenway Plaza
Suite 1400
Houston, Texas 77046

/s/ *Dimitri Dube*
DIMITRI DUBE