IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


RANDY AVILES,

        Plaintiff,

v.                              Civil Action No.   4:22-CV-03571

RIGOBERTO SALDIVAR,
CITY OF PASADENA, TX,

        Defendants.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM


*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS


REMOTE VIDEOTAPED DEPOSITION OF

SERGEANT KENNETH URBAN 30(b)(6)


TAKEN ON
MONDAY, APRIL 8, 2024
10:05 A.M.


1900 WEST LOOP SOUTH
HOUSTON, TEXAS



*Powerful*
LITIGATION SUPPORT

2

1               REMOTE APPEARANCES
2
3  Appearing on behalf of the Plaintiff:
4  DIMITRI DUBE, ESQUIRE
5  The Cochran Firm
6  1825 Market Center Boulevard, Suite 500
7  Dallas, TX  75207
8  (214) 651-4260
9  (214) 651-4261 (Fax)
10 ddube@cochrantexas.com
11
12 Appearing on behalf of the Defendant Rigoberto Saldivar:
13 STEVEN D. SELBE, ESQUIRE
14 Gordon Rees Scully Manukhani, LLP
15 1900 West Loop South, Suite 1000
16 Houston, TX  77027
17 (713) 961-3366
18 (713) 961-3938 (Fax)
19 sselbe@grsm.com
20
21
22
23
24
25

4

1                        INDEX
2                                Page
3
4  EXAMINATION BY MR. DUBE                    8
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1               REMOTE APPEARANCES
2
3  Appearing on behalf of the Defendant City of Pasadena, TX:
4  NORMAN RAY GILES, ESQUIRE
5  Lewis Brisbois Bisgaard & Smith, LLP
6  24 Greenway Plaza, Suite 1400
7  Houston, TX  77046
8  (713) 659-6767
9  (713) 759-6830 (Fax)
10 norman.giles@lewisbrisbois.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1                      EXHIBITS
2  Exhibit                         Page
3
4    1     PLAINTIFF'S ORIGINAL COMPLAINT          12
5
6    2     NOTICE OF INTENT TO TAKE ORAL AND       11
7          VIDEOTAPED DEPOSITION
8
9    3     SUMMARY OF COMPLAINT               12
10
11   4     USE OF FORCE AUDIT                 12
12
13   5     DEPOSITION OF CHIEF JOSHUA BRUEGGER    176
14
15   6     DEPOSITION OF DET MICHAEL COOPER       N/A
16
17   7     VIDEO                    N/A
18
19   8     INVESTIGATION REPORT              104
20
21   9     VIDEO                    N/A
22
23   10    WRITTEN DIRECTIVE SUBJECT OPERATIONAL    N/A
24         POLICIES  USE OF FORCE
25

6

EXHIBITS CONTINUED
Exhibit                                      Page

11    INTER-OFFICE CORRESPONDENCE SUBJECT      N/A
      COMMANDER S SUMMARY

12    VIDEO                        N/A

13    PERFORMANCE EVALUATION REPORT            170

14    INVESTIGATIVE POLICY AND PROCEDURE       73

15    SUBCHAPTER A GENERAL PROVISIONS          49

16    INDICTMENT                   140

17    EMPLOYEE SEPARATION FORM - CLASSIFIED    N/A

18    SUMARY OF COMPLAINT          119

19    WRITTEN DIRECTIVE SUBJECT OPERATIONAL    150
      POLICIES, USE OF FORCE

20    VIDEO                        156

7

REMOTE VIDEOTAPED DEPOSITION OF
SERGEANT KENNETH URBAN 30(b)(6)
TAKEN ON
MONDAY, APRIL 8, 2024
10:05 A.M.

THE VIDEOGRAPHER:  We are on the record.  The time is 10:05 a.m.  The date is April 8, 2024.  This is the beginning of the deposition of Sergeant Kenneth Urban.  Case caption is Aviles vs. Salvidar.

Will counsel please introduce yourselves and state who you represent?

MR. DUBE:  Dimitri Dube, on behalf of the plaintiff.

MR. GILES:  Norman Giles, on behalf of the City of Pasadena.

MR. SELBE:  Steve Selbe, on behalf of Officer Saldivar.

THE VIDEOGRAPHER:  Our court reporter will swear in the witness.

THE REPORTER:  Mr. Urban, please raise your right hand.

Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

8

MR. DUBE:  May I proceed?

THE VIDEOGRAPHER:  Yes, you can.

KENNETH URBAN, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. DUBE:

Q.  Good morning, sir.  How are you?

A.  I'm doing well.  How are you?

Q.  I'm doing great.  My name is Dimitri Dube, and I am the attorney for the plaintiff in this case, Randy Aviles.  I am here to take your deposition.  Do you understand that?

A.  Yes, sir.

Q.  And just to be clear, even though I'm taking your deposition, I'm not taking your deposition in your individual capacity; I'm taking your deposition as a representative of the City of Pasadena.  Do you understand that?

A.  I do.

Q.  Okay.  And you understand that you are speaking on behalf of the City of Pasadena?

A.  Yes.

Q.  And your answers may not be your answers, but they are for the City of Pasadena.  Do you understand that?

A.  I do.

Q.  Okay.  And have you served as a City rep for a deposition before?

9

A.  Not for a deposition, no.  Nothing other than traffic court, or county court.

Q.  So you have testified on behalf of the City in other proceedings?

A.  I have not.

Q.  Have you been deposed before?

A.  I have not.

Q.  Did you prepare for this deposition?

A.  I did.

Q.  Okay.  How did you prepare?

A.  I made myself aware of the materials that were presented to the City, in the Exhibit A, and I believe it's B as well.  And the -- everything that's contained in those.

Q.  Did you review the Complaint in this case?

A.  I did.

Q.  Okay.  Did you review the videos of the shootings in this case?

A.  I did.

Q.  And that's the shooting of Randy Aviles, correct?

A.  Yes.

Q.  Okay.  Did you also review the shooting of Nathan Schenk?

A.  I did.

Q.  Did you review the shooting of Angel Ramirez?

A.  I did.

10

1    Q.  Okay.  Did you review the City of Pasadena's use of
2 force procedures?
3    A.  I did.
4    Q.  Okay.  And the use of force audits from the years
5 2018 to 2021?
6    A.  Yes.
7    Q.  Did you review the deposition testimony of Chief
8 Bruegger?
9    A.  I did.
10   Q.  Okay.  Did you review the deposition testimony of
11 Michael Cooper?
12   A.  The -- what I had available to me to review, I did
13 review, yes.
14   Q.  Okay.  So there were excerpts that were provided to
15 you from that deposition?
16   A.  Correct.
17   Q.  And you reviewed that?
18   A.  Yes.
19   Q.  Okay.  Is there anything else that I did not mention
20 that you reviewed in preparation for this deposition?
21   A.  I don't believe so.
22   Q.  Did you review the Deposition Notice in this case?
23   A.  The deposition notes?
24   Q.  Notice?
25   A.  Oh, for myself?

11

1    Q.  Yes.
2    A.  Yes.
3    Q.  Okay.  Where it listed the topics that I'm going to
4 ask you questions about?
5    A.  Correct.
6    Q.  All right.  Let's start off there.  Okay.  Share
7 screen.  I'm showing you what's been marked as Plaintiff's
8 Exhibit 2 to this deposition, okay.  Are you familiar with this
9 document?
10   A.  Yes.
11   Q.  And that's -- and what is the document?
12   A.  That is the -- appears to me the lawsuit against the
13 City, the notification.
14   Q.  Okay.  And it's the Notice of Intent to take your
15 Deposition, do you see that?
16   A.  Yes.
17   Q.  Okay.  I offer this into evidence as Plaintiff's
18 Exhibit 2.  Any objections?
19       MR. GILES:  No objection for the purpose of the
20 deposition.
21       (WHEREUPON, Exhibit 2 was marked for identification.)
22 BY MR. DUBE:
23   Q.  And here are the exhibits, Exhibit A to that Notice.
24 Do you see that?
25   A.  Yes, sir.

12

1    Q.  Okay.  And you see a list of topics, correct?
2    A.  Yes.
3    Q.  Okay.  And this first topic is, "The operation of the
4 City of Pasadena police department in the ten years preceding
5 the shooting of Randy Aviles, including but not limited to the
6 identification of the police chiefs, the roles and
7 responsibilities of the police chiefs, the policy and decision-
8 makers ..."; do you see all that?
9    A.  I do.
10   Q.  Okay.  And are you prepared to testify on exhibit 1?
11   A.  Yes.
12   Q.  Okay.  And you see exhibit 2, you can read it to
13 yourself.  Are you prepared to proceed on exhibit 2?
14   A.  I am.
15   Q.  Okay.  And same with exhibit 3, are you prepared to
16 --
17   A.  Yes.
18   Q.  Okay.  And exhibit 4?
19   A.  Yes.
20   Q.  I've been saying exhibit 4, I mean paragraph 4.
21 Paragraph 5?
22   A.  Yes.
23   Q.  Paragraph 6?
24   A.  Yes.
25   Q.  Paragraph 7?

13

1    A.  Yes.
2    Q.  Paragraph 8?
3    A.  And in relationship to paragraph 8, are you prepared,
4 do you -- are you aware of, and are you prepared to testify as
5 to disciplinary procedures of the City of Pasadena Police
6 Department?
7    A.  As far as the process?
8    Q.  Yes.
9    A.  I am.
10   Q.  Okay.  And you're familiar with the Civil Service
11 Commission?
12   A.  Yes, sir.
13   Q.  Okay.  Paragraph 9?
14   A.  And on number 9, it's referring to the audits that
15 were provided, correct?
16   Q.  Yes, sir.
17   A.  Okay.  Yes, on number 9.
18   Q.  And paragraph 10?
19   A.  Yes.
20   Q.  What did you do to prepare to testify with respect to
21 paragraph 10?
22   A.  I reviewed the response of the attorney's office
23 representing the City, which indicated that there was an
24 objection I believe on this request because of the enormity of
25 it.

14

1    Q.   Did you review any communications between the Chief
2   and any employees of the Harris County District Attorney's
3   Office?
4    A.   I have not.
5    Q.   Did you review any communications from the Harris
6   County District Attorney's Office to the City of Pasadena?
7    A.   I have not.
8    Q.   Let's start off briefly with your background. How
9   long have you been employed with the Pasadena Police
10  Department?
11   A.   Over 32 years.
12   Q.   Oh wow.  Congratulations.
13   A.   Thank you.
14   Q.   So that means you started, let's see if my math is
15  good, 1992?
16   A.   That's correct.
17   Q.   How long have you been a Sergeant?
18   A.   For a little over 15 years.
19   Q.   And what department are you I guess in charge of?
20   A.   I am in charge of Internal Affairs.
21   Q.   How long have you been in charge of Internal Affairs?
22   A.   Since about August of last year, of '23.
23   Q.   Who was your predecessor in that role?
24   A.   It was Sergeant Mike Norman.
25   Q.   Are there any other members of the Internal Affairs

15

1   Division currently besides yourself?
2    A.   Detective Mauricio Reyes is a backup investigator.
3   His primary duty is Public Integrity investigations, but he is
4   also the backup Internal Affairs investigator.
5    Q.   Any other employees?
6    A.   None assigned to that Division, no.
7    Q.   When Mr. Norman was -- is Mr. Norman still with
8   Internal Affairs, Sergeant Norman?
9    A.   No, sir.  He retired.
10   Q.   When he was in charge of Internal Affairs, was there
11  anybody else that was working with him in the Division?
12   A.   Sergeant Eric Fickessen was the Public Integrity
13  Officer at the time, or Sergeant at the time.  He was working
14  next door to Sergeant Norman, just like Detective Reyes is
15  doing with me.
16   Q.   Understood.  And what are your roles as a Sergeant in
17  the Internal Affairs Division?
18   A.   My roles are to investigate any kind of complaint
19  against officers; to determine whether or not there's any
20  policy violation, that come in either through citizen directly
21  to us or routed through patrol, a supervisor, or directly to
22  the Chief's office.  Whatever comes into our office for us to
23  investigate.
24   Q.   And you've been a member of Internal Affairs since
25  August of last year, correct?

16

1    A.   It was about August, yes.  I think it's been about
2   seven months.
3    Q.   Okay.  And where were you prior to that?
4    A.   Prior to that, for six months, I was evening shift
5   patrol.
6    Q.   What was your responsibilities in evening shift
7   patrol?
8    A.   So evening shift patrol, or any patrol sergeant
9   supervises, first line supervisor, who has a squad of
10  individuals that report directly to him or her, and they're
11  responsible for the growth and guidance of the officers.  Also,
12  for evaluating their performance over a six month period.
13   Q.   And where were you before that?
14   A.   Before that, I was the Juvenile Crimes Supervisor,
15  Detective Supervisor.
16   Q.   And how long were you in that capacity?
17   A.   For five years.
18   Q.   And where were you before Juvenile Crimes?
19   A.   I was evening shift patrol supervisor for about two
20  and a half years I think.
21   Q.   And then where were you before that?
22   A.   Prior to that, I was assigned to the Pasadena Police
23  Academy for approximately three years, three and a half years I
24  think.
25   Q.   Were you a Sergeant --

17

1    A.   I was.
2    Q.   -- during that time?
3    A.   Yes, sir.
4    Q.   What was your role at the police academy?
5    A.   So my role was to oversee the day to day activities
6   of the police academy, which included recruiting, included
7   class participation in courses, reviewing course content, and
8   make sure that proper documentation is presented to TCOLE to be
9   applied to the records of the officers.
10   Q.   And how long were you in that role?
11   A.   About three years, three and a half years.
12   Q.   Three years, okay.  So I think we've covered
13  basically at least the last 10 years of your career, correct?
14   A.   Yes, sir.
15   Q.   So let's start with the Pasadena Police Department.
16  How is the Police Department structured in terms of, you know,
17  the visions and positions of I guess employees?
18   A.   Now, you're referring to like the rank structure?
19   Q.   We can start there, yes.
20   A.   So at the top of the rank structure, you have the
21  Chief of Police.  Under the Chief of Police, you have,
22  currently we have two Assistant Chiefs.  That varies at times.
23  After that, below the Assistant Chiefs you have 10 Lieutenants.
24  And then below that, you have 40 Sergeants. And then Patrol
25  Division, I mean, then the rank of Officer below the police

18

1  sergeants.
2     Q.  So it goes Officer to Sergeant?
3     A.  Yes.  It's Officer.  If you promote, then it's
4  Sergeant, and then it's Lieutenant.  And then if you get
5  selected, Assistant Chief, and then the Chief is above
6  everybody.
7     Q.  Is a Detective a separate rank, like what is I guess
8  the position of the Detective in terms of the police
9  department?
10    A.  It's not a separate rank.  It is just a title, but
11 it's not a separate rank.  You don't take a test or do anything
12 to obtain the position other than interview for it when there's
13 an opening.
14    Q.  Are there other titles similar to Detective?
15    A.  No, sir.  I mean, you may hear the word investigator,
16 but it's the same.
17    Q.  And so for the other ranks; Sergeant, Lieutenant,
18 Assistant Chief, do you have to take tests to acquire those
19 positions?
20    A.  You take a test to become a Sergeant and Lieutenant,
21 not for Assistant Chief or Chief.
22    Q.  Let's start with the Chief of Police.
23    A.  Okay.
24    Q.  What is his role or her role?
25    A.  The role of the Chief of Police is to guide and

19

1  direct the members of the department, just like any department
2  head.  And also, make sure that the policies that are in place
3  are adhered to, and -- but they're the overall person that
4  keeps an eye on the daily operation of the police department,
5  and direction for the future.
6     Q.  You mentioned the word department head.  What does
7  that mean to you in terms of the Chief of Police?
8     A.  Well, as I mentioned, as far as what their role is.
9  But a department head is a person, just like any other
10 department within the City, you have a person that is in charge
11 of that department, so they're the overseer.  They're the ones
12 that report usually to the Mayor, City Council, with whatever
13 questions or, you know, that's a point of contact for the City
14 administration to go to -- to -- if they want to -- have
15 questions or they want things done.
16    Q.  So the Chief of Police is in charge of the Pasadena
17 Police Department, correct?
18       MR. GILES:  Objection.  Form.
19       THE DEPONENT:  That's correct.
20 BY MR. DUBE:
21    Q.  In terms of decisions at the Pasadena Police
22 Department, it is their duty to make those decisions, correct?
23    A.  I'm sorry.  Repeat that.
24    Q.  In terms of decisions within policy at the City of
25 Pasadena Police Department, it is their duty and obligation to

20

1  make those decisions, correct?
2        MR. GILES:  Objection.  Form.
3        THE DEPONENT:  The City Council and the Mayor are the
4  ultimate individuals responsible for policy across the City.
5  BY MR. DUBE:
6     Q.  I'm not asking across the City, I'm asking with
7  respect to the police department?
8     A.  Yes.
9     Q.  Are they the individuals who are authorizing the
10 decisions for the Pasadena Police Department?
11       MR. GILES:  Objection.  Form.
12       THE DEPONENT:  That would be City Council and the
13 Mayor.
14 BY MR. DUBE:
15    Q.  So for each decision with the Pasadena Police
16 Department, it is the job of the Mayor to make those decisions,
17 and City Council?
18    A.  So the Chief of Police will, they have meetings with
19 the -- just like all department heads, have meetings with City
20 Council and the Mayor twice a month.  And during that time, any
21 new policies or things that are being brought up will be
22 addressed to them at that time.
23    Q.  How about decisions -- how about day to day
24 operations, who runs the police department?
25    A.  The operations, it depends on -- are you talking

21

1  about overall?
2     Q.  Overall, correct.
3     A.  Okay.  That would be the Chief.
4     Q.  With respect to discipline at the Pasadena Police
5  Department, who is in charge of making decisions with respect
6  to discipline at the police department?
7     A.  The final decision comes from the Chief of Police, as
8  far as initiating the process to administer discipline.
9     Q.  So the Chief of Police is the final decision maker at
10 the City of Pasadena Police Department with respect to
11 discipline?
12       MR. GILES:  Objection.  Form.
13       THE DEPONENT:  No.  The Chief of Police is the person
14 who starts the process of administration of discipline.
15 BY MR. DUBE:
16    Q.  Is the Chief of Police authorized to suspend officers
17 for violations of Pasadena police procedure and the rule of
18 law?
19       MR. GILES:  Objection.  Form.
20       THE DEPONENT:  The Chief of Police has the authority
21 to start the process for any kind of discipline.
22 BY MR. DUBE:
23    Q.  I hear you.  That's not my question.  My question
24 addressed specifically suspensions.  Is the Chief of Police as
25 the department head authorized to suspend an officer for a



22

1  violation of department rules and procedures?
2      MR. GILES:  Objection.  Form.
3      THE DEPONENT:  The Chief of Police can start the
4  procedure for suspension of an officer for a violation of
5  policies, yes.
6  BY MR. DUBE:
7      Q.   Can the Chief of Police place an officer on
8  indefinite suspension for a violation of a rule or procedure?
9      MR. GILES:  Objection.  Form.
10     THE DEPONENT:  The Chief of Police can start the
11  process, yes.
12 BY MR. DUBE:
13     Q.   What do you mean start the process; what do you mean
14  by that; when you say start the process, what do you mean by
15  that?
16     A.   So after the Chief of Police obtains whatever
17  information has been obtained to make that decision on
18  administration of discipline, ultimately the Civil Service
19  Commission can review that information and they can overturn
20  it, they can uphold it, they can reduce it.  They have the
21  final say so on that matter.
22     Q.   But until the Civil Service Commission rules, is the
23  word of the Police Chief, is that the operating -- strike that.
24  Let me ask that again.
25         Can a police chief, if a police chief suspends a

23

1  person, a police officer, do they remain suspended until the
2  Civil Service Commission makes a ruling?
3      A.   So you're saying if the Chief of Police suspends an
4  individual, are they suspended until the Civil Service
5  Commission has an opportunity to examine it --
6      Q.   Correct.
7      A.   -- and possibly change it?  Yes.
8      Q.   Who is the Civil Service Commission comprised of?
9      A.   Who is it comprised of?
10     Q.   Um-hmm.
11     A.   There's three individuals; one being the
12  Commissioner, and two other individuals.
13     Q.   Who are those in individuals?
14     A.   Those individuals are selected by City Council and
15  the Mayor.
16     Q.   Do they have a day to day role at the police
17  department?
18     A.   No, they do not.
19     Q.   How about the Commissioner, does he have or she have
20  a day to day role at the police department?
21     A.   No, they do not.
22     Q.   Is there anyone else authorized to, in your words,
23  start the process of discipline at the City of Pasadena Police
24  Department besides the Chief of Police?
25     A.   The only time that that would happen I think would be

24

1  if the Chief was incapacitated and someone else was appointed
2  interim Chief, but majority of the time it is the Chief of
3  Police that makes that decision.
4      Q.   So the Chief of Police or an interim Chief are the
5  ones authorized to make decisions for the police department,
6  correct?
7      A.   When it comes to start the process of administering
8  discipline, yes.
9      Q.   What is the role of the Assistant Chiefs?
10     A.   The Assistant Chiefs' roles are to -- they oversee
11  particular divisions within the police department.  Over the
12  years, the number of Chiefs and organization has changed, but
13  currently we have two Assistant Chiefs.
14     Q.   And who are they?
15     A.   That is Assistant Chief Tom Warnke, and Assistant
16  Chief John Dabrowa (phonetic).
17     Q.   And has it always been the structure of the Pasadena
18  Police Department to have one Chief, two Assistant Chiefs, and
19  10 Lieutenants, and then 40 Sergeants?
20     A.   No.
21     Q.   Okay.  How has that changed over the years?
22     A.   When I first started, or back before, we used to have
23  above Lieutenants and below Assistant Chief we had Captains.
24  And I think the number of Assistant Chiefs has varied over the
25  years.  I think we had two for the most part.  Because we had

25

1  captains that would have a layer between the Lieutenants and
2  the Assistant Chiefs, but then they through attrition, the
3  captain's positions were eliminated.  And a while, I don't
4  remember how long, exactly how long back, but they decided to
5  go with three Assistant Chiefs.  But right now currently we
6  have two at the moment.
7      Q.   Are they looking to fill the third spot?
8      A.   Yes.  Yes.  We had a recent retirement on one
9  position, and my understanding is that it's looking to be
10  filled within this year.
11     Q.   What are the levels of discipline that can be
12  administered to a City of Pasadena police department who has
13  violated policy?
14     A.   You can have a letter -- a verbal reprimand, a letter
15  of reprimand.  You can get a suspension or you can get
16  indefinitely suspension, or indefinite suspension, which is
17  basically being fired.  But that's, again that's just the
18  beginning process that the Chief starts.
19     Q.   So the person who can issue these four separate
20  levels of discipline is the Chief of Police, correct?
21     A.   Yes.
22     Q.   And at the police department itself, is there is
23  anyone who is authorized to overrule the decision of the Chief
24  of Police with respect to these levels of discipline?
25     A.   There's no one within the police department, no, sir.



26

1    Q.  Can the Mayor overrule the Chief of Police with
2  respect to those levels of discipline?
3       MR. GILES:  Objection.  Form.
4       THE DEPONENT:  Well, the person that evaluates the
5  discipline of officers is the Civil Service Commission. So
6  they, if someone was going to be overruling the Chief, you
7  know, they would look at the case or the information, and they
8  make that decision if it was just or not, or final decision.
9  BY MR. DUBE:
10   Q.  And I guess that's my question.  The Civil Service
11 Commission is permitted to overrule the Mayor based on some of
12 those rules, but the Mayor himself cannot arbitrarily, like
13 decide on his own to overrule the decision of the Police Chief,
14 correct?
15   A.  It does not go from the Chief's initial issuance of
16 discipline -- it doesn't go from him to the Mayor.  It goes --
17 it has to go through the Civil Service Commission.
18   Q.  Understood.  Thank you.
19   A.  You're welcome.
20   Q.  And what's a verbal reprimand?
21   A.  Basically a discussion.  If there was a complaint,
22 and depending on the severity of it, the officer is talked to
23 about the situation and how to improve it.
24   Q.  Are those documented?
25   A.  Yes.

27

1    Q.  So once an officer has received a verbal reprimand,
2  it's documented that that occurred?
3    A.  Correct.
4    Q.  And what is a letter of reprimand?
5    A.  Basically it's the situation where they, let's say
6  they've had a verbal reprimand previously, and this would be
7  the next level up.  Let's say if either the same or something
8  similar type of policy violation had occurred, then the next
9  level up would be a letter of reprimand.
10   Q.  Is there anything specific that the letter of
11 reprimand states or says?
12   A.  Basically it's a -- just a report on, you know, the
13 allegation itself, the complaint itself, and what was discussed
14 with the officer about the situation.  But it basically -- the
15 indication is that you had a verbal reprimand, and now this is
16 either the same thing or something similar has happened again,
17 and so now we're going to the next level of reprimand.
18   Q.  So is that a progressive discipline structure at the
19 City?
20   A.  Yes.  In the ones I gave you, that's the progression.
21   Q.  So from verbal to letter, and then suspension, then
22 indefinite suspension?
23   A.  Yes, sir.
24   Q.  Does it always have to go through that progression or
25 can somebody commit an offense or a violation that

28

1  automatically jumps to a higher level?
2    A.  It can -- it does not have to go through the levels
3  of progression.
4    Q.  What is a suspension?
5    A.  A suspension is where you get a day off from work
6  without pay, or however many, however much time off is, that
7  was administered.
8    Q.  What's the maximum days for a suspension?
9    A.  That, I don't know.  I don't know the -- I don't know
10 if it's -- cause the indefinite would be the maximum.
11   Q.  Yeah.  When I said maximum number, I mean prior to an
12 indefinite, is there a maximum number before you get to
13 indefinite?
14   A.  I don't believe --
15      MR. GILES:  Objection.  Form.
16      THE DEPONENT:  I believe that the -- well, I don't
17 know the answer to that question.
18 BY MR. DUBE:
19   Q.  Would you agree with me that number would be in the
20 Civil Service Commission, I guess, code or policy?
21   A.  I believe that it's readily available, yes.
22   Q.  I'm saying -- that's not my question.  My question is
23 --
24      MR. GILES:  Would you like a stipulation on that?
25      MR. DUBE:  Well, I'm going to get to at some point,

29

1  but it's 15 days.
2       MR. GILES:  Right.  It is 15 days.  Unless there's an
3  agreement from the officer, it's 45 days.
4       MR. DUBE:  Okay.  Thank you.
5  BY MR. DUBE:
6    Q.  So let's say an officer has been suspended, correct,
7  or even indefinitely suspended, and they wish to make an
8  appeal, what is that process?
9    A.  Did you say why is that process?
10   Q.  What is that process?  What?
11   A.  Oh.  I'm sorry.  The -- after -- within 10 days of
12 the decision from the Chief, the officer has the opportunity to
13 appeal to the Commission to hear his, basically hear his
14 discipline, you know, that was given to him.  At that point,
15 the officer, whether represented by an attorney or whatever the
16 case, they go in front of the Commission, and they listen to
17 the evidence or what is presented to them, and then make the
18 decision from there on if it was just, or they can reduce it,
19 or eliminate it.
20   Q.  And so there's a formal hearing that's done, correct?
21   A.  Correct.
22   Q.  An officer, instead of going through that appeal
23 procedure, can an officer accept the decision of the chief?
24   A.  He can or she can.
25   Q.  What happens when that occurs?



30

1     A.   What kind of discipline; I mean, are you --
2     Q.   Let's say a suspension?
3     A.   So if the -- let's say the officer receives two day
4  suspension, the officer signs documentation indicating that
5  they will not appeal that decision and they accept it, and then
6  it's scheduled at a later time for the officer to take that
7  time off without pay.
8     Q.   So the Chief makes a decision, the officer accepts
9  it, the discipline goes forward, correct?
10    A.   Correct.
11    Q.   Is a demotion possible discipline that can be
12 enforced on an officer?
13    A.   I'm sorry.  Say that again.
14    Q.   Is a demotion a possible form of discipline that can
15 be enforced on an officer?
16    A.   Yes.  Yes.  An officer can be demoted.
17    Q.   What is a demotion?
18    A.   When you are -- go from one rank to another, to one
19 usually below it or whatever is attached to the discipline.
20    Q.   Are there any other forms of demotions?
21    A.   No.
22    Q.   So what if you are a, I guess the lowest rank, which
23 is officer, correct?
24    A.   Yes.
25    Q.   So how -- can you be demoted from that rank?

31

1     A.   Not without -- no.  There's no rank lower than an
2  officer.
3     Q.   Can you be reassigned to different roles and duties;
4  would that be considered a demotion?
5     A.   It would not.  No.  As long as it's in the same rank
6  structure from what you previously were, it's not a demotion.
7     Q.   I guess, are there different levels of pay for the
8  different ranks?
9     A.   Yes.
10    Q.   So a demotion would include I guess a reduction in
11 pay?
12    A.   I believe so, yes.  I mean, if you went from a
13 sergeant back to an officer, usually it -- as that example, I
14 believe you stay at the top of the pay scale of the lower rank
15 if that makes sense to you.
16    Q.   That makes sense.
17    A.   Okay.
18    Q.   Are officers sometimes reassigned to different roles
19 within the department?
20    A.   Yes.
21    Q.   Tell me about that process?
22    A.   Well, it varies.  So the -- if there is an opening,
23 let's say in investigations, let's say violent crimes, then the
24 process is a letter is put out to everyone in the department
25 indicating that there's an opening.  The officers will fill out

32

1  a form indicating their interest in transferring to that
2  position, and interviews are held, and then a person is picked
3  to take the spot.
4     Q.   So how many different divisions are there at the
5  police department?
6     A.   I don't have an exact number.  There's quite a few.
7  I would say probably between 15 and 30.  Because some are very
8  small that, and one like internal affairs for instance, I'm the
9  only one there, so.
10    Q.   Got it.  One man crew.
11    A.   I am.
12    Q.   So how many cases do you have at any particular time?
13    A.   It varies.  The most I've had so far since I've been
14 there has been about three.
15    Q.   Are you aware of Chief Bruegger -- well, do you know
16 who Chief Bruegger is?
17    A.   Absolutely, yes.
18    Q.   And how do you know him?
19    A.   He came to work with the Pasadena Police Department
20 after I did, so I've known him ever since he started as an
21 officer, as he progressed through the ranks up to Chief.  So I
22 have worked I guess under him, you know, for -- ever since he
23 became Chief of Police.
24    Q.   But he's not Chief now, correct?
25    A.   That's correct.

33

1     Q.   Okay.  So you were under him and he was the Chief
2  until he retired, correct?
3     A.   Yes.
4     Q.   And how long ago was that, do you know?
5     A.   When did he retire?
6     Q.   Yes.
7     A.   That was last year, '23 I believe.
8     Q.   Do you remember what month?
9     A.   Not exactly, no.  I think -- I would say it's later
10 in the year, but I don't know the exact month.
11    Q.   Do you recall when he became Chief?
12    A.   He became Chief in I want to say 2018 is my guess.
13 I'm not 100 percent on that, but I think it was 2018.
14    Q.   So from 2018 through 2023, Joshua Bruegger was the
15 Chief of the police department?
16    A.   Yes.  That's my understanding of the times, yes.  If
17 those times are accurate, yes.
18    Q.   And he had the full authority of the Pasadena Police
19 Department -- sorry.
20         He has the full authority of the office of Chief of
21 Police for the Pasadena Police Department, correct?
22    A.   He was the Chief of Police and had authority over the
23 police department, yes.
24    Q.   He had the ability to issue letters of reprimand,
25 correct?



34

1    A.   Yes.
2    Q.   Okay.  He had the ability to issue verbal reprimands,
3  correct?
4    A.   Yes.
5    Q.   Okay.  I'm saying ability, I mean authority.  He had
6  the authority to issue verbal reprimands, correct?
7    A.   Yes.  He would start -- he has the authority to start
8  the process for discipline, yes.
9    Q.   And he had the authority to suspend an officer,
10  correct?
11    A.   To start the process, yes.
12    Q.   And he had the authority to issue an indefinite
13  suspension to a police officer, correct?
14    A.   To start the process, yes.
15    Q.   Okay.  And by starting the process, he had the
16  authority to suspend them pending an appeal to Civil Service
17  Commission, correct?
18    A.   Yes.
19    Q.   Okay.  And during that time, from 2018 to 2023, no
20  one else at the Pasadena Police Department had that authority,
21  correct?
22    A.   That's correct.
23    Q.   Are you aware that Chief Bruegger testified that
24  after Officer Rigoberto Saldivar shot my client, Randy Aviles,
25  he essentially ordered Mr. Saldivar to no longer be able to

35

1  patrol the streets of Pasadena; are you aware of that?
2    A.   I'm aware that Officer Saldivar was assigned to the
3  property room after the shooting, yes.
4    Q.   So after the shooting, he was assigned to the
5  property room, correct?
6    A.   Yes.
7    MR. GILES:  Object as asked and answered.
8    MR. DUBE:  I'm clarifying.  I can clarify.
9    MR. GILES:  And I can object.
10    MR. DUBE:  Okay.
11  BY MR. DUBE:
12    Q.   Is the property room a separate division within
13  Pasadena Police Department?
14    A.   It is a division within the Pasadena Police
15  Department, yes.
16    Q.   Actually, I guess, let me clarify.  I'm using the
17  word division a lot.  What do you understand division to mean?
18    A.   So for the police department, different units are
19  called divisions.  For instance, the Detective Division,
20  Violent Crime Division, Property Crimes.  There's also, you
21  know, like the property room.  I mean, they're all just, we
22  called them divisions.  So they have their own separate unit
23  with usually a supervisor in there.
24    Q.   And the property room is an actual division within
25  the police department, correct?

36

1    A.   Yes.
2    Q.   Okay.  How many officers are assigned to that
3  division?
4    A.   Currently, it is, the personnel in there is all
5  civilians.  It changes over time, but currently it's all
6  civilians.
7    Q.   How many -- what do you mean by civilians?
8    A.   A person who is not a police officer.  They're not a
9  certified police officer.  They don't have any formal police
10  training.
11    Q.   They haven't been to the academy, correct?
12    A.   Correct.
13    Q.   And how many civilians are assigned to that?
14    A.   I believe four or five, somewhere in there.
15    Q.   What do they do on a regular basis?
16    A.   So they accept property that has been turned in by
17  officers from their calls for service.  It could be a found
18  article.  It could be evidence on a case that was collected.
19  They take that, enter it into their computer system, and then
20  they will store it in their facility.
21    Q.   Do you know what was Officer Saldivar's role in that
22  division while, when he was reassigned there?
23    A.   I do not.  Not specifically, no.
24    Q.   Are the civilian members of the property division, or
25  the property room I should say, are they authorized to carry

37

1  firearms?
2    A.   They are not.
3    Q.   Do you know whether or not Officer Saldivar had his
4  firearm when he was assigned to the property room?
5    A.   Are you asking if he carried it when he was working
6  at the property room?
7    Q.   Yes.
8    A.   I do not know that.
9    Q.   Do you know whether or not, at any point whether
10  Officer Saldivar's ability to carry a firearm was taken away
11  from him?
12    A.   His ability to carry a firearm during working hours
13  -- he wasn't on the street, and I don't know if he had it with
14  him when he worked in the property room.  His traveling back
15  and forth to his job, that falls under different laws that he,
16  would make it permissible for him to do it.  So I don't know
17  the answer, if he actually carried it on his body while he was
18  working in the property room.
19    Q.   but he was authorized to carry it while traveling to
20  and from work?
21    A.   According to State law, yes.  He can do that.
22    Q.   While he was assigned on property room, if he had
23  observed a traffic violation or a crime being committed, would
24  he have had the authority to intervene?
25    MR. GILES:  Objection.  Form.

**38**

1    THE DEPONENT: He would not.
2 BY MR. DUBE:
3    Q. Why not?
4    A. Because under -- his police powers basically were
5 taken from him is my understanding. That'd be one of the
6 positions of the Chief of Police.
7    Q. I'm not sure I understand that answer. Can you
8 explain what you mean?
9    A. So the Chief has the authority to like reassign
10 people as he did in this case.
11    Q. Right.
12    A. And you were asking me if his authority to remove or
13 keep Officer Saldivar from carrying his weapon, and I don't
14 know if he did that or not is what I'm saying.
15    Q. No. But that isn't the question. The question was
16 if he had observed a crime being committed while still being in
17 employment as a City of Pasadena Police Department officer,
18 would he have had the authority or ability to intervene in
19 stopping that crime?
20    MR. GILES: Objection. Form.
21    THE DEPONENT: I believe the answer to that is no.
22 BY MR. DUBE:
23    Q. And you say that because he had his police powers
24 taken away from him is I believe what your answer was, correct?
25    A. That is my understanding of what took place, yes.

**39**

1    Q. How was his police powers taken away from him?
2    A. He was told by the Chief of Police of why he was
3 being moved, and he was also told that his, you know, while he
4 was there his police powers would be taken away from him.
5    Q. Is that one of the levels of discipline that we
6 discussed?
7    MR. GILES: Objection. Form.
8    THE DEPONENT: Taking away a person's police powers?
9 BY MR. DUBE:
10    Q. Yes.
11    A. Not necessarily, no.
12    Q. Under what authority did the Chief of Police take
13 away Officer Saldivar's police powers?
14    A. As the authority of the Chief.
15    Q. What does that mean?
16    A. He has the power to -- while a person is, there is an
17 ongoing investigation, he does have the power to advise the
18 individual that they will not --
19    (Cell phone interruption.)
20    MR. DUBE: I hear that too. Do we know what that
21 noise is?
22    MR. GILES: Steve, you're the one that's lighting up,
23 so.
24    THE VIDEOGRAPHER: It looks like it might be a cell
25 phone.

**40**

1    MR. DUBE: No. Not me.
2    THE VIDEOGRAPHER: All right. It looks like it went
3 away.
4    MR. SELBE: My cell phone may have been too close to
5 the mic. I got it away.
6    MR. DUBE: No worries. No worries.
7 BY MR. DUBE:
8    Q. All right. So --
9    A. Could you repeat the question again that we were
10 talking about?
11    MR. DUBE: Ms. Court Reporter, can you repeat the
12 question, please, because I don't remember it?
13    (WHEREUPON, the record was played back.)
14 BY MR. DUBE:
15    Q. So what authority -- under what authority did the
16 Chief of Police take away Officer Saldivar's police powers?
17    A. Under the powers that are given to the Chief of
18 Police, he has the ability to advise an individual that while
19 there's an ongoing investigation, things, you know -- there are
20 actions that will be taken. Which is, in this particular case,
21 he was reassigned from patrol to the property room.
22    Q. Right. That's a reassignment to the property room,
23 right, which is different from taking away an officer's police
24 powers, or -- correct?
25    A. Well, when a person is no longer in their assigned or

**41**

1 in their assignment, you know, the Chief, you know, who is in
2 charge of the department, he can advise someone, and he has the
3 authority to manage his personnel. So if he thinks it's in the
4 best interest of the, not only the city, but the citizens and
5 the officers themselves, to not have an individual go out there
6 and enforce these laws, then he has the authority to say, this,
7 you're going to do this until this investigation is complete.
8    Q. So as police chief, he has the authority to manage
9 personnel, correct?
10    A. That's correct.
11    Q. Okay. And that authority includes the authority to
12 make decisions on behalf of the City, correct?
13    A. He makes decisions for the best interest of the
14 citizens of this City.
15    Q. Correct.
16    A. Yes.
17    Q. And that authority includes the authority to take a
18 police officer off the streets, correct?
19    A. Correct. He can reassign them, and he can also
20 advise them that during that time of reassignment, they are not
21 to enforce police powers, or not to enforce, take any other
22 police actions.
23    Q. And are those powers listed in the, I guess in the
24 Civil Service Commission code and procedures?
25    A. I'm not -- I don't know the answer to that question.

42

1     Q.   Where is the source of that power to do so?
2     A.   It is with any department head who has the power to
3  manage his own personnel.  He can move individuals under his
4  command to where he would -- wants them to go.
5     Q.   And I understand that, you know, he can move -- he
6  can reassign them to different positions and different places,
7  right.  But it's something different I think, what I'm trying
8  to hone in on is, you know, would you say that during the time
9  when he was in the property room that Officer Saldivar was
10  still a Pasadena Police Department officer?
11     A.   Yes.
12     Q.   So he was still a police officer, correct?
13     A.   That's correct.
14     Q.   And he was still being paid as a police officer,
15  correct?
16     A.   Yes.
17     Q.   Okay.  And I think you testified earlier that, you
18  know, he was authorized, you know, to go from his home to the
19  police department and carry a weapon issued by the police
20  department, correct?
21     MR. GILES:  Objection.  Correct.
22     THE DEPONENT:  No.  That's not what I said.  He - -
23  because the police department doesn't issue weapons, number
24  one.
25  BY MR. DUBE:

43

1     Q.   Okay.
2     A.   And number two, under State law, you know, traveling,
3  you know, you can carry a weapon in your vehicle.  So that's
4  what I was referring to.
5     Q.   Got it.  So he would have the authority to carry a
6  weapon as any other citizen of Texas could, is that what you're
7  trying to say?
8     A.   Who is legally allowed to carry it, yes.
9     Q.   Okay.  So the Pasadena Police Department does not
10  issue weapons to officers?
11     A.   Correct.
12     Q.   Okay.  Are there rules regarding which weapons they
13  can carry, and the manner in which they can carry it?
14     A.   Yes.
15     Q.   And what are those rules?
16     A.   So they, like everything else, change over the years.
17  It used to be you purchased your own weapon, which we still do.
18  You can carry pretty much any caliber weapon as long as you can
19  qualify with it.  The -- over the years, and more recently,
20  they've transitioned to everyone carrying the 9 millimeter
21  pistol.  They prefer the Glock pistol; however, individuals
22  that had something different at the time that this went into
23  place were grandfathered in, and they could carry their own
24  pistol, whatever the make and model is.
25     Q.   When did those rules change?

44

1     A.   I'd say about, anywhere from three to five years ago.
2     Q.   Were there any restrictions or rules and policies in
3  place as to the manner in which a Pasadena Police Department
4  officer could carry a weapon?
5     Q.   What do you mean?
6     A.   Well, I guess like meaning like were there any rules
7  and restrictions in place as to like what their
8  responsibilities were with the weapons that they are carrying
9  as an officer?
10     A.   Are you talking about like on duty?
11     Q.   On duty.  We can start with on duty.
12     A.   Okay.  Well, I mean, they are issued equipment, duty
13  belt, which includes a holster in which the weapon would be
14  secured in.
15     Q.   Okay.  Anything else?
16     A.   As far as carrying a weapon, that's where the weapon
17  is carried when the officer's on duty, in uniform.
18     Q.   Were there any restrictions in the manners of use or
19  what they could do with it?
20     A.   Of course.
21     Q.   What were those?
22     A.   So use of force, that would fall under use of force
23  issues.
24     Q.   Okay.
25     A.   And if they had to use their weapon, then it would

45

1  fall under the policies of the use of force.
2     Q.   Okay.  So let's go back to Officer Saldivar and his
3  reassignment to the property room.  What were his roles in the
4  property room?
5     A.   I don't know what his exact roles were.  It was
6  whatever was -- he was there to assist them, so I don't know
7  what his roles were, assignment was.
8     Q.   Okay.  Do you not know like any output of his work
9  during that time?
10     A.   I do not.
11     Q.   Did he have a sergeant or supervisor during that
12  time?
13     A.   I believe there was a sergeant over the property room
14  at that time.
15     Q.   Would Officer Saldivar been able to challenge the
16  assignment to the property room?
17     A.   No.
18     Q.   Why not?
19     A.   Because it's at the discretion of the Chief of Police
20  for where to place their personnel.  And if you look at the,
21  under Civil Service, assignments are not challenged and heard
22  from the Commission.
23     Q.   So assignments -- reassignments and assignments
24  cannot be challenged?
25     A.   Yes, that's correct.



46

1    Q.   And the person who was authorized to make the
2  assignment/reassignment would have been the Chief of Police?
3    A.   Correct.
4    Q.   And he could make that decision based on his
5  assessment on what was best for the interests of the citizens
6  of the City of Pasadena?
7    A.   Not only that, but any information that he has at the
8  time he makes that decision.
9        MR. DUBE:  Can we take a break?  I need to use the
10  restroom?
11       MR. GILES:  Sure.
12       MR. DUBE:  All right.  Let's make it like five
13  minutes, please.
14       THE VIDEOGRAPHER:  The time is 11:12 a.m.  We're off
15  the record.
16       (WHEREUPON, a recess was taken.)
17       THE VIDEOGRAPHER:  We are on the record.  The time is
18  11:27 a.m.  You may now proceed.
19  BY MR. DUBE:
20    Q.   Okay, Mr. Urban, how are you?  Sergeant Urban, I'm
21  sorry.
22    A.   I'm fine.  Thank you.
23    Q.   Okay.  What was the Chief's -- did the Chief have
24  authority to request an officer receive additional training?
25    A.   He does have that authority, yes.

47

1    Q.   So if the Chief determined that an officer was
2  deficient in a particular area, he could request that the
3  officer obtain training in that particular area?
4    A.   The Chief has the authority to have anyone receive
5  additional training in any subject.
6    Q.   And that would include additional training with
7  respect to use of force, correct?
8    A.   Yes.
9    Q.   Was there anyone that had, anyone else that had that
10  ability?
11    A.   Does anyone else have the ability to request --
12    Q.   That officers undergo additional training?
13    A.   If you have someone that has identified an issue of
14  someone under their command, you can request that, with
15  approval of the -- through the chain of command.
16    Q.   You anticipated my next question.  So they could
17  determine that the person needs additional training, but then
18  they would have go through the chain of command to get that
19  authorized?
20    A.   Yeah.  It's a recommendation.  I mean because you
21  can't just send a whole squad of people to training without
22  checking on manpower, to making sure there's adequate coverage
23  for the streets, for instance, if it's a patrol officer.
24    Q.   Who would that recommendation be to?
25    A.   So it would go -- it depends on who discovers the

48

1  deficiency.  If it is an officer, it'd go up to, you know,
2  notify the sergeant who could make that recommendation to the
3  lieutenant or commander, which is the same person over that
4  shift.  And then the commander can say to, authorize go ahead
5  and schedule that individual for more training.
6    Q.   I'm showing you -- actually before I show you that.
7  I believe you testified that officers may not appeal a
8  reassignment under the Civil Service Commission rules and
9  procedures, correct?
10    A.   The Civil Service Commission does not hear
11  involuntary or voluntary transfers, cases.  That's correct.
12    Q.   Do you know which rule specifies that?
13    A.   I do not.  It's in their -- the rules of the
14  Commission.  It states what they will take an appeal on and
15  what they won't.
16    Q.   Okay.  So if I show you the rules of the Commission,
17  would you be able to identify that for me, do you think?
18       MR. GILES:  Objection.  Speculation.
19  BY MR. DUBE:
20    Q.   Do you think -- have you reviewed the rules of the
21  Commission before?
22    A.   I have looked over them, yes.
23    Q.   Did you look over them for purposes of this
24  deposition?
25    A.   I did.

49

1    Q.   Do you recall whether you saw the rule with respect
2  to challenging or appealing a reassignment?
3       MR. GILES:  Objection.  Form.
4       THE DEPONENT:  The -- I think there is specifically
5  something in there that states that they do not, that is not
6  one of the items that they will take on appeal, as someone who
7  is trying to appeal a movement of that kind.
8  BY MR. DUBE:
9    Q.   Do you know what chapter of the government code the
10  rules of the Civil Service Commission is listed in?
11    A.   The Local Government Code 143 is my understanding.
12    Q.   143.  So I am going to share screen.  I'm showing you
13  what's been marked as Exhibit 15, which is Section 143 of the
14  Local Government Code.  Do you see that?  And I've scrolled
15  down to the Disciplinary Actions subchapter.  Do you see that?
16    A.   Yes.
17    Q.   Okay.  I guess we can just go through it.  The first
18  section of that subchapter is 143.051.  Do you see that?
19    A.   I do.
20    Q.   Actually, are you familiar with subchapter -- I mean
21  Government Code Chapter 143?
22    A.   I am familiar with it, yes.
23       MR. DUBE:  Okay.  I offer Exhibit 15 into evidence.
24       MR. GILES:  We don't object to it for purpose of the
25  deposition.



50

1      MR. SELBE:  No objection for purpose of deposition.
2      (WHEREUPON, Exhibit 15 was marked for
3  identification.)
4  BY MR. DUBE:
5      Q.  And can you -- could you read 143.051 to yourself?
6  Let me know when you're ready.  If you need me to scroll or
7  anything.  Let me know when you're ready.
8      A.  I will let you know.  You can scroll down if you
9  would.  Okay.
10     Q.  If you could read the next subchapter, the next
11  section as well.
12     A.  Okay.  You can scroll down.  Can you back up just a
13  little bit?  There you go.  Thank you.  Okay.  If you want to
14  scroll down a little bit more.  Okay.
15     Q.  Can I go down to here?
16     A.  That's fine.  Right there.  Okay.
17     Q.  And the section you just read was Section 143.052,
18  correct?
19     A.  Yes.
20     Q.  Okay.  So let's go to the next section.  I just want
21  to make sure you've read it, so I'm going to ask you questions
22  about this.  I want to make sure you've taken your time to read
23  it before we proceed, okay.
24        So can you read the next subchapter please, next
25  section?

51

1      A.  Sure.  Okay.  If you scroll down.  Can you go up just
2  a little bit more?  There you go.  Okay.  Can you scroll up a
3  little bit more?  Yeah, a little bit more I think.  There we
4  go.  Okay.  If you can scroll down to where the -- page 44,
5  where the (1) up top.  Perfect.  All right.
6      Q.  Okay.  I think we can stop there.  Yeah.  We can stop
7  there.  So you've read Sections 143.051 through 053, correct?
8      A.  Was that the last one?
9      Q.  Yeah.  That's the last one I asked you to read.
10     A.  Okay.  Yes.
11     Q.  I think so.  Let me just be sure of that.  Yeah. 054
12  is the next one.
13     A.  Yes.
14     Q.  And did you see anything in there that stated that an
15  officer may not challenge a reassignment?
16     A.  It does not specifically say that in those sections,
17  no.
18     Q.  Okay.  Do you know any sections in Chapter 143 that
19  states that?
20     MR. GILES:  Objection.  Form.
21  BY MR. DUBE:
22     Q.  Are you aware of any sections --
23     A.  Not of the --
24     MR. GILES:  Objection.  Form.
25     THE DEPONENT:  Not of the sections that I have, you

52

1  have just asked for me to read.
2  BY MR. DUBE:
3      Q.  Okay.  And what is this subchapter dealing with, what
4  subject matter?
5      A.  Are you talking about the 143.051?
6      Q.  Yeah, 051, 052, and 053, or Subchapter D?
7      A.  Yeah.  So Subchapter D under Disciplinary Actions is
8  talking about the Cause for Removal or Suspension of a police
9  officer, in this particular case.  It also applies to
10  firefighters that have civil service protection.
11     Q.  And it says in 052, "This section does not apply to a
12  municipality with a population of 1.5 million or more."  Do you
13  see that?
14     A.  Correct.
15     Q.  Do you know whether or not the City of Pasadena's
16  population is greater than 1.5 million?
17     A.  It is not.
18     Q.  Was it between the years 2018 and 2023, was it ever
19  greater than 1.5 million?
20     A.  Not to my knowledge, no.  I don't -- no.
21     Q.  So as far as you know, this subchapter and section
22  applies to your -- to the City of Pasadena, correct?
23     A.  Yes.
24     Q.  Okay.  And then in I guess paragraph (b), it says,
25  "The head of the fire or police department may suspend a fire

53

1  fighter or police officer under the department head's
2  supervision or jurisdiction for the violation of a civil
3  service rule."  Do you see that?
4      A.  Yes.
5      Q.  Okay.  And the head of the police department under
6  this section would be the Chief of Police, correct?
7      A.  Yes.
8      Q.  Okay.  And from 2018 to 2023, when he was the Chief
9  of Police for the Pasadena Police Department, that would have
10  been Josh Bruegger, correct?
11     A.  Yes.
12     Q.  So -- "In the original written statement and charges
13  and in any hearing conducted under this chapter, the department
14  head may not complain of an act that occurred earlier than the
15  180th day preceding the date the department head suspends the
16  fire fighter or police officer."  Do you see that?
17     A.  Yes.
18     Q.  Okay.  So what does that section mean to you?
19     A.  I'm sorry.  Repeat that.
20     Q.  What does that, I guess, sentence mean to you; how
21  have you interpreted that sentence?
22     A.  So this is talking about a complaint of some kind
23  that came in before the 180th day before the officer or
24  individual was suspended.
25     Q.  Do you understand this, I guess, paragraph to mean

54

1 that a police chief can suspend an officer or discipline an
2 officer for an act that occurred within 180 days of him filing
3 that complaint --
4     MR. GILES: Objection. Form.
5 BY MR. DUBE:
6     Q.  Let me repeat that question. Sorry.
7     Do you understand this paragraph to mean that a
8 police chief has 180 days from an act to discipline an officer?
9     MR. GILES: Objection. Form.
10     THE DEPONENT: That is not what I take it as.
11 BY MR. DUBE:
12     Q.  What do you take it as?
13     A.  Well, it says that, "... the department head not
14 complain of an act that occurred earlier than the 180th day
15 preceding the date the department head ..." suspended of a fire
16 fighter or police officer. So it says the act that occurred
17 180 days prior to the person being suspended.
18     Q.  Okay. You just reread it, so you didn't answer my
19 question. What do you understand that sentence or that
20 paragraph to mean?
21     MR. GILES: Objection. Form.
22     THE DEPONENT: I take it to mean, you know, what it
23 says, that basically the department head can't take a complaint
24 of an act that occurred over 180 days prior to the person being
25 suspended.

55

1 BY MR. DUBE:
2     Q.  And that's exactly the question I asked. Okay. Thank
3 you.
4     And how long does the Commission have to adjudicate
5 an appeal of a suspension or act of discipline?
6     MR. GILES: Objection. Form.
7     THE DEPONENT: Under 143.053, section (b), it says
8 the decision in writing within 30 days.
9 BY MR. DUBE:
10     Q.  So 30 days, correct?
11     MR. GILES: Objection. Form. He didn't finish, but
12 then you're moving the screen where he's trying to read it. So
13 he needs to read the whole thing if we're going to read it.
14     MR. DUBE: All right. I'm sorry.
15 BY MR. DUBE:
16     Q.  Go ahead, sir.
17     A.  So under section 143.053, under the Appeal of
18 Disciplinary Suspension, under section (b), it states that,
19 "... the commission shall hold a hearing and render a decision
20 in writing within 30 days after the date it receives (the)
21 notice of appeal."
22     Q.  And do you recall how long --
23     MR. GILES: Objection. Non-responsive. There's more
24 to this section than he just read. He read part of it.
25 BY MR. DUBE:

56

1     Q.  Is there any --
2     A.  Go ahead, sir.
3     Q.  Is there any part you would like to read to answer my
4 question?
5     A.  Yes. That section continues on to say, "The
6 suspended person and the commission may agree to postpone the
7 hearing for a definite period."
8     Q.  So ordinarily they have 30 days, but they can agree
9 to postpone, correct?
10     A.  That's correct.
11     Q.  And it says "for a definite period," so it just can't
12 be an indefinite suspension, it has to be for a set period of
13 time, correct?
14     A.  For the appeal, yes, a definite period.
15     Q.  Let's talk about the Internal Affairs Division now.
16 What's the structure of the Internal Affairs Division in the
17 Pasadena Police Department?
18     A.  what do you mean by structure?
19     Q.  Who are the employees; what are their roles and
20 responsibilities?
21     A.  So as previously stated, I'm the person that is
22 currently assigned to internal affairs. I have an officer that
23 is a backup in case if I'm not available, that works Public
24 Integrity but is also assigned to be the backup internal
25 affairs investigator if need be.

57

1     Q.  And so I guess you're speaking to it in terms of this
2 current time period, right. Let's go back to 2021. What was
3 the structure then?
4     A.  The structure at that time was the same. I believe
5 if I'm not mistaken, I think there was one -- there might have
6 been two sergeants over there at that time. But I know that --
7 because that varies over the timeframe depending on manpower
8 that we have and assignments. But there has been anywhere from
9 one to three people over there in Internal Affairs.
10     Q.  At that time, between 2018 to 2021 timeframe, were
11 any -- it was just the two Sergeants and they were -- they had
12 to do their own investigations, correct?
13     A.  If there were two Sergeants assigned to Internal
14 Affairs, then yes, they would work on complaints and
15 investigations.
16     Q.  Is there a requirement that to be a member of
17 Internal Affairs, you have to have achieved the rank of
18 Sergeant or higher?
19     A.  No. There is not.
20     Q.  Has this been the policy, I guess the custom, for it
21 to have been Sergeants? Because I know you were there, then
22 before that it was Sergeant Craig Hamilton, Sergeant Norman.
23 So as far as I've learned it's always been Sergeants. Why is
24 that?
25     A.  The assignment of Internal Affairs is selected, or



58

1 the individual is selected and appointed by the Chief.
2    Q.   Um-hmm.
3    A.   So whatever, I mean -- whatever person is selected is
4 usually -- meets the I guess description of an individual with
5 the abilities to conduct fair investigations.  So there's not a
6 -- but there's not a hard set rule.  It can be an officer and
7 it has been in the past.
8    Q.   What is the role of the Internal Affairs Division at
9 the Pasadena Police Department?
10    A.   The role of the investigator in Internal Affairs is
11 to, when we receive complaints, whether it's on an officer or
12 any employee within the police department, we take the initial
13 complaint.  And then there's a discussion, depending on the
14 circumstances, with the Chief of Police who makes the decision
15 if a control number and a formal complaint will be opened up on
16 the -- to investigate the complaint that came in.
17    Q.   And what is a control number?
18    A.   A control number is assigned to a formal complaint.
19 So any formal complaint receives a control number.  And
20 depending on the, what the complaint is, whether or not it's
21 investigated by Internal Affairs or it's investigated by the
22 supervisor of the individual who basically received the
23 complaint.
24    Q.   And what is a formal complaint?
25    A.   It is a complaint that's in violation or that needs

59

1 to be investigated and is a possible violation of policy with
2 the City of Pasadena Police Department.
3    Q.   So you're using the word formal complaint as opposed
4 to just the word complaint.  What's the difference between --
5 what other types of complaints are there?
6    A.   Okay.  So there's two types of complaints.  There's a
7 Level 1 and a Level 2.  The difference between a formal
8 complaint and an informal complaint, which we call inquiry, is
9 someone will call in to make a complaint and we do some
10 investigation on it and there's just -- we find out that it is,
11 you know, it did not happen; or we look into it and it's like
12 well, okay -- let's say an investigation of rudeness, for
13 instance.
14    Q.   Um-hmm.
15    A.   Then we take that information and we will usually see
16 if they want, they being the administration, want to have a
17 control number assigned, which makes it a formal complaint.
18 And then something of that nature would be pushed down to the
19 supervisor over the individual who received the complaint to
20 investigate.
21    Q.   And what does an investigation of the complaint
22 entail?
23    A.   Depending on the nature of the complaint.  You know,
24 anything that would help either substantiate or disprove that
25 the complaint actually was valid.  So whatever information is

60

1 available to look at.
2    MR. DUBE:  Hey guys, give me a second.  My wife is
3 calling me and I think she's probably picking up my son now.
4 Give me a quick second.
5    MR. GILES:  Sure.
6    THE VIDEOGRAPHER:  Would you like to go off the
7 record, counsel?
8    MR. GILES:  Yes, thank you.
9    THE VIDEOGRAPHER:  All right.  The time is 11:55 a.m.
10 and we are off the record.
11    (WHEREUPON, a recess was taken.)
12    THE VIDEOGRAPHER:  We are on the record.  The time is
13 11:59 a.m.  You may now proceed.
14 BY MR. DUBE:
15    Q.   I believe you mentioned a Class I complaint.  What is
16 a Class I Complaint?
17    A.   So a Class I complaint consists of items of serious
18 misconduct, officer involved shootings, things that are above
19 the level of Class II; which is harassment, not being
20 courteous, rude, those type of -- just things that people would
21 encounter sometimes on a traffic stop let's say.
22    Q.   And you said serious misconduct, and officer involved
23 shootings would be Class I complaints?
24    A.   Yes.
25    Q.   How about other categories of uses of force,

61

1 excessive use of force allegations; would those all be -- let
2 me ask this question.
3    Are all excessive use of force complaints classified
4 as Class 1 complaints?
5    A.   If they are so designated by the Chief to be
6 investigated, then yes, it'd be a Class I complaint.
7    Q.   So is the Chief the person who designates the
8 categories of complaints, whether it's Class I or Class II?
9    A.   It doesn't have to be the Chief, but the Chief makes
10 the determination if a control number is going to be issued to
11 a specific complaint.  But the actual category of the complaint
12 could be the Assistant Chief.  I mean, it doesn't have to be
13 the Chief.
14    Q.   So is the control number the initiation of the
15 Internal Affairs investigation?
16    A.   Not necessarily.  A formal investigation, yes. If
17 there's a formal investigation, the Chief designates that and a
18 control number is issued.
19    Q.   So that part gets like -- would you say the Chief
20 initiates formal investigations to the Internal Affairs
21 department, correct?
22    A.   He gives approval for that, yes.  But he's the one
23 that has to make that decision.
24    Q.   So can you detail for us the process of a formal
25 Internal Affairs complaint that has acquired a control number?

62

1    A.  Sure.  So depending on how it comes in.  Let's say,
2    for instance, somebody wants to complain about an officer.
3    That person will, is required to come in and give a formal
4    statement that is signed.  That information, once received,
5    then the Chief will have to make a determination of hey, let's
6    go ahead and issue a control number so this can be
7    investigated.
8          Then, depending on the allegations in the complaint
9    will lead to how much investigation and what type of
10   investigation will be necessary.  So that could include looking
11   at bodycam videos, look at dashcam videos, videos from, you
12   know, Ring doorbells if it's in a neighborhood.  Just anything
13   that's available, as you would with any investigative case.
14   You look at everything that you can to -- and -- whether it's
15   going to be to support the allegation, or it's to disprove, or
16   if it's inconclusive.
17         I mean you just -- but you do the complete
18   investigation.  And at the end, it is -- you list any potential
19   policy violations that may or may not be involved, but any
20   potential ones.  And then the final case or the final report,
21   investigation is sent to the Chief's office.
22   Q.  And is that all conducted by I guess a Sergeant or
23   person who's in the Internal Affairs Division, the
24   investigation?
25   A.  It doesn't have to be -- whoever's in Internal

63

1    Affairs and has been assigned the case is the one that
2    completes the investigation.  It's -- also too it can be
3    handled on the patrol level at times depending on the
4    allegation, and the seriousness of it.
5    Q.  Let's like, you know, for the next few questions,
6    these are all Class I complaints of excessive use of force and
7    officer involved shootings.  So all my questions pertain to
8    that process.  Does that make sense?
9    A.  So the question is you have an officer involved
10   shooting or excessive force complaint?
11   Q.  Correct.  Complaint.
12   A.  Okay.  Is that with our department or ...?
13   Q.  With Internal Affairs.
14   A.  Is that with our department?
15   Q.  What do you mean?
16   A.  The complaints that you're talking about that you're
17   going to ask me.
18   Q.  Yeah.  So I'm going to ask you, I'm telling you the
19   background to my question for the next few questions will be,
20   you know, a complaint that's been filed with Internal Affairs,
21   that has a control number, and involves an allegation of
22   excessive force and/or officer involved shooting.
23   A.  Okay.  Is that at Pasadena?
24   Q.  In the City of Pasadena, correct.
25   A.  Okay.

64

1    Q.  Okay.  Yeah.  I'm not asking you for any other police
2    departments.
3    A.  Just want to make sure.  Just want to make sure.
4    Q.  You have enough on your plate.  All right.  So the
5    complaint comes in.  It's investigated, correct.  And then is
6    there a report always made?
7    A.  Yes.  If an investigation is done and completed, the
8    report is documented.
9    Q.  Is a conclusion always made?
10   MR. GILES:  Objection.  Form.
11   THE DEPONENT:  A summary of the incident is included.
12   BY MR. DUBE:
13   Q.  How about a determination as to whether or not the
14   policies and procedures of the police department has been
15   violated; is that conclusion made or determined?
16   A.  It is not included in the investigative report.
17   Q.  Why not?
18   MR. GILES:  Objection.  Form.
19   THE DEPONENT:  The role of the Internal Affairs
20   Division investigations is to gather information on possible
21   policy violations.  That information is then forwarded to the
22   Chief of Police who makes the determination on what if any
23   disciplinary actions may be taken in that particular incident.
24   BY MR. DUBE:
25   Q.  So gather information and produce it to the Chief of

65

1    Police?
2    A.  Yes.
3    Q.  Do the Internal Affairs investigators, do they have
4    any role in assessing or determining whether or not there's
5    been a violation of the City of Pasadena policies and
6    procedures?
7    A.  We do not have a role in determining, we being
8    internal affairs does not have a role in -- we don't make a
9    determination if rules or policies are violated.  We merely add
10   in or suggest, or not suggest, but we would add in to our
11   report possible policies that would, may or may not be included
12   in this, the actions by the officer and what the investigation
13   produced.
14   Q.  So you may include the polices that are implicated by
15   the actions, but you don't conclude whether or not they've been
16   violated?
17   A.  Yeah.  We just include possible policies that were,
18   that come into play from whatever case we're investigating,
19   possibly.  I mean, we put them in there, but the Chief makes
20   the determination if that is actually true or not.
21   Q.  Okay.  It's the Chief that makes the determination,
22   nobody else?
23   A.  He makes the final decision, yes, on disciplinary
24   actions at this point.
25   MR. DUBE:  Hey guys.  Let's take our lunch break now.

66

1 My family just arrived.
2         MR. GILES: Okay.
3         MR. DUBE: Just take the lunch break until 1:15.
4         MR. GILES: Okay.
5         THE VIDEOGRAPHER: Please stand by. The time is
6 12:08 p.m. and we are off the record.
7         (WHEREUPON, a luncheon recess was taken.)
8         THE VIDEOGRAPHER: We are on the record. The time is
9 1:15 p.m. You may now proceed.
10        MR. DUBE: So my son is gone so there's no need for
11 me to watch the eclipse, but if you guys want to let me know.
12        MR. GILES: No. I've seen the dark before. I'm
13 good.
14        MR. DUBE: Me too.
15        MR. SELBE: There's nothing to see in Houston. It's
16 cloudy.
17        MR. DUBE: Okay. How about you, Sergeant?
18        THE DEPONENT: I'm here in Houston as well, so yeah,
19 it's like a dreary day outside.
20        MR. DUBE: Vincent, Nancy, what about you guys?
21        THE VIDEOGRAPHER: It's cloudy over here, sir.
22        MR. DUBE: All right. So we'll just go on through,
23 okay.
24        MR. GILES: Sounds good.
25        MR. DUBE: All right. Are we back on the record?

67

1         THE VIDEOGRAPHER: Yes, we are.
2         MR. DUBE: Okay. Perfect.
3 BY MR. DUBE:
4     Q.    All right, sir. We just had our lunch break. Are you
5 ready to proceed?
6     A.    Yes.
7     Q.    Okay. I believe you testified that -- prior to the
8 lunch break I believe you testified that the role of Internal
9 Affairs Division is to gather the facts relating to a formal
10 complaint, correct?
11    A.    Yes. Investigate complaints against officers.
12    Q.    And then -- but not to make conclusions, correct?
13    A.    That's correct.
14    Q.    If an investigator were to come to the personal
15 conclusion that an officer had violated the use of force policy
16 for the City of Pasadena Police Department, what could they do
17 with that information?
18    A.    Can you give me an example of what --
19    Q.    Sure. If you reviewed a police shooting, okay, and
20 you determined that the officer violated the use of force
21 policy, what would be your next steps?
22    A.    So as I stated before, we don't make a determination
23 if a policy was violated. If there is a potential policy
24 violation, then that would be listed in the investigation. We
25 list violations that may or may not be applicable to the

68

1 investigation as far as the incident, but we don't make a
2 determination on if that was a violation.
3     Q.    So should the investigators be familiar with the use
4 of force policy of the Pasadena Police Department?
5     A.    Yes. They should be familiar with all the policies
6 of the department.
7     Q.    So if the investigator in Internal Affairs Division
8 thinks that a policy is violated, they don't conclude that in
9 the investigation, they just list that policy in the
10 investigation, correct; is that your testimony?
11    A.    They just -- yes. They just list it as a policy that
12 may or may not be applicable to this incident, whatever
13 incident that is.
14    Q.    What if the investigator believes that the officer
15 has violated the law, like, and committed, you know, and
16 committed a violation of criminal law; what can they do at that
17 point?
18    A.    The role of the Internal Affairs Division is to
19 investigate policy violations, not criminal violations. That is
20 the job of the Detective Division of the police department,
21 investigations.
22    Q.    So there's a separate investigation that gets taken
23 place into the use of force, correct?
24    A.    Any -- yeah. Any kind of criminal activity of the
25 officer involved in a complaint would be handled by --

69

1 especially like an officer involved shooting, as you talked
2 about, they would handle that part of it.
3     Q.    And it's your testimony that the Internal Affairs
4 only deals with the administrative side, policy side, correct?
5     A.    Yes -- that is their goal. That is their role.
6 However, if there is an incident where during their
7 investigation, something else, like a criminal incident comes
8 up, then they would investigate that as well. So they can do
9 criminal, but that's not their main role.
10        I hope you understand what I'm saying. If it's
11 something that's not the main complaint, but something that
12 comes up later --
13    Q.    So the Internal Affairs Division can investigate a
14 criminal complaint related to officer conduct if that becomes
15 apparent during their administrative investigation?
16    A.    So let me try to -- I'll try to make it easy. So if
17 a complaint comes in on let's say rudeness, right, and during,
18 you're watching the bodycam video, and you see the officer do
19 something that's a criminal activity, during that, while you're
20 investigating the rudeness complaint then the officer in
21 Internal Affairs can initiate the investigation.
22        And it'll be up to the Chief of Police to say this is
23 going to go -- you know, go ahead and investigate it, or it can
24 go to the Detective Division for them to investigate.
25 Routinely, it's we do administrative complaints on officers for

70

1 policy violations.
2     Q.   Got you.  And I understand what's typically done, and
3 what's the main purpose, okay.  I want to talk about I guess
4 the exceptions now if we can.  When you determine that hey, you
5 know, I see something that seems criminal in nature, and
6 Internal Affairs will now investigate it, can you tell me what
7 the steps in that process are?
8     A.   Okay.  So I'm not understanding.  Are you saying that
9 when a criminal investigation is done by Internal Affairs --
10     Q.   Yes.  Correct.
11     A.   -- or something of a criminal nature is observed
12 during the investigation of another case?
13     Q.   No.  I'm trying to see, I'm trying to ask you, what
14 does Internal Affairs do when they have decided to undergo a
15 criminal investigation within the Internal Affairs complaint?
16     A.   So the information that is observed -- of course with
17 anything that you observe, it's always a potential to be a
18 criminal investigation or a criminal act.  Just like anything
19 else, it is investigated and, you know, fully.  That would be
20 presented to the Chief of Police to advise of any, you know,
21 direction or where they want to go from there.
22     Q.   During your time -- during his time as Chief of
23 Police, do you know whether or not Chief Bruegger ever
24 authorized a criminal investigation by Internal Affairs?
25     A.   Not that I'm aware of.

71

1     Q.   You've observed the shooting of Randy, of plaintiff
2 Randy Aviles' vehicle in this case, correct?
3     MR. GILES:  Objection.  Form.
4     THE DEPONENT:  I watched the video.
5 BY MR. DUBE:
6     Q.   Yes.  How many times did you watch the video?
7     A.   Maybe twice.  Twice on the -- from the car video, and
8 then I think the bodycam as well.
9     Q.   What did you think upon watching the video?
10     MR. GILES:  Objection.  Form.
11     THE DEPONENT:  Can you be more specific?
12 BY MR. DUBE:
13     Q.   No, I cannot.  What did you think upon watching the
14 video?
15     MR. GILES:  Objection.  Form.
16 BY MR. DUBE:
17     Q.   What was your first thought; what were your thoughts?
18     MR. GILES:  Objection.  Form.
19     THE DEPONENT:  I had some concerns about what took
20 place.  Now, this is you talking for me personally?
21 BY MR. DUBE:
22     Q.   Right now I'm talking about you personally.
23     A.   I had some concerns about what I saw.
24     Q.   Okay.  What were those concerns?
25     A.   So having already read the report and investigation

72

1 into the case, and what knowledge that I had already had prior
2 to watching the video, which was the reason why Officer
3 Saldivar stated that he was in fear of his life, or the reason
4 why he discharged his firearm, that did not -- I did not see
5 what he was referring to initially when I watched the video.
6     Q.   So you did not see the basis for him to fear his
7 life, is that -- in your personal capacity, correct?
8     A.   Well, that's -- yes.  However, there is a big
9 difference between watching a limited view on a camera in a car
10 or body camera compared to the totality of the scene, so yes.
11     Q.   Understood.  So now if -- so now you're back in your
12 capacity as the representative for the City, okay.
13     A.   Okay.
14     Q.   So if an investigator had, you know, the concerns
15 that you had in your personal capacity upon watching the video
16 in a police shooting, okay, what could he or she do at that
17 time?
18     A.   So are you asking about the investigation that was
19 done as far as through Internal Affairs or the criminal
20 investigation, the separate shooting part of it?
21     Q.   So Internal Affairs investigator, okay, who is
22 viewing that video, okay, and you know, like you did they come
23 to a conclusion, hey, there's some concerns here regarding what
24 I'm seeing, what could they do at that time?
25     A.   I'm just trying to understand.  Are you asking me

73

1 what I would have done?
2     Q.   No.  I'm asking, what are they authorized to do, what
3 is an Internal Affairs investigator authorized to do at that
4 point?
5     MR. GILES:  Objection.  Form.
6     THE DEPONENT:  The investigator as always is to
7 conduct a complete investigation on the incident.  Just because
8 you see something you're concerned about, it does not mean that
9 it could not have been justified.  If that makes sense.  I
10 mean, it doesn't change -- it doesn't change how the
11 investigation is started or concluded.  It's you know -- if
12 you're doing an investigation, it should be a complete
13 investigation of all the facts.
14 BY MR. DUBE:
15     Q.   Understood.  Thank you.
16     I'm going to show you what's been marked as Exhibit
17 14.  Are you familiar with this document?
18     A.   Yes.
19     Q.   What is this document?
20     A.   That appears to be the internal, the portion of our
21 rules and procedure, policy and procedures for Internal
22 Affairs.
23     Q.   Is there a time limit that Internal Affairs has to
24 complete their investigations?
25     A.   Initially, it is six months, but depending on the --



74

1 they try -- I mean, it's not a time limit per se. It is a
2 recommendation to have it done by then. And -- but they can be
3 extended if there's circumstances that would warrant that.
4     Q.   What could those circumstances be?
5     A.   Let's say that the, for instance, the complainant had
6 been arrested again, and they were like in jail, or they were
7 -- maybe they had a medical condition to where you're unable to
8 complete your investigation. Any type of circumstances, it
9 could be extended further.
10     Q.   How does that work with the Civil Service Commission
11 rule that a complaint by the department head must be initiated
12 within 180 days of the conduct?
13     MR. GILES:  Objection.  Form.
14     THE DEPONENT:  I don't know how that applies to that.
15 I just don't know if it's the -- since they have -- they can
16 agree to extend the date. But to answer your question
17 directly, I don't have the answer to that. If you have
18 something that, you know, you'd like me to look at it, I would
19 look at it.
20 BY MR. DUBE:
21     Q.   No. It's a question that I had that I was hoping you
22 would have the answer to.
23     A.   Okay.
24     Q.   So I am in I guess 18.5, Complaints, correct?
25     A.   Um-hmm.

75

1     Q.   Do you see that?
2     A.   Yes.
3     Q.   Okay. And section 3 lists the Categories of
4 Complaints, correct?
5     A.   Um-hmm. Yes.
6     Q.   And as you testified before, Use of Excessive Force
7 is a Class I complaint, correct?
8     A.   Um-hmm.
9     Q.   And 18.5.3, section 2b, do you see that?
10     A.   I do.
11     Q.   Okay. Are these the steps in Internal Affairs
12 complaint process?
13     A.   Not necessarily. What that is -- so we have --
14 there's an IAD record of complaint log that we keep. And this
15 is, what they're talking about there is what is contained for
16 each entry into the log.
17     Q.   Okay.
18     A.   Each entry would have that on there.
19     Q.   What is the purpose of the log?
20     A.   Record. To keep records of the complaints that are
21 given control numbers within, you know, basically formal
22 complaints that that are investigated by Internal Affairs.
23     Q.   Should all complaints that have a formal control
24 number be completed to a final disposition?
25     A.   Well, that's an opinion. Because it does not state

76

1 -- because there have been cases where a control number is
2 issued, an investigation's started, however -- since you're
3 talking about violation of policy within the department. If
4 that individual who violated that policy separates from the
5 department, then basically that investigation is kind of a moot
6 point. Because you're just talking about policy violation at
7 that point. Because that's, currently it's -- I've seen
8 incidents where that has occurred.
9     Q.   Well, is there any part of the Internal Affairs
10 process like forward looking as to how to train current
11 officers into your policies?
12     A.   I don't understand the question.
13     Q.   So -- okay. So is it possible for Internal Affairs
14 Division to look at -- it's conducting an investigation, right,
15 and determine -- and I guess review the incident and say,
16 there's an issue here that we think is broadly applicable to
17 all of our officers and they need to be trained in X, Y, Z?
18     A.   That topic can be brought up by anyone within the
19 department. It's not Internal Affairs specifically because
20 anybody that observes that issue or an issue that thinks that
21 needs to be addressed, they can bring that suggestion up, and
22 if --
23     Q.   Yeah. But I'm asking --
24     MR. DUBE:  Objection.  Non-responsive.
25     MR. GILES:  Let him finish answering the question. I

77

1 just want to make sure the record's clear on that.
2     MR. DUBE:  Okay.
3 BY MR. DUBE:
4     Q.   Were you finished, sir?
5     A.   Well, so basically what I was saying was that, you
6 know, can Internal Affairs to answer your question more
7 specifically suggest something for more training? Yes. But
8 anybody can do it within the department.
9     Q.   Okay. So Internal Affairs can do so, correct?
10     A.   Yes.
11     Q.   So would there -- could there still be a
12 benefit to conclude an investigation even after the officer has
13 separated?
14     MR. GILES:  Objection.  Speculation.
15     THE DEPONENT:  And this is -- yes. I mean, there
16 could be.
17 BY MR. DUBE:
18     Q.   So let's go back. Let's go up. So section 18.2. Do
19 you see that?
20     A.   18.2?
21     Q.   Yes.
22     A.   Uh-huh.
23     Q.   Could you read the Primary Objectives of Internal
24 Affairs?
25     A.   Sure. 18.2, Primary Objectives of Internal



78

1    Affairs. Number 1 is, "Protection of the Public: The
2  public has the right to expect fair, efficient, and impartial
3  law enforcement; therefore, any misconduct by department
4  personnel must be detected, thoroughly investigated, and
5  properly adjudicated to assure maintenance of these qualities."
6    Q.  You can stop there.  Sorry.  So it states -- so is
7  there, as far as that right that the public has to the fair,
8  efficient, impartial law enforcement and that any misconduct
9  should be detected, thoroughly investigated, and properly
10 adjudicated, right?
11   A.  Yes.
12   Q.  Should that be an obligation for the police
13 department to conclude an Internal Affairs investigation even
14 after the officer has separated?
15      MR. GILES:  Objection.  Form.
16      THE DEPONENT:  I don't know if that's what that, you
17 know, if that's what we conclude from that.
18 BY MR. DUBE:
19   Q.  What would you conclude from that with respect to
20 whether or not an investigation should be completed even after
21 an officer has separated from the force?
22      MR. GILES:  Objection.  Form.
23      THE DEPONENT:  So the take for the Protection of the
24 Public is that if there is any kind of misconduct, it should be
25 investigated, and thoroughly, and it must be detected first,

79

1  and investigated and then properly adjudicated so that the
2  public has the right to expect that to happen.
3      So there're many forms of -- I mean, any kind of
4  complaint goes from multiple levels.  So it doesn't mean that
5  everything has to be a formal complaint or it be a complete
6  investigation.
7  BY MR. DUBE:
8    Q.  So if no final decision is made on the complaint, is
9  that a proper adjudication?
10      MR. GILES:  Objection.  Form.
11      THE DEPONENT:  That is not an answer that I can give
12 for you because I don't make that policy.  The benefit of going
13 to a complete conclusion would be if there was -- if you had a
14 reason to believe that there was some type of pattern
15 developing that needed to be looked at and more training
16 issued.
17 BY MR. DUBE:
18   Q.  Is it within the -- is it proper within the policy of
19 the Internal Affairs Division to not make a decision regarding
20 whether or not the officer properly used force after receiving
21 a report?
22      MR. GILES:  Objection.  Form.
23      THE DEPONENT:  Okay.  I'm sorry.  Would you repeat
24 that again?
25 BY MR. DUBE:

80

1    Q.  Sure.  According to the Internal Affairs policy and
2  procedures in the City of Pasadena Police Department rules and
3  operations, can a police chief decide not to make a conclusion
4  regarding an Internal Affairs investigation; can he just sit on
5  the report after they receive the report?
6      MR. GILES:  Objection.  Form.
7      THE DEPONENT:  I don't know anywhere in policy that
8  allows them to do that.  And I have -- in my years of service
9  here, I've never experienced that happening.  Because
10 information that comes across their desk, and especially in the
11 form of a complaint, they are going to want to move on it one
12 way or the other because the officer has a right to know what
13 the final allegation or the final conclusion is for their
14 investigation.
15 BY MR. DUBE:
16   Q.  And typically, how long after receiving the report
17 from the Internal Affairs investigation does the Police Chief
18 have to make a decision?
19   A.  So I don't know what the average time is on that.
20   Q.  You did not investigate that for purposes of this
21 deposition?
22   A.  I did not investigate or inquire about the length of
23 time between the conclusion of an investigation and the time
24 that the Chief made a decision on discipline.
25   Q.  In your experience, what has been the average time

81

1  between receiving, the Police Chief receiving the report and
2  making the decision?
3      MR. GILES:  Objection.  Form.
4      THE DEPONENT:  In my time in Internal Affairs, it's
5  been about, let's say, two to three weeks, if not sooner.
6  BY MR. DUBE:
7    Q.  Since you've been in Internal Affairs, how many
8  police shootings have occurred?
9    A.  Since I've been in Internal Affairs, there's been
10 one.
11   Q.  And when was that shooting?
12   A.  When was that?
13   Q.  Um-hmm.
14   A.  February 7th of this year.
15   Q.  So you're dealing with that right now?
16   A.  Yes, sir.
17   Q.  Okay.  I do not want your job.  Are you the person
18 investigating that shooting?
19   A.  I am.
20   Q.  Okay.  What were the circumstances of that shooting?
21   A.  It was -- one of our members was part of a task
22 force, and they were set up to go serve the warrant.  I think
23 they had a location on them.  Individuals got into a vehicle,
24 failed to obey commands, pulled out a gun, and the other
25 officers did have to discharge their weapons at them, and end

82

1  up killing an individual.
2      Q.  Both the subject and officers discharged weapons?
3      A.  I don't know about the -- I don't -- because Harris
4  County Sheriff's Office incident, it was in their jurisdiction
5  or is investigating it, but I don't believe that there was a
6  discharge from the person they were trying to arrest.
7      Q.  My question was in a vehicle?
8      A.  Initially.  Then he got out of the vehicle.
9      Q.  Got you, okay.  Is that investigation complete?
10     A.  No, sir.  That's one of the things that will prolong
11 an investigation too, and especially in a shooting case or if
12 there was a death, is getting reports back from all the
13 agencies that are involved, such as the medical examiner's
14 officer and stuff like that.
15     Q.  Got you.  What about when you were the Sergeant in
16 charge of evening patrol, were there any instances of shootings
17 by one of your officers?
18     A.  No.
19     Q.  Your entire five years in that position?
20     A.  So you're talking about the two different times that
21 I was on evening shift patrol?
22     Q.  Yes.
23     A.  No.  Well, I had -- I did respond to -- not on
24 evening shift patrol there was not any, no.  I was just
25 thinking back.

83

1      Q.  During your entire time as a police, as an officer --
2  actually let me rephrase.
3          During your entire time as a Sergeant in the Pasadena
4  Police Department, has any officer under your control been
5  involved in an officer involved shooting?
6      A.  Not under my control, no.
7      Q.  Or supervision?
8      A.  Not direct supervision.  So if I'm the only -- I
9  would have a squad of officers, but if there's a night that I'm
10 working by myself technically I'm, you know, I'm in charge of,
11 you know, all of the officers that are on there for that shift.
12 But they don't report directly to me.
13     Q.  Got you.  That's a very good record, sir.
14     A.  Thank you.
15     Q.  Is there any time that an Internal Affairs
16 investigator would create an offense report with respect to
17 actions of an officer in an excessive force complaint
18 situation?
19     A.  Could be.  If they're investigating a case, and like
20 I mentioned before, there was something that during their
21 investigation they uncovered or saw, like I said, videotape, as
22 you see on number 5 up there, if you'll keep going up, keep on
23 going to the next one.  Right there.
24         Look at number 5, Not Alleged In the Complaint.
25 Depending on what that is, if it's just a policy violation or

84

1  if it is a criminal act, then the investigating officer could
2  create an original report.
3      Q.  What would that report -- how would that report take
4  form -- what form would that be?
5      A.  So that's our -- that's where we would, we do our
6  offense reports.  I mean, so if you -- citizen calls you up
7  because their car got broken into, you do an offense report.
8  This is the same you would create because it's an incident that
9  occurred, and so you would document that in the original
10 report.
11     Q.  And I think you testified that in addition to the
12 Internal Affairs investigation in a police shooting, there will
13 be a criminal investigation, correct?
14     A.  Well, there will be an investigation into the offense
15 of the shooting itself, so that's more of the criminal
16 investigation, that's correct.
17     Q.  And that would be conducted by separate officers
18 other than the Internal Affairs Division, correct?
19     A.  Yes.
20     Q.  Could you describe that process for us?
21     A.  So it's another form of investigations, so they get
22 -- if there's an officer involved shooting, the detective
23 supervisor, usually commander, and the on call detective if
24 it's after hours would be notified.  They would respond to the
25 scene, and they would start their investigation with, you know,

85

1  basically what had occurred.
2          After they get all the evidence or information they
3  need from the scene, after the scene's been released that's
4  when they start their investigation into exactly what had
5  happened, looking for any evidence to support any claims that
6  were made.  And if there is a need to at the end of the
7  investigation, they can -- they will submit their information
8  to the district attorney to see if the district attorney will
9  accept charges on an individual in the case.
10     Q.  Are they -- is the investigative -- the detective in
11 those instances, are they permitted to write an offense report
12 with respect to the shooting if they deem the officer to have
13 violated the law?
14     A.  They usually don't by a separate report because the
15 incident that occurred has already been documented, you know.
16 So the officer -- once an officer involved shooting occurs,
17 whoever the officer on scene gets designated to write the
18 original offense report.
19         So even if there was something that was discovered
20 later, whether it was the officer did something wrong, or
21 whatever the case, he doesn't need to write a supplement, I'm
22 sorry, a separate offense report.  He'll supplement the
23 original report because that's where the information was
24 discovered.
25     Q.  What's contained in the supplement?



86

1    A.  Whatever information that he has discovered.  So I
2  mean, it could, people write supplements for a lot of things.
3  One being, you know, say a witness came forward and they looked
4  on their camera, they found a license plate that was involved
5  in whatever case you're working on, so they would write a
6  supplement indicating that so there's a record of, one, how the
7  information was obtained; and two, there's a record of the
8  information.  If that makes sense.
9    Q.  Are you familiar with a probable cause affidavit?
10    A.  Yes.
11    Q.  What's a probable cause affidavit?
12    A.  That's where -- an affidavit is where the officer --
13    Q.  Not affidavit.  Probable cause affidavit?  I want to
14  make sure you're answering the specific question I'm asking.
15    A.  Got you, okay.  Sorry about that.  The probable cause
16  affidavit is what an officer swears to, to a judge, to get,
17  saying this is the facts of the case that have presented or
18  been able to be shown to be true, in reference to the
19  investigation of a case.  Usually they're trying to seek
20  charges of the person listed in the affidavit, the probable
21  cause affidavit.
22    Q.  So the -- and that's done by whom typically?
23    A.  The detective working the case.
24    Q.  So the detective investigating the case can write a
25  probable cause affidavit seeking charges against the alleged

87

1  criminal, correct?
2    A.  Yeah.  Anyone involved in the case that, you know,
3  there is a criminal charge against, that's who would be listed,
4  yes.
5    Q.  So are detectives investigating an officer, for an
6  officer involved shooting, are they permitted to write a
7  probable cause affidavit against an officer?
8    A.  Anybody that is going to be filed upon criminally,
9  they can write the probable cause affidavit for.
10    MR. DUBE:  Objection.  Non-responsive.  Can you
11  answer my question, please, sir?
12    MR. GILES:  He just did.
13    MR. DUBE:  Okay.  I objected.  I'm going to reask the
14  question again.
15    MR. GILES:  Okay.
16    MR. SELBE:  Object to the sidebar.
17  BY MR. DUBE:
18    Q.  Can an officer -- oh sorry.  Can a detective
19  investigating an officer for an officer involved shooting write
20  a probable cause affidavit seeking charges against the officer
21  who shot if he's determined that he's violated the law; are
22  they permitted to do so?
23    A.  There's nothing prohibiting them.  That's not usually
24  how it happens.
25    Q.  How does it usually happen?

88

1    A.  So any case that is investigated by a detective,
2  whether it's involving an officer or anyone else that has
3  committed a felony crime, the facts of the case are presented
4  to the district attorney, and those facts of the case are
5  presented to a grand jury.  The grand jury makes the decision
6  on whether or not charges will be accepted in those particular
7  cases.
8    Q.  That's in an officer involved shooting, correct?
9    A.  No, not necessarily, but --
10    Q.  But -- okay.  Not necessarily, okay.  Is that always
11  -- is that always the process in offenses that are not -- in
12  other offenses, in "regular felony offenses," must it always go
13  --
14    A.  If it's a felony offense --
15    MR. GILES:  Objection.  Form.
16    THE DEPONENT:  If it's a felony offense, it is
17  presented to the grand jury is my understanding.
18  BY MR. DUBE:
19    Q.  Yes.  But -- so at what point does the officer, the
20  detective investigating the offense write a probable cause
21  affidavit, for what purpose?
22    A.  Now, are you referring to an officer involved
23  shooting?
24    Q.  No.  In a typical felony that does not involve an
25  officer?

89

1    A.  So when all -- the investigation is complete.
2    Q.  And so what I'm asking is, what is the difference;
3  how do the procedures differ from an officer involved shooting
4  versus a, let's say, a grand theft auto charge; like why the --
5  yeah.
6    A.  I don't understand.  What -- are you asking me if the
7  officer was involved in committing the offense in an offense?
8    Q.  Correct.
9    A.  Or he's investigating it?
10    Q.  So let me -- what I'm understanding you to say, okay,
11  and you can tell me if I'm wrong, is that in an officer
12  involved shooting, right, the officer, the detective that, who
13  is investigating the officer typically does not write a
14  probable cause affidavit with respect to a shooting even if
15  he's determined the officer broke the law, is that correct?
16    A.  It is -- okay.  This is, you know, my understanding
17  of the situation or when that happens.  The officer that's
18  involved in a shooting, there's a detective that investigates
19  that shooting, whether -- I mean, he doesn't -- he's not
20  investigating if the officer or that the officer did something
21  wrong.  He investigates what took place.
22    He takes his findings and he presents those to the
23  district attorney's office.  The district attorney's office
24  reviews that case, and then they present it to the grand jury
25  who make a determination at that point whether or not they

90

1  should accept charges on the officer or the individual that
2  they're investigating or not.
3      Q.  Okay.  So an officer investigates the shooting and
4  presents their findings to the grand jury, correct -- I mean to
5  the district attorney's office?
6      A.  Correct.  Because any charge in Harris County is
7  through the district attorney's office that's above a Class C
8  misdemeanor.
9      Q.  Does the officer make their own determinations and
10  conclusions as to whether or not the officer has broken the
11  law?
12      MR. GILES:  Objection.  Form.
13      THE DEPONENT:  I would -- I mean, I don't understand
14  what you're saying because officers, you know, they gather
15  facts of a case to present to the district attorney.  And so --
16  BY MR. DUBE:
17      Q.  Let me ask it this way.  Do the officers make a
18  determination as to whether or not to seek charges against an
19  officer?
20      A.  In normal cases, or in cases in general, if there is,
21  when it is a violation of the law, those cases are presented to
22  the district attorney's office.  It doesn't matter who the
23  person committing the offense is.  Does that make sense?
24      Q.  It's getting there.  Not quite.  But it's getting
25  there.

91

1      A.  Okay.
2      Q.  So do the -- so when does an officer decide whether
3  or not to file a probable cause affidavit when a violation has
4  occurred, a violation of the law has occurred?
5      A.  Are you talking about an arrest warrant for an
6  individual?
7      Q.  No.  Not an offense warrant, a probable cause
8  affidavit where they're seeking charges?
9      A.  Okay.  So I mean just to kind of be -- get clarity.
10  Are you asking when or what does an officer do after he
11  presents a case to the district attorney and the district
12  attorney accepts charges on an individual?
13      Q.  I'm trying to get the step before then.  When he
14  presents the case to the district attorney, what form does that
15  take place in?
16      A.  It depends on the case because -- the length of the
17  case and, you know, how big it is.  If it's just a shoplifter,
18  it can be done electronically online to where they can put the
19  probable cause statement online.  If it's a very involved case
20  that, let's say a narcotics transaction or something that's
21  been going on for months, they usually will go and sit down in
22  front of them so they have all the information.
23      Q.  You said the probable cause statement in your answer
24  just now.  So in offenses that do not involve officers, are
25  probable cause statements relating to the offense typically

92

1  written up by the investigative officer?
2      MR. GILES:  Objection.  Form.
3      THE DEPONENT:  Okay.  Would you repeat that again,
4  the first part of that, or just repeat that again?
5  BY MR. DUBE:
6      Q.  Yeah.  In your answer before, you referenced a
7  probable cause statement.  So when the offense is committed by
8  a person that is not a police officer, is the presentation to
9  the district attorney typically in the form of a probable cause
10  statement?
11      MR. GILES:  Objection.  Form.
12      THE DEPONENT:  Well, there has to be probable cause
13  on any type of presentation to the district attorney if it's
14  going -- you know, even if it's a traffic ticket, there has to
15  be probable cause to either get a warrant for an individual or
16  not.  So it's -- there's got to be probable cause for any type
17  of arrest you're going to make.
18  BY MR. DUBE:
19      Q.  Okay.  So then in a police shooting, why is it not --
20  why does the presentation to the district attorney not take
21  place in the form of a probable cause statement?
22      A.  I didn't say it didn't.  What I was saying was that
23  the -- whenever the information is presented to the district
24  attorney.  There's also -- cause they're several investigations
25  of the same incident going on by different entities.  So the

93

1  police department they do their own investigation.  The
2  district attorney's office has their investigators looking into
3  it.
4      And so when it comes to, I believe it's the civil
5  rights division of the district attorney's office, they are the
6  ones that, they will present that to the grand jury, so they
7  handle that part of it once it's complete.  They take all the
8  information and present it at one time is my understanding.
9      Q.  But the Pasadena Police Department themselves do not
10  compile it and make your recommendation to the district
11  attorney as to whether or not to file charges or not?
12      MR. GILES:  Objection to form.
13      THE DEPONENT:  In an officer involved shooting?
14  BY MR. DUBE:
15      Q.  Yes.
16      A.  I don't know the answer to the question.  I mean, to
17  say yes they do or no they don't.  I mean, I know they provide
18  the district attorney with the full investigation of the
19  incident.
20      Q.  All right.  The question I'm asking you, do they make
21  a recommendation to the district attorney whether or not to
22  file charges?
23      MR. GILES:  Objection.  Form.
24      THE DEPONENT:  The accepting of charges whether or
25  not they're filed is all on the district attorney's office.

94

1 BY MR. DUBE:
2    Q.  That's not my question, sir.
3        MR. GILES:  But it's exactly your question.
4        MR. DUBE:  It is not my question.
5 BY MR. DUBE:
6    Q.  I'm not asking what the district attorney does. I'm
7 asking the Pasadena police officer and detective -- let me
8 start over.
9        The detective who is investigating this shooting,
10 okay, do they make a recommendation to the district attorney as
11 to whether or not the following should be charged?
12        MR. GILES:  Objection.  Form.
13        THE DEPONENT:  So it doesn't matter -- I'm just
14 trying to kind of make it as clear as I can.  In Harris County,
15 the officer, whether he recommends or he doesn't recommend
16 charges filed, it's all what the district attorney -- the
17 information is provided to them and they make the decision if
18 charges are filed.
19        MR. DUBE:  Objection.  Non-responsive.
20 BY MR. DUBE:
21    Q.  I'm not asking whether it matters or not.  And I'm
22 not asking what the effect of the recommendations are. My sole
23 question to you, sir, is the officer, the detective who
24 investigates the shooting, do they make a recommendation
25 typically to the district attorney regarding whether or not

95

1 charges should be filed?
2        MR. GILES:  Objection.  Form.
3        THE DEPONENT:  I can't say that that happens
4 typically because I'm not there for every conversation between
5 the two.
6 BY MR. DUBE:
7    Q.  In offenses involving citizens who are not police
8 officers, do officers make recommendations to the district
9 attorney whether or not charges should be filed?
10    A.  Not in every case.
11    Q.  I'm not asking every case.  I'm --
12    A.  You said do they do that, and that's the answer
13 because I don't -- they don't do that in every case.
14    Q.  Okay.  Fair enough.  In offenses involving citizens
15 who are not police officers, do detectives/investigators
16 investigating a case typically make recommendations to the
17 district attorney's office as to whether or not the charges
18 should be filed?
19        MR. GILES:  Objection.  Form.
20        THE DEPONENT:  Again, not in every case.  It's not
21 standard practice to do that.
22 BY MR. DUBE:
23    Q.  It is or it is not?
24    A.  It is not standard practice to recommend or not
25 recommend charges be accepted in a particular case.

96

1    Q.  Okay.  In offenses not involving a police officer, a
2 regular citizen, do the detectives investigating those charges
3 write up a probable cause affidavit to the district attorney's
4 office with respect to the charges that could be filed?
5        MR. GILES:  objection.  Form.
6        THE DEPONENT:  As stated previously, it depends on
7 the complexity of the case.  But yes, in some form or fashion,
8 that probable cause affidavit is completed.
9 BY MR. DUBE:
10    Q.  Thank you.  And that is not done typically in police
11 shooting cases?
12        MR. GILES:  Objection.  Form.
13        THE DEPONENT:  I stated earlier than I am not aware
14 of that; if it's typically or not.
15 BY MR. DUBE:
16    Q.  If a -- if one of your predecessors in the Internal
17 Affairs were to testify that it was his understanding that they
18 could not write such probable cause affidavits, would you have
19 reason to disagree with that?
20        MR. GILES:  Objection.  Form.
21        THE DEPONENT:  I have no reason to dispute what he is
22 saying at this point.  Or she, whoever said it.
23        MR. GILES:  Or didn't.
24        MR. DUBE:  Objection to the side bar.
25        THE DEPONENT:  Or didn't.

97

1 BY MR. DUBE:
2    Q.  Do you know Officer Rigoberto Saldivar?
3    A.  Do I know him?
4    Q.  Yes.
5    A.  I do.
6    Q.  Did you know -- are you familiar with his employment
7 with the Pasadena Police Department?
8    A.  Yes, sir.
9    Q.  How long was he employed with the police department?
10    A.  I want to say roughly 16 to 18 years.  I don't know
11 the exact numbers.
12    Q.  Not, well, to you, but he was there for a fairly long
13 time, correct?
14    A.  Yes, sir.
15    Q.  And was he there throughout your 32 years with the
16 police department?
17    A.  Yes.  If -- I think he had a leave of absence for a
18 little bit.
19    Q.  Um-hmm.
20    A.  I don't recollect exactly how long.  I think it was a
21 couple of months, but I'm not 100 percent on that.
22    Q.  Okay.  Did you ever supervise Officer Saldivar?
23    A.  I don't believe so.  I know we had worked -- I was an
24 officer, we worked together for a little bit in detectives.  I
25 don't think that I worked with him on patrol.  I think he was



98

1 always on a different shift.
2    Q.  Okay.  Personnel records in preparation for this
3 deposition?
4    A.  I'm sorry.  Was that a question?
5    Q.  Yes, sir.  I said, have you reviewed his personnel
6 records in preparation for this deposition?
7    A.  I've looked over them, yes.
8    Q.  And you're familiar with his involvement in three
9 shootings, correct?
10    A.  Yes.
11    Q.  And one shooting occurred in April of 2018, correct?
12    A.  Yes.
13    Q.  Okay.  And it involved the shooting of Angel Ramirez,
14 correct?
15    A.  That is correct.
16    Q.  Did you review that video?
17    A.  I did.
18    Q.  Okay.  What were your thoughts upon reviewing that
19 video?
20        MR. GILES:  objection.  Form.
21        THE DEPONENT:  That Officer Saldivar appeared to be
22 fearful the moment right before he drew his service weapon.
23 BY MR. DUBE:
24    Q.  In determining whether or not Officer Saldivar
25 appropriately used force in that instance, do you consider any

99

1 factors besides what he would have observed in that situation?
2    A.  Yes.
3    Q.  What do you consider?
4    A.  Any form of evidence, whether it would be a camera
5 from another location, if there was a witness, anything that
6 would assist in the investigation should be taken into
7 consideration.
8    Q.  Do you believe Officer Saldivar appropriately used
9 force in that shooting?
10    A.  I don't have enough information to make that
11 determination, but I have no reason to disagree or question the
12 investigation that was completed.
13    Q.  Do you know what the position of the City is with
14 respect to whether or not Officer Saldivar appropriately used
15 force in that situation?
16        MR. GILES:  Objection.  Form.
17        THE DEPONENT:  Do I know the City's position on the
18 conclusion of the report?  What are you asking?
19 BY MR. DUBE:
20    Q.  Yes.  Do you know what -- I'm asking for the City's
21 position as to whether or not Officer Saldivar appropriately
22 used force against Angel Ramirez in April of 2018?
23        MR. GILES:  Objection.  Form.
24        THE DEPONENT:  The -- in the -- as far as the
25 investigation, I believe it was justified or exonerated.  I

100

1 don't remember exactly, but it was one of the two.
2 BY MR. DUBE:
3    Q.  And the City stands by that determination today,
4 correct?
5    A.  We have no reason to believe otherwise.
6    Q.  What are the reasons supporting the conclusion that
7 the use of force was justified?
8        MR. GILES:  Objection.  Form.
9        THE DEPONENT:  The information that was contained
10 within the report.
11 BY MR. DUBE:
12    Q.  You've read the report, correct?
13    A.  I what?
14    Q.  You've read the report?
15    A.  I have read the Internal Affairs investigation of the
16 incident, yes.
17    Q.  Okay.  And you've reviewed the shooting, correct?
18    A.  The video, yes.
19    Q.  Okay.  The video of the shooting, correct, yes.  Okay.
20 And why was that shooting justified?
21        MR. GILES:  Objection.  Form.  Asked and answered.
22 BY MR. DUBE:
23    Q.  You may answer.
24    A.  So the information concluded in the report indicated
25 that Officer Saldivar was in fear of his life, because the

101

1 individual had a pistol in his hand at the time, is my
2 understanding, recollection of the case.  In fear of his life,
3 he discharged his weapon towards the individual.
4    Q.  So the subjective view of Officer Saldivar was that
5 he was in fear of his life and that justified the shooting,
6 correct?
7        MR. GILES:  Objection.  Form.
8        THE DEPONENT:  Yes.
9 BY MR. DUBE:
10    Q.  What about the Randy Aviles shooting; what is the
11 position of the City of Pasadena with respect to that shooting
12 as to whether or not it was justified or not justified?
13        MR. GILES:  Objection.  Form.
14        THE DEPONENT:  Well, the investigation, it is
15 currently being investigated, and it was presented to the grand
16 jury and the indictment was issued for Detective -- or Officer
17 Saldivar.  The City has no reason to have any reason not to
18 believe what the investigation has uncovered.
19 BY MR. DUBE:
20    Q.  So the grand jury indicted Officer Saldivar, correct?
21    A.  Yes.
22    Q.  The grand jury is not the City though, correct?
23    A.  No, it is not.
24    Q.  So I'm asking for the City's position in this
25 litigation with respect to whether or not it believes Officer

102

1 Saldivar's shooting of Randy Aviles was justified or not
2 justified?
3        MR. GILES:  Objection.  Form.
4        MR. SELBE:  Object to form.
5        THE DEPONENT:  So the City believe that the
6 investigation into this matter was investigated thoroughly and
7 the appropriate finality of the situation was followed, which
8 is present it to district attorney.  Whether or not it was
9 considered justified or not, the City does not have an opinion
10 on that.
11 BY MR. DUBE:
12    Q.   Did the City ever conclude its Internal Affairs
13 investigation with respect to that shooting?
14    A.   At this point, no, they have not.  The police --
15    Q.   Sorry.  We were speaking over each other.  I'm sorry.
16 That's my fault.  Let me ask that question again just to be
17 clear.
18        Did the City ever conclude its investigation, its
19 Internal Affairs investigation of the shooting of Randy Aviles
20 by Officer Saldivar?
21    A.   The -- at this point, the police department has not
22 concluded their investigation through Internal Affairs because
23 of the fact of the separation from Officer Saldivar and the
24 department.
25    Q.   So will the City ever conclude that investigation?

103

1        MR. GILES:  Objection.  Form.
2        THE DEPONENT:  That would be under the direction of
3 the Chief of Police to have that concluded.  Once the final
4 outcome of the case is rendered in the criminal aspect of it,
5 if Chief Wright, who is currently the Chief, decides to want to
6 do that, then we would, if I'm there or whoever's there would
7 finish the investigation.
8 BY MR. DUBE:
9    Q.   Is it necessary for the criminal investigation, the
10 criminal trial to be concluded before Internal Affairs can
11 determine whether or not an officer has violated the use of
12 force policy?
13    A.   It's not necessary, no.
14    Q.   Okay.  Is it necessary for the criminal investigation
15 to be completed before the Pasadena Police Department can
16 conclude its Internal Affairs investigation?
17    A.   Usually they are completed around the same time.  That
18 way -- because even though the Internal Affairs completes their
19 own investigation separate from the criminal aspect of it, if
20 one of them is completed then, you know, you can't use the
21 information from one to another, correct.  So they want -- a
22 case that there was information that one didn't have, then we
23 want to make sure it's a total complete investigation.  But
24 it's an option more so than a standard.
25        MR. DUBE:  Let me take a five minute break, please.

104

1        THE VIDEOGRAPHER:  Okay.  Please stand by.  The time
2 is 2:17 p.m. and we are off the record.
3        (WHEREUPON, a recess was taken.)
4        THE VIDEOGRAPHER:  We are on the record.  The time is
5 2:39 p.m.  You may now proceed.
6 BY MR. DUBE:
7    Q.   So I'm going to ask you about the position of the
8 Pasadena, City of Pasadena, in this litigation.  Was the
9 shooting of Randy Aviles justified by Officer Saldivar?
10        MR. GILES:  Objection.  Form.
11        THE DEPONENT:  The City stands behind the
12 investigation that was completed in this incident.
13 BY MR. DUBE:
14    Q.   So I'm going to show you what's been marked as
15 Exhibit 8.
16        (WHEREUPON, Exhibit 8 was marked for identification.)
17 BY MR. DUBE:
18    Q.   Are you familiar with Exhibit 8?
19    A.   Yes.
20    Q.   Okay.  What is Exhibit 8?
21    A.   That is the investigation into Rigoberto Saldivar's
22 last shooting, which was investigated by Detective Reyes of the
23 Public Integrity unit.
24    Q.   And is the same Detective Reyes who is your backup in
25 Internal Affairs now, correct?

105

1    A.   Yes.  That was his previous stint in that, the Public
2 Integrity unit.
3    Q.   And is his first name Mauricio?
4    A.   It is.
5    Q.   Okay.  Thank you.  And ask you another question
6 related to initials.  Josh Bruegger was the former Chief of
7 Police, correct?
8    A.   He is the former -- yes.
9    Q.   Was there another Bruegger who was a sergeant or --
10 in the Pasadena Police Department?
11    A.   There is, yes.  They are brothers.  He's still
12 employed with us.
13    Q.   Okay.  What's his position?
14    A.   Currently he is the supervisor, he is a Sergeant over
15 the Police Academy.
16    Q.   Is his name David?
17    A.   Matt or Matthew.
18    Q.   Matt.  Matt Bruegger, okay.  Was there a David
19 Bruegger as well?
20    A.   I don't think so.  Not that I know of.
21    Q.   Okay.  All right.  Thank you.
22        All right.  So this is the Internal Affairs
23 Investigation of the shooting of Randy Aviles, correct?
24    A.   It appears to be, yes.
25    Q.   Okay.  And there is -- this is an Inter-Office



106

1 Correspondence, correct?
2    A.  Yes.
3    Q.  Do you recognize -- have you reviewed this report --
4    A.  Yes.
5    Q.  Okay.  And you reviewed all these pages, correct?
6    A.  That is correct.
7    Q.  Okay.  And does it appear to be the typical way these
8 Internal Affairs investigation officer-involved shootings are
9 documented?
10    A.  Yes, it does.
11    Q.  And it's -- we're looking at page 1 of 27.  Do you
12 see that at the bottom?
13    A.  I do.
14    Q.  And there was -- it's a report that is addressed to
15 Chief Bruegger, correct?
16    A.  That is correct.
17    Q.  Okay.  And this is the Control Number 1331?
18    A.  1331, that's correct.
19    Q.  And that was a Control Number for the shooting of
20 Officer Saldivar of Randy Aviles, correct?
21    A.  That is correct.
22    Q.  And the report is dated April 29, 2021?
23    A.  Yes.
24    Q.  Okay.  What does that day signify?
25    A.  I believe that's the date when the investigation from

107

1 Internal Affairs was completed and turned in.  It may not be
2 the exact date, but it is something around that time.
3    Q.  Okay.  So that would have been the date,
4 approximately the date that this report was sent to Chief
5 Bruegger, correct?
6    A.  Yes.
7    Q.  And the report summarizes the investigation or is the
8 investigation of Detective Reyes with respect to Officer
9 Saldivar's shooting of Randy Aviles, correct?
10    A.  That is correct.
11    Q.  And after Chief Bruegger received this report, it
12 would have been his role to make a determination as to whether
13 or not this shooting was justified, correct?
14    MR. GILES:  Objection.  Form.
15    THE DEPONENT:  Not necessarily.  Because with any
16 investigation, as stated before, the procedure would be to
17 present it to the grand jury, or present it to the DA's office,
18 with any case, to see what is going to happen. Chief Bruegger
19 is not going to make a determination on that part of it until
20 the -- it has been fully vetted through the DA's office.
21 BY MR. DUBE:
22    Q.  So his decision on the administrative portion,
23 whether or not the shooting is justified or not justified, is
24 dependent on the outcome of the criminal process with the grand
25 jury?

108

1    MR. GILES:  Objection.  Form.
2    THE DEPONENT:  Chief Bruegger will make it, while
3 looking at the circumstances of an event, can make a decision
4 on what to do for the time being for the officer that was
5 involved.  But once the investigation is presented to the grand
6 -- to the district attorney, who presents it to the grand jury,
7 a lot of times a final resolution to the investigation is done
8 at that time.  His determination on what to do, if there's any
9 discipline or not, is done after a complete and thorough look
10 at the incident is done.
11 BY MR. DUBE:
12    Q.  So the Internal Affairs investigation, I believe you
13 testified, that is an administrative procedure, correct?
14    A.  Internal Affairs investigations?
15    Q.  Yes.
16    A.  Yes.  It's about policy violations.
17    Q.  It's -- Internal Affairs is an administrative
18 proceeding to determine whether or not the rules of the
19 Pasadena Police Department has been violated, correct?
20    A.  Internal Affairs doesn't make the determination. They
21 investigate the incident, and then if there is a potential or
22 possible violation of policy, those are lot of times included
23 in the report, and then the Chief will make a final
24 determination.
25    Q.  I'm not asking -- I'm not asking the role of a

109

1 particular investigator.  I'm talking about the process as a
2 whole, right.  The process as to the Internal Affairs is to
3 determine whether or not the rules of the Pasadena Police
4 Department has been violated, is that correct?
5    MR. GILES:  Objection.  Form.
6    THE DEPONENT:  I mean are you asking me if we make a
7 determination in Internal Affairs?
8 BY MR. DUBE:
9    Q.  Yes.  In corroboration with the Police Chief?
10    A.  Okay.  Go ahead.  I'm sorry.
11    Q.  I believe I was done.  What is the purpose of an
12 Internal Affairs investigation?
13    A.  To gather information of an incident or complaint.
14 And after all the information is gathered, if there's something
15 that might be a potential policy violation, that is listed well
16 for the -- then it's all given to the Chief, and he makes the
17 determination if there was an actual policy violation.
18    Q.  Okay.  So are you making a distinction between the
19 chief's determination as to whether or not the policy has been
20 violated based on the Internal Affairs investigation and the
21 Internal Affairs investigation itself?
22    A.  Internal Affairs doesn't make a determination if
23 policy was violated.
24    Q.  Okay.  The Chief does that?
25    A.  That is correct.



110

1    Q.   Using the investigation from Internal Affairs?
2    A.   That, and whatever other information that he may have
3 available to him.
4    Q.   And Internal Affairs is the administrative
5 proceeding, correct?
6    A.   We investigate administrative policy violations or
7 complaints, yes.
8    Q.   So you investigate the policy violations without ever
9 make a conclusion?
10   A.   That is correct.
11   Q.   And that administrative investigation is different
12 and separate from the criminal investigation, correct?
13   A.   Yes.
14   Q.   I'm going to stop this document for a second. I'm
15 going to go back to a different document.
16       I'm showing you the Internal Affairs Policy document.
17 Do you see that?
18   A.   Yes.  The 18.9, Classification of Complaint
19 Allegations?
20   Q.   Yes.
21   A.   Okay.
22   Q.   And so there are five possible classifications,
23 correct?
24   A.   Yes.
25   Q.   Okay.  Unfounded, Exonerated, Not Sustained,

111

1 Sustained, and Misconduct Not Alleged in the Complaint.  Do you
2 see that?
3    A.   I do.
4    Q.   Okay.  So are these classifications of the complaint,
5 can they be made notwithstanding the conclusion of the criminal
6 proceeding?
7    A.   So can they -- okay.  Ask me that again.
8    Q.   Okay.  Let me ask it a different way.  Maybe it'll be
9 clearer.
10   A.   Okay.
11   Q.   Must the Police Chief wait for the conclusion of the
12 criminal investigation before he classifies an investigation in
13 one of these five classifications?
14   A.   I would think that the Chief is going to want all of
15 the information that he can obtain whether it's on the criminal
16 -- cause he can look at both.  But he's going to want all the
17 information available to him to make a determination on the
18 final outcome of the complaint.
19   Q.   Okay.  I'm going to ask my question one more time.
20       MR. DUBE:  I'm going to object as non-responsive.
21 BY MR. DUBE:
22   Q.   If you can please answer my question.  And it is --
23 and please listen to the words I'm using, must meaning is it
24 necessary for the Chief to wait for the criminal investigation
25 to be completed before he judges a formal complaint in an

112

1 officer involved shooting in one of these five classifications?
2    A.   I don't know the answer to that question if it's a
3 must.  I don't believe it is, but I don't -- I can't say that
4 it is a must.
5    Q.   Have you seen police chiefs in your 32 years as a
6 police -- as a member of the Pasadena Police Department make a
7 determination on the use of force, use of excessive force
8 complaint prior to the completion of the criminal investigation
9 and the grand jury determination?
10   A.   Are you asking me personally?
11   Q.   Yes.
12   A.   I can't say that I have, but I'm not involved in a
13 lot of that information at the time.
14   Q.   But do you know of any policy, rule or regulation
15 that requires the police chief to wait for the final outcome of
16 the criminal proceeding before judging a formal complaint in an
17 excessive use of force case?
18   A.   I don't believe there is a specific policy that says
19 he has to wait; however, the police chief is going to want all
20 the necessary information that he can gather before he makes a
21 decision.
22   Q.   At the time that the report is sent to the Police
23 Chief, that is Internal Affairs telling the Police Chief that
24 Internal Affairs has completed its investigation, correct?
25   A.   That tells the administration that we have completed

113

1 our initial investigation.
2    Q.   Do all allegations of excessive force, not shooting,
3 get evaluated by a grand jury?
4    A.   Not just because there is a complaint made of said
5 actions.  Just because someone says something happens, if it
6 cannot be shown to have been true, just like with any criminal
7 case, it's not presented to the district attorney.
8    Q.   So is your testimony that once the investigation has
9 been presented to the grand jury, the Police Chief awaits that
10 conclusion before concluding whether or not any of these five
11 classifications under 18.9 apply?
12       MR. GILES:  Objection.  Form.
13       THE DEPONENT:  As stated earlier, I am not aware of
14 any specific -- anything stating in our policy that the Chief
15 has to wait, because your question was -- or was must wait.
16 However, the Chief does want complete information before making
17 a determination that is going to affect an officer's, you know,
18 career and go on their record.
19 BY MR. DUBE:
20   Q.   What additional information is learned through the
21 grand jury process for the Chief of Police?
22       MR. GILES:  Objection.  Form.
23       THE DEPONENT:  I don't know other than the fact of
24 they make a determination with the information presented to
25 them on whether or not they think that an officer or individual

114

1  should be charged in a particular crime.
2  BY MR. DUBE:
3       Q.  Is it possible for a police officer in an officer
4  involved shooting to have violated police department procedures
5  and policy without having committed a criminal violation?
6       MR. GILES:  Objection.  Form.
7       THE DEPONENT:  Are you asking -- I mean, ask me that
8  again because I'm not understanding.
9       MR. DUBE:  Can you replay the question, ma'am?
10      (WHEREUPON, the record was played back.)
11      THE DEPONENT:  Okay.  So an officer in the listings
12  of different inclusions to investigations, one of them was
13  what's called a MNAIC.  So an officer could have, for instance,
14  been out an officer involved shooting, but let's say at the
15  time he was mad and he went up and he also scratched the car
16  with his key.  So that is something that would be found that he
17  had, or he had cussed at somebody let's say, make it non-
18  criminal, let's say he cussed at the individual, then that's
19  something that was found out that was a policy violation but
20  it's not actually against the law.  So yes, it could happen.
21  BY MR. DUBE:
22      Q.  Okay.  I appreciate that answer.  Let me try asking a
23  different way.  Is it possible for an officer to not have
24  committed a criminal act by using excessive force, but still
25  violated the use of force policy of the Pasadena Police

115

1  Department?
2       A.  I'm sorry.  I am not understanding what you're asking
3  me.
4       MR. DUBE:  I'd like to certify this portion of the
5  transcript.
6  BY MR. DUBE:
7       Q.  When was Officer Saldivar terminated from -- or
8  sorry, when did Officer Saldivar separate from Pasadena Police
9  Department?
10      A.  That was in 2021.
11      Q.  July 9, 2021, sound correct?
12      A.  It does.
13      Q.  And the report we saw before was sent to officer, I
14  mean to Chief Bruegger on April 29th, correct?
15      A.  I believe, yeah, that was the date on there.
16      Q.  So between April 29, 2021, and July 9, 2021, Chief
17  Bruegger did not make a determination as to whether or not
18  Officer Saldivar's actions violated the City of Pasadena Police
19  Department use of force policies, correct?
20      A.  That would be correct.
21      Q.  In fact, he never made that determination, correct?
22      A.  Are you saying that before the final result of the
23  Internal Affairs investigation?
24      Q.  Yes.
25      A.  He did not make an official recommendation, no.

116

1       Q.  Did he ever discipline Officer Saldivar for shooting
2  Randy Aviles?
3       A.  I -- no, he did not.
4       Q.  Did he ever discipline Officer Saldivar for shooting
5  Angel Ramirez?
6       A.  There was no discipline issued on -- and that usually
7  doesn't happen on a case that is either exonerated or
8  justified.
9       Q.  Did he ever discipline Officer Saldivar for shooting
10  and killing Nathan Schenk?
11      A.  There is usually no discipline issued when the end
12  result of an officer involved shooting has been justified.
13      Q.  I appreciate that answer.  But my question was, did
14  he ever discipline Officer Saldivar for shooting and killing
15  Nathan Schenk, yes or no?
16      A.  No.
17      Q.  Did he ever require that Officer Saldivar be
18  retrained after shooting Nathan Schenk?
19      A.  I don't have any record of that happening.
20      Q.  Did he ever recommend or require that Officer
21  Saldivar undertake any use of force training or courses after
22  he shot Nathan Schenk?
23      A.  I have not seen any documentation of such.
24      Q.  Did he reassign Officer Saldivar to any, to the
25  property room or any other, you know, or any other assignment

117

1  that would not interface with the public after he shot Nathan
2  Schenk?
3       A.  No.
4       Q.  Can a Police Chief take away an officer's ability to
5  carry a weapon while on duty?
6       A.  I don't know the direct -- I mean, I don't know of
7  any instance where that might have happened in my career and
8  time here.  But to answer your question specifically, I don't
9  see where that would happen if they're still classified as a
10  police officer.  Even, you know, if you're going to leave that
11  classification, it depends on the -- if they still have the
12  power to do their job, I think it would be a liability on the
13  part of the City if you say you can't carry a gun, and you're
14  still required to fulfill the duties of a police officer.
15      Q.  So after the Aviles shooting, and Officer Saldivar
16  was placed in the property room, was he still considered a City
17  of Pasadena police officer?
18      A.  Yes.
19      Q.  Would he have still been able to carry his weapon in
20  performance of his duties as a Pasadena police officer?
21      A.  Well, we'd have to refer back to Chief Bruegger's
22  deposition on what he did with Officer Saldivar, and what he
23  had spoken to him about, and what he was allowed to do and what
24  he wasn't.  Because I was not there so I don't know.
25      Q.  You're the representative for the City, correct?

118

1    A.   That's correct.
2    Q.   Okay.  And you -- so let me put it this way.  Was
3   there -- is there any information in Officer Saldivar's
4   personnel files showing that he was ever restricted from
5   carrying a weapon while he remain employed as a City of
6   Pasadena police officer until July 9, 2021?
7    A.   Not that I saw.
8    Q.   So would that mean that he was indeed allowed to
9   carry his weapon until he was -- until he retired or permitted
10  to retire on July 9, 2021?
11       MR. GILES:  Objection.  Form.
12       THE DEPONENT:  It means that I did not see any
13  documentation that prevented him from doing that.
14       MR. DUBE:  I got to use the restroom.  I need a break
15  until 3:15, please.
16       THE VIDEOGRAPHER:  Okay.  Please stand by.
17       MR. DUBE:  Do you think you're going to get to the
18  other officer at 3:30, or should I tell him it's going to be
19  later?
20       MR. DUBE:  It's going to be later.  Can you tell him
21  4:30?  And he's going to only be like 30 minutes.
22       MR. GILES:  Okay.
23       THE VIDEOGRAPHER:  The time is 3:08 p.m. and we are
24  off the record.
25       (WHEREUPON, a recess was taken.)

119

1        THE REPORTER:  We are on the record.  The time is
2   3:14 p.m.  You may now proceed.
3   BY MR. DUBE:
4    Q.   All right.  I'm going to show you what's been marked
5   as Plaintiff's Exhibit 18.
6        (WHEREUPON, Exhibit 18 was marked for
7   identification.)
8        MR. DUBE:  And Vincent, I've just added this to the
9   Dropbox link if you need to download it, okay.
10       THE VIDEOGRAPHER:  Okay.  Thank you.
11  BY MR. DUBE:
12   Q.   Are you able to see my screen, sir?
13   A.   I can see it.
14   Q.   I'm showing you the IAD investigation with respect to
15  the Schenk shooting.  Do you see that?
16   A.   I do.
17   Q.   Are you familiar with this document?
18   A.   I am.
19   Q.   I'm going to flip through just so you can see if
20  that's the same document that you previously looked at.  I'm
21  going to scroll.  All right.  So I direct your attention to the
22  first page, okay?
23   A.   All right.
24   Q.   This is from Sergeant Hamilton, correct?
25   A.   That's correct.

120

1    Q.   And who is Sergeant Hamilton?
2    A.   He was the Sergeant over Internal Affairs at the
3   time.
4    Q.   And it's to Chief Bruegger, correct?
5    A.   Yes.
6    Q.   Okay.  And the Control Number, that's the Control
7   Number for the Schenk shooting, correct, 1286?
8    A.   Yes, sir.
9    Q.   And the date of this report is August 12, 2019; do
10  you see that?
11   A.   I do.
12   Q.   And it's the same format as the one for the Aviles
13  shooting, correct, Summary of Complaint, Allegation,
14  Complainant, and then the details of the investigation.  Do you
15  see that?
16   A.   Yes.  They look similar.
17   Q.   And then there's a Summary at the end that summarizes
18  the conclusion of the investigation, correct?
19   A.   Yes.
20   Q.   And is this your reports are written as well, sir?
21   A.   They all follow a similar format, but most generally,
22  yes, that's the format that they follow.
23   Q.   Do you recognize these signatures here?
24   A.   I think the one in the middle, the 8-20 of '19, I
25  think that's Bruegger's.

121

1    Q.   Okay.
2    A.   Chief Bruegger I believe.  I am not sure on the
3   other signature.
4    Q.   So there's a signature on page, Pasadena 1350, that
5   signature in the middle with 8-20-19 underneath it, that would
6   be Chief Bruegger's, correct?
7    A.   I'm not -- I'm saying that's what it looks like.
8    Q.   It appears to be Chief Bruegger's signature, correct?
9    A.   I believe so, yes.
10   Q.   And would you be familiar with Chief Bruegger's
11  signature?
12   A.   Sometimes -- I don't pay attention to it a lot, but I
13  have seen it.  But I am not 100 percent sure.
14   Q.   During your 32 years, and at least five years where
15  he was your Chief, you have seen his signature on a number of
16  occasions, correct?
17   A.   I have.
18   Q.   And this here is a statement from Officer Saldivar
19  regarding the shooting, starting on page Pasadena 1351,
20  correct?
21   A.   I don't know where that number is coming from.
22   Q.   Which number?
23   A.   The 13 at the bottom of the page.
24   Q.   Oh yes.  That is the Bates number in the litigation,
25  so it's just so we know, so every document that's produced to



122

1  us by the City, that has a number at the bottom of it.
2      A.  Okay.
3      Q.  Okay?
4      A.  I got you.
5      Q.  That's just for us later on when we're trying to
6  figure out what document it is, we can say, you know, he
7  identified the signature on page 1350.
8      A.  Okay.
9      Q.  Does that make sense?
10     A.  It does.
11     Q.  Okay.  So this is Officer Saldivar's statement
12  regarding the shooting, correct?
13     A.  That appears to be, yes.
14     Q.  And on 1355, that was the notification to Officer
15  Saldivar that a Class I complaint has been issued against him,
16  correct?
17     A.  Yes.
18     Q.  Starting here on 1358, do you see that right here?
19     A.  I do.
20     Q.  What is this document?
21     A.  So that is what's called a Commander's Summary.  So
22  what will happen at times is, after the Internal Affairs
23  investigation is completed, and a Summary from the Internal
24  Affairs investigation is put onto the -- into the report, the
25  report is then forwarded to a Commander over the officer that

123

1  is involved.  If it's a patrol officer -- or sometimes it could
2  go into investigations.
3          They will read over it and then they also, or they
4  too will summarize the incident that -- the incident that was
5  investigated by Internal Affairs.
6      Q.  Do they make a conclusion?
7      A.  Well, if you look at the end of it, you'll see they
8  look at all of the information, and they may -- they don't make
9  a conclusion so much as what their opinion on the investigation
10  itself.
11     Q.  Okay.  Do you know whether or not a Commander's
12  Summary was done for the Randy Aviles shooting?
13     A.  I don't believe there was because the fact that the
14  investigation was not concluded because of his separation from
15  the City.
16     Q.  So this was done September 19th, correct?
17     A.  Yes.  That's the date on it.
18     Q.  Do you recall the date on the report -- August 12th,
19  correct?
20     A.  That is the report, yeah; that's the Internal Affairs
21  report, yes.  That's not the offense report, but yes.
22     Q.  So approximately a month after the Internal Affairs
23  report was done, August 12, 2019, the Commander's Summary was
24  done September 19, 2019, correct?
25     A.  Yes.

124

1      Q.  And the report in the Aviles shooting was completed
2  in April of 2019, is that correct, or 2021, sorry?
3      A.  I believe it was April, yes, that's correct.
4      Q.  Okay.  And Officer Saldivar retired on July 9th?
5      A.  That sounds correct.
6      Q.  And in those three months, a Commander's Summary was
7  not completed, correct?
8      A.  According to the dates on the reports, that would be,
9  sounds correct.
10     Q.  Do you know anything that prevented the report from
11  being completed in those few months?
12     A.  I don't know of any reason why it should or should
13  not have been done in that time.
14     Q.  All right.  And you see on what's stated at page 3 of
15  the Commander's Summary that, "After reviewing the information
16  gathered by Sergeant (C.A.) Hamilton, (and) regarding the
17  'Officer Involved Shooting' and the use of deadly force, it is
18  my opinion that Officer (R.) Saldivar's actions were justified
19  and he should be exonerated of any wrongdoing in this
20  investigation"; do you see that?
21     A.  I do.
22     Q.  And that was the Lieutenant's --
23     A.  McGill.
24     Q.  -- opinion that he rendered, correct?
25     A.  That was Lieutenant McGill yes.  That was his

125

1  opinion from the investigation that was concluded by or
2  conducted by Internal Affairs.
3      Q.  Okay.  And who is J. Wright?
4      A.  He is the current Chief of Police.
5      Q.  And he was the Assistant Chief at that time, correct?
6      A.  Yes.
7      Q.  And would he have been part of the Chief's office?
8      A.  Yes.  He's an Assistant Chief, so he is in the same
9  administrative office with the Chief.
10     Q.  Okay.  And then it's signed by Detective, by
11  Lieutenant McGill, correct?
12     A.  Yes.
13     Q.  Okay.  And it's also signed by Chief Bruegger,
14  correct?
15     A.  That looks like his signature, yes.
16     Q.  Okay.  And it says COP, which would be Chief of
17  Police, correct?
18     A.  Yes.
19     Q.  And do you see here it says, "It should be noted that
20  as of this date the Harris County Grand Jury has yet to meet to
21  discuss the outcome of this investigation per (Sergeant)
22  Hamilton's original summary of complaint"; do you see that?
23     A.  I do.
24     Q.  Okay.  So that means this opinion was rendered
25  regarding the City's position that the shooting was justified



126

1   prior to completion of the grand jury for this shooting, the
2   Schenk shooting, correct?
3       A.   That was Lieutenant McGill's opinion on this
4   particular investigation.
5       Q.   Yeah.  And that was concluded prior to the grand jury
6   determination, correct?
7       A.   His was, yes.  But he's Lieutenant McGill; he's not
8   the Chief of Police.
9       Q.   Do you know the date that the Schenk grand jury made
10  their determination?
11      A.   I believe it was in -- it was almost, I don't know if
12  it was a full year later, but I know it was in 2019.
13      Q.   Do you know if it was before or after 10/21/2019?
14      A.   No, I don't.
15      Q.   But nevertheless Lieutenant McGill was able to render
16  opinions to the fact that his opinion that the shooting was
17  justified prior to the determination of the grand jury,
18  correct?
19      A.   He did, yes.
20      Q.   Okay.  And Chief Bruegger signed this on 10-21- 2019,
21  correct?
22      A.   His signature is on it with that date next to it,
23  yes.
24      Q.   Do you know what that signature is meant to convey?
25      A.   So can you -- would you scroll up to the top of that

127

1   form, page 1?  Thank you.  So this was on the 19th, and his
2   signature at the bottom usually indicates that he has received
3   it.  It's not necessarily anything other than that.
4       Q.   Do you know whether or not Chief Bruegger made a
5   determination whether or not the shooting was exonerated, a
6   formal determination?
7       A.   The Schenk shooting was, I think the final
8   disposition on that was justified.
9       Q.   When was that determination made?
10      A.   I don't know the exact date.
11      Q.   Have you seen a document with the final determination
12  that it was justified?
13      A.   I believe, yes, it was in the file.  I just can't
14  recall the exact date.
15      Q.   This is what I have been provided.  Were you provided
16  anything that was, I can go page by page, that was different
17  from what you're looking at?
18      MR. GILES:  You're got to show us the whole thing now
19  because we're jumping around and we can't really discern.
20      MR. DUBE:  I'm trying to go page by page.  I don't
21  know of a way for him to control it.  If he has the document
22  that he looked at that says justified, I'll be glad to take
23  that too.
24      MR. GILES:  No.  We don't have it, but we're happy to
25  look at it.  We just have to have a chance to see it all.

128

1       Thank you.
2   BY MR. DUBE:
3       Q.   Let me know when to change the page.
4       A.   Go ahead.  It'll be, should be -- if you can go to
5   the next page.  Go to the next.  Keep on going.  Okay.  Hold on
6   to that.  That's a -- okay.  That's a statement.  Okay.  Go
7   ahead.  Continue.  Use of Force.  Oh, I'm sorry.  That's the
8   complaint.  Okay.  Allegation.  Keep going.  Okay.
9       Q.   That's all I have.
10      A.   Okay.  Nowhere there is a notification from the
11  district attorney's office indicating the final decision by the
12  grand jury.
13      Q.   And how would that -- why would that matter for
14  purposes of determining whether or not the shooting was
15  justified or not justified?
16      MR. GILES:  Objection.  Form.
17      THE DEPONENT:  So as stated previously, the district
18  attorney presents the case to the grand jury, and if they
19  listen to all the evidence involved in the case and they make a
20  determination that there was a, what they call a, no-bill
21  meaning that essentially that the officer did not violate any
22  law and charges would not be filed against him.
23  BY MR. DUBE:
24      Q.   So let me ask this hypothetical.  So you seen that
25  Lieutenant McGill wrote his opinion that the shooting was

129

1   justified, correct?
2       A.   Yes.
3       Q.   Okay.  How would that have been different -- what
4   would have been different if the grand jury, notwithstanding
5   that opinion, had rendered a true bill indictment against
6   Officer Saldivar for the Schenk shooting?
7       A.   So the true bill would be in reference to a criminal
8   case.  The Internal Affairs investigation was about policy
9   violations.
10      Q.   Right.
11      A.   So I don't know that, you know -- from what he is --
12  he indicated in his response that necessarily would conflict.
13  Even though it sounds like it would.  I don't know, you know,
14  from -- I haven't looked at it much recently but, you know,
15  what his determination was.  But he's referring basically to
16  policy violations, and that's his opinion.
17      Q.   So there would be no conflict between the civil
18  Internal Affairs administrative decision and the criminal
19  investigation, correct?
20      MR. GILES:  Objection.  Form.
21      THE DEPONENT:  I'm not saying there's a conflict.  I'm
22  saying that -- whether it would or would not be.  I'm just
23  saying that Lieutenant McGill's interpretation of what he read
24  in the investigation, he provided his opinion, which is someone
25  who doesn't have the final say so in what any type of

130

1  discipline or corrective action would have been taken in this
2  case.
3  BY MR. DUBE:
4     Q.  He was able to render his opinion without the benefit
5  of the grand jury determination.  How was he able to do that?
6        MR. GILES:  Objection.  Form.  Speculation.
7        THE DEPONENT:  Lieutenant McGill made his decision on
8  the information that was provided to him, is what it appears,
9  to make his decision on, his opinion of whether or not policy
10  violations were -- had been conducted.
11  BY MR. DUBE:
12     Q.  Why couldn't the Chief of Police make his
13  determination with respect to the Aviles shooting on the basis
14  of the information that he was provided?
15        MR. GILES:  Objection.  Speculation.  Form.
16        THE DEPONENT:  Whatever information that the Chief
17  may have provided on this type of question would be in his
18  deposition.  I would refer back to that.  However, since we are
19  speculating about the reason why he made that decision, he was
20  probably waiting for the conclusion of the investigation, which
21  includes any kind of presentation to the grand jury and their
22  decision --
23  BY MR. DUBE:
24     Q.  Do you --
25     A.  -- because he wants -- oh sorry.

131

1        MR. GILES:  Keep talking.
2        MR. DUBE:  I'm sorry.
3        THE DEPONENT:  So he was wanting the totality of the
4  information in his possession before making a final decision on
5  what to do if any form of discipline should be administered.
6  BY MR. DUBE:
7     Q.  Do you know if he did the same with respect to the
8  Schenck shooting?
9     A.  I do not have any information that would indicate one
10  way or the other.
11     Q.  Do you know if he waited for the grand jury
12  determination to determine if the Ramirez shooting was
13  justified?
14     A.  I don't have any information to determine one way or
15  the other.
16     Q.  Shouldn't that be a uniform process; if he waited for
17  the grand jury in the Aviles, shouldn't he have also waited for
18  the grand jury in Schenk and Ramirez shootings as well?
19        MR. GILES:  Objection.  Form.
20        THE DEPONENT:  So the difference between the
21  shootings, it was whether or not the cases were presented to a
22  grand jury in these matters.  Because not all shootings are
23  necessarily presented to a grand jury.
24  BY MR. DUBE:
25     Q.  Well, the Schenk shooting was presented to the grand

132

1  jury, correct?
2     A.  Yes.
3     Q.  And the Aviles shooting was presented to the grand
4  jury, correct?
5     A.  Yes.
6     Q.  Okay.  And the Ramirez shooting was presented to the
7  grand jury, correct?
8     A.  To be honest with you, I don't know on that one.  I
9  don't recall, remember if that was --
10     Q.  So let's just take the Schenk and the Aviles
11  shootings.  They were both presented to the grand jury,
12  correct?
13     A.  Schenk and Aviles, yes.
14     Q.  And so if it's your testimony that the Chief of
15  Police has to take into account the grand jury determination,
16  wouldn't it make sense that if he waited for a grand jury for
17  Aviles, he would have also waited for the grand jury after
18  Schenk?
19        MR. GILES:  Objection.  Form.
20        THE DEPONENT:  So as I stated previously, there's
21  nothing to indicate that the Chief has to do either one.  The
22  Chief normally, under any big decision, especially when it
23  comes to discipline, wants to have all the information provided
24  to him or her at the time, in this case it was him, before
25  making a decision that's going to affect an officer could be

133

1  for the rest of his career or life.
2  BY MR. DUBE:
3     Q.  So he wants to protect the officer, correct?
4        MR. GILES:  Objection.  Form.
5        THE DEPONENT:  My statement was is that he wants all
6  of the information before he makes a decision.
7  BY MR. DUBE:
8     Q.  You said before he affects the life and career of the
9  officer.  Why would he take that into consideration?
10        MR. GILES:  Objection.  Form.
11        THE DEPONENT:  As with any decision that is made by
12  the Chief of Police when it comes to an officer involved
13  shooting, you want all the information that is available to you
14  before you make a decision.
15  BY MR. DUBE:
16     Q.  I heard that, and you stated that a number of times,
17  but I'm talking about specifically the portion of your answer
18  that says that, and I think it's the second time you've stated
19  it, that, you know, because it affects the life and career of
20  the officer.  Like why would that matter to the Chief?
21        MR. GILES:  Object to the part of the question that's
22  sidebar.
23        THE DEPONENT:  So the Chief, I'll state it again, you
24  know, is -- you know, my opinion that the Chief makes the
25  decisions with all of the information available to him.  Because

134

1 if you make a decision that is with partial information, you
2 may be incorrect. If you're incorrect, the officer has a right
3 to go to Civil Service.
4        If you terminate an officer and the officer goes back
5 to Civil Service, and you don't have all the information,
6 Civil Service can overturn that decision and therefore
7 reinstating the officer and including more monies to -- from
8 the City for back pay and such. So you're putting the officer
9 through a lot more circumstances than may be necessary.
10 BY MR. DUBE:
11    Q. At that time, he's already had the full benefit of
12 the Internal Affairs investigation, right?
13        MR. GILES: Objection. Form.
14        THE DEPONENT: On which one?
15 BY MR. DUBE:
16    Q. As of July 9th; he would have had all the information
17 from Internal Affairs investigation?
18    A. On all of the -- which --
19    Q. On the Aviles shooting?
20    A. Okay.
21        MR. GILES: Objection Form.
22        THE DEPONENT: At this time, I don't know what all
23 information he had available to him to make his determination.
24 If he made any -- was leaning toward any determination at all.
25 BY MR. DUBE:

135

1    Q. That's not the question I asked. The question I
2 asked is, as of July 9, 2021, when Officer Saldivar retired,
3 would the Chief of Police have had the complete internal
4 investigation file?
5        MR. GILES: Objection. Form.
6        THE DEPONENT: If you would like to show me the dates
7 on the completed investigation, and his signature on them, I
8 could answer that question.
9 BY MR. DUBE:
10    Q. I believe I showed it to you before. It had a date
11 of April 29th, but I can show it to you again.
12    A. Yeah. I would appreciate it.
13    Q. This is from Detective Reyes, correct?
14    A. Yes.
15    Q. To Chief Bruegger, correct?
16    A. Yes.
17    Q. Okay. Dated April 29th, correct?
18    A. Yes.
19    Q. So as of July 9th, Chief Bruegger, this report would
20 have been sent to Chief Bruegger's office, correct?
21    A. If you could show me when, at the end of the report,
22 of Detective Reyes' report, because it'll have it. Should be
23 right ...
24    Q. End of Detective ...
25    A. Okay. So that was a Supplement that was presented by

136

1 Detective Reyes on May 10th.
2    Q. This is the end of this report, page 27 of 27.
3        MR. GILES: Objection. Form.
4        THE DEPONENT: Okay. Can you scroll up to the top of
5 that? So there's no date on it. That one wasn't signed, it
6 looked like, right. So it looks like it was submitted on April
7 29th of '21.
8        MR. GILES: Objection. Non-responsive.
9 BY MR. DUBE:
10    Q. Okay. When determining whether or not an officer has
11 used excessive force, what factors are assessed?
12        MR. GILES: Objection. Form.
13        THE DEPONENT: Well, first, are you referring to --
14 what are you referring to?
15 BY MR. DUBE:
16    Q. So in a shooting like the type -- actually, let's do
17 this. I'm going to show you the shooting of Randy Aviles.
18        MR. GILES: Objection. Form.
19        (WHEREUPON, the video was played.)
20        MR. GILES: You know there's no sound on this, right?
21        MR. DUBE: You're saying there is no sound?
22        MR. GILES: There's no sound.
23        THE VIDEOGRAPHER: So Mr. Dube, you will need to stop
24 your share screen. And then when you click the share screen
25 button, you'll just have to click on share sound.

137

1        MR. DUBE: Thank you.
2        THE VIDEOGRAPHER: You're welcome.
3        MR. DUBE: Thank you, Norman.
4        MR. GILES: You're welcome.
5        MR. DUBE: I'm going to go back about 10 seconds,
6 because there are no relevant sounds before that. Any
7 objections?
8        MR. GILES: No objection.
9        (WHEREUPON, the video was played.)
10 BY MR. DUBE:
11    Q. Tell us what you just observed?
12        MR. GILES: Objection. Form.
13        THE DEPONENT: I'm sorry. What was the question?
14 BY MR. DUBE:
15    Q. Can you tell us what you just observed in the video?
16        MR. SELBE: Object. Form.
17        MR. GILES: Objection. Form.
18        THE DEPONENT: I saw a traffic violation. I saw
19 Officer Saldivar conduct a traffic stop. I saw Officer
20 Saldivar give commands. And then I saw the subject put the car
21 into drive it looked like, at which time Officer Saldivar
22 discharged his weapon.
23 BY MR. DUBE:
24    Q. When did he begin discharging his weapon?
25    A. It looks like almost simultaneously with the car

138

1 either going into drive or leaving the area.
2    Q.  When did he stop discharging his weapon?
3    A.  In my opinion, it was -- what you're asking me about
4 is, the car was a little ways down the road.
5    Q.  Is that in compliance with the Pasadena use of force
6 policies?
7       MR. GILES:  Objection.  Form.
8       THE DEPONENT:  The policy does allow for the
9 discharge of a weapon at a fleeing vehicle under certain
10 circumstances.  But this, I don't know what Officer Saldivar
11 knew at the time of this occurring.
12 BY MR. DUBE:
13    Q.  Was there any circumstances that you observed to
14 justify the shooting at the vehicle as it was fleeing?
15    A.  I was -- I don't know what Officer Saldivar has
16 noticed, so I cannot answer that question with the information
17 that I have.
18    Q.  So the main piece of information that you would need
19 to assess this use of force would be Officer Saldivar's
20 subjective knowledge?
21       MR. GILES:  Objection.  Form.
22       THE DEPONENT:  That's part of it.
23 BY MR. DUBE:
24    Q.  What else?
25    A.  Whatever other information that was gathered in the

139

1 report from the investigating detectives would be helpful.
2    Q.  You've read that report, correct?
3    A.  I have looked at it, yes.
4    Q.  And you read it in preparation for this deposition,
5 correct?
6    A.  I looked at it, yes.
7    Q.  Okay.  So what prevents you from making a
8 determination as to whether or not this use of force was
9 justified or not based on what you observed and what you've
10 read?
11       MR. GILES:  Objection.  Form.
12       THE DEPONENT:  The -- you asked me about my personal
13 opinion; however, the response from the City is the fact that
14 we have no reason to believe that the investigation that was
15 conducted in this incident was done with nothing but
16 professional investigation into this case.  I mean, everything
17 was -- not a we -- there's no reason for us to think otherwise.
18 BY MR. DUBE:
19    Q.  That's not what I asked.  I'm asking as a
20 representative of the City, why can you not render an opinion
21 as to whether or not this use of force was justified, based on
22 the fact that you have read the reports from the City
23 officials, and you observed the video; can you render an
24 opinion or can you state the City's position as to whether or
25 not that use of force was justified or not?

140

1       MR. GILES:  Objection.  Form.  That's inappropriate
2 testimony from this witness.  That was the Police Chief's
3 determination as to whether there's a violation of the
4 policies, not this witness looking at the video after the fact
5 in a deposition in a lawsuit.
6       MR. DUBE:  He is the representative of the City.  He
7 can even take into account what the Police Chief has testified
8 in rendering his answer, but I would like the answer from the
9 City, from this witness.
10       THE DEPONENT:  The City believes that the
11 investigation that was conducted in this case, in this incident
12 was done thoroughly and the results that were concluded from
13 that was the -- Officer Saldivar was -- there was an indictment
14 against him in this case.  But the final conclusion of the case
15 has not been rendered.
16 BY MR. DUBE:
17    Q.  I'm showing you what's been marked as Exhibit 16.
18       MR. DUBE:  Hold on a quick second.  I'm getting
19 repeated -- hold on for a second.  Let me just pause.
20       (Pause in the proceedings.)
21       MR. DUBE:  Sorry about that.  I was getting like five
22 calls back from the same number over and over again.
23 BY MR. DUBE:
24    Q.  I'm showing you what's been marked as Exhibit 16,
25 which is a copy of the Saldivar indictment.  Do you see that?

141

1    A.  I do.
2    Q.  Are you familiar with this document; have you seen it
3 before?
4    A.  I don't think I have.
5    Q.  Okay.  Well, take your time to read it.  Let me know.
6    A.  Okay.
7       MR. DUBE:  I move Exhibit 16 into evidence.
8       MR. GILES:  There's no objection to it being used in
9 the deposition.
10       MR. SELBE:  No objection to the use in deposition.
11       (WHEREUPON, Exhibit 16 was marked for
12 identification.)
13 BY MR. DUBE:
14    Q.  Do you see where it says, "The duly organized
15 Grand Jury of Harris County presents in the District Court of
16 Harris County that in Harris County RIGOBERTO SALDIVAR,
17 hereafter styled the Defendant, on January 12, 2021, did then
18 and there unlawfully, while a public servant, to-wit; a police
19 officer, acting under color of his office and employment,
20 intentionally and knowingly caused bodily injury to Randy
21 Aviles hereafter called the Complainant by discharging a deadly
22 weapon, namely a firearm, in the direction of the Complainant";
23 do you see that?
24    A.  I do.
25    Q.  What is the City's position as to whether or not



142

1  Officer Saldivar intentionally and knowingly caused bodily
2  injury to Randy Aviles by discharging a deadly weapon in his
3  direction on January 12, 2021?
4       MR. GILES:  Objection.  Form.
5       THE DEPONENT:  The City's opinion or the City's
6  position on this is that a proper investigation was done, and
7  that Officer Saldivar was charged with a crime.
8  BY MR. DUBE:
9    Q.  I mean, that's not stating the position as to whether
10  or not -- does the City believe that Officer -- let's break it
11  down, caused bodily injury to Randy Aviles on January 12, 2021?
12    A.  The City believes that an investigation was done, and
13  the facts were presented to the district attorney's office, who
14  presented it to the grand jury, and a warrant was issued on the
15  belief that this had occurred.  This is not indicating that
16  Officer Saldivar is guilty of a crime.
17    Q.  That's not what I'm asking.  I'm not asking whether
18  or not Officer Saldivar is guilty of a crime, or none of that.
19  I'm asking whether or not -- I'm asking what is the City's
20  position with respect to whether or not Officer Saldivar
21  intentionally and knowingly caused bodily injury to Randy
22  Aviles by discharging a firearm in his direction?
23       MR. GILES:  Objection --
24       MR. SELBE:  Objection.  Asked and answered.
25       MR. GILES:  Form.

143

1       THE DEPONENT:  Again, the mere fact that it is stated
2  in there of what the grand jury and the warrant information
3  contains, the City does not believe that Rigoberto Saldivar has
4  any other or less rights than anybody else.  So until the final
5  disposition of his court case, the City cannot render a
6  decision on the mere fact of a warrant being issued.
7  BY MR. DUBE:
8    Q.  So the City cannot have a position as to whether or
9  not Saldivar shot Randy Aviles unlawfully without a
10  determination by a jury?
11    A.  That is correct.
12    Q.  If Officer Saldivar had not been, had not retired,
13  would he still be -- would the City have terminated his
14  employment?
15       MR. GILES:  Objection.  Speculation.
16       THE DEPONENT:  There's no information that I have
17  that that would or would not have occurred.
18  BY MR. DUBE:
19    Q.  Are you familiar with the Use of Force Audits?
20    A.  I have looked at them, yes.
21    Q.  I'm only going to ask you about one of them.  Okay.
22  I'm showing you the Use of Force Audit for 2021.  Do you see
23  that?
24    A.  I do.
25    Q.  Okay.  This has been marked as Plaintiff's Exhibit 4.

144

1  Are you familiar with this document?
2    A.  I have looked over it, yes.
3       MR. DUBE:  I move Exhibit 4 into evidence.
4       MR. SELBE:  No objection to using it in the
5  deposition.
6       MR. GILES:  Same.
7       (WHEREUPON, Exhibit 4 was marked for identification.)
8  BY MR. DUBE:
9    Q.  Okay.  Can you read the paragraph that begins with
10  "Two incidents ..."?  You can read it out loud or to yourself,
11  whichever you prefer.
12    A.  What was that -- out loud you said?
13    Q.  Yeah.  Please read it out loud, yes.
14    A.  Okay.  You're talking about where the "Two incidents
15  during 2021 required ...?
16    Q.  Um-hmm.
17    A.  Okay.  "Two incidents during 2021 required officers
18  to use deadly force against a suspect.  In both cases the
19  suspect was evading police in a vehicle.  One of the incidents
20  required an officer to discharge a single round from his weapon
21  toward the suspect.  The suspect was not struck by the
22  discharged round.  In that same incident, officers utilized
23  their patrol vehicles to stop the evading suspect, who was
24  ramming police and civilian vehicles, driving counterflow to
25  traffic, and placing the general public in danger.  No one was

145

1  injured in the incident.  In the other incident, and officer
2  utilized his vehicle to stop a dangerous felon with three
3  outstanding felony warrants and a history of evading
4  police.  No one was injured in that incident either."
5    Q.  So this is referring, this is use of force audits,
6  correct?
7    A.  Yes.
8    Q.  What's the purpose of the Use of Force Audit?
9    A.  It is a collection of information on the different
10  types of use of force that have occurred in that particular
11  year.
12    Q.  This is the one for 2021, correct?
13    A.  That's what it indicates, yes.
14    Q.  Okay.  And it references two use of force incidents
15  that occurred that year, correct?
16    A.  According to the paragraph, yes.
17    Q.  And you can read the remainder of this audit to see
18  if you wish, for purposes of answering the rest of my
19  questions.  I'll leave it here.  You can read it to yourself.
20    Q.  Can you scroll up just a little bit?  I think that's
21  -- okay.  If you can scroll down to the paragraph past the "Two
22  incidents during 2021 ..." -- okay.  You can scroll down some
23  more.  Okay.  Are you interested in the statistics?
24    Q.  Did you want to -- you can look at it.
25    A.  I didn't know if you had a question on that or not.



146

1 If you did --
2    Q.   I'm not going to, no.
3    A.   Okay.  Then you can go down to the last of it where
4 it says analysis.  Okay.
5    Q.   So back to the paragraph with the two incidents.  You
6 see that?
7    A.   I do.
8    Q.   The first incident, "One of the incidents required an
9 officer to discharge a single round from his weapon toward the
10 suspect."  You would agree with me that would not be the
11 incident involving Officer Saldivar, correct?
12    A.   That would be?
13    Q.   That would not be?
14    A.   Oh.  Yes.
15    Q.   Yes, it would not be, correct?
16    A.   That's correct.  It's not the Aviles shooting.
17    Q.   "In the other incident, an officer utilized his
18 vehicle to stop a dangerous felon with three outstanding felony
19 warrants and a history of evading the police."  You would agree
20 with me that is also not the Aviles shooting, correct?
21    A.   That is correct.
22    Q.   Okay.  And the Aviles shooting occurred in 2021?
23    A.   Yes.
24    Q.   January 12, 2021, correct?
25    A.   That's correct.

147

1    Q.   Okay.  Do you know why that shooting would not have
2 been included in this audit?
3    A.   I do not.
4    Q.   Should it have been included in this audit?
5    A.   You would think so, yes.  I mean, it -- I don't know
6 if there was a justification for it not to be, but if it's all
7 use of force documentation or incidents in that year, it should
8 be in the report.
9    Q.   Thank you, sir.  In the last 10 years, are you aware
10 of any instances where an individual has died after a use of
11 force incident involving the City of Pasadena Police
12 Department?
13    A.   So are you talking about a use of force incident
14 where someone has died, so an officer involved shooting?
15    Q.   Yes.  Just start with shootings first, yes, sir.
16    A.   In the last 10 years, I'm sure -- I mean off the top
17 of my head no.  I mean, I did review them, but currently
18 drawing a blank on that.
19    Q.   So you don't know -- do you know any instances of an
20 officer involved shooting resulting in the death between
21 January of 2011 and January of 2021?
22    A.   Well, you would have the Schenk shooting.
23    Q.   Okay.  Any others?
24    A.   I'm currently drawing a blank on it.
25    Q.   Were you prepared on this issue prior to the

148

1 deposition?
2    A.   I was.
3         MR. GILES:  Why don't you give him a chance to take a
4 break?  We've been doing this all day.  Give him a minute to
5 turn his brain back on.
6         MR. DUBE:  All right.  Let's do that.
7         MR. GILES:  All right.  Thanks.
8         THE DEPONENT:  Thank you.
9         THE VIDEOGRAPHER:  The time is 4:10 p.m. and we are
10 off the record.
11         (WHEREUPON, a recess was taken.)
12         THE VIDEOGRAPHER:  We are on the record.  The time is
13 4:48 p.m.  You may now proceed.
14         MR. GILES:  Sorry.  Could you -- I think he's going
15 to want you to ask the question because I think he forgot the
16 question.
17         MR. DUBE:  Okay.
18 BY MR. DUBE:
19    Q.   The question was are you aware of any officer
20 involved shootings that occurred between January 2011 and
21 January 2021?
22    A.   Are you talking about just officer involved
23 shootings?
24    Q.   Yes.
25    A.   Yes, I am.

149

1    Q.   How many occurred during that time period?
2    A.   I believe there were three.  I believe.  I'm just --
3 while we had a break, I was looking at the Interrogatory from
4 the City that I had used to initially study for to -- on the
5 information that the City provided.
6    Q.   Okay.  So the shootings identified in that
7 Interrogatory, that remains the case as to the ones that
8 occurred during that time period?
9    A.   That's the ones that were listed, among other -- yes,
10 that's on the list.
11    Q.   And there's nothing -- there are no other shootings
12 that you have identified since that Interrogatory, correct?
13    A.   Nothing that is not on the list that was submitted.
14    Q.   Okay.  How many of those involved the death of the
15 suspect?
16    A.   There was only one involved in a shooting.
17    Q.   Only one death between January 2011 and January 2021,
18 as a result of a shooting?
19    A.   That's what -- the information that I have at this
20 time, yes.
21    Q.   And that would be Mr. Schenk?
22    A.   That's correct.
23    Q.   Okay.  And this is -- and we're in the last stretch
24 now.
25         Is it documented -- when an officer is reassigned to



150

1 a different division, is that documented anywhere?
2      A.   Not every single time.  If an officer is reassigned
3 to a different position, it is not always documented.  A lot of
4 times it will -- an email will come out from the Chief or it
5 may be an Assistant Chief about the person changing
6 assignments.
7      Q.   Do you know whether or not any such documentation was
8 made for the reassignment of Officer Saldivar after the Aviles
9 shooting?
10      A.   I'm not aware of any.
11      Q.   Have you seen anything?
12      A.   No.  I have not seen anything.
13      Q.   I'm showing you what's been marked as -- it'll be
14 marked as Exhibit 19, which is the City of Pasadena Use of
15 Force Policies.
16          (WHEREUPON, Exhibit 19 was marked for
17 identification.)
18 BY MR. DUBE:
19      Q.   Are you familiar with the City of Pasadena Use of
20 Force Policies?
21      A.   Yes, sir.
22      Q.   How are you familiar with the Use of Force Policy?
23      A.   How am I familiar?
24      Q.   Yes.
25      A.   I have read them.  And then every time a change comes

151

1 out, we are -- the new version of any kind of policy change is
2 usually sent out for review.
3      Q.   Can you read the definition of Deadly Force, please?
4      A.   Under U3.3 Definitions, Deadly Force says, "Any use
5 of force that creates a substantial risk of causing death or
6 serious bodily injury."
7      Q.   Would you agree that the force used by Officer
8 Saldivar against Randy Aviles was deadly force?
9      A.   It would fit that definition.
10      Q.   Would you agree that the force used by Officer
11 Saldivar against Nathan Schenk was deadly force?
12      A.   Yes.
13      Q.   Would you agree that the force used by Officer Aviles
14 against Angel Ramirez was deadly force?
15      A.   Yes.
16      Q.   Okay.  Under 3.4, can you let us know when the use of
17 deadly force is appropriate?
18      A.   When the use of deadly force is appropriate?
19      Q.   Yes.
20      A.   So under number 2, section 2 right there under U3.4,
21 Use of deadly force, "To protect the officer or others from
22 what is" believed, "reasonably believed to be an immediate
23 threat" or death or serious "of death of serious bodily harm";
24 b) on that says, "Where practicable, prior to discharge of the
25 firearm, officers shall identify themselves as law enforcement

152

1 officers and state their intent to shoot."
2          Underneath that, where it shows restrictions, in
3 number 3 it says, "Warning shots shall not be fired"; b) says,
4 "Firearms shall not be discharged at a moving vehicle in an
5 attempt to disable the vehicle"; c) says, "Officers threatened
6 by an oncoming vehicle shall make a reasonable effort to
7 attempt to move out of its path, if possible, instead of
8 discharging a firearm at it or any of its occupants.  However,
9 if an officer reasonably believes that a person is immediately
10 threatening the officer or another person with deadly force by
11 means of a vehicle, an officer may use deadly force against the
12 driver of the vehicle"; and d) states that, "Officers are not
13 authorized to use deadly force against suspects to prevent the
14 consequences of self-imposed bodily injury or suicide."
15          And then number 4 under that section says that,
16 "Officers may use deadly force to destroy an animal that
17 represents a threat to public safety or as a humanitarian
18 measure if the animal is seriously injured and the officer
19 reasonably believes that deadly force can be used without harm
20 to the officer or others.  In these circumstances, a supervisor
21 shall be contacted prior to the use of deadly force if time
22 permits."
23      Q.   Okay.  Having reviewed this Use of Force Policy, what
24 is the City's position with respect to whether or not Officer
25 Saldivar appropriately used force against Randy Aviles on

153

1 January 12, 2021?
2          MR. GILES:  Objection to form.
3          THE DEPONENT:  The City's response is that the
4 complete investigation that was conducted from the detectives
5 and what was done with Internal Affairs indicates that charges
6 were filed against or accepted from the District Attorney's
7 office against Officer Saldivar, and that case is currently
8 working its way through the system.
9 BY MR. DUBE:
10      Q.   From the City's review of the investigative files and
11 from the video of the shooting, and if you would like for me to
12 play the video again for you one more time, which if any of
13 these policies would Officer Saldivar have violated on January
14 12, 2021?
15          MR. SELBE:  Object to form.
16          MR. GILES:  Objection.  Form.
17          THE DEPONENT:  So the -- there is more to just what
18 is a possible violation.  It's whether or not Officer Saldivar
19 was in fear of his life, which is I believe is what was stated
20 on his, from his aspect of the situation.  Anybody else that is
21 looking at the situation from the outside does not have all of
22 the information that Officer Saldivar had.
23          So the City is, has no reason to believe that the
24 investigation was anything but accurate in its conclusion and
25 disposition of what they did with the case, which was presented

154

1  to the District Attorney's office and therefore charges were
2  accepted.
3  BY MR. DUBE:
4      Q.  So if Officer Saldivar subjectively believed that he
5  was in fear of his life, that would have been justification for
6  him to shoot Mr. Aviles on January 12, 2021?
7      MR. GILES:  Objection to form.
8      THE DEPONENT:  Our policy states that an officer in
9  fear of his life or someone else's can use deadly force in a
10 situation if he believes that that will protect him or someone
11 else.
12 BY MR. DUBE:
13     Q.  And based on his belief alone?
14     MR. GILES:  Objection.  Form.
15     THE DEPONENT:  There has to be -- if he believes that
16 his life or someone else's is in immediate harm of serious
17 bodily injury or death, he -- and that decision is made, there
18 is a possibility that would be justified.
19 BY MR. DUBE:
20     Q.  Is it a possibility or is it justified?
21     MR. GILES:  Objection.  Form.
22     THE DEPONENT:  The reason why I say possibility
23 because all the facts have to be considered in the case before
24 you can say it was a justified or not justified, which is why
25 it goes to the grand jury in this particular case.

156

1  Pasadena Police Department.
2  BY MR. DUBE:
3      Q.  Um-hmm.  Is that something that the grand jury opines
4  on as far as you know --
5      MR. GILES:  Objection.  Form.
6  BY MR. DUBE:
7      Q.  -- if the officer stated their intent to shoot and
8  identified themselves as a law enforcement officer?
9      MR. GILES:  Objection.  Form.
10     THE DEPONENT:  I don't know if that was considered by
11 the grand jury in this case or not.
12 BY MR. DUBE:
13     Q.  Okay.  In watching the video, did you see Officer
14 Saldivar identify himself as a law enforcement officer and
15 state his intent to shoot?
16     A.  I neither saw nor heard him say that, that he was an
17 officer with the Pasadena Police Department.
18     Q.  How about his intent to shoot?
19     A.  He did mention those words, yes.
20     Q.  And I think, actually we can play it, I think he --
21 we can play it just so you can hear it.  Let's play it real
22 quick.  I'm showing you what's been marked as Exhibit 20, the
23 bodycam video.
24     (WHEREUPON, Exhibit 20 was marked for
25 identification.)

155

1  BY MR. DUBE:
2      Q.  So only the grand jury can make the determination
3  whether or not an officer involved shooting is justified?
4      MR. GILES:  Objection.  Form.
5      THE DEPONENT:  That is not the case.  It's not what I
6  said.
7  BY MR. DUBE:
8      Q.  Okay.  Can the Chief of Police make that
9  determination without the input of the grand jury?
10     MR. GILES:  Objection.  Form.
11     THE DEPONENT:  As stated previously, the -- there's
12 nothing in policy that states the Chief has to -- what he has
13 to do use to make his determination; however, again, the Chief
14 is going to want all information available to him before he
15 makes a decision.
16 BY MR. DUBE:
17     Q.  How about like minor violations of the use of force
18 policy, for example, where it states, "Where practicable,
19 officers shall identify themselves as law enforcement officers
20 and state their intent to shoot"; do you see that?
21     A.  Um-hmm.
22     Q.  That's not something that's within the purview of the
23 grand jury, correct?
24     MR. GILES:  Objection.  Form.
25     THE DEPONENT:  This is just part of the policy of the

157

1      (WHEREUPON, the video was played.)
2  BY MR. DUBE:
3      Q.  After reviewing the video, was the manner in which
4  Officer Saldivar informed Mr. Aviles that, his intent to shoot,
5  was that in compliance with the City of Pasadena Police
6  Department Use of Force Policies?
7      MR. GILES:  Objection.  Form.
8      MR. SELBE:  Object to form.
9      THE DEPONENT:  He identified that -- an action prior
10 to committing those actions.
11 BY MR. DUBE:
12     Q.  That did not answer my question.  My question is was
13 the manner in which Officer Saldivar stated his intent to shoot
14 Mr. Aviles, did that comply with the City of Pasadena Police
15 Department Use of Force Policies?  I need you to please say yes
16 or a no in the answer.  You can explain further but I need you
17 to state yes or no.
18     MR. GILES:  Objection.  Form.  He gets to answer the
19 question with the answer.  You're not going to tell him how to
20 answer the question.
21     THE DEPONENT:  So which part of the Use of Force
22 Policy are you asking me about?
23 BY MR. DUBE:
24     Q.  You're familiar with the entire policy, correct?
25     A.  Yes.  But if you have a specific question about which

158

1 part of it.
2    Q.  Yes.  I'm asking the manner in which he stated his
3 intent to shoot, did that comply with the policy and the
4 obligation to, where practicable, to state your intent to
5 shoot; the way he did it, did that comply with the policy?
6        MR. GILES:  Objection.  Form.
7        THE DEPONENT:  The policy states that they will
8 announce, if practical that they will, their intent to shoot,
9 and he did announce that, so yes.
10 BY MR. DUBE:
11    Q.  So he is allowed to tell a suspect whose saying okay,
12 okay, okay, I hear -- or I hear you, he's permitted under the
13 policy to state I will shoot you?
14        MR. GILES:  Objection.  Form.
15        THE DEPONENT:  So what you're -- what you stated in
16 your -- the motions of, you know, your body language was not
17 consistent with what was happening in the video.  But the
18 policy states that if practical, an officer will state his
19 intention, and that is what Officer Saldivar did.
20 BY MR. DUBE:
21    Q.  So you said it's not consistent -- can you tell me --
22        (WHEREUPON, the video was played.)
23 BY MR. DUBE:
24    Q.  Can you explain as the video plays or right after how
25 is he complying with the use of force policy?

159

1        (WHEREUPON, the video was played.)
2 BY MR. DUBE:
3    Q.  Did you hear where he says, okay, okay, I got you,
4 and then the immediate response was I will shoot you, did you
5 hear that portion?
6        MR. GILES:  Objection.  Form.
7        THE DEPONENT:  I heard that part where he tells him
8 to keep his hands up and outside of the car, yes.
9 BY MR. DUBE:
10    Q.  Okay.  Did you hear Mr. Aviles' response?
11    A.  I believe he -- I would have to replay it, but I
12 believe he agreed to it or he said okay.
13    Q.  I can replay it for you.  It's no problem for me to
14 replay it for you.
15    A.  Sure.
16    Q.  So if you want to be sure.
17    A.  That'd be great.
18        (WHEREUPON, the video was played.)
19 BY MR. DUBE:
20    Q.  What did you hear Mr. Aviles say?
21        MR. GILES:  Objection.  Form.
22        THE DEPONENT:  At which part?
23 BY MR. DUBE:
24    Q.  I played -- only saying one word, three words the
25 entire video, but I will play it again for you, so please pay

160

1 attention, sir.
2        (WHEREUPON, the video was played.)
3        MR. SELBE:  Object to the side bar.
4 BY MR. DUBE:
5    Q.  What did Officer Saldivar just say?
6    A.  He tells him to put his hands outside the window.
7    Q.  Okay.  Where are Mr. Aviles' hands at the moment, can
8 you tell?
9        MR. GILES:  Objection.  Form.  This is not -- this is
10 not the time when he made the statement.  It's not fair to ask
11 him where his hands are now.  It's when he makes the statement.
12        MR. DUBE:  I'm going to get there.  Can you let me
13 get there?
14        MR. GILES:  I want to make sure the record's clear
15 because when you say it that way, it looks like that he's
16 saying that statement at the time you're showing these
17 pictures, but this picture is not when he's made the statement,
18 it's afterward.
19        MR. DUBE:  The shot is beforehand, but we'll go back.
20 All right.  Listen, we're here, we got time.
21        (WHEREUPON, the video was played.)
22 BY MR. DUBE:
23    Q.  Okay.  What did Officer Saldivar just say?
24    A.  Don't you fuckin move.  Don't you dare move.
25    Q.  What is your opinion, or what are your thoughts I

161

1 guess on his language choice at this moment?
2        MR. GILES:  Objection.  Form.
3        THE DEPONENT:  I don't have an opinion on that.
4 BY MR. DUBE:
5    Q.  Okay.  What are your thoughts on it in terms of his
6 obligation in the way he treats the citizens of Pasadena?
7        MR. GILES:  Objection.  Form.
8        THE DEPONENT:  So according to our policy, the
9 officer will be respectful at all times when conducting the
10 public.
11 BY MR. DUBE:
12    Q.  Was that respectful?
13        MR. GILES:  Objection.  Form.
14        THE DEPONENT:  I would say that it depends on the
15 receiver of the information.
16 BY MR. DUBE:
17    Q.  I'm not sure I understand your answer.  What does
18 that mean?
19        MR. GILES:  Objection.  Form.
20        THE DEPONENT:  Well, you're asking me if it was
21 disrespectful.  Well, for some people vulgar language is not
22 disrespectful.
23 BY MR. DUBE:
24    Q.  How about per policy, can officers use vulgar
25 language per policy of the Pasadena Police Department?



162

1       MR. GILES:  Objection.  Form.
2       THE DEPONENT:  They're not supposed to, no.
3  BY MR. DUBE:
4       Q.  So did his vulgar language violate the City of
5  Pasadena Police Department policies?
6       MR. GILES:  Objection.  Form.
7       THE DEPONENT:  It could be a consideration of policy
8  violation.
9       (WHEREUPON, the video was played.)
10  BY MR. DUBE:
11      Q.  What are your thoughts on Officer Saldivar requesting
12  that Mr. Aviles return to the car during the police stop?
13      MR. GILES:  Objection.  Form.
14      MR. SELBE:  Object to form.
15      THE DEPONENT:  I don't have an opinion on his tactics
16  that he felt was necessary at the time.
17  BY MR. DUBE:
18      Q.  You had a role in the training academy, correct?
19      A.  I'm sorry.  I had what?
20      Q.  You were a Sergeant in the training academy at some
21  point?
22      A.  I was, yes.
23      Q.  Okay.  For how long?
24      A.  For about two and a half years.
25      Q.  Okay.  And did you -- during that time, did you teach

163

1  police officers how to conduct police stops?
2       A.  I did not.
3       Q.  Have you ever conducted a police stop?
4       A.  I have.
5       Q.  When's the last time you did so?
6       A.  Maybe -- sometime before July of last year, between
7  January and July of 2023, maybe.
8       Q.  Would you ever request for a suspect who is outside
9  of the vehicle to return back into the vehicle where you cannot
10  see his hands or what he has access to?
11      MR. GILES:  Objection.  Form.
12      THE DEPONENT:  It depends on the circumstances.
13  BY MR. DUBE:
14      Q.  What circumstances would it be warranted to do so?
15      MR. GILES:  Objection.  Form.
16      THE DEPONENT:  It depends on the circumstances at the
17  time of what my direction for the individual would be.
18  BY MR. DUBE:
19      Q.  And I heard that answer.  I'm asking can you give me
20  some examples of circumstances where that would be appropriate
21  to do so?
22      MR. GILES:  Objection.  Form.
23      THE DEPONENT:  So my personal opinion, and the way I
24  would do things, not as far as the City, is every traffic stop,
25  every encounter has its own intricacies that you have to

164

1  consider.  So if there was a -- if I pulled over a car for,
2  let's say if it was weaving down the road a little bit during
3  the middle of the day on a Sunday.  And I stopped the car, and
4  an elderly lady gets out and there's a lane of traffic moving
5  beside her, I may request her to sit back down in the car for
6  her safety until I can find out what's going on.
7  BY MR. DUBE:
8       Q.  Is there any traffic in this video?
9       A.  Not other than the two cars in the street.
10      Q.  No elderly ladies in this video, correct?
11      A.  No, sir.  Not that I can see.
12      Q.  Is this a circumstance in which you would request for
13  the detainee to get back into the car?
14      MR. GILES:  Objection.  Form.
15      THE DEPONENT:  I can't answer that question.  I don't
16  know the circumstances, what other possible circumstances he
17  might have been facing at the time.
18  BY MR. DUBE:
19      Q.  Who is he?
20      A.  Officer Saldivar, who made the request.
21      Q.  So what's relevant to you is Officer Saldivar's
22  subjective view of what's going on?
23      MR. GILES:  Objection.  Form.
24      THE DEPONENT:  What's relevant to me was just
25  responding to your question, which you know, what would I have

165

1  done, and I'm just letting you know that I don't know what
2  other circumstances were involved in his decision making.
3  BY MR. DUBE:
4       Q.  What would a reasonable officer have done in this
5  situation?
6       MR. GILES:  Objection.  Form.
7       THE DEPONENT:  So again, somebody who is after the
8  fact looking at this video, if they decide to make a decision
9  without knowing all the facts, then it might not be a group
10  decision what they would -- or relevant to what Officer
11  Saldivar did.
12  BY MR. DUBE:
13      Q.  Please answer my question.  What would --
14      MR. SELBE:  Object to the side bar.
15      MR. GILES:  That did answer your question.
16      MR. DUBE:  It did not.
17      MR. GILES:  If you want to ask another question, ask
18  another question.  Quit telling him how to answer you.
19      MR. DUBE:  He did not answer my question --
20      MR. GILES:  Don't tell him he's not answering your
21  question.
22      MR. DUBE:  I'm about to.  Object as non- responsive.
23  I'm going to reask the question.
24  BY MR. DUBE:
25      Q.  What would a reasonable officer in this circumstance



166

1  have done if a person steps out of the car?
2       MR. GILES:  Objection.  Form.
3       THE DEPONENT:  As stated previously, there is not
4  enough information for someone to sit there and say what they
5  would have done in comparison to what Officer Saldivar has
6  done, because they are not aware of the surrounding situations
7  that Officer Saldivar was aware of.
8  BY MR. DUBE:
9       Q.  Thank you.
10      (WHEREUPON, the video was played.)
11 BY MR. DUBE:
12      Q.  As -- when Internal Affairs is evaluating these stops
13 and these officer involved shootings, are they trying to place
14 themselves in the officer's shoes in terms of what they're
15 doing or they're trying to see what an objective officer would
16 have done?
17      MR. GILES:  Objection.  Form.
18      THE DEPONENT:  So the -- my response is from the --
19 for the City is that the officers that investigated, whether
20 through Internal Affairs or criminal investigation, they look
21 at all the facts of the case, you know, not just want may be
22 hearsay or something else.  It's try to look at the situation
23 as a whole, and what the officer -- and why they made that
24 decision that they did.
25 BY MR. DUBE:

167

1       Q.  So from the viewpoint of the officer?
2       MR. GILES:  Objection.  Form.
3       THE DEPONENT:  With the -- they try to determine what
4  the decision of the officer was made at the time and with the
5  information that he had to make that decision, when he made
6  that decision.
7  BY MR. DUBE:
8       Q.  Thank you.
9       (WHEREUPON, the video was played.)
10 BY MR. DUBE:
11      Q.  What did Officer Saldivar just say?
12      A.  Put your hands out the window.
13      Q.  Where are Mr. Aviles' hands?
14      MR. GILES:  Objection.  Form.
15      THE DEPONENT:  His hands -- actually, the car door is
16 open, so his hands are outside the door.
17      (WHEREUPON, the video was played.)
18 BY MR. DUBE:
19      Q.  What did Mr. Saldivar just say?
20      A.  Keep your hands up.
21      Q.  What did Mr. Aviles say in response?
22      A.  Okay, okay.  I got you.  Is what I think I heard.
23      Q.  Where are his hands?
24      MR. GILES:  Objection.  Form.
25      THE DEPONENT:  At this time, they're currently

168

1  outside the doorframe of the passenger seat of the car.
2       (WHEREUPON, the video was played.)
3  BY MR. DUBE:
4       Q.  What did Officer Saldivar just say?
5       A.  I believe he said, I will shoot you.  Keep your hands
6  where I can see you -- see 'em.
7       Q.  Do you see a reason for Officer Saldivar to have
8  stated I will shoot you at this moment to Mr. Aviles?
9       MR. GILES:  Objection.  Form.
10      THE DEPONENT:  It sounds like Officer Saldivar was
11 instructing Mr. Aviles to keep his hands where Officer Saldivar
12 could see them, and not move them back into the car or place
13 them where he cannot see them.
14 BY MR. DUBE:
15      Q.  And then again my question is, do you see a reason
16 why Officer Saldivar would have said to Mr. Aviles, I will
17 shoot you?
18      MR. GILES:  Objection.  Form.
19 BY MR. DUBE:
20      Q.  Based on the -- based on what you're observing?
21      MR. GILES:  Objection.  Form.
22      THE DEPONENT:  He was instructing the driver of the
23 car what to do and the possible consequences if he did not do
24 that.
25 BY MR. DUBE:

169

1       Q.  Did he tell him that would be the consequence if he
2  did not follow his instructions?
3       MR. GILES:  Objection.  Form.
4       THE DEPONENT:  So his words were that if he --
5  basically if he puts them back in the car, he is subject
6  depending on, that's adding onto it, but he tells him that he
7  would shoot him, to keep his hands out, outside the car.  That
8  was his words --
9  BY MR. DUBE:
10      Q.  Did you hear him pose that hypothetical to Mr.
11 Aviles, like if you put your hands back in the car I will shoot
12 you, or did he just state I will shoot you?
13      MR. GILES:  Objection.  Form.
14 BY MR. DUBE:
15      Q.  Did he give him a condition when making the
16 instruction that I will shoot you?
17      MR. GILES:  Objection.  Form.
18      THE DEPONENT:  I'm sorry.  Ask your -- I don't
19 understand your question on that.
20 BY MR. DUBE:
21      Q.  Was his statement -- because the way you said it, you
22 made it conditional, right.  If you put your hands back in the
23 car, I will shoot you.  I'm asking you, did you hear Officer
24 Saldivar make that condition to Mr. Aviles?
25      MR. GILES:  Objection.  Form.



170

1    THE DEPONENT:  I think Officer Saldivar is
2  instructing Mr. Aviles -- since we're doing, you know, this is
3  a hypothetical, and I am not there, and I am not in his mind,
4  that Officer Saldivar is instructing Mr. Aviles that he should
5  keep his hands outside the car and visible at all times.
6  BY MR. DUBE:
7    Q.  And would the manner of their interaction that we've
8  just gone through step by step, was that in compliance with
9  City of Pasadena Police Department Use of Force Policies?
10    MR. GILES:  Objection.  Form.
11    THE DEPONENT:  I don't see where there was a
12  violation of policy, and according to the -- and we have all
13  the confidence that the investigation was done completely and
14  thoroughly.
15  BY MR. DUBE:
16    Q.  For -- how can I rotate this?  I'm showing you what's
17  been marked as Exhibit 13.
18    (WHEREUPON, Exhibit 13 was marked for
19  identification.)
20  BY MR. DUBE:
21    Q.  I'm showing you page 2 of Exhibit 13.  Do you see it?
22    A.  I don't see a page number on this.
23    Q.  Oh you know what it may not be -- okay.  Fair enough.
24  I'm showing you Officer Saldivar's Performance Evaluations for
25  the year 2018, from July 1, 2018, to December 31, 2018.  Do you

171

1  see that?
2    A.  Yes.
3    Q.  Are you familiar with this document?
4    A.  Yes.
5    Q.  Have you reviewed this document in preparation for
6  this deposition?
7    A.  I don't remember specifically looking at this
8  particular one, but I glanced over all of them.
9    Q.  In the time period between 07/01/2018 and 12/31/2018,
10  the shooting of Mr. Schenk occurred during that time period,
11  correct?
12    A.  Yes.
13    Q.  The shooting occurred in November of 2018, is that
14  correct?
15    A.  Yes, sir.
16    Q.  And there's been identified no areas needing
17  improvement.  Do you see that?
18    A.  I do.
19    Q.  And do you see any mention of the shooting in this
20  evaluation?
21    A.  I do not.
22    Q.  Would you have expected to see some discussion of the
23  shooting in the evaluation?
24    A.  Not necessarily.
25    Q.  Why not?

172

1    MR. GILES:  Objection.  Form.
2    THE DEPONENT:  Well, as a supervisor, normally or
3  sometimes I can see where in an instance like this that until
4  the conclusion has come forth, you know, one way or the other,
5  it may be mentioned then but I am -- I mean, I would think that
6  it would at least be mentioned, saying that there may be
7  further investigation.
8    But I am not surprised.  I have seen evaluations that
9  didn't contain a whole lot of information from the supervisors.
10  BY MR. DUBE:
11    Q.  I'm showing you his evaluation from January of 2019
12  to June of 2019.  Do you see that?
13    A.  I do.
14    Q.  Okay.  And that time period would have been when the,
15  at least the initial investigation by IAD of the Schenk
16  shooting would have occurred, correct?
17    A.  Yes.  That is correct.
18    Q.  And there's no mention of that shooting in this
19  evaluation, correct?
20    A.  That's correct.  I don't know if that's the same
21  evaluator or not that did the previous one.
22    Q.  Well, when an evaluator is making an evaluation,
23  shouldn't they take into account all of the information for the
24  officer during that time period?
25    A.  In a perfect world, yes.  But just because the

173

1  investigation is completed by internal affairs, the rater on
2  this evaluation may not have knowledge of said investigation
3  and upon its completion to add that into the evaluation.
4    Q.  So -- and who would the rater be?
5    A.  The rater is -- the vast majority of the time is the
6  supervisor of that particular officer.  Like in this case --
7  I'm sorry.  Go ahead.
8    Q.  No.  You can finish.  I'm sorry.
9    A.  It looks like this one was Sergeant Michael, in the
10  upper right hand corner.
11    Q.  And then Reviewer is Lieutenant McGill?
12    A.  Yes.  He would be the Lieutenant on the shift.
13    Q.  And then you have I guess Assistant Chief Wright,
14  correct?
15    A.  Yes.
16    Q.  So none of these individuals would have been aware of
17  Officer Saldivar's shooting of Mr. Schenk in November 2018?
18    MR. GILES:  Objection.  Form.
19    THE DEPONENT:  I don't know what knowledge they had
20  of the shooting.  I mean I'm sure that they do.  They also sign
21  3 to 400 evaluations every rating period as well.
22  BY MR. DUBE:
23    Q.  So they don't -- they just sign without looking?
24    A.  I'm not saying that.  I'm just telling you that they
25  sign on a rating period.



174

1    Q.   Would they have an obligation to review the
2  performance evaluation before signing it to make sure that it
3  includes all relevant information?
4    A.   The Commander and Assistant Chief and Chief should
5  make sure the accuracy of the evaluation represents what the
6  officer has done during that rating period.
7    Q.   And if the officer had shot somebody during that
8  rating period and killed that person, would you expect that to
9  have been discussed in the review?
10    MR. GILES:   Objection. Form.
11    THE DEPONENT:   Well, as I stated previously, this
12  one, this form, this is the rating period after that, so I
13  mentioned before how it was a little surprising that nothing at
14  all was mentioned about it.
15  BY MR. DUBE:
16    Q.   What is the date of this indictment?  I'm showing you
17  again Exhibit 16 with is Officer Saldivar's indictment.  Do you
18  see that?
19    A.   I do.
20    Q.   Okay.  What is the date on the indictment?
21    A.   I believe that's the date there of January 4th of
22  '23.  Of 2023.  That was -- well, that was when it was filed.
23    Q.   And I'm showing you Plaintiff's Complaint in this
24  case.  What date was it filed on?
25    A.   October 16, 2022, which is what's highlighted on top.

175

1    Q.   Do you know why Officer Saldivar was not indicted
2  until after Plaintiff filed their lawsuit?
3    MR. GILES:   Objection. Form. Speculation.
4    THE DEPONENT:   I do not have knowledge of the inner
5  workings of the Harris County DA's office and their
6  presentation to the grand jury and their final decision making,
7  the timing of it.
8  BY MR. DUBE:
9    Q.   Are you aware of any communications between the City
10  of Pasadena Police Department and the District Attorney's
11  office between October 16th, '22, and January 2023?
12    A.   I am not aware of any direct communication.
13    Q.   Did you review any communications between the Chief
14  of Police, his office, and the Harris County District
15  Attorney's office during that time period of, between October
16  2022 and January 2023?
17    A.   I did not have any communication during that
18  timeframe between those individuals for me to review.
19    Q.   Okay.  Did you review Chief Bruegger's deposition?
20    A.   I got over it, yes.
21    Q.   Okay.  Are you aware that he testified that he spoke
22  to the District Attorney during that time period?
23    MR. GILES:   Objection. Form.
24    THE DEPONENT:   I believe -- well, I can't honestly
25  say that I remember that specifically in his deposition.

176

1  BY MR. DUBE:
2    Q.   Would that have been -- if he testified that
3  communication occurred, would that have been an appropriate
4  type of communication?
5    MR. GILES:   Objection. Speculation.
6    THE DEPONENT:   I can't comment on that because I
7  don't know -- I don't remember what he had said or if he had
8  said it.  I would have to refer back to his deposition and
9  assume that what he is saying is (audio disruption).
10  BY MR. DUBE:
11    Q.   Are you done?
12    A.   I am.
13    MR. DUBE:   Let me take a two minute break to make
14  sure I have no further questions and then we'll go back on the
15  record.
16    THE VIDEOGRAPHER:   Okay.  Please stand by.  The time
17  is 5:35 p.m. and we are off the record.
18    (WHEREUPON, a recess was taken.)
19    THE VIDEOGRAPHER:   We are on the record.  The time is
20  5:42 p.m.  You may now proceed.
21    (WHEREUPON, Exhibit 5 was marked for identification.)
22  BY MR. DUBE:
23    Q.   I'm showing you what's been marked as Exhibit 5,
24  which is Chief Bruegger's deposition testimony.  Do you see
25  that?

177

1    A.   I do.
2    Q.   And just so -- just so you can be sure because it
3  doesn't say his name in the page I was showing you.  Do you see
4  here where it says Videotaped Deposition of Chief Joshua
5  Bruegger?
6    A.   Yes.
7    Q.   Taken on Friday, January 5th.  Do you see that?
8    A.   I do.
9    Q.   Okay.  If -- do you -- if you can read pages 218 to
10  221.  You can read it to yourself.
11    A.   Oh okay.  Can you scroll up some more?  Okay.  There
12  you go.  Thank you.
13    Q.   It goes like right to left.  218.
14    A.   Okay.
15    Q.   Just making sure.
16    A.   So go -- scroll back up to the top so I can see the
17  page numbers up.  Okay.  So it goes down, right?
18    Q.   Yeah.  That's what I was trying to tell you.
19    A.   Okay.  Okay.  Thank you.  That's why you were
20  scrolling up.  I got you.
21    Q.   Yeah.  Let me know when you want me to scroll up
22  again.
23    A.   You can start scrolling down.  You can scroll down
24  some more.  Okay.  If you'll go back up to the top.  Okay.  You
25  can scroll down to 21.  Okay.

178

```
1     Q.   Okay.  And in those pages you read, there's a
2   conversation between the Chief of Police and the District
3   Attorney's office.  Do you see that?
4     A.   Yes.  Where he talked about it.
5     Q.   And the district attorney specifically, correct?
6     A.   I'm sorry?
7     Q.   The district attorney herself, correct?
8          MR. GILES:  Objection.  Form.
9          THE DEPONENT:  I read on here where he was asked
10   about the conversation and he had a conversation with the
11   district attorney.
12         MR. GILES:  It said a district attorney.
13         THE DEPONENT:  It says that, yes.
14   BY MR. DUBE:
15     Q.   Oh okay.  It says "with the" and then -- okay.
16     A.   "... a D.A."
17     Q.   Do you see where it says "with the"?
18     A.   I do.
19     Q.   Okay.
20     A.   Then it says "... a D.A." after that.
21     Q.   Okay.  So I'm going to scroll up to 216.  Do you see
22   that?
23     A.   I do see page 216, yes.
24     Q.   Okay.  It says, "The civil rights prosecutors were
25   busy with Harding Street, and didn't have time to review it and
```

179

```
1   get on it."  Do you see that?
2     A.   I see that statement, yes, or that answer.
3     Q.   Okay.  What's Harding Street?  And the Answer:
4   "Harding Street was a shooting in Houston, ended up with
5   several officers indicted."  Do you see that?
6     A.   I do.
7     Q.   Okay.  It says:  So how did you learn this
8   information?  "I talked to the district attorney."  Do you see
9   that?
10     A.   Um-hmm.
11     Q.   Okay.  And when did you have this conversation?
12   November of 2022.  Do you see that?
13     A.   Um-hmm.  Yes.
14     Q.   Okay.  Did you speak to officer -- to Chief Bruegger
15   or former Chief Brueggen in preparation for this deposition?
16     A.   I did not.
17     Q.   Okay.  Were you aware of this conversation between
18   Chief Brueggen and the district attorney prior to today?
19         MR. GILES:  Objection.  Form.
20         THE DEPONENT:  Only from what I read when I read
21   through his deposition.  That's when I first learned about it.
22   BY MR. DUBE:
23     Q.   Do you know anything about the content of that
24   conversation?
25     A.   Nothing outside of what is presented in the
```

180

```
1   deposition by the Chief.
2     Q.   Did you speak to anybody with the Harris County
3   District Attorney's office prior to this deposition?
4     A.   I have not.
5     Q.   So the Deposition Notice asked for you to be prepared
6   on all communication between the City of Pasadena Police
7   Department or its employees with the Harris County District
8   Attorney's Office during the prosecution of Rigoberto Saldivar
9   for the shooting of Randy Aviles.  What did you do to prepare
10   for that topic?
11     A.   Sorry.  I missed that.  I -- there we go.  Sorry.  So
12   when I was looking at the Interrogatory from the City, the --
13   which one are you referring to on that particular one?
14     Q.   The communications between the City of Pasadena
15   Police Department and its employees with the Harris County
16   District Attorney's Office regarding the prosecution of
17   Rigoberto Saldivar for the shooting of Randy Aviles.
18     A.   Is there -- was that a question number on your
19   request?
20     Q.   That, I don't recall.  But it was a paragraph in your
21   deposition topics.
22     A.   Yes.  I was trying to find out which one that was on
23   this Interrogatory.  Let me see if I can --
24         MR. GILES:  If it helps I think he might be thinking
25   about a response to a Request for Production.
```

181

```
1   BY MR. DUBE:
2     Q.   So -- okay.  To prepare -- is it fair to say to
3   prepare, you did not attempt to speak to Chief Bruegger or
4   attempt to speak to the district attorneys, or review their
5   emails and communications to see what communications occurred
6   between the two?
7     A.   So the City is relying on the information that is
8   provided in the investigation and in reference to this
9   particular lawsuit, which was the deposition of the -- of Chief
10   Bruegger.  So any information that he provided in that
11   deposition is what the City is using as a response to what was
12   -- what actions were taken by the Chief at the time of this
13   incident.
14     Q.   So would it be fair to say that the City adopts the
15   deposition testimony of Chief Bruegger as its own?
16     A.   We are -- we have no reason to believe that the
17   information that was provided in the deposition is inaccurate
18   in any way.
19     Q.   Okay.  And could his -- can his answers be ascribed
20   to the City?
21     A.   I'm sorry.  Repeat that.
22         MR. SELBE:  Object to form.
23   BY MR. DUBE:
24     Q.   Would the City have any objection to the responses of
25   Chief Bruegger at the deposition -- would the City adopt his
```



182

1  answers?
2      MR. GILES:  Is that my question or his question?
3      MR. DUBE:  I'm asking him.  If you want to stipulate
4  to that, that's fine.
5      ME. GILES:  Go ahead and answer.
6      THE DEPONENT:  I mean I don't -- I'm not -- I don't
7  have the knowledge of -- to answer that question as I'm not an
8  attorney as far as the -- being able to answer that without
9  having more knowledge.
10 BY MR. DUBE:
11     Q.  All right, sir.  I really appreciate your time, and I
12 thank you.
13     Have I been respectful to you throughout this
14 deposition?
15     A.  I think you have, yes.
16     Q.  Okay.  Well again, I appreciate your time.  And thank
17 you for your answers.
18     A.  Yes, sir.  Thank you.
19     MR. GILES:  How much time do you need before we start
20 again?
21     MR. DUBE:  Like five minutes, 10 minutes.
22     THE VIDEOGRAPHER:  Please stand by.  Since this is
23 the end of the deposition, our court reporter will take orders
24 for the transcript.
25     MR. SELBE:  This is Steve Selbe.  I do not want a

183

1  copy of the transcript.
2      THE VIDEOGRAPHER:  Sorry, Nancy.  It's a little hard
3  to hear you.
4      THE REPORTER:  Oh sorry.  Can you guys hear me a
5  little better?
6      THE VIDEOGRAPHER:  Yeah.  Now, we do.
7      THE REPORTER:  All right.  Mr. Dube, would you like
8  an order of the original?
9      MR. DUBE:  Yes, please.
10     THE REPORTER:  Mr. Giles, would you like an order of
11 the copy?
12     MR. GILES:  I want a copy of the transcript.  I don't
13 want a movie.
14     THE VIDEOGRAPHER:  All right.  Perfect.  All right.
15 The time is 5:55 p.m. and we are off the record.
16     (WHEREUPON, the deposition of SERGEANT KENNETH URBAN
17 30(b)(6) was concluded at 5:55 p.m.)
18
19
20
21
22
23
24
25

184

1              CERTIFICATE
2
3      I the undersigned, Vincent Guerrera, am a videographer on
4  behalf of NAEGELI Deposition & Trial.  I do hereby certify that
5  I have accurately made the video recording of the deposition of
6  Kenneth Urban 30(b)(6), in the above captioned matter on the
7  8th day of April, 2024, taken at the location of 1900 W Loop S.
8  Houston, TX 77027.
9
10     No alterations, additions or deletions were made thereto.
11
12     I further certify that I am not related to any of the
13 parties in the action and have no financial interest in the
14 outcome of this matter.
15
16
17 Vincent Guerrera
18
19
20
21
22
23
24
25

185

1              CERTIFICATE
2
3      I, Nancy Do, do hereby certify that I reported all
4  proceedings adduced in the foregoing matter and that the
5  foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9      I further certify that I am neither related to
10 counsel or any part to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13     IN WITNESS HEREOF, I have hereunto set my hand this
14 23rd day of April, 2024.
15
16
17
18
19
20 /S/  Nancy Do
21
22
23
24
25

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

186

```
 1         CORRECTION SHEET
 2  Deposition of: Kenneth Urban 30(b)(6)  Date: 04/08/24
 3  Regarding:    Aviles vs Saldivar et al
 4  Reporter:    Do/Raposa
 5  _____
 6  Please make all corrections, changes or clarifications
 7  to your testimony on this sheet, showing page and line number.
 8  If there are no changes, write "none" across
 9  the page.  Sign this sheet on the line provided.
10  Page   Line   Reason for Change
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24         Signature_____
25             Kenneth Urban
```

187

```
 1         DECLARATION
 2  Deposition of: Kenneth Urban 30(b)(6)  Date: 04/08/24
 3  Regarding:    Aviles vs Saldivar et al
 4  Reporter:    Do/Raposa
 5  _____
 6
 7  I declare under penalty of perjury the following to
 8  be true:
 9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Page herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 2024.
16
17
18
19
20
21
22
23
24         Signature_____
25             Kenneth Urban
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

| | | | |
|---|---|---|---|
| **0** | **12:08** 66:6 | 113:11 | 118:10 |

**0**

**051** 52:6

**052** 52:6 52:11

**053** 51:7 52:6

**054** 51:11

**07/01/2018**
171:9

**1**

**1** 12:10 51:5
59:7 61:4
78:1 106:11
127:1 170:25

**1.5** 52:12 52:16
52:19

**1:15** 66:3 66:9

**10** 13:18
13:21 17:13
17:23 24:19
29:11 137:5
147:9
147:16 182:21

**10/21/2019**
126:13

**10:05** 7:5 7:8

**100** 33:13 97:21
121:13

**10-21** 126:20

**10th** 136:1

**11:12** 46:14

**11:27** 46:18

**11:55** 60:9

**11:59** 60:13

**12** 120:9 123:23
141:17
142:3
142:11 146:24
153:1
153:14 154:6

**12/31/2018**
171:9

**12:08** 66:6

**1286** 120:7

**12th** 123:18

**13** 121:23
170:17 170:18
170:21

**1331** 106:17
106:18

**1350** 121:4
122:7

**1351** 121:19

**1355** 122:14

**1358** 122:18

**14** 73:17

**143** 49:11 49:12
49:13 49:21
51:18

**143.051** 49:18
50:5 51:7
52:5

**143.052** 50:17

**143.053** 55:7
55:17

**15** 14:18 29:1
29:2 32:7
49:13 49:23
50:2

**16** 97:10 140:17
140:24
141:7
141:11 174:17
174:25

**16th** 175:11

**18** 97:10
119:5 119:6

**18.2** 77:18
77:20 77:25

**18.5** 74:24

**18.5.3** 75:9

**18.9** 110:18

113:11

**180** 54:2 54:8
54:17 54:24
74:12

**180th** 53:15
53:23 54:14

**19** 120:24
123:24 150:14
150:16

**1992** 14:15

**19th** 123:16
127:1

**2**

**2** 11:8 11:18
11:21 12:12
12:13 59:7
151:20 151:20
170:21

**2:17** 104:2

**2:39** 104:5

**20** 156:22
156:24

**2011** 147:21
148:20 149:17

**2018** 10:5 33:12
33:13 33:14
34:19 52:18
53:8 57:10
98:11 99:22
170:25 170:25
170:25 171:13
173:17

**2019** 120:9
123:23 123:24
124:2
126:12 126:20
172:11 172:12

**2021** 10:5
57:2 57:10
106:22 115:10
115:11 115:16
115:16 118:6

118:10

**124:2** 135:2
141:17
142:3
142:11 143:22
144:15 144:17
145:12 145:22
146:22 146:24
147:21 148:21
149:17
153:1
153:14 154:6

**2022** 174:25
175:16 179:12

**2023** 33:14
34:19 52:18
53:8 163:7
174:22 175:11
175:16

**2024** 7:4 7:8

**21** 136:7 177:25

**216** 178:21
178:23

**218** 177:9
177:13

**22** 175:11

**221** 177:10

**23** 14:22 33:7
174:22

**27** 106:11 136:2
136:2

**29** 106:22
115:16

**29th** 115:14
135:11 135:17
136:7

**2b** 75:9

**3**

**3** 12:15 75:3
124:14
152:3 173:21

**3.4** 151:16

**3:08** 118:23

**3:14** 119:2

**3:15** 118:15

**3:30** 118:18

**30** 32:7 55:8
55:10 55:20
56:8 118:21

**30(b)(6** 7:2
183:17

**31** 170:25

**32** 14:11
97:15 112:5
121:14

---

**4**

**4** 12:18 12:20
12:20
143:25
144:3 144:7
152:15

**4:10** 148:9

**4:30** 118:21

**4:48** 148:13

**40** 17:24 24:19

**400** 173:21

**44** 51:4

**45** 29:3

**4th** 174:21

---

**5**

**5** 12:21 83:22
83:24
176:21 176:23

**5:35** 176:17

**5:42** 176:20

**5:55** 183:15
183:17

**5th** 177:7

---

**6**

**6** 12:23

---

**7**

**7** 12:25

**7th** 81:14

---

**8**

**8** 7:4 7:8
13:2 13:3
104:15 104:16
104:18 104:20

**8-20** 120:24

**8-20-19** 121:5

---

**9**

**9** 13:13 13:14
13:17 43:20
115:11 115:16
118:6
118:10 135:2

**9th** 124:4
134:16 135:19

---

**A**

**a.m** 7:5 7:8
46:14 46:18
60:9 60:13

**abilities** 58:5

**ability** 33:24
34:2 34:5
37:10 37:12
38:18 40:18
47:10 47:11
117:4

**able** 34:25
45:15 48:17
86:18
117:19 119:12
126:15
130:4 130:5
182:8

**absence** 97:17

**Absolutely**
32:17

**academy** 16:23
17:4 17:6
36:11
105:15 162:18
162:20

**accept** 29:23
30:5 36:16
85:9 90:1

**accepted** 88:6
95:25 153:6
154:2

**accepting** 93:24

**accepts** 30:8
91:12

**access** 163:10

**according** 37:21
80:1 124:8
145:16
161:8 170:12

**account**
132:15
140:7 172:23

**accuracy** 174:5

**accurate**
33:17 153:24

**achieved** 57:17

**acquire** 18:18

**acquired** 61:25

**across** 20:4
20:6 80:10

**act** 53:14
54:2 54:8
54:14 54:16
54:24 55:5
70:18 84:1
114:24

**acting** 141:19

**action** 130:1
157:9

**actions** 40:20
41:22 49:15

**52:7** 64:23
65:12 65:15
65:24 83:17
113:5
115:18 124:18
157:10 181:12

**activities** 17:5

**activity**
68:24 69:19

**actual** 35:24
61:11 109:17

**actually**
35:16 37:17
48:6 49:20
59:25 65:20
83:2 114:20
136:16 156:20
167:15

**add** 65:9
65:10 173:3

**added** 119:8

**adding** 169:6

**addition** 84:11

**additional**
46:24 47:5
47:6 47:12
47:17 113:20

**addressed** 20:22
21:24 76:21
106:14

**adequate** 47:22

**adhered** 19:3

**adjudicate** 55:4

**adjudicated**
78:5 78:10
79:1

**adjudication**
79:9

**administer** 21:8

**administered**
25:12 28:7
131:5

**administering**
24:7

**administration**
19:14 21:14
22:18 59:16
112:25

**administrative**
69:4 69:15
69:25
107:22 108:13
108:17
110:4 110:6
110:11
125:9 129:18

**adopt** 181:25

**adopts** 181:14

**advise** 39:17
40:18 41:2
41:20 70:20

**affairs** 14:20
14:21 14:25
15:4 15:8
15:10 15:17
15:24 32:8
56:15 56:16
56:22 56:25
57:9 57:14
57:17 57:25
58:8 58:10
58:21 61:15
61:20 61:25
62:23 63:1
63:13 63:20
64:19 65:3
65:8 67:9
68:7 68:18
69:3 69:13
69:21 70:6
70:9 70:14
70:15 70:24
72:19 72:21
73:3 73:22
73:23 75:11
75:22 76:9
76:13 76:19
77:6 77:9

77:24 78:1
78:13 79:19
80:1 80:4
80:17 81:4
81:7 81:9
83:15 84:12
84:18 96:17
100:15 102:12
102:19 102:22
103:10 103:16
103:18 104:25
105:22
106:8 107:1
108:12 108:14
108:17 108:20
109:2 109:7
109:12 109:20
109:21 109:22
110:1 110:4
110:16 112:23
112:24 115:23
120:2
122:22 122:24
123:5
123:20 123:22
125:2 129:8
129:18 134:12
134:17
153:5
166:12 166:20
173:1

**affect** 113:17
132:25

**affects** 133:8
133:19

**affidavit**
86:9 86:11
86:12 86:13
86:13 86:16
86:20 86:21
86:25 87:7
87:9 87:20
88:21 89:14
91:3 91:8
96:3 96:8

**affidavits**
96:18

**affirm** 7:22

**affirmed** 8:3

**afterward**
160:18

**against** 11:12
15:19 67:11
86:25 87:3
87:7 87:20
90:18 99:22
114:20 122:15
128:22
129:5
140:14 144:18
151:8
151:11 151:14
152:11 152:13
152:25
153:6 153:7

**agencies** 82:13

**ago** 33:4 44:1

**agreed** 159:12

**agreement** 29:3

**ahead** 48:4
55:16 56:2
62:6 69:23
109:10
128:4 128:7
173:7 182:5

**allegation**
27:13 62:15
63:4 63:21
80:13
120:13 128:8

**allegations**
61:1 62:8
110:19 113:2

**alleged** 83:24
86:25 111:1

**allow** 138:8

**allowed** 43:8
117:23
118:8 158:11

**allows** 80:8

**alone** 154:13

**already** 71:25
72:1 85:15
134:11

**am** 8:9 8:11
12:14 13:9
14:20 32:11
49:12 49:22
74:24 81:19
96:13
113:13
115:2
119:18
121:2
121:13 148:25
150:23
170:3 170:3
172:5 172:8
175:12 176:12

**among** 149:9

**analysis** 146:4

**and/or** 63:22

**Angel** 9:24
98:13 99:22
116:5 151:14

**animal** 152:16
152:18

**announce**
158:8 158:9

**answer** 28:17
37:17 38:7
38:21 38:24
41:25 54:18
56:3 74:16
74:17 74:22
77:6 79:11
87:11 91:23
92:6 93:16
95:12
100:23 111:22
112:2
114:22 116:13
117:8
133:17 135:8

138:16
140:8 140:8
157:12 157:16
157:18 157:19
157:20 161:17
163:19 164:15
165:13 165:15
165:18 165:19
179:2 179:3
182:5 182:7
182:8

**answered** 35:7
100:21 142:24

**answering** 76:25
86:14
145:18 165:20

**answers** 8:21
8:21 181:19
182:1 182:17

**anticipated**
47:16

**anybody** 15:11
76:20 77:8
87:8 143:4
153:20 180:2

**anyone** 23:22
25:23 47:4
47:9 47:9
47:11 76:18
87:2 88:2

**anything**
10:19 18:11
27:10 44:15
50:7 51:14
59:24 62:12
70:17 70:18
99:5 113:14
124:10
127:3
127:16 150:11
150:12 153:24
179:23

**anywhere** 44:1
57:8 80:7
150:1

**apparent** 69:15

**appeal** 29:8
29:13 29:22
30:5 34:16
48:7 48:14
49:6 49:7
55:5 55:17
55:21 56:14

**appealing** 49:2

**appear** 106:7

**appeared** 98:21

**appears** 11:12
73:20
105:24
121:8
122:13 130:8

**applicable**
67:25 68:12
76:16

**applied** 17:9

**applies** 52:9
52:22 74:14

**apply** 52:11
113:11

**appointed**
24:1 58:1

**appreciate**
114:22 116:13
135:12 182:11
182:16

**appropriate**
102:7
151:17 151:18
163:20 176:3

**appropriately**
98:25 99:8
99:14 99:21
152:25

**approval**
47:15 61:22

**approximately**
16:23 107:4
123:22

**April** 7:4 7:8
98:11 99:22
106:22 115:14
115:16
124:2 124:3
135:11 135:17
136:6

**arbitrarily**
26:12

**area** 47:2
47:3 138:1

**areas** 171:16

**arrest** 82:6
91:5 92:17

**arrested** 74:6

**arrived** 66:1

**article** 36:18

**ascribed** 181:19

**aspect** 103:4
103:19 153:20

**assess** 138:19

**assessed** 136:11

**assessing** 65:4

**assessment** 46:5

**assigned** 15:6
16:22 35:2
35:4 36:2
36:13 37:4
37:22 40:25
56:22 56:24
57:13 58:18
59:17 63:1

**assignment** 41:1
45:7 45:16
57:25 116:25

**assignment/**
**reassignment**
46:2

**assignments**
45:21 45:23
45:23 57:8
150:6

**assist** 45:6
99:6

**Assistant** 17:22
17:23 18:5
18:18 18:21
24:9 24:10
24:13 24:15
24:15 24:18
24:23 24:24
25:2 25:5
61:12 125:5
125:8 150:5
173:13 174:4

**assume** 176:9

**assure** 78:5

**attached** 30:19

**attempt** 152:5
152:7 181:3
181:4

**attention**
119:21 121:12
160:1

**attorney** 8:10
29:15 85:8
85:8 88:4
90:15 91:11
91:12 91:14
92:9 92:13
92:20 92:24
93:11 93:18
93:21 94:6
94:10 94:16
94:25 95:9
102:8 108:6
113:7
128:18 175:22
178:5 178:7
178:11 178:12
179:8
179:18 182:8

**attorneys** 181:4

**attorney's**
13:22 14:2
14:6 89:23
89:23 90:5

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3343
NAEGELIUSA.COM

90:7 90:22
93:2 93:5
93:25 95:17
96:3 128:11
142:13
153:6 154:1
175:10 175:15
178:3 180:3
180:8 180:16

**attrition** 25:2

**audio** 176:9

**audit** 143:22
145:8
145:17
147:2 147:4

**audits** 10:4
13:14
143:19 145:5

**August** 14:22
15:25 16:1
120:9
123:18 123:23

**authority** 21:20
33:18 33:20
33:22 34:5
34:6 34:7
34:9 34:12
34:16 34:20
37:24 38:9
38:12 38:18
39:12 39:14
40:15 40:15
41:3 41:6
41:8 41:11
41:11 41:17
41:17 43:5
46:24 46:25
47:4

**authorize** 48:4

**authorized**
21:16 21:25
23:22 24:5
25:23 36:25
37:19 42:18
46:1 47:19
70:24 73:2

73:3 152:13

**authorizing**
20:9

**auto** 89:4

**automatically**
28:1

**available** 10:12
28:21 56:23
60:1 62:13
110:3
111:17 133:13
133:25 134:23
155:14

**average** 80:19
80:25

**Aviles** 7:10
8:10 9:19
12:5 34:24
71:2 101:10
102:1
102:19
104:9
105:23 106:20
107:9 116:2
117:15 120:12
123:12
124:1
130:13 131:17
132:3
132:10 132:13
132:17 134:19
136:17 141:21
142:2
142:11 142:22
143:9
146:16 146:20
146:22
150:8 151:8
151:13 152:25
154:6 157:4
157:14 159:10
159:20
160:7
162:12 167:13
167:21 168:8

168:11 168:16
169:11 169:24
170:2 170:4
180:9 180:17

**awaits** 113:9

**aware** 9:11 13:4
32:15 34:23
35:1 35:2
51:22 70:25
96:13
113:13
147:9
148:19 150:10
166:6 166:7
173:16
175:9
175:12 175:21
179:17

**away** 37:10
38:24 39:1
39:4 39:8
39:13 40:3
40:5 40:16
40:23 117:4

—————————
B
—————————

**background** 14:8
63:19

**backup** 15:2
15:4 56:23
56:24 104:24

**bar** 96:24 160:3
165:14

**based** 26:11
46:4 109:20
139:9
139:21 154:13
168:20 168:20

**basically** 17:13
25:17 26:21
27:5 27:12
27:14 29:13
38:4 54:23
58:22 75:21
76:5 77:5
85:1 129:15

169:5

**basis** 36:15
72:6 130:13

**Bates** 121:24

**became** 32:23
33:11 33:12

**become** 18:20

**becomes** 69:14

**beforehand**
160:19

**begin** 137:24

**beginning** 7:8
25:18

**begins** 144:9

**behalf** 7:13
7:14 7:16
8:19 9:3
41:12

**behind** 104:11

**belief** 142:15
154:13

**believe** 9:12
10:21 13:24
28:14 28:16
28:21 31:12
31:14 33:7
36:14 38:21
38:24 45:13
48:7 57:4
60:15 67:7
67:8 79:14
82:5 93:4
97:23 99:8
99:25 100:5
101:18
102:5
106:25 108:12
109:11
112:3
112:18 115:15
121:2 121:9
123:13
124:3
126:11 127:13

135:10 139:14
142:10
143:3 149:2
149:2
153:19 153:23
159:11 159:12
168:5
174:21 175:24
181:16

**believed** 151:22
151:22 154:4

**believes**
68:14
101:25 140:10
142:12
152:9
152:19 154:10
154:15

**belt** 44:13

**benefit** 77:12
79:12 130:4
134:11

**beside** 164:5

**besides** 15:1
23:24 99:1

**best** 41:4 41:13
46:5

**better** 183:5

**bill** 129:5
129:7

**bit** 50:13 50:14
51:2 51:3
51:3 97:18
97:24
145:20 164:2

**blank** 147:18
147:24

**bodily** 141:20
142:1
142:11 142:21
151:6
151:23 152:14
154:17

**body** 37:17

72:10 158:16

**bodycam** 62:11
69:18 71:8
156:23

**bottom** 106:12
121:23
122:1 127:2

**brain** 148:5

**break** 46:9
65:25 66:3
67:4 67:8
103:25 118:14
142:10
148:4 149:3
176:13

**briefly** 14:8

**bring** 76:21

**broadly** 76:16

**broke** 89:15

**broken** 84:7
90:10

**brothers** 105:11

**brought** 20:21
76:18

**Bruegger** 10:8
32:15 32:16
33:14 34:23
53:10 70:23
105:6 105:9
105:18 105:19
106:15
107:5
107:11 107:18
108:2
115:14 115:17
120:4
125:13 126:20
127:4
135:15 135:19
177:5
179:14 179:15
179:18
181:3
181:10 181:15

181:25

**Bruegger's**
117:21 120:25
121:2 121:6
121:8
121:10 135:20
175:19 176:24

**busy** 178:25

**button** 136:25

_____

C

**C.A** 124:16

**caliber** 43:18

**camera** 72:9
72:10 86:4
99:4

**capacity** 8:15
16:16 72:7
72:12 72:15

**captains** 25:1

**captain's** 25:3

**Captains** 24:23

**caption** 7:9

**car** 71:7 72:9
84:7 114:15
137:20 137:25
138:4 159:8
162:12
164:1 164:3
164:5
164:13
166:1
167:15
168:1
168:12 168:23
169:5 169:7
169:11 169:23
170:5

**career** 17:13
113:18
117:7 133:1
133:8 133:19

**carried** 37:5

37:17 44:17

**carry** 36:25
37:10 37:12
37:19 42:19
43:3 43:5
43:8 43:13
43:13 43:18
43:23 44:4
117:5
117:13 117:19
118:9

**carrying**
38:13 43:20
44:8 44:16
118:5

**cars** 164:9

**case** 7:9 8:10
9:14 9:17
10:22 26:7
29:16 36:18
38:10 40:20
52:9 56:23
62:13 62:20
63:1 65:18
70:12 71:2
72:1 82:11
83:19 85:9
85:21 86:5
86:17 86:19
86:23 86:24
87:2 88:1
88:3 88:4
89:24 90:15
91:11 91:14
91:16 91:17
91:19 95:10
95:11 95:13
95:16 95:20
95:25 96:7
101:2 103:4
103:22 107:18
112:17
113:7 116:7
128:18 128:19
129:8 130:2
132:24 139:16
140:11 140:14

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

140:14
143:5 149:7
153:7
153:25 154:23
154:25
155:5
156:11 166:21
173:6 174:24

**cases** 32:12
48:11 76:1
88:7 90:20
90:20 90:21
96:11
131:21 144:18

**categories**
60:25 61:8
75:3

**category** 61:11

**cause** 28:10
52:8 86:9
86:11 86:13
86:15 86:21
86:25 87:7
87:9 87:20
88:20 89:14
91:3 91:7
91:19 91:23
91:25 92:7
92:9 92:12
92:15 92:16
92:21 92:24
96:3 96:8
96:18 111:16

**caused** 141:20
142:1
142:11 142:21

**causing** 151:5

**cell** 39:19
39:24 40:4

**certain** 138:9

**certified** 36:9

**certify** 115:4

**chain** 47:15
47:18

**challenge** 45:15
51:15

**challenged**
45:21 45:24

**challenging**
49:2

**chance** 127:25
148:3

**change** 23:7
43:16 43:25
73:10 73:10
128:3
150:25 151:1

**changed** 24:12
24:21

**changes** 36:5

**changing** 150:5

**chapter** 49:9
49:21 51:18
53:13

**charge** 14:19
14:20 14:21
15:10 19:10
19:16 21:5
41:2 82:16
83:10 87:3
89:4 90:6

**charged** 94:11
114:1 142:7

**charges** 53:12
85:9 86:20
86:25 87:20
88:6 90:1
90:18 91:8
91:12 93:11
93:22 93:24
94:16 94:18
95:1 95:9
95:17 95:25
96:2 96:4
128:22
153:5 154:1

**checking** 47:22

**chief** 10:7 14:1

17:21 17:21
18:5 18:5
18:18 18:21
18:21 18:22
18:25 19:7
19:16 20:18
21:3 21:7
21:9 21:13
21:16 21:20
21:24 22:3
22:7 22:10
22:16 22:23
22:25 22:25
23:3 23:24
24:1 24:2
24:2 24:4
24:4 24:15
24:16 24:18
24:23 25:18
25:20 25:23
26:1 26:6
26:13 29:12
29:23 30:8
32:15 32:16
32:21 32:23
32:24 33:1
33:11 33:12
33:15 33:20
33:22 34:23
38:6 38:9
39:2 39:12
39:14 40:16
40:17 41:1
41:8 45:19
46:2 46:23
47:1 47:4
53:6 53:8
54:1 54:8
58:1 58:14
61:5 61:7
61:9 61:9
61:12 61:13
61:17 61:19
62:5 64:22
64:25 65:19
65:21 69:22
70:20 70:22
70:23 80:3
80:17 80:24

81:1 103:3
103:5 103:5
105:6
106:15
107:4
107:11 107:18
108:2
108:23
109:9
109:16 109:24
111:11 111:14
111:24 112:15
112:19 112:23
112:23
113:9
113:14 113:16
113:21 115:14
115:16
117:4
117:21
120:4 121:2
121:6 121:8
121:10 121:15
125:4 125:5
125:8 125:9
125:13 125:16
126:8
126:20
127:4
130:12 130:16
132:14 132:21
132:22 133:12
133:20 133:23
133:24
135:3
135:15 135:19
135:20
140:7 150:4
150:5 155:8
155:12 155:13
173:13
174:4 174:4
175:13 175:19
176:24
177:4 178:2
179:14 179:15
179:18
180:1 181:3
181:9

181:12 181:15
181:25

**chiefs** 12:6
12:7 112:5

**chief's** 109:19

**Chiefs** 17:22
17:23 24:9
24:10 24:12
24:13 24:18
24:24 25:2
25:5

**Chief's** 15:22
26:15 46:23
62:21 125:7
140:2

**choice** 161:1

**circumstance**
164:12 165:25

**circumstances**
58:14 74:3
74:4 74:8
81:20 108:3
134:9
138:10 138:13
152:20 163:12
163:14 163:16
163:20 164:16
164:16 165:2

**citizen** 15:20
43:6 84:6
96:2

**citizens** 41:4
41:14 46:5
95:7 95:14
161:6

**city** 7:14
8:16 8:19
8:22 8:24 9:3
9:12 10:1
11:13 12:4
13:5 13:23
14:6 19:10
19:12 19:13
19:24 20:3
20:4 20:6

20:12 20:17
20:19 21:10
23:14 23:23
25:12 27:19
38:17 41:4
41:12 41:14
46:6 52:15
52:22 59:2
63:24 65:5
67:16 72:12
80:2 99:13
100:3
101:11 101:17
101:22
102:5 102:9
102:12 102:18
102:25
104:8
104:11 115:18
117:13 117:16
117:25
118:5 122:1
123:15
134:8
139:13 139:20
139:22
140:6 140:9
140:10 142:10
142:12
143:3 143:5
143:8
143:13 147:11
149:4 149:5
150:14 150:19
153:23
157:5
157:14
162:4
163:24 166:19
170:9 175:9
180:6
180:12 180:14
181:7
181:11 181:14
181:20 181:24
181:25

**City's** 99:17
99:20

101:24 125:25
139:24 141:25
142:5 142:5
142:19 152:24
153:3 153:10

**civil** 13:10
22:18 22:22
23:2 23:4
23:8 26:5
26:10 26:17
28:20 34:16
41:24 45:21
48:8 48:10
49:10 52:10
53:2 74:10
93:4 129:17
134:3 134:5
134:6 178:24

**civilian**
36:24 144:24

**civilians**
36:5 36:6
36:7 36:13

**claims** 85:5

**clarify** 35:8
35:16

**clarifying** 35:8

**clarity** 91:9

**class** 17:7
60:15 60:16
60:17 60:19
60:23 61:4
61:6 61:8
61:8 63:6
75:7 90:7
122:15

**classification**
110:18 117:11

**classifications**
110:22
111:4
111:13
112:1 113:11

**classified** 61:3

117:9

**classifies**
111:12

**clear** 8:13 77:1
94:14
102:17 160:14

**clearer** 111:9

**click** 136:24
136:25

**client** 34:24

**close** 40:4

**cloudy** 66:16
66:21

**code** 28:20
41:24 49:9
49:11 49:14
49:21

**collected** 36:18

**collection**
145:9

**color** 141:19

**comes** 15:22
21:7 24:7
62:1 64:5
69:7 69:12
69:17 80:10
93:4 132:23
133:12 150:25

**coming** 121:21

**command** 42:4
47:14 47:15
47:18

**commander**
48:3 48:4
84:23
122:25 174:4

**Commander's**
122:21 123:11
123:23
124:6 124:15

**commands**
81:24 137:20

**comment** 176:6

**commission**
13:11 22:19
22:22 23:2
23:5 23:8
26:5 26:11
26:17 28:20
29:13 29:16
34:17 41:24
45:22 48:8
48:10 48:14
48:16 48:21
49:10 55:4
55:19 56:6
74:10

**Commissioner**
23:12 23:19

**commit** 27:25

**committed** 37:23
38:16 68:15
68:16 88:3
92:7 114:5
114:24

**committing** 89:7
90:23 157:10

**communication**
175:12 175:17
176:3 176:4
180:6

**communications**
14:1 14:5
175:9
175:13 180:14
181:5 181:5

**compared** 72:10

**comparison**
166:5

**compile** 93:10

**complain**
53:14 54:14
62:2

**complainant**
74:5 120:14
141:21 141:22

**complaint**
9:14 15:18
26:21 27:13
53:22 54:3
54:23 58:13
58:15 58:16
58:18 58:19
58:20 58:23
58:24 58:25
59:3 59:4
59:8 59:8
59:9 59:17
59:19 59:21
59:23 59:25
60:15 60:16
60:17 61:6
61:11 61:11
61:25 62:8
63:10 63:11
63:20 64:5
67:10 68:25
69:11 69:14
69:17 69:20
70:15 74:11
75:7 75:12
75:14 79:4
79:5 79:8
80:11 83:17
83:24
109:13 110:18
111:1 111:4
111:18 111:25
112:8
112:16
113:4
120:13 122:15
125:22
128:8 174:23

**complaints**
57:14 58:11
59:5 59:6
60:23 61:3
61:4 61:8
63:6 63:16
67:11 69:25
74:24 75:4
75:20 75:22
75:23 110:7

**complete** 41:7
62:17 73:7
73:12 73:24
74:8 79:5
79:13 82:9
89:1 93:7
103:23
108:9
113:16
135:3 153:4

**completed**
64:7 75:24
78:20 96:8
99:12
103:15 103:17
103:20 104:12
107:1
111:25 112:24
112:25 122:23
124:1 124:7
124:11
135:7 173:1

**completely**
170:13

**completes**
63:2 103:18

**completion**
112:8 126:1
173:3

**complexity** 96:7

**compliance**
138:5 157:5
170:8

**comply** 157:14
158:3 158:5

**complying**
158:25

**comprised**
23:8 23:9

**computer** 36:19

**concerned** 73:8

**concerns**
71:19 71:23
71:24 72:14

72:23

**conclude**
65:15 68:8
77:12 78:13
78:17 78:19
102:12 102:18
102:25 103:16

**concluded** 73:11
100:24 102:22
103:3
103:10 123:14
125:1 126:5
140:12 183:17

**concluding**
113:10

**conclusion** 64:9
64:15 67:15
72:23 79:13
80:3 80:13
80:23 99:18
100:6 110:9
111:5
111:11 113:10
120:18
123:6 123:9
130:20 140:14
153:24 172:4

**conclusions**
67:12 90:10

**condition**
74:7 169:15
169:24

**conditional**
169:22

**conduct** 58:5
69:14 73:7
74:12
137:19 163:1

**conducted** 53:13
62:22 84:17
125:2
130:10 139:15
140:11
153:4 163:3

**conducting**

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

76:14 161:9

**confidence**
170:13

**conflict** 129:12
129:17 129:21

**Congratulations**
14:12

**consequence**
169:1

**consequences**
152:14 168:23

**consider**
98:25 99:3
164:1

**consideration**
99:7 133:9
162:7

**considered** 31:4
102:9
117:16 154:23
156:10

**consistent**
158:17 158:21

**consists** 60:17

**contact** 19:13

**contacted**
152:21

**contain** 172:9

**contained**
9:13 75:15
85:25 100:9

**contains** 143:3

**content** 17:7
179:23

**Continue** 128:7

**continues** 56:5

**control** 58:15
58:17 58:18
58:19 59:17
61:10 61:14
61:18 61:25

62:6 63:21
75:21 75:23
76:1 83:4
83:6 106:17
106:19
120:6 120:6
127:21

**conversation**
95:4 178:2
178:10 178:10
179:11 179:17
179:24

**convey** 126:24

**Cooper** 10:11

**COP** 125:16

**copy** 140:25
183:1
183:11 183:12

**corner** 173:10

**correct** 9:19
10:16 11:5
12:1 13:15
14:16 15:25
17:13 19:17
19:19 19:22
20:1 21:2
23:6 24:6
25:20 26:14
27:3 29:6
29:20 29:21
30:9 30:10
30:23 32:24
32:25 33:2
33:21 33:25
34:3 34:6
34:10 34:13
34:17 34:21
34:22 35:5
35:25 36:11
36:12 38:24
40:24 41:9
41:10 41:12
41:15 41:18
41:19 42:12
42:13 42:15
42:20 42:21

43:11 45:25
46:3 47:7
48:9 48:11
50:18 51:7
52:14 52:22
53:6 53:10
55:10 56:9
56:10 56:13
57:12 61:21
63:11 63:24
64:5 67:10
67:12 67:13
68:10 68:23
69:4 70:10
71:2 72:7
74:24 75:4
75:7 77:9
84:13 84:16
84:18 87:1
88:8 89:8
89:15 90:4
90:6 97:13
98:9 98:11
98:14 98:15
100:4
100:12 100:17
100:19
101:6
101:20 101:22
103:21 104:25
105:7
105:23
106:1 106:5
106:6
106:15 106:16
106:18 106:20
106:21
107:5 107:9
107:10 107:13
108:13 108:19
109:4
109:25
110:5
110:10 110:12
110:23 112:24
115:11 115:14
115:19 115:20
115:21 117:25
118:1

119:24 119:25
120:4 120:7
120:13 120:18
121:6 121:8
121:16 121:20
122:12 122:16
123:16 123:19
123:24
124:2 124:3
124:5 124:7
124:9
124:24
125:5
125:11 125:14
125:17
126:2 126:6
126:18 126:21
129:1
129:19
132:1 132:4
132:7
132:12
133:3
135:13 135:15
135:17 135:20
139:2 139:5
143:11
145:6
145:12 145:15
146:11 146:15
146:16 146:20
146:21 146:24
146:25 149:12
149:22 155:23
157:24 162:18
164:10 171:11
171:14 172:16
172:17 172:19
172:20 173:14
178:5 178:7

**corrective**
130:1

**Correspondence**
106:1

**corroboration**
109:9

**Council** 19:12

20:3 20:12
20:17 20:20
23:14

**counsel** 7:11
60:7

**counterflow**
144:24

**county** 9:2 14:2
14:6 82:4
90:6 94:14
125:20 141:15
141:16 141:16
175:5
175:14
180:2 180:7
180:15

**couple** 97:21

**course** 17:7
44:20 70:16

**courses** 17:7
116:21

**court** 7:18
9:2 9:2 40:11
141:15
143:5 182:23

**courteous** 60:20

**coverage** 47:22

**covered** 17:12

**Craig** 57:22

**create** 83:16
84:2 84:8

**creates** 151:5

**crew** 32:10

**crime** 35:20
37:23 38:16
38:19 88:3
114:1 142:7
142:16 142:18

**crimes** 16:14
16:18 31:23
35:20

**criminal**

68:16 68:19
68:24 69:7
69:9 69:14
69:19 70:5
70:9 70:11
70:15 70:18
70:18 70:24
72:19 84:1
84:13 84:15
87:1 87:3
103:4 103:9
103:10 103:14
103:19 107:24
110:12
111:5
111:12 111:15
111:24
112:8
112:16
113:6 114:5
114:18 114:24
129:7
129:18 166:20

**criminally** 87:8

**current** 57:2
76:10 125:4

**currently**
15:1 17:22
24:13 25:5
36:4 36:5
56:22 76:7
101:15
103:5
105:14 147:17
147:24
153:7 167:25

**cussed** 114:17
114:18

**custom** 57:20

———————
D
———————
**D.A** 178:16
178:20

**Dabrowa** 24:16

**daily** 19:4

**danger** 144:25

**dangerous** 145:2
146:18

**dare** 160:24

**dark** 66:12

**DA's** 107:17
107:20 175:5

**dashcam** 62:11

**date** 7:8
53:15 54:15
55:20 74:16
106:25
107:2 107:3
107:4
115:15
120:9
123:17 123:18
125:20
126:9
126:22 127:10
127:14 135:10
136:5
174:16 174:20
174:21 174:24

**dated** 106:22
135:17

**dates** 124:8
135:6

**David** 105:16
105:18

**day** 17:5 17:5
20:23 20:23
23:16 23:16
23:20 23:20
28:5 30:3
53:15 53:23
54:14 66:19
106:24
148:4 164:3

**days** 28:8
29:1 29:2
29:3 29:11
54:2 54:8
54:17 54:24

55:8 55:10
55:20 56:8
74:12

**deadly** 124:17
141:21
142:2
144:18
151:3 151:4
151:8
151:11 151:14
151:17 151:18
151:21 152:10
152:11 152:13
152:16 152:19
152:21 154:9

**dealing** 52:3
81:15

**deals** 69:4

**death** 82:12
147:20 149:14
149:17
151:5
151:23 151:23
154:17

**December** 170:25

**decide** 26:13
80:3 91:2
165:8

**decided** 25:4
70:14

**decides** 103:5

**decision** 12:7
20:15 21:7
21:9 22:17
24:3 25:23
26:8 26:8
26:13 29:12
29:18 29:23
30:5 30:8
46:4 46:8
55:8 55:19
58:14 61:23
65:23 79:8
79:19 80:18
80:24 81:2

88:5 94:17
107:22
108:3
112:21 128:11
129:18
130:7 130:9
130:19 130:22
131:4
132:22 132:25
133:6
133:11 133:14
134:1 134:6
143:6
154:17 155:15
165:2 165:8
165:10 166:24
167:4 167:5
167:6 175:6

**decisions** 19:21
19:22 19:24
20:1 20:10
20:16 20:23
21:5 24:5
41:12 41:13
133:25

**deem** 85:12

**Defendant**
141:17

**deficiency** 48:1

**deficient** 47:2

**definite** 56:7
56:11 56:14

**definition**
151:3 151:9

**Definitions**
151:4

**demoted** 30:16
30:25

**demotion**
30:11 30:14
30:17 31:4
31:6 31:10

**demotions** 30:20

**department** 12:4

13:6 14:10
14:19 17:15
17:16 18:9
19:1 19:1
19:4 19:6
19:9 19:10
19:11 19:17
19:22 19:25
20:7 20:10
20:16 20:19
20:24 21:5
21:6 21:10
21:25 22:1
23:17 23:20
23:24 24:5
24:11 24:18
25:12 25:22
25:25 31:19
31:24 32:5
32:19 33:15
33:19 33:21
33:23 34:20
35:13 35:15
35:18 35:25
38:17 41:2
42:2 42:10
42:19 42:20
42:23 43:9
44:3 52:25
53:1 53:5
53:9 53:13
53:15 54:13
54:15 54:23
56:17 58:9
58:12 59:2
61:21 63:12
63:14 64:14
67:16 68:4
68:6 68:20
74:11 76:3
76:5 76:19
77:8 78:3
78:13 80:2
83:4 93:1
93:9 97:7
97:9 97:16
102:21 102:24
103:15 105:10
108:19

109:4 112:6
114:4 115:1
115:9
115:19 147:12
156:1
156:17
157:6
157:15 161:25
162:5 170:9
175:10
180:7 180:15

**departments**
64:2

**dependent**
107:24

**depending** 26:22
57:7 58:13
58:20 59:23
62:1 62:8
63:3 73:25
83:25 169:6

**depends** 20:25
47:25 91:16
96:6 117:11
161:14 163:12
163:16

**DEPONENT** 7:25
19:19 20:3
20:12 21:13
21:20 22:3
22:10 26:4
28:16 38:1
38:21 39:8
42:22 49:4
51:25 54:10
54:22 55:7
64:11 64:19
66:18 71:4
71:11 71:19
73:6 74:14
77:15 78:16
78:23 79:11
79:23 80:7
81:4 88:16
90:13 92:3
92:12 93:13
93:24 94:13

95:3 95:20
96:6 96:13
96:21 96:25
98:21 99:17
99:24 100:9
101:8
101:14
102:5 103:2
104:11 107:15
108:2 109:6
113:13 113:23
114:7
114:11 118:12
128:17 129:21
130:7
130:16
131:3
131:20 132:20
133:5
133:11 133:23
134:14 134:22
135:6 136:4
136:13 137:13
137:18
138:8
138:22 139:12
140:10
142:5 143:1
143:16
148:8 153:3
153:17
154:8
154:15 154:22
155:5
155:11 155:25
156:10
157:9
157:21
158:7
158:15
159:7
159:22
161:3 161:8
161:14 161:20
162:2 162:7
162:15 163:12
163:16 163:23
164:15 164:24
165:7 166:3

166:18
167:3
167:15 167:25
168:10 168:22
169:4
169:18
170:1
170:11
172:2
173:19 174:11
175:4
175:24
176:6 178:9
178:13 179:20
182:6

**deposed** 9:6

**deposition**
7:1 7:9
8:11 8:14
8:14 8:15
8:25 9:1
9:8 10:7
10:10 10:15
10:20 10:22
10:23 11:8
11:15 11:20
48:24 49:25
50:1 80:21
98:3 98:6
117:22 130:18
139:4 140:5
141:9
141:10
144:5 148:1
171:6
175:19 175:25
176:8
176:24
177:4
179:15 179:21
180:1 180:3
180:5
180:21
181:9
181:11 181:15
181:17 181:25
182:14 182:23
183:16

**describe** 84:20

**description**
58:4

**designated** 61:5
85:17

**designates** 61:7
61:17

**desk** 80:10

**destroy** 152:16

**detail** 61:24

**details** 120:14

**detainee** 164:13

**detected** 78:4
78:9 78:25

**detective**
15:2 15:14
16:15 18:7
18:8 18:14
35:19 68:20
69:24 84:22
84:23 85:10
86:23 86:24
87:18 88:1
88:20 89:12
89:18 94:7
94:9 94:23
101:16 104:22
104:24
107:8
125:10 135:13
135:22 135:24
136:1

**detectives** 87:5
96:2 97:24
139:1 153:4

**detectives/
investigators**
95:15

**determination**
61:10 62:5
64:13 64:22
65:9 65:20
65:21 67:22
68:2 89:25

90:18 99:11
100:3
107:12 107:19
108:8
108:20 108:24
109:7
109:17 109:19
109:22 111:17
112:7 112:9
113:17 113:24
115:17 115:21
126:6
126:10 126:17
127:5 127:6
127:9
127:11 128:20
129:15
130:5
130:13 131:12
132:15 134:23
134:24
139:8 140:3
143:10
155:2 155:9
155:13

**determinations**
90:9

**determine** 15:19
47:17 70:4
76:15
103:11 108:18
109:3
131:12 131:14
167:3

**determined** 47:1
64:15 67:20
87:21 89:15

**determining**
65:4 65:7
98:24
128:14 136:10

**developing**
79:15

**died** 147:10
147:14

**differ** 89:3

**difference** 59:4
59:7 72:9
89:2 131:20

**different**
31:3 31:7
31:8 31:18
32:4 35:18
37:15 40:23
42:6 42:6
42:7 43:22
82:20 92:25
98:1 110:11
110:15
111:8
114:12 114:23
127:16
129:3 129:4
145:9 150:1
150:3

**Dimitri** 7:13
8:9

**direct** 19:1
83:8 117:6
119:21 175:12

**direction**
19:5 70:21
103:2
141:22
142:3
142:22 163:17

**directly**
15:20 15:21
16:10 74:17
83:12

**disable** 152:5

**disagree**
96:19 99:11

**discern** 127:19

**discharge** 81:25
82:6 138:9
144:20
146:9 151:24

**discharged** 72:4
82:2 101:3
137:22 144:22

152:4

**discharging**
137:24
138:2
141:21
142:2
142:22 152:8

**disciplinary**
13:5 49:15
52:7 55:18
64:23 65:23

**discipline** 21:4
21:6 21:8
21:11 21:14
21:21 22:18
23:23 24:8
25:11 25:20
25:24 26:2
26:5 26:16
27:18 29:14
30:1 30:9
30:11 30:14
30:19 34:8
39:5 54:1
54:8 55:5
80:24 108:9
116:1 116:4
116:6 116:9
116:11 116:14
130:1 131:5
132:23

**discovered**
85:19 85:24
86:1

**discovers** 47:25

**discretion**
45:19

**discuss** 125:21

**discussed** 27:13
39:6 174:9

**discussion**
26:21 58:13
171:22

**disposition**
75:24 127:8

143:5 153:25

**disprove**
59:24 62:15

**dispute** 96:21

**disrespectful**
161:21 161:22

**disruption**
176:9

**distinction**
109:18

**district** 14:2
14:6 85:8
85:8 88:4
89:23 89:23
90:5 90:7
90:15 90:22
91:11 91:11
91:14 92:9
92:13 92:20
92:23 93:2
93:5 93:10
93:18 93:21
93:25 94:6
94:10 94:16
94:25 95:8
95:17 96:3
102:8 108:6
113:7
128:11 128:17
141:15 142:13
153:6 154:1
175:10 175:14
175:22
178:2 178:5
178:7
178:11 178:12
179:8
179:18
180:3 180:7
180:16 181:4

**division** 15:1
15:6 15:11
15:17 17:25
35:12 35:14
35:17 35:17
35:19 35:20

35:24 36:3
36:22 36:24
56:15 56:16
58:8 62:23
64:20 67:9
68:7 68:18
68:20 69:13
69:24 76:14
79:19 84:18
93:5 150:1

**divisions** 24:11
32:4 35:19
35:22

**document** 11:9
11:11 73:17
73:19 84:9
110:14 110:15
110:16 119:17
119:20 121:25
122:6
122:20 127:11
127:21
141:2 144:1
171:3 171:5

**documentation**
17:8 30:4
116:23 118:13
147:7 150:7

**documented**
26:24 27:2
64:8 85:15
106:9
149:25
150:1 150:3

**done** 19:15
29:20 64:7
70:2 70:9
72:19 73:1
74:2 86:22
91:18 96:10
108:7 108:9
108:10 109:11
123:12 123:16
123:23 123:24
124:13 139:15
140:12 142:6

142:12
153:5 165:1
165:4 166:1
166:5 166:6
166:16 170:13
174:6 176:11

**door** 15:14
167:15 167:16

**doorbells** 62:12

**doorframe** 168:1

**download** 119:9

**drawing**
147:18 147:24

**dreary** 66:19

**drew** 98:22

**drive** 137:21
138:1

**driver** 152:12
168:22

**driving** 144:24

**Dropbox** 119:9

**Dube** 7:13
7:13 8:1
8:6 8:9 11:22
19:20 20:5
20:14 21:15
21:22 22:6
22:12 26:9
28:18 28:25
29:4 29:5
35:8 35:10
35:11 38:2
38:22 39:9
39:20 40:1
40:6 40:7
40:11 40:14
42:25 46:9
46:12 46:19
48:19 49:8
49:23 50:4
51:21 52:2
54:5 54:11
55:1 55:9
55:14 55:15

55:25 60:2
60:14 64:12
64:24 65:25
66:3 66:10
66:14 66:17
66:20 66:22
66:25 67:2
67:3 71:5
71:12 71:16
71:21 73:14
74:20 76:24
77:2 77:3
77:17 78:18
79:7 79:17
79:25 80:15
81:6 87:10
87:13 87:17
88:18 90:16
92:5 92:18
93:14 94:1
94:4 94:5
94:19 94:20
95:6 95:22
96:9 96:15
96:24 97:1
98:23 99:19
100:2
100:11 100:22
101:9
101:19 102:11
103:8
103:25
104:6
104:13 104:17
107:21 108:11
109:8
111:20 111:21
113:19
114:2 114:9
114:21
115:4 115:6
118:14 118:17
118:20
119:3 119:8
119:11 127:20
128:2
128:23
130:3
130:11 130:23

131:2 131:6
131:24
133:2 133:7
133:15 134:10
134:15 134:25
135:9 136:9
136:15 136:21
136:23
137:1 137:3
137:5
137:10 137:14
137:23 138:12
138:23 139:18
140:6
140:16 140:18
140:21 140:23
141:7
141:13
142:8 143:7
143:18
144:3 144:8
148:6
148:17 148:18
150:18
153:9 154:3
154:12 154:19
155:1 155:7
155:16
156:2 156:6
156:12
157:2
157:11 157:23
158:10 158:20
158:23
159:2 159:9
159:19 159:23
160:4
160:12 160:19
160:22
161:4
161:11 161:16
161:23
162:3
162:10 162:17
163:13 163:18
164:7
164:18
165:3
165:12 165:16

165:19 165:22
165:24
166:8
166:11 166:25
167:7
167:10 167:18
168:3
168:14 168:19
168:25
169:9
169:14 169:20
170:6
170:15 170:20
172:10 173:22
174:15
175:8 176:1
176:10 176:13
176:22 178:14
179:22
181:1
181:23
182:3
182:10 182:21
183:7 183:9

**duly** 8:3 141:14

**during** 17:2
  20:20 34:19
  37:12 41:20
  42:8 45:9
  45:11 69:6
  69:15 69:17
  69:19 70:12
  70:22 70:22
  83:1 83:3
  83:20
  121:14 144:15
  144:17 145:22
  149:1 149:8
  162:12 162:25
  164:2
  171:10 172:24
  174:6 174:7
  175:15 175:17
  175:22 180:8

**duties** 31:3
  117:14 117:20

**duty** 15:3 19:22

19:25 44:10
44:11 44:11
44:12 44:17
117:5

_____
E
_____

**earlier** 42:17
  53:14 54:14
  96:13 113:13

**easy** 69:16

**eclipse** 66:11

**effect** 94:22

**efficient**
  78:2 78:8

**effort** 152:6

**either** 15:20
  27:7 27:16
  59:24 92:15
  116:7
  132:21
  138:1 145:4

**elderly** 164:4
  164:10

**electronically**
  91:18

**eliminate** 29:19

**eliminated** 25:3

**else** 10:19
  15:11 23:22
  24:1 34:20
  43:16 44:15
  47:9 47:11
  65:22 69:7
  70:19 88:2
  138:24
  143:4
  153:20 154:11
  166:22

**else's** 154:9
  154:16

**em** 168:6

**email** 150:4

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

emails 181:5

employed 14:9
97:9 105:12
118:5

employee 58:12

employees
14:2 15:5
17:17 56:19
180:7 180:15

employment
38:17 97:6
141:19 143:14

encounter 60:21
163:25

enforce 41:6
41:21 41:21

enforced
30:12 30:15

enforcement
78:3 78:8
151:25 155:19
156:8 156:14

enormity 13:24

entail 59:22

enter 36:19

entire 82:19
83:1 83:3
157:24 159:25

entities 92:25

entry 75:16
75:18

equipment 44:12

Eric 15:12

especially 69:1
80:10 82:11
132:22

essentially
34:25 128:21

evading
144:19 144:23
145:3 146:19

evaluated 113:3

evaluates 26:4

evaluating
16:12 166:12

evaluation
171:20 171:23
172:11 172:19
172:22
173:2 173:3
174:2 174:5

evaluations
170:24
172:8 173:21

evaluator
172:21 172:22

evening 16:4
16:6 16:8
16:19 82:16
82:21 82:24

event 108:3

everybody 18:6

everyone
31:24 43:20

everything 9:13
43:16 62:14
79:5 139:16

evidence
11:17 29:17
36:18 49:23
85:2 85:5
99:4 128:19
141:7 144:3

exact 32:6
33:10 45:5
97:11 107:2
127:10 127:14

exactly 25:4
33:9 55:2
85:4 94:3
97:20 100:1

EXAMINATION 8:5

examine 23:5

examined 8:4

examiner's
82:13

example 31:13
67:18 155:18

examples 163:20

exceptions 70:4

excerpts 10:14

excessive
61:1 61:3
63:6 63:10
63:22 75:6
83:17 112:7
112:17
113:2
114:24 136:11

exhibit 9:12
11:8 11:18
11:21 11:23
12:10 12:12
12:13 12:15
12:18 12:20
49:13 49:23
50:2 73:16
104:15 104:16
104:18 104:20
119:5 119:6
140:17 140:24
141:7
141:11 143:25
144:3 144:7
150:14 150:16
156:22 156:24
170:17 170:18
170:21 174:17
176:21 176:23

exhibits 11:23

exonerated
99:25
110:25
116:7
124:19 127:5

expect 78:2
79:2 174:8

expected 171:22

experience
80:25

experienced
80:9

explain 38:8
157:16 158:24

extend 74:16

extended 74:3
74:9

eye 19:4

---

F

facility 36:20

facing 164:17

fact 102:23
113:23 115:21
123:13 126:16
139:13 139:22
140:4 143:1
143:6 165:8

factors 99:1
136:11

facts 67:9
73:13 86:17
88:3 88:4
90:15
142:13 154:23
165:9 166:21

failed 81:24

fair 58:5
78:2 78:7
95:14
160:10 170:23
181:2 181:14

fairly 97:12

fall 44:22 45:1

falls 37:15

familiar 11:8
13:10 49:20
49:22 68:3
68:5 73:17

86:9 97:6
98:8 104:18
119:17 121:10
141:2
143:19
144:1
150:19 150:22
150:23 157:24
171:3

**family** 66:1

**fashion** 96:7

**fault** 102:16

**fear** 72:3
72:6 100:25
101:2 101:5
153:19
154:5 154:9

**fearful** 98:22

**February** 81:14

**felon** 145:2
146:18

**felony** 88:3
88:12 88:14
88:16 88:24
145:3 146:18

**felt** 162:16

**Fickessen** 15:12

**fighter** 53:1
53:16 54:16

**figure** 122:6

**file** 91:3 93:11
93:22
127:13 135:4

**filed** 63:20
87:8 93:25
94:16 94:18
95:1 95:9
95:18 96:4
128:22
153:6
174:22 174:24
175:2

**files** 118:4

153:10

**filing** 54:2

**fill** 25:7 31:25

**filled** 25:10

**final** 21:7 21:9
22:21 26:8
62:20 62:20
65:23 75:24
79:8 80:13
80:13 103:3
108:7
108:23 111:18
112:15 115:22
127:7
127:11 128:11
129:25
131:4
140:14
143:4 175:6

**finality** 102:7

**findings**
89:22 90:4

**fine** 46:22
50:16 182:4

**finish** 55:11
76:25 103:7
173:8

**finished** 77:4

**fire** 52:25
52:25 53:16
54:15

**firearm** 37:4
37:10 37:12
72:4 141:22
142:22 151:25
152:8

**firearms** 37:1
152:4

**fired** 25:17
152:3

**firefighters**
52:10

**first** 8:3

12:3 16:9
24:22 49:17
71:17 78:25
92:4 105:3
119:22 136:13
146:8
147:15 179:21

**fit** 151:9

**five** 16:17
36:14 44:1
46:12 82:19
103:25 110:22
111:13
112:1
113:10 121:14
140:21 182:21

**fleeing** 138:9
138:14

**flip** 119:19

**force** 10:2 10:4
44:22 44:22
45:1 47:7
60:25 61:1
61:3 63:6
63:10 63:22
67:15 67:20
68:4 68:23
75:6 78:21
79:20 81:22
83:17 98:25
99:9 99:15
99:22 100:7
103:12
112:7 112:7
112:17
113:2
114:24 114:25
115:19 116:21
124:17
128:7
136:11
138:5
138:19
139:8
139:21 139:25
143:19 143:22
144:18

145:5 145:8
145:10 145:14
147:7
147:11 147:13
150:15 150:20
150:22
151:3 151:4
151:5 151:7
151:8
151:10 151:11
151:13 151:14
151:17 151:18
151:21 152:10
152:11 152:13
152:16 152:19
152:21 152:23
152:25
154:9
155:17
157:6
157:15 157:21
158:25 170:9

**forgot** 148:15

**form** 19:18 20:2
20:11 21:12
21:19 22:2
22:9 26:3
28:15 30:14
32:1 37:25
38:20 39:7
49:3 51:20
51:24 54:4
54:9 54:21
55:6 55:11
64:10 64:18
71:3 71:10
71:15 71:18
73:5 74:13
78:15 78:22
79:10 79:22
80:6 80:11
81:3 84:4
84:4 84:21
88:15 90:12
91:14 92:2
92:9 92:11
92:21 93:12
93:23 94:12

95:2 95:19
96:5 96:7
96:12 96:20
98:20 99:4
99:16 99:23
100:8
100:21
101:7
101:13
102:3 102:4
103:1
104:10 107:14
108:1 109:5
113:12 113:22
114:6
118:11
127:1
128:16 129:20
130:6
130:15
131:5
131:19 132:19
133:4
133:10 134:13
134:21
135:5 136:3
136:12 136:18
137:12 137:16
137:17
138:7
138:21 139:11
140:1 142:4
142:25
153:2
153:15 153:16
154:7
154:14 154:21
155:4
155:10 155:24
156:5 156:9
157:7 157:8
157:18
158:6
158:14
159:6
159:21
160:9 161:2
161:7
161:13 161:19

162:1 162:6
162:13 162:14
163:11 163:15
163:22 164:14
164:23
165:6 166:2
166:17
167:2
167:14 167:24
168:9
168:18 168:21
169:3
169:13 169:17
169:25 170:10
172:1
173:18 174:10
174:12
175:3
175:23
178:8
179:19 181:22

**formal** 29:20
36:9 58:15
58:18 58:19
58:24 59:3
59:7 59:17
61:16 61:17
61:20 61:24
62:3 67:9
75:21 75:23
79:5 111:25
112:16 127:6

**format** 120:12
120:21 120:22

**former** 105:6
105:8 179:15

**forms** 30:20
79:3

**forth** 37:15
172:4

**forward** 30:9
76:10 86:3

**forwarded** 64:21
122:25

**Friday** 177:7

**front** 29:16
91:22

**fuckin** 160:24

**fulfill** 117:14

**full** 33:18
33:20 93:18
126:12 134:11

**fully** 70:19
107:20

**future** 19:5

——————————

G

**gather** 64:20
64:25 67:9
90:14
109:13 112:20

**gathered** 109:14
124:16 138:25

**general** 90:20
144:25

**generally**
120:21

**gets** 61:19
68:22 85:17
157:18 164:4

**getting** 82:12
90:24 90:24
140:18 140:21

**Giles** 7:14 7:14
11:19 19:18
20:2 20:11
21:12 21:19
22:2 22:9
26:3 28:15
28:24 29:2
35:7 35:9
37:25 38:20
39:7 39:22
42:21 46:11
48:18 49:3
49:24 51:20
51:24 54:4
54:9 54:21
55:6 55:11

55:23 60:5
60:8 64:10
64:18 66:2
66:4 66:12
66:24 71:3
71:10 71:15
71:18 73:5
74:13 76:25
77:14 78:15
78:22 79:10
79:22 80:6
81:3 87:12
87:15 88:15
90:12 92:2
92:11 93:12
93:23 94:3
94:12 95:2
95:19 96:5
96:12 96:20
96:23 98:20
99:16 99:23
100:8
100:21
101:7
101:13
102:3 103:1
104:10 107:14
108:1 109:5
113:12 113:22
114:6
118:11 118:22
127:18 127:24
128:16 129:20
130:6
130:15
131:1
131:19 132:19
133:4
133:10 133:21
134:13 134:21
135:5 136:3
136:8
136:12 136:18
136:20 136:22
137:4 137:8
137:12 137:17
138:7
138:21 139:11
140:1 141:8

142:4
142:23 142:25
143:15
144:6 148:3
148:7
148:14
153:2
153:16
154:7
154:14 154:21
155:4
155:10 155:24
156:5 156:9
157:7
157:18
158:6
158:14
159:6
159:21
160:9
160:14
161:2 161:7
161:13 161:19
162:1 162:6
162:13 163:11
163:15 163:22
164:14 164:23
165:6
165:15 165:17
165:20
166:2
166:17
167:2
167:14 167:24
168:9
168:18 168:21
169:3
169:13 169:17
169:25 170:10
172:1
173:18 174:10
175:3
175:23
176:5 178:8
178:12 179:19
180:24
182:2 182:5
182:19 183:10

183:12

**given** 29:14
40:17 75:21
109:16

**gives** 61:22

**glad** 127:22

**glanced** 171:8

**Glock** 43:21

**goal** 69:5

**gone** 66:10
170:8

**government** 49:9
49:11 49:14
49:21

**grand** 88:5 88:5
88:17 89:4
89:24 90:4
93:6 101:15
101:20 101:22
107:17 107:24
108:5 108:6
112:9 113:3
113:9
113:21 125:20
126:1 126:5
126:9
126:17 128:12
128:18
129:4 130:5
130:21 131:11
131:17 131:18
131:22 131:23
131:25
132:3 132:7
132:11 132:15
132:16 132:17
141:15 142:14
143:2
154:25
155:2 155:9
155:23
156:3
156:11 175:6

**grandfathered**

43:23

**great** 8:9
159:17

**greater** 52:16
52:19

**group** 165:9

**growth** 16:11

**guess** 14:19
17:17 18:7
26:10 28:20
30:22 31:7
31:10 32:22
33:12 35:16
41:23 44:6
49:17 52:24
53:20 53:25
57:1 57:20
58:4 62:22
70:3 74:24
76:15 161:1
173:13

**guidance** 16:11

**guide** 18:25

**guilty** 142:16
142:18

**gun** 81:24
117:13

**guys** 60:2 65:25
66:11 66:20
183:4

———————
H
———————

**half** 16:20
16:23 17:11
162:24

**Hamilton**
57:22
119:24
120:1 124:16

**Hamilton's**
125:22

**hand** 7:21 101:1
173:10

**handle** 69:2
93:7

**handled** 63:3
68:25

**hands** 159:8
160:6 160:7
160:11 163:10
167:12 167:13
167:15 167:16
167:20 167:23
168:5
168:11
169:7
169:11 169:22
170:5

**happen** 23:25
59:11 79:2
87:25
107:18 114:20
116:7 117:9
122:22

**happened**
27:16 85:5
117:7

**happens** 29:25
87:24 89:17
95:3 113:5

**happy** 127:24

**harassment**
60:19

**hard** 58:6 183:2

**Harding**
178:25
179:3 179:4

**harm** 151:23
152:19 154:16

**Harris** 14:2
14:5 82:3
90:6 94:14
125:20 141:15
141:16 141:16
175:5
175:14
180:2 180:7

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

180:15

**haven't** 36:11
129:14

**having** 8:3
71:25 114:5
152:23 182:9

**head** 19:2
19:6 19:9
21:25 42:2
52:25 53:5
53:14 53:15
54:13 54:15
54:23 74:11
147:17

**heads** 20:19

**head's** 53:1

**hear** 18:15
21:23 29:13
29:13 39:20
48:10
156:21 158:12
158:12
159:3 159:5
159:10 159:20
169:10 169:23
183:3 183:4

**heard** 45:21
133:16 156:16
159:7
163:19 167:22

**hearing** 29:20
53:13 55:19
56:7

**hearsay** 166:22

**held** 32:2

**He'll** 85:22

**help** 59:24

**helpful** 139:1

**helps** 180:24

**hereafter**
141:17 141:21

**herself** 178:7

**he's** 32:24
55:12 61:22
87:21 87:21
89:9 89:15
89:19
105:11 111:16
118:21
125:8 126:7
126:7
129:15 134:11
148:14 158:12
160:15 160:17
165:20

**hey** 60:2 62:5
65:25 70:4
72:23

**higher** 28:1
57:18

**highlighted**
174:25

**history** 145:3
146:19

**hold** 55:19
128:5
140:18 140:19

**holster** 44:13

**home** 42:18

**hone** 42:8

**honest** 132:8

**honestly** 175:24

**hope** 69:10

**hoping** 74:21

**hours** 37:12
84:24

**Houston** 66:15
66:18 179:4

**humanitarian**
152:17

**hypothetical**
128:24 169:10
170:3

_____
    I
_____

**IAD** 75:14
119:14 172:15

**I'd** 44:1 115:4

**identification**
11:21 12:6
50:3 104:16
119:7
141:12
144:7
150:17 156:25
170:19 176:21

**identified**
47:13 122:7
149:6
149:12
156:8 157:9
171:16

**identify**
48:17
151:25 155:19
156:14

**II** 60:19 61:8

**I'll** 69:16
127:22 133:23
145:19

**I'm** 8:8 8:9
8:13 8:14
8:15 11:3
11:7 19:23
20:6 20:6
28:22 28:25
29:11 30:13
32:8 33:13
34:5 35:2
35:8 35:16
38:7 38:14
41:25 42:7
46:20 46:22
48:6 49:12
50:21 53:19
55:14 56:21
56:23 57:5
63:18 63:18
64:1 66:12

66:18 69:10
70:8 70:13
70:13 70:25
71:22 72:24
72:25 73:2
73:16 76:23
79:23 83:8
83:9 83:10
83:10 85:21
86:14 87:13
89:2 89:10
89:11 91:13
93:20 94:6
94:6 94:13
94:21 94:21
95:4 95:11
95:11 97:21
98:4 99:20
101:24 102:15
103:6 104:7
104:14 108:25
108:25
109:1
109:10 110:14
110:14 110:16
111:19 111:20
111:23 112:12
114:8 115:2
119:4
119:14 119:19
119:20
121:7 121:7
127:20
128:7
129:21 129:21
129:22
131:2
133:17 136:17
137:5
137:13 139:19
140:17 140:18
140:24 142:17
142:17 142:19
142:19 143:21
143:22
146:2
147:16 147:24
149:2
150:10 150:13

156:22
158:2
160:12 161:17
162:19 163:19
165:1
165:22 165:23
169:18 169:23
170:16 170:21
170:24 172:11
173:7 173:8
173:20 173:24
173:24 174:16
174:23 176:23
178:6
178:21 181:21
182:3 182:6
182:7

**immediate**
151:22 154:16
159:4

**immediately**
152:9

**impartial**
78:2 78:8

**implicated**
65:14

**improve** 26:23

**improvement**
171:17

**inaccurate**
181:17

**inappropriate**
140:1

**incapacitated**
24:1

**incident**
64:11 64:23
68:1 68:12
68:13 69:6
69:7 73:7
76:15 82:4
84:8 85:15
92:25 93:19
100:16 104:12
108:10 108:21

109:13
123:4 123:4
139:15 140:11
144:22
145:1 145:1
145:4 146:8
146:11 146:17
147:11 147:13
181:13

**incidents**
76:8 144:10
144:14 144:17
144:19 145:14
145:22
146:5 146:8
147:7

**include** 31:10
47:6 62:10
65:14 65:17

**included** 17:6
17:6 64:11
64:16 65:11
108:22
147:2 147:4

**includes**
41:11 41:17
44:13
130:21 174:3

**including**
12:5 134:7

**inclusions**
114:12

**inconclusive**
62:16

**incorrect** 134:2
134:2

**indeed** 118:8

**indefinite** 22:8
25:16 27:22
28:10 28:12
28:13 34:12
56:12

**indefinitely**
25:16 29:7

**indicate**
131:9 132:21

**indicated** 13:23
100:24 129:12

**indicates** 127:2
145:13 153:5

**indicating** 30:4
31:25 32:1
86:6 128:11
142:15

**indication**
27:15

**indicted** 101:20
175:1 179:5

**indictment**
101:16
129:5
140:13 140:25
174:16 174:17
174:20

**individual** 8:14
23:4 39:18
40:18 41:5
48:5 53:24
58:1 58:4
58:22 59:19
76:4 82:1
85:9 90:1
91:6 91:12
92:15 101:1
101:3
113:25 114:18
147:10 163:17

**individuals**
16:10 20:4
20:9 23:11
23:12 23:13
23:14 42:3
43:21 81:23
173:16 175:18

**informal** 59:8

**information**
22:17 22:19
26:7 46:7
59:15 59:25

62:4 64:20
64:21 64:25
67:17 70:16
80:10 85:2
85:7 85:23
86:1 86:7
86:8 91:22
92:23 93:8
94:17 99:10
100:9
100:24 103:21
103:22 109:13
109:14
110:2
111:15 111:17
112:13 112:20
113:16 113:20
113:24
118:3 123:8
124:15
130:8
130:14 130:16
131:4 131:9
131:14 132:23
133:6
133:13 133:25
134:1 134:5
134:16 134:23
138:16 138:18
138:25
143:2
143:16
145:9 149:5
149:19 153:22
155:14 161:15
166:4 167:5
172:9
172:23
174:3 179:8
181:7
181:10 181:17

**informed** 157:4

**initial** 26:15
58:12 113:1
172:15

**initially**
72:5 73:25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

82:8 149:4

**initials** 105:6

**initiate** 69:21

**initiated** 74:11

**initiates** 61:20

**initiating** 21:8

**initiation**
61:14

**injured** 145:1
145:4 152:18

**injury** 141:20
142:2
142:11 142:21
151:6
152:14 154:17

**inner** 175:4

**input** 155:9

**inquire** 80:22

**inquiry** 59:8

**instance** 32:8
35:19 47:23
59:13 62:2
74:5 98:25
114:13
117:7 172:3

**instances** 82:16
85:11
147:10 147:19

**instead** 29:22
152:7

**instructing**
168:11 168:22
170:2 170:4

**instruction**
169:16

**instructions**
169:2

**Integrity**
15:3 15:12
56:24
104:23 105:2

**intent** 11:14
152:1
155:20
156:7
156:15 156:18
157:4
157:13
158:3 158:4
158:8

**intention**
158:19

**intentionally**
141:20
142:1 142:21

**interaction**
170:7

**interest** 32:1
41:4 41:13

**interested**
145:23

**interests** 46:5

**interface** 117:1

**interim** 24:2
24:4

**internal**
14:20 14:21
14:25 15:4
15:8 15:10
15:17 15:24
32:8 56:15
56:16 56:22
56:24 57:9
57:13 57:17
57:25 58:8
58:10 58:21
61:15 61:20
61:25 62:23
62:25 63:13
63:20 64:19
65:3 65:8
67:8 68:7
68:18 69:3
69:13 69:21
70:6 70:9
70:14 70:15

70:24 72:19
72:21 73:3
73:20 73:21
73:23 75:11
75:22 76:9
76:13 76:19
77:6 77:9
77:23 77:25
78:13 79:19
80:1 80:4
80:17 81:4
81:7 81:9
83:15 84:12
84:18 96:16
100:15 102:12
102:19 102:22
103:10 103:16
103:18 104:25
105:22
106:8 107:1
108:12 108:14
108:17 108:20
109:2 109:7
109:12 109:20
109:21 109:22
110:1 110:4
110:16 112:23
112:24 115:23
120:2
122:22 122:23
123:5
123:20 123:22
125:2 129:8
129:18 134:12
134:17
135:3 153:5
166:12 166:20
173:1

**Inter-Office**
105:25

**interpretation**
129:23

**interpreted**
53:21

**Interrogatory**
149:3 149:7
149:12 180:12

180:23

**interruption**
39:19

**intervene** 37:24
38:18

**interview** 18:12

**interviews** 32:2

**intricacies**
163:25

**introduce** 7:11

**investigate**
15:18 15:23
58:16 59:20
67:11 68:19
69:8 69:13
69:23 69:24
70:6 80:20
80:22
108:21
110:6 110:8

**investigated**
58:21 58:21
59:1 61:6
62:7 64:5
70:19 75:22
78:4 78:9
78:25 79:1
88:1 101:15
102:6
104:22
123:5 166:19

**investigates**
89:18 89:21
90:3 94:24

**investigating**
65:18 69:20
81:18 82:5
83:19 84:1
86:24 87:5
87:19 88:20
89:9 89:13
89:20 90:2
94:9 95:16
96:2 139:1

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

investigation
39:17 40:19
41:7 59:10
59:12 59:21
61:15 61:16
61:17 62:9
62:10 62:18
62:21 62:24
63:2 64:7
65:12 67:24
68:1 68:9
68:10 68:22
69:7 69:15
69:21 70:9
70:12 70:15
70:18 70:24
71:25 72:18
72:20 73:7
73:11 73:12
73:13 74:8
76:5 76:14
77:12 78:13
78:20 79:6
80:4 80:14
80:17 80:23
82:9 82:11
83:21 84:12
84:13 84:14
84:16 84:25
85:4 85:7
86:19 89:1
93:1 93:18
99:6 99:12
99:25
100:15 101:14
101:18
102:6
102:13 102:18
102:19 102:22
102:25
103:7 103:9
103:14 103:16
103:19 103:23
104:12 104:21
105:23
106:8
106:25
107:7 107:8
107:16

108:5 108:7
108:12 109:12
109:20 109:21
110:1
110:11 110:12
111:12 111:12
111:24
112:8
112:24
113:1 113:8
115:23 119:14
120:14 120:18
122:23 122:24
123:9
123:14 124:20
125:1
125:21
126:4 129:8
129:19 129:24
130:20 134:12
134:17
135:4 135:7
139:14 139:16
140:11
142:6
142:12
153:4
153:24 166:20
170:13
172:7
172:15
173:1 173:2
181:8

investigations
15:3 31:23
57:12 57:15
58:5 61:20
64:20 68:21
73:24 84:21
92:24
108:14 114:12
123:2

investigation's
76:2

investigative
62:13 64:16
85:10 92:1

153:10

investigator
15:2 15:4
18:15 56:25
58:10 67:14
68:7 68:14
72:14 72:21
73:3 73:6
83:16 109:1

investigators
65:3 68:3
93:2

involuntary
48:11

involve 88:24
91:24

involved
60:18 60:22
62:19 63:7
63:9 63:22
68:25 69:1
82:13 83:5
83:5 84:22
85:16 86:4
87:2 87:6
87:19 88:8
88:22 89:3
89:7 89:12
89:18 91:19
93:13 98:13
108:5 112:1
112:12
114:4
114:14 116:12
123:1
124:17 128:19
133:12 147:14
147:20 148:20
148:22 149:14
149:16
155:3 165:2
166:13

involvement
98:8

involves 63:21

involving

88:2 95:7
95:14 96:1
146:11 147:11

isn't 38:15

issuance 26:15

issue 25:19
33:24 34:2
34:6 34:12
42:23 43:10
47:13 62:6
76:16 76:20
76:20 147:25

issued 42:19
44:12 61:10
61:18 76:2
79:16
101:16
116:6
116:11 122:15
142:14 143:6

issues 44:23

it'd 48:1 61:6

items 49:6
60:17

it'll 69:22
111:8 128:4
135:22 150:13

I've 12:20
32:13 32:13
32:20 49:14
57:23 66:12
76:7 80:9
81:9 98:7
119:8

—————————
          J
—————————

jail 74:6

January
141:17
142:3
142:11 146:24
147:21 147:21
148:20 148:21
149:17 149:17

153:1
153:13
154:6 163:7
172:11 174:21
175:11 175:16
177:7

**job** 20:16 37:15
68:20 81:17
117:12

**John** 24:16

**Josh** 53:10
105:6

**Joshua** 33:14
177:4

**judge** 86:16

**judges** 111:25

**judging** 112:16

**July** 115:11
115:16
118:6
118:10
124:4
134:16
135:2
135:19
163:6 163:7
170:25

**jumping** 127:19

**jumps** 28:1

**June** 172:12

**jurisdiction**
53:2 82:4

**jury** 88:5
88:5 88:17
89:24 90:4
93:6 101:16
101:20 101:22
107:17 107:25
108:6 112:9
113:3 113:9
113:21 125:20
126:1 126:5
126:9
126:17 128:12

128:18
129:4 130:5
130:21 131:11
131:17 131:18
131:22 131:23
132:1 132:4
132:7
132:11 132:15
132:16 132:17
141:15 142:14
143:2
143:10 154:25
155:2 155:9
155:23
156:3
156:11 175:6

**justification**
147:6 154:5

**justified**
73:9 99:25
100:7
100:20
101:5
101:12 101:12
102:1 102:2
102:9 104:9
107:13 107:23
107:23
116:8
116:12 124:18
125:25 126:17
127:8
127:12 127:22
128:15 128:15
129:1
131:13
139:9
139:21 139:25
154:18 154:20
154:24 154:24
155:3

**justify** 138:14

**Juvenile**
16:14 16:18

―――――――
L
―――――――
**ladies** 164:10

**lady** 164:4

**lane** 164:4

**language** 158:16
161:1
161:21 161:25
162:4

**last** 14:22
15:25 17:13
33:7 51:8
51:9 104:22
146:3 147:9
147:16 149:23
163:5 163:6

**later** 30:6 33:9
69:12 85:20
118:19 118:20
122:5 126:12

**law** 21:18 37:21
43:2 68:15
68:16 78:3
78:8 85:13
87:21 89:15
90:11 90:21
91:4 114:20

8:3 183:16

**key** 114:16

**killed** 174:8

**killing** 82:1
116:10 116:14

**knew** 138:11

**knowingly**
141:20
142:1 142:21

**knowledge** 52:20
72:1 138:20
173:2
173:19
175:4 182:7
182:9

**known** 32:20

128:22 151:25
155:19
156:8 156:14

**laws** 37:15 41:6

**lawsuit** 11:12
140:5 175:2
181:9

**layer** 25:1

**lead** 62:9

**leaning** 134:24

**learn** 179:7

**learned** 57:23
113:20 179:21

**least** 17:13
121:14
172:6 172:15

**leave** 97:17
117:10 145:19

**leaving** 138:1

**legally** 43:8

**length** 80:22
91:16

**less** 143:4

**let's** 11:6 14:8
14:14 17:15
18:22 27:5
27:7 29:6
30:2 30:3
31:23 31:23
45:2 46:12
50:20 56:15
57:2 59:12
60:21 62:1
62:5 63:5
65:25 69:17
74:5 77:18
77:18 81:5
89:4 91:20
114:14 114:17
114:18 132:10
136:16 142:10
148:6
156:21 164:2

―――――――
K
―――――――
**Kenneth** 7:2 7:9

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

letter 25:14
    25:14 27:4
    27:9 27:10
    27:21 31:24

letters 33:24

letting 165:1

level 27:7 27:9
    27:17 28:1
    59:7 59:7
    60:19 63:3

levels 25:11
    25:20 25:24
    26:2 28:2
    31:7 39:5
    79:4

liability
    117:12

license 86:4

lieutenant 18:4
    18:17 18:20
    48:3 124:25
    125:11
    126:3 126:7
    126:15 128:25
    129:23
    130:7
    173:11 173:12

Lieutenants
    17:23 24:19
    24:23 25:1

Lieutenant's
    124:22

life 72:3
    72:7 100:25
    101:2 101:5
    133:1 133:8
    133:19 153:19
    154:5 154:9
    154:16

lighting 39:22

limit 73:23
    74:1

limited 12:5

72:9

line 16:9

link 119:9

list 12:1 62:18
    67:25 68:9
    68:11
    149:10 149:13

listed 11:3
    41:23 49:10
    67:24 86:20
    87:3 109:15
    149:9

listen 29:16
    111:23 128:19
    160:20

listings 114:11

lists 75:3

litigation
    101:25
    104:8 121:24

little 14:18
    50:13 50:14
    51:2 51:3
    51:3 97:18
    97:24 138:4
    145:20
    164:2
    174:13
    183:2 183:5

Local 49:11
    49:14

location
    81:23 99:5

log 75:14 75:16
    75:19

long 14:9 14:17
    14:21 16:16
    17:10 25:4
    25:4 31:5
    33:4 43:18
    55:4 55:22
    80:16 97:9
    97:12 97:20

162:23

longer 34:25
    40:25

lot 35:17
    86:2 108:7
    108:22 112:13
    121:12
    134:9 150:3
    172:9

loud 144:10
    144:12 144:13

lower 31:1
    31:14

lowest 30:22

lunch 65:25
    66:3 67:4
    67:8

luncheon 66:7

───────────

            M

ma'am 114:9

mad 114:15

main 69:9 69:11
    70:3 138:18

maintenance
    78:5

majority 24:2
    173:5

maker 21:9

makers 12:8

man 32:10

manage 41:3
    41:8 42:3

manner 43:13
    44:3 157:3
    157:13
    158:2 170:7

manners 44:18

manpower
    47:22 57:7

marked 11:7

11:21 49:13
    50:2 73:16
    104:14 104:16
    119:4 119:6
    140:17 140:24
    141:11 143:25
    144:7
    150:13 150:14
    150:16 156:22
    156:24 170:17
    170:18 176:21
    176:23

materials 9:11

math 14:14

Matt 105:17
    105:18 105:18

matter 22:21
    52:4 90:22
    94:13 102:6
    128:13 133:20

matters 94:21
    131:22

Matthew 105:17

Mauricio 15:2
    105:3

maximum 28:8
    28:10 28:11
    28:12

may 8:1 8:21
    18:15 40:4
    46:18 48:7
    51:15 52:25
    53:14 56:6
    60:13 62:19
    62:19 64:23
    65:11 65:11
    65:14 66:9
    67:25 67:25
    68:12 68:12
    100:23
    104:5 107:1
    110:2 119:2
    123:8
    130:17
    134:2 134:9

136:1
148:13
150:5
152:11 152:16
164:5
166:21 170:23
172:5 172:6
173:2 176:20

**maybe** 71:7 74:7
111:8 163:6
163:7

**Mayor** 19:12
20:3 20:13
20:16 20:20
23:15 26:1
26:11 26:12
26:16

**McGill** 124:23
124:25 125:11
126:7
126:15 128:25
130:7 173:11

**McGill's**
126:3 129:23

**mean** 12:20
17:25 18:15
19:7 22:13
22:13 22:14
28:11 30:1
31:12 34:5
35:17 35:21
36:7 38:8
39:15 44:5
44:12 47:20
49:20 53:18
53:20 53:25
54:7 54:20
54:22 56:18
58:3 61:12
62:17 63:15
65:19 73:8
73:10 74:1
77:15 79:3
79:4 84:6
86:2 89:19
90:4 90:13
91:9 93:16

93:17 109:6
114:7
115:14
117:6 118:8
139:16
142:9 147:5
147:16 147:17
161:18
172:5
173:20 182:6

**meaning** 44:6
111:23 128:21

**means** 14:14
118:12 125:24
152:11

**meant** 126:24

**measure** 152:18

**medical** 74:7
82:13

**meet** 125:20

**meetings**
20:18 20:19

**meets** 58:4

**member** 15:24
57:16 112:6

**members** 14:25
19:1 36:24
81:21

**mention** 10:19
156:19 171:19
172:18

**mentioned**
19:6 19:8
60:15 83:20
172:5 172:6
174:13 174:14

**mere** 143:1
143:6

**merely** 65:9

**mic** 40:5

**Michael** 10:11
173:9

**middle** 120:24
121:5 164:3

**Mike** 14:24

**millimeter**
43:20

**million** 52:12
52:16 52:19

**mind** 170:3

**minor** 155:17

**minute** 103:25
148:4 176:13

**minutes** 46:13
118:21 182:21
182:21

**misconduct**
60:18 60:22
78:3 78:8
78:24 111:1

**misdemeanor**
90:8

**missed** 180:11

**mistaken** 57:5

**MNAIC** 114:13

**model** 43:24

**moment** 25:6
98:22 160:7
161:1 168:8

**MONDAY** 7:4

**monies** 134:7

**month** 16:12
20:20 33:8
33:10 123:22

**months** 16:2
16:4 73:25
91:21 97:21
124:6 124:11

**moot** 76:5

**morning** 8:7

**motions** 158:16

**move** 42:3

42:5 80:11
141:7 144:3
152:7
160:24 160:24
168:12

**moved** 39:3

**movement** 49:7

**movie** 183:13

**moving** 55:12
152:4 164:4

**multiple** 79:4

**municipality**
52:12

**myself** 9:11
10:25 83:10

_____

N

**namely** 141:22

**Nancy** 66:20
183:2

**narcotics** 91:20

**Nathan** 9:21
116:10 116:15
116:18 116:22
117:1 151:11

**nature** 59:18
59:23 70:5
70:11

**necessarily**
39:11 61:16
75:13 88:9
88:10
107:15
127:3
129:12 131:23
171:24

**necessary** 62:10
103:9
103:13 103:14
111:24 112:20
134:9 162:16

**neighborhood**
62:12

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

neither 156:16

nevertheless
126:15

night 83:9

no-bill 128:20

nobody 65:22

noise 39:21

non 114:17
165:22

none 15:6
142:18 173:16

non-
responsive
55:23 76:24
87:10 94:19
111:20 136:8

nor 156:16

normal 90:20

normally 132:22
172:2

Norman 7:14
14:24 15:7
15:7 15:8
15:14 57:22
137:3

noted 125:19

notes 10:23

nothing 7:24
9:1 66:15
87:23
132:21 139:15
149:11 149:13
155:12 174:13
179:25

notice 10:22
10:24 11:14
11:23 55:21
180:5

noticed 138:16

notification
11:13

122:14 128:10

notified 84:24

notify 48:2

notwithstanding
111:5 129:4

November 171:13
173:17 179:12

Nowhere 128:10

——————————
O

obey 81:24

object 35:7
35:9 49:24
87:16 102:4
111:20 133:21
137:16 153:15
157:8 160:3
162:14 165:14
165:22 181:22

objected 87:13

objection 11:19
13:24 19:18
20:2 20:11
21:12 21:19
22:2 22:9
26:3 28:15
37:25 38:20
39:7 42:21
48:18 49:3
50:1 51:20
51:24 54:4
54:9 54:21
55:6 55:11
55:23 64:10
64:18 71:3
71:10 71:15
71:18 73:5
74:13 76:24
77:14 78:15
78:22 79:10
79:22 80:6
81:3 87:10
88:15 90:12
92:2 92:11
93:12 93:23

94:12 94:19
95:2 95:19
96:5 96:12
96:20 96:24
98:20 99:16
99:23 100:8
100:21
101:7
101:13
102:3 103:1
104:10 107:14
108:1 109:5
113:12 113:22
114:6
118:11 128:16
129:20
130:6
130:15 131:19
132:19
133:4
133:10 134:13
134:21
135:5 136:3
136:8
136:12 136:18
137:8
137:12 137:17
138:7
138:21 139:11
140:1 141:8
141:10
142:4
142:23 142:24
143:15
144:4 153:2
153:16
154:7
154:14 154:21
155:4
155:10 155:24
156:5 156:9
157:7
157:18
158:6
158:14
159:6
159:21
160:9 161:2
161:7

161:13 161:19
162:1 162:6
162:13 163:11
163:15 163:22
164:14 164:23
165:6 166:2
166:17
167:2
167:14 167:24
168:9
168:18 168:21
169:3
169:13 169:17
169:25 170:10
172:1
173:18 174:10
175:3
175:23
176:5 178:8
179:19 181:24

objections
11:18 137:7

objective
166:15

Objectives
77:23 77:25

obligation
19:25 78:12
158:4 161:6
174:1

observes 76:20

obtain 18:12
47:3 111:15

obtained
22:17 86:7

obtains 22:16

occasions
121:16

occupants 152:8

occurred 27:2
27:8 53:14
54:2 54:14
54:16 54:24
76:8 81:8

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

84:9 85:1
85:15 91:4
91:4 98:11
142:15 143:17
145:10 145:15
146:22 148:20
149:1 149:8
171:10 171:13
172:16
176:3 181:5

**occurring**
138:11

**occurs** 29:25
85:16

**October**
174:25 175:11
175:15

**offense** 27:25
83:16 84:6
84:7 84:14
85:11 85:18
85:22 88:14
88:16 88:20
89:7 89:7
90:23 91:7
91:25 92:7
123:21

**offenses**
88:11 88:12
88:12 91:24
95:7 95:14
96:1

**offer** 11:17
49:23

**office** 13:22
14:3 14:6
15:22 15:22
33:20 62:21
82:4 89:23
89:23 90:5
90:7 90:22
93:2 93:5
93:25 95:17
96:4 107:17
107:20
125:7 125:9

128:11 135:20
141:19 142:13
153:7 154:1
175:5
175:11 175:14
175:15
178:3 180:3
180:8 180:16

**officer** 7:16
15:13 17:25
18:2 18:3
21:25 22:4
22:7 23:1
26:22 27:1
27:14 29:3
29:6 29:12
29:15 29:22
29:23 30:3
30:4 30:6
30:8 30:12
30:15 30:16
30:23 31:2
31:13 32:21
34:9 34:13
34:24 35:2
36:8 36:9
36:21 37:3
37:10 38:13
38:17 39:13
40:16 41:18
42:9 42:10
42:12 42:14
44:4 44:9
45:2 45:15
46:24 47:1
47:3 47:23
48:1 51:15
52:9 53:1
53:16 53:23
54:1 54:2
54:8 54:16
56:22 58:6
58:11 60:18
60:22 62:2
63:7 63:9
63:22 65:12
67:15 67:20
68:14 68:25

69:1 69:14
69:18 69:20
72:2 77:12
78:14 78:21
79:20 80:12
82:14 83:1
83:4 83:5
83:17 84:1
84:22 85:12
85:16 85:16
85:17 85:20
86:12 86:16
87:5 87:6
87:7 87:18
87:19 87:19
87:20 88:2
88:8 88:19
88:22 88:25
89:3 89:7
89:11 89:12
89:13 89:15
89:17 89:20
89:20 90:1
90:3 90:9
90:10 90:19
91:2 91:10
92:1 92:8
93:13 94:7
94:15 94:23
96:1 97:2
97:22 97:24
98:21 98:24
99:8 99:14
99:21
100:25
101:4
101:16 101:20
101:25 102:20
102:23 103:11
104:9
106:20
107:8 108:4
112:1
113:25
114:3 114:3
114:11 114:13
114:14 114:23
115:7 115:8
115:13 115:18

116:1 116:4
116:9
116:12 116:14
116:17 116:20
116:24 117:10
117:14 117:15
117:17 117:20
117:22
118:3 118:6
118:18 121:18
122:11 122:14
122:25
123:1 124:4
124:17 124:18
128:21
129:6
132:25
133:3 133:9
133:12 133:20
134:2 134:4
134:4 134:7
134:8 135:2
136:10 137:19
137:19 137:21
138:10 138:15
138:19 140:13
141:19
142:1 142:7
142:10 142:16
142:18 142:20
143:12 144:20
145:1 146:9
146:11 146:17
147:14 147:20
148:19 148:22
149:25
150:2 150:8
151:7
151:10 151:13
151:21
152:9
152:10 152:11
152:18 152:20
152:24
153:7
153:13 153:18
153:22
154:4 154:8
155:3 156:7

156:8
156:13 156:14
156:17
157:4
157:13 158:18
158:19
160:5
160:23
161:9
162:11 164:20
164:21
165:4
165:10 165:25
166:5 166:7
166:13 166:15
166:23
167:1 167:4
167:11
168:4 168:7
168:10 168:11
168:16 169:23
170:1 170:4
170:24 172:24
173:6
173:17
174:6 174:7
174:17
175:1 179:14
**officer-**
**involved**
106:8
**officers**
15:19 16:11
17:9 21:16
26:5 31:18
31:25 36:2
36:17 41:5
43:10 47:12
48:7 67:11
69:25 76:11
76:17 81:25
82:2 82:17
83:9 83:11
84:17 90:14
90:17 91:24
95:8 95:8
95:15
144:17 144:22

151:25
152:1
155:19 155:19
161:24
163:1
166:19 179:5
**officer's** 40:23
44:17
113:17
117:4 166:14
**Officers**
152:5
152:12 152:16
**official** 115:25
**officials**
139:23
**oh** 10:25
14:12 29:11
87:18
121:24
128:7
130:25 146:14
170:23 177:11
178:15 183:4
**okay** 8:18
8:24 9:10
9:16 9:21
10:1 10:4
10:10 10:14
10:19 11:3
11:6 11:8
11:14 11:17
12:1 12:3
12:10 12:12
12:15 12:18
13:10 13:13
13:17 16:3
17:12 18:23
21:3 24:21
29:4 31:17
33:1 34:2
34:5 34:15
34:19 35:10
36:2 41:11
42:17 43:1
43:9 43:12

44:12 44:15
44:24 45:2
45:8 46:20
46:23 48:16
49:17 49:23
50:9 50:12
50:13 50:14
50:16 50:20
50:23 51:1
51:2 51:4
51:6 51:10
51:18 52:3
52:24 53:5
53:8 53:18
54:18 55:2
59:6 59:12
63:12 63:23
63:25 64:1
65:21 66:2
66:4 66:17
66:23 67:2
67:7 67:19
70:3 70:8
71:24 72:12
72:13 72:16
72:21 72:22
74:23 75:3
75:11 75:17
76:13 77:2
77:9 77:11
79:23 81:17
81:20 82:9
86:15 87:13
87:15 88:10
88:10 89:10
89:16 90:3
91:1 91:9
92:3 92:19
94:10 95:14
96:1 97:22
98:2 98:13
98:18
100:17 100:19
100:19 103:14
104:1
104:20
105:5
105:13 105:18
105:21 105:25

106:5 106:7
106:17 106:24
107:3
109:10 109:18
109:24 110:21
110:25
111:4 111:7
111:8
111:10 111:19
114:11 114:22
118:2
118:16 118:22
119:9
119:10 119:22
120:6 121:1
122:2 122:3
122:8
122:11 123:11
124:4 125:3
125:10 125:13
125:16 125:24
126:20
128:5 128:6
128:6 128:8
128:8
128:10
129:3 132:6
134:20 135:17
135:25
136:4
136:10
139:7 141:5
141:6
141:14 143:21
143:25
144:9
144:14 144:17
145:14 145:21
145:22 145:23
146:3 146:4
146:22
147:1
147:23 148:17
149:6
149:14 149:23
151:16 152:23
155:8
156:13 158:11
158:12 158:12

159:3 159:3
159:10 159:12
160:7
160:23
161:5
162:23 162:25
167:22 167:22
170:23 172:14
174:20 175:19
175:21 176:16
177:9
177:11 177:11
177:14 177:17
177:19 177:19
177:24 177:24
177:25
178:1
178:15 178:15
178:19 178:21
178:24
179:3 179:7
179:11 179:14
179:17
181:2
181:19 182:16

**oncoming** 152:6

**ones** 19:11 24:5
27:20 62:20
93:6 149:7
149:9

**ongoing** 39:17
40:19

**online** 91:18
91:19

**onto** 122:24
169:6

**open** 167:16

**opened** 58:15

**opening** 18:13
31:22 31:25

**operating** 22:23

**operation**
12:3 19:4

**operations**

20:24 20:25
80:3

**opines** 156:3

**opinion** 75:25
102:9 123:9
124:18 124:24
125:1
125:24
126:3
126:16 128:25
129:5
129:16 129:24
130:4 130:9
133:24
138:3
139:13 139:20
139:24
142:5
160:25
161:3
162:15 163:23

**opinions** 126:16

**opportunity**
23:5 29:12

**opposed** 59:3

**option** 103:24

**order** 183:8
183:10

**ordered** 34:25

**orders** 182:23

**ordinarily** 56:8

**organization**
24:12

**organized**
141:14

**original**
53:12 84:2
84:9 85:18
85:23
125:22 183:8

**others** 147:23
151:21 152:20

**otherwise** 100:5

139:17

**outcome** 103:4
107:24 111:18
112:15 125:21

**output** 45:8

**outside** 66:19
153:21
159:8 160:6
163:8
167:16
168:1 169:7
170:5 179:25

**outstanding**
145:3 146:18

**overall** 19:3
21:1 21:2

**overrule**
25:23 26:1
26:11 26:13

**overruling** 26:6

**oversee** 17:5
24:10

**overseer** 19:11

**overturn**
22:19 134:6

————————

P

**p.m** 66:6 66:9
104:2 104:5
118:23
119:2 148:9
148:13 176:17
176:20 183:15
183:17

**page** 51:4
106:11 119:22
121:4
121:19 121:23
122:7
124:14
127:1
127:16 127:16
127:20 127:20
128:3 128:5

136:2
170:21 170:22
177:3
177:17 178:23

**pages** 106:5
177:9 178:1

**paid** 42:14

**paragraph** 12:20
12:21 12:23
12:25 13:2
13:3 13:13
13:18 13:21
52:24 53:25
54:7 54:20
144:9
145:16 145:21
146:5 180:20

**partial** 134:1

**participation**
17:7

**particular**
24:11 32:12
40:20 47:2
47:3 52:9
64:23 88:6
95:25 109:1
114:1 126:4
145:10 154:25
171:8 173:6
180:13 181:9

**Pasadena** 7:15
8:16 8:19
8:22 12:4
13:5 14:6
14:9 16:22
17:15 19:16
19:21 19:25
20:10 20:15
21:4 21:10
21:17 23:23
24:17 25:12
32:19 33:18
33:21 34:20
35:1 35:13
35:14 38:17
42:10 43:9

44:3 46:6
52:22 53:9
56:17 58:9
59:2 63:23
63:24 65:5
67:16 68:4
80:2 83:3
93:9 94:7
97:7 101:11
103:15
104:8 104:8
105:10 108:19
109:3 112:6
114:25
115:8
115:18 117:17
117:20
118:6 121:4
121:19
138:5
147:11 150:14
150:19
156:1
156:17
157:5
157:14
161:6
161:25
162:5 170:9
175:10
180:6 180:14

**Pasadena's** 10:1
52:15

**passenger** 168:1

**past** 58:7
145:21

**path** 152:7

**patrol** 15:21
16:5 16:7
16:8 16:8
16:19 17:24
35:1 40:21
47:23 63:3
82:16 82:21
82:24 97:25
123:1 144:23

**pattern** 79:14

**pause** 140:19
140:20

**pay** 28:6 30:7
31:7 31:11
31:14
121:12
134:8 159:25

**penalty** 7:22

**pending** 34:16

**people** 38:10
47:21 57:9
60:20 86:2
161:21

**per** 74:1 125:21
161:24 161:25

**percent** 33:13
97:21 121:13

**perfect** 51:5
67:2 172:25
183:14

**performance**
16:12
117:20 170:24
174:2

**period** 16:12
56:7 56:11
56:12 56:14
57:2 149:1
149:8 171:9
171:10 172:14
172:24 173:21
173:25
174:6 174:8
174:12 175:15
175:22

**perjury** 7:22

**permissible**
37:16

**permits** 152:22

**permitted** 26:11
85:11 87:6
87:22 118:9

158:12

**person** 19:3
19:9 19:10
21:13 23:1
25:19 26:4
32:2 36:8
39:16 40:25
46:1 47:17
48:3 54:17
54:24 56:6
56:21 58:3
61:7 62:3
62:23 81:17
82:6 86:20
90:23 92:8
150:5 152:9
152:10
166:1 174:8

**personal**
67:14 72:7
72:15
139:12 163:23

**personally**
71:20 71:22
112:10

**personnel**
36:4 41:3
41:9 42:3
45:20 78:4
98:2 98:5
118:4

**person's** 39:8

**pertain** 63:7

**phone** 39:19
39:25 40:4

**phonetic** 24:16

**picked** 32:2

**picking** 60:3

**picture** 160:17

**pictures** 160:17

**piece** 138:18

**pistol** 43:21
43:21 43:24

101:1

**placed** 117:16

**places** 42:6

**placing** 144:25

**plaintiff**
7:13 8:10
71:1 175:2

**Plaintiff's**
11:7 11:17
119:5
143:25 174:23

**plate** 64:4 86:4

**play** 65:18
153:12 156:20
156:21 156:21
159:25

**played** 40:13
114:10 136:19
137:9 157:1
158:22
159:1
159:18 159:24
160:2
160:21
162:9
166:10
167:9
167:17 168:2

**plays** 158:24

**please** 7:11
7:20 40:12
46:13 50:24
66:5 87:11
103:25
104:1
111:22 111:23
118:15 118:16
144:13
151:3
157:15 159:25
165:13 176:16
182:22 183:9

**point** 19:13
28:25 29:14

37:9 65:24
68:17 73:4
76:6 76:7
88:19 89:25
96:22
102:14 102:21
162:21

**police** 12:4
12:6 12:7
13:5 14:9
16:22 17:4
17:6 17:15
17:16 17:21
17:21 17:25
18:8 18:22
18:25 19:4
19:7 19:16
19:17 19:21
19:25 20:7
20:10 20:15
20:18 20:24
21:4 21:6
21:7 21:9
21:10 21:13
21:16 21:17
21:20 21:24
22:3 22:7
22:10 22:16
22:23 22:25
22:25 23:1
23:3 23:16
23:20 23:23
23:24 24:3
24:4 24:5
24:11 24:18
25:12 25:20
25:22 25:24
25:25 26:1
26:13 32:5
32:19 32:23
33:15 33:18
33:21 33:21
33:22 33:23
34:13 34:20
35:13 35:14
35:18 35:25
36:8 36:9
36:9 38:4

38:6 38:17
38:23 39:1
39:2 39:4
39:8 39:12
39:13 40:16
40:16 40:18
40:23 41:8
41:18 41:21
41:22 42:10
42:12 42:14
42:19 42:19
42:23 43:9
44:3 45:19
46:2 52:8
52:25 53:1
53:5 53:6
53:9 53:9
53:16 54:1
54:8 54:16
56:17 58:9
58:12 58:14
59:2 64:1
64:14 64:22
65:1 67:16
67:19 68:4
68:20 69:22
70:20 70:23
72:16 78:12
80:2 80:3
80:17 81:1
81:8 83:1
83:4 84:12
92:8 92:19
93:1 93:9
94:7 95:7
95:15 96:1
96:10 97:7
97:9 97:16
102:14 102:21
103:3
103:15
105:7
105:10 105:15
108:19
109:3 109:9
111:11
112:5 112:6
112:6
112:15 112:19

112:22 112:23
113:9
113:21
114:3 114:4
114:25
115:8
115:18
117:4
117:10 117:14
117:17 117:20
118:6 125:4
125:17
126:8
130:12 132:15
133:12
135:3 140:2
140:7
141:18 144:19
144:24
145:4
146:19 147:11
155:8 156:1
156:17
157:5
157:14 161:25
162:5
162:12
163:1 163:1
163:3 170:9
175:10 175:14
178:2 180:6
180:15

**polices** 65:14

**policies** 19:2
20:21 22:5
44:2 45:1
64:14 65:5
65:9 65:11
65:17 68:5
76:11
115:19
138:6 140:4
150:15 150:20
153:13
157:6
157:15
162:5 170:9

**policy** 12:7
15:20 19:24
20:4 25:13
27:8 28:20
57:20 59:1
62:19 64:21
67:15 67:21
67:23 67:23
68:4 68:8
68:9 68:11
68:19 69:4
70:1 73:21
76:3 76:4
76:6 79:12
79:18 80:1
80:7 83:25
103:12 108:16
108:22 109:15
109:17 109:19
109:23
110:6 110:8
110:16 112:14
112:18 113:14
114:5
114:19 114:25
129:8
129:16
130:9 138:8
150:22
151:1
152:23
154:8
155:12 155:18
155:25 157:22
157:24
158:3 158:5
158:7
158:13 158:18
158:25
161:8
161:24 161:25
162:7 170:12

**population**
52:12 52:16

**portion** 73:20
107:22 115:4

133:17 159:5

**pose** 169:10

**position** 18:8
18:12 25:9
32:2 82:19
99:13 99:17
99:21
101:11 101:24
104:7
105:13 125:25
139:24 141:25
142:6 142:9
142:20
143:8 150:3
152:24

**positions** 17:17
18:19 25:3
38:6 42:6

**possession**
131:4

**possibility**
154:18 154:20
154:22

**possible**
30:11 30:14
59:1 64:20
65:11 65:17
76:13
108:22 110:22
114:3
114:23
152:7
153:18 164:16
168:23

**possibly** 23:7
65:19

**postpone** 56:6
56:9

**potential** 62:18
62:20 67:23
70:17
108:21 109:15

**power** 39:16
39:17 42:1

42:2 117:12

**powers** 38:4
38:23 39:1
39:4 39:8
39:13 40:16
40:17 40:24
41:21 41:23

**practicable**
151:24 155:18
158:4

**practical** 158:8
158:18

**practice**
95:21 95:24

**preceding**
12:4 53:15
54:15

**predecessor**
14:23

**predecessors**
96:16

**prefer** 43:21
144:11

**preparation**
10:20 98:2
98:6 139:4
171:5 179:15

**prepare** 9:8
9:10 13:20
180:9 181:2
181:3

**prepared**
12:10 12:13
12:15 13:3
13:4 147:25
180:5

**present** 89:24
90:15 93:6
93:8 102:8
107:17 107:17

**presentation**
92:8 92:13
92:20

130:21 175:6

**presented**
9:12 17:8
29:17 70:20
86:17 88:3
88:5 88:17
90:21 92:23
101:15
108:5 113:7
113:9
113:24 131:21
131:23 131:25
132:3 132:6
132:11 135:25
142:13 142:14
153:25 179:25

**presents**
89:22 90:4
91:11 91:14
108:6
128:18 141:15

**pretty** 43:18

**prevent** 152:13

**prevented**
118:13 124:10

**prevents** 139:7

**previous**
105:1 172:21

**previously** 27:6
31:6 56:21
96:6 119:20
128:17 132:20
155:11
166:3 174:11

**primary** 15:3
77:23 77:25

**prior** 16:3 16:4
16:22 28:11
54:17 54:24
67:7 72:1
112:8 126:1
126:5
126:17 147:25
151:24 152:21
157:9

179:18 180:3

**probable** 86:9
86:11 86:13
86:15 86:20
86:25 87:7
87:9 87:20
88:20 89:14
91:3 91:7
91:19 91:23
91:25 92:7
92:9 92:12
92:15 92:16
92:21 96:3
96:8 96:18

**probably** 32:7
60:3 130:20

**problem** 159:13

**procedure** 21:17
22:4 22:8
29:23 73:21
107:16 108:13

**procedures** 10:2
13:5 22:1
41:24 48:9
64:14 65:6
73:21 80:2
89:3 114:4

**proceed** 8:1
12:13 46:18
50:23 60:13
66:9 67:5
104:5 119:2
148:13 176:20

**proceeding**
108:18
110:5 111:6
112:16

**proceedings** 9:4
140:20

**process** 13:7
21:8 21:14
21:21 22:11
22:13 22:14
23:23 24:7
25:18 29:8

29:9 29:10
31:21 31:24
34:8 34:11
34:14 34:15
61:24 63:8
70:7 75:12
76:10 84:20
88:11
107:24
109:1 109:2
113:21 131:16

**produce** 64:25

**produced**
65:13 121:25

**Production**
180:25

**professional**
139:16

**progressed**
32:21

**progression**
27:20 27:24
28:3

**progressive**
27:18

**prohibiting**
87:23

**prolong** 82:10

**promote** 18:3

**proper** 17:8
79:9 79:18
142:6

**properly** 78:5
78:9 79:1
79:20

**property** 35:3
35:5 35:12
35:20 35:21
35:24 36:16
36:24 36:25
37:4 37:6
37:14 37:18
37:22 40:21
40:22 42:9

45:3 45:4
45:13 45:16
116:25 117:16

**prosecution**
180:8 180:16

**prosecutors**
178:24

**protect** 133:3
151:21 154:10

**protection**
52:10 78:1
78:23

**provide** 93:17

**provided**
10:14 13:15
94:17
127:15 127:15
129:24
130:8
130:14 130:17
132:23
149:5 181:8
181:10 181:17

**public** 15:3
15:12 56:23
78:1 78:2
78:7 78:24
79:2 104:23
105:1 117:1
141:18 144:25
152:17 161:10

**pulled** 81:24
164:1

**purchased** 43:17

**purpose** 11:19
49:24 50:1
70:3 75:19
88:21
109:11 145:8

**purposes**
48:23 80:20
128:14 145:18

**purview** 155:22

**pushed** 59:18

**puts** 169:5

**putting** 134:8

—————————

Q

**qualify** 43:19

**qualities** 78:5

**question**
21:23 21:23
26:10 28:17
28:22 28:22
38:15 38:15
40:9 40:12
41:25 47:16
54:6 54:19
55:2 56:4
61:2 63:9
63:19 74:16
74:21 76:12
76:25 77:6
82:7 86:14
87:11 87:14
93:16 93:20
94:2 94:3
94:4 94:23
98:4 99:11
102:16
105:5
111:19 111:22
112:2
113:15
114:9
116:13
117:8
130:17 133:21
135:1 135:1
135:8
137:13 138:16
145:25 148:15
148:16 148:19
157:12 157:12
157:19 157:20
157:25 164:15
164:25 165:13
165:15 165:17
165:18 165:19
165:21 165:23

168:15 169:19
180:18
182:2 182:2
182:7

**questions**
11:4 19:13
19:15 50:21
63:5 63:7
63:19
145:19 176:14

**quick** 60:4
140:18 156:22

**Quit** 165:18

**quite** 32:6
90:24

—————————

R

**raise** 7:20

**Ramirez** 9:24
98:13 99:22
116:5
131:12 131:18
132:6 151:14

**ramming** 144:24

**Randy** 8:10 9:19
12:5 34:24
71:1 71:2
101:10
102:1
102:19
104:9
105:23 106:20
107:9 116:2
123:12 136:17
141:20
142:2
142:11 142:21
143:9 151:8
152:25
180:9 180:17

**rank** 17:18
17:20 17:25
18:7 18:10
18:11 30:18
30:22 30:25

31:1 31:5
31:14 57:17

**ranks** 18:17
31:8 32:21

**rater** 173:1
173:4 173:5

**rating** 173:21
173:25
174:6 174:8
174:12

**readily** 28:21

**ready** 50:6 50:7
67:5

**real** 156:21

**really** 127:19
182:11

**reask** 87:13
165:23

**reason** 72:2
72:3 79:14
96:19 96:21
99:11 100:5
101:17 101:17
124:12 130:19
139:14 139:17
153:23 154:22
168:7
168:15 181:16

**reasonable**
152:6 165:4
165:25

**reasonably**
151:22
152:9 152:19

**reasons** 100:6

**reassign** 38:9
41:19 42:6
116:24

**reassigned** 31:3
31:18 36:22
40:21
149:25 150:2

**reassignment**

40:22 41:20
45:3 48:8
49:2 51:15
150:8

**reassignments**
45:23

**recall** 33:11
49:1 55:22
123:18 127:14
132:9 180:20

**receive** 46:24
47:4 58:11
80:5

**received** 27:1
58:22 59:19
62:4 107:11
127:2

**receiver** 161:15

**receives** 30:3
55:20 58:19

**receiving** 79:20
80:16 81:1
81:1

**recent** 25:8

**recently**
43:19 129:14

**recess** 46:16
60:11 66:7
104:3
118:25 148:11
176:18

**recognize** 106:3
120:23

**recollect** 97:20

**recollection**
101:2

**recommend** 94:15
95:24 95:25
116:20

**recommendation**
47:20 47:24
48:2 74:2
93:10 93:21

94:10 94:24
115:25

**recommendations**
94:22 95:8
95:16

**recommends**
94:15

**record** 7:7
40:13 46:15
46:17 60:7
60:10 60:12
66:6 66:8
66:25 75:14
75:20 83:13
86:6 86:7
104:2 104:4
113:18 114:10
116:19 118:24
119:1
148:10 148:12
176:15 176:17
176:19 183:15

**records** 17:9
75:20 98:2
98:6

**record's** 77:1
160:14

**recruiting** 17:6

**reduce** 22:20
29:18

**reduction** 31:10

**refer** 117:21
130:18 176:8

**reference** 86:18
129:7 181:8

**referenced** 92:6

**references**
145:14

**referring** 13:14
17:18 43:4
72:5 88:22
129:15 136:13
136:14

145:5 180:13

**regarding** 43:12
72:23 79:19
80:4 94:25
121:19 122:12
124:16 125:25
180:16

**regular** 36:15
88:12 96:2

**regulation**
112:14

**reinstating**
134:7

**related** 69:14
105:6

**relating** 67:9
91:25

**relationship**
13:3

**released** 85:3

**relevant**
137:6
164:21 164:24
165:10 174:3

**relying** 181:7

**remain** 23:1
118:5

**remainder**
145:17

**remains** 149:7

**remember** 25:4
33:8 40:12
100:1 132:9
171:7
175:25 176:7

**REMOTE** 7:1

**Removal** 52:8

**remove** 38:12

**render** 55:19
126:15
130:4
139:20 139:23

143:5

**rendered**
103:4
124:24 125:24
129:5 140:15

**rendering** 140:8

**rep** 8:24

**repeat** 19:23
40:9 40:11
53:19 54:6
79:23 92:3
92:4 181:21

**repeated** 140:19

**rephrase** 83:2

**replay** 114:9
159:11 159:13
159:14

**report** 16:10
19:12 27:12
62:20 64:6
64:8 64:16
65:11 71:25
79:21 80:5
80:5 80:16
81:1 83:12
83:16 84:2
84:3 84:3
84:7 84:10
85:11 85:14
85:18 85:22
85:23 99:18
100:10 100:12
100:14 100:24
106:3
106:14 106:22
107:4 107:7
107:11 108:23
112:22 115:13
120:9
122:24 122:25
123:18 123:20
123:21 123:21
123:23
124:1
124:10 135:19
135:21 135:22

136:2 139:1
139:2 147:8

**reporter** 7:18
7:20 40:11
119:1
182:23
183:4 183:7
183:10

**reports** 82:12
84:6 120:20
124:8 139:22

**represent** 7:12

**representative**
8:15 72:12
117:25 139:20
140:6

**represented**
29:15

**representing**
13:23

**represents**
152:17 174:5

**reprimand** 25:14
25:15 26:20
27:1 27:4
27:6 27:9
27:11 27:15
27:17 33:24

**reprimands** 34:2
34:6

**request** 13:24
46:24 47:2
47:11 47:14
163:8 164:5
164:12 164:20
180:19 180:25

**requesting**
162:11

**require**
116:17 116:20

**required** 62:3
117:14 144:15
144:17 144:20

146:8

**requirement**
57:16

**requires** 112:15

**reread** 54:18

**resolution**
108:7

**respect** 13:20
20:7 21:4
21:5 21:10
25:24 26:2
47:7 49:1
78:19 83:16
85:12 89:14
96:4 99:14
101:11 101:25
102:13
107:8
119:14 130:13
131:7
142:20 152:24

**respectful**
161:9
161:12 182:13

**respond** 82:23
84:24

**responding**
164:25

**response**
13:22
129:12 139:13
153:3 159:4
159:10 166:18
167:21 180:25
181:11

**responses**
181:24

**responsibilitie
s** 12:7 16:6
44:8 56:20

**responsible**
16:11 20:4

**responsive**

165:22

**rest** 133:1
145:18

**restricted**
118:4

**restrictions**
44:2 44:7
44:18 152:2

**restroom**
46:10 118:14

**result** 115:22
116:12 149:18

**resulting**
147:20

**results** 140:12

**retire** 33:5
118:10

**retired** 15:9
33:2 118:9
124:4 135:2
143:12

**retirement** 25:8

**retrained**
116:18

**return** 162:12
163:9

**review** 9:14
9:16 9:21
9:24 10:1
10:7 10:10
10:12 10:13
10:22 14:1
14:5 22:19
76:15 98:16
147:17
151:2
153:10
174:1 174:9
175:13 175:18
175:19 178:25
181:4

**reviewed**
10:17 10:20

13:22  48:20
67:19  98:5
100:17
106:3  106:5
152:23  171:5

**Reviewer** 173:11

**reviewing**
17:7  98:18
124:15  157:3

**reviews** 89:24

**Reyes** 15:2
15:14
104:22  104:24
107:8
135:13  135:22
136:1

**rights** 93:5
143:4  178:24

**Rigoberto** 34:24
97:2  104:21
141:16
143:3  180:8
180:17

**Ring** 62:12

**risk** 151:5

**road** 138:4
164:2

**role** 14:23  17:4
17:5  17:10
18:24  18:24
18:25  19:8
23:16  23:20
24:9  36:21
58:8  58:10
64:19  65:4
65:7  65:8
67:8  68:18
69:5  69:9
107:12  108:25
162:18

**roles** 12:6
15:16  15:18
24:10  31:3
31:18  45:3

45:5  45:7
56:19

**room** 35:3
35:5  35:12
35:21  35:24
36:25  37:4
37:6  37:14
37:18  37:22
40:21  40:22
42:9  45:3
45:4  45:13
45:16
116:25  117:16

**rotate** 170:16

**roughly** 97:10

**round** 144:20
144:22  146:9

**routed** 15:21

**Routinely** 69:25

**rude** 60:20

**rudeness**
59:12  69:17
69:20

**rule** 21:17  22:8
48:12  49:1
53:3  58:6
74:11  112:14

**rules** 22:1
22:22  26:12
43:12  43:15
43:25  44:2
44:6  48:8
48:13  48:16
48:20  49:10
65:9  73:21
80:2  108:18
109:3

**ruling** 23:2

**runs** 20:24

---

S

---

**safety** 152:17
164:6

**Saldivar** 7:17
34:24  34:25
35:2  37:3
38:13  42:9
45:2  45:15
72:3  97:2
97:22  98:21
98:24  99:8
99:14  99:21
100:25
101:4
101:17  101:20
102:20  102:23
104:9
106:20
115:7  115:8
116:1  116:4
116:9
116:14  116:17
116:21  116:24
117:15  117:22
121:18  122:15
124:4  129:6
135:2
137:19  137:20
137:21  138:10
138:15  140:13
140:25  141:16
142:1  142:7
142:16  142:18
142:20
143:3  143:9
143:12  146:11
150:8  151:8
151:11  152:25
153:7
153:13  153:18
153:22
154:4
156:14
157:4
157:13  158:19
160:5
160:23  162:11
164:20  165:11
166:5  166:7
167:11  167:19
168:4  168:7
168:10  168:11

168:16  169:24
170:1  170:4
175:1  180:8
180:17

**Saldivar's**
36:21  37:10
39:13  40:16
102:1
104:21
107:9
115:18
118:3
122:11  124:18
138:19  164:21
170:24  173:17
174:17

**Salvidar** 7:10

**saw** 49:1
71:23  83:21
115:13
118:7
137:18  137:18
137:19  137:20
156:16

**scale** 31:14

**scene** 72:10
84:25  85:3
85:17

**scene's** 85:3

**schedule** 48:5

**scheduled** 30:6

**Schenck** 131:8

**Schenk** 9:22
116:10  116:15
116:18  116:22
117:2
119:15
120:7  126:2
126:9  127:7
129:6
131:18  131:25
132:10  132:13
132:18  147:22
149:21  151:11
171:10  172:15

173:17

**scratched**
114:15

**screen** 11:7
49:12 55:12
119:12 136:24
136:24

**scroll** 50:6
50:8 50:12
50:14 51:1
51:2 51:4
119:21 126:25
136:4
145:20 145:21
145:22 177:11
177:16 177:21
177:23 177:25
178:21

**scrolled** 49:14

**scrolling**
177:20 177:23

**se** 74:1

**seat** 168:1

**second** 60:2
60:4 110:14
133:18 140:18
140:19

**seconds** 137:5

**section** 49:13
49:18 50:11
50:17 50:17
50:20 50:25
52:11 52:21
53:6 53:18
55:7 55:17
55:18 55:24
56:5 75:3
75:9 77:18
151:20 152:15

**sections** 51:7
51:16 51:18
51:22 51:25

**secured** 44:14

**seeing** 72:24

**seek** 86:19
90:18

**seeking** 86:25
87:20 91:8

**seems** 70:5

**seen** 66:12 76:7
112:5
116:23 121:13
121:15 127:11
128:24
141:2
150:11 150:12
172:8

**Selbe** 7:16 7:16
40:4 50:1
66:15 87:16
102:4
137:16 141:10
142:24
144:4
153:15
157:8 160:3
162:14 165:14
181:22 182:25
182:25

**selected** 18:5
23:14 57:25
58:1 58:3

**self-imposed**
152:14

**send** 47:21

**sense** 31:15
31:16 63:8
73:9 86:8
90:23 122:9
132:16

**sent** 62:21
107:4
112:22 115:13
135:20 151:2

**sentence**
53:20 53:21
54:19

**separate** 18:7
18:10 18:11
25:19 35:12
35:22 68:22
72:20 84:17
85:14 85:22
103:19 110:12
115:8

**separated** 77:13
78:14 78:21

**separates** 76:4

**separation**
102:23 123:14

**September**
123:16 123:24

**sergeant** 7:2
7:9 14:17
14:24 15:8
15:12 15:13
15:14 15:16
16:8 16:25
18:2 18:4
18:17 18:20
31:13 45:11
45:13 46:20
48:2 57:18
57:22 57:22
62:22 66:17
82:15 83:3
105:9
105:14 119:24
120:1 120:2
124:16 125:21
162:20
173:9 183:16

**sergeants** 17:24
18:1 24:19
57:6 57:11
57:13 57:21
57:23

**serious** 60:17
60:22 151:6
151:23 151:23
154:16

**seriously**

152:18

**seriousness**
63:4

**servant** 141:18

**serve** 81:22

**served** 8:24

**service** 13:10
22:18 22:22
23:2 23:4
23:8 26:5
26:10 26:17
28:20 34:16
36:17 41:24
45:21 48:8
48:10 49:10
52:10 53:3
74:10 80:8
98:22 134:3
134:5 134:6

**seven** 16:2

**several** 92:24
179:5

**severity** 26:22

**share** 11:6
49:12
136:24 136:24
136:25

**Sheriff's** 82:4

**she's** 60:3

**shift** 16:4 16:6
16:8 16:19
48:4 82:21
82:24 83:11
98:1 173:12

**shoes** 166:14

**shoot** 152:1
154:6
155:20
156:7
156:15 156:18
157:4
157:13
158:3 158:5

158:8
158:13
159:4 168:5
168:8
168:17
169:7
169:11 169:12
169:16 169:23

**shooting** 9:19
9:21 9:24
12:5 35:3
35:4 63:10
63:22 67:19
69:1 71:1
72:16 72:20
81:11 81:18
81:20 82:11
83:5 84:12
84:15 84:22
85:12 85:16
87:6 87:19
88:8 88:23
89:3 89:12
89:14 89:18
89:19 90:3
92:19 93:13
94:9 94:24
96:11 98:11
98:13 99:9
100:17 100:19
100:20
101:5
101:10 101:11
102:1
102:13 102:19
104:9
104:22 105:23
106:19
107:9
107:13 107:23
112:1 113:2
114:4
114:14
116:1 116:4
116:9
116:12 116:14
116:18 117:15
119:15

120:7
120:13 121:19
122:12 123:12
124:1
124:17 125:25
126:1 126:2
126:16
127:5 127:7
128:14 128:25
129:6
130:13
131:8
131:12 131:25
132:3 132:6
133:13 134:19
136:16 136:17
138:14 146:16
146:20 146:22
147:1
147:14 147:20
147:22 149:16
149:18
150:9
153:11
155:3
171:10 171:13
171:19 171:23
172:16 172:18
173:17 173:20
179:4 180:9
180:17

**shootings**
9:16 60:18
60:23 63:7
81:8 82:16
98:9 106:8
131:18 131:21
131:22 132:11
147:15 148:20
148:23
149:6
149:11 166:13

**shoplifter**
91:17

**shot** 34:24
87:21 116:22

117:1 143:9
160:19 174:7

**shots** 152:3

**showed** 135:10

**showing** 11:7
48:6 49:12
110:16
118:4
119:14 140:17
140:24 143:22
150:13 156:22
160:16 170:16
170:21 170:24
172:11 174:16
174:23 176:23
177:3

**shown** 86:18
113:6

**shows** 152:2

**sidebar** 87:16
133:22

**sign** 173:20
173:23 173:25

**signature** 121:3
121:4 121:5
121:8
121:11 121:15
122:7
125:15 126:22
126:24
127:2 135:7

**signatures**
120:23

**signed** 62:4
125:10 125:13
126:20 136:5

**signify** 106:24

**signing** 174:2

**signs** 30:4

**similar** 18:14
27:8 27:16
120:16 120:21

**simultaneously**

137:25

**single** 144:20
146:9 150:2

**sir** 8:7 8:12
11:25 13:12
13:16 15:9
17:3 17:14
18:15 25:25
27:23 55:16
56:2 66:21
67:4 77:4
81:16 82:10
83:13 87:11
94:2 94:23
97:8 97:14
98:5 119:12
120:8
120:20
147:9
147:15 150:21
160:1
164:11 171:15
182:11 182:18

**sit** 80:4
91:21 164:5
166:4

**situation** 26:23
27:5 27:14
83:18 89:17
99:1 99:15
102:7
153:20 153:21
154:10
165:5 166:22

**situations**
166:6

**six** 16:4
16:12 73:25

**small** 32:8

**sole** 94:22

**somebody**
27:25 62:2
114:17
165:7 174:7

**someone** 24:1

26:6 41:2
47:13 47:14
49:6 59:9
113:5
129:24 147:14
154:9
154:10 154:16
166:4

**sometime** 163:6

**somewhere** 36:14

**son** 60:3 66:10

**sooner** 81:5

**sorry** 19:23
29:11 30:13
33:19 46:21
53:19 54:6
55:14 78:6
79:23 85:22
86:15 87:18
98:4 102:15
102:15 109:10
115:2 115:8
124:2 128:7
130:25
131:2
137:13 140:21
148:14 162:19
169:18
173:7 173:8
178:6
180:11 180:11
181:21
183:2 183:4

**sound** 115:11
136:20 136:21
136:22 136:25

**sounds** 66:24
124:5 124:9
129:13
137:6 168:10

**source** 42:1

**speak** 179:14
180:2 181:3
181:4

**speaking** 8:18

57:1 102:15

**specific**
27:10 61:11
71:11 86:14
112:18 113:14
157:25

**specifically**
21:24 36:23
49:4 51:16
76:19 77:7
117:8
133:17
171:7
175:25 178:5

**specifies** 48:12

**speculating**
130:19

**Speculation**
48:18 77:14
130:6
130:15 143:15
175:3 176:5

**spoke** 175:21

**spoken** 117:23

**spot** 25:7 32:3

**squad** 16:9
47:21 83:9

**stand** 66:5
104:1
118:16 176:16
182:22

**standard**
95:21 95:24
103:24

**stands** 100:3
104:11

**start** 11:6 14:8
17:15 17:19
18:22 21:21
22:3 22:10
22:13 22:14
23:23 24:7
34:7 34:7
34:11 34:14

44:11 84:25
85:4 94:8
147:15 177:23
182:19

**started** 14:14
24:22 32:20
73:11 76:2

**starting**
34:15
121:19 122:18

**starts** 21:14
25:18

**state** 7:11
37:21 43:2
75:25
133:23 139:24
152:1
155:20 156:15
157:17
158:4
158:13 158:18
169:12

**stated** 51:14
56:21 67:22
72:3 96:6
96:13
107:16 113:13
124:14 128:17
132:20 133:16
133:18
143:1
153:19 155:11
156:7
157:13
158:2
158:15
166:3 168:8
174:11

**statement** 53:12
62:4 91:19
91:23 92:7
92:10 92:21
121:18 122:11
128:6 133:5
160:10 160:11
160:16 160:17

169:21 179:2

**statements**
91:25

**states** 27:11
48:14 49:5
51:19 55:18
78:6 152:12
154:8
155:12 155:18
158:7 158:18

**stating**
113:14 142:9

**statistics**
145:23

**stay** 31:14

**step** 91:13
170:8 170:8

**steps** 67:21
70:7 75:11
166:1

**Steve** 7:16
39:22 182:25

**stint** 105:1

**stipulate** 182:3

**stipulation**
28:24

**stop** 51:6
51:6 60:21
78:6 110:14
136:23 137:19
138:2
144:23
145:2
146:18 162:12
163:3 163:24

**stopped** 164:3

**stopping** 38:19

**stops** 163:1
166:12

**store** 36:20

**street** 37:13
164:9

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

178:25
179:3 179:4

**streets** 35:1
41:18 47:23

**stretch** 149:23

**strike** 22:23

**struck** 144:21

**structure** 17:18
17:20 24:17
27:18 31:6
56:16 56:18
57:3 57:4

**structured**
17:16

**stuff** 82:14

**styled** 141:17

**subchapter**
49:15 49:18
49:20 50:10
50:24 52:3
52:6 52:7
52:21

**subject** 47:5
52:4 82:2
137:20 169:5

**subjective**
101:4
138:20 164:22

**subjectively**
154:4

**submit** 85:7

**submitted** 136:6
149:13

**substantial**
151:5

**substantiate**
59:24

**suggest** 65:10
65:10 77:7

**suggestion**
76:21

**suicide** 152:14

**summarize** 123:4

**summarizes**
107:7 120:17

**summary** 64:11
120:13 120:17
122:21 122:23
123:12 123:23
124:6
124:15 125:22

**Sunday** 164:3

**supervise** 97:22

**supervises** 16:9

**supervision**
53:2 83:7
83:8

**supervisor**
15:21 16:9
16:14 16:15
16:19 35:23
45:11 58:22
59:19 84:23
105:14 152:20
172:2 173:6

**supervisors**
172:9

**supplement**
85:21 85:22
85:25 86:6
135:25

**supplements**
86:2

**support** 62:15
85:5

**supporting**
100:6

**supposed** 162:2

**sure** 17:8
19:2 38:7
46:11 47:22
50:21 50:22
51:1 51:11
60:5 62:1

64:3 64:3
67:19 77:1
77:25 80:1
86:14
103:23
121:2
121:13 147:16
159:15 159:16
160:14 161:17
173:20
174:2 174:5
176:14
177:2 177:15

**surprised** 172:8

**surprising**
174:13

**surrounding**
166:6

**suspect**
144:18 144:19
144:21 144:21
144:23 146:10
149:15 158:11
163:8

**suspects** 152:13

**suspend** 21:16
21:25 34:9
34:16 52:25
54:1

**suspended**
23:1 23:4
29:6 29:7
53:24 54:15
54:17 54:25
56:6

**suspends**
22:25 23:3
53:15

**suspension** 22:4
22:8 25:15
25:16 25:16
27:21 27:22
28:4 28:5
28:8 30:2
30:4 34:13

52:8 55:5
55:18 56:12

**suspensions**
21:24

**Sustained**
110:25 111:1

**swear** 7:18

**swears** 86:16

**system** 36:19
153:8

---

T

**tactics** 162:15

**taking** 8:13
8:14 8:15
39:8 40:23

**talk** 56:15 70:3

**talked** 26:22
69:1 178:4
179:8

**talking** 20:25
40:10 44:10
52:5 52:8
53:22 63:16
71:20 71:22
75:15 76:3
76:6 82:20
91:5 109:1
131:1
133:17 144:14
147:13 148:22

**task** 81:21

**TCOLE** 17:8

**teach** 162:25

**technically**
83:10

**ten** 12:4

**terminate** 134:4

**terminated**
115:7 143:13

**terms** 17:16
18:8 19:7

19:21 19:24
57:1 161:5
166:14

**test** 18:11
18:20

**testified** 8:4
9:3 34:23
42:17 48:7
67:7 67:8
75:6 84:11
108:13
140:7
175:21 176:2

**testify** 12:10
13:4 13:20
96:17

**testimony**
7:23 10:7
10:10 68:10
69:3 113:8
132:14
140:2
176:24 181:15

**tests** 18:18

**Texas** 43:6

**thank** 14:13
26:18 29:4
46:22 50:13
55:2 60:8
73:15 83:14
96:10 105:5
105:21 119:10
127:1 128:1
137:1 137:3
147:9 148:8
166:9 167:8
177:12 177:19
182:12 182:16
182:18

**Thanks** 148:7

**That'd** 38:5
159:17

**theft** 89:4

**themselves** 41:5

93:9 151:25
155:19
156:8 166:14

**therefore**
78:3 134:6
154:1

**there're** 79:3

**there's** 15:19
18:12 23:11
25:25 29:2
29:20 31:1
31:25 32:6
35:20 40:19
47:22 55:23
58:5 58:6
58:13 59:6
59:6 59:10
61:17 65:4
66:10 66:15
68:22 72:23
74:3 75:14
76:16 81:9
83:9 84:22
86:6 86:7
87:23 89:18
92:16 92:24
108:8
109:14 120:17
121:4
129:21 132:20
136:5
136:20 136:22
139:17
140:3 141:8
143:16 149:11
155:11
164:4
171:16 172:18
178:1

**they're** 16:10
19:3 19:11
19:11 35:21
36:8 75:15
83:19 86:19
90:2 91:8
92:24 93:25
117:9 162:2

166:14 166:15
167:25

**they've** 27:6
43:20 65:15

**third** 25:7

**thorough** 108:9

**thoroughly** 78:4
78:9 78:25
102:6
140:12 170:14

**thoughts**
71:17 98:18
160:25
161:5 162:11

**threat** 151:23
152:17

**threatened**
152:5

**threatening**
152:10

**throughout**
97:15 182:13

**ticket** 92:14

**timeframe**
57:7 57:10
175:18

**title** 18:10

**titles** 18:14

**today** 100:3
179:18

**Tom** 24:15

**top** 17:20 31:14
51:5 126:25
136:4
147:16 174:25
177:16 177:24

**topic** 12:3
76:18 180:10

**topics** 11:3
12:1 180:21

**total** 103:23

**totality**
72:10 131:3

**toward** 134:24
144:21 146:9

**towards** 101:3

**to-wit** 141:18

**traffic** 9:1
37:23 60:21
92:14
137:18 137:19
144:25 163:24
164:4 164:8

**train** 76:10

**trained** 76:17

**training**
36:10 46:24
47:3 47:5
47:6 47:12
47:17 47:21
48:5 77:7
79:15
116:21 162:18
162:20

**transaction**
91:20

**transcript**
115:5
182:24
183:1 183:12

**transferring**
32:1

**transfers** 48:11

**transitioned**
43:20

**traveling** 37:14
37:19 43:2

**treats** 161:6

**trial** 103:10

**true** 65:20
86:18 113:6
129:5 129:7

**truth** 7:23 7:24

7:24  8:4

**try** 69:16 69:16
74:1 114:22
166:22 167:3

**trying** 42:7
43:7 49:7
55:12 70:13
70:13 72:25
82:6 86:19
91:13 94:14
122:5
127:20 166:13
166:15 177:18
180:22

**turn** 148:5

**turned** 36:16
107:1

**twice** 20:20
71:7 71:7

**type** 27:8 60:20
62:9 74:8
79:14 92:13
92:16
129:25 130:17
136:16 176:4

**types** 59:5 59:6
145:10

**typical** 88:24
106:7

**typically**
70:2 80:16
86:22 89:13
91:25 92:9
94:25 95:4
95:16 96:10
96:14

--- U ---

**U3.3** 151:4

**U3.4** 151:20

**Uh-huh** 77:22

**ultimate** 20:4

**ultimately**

22:18

**Um-hmm** 23:10
58:2 59:14
74:25 75:5
75:8 81:13
97:19
144:16 155:21
156:3
179:10 179:13

**unable** 74:7

**uncovered** 83:21
101:18

**undergo** 47:12
70:14

**underneath**
121:5 152:2

**understand** 8:11
8:16 8:18
8:22 35:17
38:7 42:5
53:25 54:7
54:19 69:10
70:2 72:25
76:12 89:6
90:13
161:17 169:19

**understanding**
25:9 33:16
38:5 38:25
49:11 70:8
88:17 89:10
89:16 93:8
96:17 101:2
114:8 115:2

**Understood**
15:16 26:18
72:11 73:15

**undertake**
116:21

**Unfounded**
110:25

**uniform** 44:17
131:16

**unit** 35:22

104:23 105:2

**units** 35:18

**unlawfully**
141:18 143:9

**Unless** 29:2

**uphold** 22:20

**upon** 71:9 71:13
72:15 87:8
98:18 173:3

**upper** 173:10

**Urban** 7:2 7:9
7:20 8:3
46:20 46:20
183:16

**usually** 19:12
30:19 31:13
35:23 58:4
59:15 84:23
85:14 86:19
87:23 87:25
91:21
103:17
116:6
116:11
127:2 151:2

**utilized** 144:22
145:2 146:17

--- V ---

**valid** 59:25

**varied** 24:24

**varies** 17:22
31:22 32:13
57:7

**vast** 173:5

**vehicle** 43:3
71:2 81:23
82:7 82:8
138:9
138:14 144:19
145:2
146:18
152:4 152:5

152:6
152:11 152:12
163:9 163:9

**vehicles** 144:23
144:24

**verbal** 25:14
26:20 27:1
27:6 27:15
27:21 34:2
34:6

**version** 151:1

**versus** 89:4

**vetted** 107:20

**video** 69:18
71:4 71:6
71:7 71:9
71:14 72:2
72:5 72:15
72:22 98:16
98:19
100:18 100:19
136:19
137:9
137:15 139:23
140:4
153:11 153:12
156:13 156:23
157:1 157:3
158:17 158:22
158:24
159:1
159:18 159:25
160:2
160:21
162:9 164:8
164:10
165:8
166:10
167:9
167:17 168:2

**VIDEOGRAPHER**
7:7 7:18
8:2 39:24
40:2 46:14
46:17 60:6
60:9 60:12

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

66:5 66:8
66:21 67:1
104:1 104:4
118:16 118:23
119:10 136:23
137:2 148:9
148:12 176:16
176:19 182:22
183:2 183:6
183:14

**videos** 9:16
62:11 62:11
62:11

**videotape** 83:21

**Videotaped**
7:1 177:4

**view** 72:9 101:4
164:22

**viewing** 72:22

**viewpoint** 167:1

**Vincent** 66:20
119:8

**violate**
128:21 162:4

**violated**
25:13 64:15
65:9 65:16
67:15 67:20
67:23 68:8
68:15 76:4
85:13 87:21
103:11 108:19
109:4
109:20 109:23
114:4
114:25 115:18
153:13

**violation**
22:1 22:4
22:8 27:8
27:25 37:23
53:2 58:25
59:1 65:5
67:24 68:2
68:16 76:3

76:6 83:25
90:21 91:3
91:4 108:22
109:15 109:17
114:5
114:19 137:18
140:3
153:18
162:8 170:12

**violations**
15:20 21:17
62:19 64:21
67:25 68:19
68:19 70:1
108:16
110:6 110:8
129:9
129:16 130:10
155:17

**violent** 31:23
35:20

**visible** 170:5

**visions** 17:17

**voluntary** 48:11

**vs** 7:10

**vulgar** 161:21
161:24 162:4

──────────
W
──────────
**wait** 111:11
111:24 112:15
112:19 113:15
113:15

**waited** 131:11
131:16 131:17
132:16 132:17

**waiting** 130:20

**Warning** 152:3

**Warnke** 24:15

**warrant** 74:3
81:22 91:5
91:7 92:15
142:14

143:2 143:6

**warranted**
163:14

**warrants**
145:3 146:19

**wasn't** 37:13
117:24 136:5

**watch** 66:11
71:6

**watched** 71:4
72:5

**watching**
69:18 71:9
71:13 72:2
72:9 72:15
156:13

**ways** 138:4

**weapon** 38:13
42:19 43:3
43:6 43:17
43:18 44:4
44:13 44:16
44:16 44:25
98:22 101:3
117:5
117:19
118:5 118:9
137:22 137:24
138:2 138:9
141:22
142:2
144:20 146:9

**weapons** 42:23
43:10 43:12
44:8 81:25
82:2

**weaving** 164:2

**we'd** 117:21

**weeks** 81:5

**welcome** 26:19
137:2 137:4

**we'll** 66:22
160:19 176:14

**we're** 27:17
46:14 55:13
65:18
106:11
122:5
127:19 127:24
149:23 160:20
170:2

**we've** 17:12
148:4 170:7

**whatever**
15:22 19:12
22:16 29:15
30:19 43:24
45:6 58:3
58:3 59:25
65:18 68:12
85:21 86:1
86:5 110:2
130:16 138:25

**whenever** 92:23

**When's** 163:5

**WHEREUPON** 11:21
40:13 46:16
50:2 60:11
66:7 104:3
104:16 114:10
118:25
119:6
136:19
137:9
141:11
144:7
148:11 150:16
156:24
157:1
158:22
159:1
159:18
160:2
160:21
162:9
166:10
167:9
167:17
168:2
170:18 176:18

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

176:21 183:16

**whether** 15:19
29:15 37:3
37:9 37:9
49:1 52:15
58:11 58:20
61:8 62:14
64:13 65:4
65:15 70:23
78:20 79:20
85:20 88:2
88:6 89:19
89:25 90:10
90:18 91:2
93:11 93:21
93:24 94:11
94:15 94:21
94:25 95:9
95:17 98:24
99:4 99:14
99:21
101:12 101:25
102:8
103:11 107:12
107:23 108:18
109:3
109:19 111:15
113:10 113:25
115:17 123:11
127:4 127:5
128:14 129:22
130:9
131:21 136:10
139:8
139:21 139:24
140:3
141:25
142:9
142:17 142:19
142:20
143:8 150:7
152:24 153:18
155:3 166:19

**whichever**
144:11

**whoever** 85:17
96:22

**whoever's** 62:25
103:6

**whole** 7:23
47:21 55:13
109:2
127:18 166:23
172:9

**whom** 86:22

**who's** 62:23

**whose** 158:11

**wife** 60:2

**window** 160:6
167:12

**wish** 29:7
145:18

**witness** 7:19
86:3 99:5
140:2 140:4
140:9

**work** 28:5 32:19
37:20 45:8
57:14 74:10

**worked** 32:22
37:14 97:23
97:24 97:25

**working** 15:11
15:13 37:5
37:12 37:18
83:10 86:5
86:23 153:8

**workings** 175:5

**works** 56:23

**world** 172:25

**worries** 40:6
40:6

**wow** 14:12

**Wright** 103:5
125:3 173:13

**write** 85:11
85:17 85:21
86:2 86:5
86:24 87:6

87:9 87:19
88:20 89:13
96:3 96:18

**writing** 55:8
55:20

**written** 53:12
92:1 120:20

**wrong** 85:20
89:11 89:21

**wrongdoing**
124:19

**wrote** 128:25

───────────
Y
───────────

**yet** 125:20

**you'll** 83:22
123:7
136:25 177:24

**yourself**
12:13 15:1
50:5 144:10
145:19 177:10

**yourselves** 7:11

**you've** 15:24
50:21 50:22
51:7 71:1
81:7 100:12
100:14 100:17
133:18
139:2 139:9

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM