**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON TEXAS**

Randy Aviles,

      Plaintiff,

vs.                                                    #4:22-CV-03571

Rigoberto Salvidar,
City of Pasadena, TX,

      Defendants.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



*Powerful*
LITIGATION SUPPORT

**VIDEOTAPED DEPOSITION OF**

**CHIEF JOSHUA BRUEGGER**


**TAKEN ON**
**FRIDAY, JANUARY 5, 2024**
**9:22 A.M.**


**937 BROADWAY STREET**
**MYRTLE BEACH, SOUTH CAROLINA 29577**

2

```
1                    APPEARANCES
2
3   For the Plaintiff:
4   Dimitri Dube, Esquire
5   The Cochran Firm
6   1825 Market Center Blvd., Suite 500
7   Dallas, TX 75207
8   (214) 651-4260
9   (214) 651-4261 (Fax)
10  ddube@cochrantexas.com
11
12  For the Defendant:
13  Norman Giles, Esquire
14  Lewis Brisbois
15  24 Greenway Plaza, Suite 1400
16  Houston, TX 77046
17  (713) 659-6767
18  (713) 759-6830 (Fax)
19  Norman.giles@lewisbrisbois.com
20
21
22
23
24
25
```

4

```
1                  EXAMINATION INDEX
2                                      Page
3
4   EXAMINATION BY MR. DUBE              8
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1              APPEARANCES CONTINUED
2
3   For the Defendant:
4   Steven D. Selbe, Esquire
5   Gordon Rees Scully Mankhani, LLP
6   3/D International Tower
7   1900 W. Loop S #1000
8   Houston, TX 77046
9   (713) 961-366
10  (713) 961-3938 (Fax)
11  sselbe@grsm.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
1                   EXHIBITS INDEX
2   PLAINTIFF'S EXHIBIT                  Page
3
4        (ALL EXHIBITS WERE RETAINED.)
5
6   19    VIDEO                 85
7
8   32    VIDEO                 174
9
10  34    DEPOSITION TRANSCRIPT (COOPER)    145
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

**6**

1        S T I P U L A T I O N S
2  It is stipulated among Counsel that this deposition
3  is being taken pursuant to the Federal Rules of
4  Civil Procedure; and that all objections, except as
5  to the form of the question, are reserved until the
6  time of trial.
7  It is also stipulated among Counsel for the
8  respective parties and the deponent that the
9  deponent will exercise the right to read and sign
10  this transcript.
11
12  The deposition is taken pursuant to notice
13  and/or agreement, in the above-entitled cause
14  pending in the above-named court and pursuant to
15  the Federal Rules of Civil Procedure.
16
17
18
19
20
21
22
23
24
25

**8**

1      VIDEO TECHNICIAN:  All right.  Mark, would
2  you please swear in the witness.
3  Thereupon, JOSHUA BRUEGGER, being first duly sworn
4  by the Court Reporter, as hereinafter certified,
5  testified as follows:
6        MR. DUBE:  We're ready to start?
7        COURT REPORTER:  Yes, sir.
8  EXAMINATION
9  BY MR. DUBE:
10   Q   Good morning, sir.  How are you?
11   A   Good, thank you.
12   Q   We met briefly out in the hall.  My name
13  is Dimitri Dube.  I'm an attorney and I represent
14  Mr. Randy Aviles in this lawsuit.
15   A   Yes, sir.
16   Q   Okay.  And you know the lawsuit we're
17  talking -- we were referring to is lawsuit Aviles
18  versus the City of Pasadena and Rigoberto Saldivar.
19   A   Yes, sir.
20   Q   And you are familiar with that lawsuit?
21   A   Yes, sir.
22   Q   Okay.  All right.  We are here in Myrtle
23  Beach.
24   A   Yes, sir.
25   Q   And this is where you work. Correct?

**7**

1        VIDEOTAPED DEPOSITION OF
2        CHIEF JOSHUA BRUEGGER
3              TAKEN ON
4        FRIDAY, JANUARY 5, 2024
5              9:22 A.M.
6
7      VIDEO TECHNICIAN:  We're on the record in
8  the video deposition of Chief Joshua Bruegger in the
9  matter of Aviles versus Saldivar.  Today's date is
10  January 5th, 2024. We're located at Myrtle Beach
11  City Hall in Myrtle Beach, South Carolina.  The
12  court reporter is Mark Hagood.  My name is Arthur
13  Daugomah with Naegeli Deposition and Trial.  The
14  time is now 9:22.  Will counsel please identify
15  themselves for the record?
16      MR. DUBE:  Dimitri Dube on behalf of
17  plaintiff Randy Aviles.
18      MR. GILES:  Norman Giles.  I represent the
19  City of Pasadena.
20      MR. SELBE:  Steve Selbe for off-- Officer
21  Saldivar.
22      MR. DUBE:  And Larry Taylor from my
23  office, Cochran Firm, will also be joining us at
24  some point.  I think when he comes or not, he's
25  going to make his appearance as well.

**9**

1   A   Correct.
2   Q   Okay.  What do you do?
3   A   Assistant city manager.
4   Q   Okay.  How long have you been in that
5  role?
6   A   October 30th of 2023.
7   Q   Okay.  And -- bef--- October 30th of 2023?
8   A   Yes, sir.
9   Q   Okay.  So -- so very recently?
10   A   Yes, sir.
11   Q   When did you leave employment with the
12  City of Pasadena?
13   A   October 6th of 2023.
14   Q   And before we go any further, I just want
15  to get some preliminaries out of the way. Is there
16  any reason why you would not be able to give
17  truthful testimony today?
18   A   No.
19   Q   Okay.  Are you on any medications or
20  anything else that would prevent you from -- from
21  remembering or giving truthful testimony?
22   A   No.
23   Q   And you are ready to proceed today?
24   A   Yes.
25   Q   Okay.  How did you prepare for this

Chief Joshua Bruegger   January 5, 2024   NDT Assgn # 71056      Page 4

10

1  deposition?
2      A   I reviewed the reports, previous
3  testimony.
4      Q   Which reports did you review?
5      A   The internal affairs report and the
6  documents that go with that for this particular
7  incident.
8      Q   Okay.  Is that -- by internal affairs
9  report, are you referring to the report from
10  Sergeant Hamilton to you at the conclusion of -- of
11  the investigation of the Schenk case?
12      A   I -- I reviewed that as well, but the one
13  that detective Mauricio Reyes drafted or authored
14  for this -- the Aviles shooting.
15      Q   Okay.  Okay.  So you've reviewed the one
16  for the Schenk shooting and the one for the Aviles
17  shooting?
18      A   Yes.
19      Q   Okay.  Anything else that you reviewed?
20      A   No.
21      Q   Okay.  Did you review any videos?
22      A   No.
23      Q   Okay.  Did you speak to anybody?
24      A   An attorney.
25      Q   Anybody besides an attorney?

11

1      A   No.
2      Q   Okay.  Tell us a little bit about how --
3  you know, where you grew up.
4      A   Where I grew up?
5      Q   Uh-huh.
6      A   Pretty much the Houston area.  I lived
7  overseas for a couple of years as a teenager, but
8  other than that, it's been the Houston area.
9      Q   Where overseas?
10      A   Indonesia.
11      Q   Okay.  How long were you there?
12      A   Two years.
13      Q   Okay.  Why did you --
14      A   My dad -- work.  My dad's work.
15      Q   Okay.  What did he do?
16      A   He worked for ExxonMobil.
17      Q   How old were you when you were in -- in
18  Indonesia?
19      A   Seventh/eighth grade, so whatever that
20  makes you; 12, 13, somewhere in there.
21      Q   And did you come back here for high
22  school?
23      A   I did.
24      Q   Where did you go to high school?
25      A   McCullough High School in the Woodlands.

12

1      Q   Okay.  And is that in the Houston area --
2      A   Houston, Texas.  Yes.
3      Q   When did you graduate?
4      A   December of 1995.
5      Q   And what did you do after --
6      A   Correction, '94.
7      Q   Ninety-four?
8      A   Yes.
9      Q   What did you do after you graduated from
10  high school?
11      A   Started college in January of 1995 at Sam
12  Houston State.
13      Q   What was your major?
14      A   Criminal justice.
15      Q   They have a good program --
16      A   They do.
17      Q   -- there, right?
18      A   A very good program.
19      Q   Did you complete it?
20      A   I did.
21      Q   Okay.  So when did you graduate from
22  college?
23      A   My undergraduate, I graduated in December
24  of '97.
25      Q   Oh, so you finished a little early?

13

1      A   Yes.
2      Q   Okay.  How so?
3      A   Took a bunch of classes.
4      Q   And so --
5      A   Year 'round.
6      Q   Okay.  So you took summer classes?
7      A   Yes.
8      Q   Okay.  What did you do immediately after
9  college?
10      A   Started with the Pasadena Police
11  Department March 2nd of 1998.
12      Q   So you graduated in '97?
13      A   I graduated in December of '97.
14      Q   Uh-huh.
15      A   Started with the Pasadena Police
16  Department in March of nin--- 1998.
17      Q   Did you do anything between?
18      A   A little bit of substitute teaching.
19      Q   Okay.  What did you substitute teach?
20      A   Conroe Independent School District.
21      Q   Is that where you lived?
22      A   I loved in the Woodlands area, so yes.
23      Q   And were you employed with the Pasadena
24  Police Department from 1998 until you left this past
25  October?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

14

1    A    Correct.
2    Q    All right. So I just want to go through
3    the various roles you served --
4    A    Okay.
5    Q    -- in the Pasadena Police Department.
6    What was your first role there?
7    A    I was a cadet in the police academy.
8    Q    Uh-huh. How long were you there?
9    A    I graduated at the end of August of '98.
10    Q    Okay.
11    A    So approximately six months.
12    Q    That's A six-month program. Okay. Did you
13    graduate with any special distinction or honors?
14    A    I graduated at the top of the class
15    academically.
16    Q    Congrats.
17    A    Thanks.
18    Q    And what was your next role?
19    A    I was a police officer assigned to night
20    shift.
21    Q    Okay. Actually, let's go back a little
22    bit. While you were -- while you were at the police
23    academy, did you have occasion to meet Officer
24    Rigoberto Saldivar?
25    A    Yes.

15

1    Q    Tell us about that.
2    A    He was in the police academy with me.
3    Q    Okay. So for the entire time period?
4    A    Yes, sir.
5    Q    Did you guys have a friendship or
6    relationship during that time?
7    A    Just coworkers. Didn't hang out outside
8    of work or anything.
9    Q    Do you have an idea where he finished in
10    the class?
11    A    I have no idea.
12    Q    Okay. So now, I'm sorry, let's go back to
13    who you are, roles. So the night shift patrol.
14    Okay. So a regular police officer. Okay. How long
15    were you in that role?
16    A    Until April of 2000.
17    Q    Okay. And what -- what role did you move
18    to?
19    A    D.W.I. task force.
20    Q    And what did that role entail?
21    A    Impaired driving.
22    Q    Uh-huh.
23    A    Identifying, apprehending impaired
24    drivers.
25    Q    So were you -- were you an officer making

16

1    first contact with the drivers? Like what -- what -
2    - what was your actual role in the task force?
3    A    Both. One would be going out and making
4    traffic stops, trying to find intoxicated drivers.
5    And then also, if another officer stopped somebody
6    that they believed to be intoxicated, they would
7    call one of the D.W.I. task force officers over and
8    then we would go conduct the investigation at that
9    point and take it over.
10    Q    Okay. What did conducting the
11    investigation entail?
12    A    Administering field sobriety tests,
13    interviewing the subject and looking the person over
14    and, you know, seeing if you observe any signs of
15    intoxication.
16    Q    Anything else?
17    A    That's it.
18    Q    And making the arrest if -- if it was
19    warranted?
20    A    Making the arrest if it was warranted and
21    then the intoxilyzer.
22    Q    Okay. Did you do any -- like what -- what
23    would a typical investigation in a -- a D.W.I. case
24    look like?
25    A    Normally, it was interview the driver,

17

1    administer field sobriety tests, make determination
2    whether they were intoxicated. If they were, make
3    the arrest, take them to jail and then offer them a
4    breath test.
5    Q    Did you have any other role as a case --
6    as the case would proceed?
7    A    Provide courtroom testimony often times.
8    Q    So you have testified in court before?
9    A    A bunch, yes.
10    Q    Okay. Have you ever had your deposition
11    taken before?
12    A    Yes.
13    Q    How many times?
14    A    Probably five or six.
15    Q    Okay. What kind of cases were those in?
16    A    I know at least two were related to
17    crashes.
18    Q    Uh-huh.
19    A    And then I know at least three out of
20    lawsuits since I've been the chief -- or was the
21    chief.
22    Q    Were you personally named in those suits?
23    A    One of them, I was.
24    Q    Uh-huh. Do you recall the circumstances
25    of that case, or the all--- the allegations in those



18

1 cases?
2     A    Each of the cases or the case where I was
3 personally named?
4     Q    Sorry.  Do you recall the allegations in
5 the case that you were personally named?
6     A    Yes.  It -- it was an allegation of
7 excessive force in an arrest and it was -- I either
8 failed to train or failed to supervise.  One -- I --
9 one of -- one of those or both of those.  I don't
10 remember specifically.
11     Q    Uh-huh.  Was it alleged that you had used
12 excessive force?
13     A    No.
14     Q    So you were just the chief and it was --
15     A    I was -- yes.
16     Q    Okay.  And what was the nature of the
17 force that was used in that case?
18     A    Physical force.
19     Q    Okay.  Was it a shooting?
20     A    No.
21     Q    Okay.  Do you recall the outcome of the
22 case?
23     A    Personally, I was released from the
24 lawsuit.
25     Q    Uh-huh.

19

1     A    And then the case settled.
2     Q    Do you recall for how much?
3     A    I do not.
4     Q    Do you recall the name of the officer who
5 was named in the lawsuit?
6     A    There was a bunch.
7     Q    Uh-huh.
8     A    I know one of them was Officer Brinker.
9     Q    Uh-huh.
10     A    I -- I don't remember the other ones.
11     Q    Okay.  What year was this?
12     A    The lawsuit or when it happened?
13     Q    Both.
14     A    I don't know.  I believe it settled last
15 year.
16     Q    Okay.
17     A    I think in early '23 or late '22.
18     Q    Okay.
19     A    I believe.  And I'm just going to -- I
20 don't know exactly when it happened.  My guess is a
21 couple of years earlier just because of I know how
22 it plays out --
23     Q    Uh-huh.
24     A    But I couldn't tell you a...
25     Q    Do you recall what the allegations in the

20

1 lawsuit were?
2     A    They were excessive force.  I know that.
3     Q    Okay.  So but give me a little -- can you
4 give me a little more factual detail, like what was
5 the circumstance of the force that was used?
6     A    I know he was struck like with a fist,
7 hit.  I don't remember if there was any other -- I -
8 - I don't remember that he was alleged to be kicked
9 or anything like that.  I don't recall that, but --
10     Q    Uh-huh.
11     A    All I recall is strikes.
12     Q    What area in Pasadena did -- did the for--
13 - was the force used?
14     A    Where at?
15     Q    Yes.
16     A    It was at a Denny's.  Around the 4100
17 block of Spencer Highway.
18     Q    How did they allege that you failed to
19 supervise the officers in question?
20     A    I honestly don't know.
21     Q    Okay.
22     A    I'm not sure.
23     Q    Okay.  You -- you don't recall reading the
24 complaint or petition?
25     A    I did, but I don't remember -- I -- I

21

1 don't remember exactly what -- I -- I don't know.
2     Q    Okay.  Okay.  All right.  So we're still
3 going through your background now.  So now you're in
4 D.W. task for--- D.W.I. task force.
5     A    Correct.
6     Q    How long were you there for?
7     A    May or June of twenty--- 2006, I believe.
8     Q    So remind me, when -- you started back
9 there in 2000?
10     A    April of 2000.
11     Q    Okay.
12     A    Let me correct that.  It was the beginning
13 of the -- I want to say January of 2006, I left
14 there and went to day shift patrol. I had promoted
15 in there.
16     Q    Okay.
17     A    And so I went to day shift patrol in
18 January of 2006.
19     Q    Okay.  Tell us about the promotion.
20     A    In October of 2004, I was promoted to
21 sergeant and I retained the D.W.--- I was supervisor
22 then in the D.W.I. task force until the end of
23 December of 2005.
24     Q    Okay.  So just to recap, you -- so you
25 were D.W.I. task force as a regular officer from

22

1  about I guess April 2000 to when you were promoted.
2  Is that correct?
3     A   Yes.
4     Q   Okay.  And then when you got promoted, you
5  became the -- the -- the -- I guess the lead?
6     A   I was the sergeant in the D.W.I. task
7  force from October of 2004 until the end of 2005.
8     Q   Gotcha.  Okay.  What is the process to get
9  promoted?
10    A   It's varied in the organization, but
11  because it's a 143 local government code agency in
12  Texas that governs the promotional process, and so I
13  guess you could go by default.  If there's not an
14  alternative promotional process, it's a test, a
15  competitive test.
16    Q   Uh-huh.
17    A   And then the -- the candidates are ranked
18  based on test score and seniority points, and that
19  creates the eligibility list and then you're
20  promoted off that as openings come open.
21        At one point, we also later on had an
22  alternative promotional process which involved a
23  test and then assessment center as well and then
24  combine the two of those together and that created
25  an eligibility list.

23

1     Q   Okay.
2     A   So there's been two different processes in
3  the organization.
4     Q   Which process was in play when you were
5  promoted?
6     A   When I was promoted --
7  Mr. Giles:  Object to form.
8  By Mr. Dube:
9     Q   To sergeant.
10    A   When I was promoted to sergeant, it was a
11  test only.
12    Q   Test only?
13    A   Yes.
14    Q   How did your responsibilities change when
15  you went from a member of the task force to a
16  sergeant in charge of the task force?
17    A   At that point, I was a first line
18  supervisor.
19    Q   Uh-huh.
20    A   And so day-to-day oversight of the
21  officers that were assigned to that unit,
22  scheduling, approving reports, payroll, respond to -
23  - you know, when officers would call or citizens
24  would call, would respond.
25    Q   Did you have any responsibilities in terms

24

1  of discipline?
2     A   No.  Discipline -- no.  Discipline came
3  from above.
4     Q   So you moved to day shift patrol?
5     A   Yes.
6     Q   Okay.  And that was in '06.  Correct?
7     A   Correct.
8     Q   Okay.  Tell us about your responsibilities
9  there.
10    A   First line supervisor over squad and day
11  shift patrol officers.  And it was a -- a similar
12  role.  It was just more broad because the officers
13  assigned -- or duties weren't as narrowly focused,
14  and so they would respond to calls for service,
15  traffic, crime, disturbances, things like that.  And
16  so my responsibility was still, you know, approving
17  reports, day-to-day oversight, payroll, you --
18  working through, you know, some of the minor
19  complaints, but really just day-to-day supervision
20  of -- of the officers under my -- in my squad.
21    Q   How many officers were -- were you
22  responsible for?
23    A   It depends, but anywhere from usually six
24  to ten.
25        And you were the first -- I guess first

25

1  line of supervisors is the word -- is the word you
2  used before?
3     A   The first line supervisor, yes.
4     Q   Okay.  So give me a sense of the hierarchy
5  in -- in the chain of supervision at Pasadena.
6     A   So again, it's varied.
7     Q   Okay.
8     A   At one time, we had patrol officers,
9  sergeants, lieutenants, captains, assistant chiefs
10  and the chief.
11    Q   Uh-huh.
12    A   I don't know.  Maybe 15-ish years ago,
13  they did away with the captain position. And so for
14  that time period, it's been officers, sergeant,
15  lieutenant, assistant chief, chief.
16    Q   So at the time of this -- of this 2008 --
17  I mean, 2018 through twen--- 2021, the process that
18  was in place was officer, sergeant, lieutenants,
19  assistant chiefs and chief?
20    A   Correct.
21    Q   Okay.  So what were the roles of the
22  lieutenants?
23    A   Lieutenants would have a squad of
24  sergeants and they would oversee the sergeants, make
25  sure the sergeants, if you will, were doing their

26

1  job or their assignment.
2      Q   How many sergeants were there in the
3  department, you know, throughout the years?
4      A   It's -- it's either been 39 or 40.
5      Q   Okay.
6      A   It's -- I would say gone back and forth,
7  but it's been one of those two numbers throughout my
8  career.
9      Q   Why those two numbers?
10     A   At one point when there was a downturn in
11 the economy, they cut some positions. And then as
12 the economy returned, they added the position back.
13     Q   And how many lieutenants?
14     A   There were nine until July of last year.
15 Now there are ten.
16     Q   Okay. How about assistant chiefs?
17     A   It's -- it's fluctuated between two and
18 three throughout my almost 26 years there.
19     Q   Uh-huh.
20     A   Most of the time, it's been three, but
21 there's been times where it's been two.
22     Q   Okay. And one chief?
23     A   And one chief.
24     Q   I guess we discussed the role of the
25 lieutenants. What is the -- what were the role --

27

1  what was the role and responsibilities of the
2  assistant chief?
3      A   So the assistant chief then oversee the
4  lieutenants. They -- and they also regularly meet
5  with the chief and -- at -- at -- once you are in
6  the assistant chief role, it's more setting policy,
7  setting direction, kind of the vision, the goals for
8  the organization. So it's -- it's a little bit
9  broader scope beyond just the day-to-day
10 supervision. It's also, you know, helping move the
11 -- the organization in the direction we're trying to
12 go.
13     Q   And let's go back a little bit with
14 respect to the sergeants. How are they organized in
15 terms of the squads? What are the various squads
16 that are present at the Pasadena Police Department?
17     A   So patrol has -- again, it's varied
18 between four, five or six sergeants, you know,
19 throughout my career. And it just depends. Really,
20 manpower drives that to a large extent. And so
21 you'll have, you know, four, five or six sergeants,
22 and then all of the officers on the shift are
23 divided up and assigned to a sergeant. And so that's
24 how you end up with the squads.
25         And then like investigations, for the most

28

1  part, investigations, you have a sergeant that
2  oversees a squad of investigators. And usually, they
3  have a specific area, a specialty area, if you will.
4  We have person violence crimes, we have burglary and
5  theft; we have auto theft. And so there's a
6  sergeant for each of those investigative divisions.
7      Q   Uh-huh.
8      A   Narcotics has a sergeant. The training
9  academy has a sergeant. So really, all of the areas
10 have at least a sergeant.
11     Q   Uh-huh.
12     A   And then depending on the span and control
13 and how many, you know, officers are there will kind
14 of drive the number of sergeants that will be in
15 that -- that area.
16     Q   How about the D.W.I. task force? What
17 other task forces have been present while you were
18 with -- with the police department?
19     A   I guess what do you define as a task
20 force?
21     Q   What do you -- you know, because it -- it
22 has a specific name, a D.W.I. -- are there any other
23 task forces or anything that operates similar to the
24 D.W.I. task force at Pasadena?
25     A   You have to Gulf Coast violent offenders

29

1  task force.
2      Q   Okay.
3      A   Which has a sergeant. And when I left at
4  least in October, there were -- there were two
5  officers assigned there. And their job was to go
6  out and apprehend violent -- you know, persons that
7  are wanted for violent offenses.
8      Q   Uh-huh.
9      A   Those are the only real what I would call
10 a task force.
11     Q   Okay. Are there any shared programs
12 between like the local law enforcement and federal
13 law enforcement?
14     A   Yes.
15     Q   Okay. Tell me about those.
16     A   Gulf Coast violent offenders task force
17 should be one of those.
18     Q   Okay.
19     A   Works with the U.S. Marshals Service.
20 Narcotics has some of our members that are assigned
21 to the DEA.
22     Q   Uh-huh.
23     A   And then you als--- we also have --
24 there's an officer that's assigned to ATF. And I
25 believe those are the only ones.

Chief Joshua Bruegger   January 5, 2024   NDT Assgn # 71056    Page 9

---

30

1    Q   Uh-huh.
2    A   At least in recent history.
3    Q   Uh-huh.  And approximately how many
4    patrolmen, officers are employed by the City of
5    Pasadena, typically?
6    A   So it's varied.
7    Q   Uh-huh.
8    A   Total sworn personnel from the chief all
9    the way, you know, to the bottom of the
10   organization, there have been anywhere from about
11   225 to 290.
12   Q   Okay.
13   A   And it fluctuates, obviously.  You know,
14   you will have, you know, a group leave and then hire
15   -- you know, hire more to replace them.  And so it
16   fluctuates, but --
17   Q   Uh-huh.
18   A   -- somewhere in there.
19       MR. DUBE:  Let's go off the record a
20   second.  I -- I need to use the restroom.
21       THE DEPONENT:  Okay.
22       VIDEO TECHNICIAN:  All right.  The time is
23   now 9:47.
24       (Whereupon, a break was taken from the
25   proceedings.)

---

31

1        VIDEO TECHNICIAN:  The time is now 9:49.
2    We're back on the record.
3    By Mr. Dube:
4    Q   Before we took our break, you -- you were
5    telling us that approximately 200 to 290 patrolmen
6    --
7    A   The sworn personnel.
8    Q   Sworn personnel.
9    A   Yeah.
10   Q   I believe that's -- includes chiefs --
11   A   That's all the way down.
12   Q   -- and sergeants --
13   A   Yes.
14   Q   Okay.  Gotcha.  Okay.
15   A   So you do the math and figure out how many
16   officer are --
17   Q   Understood.  How many lieutenants are
18   there?  You said nine.  Right?
19   A   Nine until this past July, there's ten.
20   Q   How are the patrolmen organized?  What do -
21   - are they in particular divisions or --
22   A   Yes.  You have patrol obviously is the
23   largest.
24   Q   Uh-huh.
25   A   Patrolling operations is the largest area.

---

32

1    Q   Uh-huh.
2    A   Which include traffic, K-9.  So I always
3    say anybody that wears a uniform on a daily basis is
4    assigned to operations or patrol.
5    Q   Uh-huh.
6    A   And then the other major area of the
7    organization is investigations.
8    Q   Uh-huh.
9    A   And so you have the -- the various
10   investigative divisions from juveniles to juvenile
11   sex crimes, auto crimes, burglary and theft,
12   financial crimes, violent crimes.  Narcotics.  I
13   think that's most of them.
14   Q   Okay.
15   A   And then you have the other third area is
16   admin and support, which is your crime scene unit,
17   the training academy, community services.
18   Q   What's a percentage split between
19   operations, investigations and admin support?
20   A   The last that I know was around 50 percent
21   was assigned to operations.
22   Q   Uh-huh.
23   A   Probably 40-ish percent are assigned --
24   are -- 35, 40 percent assigned to investigations and
25   then the remaining percentage assigned to admin and

---

33

1    support.
2    Q   Okay.  We're still tracking down your
3    career path.  So daytime supervisor?
4    A   Correct.
5    Q   Okay.  Or day -- or day shift supervisor?
6    A   Day shi--- correct.
7    Q   How long were you in that role?
8    A   Until either May or June of 2006.
9    Q   And where were you shifted then?
10   A   I was then shifted to investigations, but
11   specifically, property crimes or also known as
12   burglary and theft.
13   Q   What was your role there?
14   A   To oversee the investigators in burglary
15   and theft and, you know, supervise investigations.
16   I would work some cases as well.
17   Q   Uh-huh.
18   A   But really, my -- my primary role is the
19   day-to-day supervision of -- of the investigators
20   assigned there, overseeing investigations, approving
21   reports, you know, payroll, make sure everybody's
22   complying with, you know, rules, policies, things
23   like that.
24   Q   Were you still a sergeant at that time?
25   A   I was a sergeant, yes.



34

1    Q    When did you receive your next promotion?
2    A    Next promotion?
3    Q    Uh-huh.
4    A    Was October of 2012.
5    Q    Uh-huh.  What is that process?
6    A    The promotional process?
7    Q    Uh-huh.
8    A    That was a test in an assessment center.
9    Q    What's an assessment center?
10    A    So a -- a verbal command and high -- do
11  various scenarios.  There's also a writing exercise
12  to it, a -- a -- a presentation part of it, and
13  you're assessed on your performance on that and
14  given a score.  And then I believe the test was 60
15  percent and then the assessment center was 40
16  percent.  Combine those two together and that's how
17  you grade the eligibility list.
18    Q    And who -- who are the people making the
19  assessment?
20    A    I don't know.  They -- outside -- out---
21  it was an outside firm that would bring typically
22  supervisors in from other organizations of
23  comparable size from outside the Houston area --
24    Q    Uh-huh.
25    A    -- to come in and do the assessment.

36

1    A    I believe I worked one homicide while I
2  was there.
3    Q    Okay.  Tell us about that, please.
4    A    It was a case where -- a very different
5  case.  A lady's mother was -- she was on hospice,
6  but she was immobile and on a ventilator; basically,
7  a lot of machines to keep her alive.  And at some
8  point, she took her mother off the ventilator and
9  her mother died.
10    Q    Uh-huh.  I guess without authorization?
11    A    Yes.
12    Q    Okay.  So you have person crime and you
13  have burglary and theft property crimes?
14    A    Correct.
15    Q    You're still a sergeant?
16    A    Yes.
17    Q    Okay.  And what was your next role?
18    A    In November of 2009, I was transferred to
19  internal affairs.
20    Q    How long were you in that role?
21    A    Until October of 2012.
22    Q    That's when you were promoted to
23  lieutenant?
24    A    Correct.
25    Q    Okay.  What was your role at -- as a

35

1    Q    Understood.  Okay.  You -- oh, all right,
2  let's jump back again.
3    A    Okay.
4    Q    So you were the -- a sergeant for
5  investigations.  How long were you in that role?
6    A    So I had burglary and theft from when I
7  got there, which was May or June of 2006, until I
8  believe it was like August or September of 2006 when
9  I also was given persons crime.  So I had two
10  different squads of investigators.
11    Q    Okay.
12    A    And I had that role until November of
13  2009.
14    Q    Okay.  What's persons crime?
15    A    Person crime is also known as violent
16  crime.  They investigate any crimes against persons
17  from -- all the way from homicides, harassing
18  communi--- harassing communications, robberies,
19  assaults, sexual assaults, shootings, stabbings,
20  things of that nature.
21    Q    You stated you also worked some cases
22  while you were in that position?
23    A    Yes.
24    Q    Okay.  Did you work some homicides while
25  you were in that position?

37

1  sergeant in internal affairs?
2    A    Taking complaints, conducting
3  investigations.
4    Q    Anything else?
5    A    Would review use of force forms when they
6  were committed and submitted.  That -- that's the
7  primary function is inves--- you know, conducting
8  investigations of complaints and review -- and doing
9  internal review of force incidents in the
10  department.
11    Q    So let's go back a little bit.  How is the
12  internal affairs division organized?
13    A    What -- so what do you mean?
14    Q    Because in -- in the other divisions, you
15  had, you know, I guess officers or patrolmen that
16  you supervise.  Right?
17    A    Right.
18    Q    And then they did -- and you were in
19  charge of their day-to-day activities and et cetera,
20  et cetera.  Then you go to sergeant and there would
21  be a lieutenant.  Right?  So give me the same sce---
22  scenario how the general affairs division was
23  organized.
24    A    So it depended.  At times, there were a
25  lieutenant and a sergeant.  There were two



38

1  sergeants.  There was a sergeant and an officer.
2  While there still is the rank structure --
3     Q    Uh-huh.
4     A    -- in internal affairs, you're both
5  investigators, both -- so while there may be a rank
6  difference, for a lot -- for really all practical
7  purposes, you're pretty much two investigators
8  working.  And so almost like part -- you know, you
9  would be partners as opposed to, you know,
10 supervisor subordinate even though there may be rank
11 difference.
12    Q    Is that -- it was less formal than it
13 would be in -- in other departments?
14    A    The -- the -- the rank, yes.  The rank
15 structure, yes.
16    Q    All right.
17    A    And -- and then you would report directly
18 to the chief's office, whether it was directly to
19 the chief or an assistant chief.  But it -- that's...
20    Q    Understood.  And who is your I guess
21 lieutenant or -- and partner while you were there?
22    A    I know Dan Bittner was there for a while.
23 Chris McGregor.  Those are the two I remember.  It's
24 not to say there weren't others, but those are the
25 two that stand out to me.

39

1     Q    And you were in internal affairs for
2  approximately three years?
3     A    Yes.
4     Q    Okay.  Can you give us a sense of what --
5  well, actually, let's ask this this way.  Were there
6  any officer involved shootings during those three
7  years you were a member at internal affairs?
8     A    Yes.
9     Q    Okay.  How many were there?
10    A    I couldn't give you a number.  I would say
11 probably ten-ish, but that's a approximation.
12    Q    Do you recall during your three years
13 there if any of these officer-involved shootings you
14 determined that the shootings were unjustified?
15    A    Yes.
16    Q    Okay.  How many?
17    A    I know of one for sure.  There --
18    Q    Why -- why does that one stick out?
19    A    Because it was cold that night and I
20 remember being out there.  That's why.  I mean, the
21 circumstances.  There was another one that I -- I
22 remember the facts very specifically.  I just don't
23 know -- I -- I was assigned to internal affairs
24 because now I -- yeah, so at least two that I know
25 of that -- yes.

40

1     Q    All right.  Tell us about the first one.
2     A    The first one was an off-duty officer.  Do
3  you -- my description of it, it was a road rage.  He
4  had been drinking.  Ends up following him into an
5  apartment complex.  Words were exchanged between the
6  off-duty officer and the driver of the other
7  vehicle.  Driver of the other vehicle begins to
8  drive.  The officer shoots at the back of the
9  vehicle.
10    Q    Do you remember the officer's name?
11    A    Kazz.  K-A-Z-Z.
12    Q    K-A?
13    A    Z-Z.
14    Q    First name?
15    A    I don't know.
16    Q    No worries.  Okay.  What was the outcome
17 of -- of the investigation?
18    A    He was found to have violated policy.  I
19 don't remember if he voluntarily separated his
20 employment or was terminated.  And he ultimately was
21 charged with an offense.  I don't remember if it was
22 aggravated assault or something else, but he was --
23 he was charged with a crime.
24    Q    So he was formally prosecuted?
25    A    Yes.

41

1     Q    Okay.  Do you recall the outcome?
2     A    I'm fairly certain he was found not
3  guilty.
4     Q    But he was terminated?
5     A    Yes.  Well, he was terminated -- I don't
6  know if he was terminated or if he --
7     Q    Well --
8     A    -- quit in lieu of being terminated.  I --
9  I don't know.
10    Q    So he -- so he left his employment as a
11 Pasadena police officer?
12    A    Correct.
13    Q    Okay.  And do you recall what his rank
14 was?
15    A    He was an officer.
16    Q    He was an officer?  Okay.  Do you recall
17 what year this was?
18    A    Somewhere between 2009 and 2012.  No.
19    Q    I knew you were going to say that.  Okay.
20 2009, 2012.  Gotcha.  Okay.  Anything else about
21 that incident that stick out -- that sticks out in
22 your mind?
23    A    No.
24    Q    What was your role in the investigation?
25    A    I was a supervisor.



42

1    Q    Uh-huh.  Did you interview witnesses?  Did
2  you interview --
3    A    No, I was just out there overseeing the
4  investigation, but I did not conduct the
5  investigation.
6    Q    Okay.  Do you know who -- do you know
7  which -- so -- so somebody in the investigations
8  unit would have conducted the investigation?
9    A    Yes.
10    Q    Okay.  Do you recall who it was?
11    A    I do not.
12    Q    What was the second incident?
13    A    The second incident was a traffic stop
14  involving Officer Martin.
15    Q    Uh-huh.
16    A    Some point, the driver drove away and
17  Officer Martin fired at him and struck him. And the
18  -- it was a pursuit after that, probably about ten
19  minutes, and then he was apprehended.
20    Q    Do you recall what year that was?
21    A    No.
22    Q    What was your role in that investigation?
23    A    I was assigned to internal affairs, so I -
24  - I did not work it.  The other person assigned to
25  internal affairs worked it, or -- or was the lead

43

1  investigator.  I oversaw the investigation.  I'm
2  sure I helped him on some things.
3    Q    That's two shootings -- unjustified
4  shootings that both involve allegation of a driver
5  driving away and an officer shooting at them?
6    A    Right.
7    Q    In circumstances like that, would internal
8  affairs have any responsibility or any role in
9  suggesting additional training for the officers when
10  you -- when you come across things that are hap---
11  that are happening on a repeated basis?
12    A    In internal affairs, not necessarily, no.
13    Q    You would agree with me, internal affairs,
14  that a first level or layer that could -- that could
15  see those type of patterns developing.  Correct?
16    A    Correct.
17         MR. GILES:  Object to form.
18         MR. SELBE:  Same objection.
19         THE DEPONENT:  And they may take a
20  recommendation to you the chief, potentially, and
21  say, hey, chief, here's something we're seeing.
22  Right?  But at the end of the day, it's usually the
23  chief or an assistant chief that's going to -- going
24  to dictate --
25  BY MR. DUBE:

44

1    Q    Policy?
2    A    Policy.  Yes.
3    Q    Gotcha.  But that's what I'm asking, I
4  guess.  Is there -- was there a process -- well, let
5  me start over.  Was there a process at the Pasadena
6  Police Department for internal affairs to i--- to
7  identify those type of recommendations for the chief
8  and the assistant chief?
9    A    As far as a formal process, no.  But I
10  mean, all -- all internal affairs reports go -- you
11  know, go to the chief's office for a review.  So
12  they are gonna -- they are gonna see them.  And --
13  and I'll -- I'll -- I mean, as far as this -- I
14  mean, we have a policy, you know, you can't shoot at
15  somebody that's not a threat. So this is not a --
16  that's -- as far as a training, I mean, it is
17  trained -- officers are trained, you know, you
18  cannot shoot somebody that's not a -- a threat and,
19  you know, meets the -- the elements of, you know,
20  chapter nine of the penal code.  But yes.
21    Q    So -- so I guess this is somebody's
22  testimony, the officer should know that they should
23  not shoot at a car that's moving away from them and
24  not a threat to them, based on training?
25    A    And -- and I'm going to say more not a --

45

1         MR. GILES:  Object to form.
2         THE DEPONENT:  I'm going to say not a
3  threat as opposed to driving away because you could
4  drive away and still be a threat.  So I mean, it's
5  going to depend on the circumstances. But does the
6  department have a policy prohibiting, you know, the
7  use of unjustified force?  Absolutely.  State law
8  prohibits the use of unjustified force.  And so
9  those exist.  And there's also the very real, you
10  know, possibility of being indicted for criminal
11  offense if you use, you know, force.  And so there
12  are -- the -- the organization has taken steps to
13  ensure that -- you know, to the best of our ability
14  --
15    Q    Uh-huh.
16    A    -- that officers do not use unjustified
17  force.
18    Q    But despite the policy, you will agree
19  with me that officers do sometimes use un---
20  unjustified force?
21    A    Yes.
22    Q    And was there any procedures in place at
23  the police department to identify those areas where
24  despite their training, officers were still using
25  force -- unjustified force, any patterns along those

46

1  lines?
2      A    I mean, I guess the process would be when
3  the chief's office sees, you know, these internal
4  affairs reports coming up, they are going to see
5  them and can identify.  But I -- I'm not sure what
6  else you're looking for or asking because, I mean,
7  that -- that's I guess the best way I can answer the
8  question.
9      Q    Uh-huh.  I'm not looking for anything.
10  I'm just asking what -- well, what -- what the
11  policies were or what the procedures were, just
12  informational.
13      A    Yeah.
14      Q    Okay.  So nothing formal, but you would
15  have expected that the chief's office would --
16  would, you know, take into account what they are
17  seeing and the chief's office would make those --
18  those policy determinations?
19          MR. GILES:  Objection.  Form.
20          THE DEPONENT:  Correct.
21  BY MR. DUBE:
22      Q    But nothing formal originating out of
23  internal affairs?
24      A    No.
25      Q    Okay.  All right.  What is your day-to-day

47

1  responsibility at internal affairs?
2      A    It's dependent on the day.  Some days was,
3  you know, taking complaints.  Other days, you know,
4  investigations.  It -- it just would depend on the
5  day.  And I always -- you know, internal affairs is
6  very up and down. Sometimes there's not a lot going
7  on, and other times, it's, you know, busy.  And so
8  it just -- it just depends.
9      Q    Okay.  What was your next role after
10  internal affairs?
11      A    When I was promoted to lieutenant in
12  October of 2012, I was assigned to night shift --
13  night shift patrol as a night shift commander.
14      Q    Let me ask this question.  So we're
15  October of 2012.  Correct?  And you and Officer
16  Saldivar went to the academy together.  Correct?
17      A    Correct.
18      Q    Do you have any interaction with him from
19  when you began with the police department and up
20  until this role?
21      A    If we were assigned to the same areas, it
22  was for a very short time because I don't really
23  remember -- he and I weren't friends, and so -- I
24  mean, we were academy mates, but not friends.  And
25  so not that I didn't keep up with him, but there's a

48

1  whole bunch of people in the organization and I --
2  you know, I didn't keep up with him.  So I don't --
3  I don't remember.  And it's not to say we didn't,
4  but I don't remember us working together or him
5  working for me.
6      Q    Uh-huh.
7      A    Directly for me.  I mean, obviously, as --
8  as a chief, ever--- you know, they all -- but you
9  know, as far as being a sergeant and supervising
10  him, I -- I don't remember that ever happening.
11  Even as a lieutenant, I don't recall -- I was on
12  nights for nine months or so as a lieutenant and he
13  might have been assigned to nights, but I -- I mean,
14  there's 35, 40 people assigned to nights, so I don't
15  -- I don't know.
16      Q    Nothing you recall directly.  Right?
17      A    Correct.
18      Q    Okay.  How about when you were in internal
19  affairs?  Did you come across any investigations
20  that -- where he was involved?
21      A    Yes.
22      Q    Okay.  Tell us about that.
23      A    He was involved in a shooting in two-
24  thousand-and--- I don't remember -- nine or twelve,
25  somewhere in there, I think.

49

1      Q    Okay.
2      A    Maybe '12.
3      Q    Okay.  Can you give us -- what were the
4  circumstances of that shooting?
5      A    Yes.  He was dispatched out to a subject
6  with a gun -- actually, two guns.
7      Q    Uh-huh.
8      A    Officer Saldivar -- they had been taken in
9  a theft from Walmart.
10      Q    Uh-huh.
11      A    Officer Saldivar located the individual,
12  said he had a gun in his hand -- at least one gun in
13  his hand, I -- I recall, and Officer Saldivar
14  perceived him to be a threat because of the gun in
15  his hand; didn't obey commands.  And Officer
16  Saldivar discharged his weapon.
17      Q    Was that through a fence?
18      A    Yes.
19      Q    Okay.  So I don't think that was when you
20  were in internal affairs.  That was later on.
21      A    I was out there.  I --
22      Q    Okay.
23      A    I -- I was there at least in -- several
24  hours after it happened 'cause I -- I may have been
25  an assistant chief.



50

1    Q   Uh-huh.
2    A   Maybe stopped by on my way to work because
3  it was light out and I know it happened at night.
4    Q   Uh-huh.  Okay.
5    A   I was at the scene for at least a short
6  period of time.  I know that.
7    Q   Okay.
8    A   So...
9    Q   Gotcha.  Okay.  So if -- if I told you
10  that happened in about April of 2018, would you have
11  any reason to disagree with me?
12   A   No.
13   Q   Okay.  And you were assistant chief at the
14  time?
15   A   Yes.  I was assistant chief.  So yes.
16  That's correct.  That was in April and the other one
17  was in November.  That's correct.  Yes.
18   Q   We'll get back to that shooting --
19   A   Okay.  Yeah.  Okay.  I was the assistant
20  chief probably on the way to work and stopped by the
21  scene.
22   Q   Gotcha.  Okay.  All right.  So let's go
23  back.  So I guess we're in 2012; no real
24  interactions with Officer Saldivar that you recall.
25   A   Correct.

51

1    Q   Okay.  And so in 2012, you get promoted to
2  lieutenant.
3    A   Correct.
4    Q   And you are at nighttime patrol?
5    A   Yes, sir.
6    Q   Okay.  How long are you there?
7    A   July of 2013.
8    Q   So a very short time?
9    A   Yes.
10   Q   Okay.  What's next?
11   A   I was promoted to assistant chief.
12   Q   Okay.  When were you promoted to assistant
13  chief?
14   A   July of 2013.
15   Q   Okay.  Got it.  What is your role as
16  assistant chief?
17   A   I was over operations most of my time as
18  an assistant chief, which is -- again, the easiest
19  way to tell you is everybody that wears a uniform on
20  a day-to-day basis fell under that umbrella.
21   Q   Uh-huh.
22   A   The biggest one being patrol.  But again,
23  that's the day-to-day operations.  That's more
24  setting the vision, the direction, a little bit more
25  involved in the discipline of -- of the

52

1  organization, making recommendations.  You know,
2  depending on -- you know, formal discipline by civil
3  service can only be done by the chief.  And so, you
4  know, verbal reprimands, letters of reprimands,
5  things like that would sometimes come from the
6  assistant chief.  But anything beyond that as far as
7  discipline per civil service law would have to come
8  from the chief.  And so that would be some of the
9  roles.
10   Q   Okay.  I want to unpack that a little bit.
11  Actually, before we do that, what was the process in
12  promoting to assistant chief?
13   A   It was an interview process with the
14  chief.
15   Q   Uh-huh.
16   A   And then it's -- by civil service law in
17  Texas, at least, it's pretty much the prerogative of
18  the chief who they want to be assistant chief.
19   Q   So you serve at the pleasure of the chief?
20   A   Serve at the pleasure of the chief.  Yes.
21   Q   And who was the chief at the time?
22   A   Mike Thaler.
23   Q   Okay.  How long did you serve under him as
24  assistant chief?
25   A   He retired on June 30th of 2017.

53

1    Q   Is that when you were promoted to active
2  chief?
3    A   No.
4    Q   All right.
5    A   There was another chief for about 15
6  months between Chief Thaler and myself.
7    Q   Okay.  And who was that?
8    A   Al Espinoza.
9    Q   And you were the assistant chief under him
10  as well?
11   A   Yes.
12   Q   Okay.  Did he select you to be assistant
13  chief or was it just --
14   A   He didn't unselect me.  How about that?
15   Q   Got it.  When did he leave as chief--- was
16  he formally appointed as chief or was he a --
17   A   He was formally appointed as a chief.
18   Q   Okay.
19   A   The end of November of 2018 was his --
20  when he retired.  But I was appointed the acting
21  chief before he officially departed.  He didn't come
22  to work the last couple weeks.
23   Q   Okay.
24   A   So I was appointed the active chief I
25  believe on -- it was the beginning of November.  I



54

1 believe November 7th of 2018.
2    Q   Do you -- do you recall why he left his
3 employment as chief?
4    A   He chose to retire.
5        MR. GILES:  Objection to form.
6 BY MR. DUBE:
7    Q   Was there any precipitating event that led
8 to his retirement, if you know?
9    A   There were some events.  I just know he
10 elected to retire.
11    Q   And what were those events?
12        MR. GILES:  Objection.  Form.
13        THE DEPONENT:  He -- there were some
14 issues between him and the mayor.  I don't know all
15 the details of it.
16        THE DUBE:  Okay.
17        THE DEPONENT:  But I just know he told the
18 organization he was retiring.
19    Q   Do you know any specifics regarding the
20 issues he -- he was having with the mayor?
21    A   I -- there were some personnel issues that
22 he wasn't managing appropriately, at least in the
23 eyes of the mayor.
24    Q   Okay.  What were those?
25    A   Some of the selections to different

55

1 divisions, some of the way he was handling some of
2 the complaints.
3    Q   What was the main point of contention in
4 terms of how he was managing personnel?
5        MR. GILES:  Objection.  Form.
6        THE DEPONENT:  I -- I'm not -- I don't
7 want to speak for the mayor, so I'm not sure what
8 the mayor's --
9 BY MR. DUBE:
10    Q   I'm not asking you to speak for the mayor.
11 I'm asking you -- I'm asking for what you understood
12 to be those issues were from what you heard or from
13 -- from whatever other source you may have gotten
14 that information from.
15    A   I mean, a lot of it would be ju---
16        MR. GILES:  Objection.  Form.
17        THE DEPONENT:  -- just to speculate on,
18 you know, what it is.  Do you want me to speculate?
19 BY MR. DUBE:
20    Q   I want you to tell me what you know.
21    A   The only thing I know is there were some
22 concerns at least with the way there a -- an
23 assignment to an investigative division that --
24 where there was a -- a complaint that was made.
25 There was a comment that was made from one officer

56

1 to another that he dismissed.  Those were the --
2 those are what I know of.
3    Q   Okay.  Were there any over a policy
4 defenses between him and the mayor that led to his
5 resignation?
6    A   When you say policy differences, what do
7 you mean?
8    Q   Like the mayor wanted something done one
9 way; he wanted something done differently.
10    A   I'm not sure.  I don't know.
11    Q   Okay.
12        MR. GILES:  Objection.  Form.
13 BY MR. DUBE:
14    Q   So you were the assistant chief from July
15 2013 'til November of 2018.
16    A   Correct.
17    Q   And I say the, but there are several
18 assistant chiefs.  Correct?
19    A   Correct.
20    Q   Okay.  Who were the other assistant chiefs
21 with you?
22    A   While Chief Thaler was here, the other
23 assistant chiefs were Mike Jackson and Susan
24 Clifton.
25    Q   Okay.

57

1    A   And then under Al Espinoza, it was Rick
2 Styron and Kevin Wingerson.
3    Q   Kevin?
4    A   Wingerson, W-I-N-G-E-R-S-O-N.
5    Q   Okay.  And just to get this out of the
6 way, when you were chief, who were your assistant
7 chiefs?
8    A   Kevin Wingerson.
9    Q   Uh-huh.
10    A   Rick Styron, Jerry Wright.  And then
11 Assistant Chief Styron retired and Tom Warnke was
12 who I appointed to assistant chief.  And those were
13 the assistant chiefs when I left in October.
14    Q   Who's the chief now?
15    A   Jerry Wright.
16    Q   Did you have any role in selecting the
17 chief that replaced you?
18    A   Did I have a role?
19    Q   Uh-huh.
20    A   No, that's the mayor's role.
21    Q   All right.  Okay.  So let's get to you as
22 -- how long were you acting chief for?
23    A   From the beginning of November, I --
24 again, I believe it was November 7th of 2018 until I
25 was confirmed by council on January 2nd, 2019.

58

1    Q    As acting chief, were your roles any
2  different than they was as -- as appointed chief?
3    A    The -- the biggest difference is, because
4  of civil service law, the acting chief cannot take
5  some disciplinary action like formal discipline,
6  per 143 local government code.  So an acting chief,
7  if -- if they have not been -- you could have an
8  acting chief confirmed by counsel as the acting
9  chief, but if they are not confirmed by counsel,
10 they can't take disciplinary action such as days
11 off, involuntary demotion, an indefinite suspension
12 or the equivalent of a termination.  So you can't do
13 those things.  Other than that, pretty much can do
14 all the other stuff.
15    Q    So during that time, who -- who would have
16 been able to I guess terminate a -- an officer?
17    A    Nobody.  They would have gotten -- if
18 there would have been a situation where there had to
19 been termi--- you would have had to gone before City
20 Council and at least gotten confirmed as an acting -
21 - as an acting chief.
22    Q    Could you have made the recommendation at
23 --
24    A    There's nobody to make a recommendation
25 to, because under civil service law, the only one

59

1  who can take disciplinary action against an officer
2  is the chief.
3    Q    So you had no ability to make a
4  recommendation -- so -- so acting chief has no
5  ability to make a recommendation to the City Council
6  to terminate an officer for a violation of policy?
7    A    City Council can't --
8      MR. GILES:  Objection to form.
9      THE DEPONENT:  City Council cannot -- city
10 can't -- the only person is the chief.  City Council
11 cannot fire a police officer.  The mayor cannot fire
12 a police officer.  The only person that could fire,
13 suspend, indefinitely su--- suspend an officer is
14 the chief.
15    Q    Okay.
16    A    Nobody else can do it.
17    Q    And -- and including the acting chief?
18    A    That's correct.
19    Q    Okay.  So if an officer needed to be
20 terminated by an action that warranted termination
21 during that time, what could -- what could be done?
22    A    The acting chief could be confirmed by
23 Council as the acting chief and then they could do
24 it, because if you look at 143 and it talks about
25 the department head, the department head has to be

60

1  basically nominated, if you will, by the chief
2  executive, which would be the mayor, and then
3  confirmed by the Council.  And then later on in the
4  code, it talks about the department head.  Well, to
5  be the department head, you've got to be confirmed
6  by Council.  And so City Council could confirm you as
7  an assistant chief so that you could take
8  disciplinary action if you needed to.
9    Q    Say that again.  I'm sorry.  I -- I -- I
10 got lost.
11    A    So City Council could confirm you, say we
12 are confirming you as the -- the assis--- the
13 interim chief.  That way, you are at least confirmed
14 by Council, which is what you've got to be per 143
15 to be the department head, because the department
16 head of the police department, the police chief is
17 the only person under civil service law that can
18 take disciplinary action.
19    Q    Okay.  So I guess I -- where I'm getting
20 confused is there are three categories.  There's
21 acting chief, there's interim chief and then there's
22 the chief.
23    A    Interim and acting are the same thing.
24 They are synonymous, just different terms that
25 different people use.

61

1    Q    But I thought you said the City Council
2  could confirm the interim chief.
3    A    Interim or acting, whatever you want to
4  call it, they could confirm that.  They're saying,
5  basically, we're giving you all the rights as the
6  chief, but we're still looking for a chief.  Right?
7    Q    Oh.
8    A    It doesn't mean you're going to be the
9  chief forever.  It just means temporarily, until we
10 name a permanent chief, if you will -- and it's not
11 permanent, but --
12    Q    Uh-huh.
13    A    -- you have --
14    Q    You have --
15    A    -- the authority of -- of a chief.
16    Q    Were you ever confirmed by City Council,
17 then, in the time between November 2018 and January
18 2019?
19    A    No, it was only two months and there
20 wasn't a need at that point to -- to do it.
21    Q    Okay.  So you were just -- you served as
22 the acting chief, but you were not formally
23 appointed by City Council --
24    A    That's correct.
25    Q    -- during that time.  But in January 2019,



62

1  you were appointed.
2      A    January 2nd of 2019, just under two
3  months.  Yes.
4      Q    Okay.  And at that time, you had all the
5  respons--- you had all the roles and
6  responsibilities and -- and -- and authority as
7  chief?
8      A    Yes.
9      Q    Okay.  Would you have had the ability to
10  fire or terminate an officer for actions he had done
11  prior to you obtaining that role?
12      A    Absolutely.  Well, let me back up.  As long
13  as it met the other requirements of civil service
14  law because you have to -- disciplinary action 143
15  052 of the local government code, you have to take
16  disciplinary action within 180 days of misconduct
17  occurring; not the discovery of the misconduct, but
18  the misconduct occurring.  And so it would have had
19  to have taken place -- I couldn't go back five years
20  and -- and you know, dig something up and -- and --
21  and so just understand that there is -- there are
22  some time parameters in civil service.
23      Q    But if something occurred in November of
24  2018, you could -- you had authority when you were
25  appointed chief to terminate a officer for that

63

1  misconduct?
2      A    Yes.
3      Q    What are your -- what were your roles as -
4  - as chief of police for the City of Pasadena Police
5  Department?
6      A    How long you got?  No.
7      Q    At least 'til lunch break.
8      A    You know, setting the policy of the
9  organization, you know, the direction, the vision,
10  the day-to-day operations, discipline when it's
11  needed.  You -- you know, out in the community, you
12  know, community relations.  And so there -- there's
13  -- there's a lot of roles.
14      Q    What do you mean by setting policy?
15      A    Uh-huh.
16      Q    What do you mean by that?
17      A    Make the policies.  Whether that's kind of
18  the vision of the organization, which way we're
19  going to go, what's important, you know, that --
20  that we want to accomplish or both rules and
21  policies and procedures, set those for the
22  organization as well.
23      Q    And what were your roles and
24  responsibilities in terms of discipline?
25      A    At the end of the day, I was the final

64

1  decision maker when it came to -- to discipline.
2  And -- and I just want to be clear when we talk
3  about discipline that, okay, when we talk about
4  civil service discipline, it is a disciplinary
5  discipline or days off, it's an indefinite
6  discipline, an involuntary demotion, those are what
7  I consider discipline or what's considered -- not I
8  -- it's what state law considers to be discipline.
9  But officers also sometimes get verbal repri---
10  reprimands or letters of reprimands and they are
11  often referred to as discipline, but by civil
12  service law, they are not discipline.  So just as we
13  talk, I just want to make sure that we -- you know,
14  are we talking about discipline overall or are we
15  talking about civil service discipline? Because
16  there's a difference.
17      Q    I understand.  So just -- just to clarify,
18  so there's informal discipline in terms of
19  reprimands and other things that can be done.
20  Correct?
21      A    Correct.
22      Q    Okay.  And then there are more final
23  disciplinary procedures that -- that can also be
24  done.
25      A    Correct.

65

1      Q    Okay.  And who had --
2          MR. GILES:  Objection to form.
3          MR. SELBE:  Same --
4  BY MR. DUBE:
5      Q    -- besides -- let me ask this question.
6  Okay.  For the reprimands and other lesser forms of
7  discipline, what -- who had the authority to make
8  those recommendations and make those actions?
9      A    The assistant chief.
10          MR. GILES:  Objection to form.
11          THE DEPONENT:  The assistant chiefs were
12  able to --
13          MR. DUBE:  Okay.
14          THE DEPONENT:  The more informal
15  discipline, if you will.
16  BY MR. DUBE:
17      Q    You had the authority to do so?
18      A    Yes.
19      Q    And you -- and when -- the chief had the
20  authority to make the more final, including termin--
21  - discipline, including termination?
22      A    Yes.
23      Q    Okay.
24          MR. GILES:  Objection.  Form.
25  BY MR. DUBE:



66

1    Q    Now, I think you used the word decision
2    maker. You were the final -- when you were the
3    chief of police for the City of Pasadena, you were
4    the final decision maker for policy and discipline?
5    A    Yes.
6        MR. GILES: Objection. Form.
7    BY MR. DUBE:
8    Q    So from January 2019 until you retired,
9    you were the final decision maker for the City of
10   Pasadena Police Department?
11   A    For the police department, yes.
12   Q    You -- you spoke a little bit earlier
13   about a shooting that happened in 2018 involving
14   Officer Saldivar.
15   A    Yes.
16   Q    Okay. Tell us what you recall about that
17   incident.
18   A    He and other officers were dispatched out
19   to the area. It was an apartment complex south of
20   the Walmart in the 5200 block of Fairmont. It was -
21   - there was a theft call from Walmart and there was
22   also I believe a homeowner had seen someone was on
23   the front area with a gun and called the police.
24   Officer Saldivar went out there, located the person
25   with the gun in his hand and ended up discharging

67

1    his weapon. And it was -- I believe a person was on
2    the other side of a -- like a wrought iron fence --
3    I mean, you could see through it; it was a wrought
4    iron fence -- with a gun.
5    Q    Uh-huh.
6    A    And Officer Saldivar discharged his weapon
7    and he hit a couple different things, but I don't
8    think he hit the person, from what I recall.
9    Q    Do you recall watching the video?
10   A    Back then, yes.
11   Q    Do you recall anything about the person
12   who was shot at?
13   A    All I can remember is he had a gun in his
14   hand. I don't remember --
15   Q    Do you -- do you remember how old he was?
16   A    He was younger, but I don't know -- no, I
17   don't -- late teens, early twenties comes to mind,
18   from what I recall, but...
19   Q    Do you recall if the gun was a -- was a
20   working gun or -- or a toy gun?
21   A    It was working. I believe it was either a
22   BB or a pellet gun, but it was -- it was a working
23   gun.
24   Q    Okay.
25   A    And I recall it looked like a -- I say a

68

1    regular gun. It looked like --
2    Q    A firearm?
3    A    -- a firearm, not a -- did not -- at a
4    glance would not appear to be a BB gun or a pellet
5    gun.
6    Q    Yeah. So it was a BB gun or a pellet gun,
7    but not a firearm. This is the distinction we're
8    making?
9    A    Yes.
10   Q    But it appeared to look like a firearm?
11   A    Correct.
12   Q    What was your role in that investigation?
13   A    I was assistant chief over patrol.
14   Q    Right, because this was night patrol.
15   A    Oh, '18, I was assistant chief.
16   Q    Okay.
17   A    And -- and I would not have had much of a
18   role in it other than it was personnel under my
19   command that were involved.
20   Q    Uh-huh.
21   A    But as far as the investigation, it would
22   have been under investigations, and that assistant
23   chief, internal affairs did not fall under -- under
24   my command either. And so as far as a real role in
25   the investigation, I would not have had one.

69

1    Q    Uh-huh. But you recall saying that --
2    that you actually went out on the scene?
3    A    Yes.
4    Q    Okay. Tell -- tell us about that.
5    A    I just remember stopping by. It was early
6    morning. I know there was a light outside. But
7    that would not have been uncommon for me on
8    something that happened overnight where they still
9    had the scene for me to make an appearance and --
10   and check on everybody out there.
11   Q    What do you recall about that particular
12   night in terms of what you did at the scene?
13   A    I don't remember doing anything other than
14   finding out what happened.
15   Q    So you found out what happened at the
16   scene?
17   A    I -- yes.
18   Q    Okay. Well, how did you find out what
19   happened?
20   A    I would have talked to somebody out there.
21   Q    Do you recall who you spoke to?
22   A    No.
23   Q    And do you recall what they said?
24   A    Other than what I just told you in my --
25   you know, the rundown of the scenario of the guns

70

1 had been stolen from Walmart, the original call was
2 somebody on the front porch that somebody had seen
3 or the front door area on a ring camera with a gun.
4 Saldavar had gotten out there, located the person;
5 he was on the other side of the fence, had a gun in
6 his hand. Officer Saldavar fired his gun several
7 times, didn't strike the person, but -- I think he
8 struck a car, a building and maybe the fence, from
9 what I recall. But that was -- that's all I recall
10 from it.
11    Q    Okay. And you said you recall watching a
12 video of the shooting?
13    A    Uh-huh. Yes.
14    Q    Do you recall reviewing the reports of
15 them -- of that investigation?
16    A    Do I recall it? No.
17    Q    Okay.
18    A    Would I have? Yes, just because he was
19 under my command and the recommendation would have
20 come up from the chain of command because that's how
21 it works.
22    Q    Uh-huh.
23    A    But do I have an independent recollection
24 of reading it, I -- I don't.
25    Q    Okay. Would you have read the report of

71

1 the interview with the person who was shot at?
2    A    I would have read whatever was in the
3 internal affairs report. So...
4    Q    Do you recall reading that the person who
5 was shot at indicated that he had never raised his
6 gun at the officer?
7        MR. GILES:  Objection. Form.
8        THE DEPONENT:  I don't recall him saying
9 that.
10 BY MR. DUBE:
11    Q    So let's -- let me guess I'll ask it.
12 What do you recall about what the various -- what
13 Officer Saldivar said happened and what the
14 witnesses or -- and what the person who was shot at
15 said?
16    A    All I remember is that Officer Saldivar
17 had told him, you know, drop the gun for -- whatever
18 the words were. And then the person had the gun in
19 the hand and Rigo fired his. But as far as the -- I
20 -- I don't remember the exact -- I have not gone
21 back and reviewed that since probably 2018. So it's
22 probably been six -- five or six years since I've
23 read that report.
24    Q    Do you have recollection of Officer
25 Saldivar telling the person drop the gun?

72

1    A    I thought. But I -- it's been so long,
2 I'm not going to -- I can't tell you for certain
3 that that happened or it didn't happen, actually.
4    Q    Let -- let's just ask this question. What
5 are your expectations for an officer encountering a
6 person who has a -- a firearm in their hand?
7    A    And officer --
8        MR. GILES:  Objection. Form.
9 BY MR. DUBE:
10    Q    Per policy.
11    A    Per policy --
12        MR. GILES:  Objection. Form.
13        THE DEPONENT:  So -- so policy says, when
14 possible, to give a command. But the other -- you -
15 - you asked about my expectation. The other thing is
16 action is faster than reaction as well.
17        MR. GILES:  Uh-huh.
18        THE DEPONENT:  And so certainly, officers
19 or really anybody at least in the State of Texas has
20 a right to defend themselves if they are in fear of,
21 you know, imminent bodily injury, death. And you
22 know, somebody having a -- a firearm, you know,
23 expectation, if you -- somebody has a firearm in
24 their hand and is encountered by a police officer,
25 the expectation is that you drop it whether we get

73

1 the verbal command out or not, that they are still a
2 threat to the officer.
3    Q    Per policy, should the officer give the
4 person an -- an opportunity to drop the weapon?
5        MR. GILES:  Objection. Form.
6        THE DEPONENT:  The policy say when
7 possible. It doesn't say that you -- you -- you
8 know, you have to or you're in violation of policy.
9 And so it's going to -- you know, depending on the
10 circumstances, it depends, you know -- there's --
11 there's countless scenarios that, you know, we could
12 go through. And so you know, that's one thing with
13 policy is trying to give them enough guidance, but
14 also giving them the latitude to navigate through
15 these dynamic, ever-changing situations. And so we
16 can't write a policy for every single situation that
17 occurs, and so we basically trying to give the
18 officers, hey, these are -- these are the ground
19 rules you have to operate between, but we're not
20 going to tell you, you know, every single scenario
21 how to do it because it just would not be possible.
22        I mean, the scenario you're talking about,
23 with this one, I mean, the -- the officer -- I mean,
24 we're going to write a policy that says they don't
25 drop the -- you know, drop -- if they are given --

74

1 you know, given instruction, drop the gun; they
2 don't drop it within half a second, you're -- you
3 know, and so it's got to be where it's possible.
4 And so it's going to depend on -- it's going to
5 depend on the circumstances and -- and in this
6 particular scenario that -- that you're talking
7 about with Officer Saldivar, it -- in my estimation,
8 you know, it was a reasonable use of force.
9    Q   So you're affirming, you know, the
10 determination that it was reasonable use of force?
11   A   The recommendation would have come in from
12 the lieutenant and I would have concurred with it.
13 I don't remember exactly when this happened.  As far
14 as recommendation came up, it -- these
15 investigations typically take some time to play out.
16 And so I don't remember was that made before I was
17 the acting chief or was Chief Espinoza still there,
18 because when this happened, I -- I don't know.
19   Q   Okay.  And this happened April 2018.
20 Correct?
21   A   Correct.
22   Q   And Mr. Schenk was shot on November 2018?
23   A   Yes.
24   Q   Okay.  So as you're evaluating the
25 circumstances of the shooting of Mr. Schenk, were

75

1 you area that Officer Saldivar had been involved in
2 another shooting incident that same year?
3    A   Yes.
4    Q   Okay.  Let's go back a little bit. So you
5 -- I -- I hear you when you say that, you know, you
6 can't give policy upfront to cover every possible
7 scenario an officer will encounter on the street.
8    A   Correct.
9    Q   Okay.  As when -- as assistant chief or as
10 chief, or any time while you were at the police
11 department, did -- was there ever any procedures to
12 go over with the officer the video of the incident
13 and -- and suggest how they could have handled that
14 scenario differently?
15   A   Are you asking did it happen in this case
16 or did it ever happen?
17   Q   Well, I -- well, both -- I'm going to ask
18 you about did it ever happen and then -- so let's
19 start with that first.
20   A   I -- I know from time to time the training
21 academy would review videos of incidents; not just
22 shootings, but pursuits, any kind of incident.  They
23 would review them.  I can't tell you one way or
24 another definitively whether, you know, in this
25 particular incidence anybody, you know, watched the

76

1 video of Officer Saldivar.  I don't know.
2    Q   Okay.  And I don't know if you misspoke or
3 not.  You said the academy.  So does the academy
4 have authority or opportunity to meet with ca---
5 with officers who are not cadets and actual officers
6 who are actually on the force?
7    A   Sometimes they did.
8    Q   Okay.  Was that -- was that -- would it be
9 possible when you're assistant chief or acting chief
10 or -- or appointed chief, did you have the -- the
11 opportunity to recommend for an officer -- after
12 reviewing a report, hey, maybe you've -- you fell
13 within the structures of policy, but there's still
14 things you could have done differently; review this
15 with -- with a -- with instructor or some other type
16 of training like that?
17   A   Yes.
18   Q   So you had that -- you had that ability to
19 do that?
20   A   Yes.
21   Q   Okay.
22     MR. GILES:  Hey, Dimitri, we've been going
23 about an hour or -- or even longer than that.  Any
24 chance we could take a break?
25     MR. DUBE:  Of course.  How long?

77

1     MR. GILES:  Ten minutes.
2     MR. DUBE:  Sure.
3     VIDEO TECHNICIAN:  All right.  The time is
4 now 10:46.  We are off the record.
5     (Whereupon, a break was taken from the
6 proceedings.)
7     VIDEO TECHNICIAN:  The time is now 11:01.
8 We're back on the record.
9 BY MR. DUBE:
10   Q   When you were in the -- worked in the
11 chief's office, not just as the, you know, appointed
12 chief, but assistant chief, interim chief and all of
13 those things, did you keep apprized of national news
14 stories related to police shooting incidents?
15   A   Yes.
16   Q   Why?
17   A   It's better information, current events,
18 know what's going on.
19   Q   Did that inform how -- you know, what --
20 how you trained your officers and what your -- what
21 you informed them or anything of that sort?
22   A   I mean, that would be part of it.  Learn
23 from other -- you know, other incidents that
24 happened.
25   Q   So I guess let's -- let's go just

78

1    generally, you know -- I remember I asked you a
2    question before, if as internal affairs, if you
3    noticed any particular trends that needed to be, you
4    know, fixed or to let your officers at least -- that
5    would be the office -- the -- the job of the
6    persons, the people in the chief's office. Okay.
7    Remember -- do you recall that testimony?
8    A    Uh-huh.
9    Q    Okay.
10   A    Yes.
11   Q    And now, you know, we're in the part of
12   the story that you're going -- you're now in the
13   chief's office. Right?
14   A    Right.
15   Q    As assistant chief, as the -- as the
16   interim chief and then eventually as the actual
17   appointed chief.
18   A    Correct.
19   Q    In -- in -- in those capacities, how did
20   you direct policy and inform policy and things on
21   trends that you notice from -- from day-to-day
22   experience within your police force?
23   A    Some of it would be conversations with the
24   -- with the training academy because they would
25   also, you know, stay abreast. But it -- it was, you

79

1    know, also, you know, if we had officer injuries,
2    you know, a -- one of the common things is, you
3    know, vehicle backing, all right, backing up, you
4    know. And so we would do an analysis to see, you
5    know, our crashes at the end of the year. And you
6    know, we may see a bunch of backing accidents and
7    so, you know, that may nece--- necessitate some, you
8    know, backing training, for example. And so it --
9    it really just depends.
10   Q    Uh-huh. So would you -- like how would
11   you -- if you notice something that needed to be
12   trained by your officers, how would you make that
13   known? What are the various forms of communication
14   you would use?
15   A    Roll call training was a big one.
16   Q    What -- what's that?
17   A    Where the supervisor may go over a topic
18   in -- in -- in roll call.
19   Q    Uh-huh. And what's roll call? Just
20   assume we know nothing about the police.
21   A    Patrol at the beginning of the shift.
22   Q    Uh-huh.
23   A    The patrol shift that -- you know, they
24   will meet.
25   Q    Uh-huh.

80

1    A    And the sergeant could provide roll call
2    training to the officers that are present.
3    Q    Like these are things you need to keep --
4    keep abreast of, things you need to know and be
5    aware of?
6    A    Correct.
7    Q    So the -- and what else?
8    A    The training academy.
9    Q    Uh-huh.
10   A    In-service training could provide updated
11   training on -- on various, you know, topics.
12   Q    Uh-huh. What else?
13   A    We could push out training through a
14   platform we have on -- on different topics and it
15   will keep track of the officers that, you know, have
16   taken the training. Those are the main -- and then
17   -- and then there's one on one too, you know, if --
18   you know, sometimes there's not a policy violation,
19   but maybe there's a better way to do it and so the
20   supervisor sitting down with -- with an officer and
21   saying, look, you did not violate policy, but maybe
22   there was a better way to do it. Because in -- in
23   police work, there's a -- you know, a lot of ways to
24   skin a cat. And so --
25   Q    Right.

81

1    A    -- just because you do it one way and I do
2    it another doesn't make it wrong. One may be better
3    than the other, but it doesn't make the other
4    person's wrong.
5    Q    And I guess what -- what was the culture
6    at the police depart--- Pasadena Police Department
7    while you were there in terms of providing those
8    type of training opportunities for the officers?
9    A    We did it. That -- that was -- that was
10   important to me. You know, and on the discipline
11   side of things, if there was discipline that wasn't
12   just discipline, but if there was -- you know, reme-
13   -- remedial training aspect that went with it, we
14   would avail ourselves to that as well.
15   Q    Okay. Did you guys go over, you know, I
16   guess past scenarios that had occurred involving
17   your officers to train current officers to how to
18   handle those situations?
19   A    I know the academy uses some past
20   scenarios. Which ones, I don't know, but I do know
21   that they use --
22   Q    Okay. So I guess, then, let's back up a
23   little bit. What's the role of the academy in terms
24   of training officers post, you know, graduation from
25   -- from cadet school?



82

1    A    So the state requires ongoing training
2  just like most professions.  So you have to have so
3  many hours of training.  And so they provide that.
4  But also, we -- I mean, the Pasadena Police
5  Department as an organization each year would often
6  times have mandatory training that we would put
7  officers through, depending on, you know -- you
8  know, maybe some current events, what's going on,
9  you know, crisis intervention, mental health, you
10  know, is one that, you know, comes to mind that, you
11  know, I know we -- we did training on.  Excited
12  delirium is another one that I know that -- you
13  know, and so that is another way that we would --
14  would do it.
15    Q    Okay.  As police, do -- do -- did you
16  recall an incident involving the shooting of Tamir
17  Rice?
18    A    Is that the one in Cleveland?
19    Q    Yes.
20    A    I -- I -- yes.
21    Q    You -- you were aware of that?
22    A    Yes.
23    Q    Do you recall the circumstances of that
24  shooting?
25    A    I believe it was a juvenile.  He had a

83

1  gun.  The officer came up and I believe the -- the -
2  - he ended up shooting Tamir Rice.  I believe he had
3  the gun in his hand.  I -- I -- I don't remember if
4  it was a firearm or a BB gun, but something.  But
5  vaguely, do I remember it?  Yes.  Much more than what
6  I just told you, no, but that's -- yeah.
7    Q    No, that's pretty good.  That's pretty --
8  that -- that -- and it was a BB gun.
9    A    Was it?  Okay.
10    Q    Do you recall the -- do you recall how
11  long after the officer arrived on the scene that he
12  shot Tamir Rice?
13    A    It was pretty quick.  I remember that.
14    Q    Okay.
15    A    As far as time, I don't know.
16    Q    Did that present any opportunities -- or
17  any opportunities for you in your department?
18    A    I know there were discussions about it
19  amongst some of the -- the patrol supervisors in --
20  in taking it to roll call.  But other than that, no.
21    Q    Do you recall if it was actually ever
22  taken to roll call?
23    A    I -- I know it's -- yes.
24    Q    And what -- what do you recall the
25  discussion was at roll call training?

84

1    A    It -- if you can create space, to be able
2  to create space at times, that was really the big
3  takeaway is don't force the situation if you don't
4  have to and take a little bit more time.  That was,
5  from what I recall, what the -- the message was.
6    Q    Do you recall like -- like around what
7  year the Tamir Rice incident occurred?
8    A    No idea.
9    Q    Do you know whether or not it had occurred
10  before or after the -- the -- and we're going to
11  talk -- the shooting with the -- at the fence with
12  Officer Saldivar, the person who was shot at, his
13  name was Angel Ramirez.  So I'm going to refer to
14  that as the Ramirez shooting.
15    A    Okay.
16    Q    Okay?  Do you recall whether or not it was
17  before or after the Ramirez shooting?
18    A    I don't recall that.
19    Q    Okay.  If it occurred before the Ramirez
20  shooting, would that have been you think in your
21  mind, in the back of your mind, at the time of the
22  Ramirez shooting?
23    A    I -- six years ago, I don't remember.
24    Q    Okay.  If it happened April twenty---
25  about four years before the Ramirez shooting, would

85

1  you have expected that the -- the roll call training
2  that you discussed would have occurred prior to the
3  Ramirez shoo--- shooting?
4    A    It would have, yes.
5    Q    Okay.  So it would have happened fairly
6  quickly after the Tamir Rice shooting became
7  national news?
8    A    Somewhere -- yes.  Somewhere.  Yeah.
9    Q    I'm going to show you what's been
10  previously marked as exhibit 19.  I'm going to play
11  it both at regular speed and then --
12    MR. DUBE:  Video -- video tech -- I forgot
13  your name, sir.  What's your name, sir?
14    EXHIBIT TECHNICIAN:  My name is Vincent.
15    MR. DUBE:  Vincent.  Sorry about that,
16  Vincent.  Could you --
17    EXHIBIT TECHNICIAN:  No problem.
18    MR. DUBE:  Once you start playing it,
19  could you give me I guess keyboard control?
20    EXHIBIT TECHNICIAN:  Yes, just give me one
21  moment.  I just need to get it up.
22    MR. DUBE:  And you're playing it with a
23  VIC player.  Correct?
24    EXHIBIT TECHNICIAN:  Yes.  I'm playing it
25  over -- sharing it now.  You should see the video.

86

1      MR. DUBE:  Okay.  Yeah.
2      EXHIBIT TECHNICIAN:  Correct?
3      MR. DUBE:  Do you see it?
4      THE DEPONENT:  Yes.
5      EXHIBIT TECHNICIAN:  Let me -- just give
6  me a moment to -- all right.  You should have
7  control.
8      MR. DUBE:  Okay.  Is this exhibit 19?
9      EXHIBIT TECHNICIAN:  Yes.
10     MR. DUBE:  Okay.
11 BY MR. DUBE:
12     Q   So I'm showing you what has been marked as
13 exhibit 19.  It's a shooting.  It's the Ramirez
14 shooting, captured on Officer Saldivar's body cam
15 video.
16     A   Okay.
17     Q   Okay?  And you -- you recall having seen
18 that?
19     A   At some point.  Maybe years ago, yes.
20     MR. DUBE:  I mo--- I move exhibit 19 into
21 evidence.  Any objection?
22     MR. GILES:  No objection to its admission
23 during the deposition.
24     MR. DUBE:  Okay.  Thank you.  How about
25 Steven, any opposition?  Steven, any opposition?

87

1      The Deponent:  He's on mute.
2      MR. DUBE:  Oh.
3      MR. SELBE:  I -- I have no objection to it
4  being played in the deposition.
5      MR. DUBE:  Thank you, sir.
6      (Plaintiff's exhibit 19 referenced by
7  identification.)
8      (Whereupon, a video was played.)
9  BY MR. DUBE:
10     Q   What are your thoughts about seeing that?
11     MR. GILES:  Objection.  Form.
12     THE DEPONENT:  My -- my thoughts?
13     MR. DUBE:  Uh-huh.
14     THE DEPONENT:  I'm not sure what -- I
15 mean, I can tell you what I saw.  I don't know --
16 BY MR. DUBE:
17     Q   Sure.  What do you see?
18     A   I saw him get out.  Clearly -- or at least
19 to me, my thought is, he says, oh shit, which would
20 indicate to me or is consistent with his, you know,
21 account of it where, you know, he had a gun in his
22 hand and he discharged his weapon.
23     Q   Uh-huh.  Did you tell him tell the
24 individual to drop a weapon?
25     A   No.

88

1      Q   Okay.  Do you think is that consistent
2  with his training?
3      MR. GILES:  Objection.  Form.
4      THE DEPONENT:  Is it consistent with
5  training?  Could be, yes.
6  BY MR. DUBE:
7      Q   What factors would you -- would you
8  analyze?
9      A   The -- the threat to Officer Saldivar.
10 Somebody's got a gun in their hand. Again, action
11 being faster than reaction certainly could, you know
12 -- gun in the hand, you know, at his side is -- is a
13 -- could be a threat to the officer.
14     Q   Texas is an open carry state. Correct?
15     A   Hasn't always been.
16     Q   Okay.  Do you recall if it was in 2018?
17     A   2018?  I don't recall.
18     Q   Okay.  Are officers authorized to shoot
19 individuals solely because they have a weapon in
20 their hand?
21     A   Depends on the circumstances.
22     Q   Right.  That's -- but is the -- is the
23 presence of a gun in a person's hand sufficient
24 reason on its own for an officer to open fire?
25     A   It could be.

89

1      Q   Okay.  What -- what factors could make it
2  so?
3      A   If -- if an officer is in uniform, gets
4  out to contact the individual and they have a gun in
5  their hand, the -- I -- there's a reasonable
6  expectation that -- I mean, it's a threat to the
7  officer, a threat to anybody, but certainly, you
8  know, a law enforcement officer gets out -- you
9  know, contacts somebody and they have a gun in their
10 hand, I believe that it could pose an imminent
11 threat of death or bodily injury to themselves or
12 somebody else.
13     Q   So -- so the officer would then be
14 authorized to shoot on site?
15     A   In this cir---
16     MR. GILES:  Objection.  Form.
17     THE DEPONENT:  -- circumstance I just gave
18 you, yes.
19 BY MR. DUBE:
20     Q   How does that play with re--- with respect
21 to what we just discussed with the Tamir Rice
22 shooting and -- and the need to sometimes take time
23 and assess and -- and everything else you said
24 before?
25     MR. GILES:  Objection.  Form.

90

1    THE DEPONENT:  So I think there's a couple
2  things here.  I think one is -- I mean, hindsight's
3  always 2020, and the other is because you or
4  somebody else thinks it should be done one way
5  doesn't make the way another person does it as wrong
6  or unjust -- or not justified.  And so it -- it -- it
7  depends.
8    Q   Uh-huh.
9    A   And so, you know, potentially, you know,
10 could another officer have handled this another way
11 and been justified?  Yes.  But it doesn't make
12 Officer Saldivar's wrong.  You know, a reasonable
13 officer in that situation and in that set of
14 circumstance, you know, I believe could take the
15 same actions or would take the same actions.
16   Q   Let me ask this question.  Do you think
17 the way that Officer Saldi--- actually, I already
18 asked that question.  I'll strike that. Would there
19 have been an opportunity to do an evaluation and
20 investigation of this to then speak to Officer
21 Saldivar regarding how he handled the situation?
22   A   Could -- I mean, every situation, you
23 could talk about it.  So is it an opportunity?  Of
24 course.  I mean, any incident there is, there's an
25 opportunity to discuss it.

91

1    Q   Okay.  Was -- do you know whether or not
2  Officer Sal--- Saldivar was trained after this
3  incident how -- regarding the way he handled this
4  particular shooting?
5    A   I don't know the answer to that.
6    Q   Would you have expected him to -- would
7  you have expected -- was that a policy of the police
8  department to go over shootings and other similar
9  incidents with the officer afterwards to dis--- to -
10 - to explain to them or to -- you know, what better
11 ways to handle the situation could have been?
12   MR. GILES:  Objection.  Form.
13   THE DEPONENT:  That was a long question.
14 BY MR. DUBE:
15   Q   Sure.  I'll reask it.  Did you have a
16 policy in the Pasadena Police Department to review
17 shootings or other significant uses of force of
18 officers regarding the way they handled the
19 situation?
20   A   There was not a policy, no.
21   MR. DUBE:  Vincent, this is in media
22 player.  Is there a possibility for us to do it in
23 VIC player?
24   EXHIBIT TECHNICIAN:  Let me see.  I
25 believe so.  I will have to unshare and then reshare

92

1  it.  Just give me one moment.
2    MR. DUBE:  No worries.
3    EXHIBIT TECHNICIAN:  And you would like
4  the same exhibit, exhibit 19?
5    MR. DUBE:  Yes.
6    EXHIBIT TECHNICIAN:  Okay.
7  BY MR. DUBE:
8    Q   So when you watch videos like this, do you
9  watch it at regular speed or do you sometimes slow
10 it down?
11   A   You usually do it in both, but you also
12 have to be careful with, you know, body cam, dash
13 cam, for two reasons.  One is the field of view is
14 often different than the officer's field of view at
15 the time that the event occurred.  And the other is
16 we have the luxury of looking at it in hindsight and
17 Monday morning quarterbacking an officer's split
18 second decisions, slowing it down.  And whether it's
19 Rigo, Officer Saldivar or any other officer, don't
20 have the advantage of slow motion out there at the
21 scene.  So it's -- it's a dynamic situation.
22   And so again, you have to judge it
23 through, you know, reasonableness, you know, the
24 threat, the -- the totality of the circumstances and
25 not just frame by frame.  But do we look at them in

93

1  slow motion?  Absolutely.  But it's more than just
2  looking at a video in slow motion and identifying
3  something after the fact.  It's again, the -- the --
4    Q   Totality?
5    A   The totality of it.  And on this
6  particular one, it's, you know, the middle of the
7  night.  I know the original call was he was at a --
8  you know, at least in front of the -- I believe he
9  was knocking on a door, actually, with a gun in his
10 hand.  And so, you know, Officer Saldivar, you know
11 -- armed is the wrong word -- but you know, armed
12 with that inform--- you know, having that -- that
13 knowledge going into the situation, you know, is a
14 factor in it other than just a video at slow motion
15 or frame by frame.
16   Q   Thank you.
17   A   And while you're loading it, I -- you
18 know, the -- the example I'll give you is right
19 here, is this body camera is facing toward the left-
20 hand of the street.
21   Q   Uh-huh.
22   A   You know, from the picture here, Saldavar
23 -- whether he is or he isn't, I don't know, but just
24 as an example, he could be looking to the left right
25 now and see something that you and I don't see on



94

1  body camera right here after the fact.
2    A   Uh-huh.
3    A   And so I think that, you know, we need to
4  make sure that -- or I want to make sure that the
5  record at least reflects that, you know, body
6  cameras and dash cameras are a great tool, but they
7  can have limitations and, you know.
8    Q   Yeah.  But the can also -- they can also
9  show -- you know, resolve factual discrepancies.
10  Correct?
11    A   Potentially, yes.
12       MR. DUBE:  I'm trying to press play and
13  it's not happening.  Okay.  I'm trying one more
14  down.
15  BY MR. DUBE:
16    Q   Do you recall whether or not you watched
17  this particular incident on -- in slow motion or
18  not?
19    A   I don't recall.
20    Q   Okay.
21       (Whereupon, a video was played.)
22  BY MR. DUBE:
23    Q   Can you describe what you are seeing?
24    A   I see a gun and it appears to be in his
25  left hand.

95

1    Q   Uh-huh.
2    A   It almost looked like it was tilted a
3  little forward, not straight down, but titled a
4  little forward is what it looked like to me.
5    Q   Okay.  Uh-huh.
6    A   And you have an officer that's in uniform
7  in a police car.
8    Q   Uh-huh.
9    A   It looks like his lights are on, so it's
10  pretty clear -- or should be clear, at least as I
11  evaluate this, that he knows he's being contacted by
12  the police.
13    Q   Uh-huh.
14       (Whereupon, a video was played.)
15  BY MR. DUBE:
16    Q   Did you see any opportunity where Officer
17  Saldivar gave the person an opportunity to drop
18  their weapon?
19    A   Did I see it?
20       MR. GILES:  Objection.  Form.
21  BY MR. DUBE:
22    Q   Uh-huh.  Did he -- well, let me ask you,
23  did he -- did he state -- ask the person to drop the
24  weapon?
25    A   Did he state?  No.

96

1    Q   Okay.  Did he give an oppor-- did -- do
2  you -- did he give him sufficient time to drop the
3  weapon before he began firing?
4    A   I believe he did.
5    Q   Okay.
6    A   He got out of the car in a marked police
7  car.  He's in a marked police car with lights on and
8  a uniform.
9    Q   And do you recall what the person had done
10  right immediately beforehand?
11    A   Stole the guns from Walmart and then was
12  at -- on the front porch of somebody's house that
13  called the police with a gun in his hand.
14    Q   Do you recall that the person had just
15  jumped the fence?  Correct?  Do you recall that
16  part?
17    A   I don't -- I don't -- no.
18    Q   Okay.
19    A   I don't know how he got over the fence.  I
20  don't recall that.
21    Q   Okay.  Would you have recalled -- would
22  you have recalled that at the time you reviewed this
23  incident?
24    A   Yeah.  Yeah, 'cause it -- I mean, if it's
25  in the report, yes, I would have.

97

1    Q   Okay.
2    A   But the -- the other thing, I mean,
3  talking about the fence, I mean, clearly you can see
4  through it.  He could -- Officer Saldivar can see
5  him and see the -- the gun and --
6    Q   Uh-huh.
7    A   -- the other person has the same
8  opportunity.  And so that fence is not -- it's not a
9  barrier.  It's not bullet proof.  It's not -- and so
10  certainly, the -- you know, the -- the presence of
11  the fence does not take away the threat, you know,
12  to Officer Saldivar or others of death or, you know,
13  serious bodily injury because he has a firearm.
14    Q   So was -- was there any opportunity in --
15  upon what you just reviewed for Officer Salv---
16  Saldivar to have handled this situation differently
17  or in a better way?
18       MR. GILES:  Objection.  Form.
19       TEH DEPONENT:  Is there an opportunity?  I
20  -- I -- I -- I would have the answer to that.  I
21  mean, we can play the what-if game.  I mean, he
22  could have given him a, you know, drop the gun, but
23  --
24    Q   So --
25    A   -- again, action -- it's possible, but



98

1  action being faster than reaction, the person could
2  have responded by firing a firearm at -- toward
3  Officer Saldivar.  So you know, could he have done
4  it?  Yeah.  What would the result have been?  Maybe
5  he dropped it; maybe he shot at him.  We don't know.
6      Q    Yeah.  I'm not asking you what the result
7  is.  I'm asking, you know, from your position as
8  chief of police, assistant chief, where you're
9  trying to, you know, evaluate and train officers to
10  handle these situations and other situations, you
11  know, like -- you know, upon reviewing this, you
12  know, were the -- you know, would you have trained
13  Officer Saldivar to handle this in a better way or
14  given him guidance as to how to handle this in a
15  different way?
16      A    No.
17          MR. GILES:  Objection.  Form.
18  BY MR. DUBE:
19      Q    So -- so you really -- so it's your
20  testimony that you believe he handled this situation
21  in an optimal way?
22          MR. GILES:  Objection.  Form.
23          THE DEPONENT:  I -- I believe it was
24  within policy and state law.
25  BY MR. DUBE:

99

1      Q    That's not the question I asked.  So if
2  you -- if you can answer my question, I -- I would
3  really appreciate that.  The question I asked --
4          MR. GILES:  Objection.  Form.
5  BY MR. DUBE:
6      Q    The question I asked was, do you believe
7  that Officer Saldivar handled the situation in an
8  optimal way?
9      A    Yes.
10          MR. GILES:  Objection.  Form.
11  BY MR. DUBE:
12      Q    And you would agree with me that he did
13  not inform the per--- he did not ask the person to
14  drop the weapon.  Correct?
15      A    He did not verbalize.  Correct.
16      Q    Okay.  And you would agree with me that
17  the video shows that upon immediately seeing the
18  person with the weapon at his side, Officer Saldivar
19  says, oh, shit, and then begins shooting.
20          MR. GILES:  Objection.  Form.
21          THE DEPONENT:  Yes.
22  BY MR. DUBE:
23      Q    Okay.  That's what you observed?
24      A    Yes.
25          MR. GILES:  Objection.  Form.

100

1  BY MR. DUBE:
2      Q    Did you obs--- did you observe the person
3  raising their gun towards the officer at any point
4  during this incident?
5      A    You couldn't see it.
6      Q    Okay.  In the video, you could -- you did
7  not see the person raising their gun at the officer.
8  Correct?
9          MR. GILES:  Objection.  Form.
10  By Mr. Dube:
11      Q    You -- and I can play it again for you.
12      A    You cannot see it because he's being
13  blocked.
14  BY MR. DUBE:
15      Q    Okay.  Well, do you see a person raising
16  the gun -- what -- what blocks the view?
17      A    Officer Saldivar.
18      Q    Doing what?
19      A    Raising his firearm.
20      Q    Okay.  So do you agree with me that prior
21  to Officer Saldivar raising his weapon that the
22  person did not first raise -- raise their weapon?
23          MR. GILES:  Objection.  Form.
24  BY MR. DUBE:
25      Q    From what you could see.

101

1      A    The only thing I can tell you definitively
2  is the last spot that you see the firearm is at his
3  side.  What happens after that, I can't tell you
4  based on the video.
5  BY MR. DUBE:
6      Q    Okay.  If the person never raised his
7  weapon prior to Officer Saldivar discharging his
8  weapon, would that still have been a justified use
9  of force?
10      A    I answered --
11          MR. GILES:  Objection.  Form.
12          THE DEPONENT:  I answered that yes.
13  BY MR. DUBE:
14      Q    Okay.  Even if he never raised his weapon?
15      A    Correct.
16          MR. GILES:  Objection.
17  BY MR. DUBE:
18      Q    So if he had the weapon at his side during
19  the entire encounter, the mere presence of the
20  weapon in his hand would be sufficient reason for
21  the officer to shoot at him?
22          MR. GILES:  Objection.  Form.
23          THE DEPONENT:  I mean, it's a
24  hypothetical.  It's -- 'cause I -- I don't have all
25  the facts that -- all I can tell you is what I know,

102

1   you know, or believe happened in this event.
2   BY MR. DUBE:
3       Q   No.  I'm not asking about this event.  I
4   am giving you, in fact, a hypothetical.  If the
5   person never raised his weapon and he had the weapon
6   at his side the entire time, would the officer have
7   been justified in shooting him at that time?
8       A   What are the circumstance --
9           MR. GILES:  Objection.  Form. Objection.
10  Form.
11          TEH DEPONENT:  What are the circumstances
12  leading up to it, time of day, what information does
13  the officer have?  I mean --
14  BY MR. DUBE:
15      Q   Okay.  I'll -- I'll -- I'll -- I'll --
16  I'll add to it.
17      A   Okay.
18      Q   To my hypothetical.  So my hypothetical is
19  the person has jumped a -- has been accused of
20  stealing some pellet guns from Walmart.  Okay?
21      A   Okay.
22      Q   He is observed at a -- at a residence.
23      A   Okay.
24      Q   Okay?  An officer comes upon him.
25      A   Okay.

103

1       Q   Right?  And he -- he has jumped the fence
2   prior to officer coming up upon him.  The officer
3   sees him and the officer -- and he has a gun at his
4   side without ever raising it at the officer.  Is
5   that sufficient reason for the officer to shoot at
6   him at that time?
7           MR. GILES:  Objection.  Form.
8           THE DEPONENT:  Yes.
9   BY MR. DUBE:
10      Q   Okay.  Is the gun at a person's side, does
11  that police officer in a bodily harm or death?
12          MR. GILES:  Objection.  Form.
13          THE DEPONENT:  I think it depends on the
14  circumstances.
15  BY MR. DUBE:
16      Q   Okay.  In this video, was the -- was -- is
17  it, in your opinion, Officer Saldivar was in
18  imminent bodily -- or imminent harm of bodily harm
19  or death?
20      A   Yes.
21      Q   Okay.  Is it also your testimony that upon
22  viewing -- reviewing the video, you did not feel any
23  need to -- to counsel or guide Officer Saldivar into
24  how to better approach this or similar situations in
25  the future?

104

1       A   That's correct.
2       Q   Can you explain how that squares with I
3   guess your review or your analysis of what occurred
4   in the Tamir Rice shooting situation?
5           MR. GILES:  Objection.  Form.
6           THE DEPONENT:  What do you mean?
7   BY MR. DUBE:
8       Q   Can you explain how your view -- your
9   review of this situation squares with the
10  conclusions you stated you learned from the Tamir
11  Rice shooting?
12          MR. GILES:  Objection.  Form.
13          THE DEPONENT:  I don't know that I ever
14  compared the two.  I -- I didn't -- I didn't compare
15  the two.  I -- I -- what I told you about the Tamir
16  Rice is all I know about the Tamir Rice.  And so I
17  evaluated this -- this event based on the facts and
18  the circumstance that were available to me at the
19  time and -- and --
20  BY MR. DUBE:
21      Q   Do you see how somebody could make that
22  comparison given the fact that both scenarios
23  involved a teenager with a pellet gun, an officer
24  shooting upon them within less than a second of
25  arriving at the scene?

105

1           THE DEPONENT:  Do I --
2           MR. GILES:  Objection.  Form.
3           TEH DEPONENT:  -- see how somebody could?
4   BY MR. DUBE:
5       Q   Yeah.
6       A   I --
7       Q   Do you -- yes.
8           THE DEPONENT:  I -- I mean, I -- I don't
9   know the answer to that.  I don't know what other
10  people --
11  BY MR. DUBE:
12      Q   Well, okay, do you see a comparison
13  between the two?
14          MR. GILES:  Objection.  Form.
15          MR. DUBE:  Personally.
16          THE DEPONENT:  Do I --
17          MR. GILES:  Objection.
18          THE DEPONENT:  The problem is I don't have
19  enough information other than the limited that I
20  have on Tamir Rice.  I got more on this one.
21  There's at least some video.  The circumstances, I -
22  - I don't remember the circumstance leading up to
23  Tamir Rice.
24          MR. DUBE:  Uh-huh.
25          THE DEPONENT:  And so I think we have to

106

1  be careful looking at them in a vacuum and saying
2  this is a teenager with a pellet gun who was shot
3  pretty quickly and the same thing with Tamir Rice.
4  I don't think Tamir Rice was accused of going to
5  Walmart, stealing guns.  I don't think he was on
6  Ring kit.  So I don't know even know that it was the
7  middle of the night.  And so could somebody compare
8  them?  Sure.  But you -- you got to have the fa--- I
9  mean, anybody can do anything, but you got to have
10  the facts to be able to -- to compare them.  You
11  can't just say this Tamir Rice because of a pellet
12  gun and a teenager and getting shot quickly.
13      Q   And it's your testimony that you believe
14  the officer handled it -- Saldivar handled the
15  situation in an optimal way.
16         MR. GILES:  Object.  Form.
17         MR. SELBE:  Object to the form.
18         THE DEPONENT:  I've answered this like
19  three times.  Yes.
20  BY MR. DUBE:
21      Q   Thank you.  Sometimes the reason I might
22  ask a question has nothing to do your answers.  I
23  didn't like the way I asked the question the first
24  time, so I have to ask it the way I want to ask it.
25         MR. GILES:  Object to the sidebar comment.

107

1         MR. DUBE:  I'm just trying to help him
2  out.  So yeah --
3         MR. GILES:  Object to the sidebar.  It --
4  it -- ask the question.
5  BY MR. DUBE:
6      Q   All right.  So on November 18, 2018, what
7  -- what was your role?
8      A   The interim or the acting chief.
9      Q   So you had been there just for a short
10  amount of time.  Correct?
11      A   In that capacity, yes.
12      Q   And I'm going to refer to the incident
13  where Officer Saldivar shot Mr. Schenk as the Schenk
14  shooting.
15      A   Okay.
16      Q   Is that fair?
17      A   Yes.
18      Q   Okay.  When did you first become aware of
19  the Schenk shooting?
20      A   Shortly after it happened.
21      Q   Were you -- did you make it out to the
22  scene that night?
23      A   I did.
24      Q   Okay.  So when you say shortly after it
25  happened, like what -- what does that mean?  Or

108

1  what's shortly after?
2      A   Probably within the hour.
3      Q   Okay.
4      A   Normally, a significant event like this,
5  it goes up the chain of command.  It's probably much
6  sooner than that.  It's probably within 15, 20
7  minutes, but safe to say an hour.
8      Q   And how did you become aware of it? Like
9  who contacted you?  Do you recall?
10      A   No.  Somebody would have called me, but I
11  don't know who.
12      Q   Did you have a work phone or a personal
13  phone?
14      A   A personal phone.
15      Q   Okay.  So they would have called your
16  personal phone --
17      A   Uh-huh.
18      Q   -- to -- to apprize you of the shoot---
19      A   Yes.
20      Q   -- the shooting?  Okay.  Do you use your
21  personal phone for work?
22      A   Phone calls, yes.
23      Q   Okay.  How about text messages?
24      A   Occasionally.
25      Q   Did you -- do you use your personal phone

109

1  for work in any other way?
2      A   No.
3      Q   Do you have social media?
4      A   Yes.
5      Q   Okay.  What social media do you have?
6      A   Facebook, Instagram, Twitter, Snapchat.
7  That's it.
8      Q   Okay.  Did you use any of those social
9  media to communicate with anyone regarding your work
10  responsibilities?
11      A   No.
12      Q   Facebook Messenger, Instagram direct
13  messages or anything like that?
14      A   No.
15      Q   Who had access to your phone number of --
16  for work purposes?
17      A   I -- I don't know.
18      Q   Was it po--- was it posted that this is
19  the chief's number; in case of any emergencies,
20  please contact him?
21      A   It was probably in dispatch that way.
22      Q   Okay.
23      A   Not like on a bulletin board or something,
24  but they had a -- they had a significant --
25  significant event notification list or checklist to

110

1  make sure the right people got notified.
2      Q   What telephone carrier do you use?
3      A   Verizon.
4      Q   Were you using Verizon back in 2018?
5      A   Yes.
6      Q   Okay.  And 2021?
7      A   Yes.
8      Q   Do you recall whether or not you had any
9  communications with anyone regarding the Ramirez
10 shooting or the Schenk shooting using your personal
11 phone?
12     A   Not that I recall.
13     Q   You can't rule it out, though, correct?
14     A   Definitively, no.
15     Q   Do you still have the same phone now that
16 you had in 2018?
17     A   No.
18     Q   Okay.  Do you still have access to the
19 phone that you had in 2018?
20     A   No.
21     Q   Where is it?
22     A   I have no idea.
23     Q   Did you dispose of it?
24     A   Traded it in to Verizon, I think.
25     Q   Do you recall when?

111

1      A   No.  At least a year ago, but I don't
2  know.  I don't know when.
3      Q   Do you recall whether or not you had that
4  phone at the time this lawsuit was filed?
5      A   I have no idea.
6      Q   Do you recall whether an--- whether anyone
7  told you to save that phone?
8      A   No.  I know at some point there was a
9  request at--- well, I don't even know if it was this
10 lawsuit.  At one point, there was a request for text
11 messages and whatever.  I just don't remember if it
12 was this case or something else, but whatever it
13 was, I know I didn't have anything responsive to
14 what the subpoena was.
15     Q   How did you determine whether or not you
16 had anything responsive to those requests?
17     A   Went through my phone.
18     Q   And that was the same phone that you had
19 at the time of the Schenk shooting and the Ramirez
20 shooting?
21     A   I -- I don't know.  I went through what I
22 had at the time and...
23     Q   Okay.
24     A   If they weren't on there, I didn't have
25 them.

112

1      Q   Okay.  All right.  So I got sidetracked.
2  Let's go back.  So you receive a call regarding your
3  phone -- on your personal phone about the shooting.
4  What -- what were you told?
5      A   That -- that there had been an officer-
6  involved shooting.  I don't know if I was told who,
7  the circumstances.  I just know I was told there was
8  a -- a shoo--- you know, a shooting.
9      Q   What did you do at that time?
10     A   Took a shower and got dressed.
11     Q   Okay.  What did you do next?
12     A   Drove out to scene.
13     Q   Okay.  How far was the scene from your
14 house?
15     A   Probably an hour or close to it.
16     Q   What did you do in the hour drive?
17     A   Listened to the radio.
18     Q   Well, did you talk to anybody, any
19 investigators or any detectives in that drive?
20     A   Not that I recall.
21     Q   Okay.
22     A   I'm going out there, so...
23     Q   So what happened once you arrived at the
24 scene?
25     A   I would have gotten briefed by somebody on

113

1  what at least they knew at that point in the
2  investigation.
3      Q   Do you recall what you were told?
4      A   At that point, I just remember it being
5  pretty vague, that there was a traffic stop, the
6  driver had taken off running, was discarding
7  narcotics as he was running.  There was a physical
8  struggle between the driver and Officer Saldivar.
9  And at some point, Officer Saldivar discharged his
10 weapon, striking and killing the person.
11     Q   How long was -- were you at the scene for?
12     A   A couple hours.  I think it was the night
13 before Thanksgiving or somewhere around there, I
14 think.  But it was a couple of hours.
15     Q   Were you there when Officer Saldivar
16 conducted his walk-through?
17     A   If I was there, I was not present for it.
18     Q   You did not observe him conducting his
19 walk-through?
20     A   That's correct.
21     Q   Did you speak to Officer Saldivar that
22 night?
23     A   Briefly.
24     Q   What did you speak to him about?
25     A   Just to make sure he was okay physically,



NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

114

1  that he had notified his family. And that was --
2  that was the extent of it.
3      Q   Okay. Do you recall anything specific he
4  said to you?
5      A   No. That he was good and he had already
6  contacted wife, girlfriend, somebody. But that was -
7  - that was the extent of the conversation.
8      Q   Where was he at the time you spoke to him?
9      A   He was sitting in the passenger side of a
10 police car with another officer, I believe.
11     Q   Was that standard operating procedure?
12     A   Yes.
13     Q   Okay. And describe that procedure for me.
14     A   The -- after an officer's involved in a
15 shooting, take them from the immediate area, put
16 them in a -- police vehicle with somebody else.
17 Sometimes it's their choosing. If they don't have
18 anybody in particular, we'll try to find somebody
19 whose maybe been in a similar circumstance, a
20 traumatic event like that. They are told don't
21 discuss the -- y'all can talk about anything else,
22 but don't discuss the event. And it's really there
23 just to -- so they are not sitting in a car by
24 themselves feeling alienated from everybody else.
25     Q   Actually, back up. At what point --

115

1  because you say you were informed there was an
2  officer-involved shooting. Correct?
3      A   Yes.
4      Q   Okay. At what point were you told the
5  name of the officer who was involved?
6      A   I'm not sure when.
7      Q   Okay. Was it before you arrived at the
8  scene or at the time you arrived at the scene?
9      A   I don't know the answer.
10     Q   Who -- who -- who all did you make contact
11 with at the scene? You...
12     A   I know I talked to Sergeant Skripka.
13     Q   Uh-huh.
14     A   I believe I briefly talked to Detective
15 Cooper.
16     Q   Uh-huh.
17     A   There were other people out there. I just
18 don't know. There was a lot of people out there. I
19 just don't know who else I talked to. I just know
20 those two specifically.
21     Q   Okay. Were you there when the dash cam
22 video was brought out, when the dash cam and body
23 cam videos were brought out?
24     A   I don't recall seeing them that night.
25     Q   Can you, like, describe for us everything

116

1  you did at the scene that day once you arrived?
2      A   I got there, I checked on Officer
3  Saldivar. I talked to Sergeant Skripka and
4  Detective Cooper. And then honestly, after that, I
5  just stood around shooting the breeze with people
6  that were out there.
7      Q   And you just watched what was happening.
8  Correct?
9      A   Actually, I really couldn't even see.
10 When it was dark, there were a whole bunch of cars
11 and my car was at the back. And so after my initial
12 talking to those folks, I was back closer to my car,
13 standing, talking for a while.
14     Q   Okay. Do you recall the nature of your
15 conversation with -- with Sergeant Skripka?
16     A   Yes. It was very brief at that time. It
17 was just the -- the -- the facts that, you know --
18 and really, it was what Officer Saldivar had told
19 them and kind of what they had -- had seen at that
20 point, that I guess Schenk had run a stop sign in
21 the area, traffic stop. Schenk got out of the car,
22 started walking off. And then I know they had told
23 me the route and they had -- they had walked it. I
24 didn't go on the route that Schenk had run from the
25 vehicle.

117

1      Q   Uh-huh.
2      A   And they had said there were some
3  narcotics that Schenk had thrown --
4      Q   Uh-huh.
5      A   -- or discarded as he was running from
6  Officer Saldivar. They said that there was a
7  physical struggle. They said that his body camera
8  had been ripped off in the struggle.
9      Q   Uh-huh.
10     A   And at that point, they hadn't viewed it,
11 so they didn't know what was on it, but they said it
12 was on the ground there --
13     Q   Uh-huh.
14     A   -- when I talked to them. They said it
15 was on the ground. And that was -- that was all I
16 knew.
17     Q   They said the body camera was on the
18 ground at the time they arrived?
19     A   It was on the ground at some point, they
20 told me. I -- I -- where it was at when they got --
21 I don't know. But it was -- at some -- I know at
22 some point, they had told me it was on the ground.
23     Q   Got it.
24     A   That it had gotten ripped off, because my
25 question was, did he have his body camera on, or



118

1 something -- something along those lines.  And the
2 response was, he did, but it was ripped off and on
3 the ground during part of the struggle.
4    Q   Yeah.
5    A   It's -- but where it was at when they got
6 there, the respon--- I -- I don't know. I just know
7 at some point, they had told me it was on the
8 ground.
9    Q   Understood.  So that's the conversation
10 with Sergeant Skripka?
11   A   Yes.
12   Q   Anything else you remember about that
13 conversation?
14   A   That was it at that point.
15   Q   How about officer -- Detective Cooper?
16   A   It was almost identical to that. I -- I
17 think he had walked the actual route that Schenk had
18 taken.
19   Q   Uh-huh.
20   A   And so I -- I think he described in a
21 little bit more detail maybe the -- the narcotics
22 that were disposed of.  I don't remember what it
23 was, but --
24   Q   Uh-huh.
25   A   But he -- it was essentially the same

119

1 account at that point.
2    Q   Did you know Detective Cooper prior to
3 this?
4    A   Did I know him?
5    Q   Yes.
6    A   Yes.
7    Q   How did you know him?
8    A   We've worked -- I mean, he started shortly
9 after I did.
10   Q   Uh-huh.
11   A   He's worked -- he's worked for me a couple
12 of times. I -- that --
13   Q   So when and how did he work for you?
14   A   He worked for me when I was over burglary
15 and theft, directly, at least.
16   Q   Uh-huh.
17   A   Probably as a chief.  I mean, they all
18 work under you.  But as far as --
19   Q   Yeah.  Well -- well, when I mean work for
20 you, I mean directly.
21   A   Yeah.  Burglary and theft I believe is the
22 only time that he worked directly for me.
23   Q   Okay.  What were your interactions like
24 when he worked for you?
25   A   He's a hard worker.  He -- he does good

120

1 investigations, but sometimes you have to -- he's
2 not a detail guy sometimes.  And so that was -- you
3 know, you have to go back and get Cooper to --
4 writing was not his strong suit at times.
5    Q   Uh-huh.
6    A   And so...
7    Q   Any other observations about his work?
8    A   No.  He -- he's a hard worker.
9    Q   Did you ever -- when he worked for you at
10 burglary and theft, did you ever disagree with con--
11 - his conclusion on an investigation?
12   A   Not that I recall.
13   Q   Did you know him to do good work?
14   A   He was a hard worker.
15   Q   That's a different question.  You can do -
16 - I mean --
17   A   But he -- he --
18   Q   -- you can do hard work --
19   A   He wasn't a detailed --
20   Q   You can --
21   A   He wasn't a detailed guy at times. He
22 didn't like to write the report.  He wanted to go
23 out and catch the bad guys, but lots of times would
24 -- didn't -- you know, you had to stay on him to --
25 to write the reports and to -- you know, but he --

121

1 he was a -- he was a hard worker and you just had to
2 stay on top of him sometimes.
3    Q   What about his conclusions?  Were they
4 usually reasonable and -- and -- and -- and good?
5       MR. GILES:  Objection.  Form.
6       THE DEPONENT:  But investigators often --
7 they don't usually draw a conclusion.
8       MR. DUBE:  Uh-huh.
9       THE DEPONENT:  I mean, burglary and theft,
10 it's -- you investigate it.  Somebody identifies so
11 and so as the suspect.  You get whatever evidence.
12 You present the charge.  And so as far as presenting
13 a conclu--- or finding a clu--- I think when he
14 worked for me, that -- it's a -- it's a different
15 scenario than different -- other types of
16 investigations.
17 BY MR. DUBE:
18   Q   Were -- were there any scenarios where he
19 had to try to figure out, you know, who stole what
20 or who committed the burglary?
21   A   All the time.
22   Q   Okay.  Was he often right or wrong? Which
23 one?  Was he often right in his conclusions?
24   A   I -- I don't know of him being wrong.
25   Q   Okay.  Do -- so you know the -- so --



122

1 okay, at the time he worked for you, there were
2 never any instances where he drew the conclusion,
3 assumed the -- the wrong person committed the crime?
4    A   Not that I'm aware of.
5    Q   So now we're back at the scene. You've --
6 so you said a couple occasions. Did he work for --
7 did Detective Cooper work for you on any other
8 occasion besides burglary and theft?
9    A   I think when I was on patrol as a patrol
10 sergeant.
11    Q   Okay.
12    A   Twenty years ago, maybe.
13    Q   Okay.
14    A   And then his ATF role, I created the --
15 that -- that assignment, not for him, but created
16 the assignment and he got picked for it over at ATF.
17 And because of my relationship with the special
18 agent in charge of ATF, I talked to Cooper maybe
19 more than I would some other officers.
20    Uh-huh.
21    A   But again, he -- still being assigned to
22 A--- ATF still had a sergeant, still had a
23 lieutenant and an assistant chief. But I would see
24 him in the hallway and he would tell me what's going
25 on over at ATF.

123

1    Q   Okay. So who had regular interactions
2 with him while he was at ATF?
3    A   Regular once a month, maybe, in the
4 hallway.
5    Q   When was the ATF task force created?
6    A   Sometimes during my time as chief. But I
7 don't -- it's been a couple of years. I --
8    Q   Okay. So -- so this would have been
9 before or after the Schenk and Ramirez --
10    A   After. After.
11    Q   So now we're back at the scene. Did you -
12 - did you observe the body cam or dash cam video at
13 the scene?
14    A   No.
15    Q   When did you decide to leave the scene?
16    A   Whenever we ran out of things to talk
17 about. I -- I don't know. I mean, it -- it -- I --
18 I was there probably two hours, it seemed like, and
19 then I left.
20    Q   Were you there when they discarded the
21 body -- or removed the body from the scene?
22    A   I don't know. If I was, I wasn't over
23 there. I never even -- I saw his body from a
24 distance in the field, but I never -- never got up
25 close to it or anything. And so I wasn't -- I

124

1 wasn't there when all that -- no.
2    Q   Were you informed at -- at the scene where
3 the -- where Mr. Schenk had been shot?
4    A   I don't recall, because whatever way he
5 was laying, I know they couldn't see one side. I do
6 remember that. But I don't -- I don't -- I don't
7 remember if he was face up, face down. I -- I --
8 like I said, all I could see is a body in the
9 distance. It was dark --
10    Q   But --
11    A   -- and wet and I couldn't see.
12    Q   It was raining that night. Correct?
13    A   Yes.
14    Q   Okay. But you said you spoke to Sergeant
15 Skripka and you spoke to Detective Cooper.
16    A   Yes.
17    Q   Correct? And they gave you a rundown of
18 what happened. Correct?
19    A   Yes.
20    Q   Okay. And do you know whether or not they
21 told you where on his body Mr. Schenk had wounds
22 from the shooting that night?
23    A   At that night, I don't recall them telling
24 me. It's not to say they didn't, but I don't recall
25 them telling me that night.

125

1    Q   Fair enough. I assume after you left the
2 scene, you went home?
3    A   Yes.
4    Q   Okay. What's the next thing you recall,
5 you know, doing or hearing in connection to the
6 investigation?
7    A   At some point, I want to say it was the
8 following week, after Thanksgiving, after the
9 weekend, one of my assistant chiefs, Rick Styron,
10 came to me and said -- or asked if I could meet with
11 the investigators Cooper and Skripka because they
12 wanted to run the Schenk shooting down to me, at
13 least what they knew at that point.
14    Q   Okay. So the following week, so after the
15 Thanksgiving holiday?
16    A   Yes.
17    Q   Okay. You were approached and said that
18 Detective Cooper and Sergeant Skripka wanted to
19 discuss the shooting with you?
20    A   Yes.
21    Q   Okay. Before Styron came to you and --
22 and made that request, do you recall anything --
23 hearing anything about the investigation or
24 participating in any way in that investigation
25 during that time?

126

1    A    No.
2    Q    What occurred after Chief Styron --
3  Assistant Chief Styron approached you to discuss the
4  fact that Cooper and Skripka wanted to discuss the
5  Schenk shooting with you?
6    A    At some point that day, we went down to
7  the conference room in detectives, and it was
8  myself, Assistant Chief Styron, Detective Cooper,
9  Sergeant Skripka. I think there were others there,
10  but I don't know who the others were. I just seem
11  to remember more people being in the room.
12    Q    Okay. So I was taking notes, but I didn't
13  get all the names. So who are --
14    A    Cooper, Skripka.
15    Q    Uh-huh.
16    A    Styron.
17    Q    Uh-huh.
18    A    Myself.
19    Q    Uh-huh.
20    A    And I don't know who else. I -- I recall
21  there being other people in there because it wasn't
22  just the four of us, but I don't remember who else.
23    Q    Lieutenant Warnke, was he there?
24    A    Yes. He was the lieutenant over
25  investigations, yes.

127

1    Q    Lieutenant Hamilton -- or Sergeant
2  Hamilton, was he there?
3    A    I don't recall.
4    Q    Okay. So you were in the conference room
5  with Cooper, Skripka, and the other individuals who
6  were there.
7    A    Yes.
8    Q    What -- what happened at that time?
9    A    Somebody, I don't know if it was Cooper or
10  Skripka or -- I think it was kind of both of them
11  back and forth, giving a rundown what they knew or,
12  you know, their theory on what had taken place based
13  on what they had at that point.
14    Q    What do you recall what they said?
15    A    I mean, it was basically the same
16  beginning. And by beginning, I mean the traffic
17  stop. They played the video and saw Schenk running,
18  watched the dash cam until he got out of sight.
19    Q    Let's pause for a second. Did they give
20  you a rundown of what occurred before or after they
21  played the video or did it -- did -- did they do it
22  simultaneously?
23    A    They were doing it simultaneously is what
24  my recollection was. They would tell me and then it
25  was let's watch -- you know, watch the video, and

128

1  then moved on to the next part.
2    Q    Understood. Okay.
3    A    So after the body cam -- or the -- excuse
4  me, the dash cam from the car, then they went to the
5  body cam. And at some point, I don't remember if it
6  was before they played it, played it, stopped it,
7  played it and then told me, at some point, they told
8  me what their theory was on what they thought had
9  taken place out there.
10    Q    Okay. And what was that theory?
11    A    That there was a physical struggle between
12  Officer Saldivar and Schenk. During that struggle,
13  Officer Saldivar's body camera came off. It was on
14  the ground facing straight up. They -- you know, I
15  -- I -- again, I don't remember the order of it, but
16  they told me you could tell Rigo was winded, you
17  know, that there -- he -- you know, clearly some
18  exertion. Then somewhere in there, they discussed,
19  you know, where the wounds were on the body.
20    Q    Uh-huh.
21    A    And then a theor--- they had a -- you
22  know, what they believed happened. And then they
23  explained it. I believe they even acted it out a
24  little bit. And then we watched the video a bunch.
25  I don't know how many times, but it was a bunch.

129

1    Q    Okay. We got to slow it down a little
2  bit. You said they explained where the wounds were?
3    A    Yes.
4    Q    Okay. Where were the wounds?
5    A    I believe one was in the chest, kind of to
6  Schenk's left of the midline, I believe.
7    Q    Okay.
8    A    In the front. And then there were two in
9  the lower back, I believe, at an upward trajectory,
10  if I recall correctly.
11    Q    So there were two shots in the back?
12    A    Yes.
13    Q    Okay. And you said the one on the side
14  was in the -- was the front part of the --
15    A    That was my recollection, was it was front
16  toward the side was...
17    Q    Okay. Do you recall whether or not there
18  was an exit wound and an entrance wound in the area?
19    A    I don't recall.
20    Q    Do you remember tell--- them
21  telling you where the entrance wound on the side
22  was?
23    A    No.
24    Q    Okay. Do you recall whether they told you
25  the two wounds in the back, were they entrance



130

1  wounds or exit wounds?
2      A    They were entrance.
3      Q    Okay.  They told you there were entrance
4  wounds in Schenk's back.  Correct?
5      A    Yes.
6      Q    Did that concern you?
7          MR. GILES:  Objection.  Form.
8          THE DEPONENT:  In and of themselves, not
9  necessarily, no.  It could be -- there could be a
10  lot of explanations for it, so...
11  BY MR. DUBE:
12      Q    Okay.  So what was their theory -- you
13  said they explained their theory of what occurred to
14  you.  Correct?
15      A    Correct.
16      Q    What was -- what was that theory?
17      A    There was a physical altercation between
18  Officer Saldivar and Schenk.  And at some point,
19  Schenk turned and was crawling away and Officer
20  Saldivar shot the two rounds -- or the three rounds.
21      Q    So --
22      A    But initially, they -- because the
23  question I had was the -- the wound to the front, at
24  least my recollection during this conversation, was
25  that it was -- they believed at that time at least

131

1  that it was toward -- the -- there was an entrance
2  wound on the front or the side.  And so the -- the
3  theory was that the first round hit him on the -- on
4  the side in the front and then he turned and was
5  crawling away and he fired the other two rounds was
6  the -- the theory that day.
7      Q    Do you recall that's what they told you
8  that day?
9      A    That day, yes.
10      Q    Do you recall them telling you that
11  officer -- I mean, that Mr. Schenk was his -- on his
12  hands and knees at the time he was shot?
13          MR. GILES:  Objection.  Form.
14          TEH DEPONENT:  I know they bel--- believed
15  that for the two rounds in the back, at least.
16  BY MR. DUBE:
17      Q    You said they play acted what occurred.
18  Correct?
19      A    Yes.
20      Q    Okay.  Did they play act Mr. Schenk being
21  on his hands and knees at the time he was shot?
22      A    Yes.
23      Q    They demonstrated to you that Schenk was
24  on his hands and knees at the time Officer Saldivar
25  shot two other rounds?

132

1          MR. GILES:  Objection.  Form.
2          THE DEPONENT:  Yes.
3  BY MR. DUBE:
4      Q    Did they tell you whether or not they
5  believed the shooting was justified or unjustified?
6      A    I don't recall them using -- they -- it
7  was more here's what happened.  They weren't drawing
8  a conclusion.  It was here's what we think happened.
9  And they didn't say this, but it was kind of
10  presented and you draw your own conclusion, but
11  here's what we think happened.
12      Q    Do you recall whether or not they informed
13  you that the force used was excessive during that
14  meeting?
15      A    I do not recall that.
16      Q    And you have a specific recollection of
17  them telling you that Mr. Schenk was shot in the
18  front first?
19      A    Yes, because their theory was he was
20  turning when the first shot was fired.  And then as
21  he was crawling away, that the sub--- subsequent
22  shots occurred.  And so that was how it happened
23  because he was turning and that's how he got hit on
24  the side as he was turning, and then as he was
25  crawling away, the two in the back.

133

1      Q    Did it make a difference to you whether or
2  not the shots in the back occurred after he was shot
3  in the front?
4      A    Did it make a difference?  Make a
5  difference how?
6      Q    In terms of the way you evaluated the --
7  the case.
8      A    I think you got to go back to the totality
9  of all of it.  Again, wounds in the back, I mean,
10  there could be reasonable, legitimate explanation
11  for it.  So at -- at this point, I wasn't -- I
12  wasn't prepared to draw a conclusion.  The
13  investigation was still ongoing.
14      Q    What legitimate reasons could be -- there
15  be for an officer to shoot a person in the back?
16      A    So if I make the decision -- if I identify
17  you as a threat and I make the decision to shoot
18  you, that message has to go from my brain to my hand
19  to -- to fire.  And if as I pull my gun and start to
20  fire, you're turning, I can still be in the process
21  of firing and it -- there's -- I mean, it happens
22  quick, but there's a time from the time I tell my
23  brain to stop 'til I stop pulling the trigger.  So
24  you can still be turning while I can still be
25  shooting.  So there -- there's -- I mean, it's...

134

1    Q    So I guess I'll better try to say what I
2  think you said.  There could be a reasonable
3  explanation as to how a suspect was -- was shot in
4  the back.  Correct?
5    A    Correct.
6    Q    But is it also -- would it also be
7  reasonable for an officer to -- to intentionally
8  shoot someone in the back?
9        MR. GILES:  Objection.  Form.
10        THE DEPONENT:  I -- it depends on the
11  circumstances.  If you're running away and have a
12  gun, you know, over the shoulder pointed at me and I
13  shoot you in the back, that's -- you know, that's --
14  that's a scenario.  I mean, there's -- that's not
15  the only one, but that's a scenario.  So I don't --
16  you know.
17  BY MR. DUBE:
18    Q    Would that be a legitimate reason for an
19  officer to shoot an individual who is on his hands
20  and knees crawling away from him?
21    A    Depends on the circumstances, I guess.
22    Q    What circumstances would it be justified
23  for an officer to shoot individ--- an individual on
24  his hands and knees crawling away from him?
25        MR. GILES:  Objection.  Form.

135

1        THE DEPONENT:  It -- it -- I mean, if you
2  had a gun and you're crawling away, you still could
3  -- still could shoot.  That -- that would be one.
4  The scenario I gave you of, you know, as I begin
5  shooting you, at the same time, you see the gun, you
6  know, and -- and -- you know, a lot of people -- I'm
7  not going to say everybody, but a lot of people, if
8  you shoot a gun at them, their first response, you
9  know, is -- is to turn.
10        And so if, you know, I begin to shoot and
11  you're turning and going away, I could still be
12  shooting.  And so that doesn't necessarily -- you
13  know, if that first round -- you know, the first
14  shot was -- you know, was justified, the subsequent
15  ones potentially could.  I mean, the window doesn't
16  stay open forever, but there could be a time period
17  after that, again.
18  BY MR. DUBE:
19    Q    I believe you said there could be
20  circumstance where it's reasonable for officers to
21  shoot somebody in the back if they had a weapon.
22  Are there any scenarios in which it would be
23  reasonable for an officer to shoot an individual in
24  the back crawling away when they were unarmed?
25    A    I think this scenario right here, in the

136

1  Schenk scenario, based on at least the evidence.  I
2  don't have any -- there's no evidence -- there's
3  theories, but there is no evidence to support a
4  theory other than Officer Saldivar's.
5    Q    Uh-huh.  So you think if there was a --
6  you agree that there's no evidence that Mr. Schenk
7  was armed.  Correct?
8    A    Correct.
9    Q    And -- and you think that if Officer
10  Saldivar shot Mr. Schenk in the back while he was
11  crawling away from him, that would have been
12  justified?
13        MR. GILES:  Objection.  Form.
14        THE DEPONENT:  That's not what happened
15  here, though.
16  BY MR. DUBE:
17    Q    I -- I -- I -- we'll get to what happened
18  because we have videos and everything else as to
19  what happened.
20    A    Well, I know.  But you're saying that
21  Schenk --
22    Q    No, I --
23    A    -- crawling away, shot in the back, could
24  it ever be --
25    Q    So -- okay, so let's -- let's -- let's

137

1  come at it this way.  Detective Cooper and Officer -
2  - and Sergeant Skripka, right, informed you it was
3  their belief that Mr. Schenk was on his hands and
4  knees and crawling away when Officer Saldivar shot
5  and fired two rounds in his back.
6    A    But we're leaving out the first round.
7    Q    Well, we'll get -- we'll get there, trust
8  me.
9    A    I know, but we've got to tell the stor---
10  I mean, I can't --
11    Q    Okay.
12    A    You're asking me to draw a conclusion,
13  leaving out a key important piece of it, which is
14  the first round.
15    Q    Okay.
16    A    And I can't ignore that and just address
17  these.  That's not what happened here.
18    Q    Okay.  So if I were to tell you that
19  Detective Cooper was deposed --
20    A    Yes.
21    Q    -- and he stated that he never told you
22  that the first round came while Mr. Schenk was
23  standing up, would you have reason to disagree with
24  that?
25    A    Yes.



138

1        MR. GILES:  Objection.  Form.
2   BY MR. DUBE:
3        Q    And if he stated that there were five
4   rounds there, based on the number of shell casings
5   that were found, would you have any reason to
6   disagree with that?
7        A    I -- I don't recall how many there were.
8   I don't disagree with it, but I don't -- I don't
9   recall.
10       Q    Okay.  And if he testified that --
11  actually even demonstrated the five puffs of smokes
12  exiting Officer Saldivar's gun at the time of
13  shooting and Mr. Schenk was on the ground, would you
14  have any reason to disagree with that?
15       MR. GILES:  Objection.  Form.
16       THE DEPONENT:  Do I have a reason to
17  disagree?  I -- I don't know where Mr. Schenk was.
18  They profess that the video shows where Mr. Schenk
19  is.  I've watched that video countless times and I -
20  - I don't agree with -- I don't agree that the video
21  demonstrates that.
22  BY MR. DUBE:
23       Q    Okay.  So I guess that's -- let's pause
24  there for a second.  What did you see in the video?
25       A    It's been awhile since I've seen it, but

139

1   there was the physical struggle.  I remember more
2   than anything hearing the physical struggle because
3   the body camera goes down pretty quick. And you
4   continue to hear it.  And at some point -- I know
5   you hear the -- the gunshots. But after that, it's -
6   - it's various shades of a black screen.  That --
7   that's what I recall seeing on it.  I -- I -- I -- I
8   do --
9        Q    Do you --
10       A    -- remember the -- the puffs of smoke.
11       Q    Uh-huh.
12       A    But I don't remember -- I -- well, not
13  that I don't remember.  I never saw Schenk on the
14  ground, crawling away or anything else that
15  Detective Cooper and Sergeant Skripka believe is on
16  the screen.
17       Q    So let's just set the scene.  So they are
18  showing you the videos.  Correct?
19       A    Correct.
20       Q    Did they slow it down for you?
21       A    I don't remember if they slowed it down or
22  we just watched it a bunch.  I don't remember.
23       Q    All right.
24       A    I be--- I believe they paused it.
25       Q    Okay.  Do you recall if they went frame by

140

1   frame?
2        A    I don't recall.  It's not to say they
3   didn't.  I -- I don't recall.  I just remember
4   watching it a bunch and I know it was stopped at
5   several times during the...
6        Q    Did you have access to the video yourself?
7        A    Yes.
8        Q    Okay.  Did you ever watch it?
9        A    Yes.
10       Q    Did you ever pause it?
11       A    Yes.
12       Q    Did you ever go frame by frame?
13       A    Yes.
14       Q    Okay.  In all the times you saw it, is it
15  your testimony that even going frame by frame, you
16  could not tell that Mr. Schenk was on his hands and
17  knees during the video?
18       A    I never saw that on the video.
19       Q    What screen were you guys watching it on
20  that day?
21       A    I don't remember if it was a T.V. or a
22  drop-down screen from the ceiling through a
23  projector 'cause there's both in that room.  But I -
24  - I don't remember.
25       Q    And were Sergeant Skripka and Detective

141

1   Cooper narrating what they saw as you watched the
2   video?
3        A    Yes.
4        Q    Okay.  Was there ever a point in when they
5   stopped the video and says here is Schenk on his
6   hands and knees?
7        A    Yes.
8        Q    Okay.  And it's your testimony that -- so
9   how did they do that?  Did they point out a -- a --
10  a shading or a figure or anything?
11       A    I'm honestly not sure what they pointed
12  out.  They pointed to a section of the screen and
13  said, here it is, and myself and Lieutenant Styron
14  both --
15       Q    Chief Styron.
16       A    Yeah, Chief Styron -- did not come to the
17  same conclusion.
18       Q    Assistant Chief Styron.
19       A    Assistant Chief Styron did not come to
20  same conclusion.
21       Q    So they paused the video.  They said, hey,
22  this is where Schenk is on his hands and knees.
23       A    Correct.
24       Q    And you did not see what they saw.
25       A    Correct.

142

1    Q   Did you say anything to that effect?
2    A   That -- yes, I said, I don't see what
3  you're seeing.  Yes.
4    Q   Okay.  Did you ask for any further
5  explanation from them?
6    A   No, because we were -- not at an impasse,
7  but they were convinced they saw it. Chief Sti---
8  Assistant Chief Styron and I didn't see what they
9  were seeing.  And it was y'all keep investigating
10  and that was -- yeah, we'll go from there.
11    Q   And then, again, you testified that they
12  were on their hands and knees to demonstrate to you
13  what -- what they believe occurred in the video?
14    A   Yes.
15    Q   Okay.  Did they mention to you there was
16  any discrepancies between what Officer Saldivar
17  stated and what they were observing in -- in the
18  video?
19    A   I don't recall.  I don't recall either
20  way.  So I'm not sure.
21    Q   So you state -- you told them you did not
22  see what they saw.  Correct?
23    A   Correct.
24    Q   What happened after that?
25    A   Some point, I went and watched the video

143

1  in my office, both on the computer and the T.V.
2  there.  Turned the lights out.  I slowed it down
3  frame by frame.  Everything that -- you know, try to
4  see what they were saying they saw.
5    Q   And the video is dark.  Correct?
6    A   Yes.
7    Q   Okay.  Did you attempt to have the video
8  enhanced?
9    A   No.
10    Q   Okay.  Was there any reason -- anything
11  preventing you from doing that?
12    A   No.
13    Q   Did you have the resources to do that?
14    A   We don't have resources internally to do
15  that.
16    Q   Okay.  Was there anything stopping you
17  from hiring a -- a -- you know, a reconstructionist
18  expert or a video enhance--- a video enhancer?
19    A   We could have hired somebody, yes.
20    Q   Was it concerning to you that Detective
21  Cooper and Sergeant Skripka believe that Officer
22  Saldivar had shot Mr. Schenk while he was on his
23  hands and knees?
24    A   Concerned?  No.
25    Q   Okay.

144

1    MR. DUBE:  Okay.  I think it's a good --
2  that's a good time to break for lunch.
3    VIDEO TECHNICIAN:  All right.  The time is
4  12:23 and we're off the record.
5    (Whereupon, a break was taken from the
6  proceedings.)
7    VIDEO TECHNICIAN:  The time it now 1:13
8  and we're back on the record.
9  BY MR. DUBE:
10    Q   Good afternoon, sir.  How are you?
11    A   Good.
12    Q   Good lunch break?
13    A   It was quick.  Good.
14    Q   I apologize for that.  We're trying --
15    A   No, I'm good now.
16    Q   We're both trying to catch a flight. Any
17  reason that you can't tell -- give truthful
18  testimony this afternoon like you did this -- this
19  morning?
20    A   No.
21    Q   Okay.  Are you ready proceed?
22    A   Yes.
23    Q   Okay.  Do you recall being deposed in the
24  Schenk case?
25    A   Yes.

145

1    Q   And if I told you that deposition occurred
2  on July 15th, 2021, would you have any reason to
3  object to that?
4    A   No.
5    Q   Okay.  Does that score with your memory
6  that's when it occurred?
7    A   I -- I don't know when it occurred. I know
8  it was a couple of years ago, but yes.
9    Q   And do you recall at that time being asked
10  the position Nathan and -- was in when Officer
11  Saldivar first fired his shots?
12    A   I don't recall.  No.
13    Q   Okay.  But it's your testimony now that
14  Detective Cooper and Sergeant Skripka told you that
15  Mr. Schenk was standing at the time the shots were
16  first fired?
17    A   I don't remember where they said he was
18  when he -- they first fired.  I just know that at
19  some point, they said he was crawling away when
20  shots were fired.  But I don't...
21    Q   Okay.
22    MR. DUBE:  Can you please pull up exhibit
23  34, please, at page 44?
24    EXHIBIT TECHNICIAN:  Absolutely. Just one
25  moment, please.  And which page would you like, sir,

146

1 again?
2        MR. DUBE: Forty-four.
3        EXHIBIT TECHNICIAN: Okay.
4        MR. DUBE: Okay. Can you give me video
5 control, please. Or could you highlight for me
6 lines 16 through 24?
7        EXHIBIT TECHNICIAN: Sorry, sir, it's not
8 allowing me to highlight right now. I apologize.
9        MR. DUBE: No worries. Okay. That's okay.
10 All right. I move exhibit 34 into evidence. Any
11 objection? You're on mute, Norman.
12        MR. GILES: I -- I -- I -- I don't object
13 to you using it in the deposition. I -- I don't
14 agree to its admission into evidence.
15        MR. SELBE: Yeah. And I -- the same
16 thing, I don't -- I don't agree with it being into
17 evidence anywhere other than in the deposition, but
18 that doesn't even -- that doesn't even -- it's not
19 inconsistent with the witness' testimony anyway.
20        MR. DUBE: Thank you for the speaking
21 objection. I just asked if you have any objections.
22        MR. SELBE: Oh, no, I'm -- I'm giving you
23 a response to the question you asked me. I'm
24 telling you what the evidentiary basis is for my
25 response. It's not a speaking objection.

147

1        MR. DUBE: Okay. Thank you.
2        MR. SELBE: Sure.
3        (Plaintiff's exhibit 34 referenced for
4 identification.)
5 BY MR. DUBE:
6   Q   Could you read lines 16 through 24,
7 please.
8   A   Okay. And did either Detective Cooper or
9 Sergeant Skripka say at that meeting that it
10 appeared to them that Nathan was on his hands and
11 knees at the time the shots began? The answer, they
12 thought that to be the case, yes.
13   Q   And that's -- and that's your answer.
14 Correct?
15        MR. GILES: Objection. Form.
16        THE DEPONENT: Yes.
17 BY MR. DUBE:
18   Q   Okay. That -- answer the question, did
19 either Detective Cooper or Sergeant Skripka say in
20 the meeting that it appeared to them that Nathan was
21 on his hands and knees at the time the shots began.
22 And your answer to that was yes. Correct?
23   A   Yes.
24   Q   Okay. Can you read the next four lines
25 through 24?

148

1   A   Okay. And did they point out on the video
2 recording when -- what they saw that caused them to
3 have that perception when viewing the video
4 recording? Yes.
5   Q   All right. And you would agree with me
6 that your memory in July 2021 as to that meeting is
7 fresher back at that time than it is currently?
8   A   It was closer to the time of the event.
9   Q   So I guess if I asked you -- did Detective
10 Cooper and Sergeant Skripka tell you that Nathan was
11 on his hands and knees at the time the shots first
12 began during that meeting?
13   A   After reviewing this, yes.
14   Q   Did they tell you that Nathan was standing
15 up when the first shots began?
16        MR. GILES: Objection. Form.
17        THE DEPONENT: I don't recall because I
18 know there was a -- re--- Officer Saldivar's -- you
19 know, at some point, he was facing him, but I don't
20 -- I don't recall the --
21 BY MR. DUBE:
22   Q   I'm asking you --
23   A   -- breakdown of --
24   Q   I'm asking you what Detective Cooper and
25 Sergeant Skripka told you. Same question I asked

149

1 before.
2        MR. GILES: Objection. Form.
3 BY MR. DUBE:
4   Q   Did they tell you at that meeting that
5 Nathan was standing up at the time that the shots
6 first began?
7        MR. GILES: Objection. Form.
8        THE DEPONENT: I don't know at what point
9 -- I don't know the answer to that.
10        MR. DUBE: All right. We can take the
11 exhibit off the screen, sir, Vincent.
12 BY MR. DUBE:
13   Q   And you testified, sir, that you had the
14 capability to -- well, let me ask you, what about
15 the video made it hard for you to perceive what
16 occurred?
17   A   It was dark.
18   Q   And anything else?
19   A   I mean, it was dark and grainy. That --
20   Q   Okay.
21   A   That pretty much sums it up.
22   Q   Okay. And you testified that you had the
23 capability to ask for it to be enhanced in -- in
24 some way, shape or form?
25   A   Yes, but in the past when we've done it,

150

1 it's never been of any value, so...
2    Q    Uh-huh.  And but did you -- did your --
3 did you have a -- you had investigators.  Correct?
4    A    Yes.
5    Q    Okay.  Do you know if they had ever
6 enhanced video in -- you know, in past crimes or --
7 or shootings or anything of that sort?
8    A    I know they've made attempts and you get
9 back a more pixilated image of what it was before.
10 It's not been beneficial.
11    Q    So it's your testimony that it's never
12 been beneficial, to your knowledge, to enhance the
13 video?
14    A    My experience?  No.
15    Q    Did you speak to any -- is there a
16 particular unit that handles those enhancements and
17 -- and rec--- reenactments and recreations?
18    A    Enhancements, recreations?
19    Q    Yes, of videos.  Enhan--- so let me ask
20 the question simpler.  Is there a particular unit
21 within the police department that handles
22 enhancements of video?
23    A    No.  We'd have to go to an outside agency.
24    Q    Gotcha.  Has that been done by your police
25 department in the past?

151

1    A    Gone to an outside agency?
2    Q    Yes.
3    A    Yes.
4    Q    And it's your testimony that upon viewing
5 the video and upon viewing what Skripka and Cooper
6 told you, you could not discern what was occurring
7 on the screen?
8    A    That's correct.
9        MR. DUBE:  Can you please play exhibit 17,
10 please.
11        EXHIBIT TECHNICIAN:  Absolutely. Just one
12 moment, please.
13 BY MR. DUBE:
14    Q    Just in the interest of saving time, I'm
15 going to skip ahead to about three minutes when --
16    A    Okay.
17    Q    Is that okay?
18    A    Yes.
19        MR. DUBE:  Can I get -- perfect. You can
20 skip ahead to five minutes.  Okay. Perfect.
21        (Whereupon, a video was played.)
22        MR. DUBE:  Can you pause, please? Can you
23 pause, please?  Vincent. Can he hear me?  Vincent,
24 can you pause, please?  And can you give me, I
25 guess, control?  Thank you. Okay.  I'm going to go

152

1 back a little bit to the position I wanted to pause
2 at.
3        (Whereupon, a video was played.)
4 BY MR. DUBE:
5    Q    This is Officer Saldivar effectuating the
6 traffic stop, correct?
7    A    Yes.
8    Q    Okay.  And as we see, shortly after, Mr.
9 Schenk begins running.
10    A    Correct.
11    Q    Okay.  And are you able to observe all of
12 that in the video, correct?
13    A    Yes.
14    Q    Okay.  And Mis--- and Officer Saldivar
15 cha--- eventually chases him down.  Correct?
16    A    Yes.
17    Q    Okay.  And I think right when I tried to
18 pause it, he was being tased correct? Mr. Schenk was
19 being tased by Officer Saldivar?
20    A    He attempted to tase him, yes.
21    Q    Okay.
22        (Whereupon, a video was played.)
23    Q    And this is Mr. Schenk running away?
24    A    Yes.
25        (Whereupon, a video was played.)

153

1    Q    And this is the moment that he's tasing --
2 or trying to tase him.  Correct?
3    A    Yes.
4        (Whereupon, a video was played.)
5 BY MR. DUBE:
6    Q    The first attempt to tase did not work?
7    A    Correct.
8    Q    And he still kept running?
9    A    Correct.
10        (Whereupon, a video was played.)
11 BY MR. DUBE:
12    Q    And at that moment at 5:58 in the video,
13 he is attempting to tase him again. Correct?
14    A    Correct.
15        (Whereupon, a video was played.)
16 BY MR. DUBE:
17    Q    And what can you tell -- what happens at
18 that moment?
19    A    It appears that Schenk is on his back and
20 Officer Saldivar is over him.
21    Q    Okay.  So I'm just going to play it now
22 through the shooting.
23    A    Okay.
24    Q    And then I'm going to ask you what you see
25 after I pause it.  Okay?



NAEGELI
DEPOSITION & TRIAL          (800) 528-3335
                           NAEGELIUSA.COM

154

1   A   Okay.
2   Q   And then I will go back and replay it
3 again.
4   A   Okay.
5   Q   Okay.
6       (Whereupon, a video was played.)
7 BY MR. DUBE:
8   Q   What are we observing?  What did you just
9 observe up -- up -- up to this moment?
10   A   I'm not sure.  Black screen.  You can hear
11 -- you can hear exertion.  Sounds like a struggle is
12 what it sounds like.  That's all I can tell you.
13   Q   Okay.  And at this point that we've paused
14 it, what can you observe?
15   A   It looks like Officer Saldivar on the --
16 my right side of the screen, the upper right corner.
17   Q   Okay.  And do you see Mr. Schenk at any
18 point?
19   A   Right now?
20   Q   Yes.
21   A   No.
22   Q   Okay.  Do you have an opinion as to where
23 he is in this video based on where Officer Saldivar
24 is?
25   A   Maybe on the ground in front of him.

155

1   Q   What -- what are you basing that opinion
2 on?
3   A   Officer Saldivar's position.
4   Q   I'm going to play again.
5   A   Okay.
6       (Whereupon, a video was played.)
7 BY MR. DUBE:
8   Q   And if there's any point you want me to
9 stop, if you maybe see and there's something you
10 observe, please let me know as well.
11   A   Okay.
12       (Whereupon, a video was played.)
13       THE DEPONENT:  There's a car that drove
14 by.
15 BY MR. DUBE:
16   Q   Did you see anything prior to the car
17 driving by?
18   A   Looked like a shadow on the lower left
19 corner, but --
20   Q   So you saw a shadow on the lower left
21 corner?
22   A   Well, shadow might be misleading.  Kind of
23 the -- the color changes of the screen.  I -- I don't
24 know what it is, but...
25   Q   I'm going to go back to 6:45 again, play

156

1 it one more time.
2       (Whereupon, a video was played.)
3 BY MR. DUBE:
4   Q   Okay.  Do you see anything just now?
5   A   I saw the screen discoloration change over
6 on the left side.
7   Q   Okay.  Did you see a puff of smoke?
8   A   I didn't.
9   Q   Okay.  I'm going to play it again.  Tell me
10 if you see it this time.  Tell me if you see any
11 puffs of smokes or any sparks at the time that this
12 is being shown.
13       (Whereupon, a video was played.)
14       THE DEPONENT:  There's one.
15 BY MR. DUBE:
16   Q   You saw it?
17   A   Yeah.
18   Q   What -- what did you see?
19   A   Looked like a puff of smoke and like a
20 spark like consistent with gun fire.
21   Q   Consistent with gun fire?
22   A   Yeah.
23   Q   And did you see what was the person who
24 was shooting was shooting at?
25       MR. GILES:  Objection.  Form.

157

1       THE DEPONENT:  No.
2 BY MR. DUBE:
3   Q   Okay.  All right.  I'm going to play it
4 again and you can -- tell me -- and actually,
5 I'll play it a little bit further.  Who is that
6 coming back on screen as -- as we -- see this?
7   A   That looks like Officer Saldivar.
8   Q   Yeah.  And you -- and what -- okay.  I'm
9 going to play it and you tell me what you see him
10 doing.
11       (Whereupon, a video was played.)
12 BY MR. DUBE:
13   Q   What do you -- what do you think he did --
14 just did right there?
15   A   I'm not sure.
16       MR. GILES:  Objection.
17 BY MR. DUBE:
18   Q   Okay.  I'll play -- I'll go back to 6:45,
19 and this time, please watch to see whether or not
20 you can see what it is that the person who is
21 shooting is shooting at.  Okay?
22       (Whereupon, a video was played.)
23       MR. GILES:  Objection.  Form.
24       MR. DUBE:  What's the basis of that
25 objection?  Norman?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

158

1    MR. GILES: I said Objection. Form.
2    MR. DUBE: On what basis?
3    MR. GILES: You're asking what the guy's
4 shooting at. He'd have to speculate for that.
5    MR. DUBE: Okay.
6    MR. GILES: He doesn't know what the guy's
7 shooting at.
8    (Whereupon, a video was played.)
9 BY MR. DUBE:
10    Q   Are you able to tell from that view what
11 Officer Saldivar is shooting at?
12    A   No, I can't see anything.
13    Q   Okay. All right. Now, what position is
14 the camera at this point? Can you tell?
15    A   It appears to be on the ground at an
16 angle.
17    Q   Uh-huh. And does that make it difficult
18 for you to discern what's going on?
19    A   The fact that it's dark is what makes it
20 difficult to discern what's going on.
21    Q   Understood. All right. I'll go back to
22 6:45 again. That's a good marker. And I'll -- this
23 time, I'll play it -- oh, and you stated that when
24 Officer Skrick--- Sergeant Skripka and Detective
25 Cooper played the video, they played it multiple

159

1 time for you. Correct?
2    A   Yes.
3    Q   Okay. And they slowed it down at well?
4    A   Yes -- I don't know about slow down. I
5 remember them pausing it.
6    Q   Okay.
7    A   But I can't tell you definitively whether
8 they did or they didn't slow it down.
9    Q   And you watched it at your desk. Correct?
10    A   Yes.
11    Q   And you testified you -- you -- you slowed
12 it down. Correct?
13    A   Yes.
14    Q   Okay. And did you attempt to play it
15 frame by frame?
16    A   Yes.
17    Q   So you had the capability to do all of
18 those things. Correct?
19    A   Yes.
20    Q   This time, I'll slow it down for you.
21    (Whereupon, a video was played.)
22 BY MR. DUBE:
23    Q   And you had a copy of the video yourself,
24 personally. Correct?
25    A   I did at the time. Yes.

160

1    (Whereupon, a video was played.)
2 BY MR. DUBE:
3    Q   What, if anything, have you seen so far?
4    A   Nothing, really.
5    Q   Okay. Well, see did Officer Saldivar.
6    A   I saw Officer Saldivar on the right side
7 of it and then it -- somebody moved it, bumped it,
8 something because it looks like it shifted the
9 position. But...
10    Q   Okay. All right. Please pay attention to
11 the left side of the screen, okay, as we play it
12 this time.
13    (Whereupon, a video was played.)
14 BY MR. DUBE:
15    Q   What did you see -- observe?
16    A   The colors change over there on that side,
17 but that's all I can tell you.
18    (Whereupon, a video was played.)
19 BY MR. DUBE:
20    Q   Okay. What, if anything, did you observe?
21    A   Again, the colors shift and there's a car
22 driving by.
23    Q   Did you see a puff of smoke?
24    A   Over in the lower left corner? That's
25 where I was paying attention. That's where you told

161

1 me to watch.
2    Q   Okay. All right. We'll play it again.
3 And so I'm not telling you to look at any particular
4 area. Just look at it and tell me what you see.
5    (Whereupon, a video was played.)
6    THE DEPONENT: Something on the top right,
7 but I...
8    (Whereupon, a video was played.)
9    THE DEPONENT: There's smoke around the
10 light.
11 BY MR. DUBE:
12    Q   Okay. Do you see anything consistent with
13 gun fire?
14    A   That and the muzzle flash.
15    Q   You saw a muzzle flash?
16    A   Uh-huh.
17    Q   Okay. What position is the muzzle facing?
18    A   I can't really tell. I mean, it --
19    Q   Is it being pointed upwards? Is it being
20 shooting down or is it shooting up?
21    A   It's hard to see. I -- I...
22    Q   All right. We'll play it again. And this
23 time, I'm going to move -- I'm going to do it at 7
24 minutes because I think that's really where the...
25    (Whereupon, a video was played.)



162

1  BY MR. DUBE:
2     Q   I direct you to pay attention to see what
3  direction the shots are being fired at. And also
4  tell me if you see anything consistent with a person
5  on their hands and knees.  On the ground, I should
6  say.
7         (Whereupon, a video was played.)
8  BY MR. DUBE:
9     Q   To the left, like did you see anything
10  consistent with somebody falling onto the screen and
11  -- yes or no?
12    A   No.
13    Q   Okay.  Did you see anything consistent
14  with -- with a muzzle flash?
15    A   Yes.
16    Q   Okay.  What position was the muzzle facing
17  and where was the shot being shot at?
18    A   I'm not completely certain because of the
19  -- the poor lighting in the video.
20    Q   Uh-huh.
21    A   I just saw it at the top at the center of
22  the screen.
23    Q   Uh-huh.
24    A   I -- I'm not sure where it's going. I
25  don't know.

163

1     Q   Okay.  This time I'm going to do it frame
2  by frame for you.  Okay?
3     A   Okay.
4     Q   Let's see if that helps.  Okay. I'll try
5  to get it to seven minutes so we don't -- okay.
6  Perfect.  All right.  Actually, let me go up a
7  little bit more.  Oh, too far.  And what -- what I
8  want you to pay attention to is if you see anything
9  consistent with somebody coming into the frame from
10  outside of the frame on the left-hand side, falling
11  down and being on the ground.  Okay?
12    A   Okay.
13    Q   Let me know if you see that.
14        (Whereupon, a video was played.)
15  BY MR. DUBE:
16    Q   Do you see anything there?
17    A   No.
18    Q   Okay.  Can you see my -- my cursor?
19    A   I can.
20    Q   Okay.  Do you see anything right here?
21    A   A dark spot.
22    Q   Okay.  All right.
23    A   The -- the third of the left side of the
24  screen is dark.
25    Q   Right where my cursor is, right here.

164

1     A   It's no different than the rest of the
2  left side of the screen.
3     Q   Fair enough.  That -- did you see that --
4  what -- move?
5     A   I saw a coloration change.
6     Q   Okay.  Do you see it moving?
7     A   When you say it, I --
8     Q   The -- right here.  This.  This --
9     A   Right.  But when you're saying it, what am
10  I -- I can't tell you that's a person, so that --
11    Q   Okay.  I'm not -- I'm not --
12    A   If you're saying it --
13    Q   I'm not saying it's a person yet.  I --
14  when you -- if you --
15    A   But you said do you see it.
16    Q   Yes.  Do you see this blob right here
17  moving?
18    A   I see the colors changing.
19    Q   Okay.  All right.  We'll keep going frame
20  by frame.
21        (Whereupon, a video was played.)
22  BY MR. DUBE:
23    Q   Does that appear consistent with a person
24  falling down to you?
25    A   I have no idea what it is.

165

1     Q   Okay.  It's not -- for some reason...
2         (Whereupon, a video was played.)
3  BY MR. DUBE:
4     Q   Do you see anything?
5     A   Colors going from dark black to light
6  black or a lighter black.
7         (Whereupon, a video was played.)
8     Q   How about now?  What do you see at this
9  moment?
10    A   There's a muzzle flash at the top.
11    Q   Okay.
12    A   Appears to be a muzzle flash.
13    Q   Okay.  Can you discern what this is right
14  here?
15    A   No.
16    Q   Okay.
17        (Whereupon, a video was played.)
18  BY MR. DUBE:
19    Q   Can you -- in those last few frames, have
20  you -- is there any conclusion or opinion that
21  you've drawn?
22    A   No.
23    Q   Okay.  Anything there?
24    A   No.  I mean, other than slight color
25  changes here and there, no.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

166

1    Q   Okay.  Can you tell the position of the
2  shooter in relationship to where the color changes
3  are occurring?
4    A   Only because where the muzzle flash is,
5  maybe to the right.
6    Q   Okay.  Are they below or above where the
7  color change is occurring?
8        MR. GILES:  Objection.  Form.
9        THE DEPONENT:  I -- I'm not sure. I...
10       MR. DUBE:  Okay.  All right.  Can you
11 please play exhibit 18?
12 BY MR. DUBE:
13   Q   Okay.  So we've isolated that portion of
14 the video.  Okay?  And so I'm going to play it for
15 you.
16       MR. DUBE:  And can you do a VIC player,
17 sir?
18       THE DEPONENT:  When you say we, who is we?
19       MR. DUBE:  We is defense.
20       THE DEPONENT:  Okay.
21       EXHIBIT TECHNICIAN:  Absolutely.
22       MR. DUBE:  I'm sorry.  Not the defense.
23 I'm usually -- the plaintiffs.  Sorry.
24       THE DEPONENT:  Okay.
25 BY MR. DUBE:

167

1    Q   Okay.  And do -- I have to do the playba--
2  - okay, so I'm going to play it one time, regular
3  speed.
4    A   Okay.
5    Q   Okay?  And I'm going to slow it down again
6  and you tell me if you observe anything.
7        MR. DUBE:  Do I have control?  I think you
8  have to do it each time.
9        EXHIBIT TECHNICIAN:  Yes, sir.  You have
10 control.
11       MR. DUBE:  Is it playing -- oh, it's
12 playing at regular -- I want it at regular speed
13 first.
14       (Whereupon, a video was played.)
15 BY MR. DUBE:
16   Q   What do you see there?
17       MR. GILES:  Objection.  Form.
18       THE DEPONENT:  I'm not sure.
19 By Mr. Dube:
20   Q   Okay.  I'll play it again.
21       (Whereupon, a video was played.)
22 BY MR. DUBE:
23   Q   Do you see where it's marked Nathan's
24 head?
25       MR. GILES:  Objection.  Form.

168

1        THE DEPONENT:  I see -- I see where the
2  marker is, yes.
3        (Whereupon, a video was played.)
4  BY MR. DUBE:
5    Q   Is that consistent with a person's head up
6  here and back over here?
7        MR. GILES:  Objection.  Form.
8        THE DEPONENT:  I can't say that.
9        MR. DUBE:  Okay.
10       (Whereupon, a video was played.)
11 BY MR. DUBE:
12   Q   Do you see it consistent with a person on
13 the ground being shot?
14   A   I don't -- no, I -- it -- it's different
15 color -- I mean, it's lighter, different colors, but
16 I can't tell you -- I can't tell you what it is.
17 The other thing I -- I mean --
18   Q   I just -- you don't have to go further.
19 Just I'm asking if -- if you -- you see something.
20 If you see it, you see it.  If you don't, you don't.
21   A   Okay.
22   Q   That's all.  And I'll play -- this time,
23 I'll play it at -- this one.  Where is that?
24       (Whereupon, a video was played.)
25       MR. DUBE:  The problem with this player is

169

1  that you can't change the speed until after you
2  press play.  And so you have to -- it's unique --
3  it's a -- it's a exercise in reflexes.  Okay.
4  Playing at .25 speed.  Tell me what you see.
5        (Whereupon, a video was played.)
6  BY MR. DUBE:
7    Q   What, if anything, do you see?
8    A   I see more discolorations, moving. It --
9  they are clearer than the other one, but they're not
10 -- I can't tell you definitively that's a person.  I
11 -- I see where whoever's labeled it.  I also don't
12 know -- I -- I mean, you're showing me a video, but
13 I don't know who's done this, who -- you know, what
14 they've done.  And so that's -- I don't know the
15 process.
16   Q   I -- I'm not asking you any of that.  I'm
17 just asking you what do you see?
18   A   I saw a lighter-colored blob moving around
19 on the side over there.
20   Q   Okay.  Do you see anything -- where it's
21 labeled head, do you see something that is
22 consistent with what you would expect a head to look
23 like?
24   A   It's not round.  It's -- no.
25   Q   With -- with hair flopping?

170

1    A    I -- I'm not sure what it is.
2    Q    I'll play it one more time.  And I'll try
3 to pause it.  Right...
4         (Whereupon, a video was played.)
5 BY MR. DUBE:
6    Q    Do you see anything here consistent with a
7 person's head?  And -- and then the back?
8    A    I see a big dark side on the left over
9 there.
10    Q    Okay.  Do you see a puff of smoke?
11    A    Yes.
12    Q    Okay.  Does this appear the puff of smoke
13 is shooting at whatever it is that you see down
14 here?
15    A    Appears that direction, yes.
16    Q    And you can't tell from this still image
17 right here that this is a person's head?
18    A    You're telling me or asking me?
19    Q    I'm asking you, can you tell that?
20    A    No.
21    Q    Okay.
22         MR. GILES:  Objection.  Form.
23 BY MR. DUBE:
24    Q    Can you tell that this is a person's back?
25    A    No.

171

1    Q    The back side right here.
2    A    No.
3    Q    Okay.  Do you see any movement consistent
4 with somebody turning over after being shot?
5    A    No.  It just -- the -- I -- I see the --
6 what I call the blob -- the blob move to the bottom
7 of the screen or to the bottom left, but I can't
8 tell you that's a person.
9    Q    Okay.  If that is a person, where would
10 they be in -- relative to the -- to the -- to the
11 gun that you see shooting down?
12         MR. GILES:  Objection.  Form.
13         THE DEPONENT:  I don't know that there's
14 enough there that I can tell you where they're at.
15 BY MR. DUBE:
16    Q    All right.  Now the last time I'm going to
17 play it, but this time, I'll play it frame by frame
18 for you.  Okay?
19    A    Okay.
20    Q    And tell me if that helps you in any way,
21 shape or form.  If you see anything you want me to
22 pause, let me know and I'll -- I'll gladly pause for
23 you.  Okay?
24    A    Okay.
25         (Whereupon, a video was played.)

172

1 BY MR. DUBE:
2    Q    So I want you to pay attention to this
3 area right here.  Do you see that right there with
4 my mouse?
5    A    Yes.
6    Q    Okay.
7         (Whereupon, a video was played.)
8 BY MR. DUBE:
9    Q    And you see that something has emerged
10 right here?  Do you see that?
11    A    I -- I see the color shifted.
12    Q    So you see -- you see a change from the
13 previous frame.  Correct?
14    A    Yes.
15    Q    Okay.
16         (Whereupon, a video was played.)
17 BY MR. DUBE:
18    Q    Do you see any change from the previous
19 frame?
20    A    Yes.
21    Q    It's stuck.
22         MR. DUBE:  Did it freeze on your end, sir?
23 Vincent?  Can you get me back to -- I don't think
24 this is -- okay.
25         (Whereupon, a video was played.)

173

1 BY MR. DUBE:
2    Q    All right.  You see right here where it
3 says Nathan's head?  Do you see that?
4    A    Yes.
5    Q    Okay.
6         (Whereupon, a video was played.)
7 BY MR. DUBE:
8    Q    What do you see here?
9    A    The dark discoloration move to the right a
10 little bit.
11    Q    Okay.
12    A    Continuing to move to the right. Same.
13         (Whereupon, a video was played.)
14         MR. DUBE:  I don't know why it's not --
15 all right.  Let's do this.  Let's just do the same
16 thing.
17         (Whereupon, a video was played.)
18 BY MR. DUBE:
19    Q    You see where it says two?
20    A    No, I see three.
21    Q    Three?  Okay.
22         (Whereupon, a video was played.)
23 BY MR. DUBE:
24    Q    And you can't te--- you cannot tell that
25 is a person on the ground being shot?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

174

1    A   No.
2    Q   Okay.
3        MR. DUBE:  All right.  Let's play exhibit
4    number --
5        MR. GILES:  Could I please make sure we're
6    clear on the record that what you've been playing as
7    exhibit 18 is not a copy of the actual video that
8    the chief looked at and not an actual video of this
9    event, but some other recording that's been
10   modified?
11       MR. DUBE:  Correct.
12   BY MR. DUBE:
13   Q   And is there anything that prevented you
14   from hiring somebody, a video enhancer, to do the
15   same thing at the time of the incident?
16   A   No.
17   Q   Okay.  It was just your opinion decision
18   not to do so.  Correct?
19   A   I mean, mine, the investigators, yeah.
20       MR. DUBE:  Okay.  All right.  We will play
21   one more.  I think it is exhibit 32.
22       EXHIBIT TECHNICIAN:  Sorry, sir.  What was
23   the exhibit number one more time?
24       MR. DUBE:  Thirty-two, please.
25       EXHIBIT TECHNICIAN:  Thirty-two.  Got it.

175

1    BY MR. DUBE:
2    Q   Okay.  So in this video, the camera --
3    because the camera was on the ground, it has been
4    shifted, it's been rotated so that, you know, we are
5    at street level now.  And you will see where the car
6    passes and you will see where the light post is.
7    Okay?  So I'm going to play it one time for you.
8    I'm showing you what's been marked exhibit 32.
9    A   Okay.
10       MR. DUBE:  Any objection to it being moved
11   into this deposition?
12       MR. GILES:  No, I don't mind -- I don't --
13   I don't object to you using this for the deposition
14   as long as we identify again, this is not a copy of
15   a recording the chief has seen and not a copy of a
16   recording that is the actual recording made at the
17   scene.
18       MR. SELBE:  No problem with using it in
19   the deposition.
20       MR. DUBE:  Okay.  Thank you.
21       (Plaintiff's exhibit 32 marked for
22   identification.)
23   BY MR. DUBE:
24   Q   Okay.  I am playing it one time at regular
25   speed, then I'm going to slow it down.  Okay?

176

1    A   Okay.
2        (Whereupon, a video was played.)
3    BY MR. DUBE:
4    Q   What did you see?
5    A   I saw gun fire -- appeared to be gun fire.
6    Saw something moving, and at the end, Officer
7    Saldivar appears to be picking up his body camera.
8    Q   Was the thing moving the object that was
9    being shot at?
10   A   I am not sure.
11   Q   Okay.  Was the thing moving on the ground?
12   A   Not sure.
13   Q   All right.  We'll play it one more time.
14       (Whereupon, a video was played.)
15   BY MR. DUBE:
16   Q   What did you see?
17   A   Same thing I saw before, that it moves.
18   Q   Does it appear to you that Officer
19   Saldivar is shooting at a person on the ground?
20   A   I'm not sure of that because I don't know
21   what's -- I -- I -- I don't know what that is.
22   Q   Okay.  I'm -- I'm asking you, based on
23   what you see in the video, does it appear to you
24   that Officer Saldivar is shooting at the object on
25   the ground?

177

1    A   The object on the ground?
2    Q   Yes.
3    A   I -- I -- I don't know 'cause I don't know
4    what it is and I don't know.
5    Q   Are you able to discern whether or not
6    that is a person on the ground?
7    A   I am not.
8    Q   Okay.  And I'm going to play it in slow
9    motion for you the next time we go through.  So you -
10   - so you do not see the person's hands moving,
11   flailing, the head moving or anything from what you
12   just saw?
13   A   No.
14   Q   Okay.  Now we're going -- we're going to
15   do the exercise where I try to stop it.
16       (Whereupon, a video was played.)
17   BY MR. DUBE:
18   Q   How many muzzle flashes did you see?
19   A   I think two.
20   Q   Okay.  Could you tell what the -- what the
21   gun was shooting at?
22   A   Could not.
23   Q   Did you see an object in the direction
24   where the gun was shooting at?
25   A   I don't know what I saw there.

178

1    Q   So it's your testimony you can't -- you
2  don't know what you were seeing on the screen?
3    A   That I don't know what I'm seeing?
4    Q   Yeah.
5    A   I see colors moving, but I don't know what
6  -- or colors changing, but I don't know what those
7  colors are.
8    Q   Okay.  Within the context of the
9  investigation where you know they've been shot --
10  Schenk was shot.  Correct?
11    A   Yes.
12    Q   Okay.  And he was shot twice in the back.
13  Correct?
14    A   Yes.
15    Q   Okay.  And you are a -- and you've seen
16  the muzzle flash.  Correct?
17    A   Correct.
18    Q   Okay.  And you've seen the muzzle flash
19  put into a particular direction.  Correct?
20    A   Correct.
21    Q   Okay.  It's still your testimony you
22  cannot discern what is occurring in this video in
23  terms of where Officer Saldivar was and where Mr.
24  Schenk was at the time of the shooting.
25    A   I can't --

179

1    Q   Is that -- is that your testimony?
2    A   I cannot tell you that because there's
3  also an entrance wound to the front that -- I -- I
4  can't tell you what's happening when or where or who
5  he's pointing it at.
6    Q   I'm not asking you to make a conclusion as
7  to whether or not the shooting is justified.  I'm
8  not asking you to make any -- let me finish -- any
9  of those conclusions.  I am just asking you if you
10  can look at the video and tell me where you think
11  Schenk is, where Officer Saldivar is and what
12  direction he's shooting at.
13    A   I cannot.
14    Q   Okay.  And it's your testimony, sir, you -
15  - at this point of the movie, you cannot tell that
16  is Mr. Schenk being on his hands and knees while
17  Officer Saldivar is shooting?
18    A   I cannot tell you that from that image,
19  no.
20    Q   Okay.  One final time and then we'll move
21  on.
22        (Whereupon, a video was played.)
23        MR. DUBE:  Can you please show -- pull up
24  exhibit number -- hold on.  Let me grab it; 33,
25  please.

180

1        EXHIBIT TECHNICIAN:  I'm sorry, sir.  I
2  couldn't hear you.  What was the number one more
3  time?
4        MR. DUBE:  Thirty-three.
5        EXHIBIT TECHNICIAN:  Thirty-three.  Got it.
6        MR. DUBE:  Actually, before we go there,
7  let me take a quick break.
8        VIDEO TECHNICIAN:  All right.  The time is
9  now 2:09.  We're off the record.
10        (Whereupon, a break was taken from the
11  proceedings.)
12        VIDEO TECHNICIAN:  The time is now 2:12.
13  We're back on the record.
14        MR. DUBE:  If we can show exhibit thirty--
15  - I think it was 33, which -- whatever number I said
16  prior to break.  Is there anyway you can make this
17  full screen, sir?
18  BY MR. DUBE:
19    Q   I'm showing you what has been -- which are
20  screenshots from the video I just sent you -- I just
21  showed you.  Okay?  It's been marked as exhibit
22  number 33.
23    A   Okay.
24    Q   Do you -- do you see that?
25    A   Yes.

181

1    Q   Okay.  What if anything are you able to
2  see in this screenshot?
3    A   Street light, maybe some trees.  I'm not
4  sure -- there's black stuff down on the -- all along
5  the right -- left side, but I don't know what --
6  what it is.
7    Q   Okay.  Do you see something right here
8  where I'm moving my cursor?
9    A   It's not moving.  Where at?
10    Q   Oh, am I on the right -- yeah, I'm --
11  right here where my cursor is.  See my cursor right
12  here?  Do you see my cursor?
13    A   No.
14        MR. DUBE:  Can you give me cursor control,
15  sir?
16        THE DEPONENT:  Now.  It's moving around,
17  the cursor.
18        EXHIBIT TECHNICIAN:  I did, sir.
19  BY MR. DUBE:
20    Q   Okay.  Can you see this cursor moving?
21    A   Well, it stopped moving, but I...
22    Q   This one going in the circle?
23    A   It's not moving.
24        MR. DUBE:  It's not moving, sir.
25        THE DEPONENT:  It was and then it stopped.

Chief Joshua Bruegger    January 5, 2024    NDT Assgn # 71056

182

1        MR. DUBE:  No, it was his cursor.
2        THE DEPONENT:  Oh.
3        EXHIBIT TECHNICIAN:  For -- for some
4    reason, when I give you control and you take over,
5    the mouse disappears.
6        MR. DUBE:  Okay.  Can you -- can you go to
7    the bottom left corner where -- do you see a blob on
8    the left corner right here?  Yes.
9    BY MR. DUBE:
10    Q    Do you see that?
11    A    Yes.
12    Q    Okay.  What -- what do you think that is?
13    A    I -- I don't know.
14    Q    Okay.  Next slide, please.  Okay.  What is
15    that?
16    A    I'm not sure.
17    Q    All right.  Do you -- can you tell the
18    outline of a head right here?
19    A    I don't know where you're pointing to.
20    Q    Okay.  Can you see a head right here?
21    A    Can I see it?  No, I cannot see a head
22    there.
23    Q    Okay.  Do you see outline that's different
24    from what you see right here?
25    A    It looks like bushes, if -- it looks like

183

1    a bush or a tree.  It looks consistent to the one to
2    the right of it after the lighter -- right here --
3    Q    Uh-huh.
4    A    -- this looks consistent with this.
5        MR. DUBE:  Okay.  All right.  Next slide,
6    please.
7    BY MR. DUBE:
8    Q    Okay.  What do you see up here?
9    A    That's a -- appears to be a muzzle flash.
10    Q    Okay.  Is it pointing towards this object
11    right here?
12    A    Actually, it looks like it's pointing
13    above it.
14    Q    So it's above it.  What -- what direction
15    is it shooting at?
16    A    It's shooting above the area that you're
17    pointing.  It appears to be shooting at this area.
18    Q    Okay.  Do you see anything consistent with
19    a person's body shape here?
20    A    I do not.
21    Q    Okay.  Next slide, please.  Okay.  This has
22    been annotated.  Do you see that?
23    A    Yes.
24    Q    Okay.  And it says muzzle flash here.  Do
25    you see that?

184

1    A    Yes.
2    Q    Okay.  And it says Nathan's head.  Do you
3    see that?
4    A    Yes.
5    Q    And --
6    A    I see the words on the screen.
7    Q    Yeah.
8    A    How about that?
9    Q    Yes.  Do you see the words that say
10    Nathan's back?
11    A    Yes.
12    Q    Okay.  All right.  Do you see that?
13    A    Yes.
14    Q    Okay.  And is it your testimony that this
15    is not consistent with a person's head and a
16    person's back with a gun being shot down at them?
17    A    I can't tell you -- I -- fairly confident
18    about the muzzle flash at the top.  What you have
19    labeled Nathan's back and Nathan's head, I cannot
20    tell you that's what that is.
21    Q    Okay.  All right.  Thank you.  No further
22    questions -- on -- on -- on this topic.  Sorry.
23    After the conclusion of the investigation, did you -
24    - did you terminate Officer Saldivar?
25    A    I did not.

185

1    Q    Okay.  Would you have had the authority to
2    terminate Officer Saldivar?
3    A    The authority, I could -- have the
4    authority to indefinitely suspend him.
5    Q    Okay.
6    A    Which would start the appeals process
7    because there's a -- there's a back side in civil
8    service if you terminate somebody.  It's while I make
9    the decision to initiate the process, it's not the -
10    - it's not the final say.
11    Q    Okay.  So you had the authority to ensure
12    that he was no longer working as a member of the
13    police department at that time?
14    A    My decision's not final.  It can be
15    overridden by the civil service commission or an
16    arbitrator.  So to say that I could definitively
17    keep him from working for Pasadena Police
18    Department, I can't say that.
19    Q    But you have the authority to stop him
20    from operating from -- at that point until civil
21    service commission could make a determination.
22    Correct?
23    A    I could do that.  Yes.
24    Q    What is the process to terminate somebody
25    from the police force?

186

1    A    Beginning when?
2    Q    Beginning at act of misconduct.
3    A    At some point, you draft a letter laying
4    out the -- the policy violations, law violations.
5    It becomes what's sometimes called the charging
6    document in civil service.  And it's delivered to
7    the -- to the officer, telling them that they have
8    been indefinitely suspended and that they have a
9    certain -- the -- the appeals process is laid out to
10    them and the -- and the deadline and the timelines.
11    Q    Yes.  Did you do anything with respect to
12    Offi--- any of those things with respect to Officer
13    Saldivar after the shoo--- the Schenk shooting?
14    A    After the Schenk shooting, no.
15    Q    Did you take any steps to discipline
16    Officer Saldivar for the Schenk shooting?
17    A    No.
18    Q    What is your opinion of Officer Saldivar's
19    conduct with respect to the Schenk shooting?
20    A    It was lawful and justified.
21    Q    Do you see anything that he could have
22    done better?
23    A    No.
24    Q    Did anyone offer an opinion to you as to
25    whether or not Officer Saldivar should have remained

187

1    on the police force after the Schenk shooting?
2    A    No.  Oh -- oh, let me correct that.  The
3    lieutenant reviewed it and didn't find any policy
4    violations, misconduct, the assistant chief and then
5    myself.  And so we were in agreement that he -- he
6    should remain employed with the department.
7    Q    The officers -- did Sergeant Skripka offer
8    an opinion to you that Detective Saldivar (sic)
9    should not remain on the police force?
10    A    No.  And I -- he -- they were conducting a
11    criminal investigation, which is separate from the
12    administrative investigation. And so -- so as not to
13    appear to be influencing a criminal investigation in
14    any way, they run that investigation after initial
15    contact that I had with them regarding the video.
16    They pre--- completed their case, present it to the
17    D.A.'s office and then we go through the
18    administrative process.
19    Q    You mentioned that the -- the -- the video
20    could have been sent to an outside agency for it to
21    be enhanced.
22    A    Could have been?  Yes.
23    Q    Okay.  Is there a particular agency that
24    the Pa--- Pasadena Police Department uses?
25    A    We've gone to NASA before.  We've gone to

188

1    Houston before.  We've gone to some of our federal
2    partners before.
3    Q    At the time you were evaluating Officer
4    Saldivar's conduct, did you take the account that he
5    had also shot -- well, let me start over.  At the
6    time you evaluated Officer Saldivar's conduct for
7    the Schenk shooting, did you also consider the
8    Ramirez shooting and his actions in that shooting as
9    well?
10    A    No, because there -- it was a -- it was a
11    justified shooting in compliance with departmental
12    policy.
13    Q    Did it concern you that the same officer
14    had shot two individuals within six months of each
15    other?
16    A    No.
17    Q    Okay.  How did you hear about the Aviles
18    shooting?  And by Aviles, I'm talking about the
19    shooting of Randy Aviles by Rigo Sal--- Salvidar.
20    A    It was the night of, but I don't remember
21    -- I didn't make the scene, so I don't -- I don't
22    remember how I found out or who.
23    Q    What did you hear about the shooting?
24    A    That -- that it was a traffic stop that
25    Officer Saldivar had made.  The driver had stopped,

189

1    jumped out, simply drove away and Officer Saldivar
2    fired at the vehicle.
3    Q    How were you contacted?
4    A    I assume by phone, but I don't know.  I
5    can't tell you -- I -- I don't have an independent
6    recollection on this one like I do on some of the
7    other ones.
8    Q    What phone would -- would you have been
9    contacted on, a personal phone?
10    A    Yes.
11    Q    Okay.  Is this the same phone that you
12    currently possess?
13    A    No.
14    Q    Okay.  When did you change out that phone?
15    A    The same thing -- it's the same.  It was
16    probably about a year ago, I got a new phone, so
17    that would have been after.
18    Q    Did -- when you trans--- when you got the
19    new phone, did you transition any data from the
20    previous phone to that phone?
21    A    No.  I start over, 'cause otherwise, they
22    get slow and sluggish and...
23    Q    Did you back up any data, like pictures or
24    anything you had on that phone, to a cloud or
25    anything?



190

1    A    They are backed up to a hard drive I have.
2    Q    Okay.  So the data on the previous phone
3  is backed up to the data to a hard drive that you
4  have?
5    A    Data?  The pictures.
6    Q    Yeah.
7    A    Pictures are all I have.
8    Q    Okay.  How about text messages or anything
9  of that sort?
10    A    No.
11    Q    Are you sure -- like what is the process
12  of backing up?
13    A    Back the pictures -- drag them over to my
14  hard drive and then they -- that's where they're at.
15    Q    Did you do that or did somebody at Verizon
16  do it?
17    A    No, I did that.
18    Q    All right.  So you were contacted on your
19  personal phone about the Saldivar shooting. Who --
20  who contact you?
21    A    I don't know.
22    Q    Okay.  What were you told?
23    A    That there was a traffic stop, the -- the
24  driver had gotten out, driven away. And at some
25  point, Officer Saldivar discharged his firearm at

191

1  the -- at the person in the vehicle.
2    Q    Were you told anything else?
3    A    At that point, no.
4    Q    Okay.  Was --
5    A    Well, he -- I -- I was told that the
6  person was struck, but he was likely going to
7  survive his injuries.  But that was -- that was the
8  extent of it.
9    Q    Okay.  What's the next thing you recall
10  with respect to the -- of the shooting that involved
11  you and your participation?
12    A    The next morning, I reviewed the video,
13  drafted the administrative leave letter for Officer
14  Saldivar.  And that's what I recall my initial --
15    Q    What were your thoughts upon seeing that
16  video?
17    A    I had concerns.
18    Q    Okay.  What were those concerns?
19    A    That Officer Saldivar had shot at a
20  vehicle that was driving away.
21    Q    Any other concerns?
22    A    I mean, I think that's a big enough
23  concern.  That's the only one I had at the time.
24    Q    Did you feel that he was under any
25  imminent harm at the time he was shooting?

192

1    A    I had made the decision the following
2  morning that caused pause, caused concern.  But
3  Officer Saldivar is also entitled to due process and
4  so I don't know what -- you know, had he been
5  interviewed?  I didn't know -- all I had at that
6  point was making a decision based on the video and -
7  - and the quick evidence that I had to protect
8  Officer -- Officer Saldivar and the organization.
9    Q    How did you get a copy of the video?
10    A    It was -- they're -- they're online. They
11  all upload to the cloud.
12    Q    Well, what made you go review the video?
13    A    Because it was an officer-involved
14  shooting and it's a significant event.
15    Q    So do you -- so do you review videos of
16  every officer-involved shooting?
17    A    Yes.
18    Q    Okay.  While you were chief of police, how
19  many officer-involved shootings occurred during your
20  watch?
21    A    I'm not sure.
22    Q    Okay.  As -- as assistant chief, how many
23  officer-involved shootings occurred?
24    A    I -- I would be guessing.  I don't know.
25    Q    Okay.

193

1    A    Some years there's more than others. So I
2  don't -- I don't know.
3    Q    Okay.  Let's just take it -- let's take it
4  position by position.  Okay?  When you were
5  assistant chief, do you recall whether or not there
6  were more than five, more than ten?  How many
7  officer-involved shootings occurred while you were
8  assistant chief of police?
9    A    I would say ten.  Probably more than ten.
10    Q    And how long were you chief of police?
11  Assistant chief of police.  Sorry.
12    A    Five years and a couple months.
13    Q    And then in the two months that you were
14  interim chief of police, how many officer-involved
15  shootings occurred during that time?
16    A    I only know of the Schenk, but that
17  doesn't mean there wasn't another one.  I don't --
18  I'm not sure.
19    Q    And how long between that -- because that
20  -- that was in April -- or that was in November of
21  2018.  Correct?
22    A    Correct.
23    Q    Okay.  And you became chief of police
24  January 2019.  Correct?
25    A    Yes.

194

1    Q   Okay.  So from January ni--- 2019 to
2  January 2021 when Officer Saldivar shot Mr. Aviles,
3  how many officer-involved shootings occurred during
4  that time?
5    A   I'm not sure.  They all run together and I
6  can't tell you by -- you know, by years.
7    Q   Okay.  More than five, more -- less than
8  ten?  Like can you give me your best estimate?
9    A   My best estimate is five to ten.
10    Q   Five to ten.
11    A   Well, that might be high because I'm --
12  I'm thinking my entire time as chief. That's just a
13  two-year period.  Probably closer to five.
14    Q   Closer -- okay.  So while you were chief,
15  you estimate there were about five to ten shootings
16  that occurred?
17    A   During the five years that I was -- or
18  almost five years I was chief, yes.
19    Q   Okay.  And during the two years between
20  when you became chief and when Officer Saldivar shot
21  Mr. Aviles, there were approximately five shootings?
22    A   Give or take, yes.
23    Q   Of those shootings, how many did the
24  police department determine were justified or
25  unjustified?

195

1    A   I'm not -- I -- I don't know the answer to
2  that.
3    Q   What other pro--- so what are the
4  procedures that your police department implemented
5  or incorporated while you were chief for an officer-
6  involved shooting?  Like what were the due process
7  rights of an officer?  What were the steps after a
8  shooting?
9    A   So they were already in place.  The only
10  change we made was when an officer's involved in a
11  shooting, they previously had gotten three -- were
12  on administrative leave for a minimum of three days.
13  We moved that to five.
14    Q   Uh-huh.
15    A   To five days.
16    Q   Uh-huh.
17    A   And so that was the only change that was
18  made.  There was already a pretty good process and
19  procedure in place.
20    Q   And what was that process and procedure?
21    A   So when an officer's involved in a
22  shooting, at the time of the scene, they are put in
23  a car with what we call a buddy officer and they are
24  not to talk about the case.  The officer then goes
25  on administrative leave after that day for at least

196

1  three days.  And then before they come back, they
2  have to go see a police psychiatrist to be cleared
3  to come back as well as have to go to the range and
4  qualify. Once those are done -- and again, each case
5  is a little bit different because it depends on the
6  circumstances of the shooting as well.
7        This last shooting the Officer Saldivar,
8  the Aviles shooting, was a little bit different
9  because he never went back to the streets after that
10  shooting.
11        That day was -- after that, he never
12  worked the streets.  And that was because of the
13  concerns.  And so allowing the process to play out -
14  - and so you asked about due process; you -- you --
15  there's really three investigations that go on when
16  there's a shooting.  You have the criminal
17  investigation done by the detectives with the
18  organization. You have the internal affairs
19  investigation, which in some ways parallels the
20  criminal investigation, but it's also separate.
21        And then you also have the district
22  attorney's office comes out on all of the officer-
23  involved shootings and they conduct their own
24  investigation.  And then they take their
25  investigation and the criminal investigation and

197

1  present it to a grand jury.
2    Q   What -- are officers given access to an
3  attorney at the scene of a shooting?
4    A   Are they given access?
5    Q   Yes.
6    A   That's their right through the union.
7  It's a criminal investigation, so just like anybody
8  else that's accused of a crime, if they request an
9  attorney, then they are entitled to an attorney just
10  like anybody else.
11    Q   Are they provided an attorney with the --
12  are they required to request an attorney before the
13  attorney gets there or is the off-- is the attorney
14  automatically dispatched to the scene?
15    A   It's not automatic.  We -- the Pasadena
16  Police Department as an organization does not do it.
17  Now, if other officers call for an officer, I have
18  no knowledge of that.  I don't -- I don't ask, hey,
19  how did you get out here?  So I'm not sure.  I can
20  just tell you from my experience with the
21  organization that sometimes the officer will call;
22  sometimes another officer will call on their behalf.
23  But the legal protection is -- is provided through
24  their union dues.
25    Q   Uh-huh.



198

1    A    And so sometimes the union president will
2  find out about it and the union president will
3  contact the attorney.
4    Q    Okay.  Back to Officer Saldivar in the
5  Aviles shooting, so after the Aviles shooting, you
6  stated the next day, you watched the video.
7  Correct?
8    A    Yes.
9    Q    And then you wrote a -- a administrative
10  leave memo?
11    A    Yes.
12    Q    What did that memo say?
13    A    It's standard.  It says you're -- you --
14  basically, you're on leave, administrative leave,
15  because you were involved in a shooting, and -- and
16  you can't come back to work until at least these --
17  this criteria is met.
18    Q    Did you draft the administrative leave
19  memo after the Schenk shooting?
20    A    Yes.  Well, one was drafted.  Whether I did
21  it or one of the assistant chiefs, one was done.
22  Yes.  Yes.
23    Q    Okay.  So one was done, but not you?
24    A    I may have done it.  I don't know.
25    Q    Okay.  How about after the Ramirez

199

1  shooting?
2    A    Yes.
3    Q    Okay.
4    A    It would have been -- it -- it's standard
5  procedure that's done on officer-involved shootings.
6    Q    Do you recall whether or not you did it?
7    A    I don't recall.
8    Q    Okay.  Why -- why did you take it upon
9  yourself to write the memo after the Aviles
10  shooting?
11    A    Because I was in the office dealing with
12  all of that -- normally, I do them.
13    Q    Okay.
14    A    If I'm out of town, not there, somebody
15  else will do it.
16    Q    Uh-huh.
17    A    But generally, I do them.  So that wasn't
18  out of the ordinary for me to do it for the Aviles
19  shooting.
20    Q    Gotcha.  And then what did you do after
21  you wrote the memo?
22    A    Delivered it to internal affairs so they
23  could deliver it to Officer Saldivar.
24    Q    Uh-huh.
25    A    Because he was on administrative leave.  I

200

1  -- I believe the shooting was on January 12 of '21.
2  I believe.  And then the following day, the letter
3  was drafted and then Officer Saldivar stayed out on
4  administrative leave until the 24th of January.
5    Q    Okay.
6    A    And then when he came back on the 25th, I
7  met with him and told him he was going to be
8  assigned to inside duties.
9    Q    And how long would he be assigned to
10  inside duties did you tell him?
11    A    I told him until we got this all -- the
12  investigation was done.
13    Q    And who was conducting that investigation?
14    A    Detectives were investigating, one, the
15  criminal investigation, and then internal affairs
16  conducted the administrative investigation.
17    Q    How long did Officer Saldivar remain on
18  inside duty?
19    A    Until his separation from the department.
20    Q    When was that?
21    A    I believe it was July 9th of 2021.
22    Q    What caused the separation from the
23  department?
24    A    What caused it?  He ele---
25    Q    For -- go ahead.

201

1    A    Go --
2    Q    No.  What caused it?
3    A    He elected to retire.
4    Q    Was he suspended for the Aviles shooting?
5    A    Suspended?
6    Q    Yes.
7    A    No.  The investigation wasn't done when he
8  separated.  He still had an open criminal
9  investigation that was at the -- the district
10  attorney's office.  And so as chief, if I'm at --
11  end up having to indefinitely suspend or terminate
12  somebody, I want the best case that I can get
13  because the last thing I want is an officer that --
14  you know, that I separate from, an arbitrator
15  sending them back.
16         And so we have -- one of our rules, for
17  example, is that you have to follow the laws.  And
18  so, you know, my concerns with this last shooting,
19  the Aviles shooting, was potentially, there could be
20  criminal violations.  And if so, it would be prudent
21  for me as chief to wait until all of it's done
22  because he was no longer -- he -- he was inside.
23         He was restrictive duties, inside duties.
24  And so he -- he didn't have contact with the public.
25  He was assigned to the property room.  And so to

202

1  allow this investigation to play out, allow the
2  district attorney's office to make their decision
3  because if I get to a position where I have to
4  terminate or indefinitely suspend him, the more I
5  have, the better.
6         And so you know, had he been -- had he
7  still been employed with us when he was indicted,
8  that would be another -- another thing that I could
9  articulate as a reason for the -- for the
10 termination.  And so...
11     Q    While he was inside, did -- did he have
12 access to a weapon?
13     A    I don't recall.  I don't rec--- I -- I
14 don't remember whether his police powers were
15 terminated or he was just inside because I know he
16 could not work extra jobs; he couldn't -- I can't
17 take somebody -- I -- I can't take somebody's
18 weapon.  Officers' weapons are owned by the officer.
19 They are not owned by -- by the organization.  So I
20 -- I can't take officers' weapons.  Even --
21     Q    Well, his -- so you -- you could not
22 restrict his ability to have a gun while he was
23 working for the City?
24     A    I could restrict his ability to possess a
25 gun because of his being a peace officer in the

203

1  State of Texas.  However, I think you said earlier,
2  you know, open carry and all of that, because of
3  that, just like anybody else in Texas, assuming
4  you're not a felon and -- and the limited criteria,
5  could carry a gun, Officer Saldivar could carry a
6  gun under that authority whether I took his police
7  powers away from him or not.
8      Q    Could -- but while he was at the police
9  department and on his way to work at the police
10 department or leaving work from the police
11 department, would you have had the ability to
12 restrict his ability to possess a gun during those
13 times?
14     A    Coming to and from work?  No.
15     Q    At work?
16     A    At work, I could.  He was in plain
17 clothes.  He was not in uniform.  After -- whenever
18 he came back on June 25th, he was never in uniform
19 again either.  So I don't --
20     Q    So -- and --
21     A    He wasn't walking around with a gun on his
22 hip.  I don't know if -- I -- I -- again, I -- one,
23 I don't know if we suspended those privileges.
24     Q    Do you -- so let me ask the question this
25 way.  Sitting where you are today, do you recall

204

1  affirmatively taking away his ability to carry a gun
2  while performing his duties as a police officer
3  after the Aviles shooting?
4      A    He wasn't performing duties as a police
5  officer after the shooting.  He was inside assigned
6  to the property room doing clerical work.
7      Q    Okay.  Is clerical work not part of police
8  duties?
9      A    It's no different than all the civilians
10 that are in there.  It's -- it's all civilians and
11 then it was him while he was assigned there.
12     Q    Was he being paid?
13     A    Yes.
14     Q    He was being paid by the police
15 department?
16     A    Yes.
17     Q    Okay.  So at -- at that time, do you
18 recall whether or not you took -- you took away his
19 ability to possess a gun while on the premises of
20 Pasadena Police Department?
21     A    I do not recall that.
22     Q    So from January 25th 'til he retired in --
23     A    It was July 9th, I believe.
24     Q    -- on July 9th, he remained employed by
25 the Pasadena Police Department?

205

1      A    Yes.
2      Q    Okay.  And he was being paid by the
3  Pasadena Police Department?
4      A    Yes.  But civil service also governs the
5  ability to --
6      Q    There's not a question pending, sir.
7      A    I'm sorry?
8      Q    There's not a question pending.  I just
9  ask the questions I ask.  I'm -- would it have been
10 -- would it have been accurate for him during that
11 time period to tell somebody I am a Pasadena Police
12 Department officer?
13     A    Would it have been what?
14     Q    So during -- from Jan--- January 2021 --
15 January 25th, 2021 to July 9th, 2021, if Officer
16 Saldivar was asked, are you a Pasadena Police
17 Department officer and he said yes, would that have
18 been accurate?
19     A    Yes.
20     Q    Do you know when the -- when the
21 investiga--- when the internal affairs investigation
22 into the Aviles shooting concluded?
23     A    It wasn't until after he was gone because
24 it was left open and not concluded with findings
25 because we were waiting on the district attorney's

206

1 office because, again, that -- that rule that I
2 mentioned about having to follow the laws. And then
3 once he separated from the organization, there was
4 no hurry at that point because he -- he didn't work
5 for the organization and we could wait until it
6 played out in the -- in the criminal system.
7     Q    Do you know when the investigation was
8 sent over to the district attorney's office?
9     A    Definitively, no.
10     Q    Okay. Approximately, in your
11 approximation, when do you think that would have
12 been done?
13     A    I seem to recall it being in April
14 sometime.
15     Q    Okay. The shooting occurred in January
16 and was sent over to the D.A.'s office approximately
17 April?
18     A    That's my recollection.
19     Q    Okay.
20     A    I'm not a hundred percent certain on that.
21 But...
22     Q    Okay. And you said when he came back on
23 January 25th, 2021, you had a conversation with
24 Officer Saldivar?
25     A    A brief conversation, yes.

207

1     Q    What was that conversation? What did you
2 say; what did he say?
3     A    That with this shooting, the investigation
4 pending, there was some concerns and he was going to
5 be on inside duty, no uniform, no extra jobs, all of
6 that, until after the investigation was complete.
7     Q    What did he say in response?
8     A    Not much. He was mad and left.
9     Q    How do you know he was mad?
10     A    I could tell by the look on his face and
11 the way that he left the room, quickly without
12 saying anything.
13     Q    Did you have any interaction with him
14 between January 2021 and July 9th, 2021?
15     A    Yes.
16     Q    Okay. Tell me about those interactions.
17     A    The only interaction was right before he
18 separated from the organization, the -- the
19 circumstance under which he was going to leave and -
20 - and TCOL and all of that.
21     Q    The jury doesn't know. So explain to the
22 jury what you mean by that.
23     A    The Texas Commission on Law Enforcement
24 and -- and how hi-- how he was going to be -- his
25 classification was going to be on the -- when he

208

1 separated from the organization.
2     Q    Okay. Well, what was his classification
3 when he separated?
4     A    It was honorable.
5     Q    So he received an honorable -- is it
6 discharge? What --
7     A    Yes.
8     Q    What do you call it?
9     A    Yes, discharge.
10     Q    What's the effect of having a honorable
11 discharge in terms of his pension and other things?
12     A    It has no effect on pension. Whether he --
13 I mean, under these circumstances, had I -- had it
14 gotten to the point where I indefinitely suspended
15 him, it -- it -- your pension doesn't change in the
16 State of Texas. His pension is his pension. I mean,
17 even hypothetically in this case, if he were to be
18 convicted and go to prison, he still continues to
19 receive his pension. Those are his -- his monies
20 under the -- in the state.
21     Q    Is there a -- a dishonorable discharge
22 that can be given to an officer separating?
23     A    There is.
24     Q    Okay. What's the difference between a
25 dishonorable discharge and honorable discharge?

209

1     A    Typically, dishonorable, most often,
2 criminal conduct or untruthfulness are the two big
3 ones.
4     Q    Okay. But in terms of benefits and terms
5 of how it -- it affects a person going forward,
6 what's the difference in honorable discharge and
7 dishonorable discharge?
8     A    Changes absolutely nothing. And that's
9 the reason the State of Texas is about to change it,
10 changed the last legislative session.
11     Q    Okay. How is -- what's the change?
12     A    There is no categories. You just --
13     Q    Discharge --
14     A    You work from this -- for the organization
15 from this day to this day.
16     Q    When you were chief of police, did you
17 have any role in hiring or -- or not hir--- or -- in
18 hiring or -- sorry. When you were chief of police,
19 did you have any role in hiring officers?
20     A    Yes.
21     Q    Okay. Would you have hired an officer
22 with a dishonorable discharge from another police
23 department?
24     A    It depends. It's the background process.
25 Kind of -- you -- and the chiefs, we don't give a



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

210

1  lot of credence to the classifications. And that's
2  why it's incumbent upon organizations to do a
3  thorough background check with another department.
4     Q    Well, if -- if you had a -- two candidates
5  for -- for -- for a position, one was honorable
6  discharge and one was dishonorably discharged, would
7  it have affected you view as to making a decision
8  either way?
9     A    Again, it would depend on what the -- I
10 mean, you have politics in like sheriff's offices
11 and constable's office that sometimes come into play
12 in these things. And so it -- it depends on the
13 background investigation and what's the reasoning
14 behind it.
15    Q    So it played no role in your hiring
16 process?
17    A    No.
18    Q    Why did you decide to give Officer
19 Saldivar an honorable discharge as opposed to a
20 dishonorable discharge?
21    A    As an incentive for him to separate from
22 the organization.
23    Q    Explain what you mean by that.
24    A    So like I mentioned, any time if I
25 indefinitely suspend an officer, they have a right

211

1  to appeal and go to the civil service commission or
2  an arbitrator. Arbitration is binding. And way too
3  often -- this has been a topic that's come up, you
4  know, post-George Floyd, the arbitration process,
5  there's a Vanderbilt law, I recall, 46 percent of
6  terminations were overturned by an arbitrator.
7         And so as chief, first and foremost is
8  protect the organization, protect the citizens. And
9  that was at this point, after this -- this case,
10 Officer Saldivar being outside -- being out of the
11 organization. And so if he would separate without
12 me having to terminate him, it's a benefit to the --
13 it's a win/win for the organization because there's
14 no appeals process, so it's final. He's -- he's
15 gone. There's no risk of him coming back to the
16 organization.
17        And so any agency that does a background
18 check should -- all of it's there. We -- we, by law,
19 have to open up all the files to those
20 organizations. So with that said, if that was
21 important to him to get him to -- to separate from
22 the organization...
23    Q    At the time Officer Saldivar departed --
24 separated from Pasadena Police Department, was there
25 anything in his employment files that indicated that

212

1  the Aviles shooting was unjustified?
2     A    When he separated, no, because the
3  investigation wasn't complete.
4     Q    So when he separated eight months later,
5  nothing in his employment file indicated that he had
6  been involved in a shooting that was deemed
7  unjustif--- that you deemed unjustified?
8         MR. SELBE:  Objection.
9         MR. GILES:  Ob--- object. Form.
10        THE DEPONENT:  Sorry. Repeat your
11 question.
12 BY MR. DUBE:
13    Q    Sure. So at the time he separated from
14 the Pasadena Police Department eight months after
15 the Aviles shooting, there is nothing in his
16 employment file that indicated that you or anybody
17 else at the Pasadena Police Department determined
18 that his shooting of Randy Aviles was unjustified.
19    A    There wasn't because we couldn't.
20        MR. GILES:  Dimitri, we've been going
21 almost two hours.
22        MR. DUBE:  Uh-huh.
23        MR. GILES:  Can we take a short break?
24        MR. DUBE:  Of course. All right. Ten --
25        MR. GILES:  Ten minutes?

213

1         MR. DUBE:  Sure.
2         VIDEO TECHNICIAN:  The time is now 2:53
3  and we're off the record.
4         (Whereupon, a break was taken from the
5  proceedings.)
6         VIDEO TECHNICIAN:  The time is now 3:09
7  and we're back on the record.
8  BY MR. DUBE:
9     Q    During the time from January of 2021 and
10 August of 2021 when he was terminated -- sorry, when
11 he retired, what were his exact duties for Officer
12 Saldivar?
13    A    They were inside, basically clerical
14 duties, receiving evidence as it comes in, doing
15 research on evidence that -- that can be destroyed.
16 And so it's clerical work.
17    Q    Okay. Are there any other Pasadena police
18 officers who performed that same -- those same
19 duties and work?
20    A    It's civilians.
21    Q    Okay.
22    A    There's a sergeant in there.
23    Q    Uh-huh.
24    A    There is now -- it's gone back and forth,
25 but as far as officers, there's not officers.



214

1  It's...
2      Q   And that was a decision that you made.
3  Correct?
4      A   Yes.
5      Q   And that was within your authority.
6  Correct?
7      A   Yes.
8      Q   Okay.  And the reason you made that
9  decision was to prevent him from interacting with
10  the public?
11     A   Yes.
12     Q   Okay.  And from placing the public in
13  danger?
14     A   Yes.
15     Q   Okay.  And did you believe that he was a
16  threat to the public at that time?
17     A   I don't know that I -- threat's not the
18  right word.
19     Q   A danger.
20     A   I -- I -- I don't even know that I would
21  call it danger.  I just think the prudent thing to
22  do would be to keep him inside and not interact with
23  the public.
24     Q   Prudent in what way?
25     A   You had an open investigation.  I had

215

1  concerns, you know, with -- with the last shooting.
2  And so to prevent anything else, you know, from
3  happening until all of this was done and I could
4  make a final decision was the best place.
5      Q   So because there's an open investigation
6  into the Aviles shooting, you felt it was best to --
7  to keep him from interacting with the public?
8      A   Because of the circumstances of the Aviles
9  pu--- Aviles shooting, yes.
10     Q   And that investigation did not close prior
11  to him leaving the police department?
12     A   That's correct.  Criminal investigation
13  was open -- I mean, technically, it's still open.
14     Q   Do you recall when he was actually
15  indicted?
16     A   Right before the two-year anniversary.  I
17  want to say the middle of December of 2022.
18     Q   If I told you it was the beginning of
19  January of 2023, would you have any reason to
20  dispute --
21     A   No, it was around that time.  Right --
22  short of two years.  I knew that.  Or right around
23  two years.
24     Q   And you stated before that the D.A.'s
25  office had received the file from you guys in about

216

1  April of 2021?
2      A   Yes.
3      Q   Do you know why it took so long for an
4  indictment?
5      A   Do I know why?
6      Q   Uh-huh.
7      A   I know what I was told.
8      Q   Okay.  What were you told?
9      A   The civil rights prosecutors were busy
10  with Harding Street and didn't have time to review
11  it and get on it.
12     Q   What's Harding Street?
13     A   Harding Street was a shooting in Houston,
14  ended up with several officers indicted.
15     Q   So how did you learn this information?
16     A   I talked to the district attorney.
17     Q   Okay.  When did you talk to the district
18  attorney?
19     A   November of -- he was indicted in January
20  of '23?
21     Q   Uh-huh.
22     A   November of '22.
23     Q   Well, can you tell me about that
24  conversation?
25     A   Tell you about it?

217

1      Q   Yes.
2      A   I -- I just asked her why it was taking so
3  long, that they had had it for some time.
4      Q   Uh-huh.
5      A   And she was initially surprised, told me
6  they shouldn't take that long, told me that, you
7  know, they had been busy with Harding Street.  And
8  she told me when she got back to the office, she
9  would figure out what the delay was.
10     Q   Okay.  Do you know whether or not it had
11  been presented to the grand jury prior to January
12  2023?
13     A   Aviles shooting?
14     Q   Yes.
15     A   To my knowledge, no.
16         MR. GILES:  Hey, Dimitri, could you keep
17  your voice up?  You --
18         MR. DUBE:  Yeah.
19         MR. GILES:  You may be a little far away
20  from the microphone or something, but every once in
21  awhile, you're difficult to hear.
22         MR. DUBE:  Okay.  Thank you for telling me
23  that.
24  BY MR. DUBE:
25     Q   And at that time, in November 2022,

218

1  Officer Saldivar had already separated himself from
2  the police department.  Correct?
3       A   Yes, but we still had -- we still had the
4  open case sitting there, so yes.
5       Q   Do you know approximately how long after
6  the Schenk shooting did that case go to the grand
7  jury?
8       A   There was a delay there as well.  It
9  wasn't two years.  But I -- I don't remember when it
10 was.  I -- I know it took a long time only because
11 there was some litigation over -- over some records
12 over it, but it was -- it was awhile.
13      Q   It was -- it was less than two years?
14      A   Yes.
15      Q   Was it less than a year?
16      A   I -- I don't know.  I -- I seem to recall
17 it being around a year, but it was -- it was
18 lengthy.
19      Q   How about the Ramirez shooting?  Was there
20 a grand jury there as well?
21      A   I don't know -- I -- I'm not sure if that
22 one was presented since nobody was hit. They've gone
23 back and forth on whether they present cases where a
24 person is not actually struck.
25      Q   Okay.  So Officer Saldivar was indicted in

219

1  late December, early January twenty-twen--- late
2  December 2022, early January 2023.  Correct?
3       A   Yes.
4       Q   Okay.  Do you recall when this lawsuit was
5  filed?
6       A   No.
7       Q   Okay.  If I told you it was filed on
8  October 16th, 2022, would that refresh your memory?
9       A   I'm not sure.
10      Q   Okay.  Let me ask you this.  When -- when
11 did you first become aware of this lawsuit?
12      A   Whenever the City was served.
13      Q   Okay.  So whenever the City was served,
14 that's when you became aware of the lawsuit?
15      A   Yes.
16      Q   Okay.  Did your conversation with the
17 district attorney's office, did that occur before or
18 after the City was served?
19      A   It was in November of '22.  When did you
20 say the City was served?
21      Q   In October.
22      A   It was after that.
23      Q   Okay.  And he was indicted while this case
24 was pending.  Correct?
25      A   While the lawsuit was pending?

220

1       Q   Yes.
2       A   It -- yes.  If we were served in twenty-
3  two -- October of '22, then yes.
4       Q   Do you recall whether in your conversation
5  with the -- with the -- a D.A. if you told -- if you
6  informed them that the City had been sued for a
7  shooting?
8       A   No, I had not.
9       Q   You don't recall or you did not tell them?
10      A   I did not tell them that.
11      Q   Do you know if anybody told him that?
12      A   I have no knowledge of anybody telling
13 him, no.
14      Q   What's your opinion -- actually, no,
15 before we get to that, tell me how the conversation
16 -- I'm sorry, let me start over. Tell me the
17 conversations that occurred at the time of Saldivar
18 separating himself from the police department August
19 2021.
20      A   A lot of it's going to be attorney--- it's
21 going to be attorney/client, so...
22      Q   Well, I'll -- let's unpack that a little
23 bit because I just -- I'm trying to understand what
24 -- what -- what would have been and what would
25 have been.  The conversation with Saldivar would not

221

1  be attorney/client privilege.
2       A   Correct.
3       Q   Okay?  And so -- so without telling me
4  what -- like, you know, what you said, okay, or what
5  any attorney said to you, okay, tell me what type of
6  conversations you had at the time that Officer
7  Saldivar separated from the police department.
8       A   There was only one conversation.  That was
9  after discussions with the attorney where Officer
10 Saldivar reached out about separation and his F-5
11 form with TCOL.  And he just wanted it in writing
12 what it was going to be.  And I said I would do that
13 as long as I got his retirement from him.  And that
14 was the extent of the conversation.
15      Q   What's a T-5 file?
16      A   No.  F-5.
17      Q   F-5.
18      A   It's the separation form with TCOL.
19      Q   I'm sorry.
20      A   Yeah.
21      Q   What's -- what's the F-5 file?
22      A   What is it?
23      Q   Yes.
24      A   It's the separation form with TCOL, the
25 honorable, dishonorable.  That -- that --

222

1    Q    Okay.
2    A    It's that form.
3    Q    I gotcha.  And he wanted to know what it
4    would say?
5    A    Yes.
6    Q    Did he ask you why?  Did he -- did he tell
7    you why he wanted to know?
8    A    Yes, he said, I just want to make sure
9    this is going to be an honorable discharge. And he
10   said, I just don't want you to say one thing and
11   change it later.  And so I said, I'll give it to you
12   in writing as long as I have a resignation letter
13   from you.  And so...
14   Q    When did he first inform you that he
15   intended to resign?
16   A    It was the week -- it was within a week or
17   two of him actually leaving because part of the
18   problem was we were coming up -- civil service, you
19   got to impose discipline within 180 days from the
20   day of the offense.  And I believe that day was July
21   11th because I think the 9th was a Friday.  And so
22   it was a Sunday and I wasn't coming to work Sunday.
23   And so we had to -- I -- at that point, was being --
24   my hand was being forced to -- to -- to make a
25   decision. And so --

223

1    Q    Okay.  So let's -- let's back up. So the
2    incident ha--- occurred on January 12th, 2021.
3    A    Yes.
4    Q    Okay.  Civil service discipline, right --
5    A    One -- yeah, 143.052 of the local
6    government code.
7    Q    Okay.  Had to occur within six months?
8    A    180 days is what it says.
9        180 days of the misconduct.
10   A    Correct.
11   Q    Okay.  So that would be July --
12   A    11th.
13   Q    -- 11th?
14   A    Yes.
15   Q    Okay.  Of 2021.  Okay.
16   A    Yes.
17   Q    Okay.  So during -- so during those six
18   months, did you impose any civil service discipline
19   upon Officer Saldivar?
20   A    I didn't because the investigation wasn't
21   complete.
22   Q    I'll strike everything after did not.  So
23   I'm going to ask you the question again.  Between
24   January 12th, 2021 and July 11th, 2021, did you
25   impose any civil service discipline on Officer

224

1    Saldivar?  Yes or no.
2    A    No.
3    Q    So his employment file would not reflect
4    any discipline for the shooting of Randy Aviles in
5    his -- sorry, I'm going to say it twice.  Strike
6    that.  So his employment file would not reflect any
7    civil service discipline for the shooting of Randy
8    Aviles.  Correct?
9    A    Correct.
10   Q    Would they issue any reprimands or lesser
11   discipline for that shooting?
12   A    No.
13   Q    Would -- would -- would it reflect that he
14   was placed in the -- what's it called? What did you
15   say?
16   A    The property room?
17   Q    The property room?
18   A    I don't know that his file will say it.  I
19   know there's a record of it, but his file doesn't
20   say it.
21   Q    So now we're going from July 11, 2021 to
22   August 2021.  Or August 9th when he --
23   A    July 9th.  He separated July 9th.
24   Q    No, he separated August 9th.
25   A    From the Pasadena Police Department?

225

1    Q    Uh-huh.  Yeah.  It...
2    A    I don't think so.  You might be right, but
3    it's not my recollection.
4    Q    I think you actually testified earlier
5    that it was August 9th as well, so -- but we will --
6    we'll get to -- actually, you know what?  I should
7    have it here.
8        MR. DUBE:  Let's go off the record for two
9    minutes.
10       VIDEO TECHNICIAN:  The time is now 3:26
11   and we're off the record.
12       (off the record.)
13       VIDEO TECHNICIAN:  The time is now 3:28
14   and we're back on the record.
15   BY MR. DUBE:
16   Q    Do you have any regrets with respect to
17   any of the decisions you made with respect to
18   Officer Saldivar?
19   A    No.
20   Q    What is your ultimate opinion of Officer
21   Saldivar as a police officer?
22   A    I -- I don't think he should be a police
23   officer.
24   Q    Why not?
25   A    His judgment on the Aviles shooting.



226

1    Q   Anything else?
2    A   No.
3    Q   Up until the Aviles shooting, did you have
4  any cause for concern about his judgment as a police
5  officer?
6    A   No.
7    Q   Does the Aviles shooting make you reflect
8  on the decision that you made for prior two -- on
9  the prior two shootings?
10   A   Does it make me what?
11   Q   Reflect on the decisions that you made for
12 the prior two shootings.
13   A   No.
14   Q   Why not?  Same person.
15   A   Different sets of facts.
16   Q   Okay.  After the Schenk shooting, did
17 Officer Saldivar receive a raise?
18       MR. GILES:  Objection.  Form.
19       THE DEPONENT:  I'm sure he did whe--- it -
20 - the COLAs that come in, so I'm sure he did.
21 BY MR. DUBE:
22   Q   Okay.  When do the raises typically occur?
23   A   Well, the police officers are on a step
24 scale.
25   Q   Uh-huh.

227

1    A   And so it doesn't matter whether you're a
2  mediocre officer, superstar; once you hit, you know,
3  say five years, this is your salary.  And then COLAs
4  are the same thing when the city does cost of living
5  adjustments at the -- so it goes to everybody.  And
6  so he -- he -- he wouldn't have gotten a -- Ri----
7  Salvidar wasn't singled out and said, hey, you get a
8  raise.  It's the step system and --
9    Q   Did you --
10   A   -- COLAs.
11   Q   Did you have authority to stop him from
12 receiving that raise?
13   A   No, that's civil service.
14   Q   How about after the Aviles shooting? Did
15 he receive a raise after that shooting?
16   A   It would have been the same set of
17 circumstances, depending on where he was on the step
18 chart as far as years of service and cost of living
19 adjustments across the board for the city.
20   Q   My question was do you know if he received
21 a raise after the Aviles shooting.
22   A   I -- I don't know the answer to that.
23   Q   I'm trying to find it, but I'm recalling
24 that during your deposition in the Schenk case, you
25 testified that it was ultimately within your

228

1  authority to determine whether or not he received a
2  raise.  Is there any reason why you would testify
3  that -- to that effect?
4    A   No.
5    Q   Give me a second.  When you retired from
6  the Pasadena Police Department, you received a
7  retirement party.  Correct?
8    A   Yes.
9    Q   Okay.  How -- how -- how did that occur?
10   A   How did it occur?
11   Q   Uh-huh.  Like who planned it?  Like what
12 were the circumstances around it?
13   A   Everybody that leaves, retires from the
14 organization, you have the option to do it and...
15   Q   Do -- do you know whether Officer Saldivar
16 received a retirement party before he left?
17   A   He did not.
18   Q   Okay.  Did he have the option to?
19   A   I don't know that he was even given -- I -
20 - he was not given the option. There was never a
21 discussion. He didn't ask and we weren't offering
22 it.
23       MR. DUBE:  I don't have any -- no further
24 questions.
25       MR. GILES:  Officer Saldivar will reserve

229

1  his questions until time of trial.
2        MR. SELBE:  And I'll reserve my questions
3  until time of trial.
4        MR. DUBE:  All right.
5        MR. SELBE:  Court reporter, do you need
6  anything before we finish?
7        COURT REPORTER:  Yes, I need to -- to know
8  -- and I appreciate it -- who wants copies of the
9  transcript.
10       MR. DUBE:  I do.
11       COURT REPORTER:  That is Mr. Giles?
12       THE DEPONENT:  Giles, yes.
13       MR. GILES:  Giles.  Yes.
14       COURT REPORTER:  And I didn't hear the
15 other gentleman's answer.
16       MR. SELBE:  I do not want a -- a copy of
17 the transcript.
18       MR. GILES:  Okay.  Mr. Giles, do you have
19 an email or -- or a website where I -- I just need
20 to get your information.
21       THE DEPONENT:  Norman, I'll give it to
22 him.
23       MR. GILES:  Thank you.
24       COURT REPORTER:  That'll work. Thank you
25 so much for that.  And I've got together with the



230

1  witness.  He's going to help me with the spellings
2  of the officers names that were mentioned that I
3  don't have, so we are good to go.  Oh, read and
4  sign?
5          MR. GILES:  Yes, please.
6          COURT REPORTER:  Okay.  And send it to?
7          MR. GILES:  Me.
8          COURT REPORTER:  Oh, to you.  All right.
9  We will get this done.
10         MR. GILES:  All right.  Thank you very
11  much for your help.
12         VIDEO TECHNICIAN:  All right.  Okay.  All
13  right.  This concludes the video deposition of
14  Joshua Bruegger.  The time is now three--- 3:35 and
15  we're off the record.
16         (Deponent excused.)
17         (Whereupon, at 3:35 p.m., the taking of
18  the foregoing deposition was concluded.)
19
20
21
22
23
24
25

231

1          CERTIFICATE OF VIDEOGRAPHER
2
3          I the undersigned, Clark Bolen, am a videographer
4  on behalf of NAEGELI Deposition & Trial.  I do hereby
5  certify that I have accurately made the video recording of
6  the deposition of Chief Joshua Bruegger, in the above
7  captioned matter on the 5th day of January 2024, in the
8  location of 937 Broadway Street, Myrtle Beach, SC 29577.
9
10         No alterations, additions or deletions were made
11  thereto.
12
13         I further certify that I am not related to any of
14  these parties in the matter and I have no financial
15  interest in the outcome of this matter.
16
17
18
19
20  Clark Bolen
21  Videographer
22
23
24
25

232

1                  CERTIFICATE
2
3          I, Mark Hagood, do hereby certify that I reported all
4  proceedings adduced in the foregoing matter and that the
5  foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9          I further certify that I am neither related to
10  counsel or any part to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13         IN WITNESS HEREOF, I have hereunto set my hand this
14  23rd day of January, 2024.
15
16
17
18
19
20  /S/  Mark Hagood
21
22
23
24
25

233

1  Date:    January 23, 2024      Assignment #: 71056
2  Attorney: Norman R. Giles, Esquire
3  Deponent: Chief Joshua Bruegger
4  Case:    Aviles vs. Saldivar
5
6  ATTORNEY - TRANSCRIPT ENCLOSED:  Signature of your client
7  is required.  Please have your client make any corrections
8  necessary.  Sign the Correction Sheet where indicated.
9  Forward a COPY of the executed Correction Sheet directly
10  to the attorney(s) listed below.  (The Address(es) can be
11  found on the Appearance page of the deposition.)  Also,
12  send a COPY of the executed Correction Sheet to our
13  corporation.
14
15
16
17
18
19
20  CC:  Naegeli Deposition & Trial
21      Dimitri Dube, Esquire
22
23
24
25

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

234

```
1        CORRECTION SHEET
2  Deposition of: Chief Joshua Bruegger   Date: 01/05/24
3  Regarding:   Aviles vs. Saldivar
4  Reporter:    Hagood
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page.  Sign this sheet on the line provided.
10 Page  Line  Reason for Change
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24        Signature_____
25           Chief Joshua Bruegger
```

235

```
1        DECLARATION
2  Deposition of: Chief Joshua Bruegger   Date: 01/05/24
3  Regarding:   Aviles vs. Saldivar
4  Reporter:    Hagood
5  _____
6
7  I declare under penalty of perjury the following to
8  be true:
9
10 I have read my deposition and the same is true and
11 accurate save and except for any corrections as made
12 by me on the Correction Page herein.
13
14 Signed at _____, _____
15 on the _____ day of _____, 2024.
16
17
18
19
20
21
22
23
24        Signature_____
25           Chief Joshua Bruegger
```

**0**

**052** 62:15

**06** 24:6

---

**1**

**1:13** 144:7

**10:46** 77:4

**11** 224:21

**11:01** 77:7

**11th** 222:21
 223:12
 223:13
 223:24

**12** 11:20 49:2
 200:1

**12:23** 144:4

**12th** 223:2
 223:24

**13** 11:20

**143** 22:11
 58:6
 59:24 60:14
 62:14

**143.052** 223:5

**15** 53:5 108:6

**15-ish** 25:12

**15th** 145:2

**16** 146:6
 147:6

**16th** 219:8

**17** 151:9

**18** 68:15
 107:6
 166:11
 174:7

**180** 62:16

222:19
223:8 223:9

**19** 85:10 86:8
 86:13 86:20
 87:6 92:4

**1995** 12:4
 12:11

**1998** 13:11
 13:16 13:24

---

**2**

**2:09** 180:9

**2:12** 180:12

**2:53** 213:2

**20** 108:6

**200** 31:5

**2000** 15:16
 21:9
 21:10 22:1

**2004** 21:20
 22:7

**2005** 21:23
 22:7

**2006** 21:7
 21:13 21:18
 33:8 35:7
 35:8

**2008** 25:16

**2009** 35:13
 36:18 41:18
 41:20

**2012** 34:4
 36:21 41:18
 41:20 47:12
 47:15 50:23
 51:1

**2013** 51:7

51:14 56:15

**2017** 52:25

**2018** 25:17
 50:10 53:19
 54:1
 56:15 57:24
 61:17 62:24
 66:13 71:21
 74:19 74:22
 88:16 88:17
 107:6 110:4
 110:16
 110:19
 193:21

**2019** 57:25
 61:18 61:25
 62:2 66:8
 193:24
 194:1

**2020** 90:3

**2021** 25:17
 110:6 145:2
 148:6 194:2
 200:21
 205:14
 205:15
 205:15
 206:23
 207:14
 207:14
 213:9
 213:10
 216:1
 220:19
 223:2
 223:15
 223:24
 223:24
 224:21
 224:22

**2022** 215:17

217:25
219:2 219:8

**2023** 9:6
 9:7 9:13
 215:19
 217:12
 219:2

**2024** 7:4 7:10

**21** 200:1

**22** 19:17
 216:22
 219:19
 220:3

**225** 30:11

**23** 19:17
 216:20

**24** 146:6
 147:6
 147:25

**24th** 200:4

**25** 169:4

**25th** 200:6
 203:18
 204:22
 205:15
 206:23

**26** 26:18

**290** 30:11
 31:5

**2nd** 13:11
 57:25 62:2

---

**3**

**3:09** 213:6

**3:26** 225:10

**3:28** 225:13

**3:35** 230:14

230:17

**30th** 9:6
  9:7 52:25

**32** 174:21
  175:8
  175:21

**33** 179:24
  180:15
  180:22

**34** 145:23
  146:10
  147:3

**35** 32:24
  48:14

**39** 26:4

---
        4
---
**40** 26:4 32:24
  34:15 48:14

**40-ish** 32:23

**4100** 20:16

**44** 145:23

**46** 211:5

---
        5
---
**5** 7:4

**5:58** 153:12

**50** 32:20

**5200** 66:20

**5th** 7:10

---
        6
---
**6:45** 155:25
  157:18
  158:22

**60** 34:14

**6th** 9:13

---
        7
---
**7** 161:23

**7th** 54:1
  57:24

---
        9
---
**9:22** 7:5 7:14

**9:47** 30:23

**9:49** 31:1

**94** 12:6

**97** 12:24
  13:12 13:13

**98** 14:9

**9th** 200:21
  204:23
  204:24
  205:15
  207:14
  222:21
  224:22
  224:23
  224:23
  224:24
  225:5

---
        A
---
**A.M** 7:5

**ability** 45:13
  59:3 59:5
  62:9
  76:18
  202:22
  202:24
  203:11
  203:12
  204:1
  204:19

205:5

**able** 9:16
  58:16 65:12
  84:1 106:10
  152:11
  158:10
  177:5 181:1

**abreast** 78:25
  80:4

**absolutely**
  45:7
  62:12
  93:1 145:24
  151:11
  166:21
  209:8

**academically**
  14:15

**academy**
  14:7
  14:23
  15:2 28:9
  32:17 47:16
  47:24 75:21
  76:3 76:3
  78:24
  80:8
  81:19 81:23

**access** 109:15
  110:18
  140:6 197:2
  197:4
  202:12

**accidents**
  79:6

**accomplish**
  63:20

**account** 46:16
  87:21 119:1

188:4

**accurate**
  205:10
  205:18

**accused**
  102:19
  106:4 197:8

**across**
  43:10 48:19
  227:19

**act** 131:20
  186:2

**acted**
  128:23
  131:17

**acting**
  53:20 57:22
  58:1 58:4
  58:6 58:8
  58:8
  58:20 58:21
  59:4
  59:17 59:22
  59:23 60:21
  60:23
  61:3
  61:22 74:17
  76:9 107:8

**action**
  58:10
  59:1
  59:20
  60:8
  60:18 62:14
  62:16 72:16
  88:10 97:25
  98:1

**actions**
  58:5 62:10

65:8
90:15 90:15
188:8
**active** 53:1
53:24
**activities**
37:19
**actual** 16:2
76:5
78:16
118:17
174:7 174:8
175:16
**actually**
14:21
39:5 49:6
52:11
69:2 72:3
76:6
83:21 90:17
93:9 114:25
116:9
138:11
157:4 163:6
180:6
183:12
215:14
218:24
220:14
222:17
225:4 225:6
**add** 102:16
**added** 26:12
**additional**
43:9
**address**
137:16
**adjustments**
227:5

227:19
**admin** 32:16
32:19 32:25
**administer**
17:1
**Administering**
16:12
**administrativ
e** 187:12
187:18
191:13
195:12
195:25
198:9
198:14
198:18
199:25
200:4
200:16
**admission**
86:22
146:14
**advantage**
92:20
**affairs**
10:5 10:8
36:19
37:1
37:12 37:22
38:4 39:1
39:7
39:23 42:23
42:25
43:8
43:12 43:13
44:6
44:10
46:4
46:23
47:1 47:5

47:10 48:19
49:20 68:23
71:3 78:2
196:18
199:22
200:15
205:21
**affected**
210:7
**affects** 209:5
**affirmatively**
204:1
**affirming**
74:9
**afternoon**
144:10
144:18
**afterwards**
91:9
**against** 35:16
59:1
**agency**
22:11
150:23
151:1
187:20
187:23
211:17
**agent** 122:18
**aggravated**
40:22
**ago** 25:12
84:23 86:19
111:1
122:12
145:8
189:16
**agreement**

187:5
**ahead**
151:15
151:20
200:25
**Al** 53:8 57:1
**alienated**
114:24
**alive** 36:7
**allegation**
18:6 43:4
**allegations**
17:25
18:4 19:25
**allege** 20:18
**alleged** 18:11
20:8
**allow** 202:1
202:1
**allowing**
146:8
196:13
**already** 90:17
114:5 195:9
195:18
218:1
**als** 29:23
**altercation**
130:17
**alternative**
22:14 22:22
**am** 102:4
164:9
175:24
176:10
177:7 179:9
181:10

205:11

**amongst** 83:19

**amount** 107:10

**analysis** 79:4
104:3

**analyze** 88:8

**Angel** 84:13

**angle** 158:16

**anniversary**
215:16

**annotated**
183:22

**answer** 46:7
91:5
97:20
99:2
105:9 115:9
147:11
147:13
147:18
147:22
149:9 195:1
227:22
229:15

**answered**
101:10
101:12
106:18

**answers**
106:22

**anybody** 10:23
10:25
32:3
72:19 75:25
89:7
106:9
112:18
114:18

197:7
197:10
203:3
212:16
220:11
220:12

**anyone**
109:9 110:9
111:6
186:24

**anything** 9:20
10:19 13:17
15:8
16:16
20:9
28:23
37:4
41:20
46:9 52:6
67:11 69:13
77:21 106:9
109:13
111:13
111:16
114:3
114:21
118:12
123:25
125:22
125:23
139:2
139:14
141:10
142:1
143:10
143:16
149:18
150:7
155:16
156:4
158:12
160:3

160:20
161:12
162:4 162:9
162:13
163:8
163:16
163:20
165:4
165:23
167:6 169:7
169:20
170:6
171:21
174:13
177:11
181:1
183:18
186:11
186:21
189:24
189:25
190:8 191:2
207:12
211:25
215:2 226:1
229:6

**anyway** 146:19
180:16

**anywhere**
24:23 30:10
146:17

**apartment**
40:5 66:19

**apologize**
144:14
146:8

**appeal** 211:1

**appeals** 185:6
186:9
211:14

**appear** 68:4
164:23
170:12
176:18
176:23
187:13

**appearance**
7:25 69:9

**appeared**
68:10
147:10
147:20
176:5

**appears** 94:24
153:19
158:15
165:12
170:15
176:7 183:9
183:17

**appointed**
53:16 53:17
53:20 53:24
57:12
58:2
61:23
62:1
62:25 76:10
77:11 78:17

**appreciate**
99:3 229:8

**apprehend**
29:6

**apprehended**
42:19

**apprehending**
15:23

**apprize**
108:18

apprized
  77:13

approach
  103:24

approached
  125:17
  126:3

appropriately
  54:22

approving
  23:22 24:16
  33:20

approximately
  14:11
  30:3 31:5
  39:2 194:21
  206:10
  206:16
  218:5

approximation
  39:11
  206:11

April 15:16
  21:10
  22:1
  50:10 50:16
  74:19 84:24
  193:20
  206:13
  206:17
  216:1

arbitration
  211:2 211:4

arbitrator
  185:16
  201:14
  211:2 211:6

area 11:6
  11:8 12:1

13:22 20:12
28:3 28:3
28:15 31:25
32:6
32:15 34:23
66:19 66:23
70:3 75:1
114:15
116:21
129:18
161:4 172:3
183:16
183:17

areas 28:9
  45:23 47:21

armed 93:11
  93:11 136:7

arrest
  16:18 16:20
  17:3 18:7

arrived 83:11
  112:23
  115:7 115:8
  116:1
  117:18

arriving
  104:25

Arthur 7:12

articulate
  202:9

aspect 81:13

assault 40:22

assaults
  35:19 35:19

assess 89:23

assessed
  34:13

assessment

22:23
34:8 34:9
34:15 34:19
34:25

assigned
  14:19 23:21
  24:13 27:23
  29:5
  29:20 29:24
  32:4
  32:21 32:23
  32:24 32:25
  33:20 39:23
  42:23 42:24
  47:12 47:21
  48:13 48:14
  122:21
  200:8 200:9
  201:25
  204:5
  204:11

assignment
  26:1
  55:23
  122:15
  122:16

assis 60:12

assistant 9:3
  25:9
  25:15 25:19
  26:16
  27:2 27:3
  27:6
  38:19 43:23
  44:8
  49:25 50:13
  50:15 50:19
  51:11 51:12
  51:16 51:18
  52:6
  52:12 52:18

52:24
53:9
53:12 56:14
56:18 56:20
56:23
57:6
57:11 57:12
57:13
60:7 65:9
65:11 68:13
68:15 68:22
75:9 76:9
77:12 78:15
98:8 122:23
125:9 126:3
126:8
141:18
141:19
142:8 187:4
192:22
193:5 193:8
193:11
198:21

assume
  79:20 125:1
  189:4

assumed 122:3

assuming
  203:3

ATF 29:24
  122:14
  122:16
  122:18
  122:22
  122:25
  123:2 123:5

attempt 143:7
  153:6
  159:14

attempted

152:20

**attempting**
153:13

**attempts**
150:8

**attention**
160:10
160:25
162:2 163:8
172:2

**attorney** 8:13
10:24 10:25
197:3 197:9
197:9
197:11
197:12
197:13
197:13
198:3
216:16
216:18
220:20
221:5 221:9

**attorney/**
**client**
220:21
221:1

**attorney's**
196:22
201:10
202:2
205:25
206:8
219:17

**August** 14:9
35:8 213:10
220:18
224:22
224:22
224:24

225:5

**authored**
10:13

**authority**
61:15
62:6
62:24
65:7
65:17 65:20
76:4
185:1 185:3
185:4
185:11
185:19
203:6 214:5
227:11
228:1

**authorization**
36:10

**authorized**
88:18 89:14

**auto** 28:5
32:11

**automatic**
197:15

**automatically**
197:14

**avail** 81:14

**available**
104:18

**Aviles** 7:9
7:17 8:14
8:17
10:14 10:16
188:17
188:18
188:19
194:2
194:21

196:8 198:5
198:5 199:9
199:18
201:4
201:19
204:3
205:22
212:1
212:15
212:18
215:6 215:8
215:9
217:13
224:4 224:8
225:25
226:3 226:7
227:14
227:21

**aware** 80:5
82:21
107:18
108:8 122:4
219:11
219:14

**away** 25:13
42:16
43:5
44:23
45:3 45:4
97:11
130:19
131:5
132:21
132:25
134:11
134:20
134:24
135:2
135:11
135:24
136:11
136:23

137:4
139:14
145:19
152:23
189:1
190:24
191:20
203:7 204:1
204:18
217:19

**awhile** 138:25
217:21
218:12

_____

B

**backed**
190:1 190:3

**background**
21:3 209:24
210:3
210:13
211:17

**backing**
79:3 79:3
79:6 79:8
190:12

**bad** 120:23

**barrier** 97:9

**based** 22:18
44:24 101:4
104:17
127:12
136:1 138:4
154:23
176:22
192:6

**basically**
36:6 60:1
61:5 73:17

127:15
198:14
213:13

**basing** 155:1

**basis** 32:3
43:11 51:20
146:24
157:24
158:2

**BB** 67:22 68:4
68:6 83:4
83:8

**Beach** 7:10
7:11 8:23

**became** 22:5
85:6 193:23
194:20
219:14

**become** 107:18
108:8
219:11

**becomes** 186:5

**bef** 9:7

**beforehand**
96:10

**begin** 135:4
135:10

**beginning**
21:12 53:25
57:23 79:21
127:16
127:16
186:1 186:2
215:18

**begins** 40:7
99:19 152:9

**behalf** 7:16
197:22

**behind** 210:14

**bel** 131:14

**belief** 137:3

**believe** 19:14
19:19
21:7
29:25 31:10
34:14
35:8 36:1
53:25
54:1
57:24 66:22
67:1
67:21 82:25
83:1 83:2
89:10 90:14
91:25
93:8 96:4
98:20 98:23
99:6
102:1
106:13
114:10
115:14
119:21
128:23
129:5 129:6
129:9
135:19
139:15
139:24
142:13
143:21
200:1 200:2
200:21
204:23
214:15
222:20

**believed** 16:6
128:22
130:25

131:14
132:5

**beneficial**
150:10
150:12

**benefit**
211:12

**benefits**
209:4

**besides** 10:25
65:5 122:8

**best** 45:13
46:7
194:8 194:9
201:12
215:4 215:6

**better**
77:17 80:19
80:22
81:2
91:10 97:17
98:13
103:24
134:1
186:22
202:5

**beyond** 27:9
52:6

**biggest** 51:22
58:3

**binding** 211:2

**bit** 11:2
13:18 14:22
27:8
27:13 37:11
51:24 52:10
66:12
75:4 81:23

84:4 118:21
128:24
129:2 152:1
157:5 163:7
173:10
196:5 196:8
220:23

**Bittner** 38:22

**black** 139:6
154:10
165:5 165:6
165:6 181:4

**blob** 164:16
169:18
171:6 171:6
182:7

**block** 20:17
66:20

**blocked**
100:13

**blocks** 100:16

**board**
109:23
227:19

**bodily**
72:21 89:11
97:13
103:11
103:18
103:18

**body** 86:14
92:12 93:19
94:1 94:5
115:22
117:7
117:17
117:25
123:12
123:21
123:21

123:23
124:8
124:21
128:3 128:5
128:13
128:19
139:3 176:7
183:19
**bottom** 30:9
171:6 171:7
182:7
**brain**
133:18
133:23
**break** 30:24
31:4 63:7
76:24
77:5
144:2 144:5
144:12
180:7
180:10
180:16
212:23
213:4
**breakdown**
148:23
**breath** 17:4
**breeze** 116:5
**brief**
116:16
206:25
**briefed**
112:25
**briefly**
8:12 113:23
115:14
**bring** 34:21
**Brinker** 19:8

**broad** 24:12
**broader** 27:9
**brought**
115:22
115:23
**Bruegger**
7:2 7:8 8:3
230:14
**buddy** 195:23
**building** 70:8
**bullet** 97:9
**bulletin**
109:23
**bumped** 160:7
**bunch** 13:3
17:9 19:6
48:1 79:6
116:10
128:24
128:25
139:22
140:4
**burglary** 28:4
32:11 33:12
33:14
35:6
36:13
119:14
119:21
120:10
121:9
121:20
122:8
**bush** 183:1
**bushes** 182:25
**busy** 47:7
216:9 217:7

—————
C
—————
**ca** 76:4
**cadet** 14:7
81:25
**cadets** 76:5
**cam** 86:14
92:12 92:13
115:21
115:22
115:23
123:12
123:12
127:18
128:3 128:4
128:5
**camera** 70:3
93:19
94:1
117:7
117:17
117:25
128:13
139:3
158:14
175:2 175:3
176:7
**cameras**
94:6 94:6
**candidates**
22:17 210:4
**capability**
149:14
149:23
159:17
**capacities**
78:19
**capacity**
107:11

**captain** 25:13
**captains** 25:9
**captured**
86:14
**car** 44:23
70:8 95:7
96:6 96:7
96:7 114:10
114:23
116:11
116:12
116:21
128:4
155:13
155:16
160:21
175:5
195:23
**career** 26:8
27:19 33:3
**careful** 92:12
106:1
**Carolina** 7:11
**carrier** 110:2
**carry** 88:14
203:2 203:5
203:5 204:1
**cars** 116:10
**case** 10:11
16:23
17:5 17:6
17:25
18:2 18:5
18:17 18:22
19:1 36:4
36:5
75:15
109:19
111:12

133:7
144:24
147:12
187:16
195:24
196:4
201:12
208:17
211:9 218:4
218:6
219:23
227:24

**cases** 17:15
18:1 18:2
33:16 35:21
218:23

**casings** 138:4

**cat** 80:24

**catch**
120:23
144:16

**categories**
60:20
209:12

**cause** 49:24
96:24
101:24
140:23
177:3
189:21
226:4

**caused**
148:2 192:2
192:2
200:22
200:24
201:2

**ceiling**
140:22

**center**

22:23
34:8 34:9
34:15
162:21

**certain**
41:2 72:2
162:18
186:9
206:20

**certainly**
72:18 88:11
89:7 97:10

**certified** 8:4

**cetera**
37:19 37:20

**cha** 152:15

**chain** 25:5
70:20 108:5

**chance** 76:24

**change**
23:14 156:5
160:16
164:5 166:7
169:1
172:12
172:18
189:14
195:10
195:17
208:15
209:9
209:11
222:11

**changed**
209:10

**changes**
155:23
165:25
166:2 209:8

**changing**
164:18
178:6

**chapter** 44:20

**charge**
23:16 37:19
121:12
122:18

**charged** 40:21
40:23

**charging**
186:5

**chart** 227:18

**chases** 152:15

**check** 69:10
210:3
211:18

**checked** 116:2

**checklist**
109:25

**chest** 129:5

**chief** 7:2 7:8
17:20 17:21
18:14 25:10
25:15 25:15
25:19 26:22
26:23
27:2 27:3
27:5 27:6
30:8
38:19 38:19
43:20 43:21
43:23 43:23
44:7 44:8
48:8
49:25 50:13
50:15 50:20
51:11 51:13
51:16 51:18

52:3 52:6
52:8
52:12 52:14
52:18 52:18
52:19 52:20
52:21 52:24
53:2 53:5
53:6 53:9
53:13 53:15
53:16 53:17
53:21 53:24
54:3
56:14 56:22
57:6
57:11 57:12
57:14 57:17
57:22
58:1 58:2
58:4 58:6
58:8 58:9
58:21
59:2 59:4
59:10 59:14
59:17 59:22
59:23
60:1 60:7
60:13 60:16
60:21 60:21
60:22
61:2 61:6
61:6 61:9
61:10 61:15
61:22
62:7
62:25
63:4 65:9
65:19
66:3
68:13 68:15
68:23 74:17
74:17
75:9 75:10

76:9 76:9
76:10 77:12
77:12 77:12
78:15 78:16
78:17
98:8 98:8
107:8
119:17
122:23
123:6 126:2
126:3 126:8
141:15
141:16
141:18
141:19
142:7 142:8
174:8
175:15
187:4
192:18
192:22
193:5 193:8
193:10
193:11
193:14
193:23
194:12
194:14
194:18
194:20
195:5
201:10
201:21
209:16
209:18
211:7

**chiefs** 25:9
25:19 26:16
31:10 56:18
56:20 56:23
57:7
57:13 65:11

125:9
198:21
209:25

**chief's** 38:18
44:11
46:3
46:15 46:17
77:11
78:6
78:13
109:19

**choosing**
114:17

**chose** 54:4

**Chris** 38:23

**cir** 89:15

**circle** 181:22

**circumstance**
20:5
89:17 90:14
102:8
104:18
105:22
114:19
135:20
207:19

**circumstances**
17:24 39:21
43:7 45:5
49:4
73:10
74:5
74:25 82:23
88:21 92:24
102:11
103:14
105:21
112:7
134:11
134:21

134:22
196:6
208:13
215:8
227:17
228:12

**citizens**
23:23 211:8

**city** 7:11
7:19 8:18
9:3 9:12
30:4
58:19
59:5 59:7
59:9 59:9
59:10
60:6
60:11
61:1
61:16 61:23
63:4 66:3
66:9 202:23
219:12
219:13
219:18
219:20
220:6 227:4
227:19

**civil** 52:2
52:7
52:16
58:4
58:25 60:17
62:13 62:22
64:4
64:11 64:15
185:7
185:15
185:20
186:6 205:4
211:1 216:9
222:18

223:4
223:18
223:25
224:7
227:13

**civilians**
204:9
204:10
213:20

**clarify** 64:17

**class** 14:14
15:10

**classes**
13:3 13:6

**classificatio
n** 207:25
208:2

**classificatio
ns** 210:1

**clear** 64:2
95:10 95:10
174:6

**cleared** 196:2

**clearer** 169:9

**clearly** 87:18
97:3 128:17

**clerical**
204:6 204:7
213:13
213:16

**Cleveland**
82:18

**Clifton** 56:24

**close**
112:15
123:25
215:10

closer 116:12
  148:8
  194:13
  194:14
clothes
  203:17
cloud
  189:24
  192:11
clu 121:13
Coast 28:25
  29:16
Cochran 7:23
code 22:11
  44:20
  58:6 60:4
  62:15 223:6
COLAs
  226:20
  227:3
  227:10
cold 39:19
college 12:11
  12:22 13:9
color
  155:23
  165:24
  166:2 166:7
  168:15
  172:11
coloration
  164:5
colors 160:16
  160:21
  164:18
  165:5
  168:15
  178:5 178:6

178:7
combine 22:24
  34:16
comes 7:24
  67:17 82:10
  102:24
  196:22
  213:14
coming 46:4
  103:2 157:6
  163:9
  203:14
  211:15
  222:18
  222:22
command 34:10
  68:19 68:24
  70:19 70:20
  72:14
  73:1 108:5
commander
  47:13
commands
  49:15
comment 55:25
  106:25
commission
  185:15
  185:21
  207:23
  211:1
committed
  37:6 121:20
  122:3
common 79:2
communi 35:18
communicate
  109:9

communication
  79:13
communication
s 35:18
  110:9
community
  32:17 63:11
  63:12
comparable
  34:23
compare
  104:14
  106:7
  106:10
compared
  104:14
comparison
  104:22
  105:12
competitive
  22:15
complaint
  20:24 55:24
complaints
  24:19
  37:2 37:8
  47:3 55:2
complete
  12:19 207:6
  212:3
  223:21
completed
  187:16
completely
  162:18
complex
  40:5 66:19
compliance

188:11
complying
  33:22
computer
  143:1
con 120:10
concern 130:6
  188:13
  191:23
  192:2 226:4
Concerned
  143:24
concerning
  143:20
concerns
  55:22
  191:17
  191:18
  191:21
  196:13
  201:18
  207:4 215:1
conclu 121:13
concluded
  205:22
  205:24
  230:18
concludes
  230:13
conclusion
  10:10
  120:11
  121:7 122:2
  132:8
  132:10
  133:12
  137:12
  141:17
  141:20

165:20
179:6
184:23

**conclusions**
104:10
121:3
121:23
179:9

**concurred**
74:12

**conduct**
16:8  42:4
186:19
188:4  188:6
196:23
209:2

**conducted**
42:8  113:16
200:16

**conducting**
16:10
37:2  37:7
113:18
187:10
200:13

**conference**
126:7  127:4

**confident**
184:17

**confirm**
60:6
60:11
61:2  61:4

**confirmed**
57:25
58:8  58:9
58:20  59:22
60:3  60:5
60:13  61:16

**confirming**
60:12

**confused**
60:20

**Congrats**
14:16

**connection**
125:5

**Conroe** 13:20

**consider** 64:7
188:7

**considered**
64:7

**considers**
64:8

**consistent**
87:20
88:1  88:4
156:20
156:21
161:12
162:4
162:10
162:13
163:9
164:23
168:5
168:12
169:22
170:6  171:3
183:1  183:4
183:18
184:15

**constable's**
210:11

**contact**
16:1  89:4
109:20
115:10

187:15
190:20
198:3
201:24

**contacted**
95:11  108:9
114:6  189:3
189:9
190:18

**contacts** 89:9

**contention**
55:3

**context** 178:8

**continue**
139:4

**continues**
208:18

**Continuing**
173:12

**control** 28:12
85:19
86:7
146:5
151:25
167:7
167:10
181:14
182:4

**conversation**
114:7
116:15
118:9
118:13
130:24
206:23
206:25
207:1
216:24
219:16
220:4

220:15
220:25
221:8
221:14

**conversations**
78:23
220:17
221:6

**convicted**
208:18

**convinced**
142:7

**Cooper** 115:15
116:4
118:15
119:2  120:3
122:7
122:18
124:15
125:11
125:18
126:4  126:8
126:14
127:5  127:9
137:1
137:19
139:15
141:1
143:21
145:14
147:8
147:19
148:10
148:24
151:5
158:25

**copies** 229:8

**copy** 159:23
174:7
175:14
175:15

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

192:9
229:16

**corner** 154:16
155:19
155:21
160:24
182:7 182:8

**correct**
8:25 9:1
14:1 21:5
21:12
22:2 24:6
24:7
25:20
33:4 33:6
36:14 36:24
41:12 43:15
43:16 46:20
47:15 47:16
47:17 48:17
50:16 50:17
50:25
51:3
56:16 56:18
56:19 59:18
61:24 64:20
64:21 64:25
68:11 74:20
74:21
75:8
78:18
80:6
85:23
86:2
88:14 94:10
96:15 99:14
99:15 100:8
101:15
104:1
107:10
110:13
113:20

115:2 116:8
124:12
124:17
124:18
130:4
130:14
130:15
131:18
134:4 134:5
136:7 136:8
139:18
139:19
141:23
141:25
142:22
142:23
143:5
147:14
147:22
150:3 151:8
152:6
152:10
152:12
152:15
152:18
153:2 153:7
153:9
153:13
153:14
159:1 159:9
159:12
159:18
159:24
172:13
174:11
174:18
178:10
178:13
178:16
178:17
178:19
178:20
185:22

187:2
193:21
193:22
193:24
198:7 214:3
214:6
215:12
218:2 219:2
219:24
221:2
223:10
224:8 224:9
228:7

**Correction**
12:6

**correctly**
129:10

**cost** 227:4
227:18

**council** 57:25
58:20
59:5 59:7
59:9
59:10 59:23
60:3 60:6
60:6
60:11 60:14
61:1
61:16 61:23

**counsel**
7:14 58:8
58:9 103:23

**countless**
73:11
138:19

**couple** 11:7
19:21 53:22
67:7 90:1
113:12
113:14

119:11
122:6 123:7
145:8
193:12

**course**
76:25 90:24
212:24

**court** 7:12
8:4 8:7
17:8
229:5 229:7
229:11
229:14
229:24
230:6 230:8

**courtroom**
17:7

**cover** 75:6

**coworkers**
15:7

**crashes** 17:17
79:5

**crawling**
130:19
131:5
132:21
132:25
134:20
134:24
135:2
135:24
136:11
136:23
137:4
139:14
145:19

**create** 84:1
84:2

**created** 22:24
122:14

122:15
123:5

creates 22:19

credence
210:1

crime 24:15
32:16
35:9
35:14 35:15
35:16 36:12
40:23 122:3
197:8

crimes 28:4
32:11 32:11
32:12 32:12
33:11 35:16
36:13 150:6

criminal
12:14 45:10
187:11
187:13
196:16
196:20
196:25
197:7
200:15
201:8
201:20
206:6 209:2
215:12

crisis 82:9

criteria
198:17
203:4

culture 81:5

current 77:17
81:17 82:8

currently
148:7

189:12

cursor 163:18
163:25
181:8
181:11
181:11
181:12
181:14
181:17
181:20
182:1

cut 26:11

——————————

D

D.A 220:5

D.A.'s 187:17
206:16
215:24

D.W 21:4
21:21

D.W.I 15:19
16:7
16:23
21:4
21:22 21:25
22:6
28:16 28:22
28:24

dad 11:14

dad's 11:14

daily 32:3

Dan 38:22

danger 214:13
214:19
214:21

dark 116:10
124:9 143:5
149:17
149:19

158:19
163:21
163:24
165:5 170:8
173:9

dash 92:12
94:6 115:21
115:22
123:12
127:18
128:4

data 189:19
189:23
190:2 190:3
190:5

date 7:9

Daugomah 7:13

day 21:14
21:17
24:4
24:10
33:5 33:5
33:6
43:22
47:2 47:5
63:25
102:12
116:1 126:6
131:6 131:8
131:9
140:20
195:25
196:11
198:6 200:2
209:15
209:15
222:20
222:20

days 47:2
47:3
58:10 62:16

64:5 195:12
195:15
196:1
222:19
223:8 223:9

daytime 33:3

day-to-day
23:20 24:17
24:19
27:9
33:19 37:19
46:25 51:20
51:23 63:10
78:21

DEA 29:21

deadline
186:10

dealing
199:11

death 72:21
89:11 97:12
103:11
103:19

December 12:4
12:23 13:13
21:23
215:17
219:1 219:2

decide 123:15
210:18

decision 64:1
66:1 66:4
66:9 133:16
133:17
174:17
185:9 192:1
192:6 202:2
210:7 214:2
214:9 215:4
222:25

226:8

**decisions**
92:18
225:17
226:11

**decision's**
185:14

**deemed**
212:6 212:7

**default** 22:13

**defend** 72:20

**defense**
166:19
166:22

**defenses** 56:4

**define** 28:19

**definitively**
75:24 101:1
110:14
159:7
169:10
185:16
206:9

**delay** 217:9
218:8

**delirium**
82:12

**deliver**
199:23

**delivered**
186:6
199:22

**demonstrate**
142:12

**demonstrated**
131:23
138:11

**demonstrates**
138:21

**demotion**
58:11 64:6

**Denny's** 20:16

**depart** 81:6

**departed**
53:21
211:23

**department**
13:11 13:16
13:24
14:5 26:3
27:16 28:18
37:10
44:6 45:6
45:23 47:19
59:25 59:25
60:4 60:5
60:15 60:15
60:16
63:5
66:10 66:11
75:11
81:6 82:5
83:17
91:8
91:16
150:21
150:25
185:13
185:18
187:6
187:24
194:24
195:4
197:16
200:19
200:23
203:9
203:10

203:11
204:15
204:20
204:25
205:3
205:12
205:17
209:23
210:3
211:24
212:14
212:17
215:11
218:2
220:18
221:7
224:25
228:6

**departmental**
188:11

**departments**
38:13

**depend** 45:5
47:4 74:4
74:5 210:9

**depended**
37:24

**dependent**
47:2

**depending**
28:12
52:2 73:9
82:7 227:17

**depends** 24:23
27:19
47:8
73:10
79:9
88:21
90:7 103:13

134:10
134:21
196:5
209:24
210:12

**Deponent**
30:21 43:19
45:2
46:20 54:13
54:17
55:6
55:17
59:9
65:11 65:14
71:8
72:13 72:18
73:6 86:4
87:1
87:12 87:14
88:4
89:17
90:1
91:13 97:19
98:23 99:21
101:12
101:23
102:11
103:8
103:13
104:6
104:13
105:1 105:3
105:8
105:16
105:18
105:25
106:18
121:6 121:9
130:8
131:14
132:2
134:10

135:1
136:14
138:16
147:16
148:17
149:8
155:13
156:14
157:1 161:6
161:9 166:9
166:18
166:20
166:24
167:18
168:1 168:8
171:13
181:16
181:25
182:2
212:10
226:19
229:12
229:21
230:16

**deposed**
137:19
144:23

**deposition**
7:1 7:8
7:13 10:1
17:10 86:23
87:4
145:1
146:13
146:17
175:11
175:13
175:19
227:24
230:13
230:18

**describe**

94:23
114:13
115:25

**described**
118:20

**description**
40:3

**desk** 159:9

**despite** 45:18
45:24

**destroyed**
213:15

**detail** 20:4
118:21
120:2

**detailed**
120:19
120:21

**details** 54:15

**detective**
10:13
115:14
116:4
118:15
119:2 122:7
124:15
125:18
126:8 137:1
137:19
139:15
140:25
143:20
145:14
147:8
147:19
148:9
148:24
158:24
187:8

**detectives**
112:19
126:7
196:17
200:14

**determination**
17:1
74:10
185:21

**determination
s** 46:18

**determine**
111:15
194:24
228:1

**determined**
39:14
212:17

**developing**
43:15

**dictate** 43:24

**died** 36:9

**difference**
38:6
38:11
58:3
64:16 133:1
133:4 133:5
208:24
209:6

**differences**
56:6

**different**
23:2
35:10
36:4
54:25
58:2
60:24 60:25

67:7
80:14 92:14
98:15
120:15
121:14
121:15
164:1
168:14
168:15
182:23
196:5 196:8
204:9
226:15

**differently**
56:9
75:14 76:14
97:16

**difficult**
158:17
158:20
217:21

**dig** 62:20

**Dimitri**
7:16 8:13
76:22
212:20
217:16

**direct**
78:20
109:12
162:2

**direction**
27:7
27:11 51:24
63:9
162:3
170:15
177:23
178:19
179:12

183:14

**directly**
38:17 38:18
48:7
48:16
119:15
119:20
119:22

**dis** 91:9

**disagree**
50:11
120:10
137:23
138:6 138:8
138:14
138:17

**disappears**
182:5

**discarded**
117:5
123:20

**discarding**
113:6

**discern** 151:6
158:18
158:20
165:13
177:5
178:22

**discharge**
208:6 208:9
208:11
208:21
208:25
208:25
209:6 209:7
209:13
209:22
210:6
210:19

210:20
222:9

**discharged**
49:16
67:6
87:22 113:9
190:25
210:6

**discharging**
66:25 101:7

**disciplinary**
58:5
58:10
59:1 60:8
60:18 62:14
62:16
64:4 64:23

**discipline**
24:1 24:2
24:2
51:25
52:2 52:7
58:5
63:10 63:24
64:1 64:3
64:4 64:5
64:6 64:7
64:8
64:11 64:12
64:14 64:15
64:18
65:7
65:15 65:21
66:4
81:10 81:11
81:12
186:15
222:19
223:4
223:18
223:25

224:4 224:7
224:11

**discoloration**
156:5 173:9

**discoloration s** 169:8

**discovery**
62:17

**discrepancies**
94:9 142:16

**discuss** 90:25
114:21
114:22
125:19
126:3 126:4

**discussed**
26:24
85:2
89:21
128:18

**discussion**
83:25
228:21

**discussions**
83:18 221:9

**dishonorable**
208:21
208:25
209:1 209:7
209:22
210:20
221:25

**dishonorably**
210:6

**dismissed**
56:1

**dispatch**
109:21

**dispatched**
49:5
66:18
197:14

**dispose**
110:23

**disposed**
118:22

**dispute**
215:20

**distance**
123:24
124:9

**distinction**
14:13 68:7

**district**
13:20
196:21
201:9 202:2
205:25
206:8
216:16
216:17
219:17

**disturbances**
24:15

**divided** 27:23

**division**
37:12 37:22
55:23

**divisions**
28:6
31:21 32:10
37:14 55:1

**document**
186:6

**documents**
10:6

**done** 52:3
56:8 56:9
59:21 62:10
64:19 64:24
76:14
90:4 96:9
98:3 149:25
150:24
169:13
169:14
186:22
196:4
196:17
198:21
198:23
198:24
199:5
200:12
201:7
201:21
206:12
215:3 230:9

**door** 70:3
93:9

**downturn**
26:10

**draft** 186:3
198:18

**drafted** 10:13
191:13
198:20
200:3

**drag** 190:13

**draw** 121:7
132:10
133:12
137:12

**drawing** 132:7

**drawn** 165:21

**dressed**
112:10

**drew** 122:2

**drinking** 40:4

**drive** 28:14
40:8 45:4
112:16
112:19
190:1 190:3
190:14

**driven** 190:24

**driver**
16:25
40:6 40:7
42:16
43:4
113:6 113:8
188:25
190:24

**drivers** 15:24
16:1 16:4

**drives** 27:20

**driving** 15:21
43:5 45:3
155:17
160:22
191:20

**drop** 71:17
71:25 72:25
73:4
73:25 73:25
74:1 74:2
87:24 95:17
95:23
96:2
97:22 99:14

**drop-down**
140:22

**dropped** 98:5

**drove** 42:16
112:12
155:13
189:1

**Dube** 7:16
7:16 7:22
8:6 8:9
8:13 23:8
30:19
31:3
43:25 46:21
54:6
54:16
55:9
55:19 56:13
65:4
65:13 65:16
65:25
66:7
71:10
72:9
72:17 76:25
77:2 77:9
85:12 85:15
85:18 85:22
86:1 86:3
86:8
86:10 86:11
86:20 86:24
87:2 87:5
87:9
87:13 87:16
88:6
89:19 91:14
91:21
92:2 92:5
92:7
94:12 94:15
94:22 95:15
95:21 98:18
98:25

99:5
99:11 99:22
100:1
100:10
100:14
100:24
101:5
101:13
101:17
102:2
102:14
103:9
103:15
104:7
104:20
105:4
105:11
105:15
105:24
106:20
107:1 107:5
121:8
121:17
130:11
131:16
132:3
134:17
135:18
136:16
138:2
138:22
144:1 144:9
145:22
146:2 146:4
146:9
146:20
147:1 147:5
147:17
148:21
149:3
149:10
149:12
151:9

151:13
151:19
151:22
152:4 153:5
153:11
153:16
154:7 155:7
155:15
156:3
156:15
157:2
157:12
157:17
157:24
158:2 158:5
158:9
159:22
160:2
160:14
160:19
161:11
162:1 162:8
163:15
164:22
165:3
165:18
166:10
166:12
166:16
166:19
166:22
166:25
167:7
167:11
167:15
167:19
167:22
168:4 168:9
168:11
168:25
169:6 170:5
170:23
171:15

172:1 172:8
172:17
172:22
173:1 173:7
173:14
173:18
173:23
174:3
174:11
174:12
174:20
174:24
175:1
175:10
175:20
175:23
176:3
176:15
177:17
179:23
180:4 180:6
180:14
180:18
181:14
181:19
181:24
182:1 182:6
182:9 183:5
183:7
212:12
212:22
212:24
213:1 213:8
217:18
217:22
217:24
225:8
225:15
226:21
228:23
229:4
229:10

**due** 192:3
195:6
196:14

**dues** 197:24

**duly** 8:3

**during** 15:6
39:6
39:12 58:15
59:21 61:25
86:23 100:4
101:18
118:3 123:6
125:25
128:12
130:24
132:13
140:5
140:17
148:12
192:19
193:15
194:3
194:17
194:19
203:12
205:10
205:14
213:9
223:17
223:17
227:24

**duties**
24:13 200:8
200:10
201:23
201:23
204:2 204:4
204:8
213:11
213:14
213:19

**duty** 200:18
207:5

**dynamic** 73:15
92:21

———————

E

**earlier** 19:21
66:12 203:1
225:4

**early** 12:25
19:17 67:17
69:5
219:1 219:2

**easiest** 51:18

**economy** 26:11
26:12

**effect**
142:1
208:10
208:12
228:3

**effectuating**
152:5

**eight** 212:4
212:14

**either** 18:7
26:4 33:8
67:21 68:24
142:19
147:8
147:19
203:19
210:8

**ele** 200:24

**elected** 54:10
201:3

**elements**
44:19

eligibility
  22:19 22:25
  34:17
else 9:20
  10:19 16:16
  37:4
  40:22 41:20
  46:6
  59:16
  80:7
  80:12 89:12
  89:23
  90:4 111:12
  114:16
  114:21
  114:24
  115:19
  118:12
  126:20
  126:22
  136:18
  139:14
  149:18
  191:2 197:8
  197:10
  199:15
  203:3
  212:17
  215:2 226:1
email 229:19
emerged 172:9
emergencies
  109:19
employed
  13:23
  30:4
  187:6 202:7
  204:24
employment
  9:11
  40:20 41:10

  54:3 211:25
  212:5
  212:16
  224:3 224:6
encounter
  75:7 101:19
encountered
  72:24
encountering
  72:5
enforcement
  29:12 29:13
  89:8 207:23
Enhan 150:19
enhance
  143:18
  150:12
enhanced
  143:8
  149:23
  150:6
  187:21
enhancements
  150:16
  150:18
  150:22
enhancer
  143:18
  174:14
ensure
  45:13
  185:11
entail
  15:20 16:11
entire 15:3
  101:19
  102:6
  194:12

entitled
  192:3 197:9
entrance
  129:18
  129:21
  129:25
  130:2 130:3
  131:1 179:3
equivalent
  58:12
Espinoza 53:8
  57:1 74:17
essentially
  118:25
estimate
  194:8 194:9
  194:15
estimation
  74:7
et 37:19
  37:20
evaluate
  95:11 98:9
evaluated
  104:17
  133:6 188:6
evaluating
  74:24 188:3
evaluation
  90:19
event 54:7
  92:15 102:1
  102:3
  104:17
  108:4
  109:25
  114:20
  114:22

  148:8 174:9
  192:14
events 54:9
  54:11 77:17
  82:8
eventually
  78:16
  152:15
ever-changing
  73:15
everybody
  51:19 69:10
  114:24
  135:7 227:5
  228:13
everybody's
  33:21
everything
  89:23
  115:25
  136:18
  143:3
  223:22
evidence
  86:21
  121:11
  136:1 136:2
  136:3 136:6
  146:10
  146:14
  146:17
  192:7
  213:14
  213:15
evidentiary
  146:24
exact 71:20
  213:11
exactly 19:20

21:1 74:13

**EXAMINATION**
8:8

**example**
79:8
93:18 93:24
201:17

**excessive**
18:7
18:12
20:2 132:13

**exchanged**
40:5

**Excited** 82:11

**excuse** 128:3

**excused**
230:16

**executive**
60:2

**exercise**
34:11 169:3
177:15

**exertion**
128:18
154:11

**exhibit** 85:10
85:14 85:17
85:20 85:24
86:2 86:5
86:8 86:9
86:13 86:20
87:6
91:24
92:3 92:4
92:4 92:6
145:22
145:24
146:3 146:7
146:10

147:3
149:11
151:9
151:11
166:11
166:21
167:9 174:3
174:7
174:21
174:22
174:23
174:25
175:8
175:21
179:24
180:1 180:5
180:14
180:21
181:18
182:3

**exist** 45:9

**exit** 129:18
130:1

**exiting**
138:12

**expect** 169:22

**expectation**
72:15 72:23
72:25 89:6

**expectations**
72:5

**expected**
46:15
85:1 91:6
91:7

**experience**
78:22
150:14
197:20

**expert** 143:18

**explain** 91:10
104:2 104:8
207:21
210:23

**explained**
128:23
129:2
130:13

**explanation**
133:10
134:3 142:5

**explanations**
130:10

**extent**
27:20 114:2
114:7 191:8
221:14

**extra**
202:16
207:5

**ExxonMobil**
11:16

**eyes** 54:23

———————
F
———————

**F-5** 221:10
221:16
221:17
221:21

**fa** 106:8

**face** 124:7
124:7
207:10

**Facebook**
109:6
109:12

**facing**

93:19
128:14
148:19
161:17
162:16

**fact** 93:3
94:1
102:4
104:22
126:4
158:19

**factor** 93:14

**factors**
88:7 89:1

**facts** 39:22
101:25
104:17
106:10
116:17
226:15

**factual**
20:4 94:9

**failed** 18:8
18:8 20:18

**fair** 107:16
125:1 164:3

**fairly** 41:2
85:5 184:17

**Fairmont**
66:20

**fall** 68:23

**falling**
162:10
163:10
164:24

**familiar** 8:20

**family** 114:1

**faster**

72:16 88:11
98:1

**fear** 72:20

**federal** 29:12
188:1

**feel** 103:22
191:24

**feeling**
114:24

**fell** 51:20
76:12

**felon** 203:4

**felt** 215:6

**fence** 49:17
67:2 67:4
70:5 70:8
84:11 96:15
96:19
97:3 97:8
97:11 103:1

**field** 16:12
17:1
92:13 92:14
123:24

**figure**
31:15
121:19
141:10
217:9

**file** 212:5
212:16
215:25
221:15
221:21
224:3 224:6
224:18
224:19

**filed** 111:4

219:5 219:7

**files**
211:19
211:25

**final** 63:25
64:22 65:20
66:2 66:4
66:9 179:20
185:10
185:14
211:14
215:4

**financial**
32:12

**finding** 69:14
121:13

**findings**
205:24

**finish**
179:8 229:6

**finished**
12:25 15:9

**fire** 59:11
59:11 59:12
62:10 88:24
133:19
133:20
156:20
156:21
161:13
176:5 176:5

**firearm**
68:2 68:3
68:7
68:10
72:6
72:22 72:23
83:4
97:13
98:2 100:19

101:2
190:25

**fired** 42:17
70:6
71:19 131:5
132:20
137:5
145:11
145:16
145:18
145:20
162:3 189:2

**firing** 96:3
98:2 133:21

**firm** 7:23
34:21

**first** 8:3
14:6 16:1
23:17 24:10
24:25 24:25
25:3 40:1
40:2
40:14 43:14
75:19
100:22
106:23
107:18
131:3
132:18
132:20
135:8
135:13
135:13
137:6
137:14
137:22
145:11
145:16
145:18
148:11
148:15

149:6 153:6
167:13
211:7
219:11
222:14

**fist** 20:6

**five** 17:14
27:18 27:21
62:19 71:22
138:3
138:11
151:20
193:6
193:12
194:7 194:9
194:10
194:13
194:15
194:17
194:18
194:21
195:13
195:15
227:3

**fixed** 78:4

**flailing**
177:11

**flash**
161:14
161:15
162:14
165:10
165:12
166:4
178:16
178:18
183:9
183:24
184:18

**flashes**

177:18

**flight** 144:16

**flopping**
169:25

**Floyd** 211:4

**fluctuated**
26:17

**fluctuates**
30:13 30:16

**focused** 24:13

**folks** 116:12

**force** 15:19
16:2 16:7
18:7
18:12 18:17
18:18
20:2 20:5
20:13
21:4
21:22 21:25
22:7
23:15 23:16
28:16 28:20
28:24
29:1
29:10 29:16
37:5 37:9
45:7 45:8
45:11 45:17
45:20 45:25
45:25
74:8
74:10
76:6
78:22
84:3
91:17 101:9
123:5
132:13
185:25

**forced** 222:24

**forces**
28:17 28:23

**foregoing**
230:18

**foremost**
211:7

**forever**
61:9 135:16

**forgot** 85:12

**form** 23:7
43:17
45:1
46:19
54:5
54:12
55:5
55:16 56:12
59:8 65:2
65:10 65:24
66:6 71:7
72:8
72:12
73:5
87:11
88:3
89:16 89:25
91:12 95:20
97:18 98:17
98:22
99:4
99:10 99:20
99:25 100:9
100:23
101:11
101:22
102:9
102:10
103:7

103:12
104:5
104:12
105:2
105:14
106:16
106:17
121:5 130:7
131:13
132:1 134:9
134:25
136:13
138:1
138:15
147:15
148:16
149:2 149:7
149:24
156:25
157:23
158:1 166:8
167:17
167:25
168:7
170:22
171:12
171:21
212:9
221:11
221:18
221:24
222:2
226:18

**formal**
38:12
44:9
46:14 46:22
52:2 58:5

**formally**
40:24 53:16
53:17 61:22

**forms** 37:5

65:6 79:13

**forth** 26:6
127:11
213:24
218:23

**Forty-four**
146:2

**forward**
95:3 95:4
209:5

**frame** 92:25
92:25 93:15
93:15
139:25
140:1
140:12
140:12
140:15
140:15
143:3 143:3
159:15
159:15
163:1 163:2
163:9
163:10
164:19
164:20
171:17
171:17
172:13
172:19

**frames** 165:19

**freeze** 172:22

**fresher** 148:7

**Friday** 7:4
222:21

**friends** 47:23
47:24

**friendship**

15:5

**front** 66:23
70:2 70:3
93:8
96:12 129:8
129:14
129:15
130:23
131:2 131:4
132:18
133:3
154:25
179:3

**full** 180:17

**function** 37:7

**future** 103:25

————————
G
————————

**game** 97:21

**general** 37:22

**generally**
78:1 199:17

**gentleman's**
229:15

**gets** 89:3
89:8 197:13

**getting** 60:19
106:12

**Giles** 7:18
7:18 23:7
43:17
45:1
46:19
54:5
54:12
55:5
55:16 56:12
59:8 65:2
65:10 65:24

66:6 71:7
72:8
72:12
73:5
76:22
77:1
86:22 87:11
88:3
89:16 89:25
91:12 95:20
97:18 98:17
98:22
99:4
99:10 99:20
99:25 100:9
100:23
101:11
101:16
101:22
102:9 103:7
103:12
104:5
104:12
105:2
105:14
105:17
106:16
106:25
107:3 121:5
130:7
131:13
132:1 134:9
134:25
136:13
138:1
138:15
146:12
147:15
148:16
149:2 149:7
156:25
157:16
157:23

158:1 158:3
158:6 166:8
167:17
167:25
168:7
170:22
171:12
174:5
175:12
212:9
212:20
212:23
212:25
217:16
217:19
226:18
228:25
229:11
229:12
229:13
229:13
229:18
229:18
229:23
230:5 230:7
230:10

**girlfriend**
114:6

**given** 34:14
35:9
73:25
74:1
97:22 98:14
104:22
197:2 197:4
208:22
228:19
228:20

**giving** 9:21
61:5
73:14 102:4
127:11

146:22

**gladly** 171:22

**glance** 68:4

**goals** 27:7

**gone** 26:6
58:19 71:20
151:1
187:25
187:25
188:1
205:23
211:15
213:24
218:22

**gonna** 44:12
44:12

**gotcha** 22:8
31:14 41:20
44:3 50:9
50:22
150:24
199:20
222:3

**gotten**
55:13 58:17
58:20
70:4 112:25
117:24
190:24
195:11
208:14
227:6

**government**
22:11
58:6
62:15 223:6

**governs** 22:12
205:4

**grab** 179:24

grade 11:19
  34:17

graduate 12:3
  12:21 14:13

graduated
  12:9
  12:23 13:12
  13:13
  14:9 14:14

graduation
  81:24

grainy 149:19

grand 197:1
  217:11
  218:6
  218:20

great 94:6

grew 11:3
  11:4

ground
  73:18
  117:12
  117:15
  117:18
  117:19
  117:22
  118:3 118:8
  128:14
  138:13
  139:14
  154:25
  158:15
  162:5
  163:11
  168:13
  173:25
  175:3
  176:11
  176:19
  176:25

177:1 177:6

group 30:14

guess 19:20
  22:1 22:5
  22:13 24:25
  26:24 28:19
  36:10 37:15
  38:20
  44:4
  44:21
  46:2 46:7
  50:23 58:16
  60:19 71:11
  77:25
  81:5
  81:16 81:22
  85:19 104:3
  116:20
  134:1
  134:21
  138:23
  148:9
  151:25

guessing
  192:24

guidance
  73:13 98:14

guide 103:23

guilty 41:3

Gulf 28:25
  29:16

gun 49:6
  49:12 49:12
  49:14 66:23
  66:25
  67:4
  67:13 67:19
  67:20 67:20
  67:22 67:23
  68:1 68:4

68:5 68:6
68:6 70:3
70:5 70:6
71:6
71:17 71:18
71:25
74:1 83:1
83:3 83:4
83:8
87:21 88:10
88:12 88:23
89:4 89:9
93:9
94:24 96:13
97:5
97:22 100:3
100:7
100:16
103:3
103:10
104:23
106:2
106:12
133:19
134:12
135:2 135:5
135:8
138:12
156:20
156:21
161:13
171:11
176:5 176:5
177:21
177:24
184:16
202:22
202:25
203:5 203:6
203:12
203:21
204:1

204:19

guns 49:6
  69:25 96:11
  102:20
  106:5

gunshots
  139:5

guy 120:2
  120:21

guys 15:5
  81:15
  120:23
  140:19
  215:25

guy's 158:3
  158:6

———————

H

ha 223:2

Hagood 7:12

hair 169:25

half 74:2

hall 7:11
  8:12

hallway
  122:24
  123:4

Hamilton
  10:10 127:1
  127:2

hand 49:12
  49:13 49:15
  66:25 67:14
  70:6
  71:19
  72:6
  72:24 83:3

87:22 88:10
88:12 88:20
88:23
89:5
89:10 93:10
93:20 94:25
96:13
101:20
133:18
222:24

**handle**
81:18 91:11
98:10 98:13
98:14

**handled** 75:13
90:10 90:21
91:3
91:18 97:16
98:20
99:7 106:14
106:14

**handles**
150:16
150:21

**handling** 55:1

**hands**
131:12
131:21
131:24
134:19
134:24
137:3
140:16
141:6
141:22
142:12
143:23
147:10
147:21
148:11
162:5

177:10
179:16

**hang** 15:7

**hap** 43:10

**happen** 72:3
75:15 75:16
75:18

**happened**
19:12 19:20
49:24
50:3
50:10 66:13
69:8
69:14 69:15
69:19 71:13
72:3
74:13 74:18
74:19 77:24
84:24
85:5
102:1
107:20
107:25
112:23
124:18
127:8
128:22
132:7 132:8
132:11
132:22
136:14
136:17
136:19
137:17
142:24

**happens** 101:3
133:21
153:17

**harassing**
35:17 35:18

**hard** 119:25
120:8
120:14
120:18
121:1
149:15
161:21
190:1 190:3
190:14

**Harding**
216:10
216:12
216:13
217:7

**harm** 103:11
103:18
103:18
191:25

**having**
54:20 72:22
86:17 93:12
201:11
206:2
208:10
211:12

**head** 59:25
59:25
60:4 60:5
60:15 60:16
167:24
168:5
169:21
169:22
170:7
170:17
173:3
177:11
182:18
182:20
182:21
184:2

184:15
184:19

**health** 82:9

**hear** 75:5
139:4 139:5
151:23
154:10
154:11
180:2
188:17
188:23
217:21
229:14

**heard** 55:12

**hearing** 125:5
125:23
139:2

**He'd** 158:4

**help** 107:1
230:1
230:11

**helped** 43:2

**helping** 27:10

**helps** 163:4
171:20

**hereinafter**
8:4

**here's**
43:21 132:7
132:8
132:11

**he's** 7:24
87:1
95:11
96:7 100:12
119:11
119:11
119:25

120:1 120:8
153:1 179:5
179:12
211:14
211:14
230:1

**hey** 43:21
73:18 76:12
76:22
141:21
197:18
217:16
227:7

**hi** 207:24

**hierarchy**
25:4

**high** 11:21
11:24 11:25
12:10 34:10
194:11

**highlight**
146:5 146:8

**Highway** 20:17

**hindsight**
92:16

**hindsight's**
90:2

**hip** 203:22

**hir** 209:17

**hire** 30:14
30:15

**hired**
143:19
209:21

**hiring** 143:17
174:14
209:17
209:18

209:19
210:15

**history** 30:2

**hit** 20:7 67:7
67:8
131:3
132:23
218:22
227:2

**hold** 179:24

**holiday**
125:15

**home** 125:2

**homeowner**
66:22

**homicide** 36:1

**homicides**
35:17 35:24

**honestly**
20:20 116:4
141:11

**honorable**
208:4 208:5
208:10
208:25
209:6 210:5
210:19
221:25
222:9

**honors** 14:13

**hospice** 36:5

**hour** 76:23
108:2 108:7
112:15
112:16

**hours** 49:24
82:3 113:12
113:14

123:18
212:21

**house** 96:12
112:14

**Houston**
11:6 11:8
12:1 12:2
12:12 34:23
188:1
216:13

**hundred**
206:20

**hurry** 206:4

**hypothetical**
101:24
102:4
102:18
102:18

**hypotheticall
y** 208:17

———————
I
———————

**idea** 15:9
15:11
84:8 110:22
111:5
164:25

**identical**
118:16

**identificatio
n** 87:7
147:4
175:22

**identifies**
121:10

**identify** 7:14
44:7
45:23
46:5 133:16

175:14

**identifying**
15:23 93:2

**ignore** 137:16

**I'll** 44:13
44:13 71:11
90:18 91:15
93:18
102:15
102:15
102:15
102:15
102:16
134:1 157:5
157:18
157:18
158:21
158:22
158:23
159:20
163:4
167:20
168:22
168:23
170:2 170:2
171:17
171:22
171:22
220:22
222:11
223:22
229:2
229:21

**I'm** 8:13
15:12 19:19
20:22
41:2 43:1
44:3
44:25
45:2 46:5
46:9

| | | | |
|---|---|---|---|
| 46:10 | 164:11 | 223:23 | 42:13 66:17 |
| 55:6 55:7 | 164:13 | 224:5 | 75:2 |
| 55:10 55:11 | 166:9 | 226:19 | 75:12 75:22 |
| 55:11 56:10 | 166:14 | 226:20 | 82:16 |
| 60:9 | 166:22 | 227:23 | 84:7 |
| 60:19 | 166:23 | 227:23 | 90:24 |
| 72:2 | 167:2 167:5 | **image** 150:9 | 91:3 |
| 75:17 84:13 | 167:18 | 170:16 | 94:17 96:23 |
| 85:9 | 168:19 | 179:18 | 100:4 |
| 85:10 85:24 | 169:16 | **immediate** | 107:12 |
| 86:12 87:14 | 169:16 | 114:15 | 174:15 |
| 94:12 94:13 | 170:1 | **immediately** | 223:2 |
| 98:6 98:7 | 170:19 | 13:8 | **incidents** |
| 102:3 107:1 | 171:16 | 96:10 99:17 | 37:9 |
| 107:12 | 175:7 175:8 | **imminent** | 75:21 77:14 |
| 112:22 | 175:25 | 72:21 89:10 | 77:23 91:9 |
| 115:6 122:4 | 176:20 | 103:18 | **include** 32:2 |
| 135:6 | 176:22 | 103:18 | **includes** |
| 141:11 | 176:22 | 191:25 | 31:10 |
| 142:20 | 177:8 178:3 | **immobile** 36:6 | **including** |
| 144:15 | 179:6 179:7 | **impaired** | 59:17 65:20 |
| 146:22 | 180:1 | 15:21 15:23 | 65:21 |
| 146:22 | 180:19 | **impasse** 142:6 | **inconsistent** |
| 146:23 | 181:3 181:8 | **implemented** | 146:19 |
| 148:22 | 181:10 | 195:4 | **incorporated** |
| 148:24 | 182:16 | **important** | 195:5 |
| 151:14 | 188:18 | 63:19 81:10 | **incumbent** |
| 151:25 | 192:21 | 137:13 | 210:2 |
| 153:21 | 193:18 | 211:21 | **indefinite** |
| 153:24 | 194:5 | **impose** 222:19 | 58:11 64:5 |
| 154:10 | 194:11 | 223:18 | **indefinitely** |
| 155:4 | 194:12 | 223:25 | 59:13 185:4 |
| 155:25 | 195:1 | **incentive** | 186:8 |
| 156:9 157:3 | 197:19 | 210:21 | 201:11 |
| 157:8 | 199:14 | **incidence** | 202:4 |
| 157:15 | 201:10 | 75:25 | 208:14 |
| 161:3 | 205:7 205:9 | **incident** 10:7 | 210:25 |
| 161:23 | 206:20 | 41:21 42:12 | **independent** |
| 161:23 | 218:21 | | 13:20 70:23 |
| 162:18 | 219:9 | | |
| 162:24 | 220:16 | | |
| 163:1 | 220:23 | | |
| 164:11 | 221:19 | | |

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

189:5

**indicate**
87:20

**indicated**
71:5 211:25
212:5
212:16

**indicted**
45:10 202:7
215:15
216:14
216:19
218:25
219:23

**indictment**
216:4

**individ**
134:23

**individual**
49:11 87:24
89:4 134:19
134:23
135:23

**individuals**
88:19 127:5
188:14

**Indonesia**
11:10 11:18

**influencing**
187:13

**inform**
77:19 78:20
93:12 99:13
222:14

**informal**
64:18 65:14

**information**
55:14 77:17

102:12
105:19
216:15
229:20

**informational**
46:12

**informed**
77:21 115:1
124:2
132:12
137:2 220:6

**initial**
116:11
187:14
191:14

**initially**
130:22
217:5

**initiate**
185:9

**injuries** 79:1
191:7

**injury**
72:21 89:11
97:13

**In-service**
80:10

**inside**
200:8
200:10
200:18
201:22
201:23
202:11
202:15
204:5 207:5
213:13
214:22

**Instagram**

109:6
109:12

**instances**
122:2

**instruction**
74:1

**instructor**
76:15

**intended**
222:15

**intentionally**
134:7

**interact**
214:22

**interacting**
214:9 215:7

**interaction**
47:18
207:13
207:17

**interactions**
50:24
119:23
123:1
207:16

**interest**
151:14

**interim** 60:13
60:21 60:23
61:2 61:3
77:12 78:16
107:8
193:14

**internal** 10:5
10:8
36:19
37:1 37:9
37:12

38:4 39:1
39:7
39:23 42:23
42:25
43:7
43:12 43:13
44:6
44:10
46:3
46:23
47:1 47:5
47:10 48:18
49:20 68:23
71:3 78:2
196:18
199:22
200:15
205:21

**internally**
143:14

**intervention**
82:9

**interview**
16:25
42:1 42:2
52:13 71:1

**interviewed**
192:5

**interviewing**
16:13

**intoxicated**
16:4 16:6
17:2

**intoxication**
16:15

**intoxilyzer**
16:21

**inves** 37:7

**investiga**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

205:21

**investigate**
35:16
121:10

**investigating**
142:9
200:14

**investigation**
10:11
16:8
16:11 16:23
40:17 41:24
42:4 42:5
42:8
42:22
43:1
68:12 68:21
68:25 70:15
90:20 113:2
120:11
125:6
125:23
125:24
133:13
178:9
184:23
187:11
187:12
187:13
187:14
196:17
196:19
196:20
196:24
196:25
196:25
197:7
200:12
200:13
200:15
200:16
201:7 201:9

202:1
205:21
206:7 207:3
207:6
210:13
212:3
214:25
215:5
215:10
215:12
223:20

**investigation
s** 27:25
28:1 32:7
32:19 32:24
33:10 33:15
33:20
35:5 37:3
37:8 42:7
47:4
48:19 68:22
74:15 120:1
121:16
126:25
196:15

**investigative**
28:6
32:10 55:23

**investigator**
43:1

**investigators**
28:2
33:14 33:19
35:10
38:5 38:7
112:19
121:6
125:11
150:3
174:19

**involuntary**

58:11 64:6

**involve** 43:4

**involved**
22:22
39:6
48:20 48:23
51:25 68:19
75:1 104:23
112:6
114:14
115:5
191:10
195:6
195:10
195:21
196:23
198:15
212:6

**involving**
42:14 66:13
81:16 82:16

**iron** 67:2
67:4

**isn't** 93:23

**isolated**
166:13

**issue** 224:10

**issues**
54:14 54:20
54:21 55:12

**I've** 17:20
71:22
106:18
138:19
138:25
229:25

———————

J

**Jackson** 56:23

**jail** 17:3

**Jan** 205:14

**January** 7:4
7:10
12:11 21:13
21:18 57:25
61:17 61:25
62:2 66:8
193:24
194:1 194:2
200:1 200:4
204:22
205:14
205:15
206:15
206:23
207:14
213:9
215:19
216:19
217:11
219:1 219:2
223:2
223:24

**Jerry** 57:10
57:15

**job** 26:1 29:5
78:5

**jobs** 202:16
207:5

**joining** 7:23

**Joshua** 7:2
7:8 8:3
230:14

**ju** 55:15

**judge** 92:22

**judgment**
225:25
226:4

July 26:14
31:19
51:7
51:14 56:14
145:2 148:6
200:21
204:23
204:24
205:15
207:14
222:20
223:11
223:24
224:21
224:23
224:23

jump 35:2

jumped
96:15
102:19
103:1 189:1

June 21:7
33:8 35:7
52:25
203:18

jury 197:1
207:21
207:22
217:11
218:7
218:20

justice 12:14

justified
90:6
90:11 101:8
102:7 132:5
134:22
135:14
136:12
179:7
186:20

188:11
194:24

juvenile
32:10 82:25

juveniles
32:10

———————
        K
———————
K-9 32:2

K-A 40:12

Kazz 40:11

K-A-Z-Z 40:11

Kevin 57:2
57:3 57:8

key 137:13

keyboard
85:19

kicked 20:8

killing
113:10

kit 106:6

knees
131:12
131:21
131:24
134:20
134:24
137:4
140:17
141:6
141:22
142:12
143:23
147:11
147:21
148:11
162:5
179:16

knew 41:19
113:1
117:16
125:13
127:11
215:22

knocking 93:9

knowledge
93:13
150:12
197:18
217:15
220:12

known 33:11
35:15 79:13

———————
        L
———————
labeled
169:11
169:21
184:19

lady's 36:5

laid 186:9

large 27:20

largest 31:23
31:25

Larry 7:22

last 19:14
26:14 32:20
53:22 101:2
165:19
171:16
196:7
201:13
201:18
209:10
215:1

late 19:17
67:17 219:1

219:1

later 22:21
49:20
60:3
212:4
222:11

latitude
73:14

law 29:12
29:13
45:7 52:7
52:16
58:4
58:25 60:17
62:14
64:8
64:12
89:8
98:24 186:4
207:23
211:5
211:18

lawful 186:20

laws 201:17
206:2

lawsuit
8:14 8:16
8:17 8:20
18:24
19:5
19:12
20:1
111:4
111:10
219:4
219:11
219:14
219:25

lawsuits
17:20

layer 43:14

laying
  124:5 186:3

lead 22:5
  42:25

leading
  102:12
  105:22

learn 77:22
  216:15

learned
  104:10

least 17:16
  17:19 28:10
  29:4 30:2
  39:24 49:12
  49:23
  50:5
  52:17 54:22
  55:22 58:20
  60:13
  63:7
  72:19
  78:4
  87:18
  93:8 94:5
  95:10
  105:21
  111:1 113:1
  119:15
  125:13
  130:24
  130:25
  131:15
  136:1
  195:25
  198:16

leave 9:11
  30:14 53:15
  123:15

191:13
195:12
195:25
198:10
198:14
198:14
198:18
199:25
200:4
207:19

leaves 228:13

leaving 137:6
  137:13
  203:10
  215:11
  222:17

led 54:7 56:4

left-hand
  163:10

legal 197:23

legislative
  209:10

legitimate
  133:10
  133:14
  134:18

lengthy
  218:18

less 38:12
  104:24
  194:7
  218:13
  218:15

lesser 65:6
  224:10

let's 14:21
  15:12 27:13
  30:19 35:2

37:11
39:5
50:22 57:21
71:11
72:4 75:4
75:18 77:25
77:25 81:22
112:2
127:19
127:25
136:25
136:25
136:25
138:23
139:17
163:4
173:15
173:15
174:3 193:3
193:3
220:22
223:1 223:1
225:8

letter
  186:3
  191:13
  200:2
  222:12

letters
  52:4 64:10

level 43:14
  175:5

lieu 41:8

lieutenant
  25:15 36:23
  37:21 37:25
  38:21 47:11
  48:11 48:12
  51:2
  74:12
  122:23

126:23
126:24
127:1
141:13
187:3

lieutenants
  25:9
  25:18 25:22
  25:23 26:13
  26:25
  27:4 31:17

light 50:3
  69:6 161:10
  165:5 175:6
  181:3

lighter 165:6
  168:15
  183:2

lighter-
  colored
  169:18

lighting
  162:19

lights 95:9
  96:7 143:2

likely 191:6

limitations
  94:7

limited
  105:19
  203:4

line 23:17
  24:10
  25:1 25:3

lines 46:1
  118:1 146:6
  147:6
  147:24

list 22:19
  22:25 34:17
  109:25
Listened
  112:17
litigation
  218:11
little 11:2
  12:25 13:18
  14:21
  20:3 20:4
  27:8
  27:13 37:11
  51:24 52:10
  66:12
  75:4
  81:23
  84:4 95:3
  95:4 118:21
  128:24
  129:1 152:1
  157:5 163:7
  173:10
  196:5 196:8
  217:19
  220:22
lived 11:6
  13:21
living
  227:4
  227:18
loading 93:17
local 22:11
  29:12
  58:6
  62:15 223:5
located
  7:10
  49:11 66:24
  70:4

long 9:4
  11:11
  14:8
  15:14
  21:6 33:7
  35:5
  36:20
  51:6
  52:23 57:22
  62:12
  63:6 72:1
  76:25 83:11
  91:13
  113:11
  175:14
  193:10
  193:19
  200:9
  200:17
  216:3 217:3
  217:6 218:5
  218:10
  221:13
  222:12
longer
  76:23
  185:12
  201:22
lost 60:10
lot 36:7 38:6
  47:6
  55:15 63:13
  80:23
  115:18
  130:10
  135:6 135:7
  210:1
  220:20
lots 120:23
loved 13:22
lower 129:9

155:18
155:20
160:24
lunch 63:7
  144:2
  144:12
luxury 92:16

———————

M

machines 36:7
mad 207:8
  207:9
main 55:3
  80:16
major 12:13
  32:6
maker 64:1
  66:2 66:4
  66:9
manager 9:3
managing
  54:22 55:4
mandatory
  82:6
manpower
  27:20
March 13:11
  13:16
Mark 7:12 8:1
marked
  85:10 86:12
  96:6 96:7
  167:23
  175:8
  175:21
  180:21
marker 158:22

168:2
Marshals
  29:19
Martin
  42:14 42:17
mates 47:24
math 31:15
matter 7:9
  227:1
Mauricio
  10:13
may 21:7 33:8
  35:7 38:5
  38:10 43:19
  49:24 55:13
  79:6 79:7
  79:17
  81:2 198:24
  217:19
maybe 25:12
  49:2 50:2
  70:8
  76:12 80:19
  80:21
  82:8
  86:19
  98:4 98:5
  114:19
  118:21
  122:12
  122:18
  123:3
  154:25
  155:9 166:5
  181:3
mayor 54:14
  54:20 54:23
  55:7
  55:10
  56:4 56:8

59:11 60:2

**mayor's**
55:8 57:20

**McCullough**
11:25

**McGregor**
38:23

**mean** 25:17
37:13 39:20
44:10 44:13
44:14 44:16
45:4 46:2
46:6
47:24
48:7
48:13 55:15
56:7 61:8
63:14 63:16
67:3
73:22 73:23
73:23 77:22
82:4
87:15
89:6 90:2
90:22 90:24
96:24
97:2 97:3
97:21 97:21
101:23
102:13
104:6 105:8
106:9
107:25
119:8
119:17
119:19
119:20
120:16
121:9
123:17
127:15

127:16
131:11
133:9
133:21
133:25
134:14
135:1
135:15
137:10
149:19
161:18
165:24
168:15
168:17
169:12
174:19
191:22
193:17
207:22
208:13
208:16
210:10
210:23
215:13

**means** 61:9

**media** 91:21
109:3 109:5
109:9

**medications**
9:19

**mediocre**
227:2

**meet** 14:23
27:4 76:4
79:24
125:10

**meeting**
132:14
147:9
147:20
148:6

148:12
149:4

**meets** 44:19

**member**
23:15
39:7 185:12

**members** 29:20

**memo** 198:10
198:12
198:19
199:9
199:21

**memory**
145:5 148:6
219:8

**mental** 82:9

**mention**
142:15

**mentioned**
187:19
206:2
210:24
230:2

**mere** 101:19

**message**
84:5 133:18

**messages**
108:23
109:13
111:11
190:8

**Messenger**
109:12

**met** 8:12
62:13
198:17
200:7

**microphone**

217:20

**middle** 93:6
106:7
215:17

**midline** 129:6

**Mike** 52:22
56:23

**mind** 41:22
67:17 82:10
84:21 84:21
175:12

**mine** 174:19

**minimum**
195:12

**minor** 24:18

**minutes** 42:19
77:1
108:7
151:15
151:20
161:24
163:5
212:25
225:9

**Mis** 152:14

**misconduct**
62:16 62:17
62:18
63:1
186:2 187:4
223:9

**misleading**
155:22

**misspoke** 76:2

**mo** 86:20

**modified**
174:10

moment
  85:21
  86:6 92:1
  145:25
  151:12
  153:1
  153:12
  153:18
  154:9 165:9
Monday 92:17
monies 208:19
month 123:3
months
  14:11 48:12
  53:6
  61:19
  62:3 188:14
  193:12
  193:13
  212:4
  212:14
  223:7
  223:18
morning
  8:10 69:6
  92:17
  144:19
  191:12
  192:2
mother 36:5
  36:8 36:9
motion
  92:20
  93:1 93:2
  93:14 94:17
  177:9
mouse 172:4
  182:5
move 15:17

27:10 86:20
146:10
161:23
164:4 171:6
173:9
173:12
179:20
moved 24:4
  128:1 160:7
  175:10
  195:13
movement
  171:3
moves 176:17
movie 179:15
moving
  44:23 164:6
  164:17
  169:8
  169:18
  176:6 176:8
  176:11
  177:10
  177:11
  178:5 181:8
  181:9
  181:16
  181:20
  181:21
  181:23
  181:24
multiple
  158:25
mute 87:1
  146:11
muzzle 161:14
  161:15
  161:17
  162:14
  162:16

165:10
165:12
166:4
177:18
178:16
178:18
183:9
183:24
184:18
Myrtle 7:10
  7:11 8:22
myself 53:6
  126:8
  126:18
  141:13
  187:5

_____

N

Naegeli 7:13
narcotics
  28:8
  29:20 32:12
  113:7 117:3
  118:21
narrating
  141:1
narrowly
  24:13
NASA 187:25
Nathan 145:10
  147:10
  147:20
  148:10
  148:14
  149:5
Nathan's
  167:23
  173:3 184:2
  184:10
  184:19

184:19
national
  77:13 85:7
nature
  18:16 35:20
  116:14
navigate
  73:14
nece 79:7
necessarily
  43:12 130:9
  135:12
necessitate
  79:7
news 77:13
  85:7
ni 194:1
night 14:19
  15:13 39:19
  47:12 47:13
  47:13
  50:3
  68:14 69:12
  93:7
  106:7
  107:22
  113:12
  113:22
  115:24
  124:12
  124:22
  124:23
  124:25
  188:20
nights
  48:12 48:13
  48:14
nighttime
  51:4

nin 13:16

nine 26:14
  31:18 31:19
  44:20 48:12
  48:24

Ninety-four
  12:7

nobody
  58:17 58:24
  59:16
  218:22

nominated
  60:1

normally
  16:25 108:4
  199:12

Norman 7:18
  146:11
  157:25
  229:21

notes 126:12

nothing 46:14
  46:22 48:16
  79:20
  106:22
  160:4 209:8
  212:5
  212:15

notice
  78:21 79:11

noticed 78:3

notification
  109:25

notified
  110:1 114:1

November
  35:12 36:18
  50:17 53:19

53:25
54:1
56:15 57:23
57:24 61:17
62:23 74:22
107:6
193:20
216:19
216:22
217:25
219:19

─────────

O

Ob 212:9

obey 49:15

object 23:7
  43:17
  45:1 106:16
  106:17
  106:25
  107:3 145:3
  146:12
  175:13
  176:8
  176:24
  177:1
  177:23
  183:10
  212:9

objection
  43:18 46:19
  54:5
  54:12
  55:5
  55:16 56:12
  59:8 65:2
  65:10 65:24
  66:6 71:7
  72:8
  72:12 73:5

86:21 86:22
87:3
87:11
88:3
89:16 89:25
91:12 95:20
97:18 98:17
98:22
99:4
99:10 99:20
99:25 100:9
100:23
101:11
101:16
101:22
102:9 102:9
103:7
103:12
104:5
104:12
105:2
105:14
105:17
121:5 130:7
131:13
132:1 134:9
134:25
136:13
138:1
138:15
146:11
146:21
146:25
147:15
148:16
149:2 149:7
156:25
157:16
157:23
157:25
158:1 166:8
167:17
167:25

168:7
170:22
171:12
175:10
212:8
226:18

objections
  146:21

obs 100:2

observations
  120:7

obtaining
  62:11

obviously
  30:13 31:22
  48:7

occasion
  14:23 122:8

Occasionally
  108:24

occasions
  122:6

occur
  219:17
  223:7
  226:22
  228:9
  228:10

occurred
  62:23 81:16
  84:7 84:9
  84:19
  85:2
  92:15 104:3
  126:2
  127:20
  130:13
  131:17
  132:22

133:2
142:13
145:1 145:6
145:7
149:16
192:19
192:23
193:7
193:15
194:3
194:16
206:15
220:17
223:2

**occurring**
62:17 62:18
151:6 166:3
166:7
178:22

**occurs** 73:17

**October** 9:6
9:7 9:13
13:25 21:20
22:7 29:4
34:4
36:21 47:12
47:15 57:13
219:8
219:21
220:3

**off-duty** 40:2
40:6

**offenders**
28:25 29:16

**offense** 40:21
45:11
222:20

**offenses** 29:7

**offer** 17:3
186:24

187:7

**offering**
228:21

**Offi** 186:12

**office** 7:23
38:18 44:11
46:3
46:15 46:17
77:11
78:5 78:6
78:13 143:1
187:17
196:22
199:11
201:10
202:2 206:1
206:8
206:16
210:11
215:25
217:8
219:17

**officer**
7:20
14:19 14:23
15:14 15:25
16:5 19:4
19:8
21:25 25:18
29:24 31:16
38:1 39:6
40:2 40:6
40:8
41:11 41:15
41:16 42:14
42:17
43:5
44:22 47:15
49:8
49:11 49:13
49:15 50:24

55:25 58:16
59:1 59:6
59:11 59:12
59:13 59:19
62:10 62:25
66:14 66:24
67:6 70:6
71:6
71:13 71:16
71:24
72:5 72:7
72:24
73:2 73:3
73:23
74:7 75:1
75:7
75:12
76:1
76:11
79:1
80:20
83:1
83:11 84:12
86:14
88:9
88:13 88:24
89:3 89:7
89:8
89:13 90:10
90:12 90:13
90:17 90:20
91:2 91:9
92:19 92:19
93:10
95:6
95:16
97:4
97:12 97:15
98:3
98:13
99:7
99:18 100:3
100:7

100:17
100:21
101:7
101:21
102:6
102:13
102:24
103:2 103:2
103:3 103:4
103:5
103:11
103:17
103:23
104:23
106:14
107:13
112:5 113:8
113:9
113:15
113:21
114:10
115:5 116:2
116:18
117:6
118:15
128:12
128:13
130:18
130:19
131:11
131:24
133:15
134:7
134:19
134:23
135:23
136:4 136:9
137:1 137:4
138:12
142:16
143:21
145:10
148:18

| | | | |
|---|---|---|---|
| 152:5 | 200:17 | 20:19 23:21 | 195:10 |
| 152:14 | 201:13 | 23:23 24:11 | 195:21 |
| 152:19 | 202:18 | 24:12 24:20 | **Officers** |
| 153:20 | 202:25 | 24:21 | 202:18 |
| 154:15 | 203:5 204:2 | 25:8 | **offices** |
| 154:23 | 204:5 | 25:14 27:22 | 210:10 |
| 155:3 157:7 | 205:12 | 28:13 | **officially** |
| 158:11 | 205:15 | 29:5 30:4 | 53:21 |
| 158:24 | 205:17 | 37:15 | **oh** 12:25 35:1 |
| 160:5 160:6 | 206:24 | 43:9 | 61:7 |
| 176:6 | 208:22 | 44:17 45:16 | 68:15 |
| 176:18 | 209:21 | 45:19 45:24 | 87:2 |
| 176:24 | 210:18 | 64:9 | 87:19 99:19 |
| 178:23 | 210:25 | 66:18 72:18 | 146:22 |
| 179:11 | 211:10 | 73:18 | 158:23 |
| 179:17 | 211:23 | 76:5 76:5 | 163:7 |
| 184:24 | 213:11 | 77:20 | 167:11 |
| 185:2 186:7 | 218:1 | 78:4 | 181:10 |
| 186:12 | 218:25 | 79:12 | 182:2 187:2 |
| 186:16 | 221:6 221:9 | 80:2 | 187:2 230:3 |
| 186:18 | 223:19 | 80:15 | 230:8 |
| 186:25 | 223:25 | 81:8 | **okay** 8:16 |
| 188:3 188:6 | 225:18 | 81:17 81:17 | 8:22 9:2 |
| 188:13 | 225:20 | 81:24 | 9:4 9:7 9:9 |
| 188:25 | 225:21 | 82:7 | 9:19 9:25 |
| 189:1 | 225:23 | 88:18 91:18 | 10:8 |
| 190:25 | 226:5 | 98:9 122:19 | 10:15 10:15 |
| 191:13 | 226:17 | 135:20 | 10:19 10:21 |
| 191:19 | 227:2 | 187:7 197:2 | 10:23 |
| 192:3 192:8 | 228:15 | 197:17 | 11:2 |
| 192:8 194:2 | 228:25 | 202:20 | 11:11 11:13 |
| 194:20 | **officer-** | 209:19 | 11:15 |
| 195:5 195:7 | **involved** | 213:18 | 12:1 |
| 195:23 | 39:13 115:2 | 213:25 | 12:21 |
| 195:24 | 192:13 | 213:25 | 13:2 13:6 |
| 196:7 | 192:16 | 216:14 | 13:8 |
| 196:22 | 192:19 | 226:23 | 13:19 |
| 197:17 | 192:23 | 230:2 | 14:4 |
| 197:21 | 193:7 | **officer's** | 14:10 14:12 |
| 197:22 | 193:14 | 40:10 92:14 | 14:21 15:3 |
| 198:4 | 194:3 199:5 | 92:17 | |
| 199:23 | **officers** 16:7 | 114:14 | |
| 200:3 | | | |

| | | | |
|---|---|---|---|
| 15:12 15:14 | 50:4 50:7 | 86:17 86:24 | 113:25 |
| 15:14 15:17 | 50:9 | 88:1 | 114:3 |
| 16:10 16:22 | 50:13 50:19 | 88:16 88:18 | 114:13 |
| 17:10 17:15 | 50:19 50:22 | 89:1 91:1 | 115:4 115:7 |
| 18:16 18:19 | 51:1 51:6 | 92:6 | 115:21 |
| 18:21 19:11 | 51:10 51:12 | 94:13 94:20 | 116:14 |
| 19:16 19:18 | 51:15 52:10 | 95:5 96:1 | 119:23 |
| 20:3 | 52:23 | 96:5 | 121:22 |
| 20:21 20:23 | 53:7 | 96:18 96:21 | 121:25 |
| 21:2 21:2 | 53:12 53:18 | 97:1 | 122:1 |
| 21:11 21:16 | 53:23 54:16 | 99:16 99:23 | 122:11 |
| 21:19 21:24 | 54:24 | 100:6 | 122:13 |
| 22:4 22:8 | 56:3 | 100:15 | 123:1 123:8 |
| 23:1 24:6 | 56:11 56:20 | 100:20 | 124:14 |
| 24:8 25:4 | 56:25 | 101:6 | 124:20 |
| 25:7 | 57:5 | 101:14 | 125:4 |
| 25:21 | 57:21 59:15 | 102:15 | 125:14 |
| 26:5 | 59:19 60:19 | 102:17 | 125:17 |
| 26:16 26:22 | 61:21 | 102:20 | 125:21 |
| 29:2 | 62:4 62:9 | 102:21 | 126:12 |
| 29:11 29:15 | 64:3 | 102:23 | 127:4 128:2 |
| 29:18 30:12 | 64:22 | 102:24 | 128:10 |
| 30:21 31:14 | 65:1 65:6 | 102:25 | 129:1 129:4 |
| 31:14 32:14 | 65:13 65:23 | 103:10 | 129:7 |
| 33:2 33:5 | 66:16 67:24 | 103:16 | 129:13 |
| 35:1 35:3 | 68:16 | 103:21 | 129:17 |
| 35:11 35:14 | 69:4 | 105:12 | 129:20 |
| 35:24 | 69:18 70:11 | 107:15 | 129:24 |
| 36:3 | 70:17 70:25 | 107:18 | 130:3 |
| 36:12 36:17 | 74:19 74:24 | 107:24 | 130:12 |
| 36:25 | 75:4 75:9 | 108:3 | 131:20 |
| 39:4 39:9 | 76:2 76:8 | 108:15 | 136:25 |
| 39:16 40:16 | 76:21 | 108:20 | 137:11 |
| 41:1 | 78:6 78:9 | 108:23 | 137:15 |
| 41:13 41:16 | 81:15 81:22 | 109:5 109:8 | 137:18 |
| 41:19 41:20 | 82:15 | 109:22 | 138:10 |
| 42:6 | 83:9 | 110:6 | 138:23 |
| 42:10 46:14 | 83:14 84:15 | 110:18 | 139:25 |
| 46:25 | 84:16 84:19 | 111:23 | 140:8 |
| 47:9 | 84:24 | 112:1 | 140:14 |
| 48:18 48:22 | 85:5 86:1 | 112:11 | 141:4 141:8 |
| 49:1 49:3 | 86:8 | 112:13 | 142:4 |
| 49:19 49:22 | 86:10 86:16 | 112:21 | 142:15 |

| | | | |
|---|---|---|---|
| 143:7 | 158:5 | 170:12 | 182:23 |
| 143:10 | 158:13 | 170:21 | 183:5 183:8 |
| 143:16 | 159:3 159:6 | 171:3 171:9 | 183:10 |
| 143:25 | 159:14 | 171:18 | 183:18 |
| 144:1 | 160:5 | 171:19 | 183:21 |
| 144:21 | 160:10 | 171:23 | 183:21 |
| 144:23 | 160:11 | 171:24 | 183:24 |
| 145:5 | 160:20 | 172:6 | 184:2 |
| 145:13 | 161:2 | 172:15 | 184:12 |
| 145:21 | 161:12 | 172:24 | 184:14 |
| 146:3 146:4 | 161:17 | 173:5 | 184:21 |
| 146:9 146:9 | 162:13 | 173:11 | 185:1 185:5 |
| 147:1 147:8 | 162:16 | 173:21 | 185:11 |
| 147:18 | 163:1 163:2 | 174:2 | 187:23 |
| 147:24 | 163:3 163:4 | 174:17 | 188:17 |
| 148:1 | 163:5 | 174:20 | 189:11 |
| 149:20 | 163:11 | 175:2 175:7 | 189:14 |
| 149:22 | 163:12 | 175:9 | 190:2 190:8 |
| 150:5 | 163:18 | 175:20 | 190:22 |
| 151:16 | 163:20 | 175:24 | 191:4 191:9 |
| 151:17 | 163:22 | 175:25 | 191:18 |
| 151:20 | 164:6 | 176:1 | 192:18 |
| 151:25 | 164:11 | 176:11 | 192:22 |
| 152:8 | 164:19 | 176:22 | 192:25 |
| 152:11 | 165:1 | 177:8 | 193:3 193:4 |
| 152:14 | 165:11 | 177:14 | 193:23 |
| 152:17 | 165:13 | 177:20 | 194:1 194:7 |
| 152:21 | 165:16 | 178:8 | 194:14 |
| 153:21 | 165:23 | 178:12 | 194:19 |
| 153:23 | 166:1 166:6 | 178:15 | 198:4 |
| 153:25 | 166:10 | 178:18 | 198:23 |
| 154:1 154:4 | 166:13 | 178:21 | 198:25 |
| 154:5 | 166:14 | 179:14 | 199:3 199:8 |
| 154:13 | 166:20 | 179:20 | 199:13 |
| 154:17 | 166:24 | 180:21 | 200:5 204:7 |
| 154:22 | 167:1 167:2 | 180:23 | 204:17 |
| 155:5 | 167:4 167:5 | 181:1 181:7 | 205:2 |
| 155:11 | 167:20 | 181:20 | 206:10 |
| 156:4 156:7 | 168:9 | 182:6 | 206:15 |
| 156:9 157:3 | 168:21 | 182:12 | 206:19 |
| 157:8 | 169:3 | 182:14 | 206:22 |
| 157:18 | 169:20 | 182:14 | 207:16 |
| 157:21 | 170:10 | 182:20 | 208:2 |

208:24
209:4
209:11
209:21
213:17
213:21
214:8
214:12
214:15
216:8
216:17
217:10
217:22
218:25
219:4 219:7
219:10
219:13
219:16
219:23
221:3 221:4
221:5 222:1
223:1 223:4
223:7
223:11
223:15
223:15
223:17
226:16
226:22
228:9
228:18
229:18
230:6
230:12
**old** 11:17
67:15
**ones** 19:10
29:25 81:20
135:15
189:7 209:3
**ongoing**

82:1 133:13
**online** 192:10
**onto** 162:10
**open** 22:20
88:14 88:24
135:16
201:8 203:2
205:24
211:19
214:25
215:5
215:13
215:13
218:4
**openings**
22:20
**operate** 73:19
**operates**
28:23
**operating**
114:11
185:20
**operations**
31:25
32:4
32:19 32:21
51:17 51:23
63:10
**opinion**
103:17
154:22
155:1
165:20
174:17
186:18
186:24
187:8
220:14
225:20

**oppor** 96:1
**opportunities**
81:8
83:16 83:17
**opportunity**
73:4 76:4
76:11 90:19
90:23 90:25
95:16 95:17
97:8
97:14 97:19
**opposed**
38:9 45:3
210:19
**opposition**
86:25 86:25
**optimal** 98:21
99:8 106:15
**option** 228:14
228:18
228:20
**order** 128:15
**ordinary**
199:18
**organization**
22:10
23:3 27:8
27:11 30:10
32:7
45:12
48:1 52:1
54:18
63:9
63:18 63:22
82:5
192:8
196:18
197:16
197:21

202:19
206:3 206:5
207:18
208:1
209:14
210:22
211:8
211:11
211:13
211:16
211:22
228:14
**organizations**
34:22 210:2
211:20
**organized**
27:14 31:20
37:12 37:23
**original** 70:1
93:7
**originating**
46:22
**others**
38:24 97:12
126:9
126:10
193:1
**otherwise**
189:21
**ourselves**
81:14
**outcome** 18:21
40:16 41:1
**outline**
182:18
182:23
**outside**
15:7
34:20 34:21

34:23
69:6 150:23
151:1
163:10
187:20
211:10

**overall** 64:14

**overnight**
69:8

**overridden**
185:15

**oversaw** 43:1

**overseas** 11:7
11:9

**oversee** 25:24
27:3 33:14

**overseeing**
33:20 42:3

**oversees** 28:2

**oversight**
23:20 24:17

**overturned**
211:6

**owned**
202:18
202:19

_____
P
_____

**p.m** 230:17

**Pa** 187:24

**page** 145:23
145:25

**paid** 204:12
204:14
205:2

**parallels**
196:19

**parameters**
62:22

**participating**
125:24

**participation**
191:11

**particular**
10:6
31:21 69:11
74:6
75:25
78:3 91:4
93:6
94:17
114:18
150:16
150:20
161:3
178:19
187:23

**partner** 38:21

**partners** 38:9
188:2

**party** 228:7
228:16

**Pasadena** 7:19
8:18 9:12
13:10 13:15
13:23
14:5
20:12
25:5
27:16 28:24
30:5
41:11
44:5 63:4
66:3
66:10
81:6 82:4
91:16

185:17
187:24
197:15
204:20
204:25
205:3
205:11
205:16
211:24
212:14
212:17
213:17
224:25
228:6

**passenger**
114:9

**passes** 175:6

**past** 13:24
31:19 81:16
81:19
149:25
150:6
150:25

**path** 33:3

**patrol**
15:13 21:14
21:17
24:4
24:11
25:8
27:17 31:22
32:4
47:13
51:4
51:22 68:13
68:14 79:21
79:23 83:19
122:9 122:9

**Patrolling**
31:25

**patrolmen**
30:4 31:5
31:20 37:15

**patterns**
43:15 45:25

**pause**
127:19
138:23
140:10
151:22
151:23
151:24
152:1
152:18
153:25
170:3
171:22
171:22
192:2

**paused** 139:24
141:21
154:13

**pausing** 159:5

**pay** 160:10
162:2 163:8
172:2

**paying** 160:25

**payroll** 23:22
24:17 33:21

**peace** 202:25

**pellet**
67:22
68:4 68:6
102:20
104:23
106:2
106:11

**penal** 44:20

**pending** 205:6

205:8  207:4
219:24
219:25

**pension**
208:11
208:12
208:15
208:16
208:16
208:19

**people**
34:18
48:1
48:14  60:25
78:6  105:10
110:1
115:17
115:18
116:5
126:11
126:21
135:6  135:7

**per** 52:7  58:6
60:14  72:10
72:11
73:3  99:13

**perceive**
149:15

**perceived**
49:14

**percent** 32:20
32:23  32:24
34:15  34:16
206:20
211:5

**percentage**
32:18  32:25

**perception**
148:3

**perfect**

151:19
151:20
163:6

**performance**
34:13

**performed**
213:18

**performing**
204:2  204:4

**period** 15:3
25:14
50:6  135:16
194:13
205:11

**permanent**
61:10  61:11

**person**
16:13
28:4
35:15  36:12
42:24  59:10
59:12  60:17
66:24
67:1  67:8
67:11
70:4  70:7
71:1  71:4
71:14  71:18
71:25
72:6  73:4
84:12
90:5
95:17  95:23
96:9
96:14
97:7  98:1
99:13  99:18
100:2  100:7
100:15
100:22
101:6  102:5

102:19
113:10
122:3
133:15
156:23
157:20
162:4
164:10
164:13
164:23
168:12
169:10
171:8  171:9
173:25
176:19
177:6  191:1
191:6  209:5
218:24
226:14

**personal**
108:12
108:14
108:16
108:21
108:25
110:10
112:3  189:9
190:19

**personally**
17:22
18:3  18:5
18:23
105:15
159:24

**personnel**
30:8  31:7
31:8
54:21
55:4  68:18

**persons**
29:6  35:9

35:14  35:16
78:6

**person's** 81:4
88:23
103:10
168:5  170:7
170:17
170:24
177:10
183:19
184:15
184:16

**petition**
20:24

**phone**
108:12
108:13
108:14
108:16
108:21
108:22
108:25
109:15
110:11
110:15
110:19
111:4  111:7
111:17
111:18
112:3  112:3
189:4  189:8
189:9
189:11
189:14
189:16
189:19
189:20
189:20
189:24
190:2
190:19

**physical**
18:18 113:7
117:7
128:11
130:17
139:1 139:2

**physically**
113:25

**picked** 122:16

**picking** 176:7

**picture** 93:22

**pictures**
189:23
190:5 190:7
190:13

**piece** 137:13

**pixilated**
150:9

**placed** 224:14

**placing**
214:12

**plain** 203:16

**plaintiff**
7:17

**plaintiffs**
166:23

**Plaintiff's**
87:6
147:3
175:21

**planned**
228:11

**platform**
80:14

**play** 23:4
74:15 85:10
89:20 94:12

97:21
100:11
131:17
131:20
151:9
153:21
155:4
155:25
156:9 157:3
157:5 157:9
157:18
158:23
159:14
160:11
161:2
161:22
166:11
166:14
167:2
167:20
168:22
168:23
169:2 170:2
171:17
171:17
174:3
174:20
175:7
176:13
177:8
196:13
202:1
210:11

**playba** 167:1

**played** 87:4
87:8
94:21 95:14
127:17
127:21
128:6 128:6
128:7
151:21

152:3
152:22
152:25
153:4
153:10
153:15
154:6 155:6
155:12
156:2
156:13
157:11
157:22
158:8
158:25
158:25
159:21
160:1
160:13
160:18
161:5 161:8
161:25
162:7
163:14
164:21
165:2 165:7
165:17
167:14
167:21
168:3
168:10
168:24
169:5 170:4
171:25
172:7
172:16
172:25
173:6
173:13
173:17
173:22
176:2
176:14
177:16

179:22
206:6
210:15

**player**
85:23 91:22
91:23
166:16
168:25

**playing** 85:18
85:22 85:24
167:11
167:12
169:4 174:6
175:24

**plays** 19:22

**please** 7:14
8:2 36:3
109:20
145:22
145:23
145:25
146:5 147:7
151:9
151:10
151:12
151:22
151:23
151:24
155:10
157:19
160:10
166:11
174:5
174:24
179:23
179:25
182:14
183:6
183:21
230:5

**pleasure**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

52:19 52:20

**po** 109:18

**point** 7:24
16:9
22:21 23:17
26:10
36:8
42:16
55:3
61:20 86:19
100:3 111:8
111:10
113:1 113:4
113:9
114:25
115:4
116:20
117:10
117:19
117:22
118:7
118:14
119:1 125:7
125:13
126:6
127:13
128:5 128:7
130:18
133:11
139:4 141:4
141:9
142:25
145:19
148:1
148:19
149:8
154:13
154:18
155:8
158:14
179:15
185:20

186:3
190:25
191:3 192:6
206:4
208:14
211:9
222:23

**pointed**
134:12
141:11
141:12
161:19

**pointing**
179:5
182:19
183:10
183:12
183:17

**points** 22:18

**police**
13:10 13:15
13:24
14:5 14:7
14:19 14:22
15:2
15:14 27:16
28:18 41:11
44:6
45:23 47:19
59:11 59:12
60:16 60:16
63:4 63:4
66:3
66:10 66:11
66:23 72:24
75:10 77:14
78:22 79:20
80:23
81:6 81:6
82:4 82:15

91:7
91:16
95:7
95:12
96:6 96:7
96:13
98:8 103:11
114:10
114:16
150:21
150:24
185:13
185:17
185:25
187:1 187:9
187:24
192:18
193:8
193:10
193:11
193:14
193:23
194:24
195:4 196:2
197:16
202:14
203:6 203:8
203:9
203:10
204:2 204:4
204:7
204:14
204:20
204:25
205:3
205:11
205:16
209:16
209:18
209:22
211:24
212:14
212:17

213:17
215:11
218:2
220:18
221:7
224:25
225:21
225:22
226:4
226:23
228:6

**policies**
33:22 46:11
63:17 63:21

**policy** 27:6
40:18
44:1 44:2
44:14
45:6
45:18
56:3 56:6
59:6 63:8
63:14
66:4
72:10 72:11
72:13
73:3 73:6
73:8
73:13 73:16
73:24
75:6
76:13 78:20
78:20 80:18
80:21
91:7
91:16 91:20
98:24 186:4
187:3
188:12

**politics**
210:10

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

pollicy 46:18

poor 162:19

porch 70:2
 96:12

portion
 166:13

pose 89:10

position
 25:13 26:12
 35:22 35:25
 98:7 145:10
 152:1 155:3
 158:13
 160:9
 161:17
 162:16
 166:1 193:4
 193:4 202:3
 210:5

positions
 26:11

possess
 189:12
 202:24
 203:12
 204:19

possibility
 45:10 91:22

possible
 72:14
 73:7
 73:21
 74:3 75:6
 76:9 97:25

post 81:24
 175:6

posted 109:18

post-George

211:4

potentially
 43:20
 90:9
 94:11
 135:15
 201:19

powers 202:14
 203:7

practical
 38:6

pre 187:16

precipitating
 54:7

preliminaries
 9:15

premises
 204:19

prepare 9:25

prepared
 133:12

prerogative
 52:17

presence
 88:23 97:10
 101:19

present 27:16
 28:17
 80:2
 83:16
 113:17
 121:12
 187:16
 197:1
 218:23

presentation
 34:12

presented

132:10
 217:11
 218:22

presenting
 121:12

president
 198:1 198:2

press 94:12
 169:2

pretty 11:6
 38:7
 52:17 58:13
 83:7 83:7
 83:13 95:10
 106:3 113:5
 139:3
 149:21
 195:18

prevent
 9:20
 214:9 215:2

prevented
 174:13

preventing
 143:11

previous 10:2
 172:13
 172:18
 189:20
 190:2

previously
 85:10
 195:11

primary 33:18
 37:7

prior 62:11
 85:2 100:20
 101:7 103:2
 119:2

155:16
 180:16
 215:10
 217:11
 226:8 226:9
 226:12

prison 208:18

privilege
 221:1

privileges
 203:23

pro 195:3

probably
 17:14 32:23
 39:11 42:18
 50:20 71:21
 71:22 108:2
 108:5 108:6
 109:21
 112:15
 119:17
 123:18
 189:16
 193:9
 194:13

problem 85:17
 105:18
 168:25
 175:18
 222:18

procedure
 114:11
 114:13
 195:19
 195:20
 199:5

procedures
 45:22 46:11
 63:21 64:23
 75:11 195:4

proceed
  9:23 17:6
  144:21
proceedings
  30:25
  77:6
  144:6
  180:11
  213:5
process
  22:8
  22:12 22:14
  22:22
  23:4
  25:17
  34:5 34:6
  44:4 44:5
  44:9 46:2
  52:11 52:13
  133:20
  169:15
  185:6 185:9
  185:24
  186:9
  187:18
  190:11
  192:3 195:6
  195:18
  195:20
  196:13
  196:14
  209:24
  210:16
  211:4
  211:14
processes
  23:2
profess
  138:18
professions
  82:2

program 12:15
  12:18 14:12
programs
  29:11
prohibiting
  45:6
prohibits
  45:8
projector
  140:23
promoted
  21:14 21:20
  22:1 22:4
  22:9
  22:20
  23:5 23:6
  23:10 36:22
  47:11
  51:1
  51:11 51:12
  53:1
promoting
  52:12
promotion
  21:19
  34:1 34:2
promotional
  22:12 22:14
  22:22 34:6
proof 97:9
property
  33:11 36:13
  201:25
  204:6
  224:16
  224:17
prosecuted
  40:24

prosecutors
  216:9
protect 192:7
  211:8 211:8
protection
  197:23
provide
  17:7 80:1
  80:10 82:3
provided
  197:11
  197:23
providing
  81:7
prudent
  201:20
  214:21
  214:24
psychiatrist
  196:2
pu 215:9
public 201:24
  214:10
  214:12
  214:16
  214:23
  215:7
puff 156:7
  156:19
  160:23
  170:10
  170:12
puffs
  138:11
  139:10
  156:11
pull 133:19
  145:22

  179:23
pulling
  133:23
purposes 38:7
  109:16
pursuit 42:18
pursuits
  75:22
push 80:13

—————

Q

qualify 196:4
quarterbackin
  g 92:17
question
  20:19
  46:8
  47:14
  65:5 72:4
  78:2
  90:16 90:18
  91:13
  99:1 99:2
  99:3 99:6
  106:22
  106:23
  107:4
  117:25
  120:15
  130:23
  146:23
  147:18
  148:25
  150:20
  203:24
  205:6 205:8
  212:11
  223:23
  227:20
questions

184:22
205:9
228:24
229:1 229:2

**quick** 83:13
133:22
139:3
144:13
180:7 192:7

**quickly**
85:6
106:3
106:12
207:11

**quit** 41:8

———————

R

**radio** 112:17

**rage** 40:3

**raining**
124:12

**raise**
100:22
100:22
226:17
227:8
227:12
227:15
227:21
228:2

**raised** 71:5
101:6
101:14
102:5

**raises** 226:22

**raising** 100:3
100:7
100:15
100:19

100:21
103:4

**Ramirez** 84:13
84:14 84:17
84:19 84:22
84:25
85:3
86:13 110:9
111:19
123:9 188:8
198:25
218:19

**ran** 123:16

**Randy** 7:17
8:14 188:19
212:18
224:4 224:7

**range** 196:3

**rank** 38:2
38:5
38:10 38:14
38:14 41:13

**ranked** 22:17

**re** 89:20
148:18

**reached**
221:10

**reaction**
72:16 88:11
98:1

**reading** 20:23
70:24 71:4

**ready** 8:6
9:23 144:21

**real** 29:9
45:9
50:23 68:24

**really**

24:19 27:19
28:9
33:18
38:6
47:22 72:19
79:9 84:2
98:19
99:3 114:22
116:9
116:18
160:4
161:18
161:24
196:15

**reask** 91:15

**reason** 9:16
50:11 88:24
101:20
103:5
106:21
134:18
137:23
138:5
138:14
138:16
143:10
144:17
145:2 165:1
182:4 202:9
209:9 214:8
215:19
228:2

**reasonable**
74:8
74:10
89:5
90:12 121:4
133:10
134:2 134:7
135:20
135:23

**reasonablenes
s** 92:23

**reasoning**
210:13

**reasons** 92:13
133:14

**rec** 150:17
202:13

**recall**
17:24
18:4
18:21
19:2 19:4
19:25
20:9
20:11 20:23
39:12
41:1
41:13 41:16
42:10 42:20
48:11 48:16
49:13 50:24
54:2
66:16
67:8 67:9
67:11 67:18
67:19 67:25
69:1
69:11 69:21
69:23
70:9 70:9
70:11 70:14
70:16
71:4 71:8
71:12
78:7
82:16 82:23
83:10 83:10
83:21 83:24
84:5 84:6
84:16 84:18

86:17 88:16
88:17 94:16
94:19
96:9
96:14 96:15
96:20 108:9
110:8
110:12
110:25
111:3 111:6
112:20
113:3 114:3
115:24
116:14
120:12
124:4
124:23
124:24
125:4
125:22
126:20
127:3
127:14
129:10
129:17
129:19
129:24
131:7
131:10
132:6
132:12
132:15
138:7 138:9
139:7
139:25
140:2 140:3
142:19
142:19
144:23
145:9
145:12
148:17
148:20

191:9
191:14
193:5 199:6
199:7
202:13
203:25
204:18
204:21
206:13
211:5
215:14
218:16
219:4 220:4
220:9
**recalled**
96:21 96:22
**recalling**
227:23
**recap** 21:24
**receive**
34:1
112:2
208:19
226:17
227:15
**received**
208:5
215:25
227:20
228:1 228:6
228:16
**receiving**
213:14
227:12
**recent** 30:2
**recently** 9:9
**recollection**
70:23 71:24
127:24
129:15

130:24
132:16
189:6
206:18
225:3
**recommend**
76:11
**recommendatio
n** 43:20
58:22 58:24
59:4 59:5
70:19 74:11
74:14
**recommendatio
ns** 44:7
52:1 65:8
**reconstructio
nist** 143:17
**record** 7:7
7:15
30:19
31:2 77:4
77:8 94:5
144:4 144:8
174:6 180:9
180:13
213:3 213:7
224:19
225:8
225:11
225:12
225:14
230:15
**recording**
148:2 148:4
174:9
175:15
175:16
175:16
**records**

218:11
**recreations**
150:17
150:18
**reenactments**
150:17
**refer** 84:13
107:12
**referenced**
87:6 147:3
**referred**
64:11
**referring**
8:17 10:9
**reflect** 224:3
224:6
224:13
226:7
226:11
**reflects** 94:5
**reflexes**
169:3
**refresh** 219:8
**regarding**
54:19 90:21
91:3
91:18 109:9
110:9 112:2
187:15
**regrets**
225:16
**regular** 15:14
21:25
68:1
85:11
92:9
123:1 123:3
167:2

167:12
167:12
175:24

**regularly**
27:4

**related** 17:16
77:14

**relations**
63:12

**relationship**
15:6 122:17
166:2

**relative**
171:10

**released**
18:23

**remain**
187:6 187:9
200:17

**remained**
186:25
204:24

**remaining**
32:25

**reme** 81:12

**remedial**
81:13

**remember**
18:10 19:10
20:7 20:8
20:25
21:1
38:23 39:20
39:22 40:10
40:19 40:21
47:23
48:3 48:4
48:10 48:24

67:13 67:14
67:15
69:5
69:13 71:16
71:20 74:13
74:16
78:1 78:7
83:3 83:5
83:13 84:23
105:22
111:11
113:4
118:12
118:22
124:6 124:7
126:11
126:22
128:5
128:15
129:20
139:1
139:10
139:12
139:13
139:21
139:22
140:3
140:21
140:24
145:17
159:5
188:20
188:22
202:14
218:9

**remembering**
9:21

**remind** 21:8

**removed**
123:21

**Repeat** 212:10

**repeated**
43:11

**replace** 30:15

**replaced**
57:17

**replay** 154:2

**report** 10:5
10:9 10:9
38:17 70:25
71:3
71:23 76:12
96:25
120:22

**reporter** 7:12
8:4 8:7
229:5 229:7
229:11
229:14
229:24
230:6 230:8

**reports**
10:2 10:4
23:22 24:17
33:21 44:10
46:4
70:14
120:25

**represent**
7:18 8:13

**repri** 64:9

**reprimands**
52:4 52:4
64:10 64:10
64:19
65:6 224:10

**request** 111:9
111:10
125:22
197:8

197:12

**requests**
111:16

**required**
197:12

**requirements**
62:13

**requires** 82:1

**research**
213:15

**reserve**
228:25
229:2

**reshare** 91:25

**residence**
102:22

**resign** 222:15

**resignation**
56:5 222:12

**resolve** 94:9

**resources**
143:13
143:14

**respect** 27:14
89:20
186:11
186:12
186:19
191:10
225:16
225:17

**respon** 118:6

**respond** 23:22
23:24 24:14

**responded**
98:2

**respons** 62:5

**response**
118:2 135:8
146:23
146:25
207:7

**responsibilit**
**ies** 23:14
23:25
24:8 27:1
62:6
63:24
109:10

**responsibilit**
**y** 24:16
43:8 47:1

**responsible**
24:22

**responsive**
111:13
111:16

**rest** 164:1

**restrict**
202:22
202:24
203:12

**restrictive**
201:23

**restroom**
30:20

**result** 98:4
98:6

**retained**
21:21

**retire** 54:4
54:10 201:3

**retired** 52:25
53:20 57:11

66:8 204:22
213:11
228:5

**retirement**
54:8 221:13
228:7
228:16

**retires**
228:13

**retiring**
54:18

**returned**
26:12

**review** 10:4
10:21
37:5 37:8
37:9
44:11 75:21
75:23 76:14
91:16 104:3
104:9
192:12
192:15
216:10

**reviewed** 10:2
10:12 10:15
10:19 71:21
96:22 97:15
187:3
191:12

**reviewing**
70:14 76:12
98:11
103:22
148:13

**Reyes** 10:13

**Ri** 227:6

**Rice** 82:17
83:2

83:12
84:7 85:6
89:21 104:4
104:11
104:16
104:16
105:20
105:23
106:3 106:4
106:11

**Rick** 57:1
57:10 125:9

**rights** 61:5
195:7 216:9

**Rigo** 71:19
92:19
128:16
188:19

**Rigoberto**
8:18 14:24

**ring** 70:3
106:6

**ripped**
117:8
117:24
118:2

**risk** 211:15

**road** 40:3

**robberies**
35:18

**role** 9:5 14:6
14:18 15:15
15:17 15:20
16:2 17:5
24:12 26:24
26:25
27:1 27:6
33:7
33:13 33:18

35:5
35:12 36:17
36:20 36:25
41:24 42:22
43:8 47:9
47:20 51:15
57:16 57:18
57:20 62:11
68:12 68:18
68:24 81:23
107:7
122:14
209:17
209:19
210:15

**roles** 14:3
15:13 25:21
52:9 58:1
62:5 63:3
63:13 63:23

**roll** 79:15
79:18 79:19
80:1
83:20 83:22
83:25 85:1

**room** 126:7
126:11
127:4
140:23
201:25
204:6
207:11
224:16
224:17

**rotated** 175:4

**round** 13:5
131:3
135:13
137:6
137:14
137:22

169:24

**rounds** 130:20
130:20
131:5
131:15
131:25
137:5 138:4

**route**
116:23
116:24
118:17

**rule** 110:13
206:1

**rules** 33:22
63:20 73:19
201:16

**run** 116:20
116:24
125:12
187:14
194:5

**rundown** 69:25
124:17
127:11
127:20

**running** 113:6
113:7 117:5
127:17
134:11
152:9
152:23
153:8

———————
S
———————

**safe** 108:7

**Sal** 91:2
188:19

**salary** 227:3

**Saldavar** 70:4

70:6 93:22

**Saldi** 90:17

**Saldivar**
7:9 7:21
8:18
14:24 47:16
49:8
49:11 49:13
49:16 50:24
66:14 66:24
67:6
71:13 71:16
71:25
74:7 75:1
76:1
84:12
88:9
90:21
91:2
92:19 93:10
95:17
97:4
97:12 97:16
98:3
98:13
99:7
99:18
100:17
100:21
101:7
103:17
103:23
106:14
107:13
113:8 113:9
113:15
113:21
116:3
116:18
117:6
128:12
130:18

130:20
131:24
136:10
137:4
142:16
143:22
145:11
152:5
152:14
152:19
153:20
154:15
154:23
157:7
158:11
160:5 160:6
176:7
176:19
176:24
178:23
179:11
179:17
184:24
185:2
186:13
186:16
186:25
187:8
188:25
189:1
190:19
190:25
191:14
191:19
192:3 192:8
194:2
194:20
196:7 198:4
199:23
200:3
200:17
203:5
205:16

206:24
210:19
211:10
211:23
213:12
218:1
218:25
220:17
220:25
221:7
221:10
223:19
224:1
225:18
225:21
226:17
228:15
228:25

**Saldivar's**
86:14 90:12
128:13
136:4
138:12
148:18
155:3
186:18
188:4 188:6

**Salv** 97:15

**Salvidar**
188:19
227:7

**Sam** 12:11

**save** 111:7

**saving** 151:14

**saw** 87:15
87:18
123:23
127:17
139:13
140:14

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

140:18
141:1
141:24
142:7
142:22
143:4 148:2
155:20
156:5
156:16
160:6
161:15
162:21
164:5
169:18
176:5 176:6
176:17
177:12
177:25
**scale** 226:24
**sce** 37:21
**scenario**
37:22 69:25
73:20 73:22
74:6 75:7
75:14
121:15
134:14
134:15
135:4
135:25
136:1
**scenarios**
34:11 73:11
81:16 81:20
104:22
121:18
135:22
**scene** 32:16
50:5
50:21
69:2 69:9

69:12 69:16
83:11 92:21
104:25
107:22
112:12
112:13
112:24
113:11
115:8 115:8
115:11
116:1 122:5
123:11
123:13
123:15
123:21
124:2 125:2
139:17
175:17
188:21
195:22
197:3
197:14
**scheduling**
23:22
**Schenk**
10:11 10:16
74:22 74:25
107:13
107:13
107:19
110:10
111:19
116:20
116:21
116:24
117:3
118:17
123:9 124:3
124:21
125:12
126:5
127:17

128:12
130:18
130:19
131:11
131:20
131:23
132:17
136:1 136:6
136:10
136:21
137:3
137:22
138:13
138:17
138:18
139:13
140:16
141:5
141:22
143:22
144:24
145:15
152:9
152:18
152:23
153:19
154:17
178:10
178:24
179:11
179:16
186:13
186:14
186:16
186:19
187:1 188:7
193:16
198:19
218:6
226:16
227:24
**Schenk's**

129:6 130:4
**school**
11:22 11:24
11:25 12:10
13:20 81:25
**scope** 27:9
**score** 22:18
34:14 145:5
**screen**
139:6
139:16
140:19
140:22
141:12
149:11
151:7
154:10
154:16
155:23
156:5 157:6
160:11
162:10
162:22
163:24
164:2 171:7
178:2
180:17
184:6
**screenshot**
181:2
**screenshots**
180:20
**second**
30:20 42:12
42:13
74:2
92:18
104:24
127:19
138:24

228:5

**section**
141:12

**seeing**
16:14  43:21
46:17  87:10
94:23  99:17
115:24
139:7  142:3
142:9  178:2
178:3
191:15

**seem** 126:10
206:13
218:16

**seemed** 123:18

**seen** 66:22
70:2
86:17
116:19
138:25
160:3
175:15
178:15
178:18

**sees** 46:3
103:3

**Selbe** 7:20
7:20
43:18
65:3  87:3
106:17
146:15
146:22
147:2
175:18
212:8  229:2
229:5
229:16

**select** 53:12

**selecting**
57:16

**selections**
54:25

**send** 230:6

**sending**
201:15

**seniority**
22:18

**sense** 25:4
39:4

**sent** 180:20
187:20
206:8
206:16

**separate**
187:11
196:20
201:14
210:21
211:11
211:21

**separated**
40:19  201:8
206:3
207:18
208:1  208:3
211:24
212:2  212:4
212:13
218:1  221:7
224:23
224:24

**separating**
208:22
220:18

**separation**
200:19
200:22

221:10
221:18
221:24

**September**
35:8

**sergeant**
10:10  21:21
22:6  23:9
23:10  23:16
25:14  25:18
27:23
28:1  28:6
28:8  28:9
28:10
29:3
33:24  33:25
35:4
36:15
37:1
37:20  37:25
38:1  48:9
80:1  115:12
116:3
116:15
118:10
122:10
122:22
124:14
125:18
126:9  127:1
137:2
139:15
140:25
143:21
145:14
147:9
147:19
148:10
148:25
158:24
187:7
213:22

**sergeants**
25:9
25:24  25:24
25:25
26:2
27:14  27:18
27:21  28:14
31:12  38:1

**serious** 97:13

**serve** 52:19
52:20  52:23

**served** 14:3
61:21
219:12
219:13
219:18
219:20
220:2

**service** 24:14
29:19
52:3  52:7
52:16
58:4
58:25  60:17
62:13  62:22
64:4
64:12  64:15
185:8
185:15
185:21
186:6  205:4
211:1
222:18
223:4
223:18
223:25
224:7
227:13
227:18

**services**
32:17

session
  209:10

sets 226:15

setting
  27:6 27:7
  51:24
  63:8 63:14

settled
  19:1 19:14

seven 163:5

Seventh/
  eighth
  11:19

several 49:23
  56:17
  70:6
  140:5
  216:14

sex 32:11

sexual 35:19

shades 139:6

shading
  141:10

shadow 155:18
  155:20
  155:22

shape
  149:24
  171:21
  183:19

shared 29:11

sharing 85:25

shell 138:4

sheriff's
  210:10

shi 33:6

shift 14:20
  15:13 21:14
  21:17
  24:4
  24:11 27:22
  33:5
  47:12 47:13
  47:13 79:21
  79:23
  160:21

shifted
  33:9
  33:10 160:8
  172:11
  175:4

shit 87:19
  99:19

shoo 85:3
  112:8
  186:13

shoot 44:14
  44:18 44:23
  88:18 89:14
  101:21
  103:5
  108:18
  133:15
  133:17
  134:8
  134:13
  134:19
  134:23
  135:3 135:8
  135:10
  135:21
  135:23

shooter 166:2

shooting
  10:14 10:16
  10:17 18:19
  43:5

48:23
49:4
50:18 66:13
70:12 74:25
75:2
77:14 82:16
82:24
83:2
84:11 84:14
84:17 84:20
84:22 84:25
85:3 85:6
86:13 86:14
89:22
91:4
99:19 102:7
104:4
104:11
104:24
107:14
107:19
108:20
110:10
110:10
111:19
111:20
112:3 112:6
112:8
114:15
115:2 116:5
124:22
125:12
125:19
126:5 132:5
133:25
135:5
135:12
138:13
153:22
156:24
156:24
157:21
157:21

158:4 158:7
158:11
161:20
161:20
170:13
171:11
176:19
176:24
177:21
177:24
178:24
179:7
179:12
179:17
183:15
183:16
183:17
186:13
186:14
186:16
186:19
187:1 188:7
188:8 188:8
188:11
188:18
188:19
188:23
190:19
191:10
191:25
192:14
192:16
195:6 195:8
195:11
195:22
196:6 196:7
196:8
196:10
196:16
197:3 198:5
198:5
198:15
198:19

199:1
199:10
199:19
200:1 201:4
201:18
201:19
204:3 204:5
205:22
206:15
207:3 212:1
212:6
212:15
212:18
215:1 215:6
215:9
216:13
217:13
218:6
218:19
220:7 224:4
224:7
224:11
225:25
226:3 226:7
226:16
227:14
227:15
227:21
**shootings**
35:19
39:6
39:13 39:14
43:3 43:4
75:22
91:8
91:17 150:7
192:19
192:23
193:7
193:15
194:3
194:15

194:21
194:23
196:23
199:5 226:9
226:12
**shoots** 40:8
**short** 47:22
50:5 51:8
107:9
212:23
215:22
**shortly**
107:20
107:24
108:1 119:8
152:8
**shot** 67:12
71:1 71:5
71:14 74:22
83:12 84:12
98:5
106:2
106:12
107:13
124:3
130:20
131:12
131:21
131:25
132:17
132:20
133:2 134:3
135:14
136:10
136:23
137:4
143:22
162:17
162:17
168:13
171:4

173:25
176:9 178:9
178:10
178:12
184:16
188:5
188:14
191:19
194:2
194:20
**shots**
129:11
132:22
133:2
145:11
145:15
145:20
147:11
147:21
148:11
148:15
149:5 162:3
**shoulder**
134:12
**showed** 180:21
**shower** 112:10
**showing** 86:12
139:18
169:12
175:8
180:19
**shown** 156:12
**shows** 99:17
138:18
**sic** 187:8
**sidebar**
106:25
107:3
**sidetracked**

112:1
**sight** 127:18
**sign** 116:20
230:4
**significant**
91:17 108:4
109:24
109:25
192:14
**signs** 16:14
**similar** 24:11
28:23
91:8 103:24
114:19
**simpler**
150:20
**simply** 189:1
**simultaneousl**
**y** 127:22
127:23
**single**
73:16 73:20
**singled** 227:7
**sir** 8:7
8:10 8:15
8:19 8:21
8:24 9:8
9:10 15:4
51:5
85:13 85:13
87:5 144:10
145:25
146:7
149:11
149:13
166:17
167:9
172:22
174:22

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

179:14
180:1
180:17
181:15
181:18
181:24
205:6

**site** 89:14

**sitting** 80:20
114:9
114:23
203:25
218:4

**situation**
58:18  73:16
84:3
90:13  90:21
90:22  91:11
91:19  92:21
93:13  97:16
98:20
99:7
104:4  104:9
106:15

**situations**
73:15  81:18
98:10  98:10
103:24

**six** 14:11
17:14  24:23
27:18  27:21
71:22  71:22
84:23
188:14
223:7
223:17

**six-month**
14:12

**size** 34:23

**skin** 80:24

**skip** 151:15
151:20

**Skrick** 158:24

**Skripka**
115:12
116:3
116:15
118:10
124:15
125:11
125:18
126:4  126:9
126:14
127:5
127:10
137:2
139:15
140:25
143:21
145:14
147:9
147:19
148:10
148:25
151:5
158:24
187:7

**slide**
182:14
183:5
183:21

**slight** 165:24

**slow** 92:9
92:20
93:1  93:2
93:14  94:17
129:1
139:20
159:4  159:8
159:20
167:5

175:25
177:8
189:22

**slowed** 139:21
143:2  159:3
159:11

**slowing** 92:18

**sluggish**
189:22

**smoke**
139:10
156:7
156:19
160:23
161:9
170:10
170:12

**smokes** 138:11
156:11

**Snapchat**
109:6

**sobriety**
16:12  17:1

**social**
109:3  109:5
109:8

**solely** 88:19

**somebody** 16:5
42:7
44:15  44:18
69:20
70:2  70:2
72:22  72:23
89:9
89:12
90:4  104:21
105:3  106:7
108:10
112:25

114:6
114:16
114:18
121:10
127:9
135:21
143:19
160:7
162:10
163:9  171:4
174:14
185:8
185:24
190:15
199:14
201:12
202:17
205:11

**somebody's**
44:21  88:10
96:12
202:17

**someone** 66:22
134:8

**sometime**
206:14

**somewhere**
11:20  30:18
41:18  48:25
85:8  85:8
113:13
128:18

**sooner** 108:6

**sorry** 15:12
18:4  60:9
85:15  146:7
166:22
166:23
174:22
180:1
184:22

193:11
205:7
209:18
212:10
213:10
220:16
221:19
224:5
**sort** 77:21
150:7 190:9
**sounds** 154:11
154:12
**source** 55:13
**south** 7:11
66:19
**space** 84:1
84:2
**span** 28:12
**spark** 156:20
**sparks** 156:11
**speak** 10:23
55:7
55:10 90:20
113:21
113:24
150:15
**speaking**
146:20
146:25
**special** 14:13
122:17
**specialty**
28:3
**specific** 28:3
28:22 114:3
132:16
**specifically**
18:10 33:11

39:22
115:20
**specifics**
54:19
**speculate**
55:17 55:18
158:4
**speed** 85:11
92:9
167:3
167:12
169:1 169:4
175:25
**spellings**
230:1
**Spencer** 20:17
**split** 32:18
92:17
**spoke** 66:12
69:21 114:8
124:14
124:15
**spot** 101:2
163:21
**squad** 24:10
24:20 25:23
28:2
**squads**
27:15 27:15
27:24 35:10
**squares** 104:2
104:9
**stabbings**
35:19
**stand** 38:25
**standard**
114:11
198:13

199:4
**standing**
116:13
137:23
145:15
148:14
149:5
**start** 8:6
44:5
75:19 85:18
133:19
185:6 188:5
189:21
220:16
**started** 12:11
13:10 13:15
21:8 116:22
119:8
**state** 12:12
45:7 64:8
72:19
82:1
88:14 95:23
95:25 98:24
142:21
203:1
208:16
208:20
209:9
**stated**
35:21
104:10
137:21
138:3
142:17
158:23
198:6
215:24
**stay** 78:25
120:24
121:2

135:16
**stayed** 200:3
**stealing**
102:20
106:5
**step** 226:23
227:8
227:17
**steps** 45:12
186:15
195:7
**Steve** 7:20
**Steven**
86:25 86:25
**Sti** 142:7
**stick** 39:18
41:21
**sticks** 41:21
**stole** 96:11
121:19
**stolen** 70:1
**stood** 116:5
**stop** 42:13
113:5
116:20
116:21
127:17
133:23
133:23
152:6 155:9
177:15
185:19
188:24
190:23
227:11
**stopped**
16:5 50:2
50:20 128:6

140:4 141:5
181:21
181:25
188:25

**stopping** 69:5
143:16

**stops** 16:4

**stor** 137:9

**stories** 77:14

**story** 78:12

**straight** 95:3
128:14

**street** 75:7
93:20 175:5
181:3
216:10
216:12
216:13
217:7

**streets** 196:9
196:12

**strike** 70:7
90:18
223:22
224:5

**strikes** 20:11

**striking**
113:10

**strong** 120:4

**struck** 20:6
42:17
70:8
191:6
218:24

**structure**
38:2 38:15

**structures**

76:13

**struggle**
113:8 117:7
117:8 118:3
128:11
128:12
139:1 139:2
154:11

**stuck** 172:21

**stuff** 58:14
181:4

**Styron** 57:2
57:10 57:11
125:9
125:21
126:2 126:3
126:8
126:16
141:13
141:15
141:16
141:18
141:19
142:8

**su** 59:13

**sub** 132:21

**subject** 16:13
49:5

**submitted**
37:6

**subordinate**
38:10

**subpoena**
111:14

**subsequent**
132:21
135:14

**substitute**

13:18 13:19

**sued** 220:6

**sufficient**
88:23
96:2 101:20
103:5

**suggest** 75:13

**suggesting**
43:9

**suit** 120:4

**suits** 17:22

**summer** 13:6

**sums** 149:21

**Sunday** 222:22
222:22

**superstar**
227:2

**supervise**
18:8
20:19 33:15
37:16

**supervising**
48:9

**supervision**
24:19
25:5
27:10 33:19

**supervisor**
21:21 23:18
24:10
25:3 33:3
33:5
38:10 41:25
79:17 80:20

**supervisors**
25:1
34:22 83:19

**support** 32:16
32:19
33:1 136:3

**sure** 20:22
25:25 33:21
39:17
43:2 46:5
55:7
56:10 64:13
77:2
87:14 87:17
91:15
94:4 94:4
106:8 110:1
113:25
115:6
141:11
142:20
147:2
154:10
157:15
162:24
166:9
167:18
170:1 174:5
176:10
176:12
176:20
181:4
182:16
190:11
192:21
193:18
194:5
197:19
212:13
213:1
218:21
219:9 222:8
226:19
226:20

**surprised**

217:5

**survive** 191:7

**Susan** 56:23

**suspect**
121:11
134:3

**suspend** 59:13
59:13 185:4
201:11
202:4
210:25

**suspended**
186:8 201:4
201:5
203:23
208:14

**suspension**
58:11

**swear** 8:2

**sworn** 8:3
30:8 31:7
31:8

**synonymous**
60:24

**system**
206:6 227:8

———————
T
———————

**T.V** 140:21
143:1

**T-5** 221:15

**takeaway** 84:3

**taking** 37:2
47:3
83:20
126:12
204:1 217:2
230:17

**talk** 64:2
64:3
64:13 84:11
90:23
112:18
114:21
123:16
195:24
216:17

**talked**
69:20
115:12
115:14
115:19
116:3
117:14
122:18
216:16

**talking**
8:17
64:14 64:15
73:22
74:6 97:3
116:12
116:13
188:18

**talks** 59:24
60:4

**Tamir** 82:16
83:2
83:12
84:7 85:6
89:21 104:4
104:10
104:15
104:16
105:20
105:23
106:3 106:4
106:11

**tase** 152:20

153:2 153:6
153:13

**tased**
152:18
152:19

**tasing** 153:1

**task** 15:19
16:2 16:7
21:4 21:4
21:22 21:25
22:6
23:15 23:16
28:16 28:17
28:19 28:23
28:24
29:1
29:10 29:16
123:5

**Taylor** 7:22

**TCOL** 207:20
221:11
221:18
221:24

**te** 173:24

**teach** 13:19

**teaching**
13:18

**tech** 85:12

**technically**
215:13

**TECHNICIAN**
7:7 8:1
30:22
31:1 77:3
77:7
85:14 85:17
85:20 85:24
86:2 86:5
86:9

91:24
92:3 92:6
144:3 144:7
145:24
146:3 146:7
151:11
166:21
167:9
174:22
174:25
180:1 180:5
180:8
180:12
181:18
182:3 213:2
213:6
225:10
225:13
230:12

**teenager** 11:7
104:23
106:2
106:12

**teens** 67:17

**TEH** 97:19
102:11
105:3
131:14

**telephone**
110:2

**temporarily**
61:9

**ten** 24:24
26:15 31:19
42:18
77:1
193:6 193:9
193:9 194:8
194:9
194:10
194:15

212:24
212:25

**ten-ish** 39:11

**termi** 58:19

**termin** 65:20

**terminate**
58:16
59:6
62:10 62:25
184:24
185:2 185:8
185:24
201:11
202:4
211:12

**terminated**
40:20
41:4 41:5
41:6 41:8
59:20
202:15
213:10

**termination**
58:12 59:20
65:21
202:10

**terminations**
211:6

**terms** 23:25
27:15
55:4
60:24 63:24
64:18 69:12
81:7
81:23 133:6
178:23
208:11
209:4 209:4

**test** 17:4
22:14 22:15

22:18 22:23
23:11 23:12
34:8 34:14

**testified** 8:5
17:8 138:10
142:11
149:13
149:22
159:11
225:4
227:25

**testify** 228:2

**testimony**
9:17 9:21
10:3 17:7
44:22
78:7
98:20
103:21
106:13
140:15
141:8
144:18
145:13
146:19
150:11
151:4 178:1
178:21
179:1
179:14
184:14

**tests** 16:12
17:1

**Texas** 12:2
22:12 52:17
72:19 88:14
203:1 203:3
207:23
208:16
209:9

**text** 108:23

111:10
190:8

**Thaler**
52:22
53:6 56:22

**thank** 8:11
86:24
87:5
93:16
106:21
146:20
147:1
151:25
175:20
184:21
217:22
229:23
229:24
230:10

**Thanks** 14:17

**Thanksgiving**
113:13
125:8
125:15

**That'll**
229:24

**theft** 28:5
28:5
32:11 33:12
33:15
35:6
36:13
49:9
66:21
119:15
119:21
120:10
121:9 122:8

**themselves**
7:15

72:20 89:11
114:24
130:8

**theor** 128:21

**theories**
136:3

**theory** 127:12
128:8
128:10
130:12
130:13
130:16
131:3 131:6
132:19
136:4

**there's** 22:13
23:2
26:21
28:5
29:24 31:19
34:11
45:9 47:6
47:25 48:14
58:24 60:20
60:21 60:21
63:12 63:13
64:16 64:18
73:10 73:11
76:13 80:17
80:18 80:19
80:23
89:5 90:1
90:24
105:21
133:21
133:22
133:25
134:14
136:2 136:2
136:6
140:23

155:8  155:9
155:13
156:14
160:21
161:9
165:10
171:13
179:2  181:4
185:7  185:7
193:1
196:15
196:16
205:6  205:8
211:5
211:13
211:15
213:22
213:25
215:5
224:19

**Thereupon** 8:3

**they're**
61:4
169:9
171:14
190:14
192:10
192:10

**they've** 150:8
169:14
178:9
218:22

**third** 32:15
163:23

**thirty** 180:14

**Thirty-**
**three** 180:4
180:5

**Thirty-two**
174:24

174:25

**thorough**
210:3

**thoughts**
87:10  87:12
191:15

**thousand-**
**and** 48:24

**threat**
44:15  44:18
44:24
45:3  45:4
49:14
73:2  88:9
88:13
89:6  89:7
89:11  92:24
97:11
133:17
214:16

**threat's**
214:17

**throughout**
26:3  26:7
26:18  27:19

**thrown** 117:3

**til** 56:15
63:7  133:23
204:22

**tilted** 95:2

**timelines**
186:10

**titled** 95:3

**today** 9:17
9:23  203:25

**Today's** 7:9

**Tom** 57:11

**tool** 94:6

**top** 14:14
121:2  161:6
162:21
165:10
184:18

**topic** 79:17
184:22
211:3

**topics**
80:11  80:14

**Total** 30:8

**totality**
92:24
93:4  93:5
133:8

**toward**
93:19
98:2  129:16
131:1

**towards** 100:3
183:10

**town** 199:14

**toy** 67:20

**track** 80:15

**tracking** 33:2

**Traded** 110:24

**traffic**
16:4
24:15
32:2
42:13  113:5
116:21
127:16
152:6
188:24
190:23

**train** 18:8

81:17  98:9

**trained** 44:17
44:17  77:20
79:12
91:2  98:12

**training** 28:8
32:17
43:9
44:16  44:24
45:24  75:20
76:16  78:24
79:8
79:15
80:2  80:8
80:10  80:11
80:13  80:16
81:8
81:13  81:24
82:1  82:3
82:6
82:11  83:25
85:1  88:2
88:5

**trajectory**
129:9

**trans** 189:18

**transcript**
229:9
229:17

**transferred**
36:18

**transition**
189:19

**traumatic**
114:20

**tree** 183:1

**trees** 181:3

**trends** 78:3
78:21

trial 7:13
  229:1 229:3

tried 152:17

trigger
  133:23

trust 137:7

truthful 9:17
  9:21 144:17

try 114:18
  121:19
  134:1 143:3
  163:4 170:2
  177:15

trying 16:4
  27:11 73:13
  73:17 94:12
  94:13
  98:9
  107:1
  144:14
  144:16
  153:2
  220:23
  227:23

turn 135:9

turned 130:19
  131:4 143:2

turning
  132:20
  132:23
  132:24
  133:20
  133:24
  135:11
  171:4

twelve 48:24

twen 25:17

twenties

67:17

twenty 21:7
  84:24
  122:12
  220:2

twenty-twen
  219:1

twice
  178:12
  224:5

Twitter 109:6

two-year
  194:13
  215:16

type 43:15
  44:7
  76:15
  81:8 221:5

types 121:15

typical 16:23

typically
  30:5
  34:21 74:15
  209:1
  226:22

_____
      U
_____

U.S 29:19

Uh-huh 11:5
  13:14
  14:8
  15:22 17:18
  17:24 18:11
  18:25
  19:7 19:9
  19:23 20:10
  22:16 23:19
  25:11 26:19
  28:7

28:11
29:8
29:22
30:1 30:3
30:7
30:17 31:24
32:1 32:5
32:8
32:22 33:17
34:3 34:5
34:7
34:24 36:10
38:3 42:1
42:15 45:15
46:9 48:6
49:7
49:10
50:1 50:4
51:21 52:15
57:9
57:19 61:12
63:15
67:5
68:20
69:1
70:13 70:22
72:17
78:8
79:10 79:19
79:22 79:25
80:9
80:12 87:13
87:23
90:8
93:21
94:2 95:1
95:5 95:8
95:13 95:22
97:6 105:24
108:17
115:13
115:16
117:1 117:4

117:9
117:13
118:19
118:24
119:10
119:16
120:5 121:8
122:20
126:15
126:17
126:19
128:20
136:5
139:11
150:2
158:17
161:16
162:20
162:23
183:3
195:14
195:16
197:25
199:16
199:24
212:22
213:23
216:6
216:21
217:4 225:1
226:25
228:11

ultimate
  225:20

ultimately
  40:20
  227:25

umbrella
  51:20

un 45:19

unarmed

135:24

uncommon 69:7

undergraduate
12:23

understand
62:21 64:17
220:23

understood
31:17
35:1
38:20 55:11
118:9 128:2
158:21

uniform
32:3
51:19
89:3 95:6
96:8 203:17
203:18
207:5

union 197:6
197:24
198:1 198:2

unique 169:2

unit 23:21
32:16
42:8 150:16
150:20

unjust 90:6

unjustif
212:7

unjustified
39:14
43:3 45:7
45:8
45:16 45:20
45:25 132:5
194:25
212:1 212:7

212:18

unpack
52:10
220:22

unselect
53:14

unshare 91:25

untruthfulnes
s 209:2

updated 80:10

upfront 75:6

upload 192:11

upon 97:15
98:11 99:17
102:24
103:2
103:21
104:24
151:4 151:5
191:15
199:8 210:2
223:19

upper 154:16

upward 129:9

upwards
161:19

usually 24:23
28:2
43:22 92:11
121:4 121:7
166:23

─────────
V
─────────
vacuum 106:1

vague 113:5

vaguely 83:5

value 150:1

Vanderbilt
211:5

varied
22:10
25:6
27:17 30:6

various
14:3
27:15
32:9
34:11 71:12
79:13 80:11
139:6

vehicle
40:7 40:7
40:9 79:3
114:16
116:25
189:2 191:1
191:20

ventilator
36:6 36:8

verbal
34:10
52:4 64:9
73:1

verbalize
99:15

Verizon 110:3
110:4
110:24
190:15

versus 7:9
8:18

VIC 85:23
91:23
166:16

video 7:7 7:8
8:1 30:22

31:1 67:9
70:12 75:12
76:1 77:3
77:7
85:12 85:12
85:25 86:15
87:8 93:2
93:14 94:21
95:14 99:17
100:6 101:4
103:16
103:22
105:21
115:22
123:12
127:17
127:21
127:25
128:24
138:18
138:19
138:20
138:24
140:6
140:17
140:18
141:2 141:5
141:21
142:13
142:18
142:25
143:5 143:7
143:18
143:18
144:3 144:7
146:4 148:1
148:3
149:15
150:6
150:13
150:22
151:5
151:21

152:3
152:12
152:22
152:25
153:4
153:10
153:12
153:15
154:6
154:23
155:6
155:12
156:2
156:13
157:11
157:22
158:8
158:25
159:21
159:23
160:1
160:13
160:18
161:5  161:8
161:25
162:7
162:19
163:14
164:21
165:2  165:7
165:17
166:14
167:14
167:21
168:3
168:10
168:24
169:5
169:12
170:4
171:25
172:7
172:16

172:25
173:6
173:13
173:17
173:22
174:7  174:8
174:14
175:2  176:2
176:14
176:23
177:16
178:22
179:10
179:22
180:8
180:12
180:20
187:15
187:19
191:12
191:16
192:6  192:9
192:12
198:6  213:2
213:6
225:10
225:13
230:12
230:13

**videos**
10:21  75:21
92:8  115:23
136:18
139:18
150:19
192:15

**VIDEOTAPED**
7:1

**view** 92:13
92:14
100:16
104:8

158:10
210:7

**viewed** 117:10

**viewing**
103:22
148:3  151:4
151:5

**Vincent** 85:14
85:15  85:16
91:21
149:11
151:23
151:23
172:23

**violate** 80:21

**violated**
40:18

**violation**
59:6  73:8
80:18

**violations**
186:4  186:4
187:4
201:20

**violence** 28:4

**violent** 28:25
29:6  29:7
29:16  32:12
35:15

**vision** 27:7
51:24
63:9  63:18

**voice** 217:17

**voluntarily**
40:19

——————
W
——————
**wait** 201:21

206:5

**waiting**
205:25

**walked** 116:23
118:17

**walking**
116:22
203:21

**walk-**
**through**
113:16
113:19

**Walmart**
49:9
66:20  66:21
70:1
96:11
102:20
106:5

**Warnke**
57:11
126:23

**warranted**
16:19  16:20
59:20

**wasn't**
54:22  61:20
81:11
120:19
120:21
123:22
123:25
124:1
126:21
133:11
133:12
193:17
199:17
201:7
203:21

204:4
205:23
212:3
212:19
218:9
222:22
223:20
227:7

**watch** 92:8
92:9 127:25
127:25
140:8
157:19
161:1
192:20

**watched** 75:25
94:16 116:7
127:18
128:24
138:19
139:22
141:1
142:25
159:9 198:6

**watching** 67:9
70:11 140:4
140:19

**ways** 80:23
91:11
196:19

**weapon**
49:16
67:1 67:6
73:4
87:22 87:24
88:19 95:18
95:24
96:3
99:14 99:18
100:21
100:22

101:7 101:8
101:14
101:18
101:20
102:5 102:5
113:10
135:21
202:12
202:18

**weapons**
202:18
202:20

**wears** 32:3
51:19

**website**
229:19

**We'd** 150:23

**week** 125:8
125:14
222:16
222:16

**weekend** 125:9

**weeks** 53:22

**we'll** 50:18
114:18
136:17
137:7 137:7
142:10
161:2
161:22
164:19
176:13
179:20
225:6

**we're** 7:7
7:10 8:6
8:16 21:2
27:11
31:2 33:2
43:21 47:14

50:23
61:5 61:6
63:18
68:7
73:19 73:24
77:8
78:11 84:10
122:5
123:11
137:6 144:4
144:8
144:14
144:16
174:5
177:14
177:14
180:9
180:13
213:3 213:7
224:21
225:11
225:14
230:15

**wet** 124:11

**we've** 76:22
119:8 137:9
149:25
154:13
166:13
187:25
187:25
188:1
212:20

**whatever**
11:19 55:13
61:3 71:2
71:17
111:11
111:12
121:11
124:4
170:13

180:15

**what-if** 97:21

**whe** 226:19

**whenever**
123:16
203:17
219:12
219:13

**Whereupon**
30:24
77:5 87:8
94:21 95:14
144:5
151:21
152:3
152:22
152:25
153:4
153:10
153:15
154:6 155:6
155:12
156:2
156:13
157:11
157:22
158:8
159:21
160:1
160:13
160:18
161:5 161:8
161:25
162:7
163:14
164:21
165:2 165:7
165:17
167:14
167:21
168:3

168:10
168:24
169:5 170:4
171:25
172:7
172:16
172:25
173:6
173:13
173:17
173:22
176:2
176:14
177:16
179:22
180:10
213:4
230:17

**whether**
17:2
38:18 63:17
72:25 75:24
84:9
84:16
91:1
92:18 93:23
94:16 110:8
111:3 111:6
111:6
111:15
124:20
129:17
129:24
132:4
132:12
133:1
157:19
159:7 177:5
179:7
186:25
193:5
198:20

199:6
202:14
203:6
204:18
208:12
217:10
218:23
220:4 227:1
228:1
228:15

**whoever's**
169:11

**whole** 48:1
116:10

**who's** 57:14
169:13

**whose** 114:19

**wife** 114:6

**win/win**
211:13

**winded** 128:16

**window** 135:15

**Wingerson**
57:2 57:4
57:8

**W-I-N-G-E-R-**
**S-O-N** 57:4

**witness** 8:2
146:19
230:1

**witnesses**
42:1 71:14

**Woodlands**
11:25 13:22

**work** 8:25
11:14 11:14
15:8
33:16 35:24

42:24
50:2
50:20 53:22
80:23
108:12
108:21
109:1 109:9
109:16
119:13
119:18
119:19
120:7
120:13
120:18
122:6 122:7
153:6
198:16
202:16
203:9
203:10
203:14
203:15
203:16
204:6 204:7
206:4
209:14
213:16
213:19
222:22
229:24

**worked**
11:16 35:21
36:1
42:25 77:10
119:8
119:11
119:11
119:14
119:22
119:24
120:9
121:14

122:1
196:12

**worker** 119:25
120:8
120:14
121:1

**working** 24:18
38:8 48:4
48:5
67:20 67:21
67:22
185:12
185:17
202:23

**works** 29:19
70:21

**worries** 40:16
92:2 146:9

**wound**
129:18
129:18
129:21
130:23
131:2 179:3

**wounds** 124:21
128:19
129:2 129:4
129:25
130:1 130:1
130:4 133:9

**Wright**
57:10 57:15

**write** 73:16
73:24
120:22
120:25
199:9

**writing** 34:11
120:4
221:11

```
  222:12

wrong 81:2
  81:4 90:5
  90:12 93:11
  121:22
  121:24
  122:3

wrote 198:9
  199:21

wrought
  67:2 67:3

─────────────
        Y
─────────────
y'all
  114:21
  142:9

yet 164:13

you'll 27:21

younger 67:16

yourself
  140:6
  159:23
  199:9

you've
  10:15
  60:5
  60:14 76:12
  122:5
  165:21
  174:6
  178:15
  178:18

─────────────
        Z
─────────────
Z-Z 40:13
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM